## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

STATE OF SOUTH CAROLINA,

          Plaintiff,

    v.

UNITED STATES OF AMERICA and
ERIC H. HOLDER, JR.,
in his official capacity as Attorney General,

          Defendants,

    and

JAMES DUBOSE, JUNIOR GLOVER,
FAMILY UNIT, INC., BRENDA C.
WILLIAMS, M.D., and AMANDA WOLF,

          Defendant-
          Intervenors,

    and

LEAGUE OF WOMEN VOTERS OF
SOUTH CAROLINA,

          Proposed Defendant-
          Intervenor.

Case No. 1:12-cv-00203-CKK-BMK-JDB

## MEMORANDUM OF LAW IN SUPPORT OF
## MOTION TO INTERVENE AS DEFENDANT

The League of Women Voters of South Carolina (the "League" or "Applicant")

respectfully submits this memorandum in support of its motion to intervene as a defendant in this

lawsuit. The instant suit was brought by the State of South Carolina requesting preclearance,

under Section 5 of the Voting Rights Act ("VRA"), 42 U.S.C. § 1973c, for certain voting

changes enacted by the South Carolina General Assembly in Act R54 (2011).  The principal change is the requirement that voters generally would need to present photographic identification as a prerequisite to casting a regular ballot at the polls.

The League seeks to intervene as of right or, in the alternative, to intervene with this Court's permission, pursuant to Rule 24 of the Federal Rules of Civil Procedure.  It is well established that "[p]rivate parties may intervene in § 5 actions" under Rule 24.  *Georgia* v. *Ashcroft*, 539 U.S. 461, 477 (2003).  Indeed, this Court has already recognized that intervention may be appropriate in this litigation by granting intervention to James Dubose, Junior Glover, Family Unit, Inc., Brenda C. Williams, and Amanda Wolf.  Order, No. 1:12-CV-203 (Mar. 20, 2012, doc. 10).

As shown in detail below, the League clearly meets the standards for intervention as of right as well as permissive intervention.  The League is directly and adversely impacted by the South Carolina photo identification requirement, which substantially interferes with the League's mission to encourage civic participation including, most particularly, voting.  Moreover, preclearance of the photo identification requirement and related changes would have an adverse impact on the League's limited financial resources, as the cost of attempting to mitigate the requirement's retrogressive effect would be substantial.

For the reasons detailed below, the Court should grant Applicant's motion and permit intervention.

## **BACKGROUND**

### I.     **Instant Lawsuit and Section 5 of the VRA**

On February 8, 2012, the State of South Carolina filed the instant declaratory judgment action seeking Section 5 preclearance for the photo identification requirement and related voting

changes enacted by Act R54.  The State of South Carolina in its entirety is covered by Section 5

of the VRA.  28 C.F.R. Pt. 51 App.  Under Section 5, whenever a covered State or political

subdivision "shall enact or seek to administer" a change in a voting practice or procedure, that

jurisdiction must obtain federal preclearance by demonstrating to this Court (in a declaratory

judgment action) or to the Attorney General (in an administrative proceeding) that the voting

change "neither has the purpose nor will have the effect of denying or abridging the right to vote

on account of race or color, or [membership in a language minority group]."  42 U.S.C.

§ 1973c(a).  Accordingly, South Carolina may not implement any change in voting practice or

procedure—including the new photo identification requirement at issue in this lawsuit—unless

and until preclearance is obtained.  *See Clark* v. *Roemer*, 500 U.S. 646, 652 (1991) ("A voting

change in a covered jurisdiction will not be effective as law until and unless cleared pursuant to

[either a judicial or administration preclearance proceeding]." (Internal quotation marks

omitted)).

     Under South Carolina's new photo identification requirement, voters generally would

need to produce one of the prescribed types of photo identification at the polls prior to casting a

ballot.[1]  Only five types of photo identification would be acceptable:

- a South Carolina driver's license;

- any other form of ID issued by the DMV;

- a U.S. passport;

- a U.S. military ID; or

---

[1]    Act R54 has a few limited exceptions.  Persons with religious objections to being photographed or who have a "reasonable impediment" to obtaining a photo ID would be allowed to cast a provisional ballot with an accompanying sworn affidavit.  The Act provides no guidance as to what would constitute a "reasonable impediment."

- a South Carolina voter registration card that contains a photograph.

In addition, in order for any of these types of identification to be used, the Act requires that the document be "valid and current."

This is a marked departure from the State's currently effective law, which has been in effect since 1988.  Under current law, South Carolina voters may show a valid South Carolina driver's license, a non-driver's ID card issued by the State's Department of Motor Vehicles ("DMV"), or a voter registration card—a document South Carolina undertakes to send to all registered voters.  There is no requirement that the identification provided contain a photograph of the voter.

South Carolina initially submitted the photo identification requirement and related changes to the Attorney General for administrative preclearance.  *See* Procedures for Administration of Section 5, 28 C.F.R. Pt. 51.  On August 5, 2011, the League, along with the Lawyers' Committee for Civil Rights Under Law and the Brennan Center for Justice, submitted a detailed comment letter to the Attorney General, contending that the photo identification requirement would have a prohibited retrogressive effect on minority voting rights, and that the State had failed to meet its burden under Section 5 of demonstrating the absence of a discriminatory purpose.[2]

Shortly thereafter, the Department of Justice requested additional information from South Carolina regarding the changes.  After the State's response, the League submitted a second comment letter on December 7, 2011, again urging the Attorney General to reject the State's preclearance request as failing to satisfy the Section 5 nondiscrimination standards.[3]  On

---

[2]     The League's first comment letter is attached as Exhibit A.

[3]     The League's second comment letter is attached as Exhibit B.

December 23, 2011, the Department of Justice issued an objection letter, finding that South Carolina had failed to establish that the photo identification requirement would not have a discriminatory effect. South Carolina thereafter filed the present action for declaratory judgment before this Court.

## II.     Applicant for Intervention

The League is a non-partisan organization dedicated to building citizen participation in the democratic process since 1951, with a particular emphasis on encouraging voting. The League has a statewide office in Columbia and eleven local League offices throughout the State. The League retains no paid staff and is thus totally volunteer-run; its annual budget is roughly $25,000. The League represents approximately 700 dues-paying members, and thousands of South Carolinians receive the League's email communications.

The League engages in a number of non-partisan activities geared to facilitate voting and other forms of civic participation. Its civic engagement activities are often focused on low-income neighborhoods, rural areas, and communities of color. To bring members of these historically underrepresented communities into the political process, the League hosts regular voter registration drives, widely distributes information about how and where to vote, assists with a voter protection hotline on Election Day, and frequently deploys its representatives to speak publicly about the importance of voting and other forms of participation in our democracy. In addition, the League partners with numerous community organizations—such as high schools and universities, local businesses, faith-based groups, and civil rights advocates—to promote and protect voting rights, particularly for South Carolinians who are low-income and/or racial minorities. On occasion, the League is asked by local leaders to monitor polling booths on

Election Day, and the League has been involved in audits of voting machines—both activities intended to ensure that every vote cast is counted.

The League has long objected to conditioning the right to vote on presenting limited forms of identification, and has actively lobbied against the photo identification requirement that was ultimately enacted. Based on its experience, the League believes this requirement would prevent many eligible South Carolinians from voting—particularly voters from low-income communities and/or communities of color on whom the League focuses its voter engagement efforts. Indeed, since the enactment of this requirement, the League has received numerous inquiries from concerned citizens who lack the newly mandated photo ID, do not understand how they can acquire this photo ID, or are frustrated by the expensive and complicated procedures involved in obtaining a photo ID acceptable under Act R54. Because the photo identification requirement chills and in some cases prevents voting, it is directly at odds with the League's primary mission of facilitating civic participation.

If Act R54 is precleared and implemented, the League would be forced to expend substantial resources in educating the public about the new requirements and, possibly, in assisting eligible voters in securing proper ID. South Carolina's Act R54 thus would impose new, concrete financial and other costs on both the League and its volunteer members in carrying out the League's mission of promoting full civic participation in elections. These extra costs would likely drain the League's limited resources and could deter volunteer participation in election drives. In addition, individual members of the League who do not currently possess qualifying photo ID would be faced with the costs of securing such ID or being denied their right to vote at the polls.

## ARGUMENT

This Court should grant Applicant's Motion to Intervene to oppose Section 5 preclearance as of right under Rule 24(a)(2) of the Federal Rules of Civil Procedure or, in the alternative, by permission of the Court under Rule 24(b)(1).

In Section 5 declaratory judgment actions, the District of Columbia District Court has routinely granted intervention to organizations and individuals who oppose preclearance and are directly impacted by the voting changes at issue.  Indeed, interventions by affected individuals and groups—including another chapter of the League of Women Voters—have recently been granted in other pending Section 5 declaratory judgment actions in this District and in this very litigation.  Order, No. 1:12-CV-203 (Mar. 20, 2012, doc. 10; *Texas* v. *United States*, 1:12-cv-00128 (D.D.C. March 15, 2012, doc. 17) (Texas photo identification requirement); *Florida* v. *United States*, 11-cv-01428 (D.D.C. Oct. 19, 2011, doc. 42) (changes regarding voter registration drives, early voting, and voters changing their residence address at the time of voting); *Texas* v. *United States*, 1:11-cv-1303 (D.D.C. Aug. 16, 2011, doc. 11; Sept. 8, 2011, doc. 32; Sept. 29, 2011, doc. 55) (statewide redistricting plans for Congress, the Texas House, and the Texas Senate).  *See also Georgia* v. *Ashcroft*, 539 U.S. at 477; *Bossier Parish School Board* v. *Reno*, 157 F.R.D. 133, 135 (D.D.C. 1994); *Texas* v. *United States*, 802 F. Supp. 481, 482 n.1 (D.D.C. 1992); *County Council of Sumter County, SC* v. *United States*, 555 F. Supp. 694, 697 (D.D.C. 1983); *City of Lockhart* v. *United States*, 460 U.S. 125, 129 (1983); *Busbee* v. *Smith*, 549 F. Supp. 494 (D.D.C. 1982); *City of Port Arthur, Texas* v. *United States*, 517 F. Supp. 987, 991 n.2 (D.D.C. 1981); *City of Richmond, Virginia* v. *United States*, 376 F. Supp. 1344, 1349 n.23

(D.D.C. 1974), *vacated on other grounds*, 422 U.S. 358 (1975); *Beer* v. *United States*, 374 F.

Supp. 363, 367 n.5 (D.D.C. 1974), *vacated on other grounds*, 425 U.S. 130, 133 n.3 (1976).[4]

## I.     The Court Should Grant Intervention as of Right.

The standards for intervention as of right are set forth in Rule 24(a) of the Federal Rules

of Civil Procedure.  In relevant part, Rule 24(a)(2) provides:

> On timely motion, the court must permit anyone to intervene who: . . . claims an
> interest relating to the property or transaction that is the subject of the action, and
> is so situated that disposing of the action may as a practical matter impair or
> impede the movant's ability to protect its interest, unless existing parties
> adequately represent that interest.

To apply this standard, courts in this Circuit consider four factors:  (1) timeliness; (2) the

Applicant's interest in the transaction which is the subject of the action; (3) whether the

Applicant is so situated that the disposition of the action may as a practical matter impair or

impede its ability to protect that interest; and (4) whether the Applicant's interest is adequately

represented by the existing parties.  *Fund for Animals* v. *Norton*, 322 F.3d 728, 731 (D.C. Cir.

2003).  As demonstrated below, the League satisfies all four factors.

In addition, the D.C. Circuit has held that a party seeking to intervene as of right as a

defendant must satisfy the basic standing requirements of Article III of the Constitution.  *Fund*

*for Animals Inc.*, 322 F.3d at 732-33.  *But see Roeder* v. *Islamic Republic of Iran*, 333 F.3d 228,

---

[4]      Intervention also has been recently granted in other types of Section 5 cases brought in
this District Court.  *See Arizona* v. *Holder*, No. 1:11-cv-1559 (D.D.C. Jan. 11, 2012, doc
28) (granting intervention to individuals to oppose suit seeking bailout from Section 5
coverage and challenging its constitutionality); *Shelby* v. *Holder*, no. 1:10-cv-651
(D.D.C. Aug. 25, 2010, doc. 29) (granting intervention to individuals and organizations
to oppose suit challenging constitutionality of Section 5); *Laroque* v. *Holder*, no. 1:10-
cv-561 (D.D.C. Aug. 25, 2010, doc. 24) (same); *Nw. Austin Mun. Utility District No. One*
v. *Holder*, 573 F. Supp. 2d 221, 230 (D.D.C. 2008) (granting intervention to individuals
and organizations to oppose suit challenging constitutionality of Section 5 and seeking
bailout from Section 5 coverage).

233 (D.C. Cir. 2003) (questioning whether an applicant to intervene as defendant need establish standing since "the standing inquiry is directed at those who invoke the court's jurisdiction," and recognizing that "any person who satisfies Rule 24(a) will also meet Article III's standing requirement."). To the extent that a separate standing inquiry is required, the League satisfies that as well.

A.    **Applicant's Motion Is Timely.**

The League's motion to intervene in the instant action is plainly timely. Defendants have not yet filed an Answer. No scheduling order has been entered or requested, no discovery has been undertaken, no dispositive motions have been filed, no dispositive orders have been entered, and no trial date has been set. The Court only recently granted intervention to James Dubose, Junior Glover, Family Unit, Inc., Brenda C. Williams, and Amanda Wolf, and provided them until April 9, 2012 to file an Answer. Order, No. 1:12-CV-203 (Mar. 20, 2012, doc. 10). Granting intervention would not, therefore, cause any delay in the trial of the case; nor would it prejudice the rights of any existing party. *See Smoke* v. *Norton*, 252 F.3d 468, 471 (D.C. Cir. 2001) (setting forth timeliness factors, including "the probability of prejudice to those already parties in the case"); *Council of Sumter County*, 555 F. Supp. at 697 (permitting applicants to intervene in Section 5 preclearance lawsuit on eve of argument on motions for summary judgment); *see also Bossier Parish School Board*, 157 F.R.D. at 135 (permitting permissive intervention in Section 5 declaratory judgment action on same day that court held first status conference).

B.    **Applicant Has a Substantial Interest in the Underlying Litigation.**

In determining the sufficiency of a proposed intervenor's interest under Rule 24(a), courts in this Circuit apply a "liberal approach" by permitting the involvement of "as many

apparently concerned persons as is compatible with efficiency and due process." *S. Utah Wilderness* v. *Norton*, No. 01-2518, 2002 WL 32617198, at *5 (D.D.C. June 28, 2002) (quoting *Nuesse* v. *Camp*, 385 F.2d 694, 700 (D.C. Cir.1967)).  This "pragmatic test" favors allowing intervention by affected parties.  *See American Horse Protection Ass'n, Inc.* v. *Veneman*, 200 F.R.D. 153, 157-58 (D.D.C. 2001).  Accordingly, to demonstrate sufficient interest in the litigation, the Applicant must simply show a "direct and concrete interest that is accorded some degree of legal protection."  *Diamond* v. *Charles*, 476 U.S. 54, 75 (1986).

The League has direct, concrete and legally protected interests in this action.  As explained above, if the photo identification requirement is implemented, the League would face new and substantial barriers in carrying out its core mission of promoting voting among racial minorities and other traditionally disenfranchised individuals.  The new financial and labor costs imposed on the League's and its volunteers' efforts to promote minority participation in elections—including depletion of League resources and deterrence of volunteers—would be both "direct" and "concrete" burdens.  *Diamond*, 476 U.S. at 75.  Moreover, there is no question that the League's efforts to build citizen participation in the democratic process are "legally protect[ed]," *id.*, as First Amendment activities.  *See, e.g.*, *Anderson* v. *Celebrezze*, 460 U.S. 780, 787 (1983) ("[T]he right of individuals to associate for the advancement of political beliefs, and the right of qualified voters, regardless of their political persuasion, to cast their votes effectively. . . . rank among our most precious freedoms.")  (quoting *Williams* v. *Rhodes*, 393 U.S. 23, 30-31 (1968)).

**C.   The Disposition of this Action Could Impair Applicant's Interests.**

Beyond demonstrating an interest in the underlying litigation, the Applicant must show that it is "so situated that the disposition of the action may as a practical matter impair or impede

- 10 -

[its] ability to protect [its] interest." Fed. R. Civ. P. 24(a)(2). In interpreting this requirement, the D.C. Circuit has held that this factor "look[s] to the practical consequences of denying intervention, even where the possibility of future challenge to the regulation remains available." *Natural Res. Def. Council* v. *Costle*, 561 F.2d 904, 909 (D.C. Cir. 1977) (internal quotation marks omitted).

If preclearance is granted by this Court, South Carolina's photo identification requirement would be implemented instantly, and would have significant ramifications on Election Day. Many of the League's members would face significant obstacles in exercising their right to vote or be prevented from voting altogether this November and thereafter. The League also would be unduly limited in its subsequent ability to challenge the photo identification requirement. Indeed, as provided by Section 5 itself, the District of Columbia District Court is the only court that may decide whether this voting change violates Section 5. While the League could bring a subsequent action to enjoin enforcement of the photo identification requirement under statutory or constitutional provisions other than Section 5 of the VRA, such subsequent action "may, 'as a practical matter,' afford much less protection than the opportunity to participate in" the present proceedings to prevent preclearance. *Costle*, 561 F.2d at 909. For example, while the League could subsequently challenge the law under Section 2 of the VRA, 42 U.S.C. § 1973, Section 2 litigation "(1) cannot prevent enactment of discriminatory voting measures, which remain in effect for years until litigation ends; (2) imposes a heavy financial burden on minority plaintiffs; and (3) places the burden of proof upon plaintiffs rather than upon covered jurisdictions." *Nw. Austin Mun. Util Dist. No. One*, 573 F. Supp. 2d at 273, *rev'd on other grounds*, 557 U.S. 193 (2009).

Thus, the League's ability to protect its interests with regard to the newly enacted photo identification requirement will be impaired or impeded if preclearance is granted in this action.

D.     **The Existing Parties Do Not Adequately Represent the Interests of the Applicant.**

The final prong of Rule 24(a)(2)'s test requires the Applicant to meet the "'minimal burden' of showing that existing representation 'may be' inadequate to protect [its] interest." *Costle*, 561 F.2d at 911 (quoting *Trbovich* v. *United Mine Workers*, 404 U.S. 528, 538 n.10 (1972)).

The Attorney General—the statutory defendant in a Section 5 declaratory judgment action—represents the interests of the federal government and the American public at large. Courts in this Circuit, however, have "often concluded that governmental entities do not adequately represent the interests of aspiring intervenors." *Fund for Animals*, 322 F.3d at 736; *see also id*. at 736 n.9 (citing cases); *Dimond* v. *Dist. of Columbia*, 792 F.2d 179, 192-93 (D.C. Cir. 1986); *Smuck* v. *Hobson*, 408 F.2d 175, 181 (D.C. Cir. 1969).[5] The same rationale applies here.

---

[5]     For instance, in *Castle*, the D.C. Circuit held that the Environmental Protection Agency ("EPA") could not be found to represent adequately the private industry intervenors' interests despite the fact that they all shared a "general agreement . . . that the [challenged] regulations should be lawful." 561 F.2d at 912. That general agreement, the court held:

> does not necessarily ensure agreement in all particular respects about what the law requires. Without calling the good faith of EPA into question in any way, appellants may well have honest disagreements with EPA on legal and factual matters. . . . Good faith disagreement, such as this, may understandably arise out of the differing scope of EPA and appellants' interests: EPA is broadly concerned with implementation and enforcement of the settlement agreement, appellants are more narrowly focused on the proceedings that may affect their industries. Particular interests, then, always "*may* not coincide," thus justifying separate representation.

Indeed, a comparison of the League's comment letters with the Attorney General's letter rejecting preclearance shows that the League presents a unique legal and factual perspective and position with respect to the issues this Court will have to resolve.  For instance, the League's letter focused on "the fact that historical discrimination in South Carolina, and the resulting stark socio-economic disparities between the State's white and minority residents, burden minority voters' participation in the electoral process" and how those factors would be further aggravated by the photo identification requirement.  The League explained that the continuing effects of historical discrimination would make minority voters less likely to have or to obtain photo identification, and that these factors should be considered as part of the Section 5 analysis.[6]

Further, the League may disagree with the Attorney General on the proper application of Section 5 and what constitutes adequate protection of minority voting rights.  *See, e.g.*, *City of Lockhart* v. *United States*, 460 U.S. 125, 130 (1983) (in appeal to the Supreme Court, United States agreed with covered jurisdiction, while minority intervenor continued to defend denial of preclearance); *Blanding* v. *DuBose*, 454 U.S. 393, 394, 398-400 (1982) (minority plaintiffs, but not the United States, appealed and prevailed in the Supreme Court in voting rights case).[7]

Further, the League is able to provide a local perspective regarding the purpose and effect of the photo identification requirement in a manner the Attorney General is not suited to do.

---

*Id.* (quoting *Nuesse* v. *Camp*, 385 F.2d 694, 703 (D.C. Cir. 1967) (footnote omitted)).

[6]   *See* Ex. C at 4.

[7]   There are additional instances in which the involvement of private citizens in cases brought under the Voting Rights Act has been particularly valuable because of different legal positions taken by the United States and the private minority voters.  *See, e.g*., *Young* v. *Fordice*, 520 U.S. 273, 281 (1997) (private plaintiffs challenged certain changes to Mississippi's voter registration procedures and won reversal of lower court's decision, although United States opted not to appeal); *County Council of Sumter County*, 555 F. Supp. at 696 (minority intervenors and United States took conflicting positions regarding application of Section 2 to Section 5 preclearance process).

Based on its extensive civic engagement activities in South Carolina, the League can speak concretely to the real-world impact of this new mandate.  *See, e.g., Georgia* v. *Ashcroft*, 539 U.S. at 477 (upholding District Court's grant of motion to intervene based on finding that the intervenors' analysis "'identifies interests that are not adequately represented by the existing parties.'"); *County Council of Sumter County*, 555 F. Supp. at 696-97 & n.2 (permitting intervention in light of African-American intervenors' local perspective and noting possibility of inadequate representation by United States); *Costle*, 561 F.2d at 912-13 (granting intervention as of right to the industry intervenors, whose "more narrow and focussed" interests would "serve as a vigorous and helpful supplement to EPA's defense" and, "on the basis of their experience and expertise in their relevant fields, appellants can reasonably be expected to contribute to the informed resolutions of [] questions when, and if, they arise").

### E.    Applicant Satisfies the Requirements of Article III Standing.

Because the League satisfies the requirements for intervention as of right under Rule 24(a), it satisfies any applicable standing requirements as well.  As previously noted, the D.C. Circuit has recognized that "any person who satisfies Rule 24(a) will also meet Article III's standing requirement."  *Roeder*, 333 F.3d at 233.  Moreover, as discussed above, the League faces direct injury resulting from South Carolina's pending voting changes, which would be redressed by a denial of preclearance.[8]

---

[8]    The League also has Article III standing to represent the interests of its members under *Lujan* v. *Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992) (requiring showing of injury-in-fact, causation and redressibility), and *Hunt* v. *Wash. State Apple Advertising Comm'n*, 432 U.S. 333, 343 (1977) (organization has standing to sue on behalf of its members when "(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit.")

**II.     In the Alternative, the Court Should Grant Permissive Intervention Under Rule 24(b)(1).**

In addition to meeting the standards for intervention as of right, the League meets the requirements of permissive intervention pursuant to Fed. R. Civ. P. 24(b)(1), which permits intervention "upon timely application" when an applicant "has a claim or defense that shares with the main action a common question of law or fact."

Like other intervening defendants, the League satisfies the requirements of Rule 24(b)(1). While the League's perspective on certain factual and legal issues will assuredly be distinct from that of the Attorney General and other intervening defendants, the fundamental questions of law and fact which the League seeks to litigate in this action are no different from the questions already presented by South Carolina's lawsuit.  *See, e.g.*, *Miller* v. *Silbermann*, 832 F. Supp. 663, 673-74 (S.D.N.Y. 1993) (allowing permissive intervention where intervenors' defense "raises the same legal questions as the defense of the named defendants").  Moreover, permissive intervention is particularly warranted where, as here, the League's unique knowledge and experiences may help contribute to the proper development of the factual issues in the litigation. *See, e.g.*, *Johnson* v. *Mortham*, 915 F. Supp. 1529, 1538-39 (N.D. Fla. 1995) (holding that the NAACP should be permitted to intervene because the organization's unique perspective and expertise would aid the court's constitutional inquiry); *see also Miller*, 832 F. Supp. at 674 (permitting intervention where applicant's "knowledge and concern" would "greatly contribute to the court's understanding").

Finally, granting the League's motion to intervene at this stage would not delay or prejudice the adjudication of the rights of the original parties.  Fed. R. Civ. P. 24(b).  As noted, this Court has not conducted or scheduled a hearing or issued a case management order; other

Defendant-Intervenors have until April 9, 2012 to file an Answer.  Consequently, granting the League's motion would not delay this litigation.  Moreover, neither Plaintiff nor Defendants can plausibly claim prejudice as a result of this Court's permitting intervention; the League does not propose to add a counterclaim, expand the questions presented by the Complaint, or raise any additional affirmative defenses, and will confer with Defendants and other Intervenors to avoid redundant filings.  Rather, the League's participation will enhance the Court's understanding of the factual and legal context necessary to properly dispose of the merits of this case.

## CONCLUSION

For the above and foregoing reasons, the Court should permit Applicant to intervene in this action as a defending party.

Dated:  March 26, 2012

/s/ Mark A. Posner
Jon M. Greenbaum (D.C. Bar No. 489887)
Mark A. Posner (D.C. Bar No. 457833)
Robert A. Kengle
LAWYERS' COMMITTEE FOR
   CIVIL RIGHTS UNDER LAW
1401 New York Ave. NW
Ste. 400
Washington, D.C.  20005
Tel:  (202) 662-8389
Fax:  (202) 628-2858
mposner@lawyerscommittee.org

Michael A. Cooper *(pro hac vice to be sought)*
Garrard R. Beeney *(pro hac vice to be sought)*
Theodore A.B. McCombs *(pro hac vice to be sought)*
Sambo Dul *(pro hac vice to be sought)*
Sean A. Camoni *(pro hac vice to be*

*sought)*
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, New York  10004-2498
Tel:  (212) 558-4000
Fax:  (212) 291-9007
beeneyg@sullcrom.com

Wendy R. Weiser (*pro hac vice to be
      sought*
Keesha M. Gaskins (*pro hac vice to be
      sought*)
Mimi Marziani (*pro hac vice to be sought*)
Elisabeth Genn (*pro hac vice to be sought*)
THE BRENNAN CENTER FOR JUSTICE
      AT NYU SCHOOL OF LAW
161 Avenue of the Americas, Floor 12
New York, NY  10013-1205
Tel:  (646) 292-8310
Fax:  (212) 463-7308
keesha.gaskins@nyu.edu

Armand Derfner (*Bar renewal pending*)
DERFNER, ALTMAN & WILBORN
575 King Street, Suite B
P.O. Box 600
Charleston, SC 29402
Tel:  (843) 723-9804
Fax:  (843) 723-7446
aderfner@dawlegal.com

# Exhibit A

**LEGAL DEPARTMENT**
**SOUTHERN**
**REGIONAL OFFICE**
**VOTING RIGHTS**
**PROJECT**



August 5, 2011

Mr. T. Christian Herren
Chief, Voting Section
Civil Rights Division
Room 7254-NWB
U.S. Department of Justice
950 Pennsylvania Avenue, NW
Washington, DC 20530

Re:     Comment: South Carolina Section 5 Submission No. 2011-2495

Dear Mr. Herren:

**AMERICAN CIVIL LIBERTIES**
**UNION FOUNDATION**

SOUTHERN
REGIONAL OFFICE
230 PEACHTREE STREET, NW
SUITE 1440
ATLANTA, GA 30303-1513
T/404.523.2721
F/404.653.0331
WWW.ACLU.ORG
WWW.VOTINGRIGHTS.ORG

NATIONAL OFFICE
125 BROAD STREET, 18TH FL.
NEW YORK, NY 10004-2400
T/212.549.2500
F/212.549.2654
WWW.ACLU.ORG

OFFICERS AND DIRECTORS
SUSAN N. HERMAN
*PRESIDENT*

ANTHONY D. ROMERO
*EXECUTIVE DIRECTOR*

RICHARD ZACKS
*TREASURER*

        This comment letter is in reference to the June 28, 2011, Section 5
submission from the State of South Carolina regarding the voting changes set forth in
Act R54 (A27 H3003).  Act R54 amends S.C. Code Ann. § 7-1-25 by limiting the
acceptable forms of identification for purposes of in-person voting.  For the reasons
set forth below, we the undersigned organizations respectfully request that the
Department object to the proposed voting changes because they are retrogressive and
will reduce minority voting strength across the state.

        On May 11, 2011, the South Carolina General Assembly passed Act R54,
H3003, and Governor Nikki Haley signed the bill into law on May 18, 2011.  South
Carolina law currently allows an eligible voter to present the following forms of
personal identification in order to vote: (1) a voter registration card (which does not
contain a photograph); (2) a South Carolina driver's license; and (3) a South Carolina
DMV-issued identification card.  Act R54 would now require eligible voters to
present one of the following forms of *photo* identification:

- a South Carolina driver's license;
- another form of identification containing a photograph issued by the
  Department of Motor Vehicles;
- a passport;
- a military identification containing a photograph issued by the federal
  government; or
- a South Carolina voter registration card with a photograph.

        The State's submission fails to include any information regarding the number
of minorities who lack the acceptable forms of identification required under Act R54,
either alone or in comparison to the State's white residents.  The data that are
available, however, reveal that African-Americans in South Carolina continue to be
disproportionately impacted by social and economic conditions that affect their

ability to comply with Act R54. South Carolina's current identification law goes much further in protecting the voting rights of minorities than Act R54. In addition, given the information presented before the legislature when the bill was pending, it is reasonable and fair to conclude that the law was enacted for a discriminatory purpose – namely to reduce voter turnout among South Carolina's African-American voting population. Because the State has failed to provide sufficient information for the Department to make a well-informed decision regarding its submission, and because of the tenuous relationship between the photo identification requirement and South Carolina's justification for enacting this law, the Department should object to the voting changes. At the very least, a request for additional information is warranted to determine whether South Carolina will adopt procedures to mitigate the new law's retrogressive effect.

A.      **The proposed amendments to South Carolina's voter identification law as contained in Act R54 will have a retrogressive effect on African-American voters in South Carolina.**

AMERICAN CIVIL LIBERTIES
UNION FOUNDATION

Section 5 of the Voting Rights Act requires the Department of Justice to deny pre-clearance of state legislation, rules, or regulations affecting voting procedures that either have a discriminatory purpose or "the effect of denying or abridging the right to vote on account of race or color," or membership in a language minority. 42 U.S.C. § 1973c; *League of United Latin American Citizens v. Perry*, 548 U.S. 399, 446 (2006); *Reno v. Bossier Parish School Bd.*, 520 U.S. 471, 476-80 (1997). The procedures for the administration of Section 5 provide that the Attorney General "will consider whether the change is free of discriminatory purpose and retrogressive effect in light of, and with particular attention being given to, the requirements of the 14th, 15th, and 24th amendments to the Constitution, 42 U.S.C. §§ 1971(a) and (b), Sections 2, 4(a), 4(f)(y), 201, 203(c), and 208 of the Act.[1] A covered jurisdiction bears the burden of showing that its proposed voting changes do not violate either prong of Section 5. *Branch v. Smith*, 538 U.S. 254, 263 (2003). South Carolina clearly has not satisfied its burden in showing that its voter photo identification law is neither retrogressive nor discriminatory in its purpose.

1.      **African-Americans are less likely than whites to possess a driver's license or other identification issued by the Department of Motor Vehicles.**

According to the 2010 Census, South Carolina's racial make-up is 66.2% white and 27.9% black.[2] In January 2010, the South Carolina State Elections Commission published a report with a county by county breakdown of registered

---

[1] Procedures for the Administration of Section 5 of the Voting Rights Act of 1965, as amended, 28 C.F.R. Part 51.55(a).

[2] South Carolina's minority population also consists of 5.1% Hispanics or Latinos (of any race), 1.3% Asians, 0.4% American Indian or Alaska Natives, and 0.1% of people who self-identified as "Some Other Race." *See* http://factfinder2.census.gov/faces/tableservices/jsf/pages/productview.xhtml?pid=DEC_10_PL_QTP L&prodType=table

voters by race who lack a driver's license or other form of identification issued by
the Department of Motor Vehicles (DMV).  (See Exhibit A).  The results
demonstrated that, overall, there were 178,175 registered voters in the state who do
not possess either form of identification.  Although African-Americans currently
make up 30.4 percent of registered voters, as of January 2010, black voters made up
35.8% of persons without a South Carolina driver's license or DMV-issued
identification.  Moreover, the report showed that in the following counties with an
African-American population over 50%, African-Americans lacked a driver's license
or DMV-issued identification at higher rates than whites:

AMERICAN CIVIL LIBERTIES
UNION FOUNDATION

| COUNTY | TOTAL POPULATION | | NUMBER OF REGISTERED VOTERS | REGISTERED VOTERS WITHOUT IDs | |
|---|---|---|---|---|---|
| | BLACK | WHITE | | BLACK | WHITE |
| Allendale | 74.1% | 24.1% | 5,398 | 8.80% | 2.22% |
| Bamberg | 62.1% | 36.9% | 8,707 | 5.83% | 1.95% |
| Clarendon | 50.6% | 47.7% | 21,167 | 5.66% | 2.93% |
| Fairfield | 59.9% | 39.5% | 14,408 | 3.21% | 1.94% |
| Hampton | 54.7% | 43.6% | 12,189 | 5.34% | 2.31% |
| Lee | 64.9% | 33.9% | 11,320 | 6.04% | 2.08% |
| Marion | 56.7% | 41.5% | 20,158 | 6.19% | 2.38% |
| Marlboro | 51.8% | 42.8% | 15,737 | 7.07% | 4.51% |
| Orangeburg | 62.9% | 35.2% | 56,372 | 6.94% | 2.14% |
| Williamsburg | 66.3% | 32.3% | 20,676 | 6.97% | 1.54% |

In addition, the Commission's report further showed that even in
predominately white counties, African-American voters were still less likely to
possess a driver's license or other form of DMV-issued identification:

| COUNTY | TOTAL POPULATION | | NUMBER OF REGISTERED VOTERS | REGISTERED VOTERS WITHOUT IDs | |
|---|---|---|---|---|---|
| | BLACK | WHITE | | BLACK | WHITE |
| Barnwell | 45.1% | 53.9% | 12,542 | 3.39% | 2.34% |
| Calhoun | 43.2% | 54.8% | 9,789 | 4.38% | 2.50% |
| Darlington | 42.3% | 56.7% | 38,029 | 4.03% | 2.66% |
| Dillon | 47.1% | 49.3% | 17,999 | 6.14% | 2.96% |

Notably, the law does not allow student IDs to serve as proof of
identification.  There are eight historically black colleges and universities in South
Carolina, and the estimated number of students attending these schools is 9,804.[3]

---

[3] The Historically Black Colleges and Universities in South Carolina are: Allen University in
Columbia, SC; Benedict College in Columbia; Claflin College in Orangeburg; Clinton Junior College
in Rock Hill, Denmark Technical College in Denmark, Morris College in Sumter; South Carolina
State University in Orangeburg; and Voorhees College in Denmark. *See*
*http://www.edonline.com/cq/hbcu/sc.htm*

3

Thus, thousands of students attending predominately black colleges or universities will not be allowed to use their student IDs to vote. This further exacerbates the proposed law's impact on minorities, especially younger minority voters.

Section 7 of Act R54 requires the South Carolina State Election Commission to "[n]otify each registered elector who does not have a South Carolina issued driver's license or identification card a notice of the provisions of this act by no later than December 1, 2011," and that the "notice must include the requirements to vote absentee, early, or on election day and a description of voting by provisional ballot." Section 8 further directs the Commission "to create a list containing all registered voters who are otherwise qualified to vote but do not have a South Carolina driver's license or other form of identification consisting of a photograph issued by the Department of Motor Vehicles as of Dec. 1, 2011." The State's Section 5 submission does not provide any information regarding the procedures that will be used to identify those registered voters without a driver's license or DMV-issued identification, or information regarding the creation of a list of all such persons. This missing information is critical for purposes of the Department determining the retrogressive effect the law will have on minority voters, especially in those counties with greater minority populations and in places with higher minority voter registration rates. The State's failure to provide this information warrants, at the very least, a request by the Department for more information related to this data.

AMERICAN CIVIL LIBERTIES
UNION FOUNDATION

2. **African-Americans face social and economic barriers to obtaining an acceptable form of identification as required by Act R54.**

a. **African-Americans have less access to transportation, thereby making it more difficult for them to obtain a free photo identification card at the Department of Motor Vehicles.**

Despite the fact that the State has offered to provide photo identification cards at Department of Motor Vehicle offices free of charge to voters, there still are accompanying costs to obtain the card that will disparately impact African-American voters. In its Section 5 submission, the State did not provide any information regarding what steps the DMV will take to ensure that voters who lack their own transportation and/or do not have access to public transportation will be able to obtain a photo identification card. There appears to be an inherent assumption on the State's part that all voters can easily get to a DMV office. This assumption fails to account for the fact that African-Americans disproportionately face transportation obstacles to obtaining a free identification card.

Although a majority of South Carolina residents have access to a motor vehicle, African-Americans are still more likely than whites to rely upon public

transportation.[4]  South Carolina's DMV offices are not within walking distance for most voters, and the State does not have an extensive mass transit system. Therefore, if DMV offices are the only locations where a voter can obtain a photo identification card, African-Americans will be more disadvantaged than whites when it comes to obtaining the card.  This will result in a disproportionate number of African-American voters being ineligible to cast a ballot merely because they lack an acceptable form of photo identification.

Moreover, under the current law, a person's voter registration card (which does not contain a photograph) may serve as a form of identification.  County election offices mail these registration cards directly to the voters, and a voter can handle the whole process from his or her home without traveling very far.  Act R54, on the other hand, now requires county election offices to issue voter registration cards with photographs.  But, again, the State's submission does not include any information regarding how a voter without transportation is supposed to provide their photograph to the election office.  Whereas now, a person can fill out a voter registration form, mail it to his or her county election office, and receive a voter registration card in the mail that may serve as the person's identification, Act R54 essentially requires a citizen to appear in person at a county election office in order to register to vote and supply a photograph.  It remains unclear whether county election offices will have the necessary equipment to take photographs of applicants when the registration forms are submitted, whether the voter will have to come back to the county election office at a later date once his or her eligibility is determined, or whether some other procedure will be put in place for purposes of implementing the law.  This is information that should have been included in the State's submission, and the Department should request more information regarding this particular aspect of the law.

AMERICAN CIVIL LIBERTIES
UNION FOUNDATION

### b.  Illiteracy rates within the African-American community are higher than among whites.

The literacy level in South Carolina is another source for determining the retrogressive impact of Act R54.  The following statistics are particularly alarming with respect to the ability of voters to navigate the drastically changed voter identification requirements under Act R54.  For example:

- Based on a study by the National Institute for Literacy, 25% of South Carolina's adult population is at the lowest literacy level, "Level 1."[5] These adults have difficulty using basic literacy skills to complete tasks

---

[4] http://factfinder.census.gov/servlet/DTTable?_bm=y&-context=dt&-ds_name=ACS_2009_1YR_G00_&-mt_name=ACS_2009_1YR_G2000_C08505H&-mt_name=ACS_2009_1YR_G2000_C08505B&-CONTEXT=dt&-tree_id=309&-geo_id=04000US45&-search_results=01000US&-format=&-_lang=en.
[5] National Institute for Literacy, *The State of Literacy in America: Estimates at the Local, State, and National Levels*, at 242, *available at* http://www.eric.ed.gov/ERICWebPortal/search/detailmini.jsp?_nfpb=true&_&ERICExtSearch_Searc hValue_0=ED416407&ERICExtSearch_SearchType_0=no&accno=ED416407.

"considered necessary for functioning in everyday life."[6]  Although adults at this literacy level can sign their name, they generally cannot enter background information on a social security form, locate their eligibility from a table of benefits, or even locate an intersection on a street map.

- Voters at Level 1 Literacy have the skills to sign their name.  South Carolina's current identification law allows voters to sign their name attesting to their identity and that they are eligible to vote.  By eliminating affidavits and imposing more cumbersome standards and procedures, Act R54 will disparately impact and disenfranchise many African-American voters at the lowest literacy levels.

- The ten counties with the highest percentage of their voting age population at Level 1 Literacy also have African-American populations above 50%.

AMERICAN CIVIL LIBERTIES
UNION FOUNDATION

| COUNTY | BLACK POPULATION | TOTAL POPULATION AT LEVEL 1 LITERACY |
|---|---|---|
| Allendale | 74.1% | 46% |
| Bamberg | 62.1% | 39% |
| Clarendon | 50.6% | 40% |
| Fairfield | 59.9% | 37% |
| Hampton | 54.7% | 37% |
| Lee | 64.9% | 40% |
| Marion | 56.7% | 38% |
| Marlboro | 51.8% | 37% |
| Orangeburg | 62.9% | 37% |
| Williamsburg | 66.3% | 41% |

The Level 1 Literacy rate is also high in those counties where African-Americans make up less than 50% of the population, but still have higher voter registration rates than whites:

---

[6] *Id.*

| COUNTY | BLACK POPULATION | TOTAL POPULATION AT LEVEL 1 LITERACY |
|--------|------------------|--------------------------------------|
| Barnwell | 45.1% | 32% |
| Calhoun | 43.2% | 35% |
| Darlington | 42.3% | 31% |
| Dillon | 47.1% | 34% |

By requiring South Carolinians who are illiterate to navigate a newly established voter identification system, in addition to other documentary requirements, the South Carolina legislature essentially is imposing a literacy test on South Carolina voters. Ironically, while South Carolina uses a touch screen voting system which reduces barriers for South Carolina's illiterate population to exercise their right to vote, requiring these voters to navigate a new administrative system to even access the ballot diminishes these benefits.

AMERICAN CIVIL LIBERTIES
UNION FOUNDATION

> c.   **Other costs associated with implementing Act R54 will fall more heavily upon low-income, African-American voters.**

Even though the State is now offering the DMV-issued identification card to voters free of charge, there still are accompanying costs to obtain the card that will disparately impact African-American voters. In order to obtain a photo identification card as required under Act R54, an individual will still need to provide some other form of certified identification information. For example, to obtain a driver's license or identification card, a South Carolina resident must prove his or her name, Social Security number, and date and place of birth. S.C. Code Ann. § 56-1-90. He or she can prove his U.S. citizenship, identity, name and place of birth using an original copy of one of the following documents: a birth certificate issued by the county or Bureau of Vital Statistics, a birth certificate from a U.S. Territory, a current U.S. passport or a U.S. passport that has not been expired for more than ten years, a certificate of naturalization, a U.S. government-issued consular report of birth abroad or a certificate of citizenship.[7]

Obtaining these certified documents, as well as the time and cost needed to actually travel and obtain the photo identification card, have a disparate impact on lower income African-Americans. The federal poverty level for a family of four is $22,350. In South Carolina, 12.6% of African-American families live at this poverty level. Overall, 27.7% of the African-American population is below the federal poverty level as compared to 10.6% of whites. Given that the uniform requirements for what certified documentation will be acceptable by each county election office have not yet been finalized (or even submitted to the Department for Section 5

---

[7] South Carolina Department of Motor Vehicles, Form MV-93: United States Citizens' Checklist for First Time Issuance of Driver's License, Beginner's Permit, and Identification Cards, Rev. January, 2007, *available at* http://www.scdmvonline.com/DMVNew/forms/MV-93.pdf.

preclearance review) the aggregate per person costs are still uncertain.  However, the following costs will disproportionately bear upon the State's African-American voters:

- A certified birth certificate can cost anywhere from $12 to $17, depending on whether rush delivery is required.  In situations where voters might use provisional ballots because they do not have the proper identification, it is highly likely that voters will need to have these materials sent overnight in order to meet the deadline required for the provisional ballot to be counted.  For those born in South Carolina, a birth certificate requested by mail from South Carolina Vital Records Services costs $12 and the usual turn-around time is more than four weeks from when the request is received.[8]

AMERICAN CIVIL LIBERTIES
UNION FOUNDATION

- In certain cases, individuals who do not have birth certificates because they were delivered by midwives or at a time prior to centralized birth record keeping, a birth certificate would be very difficult if not impossible to obtain.[9]

- Certified naturalization documents can cost between $345 to $460.[10]

- South Carolina has an overall population of 4,625,364.  However, between 2007 and 2010, only 593,749 people in the State were issued a passport. [11]  Also, the average cost of obtaining a passport is $165 including the execution fee, and that is on a non-expedited basis.[12]  Passports issued through the routine service usually arrive within ten to twelve weeks.

- In order to obtain these supporting documents and the photo identification card itself, many voters will likely have to choose between their livelihood and voting.  No laws require employers to provide workers with such leave, and so for lower income hourly-waged workers, obtaining identification could cost the worker not only the missed wages that they can ill afford, but the voter's job as well if the employer refuses to provide the worker with time off.  Statistics generally support the proposition that this cost would disproportionately impact South Carolina's African-American population.

---

[8] South Carolina Department of Health and Environmental Control, How to Obtain a Certified Copy of a Birth Certificate, *available at* http://www.scdhec.gov/administration/vr/birth.htm.
[9] *See* http://www.thestate.com/2011/07/09/1891400/critics-challenge.html;
http://www.postandcourier.com/news/2011/jul/08/groups-try-block-new-voter-id-law/
[10] http://www.uscis.gov/portal/site/uscis/menuitem.5af9bb95919f35e66f614176543f6d1a/?vgnextchannel=db029c7755cb9010VgnVCM10000045f3d6a1RCRD&vgnextoid=a910cac09aa5d010VgnVCM10000048f3d6a1RCRD; http://www.usacitizenship.info/certificatecitizenship.html.
[11] http://travel.state.gov/passport/ppi/stats/stats_890.html.
[12] http://travel.state.gov/passport/fees/fees_837.html.

In sum, African-American voters in South Carolina are less likely than white voters to possess one of the acceptable forms of identification as required under Act R54, and given their social and economic status, it will be much more burdensome for them to meet the requirements under the new law.

**B.      The absence of any genuine nondiscriminatory justification for South Carolina's voter identification law and the Legislature's failure to address concerns regarding its retrogressive impact indicate the law was enacted for a discriminatory purpose.**

The State's primary justification for Act R54's voter ID requirement is the elimination of voter fraud.  However, the sponsors of Act R54 never produced any evidence of a voter fraud problem in South Carolina that could be solved by this requirement.  Yet, as outlined above, there is abundant evidence of its potential retrogressive impact.  Therefore, the State's unfounded justification is far outweighed by the legislation's retrogressive effect.

AMERICAN CIVIL LIBERTIES
UNION FOUNDATION

**1.      The justification for the proposed amendments to South Carolina's voter identification law as contained in Act R54 is unfounded and pretextual.**

Act R54, in requiring voters to show one of five forms of photographic identification, has the potential to prevent one, and only one, type of voter fraud – voter impersonation.  The ID requirement will prevent a person from going to a polling place on Election Day, fraudulently requesting a ballot under the name of a qualified voter of that precinct who has registered to vote but has not voted prior to the fraud, and casting that ballot.  The ID requirement will not prevent any other type of fraud, such as double-voting, felon voting, non-citizen voting, absentee fraud, registration fraud, vote buying, or negative vote buying.

The South Carolina legislature did not conduct any studies to determine the existence or prevalence of voter fraud, and there is no such South Carolina-focused study.  Nor does the legislative record show other evidence of convictions or even prosecutions for voter impersonation fraud.  Many studies have been conducted over the past ten years researching the issue nationwide and they have all concluded that there is little evidence of voter fraud in our country's elections.  A draft of a report that was commissioned by the Elections Assistance Commission (EAC), based on a thorough examination by two election experts, concluded that there is "widespread but not unanimous agreement that there is little polling place fraud."[13] Unfortunately, the EAC infamously watered down the report and, instead of commenting on the pervasiveness of fraud, stated only the non sequitur that "there is a great deal of *debate* on the pervasiveness of fraud."[14]  Even so, the EAC

---

[13] Ian Urbina and Eric Lipton, "Panel Said to Alter Finding on Voter Fraud," *The New York Times*, April 11, 2007, *available at* http://www.nytimes.com/2007/04/11/washington/11voters.html.
[14] Election Assistance Commission, *Election Crimes: An Initial Review and Recommendations for Future Study* 1 (2006), *available at* http://www.eac.gov/assets/1/workflow_staging/Page/57.pdf

acknowledged the experts' original conclusions that, based on a survey of articles, reports and books, and confirmed by interviews with other experts, voter impersonation "is probably the least frequent type of fraud."

A report conducted in 2003, and re-adapted in 2007, by Lorraine Minnite of Demos concluded that "[v]oter fraud appears to be very rare in the 12 states examined. Legal and news records turned up little evidence of significant fraud in these states or any indication that fraud is more than a minor problem. Interviews with state officials confirmed this impression."[15] The Demos report, which was based on testimony from attorneys general and secretaries of state in 12 states, as well as database searches, statutory and case law, and other research from the government and academia, also correctly noted that, despite the Department of Justice's 2002 "Ballot Access and Voting Integrity Initiative" promising to vigorously prosecute allegations of voter fraud, the federal government obtained only 26 convictions or guilty pleas for voter fraud between 2002 and 2005 – an average of 8 or 9 individual incidents a year nationwide.[16] A 2007 study by Justin Levitt for the Brennan Center for Justice found that "by any measure, voter fraud is extraordinarily rare."[17] The report analyzed materials in some of the areas branded as notorious election fraud "hotspots," and found not a single incidence of voter impersonation.[18]

Thus, little evidence of voter fraud exists generally, but there is essentially no credible evidence of voter impersonation. Unable to identify and present evidence of voter impersonation, proponents of voter ID rely upon evidence of voter fraud that is immaterial to voter ID and touted it as proof of the need for this requirement. Senator Chip Campsen, one of the primary proponents of Act R54, and the sponsor of a similar bill in the state senate, addressed the issue of fraud during his comments on the floor of the senate.[19] The senator cited to out-of-state statistics regarding the number of people who are registered in more than one state and the number of felons who are registered to vote. These statistics are irrelevant to the need for a voter ID requirement to combat fraud because they address potential fraud that could not be solved by a voter ID. The senator also cited to nine individual cases of fraud, only five of which occurred in South Carolina and none of which would have been prevented by voter ID. Two of the incidents involved vote-buying, one involved voter registration fraud, and four involved double-voting, none of which could be

AMERICAN CIVIL LIBERTIES
UNION FOUNDATION

---

(emphasis added). The watering-down of the report caused quite a controversy, as well as a Department of the Interior Office of Inspector General investigation into its propriety. Office of the Inspector General, *Report of Investigation: Preparation of the Voter Fraud and Voter Intimidation Report* (2008), http://www.eac.gov/assets/1/Page/Report%20of%20Investigation%20-%20Preparation%20of%20the%20Vote%20Fraud%20and%20Voter%20Intimidation%20Report.pdf.
[15] Lori Minnite, *An Analysis of Voter Fraud in the U.S.* 6 (2007), *available at* www.demos.org/pubs/Analysis.pdf.
[16] *Id.* at 9.
[17] Justin Levitt, *The Truth About Voter Fraud* 7 (2007), *available at* www.truthaboutfraud.org/pdf/TruthAboutVoterFraud.pdf.
[18] *Id.* At 23-32.
[19] 119 S.C. Senate H3003 (May 10, 2011) (statement of Sen. Campsen).

prevented by this voter ID legislation.[20]  The other two cases involved absentee ballot fraud, a problem that has been proven to exist (indeed, the study behind the EAC report confirmed that "absentee balloting is subject to the greatest proportion of fraudulent acts"[21]) but which was conspicuously not addressed in this legislation. Although Act R54 amends only that portion of the election code that deals with voting at the polls on Election Day, the State's submission broadly asserts that "the Act requires that a photo ID be presented when voting."  The State, accordingly, should clarify whether the voter ID requirement applies to absentee voting generally or to in-person absentee voting.

AMERICAN CIVIL LIBERTIES
UNION FOUNDATION

The publicly available legislative history does not contain any additional evidence of voter fraud, and the state's submission to the Department of Justice provides little further information regarding its legislative history.  If a "more information" letter is sent, the state should be required specifically to identify and produce the information that was presented to the legislature during its deliberations, as well as any further legislative history of the act.  In any event, Senator Campsen is not alone in his reliance on election problems that could not possibly be solved by a voter ID law.  Indeed, a Brennan Center study of the evidence used to justify the law at issue in the Supreme Court case *Crawford v. Marion County Election Board*, 553 U.S. 181 (2008), a law that South Carolina legislators repeatedly cited as the model for Act R54, found that, of the more than 250 examples of fraud cited by the state of Indiana and its allied amici, not one proven instance of voter fraud would have been prevented by the voter ID law.[22]  Remarkably, there is only one mention of South Carolina among these 250 allegations, and it is a report of absentee fraud and voting in an incorrect precinct – issues that would remain unresolved under Act R54.

There is an obvious reason for the lack of voter impersonation.  Because of today's computer trails, centralized voting lists, precinct lists with address, age, voting history, etc., it would be a high risk and highly inefficient way to try to illicitly affect an election.  To steal even one vote by impersonation requires the impersonator to go to a precinct where he will not be recognized and the registered voter he intends to impersonate would not be recognized.  The impersonator has to know that the registered voter has not already voted either in person or by absentee. And that's just for one vote.  Even if a candidate could reasonably predict that an election would be within one hundred votes, she would need ten co-conspirators to vote at ten precincts each to get those one hundred fraudulent votes by

---

[20] Senator Campsen's cited examples of double-voting would not have been resolved by a voter ID requirement because they involved people who attempted to vote twice, or did so successfully, in their own names.  One of the examples involved a person who was registered in two states and voted in her own name in both states.  The other three examples involved voters who attempted to vote twice in the same state using their own names.  None of the examples involved voter impersonation and, while more thorough maintenance of voter registration lists may have prevented the problems, voter ID requirements would not.

[21] Election Assistance Commission, *Election Crimes: An Initial Review and Recommendations for Future Study* 9 (2006), *available at* http://www.eac.gov/assets/1/workflow_staging/Page/57.pdf .

[22] Justin Levitt, *Analysis of Alleged Fraud in Briefs Supporting Crawford Respondents* 1 (2007), *available at* www.truthaboutfraud.org/pdf/CrawfordAllegations.pdf.

impersonation. Apart from all the logistical landmines in such a scheme, the candidate would then have ten or more co-conspirators, all of whom would know she has committed multiple felonies.

Many state and federal laws are already in place to adequately, and thoroughly, address the issue of voter impersonation. S.C. Code Ann. § 7-25-20 makes it unlawful "to vote…under any false pretense as to circumstances affecting [one's] qualifications to vote." A violation of this section is punishable by up to one year in prison or by a fine of $200-$500. S.C. Code Ann. § 7-25-110 makes it a crime to vote more than once, and subjects violators to a fine or imprisonment of up to three years or both. S.C. Code Ann. § 7-25-120 imposes a fine of $300-$1200 or imprisonment for up to three years, or both, for voter impersonation. S.C. Code Ann. § 7-25-150 subjects anyone who falsely swears at an election to the full penalties for perjury. S.C. Code Ann. § 16-8-10 imposes a fine or up to five years of imprisonment as punishment for perjury. Finally, S.C. Code Ann. § 7-25-190 makes any violation of any provision of the Elections Code punishable by a $100-$1000 fine, up to five years imprisonment, or both.

AMERICAN CIVIL LIBERTIES
UNION FOUNDATION

Federal law, likewise, imposes serious penalties for voter impersonation. 18 U.S.C. § 241 makes voter impersonation punishable by up to 10 years in prison, a fine, or both. 42 U.S.C. § 1973i(c) places up to five years of imprisonment, a $10,000 fine, or both, on a person convicted of giving false information in obtaining a ballot. 42 U.S.C. § 1973i(e) similarly punishes a person who votes more than once. And 42 U.S.C. § 1973gg-10(2)(B) makes it a crime to defraud the residents of a State of a fair and impartially conducted election process through the fraudulent procurement of a ballot. Under this section, voter impersonation is punishable by up to 5 years in prison, a fine, or both.

The lack of evidence of voter impersonation, then, can be attributed to the high risk and low returns of voter impersonation. The deterrent efficacy of the already extensive criminal treatment of voter impersonation far outweighs the returns a voter or candidate could realize from it. Furthermore, the state already has a system for verifying voter identity at the polls – i.e., comparing the voter's signature on the poll list to the signature contained on the identification that current law requires of voters. The state has provided no explanation as to why its existing voter verification process, in addition to the various criminal provisions addressing voter impersonation, do not provide adequate protection against voter impersonation.

**2.      The legislative history behind Act R54 suggests the law was enacted for a discriminatory purpose.**

The legislature ignored significant testimony from opponents of the bill regarding its racial impact. This disregard for evidence of a disparate racial impact from the voter ID requirement, in conjunction with the absence of evidence as to a legitimate justification, suggests that South Carolina may have enacted the requirement with the intent to discriminate against minorities.

Not a single member of the South Carolina Legislative Black Caucus, whose membership represents 9 of the 46 seats in the state senate and 29 of the 124 seats in the state house, voted in favor of the voter ID requirement. Many members of the caucus spoke at length in opposition to the legislation:

- In a January 25, 2011, house floor debate on the bill, Representative Bakari Sellers called the bill a "travesty with no reasoning and no justification." He pointed out that, according to records from the State Election Commission, "178,000 qualified taxpayers will lose their right to vote if this bill is signed into law" and that the United States Attorney's office and the State Election Commission acknowledged very few investigations into fraud.[23]

AMERICAN CIVIL LIBERTIES
UNION FOUNDATION

- In that same house floor debate, Representative Robert L. Brown explained his objection to the bill, saying it "suppresses the votes of the disabled, the handicapped, and those voters without transportation, making the system more complicated and confusing to cast a vote, and therefore, disenfranchising many registered voters."[24]

- The next day, in a house floor debate, Representative Seth Whipper testified that the state is "rural, poor, educationally challenged, aging, and suffering from high unemployment." He said that, because the legislation will "cause the ballot box to be hidden beneath a shroud of inconveniences and balanced on a narrow ledge of availability," it will "discourage[] citizens from participating in the process, and its effect will be insidious and profound." He further expressed his "strong concern, [] deep discomfort, and [] heavy presumption that the effects of this legislation are deliberately disregarded, if not desired. There is no true justification for this legislation."[25]

- On the senate floor on February 23, 2011, Senator Floyd Nicholson warned of going "back where people are denied the right to vote" and suggested that "as members of this Senate, [we] do everything we can to make sure that all citizens have equal rights."[26]

- During a senate floor debate on March 8, 2011, Senator Gerald Malloy remarked that "there was no evidence in any of the committees that came before us, that there was fraud; that

---

[23] 119 S.C. House of Representatives H3003 (Jan. 26, 2011) (statement of Rep. Sellers).
[24] 119 S.C. House of Representatives H3003 (Jan. 26, 2011) (statement of Rep. Brown).
[25] 119 S.C. House of Representatives H3003 (Jan. 27, 2011) (statement of Rep. Whipper).
[26] 119 S.C. Senate H3003 (Feb. 23, 2011) (statement of Sen. Nicholson).

someone was trying to vote who wasn't supposed to vote." He also brought to the body's attention that "[o]ver 36% of those lacking state-issued photo ID's are non-whites" and that, in a state with a population of less than 5 million, there would be about 178,000 people who "had the ability to vote in the last election and may not be able to vote in the next."[27]

A voter ID requirement determines who gets to vote, a fundamental issue on which minority legislators have particular experience and insight that should be accorded great significance. Moreover, any legislation that evokes extensive testimony regarding its racially disparate impact should be closely deliberated before passage. The legislature did not thoroughly evaluate or weigh the views expressed by minority legislators and other opponents of Act R54. The legislature's failure to fully investigate the racial impact of the voter ID requirement, viewed alongside the relative vacuum of evidence indicating its need, suggests the law has a discriminatory purpose.

AMERICAN CIVIL LIBERTIES
UNION FOUNDATION

**C.**     **South Carolina must provide more information clarifying the ambiguous language and defining the practical application of the provisional balloting procedure for voters who suffer from a "reasonable impediment" preventing them from obtaining qualified photo identification.**

The state's submission to the Department failed to demonstrate that the "reasonable impediment" provisional balloting procedure of Section 5 of Act R54 will mitigate the retrogressive effect of the Act's photo identification requirements on African-American voters.
The "reasonable impediment" provisional balloting procedure ("the Reasonable Impediment Exception") provides:

> If an elector does not produce a valid and current photograph identification because the elector suffers from a reasonable impediment that prevents the elector from obtaining photograph identification, he may complete an affidavit under the penalty of perjury at the polling place and affirm that the elector: (i) is the same individual who personally appeared at the polling place; (2) cast the provisional ballot on election day; and (iii) the elector suffers from a reasonable impediment that prevents him from obtaining photographic identification. The elector also shall list the impediment, unless otherwise prohibited by state or federal law. Upon completion of the affidavit, the elector may cast a provisional ballot. The affidavit must be submitted with the provisional ballot envelope and be filed with the county board of registration and elections before certification of the election by the county board of canvassers.

---

[27] 119 S.C. Senate H3003 (Mar. 8, 2011) (statement of Sen. Malloy).

If the county board of registration and elections determines that the voter was challenged only for the inability to provide proof of identification and the required affidavit is submitted, the county board of registration and election shall find the provisional ballot is valid unless the board has grounds to believe the affidavit is false.

*See* South Carolina Code Sec. 7-13-710 (D)(1)(b)- (D)(2).

The ambiguous language of this portion of Act R54, along with South Carolina's decentralized election administration, requires that South Carolina provide additional information to the Department in order to demonstrate that the "reasonable impediment" provisional balloting procedure can mitigate the Act's retrogressive effects.

AMERICAN CIVIL LIBERTIES
UNION FOUNDATION

**1.      South Carolina must provide additional information to clarify the ambiguous language of the Reasonable Impediment Exception.**

The Reasonable Impediment Exception can be interpreted and applied in a way that may mitigate the law's retrogressive effect, or it can be interpreted and applied in a way that does not. The law directs county boards of registration and elections to find the provisional ballot accompanied by an affidavit of "reasonable impairment" valid unless the board has grounds to believe the affidavit is false. Consequently, if the Reasonable Impediment Exception is interpreted to limit the discretion of county election boards to reject a provisional ballot solely upon a determination that an affiant's stated impediment is false then the Reasonable Impediment Exception may operate to mitigate the Act's otherwise retrogressive effect. Alternatively, if county boards are permitted to determine whether an impediment is "reasonable" before making a final determination about its truth or falsity, the ambiguity of the word "reasonable" precludes the Exception from mitigating the retrogressive effect of Act R54. Without such clarification voters are likely to feel apprehension about signing a statement under oath and thereby be deterred from exercising that option.

In drafting the Reasonable Impediment Exception the legislature failed to establish criteria to determine "reasonableness" of a stated impediment. The South Carolina State Election Commission has made it clear that it will not promulgate any rules to provide any clarity to the 46 county election boards that will apply the Reasonable Impediment Exception. The Department needs additional information from South Carolina to ascertain whether and/or how it intends to give direction to the various county boards to interpret the law.

**2.      South Carolina must provide additional information on how it intends to ensure the fair application of the Reasonable Impediment Exception by all county boards of election and registration.**

15

South Carolina elections are operated at the county level by county boards of registration and election.  Although the South Carolina Election Commission has broad authority and responsibility for the election process, it does not conduct the elections held throughout the state nor does it exercise any direct control over the municipal or county election commissions.  The 46 county election commissions have direct responsibility to conduct elections throughout the state.[28]  Despite its ability to give non-binding guidance to the various county election boards, the South Carolina State Election Commission has indicated that it has no intention of promulgating regulations for the uniform application of Act R54.[29]

South Carolina's decentralized manner for conducting elections limits the ability of the Reasonable Impediment Exception to mitigate the retrogressive effect of Act R54 on African-Americans. South Carolina's individual county boards of election and registration control the manner and processes for conducting elections. The South Carolina Election Commission, while able to provide guidance, cannot direct the actions of county election boards through its regulatory processes. Consequently, South Carolina must provide more information to the Department as to how it intends to direct county election boards to apply the Reasonable Impediment Exception in order to ensure it is not implemented in an arbitrary, capricious or discriminatory manner.

South Carolina must provide more information to the Department regarding the interpretation of the language contained in the Reasonable Impediment Exception.  Without binding, clearly defined standards for reasonableness or specific direction that county boards must accept an impediment stated by a voter as reasonable, the potential for arbitrary, capricious or discriminatory application of the Reasonable Impediment Exception prevents the procedure from mitigating the retrogressive effect of Act R54 on African-American voters.

**D.   Conclusion**

We urge the Department to further investigate the retrogressive impact and discriminatory purpose for the enactment of R54.  In particular, we recommend that the Department request further information from the state on the following issues:

- the procedures that will be used to identify "each registered voter who does not have a South Carolina issued driver's license or identification card," as required by Section 7 of the act and the procedures that will be used to create a list of all such persons, as required by Section 8 of the act;

AMERICAN CIVIL LIBERTIES
UNION FOUNDATION

---

[28] *See* Treva G. Ashworth, 17 South Carolina Jurisprudence:  ELECTIONS § 9.
[29] 19 July 2011, Interview with Chris Whitmore, Assistant to South Carolina State Election Commission Executive Director.  Summary of interview on file with Brennan Center for Justice at NYU School of Law, New York, NY.

- whether the voter ID requirement applies to absentee voting generally or to in-person absentee voting;

- what preparatory actions, if any, the South Carolina State Election Commission is undertaking to "implement a system in order to issue voter registration cards with a photograph of the elector," as required by Section 4 of the act;

- the manner in which the State will implement the "reasonable impediment" exception to the voter ID requirement;

- the legislative history of the act, including data and information provided to the legislature during its consideration of the act; and

- any evidence of voter fraud that is in the state's possession.

AMERICAN CIVIL LIBERTIES
UNION FOUNDATION

The voter ID provision of Act R54 is racially discriminatory and will have a retrogressive impact on the voting rights of minorities in South Carolina. Because there is ample evidence of its retrogressive impact, and given the dearth of evidence for its need, South Carolina has failed to meet its burden under Section 5. For these reasons, we strongly urge the Department to deny the State's request for preclearance or, in the alternative, request more information regarding the law's application and impact on minority voting rights.

Respectfully submitted,

Laughlin McDonald
Nancy Abudu
Katie O'Connor
American Civil Liberties Union Foundation, Inc.
230 Peachtree Street NW, Suite 1440
Atlanta, Georgia 30303

Susan Dunn
Victoria Middleton
American Civil Liberties Union of South Carolina
Post Office Box 20998
Charleston, South Carolina 29413

Robert Kengle
Mark Posner
Lawyers' Committee for Civil Rights Under Law
1401 New York Avenue, NW, Suite 400
Washington, DC 20005

17

Wendy Weiser
Keesha Gaskins
Brennan Center for Justice at NYU School of Law
161 Avenue of the Americas, Floor 12
New York, NY 10013

Armand Derfner
Derfner, Altman and Wilborn
575 King Street, Suite B
Charleston, South Carolina 29403

Barbara Zia
Peggy J. Brown
League of Women Voters
 of South Carolina
P.O. Box 8453
Columbia, South Carolina 29202

AMERICAN CIVIL LIBERTIES
UNION FOUNDATION

18

**EXHIBIT A**

### South Carolina Voter Registration Demographics
### Registered Voters Without A Driver's License or Identification Issued by DMV
### (by County)

| County Name | Registered Voters | Registered Voters w/o DL or ID | |
|---|---|---|---|
| | | Total | % |
| ABBEVILLE | 13,791 | 819 | 5.94% |
| AIKEN | 91,439 | 6,463 | 7.07% |
| ALLENDALE | 5,398 | 595 | 11.02% |
| ANDERSON | 99,054 | 4,935 | 4.98% |
| BAMBERG | 8,707 | 676 | 7.76% |
| BARNWELL | 12,542 | 718 | 5.72% |
| BEAUFORT | 92,879 | 9,674 | 10.42% |
| BERKELEY | 88,204 | 4,799 | 5.44% |
| CALHOUN | 9,789 | 674 | 6.89% |
| CHARLESTON | 210,308 | 14,100 | 6.70% |
| CHEROKEE | 28,546 | 1,689 | 5.92% |
| CHESTER | 18,682 | 1,186 | 6.35% |
| CHESTERFIELD | 21,919 | 1,389 | 6.34% |
| CLARENDON | 21,167 | 1,819 | 8.59% |
| COLLETON | 21,981 | 1,096 | 4.99% |
| DARLINGTON | 38,029 | 2,618 | 6.88% |
| DILLON | 17,999 | 1,637 | 9.09% |
| DORCHESTER | 74,655 | 5,578 | 7.47% |
| EDGEFIELD | 14,565 | 1,146 | 7.87% |
| FAIRFIELD | 14,408 | 741 | 5.14% |
| FLORENCE | 75,037 | 5,503 | 7.33% |
| GEORGETOWN | 38,513 | 2,979 | 7.74% |
| GREENVILLE | 253,476 | 16,844 | 6.65% |
| GREENWOOD | 36,914 | 1,936 | 5.24% |
| HAMPTON | 12,189 | 932 | 7.65% |
| HORRY | 147,465 | 11,048 | 7.49% |
| JASPER | 11,987 | 1,220 | 10.18% |
| KERSHAW | 35,544 | 1,883 | 5.30% |
| LANCASTER | 40,694 | 2,611 | 6.42% |
| LAURENS | 34,449 | 1,932 | 5.61% |
| LEE | 11,320 | 914 | 8.07% |
| LEXINGTON | 145,446 | 7,656 | 5.26% |
| MCCORMICK | 6,435 | 548 | 8.52% |
| MARION | 20,158 | 1,715 | 8.51% |
| MARLBORO | 15,737 | 1,823 | 11.58% |
| NEWBERRY | 20,586 | 949 | 4.61% |
| OCONEE | 41,367 | 2,714 | 6.56% |
| ORANGEBURG | 56,372 | 5,116 | 9.08% |
| PICKENS | 60,239 | 3,813 | 6.33% |
| RICHLAND | 215,515 | 18,865 | 8.75% |
| SALUDA | 10,711 | 597 | 5.57% |
| SPARTANBURG | 145,267 | 7,767 | 5.35% |
| SUMTER | 59,049 | 4,794 | 8.12% |
| UNION | 16,613 | 933 | 5.62% |
| WILLIAMSBURG | 20,676 | 1,759 | 8.51% |
| YORK | 124,718 | 8,972 | 7.19% |
| **STATE TOTAL** | **2,560,539** | **178,175** | **6.96%** |

**SOUTH CAROLINA**
ELECTION COMMISSION

**South Carolina Voter Registration Demographics**
**Registered Voters Without A Driver's License or Identification Issued by DMV**
**(Sorted by Percentage)**

| County Name | Registered Voters | Registered Voters w/o DL or ID Total | % |
|---|---|---|---|
| MARLBORO | 15,737 | 1,823 | 11.58% |
| ALLENDALE | 5,398 | 595 | 11.02% |
| BEAUFORT | 92,879 | 9,674 | 10.42% |
| JASPER | 11,987 | 1,220 | 10.18% |
| DILLON | 17,999 | 1,637 | 9.09% |
| ORANGEBURG | 56,372 | 5,116 | 9.08% |
| RICHLAND | 215,515 | 18,865 | 8.75% |
| CLARENDON | 21,167 | 1,819 | 8.59% |
| MCCORMICK | 6,435 | 548 | 8.52% |
| MARION | 20,158 | 1,715 | 8.51% |
| WILLIAMSBURG | 20,676 | 1,759 | 8.51% |
| SUMTER | 59,049 | 4,794 | 8.12% |
| LEE | 11,320 | 914 | 8.07% |
| EDGEFIELD | 14,565 | 1,146 | 7.87% |
| BAMBERG | 8,707 | 676 | 7.76% |
| GEORGETOWN | 38,513 | 2,979 | 7.74% |
| HAMPTON | 12,189 | 932 | 7.65% |
| HORRY | 147,465 | 11,048 | 7.49% |
| DORCHESTER | 74,655 | 5,578 | 7.47% |
| FLORENCE | 75,037 | 5,503 | 7.33% |
| YORK | 124,718 | 8,972 | 7.19% |
| AIKEN | 91,439 | 6,463 | 7.07% |
| CALHOUN | 9,789 | 674 | 6.89% |
| DARLINGTON | 38,029 | 2,618 | 6.88% |
| CHARLESTON | 210,308 | 14,100 | 6.70% |
| GREENVILLE | 253,476 | 16,844 | 6.65% |
| OCONEE | 41,367 | 2,714 | 6.56% |
| LANCASTER | 40,694 | 2,611 | 6.42% |
| CHESTER | 18,682 | 1,186 | 6.35% |
| CHESTERFIELD | 21,919 | 1,389 | 6.34% |
| PICKENS | 60,239 | 3,813 | 6.33% |
| ABBEVILLE | 13,791 | 819 | 5.94% |
| CHEROKEE | 28,546 | 1,689 | 5.92% |
| BARNWELL | 12,542 | 718 | 5.72% |
| UNION | 16,613 | 933 | 5.62% |
| LAURENS | 34,449 | 1,932 | 5.61% |
| SALUDA | 10,711 | 597 | 5.57% |
| BERKELEY | 88,204 | 4,799 | 5.44% |
| SPARTANBURG | 145,267 | 7,767 | 5.35% |
| KERSHAW | 35,544 | 1,883 | 5.30% |
| LEXINGTON | 145,446 | 7,656 | 5.26% |
| GREENWOOD | 36,914 | 1,936 | 5.24% |
| FAIRFIELD | 14,408 | 741 | 5.14% |
| COLLETON | 21,981 | 1,096 | 4.99% |
| ANDERSON | 99,054 | 4,935 | 4.98% |
| NEWBERRY | 20,586 | 949 | 4.61% |
| **STATE TOTAL** | **2,560,539** | **178,175** | **6.96%** |



**South Carolina Voter Registration Demographics**
**Registered Voters Without A Driver's License or Identification Issued by DMV**
**(by Age)**

| County Name | Registered Voters | Registered Voters without DL or ID | | | | |
| --- | --- | --- | --- | --- | --- | --- |
| | | Total | Ages 18-24 | Ages 25-44 | Ages 45-64 | Ages 65+ |
| ABBEVILLE | 13,791 | 819 | 73 | 213 | 208 | 325 |
| AIKEN | 91,439 | 6,463 | 545 | 2,612 | 1,772 | 1,534 |
| ALLENDALE | 5,398 | 595 | 64 | 140 | 171 | 220 |
| ANDERSON | 99,054 | 4,935 | 420 | 1,642 | 1,269 | 1,604 |
| BAMBERG | 8,707 | 676 | 105 | 152 | 168 | 251 |
| BARNWELL | 12,542 | 718 | 69 | 227 | 209 | 213 |
| BEAUFORT | 92,879 | 9,674 | 620 | 3,187 | 2,583 | 3,284 |
| BERKELEY | 88,204 | 4,799 | 553 | 2,033 | 1,281 | 932 |
| CALHOUN | 9,789 | 674 | 52 | 216 | 164 | 242 |
| CHARLESTON | 210,308 | 14,100 | 2,069 | 5,825 | 3,170 | 3,036 |
| CHEROKEE | 28,546 | 1,689 | 166 | 559 | 415 | 549 |
| CHESTER | 18,682 | 1,186 | 115 | 321 | 357 | 393 |
| CHESTERFIELD | 21,919 | 1,389 | 144 | 431 | 378 | 436 |
| CLARENDON | 21,167 | 1,819 | 172 | 446 | 536 | 665 |
| COLLETON | 21,981 | 1,096 | 112 | 340 | 289 | 355 |
| DARLINGTON | 38,029 | 2,618 | 265 | 794 | 780 | 779 |
| DILLON | 17,999 | 1,637 | 166 | 517 | 498 | 456 |
| DORCHESTER | 74,655 | 5,578 | 443 | 2,349 | 1,623 | 1,163 |
| EDGEFIELD | 14,565 | 1,146 | 111 | 384 | 327 | 324 |
| FAIRFIELD | 14,408 | 741 | 48 | 198 | 200 | 295 |
| FLORENCE | 75,037 | 5,503 | 574 | 1,918 | 1,523 | 1,488 |
| GEORGETOWN | 38,513 | 2,979 | 239 | 735 | 848 | 1,157 |
| GREENVILLE | 253,476 | 16,844 | 1,435 | 7,100 | 4,337 | 3,972 |
| GREENWOOD | 36,914 | 1,936 | 161 | 636 | 518 | 621 |
| HAMPTON | 12,189 | 932 | 93 | 315 | 284 | 240 |
| HORRY | 147,465 | 11,048 | 950 | 3,835 | 3,062 | 3,201 |
| JASPER | 11,987 | 1,220 | 141 | 371 | 343 | 365 |
| KERSHAW | 35,544 | 1,883 | 173 | 632 | 528 | 550 |
| LANCASTER | 40,694 | 2,611 | 200 | 884 | 696 | 831 |
| LAURENS | 34,449 | 1,932 | 169 | 534 | 502 | 727 |
| LEE | 11,320 | 914 | 73 | 205 | 258 | 378 |
| LEXINGTON | 145,446 | 7,656 | 729 | 3,144 | 1,975 | 1,808 |
| MCCORMICK | 6,435 | 548 | 51 | 140 | 148 | 209 |
| MARION | 20,158 | 1,715 | 168 | 475 | 474 | 598 |
| MARLBORO | 15,737 | 1,823 | 193 | 545 | 523 | 562 |
| NEWBERRY | 20,586 | 949 | 87 | 244 | 229 | 389 |
| OCONEE | 41,367 | 2,714 | 226 | 763 | 685 | 1,040 |
| ORANGEBURG | 56,372 | 5,116 | 1,012 | 1,426 | 1,136 | 1,542 |
| PICKENS | 60,239 | 3,813 | 434 | 1,534 | 806 | 1,039 |
| RICHLAND | 215,515 | 18,865 | 2,990 | 8,444 | 4,252 | 3,179 |
| SALUDA | 10,711 | 597 | 58 | 126 | 129 | 284 |
| SPARTANBURG | 145,267 | 7,767 | 799 | 2,748 | 1,947 | 2,273 |
| SUMTER | 59,049 | 4,794 | 630 | 1,851 | 1,228 | 1,085 |
| UNION | 16,613 | 933 | 81 | 193 | 233 | 426 |
| WILLIAMSBURG | 20,676 | 1,759 | 138 | 383 | 490 | 748 |
| YORK | 124,718 | 8,972 | 758 | 3,596 | 2,566 | 2,052 |
| **STATE TOTAL** | **2,560,539** | **178,175** | **18,874** | **65,363** | **46,118** | **47,820** |


SOUTH CAROLINA
ELECTION COMMISSION

**South Carolina Voter Registration Demographics**
**Registered Voters Without A Driver's License or Identification Issued by DMV**
**(by Race)**

| County Name | Registered Voters | Registered Voters without DL or ID | | | | |
|---|---|---|---|---|---|---|
| | | Total | White | % | Nonwhite | % |
| ABBEVILLE | 13,791 | 819 | 519 | 3.76% | 300 | 2.18% |
| AIKEN | 91,439 | 6,463 | 4,712 | 5.15% | 1,751 | 1.91% |
| ALLENDALE | 5,398 | 595 | 120 | 2.22% | 475 | 8.80% |
| ANDERSON | 99,054 | 4,935 | 3,980 | 4.02% | 955 | 0.96% |
| BAMBERG | 8,707 | 676 | 170 | 1.95% | 506 | 5.81% |
| BARNWELL | 12,542 | 718 | 293 | 2.34% | 425 | 3.39% |
| BEAUFORT | 92,879 | 9,674 | 7,658 | 8.25% | 2,016 | 2.17% |
| BERKELEY | 88,204 | 4,799 | 3,047 | 3.45% | 1,752 | 1.99% |
| CALHOUN | 9,789 | 674 | 245 | 2.50% | 429 | 4.38% |
| CHARLESTON | 210,308 | 14,100 | 9,765 | 4.64% | 4,335 | 2.06% |
| CHEROKEE | 28,546 | 1,689 | 1,212 | 4.25% | 477 | 1.67% |
| CHESTER | 18,682 | 1,186 | 597 | 3.20% | 589 | 3.15% |
| CHESTERFIELD | 21,919 | 1,389 | 690 | 3.15% | 699 | 3.19% |
| CLARENDON | 21,167 | 1,819 | 621 | 2.93% | 1,198 | 5.66% |
| COLLETON | 21,981 | 1,096 | 507 | 2.31% | 589 | 2.68% |
| DARLINGTON | 38,029 | 2,618 | 1,087 | 2.86% | 1,531 | 4.03% |
| DILLON | 17,999 | 1,637 | 532 | 2.96% | 1,105 | 6.14% |
| DORCHESTER | 74,655 | 5,578 | 3,946 | 5.29% | 1,632 | 2.19% |
| EDGEFIELD | 14,565 | 1,146 | 636 | 4.37% | 510 | 3.50% |
| FAIRFIELD | 14,408 | 741 | 279 | 1.94% | 462 | 3.21% |
| FLORENCE | 75,037 | 5,503 | 2,740 | 3.65% | 2,763 | 3.68% |
| GEORGETOWN | 38,513 | 2,979 | 1,740 | 4.52% | 1,239 | 3.22% |
| GREENVILLE | 253,476 | 16,844 | 13,013 | 5.13% | 3,831 | 1.51% |
| GREENWOOD | 36,914 | 1,936 | 1,243 | 3.37% | 693 | 1.88% |
| HAMPTON | 12,189 | 932 | 281 | 2.31% | 651 | 5.34% |
| HORRY | 147,465 | 11,048 | 9,303 | 6.31% | 1,745 | 1.18% |
| JASPER | 11,987 | 1,220 | 522 | 4.35% | 698 | 5.82% |
| KERSHAW | 35,544 | 1,883 | 1,252 | 3.52% | 631 | 1.78% |
| LANCASTER | 40,694 | 2,611 | 1,848 | 4.54% | 763 | 1.87% |
| LAURENS | 34,449 | 1,932 | 1,332 | 3.87% | 600 | 1.74% |
| LEE | 11,320 | 914 | 230 | 2.03% | 684 | 6.04% |
| LEXINGTON | 145,446 | 7,656 | 6,193 | 4.26% | 1,463 | 1.01% |
| MCCORMICK | 6,435 | 548 | 291 | 4.52% | 257 | 3.99% |
| MARION | 20,158 | 1,715 | 479 | 2.38% | 1,236 | 6.13% |
| MARLBORO | 15,737 | 1,823 | 710 | 4.51% | 1,113 | 7.07% |
| NEWBERRY | 20,586 | 949 | 611 | 2.97% | 338 | 1.64% |
| OCONEE | 41,367 | 2,714 | 2,448 | 5.92% | 266 | 0.64% |
| ORANGEBURG | 56,372 | 5,116 | 1,204 | 2.14% | 3,912 | 6.94% |
| PICKENS | 60,239 | 3,813 | 3,374 | 5.60% | 439 | 0.73% |
| RICHLAND | 215,515 | 18,865 | 9,182 | 4.26% | 9,683 | 4.49% |
| SALUDA | 10,711 | 597 | 337 | 3.15% | 260 | 2.43% |
| SPARTANBURG | 145,267 | 7,767 | 5,624 | 3.87% | 2,143 | 1.48% |
| SUMTER | 59,049 | 4,794 | 2,020 | 3.42% | 2,774 | 4.70% |
| UNION | 16,613 | 933 | 542 | 3.26% | 391 | 2.35% |
| WILLIAMSBURG | 20,676 | 1,759 | 318 | 1.54% | 1,441 | 6.97% |
| YORK | 124,718 | 8,972 | 6,966 | 5.59% | 2,006 | 1.61% |
| STATE TOTAL | 2,560,539 | 178,175 | 114,419 | 4.47% | 63,756 | 2.49% |



SOUTH CAROLINA
ELECTION COMMISSION



Percentage of Registered Voters without
Driver's License or State I.D. Cards

**Percentage w/o DL or ID**
4.61% - 5.72%
5.73% - 6.89%
6.90% - 8.12%
8.13% - 9.09%
9.10% - 11.58%

# Exhibit B

  

December 7, 2011

Mr. T. Christian Herren
Chief, Voting Section
Civil Rights Division
Room 7254-NWB
U.S. Department of Justice
950 Pennsylvania Avenue, NW
Washington, DC 20530

      Re:    Comment: South Carolina Section 5 Submission No. 2011-2495

Dear Mr. Herren:

      This comment letter is in reference to Section 5 submission no. 2011-2495 from the State of South Carolina regarding the voting changes set forth in Act R54 (A27 H3003). Act R54 amends S.C. Code Ann. § 7-1-25 to require that voters produce certain government-issued photo identification in order to cast a ballot at the polls. For the reasons set forth below, and for the reasons stated in our August 5, 2011 comment letter, we the undersigned organizations respectfully request that the Justice Department interpose an objection to the proposed voting changes.

    **1.**      **Overview.**

      The proposed voter identification requirement is retrogressive. As explained below, the State's own data (regarding the number of registered voters, by race, who lack a driver's license or state-issued identification card) demonstrate that the requirement would have a disproportionate effect on minority voters. This effect is evidenced in two ways. First, the State's data demonstrate that minority voters disproportionately lack the requisite identification, and thus would be disproportionately required to obtain that identification in order to vote at the polls on election day. Second, the available evidence indicates that minority voters would continue to disproportionately lack the requisite identification, resulting in minority voters being disproportionately barred from voting at the polls.

      This discriminatory election day disenfranchisement would occur for several reasons. First, as noted, from the outset, minority voters would disproportionately not have the requisite identification. Second, it is well recognized that minority voters' ability to participate equally in the electoral process is significantly hampered by South Carolina's history of discrimination in voting and other areas, and by the resulting socio-economic disparities between whites and African Americans. Lastly, the State has failed to demonstrate that the measures it has proposed, which purportedly ameliorate the impact of the photo identification requirement, would overcome and eliminate the existing racial disparity.

In relying on the data provided by the State, we recognize these data do not quantify all of the factors that would define the population of persons who would be burdened by the new requirement, or the population of persons who ultimately would be precluded from voting at the polls in a particular election.  However, the State has not provided any data regarding the unaccounted-for variables, and has not identified any method for quantifying these variables.  It therefore appears that the data the State provided are the best available data for judging whether the proposed change would have a prohibited retrogressive effect.  While unaccounted-for variables might, alternatively, increase, decrease, or not affect the racial disparity shown by the data the State has provided, the State has the burden of proving the absence of a retrogressive effect.  It has failed to do so.

The "reasonable impediment" exception the State has proposed to its voter identification requirement does not rescue the requirement from being retrogressive.  Given the State's burden of proof, the exception is an un-quantified variable that cannot tip the retrogression analysis in the State's favor.  The exception may, to some extent, shrink the population of persons needing to obtain acceptable photo identification; however, the State has provided no data as to whether this would increase, decrease, or not affect the racially disparate effects of the photo identification requirement.  In addition, the South Carolina Attorney General's interpretation of the "reasonable impediment" exception and how it should be applied does not repair the discriminatory effect of the identification requirement.  The exception would apply only to voters for whom it is outside of their "control" to obtain the requisite identification.  The Attorney General's definition of "reasonable impediment" is ambiguous, providing no clear standard for when an impediment is "reasonable" and outside of the "control" of the voter.  The failure to clearly define the exception creates opportunities for its discriminatory application by the poll workers and county election boards in the 46 independent counties conducting elections across South Carolina.

The State's implementation and education plan also does not eliminate the retrogressive impact of this change.  First, the State has not provided any basis on which to conclude that even a well-designed and adequately funded publicity campaign would overcome the racial disparity in photo ID ownership.  Second, the State's plan has several design problems and there is no indication that it would be adequately funded.  The State fails to indicate how the education plan would target populations most affected by the photo identification requirement or how well the plan would be funded.  In addition, the State's sample educational materials are incomplete and potentially misleading.

Finally, to the extent it is relevant to consider whether the State has a non-retrogressive alternative to the photo identification requirement, the information provided – or, rather, not provided – by the State indicates that it clearly does have such an alternative.  That is, the State's submission fails to indicate that there is any need at all for the photo identification requirement given that the alleged problem the requirement has been adopted to address – voter impersonation at the polls – does not appear to exist in South Carolina.  Thus, the State can continue to conduct election day voting in a safe, orderly, and efficient manner by continuing to enforce its current voter identification provision.

**2.      Act R54 is retrogressive.**

      **a.      Hundreds of thousands of South Carolina voters will be negatively impacted by the law.**

At the outset, it is important to recognize the massive scope of the proposed change: the State of South Carolina is essentially seeking to implement a supplementary registration program involving apparently hundreds of thousands of registered voters in the State, requiring them to "register" with the State or federal photo identification authorities before voting.  The magnitude of the proposed "re-registration" is unprecedented; at the least, it is our understanding that no supplementary or re-registration of this size has occurred in the State since the 1960s.

- According to the State's own data, there currently are up to 216,596 registered voters in the State whose registration will not allow them to vote in person at the polls on election day because they apparently lack the additional documentation – a photo ID – which will allow their current registration to be deemed effective and sufficient for voting.  These are the individuals who currently do not have a state driver's license or a DMV-issued identification card.

- The actual number of registered voters who would be required to obtain new identification in order to vote at the polls is somewhat less because of the State's proposed "reasonable impediment" exception.  However, that exception is ambiguous and its scope, as best can be understood, is extremely limited – it applies only to registered voters who experience an "obstacle to . . . obtaining the necessary photographic identification" where that "obstacle" was "valid" and "beyond the voter's control".  Op. S.C. Att'y Gen. August 16, 2011.  The State has provided no data or estimate as to the number of persons who may qualify for this exception.  Given that the State has the burden of proof , there is no basis for assuming that this exception will substantially limit the number of affected registered voters.

- The new law also allows for two other existing forms of identification to be used for voting (passports and military identification containing a photograph), but the State also has not provided any data regarding the number of additional persons this would cover (*i.e.*, the number who have one of these forms of identification but do not have a driver's license or state identification card).  Accordingly, the State has not shown that these other forms of acceptable identification would significantly reduce the number of affected individuals.

      **b.      A disproportionate number of those affected by Act R54 are racial minorities.**

The State's data demonstrate that the photo identification requirement would disproportionately burden the non-white population of South Carolina, and that the disparity is significant.

- The State's data show that non-whites compose 33.9 percent of the registered voters in the State who lack a driver's license or state-issued identification card, whereas non-whites compose 30.4 percent of all registered voters.  This means that non-whites constitute 11.5 percent more of those who lack qualifying DMV photo identification than would be true if the new requirement was race-neutral based on the current registration figures.[1]

- Although the number of persons who ultimately would be required to obtain identification would be mitigated, to some extent, by the fact that two other forms of existing identification would be accepted for voting, and also by the existence of the "reasonable impediment" exception, the State has not provided any data regarding the racial impact of these factors or any basis on which to estimate or in any way gauge their racial impact.  Furthermore, as noted above, there also is a concern that the ambiguity of the "reasonable impediment" exception would open the door to inconsistent or discriminatory application at the polls, which could further aggravate the existing racial disparity.  Accordingly, the State has not shown that these factors would mitigate the racial impact of the photo identification requirement.

- Similarly, while the number of persons who ultimately would be precluded from election day voting by the photo identification requirement would decrease because some number of persons lacking identification would now obtain it (by obtaining either one of the existing forms of acceptable photo ID or the new photo ID included in the submitted legislation), the State has not provided any data that assesses the racial composition of this subset of persons or any basis on which to estimate or in any way gauge the racial impact of this factor.  Accordingly, the State has failed to show that that the fact that some number of individuals currently without the requisite photo ID would now obtain it would mitigate the racial impact of the change.

- Finally, the racial effect of the new requirement likely would be exacerbated – and certainly not mitigated – by the fact that historical discrimination in South Carolina, and the resulting stark socio-economic disparities between the State's white and minority residents, burden minority voters' participation in the electoral process.  Voting Rights Act reviews have always taken these factors into account in assessing the impact of a particular voting practice or procedure on minority voters, recognizing that impact must be judged by conducting a functional analysis of the electoral circumstances.  These factors would tend to make it less likely that minority voters who lack photo identification would obtain it, and would make it particularly unlikely that, after implementation, minority voters would obtain identification to such an extent that the current disparity would be eliminated.[2]

---

[1] The figure of 11.5 percent is derived as follows: the non-white percentage of those lacking DMV identification is 3.5 percentage points higher than the non-white percentage of the registered voters; 3.5 divided by 30.3 equals 11.5 percent.
[2] See Letter from ACLU, Lawyers' Committee, Brennan Center, Armand Derfner, and LWV of South Carolina to Christian Herren (August 5, 2011) at 4-9 (discussing racial disparities in access to transportation, literacy, and poverty levels in South Carolina).

### c. The "reasonable impediment" exception is insufficient.

The State's proposed "reasonable impediment" provision provides an extremely limited "safe harbor" from the photo identification requirement, and thus, in the absence of racial data as to its effect, does not provide a basis for preclearing the new requirement. This provision is unlike a provision that would allow any voter lacking photo ID to instead submit an affidavit of identity at the polls, which, because of its application to all voters lacking ID, could (if properly designed) eliminate any racial impact that otherwise would result from a photo ID requirement.

- The "reasonable impediment" exception purports to excuse registered voters from obtaining photo identification if their lack of such identification may be attributed to a circumstance "beyond the voter's control." This ill-defined exception cannot operate to meaningfully limit the retrogressive effect of South Carolina's photo ID law because it does not apply universally to voters who lack photo identification. Moreover, because of its vague and ill-defined parameters, the exception creates greater opportunity for racial discrimination through inconsistent application throughout South Carolina's decentralized election administration system.

- The South Carolina Attorney General gives examples of "reasonable impediments" beyond the "control" of a voter. These "reasonable impediments" include the inability to obtain a birth certificate or a physical infirmity affecting a voter's ability to obtain ID. The Attorney General's opinion omits myriad circumstances over which a voter has no actual control but which State officials might formally consider to be within the "control" of a voter, such as lack of access to transportation or inability to afford the underlying documentation required to obtain photo identification. Based upon the South Carolina Attorney General's opinion, these apparently would be considered within the "control" of a voter but would impact minority voters disproportionately.[3]

### d. The State has not shown that its proposed voter education program would eliminate the racial disparity.

The State's education plan suffers from several particular problems and does not provide any data suggesting that it will mitigate the law's retrogressive effect

- There is no mention of how the information the State plans to distribute is targeted to actually have an impact and penetrate the markets, particularly of minority communities, to ensure that voters understand the obligations imposed by the new photo identification laws. While the South Carolina Election Commission (SCEC) identifies various specific outlets for television, radio, newspaper, printed material distribution, social media and

---

[3] Voters who are unable to use the "reasonable impediment" exception could, in theory, avoid the identification requirement by voting absentee, and thus it perhaps could be argued that this would limit the requirement's discriminatory effect. The State, however, has not made this argument in its submissions and, in any event, it is problematic either way voting by absentee ballot as interchangeable with voting at the polls. Absentee voting requires a voter to cast a ballot before election day which may deprive the voter of knowledge of events, statements by candidates, revelations concerning candidates, etc. that might occur in the days immediately preceding the election. Moreover, absentee voting in South Carolina is only available to voters falling within predetermined parameters and would not be available to otherwise able-bodied voters whose sole reason for needing to vote absentee is lack of ID.

public relations purposes, there is no mention of scope or market penetration to the key audiences identified by the SCEC. The plan is silent on ability of these efforts to penetrate key markets: there is no information on the volume of website traffic, number of twitter followers, size of membership organizations, diversity and volume of population attendance at local fairs and festivals, or historic effectiveness with editorial boards on a strictly educational issue with little news value. Most importantly, there is no mention of a dedicated budget to ensure a significant resource investment in the public education campaign.

- Furthermore, the State's sample educational materials are incomplete and potentially misleading. The materials fail to educate voters on the opportunity to vote absentee without photo identification. Many of the materials also fail to notify voters of the "reasonable impediment" exception to the ID requirement.

Even a well designed and carefully implemented voter education program would fail to remedy the retrogressive effect of the voter identification requirement of Act R54, since the factors that hamper minority electoral participation are complex and do not simply involve a lack of information. Minority voters face particular burdens at every step of the electoral process, burdens that result from historical discrimination and its lingering socioeconomic effects. A limited publicity campaign taking place over a limited period of time cannot possibly offset the retrogressive effect of this law.

### e.     Act R54 is an unnecessary and burdensome law.

The State has failed to provide any information indicating that there is any need for a photo identification requirement in order to maintain the integrity of elections in South Carolina. In other words, regardless of whether the State's motivation was in part racial, or instead was simply partisan, the new requirement is entirely gratuitous.

- The potential "voting integrity" problem that a photo ID requirement might address is voter impersonation (i.e., the situation where a person impersonates a registered voter and casts a ballot as that registered voter). But the State indicates that there is no documented instance of voter impersonation, and no recent documented instance of any voter fraud at all, and thus there is no empirical basis for imposing the new requirement.[4]

- Furthermore, the fact that the proposed photo ID requirement would not apply to absentee voting also demonstrates that the new requirement is not aimed at fixing any real problem in the administration of elections in the State. If an individual did wish to commit fraud by impersonating a registered voter, it seemingly would be much easier to do that by voting that person absentee since the impersonator then would avoid personally appearing before poll officials who might know the person being impersonated and thus discover the illegal conduct. The State has not provided any valid explanation for allowing such a significant exception to its new "voting integrity" enforcement scheme if indeed there were any real problem with voter impersonation.

---

[4] Brie Jackson, *S.C. Election Commission has no confirmed cases of voter fraud*, October 28, 2011, http://www2.scnow.com/news/2011/oct/28/south-carolina-election-commission-has-no-confirme-ar-2622257/.

- The apparent reason for the absence of any evidence of voter impersonation problem at the polls is the inherent difficulty and danger in such conduct. Voter impersonation is a crime in South Carolina. See S.C. Code Ann. § 7-25-120. A person who attempts to impersonate a registered voter at the polls runs the clear risk that the fraud will be discovered because one of the poll workers may know the individual being impersonated or the individual being impersonated already has voted (either in person or absentee). Furthermore, the risk is multiplied many times over by the fact that, in order to affect an election, many voters would need to be impersonated by many individuals. This would dramatically increase the likelihood that the conspiracy would be discovered by poll workers, and that one of the conspirators, or an acquaintance of the conspirators, would disclose the illegal conduct to election officials or to law enforcement.

Finally, the absence of any genuine nondiscriminatory justification for South Carolina's voter identification law and the Legislature's failure to address concerns regarding its retrogressive impact (discussed in our prior comment letter) raise a significant concern as to whether the law was enacted for a discriminatory purpose.

### 3. The Supreme Court's decision in *Crawford v. Marion County Election Board* has no bearing on the Department's decision here.

The Supreme Court's decision in *Crawford v. Marion County Election Board*, 553 U.S. 181 (2008), has little or no relevance to this submission. *Crawford* was not a Section 5 case and did not involve a claim of racial discrimination. It was a facial challenge to Indiana's photo ID requirement brought under the Fourteenth Amendment. That is very different than a Section 5 matter, which does of course require a demonstration of nondiscrimination on the basis of race, places the burden of proof on the covered jurisdiction, and employs a completely different legal test for lawfulness.

The *Crawford* Court noted that (1) the State had demonstrated that it had legitimate generalized interests in prescribing the photo ID requirement, *id.* at 191-98; and (2) the plaintiffs had failed to proffer sufficient evidence of the burden that would be placed upon the affected voters. *Id.* It is for these reasons that the Court rendered its narrow holding: "We are persuaded that the [lower courts] correctly concluded that the evidence in the record is not sufficient to support a facial attack on the validity of the entire statute, and thus affirm." *Id.* at 188-89. This narrow holding was predicated on the fact that the burden in *Crawford* was on the plaintiffs, in stark contrast to a Section 5 review, where the burden is on the State. Moreover, the generalized interests cited in *Crawford* do not provide a basis for preclearance of an otherwise retrogressive change, and the legal holding and factual findings in *Crawford* otherwise provide no guidance for assessing the instant submission.

In short, *Crawford* is inapposite and, thus, does not and cannot dictate any outcome here.

**4.      Conclusion.**

The voter ID provision of Act R54 is racially discriminatory and will have a retrogressive impact on the voting rights of minorities in South Carolina.  South Carolina has failed to meet its burden under Section 5 and, therefore, we strongly urge the Department to deny the State's request for preclearance.

Respectfully submitted,

Laughlin McDonald
Nancy Abudu
Katie O'Connor
American Civil Liberties Union Foundation, Inc.
230 Peachtree Street NW, Suite 1440
Atlanta, Georgia 30303

Susan Dunn
Victoria Middleton
American Civil Liberties Union of South Carolina
Post Office Box 20998
Charleston, South Carolina 29413

Robert Kengle
Mark Posner
Lawyers' Committee for Civil Rights Under Law
1401 New York Avenue, NW, Suite 400
Washington, DC 20005

Wendy Weiser
Keesha Gaskins
Brennan Center for Justice at NYU School of Law
161 Avenue of the Americas, Floor 12
New York, NY 10013

Armand Derfner
Derfner, Altman and Wilborn
575 King Street, Suite B
Charleston, South Carolina 29403

Barbara Zia
Peggy J. Brown
League of Women Voters
  of South Carolina
P.O. Box 8453
Columbia, South Carolina 29202