# EXHIBIT 1



**U.S. Department of Justice**

Civil Rights Division

---

*Office of the Assistant Attorney General*     Washington, D.C. 20530

December 23, 2011

C. Havird Jones, Jr., Esq.
Assistant Deputy Attorney General
P.O. Box 11549
Columbia, South Carolina 29211-1549

Dear Mr. Jones:

    This refers to Act R54 (A27 H3003) (2011), relating to domicile factors, duplicate registration, consideration of challenges, the State Election Commission voter registration card system implementation, photographic identification requirements and provisional ballots, special identification card provisions, the State Election Commission voter education program, and the State Election Commission registered voter list, for the State of South Carolina, submitted to the Attorney General pursuant to Section 5 of the Voting Rights Act of 1965, 42 U.S.C. 1973c. On August 29, 2011, the Attorney General informed you that no objection would be interposed to sections 1 and 3 of Act R54, and that additional information was required to complete our review of sections 2, 4, 5, 6, 7, and 8 of Act R54. We received your response to our request for additional information on October 27, 2011; additional information was received through December 23, 2011.

    Under Section 5 of the Voting Rights Act, the submitting authority has the burden of showing that the proposed changes have neither the purpose nor the effect of denying or abridging the right to vote on account of race, color, or membership in a language minority group. *Georgia v. United States*, 411 U.S. 526 (1973); Procedures for the Administration of Section 5 of the Voting Rights Act of 1965, 28 C.F.R. 51.52(c). The voting change at issue must be measured against the benchmark practice to determine whether it would "lead to a retrogression in the position of racial minorities with respect to their effective exercise of the electoral franchise." *Beer v. United States*, 425 U.S. 130, 141 (1976).

    We have given careful consideration to the information you provided, as well as Census data and information and comments from other interested persons. The Attorney General does not interpose any objection to sections 2 and 6 of Act R54, concerning issuance of a duplicate registration notification card and amendment of procedures for special identification cards issued by the Department of Motor Vehicles (DMV). However, we note that Section 5 of the Voting Rights Act expressly provides that failure of the Attorney General to object does not bar subsequent litigation to enjoin enforcement of the changes. 28 C.F.R. 51.41.

With regard to section 5 of Act R54, concerning photographic identification requirements and provisional ballots, I cannot conclude that the state has sustained its burden under Section 5 of the Voting Rights Act. Therefore, on behalf of the Attorney General, I must object to section 5 of Act R54.

Section 5 of Act R54 would require voters to present one of five forms of photo identification to vote in person. Currently, state law does not require voters to present photo identification in order to vote; in addition to a driver's license or non-driver photo identification card, an elector can vote using a voter registration card with no photograph, along with the voter's signature on the poll list. The current version of the state's identification requirement has been in effect since 1988. In the state's submission and in the record of the legislative proceedings, the justification offered for changing the current practice to require photo identification to vote in person has been to combat voter fraud. Although the state has a legitimate interest in preventing voter fraud and safeguarding voter confidence, *Crawford v. Marion County Election Board*, 128 S. Ct. 1610 (2008), the state's submission did not include any evidence or instance of either in-person voter impersonation or any other type of fraud that is not already addressed by the state's existing voter identification requirement and that arguably could be deterred by requiring voters to present only photo identification at the polls.

In assessing the impact of the proposed photo identification requirements in section 5 of Act R54, we turn first to the data that the state has provided concerning registered voters within the state. The most recent voter registration data available from the State Election Commission indicate that, as of October 1, 2011, there were a total of 2,701,843 registered voters in the state, of whom 69.6% were white and 30.4% were non-white. These data also show that of the total number of registered voters in the state, 239,333 (or 8.9%) did not possess DMV-issued photo identification (either a driver's license or a non-driver's photo ID card) that would satisfy the requirements under Act R54.[1] When disaggregated by race, the state's data show that 8.4% of white registered voters lacked any form of DMV-issued ID, as compared to 10.0% of non-white registered voters. In other words, according to the state's data, which compare the available data in the state's voter registration database with the available data in the state's DMV database, minority registered voters were nearly 20% more likely to lack DMV-issued ID than white registered voters, and thus to be effectively disenfranchised by Act R54's new requirements. We note that the voter registration data matched against the DMV database, and provided to us by the state, does not include several categories of existing registered voters listed as inactive voters, and hence, the number of registered voters without DMV-issued ID may well be higher than even these numbers suggest.

---

[1] Section 5 of Act R54 would also permit a voter to vote in person using a U.S. passport, a military photo identification, or a state voter registration card containing a photograph of the voter. The state has produced no data demonstrating what percent of registered voters lack a DMV-issued identification but do possess a U.S. passport or military photo identification. The state voter registration card containing a photograph of the voter does not yet exist and is proposed to be implemented by section 4 of Act R54.

Put differently, although non-white voters comprised 30.4% of the state's registered voters, they constituted 34.2% of registered voters who did not have the requisite DMV-issued identification to vote. Non-white voters were therefore disproportionately represented, to a significant degree, in the group of registered voters who, under the proposed law, would be rendered ineligible to go to the polls and participate in the election.

An examination of the county-by-county rates of total registered voters without DMV-issued identification raises additional concerns. Across the state's 46 counties, the rate of registered voters without DMV-issued identification ranges from a low of 6.3% to a high of 14.2%. Notably, seven counties with the highest percentages of registered voters who lack DMV-issued identification are also among the ten counties in South Carolina that have the highest percentage of voting-age persons who are non-white.

The absolute number of minority citizens whose exercise of the franchise could be adversely affected by the proposed requirements runs into the tens of thousands. According to the state's statistics, there are 81,938 minority citizens who are already registered to vote and who lack DMV-issued identification.

These data showing significant racial disparities in the proposed photo identification requirement are of course as available to the state as they are to the Attorney General. However, both in the state's initial submission and in the subsequent communications between us during the course of our review, the state has failed entirely to address the disparity between the proportions of white and non-white registered voters who lack DMV-issued identification.

In sum, however analyzed, the state's data demonstrate that non-white voters are both significantly burdened by section 5 of Act R54 in absolute terms, and also disproportionately unlikely to possess the most common types of photo identification among the forms of identification that would be necessary for in-person voting under the proposed law.

Act R54 includes an exemption to the photo identification requirement if "the elector suffers from a reasonable impediment that prevents the elector from obtaining a photograph identification." The Act provides that this exemption is to be applied by the individual county boards of registration and elections, but does not provide a definition of "reasonable impediment" or guidance regarding how this standard should be interpreted or applied. On August 16, 2011, the state attorney general issued an opinion that provides some limited guidance on this provision, but no additional guidelines have been made available. You have further informed us that the state attorney general's opinion will not be supplemented to provide additional clarity, and no other state entity plans to issue any further guidance on applying the "reasonable impediment" exemption. Given the ambiguity of the Act's "reasonable impediment" exemption and the uncertainty as to how it may be applied, we cannot conclude that this provision will mitigate the law's discriminatory effects. To the contrary, the exemption's vagueness raises the possibility that it will be applied differently from county to county, and possibly from polling place to polling place, and thus risks exacerbating rather than mitigating the retrogressive effect of the new requirements on minority voters.

Section 4 of Act R54 requires the State Election Commission to implement a system in order to issue new free photographic voter registration cards, to be used for voting purposes only. This new system has the potential to mitigate the discriminatory effect described above as regards the existing forms of DMV-issued identification. However, the procedures submitted by the state purporting to set forth the specifications of the system and planned distribution of the photo voter registration cards were described to us as being not final and subject to change. In addition, section 4 provides that the new cards "may be used for voting purposes only," but the state's current requirements, in light of the Attorney General's objection to section 5 of Act R54, would not permit this new registration card to be used as an allowable form of ID for voting.

Section 7 of Act R54 requires the State Election Commission to undertake a number of training, public education, and outreach activities regarding the new photo identification requirements and other provisions of the Act. In the course of our review, the state has provided various drafts of educational material it believes may be effective, but has not developed any final training or educational materials. And section 8 of Act R54, in conjunction with section 7 of the Act, requires the State Election Commission to contact registered voters who lack the requisite identification to inform them of the manner in which they can obtain the necessary identification. The state has provided significantly conflicting information regarding how it will ascertain which voters will be targeted by this program, and has not provided details regarding this proposed process, which is not yet final.

Because the proposed procedures to implement sections 4, 7, and 8 are not yet final, and because these changes are related to the proposed photographic identification requirement in section 5 of Act R54, the Attorney General will make no determination with regard to sections 4, 7, and 8 of the Act. See 28 C.F.R. 51.22(b), 51.35.

We recognize the possibility that efforts by the state, including efforts made pursuant to sections 4, 7, and 8 of Act R54, if applied comprehensively throughout the state, could potentially mitigate Act R54's discriminatory effects. Of course, if the state adopts finalized measures that substantially address the racial disparities described above, the state should not hesitate to resubmit section 5 of Act R54 for further review under Section 5 of the Voting Rights Act. 28 C.F.R. 51.45.

As the state may be aware, the Attorney General interposed an objection in 1994 to a voter photo identification law in Louisiana that would have required first-time voters to show a driver's license or other photo identification at the polls, on the ground that this requirement would have had a retrogressive effect at that time on Louisiana's minority voters. In 1997, Louisiana submitted a modified version of its voter identification requirement that included measures designed to substantially address this retrogressive effect, and the Attorney General interposed no objection to this revised procedure.

Until South Carolina succeeds in substantially addressing the racial disparities described above, however, the state cannot meet its burden of proving that, when compared to the benchmark standard, the voter identification requirements proposed in section 5 of Act R54 will not have a retrogressive effect. Because we conclude that the state has failed to meet its burden

of demonstrating that section 5 of Act R54 will not have a retrogressive effect, we do not make any determination as to whether the state has established that the proposed changes to its voter identification requirements were adopted with no discriminatory purpose.

The state made its initial submission to the Attorney General on June 30, 2011. Almost six months later, and on the 55th day of the 60-day administrative review period following your response to our written request for additional information, the state forwarded an undated letter from the state DMV director that purports to disagree with the data previously provided to us by the State Election Commission regarding the number of registered voters in the state who lack DMV-issued identification. We followed up with you immediately by telephone, but the state offered no additional supporting documentation. Moreover, the state did not provide any data whatsoever refuting the fact, demonstrated by the state's earlier data, that minority registered voters are about 20% more likely than white registered voters to lack DMV-issued identification. The state instead advised that it had nothing further to add to assist in our analysis. The absence of any supporting documentation to accompany this new letter, including racial data and methodology, reinforces our conclusion that the state has not met its burden of proving that the requirements of section 5 of Act R54 comply with the Voting Rights Act. In this regard, I note that our regulations permit the state to request that the Attorney General reconsider this objection. 28 C.F.R. 51.45. Any request for reconsideration should be in written form and should contain all relevant information or legal argument. We also reiterate our willingness to continue our discussions regarding efforts the state may take to address the racial gap that presently exists among photo identification holders in the state.

Under Section 5 of the Voting Rights Act you have the right to seek a declaratory judgment from the United States District Court for the District of Columbia that the proposed changes neither have the purpose nor will have the effect of denying or abridging the right to vote on account of race, color, or membership in a language minority group. 28 C.F.R. 51.44. However, until the objection is withdrawn or a judgment from the United States District Court for the District of Columbia is obtained, the submitted change continues to be legally unenforceable. *Clark* v. *Roemer*, 500 U.S. 646 (1991); 28 C.F.R. 51.10. To enable us to meet our responsibility to enforce the Voting Rights Act, please inform us of the action that South Carolina plans to take concerning this matter. If you have any questions, you should contact Robert S. Berman (202-514-8690), a deputy chief of the Voting Section.

                                Sincerely,

                                Thomas E. Perez
                                Assistant Attorney General