# Exhibit D

**IN THE UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF COLUMBIA**

------------------------------------------------------------------------)
                                                                        )
STATE OF SOUTH CAROLINA                                                 )
                                                                        )
      *Plaintiff*,                       )   CIVIL ACTION NO:
                                                                        )
         v.                 )   1:12-CV-203-CKK-BMK-JDB
                                                                        )
THE UNITED STATES OF AMERICA                                            ) (Three Judge Court)
And ERIC H. HOLDER, JR. in his                                          )
Official capacity as Attorney General                                   )
Of the United States,                                                   )
                                                                        )
      *Defendants*,                      )
                                                                        )
      And                               )
                                                                        )
JAMES DUBOIS, *et al.,*                                                 )
                                                                        )
      *Defendant-Interveners.*          )
                                                                        )
------------------------------------------------------------------------)

**SUPPLEMENTAL DECLARATION OF THEODORE S. ARRINGTON, PH.D.**

1.      The purpose of this supplemental declaration is to present my analysis of transcripts of

depositions, and transcripts of audio recordings of Senate Judiciary Sub-Committee hearings,

Judiciary Committee and Senate Floor debates that were not available to me as of the deadline

for submission of my initial declaration on 19 June 2012. There is nothing in these materials that

causes me to change my opinion that the photo ID law (R54) was enacted with the purpose or

intent to discriminate against Minority voters. This additional evidence reinforces some points in

that initial declaration and presents some new information.

2.      I now have studied additional depositions from legislators who supported the photo ID

law: Lt. Governor Glenn McConnell; Senator George F. "Chip" Campsen III, the chair of the

sub-committee of the Judiciary Committee that passed the photo ID law;[1] and Senator John M.

Knotts, who was also on the Judiciary committee during the photo ID debate.

3.      I also have studied the deposition of a staff member of supporters of the photo ID law:

Mr. Wesley Donehue, with the Senate Republican Caucus. In addition, I have studied deposi-

tions from four individuals with in-depth knowledge of the application of election law and pro-

cedures in South Carolina: Ms. Marci Andino, Executive Director of the State Election Commis-

sion (SEC); Joseph Debney, Director of the Charleston County Election Commission; Ms. Mari-

lyn Bowers, a member of the South Carolina State Election Commission (SEC); and Dr. Patricia

Calkins, who has extensive experience as a precinct election official and is now chair of the York

County Democratic Party.

---

[1] I rely on both Sen. Campsen's 18 June as well as his 18 July deposition.  His 18 June deposi-
tion was not available to me in time to incorporate into my initial 19 June declaration.

4.      The transcripts of audio recordings of the Senate floor debate, Senate Judiciary Commit-
tee and the sub-committees that held hearings and considered the photo ID bills in the 2009-10
and 2011-12 legislative sessions are not complete. And I have no records of the House hearings.
I rely on two recently produced sets of transcripts from the Senate produced by Intervenors and
South Carolina.

**Nature of the Registration Certificate**

5.      Paragraphs 80 and 91 of my initial declaration point out that a potential impersonator at
the polls would have to be of approximately the same age as the voter he or she is impersonating
because the voter's date of birth is given in the poll book. Now that I have physically examined a
voter registration certificate, I can testify that it also has this date as well as the race and sex of
the voter. So all of this information would have to match the potential impersonator as well. At
one time the registration certificate also contained the voter's hair and eye color, height, and
weight (Bowers, p. 29). So the state has in recent years moved away from having specific infor-
mation to identify voters on the registration certificate.

**Impersonation Fraud and Public Confidence**

6.      From the evidence presented in my initial declaration and the additional evidence that I
have now reviewed, I conclude that both the claim of preventing impersonation vote fraud and
the claim of increasing public confidence in the election process are pretextual. There is simply
no credible evidence of impersonation vote fraud in South Carolina, and the Legislators who
were proponents of the law knew that at the time of enactment. Furthermore, they had no evi-
dence of a lack of confidence in the election process, and did not attempt to find such evidence,

2

although surveys showing the high level of public confidence in the South Carolina election process were available from the SEC. Thus, one must look elsewhere for the basis of their decision. This basis is found in partisan pressure to take an action that they knew would have a disproportionate negative impact on Minority voters.

7.      Senator Campsen testified that he knew of no evidence of impersonation voter fraud in South Carolina (pp. 30, 64, 93, 114-115). When asked about the testimony about voter fraud of Rusty DePass and Gay Suber at the sub-committee hearings and his failure to follow up on their claims, he dismissed their allegations, testifying that they are "older gentlemen, they are talking about things that happened many years ago" (p. 301). Senator Campsen understands that many of the stories about voter fraud involve registration fraud, sometimes facilitated with the complicity of election officials; he understands that the photo ID law would not detect these actions (pp. 283-90, 302). Still, he alleges that even registration fraud would be deterred by the photo ID law (pp. 288-89). Regardless, he claims that such evidence is not necessary given the opinion of the Supreme Court in *Crawford v. Marion County Election Bd.*, 553 U.S. 181 (2008) (Campsen, p. 66). He testified that the purpose of the bill is to increase confidence in the election process, not necessarily to prevent impersonation fraud (pp. 64, 103-04). Yet he did not know of any study of voter confidence in the election process, and did not inquire whether the SEC (South Carolina Election Commission) might have such a study (p. 181). He claims that local election officials and the SEC would be the experts on impersonation fraud and a lack of public confidence in the process, but admits that he knew that SCARE (the association of South Carolina election officials) was at first neutral and then opposed to the photo ID law (pp. 159-60) and that the SEC was uncommitted.

8.      Senator Knotts testified that he knows of no examples of impersonation fraud, or counter-feit registration certificates, or stolen certificates in South Carolina (pp. 17-18). His understand-ing of voter impersonation is accurate and worth quoting: "No sir, it's [impersonating a voter] not like robbing a bank, you know, you get something out of the bank, the only thing you get to do [if you impersonate a voter] is vote for the best of the two or least of the two evils, so it's not like you get rewarded for going and voting. . . You've got to really want to be elected to go out here and get people to go to jail – I just don't believe, with all the crime opportunities out there, that voter fraud is the top of the list to go out there and commit a crime, you know. These people that vote are usually good, honest, hard working, decent people that want to be a part of the pro-cess and make government work; they're not a bunch of criminals out there trying to – I mean, if they were going to get something at the polls and walk away with something it would be a dif-ferent story, I guess, but I've never – I've never encountered it" (pp. 54-55).

9.      Mr. Donehue has no knowledge of impersonation fraud in South Carolina (p. 108), in-cluding no knowledge of any kind of fraud involving college students (p. 55). In testifying about his message to Twitter on allegedly fraudulent voting by college students, he admits that he may have been wrong about residency and the ability of students to vote under the new law (pp. 128-29). Mr. Donehue testifies that although he is a specialist in public opinion polling, he was not asked to, and did not do, any polling on impersonation voter fraud or confidence in the election process (pp. 135-36). He was not aware of any polling on public confidence by the SEC or any-one else (p. 136).

10.     Mr. Debney has never encountered impersonation election fraud (p. 46). For him, elec-tion security means making sure the voting machines are accurate, and training on ballot security

deals mainly with the machines, nothing on impersonation fraud (pp. 44-5). He looked into the post-enactment charge that 953 deceased individuals had their votes cast in recent South Carolina elections and found that none of those listed from Charleston county were valid examples of impersonation fraud (p. 132). Likewise, Dr. Calkins has never encountered impersonation fraud. (p. 42).  She outlines what one would have to do to impersonate a voter and how difficult it would be (pp. 22-23, 43-46). Her analysis of the lack of incentive to impersonate versus the potential penalty (pp. 48-49) is similar to that outlined by Senator Knotts (above) and given in my initial declaration (at ¶ 28).

11.     Ms. Bowers provides the only example of alleged impersonation voter fraud in her long experience in election administration. An unknown women told Ms. Bowers that she gave her mother her own registration certificate and asked her mother to go vote with it. Ms. Bowers did not follow up on this admission, does not know who this woman was, and has no idea whether the woman or her mother voted in that election (pp. 20, 24-25, 38-39). Ms. Bowers had previously explained that "most fraud is committed through mail ballots" (pp. 80-3). Nevertheless, she cites her one example of possible impersonation fraud, as a reason that the law is needed (p. 97).

**Troubling Problems with Implementation**

12.     There is no common understanding, no standard, no agreement on how to implement the photo ID law. Neither the legislative proponents of the photo ID law, their staff, or county or state level election administrators have any consistent idea of how to interpret the key phrases in the legislation: "reasonable impediment," "valid and current," and "shall find that the provisional ballot is valid." Nor do they know what kinds of military ID are appropriate for voting under the photo ID law. Nor do they know how the affidavit and provisional ballot procedures for those

who do not have a photo ID will be handled. This confusion is troubling because it would allow local election officials boundless discretion to interpret the new law in a discriminatory fashion, which Federal courts have determined to be a problem in South Carolina in the past (see my initial declaration ¶ 83-6).

13.     Senator Campsen's position on the meaning of "reasonable impediment" (pp. 143-146), adds to the confusion over the law evident in the other depositions. He cites the "reasonable man standard" meaning that the term has to be interpreted in terms of what election officials think is reasonable, not what the voter may think is reasonable. He testified that the county EC (election commission, board of canvassers, etc.) would have some discretion with guidance from the South Carolina State Election Commission (SEC). The deposition of Ms. Andino, Executive Director of the SEC, cited in my initial declaration, indicates that the SEC has little authority to control and direct the county ECs much less the poll managers even when the SEC understands the standard.

14.     Like other witnesses, Senator Knotts cannot clearly define "reasonable impediment." He testified, however, that the person who has no photo ID when they come to vote and completes the affidavit and votes a provisional ballot would have to appear at the county EC office in order to have their vote counted (pp. 39-40). But after an objection from counsel for South Carolina and pressed to explain this extraordinary effort that would be required of voters who lack a photo ID, he says he is unsure about the issue (p. 40). He appears to not be concerned or attentive to the photo ID issue as he stated, it is not his "bag" (p. 13).

15.     Mr. Debney's testimony suggests confusion among county level election officials about the photo ID law. He testified that he does not know what "reasonable impediment" means and

would refer a voter who wanted to know to a lawyer or to the legislators who wrote the law (pp. 82-83). He has no understanding of when a county board will have grounds to believe that an affidavit is false, and has no plans to provide notaries in each polling place or to provide form affidavits (pp. 83-84). Similarly, Dr. Calkins also testifies that she has no idea how to interpret reasonable impediment (pp. 77-78).

16.      There is also some question about how to interpret military ID and the term current and valid when deciding what ID could be used to vote. Senator Knotts, for example, testified that military ID as specified in the law means only the ID of active duty members of the military, not dependents' or contractors' ID (p. 50-51). Mr. Debney testified that he does not know anything about military ID, whether they have expiration dates, what they look like, what kinds would be acceptable under the photo ID law, or whether they contain the current address of the voter (pp. 137-38). He does not know how to interpret "current and valid" in the photo ID law either (p. 138). Like Mr. Debney, Dr. Calkins does not know what a military ID looks like or who has one, nor does she know what "current and valid" means under the photo ID law (pp. 90-91).

17.      There are uncertainties in the handling of provisional ballots and affidavits. Mr. Debney testified that there is no appeal from a poll manager who refuses to allow a voter to use a provisional ballot (p. 53). The EC decides to count or not count the provisional ballot on the basis of evidence on the envelope, not generally on testimony (pp. 38-39). According to him the EC has total discretion to count or not count a provisional ballot (pp. 40, 84-85). Ms. Bowers also notes that the county ECs still have some independent authority: ". . . the county boards do have a certain level of ability to do things, as long as they are within the law, their way, but over the past few years particularly, the state has tried to make more policies in things and provide those to the

counties so that things are done more uniformly in the 46 counties instead of being done differently" (pp. 87). Notice the word "provide" in her testimony, not "require."

18.     Ms. Bowers notes that the county EC searches the registration records and if the voter's registration is found, the provisional ballot is counted. If the registration cannot be found, it is not counted (p. 36). It is not clear from this practice how the provisional ballots of those who lack photo ID would be treated. She testified that the person who votes a provisional ballot because he or she does not have a valid ID under the benchmark law has to go to the county EC office at or before the canvass to present an ID in order for the vote to be counted, (pp. 33-34, 91-92).

19.     These deponents' testimony also highlights problems that could arise in implementing the affidavit provisions for those voters who lack a photo ID. For example, Senator Campsen testified that affidavits for those without a photo ID would have to be notarized. He testified that the legislative delegations have control over authorizing notaries, they could have all the poll managers become notaries if that were needed, and legislative delegation meetings can be held any time (pp. 149-50, see S.C. Code §§ 26-1-20 and 26-1-25). It would not be as simple as he makes it sound. The South Carolina provisions for notaries (see S.C. Code § 26-1-95) also provides that prospective notaries must file in the office of the Secretary of State, be enrolled by the County Clerk, pay a fee, and obtain an official seal. It is unclear how a notary would be able to notarize the signature of a person who has no photo ID. Notaries who falsely attest to a signature are liable to legal penalties.

20.     South Carolina law seems to require that an affidavit be notarized: "An affidavit is a voluntary *ex parte* statement reduced to writing and sworn to or affirmed before some person legally

authorized to administer an oath or affirmation." *State v. McKnight*, 352 S.E.2d 471, 472-3 (S.C. 1987). But Chris Whitmire, Director of Public Information and Training for the SEC, testified that providing notaries in the polling places has never been given serious consideration (deposition 8 June 2012, p. 164).

21.     As an example of how even long settled law can be misinterpreted at the county level in South Carolina, Mr. Debney testified that a person must show a photo ID when they register to vote in a county EC office. And, if they register by mail, he testified that they need to show a photo ID when they vote the first time (pp. 22-23, 127). This appears to be an incorrect statement of federal law. According to The Help America Vote Act, 42 U.S.C. § 15483(b) (first-time registrants by mail must present "a current and valid photo identification" or "a copy of a current utility bill, bank statement, government check, paycheck, or other government document that shows the name and address of the voter."). Nor is having a photo ID a registration requirement under South Carolina law (See S.C. Code § 7-5-120).

22.     The lack of control by the SEC over county officials is illustrated by the fact that 82 county EC officials are not certified as required by law (Andino deposition, p. 292). This brings into question the ability of the SEC to provide uniform implementation of the photo ID law and the possibility of racial discrimination in its application (see my initial declaration ¶¶ 83-6).

**The Legislative Process Was Irregular and Excluded
Effective Participation by Minority Legislators**

23.     I have identified two aspects of the legislative process for the photo ID law that were ir-

regular in the sense of the *Arlington Heights* criteria. The strong norm and tradition of the Senate

is consensus rather than strict majority rule as in the House. (See Lt. Governor McConnell's dis-

cussion of Senate rules at pp. 219-33, 239-45, 274, & 286-90; Campsen, pp. 50-51; and Donehue,

p.124.) Under Senate Rule 33B (see Appendix A), however, the Chair of the Senate Rules

Committee backed by a majority of that committee can choose to move a bill by special order by

majority vote, allowing it to be brought to the floor for debate if a simple majority of the Sena-

tors present and voting wish to consider it. Without the extraordinary use of this rule, it requires

a two-thirds vote of the Senate to bring a bill to the floor for debate and possible passage, also

under Rule 33. As the rules are set up, the Senate cannot use this procedure with very many bills.

(Lt. Governor McConnell discusses the rule at pp. 286-88.) In 2010, Rule 33B was used to bring

the photo ID bill to the floor after the proponents of the bill had once failed to gain the necessary

two-thirds vote, while in 2011 the Rule was used after they twice failed to gain a two-thirds vote.

This parliamentary maneuver was controversial, and objected to by some Senators. Perhaps this

is because the move is rare. But Lt. Governor McConnell testifies that it is not unusual, and that

some Senators just don't know the rules (p. 287). Senator Knotts agrees (pp.41-43). But this rule

certainly is a violation of Senate norms of consensus and therefore irregular.

24.     The second irregularity is the way in which the conference committee was conducted in

2010. The purpose of a conference committee is to work out differences between the two houses

on legislation when both houses have passed different versions of the same bill. Conference

committees consist of three Senators and three Representatives. A meeting was scheduled in

2010 to work out a compromise on the photo ID bills, and the House representatives presented their position. The Senators were scheduled to present the Senate side and start the negotiations later that day. But while the Senators were present on the floor of the Senate debating the budget conference report, two of the three House representatives (both White Republicans) signed a conference report, terminated discussions, and essentially ended negotiations on their terms (See transcripts provided by South Carolina, for Senate floor debate on 15 June 2010, Bates SC_00161879-82). Lt Governor McConnell says the House was "playing difficult" (p. 294). Senator Knotts also complains about how the House leadership played the inter-chamber game with less willingness to compromise than when he was there: "We've got a new breed in the House" (pp. 61-62). While Senator Campsen testifies that negotiations could have continued (pp. 309-312), the fact is that the two White Republican Senators then also signed the conference report proffered by the House representatives and that conference report went to the full House and the full Senate. Without an actual count of the number of times conferees ended a conference without actually conferring, one cannot tell whether the practice is rare. Clearly, it is irregular, since it violates the entire purpose of having a conference, and shows a lack of respect for the other chamber, which is a legislative norm in any bicameral legislature.

25.     Conference committee members Senator Malloy and Representative Mitchell (both Black Democrats) did not agree to the conference report, which reflected almost totally the position of the House (Senate floor debate on 15 June 2010, SC_00161898). It was debated at length in the Senate. The bill was filibustered during the short legislative session in June that is supposed to be devoted mostly the budget and considering the Governor's vetoes. Several Black senators indicated that they now regretted agreeing to the compromise worked out in Lt. Governor (then Senator) McConnell's office, since the conference contained the photo ID provisions they opposed

and contained none of the early voting and other provisions they favored (see Senator Scott's remarks on the floor of the Senate on 15 June 2010, SC_00161919-21 and SC_00162327).

26.     Senator Hutto, a White Democrat, led the filibuster to kill the conference report on the photo ID bill in 2010. The filibuster included ample evidence that both White and Black Democrats were opposed to a photo ID requirement for voting. They were not just objecting to the absence of a generous early voting provision in the conference report as Senator Campsen testified (pp. 307-08). For examples of their specific objection to the photo ID requirement see transcript of Senate floor debate on 15-16 June 2010 ( SC_00161961, SC_00162094, SC_00162341-2, and SC_00162409).

27.     During the filibuster various attempts were made to bring the conference report to a vote, but these efforts failed, in part because several Republican Senators refused to vote to make Senator Hutto "sit down." As Senator Knotts makes clear, this was because of the traditions of the Senate, not because these Republicans opposed the photo ID law. These Republican Senators would later find party activists strongly critical of their action. (See, for example, Senator Knotts' deposition, pp. 33-35.) Eventually the time set for adjournment *sine die* arrived and the photo ID bill died for lack of Senate action.

28.     These irregularities had the effect of excluding Black representatives from meaningful participation in the process. In both legislative sessions the Speaker and majority caucus in the House were in the position to ignore the Black representatives (Donehue, p. 124). That is, the House version of the photo ID bill simply reflected the position of the Speaker and the majority caucus. Minority Senators (in both partisan and racial senses) worked with the White Republican senators to provide at least some provisions in the bill that they could support, given that the Re-

publicans had the votes to pass a photo ID bill without them. But, in both sessions the conference committee stripped out the provisions favored by Black Senators, leaving only the provisions opposed by Black Senators and Representatives. In 2010 the minority Senators (Black and White Democrats) successfully filibustered the conference committee report because it came to the Senate at the end of the session in June. In the 2011 session, however, attempts to filibuster were not successful, and the conference committee report passed the Senate without the support of any Black or White Democrats (see Table 4 of my initial declaration).

29.     It is important to understand why, during the 2010 legislative session, Black Senators worked with Republicans on a consensus photo ID bill they opposed and would ultimate vote against. The Senate has unlimited debate rules, and this controversial bill did not seem to be going anywhere in 2010. The opponents of a photo ID requirement had prepared over 1,000 amendments to present, effectively filibustering the bill. The leadership of the Senate wished to have an opportunity to curb what were seen as excesses in the House version of the bill, but that would require the Senate to pass their version so that the two houses could go to conference. Otherwise the senators who favored a photo ID requirement for voting would have no choice but to concur in the bill passed by the House that would not include early voting. This would be the worst possible outcome for Black and White Democratic senators as well. Lt. Governor McConnell (then Senate President *pro tempore*) convened a meeting of senators in his office to work out a compromise that would be acceptable to almost all Senators for the purpose of passing something so they could go to conference. This meeting included Black and White Democratic Senators. This agreement included a photo ID requirement for voting and an early voting provision.

13

30.     The McConnell-brokered agreement of the Black and White Democratic Senators, how-ever, does not indicate their acceptance of a photo ID requirement for voting, as the debate on the conference report indicates. It should be seen, rather, in terms of the collegiality traditions of the Senate. Minority senators can go along with a compromise to move the process along, and still object to the final bill. Failure to reciprocate in this fashion would effectively exclude them from later negotiations on this and other pieces of legislation. It is this compromise worked out in Senator McConnell's office that is proudly referred to by various Senators as a near unani-mous Senate agreement on a photo ID requirement. That is not an accurate characterization. The Senate Journal for 3 February 2010 gives the vote on the third reading of the Senate version of the photo ID bill (which included early voting) and lists six Black Democrats (Senators Jackson, Anderson, Ford, Nicholson, Matthews, and Williams) and one White Democrat (Senator Leventis) as voting against passage. Certainly the inclusion of early voting in the photo ID bill was favored in the Senate unanimously, or nearly so, in both sessions. But all Black and White Democrats voted against the Senate versions of the bill even though they contained early voting provisions in the 2011-12 Session (see my initial declaration Table 4).

31.     Without an actual count of the number of times these maneuvers are used in each legisla-tive session, I can't know whether the use of the "special order by majority vote" and conferees ending a conference without actually conferring are rare. Clearly, both of these actions are irreg-ular because they contravene established norms of behavior, even if they are within the rules. Irregular does not have to mean unique.

14

**What the Legislators Knew or Should Have Known**

32.     The transcripts and depositions I have studied since the submission of my initial declaration provide a better view of the hearings and debates in the Senate and therefore a better understanding of what the legislature knew or should have known when the photo ID law was passed.

33.     During consideration of the photo ID bill during the 2009-10 legislative session, Senator Campsen (and all other senators and at least those representatives on the House Judiciary Committee) received what I have called the "Andino report" in my initial declaration. This report presented statistics on the number of registered voters who lack a DMV-issued ID by race, sex, age, and county, and the numbers are very similar to those in Dr. Charles Stewart's initial declaration in this case. Senator Campsen was surprised by the large number of non-matches, and concerned about the larger impact the requirement for a photo ID would have on Minority voters (pp. 95-102). He testified that any legislator should be concerned about this racial difference, and this is part of the reason for the various provisions in the bill to mitigate the impact (pp. 100-01). But in the second deposition (pp. 251-52) he says the number one reason for the educational requirements is to facilitate preclearance by the courts, and protecting the ability of people to vote is secondary. He also understood that the NAACP, ACLU, League of Women Voters, and a group representing disabled people were all opposed to the law, and that no organization, except the Republican Party, spoke in favor of the law in the hearings (pp. 160-61). Other witnesses representing organized publics either testified exclusively about early voting, or opposed the photo ID law.

34.     Ms. Andino confirms in her second deposition that SCARE was opposed to a photo ID requirement (pp. 290, 305). The decision of the SEC to take no position on photo ID, but to favor

early voting was made by her and her staff and then communicated to the members of the SEC, and "everyone was in agreement" (p. 282).

35.     Ms. Bowers, who now testifies that she personally favors a photo ID requirement for voting, has a somewhat different explanation for the opposition of SCARE to a photo ID requirement. She testifies: "The issue with having to go to the voter registration office to get your photo ID is what we as county officials based our opposition to photo ID on. Years back everybody that registered to vote came to our office to register to vote. We saw every person face-to-face. That's the only way you could register. Then came registration by mail and then came registering at outreach agencies such as DMV. And pretty much if ten percent of people register in person at a voter registration office, I would be surprised. So the average voter we never see. So they need to have an option of going to DMV or somewhere else to get that photo ID, not having to come to our office because we don't see them" (p. 48, also see pp. 66 and 112). In other words, election officials are unwilling to see registration return to the narrow confines of the past where registration required a visit downtown at the courthouse during banker's hours. Whatever the basis of opposition by SCARE, the position of the organization has consistently been that photo ID is not necessary to prevent impersonation fraud or to provide public confidence in the election process. Neither SCARE not the SEC has indicated a need for this legislation. Ms. Bowers does not know what documents the DMV requires for issuing ID, and she implies, erroneously, that the DMV would be able to offer transportation to voters to obtain picture ID for voting (pp. 52-53).

36.     In explaining the position of SCARE, which was well known to the legislators, it is important to note that as Mr. Debney testifies (pp. 112, 122-23), SCARE avoids taking an official position on pending legislation. However, they do provide a list of priorities for the General As-

sembly (p. 15). That listing has never included photo ID, but has listed early voting according to Mr. Debney's testimony. He notes that some members of SCARE are opposed to photo ID, which seems to be opposition beyond just reluctance to issue photo ID at EC offices as Ms. Bowers testimony could be read to indicate.

37.     The Senate hearings in a sub-committee of the Senate Judiciary Committee are them-selves an indication of what the legislators knew or should have known, since hearings are in-tended for the purpose of informing the legislators and forming a reliable record for judicial in-terpretation of statutes. In the 2009 senate hearings the testifiers in favor of a photo ID require-ment for voting were William "Rusty" Depass, former Chair of the SEC; Butch Bowers, also a former Chair of the SEC and former attorney in the Department of Justice in the second Bush Administration; Gay Suber, former Executive Director of the South Carolina Republican Party; Katon Dawson, Chair of the S.C. Republican Party; and Jim Duffy, State Ballot Security Chair for the S.C. Republican Party. As indicated above, Senator Campsen dismissed the testimony of Mr. Depass and Mr. Suber with regard to examples of impersonation voter fraud. No others of-fered any evidence of impersonation fraud or a lack of public confidence in the integrity of the election process. Marci Andino testified at the hearing that she was not aware of anyone imper-sonating a voter (see pp. 38-43 of the Intervener's transcript of the Senate Judiciary sub-committee hearing of 26 March 2009). In other words, the testimony in favor of a photo ID re-quirement came from Republican Party officials or former officials or activists.

38.     Opposed to a photo ID requirement were Mr. Brett Bursey, director of the South Carolina Progressive Network, who introduced the study of voter fraud completed by the Brennan Center showing that impersonation fraud is extremely rare. Also testifying against the photo ID re-

quirement were Mr. Kent Lesesne, representing the Association of Counties; Dr. John Ruoff, a social scientist who frequently testifies in voting rights cases; Ms. Carol Fowler, Chair of the South Carolina Democratic Party; Ms. Susan Breslin, Chair of the Charleston County Democratic Party; Ms. Joanne Daly, League of Women Voters; Mr. George Temple, Executive Chair of the Charleston County Democratic Party; Ms. Alice Henderson, Vice President of the League of Women Voters; Mr. John Kringle, Executive Director of Common Cause of South Carolina; and Senator Laveness Rose, who is not on the Judiciary Committee. Testimony against a photo ID requirement came from Democratic Party representatives and activists, and groups that might be seen as allied with Democrats. But opposition also came from groups that have responsibility for administering the proposed law and the League, a non-partisan group that deals directly with voters.

39.     Almost all of the testimony favored early voting. Ms. Daly requested that hearings be held on the bill in Charleston, Columbia, and Florence so the public could speak. This request came from the South Carolina League of Women Voters, American Association of Retired Persons, American Civil Liberties Union, Common Cause of South Carolina, the South Carolina Appleseed Legal Justice Center, and the South Carolina Chapter of the National Association for the Advancement of Colored People. Senator Campsen rejected the idea of having hearings around the state (pp. 19-25 of the Intervener's transcript of the Senate Judiciary sub-committee hearing of 26 March 2009). The number and limited range of testimony in the 2009 hearing indicates that there was very little public interest in the issue of photo ID at that time.

40.     Marilyn Bowers, speaking for SCARE, supported early voting. She also pointed out the large number of voters who do not have DMW-issued ID, especially among the elderly. She

suggests other forms of ID that might be acceptable, such as student ID, which would make the requirements consistent with HAVA (see her testimony at pp. 1-8 of the sub-committee hearing of 2 April 2009 from the Intervener's transcript). She has changed her mind about some opinions expressed at the hearing as reflected in her deposition. But she still advocates early voting and the acceptance of college or university ID for voting.

41.     In the subsequent session of the General Assembly, the same groups provided representatives who gave similar testimony with the addition of Ms. Victoria Middleton, of the American Civil Liberties Union testifying against photo ID. Dr. Patricia Calkins also testified against a photo ID requirement. This time, however, Marci Andino, Executive Director of the SEC, testified that county election officials are opposed to the photo ID requirement (pp. 28-32 of the Interveners transcript of the sub-committee hearing on 6 January 2011), and Kent Lesesne from the Association of Counties testified that other county officials are also opposed (p. 28 of the same hearing transcript). In this hearing the representative of the League of Women Voters, Carol Cato, formally presented what I have called the "Andino report" in detail giving the figures on the registered voters who do not have a DMV-issued ID by race showing the greater impact of the law on Minorities (p. 25-8 of the same hearing transcript). That report had previously been given to all members of the Senate and at least to the members of the House Judiciary Committee. The arguments against the photo ID requirement in the sub-committees are the same as the ones that were presented in the meeting of the full Judiciary Committee, and on the floor of the Senate in both sessions.

42.     What I have called the Andino report, showing that Minority voters were more likely than White voters to lack a DMV-issued ID was fully debated in the General Assembly in 2009

19

and 2010 (see Floor debates in the Senate on 27January 2010, at SC_00161118 and SC_00161500-7). The members of the legislature were fully aware of the disparate impact the law would have on Minority voters.

43.     Legislators were not only aware of the disparity between the proportion of Whites and Minority voters who had a DMV-issued ID, but they were also aware of the socio-economic (SES) differences that increase the extent to which minority voters without a photo ID will be adversely affected by the law. And they were also aware that these Minority voters are the predominant base of the Democratic Party vote in South Carolina.  Lt. Governor McConnell testifies that Minorities generally support Democrats and that Senators are well aware of this fact (p. 67). Senator Campsen testifies that he is aware that Minority voters are more likely to have lower SES, and that Minority voters in South Carolina do not support Republicans. He cites election returns as a reason that other Senators and Representatives also understand these political and social realities (pp. 55-6).

44.     Senator Knotts was concerned about the large number of people who do not have a DMV-issued ID, but thinks the educational arrangements in the law will take care of it, even though he knows there are no transportation arrangements for those without a photo ID (pp. 75-81).

45.     The proponents of a photo ID requirement for voting understood that the manipulation of the kinds of ID that are permitted for voting can be used to make it more difficult for some kinds of people to vote. An illustration of this is in the exclusion of student ID from the list of acceptable ID for voting. Senator Campsen explained the rejection of student ID to vote in terms of residency concerns (p. 124-25). This is also the reason given by Senator Knotts (p. 48). Yet they

admit that since the photo ID law provides that the address on the ID is not determinative of domicile, this argument makes no sense. Ms. Bowers testifies that the reason there is opposition to allowing student ID for voting is that "a lot of people don't like the fact of students voting in their college towns. A lot of people just have a problem with that" (p. 32). Here the reference ("a lot of people") seems to refer to individuals like Mr. Wesley Donehue. It is a clear statement that part of the purpose of restricting the kinds of ID that can be used to vote could be to suppress the vote of some kinds of voters. While most student voters might be White, there are several historically Black colleges and universities in South Carolina.

46.     Senator Campsen testified that he and Senator McConnell (now Lt. Governor) believed that the more strict provisions in the House version of the bill, which became law, made it less likely to be precleared than would the Senate preferred version (pp. 136-37, 175). That is, according to Campsen, part of the reason that he and Senator McConnell voted to non-concur to the House passed version before the conference.

**Partisan Pressure, not Public Opinion Drove Legislation**

47.     The proponents of the photo ID law argue that they were responding to public pressure to increase confidence in the election process by ending impersonation voter fraud. They had no evidence of impersonation fraud, and indeed, abundant evidence that it did not exist as a public problem in South Carolina as demonstrated in my analysis above and in my initial declaration. Nor did they have any evidence of a lack of public confidence in the election process, or public concern with the lack of a photo ID requirement for voting. If they had sought out such evidence, they would have discovered the SEC studies that showed high levels of voter confidence in the

process. But they would also have discovered great dissatisfaction with the long lines experienced throughout the state in 2008 and to a lesser extent in 2010.

48.   Almost everyone (even several of the Republicans) who testified in the Senate hearings was in favor of early voting as a realistic solution to two problems. First, the public was "voting with their feet" by misusing the in-person absentee process as a way to vote early. This involved falsifying an oath, since South Carolina does not have no-excuse absentee. The lines around the county EC offices during the in-person absentee period were quite long in 2008 and this was mentioned frequently in the hearings and debates. Second, early voting would also relieve the long lines at the polling places on election day. South Carolina had the longest average wait time for voting in the country, as much as six hours (see my initial declaration ¶ 70). The need for relief from these problems was repeated made clear by the SEC, SCARE, testimony at the hearings, and other sources. Yet the General Assembly chose to pass legislation creating a photo ID requirement, but no early voting. It is even probable that the photo ID law would make the lines even longer (Calkins deposition, pp. 31, 57, 73-4), although Mr. Debney was unwilling to use his expertise to estimate the impact the law might have on the length of lines (pp. 78-79). Dr. Calkins indicates that while she has never heard a complaint about the kinds of ID required to vote, she hears frequently about long lines (p. 49).

49.   The source of pressure for a photo ID law came from a specific faction, not from the general public. As I indicated in my initial declaration, this source of specific pressure was from Republican Party organization members and conservative activists, who would have no reason to be concerned about the possible disenfranchisement of Minority voters who are strongly associated with the Democratic Party. As the Federal courts have found repeatedly, in South Carolina party

means race, they cannot be disentangled (see ¶¶ 58-59 of my initial declaration). Given that voters do not register to vote by party in South Carolina, race becomes a proxy for partisanship.

50.    Senator Campsen testifies about the pressure from conservative and party activists to adopt only a "clean bill," meaning the House version of the bill (pp. 119-20, 130-3, 137-38, 213-14). It was a "PR campaign from the House side" (p. 132). His testimony makes clear that the pressure came from party activists, not from the general public. This pressure was so intense that he and other Republicans in the Senate were not able to stand against their partisan colleagues in the House to successfully advocate for early voting which the Senate unanimously favored and which the general public clearly wanted. The pressure was great enough to cause the Senate to abandon the norm of collegiality and consensus decision-making.

51.    Mr. Donehue presents the most detailed picture of the relationship between the party and the General Assembly, because that relationship is his responsibility. He testifies that pressure was greater on this issue than on any other in the two sessions that considered photo ID (pp. 34-35). The sources of this pressure are clear from his testimony, but discernment of the nature of the pressure requires a careful reading of his entire testimony on this subject (pp. 28-35, 63, 82-83, 89-91, 124-27). Mr. Donehue's role is to facilitate communication between the Senate Republican Caucus and the Republican Party organization and activists. He sometimes seemed to confuse party opinion with general public opinion. But when examined closely in terms of where he says the pressure was coming from and who was applying that pressure, it is clear that this was not generalized public concern with the issue, but party activists and organization members forcefully expressing their views. Emails to and from Representative Clemmons cited in my initial declaration and remarks in the Journal from then Senator McConnell (see appendix C of my

initial declaration) confirm the Republican Party organization, party activists, and conservative or Tea Party activists as the source. This does not mean, of course, that the more public part of the pressure campaign would not result in some public awareness of the issue.

52.     Mr. Donehue also reflected the attitude of many party activists and organizational members in his assumption, without any evidence, of voter fraud by students discussed in my initial declaration (¶ 51), and in his discussion of the role of predominantly Black churches in South Carolina politics. Mr. Donehue testified that Democrats (he cites Senator Yancey McGill, a White Democrat) make donations to majority or historically Black churches in their district in an attempt to get the votes of the church members (pp. 114-120).

**Conclusions**

53.     These additional depositions and transcripts of hearings and committee meetings are consistent with the evidence I presented in my initial declaration. The *Arlington Heights* criteria suggest that irregular procedures are evidence of intent to discriminate. In the 2009-10 legislative session the House conference committee representatives short-circuited the conference process leaving the Senate representatives with no choice but to acquiesce to the House version of the photo ID bill. In both the 2009-10 and 2011-12 legislative sessions the advocates of the photo ID bill resorted to the use of the Rules Committee "special order by majority vote" to avoid the usual rules for setting the agenda of the Senate. Both of these actions are unusual deviations from the normal procedures in the General Assembly, even if neither deviation is unique or contrary to the rules.

54.     All of the deponents testified that they have no evidence of impersonation voter fraud in South Carolina except Ms. Bowers, who presents a single case of uncertain origin and outcome. The deponents sometimes refer to stories or rumors, but have to admit there is no concrete or credible evidence of such fraud that could be relied on. Nor do they claim to have any evidence of a lack of confidence in the election process by the South Carolina public. Nor do they claim to have any evidence that voters generally are concerned about impersonation voter fraud. Nor did they seek out any evidence of public confidence or fears of voter impersonation fraud. The key word is "evidence." Therefore, the claim that they have a basis for using a photo ID law to increase confidence in the South Carolina election process is pretextual. In terms of the *Arlington Heights* standards, this evidence indicates that the justifications for the photo ID law are pretextual, and we have to search for another basis for the passage of the law. That basis is the pressure applied by Republican Party activists, who would have no concern about the greater impact of the law on minority voters.

55.     These depositions and the transcripts of Senate Judiciary Committee and sub-committee hearings and meetings confirm my description of the process by which the photo ID law was adopted. There is now a clearer picture of the testimony in the sub-committee hearings. That testimony was overwhelmingly negative on the photo ID requirement, while strongly positive on early voting. The testimony in favor of a photo ID requirement for voting comes almost exclusively from Republican Party organization activists. The House was unresponsive to the Black representatives, while the Senate negotiated with the minority (racial and political) only within the absolute requirement of a photo ID law. That is, the Republicans in the Senate, like their counterparts in the House, were unresponsive to arguments that the law was not needed and that it would disproportionately affect Minority voters, and that provisions to ameliorate the impact

on Minorities would not be sufficient. Some of the important provisions favored by Black sena-

tors were, in turn, stripped from the final bill by the conference committee.

56.     These depositions illustrate the confusion over the meaning of the reasonable impediment

clause in the law. Deponents not only disagree with each other over the meaning, but seem to

disagree with themselves in some instances. Nor is the situation any clearer with regard to the

process by which the reasonable impediment provision would be implemented. Several propo-

nents of the photo ID law have an unjustified faith in the ability of the SEC to standardize the

application of the law at the polls and the canvass of the votes. This faith is unjustified, as indi-

cated in my initial declaration, because the SEC has no authority over the county ECs, much less

the individual poll managers. Local election officials in South Carolina are somewhat independ-

ent of the SEC. The problems with the reasonable impediment clause were barely discussed in

the hearings or committee meetings on the bill. They present the troubling opportunity for bias in

the application of the law.

57.     There is also direct confirmation that the impetus for the photo ID law came from the Re-

publican Party and party activists and not from a generalized concern in the public or a lack of

public confidence in the election process. This is clear in all the depositions, but especially in the

deposition of Mr. Donehue. It is also clear from the hearings in which mainly Republican Party

officials testified in favor of the law. This pressure, rather than an evidence-based need to pre-

vent voter impersonation fraud or increase public confidence in the election process, is the impe-

tus for passage of the photo ID law.

58.     This evidence confirms my opinion that the photo ID law was adopted with the intent or purpose to discriminate against Minority voters using the criteria from the *Arlington Heights* decision.

I declare under penalty of perjury, that the foregoing is true and correct.

Executed this _____28th_____ day of _____July_____ 2012.

_Theodore S. Arrington_

_____

Theodore S. Arrington, Ph.D.

Appendix A
Senate Rule 33

**Rule 33.**

**Motion Period and Special Orders**

**A.**

During the motion period, any motion pertaining to the business of the Senate may be made. When a motion is made to set a Bill for Special Order, time shall be given to one proponent and one opponent to speak on the motion. Such remarks shall be limited in the discretion of the presiding officer provided, that no Bill may be taken up during the motion period for the purpose of debating the merits of the Bill or for the purpose of giving the Bill a reading. Procedural motions shall be decided without debate; provided, that procedural motions which present a main question, such as a motion to recall, are subject to not more than ten minutes of debate, five (5) minutes for and five (5) minutes against. The motion period shall not exceed thirty (30) minutes unless extended by a majority of Senators present and voting. At any time, the President *Pro Tempore*, after consultation with the Majority Leader and Minority Leader, may make any motion pertaining to the business of the Senate and such motion shall be adopted upon approval of three-fourths (3/4) of the membership of the Senate.

**B.**

During the motion period, all motions to set a Bill or Resolution for Special Order on a subsequent legislative day shall be in order irrespective of whether the Bill or Resolution was given a reading on the legislative day the motion is made. Said motions shall be considered in the priority established by the recognition of the Senators making said motions. Each such motion shall relate to a separate Bill or Resolution. Except for explanatory remarks authorized in subsection A, such motions shall be determined without debate and by two-thirds (2/3) of the Senators present and voting. Provided, that, when authorized in writing by a majority of the members of the Rules Committee and delivered to the desk, a motion to set a bill for Special Order, shall require a vote of a majority of the members present and voting. At no time may the Special Order calendar have more than one Bill which is set for Special Order by a motion authorized by the Rules Committee. During the motion period, no Bill or Resolution can be made a Special Order ahead of Bills or Resolutions which have already been placed in the status of Adjourned Debate.

If a Bill is set for Special Order on a date and/or time certain, such Bill is not subject to consideration at the specified date and/or time unless the Senate reaches that order of business or unless by unanimous consent the Senate has agreed that consideration of the Bill will be to the exclusion of all other matters pending before the Senate at such time.

If a Bill or Resolution is set for Special Order for second reading and subsequently receives such reading, the Bill or Resolution shall remain on Special Order unless otherwise agreed to by three-fifths (3/5) of the Senators present and voting.

Last Updated: 1/15/09 11:07 AM