# Exhibit F

# Supplemental Expert Report on South Carolina's

# Voter Identification Law, Act R54

Orville Vernon Burton

Director, Clemson CyberInstitute

Professor of History and Computer Science

Clemson University

July 26, 2012

# Table of Contents

Page

I.      Introduction...........................................................................................................1

II.     Key Pieces of New Evidence Demonstrating South Carolina's Discriminatory
        Purpose..................................................................................................................2

        A.      The legislative histories of the Voter ID Law and its predecessor bill were
                characterized by procedural irregularities that suggest the presence of a
                discriminatory purpose...............................................................................2

                1.      Passing a Voter ID Law was an Urgent, Top Priority for the South
                        Carolina Legislature......................................................................2

                2.      The Legislature Used a Rare Senate Procedure Twice to Advance
                        Voter ID Legislation .....................................................................4

                3.      The House Circulated the Voter ID Bill's Conference Report
                        without Full Approval....................................................................5

                4.      Certain Senators Cast Rare Votes for Cloture to End Debate in
                        2011.................................................................................................6

        B.      The Legislature repeatedly rejected a provision to expand early voting, an
                amendment that would have ameliorated the Law's disparate impact. .................7

        C.      Key decision-makers were made aware of the disparate impact the Voter
                ID Law would have on African American voters, but made no effort to
                address this issue; instead, they showed an utter disregard for minority
                viewpoint and impact. ..............................................................................11

        D.      No bill sponsors, election administrators or members of the testifying
                public could identify any verified instances of voter fraud that would be
                addressed by the Voter ID law, strongly suggesting that the stated reason
                for the Law is a pretext. ...........................................................................14

III.    Corrections to My Initial Report.......................................................................16

        A.      Correction to Page 24..............................................................................16

        B.      Clarification to Pages 23 and 35 .............................................................16

        C.      Correction to Page 35..............................................................................17

I.    INTRODUCTION

In this case, Defendant-Intervenors asked me to form an opinion about whether the South Carolina legislature passed Act R54 (as H.3003), the government-issued photo identification law that Governor Nikki Haley signed into law in 2011 (hereinafter, the "Voter ID Law," "ID Law," or the "Law"), with a racially discriminatory intent.

As detailed in my initial report, my review of the *Arlington Heights* factors[1] and other relevant evidence led me to conclude that the Law was motivated by a discriminatory purpose. Specifically, the goal of suppressing the African American vote played a substantial role in the legislature's introduction of the Voter ID Law's predecessor legislation in 2009 (the "Voter ID Bill" or "H. 3418") immediately following President Obama's inauguration. That same discriminatory motivation was present in 2011 when the South Carolina Legislature introduced — and ultimately passed — the current Voter ID Law.

Since submitting my initial report to the Plaintiffs on June 19, 2012, additional facts have become available to me. Specifically, South Carolina has located key pieces of legislative history — including recordings from the Senate Floor debate on the 2009 Voter ID Bill and from several Senate subcommittee and committee hearings, which have since been transcribed — that shed light on the *Arlington Heights* factors that I have considered. In addition, South Carolina

---

[1] According to the United States Supreme Court, when evaluating whether a governmental act was motivated by a discriminatory purpose, one should consider a range of facts and circumstances. *See Village of Arlington Heights v. Metropolitan Housing Corp.*, 429 U.S. 252, 265-68 (1977). In the *Arlington Heights* case, the Court identified four factors as relevant circumstantial evidence of discriminatory intent: (1) the historical background of the decision; (2) the views expressed by decision-makers on related issues; (3) the specific sequence of events leading to the decision (including whether there has been a departure from the usual practices or procedures of the decision-making body); and (4) the anticipated or foreseen effect of the change on minority citizens. *Id.* These factors are consistent with the inquiries a historian makes to draw conclusions about discriminatory purpose, and that I discuss fully in my initial report.

has produced hundreds of new documents and counsel for Defendant-Intervenors have taken several additional depositions in the past weeks.

Together, this additional evidence provides further support for my ultimate conclusion: The South Carolina legislature was motivated by an unlawful, racially discriminatory purpose in passing the Voter ID Law.  Below, I highlight some of the most compelling pieces of new evidence, and explain how these facts advance my conclusions.  Then, in Part III, *supra*, I provide some minor clarification of my initial report.

**II.   KEY PIECES OF NEW EVIDENCE DEMONSTRATING SOUTH CAROLINA'S DISCRIMINATORY PURPOSE**

**A.   The legislative histories of the Voter ID Law and its predecessor bill were characterized by procedural irregularities that suggest the presence of a discriminatory purpose.**

New evidence emphasizes some of the procedural irregularities in the passage of the Voter ID Law noted in my initial report, such as the urgency and importance that the South Carolina legislature attributed to passing a photo ID Law and the Senate's reliance upon a rare form of the Special Order motion.  Further discovery has unearthed some additional procedural irregularities during debate over the Voter ID Bill, including the legislature's decision to circulate the H. 3418 conference committee report *before* the Senate had an opportunity to give meaningful input and all committee members had the opportunity to provide signatures.  I briefly discuss these irregularities below.

**1.   *Passing a Voter ID Law was an Urgent, Top Priority for the South Carolina Legislature***

As I explained in my initial report, a Republican majority pushed forward the Voter ID Law with an unusual urgency following the 2008 presidential election — a fact that new

evidence repeatedly reinforces.[2]  During Senate Floor debates in 2010, for example, Senator

Floyd Nicholson, an African American Democrat from Greenwood, voiced his suspicions about

the bill's timing and motivation.[3]  As Senator Nicholson explained, prior to the 2008 presidential

election, lawmakers focused on ways to address voter apathy.  After the 2008 presidential

election, however, South Carolina lawmakers suddenly claimed a pressing need to combat voter

fraud — despite a total lack of credible evidence of such fraud presented on the Senate Floor.

Senator Nicholson further stated:

> I know a lot of my constituents back home when I told them what we're going to
> be debating this week, they were saying with the tough economic times, a lot of
> people out of work, we need to be creating jobs and everything, do you think this
> is an issue that we need to spend a lot of time on right now, especially after the
> 2008 election we had the highest turnout of voters to ever occur in the state.  Why
> is this coming about at this time?[4]

Recent deposition testimony further illustrates this point.  Wesley Donehue, a well-

known political consultant who worked for the Senate Republican Caucus when the legislature

considered voter ID legislation, testified that "this issue was pushed greater than any other issue

that we have worked on" in roughly ten years of working with Republican lawmakers in the

State.[5]  Lt. Governor Glenn McConnell, an influential white Republican from Charleston who

served as President Pro Tempore of the Senate when the Law was enacted, testified that he could

not recall another bill being introduced in the House and sent to the Senate as quickly as the

Voter ID Law.[6]

---

[2] *See also* Burton Initial Report at 36 (June 19, 2012).
[3] SC_00161127-30 (South Carolina Senate Session, Jan. 27, 2010).
[4] SC_00161129- 30 (South Carolina Senate Session, Jan. 27, 2010).
[5] Donehue 6/20/12 Tr. at 34:25 – 35:1; *see also id*. at 29:4 – 29:19 (explaining that Republican party activists deemed voter ID their number one issue).
[6] McConnell 7/17/12 Tr. at 238-39.

### 2. The Legislature Used a Rare Senate Procedure Twice to Advance Voter ID Legislation

In my initial report, I also discussed the unusual use of a Special Order motion — a procedure for bringing a contested bill to the floor for prompt consideration — by a majority vote instead of the supermajority that is typically required.[7]  In 2010, and again in 2011, the Law twice failed to achieve supermajority approval to proceed from the full Senate.  In both years, the legislation was ultimately advanced through a rarer, alternative method for achieving a Special Order motion — obtaining special approval from the Rules Committee and then pushing the law forward through a majority vote on the Senate floor.

Senator John Land, a white Democrat from Clarendon, and Senator Larry Martin, a white Republican from Pickens and chair of the Rules Committee in 2010, engaged in a heated discussion about this procedural irregularity in 2010.[8]  Senator Land referred to it as a "little trick move" and stated the "president pro tempore [Glenn McConnell] even said this is a little used approach, we don't normally do this."[9]  He added:

> But we had to [use this device] this time because we needed to disenfranchise 178,000 people as quickly as we can because last November they turned out in droves and droves and droves and voted, and we got to stop that.[10]

Notably, on the Senate floor in 2010, then-Senator McConnell justified this rare procedural move by the importance of adding the early voting days that were part of the original bills.[11]  But in 2011, after again twice failing to achieve a Special Order motion by supermajority vote to advance the voter ID Law, Senate leadership used the same tactic.[12]

---

[7] See also Burton Initial Report at 28, 35-36.
[8] SC_00161283-86 (South Carolina Senate Session, Jan. 27, 2010).
[9] Id. at SC_00161284.
[10] Id. at SC_00161284-85.
[11] SC_00160993 (South Carolina Senate Session, Jan. 26, 2010).
[12] See McConnell 7/17/12 Tr. at 288:4-289:2.

Deposition testimony further underscores the irregularity of this Special Order procedural move.[13]  After thirty years in the General Assembly, Lt. Governor McConnell could not name another instance when the legislature pushed a Special Order motion through the Rules Committee after failing to achieve supermajority approval on the Senate Floor.[14]  Senator John "Jake" Knotts, a white Republican from Lexington and the current chair of the Rules Committee, claimed that "some chairmen" use this device "a lot," without providing any concrete instances of that being so.[15]  Senator Knotts also acknowledged that he had not relied upon this procedural tactic since chairing the Rules Committee.[16]

### 3.   The House Circulated the Voter ID Bill's Conference Report without Full Approval

New evidence shows that House members of the Voter ID Bill conference committee circulated a final conference committee report before the Senate had any meaningful opportunity for input.[17]  The House excluded some committee members from the deliberative process, such as Senator Gerald Malloy, an African American Democrat from Darlington.  According to Senator Malloy, "The Senate really never spoke…on this bill" because "the House signed the conference report before the next meeting started," referring to the afternoon meeting where Senate members of the committee were scheduled to voice their concerns about the Voter ID Bill.[18]  As a result, Malloy refused to sign the committee report.  This unusual occurrence jarred many members of the Senate; when Senator George "Chip" Campsen, a white Republican from

---

[13] *Id*. at 363:11-12.
[14] *Id.* at 245:17 – 247:11.
[15] Knotts 7/17/12 Tr. at 43:22 – 44:10.
[16] *Id.*
[17] As explained on page 24 of my initial report, House representatives to the 2010 conference committee on H. 3418 included Alan Clemmons and Harry Cato, both white Republicans, and Harold Mitchell, an African American Democrat.  Senate conference members were Chip Campsen, a white Republican, Gerald Malloy, an African American Democrat, and Phillip Shoopman, a white Republican. (Representative Clemmons and Senator Campsen were also members of the conference committee that considered H. 3003 one year later.)
[18] SC_00161881-84 (South Carolina Senate Session, June 15, 2010).

Charleston, reported that Malloy had not signed the report, the President Pro Tempore (then-Senator McConnell) had to call the Senate to order twice, apparently due to chaos in the chamber.[19]

Moreover, Representative Harold Mitchell, an African American Democrat from Spartanburg, did not sign the conference committee report either.  Thus, the conference report was finalized with just two signatories from the Senate and two from the House — and meaning that the only signatories were the white Republicans on the committee, and that neither of the African American Democrats signed the report.[20]  Subsequently, on the Senate floor, Senator Malloy explained, "I realize [that two signatories from each chamber is all] that is required; but again, I submit that it was there only for political purposes to assist one of the members from the conference committee….The way that this one was done is not right.  It's just not right."[21] Senator Land added, "I've been [in the Senate] a long time.  I can't remember – I can't remember another time where a conference committee report came back with one signature missing."[22]

### 4.    Certain Senators Cast Rare Votes for Cloture to End Debate in 2011

There is additional evidence of the extreme party pressure to pass the Voter ID Law.  In February 2011, certain members of the Senate voted for cloture to end a Senate filibuster and push forward the legislation, even though the Senate typically refuses to vote for cloture as a matter of principle.[23]  In general, the use of cloture in the South Carolina Senate is rare.[24]  In the

---

[19] *Id*. at SC_00161821.
[20] *Id*. at SC_00161897-98.
[21] *Id*. at SC_00161898.
[22] *Id*. at SC_00162101.
[23] *See* Legislative History for H. 3003, 119th Reg. Sess. (S.C. 2011-2012), *available at* http://www.scstatehouse.gov/sess119_2011-2012/sj11/20110216.htm; McConnell 6/14/12 Tr. at 106-07.
[24] Cleary 6/14/12 Tr. at 186; Burton Initial Report at 21.

words of Lt. Governor McConnell, "my experience [in the Senate] is that people don't vote cloture on you and you don't vote it on them."[25]

## B.   The Legislature repeatedly rejected a provision to expand early voting, an amendment that would have ameliorated the Law's disparate impact.

As I discussed in my initial report, lawmakers repeatedly and systemically rejected proposed amendments, including provisions allowing for early voting, that would have ameliorated the Law's disparate burden on minorities.[26]  The decision to pass the Voter ID Law without early voting provisions is particularly significant.  Early voting enjoyed widespread support from voters, local election officials, many lawmakers, and the State Election Commission ("SEC"), and the record shows no legitimate, nondiscriminatory reason behind the House Republican's strong opposition to this reform.

Before the start of the 2009-2010 legislative session, there was strong interest in passing early voting legislation in both the Senate and the House.[27]  Moreover, Senate hearing testimony and floor debate underscored significant support for early voting as a way to boost turnout.[28]  For instance, before the Senate Judiciary Sub-Committee in 2009, Director of the Charleston County Election Commission, Joseph Debney, testified that the phone lines in his office were flooded by calls from voters during the 2008 presidential election — both Democrats and Republicans — who supported early voting.[29]  At another 2009 Senate committee hearing, Marilyn Bowers, speaking on behalf of the South Carolina Association of Registration and Election Officials (and

---

[25] McConnell 6/14/12 Tr. at 107.

[26] *See also* Burton Initial Report at 37.

[27] *See* Andino 7/17/12 Tr. at 286 (recalling several General Assembly members calling to express interest in early voting after 2008 election).

[28] *See, e.g.*, SC_00160855-68 (South Carolina Senate Judiciary Subcommittee, April 16, 2009); SC_00160995-96, SC00161002 (South Carolina Senate Session, Jan. 26, 2010); SC_00161823 (South Carolina Senate Session, June 15, 2010); SC_00162479-81 (South Carolina Senate Session, June 16, 2010).

[29] S&CTR_000017 (Debney's testimony to Senate Judiciary Sub-Committee on March 26, 2009); *see also* Debney 7/16/12 Tr. at 110-11.

now of SEC), described the many benefits of early voting, including shorter lines at the polls, greater flexibility for voters and decreased administrative costs, and voiced election officials' support for that reform.[30]  Indeed, in 2010, Senator Campsen, a proponent of voter ID legislation, argued on the Senate floor that early voting and voter ID are connected, because early voting would increase voter participation while voter ID would make elections more secure.[31]

That support persisted in the Senate into the next legislative session.  As Senator John Scott, an African American Democrat from Richmond, explained on the Senate floor in February 2011 (just before the Senate passed an amended Voting ID Law with early voting provisions), early voting is necessary "to expand this process so that those who live long distances, who want to participate in this process . . . can vote early.  I think that's a good thing for this bill."[32] Senator McConnell argued that early voting allows "the average South Carolinian that works an opportunity to go in on a Saturday . . . and vote without having to take time off from their job, or stand in a line."[33]

Nevertheless, the Republican majority in the Senate ultimately yielded to political pressures and passed the so-called "clean" version of the Voter ID Law in 2011 — without expanding early voting.[34]  Notably, a majority of the Senate passed the Law even though several key Senators, including then-Senator McConnell and Senator Campsen, expressed concern that the Department of Justice would not pre-clear the Law without an early voting provision.[35]

---

[30] *See* Bowers 7/19/12 Tr. at 40-42.
[31] SC_00161125-26 (South Carolina Senate Session Jan. 27, 2010).
[32] Tr. of Senate Floor Debate, Feb. 24, 2011, at 103.
[33] *Id*. at 131.
[34] Tr. of Senate Floor Debate, May 6, 2011, at 127, 143-44 (McConnell discussing intense "media campaign" directed toward Senate Republicans to vote for the "clean" voter ID bill).
[35] *See, e.g.*, Campsen 6/18/12 Tr. 137:12 – 137:25; McConnell 6/14/12 Tr. at 192:9 – 192:11; 204:10 – 204:15.

In fact, Republican Party pressure to pass "clean" voter ID legislation was so strong it strained relationships between lawmakers.  During the conference committee debate in 2011, Representative Alan Clemmons, a white Republican from Horry County who was the Law's lead sponsor, assured then-Senator McConnell that the House would handle early voting under a separate bill.[36]  From that exchange, McConnell assumed that the House would send an early voting bill to the Senate soon thereafter, but the House never did.[37]  At his deposition, McConnell could not recall another time in his legislative career when the House promised to send a bill to the Senate but failed to do so.[38]  According to McConnell, "the House had set up a political front that it wanted a clean voter ID bill.  And internally, what [was] going on over there, I can't be sure."[39]

New evidence, however, underscores a widespread perception, particularly salient among House Republicans, that early voting facilitates the African American vote and, thus, helps the Democratic Party — suggesting that Republican lawmakers actually objected to early voting because they did not want to promote early voting by minority voters.  Patricia Calkins, who has extensive experience working at the polls in York County, testified that African American churches used busses to transport voters to the polls to cast in-person, absentee votes in 2008.[40]  According to Wesley Donehue, this trend concerned members of the State's Republican Party, who worried that expanding early voting would "allow Democrats to do some things that

---

[36] McConnell 7/17/12 Dep. Tr. at 260.
[37] *Id.*
[38] *Id.*
[39] *Id.* at 262-63.
[40] Calkins 7/16/12 Tr. at 57-60 (discussing specific incidents in 2008 where Democratic Party worked with African American churches to bus voters to polls to vote early).

Democrats often get accused of doing and it would help them."[41]  Asked to define "some things,"

Donehue explained:

> I mean there are often movements within African American churches to — for absentee voting drives and to bus African Americans to the polls. And a lot of people believe that early voting would give the African American community a chance to do those things.  And I believe that because it's in writing.  I mean, that's just not a hidden belief here.  That's a very public belief here.[42]

> Older deposition testimony further confirms this "very public belief" among white

Republican lawmakers.  For instance:

- Senator Raymond Cleary identified specific counties where, in 2008, "there were buses provided by the minority community for absentee ballots, for early voting absentee ballots."[43]

- Representative Clemmons acknowledged "[t]he perception is that the Democrats do bussing a lot more so than do Republicans."[44]

- Representative Phillip Lowe recalled a discussion he had with one African American individual on this topic: "He told me they would go into a certain area over there, meaning a project-type area, and that he was assisting them in picking people up and bringing them over to vote.  So he was an African American. He was going to African American areas; but he was going to the projects, which would have included some white people, too, I'm sure."[45]

  Lowe also testified that "I just witnessed and was told by activists that they were driving to certain areas and picking up people and bringing them to the polls to vote.  After they voted, if they had the sticker on that said, I voted, that they could — that was their entrance into the tent where liquor and beer and chicken bog and all was available to them."[46]

---

[41] Donehue 6/20/12 Tr. at 115. As discussed in my initial report and re-affirmed by McConnell's recent deposition testimony, "most people [in the] Senate, both Democrat and Republican, know that the majority of minority voters vote Democrat."  McConnell 7/17/12 Tr. at 284.
[42] Donehue 6/20/12 Tr. at 115-16.
[43] Cleary 6/14/12 Tr. at 207.
[44] Clemmons 6/11/12 Tr. at 206:11-14; *see also* Burton Initial Report at 25 (describing email exchange during which Clemmons responds, in part, "[w]e thought that we saw a great deal of bussed liberals and fraudulent early votes in the 2008 election, but with these kinds of early voting provisions it has the potential to be even worse!").
[45] Lowe 6/13/12 Tr. at 126:21-127:3.
[46] *Id.* at 27:2-8.

**C.    Key decision-makers were made aware of the disparate impact the Voter ID Law would have on African American voters, but made no effort to address this issue; instead, they showed an utter disregard for minority viewpoint and impact.**

Lawmakers' awareness of the anticipated or reasonably foreseen disparate impact of voter ID measures on minority citizens is a key factor in determining discriminatory intent consistent with *Arlington Heights*.  In my initial report, I cited a recent study on South Carolina's so-called "Corridor of Shame," and appended my expert report in a 2003 Charleston County Council case where I detailed the persisting socioeconomic disparities between white and African American South Carolinians.  These materials support my opinion that, because of these well-documented socioeconomic disparities, the burdens of voter ID legislation would inevitably have a disproportionate impact on the minority electorate.[47]  Since submitting my initial report, I have received and read other expert witness reports in this litigation, specifically those of Drs. Andrew Martin, Theodore Arrington, and Charles Stewart III.  All three discuss the disparities in socioeconomic data for black and white South Carolinians, and Dr. Arrington touches on the social science literature concerning the relationship between socioeconomic indicators and political involvement.

As discussed in my initial report, the evidence overwhelmingly shows that lawmakers foresaw, or reasonably should have foreseen, the disparate and discriminatory effects of the Voter ID Law.  Therefore, they knew, or should have known, that they were making voting more difficult for African American citizens.  For example, the evidence demonstrates that the legislators' debate on voter ID overlapped with their debates on redistricting.  This is meaningful because legislators had before them documentation concerning the socioeconomic and political

---

[47] TOBY MOORE & SARA LAWRENCE, CREATING GREATER OPPORTUNITY IN SOUTH CAROLINA'S I-95 CORRIDOR: A HUMAN NEEDS ASSESSMENT 39  n. 170 (2009); *see also* Burton Initial Report at App'x B (Report of Dr. Orville Vernon Burton for *Moultrie v. Charleston County Council*, No. 9-01 562 11, October 5, 2001).

characteristics of various jurisdictions, state voter registration and turnout data disaggregated, and census data.  Furthermore, opponents of the Law repeatedly emphasized these socioeconomic disparities during legislative debate and hearings.[48]

The record provides additional evidence that lawmakers were acutely aware of the disparate racial impact of voter ID laws generally, and of South Carolina's proposed law particularly.  For instance, on the Senate floor in 2010, several opposing lawmakers gave impassioned speeches about the State's long history of discrimination against minority voters and their fear that photo ID was the most recent example of such discrimination.  Specifically, Senator Robert Ford, an African American Democrat from Charleston and a leader in the 1960s civil rights movement, spoke about racial disfranchisement in the South until the passage of the Voting Rights Act in 1965 and the State's general history of discrimination.[49]  He expressed concern that the Voter ID Bill would turn back the clock on African American voters.[50]  Senator Ralph Anderson, an African American Democrat from Greenville, warned, "[t]he legislation has potential of suppressing the African American votes, along with other minorities and the aged people within our community . . . [The] legislation helps to legalize intimidation of our people."[51]

Senator Michael Rose, a white Republican from Dorchester, and Senator Land discussed at length the data evidencing a disparate impact on minority voters.[52]  Land argued that the Law would impact a higher proportion of the African American community, thereby constituting "a greater disenfranchisement of the African American vote than the white vote."  Rose retorted that, because the white population is larger than the African American population, a larger

---

[48] *See, e.g.*, Burton Initial Report at 29, 32, 40.
[49] SC_00160985-89 (South Carolina Senate Session, Jan. 26, 2010).
[50] *Id.*
[51] SC_00161251 (South Carolina Senate Session, Jan. 27, 2010).
[52] *Id.* at SC_00161415-17.

number of white individuals would be affected.[53]  As their debate continued, Land asked, "So

you're conceding the fact that there is going to be an impact on them [referring to African

American voters] and it's going to be a disenfranchisement of their vote, and a watering down of

their vote or taking their vote away or causing them to do more to vote than the other folks,

right?"[54]  Rose responded, "Right," thereby ending that portion of the debate.[55]

The next day, Senator Joel Lourie, a white Democrat from Richland, presented the data

on the disproportionate impact the Law would have on minority voters on the Senate floor:

> And then I've heard today and other days that this is not targeted at minority
> voters, but yet the statistics will tell you that's exactly where it's targeted when 25
> percent of the registered voters in this state, the election committee list them as
> non-white.  That's how they say, white, non-white.  Twenty-five percent of the
> registered voters are non-white.  But yet close to 31 percent of the 178,000 are
> listed as non-white.  There you can see how it disproportionately affects minority
> voters.[56]

Following Senator Lourie's reference to this data, the President Pro Tempore ordered that the

data on ID ownership that was compiled by Senate staff and the SEC be distributed to all

Senators.[57]  Even the Law's main supporters, such as Senator Campsen, acknowledge that

information about the Law's disparate impact was well known.[58]

---

[53] *Id*.

[54] *Id*. at SC_00161417.

[55] *Id*.

[56] SC_00160172 (South Carolina Senate Session, Jan. 28, 2010).

[57] *See id*. at SC_00160184-86.

[58] *See* Campsen 6/18/12 Tr. at 97, 100 (recalling floor discussion on percentage of non-white persons
lacking ID) & 178-180 (recalling concerns from African-American lawmakers and statements that Law
would supress minority voting).  In addition, during floor debate, Campsen admitted to reviewing county-
by-county data of persons lacking identification. SC_00161168-70 (South Carolina Senate Session, Jan.
27, 2010).

### D. No bill sponsors, election administrators or members of the testifying public could identify any verified instances of voter fraud that would be addressed by the Voter ID law, strongly suggesting that the stated reason for the Law is a pretext.

There continues to be no evidence of actual impersonation fraud or any reasonable perceptions of widespread impersonation fraud, strongly suggesting that the stated reason for the Law is a pretext.

Indeed, Senate debate on the Voter ID Bill contains some vague allegations of impersonation fraud, but no credible accounts. For instance, one Senator described an election day when he traveled from precinct to precinct and witnessed one van traveling to various polling places, full of voters. He suspected fraud, but admitted that no charges were brought.[59] Of course, as another Senator explained, while there are vans that transport groups of people to different polling places, this provides no proof that the *same people* vote at multiple precincts.[60]

Similarly, during the April 16, 2009 Senate judiciary subcommittee hearing, Mr. Rusty DePass, former State Election Commission Chairman and a well-known Republican political figure who made national news after joking that an escaped gorilla was one of Michelle Obama's ancestors,[61] was one of the very few who testified in favor of photo ID. Mr. DePass claimed to know of "at least six or eight very, very old people who were still on the books who were still voting [but] were found not to exist." When pressed, however, he could not give any details of these alleged incidents, nor is there any evidence on the record to support Mr. DePass' claims.[62] Notably, at that same hearing, Kent Lesesne, an African American staff member from the South Carolina Association of Counties, opposed the Voter ID Bill because, "again, as you've heard

---

[59] SC_00160151-53, 55 (South Carolina Senate Session, Jan. 28, 2010).
[60] SC_00160203-4 (South Carolina Senate Session, Jan. 28, 2010).
[61] Helen Kennedy, *GOP Activist DePass Apologizes After Joking on Facebook that Gorilla is Related to Michelle Obama*, N.Y. DAILY NEWS, June 14, 2009, http://articles.nydailynews.com/2009-06-14/news/17925944_1_gop-activist-south-carolina-republicans-facebook.
[62] SC_00160848-50 (South Carolina Senate Judiciary Subcommittee, April 16, 2009).

from a number of the testimony, [local election officials who] actually are doing this simply

don't see the necessity for this and; in fact, any good that might come out of [the Bill] we believe

would be overset by the detriment in disenfranchising voters."[63]

And indeed, during the 2010 Senate floor debates, Senator Nicholson credibly recounted

his wife's experience working for the SEC for four years.  He explained that "there was never a

complaint [of] voter fraud," instead, there were problems with attempts to suppress the voting of

low-income and minority residents.[64]  Senator Matthews commented, "I can just tell you in the

testimony before the subcommittee, our own election commission said they have no record in

recent history of anybody showing up to vote that was not who they say they were."[65]

In short, as highlighted in my initial report and as repeatedly confirmed, there is no

evidence of impersonation fraud.[66]  In my original report, I explained that if the Voter ID Law

were a genuine attempt to combat potential voter fraud, it would apply to voting by mail, where

incidents of fraud actually have occurred.  But as Professor Martin reports—based on readily

available public data—whites were approximately twice as likely as blacks to vote by mail in

2004 and 2008.[67]  That the legislature chose not to impose a photo ID requirement on the method

of voting that poses a greater risk of fraud but that is disproportionately utilized by white voters

is further evidence of the Law's discriminatory purpose.

---

[63] *Id*. at SC_00160867-68.
[64] SC_00161357-58 (South Carolina Senate Session, Jan. 27, 2010).
[65] SC_00161302 (South Carolina Senate Session, Jan. 27, 2010).
[66] For new deposition testimony on this topic, *see* Campsen 6/18/12 Tr. at 65-66 (not aware of any credible allegations of voter impersonation in South Carolina); Debney 7/16/12 Tr. at 46 (never encountered instance of voter impersonation, including in years as Director of Charleston County Election Commission); Calkins 7/16/12 Tr. at 42-43 (never encountered instance of voter impersonation during many years as poll worker, nor has she heard of voter impersonation occurring anywhere else in South Carolina).
[67] Expert Report of Andrew D. Martin, Ph.D at 9 (June 19, 2012).

15

### III.    CORRECTIONS TO MY INITIAL REPORT

Below, I correct two minor mistakes from my initial report, and offer one clarification. None of these issues undercut or otherwise affect my ultimate conclusions.

### A.    Correction to Page 24

On page 24 of my initial report, I mistakenly identified Senator Knotts as the Chair of the Senate Rules Committee.  In fact, Knotts did not become Chair of the Senate Rules Committee until this year.[68]  On June 15, 2010, Senator Larry Martin was the Committee Chair.[69]

### B.    Clarification to Pages 23 and 35

As I note in my initial report, the Legislative Black Caucus staged a walk-out during consideration of H. 3418, because the Republicans would not allow serious discussion of Democrats' proposed amendments.  I wanted to clarify what occurred in response to the walk-out.  The House voted to quickly advance the Bill to a final vote, foreclosing any further amendments.  Representative G. Murrell Smith, a white Republican from Sumter and a co-sponsor of H. 3418, then made a motion to reconsider that vote (a "clinching" motion).[70]  This motion precluded the bill's opponents from later making a clinching motion themselves, and ultimately prevented the debate that such a motion would have entailed, had it been allowed before the full General Assembly. That this motion was made immediately after the walk-out of the Legislative Black Caucus—which was itself in protest of limited debate on amendments to the bill—showed a lack of respect for the minority position that was, in itself, unusual.

---

[68] Knotts 7/19/12 Tr. at 9:11 – 12.
[69] Martin 6/13/12 Tr. at 21:10 – 14.
[70] *See* Legislative History for H. 3418, 118th Reg. Sess. (S.C. 2009-2010), *available at* http://www.scstatehouse.gov/sess118_2009-2010/hj09/20090226.htm.

## C.    Correction to Page 35

On page 35 of my initial report, I stated that there have been five instances of a Special

Order motion achieved by a majority vote in the last decade. This statement was inaccurate:

Subsequent research shows that this procedural tactic was used three additional times after it was

last used to advance voter ID legislation; thus it has been used seven times in the last decade,

including the two times a majority-vote Special Order motion was used to advance voter ID

legislation.[71]  Notably, *before* this procedure was used to advance the 2009 Voter ID Bill and

then to advance the 2011 Voter ID Law, the tactic had only been used twice — once on April 17,

2008 concerning a bill to increase the cigarette tax, H. 3567, and once on February 3, 2005

concerning a medical malpractice bill, S. 83.

---

[71] Special Order motion through a majority vote have been achieved on the following dates (please note
the correction to the dates of Special Order motions on the Voter ID Bill and Voter ID Law that were
mistakenly reported as 2008 and 2010 on p. 35 of my initial report):
- May 12, 2011 on S. 1437 (concerning roll call voting)
- March 15, 2011 on H. 3375 (concerning tort reform)
- March 1, 2011 on S. 20 (concerning immigration)
- Feb. 10, 2011 on H. 3003 (the Voter ID Law)
- Jan. 26, 2010 on H. 3418 (the Voter ID Bill)
- April 17, 2008 on H. 3567 (concerning increasing cigarette taxes)
- Feb. 3, 2005 on S. 83 (concerning medical malpractice)

17

I declare under penalty of perjury that the report is true and correct, to the best of my knowledge.

Executed on this 26th day of July 2012

Orville Vernon Burton