UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| STATE OF SOUTH CAROLINA,<br><br>   *Plaintiff*,<br><br> v.<br><br>UNITED STATES OF AMERICA and ERIC H. HOLDER, JR., in his official capacity as Attorney General,<br><br>   *Defendants*,<br><br> and<br><br>JAMES DUBOSE, *et al.*,<br><br>   *Defendant-Intervenors*. | Case No. 1:12-cv-203 (CKK-BMK-JDB) |

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF SOUTH CAROLINA'S MOTION TO EXCLUDE THE TESTIMONY OF <u>THEODORE ARRINGTON AND ORVILLE BURTON</u>**

  The linchpin of admissible expert testimony is "scientific, technical, or other specialized knowledge" that will "help the trier of fact to understand" complex evidence. Fed. R. Evid. 702(a). The proffered testimony of Defendants' expert Theodore Arrington and Defendant-Intervenors' expert Orville Vernon Burton fails to meet this standard, and is inadmissible for several independent reasons.

  *First*, both Arrington and Burton were expressly retained in order to opine about whether the South Carolina General Assembly acted with a prohibited purpose when it enacted Act R54. But courts have repeatedly held that issues such as a party's intent, purpose, motivation, or state of mind are wholly off-limits for expert testimony. Determining intent or purpose is the core

province of the finder of fact, and judges and jurors are perfectly capable of making those determinations without expert assistance.

*Second*, Arrington and Burton also offer inadmissible testimony about ultimate legal issues and the application of law to fact. Both witnesses cite and purport to apply the standard for discriminatory intent set forth in *Village of Arlington Heights v. Metro. Hous. Corp.*, 429 U.S. 252 (1977), and both offer extensive discussions of the legislative history of Act R54. None of this is remotely appropriate expert testimony. Legal arguments must be made by lawyers in their briefs, not expert witnesses on the stand. The interpretation of legislative history and the application of law to fact are the exclusive province of the Court—and are well within the comprehension of the Court without the aid of expert assistance.

*Third*, it is well-established that an expert witness may not be used simply to summarize and regurgitate other facts and testimony in the record. Yet that is exactly what Arrington and Burton do. Large swaths of their reports consist of selective summaries of documents in the record and other witnesses' deposition testimony. All of this material can be presented through fact witnesses, and can be readily understood without specialized expertise. Moreover, Arrington's and Burton's summaries of out-of-court statements and newspaper articles are nothing more than conduits for otherwise-inadmissible hearsay.

*Fourth*, even if Arrington and Burton were addressing proper subjects of expert testimony, the methodology underlying their proffered testimony fails to meet the standard of "evidentiary reliability" set forth in Rule 702 and *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993). Indeed, neither Arrington nor Burton appears to use any methodology at all. Instead, they simply review and summarize a large body of material—speeches, legislative history, Facebook and Twitter posts, newspaper articles, press releases, and other materials—and

conclude that this all adds up to a discriminatory purpose. These subjective, *ad hoc* analyses cannot satisfy any plausible standard of reliable expert inquiry.

## ARGUMENT

I.  ARRINGTON AND BURTON EXCLUSIVELY ADDRESS MATTERS THAT ARE NOT APPROPRIATE SUBJECTS OF EXPERT TESTIMONY

### A.  Individuals' Intentions, Motivations, and States of Mind are Not Appropriate Subjects of Expert Testimony

To be admissible under Rule 702, expert testimony must, as a threshold matter, consist of "scientific, technical, or other specialized knowledge" that will "assist the trier of fact." Fed. R. Evid. 702. Applying this rule, courts have repeatedly held that "[i]nferences about the intent or motive of parties or others lie outside the bounds of expert testimony." *In re Rezulin Prods. Liab. Litig.*, 309 F. Supp. 2d 531, 547 (S.D.N.Y. 2004). Such testimony is purely subjective and has "no basis in any relevant body of knowledge or expertise." *Id.* at 546.

Whether a party acted with a proscribed intent, purpose, or motivation is thus not amenable to expert testimony because it concerns "lay matters" that the trier of fact "is capable of understanding and deciding without the expert's help." *Id.* (quoting *Andrews v. Metro. N. Commuter R.R. Co.*, 882 F.2d 705, 708 (2d Cir. 1989)); *see also Securities & Exch. Comm'n v. Johnson*, 525 F. Supp. 2d 70, 78-79 (D.D.C. 2007) (question of intent is "for the jury, rather than for an expert"); *Lippe v. Bairnco Corp.*, 288 B.R. 678, 688 (S.D.N.Y. 2003) (excluding expert testimony that the "real purpose" of certain transactions was to hide assets from creditors); *Highland Capital Mgmt. v. Schneider*, 379 F. Supp. 2d 461, 469 (S.D.N.Y. 2005) (experts may not offer opinions about whether the defendant was "likely aware" of certain facts or "concerned" about something). This Court has held in a recent Section 5 case that "experts can rarely, if ever, offer state of mind testimony," and that the government's expert "will not be

3

allowed to opine on the actual intent of the [state's] legislature." *See Texas v. United States*, No. 1:11-cv-1303, Trial Tr. at 7.

Dr. Arrington was retained by the United States to "determine whether the provisions of voting-related changes enacted by the South Carolina General Assembly … were <u>intentionally</u> drawn to minimize, cancel out, or reduce the ability of Minority (i.e., non-White) voters in South Carolina to participate equally in the political process and elect representatives of their choice." Arrington Rep. 1 (Ex. 1) (emphasis in original). Prof. Burton was similarly retained by Defendant-Intervenors to "form an opinion about whether Act R54 … was passed with a racially discriminatory intent." Burton Rep. 1 (Ex. 2). Given that both experts were expressly tasked with assessing the South Carolina legislature's intent, it is unsurprising that their reports are riddled with improper "musings as to [legislators'] motivations [that] would not be admissible if given by any witness—lay or expert." *Rezulin*, 309 F. Supp. 2d at 546.

Among many other such conclusions, Arrington opines that: the Republican majority "knew" the number of voters who did not have photo IDs (p.18-19); the Legislature "ignor[ed]" concerns raised by opponents of the bill (p. 23); minority legislators "may have been casting a strategic vote" (p. 24); Democrats "believed they would get something they wanted out of the conference report" (p. 27); proponents of the law had "little interest or concern" about the alleged burdens on minorities (p. 29); Republicans "feared" what would happen in the event of a compromise bill (p. 29); various individuals did not "know" the meaning of "reasonable impediment" (p. 41-42); voting by provisional ballot would be "embarrassing" and "stressful" (p.44); election officials "understand[ ]that there are no perfect elections" (p. 48); many voters "believe that photo ID is already required" (p.50); Republican Party activists and Tea Party groups "were the pressure" for the photo ID bill (p. 52); the Legislature "did not take the

4

concerns of Minorities into account" (p. 53); and, to sum up, "the photo ID law was enacted with the intent to discriminate against Minority citizens" (p. 54).

Prof. Burton's conclusions about various individuals' intent and motivation are equally impermissible. He opines that: South Carolina leaders have made a "deliberate attempt to polarize white voters" (p. 21); the introduction of certain legislation "indicate[s] the mindset of the lawmakers" (p. 21-22); the "subtext" of certain comments was a desire to make it more difficult for certain individuals to vote (p. 25); Republicans were "adamantly committed" to passing the bill quickly (p. 27); certain amendments were "not to the liking" of the bill's proponents (p. 30); the law was "motivated by a discriminatory purpose" (p. 35); the conference committee "turned a blind eye and deaf ear" to opponents of the bill (p. 38); the Legislature "anticipated" the effects of the law on minority voters (p. 38); lawmakers "were aware" of the presence of several predominantly African-American colleges in the state (p. 39); certain facts about the law were "evident to the Legislature" (p. 40); and "the motivations for introducing and passing the ID Law[] were different from those stated by the Law's supporters" (p. 47).

This proffered testimony about legislators' intentions and purposes—which is the precise reason why Arrington and Burton were retained, and which pervades both of their expert reports—is inadmissible, as it has "no basis in any relevant body of knowledge or expertise." *Rezulin*, 309 F. Supp. 2d at 546. And the materials on which Arrington and Burton rely in reaching their conclusions—speeches, e-mails, newspaper articles, legislative history, deposition transcripts, and postings on blogs, Twitter, and Facebook—can be readily understood by non-experts. This Court does not need expert assistance to review such documents and draw inferences about the relevant individuals' intent. *See City of Tuscaloosa v. Harcros Chems., Inc.*, 158 F.3d 548, 565 (11th Cir. 1998) (excluding expert's "characterizations of documentary

evidence" because "the trier of fact is entirely capable of determining whether or not to draw such conclusions without any technical assistance").

### B. Analysis of Legal Precedent and Legislative History is Not an Appropriate Subject of Expert Testimony

Interpretation and application of the governing legal standards are "matters of law for the court's determination," and are "inappropriate subjects for expert testimony." *Aguilar v. Int'l Longshoremen's Union*, 966 F.2d 443, 447 (9th Cir. 1992). District courts thus "prohibit experts from offering legal opinions because such testimony is not helpful to the trier of fact." *FedEx Ground Package System Inc. v. Applications Int'l Corp.*, 695 F. Supp. 2d 216, 221 (W.D. Pa. 2010). An expert whose "opinions result from nothing more than an application of law to the facts" does nothing to help the court "understand[] the evidence or [] resolv[e] any factual dispute," and such testimony must be excluded. *Id.* at 223; *see also In re Ocean Bank*, 481 F. Supp. 2d 892, 900 (N.D. Ill. 2007) (expert testimony that the defendant "complied with the letter and spirit of the law" was a "bare legal conclusion" and must be stricken); *Highland Capital Mgmt.*, 379 F. Supp. 2d at 470-72 (excluding testimony in which the expert merely "states his opinion concerning the law governing securities fraud and concludes that the conduct of certain defendants and non-parties violated that law").

That is precisely the case here. Dr. Arrington's report reads much like a legal brief. He discusses DOJ regulations and the *Arlington Heights* standard for assessing discriminatory intent (at 5-9), parses case law (at 29-31, 39, 43), analyzes the legislative history of the statute (at 18-29), and applies the legal standards to the facts of this case (at 52-54). Parroting the language of Section 5, he concludes (at 54) that the challenged law "was enacted with the intent to discriminate against Minority citizens and to retrogress by offering them less of an ability to participate in the political process and elect candidates of their choice than they have under the

benchmark statutes."  Burton similarly asserts that "my review of the *Arlington Heights* factors and other relevant evidence [leads] me to conclude that the Law was motivated by a discriminatory purpose."  Burton Supp. Rep. 1 (Ex. 3); *see also* Burton Rep. 1 ("Based on my evaluation of the *Arlington Heights* factors and other relevant criteria related to South Carolina's passage of Act R54 … I conclude that the Law was motivated by a discriminatory purpose").  None of this material consists of "scientific, technical, or other specialized knowledge" that will "assist the trier of fact."  Fed. R. Evid. 702.  Recitation of the governing law and application of law to fact is the province of lawyers and judges, not expert witnesses.

Prof. Burton also devotes an entire section of his report to "The Law's Legislative History."  Burton Rep. 22-38; *see also id.* at 15-18 (discussing public statements made by legislators); *id.* at 19-22 (discussing other "contemporaneous legislation").  He discusses a predecessor bill, *id.* 22-25, summarizes the debates and hearings, *id.* 25-34, and offers his "conclusions" about how to interpret this legislative history, *id.* 35-38.  Burton's rebuttal report also consists *entirely* of an analysis of the legislative history.  *See* Burton Supp. Rep. 1-15.  But courts encounter some form of legislative history in nearly every case they decide, and they do not need "expert" assistance (from a non-lawyer) in order to comprehend those materials.[1]  DOJ and Defendant-Intervenors may, of course, make legal arguments in their briefs based on the legislative history of Act R54, but this is a wholly inappropriate subject for expert testimony.

---

[1] Moreover, Burton is a professor who specializes in history, computer science, and race relations.  *See* Burton Rep. 3.  He does not claim to have any specialized expertise in South Carolina legislative procedures.  Thus, even if legislative history were a proper subject of expert testimony, it is not at all clear that Burton is even *qualified* to offer expert opinions about purported "procedural irregularities" in the legislative history of Act R54.  *See* Burton Supp. Rep. 2-7; Burton Rep.35-36.

7

### C. Regurgitating and Summarizing Facts in the Record and Other Experts' Testimony is Not an Appropriate Subject of Expert Testimony

**1.** A purported expert witness may not "merely repeat[] facts or opinions stated by other potential witnesses or in documents produced in discovery." *Rezulin*, 309 F. Supp. 2d at 546; *see also In re Fosamax Prod. Liab. Litig.*, 645 F. Supp. 2d 164, 192 (S.D.N.Y. 2009) (expert may not simply "read, selectively quote from, or 'regurgitate' the evidence"). That is, expert testimony may not be used to offer an "advocacy-based interpretation of [selected] documents in the record." *Fisher v. CIBA Specialty Chems. Corp.*, 238 F.R.D. 273, 281 (S.D. Ala. 2006); *see also In re Fresh Del Monte Pineapples Antitrust Litig.*, 2009 WL 3241401, at *16 (S.D.N.Y. Sept. 30, 2009) (expert may not "recite selective facts in the record and then offer[ ]his own legal conclusion[]").

Large sections of Arrington's and Burton's reports do nothing more than summarize and regurgitate other record material and expert testimony. Burton spends large swaths of his report summarizing federal court cases (p. 5-7,11), the legislative history of the Voting Rights Act (p. 7-8), DOJ's enforcement efforts (p. 8-10), newspaper articles about the 2008 election (p. 12-14), newspaper articles and social media posts involving "racially-charged statements" (p. 15-18); newspaper articles about other "bills with racially discriminatory undertones" (p. 19-22); and transcripts of the legislative debates (p. 22-35). These summaries of record evidence and publicly available materials do not in any way provide "specialized knowledge" that will "help the trier of fact." Fed. R. Evid. 702(a). Similarly, Arrington repeatedly cites and summarizes the work of another one of the government's experts, Prof. Charles Stewart. *See* Arrington Rep. 12-13, 15-17, 19, 38, 53. Indeed, Arrington's rebuttal report relies almost exclusively on Prof. Stewart's findings and conclusions. *See* Arrington Reb. Rep. 1-4, 8-11, 13-16 (Ex. 4). But

Professor Stewart is a witness in this proceeding, and is perfectly capable of testifying for himself.

**2.** An expert who merely regurgitates public statements made by others is often nothing more than a conduit for inadmissible hearsay. Although experts may rely on hearsay in forming opinions, they may not simply "transmit that hearsay" to the finder of fact: "[T]he expert must form his own opinions by applying his extensive experience and a reliable methodology to the inadmissible materials. Otherwise, the expert is simply repeating hearsay evidence without applying any expertise whatsoever." *United States v. Mejia*, 545 F.3d 179, 197 (2d Cir. 2008); *see also Arista Records LLC v. Usenet.com, Inc.*, 608 F.Supp.2d 409, 424 (S.D.N.Y. 2009) ("An expert who simply regurgitates what a party has told him provides no assistance to the trier of fact through the application of specialized knowledge.").

Burton's proffered testimony falls squarely within this rule. Indeed, one section of his report—entitled "Racially-Charged Statements or Conduct by Sponsors and Advocates of Voter ID"—consists *entirely* of out-of-court statements made by others, including speeches, newspaper articles, press releases, flyers, license plate slogans, and posts on Facebook and Twitter. *See* Burton Rep. 15-18; *see also* Arrington Rep. at 25-28 (citing numerous public statements from speeches, newspaper articles, and Twitter).

## II. ARRINGTON'S AND BURTON'S OPINIONS ARE NOT BASED ON A RELIABLE METHODOLOGY

Even if Arrington and Burton were opining on proper subjects of expert testimony, their conclusions were not "the product of reliable principles and methods." Fed. R. Evid. 702(c). A reliable methodology is central to the *Daubert* inquiry. The testimony must be "based on sufficient facts or data," be "the product of reliable principles and methods," and the expert must "appl[y] the principles and methods reliably to the facts of the case." Fed. R. Evid. 702(1)-(3);

9

*see Daubert*, 509 U.S. at 589-90.  That is, "[a]n expert must offer good reason to think that his approach produces an accurate estimate using professional methods, and this estimate must be testable.  Someone else using the same data and methods must be able to replicate the result." *Zenith Elec. Corp. v. WH-TV Broad. Corp.*, 395 F.3d 416, 419 (7th Cir. 2005).

Arrington and Burton do not appear to use *any* methodology, much less a reliable, testable methodology, for reaching their conclusions that the South Carolina Legislature acted with a discriminatory purpose.  Instead, they merely summarize a hodgepodge of materials—legislative history, public statements, newspaper articles, Facebook and Twitter posts, press releases, and e-mails—and opine that this all adds up to a prohibited purpose.[2]  How they reached that conclusion is entirely unclear.  For example Arrington notes cryptically that "[n]ot all legislators need to have acted with discriminatory intent, *just enough to make the difference*." Arrington Rep. at 7 (emphasis added).  He provides no further guidance about how many is "enough" or what constitutes the "difference."  Burton similarly provides long lists of "factors" that, "taken together," comprise a discriminatory purpose, but he does not explain his methodology for determining when such factors cross the line into purposeful discrimination. Burton Rep. 1-3, 35-38.

This proffered testimony is *ipse dixit*, not reliable scientific inquiry.  It would be impossible for anyone else to test or replicate Arrington's and Burton's findings because they do not explain how they weighed the relevant considerations, how they validated their results, or why they rejected alternate hypotheses.  Indeed, issues such as intent, purpose, and state of mind are not amenable to expert testimony at all *precisely because* there is no reliable, scientific way

---

[2] Arrington and Burton may assert that their "methodology" is application of the *Arlington Heights* mutli-factor balancing test for assessing discriminatory purpose.  But this would only reinforce the inadmissibility of their testimony, as legal analysis and application of law to fact is the province of the Court.  *See supra*, Part I.B.

10

of assessing these matters.  *See supra* Part I.A.  Drawing inferences about other peoples' intent based on a factual and documentary record is an inherently subjective inquiry that simply does not lend itself to specialized "expertise."

In sum, the proffered testimony is based not on a reliable methodology, but on "vague standards" and "subjective inference[s] [the expert] has drawn from his own personal experience," *Algarin v. New York City Dep't of Correction*, 460 F. Supp. 2d 469, 477 (S.D.N.Y. 2006).  That testimony fails to meet the basic standard of evidentiary reliability, and must accordingly be excluded.

## CONCLUSION

The Court should enter an order barring any expert testimony from Theodore Arrington and Orville Burton.

                Respectfully submitted,

                /s/ H. Christopher Bartolomucci
                Paul D. Clement (DC Bar No. 433215)
                H. Christopher Bartolomucci (DC Bar No. 453423)
                Stephen V. Potenza (admitted *pro hac vice*)
                Brian J. Field (DC Bar No. 985577)
                Michael H. McGinley (DC Bar No. 1006943)
                BANCROFT PLLC
                1919 M Street, N.W., Suite 470
                Washington, D.C. 20036
                (202) 234-0090

Dated: August 13, 2012                *Counsel for the State of South Carolina*

## CERTIFICATE OF SERVICE

I hereby certify that on August 13, 2012, I filed the foregoing notice with the Court's electronic filing system, which will provide notice to all counsel of record.

<u>/s/ H. Christopher Bartolomucci</u>

H. Christopher Bartolomucci
(D.C. Bar No. 453423)