# EXHIBIT 1

# IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA

------------------------------------------------------------------------)
                                        )

STATE OF SOUTH CAROLINA     )

          *Plaintiff*,     )  CIVIL ACTION NO:

              v.     )  1:12-CV-203-CKK-BMK-JDB

THE UNITED STATES OF AMERICA  ) (Three Judge Court)
And ERIC H. HOLDER, JR. in his  )
Official capacity as Attorney General  )
Of the United States,  )

          *Defendants*,     )

          And     )

JAMES DUBOIS, *et al.*,     )

          *Defendant-Intervenors*.     )
------------------------------------------------------------------------)

## DECLARATION OF THEODORE S. ARRINGTON, PH.D.

1.      I am a recognized expert in the fields of voting processes, districting, reapportionment, and racial and partisan voting patterns in the United States and Canada. I have practical experience in election administration, including detection of election fraud; and have been recognized by a Federal Court as an expert in that area. I have been retained by the United States Department of Justice to provide expert testimony in this case. I am compensated for my time at the rate of $250 per hour.

<u>OBJECTIVES AND FINDINGS OF DECLARATION</u>

2.      I have been asked to determine whether the provisions of voting-related changes enacted by the South Carolina General Assembly and signed into law by the Governor, as provided in Section 5 of Act R54 (A27 H3003) (2011) were <u>intentionally</u> drawn to minimize, cancel out, or reduce the ability of Minority (i.e., non-White) voters in South Carolina to participate equally in the political process and elect representatives of their choice. This provision shall be called "photo ID law" below.

3.      Dr. Charles Haines Stewart III, Kenan Sahin Distinguished Professor of Political Science at the Massachusetts Institute of Technology, has prepared a declaration on the <u>effects</u> of the photo ID law. His methods are those I would have used if I had been asked to determine the effects of the proposed photo ID law. I have thoroughly reviewed his declaration, and agree with his opinions based on his analysis of the data. His overall conclusion is that the effect of the law bears more heavily on Minority citizens than on White citizens. First, he finds that Minorities are more likely than Whites to lack a DMV-issued photo ID. Second, his analysis shows that Minorities who lack a DMV photo ID have lower socio-economic status than Whites who lack a DMV

photo ID, and the burden imposed by this requirement would be more onerous on those with low socio-economic status than on those with higher incomes and more education. Third, he finds that the provision that the ID issued by the Department of Motor Vehicles (DMV) must not be expired or suspended has a large impact on the number of registered voters who lack a photo ID that could be used for voting. This requirement, that the photo ID be current and not suspended, increases the disparity between Minority and White voters.  Dr. Stewart shows that these differences between the races are highly significant statistically, and that the data understate, rather than overstate, the differences. He concludes that Minority voters bear a disproportionate burden under the photo ID law.

4.      It is my opinion that the photo ID law was enacted with a purpose of reducing the ability of Minority citizens to vote. The South Carolina legislators who supported the photo ID law knew that it would reduce the ability of citizens, who do not already have "current and valid photo ID" (always as defined by the photo ID law and South Carolina's planned implementation), to vote. And they knew that Minority registered voters were more likely than White registered voters to lack such valid photo ID. The provisions of the law that are claimed to mitigate the "burden" (South Carolina's word in the Complaint, page 2) making it inconsequential, would not have significant effect. Therefore, South Carolina's claim that the burden is slight or trivial in their Complaint (page 2) is incorrect. The claim that the law is intended to reduce the problem of voter impersonation fraud at the polls is pretextual, as the evidence indicates that this is not a problem, and certainly not a concern that outweighs the public interest in encouraging political participation and making sure the right to vote is equally accessible to all adult citizens of South Carolina.

5.      I neither claim nor deny that this intent is motivated by racial animus. As Judge Kozinski wrote in *Garza v. Los Angeles Board of Supervisors,* 918 F.2d 763 (9th Cir. 1990), "[t]here can be intentional discrimination without an invidious motive[,]" and "[y]our personal feelings toward minorities don't matter; what matters is that you intentionally took actions calculated to [discriminate]." *Id.* at 779 n.1 (concurring in part and dissenting in part). The Republican leadership in both houses of the South Carolina General Assembly could act with a disregard for the known disparate impact the photo ID law would foreseeably have on Minority voters, since these voters almost never vote for Republicans. But when partisanship leads, or at least allows, decision-makers to take an action that they know has a disproportionate negative impact on Minority voters, it is evidence of intent to discriminate (*Id.* at 779).

## CREDENTIALS

6.      The full range of my professional qualifications and experience is described in my curriculum vitae. That vita includes a complete listing of all publications authored by me, and all of the voting rights cases in which I have testified by affidavit, report, deposition, or courtroom testimony. I am Professor Emeritus of Political Science at The University of North Carolina at Charlotte (UNC Charlotte). I received my Doctor of Philosophy degree from The University of Arizona in 1973. I joined the UNC Charlotte faculty that year. I have taught both undergraduate and graduate courses in topics such as research methodology, voting behavior, political parties, interest groups, Congress, the Presidency, and Southern politics. I retired from the University in July 2010. During my tenure at UNCC, I served as Chair of the Department of Political Science for 18 years, and was elected President of the University Faculty. I was President of the North Carolina Political Science Association in 2010-11. I have co-edited one book and coauthored two

monographs, published 37 refereed articles, and delivered numerous papers in the last 40 years. These works concern the effects of party and race on voting behavior and election administration.

7.     For twelve years I was a member and for six years the chair of the Charlotte/Mecklenburg Board of Elections, the largest and most complicated county election office in the Carolinas. During my tenure on the Board I attended annual training sessions provided by the North Carolina State Board of Elections. These training sessions included instruction in the detection and prevention of election fraud. A Federal Court recognized me as an expert on voting fraud in *United States v. Ike Brown,* 494 F. Supp. 2d 440 (S.D. Miss. 2007).

8.     My academic specialties have led to my retention as an expert witness in 41 lawsuits involving voting rights. In 21 of these cases I have given trial testimony. In two of these cases I was specifically asked to opine about the intent of policy makers. In *Texas v. United States,* Civil Action No: 1:11-cv-01303 (D.D.C.), I was retained by the U.S. Department of Justice to testify about whether the Congressional and Texas House of Representatives redistricting plans submitted to the court for pre-clearance under § 5 of the Voting Rights Act were intentionally drawn to discriminate against Minority voters.

9.     The second intent case is the *Ike Brown* case cited above. I was retained as an expert witness by the Department of Justice to examine whether there were fraudulent election practices in Noxubee County, Mississippi that violated § 2 of the Voting Rights Act by intentionally denying White citizens an equal opportunity to elect representatives of their choice and participate equally in the political process. I determined on the basis of public records, statistical evidence, interviews, newspaper analysis, study of depositions, and other sources that Mr. Ike Brown and others

acted in collusion to violate Mississippi election laws and regulations with the intent to discrimi-nate against White voters. Their activity did not include impersonation of properly registered voters at the polls. Their methods did include manipulation of the absentee ballot processes and providing unneeded and unwanted assistance to both absentee voters and in-person voters. As is the case with virtually all established cases of election fraud, corruption of election officials was necessary.

10.     I was an expert witness retained by Republicans in redistricting litigation in both the 1990 and 2000 redistricting cycles in South Carolina, and I was retained to testify by the United States in the Charleston County Commission § 2 case, challenging the dilutive aspects of the county's at-large election system. See *United States v. Charleston County,* 316 F. Supp. 2d 268 (D.S.C. 2003) aff'd 365 F.3d 241 (4th Cir. 2004). In all three cases I testified by affidavit, deposition, and at trial.

<u>STANDARDS FOR DETERMINING INTENT</u>

11.     The United States Supreme Court provides guidelines for courts in the kinds of evidence that could be used to determine intent. As I understand it, the case that sets forth the guidelines for determining intent is *Village of Arlington Heights v. Metropolitan Housing Development Corporation,* 429 U.S. 252 (1977). The majority opinion in this case provides guidelines for the circumstantial evidence that would be probative in determining whether a decision was motivat-ed by discriminatory purpose or intent. In adopting its new procedures for the administration of the reauthorized § 5 of the Voting Rights Act, the U.S. Department of Justice accepted Con-gress's invitation and included the analysis from *Arlington Heights* into its procedures. Section 51.57 of the department's § 5 procedures, 28 C.F.R. Part 51, states that the department will con-

sider the following factors in reviewing all types of voting changes:

(a) the extent to which a reasonable and legitimate justification for the change exists;

(b) the extent to which the jurisdiction followed objective guidelines and fair and conventional procedures in adopting the change;

(c) the extent to which the jurisdiction afforded members of racial and language Minority groups an opportunity to participate in the decision to make the change;

(d) the extent to which the jurisdiction took the concerns of members of racial and language Minority groups into account in making the change; and

(e) the factors set forth in *Arlington Heights*:

(1) whether the impact of the official action bears more heavily on one race than another;

(2) the historical background of the decision;

(3) the specific sequence of events leading up to the decision;

(4) whether there are departures from the normal procedural sequence;

(5) whether there are substantive departures from the normal factors considered; and

(6) the legislative or administrative history, including contemporaneous statements made by the decision makers.

12.    Governmental actions that have a discriminatory effect on a Minority group have often been defended with the argument that the discriminatory effect is merely an incidental result of an otherwise legitimate and racially neutral purpose, such as preventing vote fraud. However, the application of the *Arlington Heights* standard to a § 5 analysis means that the party objecting to preclearance is not required to prove that racial discrimination was the sole, primary, or dominant motivation behind a law that adversely affects a Minority group. As I understand it, a court may find that a policy with a clearly foreseeable and significant adverse effect on a Minority population was enacted with discriminatory intent even if that adverse effect results from the application of an otherwise neutral state policy.

6

13.     In *Reno v. Bossier Parish School Board,* 528 U.S. 320 (2000), the Supreme Court set forth a stringent version of discriminatory intent in § 5 cases – "intent to retrogress." But when Congress revised the language of § 5 in 2006, it made clear that the purpose standard intended was "any discriminatory purpose."

14.     Political scientists, historians, other social scientists, and legal scholars have written about the application of the *Arlington Heights* and Equal Protection clause standards to determine intent in voting rights and other discrimination litigation. A selection of some of the most important of these articles and books is at the end of this declaration. Also at the end are the bibliographic entries for other social science references that are cited in text by author and date, as is standard in Political Science. In determining intent of a legislature, one reviews the process that led to the adoption of the law and how it might be implemented with the use of depositions, newspapers, official minutes, and other records. The effect of the law is, of course, a critical piece of evidence. This scholarship indicates that one can only examine what individuals wrote, said, and did, not what they were thinking. See *Washington v. Davis* 426 U.S. 242 (1976) and *Garza,* 918 F.2d at 779. But one can determine what the legislators knew and would logically foresee on the basis of evidence presented to them during the multi-year debate over the photo ID law. This is often called "foreseeability."

15.     Institutional intention, the sum of a series of decisions by different officials, can also be examined under the *Arlington Heights* standard. Not all legislators need to have acted with discriminatory intent, just enough to make the difference. The photo ID law was passed on a party-line vote with virtually all Republicans in favor and all Democrats (including all the Minority, i.e., Black or African American, members) opposed. So the intent at issue in this case would be that of the proponents of the photo ID law.

16.     In determining intent, direct evidence would be statements of intent by policy makers in situations where candid rather than artful comments would be expected. Especially when expecting litigation, policy makers might be cautious in their public commentary, which would then be an unreliable guide to motive. Circumstantial evidence would be things like the sequence of events or alternatives that are rejected or accepted as the bill progressed through the legislative process. Discriminatory purpose may be "inferred" indirectly from the totality of the relevant facts, including the fact, if it is true, that the law bears more heavily on one race than on another. According to the 1982 Report on the Reauthorization of the Voting Rights Act by Congress, one may rely on: "direct and indirect circumstantial evidence, including the normal inferences to be drawn from the foreseeability of defendant's actions" (S. Rep. No.417, 97th Cong, 2nd Sess. 27 (1982) p. 27 n. 108.)

17.     Kousser (1991[1]) lists elements that are of particular importance in intent cases involving retrogression analysis. Here are some that might apply to this case:

> 1. Often the possible effects of policy maker's actions are common knowledge or just logical results. These common knowledge effects are "keys" to what decision makers know and foresee.
> 2. The historical context of the decision (e.g., a history of discrimination) is always important in understanding the intent of policy makers.
> 3. Another important consideration is the personal backgrounds of key decision makers. Who or what do they campaign for or against? Who do they appoint for office?
> 4. Direct statements of racial animus or desire to discriminate would be an indicator of intent. But attribution of motive by statements of decision makers after the fact may involve attempts to cover up actual intent.
> 5. A history of state policies and formal and informal rules is another guide to intent. Do the rules differ across the state or over time? Is there assurance that the implementation of the law at the local level would be non-discriminatory? What discretion do local decision-makers have and who are they?

---

[1] References to academic sources are found at the back of the declaration listed in alphabetical order by author and year.

18.     When examining the question of intent, one should determine whether there is another reasonable and complete explanation other than discrimination for the law. If there are other possible rationales, one must weigh the importance of them. Does the non-discriminatory explanation outweigh the discriminatory effect? Were there non-discriminatory alternatives reasonably available? All explanations, not just racial ones, must be examined. What explanation has the best surviving evidence? Motives may be intertwined, but if race is part of the mix, that is highly relevant evidence of racially discriminatory intent (see *Arlington Heights,* 429 U.S. at 265-66, and *Garza*, 918 F. 2d at 779 (Kozinski, J., concurring and dissenting in part)).

<u>SOURCES OF DATA</u>

19.     All of the data for this declaration are in the possession of South Carolina or readily available in public sources such as the internet or Westlaw. Here is a listing of the sources on which I rely. The first is the declaration of Dr. Stewart. I studied the text of the law itself and other evidence provided by South Carolina in its submission to the Department of Justice, and the other formal documents exchanged between the U.S. Attorney General, South Carolina, the Defendant Interveners, and the court. I also studied the materials in the administrative preclearance file relating to Act R54 that was produced in discovery by the Department of Justice. At my direction, the Department of Justice assembled all of the media reports related to the legislative consideration of the photo ID (see Appendix A for search criteria).

20.     I studied various records on the General Assembly debate on the photo ID bill in the 2010-11 session and, to a lesser extent, previous sessions. This includes the formal records, including recorded votes, and the race and party of the Representatives and Senators. Because there is no formal written transcript of the House and Senate sessions and the conference com-

9

mittee, I studied transcriptions provided by the Defendant Interveners made from video record-ings. I also had access to those recordings. Because these transcriptions are not a formal or offi-cial record, I will not quote from them. I will use the formal record (House and Senate Journals) to check for the accuracy of the sense of the debate gained from the transcripts, and will cite and quote from the Journals.

21.     Additionally I examined a collection of emails provided by Representative Alan Clem-mons, the primary sponsor of the photo ID bill in the House, and documents that were in the pos-session of Senator George Campsen, the primary sponsor of the photo ID bill in the Senate. I will also rely on depositions taken for this case cited in text, several of which are rough rather than final transcripts because the final versions were not available as of the deadline for completion of this declaration. Finally, I have also relied on U.S. Census documents available on-line, and var-ious court decisions and Department of Justice documents and other sources cited below.

## THE BENCHMARK AND THE PROPOSED PHOTO ID LAW

22.     The benchmark voter ID law in South Carolina is one of the toughest in the country in terms of the limited kinds of identification documents that are allowed for voting (see the Na-tional Conference of State Legislatures comparison at http:www.ncsl.org/legislatures-elections/elections/voter-id.aspx). Only a few states, such as Mississippi, Rhode Island, and Ten-nessee seem to be as tough as South Carolina. Eighteen states do not require any ID for voting. The requirements of the other 32 states vary widely. But almost all have a longer list of permis-sible documents than South Carolina. Florida, Indiana, and Georgia are tougher in the sense that their laws require a photo ID, but these states have a longer list of possible IDs that could be used for voting than does the benchmark South Carolina law. Under the benchmark law, the voter

must present one of these at the polling place: voter registration certificate issued by the Election Commission that does not currently have a photo, South Carolina photo driver's license, or DMV photo ID card. All of these include a signature of the voter that can be matched to the signature the voter places in the poll book.

23.     Under the photo ID law the voter must present one of these which is "valid and current": a revised voter registration certificate with a photo, South Carolina driver's license, South Carolina Department of Motor Vehicles photo ID card, U.S. passport, or military identification containing a photograph issued by the federal government.  According to the photo ID law, the address on the photo identification is not determinative of an elector's domicile for the purposes of voting. The photo ID law also provides a provisional ballot for voters who cannot provide a valid and current photo ID or when the poll managers dispute that the photo is of the person presenting him or herself to vote. Provisional ballots can be obtained by those who have a religious objection to being photographed and for voters who have a "reasonable impediment that prevents the elector from obtaining a photograph identification." Uncertainties in the application of the law are discussed below.

24.     The essence of the change in the proposed law is that all voters must have one of the specified photo IDs in order to vote with certain limited exceptions. The questions then become: 1) to what extent are Minority voters more likely than Whites to lack one of the photo IDs specified in the law?, 2) if Minorities are less likely to have the required photo ID, to what extent does the requirement place a significant burden on their ability to vote?, 3) to what extent do other provisions in the law ameliorate or cancel out any burden the photo ID provision places disproportionately on Minority voters?, and 4) if the law places a disproportionate burden on Minority

11

voters, was it enacted with that purpose or intent?

## EFFECTS TEST SHOWS THAT PHOTO ID WOULD
## BEAR MORE HEAVILY ON MINORITY VOTERS

25.    The first *Arlington Heights* factor is whether the impact of the official action bears more heavily on one race than another. Dr. Stewart's analysis shows that the photo ID law bears more heavily on Minorities in South Carolina than Whites. Several summary statistics from Dr. Stewart's declaration are reproduced in Table 1 (tables are placed at the end of this declaration). His data show that Minority registered voters are more likely to lack a current and valid driver's license or DMV ID card than are White voters. Although Blacks are 28% of the registered voters, they are 40% of the registered voters who did not "match" with current and valid (as defined by the photo ID law) DMV records. The probability of a White voter not having a valid DMV match is 5.5%, while the probability of a Black voter not having one is 9.5%. Other Minority group members have similarly higher rates of non-match than do White voters. Dr. Stewart shows that these differences between the races are statistically significant.

26.    Dr. Stewart's data and analysis demonstrate that the words "current and valid" make a large difference in the application of the photo ID law. Indiana and Georgia photo ID laws do not require that all drivers' licenses be current if used for voting. In Indiana, an expired license is acceptable for voting providing that the license expired after the previous general election, while a suspended license is still acceptable. Georgia even allows non-Georgia licenses to be used for voting if they are not expired. Dr. Stewart's data reproduced in part in Table 1 show that regardless of the current and valid provision, Minority voters are less likely to have an ID from the DMV records than are Whites. But the number of non-matches triples because of the current and

valid rule. The number of non-matches between the voter rolls and all DMV ID cards is 62,890, but the number of non-matches with only unexpired and unsuspended DMV ID cards is 173,250. Similarly, every racial or ethnic group has a much larger number of non-matches if only current and valid photo ID is matched. For example, 26,035 Black voters have no match if all DMV ID records are matched, but 69,283 Black voters have no match if only current and valid DMV records are matched. Furthermore, the disparity between Minorities and Whites is increased in the non-match data that matches only unexpired and unsuspended DMV ID cards. Dr. Stewart's data show a non-match from both sets of data for those individuals who have surrendered their license, since they would then not have that license to present at the polls under either set of rules.

27.     The other forms of valid photo ID in the proposed law probably do not significantly expand the number of registered voters with a current and valid photo ID. According to Defense Manpower Data Center Department of Defense statistics from 2008, 25.4% of active duty military personnel were Minorities – 17.8% were Black (see www.deomi.org/home/saveCountFiles.cfm?fileid=332). This figure (17.8%) is less than the proportion of Black registered voters in South Carolina (28%). All Minorities registered to vote in South Carolina constitute 30.5% of the voters. Assuming that the racial breakdown of military personnel in South Carolina is roughly similar to that of the military overall, the inclusion of military IDs to vote might increase the disparity between the proportion of Minorities and Whites who lack valid photo ID. I have no data on those who possess a passport. It is possible that additional data will be presented in this case that would help to determine the extent to which these other permissible IDs expand the number of registered voters who possess at least one of the kinds of ID required under the photo ID law, and whether the inclusion of these other forms of ID narrows or increases the disparity between Minorities and Whites. In his deposition (8 June 2012, p. 122-124), Chris Whitmire, Director of

Public Information and Training for the SEC, testified that he is uncertain what kinds of military ID are covered under the new law, what these IDs look like, and how to train poll managers to recognize them. Similar confusion over military IDs is expressed in depositions of legislative proponents of the photo ID law (Senator Larry Martin13 June 2012, pp. 103-4, rough transcript; Senator Harvey Peeler, Jr., Senate Majority Leader, 13 June 2012, pp. 47 and 98, rough transcript; Representative Robert W. Harrell, Speaker of the House, 13 June, pp. 169-70, rough transcript).

## PHOTO ID REQUIREMENT CAN SUPPRESS VOTING

28.     Erecting barriers to voting, even barriers that many would consider minor, can result in vote suppression because the "payoff" for voting is so slight. This is expressed in classic political science by the formula: $PB + D > C$ (see Riker and Ordeshook 1970, from a basic idea of Downs 1957). PB means the probability of the candidate or party you prefer winning. So if the voter perceives that the vote will be close (P) the value of PB is greater. But major elections are not won by one vote – not even the Florida election for President in 2000. So PB always approaches zero. D stands for "duty" and simply refers to the fact that people want to vote to "do their civic duty" or to "do one for the team" (party or candidate of choice). In effect D substitutes for PB, for even in a close election the value of the team winning (B) must be high in order for PB to be meaningful. C is the cost of voting. The equation simply tells us that the effort and expenditure the voter has to make to cast a ballot (C) has to be less than the value of civic duty and party or candidate loyalty (D), or the individual will not cast a ballot.

29.     Civic duty and party/candidate attachment are not strong for most people. Only in presidential elections do as many as about two-thirds of eligible voters cast a ballot, non-presidential

elections have typical turnout of 40%, while primaries and local elections sometimes have turn-out in the single digits. Any introductory textbook in electoral behavior confirms these facts, and South Carolina is not an exception. In the 2008 elections 1,920,969 people voted in South Carolina (58.6% of the eligible)(http://elections.gmu.edu/preliminary_vote_2008.html). In the 2010 elections 1,365,480 people voted (40.3%)(http://elections.gmu.edu/Turnout_2010G.html).  Also see the classic books on Southern politics by Merle and Earl Black (1987 and 2003) for more on voter turnout in the South generally and South Carolina particularly.

30.     Dr. Stewart's analysis shows that Minorities are more likely than Whites to lack a photo ID from the DMV, and that those Minorities who lack such IDs are more likely to have lower socio-economic status than Whites who lack a DMV-issued ID. As Dr. Stewart points out, the cost of political participation, even voting, is greater for those with lower socio-economic status. There are few findings in social science that have been more studied, confirmed, and less disput-ed than the difficulty that the poor and little educated have in participating politically. Minorities in South Carolina would fall into this category more often than Whites. For a discussion of the effects of socioeconomic status on voting see Wolfinger and Rosenstone (1980), Verba and Nie (1972), and Gurin, Hatchett and Jackson (1989). For a broader international perspective see Verba, Nie, and Kim (1978). Table 2 presents U.S. Census data from the American Community Survey comparing the socio-economic status of Whites and Blacks in South Carolina as of 2010. I have restricted the table to Whites and Blacks because the South Carolina Election Commission definition of race and ethnicity is not the same as the U.S. Census definition. While four percent of households headed by a White lack a vehicle available to the household, 15.3% of households headed by a Black do not have a vehicle. From this we can conclude that Blacks will be more

15

likely than Whites to have difficulty getting to the county election commission office (EC[2]) to obtain a photo ID: they are more likely to have no license or vehicle.

31.     The other rows in Table 2 compare the usual measures of socio-economic status between Whites and Blacks. Blacks are more than twice as likely as Whites to live in a household with income below the poverty level. The poverty rate for Blacks is 28.4%, while for Whites it is only 11.1%. The median household income of Whites ($51,141) is much greater than that of Blacks ($28,970). Educational attainment is perhaps the most important determinant of political partici- pation. About three-quarters of Black adults (75.7%) have completed high school (or the equiva- lent), but not quite 13% have a college degree. On the other hand, 86.2% of Whites have a high school diploma, and 27.9% have a college degree.

32.     A recent example of the impact of seemingly minor voting changes on political participa- tion is Brady and McNulty (2011). Their research shows that just changing the voting place de- presses voter turnout. Moreover, the decline is not consistent for all groups with young people and the poor (i.e., in large part racial Minorities) most affected. Brady and McNulty did not find that travel distance to the polls was a big problem, but that "search costs" were the main culprit. By this they mean that voters were uncertain of where to go to vote because of the change. Even the seemingly minor inconvenience of finding out where to go and then finding the location will be enough additional cost to depress turnout especially for poor and young voters. For a more general analysis of the extent to which increasing the costs slightly will depress turnout see McNulty, Dowling, and Ariotti (2009).

---

[2] I will use the acronym "EC" to refer to the county election commissions, board of registration and election and the board of canvassers, as these terms seem to vary. I will refer to the South Carolina State Election Commission as "SEC."

33.     It follows that voter turnout is sensitive to raising the cost of voting even slightly. Asking registered voters to make a trip to the county seat to find the DMV or county election and registration office is a substantial cost to individuals who do not have ready transportation. These additional costs will not be imposed on those who drive, cash checks, ride on airplanes, travel internationally, and military families. It will, however, be imposed on those who live aside from the world of legal requirements for a photo ID. And these individuals are more likely to be Minority.

34.     It is difficult for those who use photo ID every day for a multitude of tasks to realize that there is another world, where people live without having to confirm identity with a photo ID. But such people do exist, and evidently may be 173,000 strong in South Carolina. Such individuals include those who are poor, little educated, often elderly, and more often Minority. What would seem to be a minor cost to those who live in a world of constant security scans, can be a major burden to those who live in this other world.

35.     Some registered voters, who do not have one of the kinds of ID specified in the photo ID law, are not part of this other world. For example, "snowbirds" – wealthy, typically White retirees who have maintained a driver's license or other ID from another state where they might spend part of the year. For these individuals the law may be a mere minor inconvenience. Stewart's analysis shows that Whites who lack a DMV ID have higher socio-economic status than Minorities who lack such an ID. His analysis also shows that concentrations of Whites without a DMV ID are mostly in higher income areas such as resorts along the coast and around lakes in the upstate region. Minority voters who lack a DMV ID are more concentrated in the intercoastal plain, a band through the middle of the state were poverty is concentrated, and in places such as

Sumter and Orangeburg, where historically Black colleges and universities are located.

36.     South Carolina's claim that the burden imposed on those who do not have a valid photo ID is a "temporary inconvenience no greater than the inconvenience inherent in voting itself" (Complaint, p. 2) is not true for those who really are part of this other world. Many in this latter group are Minorities. In the first place, it is an <u>additional</u> cost not borne by others. In the second place, as demonstrated with the data analysis above, this is a more substantial burden for those from this other world than for those who live in the world in which a photo ID is part of every-day life. The mere fact that those in this other world don't need a photo ID for other activities tells us about their lifestyle and the extent of the cost of voting this law places on them. And in the third place, even a seemingly minor inconvenience can suppress voter turnout.

<u>PROCESS DID NOT SUFFICIENTLY TAKE
CONCERNS OF MINORITIES INTO ACCOUNT</u>

37.     For intent analysis, it is important to note that the Republican majority in the General Assembly knew the approximate size of this other world and that it was more likely to be inhabited by Minorities. Marci Andino, Executive Director of the State Election Commission (SEC), prepared a report to determine the extent that registered voters do not match with DMV records and therefore likely would not have a current and valid photo ID ("Andino report"). She uses the word "disenfranchised" to describe those without a photo ID match (see Andino deposition 7 June 2012, p. 69). Mr. Chris Whitmire in his deposition (8 June 2012 p. 29) indicates that the report was prepared at the request of Ken Harris, senior minority researcher for the Senate. The report was sent by email directly to members of the House Judiciary Committee: Representatives Clemmons, Sellers, Horne, Nanney, and Allen on 26 January 2010. The email included the re-

18

port as an attachment: "VoterRegistrationVersesDriversLicense.pdf." Heather Anderson, a Senate Judiciary Committee staff member, sent the same data to all members of the Senate on 22 January 2010 and 25 January 2010. The data in the third email was different from the other two only in that 17 year olds were deleted from the analysis by age. Some legislators who were proponents of the photo ID law remember seeing one of the reports or hearing of them in the debates or in the media (see Senator Peeler deposition, p. 93; Harrell deposition, pp. 98-9; Representative Philip Lowe, co-sponsor of the law in the Judiciary Committee, 15 June 2012, p. 69 rough transcript; Lt. Governor Glenn McConnell, deposition 14 June 2012, p. 91 rough transcript).

38.     The statistics in this report are similar to those derived from Dr. Stewart's more complete and current analysis. The Andino report shows the number of "non-matches" by county, age, and race. The total number of non-matches is 178,175 – a figure that is quoted frequently in the debates in both the House and the Senate and in emails during the debate in 2011. The Andino report shows 114,419 registered Whites have no matching DMV ID (6.0% of the registered Whites), while 63,756 Blacks (8.3%) have no match. The comparable figures from Dr. Stewart's declaration (see Table 1) are: total non-matches of 173,250; 98,113 Whites (5.5%); and 69,283 Blacks (9.5%).

39.     No one in the General Assembly debates argued that the numbers given in the Andino report were in error, although some proponents claim that such racial disparity in the impact of the law would not matter (see Martin deposition, pp. 67-8, 76-8; Lowe deposition, pp. 66, 69, 105; McConnell deposition, pp. 52, 91). Moreover, the members of the General Assembly are experienced politicians. They know the state, and they could not reasonably fail to know that this other world exists, and that Minorities are more likely to inhabit it. They know basic socio-

political facts of life in South Carolina. If they had any doubt, the Black members of both the House and Senate made them fully aware of this other world and the facts generated by the Andino report were statistical proof from the South Carolina government.

40.     Both the House and the Senate passed a version of photo ID in 2010. The Senate combined a provision to establish early voting as part of the photo ID bill, but the House was opposed to early voting. Early voting is a provision that allows any registered voter to cast their ballot in person before the day of the election in one or more sites in each county. Democrats in both houses favored an early voting provision as did most Republicans in the Senate. The two houses were not able to work out the differences before the mandated end of the session, and the bills died. It is possible to blame a filibuster in the Senate led by Democrats (especially Senator C. Bradley Hutto) who "ran out the clock." But it is more complicated than that. Republicans in the Senate had enough votes to overcome the filibuster. Four Republican senators joined all the Democrats in preventing the bill from coming to a vote (Alan Clemmons deposition, 11 June 2012, p. 167). The bill could have been taken up again when the General Assembly returned to consider the Governor's vetoes, but this would have required the House to pass the Senate version with early voting included, and they refused (see the series of emails to and from Representative Clemmons 17-18 June 2010, SC_00000633-636). Differences of opinion among the Republicans – especially differences between Senate and House Republicans on early voting – were responsible for the loss. There were simply not enough Democratic members to make a difference unless the Republicans were divided. In 2010 they were not divided on the question of requiring a photo ID to vote, but were divided on other questions (mainly early voting). The Democrats, including all the Blacks except the one Black Republican then in the General Assembly, were opposed to the photo ID bill in the 2009-10 legislative session.

20

41.     The Republicans returned in 2011, with strengthened delegations in both houses as a re-
sult of the 2010 elections, determined to pass a photo ID bill. Representative Clemmons states
many times in his emails that the bill must be "clean" in order to pass. That is, he had to avoid
extraneous provisions (especially early voting) and just address photo ID (see for example, email
from Alan Clemmons to Ralph Panzrino and Lee Frye, 7 April 2011, SC_00000914-915). The
differences between the houses and among the Republican majority were the same as in 2010,
but the Republican leadership in the House (led by Representative Clemmons) pursued a strategy
to avoid the problems of the previous session.

42.     A time line for the adoption of the photo ID law in 2011-2012 is in Appendix B. Two as-
pects of traditions and rules affected the process of adoption of the photo ID law. The first tradi-
tion is that when both houses are considering the same subject, the body that passes the bill first
gets a tactical advantage (see Patrick Dennis, Chief Counsel of the House Judiciary Committee,
deposition 4 June 2012, p. 47), because that house will have the last chance to amend the bill be-
fore it goes to a conference committee. The House passed its version of the photo ID bill (H
3003) on 26 January 2011. The bill then "crossed over" to the Senate and became, by tradition,
the basis for their debate and amendments. The Senate passed their version of H 3003, with an
expanded list of acceptable photo ID and the addition of early voting, on 24 February. The bill
then crossed back over to the House, giving them a chance to amend the bill knowing what the
Senate preferred. The House essentially re-passed their original version of H 3003 sending it
back to the Senate, stripped of virtually everything the Senate had added. But the rules restrict
the Senate at that point to either accepting the House version or rejecting it (to "non-concur").
The Senate could not amend the bill at this point, and chose to non-concur on 13 April sending
the bill to a conference committee.

21

43.     The second rule that affected the outcome is that both houses did not give the conference committee "free conference powers" (see Dennis deposition, p. 53). Therefore, the conference was restricted to provisions that were in one version of the bill or another. They could not craft compromises on specific provisions, such as early voting or the IDs that would be acceptable. The House passed the conference report, essentially the House bill with minor fixes (McConnell deposition, pp. 141, 202; Dennis deposition, p. 52), on 26 April, and the Senate followed on 11 May.

44.     The debate rhetoric in both houses, in the media, in communications to the Department of Justice, and in emails sent to Representative Clemmons is consistent. Both sides have talking points, and there is little deviation from them. The remarks of Representative Bakari Sellers (a Black Democrat) in the House Journal (26 January 2011, pp. 21-3) are an example of the major arguments against the photo ID bill. Essentially the opponents argue that the law is: 1) unnecessary because there is no evidence of impersonation vote fraud; 2) expensive in a time of budget constraints; and 3) intended to suppress the Minority vote. Representative Sellers cites the number of registered voters that do not match with DMV identification found in the Andino Report as an illustration of the report as part of the debate.

45.     The speeches in favor of the bill are captured in the remarks of Senator George Campsen (a White Republican) in the Journal for 24 February 2012 (pp. 10-12). The arguments are precisely the reverse of those offered by the opponents. There are several things to notice in the arguments for the bill. The argument is that having a photo ID is so accepted in the general population that it would not be a substantial burden on anyone, despite the known fact (from the Andino report) that perhaps 178,000 South Carolina voters did not have a photo ID. Nor is there any at-

tempt to deny that the burden – whatever it might be – weighs more heavily on Minority voters than on Whites as the Andino report demonstrated. Other provisions in the bill supporters claim to mitigate whatever burden there may be. The emphasis is on the importance of preventing fraud. The cases cited, however, tend to be largely irrelevant to the incidence and prevention of voter impersonation fraud in South Carolina. The cited events come mostly from other states, and the few South Carolina cases didn't involve impersonation fraud. Indeed, the proponents of the photo ID bill could not deny the assertion of the photo ID bill's opponents that there were no established cases of impersonation vote fraud in the state. The General Assembly legislated on a nonexistent problem, while ignoring the consequences of requiring a photo ID on the political participation of Minority voters.

46.     Last of all, the pro photo ID arguments emphasize the similarity of the photo ID law to the laws in Indiana and Georgia. But the list of IDs that can be used in the South Carolina photo ID law is more restrictive than in these other states. The Indiana and Georgia law are also different from the proposed law in whether expired and suspended driver's licenses can be used in some cases.

47.     The debates in the two houses in 2011 were very different, as reflected in the voting patterns presented in Tables 3 and 4, and in the differences in the House and Senate versions of the bill (see Appendix C for Lt. Governor Glenn McConnell's discussion of the differences when he was still President Pro-Tem of the Senate). In the House, the Republican majority was disciplined and the Democratic Minority (including all the Black Representatives) ignored. There were no efforts to build a compromise even on minor matters and provisions that did not involve photo ID. As Table 3 shows, except for the vote to table Amendment 2, the Democrats – espe-

cially the Black Democrats – almost never joined the Republican majority. Twelve Black Democrats voted with the Republicans to table Amendment 2, which would have expanded the kinds of photo ID that would be acceptable for voting to include employee identification for state and local governments, but not student ID. The Black representatives may have been casting a strategic vote, reasoning that this change would make the bill more acceptable to the Senate and perhaps to the Justice Department or Federal Courts for preclearance. In any case, their twelve votes were not needed to table the amendment, because the votes of the Republicans alone were sufficient.

48.     The greater degree of compromise in the Senate is reflected in the extent to which Democrats, including all the Blacks, joined the Republicans on several amendments, mostly on issues other than photo ID (see Table 4).  The Senate agreed (amendment P4) to exempt the elderly from the photo ID requirement. The version of the photo ID bill, as it came from the Senate Judiciary Committee, contained provisions for Federal, State, and Local government employee ID to be used for voting. This provision might have narrowed the gap between White and Minority voters who do not have a photo ID, because the government workforce includes a higher proportion of Minorities than voter registration, which is only 28% Black. Demographics of federal and state employees for the Public Administration sector in South Carolina from the U.S. Census American Community Survey for 2010 shows 97,219, of whom 64,486 (66.3%) were White alone and 31,026 (31.9%) were any part Black. This includes most government services, other than schools and health. The South Carolina Workforce Plan for 2009 shows that 38.7% of SC state employees were Black, and 59.4% were White, as of 30 September 2009 (www.ohr.sc.gov/OHR/wfplan/209-SC-OHRWork forePlan.pdf).

24

49.     The Senate Republican majority, however, was unwilling to match the requirements in the Indiana and Georgia laws with regard to student ID as amendment P1 was defeated 27 to 13 with only one White Democrat opposing the amendment. There are 62 colleges and universities in Georgia that have ID cards that can be used for voting in that state (see http://www.sos.ga.gov/ ElectionConnection/acrobat/Photo%20ID%20%20Acceptable%20Student%20ID%20Cards %20v%202%202010.pdf). The Indiana law is a bit more complex, as the public college or university IDs must conform to three criteria: have a photo; student name that matches the voter rolls; and an expiration date. It is not clear which state school IDs meet those criteria. There are eight historically Black colleges and universities (HBCU) in Georgia, three of them are on the list of 62 colleges and universities that have IDs that can be used to vote. Indiana has no HBCUs, but South Carolina has eight, two that are public: Denmark Technical Institute and South Carolina State University  (http://www.collegescholarships.com/historically_black_colleges _universities.htm).

50.     On 19 October 2011, the Associated Press published an article by Jim Davenport that indicated the photo ID law "appears to be hitting Minority precincts the hardest." The thrust of the article is clearly on the disparate impact the law would have on Minorities, not just college students. The article points out the counties where there are concentrations of voters who do not have a matching record in the DMV office. It also points out the precincts that include Benedict College and South Carolina State University. Both of these precincts have large numbers of registered voters – presumably students – with no DMV match. In both cases the un-matched voters are almost all Minorities.

51.     Wesley Donehue is the CEO of Donehue Direct and bills himself as a "political strategist" for the South Carolina Senate Republican Caucus. During the debates on the photo ID law

Representative Clemmons communicated frequently with Mr. Donehue by email. These emails also indicate he was involved in arranging and participating in meetings on the bill. Donehue also claims to have been involved in planning the strategy to pass the photo ID law (see Ryan J. Reilly, "S.C. GOP Operative: AP Story Showing Impact of Voter ID on Blacks 'Proves EX-ACTLY Why Law is Needed,'"

http://tpmmuckraker.talkingpointsmemo.com/2011/10/sc_gop_operative

_ap_story_showing_impact_of_voter_id_on_blacks_proves_exactly_why_law_is_needed.php,

last retrieved 17 June 2012).  In a posting on Twitter, Mr. Donehue said that the Davenport AP article "proves EXACTLY why we need Voter ID in SC," and that the story "has proven that a bunch of non-South Carolinians are voting in SC elections. Did they vote in other states too?? FRAUD!" (emphasis in original as quoted by TPM).

52.     Students can claim their college or university address as their domicile. Mr. Donehue's Twitter postings provided no evidence that these students also voted absentee in the state of their parents or their former home. The SEC has looked into these kinds of allegations and found no evidence of fraud (see Andino deposition, p. 194-5). Nor would the photo ID law prevent the kind of fraud he claims is rampant among these students, since he is not accusing them of engaging in impersonation fraud. Under the benchmark law, students cannot use ID from other states or their student ID to vote in South Carolina. They must use one of the approved forms of ID in the benchmark law, probably voter registration certificates issued by the SEC, since the matching of the DMV and SEC records indicates that many of the voters in precincts heavily impacted by students did not have a South Carolina DMV issued ID.

53.     The most obvious example of compromise in the Senate is that the Democrats were pre-
pared to filibuster the bill with about 200 possible amendments. They agreed to withdraw all of
those amendments in exchange for a vote of non-concurrence to the House passed bill, which
brought about the conference committee. They evidently believed they would get something they
wanted out of the conference report. Their willingness to "go along to get along" was betrayed
when provisions they favored in the bill, such as early voting, government employee ID for vot-
ing, and the elderly exemption were excluded from the conference report and the Republicans in
the Senate reluctantly accepted that report. Lt. Governor McConnell says that the House confer-
ence members agreed to pass a separate bill on early voting (deposition, pp. 135-6), but Repre-
sentative Clemmons denies this and the House killed a separate early voting bill in a Judiciary
sub-committee (deposition, pp. 197-99).

54.     According to Senator McConnell's remarks in the Senate Journal (Appendix C), the Sen-
ate had capitulated to the intransigence of House Republicans. When Senator McConnell pre-
sented the conference report he had to admit that it still contained many of the flaws in the House
bill that he, nine other White Republicans, and one White Democrat had cited as a reason for
non-concurrence to the House bill earlier (see Senate Journal 13 April 2011, p. 28,
SC_00087841). All the Democrats who were present also voted for non-concurrence. He sum-
marizes where the Senate and House stood on this bill and where the conference report came out.
The Senate provision for government employee ID and the elderly exemption were not in the
conference report. He indicated that the report had provisions that might play into the hands of
those who opposed the bill (meaning Democrats) and hoped it would not be precleared, because
it is too tough in some regards such as the limited types of ID that would be acceptable. He also
complained that the House delayed response to the conference putting everyone on a tight sched-

ule. During this delay, the House and Senate Republicans were under pressure from Republican Party activists to produce a "clean" bill. Specifically, to accede to the House bill with no early voting provisions. This organized pressure is also apparent in many emails involving Representative Clemmons from Republican officials and activists. Senator McConnell calls it a "propaganda" campaign.

55.     The House accepted a Senate provision for the DMV to get information on births from the Department of Health and Environmental Control without cost, when the individual has no copy of a birth certificate. This is not much of a concession since those with any kind of a paperwork problem would more easily go to the county EC, not the DMV to get their photo ID. Conferees proposed no change in absentee voting. It is noteworthy that absentee voting is the area of the voting process that is the most subject to vote fraud (see Alvarez, Hall, and Hyde 2008; Imai and King 2004; Fortier and Ornstein 2003; Fay 2005; and Karlawish, *et al.* 2008). Ms. Andino (pp. 51-2, 175) and Mr. Whitmire (p. 61, 66-8) discuss absentee vote fraud in South Carolina involving corrupt election officials in their depositions. The Conference report deals with the non-existent problem of impersonation fraud and ignores absentee voter fraud and other serious problems in the election process (see for example D. A. Buell, E. Hare, F. Heinde, C. Moore, and B. Zia, "Auditing a DRE-Based Election in South Carolina" Intervener's exhibit 5 in the deposition of Representative James Harrison, Chair of the Judiciary Committee, 12 June 2012, rough transcript). Representative Lowe, who discussed election fraud more comprehensively in his deposition, testified that "I think probably more of the fraud occurs in the absentee" (p. 65).

56.     The depositions of the major proponents of the photo ID law show that during the consideration of the law they had little interest or concern about investigating either the extent to which the photo ID law might burden Minorities more than Whites, the extent of actual impersonation fraud, or the lack of public confidence in the election process. See for examples, Martin deposition, pp. 67-8, 76-8, 101-2; Peeler deposition, pp. 34, 97; Harrison deposition, pp. 51, 126-7; Harrell deposition, pp. 46-7; Lowe deposition, pp. 76; McConnell deposition, pp. 91.

57.     Two of the *Arlington Heights* factors to consider are: 1) the extent to which the jurisdiction afforded members of racial and language Minority groups an opportunity to participate in the decision to make the change; and 2) the extent to which the jurisdiction took the concerns of members of racial and language Minority groups into account in making the change. This legislative process was controlled completely by the Republican majorities in both houses. The Democrats participated in the debate in both houses, but were actually consulted and taken seriously only in the Senate, and only to a limited degree with regard to the photo ID requirements. The provisions that Democratic Senators (about half of whom are Black) preferred were not in the conference bill. The Republican majority in the Senate wanted a photo ID bill, and feared that insisting on compromise on issues other than photo ID would recreate the same problems that resulted in defeat a year earlier. Therefore, they abandoned early voting, even though it was unanimously passed in the Senate (amendment P482, see Table 4). No Democrats, White or Black in either house, voted to accept the conference report and institute a photo ID requirement for voting in South Carolina.

58.     Minorities in South Carolina vote overwhelmingly for Democratic candidates, so even White Democrats can be considered as representatives of Minority voters, because they are can-

didates of choice. For evidence of this see *Colleton County Council v. McConnell,* 201 F. Supp.

2d 618 (D.S.C. 2002), the statewide redistricting case in South Carolina in which I testified. The

court wrote at 641:

> In this case, the parties have presented substantial evidence that this disturbing fact [racial polarization] has seen little change in the last decade. Voting in South Carolina continues to be racially polarized to a very high degree, in all regions of the state and in both primary elections and general elections. Statewide, black citizens generally are a highly politically cohesive group and whites engage in significant white-bloc voting. Indeed, this fact is not seriously in dispute. . . Racial polarization is highest in black-white elections— those involving a black candidate running against a white candidate. And, there is a well-documented hierarchy in the preference of black voters. With few exceptions, black voters demonstrate an overwhelming preference for black Democrats as their representatives, followed by white Democrats, particularly in a general election, but black voters virtually never vote for a Republican candidate."

59.    The same conclusion was reached in *United States v. Charleston County Council,* 316 F.

Supp.2d 268 (D.S.C. 2003), a case in which the court relied primarily on my analysis of polarized voting. The court wrote:

> Dr. Theodore Arrington, expert for the United States, found that out of 31 contested, County-Council elections studied from 1984 to 2000, voting was racially polarized 29 times (94%). The findings of Defendants' own expert, Dr. Ronald Weber, also confirm that voting in Charleston County Council elections is severely and characteristically polarized along racial lines. In 25 of the 33 contested general elections, from 1988 to 2000, African-American and white voters were polarized (75.8%). This pattern of racially polarized voting is perhaps most dramatically demonstrated by Dr. Weber's findings that, in general election contests for Charleston County Council with at least one African-American candidate, there was polarization between African-American and white voters 100% of the time. Even in general election contests for Charleston County Council involving no African-American candidates, there was polarization between African-American and white voters 87.5% of the time. A number of discrepancies exist in Dr. Weber's various reports concerning polarization in Charleston County Council elections. Importantly, however, Dr. Weber has universally found severe and legally significant voting polarization, notwithstanding any conclusions he may have concerning the *cause* of such polarization. Ultimately, the Court is particularly compelled by the careful report prepared by Dr. Arrington.

60.    As these courts recognized, in South Carolina political party means race, and race means

political party. They cannot be meaningfully separated because of the almost unanimous adherence of Minority voters to the Democratic Party and the usual, but not overwhelming, preference of White voters for the Republican Party. Any action that aids either party cannot be said to be "just partisanship" or "just politics," because race and partisanship are inevitably intertwined, as these courts recognized. In the Charleston case, Dr. Weber opined that the polarized voting was "just partisanship," but the court rejected his analysis.

## REMEDIATION OF THE BARRIERS INSUFFICIENT

61.    The photo ID law contains various provisions that South Carolina claims will make it easier for voters to obtain a photo ID, or vote without one. These provisions are not as helpful as might appear on the surface. The first provision is a free ID card for voting age applicants from the DMV offices. According to the web sites, these 67 offices are open Monday, Tuesday, Thursday, and Friday from 8:30-5:00, and Wednesday from 9:30-5:00. Six offices (Aiken, one in Charleston, Florence, Greenville, Lexington, and Rock Hill) are also open on Saturday from 8:30-1:00 (also see deposition of Col. Kevin Shwedo, Executive Director of the DMV in his deposition, 7 June 2012, pp. 20-4). The state has made no provision for extra offices or extra hours to accommodate tens of thousands of registered voters who may need a photo ID. These offices are located in or near the county seat or in suburban areas of the larger cities. As the data in Table 2 shows, Blacks are more likely than Whites to lack a vehicle in the household for travel to the DMV office. The advantage of receiving a photo ID from the DMV is that it is an all-purpose ID that could be used for things like cashing a check or riding on an airplane. The disadvantage is that it expires after five years and is no longer current and valid.

62.    The biggest disadvantage of the DMV provision for those registered voters without a photo ID is that DMV bureaucracy is quite complex and not user-friendly. To illustrate this point, their rules governing required documentation to receive an ID are in Appendix D. DMV offices must be governed by bureaucratic regulations because DMV IDs are all purpose documents that can be used for things like boarding an airplane. The problems with the DMV offices also involve lack of resources and necessary complexity of rules that the personnel in these offices cannot control. The "DMV Policy Task Force Findings and Recommendations" presented to Governor-Elect Mark Sanford on 9 January 2003 stated: "The current state of South Carolina's DMV is alarming. South Carolinians are all too familiar with its inefficiencies - long lines at branch offices, painfully slow mail-in services, inefficient call centers (with two out of five calls going unanswered), a multimillion dollar computer system that is not yet fully-functional, and facilities that are too small, uncomfortable, and are not customer-friendly. South Carolinians know there are serious problems at the DMV" (p. 3). Col. Shwedo outlined some of the pressures on the DMV in his deposition. The issuing of free ID under the bill will cost the agency money. This will impact services, because the DMV is self-supporting and the General Assembly has been unwilling to increase fees on licenses, (pp. 55-7, 109). The DMV is currently operating at 80% of authorized staff (p. 108).

63.    Although various reforms were instituted under Governor Sanford, the old patterns remain or resurfaced (see http://www.fitsnews.com /2012/02/09/scdmv-is-incompetence-back). Gregg Easterbrook (a fellow at the Brookings Institute) points out that bureaucratic problems at DMV offices are the norm across the country, not unique to South Carolina: "Lines are long, clerks are rude. It can take hours to conduct the simplest transaction. The mindset of the typical DMV office is that the taxpayer's time is utterly worthless — expect to spend the whole day in

the waiting room. Then finally get to the window, and the clerk will search your paperwork for some trivial imperfection and send you away, knowing full well this will force you to waste another day in the waiting room to get back to the window" (http://blogs.reuters.com/gregg easterbrook/2011/01/06/american-exceptionalism-and-the-dmv-factor/).

64.     There is another aspect of the DMV provisions that is worth notice. Any DMV photo ID must be current and valid according to the photo ID law. This is interpreted to mean that an expired or suspended South Carolina driver's license cannot be used for voting. This is different from the laws in Georgia and Indiana (see the National Conference of State Legislatures comparison at http:www.ncsl.org/ legislatures-elections/elections/voter-id.aspx). The only purpose of the photo ID law, according to its sponsors and its text, is to confirm the voter's identity. There is no reason that an expired license, or a revoked one for that matter, cannot adequately document the identity of the voter. The current and valid provision in the South Carolina law, as interpreted, simply provides further restrictions on voters without any decrease in fraud. Mr. Whitmire in his deposition (pp. 124-6) admits that it is not clear what valid means and that poll managers would probably have no way to determine whether the ID was valid, other than expiration date. The exact meaning of these terms is also unclear to the major proponents of the photo ID law (see Peeler deposition, pp. 78-80; and McConnell deposition, p. 125).

65.     According to the procedures to implement the photo ID law prepared solely by Ms. Andino and her staff and submitted to the court for preclearance (see ECF No. 65 and her deposition pp. 99-101), the county ECs will only require a registered voter to give name, address, date of birth, and last four digits of the Social Security number to receive a photo ID that is good only for voting, but has no expiration date. There is some question, however, whether a permanent

33

voter ID is really permanent. Mr. Whitmire discusses this problem in his deposition (pp. 148-9). After some years the voter may no longer resemble the old picture. Mr. Whitmire recommends that voters get a new card every few years to prevent questions about whether the voter is really the person in the photo. Given the lack of clear rules from the SEC and their ability to enforce any rules, additional trips downtown to get a photo might be necessary in order to avoid problems at the polls on the day of the election.

66.      There is one EC office in each county. The business hours on web sites are regular courthouse hours, 8:30-5:00 Monday through Friday. The locations are at the county seat (see Andino deposition, p. 106). Most of these offices are in the county courthouse or county office building, and may have limited parking. Unlike DMV offices, EC offices may be less accustomed to heavy foot traffic, since much of the business of registration is now handled by mail and on-line. In her deposition, Ms. Andino knows of no plans by the county ECs to expand their hours or days of operation to accommodate tens of thousands of registered voters who may need a photo ID (deposition, pp. 166-9), although Mr. Whitmire indicates that Saturday hours for county EC offices are sometimes established near the election (deposition, p. 134).

67.      For those who do not need a photo ID for other purposes, the photo ID law takes us back fifty years to when voter registration in many states – especially in the South – was restricted to the county courthouse during banker's hours (see Keyssar 2001). While one can "register" in all the new ways including by mail, at public events, or even in the comfort of one's home; one can only get the required photo ID by making a trip downtown during the work day. The SEC has one bus that can go around to events to register and photograph voters for the new photo ID law. Mr. Whitmire testifies in his deposition (pp. 82-87) how this vehicle will be used. He cannot

even be sure that the bus could get around to every county by November if the photo ID law is precleared in early September. Ms. Andino testifies that the bus would not be able to reach all counties if the law is precleared in September (p. 111). In any case, a single mobile unit for the entire state is hardly a significant outreach effort for either the short or the long term. Essentially, the provisions of the National Voter Registration Act (NVRA), the Help America Vote Act (HAVA), the Voting Rights Act, and fifty years of reform that made registration and voting easily available are abrogated for those who do not already have a valid photo ID.

68.     The requirement to go downtown to get a photo ID is the practical equivalent of requirements for reregistration that have been objected to by the U.S. Attorney General and were of concern to the Congress. A report of the United States Commission on Civil Rights to the Congress in January 1975 titled "The Voting Rights Act: Ten Years After" stated that a requirement for reregistration ". . . places a substantial burden on the Minority voter, who has often succeed in registering only after overcoming many obstacles. The result of a reregistration can be a decline in the number of Minorities who are registered" (p. 93). The report goes on to cite a specific example in Arizona in 1970, and is critical of the Department of Justice for sometimes not objecting to reregistration in Mississippi. A basic source on this subject is "The Shameful Blight: The Survival of Racial Discrimination in Voting in the South," by the Washington Research Project, 1972, which provides a list of Mississippi counties' use of the reregistration strategy and the Justice Department's response.

69.     The Department has objected to reregistration processes in states covered by § 5 in some instances. In an objection letter to Perry County Alabama dated 25 September 1981 the Department wrote: "Our analysis shows that the likely effect of this reidentification and purge will be to

effectively dilute the voting strength of the black electorate in Perry County. . . the limited hours and locations at which reidentification can be accomplished, and the generally restrictive manner in which one would have to go about perfecting his or her reidentification, . . . shows that the burden cast by this process upon blacks would be much greater than on whites and would make it much more difficult for blacks to preserve their voting status." In an objection letter to Jasper County Mississippi dated 8 June 1971, the Attorney General objected to a reregistration and nullified the results. The objection letter indicates that only 75% of the registered voters were able to reregister, and that the proportion of Blacks who reregistered was lower than 75%.

70.     There is also an additional significant short-term problem with preclearing the photo ID law and applying it to the 2012 elections. The county ECs are not geared up to process tens of thousands of photo IDs before the November elections. Election offices are facing the highest volume of business in the four-year election cycle – the presidential general election (see turnout figures cited above). Sometimes precinct lines must be changed to accommodate redistricting with all the work that this entails, because this is not only a "presidential" but also the first general election after decennial redistricting – a double whammy for election offices. Ms. Andino says that at this critical time just before any election – much less a presidential – the county ECs could use twice as many staff and are chronically underfunded and understaffed (see deposition pp. 22-3). In 2008 the lines for voting absentee in South Carolina were as long as six hours (Andino deposition, pp. 189). In their extensive analysis of the experience of voters in the 2008 elections, Alvarez, et al. (2012) show that the average wait time at the polls was longer in South Carolina than in any other state (pp. 73-4), and that 20% of the registered voters who failed to vote cited long lines as the reason (p. 34).

71.     On top of this, the photo ID law will place a new task on the county EC offices to process photo ID for both the flood of new voters, and the backlog of tens of thousands of old voters who now need an ID. They are also responsible for notification to those voters who do not appear to have a photo ID, and other miscellaneous public notice provisions. The photo and processing equipment and supplies have not been purchased (Ms. Andino's deposition, pp. 82-3, and Mr. Whitmire's deposition, pp. 72-74). Indeed, it is not clear that South Carolina has appropriated the funds that will be needed, although Representative Clemmons claims this has been done (see deposition, pp. 76-7). The county EC staffs have not been trained in the use of the equipment and the procedures will be new and untested in the field. No provision has been made to increase the personnel to handle the additional load. If this is an unfunded mandate on county government, there is no evidence that they have prepared the funding and staffing either. See the Andino deposition, (pp. 82-4, 98-104, 107-11, 163-171) and Whitmire deposition (pp. 70-9, 87-123, 138-140) for discussion of partial preparation at this point.

72.     The court has indicated that its decision on preclearance of the photo ID law will come in early September 2012 (Scheduling and Procedure Order, 26 April 2012, p. 8). Ms. Andino, testified by Affidavit dated 10 April 2012 ¶ 28: ". . . the [photo ID] Act must go into effect by at least August 1, 2012. This is the latest date at which the Act can become effective and the SEC can still completely fulfill its duties under Section 7 of the Act." According to her deposition on 6 June, however, she says that the court's date of early September is not too late for implementation for the November election. Yet she testifies that nothing has changed since her affidavit in April in terms of the ability of the SEC to carry out its responsibilities under the act and the time she previously estimated it would take to perform these tasks (deposition, p. 166, 192-4). Mr.

Whitmire is only willing to say he "believes it is possible" to be ready for the November election if the photo ID bill is precleared in early September (deposition, p. 140).

73.    Notice two contradictory scenarios: 1) that many individuals without a photo ID will be unable or unwilling to bear the cost to obtain one and will be denied the right to vote, or 2) that many individuals will seek to obtain an ID from the ECs and the offices will be unable to handle the load. Given Dr. Stewart's estimates of the numbers of individuals who are properly registered but do not have a valid ID as required by the law (173,000), it is possible that both scenarios would occur if the law is precleared.

74.    The photo ID law provides that a person who has a religious objection to being photo-graphed or suffers a "reasonable impediment that prevents the elector from obtaining photograph identification" can complete a paper ballot that is placed in an envelope with the attached affida-vit stating the reasonable impediment or religious objection. The county EC would determine whether the ballot should be counted on the basis of information on the unopened envelope (pre-cinct number, voter's name, etc.) and the affidavit. The photo ID law provides that the provision-al ballot of someone whose only problem is that they did not show a valid photo ID and had a religious objection or reasonable impediment "shall be counted" unless the affidavit is "false." The South Carolina Attorney General has issued an opinion (16 August 2011 letter to Marci Andino) in an attempt to clarify this wording with regard to "reasonable impediment," but not "false." Here are the relevant excerpts from his opinion:

> Based upon the words used in Subsection (D)(1)(b) - "suffers a reasonable imped-iment that prevents the elector from obtaining photograph identification" - it is evident that the General Assembly sought to make allowances for those voters who have a valid reason, beyond their control, which would prevent them from obtaining a Photo ID. One such reason which is obvious is that there are numerous South Carolinians, generally over age 50, who do not have a birth certificate. A primary cause is that, decades ago, many

babies were not born in hospitals, but were delivered by midwives and thus no birth certificates were obtained. See, "Many Face Fight to Prove Identity," *The State,* July 19, 2011. In addition, persons with disabilities also might be unable to obtain a Photo ID. Thus, the Legislature, cognizant of the conditions beyond a person's control, for obtaining photographic identification, provided the affidavit mechanism as a means to vote for those who presented themselves at the polls, lacking such identification because of these circumstances. (page 3)

Therefore in response to your specific question, the short time frame between any preclearance of the legislation and the date of any election immediately thereafter would constitute a "reasonable impediment" for purposes of the Voter ID legislation. Such short time period is beyond the voter's control. (page 5)

75.     Given the lack of a clear standard in the law and conflicting testimony about the meaning of reasonable impediment and how its meaning would be determined by the county ECs (see below), the provisional ballot procedure might allow anyone to vote without producing any kind of documentary ID at the polls, or might not allow any such provisional ballots to be counted. The question involves the meaning of "false" and whether the county EC has discretion to interpret the meaning of "reasonable impediment," and the standards for such discretion if it exists. These words may be interpreted by the county EC as allowing anything or allowing nothing. Therefore this provision is troubling, if voters have no valid and current photo ID and choose to execute an affidavit and a disproportionate number of them are Minorities. A process that is so open to subjective application of the law is vulnerable to abuse including racial discrimination (see e.g., *Charleston County,* 316 F. Supp. 2d at 286 n. 23).

76.     I first list interpretations that would exclude most, if not all, possible reasonable impediments. Then I cite conflicting testimony that anything might be permitted as a reasonable impediment.

77.      The law specifically provides a religious exemption. It is hard to know how the county EC would know whether religious objections were true or false.

78.     Second, the South Carolina Attorney General indicates that if the preclearance of the photo ID law is too close to the election, making it impossible to fully implement its provisions, this would be a reasonable impediment. Presumably all voters who lack a valid photo ID could use this excuse if the court preclears the law in September and it applies to the November 2012 elections, given Ms. Andino's original opinion that full implementation must begin August 1st. Having large numbers of voters use the provisional ballot during a presidential election would cause long lines at polling places, and voter confusion. The provisional ballot arrangement works as long as it is an occasional safety valve. If tens of thousands of voters use it, the system is in danger of breaking down. The South Carolina association of county election officials (SCARE) has objected to the photo ID law specifically because they are concerned that it will cause long lines and delays during the election process (see Andino deposition, p. 91-2). In 2008 South Carolina had an average wait time to vote of 57.7 minutes, which was the longest of any state. The next longest was Georgia at 33.0 minutes (see Alvarez, et al. pp. 73-4). So local election officials are on target in their concerns about anything that would further delay the voting process.

79.     Third, the South Carolina Attorney General gives the example of a person with a disability. If the voter is able to present him or herself at the polling place on election day, they are presumably abled enough that they could get down to the EC office prior to the election. Those who are too disabled to get downtown for their photo would presumably vote absentee by mail. To say that disability would be sufficient to prevent the voter from going downtown, but not sufficient to prevent him or her from getting to his local polling place, would suggest that the lack of access to a vehicle and travel problems are a reasonable impediment. One can imagine a temporary disability that was relieved just before the election day, but again it is not clear how this would be supported or falsified, and it is surely a rare situation.

80.     Whether the "over 50" example cited by the South Carolina Attorney General would be allowed is also unclear, especially since the General Assembly specifically rejected an exception for the elderly. The requirement for a birth certificate only applies to the DMV. Voters without a birth certificate can get a photo ID at the EC office. Since both kinds of offices are about equally inconvenient for any particular voter, not having a birth certificate could not be considered a "reasonable impediment." This excuse could automatically be regarded as false.

81.     On the other hand, Ms. Andino's interpretation of the law is that the county ECs must accept any reason given. She testified that the following are reasonable impediments in her deposition: A lack of transportation to get downtown to the EC office (p. 113) and the inability to get to the EC or DMV office during working hours (pp. 113-4). She testified that a reasonable impediment is whatever the voter says it is (pp. 113-115) also see her discussion on pp. 155-6 and 169.) She testified that the county ECs have no discretion in their interpretation of reasonable impediment (p. 115). And it is difficult to see how any of these permissible excuses, according to Ms. Andino, could be proven false. Mr. Whitmire seems confused about this issue in his deposition. He first testified that he agreed with Ms. Andino's interpretation (pp. 132, 196), but then rethinks his opinion after reading the statute and comes to the conclusion that he doesn't know how to interpret these phrases (pp. 197-8).

82.     The proponents of the photo ID law in the General Assembly are not in agreement about what reasonable impediment means in their depositions. Senator Martin testifies that transportation problems would not be a reasonable impediment, and that it is not just anything that the voter believes it to be (pp. 108, 192). Senator Peeler testifies that he does not know what it means (pp. 63-4), he seems to say that any excuse is acceptable (p. 65-68), but then his testimony on

this subject becomes unclear. He can't decide whether "I just didn't feel like it" is or is not a reasonable impediment (pp. 70-1). Representative Harrison testifies that being bedridden or not having a birth certificate is a reasonable impediment (pp. 57), but just not wanting to do it is not (p. 58). According to Representative Harrison, even for the birth certificate excuse, the voter needs to make an effort in order for it to be a reasonable impediment (p. 58). He testifies that the SEC will make sure that not having enough notice is not a reasonable impediment (p. 58). He doesn't know whether the following are reasonable impediments: no bus service, did not know that one could not vote on an expired license, a photo is an invasion of privacy, my child was sick or I could not get a babysitter to go downtown (p. 106). But he testified that just being poor is not a reasonable impediment (p. 141). Representative Harrell testifies that any reason may be acceptable (p. 130). Mr. Dennis, who drafted the photo ID bill for the House, testified in his deposition (p. 149) that he does not know what reasonable impediment means in practice. In Representative Clemmons' testimony (pp. 56-60) he says he would rely on the SEC to define reasonable impediment, cites the Attorney General's birth certificate exemption, and indicates that transportation issues could be a reasonable impediment. Lt. Governor McConnell is unsure about whether "I didn't know about the law before" would be an acceptable reasonable impediment (deposition, p. 168).

83.    The SCARE Legislative Committee indicated that its members are also uncertain (see Andino deposition, pp. 92-3). In her deposition, Ms. Andino does not know whether the opinion of the Attorney General (cited above) addresses the local election officials concerns (p. 94). Furthermore, Ms. Andino (deposition, pp. 135, 205-7) and Mr. Whitmire (deposition pp. 185-90) admit that the State Election Commission has no control over how poll managers are trained and instructed, or how the photo ID provisions would be implemented. There is reason to believe that

42

the county ECs will not necessarily be governed by the SEC decisions. Mr. Dennis testified that "It is fair to say, I think, that the 46 voter registration boards in this state have 46 different processes by which you register to vote" (deposition, p. 141-2). Yet voter registration is set in the South Carolina Constitution (Dennis deposition, p. 96-98). If there is no uniformity in implementing a constitutional provision, one would not expect uniformity on a statutory question. Yet the legislative proponents of the photo ID law are depending on the SEC to impose uniformity and an appropriate definition of reasonable impediment. See depositions of Martin, pp. 108-10, 187-93; Peeler, pp. 65, 71; Harrison, pp. 59, 103-5; Harrell, pp. 79-80, 130-2; Dennis, p. 56, 92; Clemmons, pp. 65 for discussion of reliance on the SEC.

84.     Because the discretion is left up to the county ECs with the criteria so uncertain, troubling concerns are raised. In *United States v. Charleston County* (316 F. Supp. 2d at 286-89 n.23) the court found "significant evidence of intimidation and harassment" of Black voters in Charleston County, SC by poll managers and poll watchers based on testimony about such conduct in elections from the 1980s through 2002. The problem is that the county ECs are not responsible to the SEC. They are appointed by the governor or the legislative delegation; and cannot be removed by, and are independent of, the SEC. The selection of election officials in South Carolina is partisan, and there are no provisions in many counties for the minority party to have representation on the commissions and boards that will make these decisions. The governor makes the county EC appointments with the advice of the majority of the county delegation in the General Assembly, except in a few counties where the majority of the delegation appoints directly. The race of the voter who submitted the provisional ballot can be known prior to the canvass and it is possible for election officials to arbitrarily decide to accept or reject a provisional ballot on the basis of race and known relationship of race to partisanship or some other factors, especially in pre-

cincts with a high proportion of Minority voters.

85.     The scholarship on the behavior of election officials is clear: partisanship makes a differ-ence in how provisional ballots are judged (Kropf and Kimball (2012, chapter 6). Foley (2005) discusses the vulnerability of provisional ballots to "post election abuse" (e.g., not being counted by the county EC) if rules are not clear and effectively enforced. Baybeck and Kimball (2008, p. 18) also indicate problems with implementation of provisional ballot procedures: "… provisional ballots are more likely to be rejected in precincts with non-white residents and female-headed households with children. Where we have individual-level data on provisional voters, Independ-ents and nonpartisans are more likely than partisans to see their provisional votes rejected, and non-whites are more likely than whites to see their provisional ballots rejected."

86.     Even if we assume fair administration at the polling place and county EC office and Ms. Andino's broad interpretation of the statute, the provisional ballot procedure would still have a disproportionate negative effect on Minority voters. The voters who decide to try to vote without a photo ID, will be redirected away from their neighbors, family, and friends to a different table where they will be asked to complete an affidavit swearing that they are who they claim to be and declaring that they have some kind of impediment. Their ballot will be sealed in an envelope and they will not know whether it will be counted. This procedure is embarrassing, occurring within what for some of those with low levels of literacy is a stressful process. They are, in es-sence, being singled out as potentially fraudulent voters without probable cause. This apparently minor increase in the cost of voting, can have an impact on turnout.

<u>THE NEED FOR PHOTO ID TO PREVENT</u>
<u>IMPERSONATION VOTE FRAUD IS PRETEXTUAL</u>

44

87.    Hypothetically, it is possible that an individual in South Carolina has impersonated a registered voter. If the photo ID law is not precleared, an instance of impersonation might occur in the future. Implementation of the photo ID law might deter some instance of impersonation fraud. That said, impersonation fraud is not a problem (see Andino deposition, p. 142 for the lack of impersonation fraud in South Carolina). Certainly not a problem that outweighs the public interest in encouraging voting, the greater problems in the voting process not being address by South Carolina such as long lines at the polls, and the disproportionate negative impact this law would have on Minority voters. Moreover, the photo ID law would not necessarily prevent impersonation fraud (see Andino deposition, p. 64 and Whitmire deposition, p. 152-3). Mr. Whitmire indicates in his deposition (pp.157-8) that there are no plans to train poll managers in spotting fake ID, and there is nothing to prevent counterfeiting the planned EC photo registration card. There is no chance that poll managers will be trained in the identification of fake ID in the same way that personnel in the DMV are trained (see Col. Shwedo's deposition, p. 187).

88.    Impersonation vote fraud can be put in formula terms like the calculus of voting presented above: PF > One-Vote. The impersonator has a chance (P) of being caught committing felony (F). If he or she succeeds in the impersonation the preferred candidate or party gains one vote. The chance of one vote deciding any election is virtually nil. While it is true that without photo ID, the probability of detection (P) is also low, the incentive to commit this crime still cannot match the possible cost. In other words, we would logically expect this particular kind of vote fraud to be extremely rare, unless part of an organized effort that would surely be detected unless it involved corrupt election officials.

89.     To succeed in this kind of fraud the impersonator must know that the voter he or she is impersonating has not already voted, and that the voter won't be in the voting place at the time of the impersonation. He or she must also know that none of the poll workers and no one who might be coming to vote at about that time knows the voter. He must also match the sex and approximate age of the voter. The voter's date of birth is on the poll book, and the sex of the voter can usually, but not always, be determined by the given name. Since an impersonator cannot use a photo ID, he must obtain the voter registration certificate issued to the impersonated voter by the EC. This card has to have the voter's signature. So he must also be able to forge a reasonable facsimile of the voter's signature in the poll book (see discussion of the uncertainty about a signature on the new photo ID card from Mr. Whitmire's deposition, p. 155).

90.     The evidence available to the General Assembly and the Governor about impersonation vote fraud is not in dispute. There are no cases of impersonation vote fraud that have resulted in indictments, much less convictions, in South Carolina at least in the last ten years and perhaps for a longer period. This fact was repeated again and again in the debates in the House and Senate. Advocates of the photo ID law argue that impersonation fraud is difficult to detect when valid and current photo ID is not required. While this is true, the undisputed facts closely match the logic presented above. Impersonation fraud is difficult to pull off, and just not worth the risk. That is why it is extremely rare, and not a public policy problem. Scientific studies of fraud in many places in the country have confirmed the absence of this type of vote fraud, and these studies were cited in the General Assembly debate (see statement of Representative Sellers cited above and specifically the five-year study of voter fraud conducted during the administration of George W. Bush discussed in the *New York Times*, 12 April 2007, http://www.nytimes.com /2007/04/12/washington/12fraud.html?pagewanted=all, that was cited frequently in the debates).

46

91.     In her deposition, Ms. Andino was questioned closely about the absence of impersonation vote fraud. Here are some of the things she testified about this subject in her deposition. There is no evidence that the current procedures for preventing vote fraud are not effective (p. 50). She did not ask for a photo ID law (p. 50). Only two examples have been brought to her attention, and neither were verified (pp. 53-4). The survey the SEC undertook of the county ECs, uncovered no evidence of impersonation fraud (pp. 54-6). The statewide association of county election officials (SCARE) has opposed a photo ID law (p. 67). Indeed, the legislative priorities for SCARE have not included anything about fraud, but did include advocacy of no excuse absentee and early voting (pp. 67, 86-90). Asked whether in her 25 years of experience with the SEC covering perhaps 20 million votes cast, has she determined to her satisfaction that anyone attempted to impersonate another voter at the polls, she answered "Not at the polls" (p. 142). She is not aware of any vote fraud that the photo ID law would have prevented (p. 142). She was asked by Senator Campsen to look into the issue of voters being registered in more than one state. She sent him a letter saying that the SEC had looked into that and that there was no evidence of people voting in multiple states (p. 195). One case that was reported from Charleston County merely on the basis of an unsubstantiated conversation, was of a mother voting for her daughter (Andino deposition p. 53 and Whitmire deposition, p. 56-58). But the birth date of the voter is on the poll book, so it is difficult to believe this story unless the poll manager was corrupt or inattentive.

92.     The legislative advocates of the photo ID law testified in their depositions that they, like Ms. Andino, do not have any actual credible evidence of voter impersonation fraud. Instead, they present unverified "anecdotes" (term used by Mr. Dennis, p. 18, and Representative Clemmons, p.54). They sometime cite other kinds of fraud. They make these admissions in these pages: Senator Martin, pp. 25, 38, 42, 89, 119-10; Senator Peeler, pp. 25-8; Representative Harrison, pp.

47

34-41, 78-79, 96-97; Representative Harrell, pp. 40-3, 147; Representative Lowe, pp. 19-20, 78; Mr. Dennis, pp. 18, 24, 119-20; Representative Clemmons, pp. 41-2, 54; and Lt. Governor McConnell, pp. 44-6.

93.     The Republican majority in the General Assembly agrees that South Carolina has an ob-ligation to make the ballot available to all eligible citizens, because voting is a right (see Senator Campsen's speech cited above). But the state also has a public policy of actually encouraging turnout (see Andino deposition, p. 141). In accordance with state and Federal law, policies are designed to encourage voting. That is why registration can be accomplished by mail, at the DMV, or by registrars out in the field like the political parties and the League of Women Voters. Absentee voting is available in South Carolina (although not "no excuse" absentee), polling places have to be well marked and accessible, and voting equipment is purchased in part with the ease of the voter in mind.

94.     Anyone who has been involved in the administration of elections understands that there are no perfect elections. Clerical errors, human errors throughout the process from the poll man-agers to the canvassing board, bad ballot design, and machine errors far exceed any imagined votes changed by impersonation at the polls. Kropf and Kimball (2012, especially pp. 110-1) write extensively about the really important problems with the election system all of which stem not from fraud, much less impersonation fraud, but from underfunding and some partisanship in election administration.

95.     Some election officials argue that the photo ID law, as contained in the House bill, con-tains loopholes that open the door to impersonation fraud, rather than closing it. In an email from Marshall Scott to Senator Tom Davis, Representative Clemmons and others dated 18 April 2011

(SC_00000953-960) is a document titled "House Bill 3003 Concerns from the Beaufort County Board of Elections and Registration." Here is a summary of their concerns. Current and valid ID cards do not establish domicile according to the new law. (Passports and military ID do not have an address either). Assume that "John Smith" gets a current and valid photo ID. He could then go into any precinct where a "John Smith" is registered and vote. His identity would not be questioned, and he would not need to present one of the authorized forms of ID under the benchmark South Carolina law that do contain an address.

96.     Ms. Andino stated that the only change the photo ID law would bring to an impersonation attempt is that the impersonator would have to complete an affidavit giving a reasonable impediment for not having a photo ID, in addition to everything else that would be involved in an impersonation (deposition, p. 162). This is an incomplete analysis. Under the benchmark law the impersonator has to produce the voter registration certificate of the voter who is being impersonated (the other acceptable IDs have a photo) and forge the signature in the poll book to resemble the signature on the certificate. It is possible that under the photo ID law the impersonator might not need to present any documentation at the polls, and the poll managers would have no signature of the voter to compare to that of the impersonator. The new law may, in that sense, make impersonation voter fraud easier. Also see Lt. Governor McConnell's discussion of the signature provision in the current law (deposition, p. 56).

97.     The Beauford County Board of Elections and Registration also question the legality of an affidavit executed in the precinct that would not be properly witnessed by a notary public. The legislative proponents of the photo ID law are divided on whether a Notary Public is needed to verify the signature according to their depositions. Senator Martin testifies that he does not think

49

a notary is needed at the polls for this purpose (p. 112). Senator Peeler does not know (p. 73). Representative Harrison does not know either, but testifies that if a notary is needed the SEC will see that there is a notary at every polling place (pp. 60-2). Representative Harrell is not sure either but if it is required by law then one would have to be present in every polling place, and the county EC would have to provide them. Neither does he know how a notary could notarize a signature for a person who has no picture ID (pp. 128-9). Representative Clemmons is sure that a notary must be present at the polls to notarize signatures on the affidavits for provisional ballots because "one cannot execute an affidavit without a notary" (p. 68), and the law cannot be implemented with regard to the provisional ballots without notaries (pp. 70-1). He does not, however, know of any plans for the county ECs to have notaries at the polls (pp.70-1), and he does not indicate how a notary would be able to notarize a signature of a person who has no photo ID. There is also an obvious logical problem. The impersonator is anonymous. Only the name of the person being impersonated is known. It is difficult to see how impersonation voter fraud is prevented, or even deterred somewhat by the photo ID law.

98.     The Republican majority in the General Assembly and Governor Haley have emphasized their belief that the public lacks confidence in the election process in South Carolina because voters are not required to show a photo ID when they vote. But they present no evidence. The anecdotal evidence cited by the Republican advocates of the photo ID policy in the debates and Representative Clemmons emails suggests that many voters believe that photo ID is already required. He says: "The first response I get when I discuss this bill with my constituents is: "That's not already the law?" (see email from Representative Clemmons to Ralph Panzrino, 6 May 2010, SC_00000575-576). In their depositions the legislative proponents of the photo ID law repeat these anecdotal assessments of public confidence, but admit they neither collected nor sought

systematic evidence of confidence (see Representative Harrison, p.47-8, 50; and Clemmons, pp. 53-5).

99.     The SEC conducted the only polls on public confidence that would have been available to the General Assembly. Ms. Andino said that post election surveys of voters conducted by the SEC in the past (as recently as 2004 and 2006) indicate that 80 to 90% of the voters were "very confident" in the election process, and she has no reason to believe that the level of confidence has changed (deposition, pp. 177-8). There is no evidence that the SEC offered these data to the General Assembly or that they asked whether such data existed.

100.    Those most in touch with public perception would be the grassroots officials who implement elections in South Carolina. Ms. Andino, however, reports that her staff and the SEC did not ask the General Assembly to pass a photo ID requirement, but they have supported early voting (deposition, p. 50), and the association of county election officials (SCARE) has consistently opposed a photo ID requirement, while also supporting early voting (Andino deposition, pp. 67, 86-90, 146). Mr. Whitmire claims that the SEC has taken no position on the photo ID law because it is too "political" (meaning partisan), and they wish to maintain their neutrality (deposition, pp. 35-6).

101.    The photo ID law was a primary goal of the Republican Party organization, Republican activists, and some Republican members in both the House and Senate (for example, see the Republican Party Platform, Summer 2010), not from the general public. The campaign from party activists for the law as a "clean bill," mentioned in Senator McConnell's explanation of the conference report (Appendix C) and described by him as "propaganda," is another clear indication of the Republican Party organization as the main source of pressure for a photo ID bill. Most of

51

the emails to and from Representative Clemmons also reflect this source of the pressure, and he confirms this conclusion in his deposition (pp. 175-8).

102.     Other proponents of the photo ID bill also testify that Republican Party activists and Tea Party groups were the pressure for the photo ID bill. These groups were the source of the idea that Republican senators were responsible for the defeat of the law in the 09-10 session of the General Assembly. This pressure was sufficient to force Republican Senators to abandon early voting, and elderly exemption from the law, and the inclusion of government employee ID for voting. They did not want to be blamed again for the defeat of the photo ID law. For further discussion of this political situation see Lt. Governor McConnell's statement in Appendix C and his deposition, pp. 104-8, 127-8, 135-6, 159-61, 172-3. For similar support see depositions of: Senator Martin, pp. 142-152; Representative Harrison, pp. 50, 155; and Representative Harrell, pp. 115, 164-6.

## CONCLUSIONS

103.     Under the *Arlington Heights* framework one is not required to prove that racial discrimination was the sole, primary, or dominant motivation behind a law that adversely affects a Minority group. A court may find that a policy with a clearly foreseeable and significant adverse effect on a Minority population was enacted with discriminatory intent even if that adverse effect results from the application of an otherwise neutral state policy. Requiring a valid photo ID to vote may appear to be a "neutral state policy," but it is not a policy that could reasonably be intended to deal with a significant public problem. It runs counter to another important public interest in promoting voting, and it adversely affects Minorities to a greater extent than Whites.

104.    Why would the proponents of a photo ID law in the General Assembly and the governor enact a policy that addresses no public problem, and runs counter to an important public interest in voter turnout? The people who will be most seriously affected by the photo ID law are Minorities who almost never vote for Republicans in South Carolina. A law in South Carolina that more seriously hurts Minorities than Whites, works to the advantage of Republicans. While it may be that the advocates of the photo ID law believe it is good public policy, they can afford to be unconcerned about the effect it might have on voter turnout since any effect would harm Democratic voters more than Republicans.

105.    Dr. Stewart's analysis shows clearly that the photo ID law will impose a burden that disproportionately affects Minority citizens. This "burden" is not slight or insignificant as South Carolina claims. There is not, as required by the *Arlington Heights* decision, a "reasonable and legitimate justification" for this change. The alleged fraud justification is pretextual. There is no evidence of impersonation vote fraud or of a lack of public confidence in the election process because of impersonation vote fraud. But even if one assumes that the photo ID law is an "otherwise neutral state policy" the law has a clearly foreseeable and significant adverse effect on the Minority population, and therefore was enacted with discriminatory intent. The General Assembly was aware of this adverse effect and enacted the photo ID law in spite of that knowledge.

106.    The General Assembly did not take the concerns of Minorities into account in the formation of this policy. Whatever compromises were made with Minority Senators were negated in the conference committee that adopted the House version on all matters involving the photo ID provision of Section 5. Therefore, Minority representatives in the House did not play any important role in the formation of this policy.

107.    South Carolina is covered under § 5 of the Voting Rights Act because it is one of several states that had a long history of racial discrimination in registration and voting prior to the adoption of the Act (see Bullock and Gaddie 2009, chapter 6). South Carolina has a history of *de jure* segregation, and continuing racial disparities between the races in socio-economic status, education, employment, and income.

108.    I conclude that the photo ID law was enacted with the intent to discriminate against Minority citizens and to retrogress by offering them less of an ability to participate in the political process and elect candidates of their choice than they have under the benchmark statutes.

I declare under penalty of perjury, that the foregoing is true and correct.

Executed this ___*19th*___ day of ___*June*___ 2012.

_____

Theodore S. Arrington, Ph.D.

## SELECTED REFERENCES ON INTENT

Binion, Gayle. 1983. "'Intent' and Equal Protection: A Reconsideration." *Supreme Court Review*: 397-457.

Eisenberg, Theodore, and Sheri Lynn Johnson. 1991. "The Effects of Intent: Do We Know How Legal Standards Work?" *Cornell Law Review* 76: 1151-97.

Ely, John Hart. 1970. "Legislative and Administrative Motivation in Constitutional Law." *Yale Law Journal* 79: 1025-1341.

Karlan, Pamela S. 1983. "Discriminatory Purpose and Mens Rea: The Tortured Argument of Invidious Intent." *Yale Law Journal* 93: 111-34.

Karst, Kenneth L. 1978. "The Costs of Motive-Centered Inquiry." *San Diego Law Review* 15:1163-66.

Kousser, J. Morgan. 1988. "Expert Witnesses, Rational Choice and the Search for Intent." *Constitutional Commentary* 5:352-53.

Kousser, J. Morgan. 1991. "How to Determine Intent: Lessons From L.A." *Journal of Law and Politics* 7:591-732.

Kousser, J. Morgan. 1992. "Was Memphis's Electoral Structure Adopted or Maintained for a Racially Discriminatory Purpose?" *Caltech Social Science Working Paper No. 807.* Pasadena: California Institute of Technology.

Kousser, J. Morgan. 1999. *Colorblind Injustice: Minority Voting Rights and the Undoing of the Second Reconstruction.* Chapel Hill: The University of North Carolina Press [especially chapters 2 and 7].

McCrary, Peyton. 1985. "Discriminatory Intent: The Continuing Relevance of 'Purpose' Evidence in Vote-Dilution Lawsuits." *Howard Law Journal* 28:463-93.

Mele, Alfred R. 1992. *Springs of Action: Understanding Intentional Behavior.* New York: Oxford University Press.

Miller, Andrew P., and Mark A. Packman. 1987. "Amended Section 2 of the Voting Rights Act: What is the Intent of the Result Test?" *Emery Law Journal* 36:1-73.

Miller, Barry A. 1977. "Proof of Racially Discriminatory Purpose Under the Equal Protection Clause: *Washington v. Davis, Arlington Heights, Mt. Healthy, and Williamsburgh.*" *Harvard Civil Rights-Civil Liberties Law Review* 12: 725-70.

Note. 1976. "Reading the Mind of the School Board: Segregative Intent and the De Facto/De Jure Distinction." *Yale Law Journal* 86:317-55.

1

Note. 1982. "Making the Violation Fit the Remedy: The Intent Standard and Equal Protection Law." *Yale Law Journal* 92:328-51.

Ortiz, Daniel R. 1989. "The Myth of Intent in Equal Protection." *Stanford Law Review* 41:1105-52.

Parker, Frank R. 1983. "The 'Results' Test of Section 2 of the Voting Rights Act: Abandoning the Intent Standard." *Virginia Law Review* 69: 715-64.

Weinzweig, Marjorie J. 1983. "Discriminatory Impact and Intent Under the Equal Protection Clause: The Supreme Court and the Mind-Body Problem." *Law and Inequality* 1: 277-339.

## OTHER WORKS CITED

Alvarez, R. Michael; Thad Hall; and Susan Hyde (eds.). 2008. *Election Fraud: Detecting and Deterring Electoral Manipulation.* Washington: Brookings Institution Press.

Alvarez, Michael R.; Stephen Ansolabehere; Adam Berinsky; Gabriel Lenz; Charles Stewart III; and Thad Hall. 2012. "2008 Survey of the Performance of American Elections Final Report." Pew Charitable Trust, the JEHT Foundation, and the American Association of Retired Persons.

Baybeck, Brady; and David C. Kimball. 2008. "The Political Geography of Provisional Ballots," Paper presented at the Annual Meeting of the American Political Science Association, Boston, MA, August 2008.

Black, Earl and Merle. 1987. *Politics and Society in the South.* Cambridge: Harvard University Press.

Black, Earl and Merle. 2003. *The Rise of Southern Republicans.* Cambridge: Harvard University Press.

Brady, Henry E. and John E. McNulty. 2011. "Turning Out to Vote: the Costs of Finding and Getting to the Polling Place." *American Political Science Review* 105:115-134.

Bullock, Charles S. III and Ronald Keith Gaddie. 2009. *The Triumph of Voting Rights in the South.* Norman: University of Oklahoma Press.

Downs, Anthony. 1953. *An Economic Theory of Democracy.* New York: Harper.

Fay, Jessica A. 2005. "Elderly Electors Go Postal: Ensuring Absentee Ballot Integrity for Older Voters." *Elder Law Journal* 13:453ff.

Foley, Edward B. 2005. "The Promise and Problems of Provisional Voting," 73 *George Washington Law Review* 73:1193.

Fortier, John C. and Norman J. Ornstein. 2003. "The Absentee Ballot and the Secret Ballot: Challenges for Election Reform." *University of Michigan Journal of Law Reform* 36:483ff.

Gurin, Patricia; Hatchett, Shirley; Jackson, Jon S. 1989. *Hope and Independence: Minority's Response to Electoral and Party Politics.* New York: Russell Sage Foundation.

Imai, Kosuke; and Gary King. 2004. "Did Illegal Overseas Absentee Ballots Decide the 2000 U.S. Presidential Election?' *Perspectives on Politics* 2:537-549.

Karlawish, Jason; H.T. Richard; J. Bonnie; Paul S. Appelbaum; Rosalie A. Kane; Constantine G. Lyketos; Pamela S. Karlan; Bryan D. James; Charles Sabatino; Thomas Lawrence; and David

Knopman. 2008. "Identifying the Barriers and Challenges to Voting by Residents in Nursing Homes and Assisted Living Settings." *Journal of Aging and Social Policy* 20:65-79.

Keyssar, Alexander. 2001. *The Right to Vote: The Contested History of Democracy in the United States.* New York: Basic Books.

Kropf, Martha, and David C. Kimball. 2012. *Helping America Vote: The Limits of Election Reform.* New York: Routledge.

McNulty, John E.; Conor M. Dowling; and Margret H. Ariotti. 2009. "Driving Saints to Sin: How Increasing the Difficulty of Voting Dissuades Even the Most Motivated Voters." *Political Analysis* 17:435-455.

Pitts, Michael J. 2008. "Empirically Assessing the Impact of Photo Identification at the Polls Through an Examination of Provisional Balloting," *Journal of Law & Politics* 24:1-40.

Riker, William H., and Peter Ordeshook. 1970. "A theory of the Calculus of Voting." *American Political Science Review* 62:25-41.

Verba, Sidney and Norman H. Nie. 1972. *Participation in America: Social Equality and Political Democracy (*New York: Harper and Row).

Verba, Sidney; Norman H. Nie; and Jae-on Kim. 1978. *Participation and Political Equality: A Seven National Comparison* (Cambridge: Cambridge University Press).

Wolfinger, Raymond E. and Rosenstone, Steven  J. 1980. *Who Votes?* (New Haven: Yale University Press).

4

Table 1

Selected Statistics from Dr. Charles Stewart's Declaration

On the "No Match" Between the DMV Records and Voter Registration

| Race/ Ethnicity | All Active Registered Voters | | "No Match" Valid and Invalid License/ID Card[1] | | | "No Match" Only Valid License/ID Card[2] | | |
|---|---|---|---|---|---|---|---|---|
| | Number | Per-cent | Num-ber | Percent | Probability Expressed As % | Number | Percent | Probability Expressed As % |
| White | 1,902,625 | 69.5% | 33,754 | 53.7% | 1.9% | 98,113 | 56.6% | 5.5% |
| Black | 767,037 | 28.0% | 26,035 | 41.4% | 3.6% | 69,283 | 40.0% | 9.5% |
| Hispanic | 28,214 | 1.0% | 1,240 | 2.0% | 4.8% | 2,586 | 1.5% | 10.0% |
| Asian | 18,293 | 0.7% | 538 | 0.9% | 3.2% | 1,047 | 0.6% | 6.2% |
| Other | 14,140 | 0.5% | 1,035 | 1.6% | 8.0% | 1,668 | 1.0% | 12.9% |
| Indian | 5,345 | 0.2% | 245 | 0.4% | 4.9% | 502 | 0.3% | 10.1% |
| Mixed | 164 | 0.0% | 17 | 0.0% | 10.6% | 23 | 0.0% | 14.4% |
| Unknown | 91 | 0.0% | 26 | 0.0% | 29.2% | 28 | 0.0% | 31.5% |
| Total | 2,735,909 | 100% | 62,890 | 100% | 2.4% | 173,250 | 100% | 6.7% |

Notes:

1.  6,346 records are excluded, mostly due to missing Social Security numbers, but also potentially due to the failure of the SSN+Sex algorithm. It appears that the latter is rare. These are 0.23% of the records. Surrendered licenses removed from the anaysis, because the voter would not have the license card to use for ID.

2.  13,353 records are excluded. These are .48% of the records.

5

Table 2

Comparison of the Socio-Economic Status  and Availability of Automobile Transportation

of Whites and Blacks in South Carolina

| Category or Description of Statistic | Whites Alone | Any Part Black |
|---|---|---|
| Percent of households without a vehicle available | 4.0% | 15.3% |
| Percent of individuals below the poverty level | 11.1% | 28.4% |
| Median household income, adjusted for inflation | $51,141 | $28,970 |
| Percent of individuals over 25 who have completed high school | 86.2% | 75.7% |
| Percent of individuals over 25 who have a baccalauriate degree | 27.9% | 12.9% |

Source: U.S. Census American Community Survey, 5 year composite for 2010.

6

Note: Race of the household is determined by the race of the household head.

Table 3
Votes in the General Assembly on H3003, Session 119 (2011-12) in the House

| Description of Action Being Voting On In the House of Representatives | Number of Minority Democrats Voting With Republicans (out of 29 in House) | Number of White Democrats Voting With Republicans (out of 18 in House) |
|---|---|---|
| Amendment 1: Miscellaneous minor changes, but might be seen as restricting the kinds of identification which could be used to vote. Adopted 73 to 41 | 0 | 3 |
| Amendment 2: Broadens the kinds of identification that would suffice to include identification issued by municipality, boards, authority, or other entities of SC. Tabled 83 to 28 | 12 | 0 |
| Amendment 4: Eliminate Sections 8, 9, and 11.  Would remove notification and other parts that received pre-clearance from DOJ, and take effect immediately. Tabled 69 to 42 | 2 | 0 |
| Amendment 5: Exempt people over 65 or with disabilities. Tabled 70 to 42 | 0 | 0 |
| Amendment 8: Establish early voting. Tabled 69 to 41 | 0 | 0 |
| Amendment 18: Remove funding. Tabled 69 to 41 | 0 | 0 |
| Amendment 26: Allow poll watchers to sit directly behind poll managers who are checking identification. Motion to table failed 35 to 77 | 0 | 7 |
| Amendment 26: Adopted 79  to 31 | 0 | 8 |
| Amendment 27: Bill not to take effect until funding is approved. Tabled 72 to 42 | 0 | 0 |
| Motion to Not Continue: Failed 43 to 76 | 0 | 2 |
| Table Motion to Re-Commit The Bill: Passed 81 to 36 | 3 | 4 |
| Passage of Bill: Passed 74 to 45 | 0 | 0 |
| Reconsider Passage of Bill: Tabled 71 to 38 | 0 | 0 |
| Adopt Amendment 1a to Conference Bill: Provisions for situations where individual does not have valid identification and votes provisional ballot. Sets criteria for counting the provisional ballot. Adopted 66 to 38. | 0 | 0 |
| Cloture: Cloture called 69 to 40 | 0 | 0 |
| Conference Report: Adopted 71 to 36 | 0 | 0 |

Source:
http://www.scstatehouse.gov/billsearch.php?billnumbers=3003&session=0&summary=B
3/29/2012

South Carolina Legislature Online - Bill Search by Bill Number

Table 4
Votes in the General Assembly on H3003, Session 119 (2011-12) in the Senate

| Description of Action Being Voting On In the Senate | Number of Minority Democrats Voting With Republicans (out of 9 in Senate) | Number of White Democrats Voting With Republicans (out of 10 in Senate) |
|---|---|---|
| To Set for Special Order: Failed 25 to 15 | 0 | 0 |
| To Set for Special Order: Failed 26 to 14 | 0 | 0 |
| To Set for Special order: Failed 26 to 17 | 0 | 0 |
| Rule 15A—Cloture: Passed 24 to 17 | 0 | 0 |
| Amendment P1: Add student identification. Tabled 27 to 13 | 0 | 1 |
| Amendment P3: Hospital patients get absentee ballot. Tabled 27 to 13 | 0 | 3 |
| Amendment P4: Exemption for persons 62 years of age or older. Adopted 17 to 25 | 0 | 0 |
| Amendment P7: Increase the fee for renewal of special identifications card to $15.50 for persons from 10 to 16 years of age. Failed 3 to 38 | 6 | 8 |
| Amendment P482: Authorized representative of a voter may request absentee ballot. Counties may establish additional early voting centers. Adopted 41 to 0 | Unanimous | Unanimous |
| Amendment P8: Early voting centers may be open 8:00 am to 9:00 pm Monday through Friday. Adopted 5 to 34 | 5 | 6 |
| Amendment P9: Signature on absentee ballot must be red or blue ink. Failed 2 to 40 | 6 | 6 |
| Amendment P11: Fee for renewal of identification card for those between 10 and 16 would be $11. Failed 3 to 38 | 5 | 9 |
| Amendment P15: Each county shall establish 3 to 8 early voting centers. Failed 9 to 31 | 2 | 5 |
| Amendment P14B: Exempt from photo identification requirement those born on or before 1 January 1947. Adopted 39 to 3 | 8 | 10 |
| 2nd Reading As Amended: Passed 26 to 15 | 0 | 2 |
| 3rd Reading As Amended: Passed 24 to 15 | 0 | 1 |
| To Nonconcur to the House Bill: Passed 28 to 15 | 7 | 10 |
| Conference Report: Adopted 26 to 16 | 0 | 0 |

Source:
http://www.scstatehouse.gov/billsearch.php?billnumbers=3003&session=0&summary=B

3/29/2012
South Carolina Legislature Online - Bill Search by Bill Number

# Appendix A

## Search Criteria for Media Coverage of Photo ID Bill

**Newspapers**:
- *Associate Press State Wire*
- *Charlotte Observer*
- *Examiner Online*
- *The Herald*
- *The State*

**Search Provider:** NewsBank
**Search terms:** Voter ID, Voter ID Bill

**Newspaper:**
- *NYT*

**Search Provider:** Lexis
**Search terms:** "South Carolina Voter ID Bill"

**Newspaper:**
- Post & Courier

**Search Provider:** Post & Courier Online Archives
**Search Terms:** Voter ID, Voter ID Bill

The majority of the research was done using NewsBank.

10

**Appendix B**
**Time Line for Photo ID Bill**
**H3003, Act R 54**
**2010-11 Session of the South Carolina General Assembly**

12/07/10House Prefiled
12/07/10House Referred to Committee on Judiciary
01/11/11House Introduced and read first time (**House Journal-page 3**)
01/11/11House Referred to Committee on Judiciary (**House Journal-page 3**)
01/12/11House Member(s) request name added as sponsor: Atwater
01/18/11House Member(s) request name added as sponsor: Henderson, Quinn, Tallon, Patrick,
J.R.Smith, Hixon, Taylor, Young, Bedingfield, Corbin, Pitts, Chumley, Spires, Pope,
Bikas, Pinson
01/19/11House Committee report: Favorable with amendment Judiciary
(**House Journal-page 2**)
01/20/11House Member(s) request name added as sponsor: D.C.Moss
01/25/11House Member(s) request name added as sponsor: Erickson, Willis
01/25/11House Objection by Rep. Cobb-Hunter and Sellers (**House Journal-page 32**)
01/25/11House Requests for debate-Rep(s). Clemmons, Crawford, JE Smith, Hart, Govan,
McEachern,
Erickson, Brantley, King, Jefferson, Munnerlyn, Forrester, Parker, Allison, Mack,
Mitchell, Bikas, DC Moss, JR Smith, Hixon, Taylor, Young, RL Brown, GA Brown,
Anderson, Clyburn, Hosey, Brannon, Hayes, Battle, Gilliard, McCoy, Stringer, Sandifer,
Whitmire, VS Moss, Nanney, Bedinfield, Henderson, Allen, Hearn, Dillard, Corbin,
Hardwick, Loftis, Pope, Whipper, Ott, and Vick (**House Journal-page 32**)
01/26/11House Member(s) request name added as sponsor: Brady, Herbkersman, Nanney,
Brannon, Whitmire
01/26/11House Amended (**House Journal-page 28**)
01/26/11House Read second time (**House Journal-page 28**)
01/26/11House Roll call **Yeas-74 Nays-45** (**House Journal-page 28**)
01/27/11House Read third time and sent to Senate (**House Journal-page 34**)
01/27/11Senate Introduced and read first time (**Senate Journal-page 17**)
01/27/11Senate Referred to Committee on Judiciary (**Senate Journal-page 17**)
02/08/11Senate Motion For Special Order Failed (**Senate Journal-page 14**)
02/08/11Senate Roll call **Ayes-25 Nays-15** (**Senate Journal-page 14**)
02/09/11Senate Motion For Special Order Failed (**Senate Journal-page 23**)
02/09/11Senate Roll call **Ayes-26 Nays-14** (**Senate Journal-page 23**)
02/10/11Senate Special order, set for February 10, 2011 (**Senate Journal-page 19**)
02/10/11Senate Roll call **Ayes-26 Nays-17** (**Senate Journal-page 19**)
02/15/11Senate Debate interrupted (**Senate Journal-page 24**)
02/16/11Senate Debate interrupted (**Senate Journal-page 23**)
02/17/11Senate Debate interrupted (**Senate Journal-page 12**)
02/22/11Senate Debate interrupted (**Senate Journal-page 23**)
02/23/11Senate Committee Amendment Amended and Adopted (**Senate Journal-page 36**)

02/23/11 Senate Read second time (**Senate Journal-page 36**)
02/23/11 Senate Roll call **Ayes-26 Nays-15** (**Senate Journal-page 36**)
02/24/11 Senate Read third time and returned to House with amendments
      (**Senate Journal-page 11**)
02/24/11 Senate Roll call **Ayes-24 Nays-15** (**Senate Journal-page 11**)
03/02/11 House Debate adjourned until Thursday, March 3, 2011 (**House Journal-page 49**)
03/03/11 House Debate adjourned until Tuesday, March 8, 2011 (**House Journal-page 28**)
03/08/11 House Debate adjourned until Wednesday, March 9, 2011 (**House Journal-page 73**)
03/09/11 House Debate adjourned on amendments (**House Journal-page 27**)
03/10/11 House Debate adjourned on amendments (**House Journal-page 30**)
03/29/11 House Debate adjourned on Senate amendments until Wednesday, March 30, 2011
      (**House Journal-page 30**)
03/30/11 House Debate adjourned on Senate amendments until Thursday, March 31, 2011
      (**House Journal-page 33**)
03/31/11 House Debate adjourned on amendments (**House Journal-page 35**)
04/05/11 House Debate adjourned on Senate amendments until Wednesday, April 6, 2011
      (**House Journal-page 22**)
04/06/11 House Senate amendment amended (**House Journal-page 36**)
04/06/11 House Returned to Senate with amendments (**House Journal-page 36**)
04/13/11 Senate Non-concurrence in House amendment (**Senate Journal-page 35**)
04/13/11 Senate Roll call **Ayes-28 Nays-15** (**Senate Journal-page 35**)
04/14/11 House House insists upon amendment and conference committee appointed
      Reps. Clemmons, Lucas, and Merrill (**House Journal-page 2**)
04/14/11 Senate Conference committee appointed McConnell, Campsen, and Scott
      (**Senate Journal page 21**)
04/26/11 House Conference report received and adopted (**House Journal-page 38**)
04/26/11 House Roll call **Yeas-71 Nays-36** (**House Journal-page 38**)
05/11/11 Senate Conference report received and adopted (**Senate Journal-page 35**)
05/11/11 Senate Roll call **Ayes-26 Nays-16** (**Senate Journal-page 35**)
05/11/11 Senate Ordered enrolled for ratification (**Senate Journal-page 47**)
05/17/11 Ratified R 54
05/18/11 Signed By Governor


Source:
http://www.scstatehouse.gov/billsearch.php?billnumbers=3003&session=0&summary=B
3/29/2012
South Carolina Legislature Online - Bill Search by Bill Number

## APPENDIX C -- REMARKS OF SENATOR MCCONNELL
## ON CONFERENCE COMMITTEE REPORT

I will try to give you the history of what happened with this Voter ID Bill -- where we went, how we ended up in conference, what was done before we got to conference, what we got out of conference, what the Senate has done and where we are.

For those of you who didn't want this Bill, some of the things the House refused to take may have well played into your hands. On the other hand, those of us who wanted the Bill are getting something out of it. Senator LAND, one of the things y'all were very opposed to from the start after it left the Senate – I went over to the Speaker of the House to tell him of our concerns. I told him absolutely and unequivocally, if they sent us a Bill that had that absentee precinct eliminated, the Bill was in mortal trouble. I said, "Please do not put that in this Bill." To their credit, they didn't put that back in and took that out. None of this limitation on absentee voting precinct is in the Bill.

However, let me tell you what they did do. I'm going to lay all the cards out, because I have gotten beaten up. Senator CAMPSEN got beaten up. Senator SCOTT got beaten up. Here is what happened and how we approached conference. The House kept the Bill for something like five to six weeks. We didn't hear any more communication but communicated back to the Speaker we needed something on early voting in the Bill -- that provision we needed for early voting in the Bill. I said, if you don't want to go to a day, put zero in it. The Speaker said, "We'll go back and talk to my caucus." He did. Apparently, they were not persuaded. So, let me stop and say that we couldn't get that early voting provision in here; but, we have done the best we could do to preserve the Senate position. We have taken the Senate Bill and have put early voting in it and sent it over to the House. We will do our best to keep heat on that part, and, I think, it passed the Senate unanimously. Here is what I want -- particularly the Democratic members to hear what happened -- to thank you for your nonconcurrence vote, because you kept something very bad from happening to the State with this Bill. Those of you who stampeded to concur -- I want you to hear this, because I want you to see what you almost inflicted on this State and would have been blamed for back home.

After the Bill went back to the House, there was apparently a media campaign. I suspect it had to have been coordinated with our state party. In either case, the propaganda pumps began Monday with the language to vote for the clean Voter ID Bill -- vote to concur with the clean Bill. Our state party put out an email publication to call us to vote for a clean Bill. As you know, then the propaganda pumps at the House of Representatives also began spitting forth their jargon, which was that they had provided a clean Bill. We didn't have very long to look at it. But what we were able to see in the Bill, when I got Senator CAMPSEN and staff, Ms. Anderson, and others to look at it to see what was in here, we found there had been language inserted in the Bill that is not clean.

I'm going to go over that with you, because we had to argue -- and I want to tell you Senator SCOTT did an excellent job of trying to sell it. He just didn't have takers. I don't want anybody on this side not to think that he didn't speak up and he didn't forcefully try to nail the points. He argued and helped in improving other parts of the Bill on which we could improve, but this campaign on this so-called "clean Bill" that the House of Representatives had passed was so bad and it was orchestrated. Senator CAMPSEN and I had to appear before our county convention

13

and get up and explain why we voted to nonconcur. Now, in retrospect, this is the second time that two major pieces of legislation in this Senate have almost gotten stampeded by either emails or blogs or whatever.

We almost made the same mistake with the Immigration Bill; we were warned was unconstitutional. If we hadn't nonconcurred, we wouldn't have had a good illegal Immigration Bill. Now, we are faced with a similar thing. Let me tell you -- all of you who voted to nonconcur -- what you stopped. In the House Bill, they became concerned as they were writing this. Senator SCOTT and Senator CAMPSEN, if I get this wrong, please correct me. They were concerned that the requirement of a birth certificate would amount to a poll tax. For that, they went in and put in the following language. Then, I want to tell you what this language did, Senator RANKIN, so you can go back and tell your party chairman what would have occurred if you had not voted the way you voted. "For the purposes of meeting requirements of this Item 2, the Department of Motor Vehicles may receive and shall accept, no discretion, from the Bureau of Vital Statistics, Department of Health and Environmental Control, suitable information verifying the applicant's name and date of birth." What they did was repeal the requirement "in South Carolina for South Carolina ID that you had to have a birth certificate and a picture ID". What good is a South Carolina ID if you don't have to prove the birth and the picture to match the face? They put it in. They put it in as an alternative to requiring a birth certificate to get a South Carolina ID.

So, where is the clean House Bill? Where is the clean Bill? It was in two places. When we checked with DHEC, they said what? "The birth date and notify the parents?" You open South Carolina wide up. If you are worried about fraud, you have opened the grand doors to fraud, to the identity thieves and illegal immigrants or anyone else who could go in with two pieces of information without a birth certificate and get a South Carolina ID and access benefits and everything else. Why? Because we were to give the stamp of approval to the House version. I think if any member of the Senate has read this Bill and seen that language, no one would have voted for it. It had occurred. They put it in there under the South Carolina ID, then went back and repeated the mistake again -- and said on the State Registrar -- and goes through the same thing again -- then says shall accept, giving DMV no discretion. They had to accept from DHEC. I will tell you, Senator CAMPSEN and I had our state party attempt to make it appear that we were not loyal Republicans -- that we were not looking out for our side of the question, because we voted to nonconcur along with another group of you. I saw the press release that said only 15 of us were true Republicans and that the other group of us who voted to nonconcur were not.

I wanted y'all to have the backdrop to what was going on before we ever approached the conference table; but, now, let me tell you about this so-called clean Bill of theirs and what else they did. They added in here a section. I think Senator SCOTT brought this to my attention -- that they were involved in poll-watcher amendments. This was supposed to be a clean Voter ID Bill and there's a new section of the law and I won't even read it. I will just tell you what it effectually did. The poll-watcher couldn't stand behind the table -- couldn't stand to the side of the person and look -- had to sit directly behind them. How can you see when you've got to sit directly behind somebody? When we argued the point, they said, "Oh, no." I said, "No." I'm quoting it to you. I thought you said this was a clean Bill. What did that have to do with Voter ID? It didn't have a thing to do with it, but it is so-called out on the blogs and with the emails that it was a clean Voter ID Bill.

Then, in their zeal to write their Bill -- they had certain portions of the Bill going into effect before Section 5 review. The problem was the sections that would go in effect on Section 5 review aren't subject to Section 5 review. If they never got approved, how could they ever go in-

to effect? I hope all of you who voted to concur listen to this, so it is a good lesson for future complex legislation not to stampede it in and to look at it, because another section of the Bill made everything go into effect on an effective date which would have been before we got the approval of the Justice Department.

Now, what items would the House not accept of our version? They would not accept our government ID section. We tried and tried. They would not accept that. They would not accept our early voting. They accepted and we got them to agree to all of our language on early voting. This is something Senator CAMPSEN worked very hard on, which was the language that set up the residency issues that would have to be judged on the question of an illegal ballot. The House agreed to put that into the Bill. We had to pick up -- I believe it was language from our section of the Bill on severability. We straightened out the language. The House picked up most of our language on the written procedures at the polls – we made sure that people's rights on a challenged ballot were protected, and we did everything we could. We have the outreach in the Bill, the education programs. We had to accept House language on the South Carolina ID, because we were wrong on seven years. They were right on the five-year time period. We picked up their interests because those interested told us they wanted early voting. We put their provisions in the Bill and sent them back, so the people of South Carolina could have an opportunity to have early voting. All the other stuff on Voter ID is in here.

I know some of you are not going to vote for it. I understand that. We have debated this thing and debated it. We have tried, in good faith, to extend the olive branch. We went forward. We didn't object at all to early voting. We have tried to push our case forward; but, particularly to the Republicans that are out there who look at this group of us who voted to nonconcur to try to straighten this Bill up, I wanted to make sure that the story was told, because we were subjected, in my opinion, to a propaganda campaign aimed at trying to make us look weak-kneed and all of that when most legislation goes through the process. It is just an unhealthy environment when you are trying to battle the House to have somebody come in and undermine your position. That is what was happening. We should have been able to go to that table with a more united front and said, 'This is what our Senate position is." They knew some of the weaknesses we had on this. We did the best we could under the circumstances. Anyway, when we face off on reapportionment, it will be easier.

I'm wrapping up. Again, I want to say I know the Bill didn't come out like you wanted it, but I wanted to make sure you were aware that Senator SCOTT did an excellent job articulating his position. He was very knowledgeable and very firm about it. He was very up-front. He wouldn't sign the report. I respect that, and he warned them of some things they put in this Bill that may come back to haunt them that should have been put in from the Senate side, but we did the best we could do. Senator CAMPSEN, I want to thank you. We worked very hard on this Bill. Both of you were very active participants in the debate with the House members. I want to thank you for hanging in there, despite the political roughness on this to get a good Bill. Had we not nonconcurred and gone to conference, we would have ended up with a flawed law. Instead of making sure we don't have fraud in this State, it would have opened it to fraud, because we would have removed a requirement for a birth certificate and a photo ID on a South Carolina ID. I know not one of you intended it to happen, but it should be a good lesson to you about having cheerleaders from the House and outside on the street telling you to blindly vote for a Bill and not find out what is in that Bill. It was a terrible provision along with the poll watchers. The record is absolutely clear. It was not a clean Voter ID Bill. It is their language -- their amendment. It was never in the Senate Bill and it was their mistake. Thank you for helping us to clean that up.

Source: Senate Journal 11 May 2012, pp. 32-3

# APPENDIX D
# DMV Paperwork

> **Proof of Residency**
> *Applicants MUST provide one of the following and all documents*
> *must show name and S.C. address of applicant, except as noted*:

- School Records - Records must be from S.C. school (current or prior school year).
    - Student ID (address not required).

    - Report Card.

    - Letter or contract from Home Schooling Association.

    - Official letter from individual's school or school district on school or district letter-head.

    - Certified transcript.

    - Diploma from S.C. school (child has graduated within the last school year - address not required).

- Out-of-state or in-state tuition bill with applicant's S.C. physical address.
- Current employment records (no more than 90 days old).  Records must be from S.C. employer or have S.C. address for applicant on records from an out of state employer.
    - Letter on employer letterhead.

    - Payroll stub showing S.C. withholdings.

- Current utility bill no more than 90 days old. A utility bill is specific to services for your residence. Examples are electric, water, sewage, cable, and land line phone lines. Cell phone and satellite bills are not acceptable.
- S.C. Medicaid card
- Parolee Card or letter from parole officer (no more than 90 days old).
- Home mortgage monthly statement (no more than 90 days old), or deed.
- Current S.C. Weapon's Permit
- County Tax Bill for home (not vehicle) or Property Tax Receipt for home, not vehicle (current or preceding calendar year)
- State or Federal Tax records.
    - Income tax returns for current or prior year are acceptable including electronic tax file or W2.

    - If applicant listed as dependent on SC tax return that is presented as proof of residency, proof applies to dependent also.

16

- Current Military Orders detailing active duty assignment in S.C.
- Current letter from Military Base with the commander verifying duty station in S.C.
- S.C. bank statement or signed letter (must be on bank letterhead) showing name of applicant and S.C. physical address (no more than 90 days old).
- Social security check showing name and S.C. physical address of applicant (no more than 90 days old).
- Insurance documentation:
   - Current automobile or life insurance bill (no more than 90 days old – cards or policies are not accepted).

   - Current homeowners insurance policy or bill (no more than 90 days old).

   - Current health insurance statement (no more than 90 days old – cards or policies are not accepted).

- Letter from director of S.C. social welfare institution (homeless shelter, battered women's shelter, halfway house, group home, orphanage, etc.) stating applicant is resident of facility (no more than 90 days old).
- U.S. Postal Service change of address confirmation letter or postmarked U.S. mail with forwarding address label.

| **Proof of U.S. Citizenship/Proof of Identity and Date of Birth** - *Applicants MUST provide one of the following:* |

- Birth Certificate with birth/file number and registrar's signature issued by the county or Bureau of Vital Statistics.
- Birth Certificate from U.S. Territory (Must be translated if not in English) - Puerto Rico, Guam, U.S. Virgin Islands and U.S. Samoa.
- Delayed birth certificate – If birth certificate is not issued at time of birth, customer can apply for birth certificate from Bureau of Vital Statistics.
- Current U.S. Passport or U.S. Passport that has not been expired more than 10 years.
- Current U.S. Passport Card
- Certificate of Naturalization -- USCIS Form (N-550 or N-570).
- U.S. government issued Consular Report of Birth Abroad.
- Certificate of Citizenship (N-560 or N-561).

**NOTE:** If the applicant's birth certificate shows that he was not born in the United States, the applicant must ALSO provide an additional document from the above list proving U.S. citizenship.

[1]**IMPORTANT:** If name has changed since birth, applicant must present all legal documents (i.e., adoption records, marriage certificate or license issued by state/county records office,

certificate of naturalization, and court ordered name change) supporting all name changes from the name which appears on the birth certificate or proof of identity to the present.

**Proof of Social Security Number (SSN)-**
*Applicants MUST provide one of the following and*
*all documents must show SSN*:

- Social Security Card.
- SSA-1099 - "Survivor Benefit Form".
- U.S. Military Photo ID Card when SSN is present on card (active, retired or reservist military status DOD, ID, DD-214).
- Current military dependent I.D. card.
- U.S. Uniform Services Identification and Privilege Card (DD 1173) must include photograph.
- Letter from Social Security Administration (no more than 90 days old).*
- Medicare letter from Social Security Administration*
- Medicare Card*
- Payroll Stub must include employer's name and applicant's name.*
- W-2 Form must include employer's name, address, and applicant's name.*
  *\*NOTE – DMV is required to perform online verification.*

**Source: MV-93, Obtained at**

**http://www.scdmvonline.com/dmvnew/default.aspx?n=accepted_forms_of_identification**

**[Accessed 25 May 2012]**