# EXHIBIT 2

# Expert Report on South Carolina's

# Voter Identification Law, Act R54

Orville Vernon Burton

Director, Clemson CyberInstitute

Professor of History and Computer Science

Clemson University

June 19, 2012

## Table of Contents

Page

I. EXECUTIVE SUMMARY ................................................................1

II. QUALIFICATIONS AND PROCESS ...............................................3
   A. Professional Background and Experience ...............................3
   B. Statement of Inquiry and Description of Sources and Methods ..................4

III. HISTORY OF STATE-SPONSORED DISCRIMINATION IN SOUTH CAROLINA................5
   A. Recent Evidence of State-Sponsored Discrimination ....................5
   B. Race and Partisanship in South Carolina .....................................10
   C. The 2008 Election ..............................................................12
   D. Conclusion ........................................................................14

IV. THE DECISION MAKERS ..........................................................15
   A. Racially-Charged Statements or Conduct by Sponsors and Advocates of Voter ID ..........................................................................15
   B. Contemporaneous Legislation with Racially Disparate Consequences........19
   C. Conclusion ........................................................................21

V. THE LAW'S LEGISLATIVE HISTORY ...........................................22
   A. The Law's Predecessor: H. 3418 (2009-10) ...............................22
   B. The Voter ID Law: R54 (H.3003)..........................................25
   C. Conclusion ........................................................................35

VI. THE ANTICIPATED EFFECT OF THE CHANGE ON MINORITY CITIZENS...................38

VII. EVIDENCE OF PRETEXT IN THE LAW'S STATED PURPOSE .......................................44

## I.   EXECUTIVE SUMMARY

In this case, Defendant-Intervenors asked me to form an opinion about whether Act R54, the government-issued photo identification law passed by the South Carolina legislature as H. 3003 and signed by Gov. Nikki Haley in 2011 (hereinafter, the "Voter ID Law," "ID Law," or the "Law") was passed with a racially discriminatory intent. As detailed below, I conclude that it was.

According to the United States Supreme Court in *Arlington Heights*, when evaluating whether a governmental act was motivated by a discriminatory purpose, one should consider a range of facts and circumstances.  The Court identified four factors as relevant circumstantial evidence of discriminatory intent: (1) the historical background of the decision; (2) the views expressed by decision-makers on related issues; (3) the specific sequence of events leading to the decision (including whether there has been a departure from the usual practices or procedures of the decision-making body); and (4) the anticipated or foreseen effect of the change on minority citizens.[1]  These factors are consistent with the inquiries a historian makes in order to draw conclusions in this area.

This report first summarizes my qualifications and methodology as an expert witness.  Then, Section III examines the recent history of discrimination in South Carolina and specific events in the State to ascertain the climate of race relations during the period when the Law was being considered. Section IV of the report examines racial views expressed by sponsors and advocates of the Voter ID Law, as well as other legislation contemporaneously considered or passed that threatened to impact the rights of racial minorities. Section V presents the legislative history of the Voter ID Law, as well as that of its predecessor, H. 3418.  Section VI examines the anticipated effects of the Voter ID Law on minority citizens.  The final section includes an analysis of the main justification given for the Law, namely that the bill was intended to reduce voter fraud. Notably, there is absolutely no evidence of the kind of in-person voter fraud that the Voter ID Law purports to address.

Based on my evaluation of the *Arlington Heights* factors and other relevant criteria related to South Carolina's passage of Act R54, identified *infra*, I conclude that the Law was motivated by a discriminatory purpose.  My research persuaded me that the

---

1 *Village of Arlington Heights v. Metropolitan Housing Corp.*, 429 U.S. 252, 265-68 (1977).

goal of hindering African American voting played a substantial role in the introduction of the Voter ID Law's predecessor legislation in 2009 (the "2009 Voter ID Bill") immediately following President Obama's inauguration.  The same motivation was present in 2011 when the South Carolina Legislature introduced and passed the current Voter ID Law.  In particular, I conclude that South Carolina's Law was intended to suppress the growing strength of the African American vote.

I base this conclusion on all of the factors described below, including the following findings:

- South Carolina has a long history of efforts to hinder African American voting, including very recent examples of state-sponsored discrimination;

- a sustained history of racial bloc voting by African Americans and their overwhelming support for Democrats has led to a perception on the part of the Republican party that African American turnout is an electoral threat;

- adamant and unprecedented efforts to pass voter ID legislation followed on the heels of President Obama's election and record African American turnout in South Carolina;

- the 2011 South Carolina Legislature considered and passed a number of other measures that  targeted minority populations;

- the Law was a partisan bill and opposed by every African American legislator in the House and the Senate;

- key decision-makers demonstrate a propensity for racially-charged remarks and embrace racially insensitive culture;

- the legislative histories of the Voter ID Law and its predecessor were characterized by procedural irregularities that suggest the presence of a discriminatory purpose;

- the Legislature rejected proposed amendments that would not undermine the stated purpose of the Law but would ameliorate the Law's disparate burden;

- the Voter ID Law was treated with the utmost urgency in the face of severe opposition, even though there is no evidence of any problem the law would address;

- key decision-makers were made aware of the disparate impact the Voter ID Law would have on African American voters through their own research in the redistricting context, through the hearing process, and through public

discourse, but made no effort to address this issue; instead, they showed an utter disregard for minority viewpoints;

- the strict limitations on what IDs are accepted under the Law are not necessary to ensure a voter is who he says he is, raising serious questions about the Legislature's decision to reject the use of State employee IDs and student IDs; and

- no bill sponsors, election administrators or members of the testifying public could identify any verified instances of voter fraud that would be addressed by the Voter ID law, strongly suggesting that the stated reason for the Law is a pretext.

## II.   QUALIFICATIONS AND PROCESS

### A.    Professional Background and Experience

I am Professor of History and of Computer Science at Clemson University as well as the Director of the Clemson CyberInstitute.  From 2008 to 2010, I was the Burroughs Distinguished Professor of Southern History and Culture at Coastal Carolina University. I am emeritus University Distinguished Teacher/Scholar, University Scholar, Professor of History, African American Studies, and Sociology at the University of Illinois at Urbana-Champaign.  My research and writing focus on American History and particularly on race relations.  For the past four decades I have taught courses in U.S. History, Southern History, South Carolina history, race relations, discrimination, ethnicity, family, and community.  I use statistical analysis in my own research and writing, and I also taught courses in quantitative techniques at the University of Illinois.  I was a member of the graduate statistics faculty and am still a Senior Research Scientist at the National Center for Supercomputing Applications where I was Associate Director for Humanities and Social Sciences (2004-2010).  I was also the founding Director of the Institute for Computing in Humanities, Arts, and Social Science at the University of Illinois and currently chair the their Advisory Board.

I have been qualified as an expert in the fields of districting, reapportionment, and racial voting patterns and behavior in elections in the United States.  I have had extensive experience in analyzing social and economic status, discrimination, and intent in voting rights cases, and group voting behavior.  I have been retained to serve as an expert witness and consultant in numerous voting rights cases by the Voting Section of the

Division of Civil Rights of the United States Department of Justice, the Voting Rights Project of the Southern Regional Office of the American Civil Liberties Union, the National Association for the Advancement of Colored People, the Mexican American Legal Defense and Educational Fund, the California Rural Legal Association, the League of United Latin American Citizens, the Lawyers' Committee for Civil Rights Under Law, the Legal Services Corporation, and other individuals and groups.

To the best of my knowledge and memory, in the last five years I have not testified in any cases.  In 2011, I gave a deposition in *Perez v. Perry*, regarding congressional redistricting in Texas and the State House of Representatives, and in 2012 I gave a deposition in the habeas proceeding of Albert Woodfox, convicted of a 1972 murder in Angola prison, Louisiana.

A detailed record of my professional qualifications is set forth in the attached Curriculum Vitae.[2]

### B.      Statement of Inquiry and Description of Sources and Methods

In this case, I have been asked to research and form an opinion on whether the Voter ID Law was adopted with a racially discriminatory intent.

In the course of my investigation into the purpose behind Act R54, I have examined a wide range of sources, including published works by historians, political scientists, and sociologists; reviews of newspaper clippings, census reports, trial transcripts and transcripts of legislative debates, deposition transcripts, legislative journals, and other government documents and reports.  I also studied emails, blogs, and materials prepared by different organizations about the Voter ID Law, some of which were produced in this litigation.  For the most part, I gathered these materials independently or with the help of my research assistant, Beatrice Burton, a History Ph.D. candidate.  In some cases I requested specific documents that were supplied by the attorneys for the Defendant-Intervenors.

In preparing my report and my testimony in this case, I used sources of documentation that experts commonly consult in investigating questions of this nature. The methodology that I have employed in preparing my report is the same methodology experts in the fields of history and sociology regularly employ when examining issues of

---

2 App'x A.

the sort investigated here.  Finally, the analysis presented here is consistent with related scholarly research; I have used assumptions, methods, and analytical principles consistent with those employed in this field.

### III.   HISTORY OF STATE-SPONSORED DISCRIMINATION IN SOUTH CAROLINA

No one disputes South Carolina's dark, long and well documented history of racial discrimination.  "The central fact in the history of black Carolina," stated historian I. A. Newby, "has been the racism of white Carolina."[3]  And indeed, the historical experience and background to the enactment of the Voter ID Law can only be fully understood in the context of the State's past.  In Appendix B, I document the longstanding history of both official and unofficial state discrimination and racism.[4]  Here, I focus on recent evidence of state-sponsored discrimination.

### A.   Recent Evidence of State-Sponsored Discrimination

In the last twelve years, every branch of the federal government has recognized evidence of systemic, state-sponsored racial discrimination in South Carolina.

#### 1.   Federal Judiciary

First, the federal courts have recognized multiple occurrences of state-sponsored discrimination.[5]  For instance,

- In the litigation that followed the 2000 census, a three-judge District Court panel noted that the parties largely stipulated to the "extensive documentation of the history of voting-related racial discrimination in South Carolina."[6]  The court also acknowledged the "socio-economic gap between the average white citizen and the average black citizen."[7]

---

3 I.A. NEWBY, BLACK CAROLINIANS: A HISTORY OF BLACKS IN SOUTH CAROLINA FROM 1895 TO 1968 15 (Columbia: University of South Carolina, 1973).

4 I have also analyzed that history and particularly the more recent history of discrimination through the 1990s: Orville Vernon Burton et al., SOUTH CAROLINA, THE QUIET REVOLUTION IN THE SOUTH: THE IMPACT OF THE VOTING RIGHTS ACT, 1965–1990 199 (Chandler Davidson & Bernard Grofman eds., 1994); see also John C. Ruoff & Herbert E. Buhl, Voting Rights in South Carolina: 1982-2006, 17 S. CAL. REV. L. & SOC. JUST. 700 (2006).

5 See especially the more than one hundred pages of details of the various cases documented on South Carolina for the renewal of the Voting Rights Act by the ACLU.  LAUGHLIN MCDONALD & DANIEL LEVITAS, THE CASE FOR EXTENDING AND AMENDING THE VOTING RIGHTS ACT, VOTING RIGHTS LITIGATION, 1982-2006: A REPORT OF THE VOTING RIGHTS PROJECT OF THE AMERICAN CIVIL LIBERTIES UNION (2006), available at http://www.aclu.org/files/votingrights/2005_report.pdf/.  For extensive case examples from South Carolina, see id. at 562-663.

6 Colleton Cnty. Counsel v. McConnell, 201 F. Supp.2d 618, 641 (D.S.C. 2002).

7 Id. at 642 fn. 20.

- In 2003, Judge Patrick Michael Duffy issued a lengthy opinion detailing evidence of state-sponsored racial discrimination in *United States v. Charleston*,[8] ultimately concluding that the challenged at-large electoral system "unlawfully exacerbate[d] the disadvantaged political posture inherited by generations of African Americans through centuries of institutional discrimination" and was therefore unlawful under Section 2 of the Voting Rights Act.[9]  Several of the observations made by that federal court are of particular importance to this case.

- First, the court found that African Americans in Charleston County suffer lower levels of education, employment, income, and living conditions as a result of the long history of past discrimination.[10] Second, the court specifically concluded that "there has been a long history of official discrimination touching the right of African Americans to register, to vote, or otherwise to participate in the democratic process."[11]  Finally, after reviewing a voluminous record, the court found "significant evidence of intimidation and harassment" of African American voters, including in very recent elections.[12] Charleston County Election Commissioner Carolyn Collins credibly testified, for instance, that "she had received complaints from African American voters concerning rude or inappropriate behavior by white poll officials in *every* election between 1992 and 2002."[13]

- In 2009, the district court in *Levy v. Lexington County,* a case concerning a local school board election scheme, similarly noted examples of past and continuing discrimination.[14]  The court found myriad "lingering socio-economic effects of discrimination."[15]  Poverty was triple the rate for African Americans than for whites, African American median income was half that of whites, and educational attainment of African Americans was also substantially lower.[16]  The Court also noted that segregation persists "to a great extent with respect to churches, workplaces, businesses, and communities."[17] And, the court found that School Board testimony "suggests a lack of responsiveness to the needs of those black students who are performing poorly."[18]

---

8 316 F. Supp. 268 (2003).

9 *Id.* at 271.

10 *Id.* at 284-86.

11 *Id.* at 286 n. 23.

12 *Id.*

13 *Id* (emphasis added) (referencing Tr. at 845-46, 2689).

14 *Levy v. Lexington Cnty., S.C.*, 2009 WL 440338 (D.S.C. Feb. 19, 2009), *order vacated*, 589 F.3d 708 (4th Cir. 2009).  The district court ultimately ruled against the plaintiffs, after a favorable decision was vacated and remanded by the 4th circuit.  *See Levy v. Lexington Cnty., S.C.*, 2012 WL 1229511 (D.S.C. Apr. 12, 2012).  The findings of past and continuing discrimination, however, were not called into question.

15 *Levy v. Lexington Cnty., S.C.*, 2009 WL 440338, at 2.

16 *Id.*

17 *Id*.

18 *Id.* at 18.

These cases are just some recent illustrations of South Carolina's long history of discriminatory election laws. In the 1980s, South Carolina's refusal to comply with the preclearance requirements of the Voting Rights Act (the "VRA") has required the U.S. Supreme Court action to force compliance.[19] And, in 1995, South Carolina refused to comply with the National Voter Registration Act (the "NVRA"), ultimately necessitating the issuance of an injunction. In that case, *Condon v. Reno*,[20] the federal district court specifically noted that South Carolina's deliberate actions excluded large groups of minority voters. While the State eased registration procedures at the Department of Motor Vehicles (the "DMV") and attempted to follow the NVRA, it refused to follow that law's mandates in the Department of Social Services where 70-80% of the clientele was minority. In other words, the State's non-compliance with NVRA was not universal; rather, the State refused to comply only at the Department of Social Services (and other social service agencies) where minority clients were most likely to be served.

### 2.    U.S. Congress

Moreover, when the U.S. Congress re-authorized the Voting Rights Act in 2006, it relied upon considerable evidence of racial discrimination nationwide, including discrimination stemming in South Carolina.[21] Evidence of discrimination in South Carolina was presented throughout the hearings,[22] and one hearing focused on discrimination in Charleston, Lancaster, and Sumter Counties.[23] "Protecting Minority Voters: The Voting Rights Act at Work 1982-2005," a publication by The Lawyers'

---

19 *See, e.g.*, *Blanding v. DuBose*, 454 U.S. 393 (1982); *McCain v. Lybrand*, 465 U.S. 236 (1984); *NAACP v. Hampton County*, 470 U.S. 166 (1985).
20 913 F.Supp. 946 (D.S.C. 1995).
21 *See generally* H.R. REP. NO. 109-478 (2006), *available at* http://thomas.loc.gov/cgi-bin/cpquery/?&sid=cp109lijdp&refer=&r_n=hr478.109&db_id=109&item=&sel=TOC_23165&; S. REP. NO. 109-295 (2006), *available at* http://www.congress.gov/cgibin/cpquery/T?&report=sr295&dbname=109&. *See also* John C. Ruoff & Herbert E. Buhl, *Voting Rights in South Carolina, supra.*
22  See, for example, two reports prepared to be presented as evidence to Congress on renewal of the Voting Rights Act: Laughlin McDonald & Daniel Levitas, *The Case for Extending and Amending the Voting Rights Act: Voting Rights Litigation, 1982-2006*, ACLU VOTING RIGHTS PROJECT, March 2006, at 562-663, *available at* http://www.aclu.org/files/votingrights/2005_report.pdf; Ruoff & Buhl, *Voting Rights in South Carolina, supra.*  Also, evidence from South Carolina presented for the renewal of the Voting Rights Act was also presented as evidence for the Texas Section 5 preclearance case, *Northwest Austin Mun. Util. Dist. No. One v. Holder*, 129 S. Ct. 2504 (2009).
23 *Renewing the Temporary Provisions of the Voting Rights Act: Legislative Options After* LULAC v. Perry*: Hearing Before the Subcomm. on the Constitution, Civil Rights and Property Rights of the S. Comm. on the Judiciary*, 109th Cong. 252-55, 265-67 (2006) (statement of Jon Greenbaum, Director of the Voting Rights Project).

Committee for Civil Rights under Law that was presented to Congress, chronicles myriad examples of voting discrimination in South Carolina.  In one instance, a group of Lexington County white citizens "informed one of their Republican representatives that they didn't want any [African American representatives], and they used a racial epithet, the 'n' word, on the Lexington County delegation, referring specifically to a plan that had drawn a black representative into portions of Lexington County."[24]

### 3.  *The Department of Justice*

Finally, the Department of Justice (the "DOJ") has objected 122 times to proposed changes in voting practices or procedures in South Carolina since 1972, and eleven times since 2000.  A careful study of objections from 1982 to 2006 came to the following conclusion:

> Since 1982, the discriminatory practices to which the DOJ objected have covered a wide variety of changes that affected nearly every aspect of African American citizens' participation in South Carolina's electoral processes, including discriminatory redistricting, annexations, voter assistance, changing county boundaries, eliminating offices, reducing the number of seats on a public body, majority vote requirements, changing to at-large elections, using numbered posts or residency requirements, staggering terms, unfair scheduling of elections, changing from nonpartisan to partisan elections and limiting the ability of African American citizens to run for office.

> Since 1982, those Department of Justice objections to discriminatory practices have covered all levels of government: the General Assembly (both Senate and House), counties, county boards of education, school districts, cities and municipalities and a board of public works.  These objections also have covered the state geographically.  Many of those jurisdictions engaged in decade-long resistance to the Voting Rights Act and full representation for their African American citizens.[25]

Since that study, DOJ has objected three additional times to new South Carolina voting changes under Section 5 of the VRA.  In 2010, for instance, DOJ objected to a state law, Act 136, giving members of the Fairfield County legislative delegation the power to *appoint* an additional two members to the local *elected* seven member school

---

24  THE NATIONAL COMMISSION ON THE VOTING RIGHTS ACT, PROTECTING MINORITY VOTERS: THE VOTING RIGHTS ACT AT WORK 1982-2005 92 (February 2006).  This specific incident is also discussed in Jeffrey Collins, *Wilkins Says Most of House Supports GOP Redistricting Plan*, ASSOCIATED PRESS, Jan. 16, 2002.
25 Ruoff & Buhl, *Voting Rights in South Carolina*, *supra*, at 656.

board.[26]  "The act expands the board's membership by more than a quarter, without a concomitant expansion of the electoral franchise."[27] DOJ argued that Act 136 reduced the proportion of positions in "which minority voters can elect candidates of choice on a local elected body."[28] Moreover, under the new law, these new members were given exceptionally long terms of twelve years, and they would be appointed from the two-member legislative delegation itself, neither of whom was allegedly "a candidate of choice of minority voters."[29]  For all of these reasons, DOJ concluded that "the sole impact of the decision [was] to reduce the level of electoral influence that African American voters have on the board."[30]

In addition to its Section 5 objections, the DOJ brought affirmative lawsuits under Section 2 of the VRA.  In 2008, DOJ filed a Section 2 lawsuit against Georgetown County, challenging their at-large election system.[31]  Georgetown allegedly used discriminatory devices such as primaries, very large election districts, majority vote requirements, and staggered terms, all of which rigged elections "against the minority group."  DOJ also alleged that "[p]olitical campaigns in Georgetown County have been characterized by subtle and overt racial appeals" and that "African Americans in the County have suffered from a history of official discrimination."  Moreover, the "[s]ignificant socioeconomic disparities" of African Americans and whites limited "African American participation in the District's at-large elections."  And, although African Americans are more than 38 percent of the population of Georgetown County, there was not one black school board member.   Georgetown County ultimately resolved the matter by entering into a consent decree.[32]

---

26 It was unusual, DOJ noted, that Act 136 "through an ad hoc local legislation process" instead of through a statewide approach which would apply uniformly.  Noting that they agreed with Gov. Mark Sanford who originally vetoed the bill, DOJ wrote that "the more appropriate approach would be for the electorate in Fairfield County to express its will through the ballot."  Letter from Thomas E. Perez, Assistant Attorney General, U.S. Dep't. of Justice, to C. Harvird Jones, Jr., Senior Assistant Attorney General, Aug. 16, 2010, *available at* http://www.lawyerscommittee.org/admin/section_5/objections/files/Objection-Fairfield-County-School-District-SC-2010-0971.pdf.

27 *Id.*

28 *Id.*

29 *Id.*

30 *Id.*

31 *See generally* Complaint, U.S. v. Georgetown Cnty. Sch. Dist., No. 2:08-CV-00889-DCN (D.S.C. Mar. 14, 2008).

32  *Id*. at 2-5; *see also* Consent Decree, U.S. v. Georgetown Cnty. Sch. Dist., 2:08-CV-00889-DCN, at 1 (D.S.C. Mar. 21, 2008).

### B.      Race and Partisanship in South Carolina

Another important factor in understanding the motivation behind the Law is the integral link between race and party in South Carolina.  More than in any other southern state, the development of the modern Republican Party is inextricably tied to distinguishing the Republican Party from the heavily black Democratic Party.

In 1964, in the midst of the Civil Rights Movement, the Republican Party's nominee for President, Senator Barry Goldwater, announced that he did not support the Civil Rights Act of 1964.  As he told a group of Republicans from southern states, it was better for the Republican Party to forego the "Negro vote" and instead court white southerners who opposed equal rights.[33]  Historians agree that Goldwater "sought to create a general polarization of southern voters along racial lines."[34]  These efforts at racial polarization were effective in the South generally and in South Carolina in particular.  By the 1990s—as a result of decades of racial polarization—the Republican Party was almost exclusively white, and African Americans who wanted input into the political process had no alternative to the Democratic Party.[35]  Such polarization means that efforts to diminish the vote among Democrats, and particularly poor Democrats, will automatically strike at the African American community.

In my article on South Carolina of the book, *The Quiet Revolution*, I detail the history of racial bloc voting until 1990,[36] and conclude that high levels of racial bloc voting have long persisted in State elections.  The DOJ has recently agreed, alleging in 2008 that"[r]acially polarized voting patterns prevail in elections in [Georgetown] County."  Although African Americans were "politically cohesive ….[w]hite bloc voting usually results in the defeat of candidates who are preferred by African American voters. That is, in [Georgetown] District elections since 2002, white voters have consistently voted as a bloc so as to defeat every African American preferred candidate."[37]   In addition, a 2011 expert report by Dr. Richard Engstrom, from Georgia State University, found strong racially polarized voting in South Carolina Senate elections from 2002 to

---

33  DAN T. CARTER, THE POLITICS OF RAGE: GEORGE WALLACE, THE ORIGINS OF THE NEW CONSERVATISM, AND THE TRANSFORMATION OF AMERICAN POLITICS 218 (1995).
34  Declaration of Dan T. Carter, U.S. v. Charleston County Council, D.S.C., No. 2-01-0155-11, (2001), at 20.
35  *See generally id.*
36 Burton et al., *supra*, at 212-213; Ruoff & Buhl, *Voting Rights in South Carolina, supra,* at 711.
37 Complaint, U.S. v. Georgetown Cnty. Sch. Dist., No. 2:08-CV-00889-DCN (D.S.C. Mar. 14, 2008).

2010.  His careful study of 59 elections for county officials also "reveal[ed] pervasive and persistent racially polarized voting within these counties across elections for different offices and held in different years."  Dr. Engstrom concluded that "racially polarized voting was pervasive across the counties in both statewide elections and in the presidential primary."[38]

Federal courts have recently affirmed that African Americans and whites in South Carolina consistently vote in racially polarized blocs:

- In a redistricting case in the early 1990s, the district court found that "[i]n South Carolina, voting has been, and still is, polarized by race.  This voting pattern is general throughout the state and is present in all of the challenged House and Senate districts in this litigation."[39]

- When redistricting decisions were challenged ten years later, the *Colleton County* court found: "Voting in South Carolina continues to be racially polarized to a very high degree, in all regions of the state and in both primary elections and general elections. Statewide, black citizens generally are a highly politically cohesive group and whites engage in significant white-bloc voting.  Indeed, this fact is not seriously in dispute."[40]

- In 2003, the *Charleston County* court affirmed again that "significant and pervasive polarization" exists in South Carolina.[41]

In addition to the courts, the Department of Justice has referred to evidence of racial bloc voting in thirty-eight separate Section 5 objections between 1974 and 1992.[42] Sociologist James W. Loewen once examined precinct-level data from 130 contests (held from 1972 to 1985) between black and white candidates.[43]  Over two-thirds were elections for local office in both rural and urban jurisdictions from every section of South Carolina.  An average of 90 percent of white voters cast their ballots as a bloc for white

---

38 RICHARD L. ENGSTROM, CENTER FOR THE STUDY OF RACE, ETHNICITY, AND GENDER IN THE SOCIAL SCIENCES, DUKE UNIVERSITY, RETROGRESSION ANALYSIS FOR THE SOUTH CAROLINA SENATE DISTRICTING PLAN ADOPTED IN 2011 (2011), available at http://redistricting.scsenate.gov/Exhibits/Exhibit%2014%20-%20REPORT%20BY%20RICHARD%20ENGSTROM,%20PHD/Exhibit%2014%20-%20Report%20by%20Richard%20Engstrom%20PhD.pdf.
39 *Smith v. Beasley*, 946 F. Supp. 1174 (D.S.C. 1996).
40 *Colleton County*, 201 F. Supp. at 641 (D.S.C. 2002).
41 *Charleston County*, 316 F .Supp. 2d at 278.
42 *See* Burton et al., *supra*.
43 James W. Loewen, *Racial Bloc Voting and Political Mobilization in South Carolina*, REV. OF BLACK POL. ECON., Summer 1990, at 23, 25.

candidates; African Americans were almost as cohesive, voting for candidates of their own race 85 percent of the time.

There is only one exception to this pattern.  As the *Colleton County* court explained:

> The evidence presented overwhelmingly demonstrates that, with rare exceptions, blacks currently prefer to be represented first by black Democrats. In the absence of either the choice, such as in a primary, or the opportunity, due to percentages too low to outvote a cohesive majority bloc vote, blacks prefer to be represented by white Democrats.[44]

With strong racially polarized voting in the state, any reduction in African American turnout can only benefit the state Republican Party.  Conversely, significant gains in African American voting strength are perceived as a threat to the state Republican Party's electoral success.

## C.    The 2008 Election

After more than one hundred years of relying upon non-photographic voter registration cards to verify voters' identities, South Carolina introduced its first photo identification bill in early 2009.  Accordingly, the history immediately preceding that introduction bears significantly on the question of motivation.

South Carolina is perhaps unusual in having a long history of relying upon one specific method of voter identification.  That method, the State registration card, was created by the 1895 Constitution and implemented by an 1896 statute.  Voters have been presenting that card as proof of their registration and identity ever since.

For the first half century after the card's creation, a voter had to present a poll tax receipt in addition to their registration card.[45]  After the poll tax was eliminated for being racially discriminatory, only the registration card was required.[46]  Since 1984, a driver's license or DMV identification card can also be used as an alternative.  Through 2008, during 115 years and tens of millions of votes cast in state and federal elections, the State

---

44 *Colleton County Council* v. *McConnell*, 201 F. Supp. 2d 618, 643 (D.S.C. 2002).
45 S.C. CODE § 213 (1902); S.C. CODE § 239 (1912); S.C. CODE § 241 (9) (1922); S.C. CODE § 2307 (1932); and S.C. CODE § 2306 (1942).
46 S.C. CODE §§ 23-322, 23380 (1952); S.C. CODE § 23-400.51 (1962); and S.C. CODE § 7-13-710 (1976).

voter registration card was an acceptable method of identification and its legitimacy was never questioned.

The Voter ID Law was introduced—and ultimately passed—by an all-white Republican majority, along partisan lines, in the wake of the election of the first African American president.  President Obama inspired an unprecedented turnout among black registered voters in South Carolina as he did nationwide.  2008 was the first time ever that a higher proportion of young black voters turned out to vote than whites.[47]  Overall, in South Carolina, non-whites increased their proportion of the electorate from 26.6% in 2004, to 30.6% in 2008. [48]

To be sure, the Law was first introduced in the legislative session following the Supreme Court's 2008 decision in *Crawford v. Marion County*, upholding Indiana's photo identification law. [49]  But Indiana's successful implementation of an election law cannot establish why South Carolina felt suddenly—and urgently—compelled to enact its own identification law.

Moreover, all of the available evidence illustrates a connection between President Obama's election and the push for photo ID.  One example: Representative Alan Clemmons, the Law's lead sponsor, distributed cards promoting the Voter ID Law that expressly proclaimed, "Let's continue the fight to stop Obama's nutty agenda!"[50]  Moreover, during legislative floor debates, numerous lawmakers commented on the ID Law's telling timing.  To cite a couple of examples:

- Rep. Leon Howard: "What troubles me the most Mr. Speaker, ladies and gentlemen of the house, [is that] this bill suddenly became so important after the election of President Barack Obama.  That seems so suspicious to me . . . Now, you know we can tap around the issue…but the bottom line is . . . a fear in reelecting President Barack Obama is all this bill is about."[51]

---

47 Sam Roberts, *2008 Surge in Black Voters Nearly Erased Racial Gap*, N.Y. TIMES, July 20, 2009, http://www.nytimes.com/2009/07/21/us/politics/21vote.html?_r=1.

48 Notably, in 2010, the African American turnout rate returned to pre-2008 levels, suggesting that 2008 turnout was tied to Obama's candidacy in particular.  Statistics for the 2004, 2006, 2008, and 2010 elections were calculated from the Voting History section of the South Carolina Election Commission website, http://scvotes.org/statistics/voter_history.

49 The Supreme Court issued its decision in *Crawford* v. *Marion County*, 553 U.S. 181 (2008) in April 2008, months before the voter ID legislation was introduced in the 118th Session of the legislature.

50 *A little SWAG from the Convention*, SPARTANBURG TEA PARTY (May 8, 2011), http://www.spartanburgteaparty.org/2011/05/08/a-little-swag-from-the-convention/

51 Tr. of House Debate, Jan. 26, 2011, at 32-35.

- Rep. David Mack: "This is not about integrity. . . . This is about politics, pure politics. The Republican Party benefits from a low voter turnout. The Democratic Party benefits from a better, higher voter turnout. . . . In 2008 our president brought a lot of black and brown people to the polls. That's not good as far as the Republican Party is concerned."[52]

- Sen. Phil Leventis: "I think this Bill might be [an] initiative because many people didn't like the outcome of elections. If this Bill is supposed to affect the outcome of elections by addressing the voter or blaming voters because of the outcome of election—there is something un-American about that."[53]

On top of all of this, contemporaneous events illustrate the racial tensions felt by some after the 2008 election. In June 2009, a gorilla briefly escaped from the Columbia zoo. During its absence, former State Election Commission Chairman Rusty DePass posted on Facebook that he was sure "it's just one of [First Lady] Michelle's ancestors— probably harmless."[54] That a former state official and well-known state political figure felt comfortable posting such a blatantly racist comment is remarkable, and suggests that such inflammatory rhetoric could have been common in the months following the 2008 election.

### D.    Conclusion

South Carolina has a long, well documented history of state-sponsored discrimination, including laws and devices specifically geared to suppress the vote of African Americans. In recent years, such acts have not been overtly racist, but have promoted the suppression of minority voting through more subtle means. Tellingly, to date, no African American has been elected for South Carolina statewide office.[55] In full, this history, coupled with the Law's suspicious timing and the evidence detailed below, supports the conclusion that the Voter ID Law is one of the most recent examples of voting discrimination in South Carolina.

---

52 Tr. of House Debate, Jan. 26, 2011, at 32-35.

53 Tr. of Senate Debate, Feb. 24, 2011, at 143.

54 *See* Katrina Goggins, *Ex-SC Official Apologizes for Racist Remark*, AIKEN STANDARD, June 18, 2009, http://www.aikenstandard.com/story/m1050-BC-SC-RacistRemark-3rdLd-Writethru-06-17-0669.

55 In 2005, then Governor Mark Sanford, a Republican, was asked about this reality. Sanford proclaimed it a tragedy, but stated he "think[s] there never will be" a statewide African American representative. Ruoff & Buhl, *Voting Rights in South Carolina supra*, at 648 (citing *A Quick Spin Around the State House: Sanford's Views on Black leaders in S.C.*, COLUMBIA STATE, May 11, 2005, at B3).

## IV.  THE DECISION MAKERS

In recent years, there have been several, well-publicized, racially-charged incidents involving South Carolina lawmakers who were advocates of strict photo identification requirements.  In addition, many of the proponents of the 2009 Bill and the Voter ID Law also supported other legislation which threatened racially discriminatory effects.  While not sufficient by themselves to reach the conclusions of this report, the following actions and statements by elected state officials and other legislative efforts in the General Assembly provide added support for my ultimate conclusion.

### A.  Racially-Charged Statements or Conduct by Sponsors and Advocates of Voter ID

#### 1.  *Lt. Governor Glenn McConnell*

Lt. Governor McConnell was President Pro Tempore of the Senate when the Law was enacted, and a sponsor of the Senate's photo identification bill.  He is an outspoken defender of the Confederate South, including the Confederate flag.  For instance, McConnell's official website includes "Sons of Confederate Veterans, Secession Camp #4" with his personal information.[56]

McConnell was strongly opposed to the 2000 decision to remove the Confederate Flag from the dome of the statehouse after widespread pressure from the national media, businesses and religious organizations.  Afterward, evoking Civil War imagery, McConnell said, "Like General Lee when he was confronted with Appomattox and said, 'There's nothing left for me to do than get terms from General Grant.'  It is very difficult, extremely difficult for us on our side to vote to move that flag."[57]  Soon thereafter, McConnell wielded his authority to defend Maurice Bessinger, a South Carolina restaurateur whose "decision to hoist the Confederate battle flag over his restaurants in 2000 and to sell tracts defending slavery led Wal-Mart, Sam's Club and seven grocery chains to pull his top-selling barbecue sauce from their shelves."[58]  Indeed, Bessinger's

---

56 *Lieutenant Governor Glenn F. McConnell*, SOUTH CAROLINA LEGISLATURE ONLINE –BIOGRAPHY, http://www.scstatehouse.gov/member.php?code=1213636218
57 David Firestone, *S. Carolina Senate Votes to Remove Confederate Flag*, THE NEW YORK TIMES ON THE WEB (April 13, 2000), http://partners.nytimes.com/library/national/race/041300race-ra.html.
58 Ariel Sabar, *S.C. Barbecue King Stands His Ground*, THE BALTIMORE SUN (Sep 22, 2002), , http://articles.baltimoresun.com/2002-09-22/news/0209210340_1_bessinger-barbecue-sauce-south-carolina.

chain refused to serve African Americans until ordered to do so by the Supreme Court in the 1960s, and he has recently called the NAACP a "terrorist group." McConnell threatened to deny state contracts to local businesses that mistreat Bessinger.

In 2010, McConnell attended the "Secession Ball," a widely-protested gala to commemorate the anniversary of South Carolina's secession from the United States following Abraham Lincoln's election to the presidency. Dot Scott, president of the Charleston NAACP, commented that "while we're trying to say we're in a post-racial era, South Carolina's elected officials both locally and nationally have continued to do things that are really atrocious."[59]

### 2. *Rep. Alan Clemmons*

Rep. Clemmons was the Law's lead sponsor. In response to a statement by U.S. Congressman Jim Clyburn comparing voter identification laws to the methods of disfranchisement once common in the South,[60] Clemmons released a misleading Twitter message that ignored the major realignment in the political parties in the twentieth century South: "Jim Crow: made by DEMS to stop black Americans from voting. Voter ID: made by GOP so every voter has 1vote & ONLY 1vote!"[61]

### 3. *Governor Nikki Haley*

Governor Haley signed Act R54 into law, and has been a vocal supporter of photo identification laws. On August 29, 2011, after the Department of Justice sent a letter to the State requesting more information to support preclearance of the Law, Haley posted a note on her Facebook page stating:

> The NAACP and Dems are fighting me on the Voter ID bill we passed in South Carolina that requires a person show picture ID before voting. An executive of NAACP in Mississippi was just sent to prison for voter fraud on ten counts including voting for dead people. That is why I will continue to fight for the integrity of our electoral process.[62]

---

59 Bruce Smith, *Pic of SC leader, black re-enactors spurs flap*, THE SEATTLE TIMES, (Sep 16, 2010), http://seattletimes.nwsource.com/html/nationworld/2012910683_apussconfederatephoto.html.
60 James S. Rosen, *S.C. Rep. Clyburn compares voter ID laws to Jim Crow era*, THE MIAMI HERALD (April 5, 2012), http://www.miamiherald.com/2012/04/05/2733211/sc-rep-clyburn-compares-voter.html.
61 Alan Clemmons, TWITTER (April 5, 2012, 5:27 p.m.), https://twitter.com/RepAlanClemmons/statuses/188060284710166530 (last accessed June 18, 2012).
62 Nikki Haley, FACEBOOK Page, (August 29, 2011), https://www.facebook.com/NikkiHaley/posts/10150278081073226 (last accessed June 18, 2012.

That Mississippi incident, however, involved fraudulently submitting fake absentee ballots by mail,[63] an act which an in-person photo identification requirement cannot prevent.

### 4.    Representative George "Chip" Limehouse

Rep. Limehouse, one of the Law's sponsors, also attended the Confederate Ball. When asked about the NAACP and others protesting the event, Limehouse responded, "They actually helped ticket sales . . . We'd like to thank them.  Without them, we wouldn't have made budget."[64]

### 5.    Senator Danny Verdin

While the South Carolina Legislature was discussing H. 3418, one of that bill's supporters, Senator Danny Verdin pushed legislation to have a specialty South Carolina car tag that read "Coon Hunters."  Opponents argued that this tag "would be misinterpreted as a racial slur,"[65] and there was significant opposition from the civil rights community.[66]  Ultimately, the law was vetoed by Governor Sanford.

### 6.    Representative Bill Sandifer

Another sponsor, Rep. Sandifer attracted national attention in April 2008 when he left a colorful flyer on his desk entitled "Why He'll Lose the Black Vote."  The flyer depicts African American men fleeing from a superimposed Barack Obama who is saying, "I'll make sure everyone who can work, will have a job."[67]  In a follow-up story, colleagues stated that Sandifer was enjoying the attention.  One said, "He's thrilled by it." Another colleague said, "He told me (the scandal) would guarantee his reelection in

---

63 Matthew Vadum, *Mississippi NAACP leader sent to prison for 10 counts of voter fraud*, THE DAILY CALLER ( July 29, 2011), http://dailycaller.com/2011/07/29/mississippi-naacp-leader-sent-to-prison-for-10-counts-of-voter-fraud.
64 Manuel Roig-Franzia, *Divided They Stand on Rebel Spirit*, THE WASHINGTON POST (Dec 22, 2010), http://www.washingtonpost.com/wp-dyn/content/article/2010/12/21/AR2010122105645.html.
65 *Anti-Coon Hunters Plate Petition, Veto Of "Coon Hunter" Plate Urged*, THE WASHINGTON POST POLITICAL BLOG NETWORK (June 22, 2010), http://voices.washingtonpost.com/politics/blog-network/2010/06/veto_of_coon_hunter_plate_urge.html.
66 Stefan Lonce, *South Carolina: Repeal the "Coon Hunters" Special License Plate PL8 Petition* (June 10, 2010) http://www.gopetition.com/petitions/no-to-coon-hunters-plate.html; FITSNEWS, *Veto Of "Coon Hunter" Plate Urged"* (June 22, 2010),  http://www.fitsnews.com/2010/06/22/veto-of-coon-hunter-plate-urged/.
67 *What's This?*, FITSNEWS (Apr. 3, 2008); *Here's What Was on S.C. Legislator's Desk*, FITSNEWS (Apr. 18, 2008), http://www.fitsnews.com/2008/04/18/heres-what-was-on-sc-legislators-desk.

Oconee County," and that Sandifer had sent the article to several residents of his district as "free advertising."[68]

### 7.   Senator John "Jake" Knotts

Senator Knotts was another outspoken advocate of the ID Law.  During the 2010 gubernatorial race, Knotts referred to then-candidate Nikki Haley as a "raghead" on an internet political show.  Specifically, Knotts stated:

> [The voters are] going to find out in the next three days that her daddy wears a turban around Lexington and her mommy has a ruby between her head and she is a Sikh and trying to be a Methodist, and it gets to Greenville, around the Bob Jones University people, they're not going to like that. . .  "We got a raghead in Washington.  We don't need a raghead in the State House."

In response to national backlash, Knotts claimed that his comments "were intended in jest."  He went on to explain that "I still believe Ms. Haley is pretending to be someone she is not, much as Obama did, but I apologize to both for an unintended slur."[69] Soon thereafter, during floor debate on the Law's predecessor bill, Knotts defended himself from other House members on the record, claiming, "They make much worse racial and religious statements in private company, some that would make even me blush."[70]

Similarly, during South Carolina's redistricting process in 2002, Knotts objected to a majority-black precinct in his district, and used a racial slur.  He later claimed that allegations were misleading, because he was actually relaying a statement made by one of his constituents, a Ku Klux Klan leader.[71]

---

68 *Colleagues: Sandifer Reveling in Scandal*, FITSNEWS (Apr. 15, 2008),
http://www.fitsnews.com/2008/04/15/colleagues-sandifer-reveling-in-scandal.
69 Logan Smith, *Who Leaked th eLong-Lost Video of Jake Knotts' "Raghead" Comment?*, PALMETTO PUBLIC RECORD (May 15, 2012), http://palmettopublicrecord.org/2012/05/15/who-leaked-the-long-lost-video-of-jake-knotts-raghead-comment/ (containing embedded video of Jake Knotts' comment).  The video can also be found at *SC Sen. Jake Knotts Calls barack Obama and Nikki Haley "Ragheads*,*"* YOUTUBE (May 15, 2012), http://www.youtube.com/watch?v=Zq5xMT3z560&feature=plcp.
70 Point of Personal Privilege by Senator Knotts, Legislative History for H.3418 (June 15, 2010), www.scstatehouse.gov/sess118_2009-2010/sj10/20100615.htm.  *See also* John O'Connor, *"Knotts' slur stirs the Haley storm,"* THE STATE, June 3, 2010; Andy Barr, *South Carolina Republican Party Calls on Jake Knotts to Resign*, POLITICO (June 11, 2010), http://www.politico.com/news/stories/0610/38422.html.
71 Jim Davenport, *Suit Reply Draws Fire*, WILMINGTON MORNING STAR, January 11, 2002, *available at*http://news.google.com/newspapers?id=6QJPAAAAIBAJ&sjid=Ux8EAAAAIBAJ&pg=6775%2C27716
60 *South Carolina's Redistricting News (August 18, 2001-February 7, 2002),* accessed June 11, 2012, http://archive.fairvote.org/redistricting/reports/remanual/scnews3.htm.

### B.      Contemporaneous Legislation with Racially Disparate Consequences

The South Carolina House and Senate considered—and in some instances passed—several controversial bills with racially discriminatory undertones, while they were considering the ID Law and the 2009 ID Bill.  The following four examples particularly illustrate this subtext.

### 1.      Immigration Bill

First, the S. 20 Immigration Bill was signed into law on June 27, 2011.  The law requires adults to carry immigration papers on them at all times and grants police broad discretion to detain those suspected of violating immigration law.[72]  Several organizations, including the American Civil Liberties Union, the National Immigration Law Center, Mexican American Legal Defense and Educational Fund, and the Southern Poverty Law Center, filed a lawsuit to challenge the immigration law, claiming the law would lead to harassment of state Latinos, who account for about five percent of the state's population.[73]  The Justice Department also filed suit against the law, agreeing that the law will unfairly target Latinos and could increase the incidents of wrongful detention.[74]

A South Carolina federal court issued a preliminary injunction against key parts of S. 20 in December 2011.  Among others, the injunction blocked the provision that police officers must detain suspected undocumented residents and the provision that

---

[72] Legislative History for S. 20, 119th Reg. Sess. (S.C. 2011-12), *available at* http://www.scstatehouse.gov/sess119_2011-2012/bills/20.htm.  Section 5 of the Bill creates the misdemeanor of failure to carry a certificate of alien registration and Section 6 authorizes law enforcement to determine immigration status upon reasonable suspicion that the person is unlawfully present in the United States.  *Id.*

[73] *See Federal Court Blocks Major Parts of South Carolina Anti-Immigrant Law*, AMERICAN CIVIL LIBERTIES UNION (Dec. 22, 2011), http://www.aclu.org/immigrants-rights/federal-court-blocks-major-parts-south-carolina-anti-immigrant-law; *Legal Residents Fear South Carolina Immigration Law*, FOX NEWS LATINO (Oct. 26, 2011), http://latino.foxnews.com/latino/politics/2011/10/26/legal-residents-fear-south-carolina-immigration-law.

[74] Press Release, U.S. DEP'T OF JUSTICE, *Department of Justice Challenges South Carolina's Immigration Law* (Oct. 31, 2011), http://www.justice.gov/opa/pr/2011/October/11-ag-1429.html.  *See also* Elise Foley, *South Carolina Immigration Law Draws Challenge from Justice Department*, HUFFINGTON POST (Oct. 31, 2011), http://www.huffingtonpost.com/2011/10/31/south-carolina-immigration-law-justice-department-lawsuit_n_1068247.html.

required adults to carry documentation of their legal status.[75] This law had many of the same Senate sponsors who pushed for the Voter ID Law, including McConnell, Knotts, and Campsen.

### 2.      Driver's License Bill

A second law that garnered much opposition from the African American community was S. 288, passed on June 2, 1010.  This new law requires individuals who had pled guilty, no contest, or had been convicted of a violent crime to have a distinguishing mark on their driver's licenses.[76]  State Democrats and Republican Governor Mark Sanford also opposed the bill, but it was uniformly supported by legislative Republicans, just like the Voter ID Law.[77]  The driver's license law was also opposed by a variety of civil rights groups, who argued that it imposed an unnecessary "Scarlet Letter" on ex-offenders—who are disproportionately persons of color.[78]  The law unnecessarily brands ex-offenders and prejudices police officers who might approach them.  While Governor Sanford vetoed the bill, both chambers overrode that veto, and the law went into effect in July 2011.[79]

### 3.      English Only Bill

Senators McConnell and Campsen, who were the lead proponents of the ID Law, were among the senators who introduced a bill making English South Carolina's official language, and requiring all state government documents and services to be in English only.  The bill was referred to the Judiciary Committee, where it apparently stalled.[80]  As

---

75 *See Judge blocks portions of South Carolina's immigration law*, L.A. TIMES: NATION NOW (Dec. 22, 2011 1:20 PM), http://latimesblogs.latimes.com/nationnow/2011/12/judge-blocks-portions-of-south-carolinas-immigration-law.html.
76 Legislative History for S. 288, 118th Reg. Sess. (S.C. 2009-2010), *available at* http://www.scstatehouse.gov/sess118_2009-2010/bills/288.htm; Sarita Chourey, *New SC Law Adds CriminalRecord to Driving License*, AUGUSTA CHRON., Nov. 4, 2011, *available at*http://chronicle.augusta.com/latest-news/2011-11-04/new-sc-law-adds-criminal-record-driving-license.
77 *Compare* Legislative History, House Roll Call Vote Number 257 (Apr. 26, 2011,) http://www.scstatehouse.gov/votehistory.php?KEY=2559 (House vote to adopt conference report for voter ID bill), *with* Journal for the House of Representatives, 118th Reg. Sess., R. 296, S. 288—Governor's Veto Overridden (June 29, 2010), http://www.scstatehouse.gov/sess118_2009-2010/hj10/20100629.htm (House vote that overrode the governor's veto of S. 288).
78 Anthony Miller, *ACLU compares license proposal to "Scarlet Letter,"*ACLU (Apr. 29, 2010), http://www.aclusouthcarolina.org/newsroom/04292010_aclu_compares_license_proposal_scarlet_letter.pdf.
79 Legislative History for S. 288, 118th Reg. Sess. (S.C. 2009-2010), *available at* http://www.scstatehouse.gov/sess118_2009-2010/bills/288.htm.
80 Legislative History for S. 19, 19th Reg. Sess. (S.C. 2011-2012), *available at* http://www.scstatehouse.gov/sess119_2011-2012/bills/19.htm.

many opponents of the measure have argued, if this bill becomes law, residents for whom English is a second or third language may find it more difficult to access government services and complete government forms, including those related to voting.

### 4.        Bills to Further Suppress Voting

H. 4549, introduced in January 2012, would require third-party registration organizations to register with the state and return the registration forms within a truncated amount of time.[81]  A larger proportion of minority voters become registered through registration drives,[82] and measures like H. 4549 would make that process more difficult—and perhaps impossible—for the community-based groups doing this type of work.[83] This bill could thus have the effect of reducing the number of minorities registered to vote in the state.

Similarly, S. 304, called the "Voter Citizenship Verification Act," was introduced in January 2011.  This bill would require proof of citizenship from those seeking to register to vote.  One of the bill's cosponsors is Senator Campsen, who was instrumental in passing the Voter ID Law.[84]  And, like the Law at issue here, proof-of-citizenship requirements disproportionately burden the poor and racial minorities.

### C.        Conclusion

Taken together, the racially-charged statements and conduct of proponents of voter ID in other contexts, as well as legislation from the two most recent congressional sessions that threatened the rights of racial minorities, show a pattern among South Carolina lawmakers of stigmatizing the "other," including and particularly African Americans. Racially-charged statements by leaders in the South Carolina government, and proponents of voter ID, show a deliberate attempt to polarize white voters by playing upon stereotypes of African Americans.  Similarly, the proposed bills described above

---

81 *See* Legislative History for H. 4549, 119th Reg. Sess. (S.C. 2011-2012), *available at* http://www.scstatehouse.gov/sess119_2011-2012/bills/4549.htm.
82 *See* Douglas Hess and Jody Herman, *Representational Bias in the 2008 Electorate*, PROJECT VOTE (2009), table 3, *available at* http://www.voterparticipation.org/wp-content/uploads/2011/10/Project_Vote_-_Representational_Bias_the_2008_Electorate.pdf (showing that 12 percent of minority voters reported registering through a voter registration drive, whereas 6 percent of white voters reported doing so).
83 *See* Press Release, Brennan Center for Justice, *National Council of La Raza, League of Women Voters of Florida, File in Court to Stop Anti-Voter Restrictions in Florida* (Sept. 9, 2011), *available at* http://www.brennancenter.org/page/-/Florida%20Intervention%20Release%20-%20FINAL.pdf.
84 Legislative History for S. 304, 119th Reg. Sess. (S.C. 2011-2012), *available* at http://www.scstatehouse.gov/sess119_2011-2012/bills/304.htm.

indicate the mindset of the lawmakers themselves.  That the Law was considered and passed by the same legislators against this backdrop provides additional supporting evidence of a discriminatory purpose behind the Voter ID Law.

## V.   THE LAW'S LEGISLATIVE HISTORY [85]

### A.   The Law's Predecessor: H. 3418 (2009-10)

The earlier version of the Voter ID Law, H. 3418 or the Voter ID Bill, was introduced in the House on February 3, 2009.  H. 3418 was nearly identical to the Law with one notable exception: The Law does not provide for early voting; H. 3418 did. While a full review of the Voter ID Bill's legislative history is beyond the scope of this report, I focus my analysis below on those aspects that bear on the question of purpose.

The legislative history of the Voter ID Bill foreshadowed, in many ways, what came two years later when lawmakers took up the Law.  The bill started in the House, where debate was intense.  Opponents argued that the bill was a deliberate attempt to make it more difficult for minority, poor, elderly, student, or disabled residents to vote.[86] Many also alleged that the purpose of the bill was to curb voter turnout in the black community.[87]

Moreover, the majority rejected several amendments that would have ameliorated the bill's disparate impact.  For instance, Representative David Weeks, the Chairman of the Legislative Black Caucus, proposed an amendment permitting a wide range of acceptable photo IDs.[88]  He proposed another amendment to allow a wide range of student IDs.[89]  These amendments were both tabled.

At public hearings on H. 3418, many groups, including the League of Women Voters, the American Civil Liberties Union, Common Cause of South Carolina, and the

---

85 In drafting this section, I consulted the legislative histories available online at
http://www.scstatehouse.gov/sess118_2009-2010/bills/3418.htm and
http://www.scstatehouse.gov/sess119_2011-2012/bills/3003.htm.  I also read the voluminous transcripts of the legislative floor debates that were provided to me by counsel, as well as transcripts of the depositions that had taken place before this report was finalized.  In addition, I relied upon other public materials as cited herein. Due to the compressed timeframe of this litigation, I will continue to review materials as they become available and will supplement this report and my opinion if necessary.
86 Rep. Bill Clyburn, for example, vehemently opposed the bill as being discriminatory.
87 Todd Rutherford, for instance, maintained that the purpose of the bill was to suppress voting. *See also* Matt Long, *House OKs Voter ID Bill Despite Black Caucus Objections*, South Carolina Radio Network, Apr. 26, 2011.
88 House Journal, 118th Gen. Assembly, 1st Sess., at 1351-82 (S.C. 2009).
89 *Id*.

NAACP, testified on the discriminatory impacts of the proposed law. [90]  State officials like Marci Andino, Executive Director of the State Election Committee and Kristen Moore Lominack, of the South Carolina Department of Transportation, took no position. One would assume that these state officials would have supported the Law if they had perceived it to increase election integrity.

In addition, the League was a joint signatory to a formal letter to Sen. Campsen and the Senate Judiciary subcommittee requesting that three public hearings be held around the state to give voters—particularly older, disabled, and minority voters—the opportunity to address the bill's impact.  Although a voter identification program costs over a million dollars to implement, the Subcommittee responded that the state could not afford to hold hearings.  Opponents of the bill also held a Press Conference on March 25, 2009.  There, they described the ways in which H. 3418 would discriminate against minority voters and other disadvantaged populations.[91]

Before the final vote on the bill on February 26, 2009, many House Democrats, including thirty members of the Black Caucus, walked out of the chambers in a highly unusual demonstration of protest. [92]  Ultimately, the majority used the rare device of cloture to shut down any chance to offer additional amendments.[93]  Cloture is hard to obtain,[94] and very rare in the South Carolina legislative process.[95]  The bill then passed largely along racial and party lines, with a vote of 65-14.

The bill was sent to the Senate on March 3, 2009.  As in the House, debate in the Senate was intense.  Proponents argued that eliminating fees for identification cards would eliminate any barriers to voters in need of photo identification.[96]  Opponents retorted that registered voters who did not have proper ID were also unlikely to have the underlying documents necessary to obtain photo identification or the money to pay for

---

90 *See* SC_00044262; SC_00044263; SC_00044264; SC_00044265.

91 *Groups Rallying Against SC Voter ID Bill*, Associated Press, Mar. 25 2009.
92 Clemmons Dep. at 182:19 – 183:7; Martin Dep. at 52:4-15; Harrison Dep. at 123:6-23 (testifying that he recalled only once instance in his 23 years in the South Carolina House that Legislative Black Caucus walked out); *see also* Gina Smith, *Voter ID wins key approval: House Democrats walk out in protest*, The State, Feb. 27, 2009, *available at* http://www.freerepublic.com/focus/f-news/2195258/posts; Seanna Cox, *South Carolina Legislative Panel Approves Voting ID Bill*, Associated Press, May 7, 2009.
93 Clemmons Dep. at 179:9-10.
94 Cleary Dep. at 14:18.
95 Cleary Dep. at 186:3-4.
96 Cox, *South Carolina Legislative Panel Approves Voting ID Bill, supra*.

those underlying documents.[97]  Opponents also argued that travel to government offices to obtain ID would be costly and time-consuming for poor and disabled voters.  And they highlighted the cost of the bill for the taxpayers of South Carolina, explaining that the bill would cost substantial sums on an annual basis.[98]

Ultimately, the Senate passed an amended version of the bill by a vote of 36-2. The Senate version established an early voting period and eliminated any fees for DMV photo identification cards.

After some back and forth between the chambers, the House requested a conference committee to resolve their differences.  House representatives to the conference committee included Alan Clemmons and Harry Cato, both Republicans, and Harold Mitchell, an African American Democrat.[99]  Senate conference members were Chip Campsen, a Republican, Gerald Malloy, an African American Democrat, and Phillip Shoopman, a Republican.  (Representative Clemmons and Senator Campsen were also members of the conference committee that considered H. 3003 two years later.)

The committee recommended H. 3418, but also recommended that a federally-issued employee photo ID be included among acceptable forms of voter ID.

On June 15, 2010, the House approved the conference report's version of the bill by a vote of 69-47.  That same day, the bill died in the Senate due to a Democratic filibuster. (Republican Jake Knotts, then-chair of the Senate Rules Committee, allowed the filibuster to continue by refusing to vote to "Set a Time Certain to Vote" under Rule 15).  Therefore, the Senate moved to adjourn debate on H. 3418, and the 118th General Assembly adjourned *sine die*, effectively killing any bill not adopted by the General Assembly.

As would be true of the Voter ID Law, throughout its consideration, proponents of H.3418 treated enactment of voter identification requirements as a matter of great urgency—and in some cases, openly trumpeted its potential to disenfranchise certain

---

97 Alice Watson, *Voter ID Bill Just Another Poll Tax*, THE STATE, Apr. 6, 2009.
98 Virginia Ghirardelli, Barbara Swift, & The League of Women Voters of Hilton Head Island, *Voter photo ID a solution without a problem*, ISLAND PACKET, Jan. 29, 2010.
99 Party affiliations can be found at http://www.scstatehouse.gov/house.php, where individual members can be searched for party identification.  The same can be done for senators at http://www.scstatehouse.gov/member.php?chamber=S.

voters. On March 20, 2010, a voter ID proponent, Lanneau Siegling, wrote to Rep. Clemmons:

> In my opinion there is no plan B… no fallback position and no compromise position… We must sign into law, this year, to go into effect whenever… a Voter ID Bill! I'm OK giving some window of early voting or absentee voting to get this done… *I think a good ID bill blunts the gain for 'them' that they think they get in early voting*… Tell them to stay in session until it's done! … Voter ID… don't come home without it! (emphasis added)

> Clemmons responded: "I'm with you, Lanneau!"[100]

On June 26, 2010, another constituent, Joe Dugan, wrote to Clemmons to see whether the House could support the Senate version of the bill, and to express his concern "that the administration in Washington is destroying our heritage" and that the next election "may very well be the most important election in our lifetime." Clemmons responded, in part, that "[w]e thought that we saw a great deal of bussed liberals and fraudulent early votes in the 2008 election, but with these kinds of early voting provisions it has the potential to be even worse!" Neither Dugan nor Clemmons cited any documented case of voter fraud. Instead, the subtext of the exchange was that voter ID would make it more difficult for some voters who turned out in the 2008 election to vote again in 2012.

### B.    The Voter ID Law: R54 (H.3003)

Seventy-one South Carolina House Republicans, the all-white Republican Caucus, sponsored the Voter ID Law. It was passed by the South Carolina General Assembly on May 11, 2011, and signed by Governor Haley on May 18, 2011. As with the discussion of the Voter ID Bill, I focus my analysis on the parts of the legislative history that bear on the question of purpose. Act R54's full legislative history can be found at Appendix C.

### 1.    *House Debate*

H. 3003 was introduced on December 7, 2010. From the very outset, the bill drew strong opposition from Democrats, and particularly from African American

---

[100] SC_00000609-10.

representatives. And from the outset, amendments that would have served to ameliorate the harsh effects of the law failed to pass.

On January 26, 2011, the judiciary committee offered an amendment that, among other things, mandated the SEC to issue voter identification cards with photos to denote voters who cast absentee ballots in general elections, and to permit the state to charge a fee of $5.00 for the ID card. When Rep. Clemmons explained the amendment, Rep. Sellers spoke against the massive cost of the bill against the backdrop of South Carolina's "historic, current crushing $830 million State deficit."[101]  Sellers further explained that the law risked disenfranchising 178,000 qualified voters, and that its stated justification was inadequate. While it was supposedly meant to eliminate fraud, Sellers explained, South Carolina had only one allegation of fraud in the 2010 gubernatorial election, and the state already had laws criminalizing voter fraud.[102]  The amendment was adopted by a vote of 73-41.

Other amendments—most of them designed to mitigate the burden of the bill on voters—were tabled. Among these were amendments to include State employee ID as an acceptable form of ID under the Law, exempting persons over age 65 or those with physical disabilities, and establishing an early voting period.[103]

Debate on the amended version of the Law was intense with numerous opponents of the bill, including several African American Democrats, voicing strong opposition to the Law's anticipated effects on voters and its lack of justification:

- Rep. Sellers objected passionately and extensively to making it harder for citizens to vote: "Before our eyes, freedom and liberty is being dismantled." As before, he explained that existing laws already criminalized voter fraud, that the current bill would not solve any of the voting issues that its advocates raised, and that it would impose an unjustifiable cost on the taxpayers.[104]

- Rep. Leon Howard reiterated that the bill's stated purpose could not justify its massive costs.  He explained that even if there has been one fraud case, the need to stop it could not be reconciled with costs over $1 million or the

---

101 House Journal, 119th Gen. Assembly, 1st Sess., at 646-49 (S.C. 2011)(statement of Rep. Sellers).
102 *Id.*
103 *See, e.g.*, *Id.* at 652-53 (proposed amendment by Rep. McEachern); *id.* at 656-57 (proposed amendment by Rep. Smith).  Republican consultant Wesley Donehue later said in an article, "There's been a false impression over there that Republicans will be hurt with early voting . . . ."  Jim Davenport, *GOP's Early Voting Opposition May Nix Haley Agenda*, Associated Press, June 12, 2011.
104 Tr. of House Debate, Jan. 26, 2011, at 9-21.

damage to voting rights for which people had been subjected to water hoses, attacked by dogs, and even died.[105]

- Rep. Christopher Hart issued a statement for the Journal.  He questioned why South Carolina did not feel the need for voter ID over the course of its 212 year history until after an unusually high African American turnout in 2008 and the election of an African American president. [106]

- Rep. David Mack stated, "This is about politics, pure politics.  The Republican Party benefits from a low voter turnout.  The Democratic Party benefits from a better, high voter turnout.  That's what it's all about.  In 2008, our president brought a lot of black and brown people to the polls."[107]

- Rep. Joseph Neal reiterated the connection between the record turnout of African Americans and the push for voter ID.  He reminded his colleagues that in the 2008 election, poll watchers harassed students from Benedict College—a historically black college—for using their student IDs, noting that the poll watchers did not give students at Clemson University or other schools any trouble.[108]

- Rep. Robert Brown "vehemently object[ed] to H. 3003."  He explained that the bill suppresses the votes of the handicapped, the disabled, and citizens who have no access to transportation.[109]

- Rep. J. Seth Whipper noted that the bill had no justification in fact.  Since the bill was not needed, Whipper said, "I have a strong concern, a deep discomfort, and a heavy presumption that the effects of this legislation are deliberately disregarded, if not desired."[110]

Despite these objections, the House Republicans were adamantly committed to passing H. 3003—and quickly.  In particular, Clemmons wanted the House to pass the bill before the Senate to beat the Senate to the "crossover date."[111]  Crossover usually refers to the requirement that a bill be passed in one body by May 1st, "the crossover date," in order to be taken up in the regular course of business by the other body. Otherwise it takes a two-thirds vote to consider the bill.  Clemmons and the House wanted to beat the Senate, and get the Bill to the Senate first.

---

105 Tr. of House Debate, Jan. 26, 2011, at 33-41.
106 *Id.* at  44-46.
107 *Id.* at  57.
108 *Id.* at  30.
109 House Journal, Jan. 26, 2011, at 673 (Statement of Rep. Brown).
110 House Journal, Jan. 27, 2011 (Statement of Rep. Whipper).
111 Dennis Dep. at 43:16 – 49:10; *cf.* Cleary Tr. at 143:16 – 144:6.

On January 26, 2011, the House passed the bill along racial and party lines by a vote of 74-45.[112]

### 2. *Senate Debate*

On January 27, 2011, H. 3003 was read for the first time in the South Carolina Senate and, in an unusual move, referred to the full Judiciary Committee as opposed to a subcommittee.  On February 8 and February 9, 2011, two motions were made to make the bill a Special Order.  "Special Order" is a means to deal with contested bills because, in general, the Senate only considers "uncontested" bills.  A bill becomes contested one of two ways:  1) one or more Senators attach a Minority Report as a bill comes from committee; or 2) a Senator objects to consideration.  When there is a contest, a bill typically will not come up unless the Senators get Unanimous Consent to remove the Minority Report or individual objectors "remove their name" from the bill.  The exception is through a Special Order, which puts the contested bill in line.  Ordinarily such a motion requires a two-thirds vote of Senators present and voting.

In this case, the Senate failed twice to muster the two-thirds vote necessary to set H. 3003 for Special Order.  Then, Larry Martin, as Chair of the Rules Committee, made the motion under the special provision requiring only a written majority vote of the Rules Committee.  A motion to set for Special Order with only a majority vote of the Senate pursuant to Rule 33B is very unusual.  On February 10, 2011, the bill was set for Special Order by a vote of 26-17.

Thereafter, some amendments designed partially to mitigate the Law's disparate effects failed, including an amendment that would allow student ID cards and that was tabled by a vote of 27-13 on February 16, 2011[113] and an amendment exempting persons aged 65 or older that was defeated 17-25 on February 23, 2011.[114]  Sen. McConnell, however, was successful in proposing an amendment establishing early voting, loosening ID restrictions for persons older than 65 who lived in assisted living facilities, and loosening restrictions on absentee voting.  The amendment was adopted 41-0.[115]

---

112 *See* House Journal, Jan. 26, 2011.
113 Senate Journal, Feb. 16, 2011 (Amendment No. P1).
114 Senate Journal, Feb. 23, 2011 (Amendment No. P4).
115 Senate Journal, Feb. 16, 2011 (Amendment No. P1).

Opposition to the bill remained powerful in the Senate, with opponents emphasizing the law's impact on more disadvantaged voters.

- Senator Sheheen spoke passionately against the bill: "You know, the whole goal of this bill, senator from Clarendon, the whole goal of this bill was to make it harder for people to vote. Let's not pretend. We know it's gonna happen. There are 170,000 people who vote currently, who are registered to vote currently, who do not have picture IDs. Why? Because everyone doesn't live in the same world that we do. Everyone doesn't cash…doesn't cash their checks at their bank because they don't have a bank account. I know y'all find that hard to believe, but there are lots of people in this state who don't have a checking account. There are many people that don't present an ID when they get on a plane because they've never flown and never will. There are many people who don't do these things that everybody over here apparently thinks that everybody in the state does. They don't. We know that a hundred…almost 170,000 of them do do one of the most fundamental, probably the most fundamental, thing that we do as citizens. They vote. And the estimates – and I hope you listen to this senators, 'cause I think this is important; it's why I'm pretty passionate about this bill – the estimates are that 40,000 of those people will never vote again."[116]

- Senator Creighton Coleman echoed Sheheen's concerns, saying "It's going to have a big impact upon the voters because of course we all know it is going to deter people from voting mostly with the elderly and the poor." He also raised the question of how the law would impact someone who had their driver's license suspended.[117]

- Senator Gerald Malloy reiterated concerns of vote suppression, noting that the effect of the bill would be that voters, and especially nonwhite citizens, would be less able to participate in the political process. [118] He also criticized the flimsy justification for the bill: "the essence of this Bill, in total, is to discourage people from voting….And I submit to you that this is a solution to a non-problem."[119] In addition, he highlighted the potential for disparate enforcement of the law, asking whether he could be forced to vote with a provisional ballot if a poll worker decided he looked different from his photo ID, for example older with less hair. The answer was yes.[120]

Despite these repeated and insistent concerns about the effect of the law on voters, proponents of the bill held firm. Indeed, while remarks in favor of the bill—including by Senators Campsen and McConnell—stated that it was not the intent of the bill to stifle

---

116 Senate Journal, Feb. 23, 2011(Amendment No. P4).
117 Senate Tr., Feb. 23, 2011, at 77.
118 Senate Tr., Feb. 24, 2011, at 105-106.
119 *Id.*
120 Senate Tr., Feb. 24, 2011, at 122-23.

voting, the supporters did not substantively address the minority's concerns that it would have that effect.

Likewise, while Sen. Campsen stated that the bill was necessary to address fraud, neither he nor other proponents of the law relied on any evidence that voter impersonation fraud was a problem in South Carolina. Indeed, the potential South Carolina fraud issues he did raise—absentee ballots fraud, voter intimidation, and buying votes—were not ones the legislation addressed, as Sen. Bradley Hutto pointed out.[121] Ultimately, Sen. Campsen could not defend the position that South Carolina had an impersonation fraud problem, arguing instead that the South Carolina should protect itself against that possibility: "It is a preventive measure."[122]

On February 24th, the amended bill, which faced strong opposition from the Senate Democrats, was adopted 24-15. [123]

The Senate versions included provisions to soften the bill's impact on voters that was not to the liking of proponents of a harsher Voter ID Law. A supporter emailed Representative Clemmons in response to the bill's passage that he understood "it was weakened… everyone over 65 exempt… old dems will be voting when they're 110…"[124] Clemmons responded: "That's unacceptable…" And the South Carolina GOP, which is not authorized by any candidate or candidate's committee, circulated an email to its distribution list celebrating the Senate passage of the bill.  It stated, "Though the version of the legislation that passed the House is preferable, deals have to be made in the Senate in ways they do not in the House to move the bill through the process.  But we are counting on a stronger bill coming through conference committee."[125]

The amended bill was returned to the House, which adjourned debate until April 6, 2011. At that point, the House amended the Senate bill to the previous House version. This House version did not establish any exceptions for elderly voters and did not include any early voting procedures.

---

121 *See* Senate Tr., Feb. 24, 2011, at 108-112 (Senator Campsen describes alleged electoral abuses); *id.* at 112 (Senator Hutto questions Campsen about how voter ID addresses those particular problems he raised).
122 Senate Tr., Feb. 24, 2011, at 128.
123 *See South Carolina Senate Passes Voter ID*, SOUTH CAROLINA STATEHOUSE BLOG (Feb. 25, 2011), http://sc.statehouseblogs.com/2011/02/25/south-carolina-senate-passes-voter-id-press-release/
124 SC_00000857.
125 SC_00094030.

Opponents of the bill in the House once again questioned the motivations behind

it.  Rep. Sellers said:

> Now, I know what is this about, in 2008 Barack Obama became president
> of United States and he scared the Republican Party and Tea Party to
> death.  You have lines that stretched from polling booth to miles and miles
> around, and I know there is a fear that is deep down in the hearts of good
> republican colleagues.[126]

Likewise Representative Sellers and Representative Harry Ott questioned why an

expired driver's license should not be accepted if the purpose of the bill was just to verify

a voter's identity.[127]  Representative Mack answered that the bill's true purpose was not to

verify who is voting but to disfranchise people of color.[128]

On April 13, the Senate debated the bill.  Several Senators expressed frustration

that the House had stripped so many provisions from the Senate bill and particularly that

the Chairman, Senator Raymond Cleary, was encouraging them to vote for the House bill

despite its failure to include any of the Senate additions.[129]  A Senator from Charleston

questioned why the Chairman was applying this pressure when usually if the Senate

disagreed with a bill the House sent back, the House and Senate went to conference

committee.[130]

Senator Sheheen answered the question, explaining that Republicans were

circulating a request to their distribution list to have constituents call their Senators to

pass the House bill.  He stated, "We know that the political party is driving this debate,

right?  Nationally and locally."[131]

Senators Malloy and McConnell engaged in a mini-filibuster to forestall a vote to

concur with the House bill.  Ultimately, the Senate failed to pass the House version of the

bill, 28-15.  The House insisted on its version and requested a conference.

### 3. Public Hearings

The public was given limited opportunity to provide public testimony on H.3003.

To my knowledge, there were only two public hearings on the bill. Both were held at the

---

126 Transcript of House Debate, Apr. 6, 2011, at 120.
127 Transcript of House Debate, Apr. 6, 2011, at 127-29.
128 Transcript of House Debate, Apr. 6, 2011, at 137.
129 Transcript of Senate Debate, Apr. 13, 2011, at 1-5.
130 Transcript of Senate Debate, Apr. 13, 2011, at 6-13.
131 Transcript of Senate Debate, Apr. 13, 2011, at 36-38; *see also* SC_00093980-93981; SC_00070510.

subcommittee level and both were during the beginning of the session shortly after the bill was first introduced.

On January 6, 2011, the Senate Judiciary Subcommittee held a hearing on Senate Bill 1, the companion bill to H. 3003 which contained a 15-day early voting period.[132] Eight people testified in person.[133] While some praised the Senate for the early voting provision, not a single person testified in favor of photo ID.  Instead, opponents voiced concerns about the added hurdles the bill would place in front of voters, its high cost, lack of basis, and the disparate impact it would have on the elderly, students, minorities, low-income voters, and voters with disabilities. Carole Cato of the League of Women Voters presented legislators with data from the State Election Commission showing that "178,175 legally registered voters have no photo ID from the DMV.  More than 27% of persons with no photo ID are 65 and over, some with disabilities; 26% are 45-64, some with disabilities; 36% are minorities; 64% are white; and almost all live in poor rural areas with little or no public transportation."[134]  Others referred to the bill as "a solution in search of a problem."[135] And Patricia Calkins, a York County Poll Manager, expressed concern about the bill's burden on poll workers.[136]

On January 13, 2011, the House Election Laws Subcommittee held its hearing on H. 3003.  It lasted just 70 minutes.[137]  Cato was among five people who testified in person. She referred to the photo ID requirement as "an idea with no basis, shaky legality and high costs." As she did before the Senate Subcommittee, she presented legislators with the State's own statistics on the number of South Carolina voters who do not possess a photo ID and its disproportionate impact on minorities, the elderly, and the poor.[138]

### 4.    *Conference Committee*

Members appointed to the conference committee were Representatives Alan Clemmons, James Lucas, and James Merrill—not one House Democrat—and Senators

---

132 S*ee* SC_00044273.

133 *See generally* Hearing on S. 1 Before the S. Judiciary Comm., 119th Sess., Jan. 6, 2011 (audio recordings of hearing on file with counsel for Intervenor-Defendants).

134 SC_00095826.

135 Hearing on S. 1 (testimony of Bret Bursey, Progressive Network).

136 Hearing on S. 1 (testimony of Patricia Caulkins).

137 U.S. Exhibit No. 8 to Andino Deposition.

138 Hearing on H. 3003 Before the H. Election Laws Subcomm, 119th Sess. (S.C. Jan. 13, 2011) (testimony of Carole Cato, League of Women Voters of South Carolina) (audio recordings of hearing on file with counsel for Intervenor-Defendants); *see also* U.S. Exhibit No. 8 to Andino Deposition.

Chip Campsen, Glenn McConnell, and John Scott (African American Democrat from Richland).139  (Clemmons and Campsen had also been on the conference committee for H. 3418, the predecessor to H. 3003.)  Patrick Dennis served as Chief Counsel to the South Carolina House Judiciary Committee, and the committee elected Sen. McConnell as its chairman.

In the conference committee, representatives of the House and Senate continued to disagree vehemently on the question of which IDs should be accepted. Clemmons reiterated that only identification that allows a passenger onto a plane would ensure secure voting and instill confidence in the South Carolina electoral process. The Senate perspective was that expired drivers' licenses still confirm the voters' identities; therefore, seniors who no longer drive should still be allowed to use expired licenses. While the House countered that identification needs to be kept current because one's identity changes over time,[140] House members had no explanation for refusing to include an expired driver's license among acceptable forms of ID, while the SEC's new photo ID registration card will never expire, or require voters to update their photograph.

The Senate version of the bill also included State employee IDs to make voting more accessible and the law less costly because the State would not need to pay for SEC- or DMV- issued identification for State employees. The House was again intransigent, insisting that only forms of ID that would allow one to board a plane should be accepted. In particular, Clemmons argued that State employee IDs should not be permitted because there was no law regulating how employee IDs could be verified.[141]

The most contentious point in these deliberations was early voting. Senator McConnell explained the Senate wanted early voting to signal to the Department of Justice its good faith effort not to disenfranchise voters.  Sen. Scott pointed out that the people of South Carolina had been asking for early voting for years.  According to Sen. Scott, the question was not if South Carolinians needed early voting (they did); but whether they needed voter identification.  While Rep. Merrill countered that early voting undermines the security that voter identification brings, Senator McConnell argued that

---

139 The House appointed a Democrat to the conference committee when it worked on H. 3418, but not to the committee working on H. 3003.
140 Conference Committee Tr. at 8-9.
141 Conference Committee Tr. at 9-17.

the Senate version did more to secure the electoral process while making it more accessible than the House bill.[142]  Ultimately, the conference committee reverted to the House bill.[143]  Still today, Senator McConnell believes that the Senate bill is more likely to be consistent with the Voting Rights Act than the House bill that was passed.[144]

As committee members were congratulating each other on finishing the legislation, African American Sen. Scott made a statement.  He believed the finished bill disregarded the minority perspective, and he informed the committee he would not be signing the bill.  He lamented that the committee had turned a "deaf ear" to the demands of minority voters, such as early voting.[145]

On April 26, 2011, the House considered the conference committee report.  Again opponents of the bill spoke out.  Representative Sellers wanted to know what the price would be, but Clemmons declined to answer.[146]  Representative Hart spoke passionately about how the bill would dissuade legitimate voters from participating in the electoral process.[147]  Representatives Cobb-Hunter and Neal questioned the proponents' commitment to electoral integrity given the lack of any response from the Republican leadership in the General Assembly to documented cases from the prior election of a thousand votes in one precinct and 800 votes in another not being counted due to problems with voting machines. Representative Neal asked where the "outcry for integrity" was over these documented cases in which citizens lost their votes.[148]

In the end, the House adopted the bill by a vote of 71-36, and returned it to the Senate.  After debate, the Senate adopted the conference committee report by a vote of 26-16 on May 11, 2011.

---

142 Tr. of Conference Committee at 52-67 (stating that by adding a few days to early voting, the legislature would signal that "we were not chilling anybody's right to participate")
143 Some wording from the Senate bill was inserted, but overall, the finished product was the House bill.
144 McConnell Dep. 140:9 - 141:9, June 14, 2012; McConnell Dep. 189:17-192:21.
145 Tr. of Conference Committee at 77. Some majority members of the conference committee turned a deaf ear not only to the views of the minority but to dissenting voices within their own party. On April 7, 2011, Alan Clemmons received a response to one of his email bulletins from Joseph and Kathryn Martin, two constituents who explained that they see Voter ID "as a cleverly disguised attempt to reinstate the Jim Crow voting restrictions that have disgraced the history of this state" and that they were registered Republicans who vote. SC_00000924-25. These concerns appeared to have no effect on Clemmons' resolve to pass a harsh Voter ID bill.
146 Tr. of House Deb. at 169-70 (April 26, 2011)..
147 Tr. of House Deb. at 178-199 (April 26, 2011)..
148 Tr. of House Deb. at 202-03 (April 26, 2011).,

The Voter ID Law was ratified on May 17, 2011, and signed by the governor on May 18, 2011.

### C.    Conclusion

From studying the legislative history, I have reached several conclusions that, taken together, allow me to ultimately conclude that the Law was motivated by a discriminatory purpose.

1.    Every African American legislator and every legislator who represented an African American majority district opposed the bill adamantly, on the grounds that it discriminated against minority voters.[149]

2.    There were several procedural irregularities and unusual incidents in the consideration of H. 3418 and the consideration and passage of H. 3003.

First, in the debate over H. 3418, Representative David Weeks declared that opponents had been denied a meaningful role in the negotiations.  Then, before the final vote on the bill on February 26, 2009, many House Democrats joined the members of the Legislative Black Caucus when they walked out of the chambers.[150]  Thereafter, the majority responded by amending the bill to make it even more restrictive, possibly in retaliation for the walkout.

Second, on January 27, 2011, when H. 3003 was read for the first time in the Senate, it was referred directly to the full Judiciary Committee rather than to the subcommittee.  Although not unheard of, this is an unusual procedure.

Third, was the use of a Senate Special Order motion for both H. 3418 and H. 3003 by majority vote.  As explained above, although such motions are permitted under Senate Rules, they are considered a very unusual course of action.  Such Special Orders have been made five times in the last decade:  in 2005, for a medical malpractice bill; in 2008, for an increased cigarette tax; in 2011, for an immigration bill; and in 2008 and 2010 for

---

149 *See* Kent M. Williams Aff. ¶ 3 (December 21, 2011); John C. Land, III, Aff. ¶ 3(Dec. 20, 2011); Gerald Malloy Aff. ¶ 4 (December 21, 2011) , *attached to* Supplemental Section 5 Cmt. Ltr. from Sen. Malloy to T. Christian Herren as Tab 33.

150 *See, e.g.*, Gina Smith, *Voter ID Wins Key Approval: House Democrats Walk Out in Protest*, FREE REPUBLIC, (Feb. 27, 2009) http://www.freerepublic.com/focus/f-news/2195258/posts; Sarita Chourey, *Hope fades for reform bill,* AUGUSTA CHRONICLE (May 11, 2009) at A08 *available at* http://chronicle.augusta.com/stories/2009/05/11/met_523534.shtml; CONGRESS DAILY, *South Carolina House Panel Advances Voter ID Bill* (May 8, 2009).

the voter ID bills.  It is certainly striking that this rare procedural device has been used twice for voter ID.

Fourth was the scarcity of public input.  As noted above, very few public hearings were allowed.  Moreover, the General Assembly refused to hold statewide hearings in 2009, despite The League of Women Voter's request to do so.  Moreover, the League also requested a meeting with the General Assembly Republicans to share facts on the legislation, but party leaders denied this request as well.

Fifth, the bills were pushed forward by the Republican majority with unusual urgency.[151]  This is particularly unusual given the vehemence of the opposition and, as discussed *infra*, the lack of any evidence of impersonation voter fraud.

3.      In addition to these procedural irregularities, a number of additional aspects of the legislative history point to the existence of a discriminatory purpose behind the Law:

- All warnings about the adverse effect on minorities of the bill were ignored without study. Although the legislators were provided with an SEC breakdown showing higher percentages of nonwhite voters who lacked DMV issued identification,[152] the General Assembly did not ask the SEC its view on the effects of the bill,[153] nor conduct any study on the bill's effect on minorities or minority turnout.[154]  During deposition, numerous legislators admitted, in effect, to ignoring evidence of discriminatory impact.[155]

---

151 Among other places, the priority Republicans assigned to the passage of Voter ID was recognized in the press. *See* Seanna Adcox, *SC Legislators Approve Voter ID Requirements*, AUGUSTACHRONICLE (Jan. 26, 2011) *available at* http://chronicle.augusta.com/latest-news/2011-01-26/sc-legislators-approve-voter-id-requirements?v=1296079426. The urgency sometimes proved difficult to justify, however, given the other challenges confronting the state. Harrison Tr. 154:3-21 (agreeing that his campaign literature failed to list voter fraud as a priority and testifying that he was not sure that voter fraud was at the top of the list "along with the creating jobs and our economy and education and some of those issues.")

152 Andino Dep. 69:3-71:18.

153 Andino Dep. 153:4-7; Andino Dep. 188:15-23; McConnell Dep. 188:14-189:15; Harrison Dep. 96:12-25.

154 Andino Dep. 70:10-72:3 (SEC director was not asked for additional analysis regarding racial disparity of those lacking ID in consideration of H.3418); Andino Dep. 152:25 -153:7 (SEC director was not asked by anyone in General Assembly for her view on effect of photo ID on turnout or minority voting); Martin Dep. 77:18-79:13.

155 Supplemental Section 5 Cmt. Ltr. from Sen. Malloy to T. Christian Herren, Tab 33, Malloy Aff.at 3, SC_00056916 (statistical analysis of discriminatory impact was refused and ignored during legislative process); Dennis Dep.. 78:23-81:16 (testified that as Chief Counsel for the House Judiciary Committee, he drafted H.3003;  acknowledged that although the VRA requires the consideration of possible disparate effect on minority voters, he did not review any data on the effect on minority voters from the DMV; did not request anything of the SEC; is not aware of anyone asking for such data from the SEC; and does not recall reviewing any other statistical information, studies, or analyses on impact on minorities); Lowe Dep. 82:3-85:21 (noting that he did not ask for or review any data on impact on racial minorities and thatno

- The legislature considered and excluded student IDs without persuasive justification, even though there are eight predominantly African American colleges in the State.

- The House was adamant in not accepting the Senate version that would have allowed State employee IDs and early voting.[156]   It was widely believed that these additions would have mitigated the Law's adverse effects on minorities. One, lawmakers believed that state employees are more likely to be minorities than the general population.[157]   Two, early voting would have allowed more time for those turned away for insufficient ID to obtain ID or learn about the reasonable impediment exception.  Early voting is also thought to decrease long Election Day lines that cause people to turn away; with photo ID, even longer lines are expected because of the need to scrutinize photos.[158]

- Whatever may have been the justifications for excluding student and state employee IDs, there is no plausible justification for the legislature's failure to allow IDs issued by the DSS and other social service agencies to suffice under the Act.  This decision mirrors the discrimination evident in *Condon v. Reno*,[159] when the State eased registration procedures at the DMV but refused to allow voter registration at the DSS where 70-80% of the clientele was minority. Whether that omission in 1995 was purposely discriminatory or not, the State's 2011 determination to exclude social service agencies again after being put on notice by a federal court suggests intentionality.

- The cost of implementation for Act R54 is $535,000 initially and an additional $100,000 annually, plus lost DMV fees and revenue for the Department of Transportation.[160]   Indeed, the DMV wrote a letter to Sens. McConnell, Campsen, and Scott expressing concerns regarding H.3003's "unfunded mandates" that "cause DMV to eliminate mission essential functions due to funding constraints" and "increased workloads for an organization that is currently only resourced at 80% strength."[161] And Senator McConnell testified

proponents of the bill argued that it would not have disparate impact on racial minorities);  Lowe Dep. 129:23-130:15 (testified that he had no contact with SEC at all prior to bill passing); Limehouse Dep. 45:12-47:10 (testified that he agreed that it was important to consider the impact of legislation on racial minorities, but although he heard oral argument on burden to racial minorities, he was unpersuaded by them. He reviewed no data or studies.); Limehouse Dep.. 43:23-44:15 (testified that although he did not consider any burdens of the Act, he was confident that it did not pose any burdens at all).

156 Peeler Dep. 38:17-24; McConnell Dep. 132:24-133:3.

157 McConnell Dep. at 201:10-22.

158 Peeler Dep. 38:5-7; Harrison Dep. 115:19-116:1; Harrison Dep. 117:8-13; *Cf*. Andino Dep. 189:7-18; and Andino Dep. 191:12-23 (discussing virtues of early voting in decreasing waiting time and as a factor in increasing turnout).

159 913 F.Supp. 946 (D.S.C. 1995).

160 Andino Dep. 80:16 -82:1 (testified that the cost of the bill is $535,000 initially); U.S. Andino Ex. 9, SC_00098016; DMV Response to Sen. Hutto FOIA Request at 3, SC_00001746 (estimating $651,883 in lost revenues for Highway Fund and $667,525 in lost revenues to DMV for issuance of free ID cards); Statement of Estimated State Revenue Impact, Feb. 2, 2011, SC_00077538 (estimating $507,360 in reduction of revenue to highway fund based on free issuance of cards).

161 SC_00096418.

that these costs were being imposed while higher education and senior citizen services are underfunded.[162]  That the legislature chose to ignore the massive costs of voter ID at a time of budget crisis defies logic and points toward an improper purpose.

- The 2011 conference committee had only one member of the Democratic party, Senator John Scott.[163]  The House did not appoint any Democrat to the committee. While not illegal, this decision is hardly a model of good government, and differed drastically from the legislature's bipartisan approach in 2009.  In 2011, this closed circle turned a blind eye and deaf ear to anyone in opposition.

- At conference on the bill, the House promised to introduce early voting in a separate bill after ID was passed, but it never did.  The Senate sent the House such a bill, and it died without action.[164]

## VI.   THE ANTICIPATED EFFECT OF THE CHANGE ON MINORITY CITIZENS

The history and context for the passage of the Voter ID Law demonstrate that South Carolina lawmakers anticipated the disproportionate effects it would have on minority voters.  In response, rather than expanding the types of acceptable IDs to permit state employees, students and seniors to vote or increasing the number of days available for voting, South Carolina lawmakers rejected every opportunity to make the Voter ID Law more equitable. The combined legislative history, South Carolina's well-understood demographics and public media reports lead to no other conclusion than that the legislature understood the potential discriminatory effect and passed the Law anyway.

*First*, the very same legislature that passed the Voter ID Law had studied the state's demographic makeup for the redistricting following the decennial census; the legislators were well aware of racial bloc voting patterns and the number and proportion of African Americans in each district.  *See supra* Section I. Indeed, the South Carolina government website links to reports and tables of population statistics by race and geographical locations, making clear that the legislators who supported H. 3003 had detailed knowledge of each electoral district's demographics and the distribution of those

---

162 McConnell Dep. 194:11-20.

163 *See generally* Conference Committee Transcript. *Cf.* Dennis Dep. 54:4-54:10 (noting that quorum of either committee must meet publically); S.C. Code Ann. § 30-4-80(B) (1976) and Senate Rule 19(g)). Dennis Dep. 55:11-18 (noting that Senate conferees amenable to rejecting early voting, no real disagreements in committee except for Scott on early voting).

164 McConnell Dep. 143:7-20;  McConnell Dep. 161:10-16.

districts in the state.[165]  In one telling instance, Rep. Lowe testified that a House-drawn map reducing the percentage of black voters in his district by 2% (as compared to the Senate's map) would give him a definite advantage in getting re-elected.  Indeed, Lowe wrote an opinion editorial in which he pushed for the House map,[166] and admitted that the reduction of black voters could be the "deciding factor."[167]  Other documents from the Florence County Republican Party also call for a 7th District with lower Black Voting Age Population and indicate that the county party may have had "issues" with attracting people of color to their party.[168]

Similarly, there is no question that lawmakers were aware of several predominantly African-American colleges in the State when they made the determination not to accept student IDs.[169]  See *infra*.

*Second*, in the State of South Carolina, the difference in the socioeconomic position of African Americans and whites is long-standing and well-documented.  On the whole, white South Carolinians show significantly higher levels of important socioeconomic indicators (such as education and economic prosperity) than their African American counterparts.**[170]**  The evident lower socioeconomic status of African Americans means not only that they are disproportionately likely to lack the ID required by the law, but also that they would face disproportionate hurdles in seeking to comply with it. Yet lawmakers turned a blind eye to disproportionate lack of ID ownership among African

---

165 District Population Chart, S.C. Senate Judiciary Comm., Mar. 29, 2011, http://redistricting.scsenate.gov/Exhibits/Exhibit%2015%20-%20DISTRICT%20POPULATION%20CHART/Exhibit%2015%20-%20S591PlanComp.2010%20Census%20Pop.pdf.

166 Lowe Dep. Intervenors' Ex.2.

167 Lowe Dep. 90:11-98:20.

168 *See, e.g.*, from FLORENCE COUNTY REPUBLICAN PARTY (SC), FACEBOOK: Stephanie Rawlinson, "We Must Stand Up for the Pee Dee!!!" June 23, 2011 at 11:43 pm; "Florence County Council Seats Up for Election in 2012," Nov. 2, 2011 at 11:31 am; Bill Pickle, Chairman, Florence County Republican Party, "Florence County Republicans Call to Action!!! June 2011," June 13, 2011 at 4:05 am.

169 McConnell Dep. 200:20 – 201:9, June 14, 2012; Press Release, Sen. Lindsey Graham, U.S. Senate Recognizes National Historically Black Colleges and Universities Week (Sept. 14, 2010) (S.C. home to eight HBCUs); MILES TO GO: SOUTH CAROLINA, SOUTHERN EDUCATION FOUNDATION 14 (2002), http://www.che.sc.gov/AccessEquity/A&E/Miles%20To%20Go-%20Final%20Book.pdf (as of 2000, 26% of all African-American undergraduates enrolled in one of these eight historically black colleges and universities).

170 *See, e.g.*, Cleary Dep. at 205 (in rural areas where a greater percentage of minorities live you tend to have poorer health and earlier death rates, less likely to get a college education); TOBY MOORE & SARA LAWRENCE, CREATING GREATER OPPORTUNITY IN SOUTH CAROLINA'S I-95 CORRIDOR: A HUMAN NEEDS ASSESSMENT, RTI INTERNATIONAL (2009).

Americans while they considered the bill.[171]  Indeed, Rep. Brannon, one of the Law's co-sponsors, testified that despite discussions of disparate ID ownership during the floor debates, he never requested data on the issue.  Brannon "didn't feel like [he] needed that information to cast [his] vote."[172]

These facts were evident to the Legislature considering the ID Law not only from its familiarity with demographic data from the redistricting process but also because: (1) the ID Law's disparate impact was repeatedly highlighted during the floor debates; and (2) numerous advocates brought these socioeconomic disparities to its attention.  For instance, Senator Malloy expressly told his colleagues that a disproportionate "36% of those lacking state-issued photo ID's are non-whites."[173]  Carole Cato of the League of Women Voters echoed this statistic, and presented legislators with data from the SEC to confirm that "178,175 legally registered voters have no photo ID from the DMV" and that 36% of those voters are minorities. The League of Women Voters also provided a detailed handout to every lawmaker outlining its reasons for opposing the ID Law,[174] and arguing:

> [P]hoto ID would impose a number of barriers on voters, particularly seniors, minorities, and people who have disabilities, live in rural communities, and have lower incomes.  These voting barriers raise serious questions of compliance with the Help America Vote Act and the Voting Rights Act.

*Third*, concerns about the disparate effects on the African American population appeared repeatedly in the press.  For instance, the *Augusta Chronicle* wrote on June 16, 2010, "Democrats also oppose requiring voters to show a picture ID, saying it would

---

171 Martin Dep. 78:2 – 84:24, June 13, 2012 (it would not be a problem if minorities were 30% of the population but 36% of those without ID; only 40-50% would be a problem); *see also* Martin Dep. at 176:8 – 178:23 (considered retrogression statistics for reapportionment but not voter ID)); Limehouse Dep. 54:4-56-9; Lowe Dep. 85:2-21 (no proponent of the bill argued it would not have disproportionate effect on racial minorities), 115:2-116:25; Cleary Dep. at 206 (saying that "there may be a tendency for that group of minorities . . . not to have a photo ID, but that doesn't mean that they can't take five minutes, 20 minutes to get an ID" and that transportation is not a hurdle in today's society); Peeler Tr. at 94; Brannon Dep. 65:8 – 68:18 (not requesting statistics on impact of bill on minority voters because "I didn't feel like I needed that information to cast my vote")
172 Brannon Dep. 65:8 – 68:18.
173 S. Journal, 119th Sess. (statement of Sen. Gerald Malloy).
174 Undated one page sheet on League of Women Voters letterhead.  In possession of author; *see also* SC_00044252-55.

suppress the vote of minority, disabled and poor residents who don't have such ID. They called it a backlash to the election of President Obama."[175]   Another article stated,

> [T]here's little doubt that the photo ID provision would be a burden, and perhaps an onerous one, for the most downtrodden segment of the state's electorate. The poor, the elderly, the handicapped—folks who already lack much of a voice in state politics—would likely vote in even smaller numbers if (or rather when) this bill is enacted.[176]

The *Augusta Chronicle* again brought up the issue in January 2011:

> [H]ours-long debate echoed the contentious arguments of last year. ….Democrats countered that it would suppress the vote of minorities, the disabled and elderly who don't have such IDs.  They compared the requirement to Jim Crow-era laws in the South that kept blacks from voting. And they accused Republicans of pushing for the bill following the election of President Barack Obama.[177]

And, James Davenport in an AP article on April 20, 2011, stated, "Republicans say the bill is about voter integrity. Democrats say it suppresses turnout by minority, disabled and elderly voters who lack a license and they argued educating people on the measure and supplying a free photo ID will be expensive."[178]

After the Act was passed Davenport published another article examining the effects of the law and its disproportionate impact on minorities.  Davenport analyzed precinct-level identification data and concluded that "South Carolina's new voter photo identification law appears to be hitting black precincts in the state the hardest."[179]  That article highlighted the precincts surrounding Benedict College and South Carolina State

---

175 Seanna Adcox, *SC House approves photo ID, early voting proposal*, AUGUSTA CHRONICLE, June 16, 2010, *available at* http://chronicle.augusta.com/news/metro/2010-06-16/sc-house-approves-photo-id-early-voting-proposal. (last accessed June 19, 2012).
176 Editorial, *Voter I.D. bill: A solution in search of a problem, SCNOW*, Feb. 8, 2011, http://www2.scnow.com/news/2011/feb/08/editorial-voter-id-bill-solution-search-problem-ar-1439340/. (last accessed June 19, 2012).
177 Seanna Adcox, SC legislators approve voter ID requirements, AUGUSTA CHRONICLE, Jan. 26, 2011, *available at* http://chronicle.augusta.com/latest-news/2011-01-26/sc-legislators-approve-voter-id-requirements?v=1296079426.
178 Jim Davenport, *SC legislators reach agreement on voter ID bill*, ASSOCIATED PRESS, Apr. 20, 2011, *available at* http://www.goerie.com/apps/pbcs.dll/article?AID=/20110420/APN/1104201380 (last accessed June 19, 2012).
179 Jim Davenport, *Voter ID Law Hits Black Areas: 1,977 Nonwhite Voters Lack State-Issued Photo,* The Post & Courier, Oct. 19, 2011, *available at* http://www.postandcourier.com/article/20111019/PC1602/310199937.

University, both historically black schools, where nearly one-half and one-third of registered voters, respectively, lack state-issued photo identification.[180]

Thereafter, South Carolina Senate GOP Caucus Director Wesley Donehue linked to Davenport's article and tweeted, "Nice! @jimdavenport_ap proves EXACTLY why we need Voter ID in SC."[181]  After public criticism, Donehue claimed that his Tweet was taken out of context—that his point was actually those without state-issued identification in the majority-black precincts in Davenport's article did not lack state-issued identification because they are black but because they are out-of-state students.[182]  Even so, it is hard to ignore the racial undertones of Donehue's reference.[183]

*Fourth*, the law by its design vests substantial discretion and power in local officials and poll workers.  As SEC Executive Director Marci Andino testified, elections are conducted by municipal and county election commissions, and the SEC does not exercise any direct control over these commissions.[184] As a result, the SEC could not guarantee that poll managers would ask those lacking acceptable identification under the Act if something beyond their control had prevented them from obtaining such identification—which is her understanding of a "reasonable impediment."  On the contrary, county election commissioners could instruct poll managers not to ask *any* such questions concerning any "reasonable impediment" that may have prevented a voter from obtaining ID.[185]  By law, if a county board of elections disagrees with an interpretation or directive of the State, the SEC has no authority to compel that county to follow the SEC directive.[186]  Historically, the vesting of such substantial discretion in local officials and poll workers has led to abuse and discrimination.[187]

---

180 *Id.*
181 Wesley Donehue, TWITTER (Oct. 19, 2011, 9:32 AM), https://twitter.com/wesleydonehue/status/126697172187095040.
182 Ryan J. Reilly, *S.C. GOP Operative: AP Story Showing Impact of Voter ID On Blacks 'Proves EXACTLY' Why Law Is Needed*, TPMMuckraker (Oct. 20, 2011, 3:15 PM), http://tpmmuckraker.talkingpointsmemo.com/2011/10/sc_gop_operative_ap_story_showing_impact_of_voter_id_on_blacks_proves_exactly_why_law_is_needed.php.
183 Davenport, *supra*.
184 Andino Dep. 180:7-24.
185 Andino Dep. 206:1-207:1.
186 Andino Dep. 135:4-18.
187 *Burton et al.*, THE QUIET REVOLUTION, *supra*.  Indeed, during legislative debates, Representative Weeks pointed to the state's history—in the past potential voters were asked to explain part of the constitution to the registrar's satisfaction—and warned  that H.3003 vested too much discretion in local officials.  House Debates Tr., January 26, 2011, at 47.

South Carolina's history suggests that vesting excessive discretion at the local level poses a risk of discriminatory implementation. One reason is that significant appointment powers reside with the state legislative delegations, which "continue to control county boards of registration and elections, precinct line and method of election and district lines for many boards of school trustees."[188]  According to a recent study of voting rights in South Carolina, the "involvement of state legislators in local affairs removes African American citizens from participation in critical decisions as discriminatory changes are proposed."[189]  Indeed, as noted above, a federal district court found "significant evidence of intimidation and harassment" of African Americans at the polls in 2003, including by state-authorized poll managers.[190]  And, Rep. Lowe testified that poll managers are chosen not for their qualifications, but because they are family members or friends of poll clerks.[191]  This cronyism has the potential to magnify the disenfranchising effects on minority voters.

*Fifth and finally*, legislators have failed to take several self-evident steps that could serve to ameliorate some of the Voter ID Law's consequences. These failures include the following:

- SEC Executive Director Marci Andino said the Law's "reasonable impediment" exception was necessary to avoid disenfranchising eligible voters.[192] And, legislators have testified that they too believe that the "reasonable impediment" provision is critical.[193] But, to work, this prevision requires an affidavit signed under penalty of perjury for voters to make use of it, which in turn requires a notary.[194] While at least some believed that the SEC would provide notaries,[195] lawmakers took no affirmative steps to ensure that this would happen.  And indeed, the SEC confirms that there are no plans in place to have notaries at the polls,[196] creating yet another risk that voters' affidavits will not be honored and that this provision will fail to ameliorate the disparate impact of the Law on African Americans.  This result should have been foreseeable to legislators who failed to put any provisions in place to

---

188  Ruoff & Buhl, *Voting Rights in South Carolina*, *supra*.
189 *Id.*
190 Charleston County, 316 F. Supp. at 286 n.23.
191 Lowe Tr. at 50:1-12.
192 Andino Tr. at 161:13-15.
193 Harrison Dep. 106:16-107:1, June 12, 2012 (testifying that he would not have supported R54 absent the "reasonable impediment" provision).
194 *See* State v. McKnight, 352 S.E.2d 471, 472-3 (S.C. 1987).
195 Clemmons Dep. 68:10 – 69:3, June 11, 2012; Harrison Dep. 58:17-59:14.
196 Andino Dep. 156:7-19; Andino Dep. 157:12-17; Whitmire Dep. 164:2-21, June 8, 2012.

ensure that affidavits signed by voters would be notarized, as required by South Carolina law.

- The General Assembly has, to date, failed to provide adequate funding to implement various provisions of the ID Law. Most significantly, although legislators have testified that the education program was critical,[197] the State has failed in numerous respects to prepare for the educational program and for the training of poll workers and commission and board members.[198]

- The legislature chose to require that IDs be "valid," although the SEC believes that the meaning of this term is uncertain, that voters could be confused by it, and that poll workers will need guidance on the meaning of validity.[199] The SEC currently has no plans to provide such guidance.[200]

The failure to ensure the Law's responsible implementation have detrimental consequences for all voters, and will most substantially burden African American voters who are less likely to possess acceptable IDs. The legislature chose not to address these foreseeable issues implicating fair enforcement of the law, increasing the likelihood that the Voter ID Law will disproportionately injure minority voting rights. This lends support to the inescapable conclusion that a discriminatory outcome was intended.

## VII.   EVIDENCE OF PRETEXT IN THE LAW'S STATED PURPOSE

The primary justification offered for the ID Law by its chief proponents is to combat voter fraud and thus enhance public confidence in the State's electoral system. Representative Clemmons, for instance, stated during the preclearance process that "[o]pponents of this bill often claimed …there were no instances of voter impersonation prosecuted in South Carolina, claiming that H. 3003 was a solution in search of a

---

197 Harrell Dep. 132:4-13, June 13, 2012.
198 Whitmire Dep. 70:22-74:22; Whitmire Dep. 82:5- 91:17; Whitmire Dep. 95:16- 96:8; Whitmire Dep. 98:1- 99:11; Whitmire Dep.  99:17- -101:22; Whitmire Dep. 102:8-103:21; Whitmire Dep. 104:24---113:21; Whitmire Dep. 114:1-118:6; Whitmire Dep. 128:21-132:23; Whitmire Dep. 138:17-140:13 (summarizing this point).
199 Whitmire Dep.; 125:1-126:10; Whitmire Dep. 127:11- 128:3; Whitmire Dep.170:10-175:1. Further, Military IDs are just one example of the inadequacy of the training planned. The only example poll workers will be shown in training is a photo of a single military ID (just the front) in a power point presentation. Whitmire testified that any military ID qualifies, although he did not know how many there are and there are no plans to train poll workers how to distinguish real from fraudulent military IDs, nor as to what qualifies as a military ID.  Whitmire Dep. 118:11--122:11.  Research has so far uncovered 17 different military ID cards, including a veteran ID card, which is not a state or federally issued ID card, but one which Whitmire said would qualify.  In addition, it appears that the state's "final" rules are not truly final. The state has already changed the temporary card to a card that does not expire, and no longer refers to it as temporary. Whitmire Dep.76:14-79:14. Moreover, the materials submitted for preclearance are apparently subject to change at any time.  Whitmire Dep.. 91:11-92:2.
200 Whitmire Dep. 125:12-126:10.

problem.  In my years in South Carolina politics I know quite the opposite to be true
….”[201]  Senator Campsen argued that “you instill confidence in the process by requiring a
voter ID.”[202]

Despite these representations, there is no evidence of in-person impersonation
fraud in South Carolina—the only type of fraud that voter ID addresses.  Indeed, a
complete review of the floor debates about the ID Law yields not one verified example in
South Carolina’s entire history.  Representatives Hart and Howard summarized the
legislative history during floor debate in the House:

> It is my understanding that we did not have anyone to come in to our
> hearings and testify that there was a voter fraud or any indications or any
> charges of voter fraud within the two years of having these public hearings
> . . . . There’s just no incidence of voter fraud or wrongdoing in the state of
> South Carolina.  It just does not exist.  I haven’t seen it, I haven’t heard
> about it, I haven’t read about it, I haven’t received any calls, any emails,
> any faxes, it just doesn’t exist in this body, in this state…

In deposition, Rep. Clemmons agreed, and admitted that no instances of
impersonation fraud were brought into the record during debates on the ID Law.
Moreover, to this day, Clemmons is aware of no convictions for voter impersonation
fraud or any *potential* evidence of voter impersonation fraud other than two or three
unverified anecdotes.[203]   Indeed, in June 2010—just months before introducing H.
3003—Clemmons had a telling exchange with Walter Whetsell of Starboard
Communications, a political consulting agency.  Whetsell sent an article about voting
irregularities in the Lee County Council race, noting that the article was “in reference to
our voter id conversation from a year ago where I said we needed a boogey-man.”
Clemmons enthusiastically replied “Good stuff!”[204]

That voter fraud was a “boogey-man” and not a reality has been confirmed
repeatedly during the course of this litigation.  Over and over, the State’s witnesses,
including Marci Andino, testified that there is—quite simply—no evidence of in-person

---

201 Letter from Alan Clemmons, June 28, 2011, SC_00077402.
202 Senate Floor Debate Tr. 110.
203 Clemmons Dep. 41:9-47:18.
204 SC_00000637.

voter fraud.[205]  Witnesses also consistently agree that there is no reason to believe there will be an increase in voter fraud in the future, even without the ID Law.[206]

The lack of evidence of in-person impersonation fraud is not surprising.  As the ID Law's top proponents recognize, heavy penalties for all types of voter fraud already exist, including up to three years' imprisonment and $1,200 fines for voter impersonation.[207]  In addition, several other factors prevent fraud—for instance, poll workers tend to know voters because they are hired locally; signatures get matched to registration cards; and, to successfully commit fraud, a person would have to count on the real voter not showing up to vote.  In short, in-person voter impersonation would be extremely difficult to accomplish under existing laws, and would require both a substantial number of steps and fortuitous circumstances in order for the crime to go undetected.[208]

By all accounts, the heavy penalties—coupled with the practical difficulties of getting away with the voter impersonation—have successfully deterred in-person voter impersonation.  Unsurprisingly, the current system is viewed highly by South Carolina voters: In the Election Commission's post-election surveys, according to Andino, South Carolinians have consistently expressed confidence in their existing electoral system.[209]

On top of addressing a non-existent voter impersonation problem, the ID Law is oddly under-inclusive—it applies only to in-person voting but not mail-in voting.[210]  Voters can still register by mail and vote by absentee mail-in ballots and never show photo identification.[211]  If the ID Law was a serious attempt to combat potential voter fraud, it would absolutely apply to voting by mail.  As the record shows, while voter fraud in all forms is extremely rare, most of the rare incidents that do occur are through

---

205 Andino Dep.. 52:23 – 53:21, 59:15-17, 62:23 – 63:3 (no confirmed or substantiated evidence); U.S. Andino Ex. 5, SC_00070975; McConnell Dep. at 45:4-8; Peeler Dep. at 22:4-5; Harrison Dep. at 33:1-6; Clemmons Dep. at 41:6-21, 42:3-19, 44:21 – 45:1, 47:14-18, 51:19 – 52:4; Martin Dep. at 37:13-25; 41:15-19, June 13, 2012; Cleary Dep. at 28:6-9, June 14, 2012; Harrell Dep. at 37:25 – 38:5) Whitmire Dep. at 44.14-46.7; 49.5-49.11; 51.5-51.15; 53.5-54.7; 56.8-58.3 58.18-59.7; 163:4-5 (no credible allegations or confirmed instances of impersonation fraud, nor basis to believe it has ever occurred)
206 Andino Dep. 143:11-25; Harrison Dep. at 95:3-8 (no reason to believe there will be an increase in voter fraud in the future); McConnell Dep. at 148:6-11 (same)).
207 S.C. Code Ann. § 7-25-120; McConnell Dep. at 150:3-6.
208 Andino Dep. 138:17-138:21 (poll managers required to be local); Andino Dep. 144:9 – 146:12 ; McConnell Dep. at 148:12-150:2.
209 Andino Dep., 61, 142, 177-78.
210 Andino Dep., 175.
211 Andino Dep., 187-88.

mail-in ballots.  Indeed, in one notorious election, a McCormick County clerk committed voter fraud through use of fraudulently obtained and submitted absentee ballots.[212] Notably, this fraudulent act by a county official was a "significant factor" in an already "heated election," helped the white incumbent defeat his black opponent.[213]

Similarly, lawmakers also ignored recent evidence of actual election administration problems that could be addressed with legislation.  As noted above in the discussion of legislative history, Representatives Cobb-Hunter and Neal presented documented cases from the prior election of faulty machines losing hundreds of votes.[214]

Together, all of this evidence strongly suggests that the motivations for introducing and passing the ID Law's were different from those stated by the Law's supporters. Indeed, Marci Andino testified that she recalled public testimony to the effect that the purpose of the ID Law was not to prevent voter fraud but rather "to suppress votes, voter turnout, maybe,"[215] and she ultimately took no position on whether the ID Law should be precleared.[216] If the Law were truly intended to combat fraud and would be effective in doing so, one would expect the SEC Executive Director to enthusiastically support its implementation.

---

212 Lee Brandy, *McCormick Registrar Indicted,* COLUMBIA THE STATE, September 14, 1995, B3; *Area briefs: Board denies parole in Richey murder case*, AUGUSTA CHRONICLE, September 23, 1999, *available at* http://chronicle.augusta.com/stories/1999/09/23/met_270915.shtml (last accessed June 19, 2002); *Across the area*, AUGUSTA CHRONICLE, July 27, 2000, *available at* http://chronicle.augusta.com/stories/2000/07/27/met_293725.shtml (last accessed June 19, 2012).
213 Brandy, *McCormick Registrar Indicted* at *supra*.  Ruoff & Buhl, *Voting Rights in South Carolina*, *supra*.
214 House Debate Tr., Apr. 26, 2011, at 202-03.
215 Andino Dep. 174-75.
216 Andino Dep. 216:20–217:7.

I declare under penalty of perjury that the report is true and correct, to the best of my knowledge.

Executed on this 19th day of June 2012

Orville Vernon Burton

APPENDIX A

ORVILLE VERNON BURTON

The Strom Thurmond Institute of Government & Public Affairs
Clemson University, Perimeter Road
Clemson, SC 29634-0125
Tel. O -864-656-1058  C-217-649-0608 fax -864 -656-4789 h-864-543-2552
vburton@clemson.edu         http://vburton.ncsa.uiuc.edu         http://www.ageoflincoln.com

Military Service:  1969, 1974  U.S. Army, Honorably Discharged as Captain, 1977

Education:  1976, Ph.D. Princeton University     (1969, B.A. Furman University)
Ph.D. dissertation: "Ungrateful Servants?  Edgefield's Black Reconstruction:  Part I of the Total History
          of Edgefield County, South Carolina."  Advisors Sheldon Hackney and James McPherson

Academic Positions:
Director Clemson CyberInstitute, 2010-
Associate Director for Humanities, Arts, and Social Sciences, Clemson CyberInstitute, 2010
Professor Computer Science, Clemson University, 2011-
Professor of History, Clemson University, 2010-
Burroughs Distinguished Professor of Southern History & Culture, Coastal Carolina University, 2008-10
University of Illinois at Urbana-Champaign (UIUC), 1974-2008
          2009-   Chair, Advisory Board for Institute for Computing in Humanities, Arts, and
                    Social Science (I-CHASS) at University of Illinois
          2004 – 09 Founding Director I-CHASS
          2008 Emeritus University Distinguished Teacher/Scholar and Professor History, African
                    American Studies, and Sociology
          2006-Professor African American Studies
          1989- Professor, History
          1989- Professor, Sociology
          1982-1989 Associate Professor, History
          1976-1982 Assistant Professor History
          1974-1976 Instructor
          1985- Faculty Affiliate, African American Studies and Research Program
          1986- Campus Honors Program
          1988- Graduate College Statistics Faculty
National Center for Supercomputing Applications (NCSA)
          2002-  Associate Director, Humanities and Social Sciences
          1993-2002 Head, Initiative for Social Sciences and Humanities
          1986- Senior Research Scientist
Princeton University
          1972-74  Assistant Master, Woodrow Wilson Residential College
          1971-72   Instructor, Mercer County Community College, NJ
College of Charleston
          2001- Executive Director, Program in the Carolina Lowcountry and the Atlantic World (CLAW)
          1987 Governor's School of South Carolina, Professor of History, Summer 1987


Publications:
*Books*:
*The Age of Lincoln*.  NY:  Hill and Wang, 2007. (Audio:  Blackstone Audio Books).  Paperback edition
          2008.   Selection for Book of the Month Club, History Book Club, Military Book Club.
          Paperback July 2008.  The Age of Lincoln was nominated by Farrar, Straus, and Giroux for the
          Pulitzer Prize.  Three historical associations featured sessions on the book, Association for the

Burton, page 2

Study of African American Life and History, 2008; Social Science History Association, 2008; The Southern Intellectual History Circle, 2009.

(with Judy McArthur) "*A Gentleman and an Officer": A Military and Social History of James B. Griffin's Civil War*. N.Y.: Oxford University Press, 1996; second printing 1999.

*In My Father's House Are Many Mansions: Family and Community in Edgefield, South Carolina*. Chapel Hill: University of North Carolina Press, 1985 (paperback edition 1987; 5th printing 1998). *In My Father's House* was nominated by the University of North Carolina Press for the Pulitzer Prize. Two Historical Associations featured this book in sessions at their annual meetings: Social Science History Association, 1986; Southern Historical Association, 1987.

*Air Conditioning and the Voting Rights Act: The Voting Rights Act of 1965 in Historical Perspective*. Stice Lectures University of Washington. Seattle: University of Washington Press, expected 2014.

(with Wilbur Cross), foreword by Emory Shaw Campbell, *Penn Center: A History Preserved, a Culture Shared, a Future Changed* (Athens: University of Georgia Press, expected 2013).

Editor, *The Essential Lincoln*. NY: Hill and Wang, 2009.

(edited with David O'Brien) *Remembering Brown at Fifty: The University of Illinois Commemorates Brown v. Board of Education*. Urbana: University of Illinois Press, 2009.

(edited with Winfred B. Moore, Jr.) "*Toward the Meeting of the Waters: Currents in the Civil Rights Movement in South Carolina during the Twentieth Century*. Columbia: The University of South Carolina Press, 2008; paperback 2011.

Editor, *Slavery in America: Gale Library of Daily Life,* 2 vols. New York, Detroit: Gale Cengate Learning, 2008.

Editor, *Computing in the Social Sciences and Humanities*. Urbana: University of Illinois Press, 2002.

(edited with David Herr and Terence Finnegan) *Wayfarer: Charting Advances in Social Science and Humanities Computing*. Urbana: University of Illinois Press, 2002. This CD-ROM contains more than 65 essays and research and teaching applications, including illustrative interactive multimedia materials.

(edited and annotated with Georganne B. Burton, introduction pp. 1-48) *"The Free Flag of Cuba": The Lost Novel of Lucy Pickens* [orig. pub. 1854] in the Library of Southern Civilization series, edited by Lewis P. Simpson. Baton Rouge: Louisiana State University Press, 2002, paperback 2003.

(with et al.) *Documents Collection America's History*, vol. 1, to accompany James Henretta, et al., *America's History*, 2nd ed. (New York: Worth Publishers, 1993).

(edited with Robert C. McMath, Jr.) *Class, Conflict, and Consensus: Antebellum Southern Community Studies*. Westport, Conn: Greenwood Press, 1982.

(edited with Robert C. McMath, Jr.) *Toward a New South? Studies in Post-Civil War Southern Communities*. Westport, Conn: Greenwood Press, 1982.

(edited with Jerald Podair and Jennifer L. Weber) *The Struggle for Equality: Essays on Sectional Conflict, the Civil War, and the Long Reconstruction in Honor of James M. McPherson*. Charlottesville: University of Virginia Press, 2011.

Editor, *Writing the South in Fact, Fiction, and Poetry: Essays in Honor of Charles Joyner*. Columbia: University of South Carolina Press, expected 2013.


*Plays:*

(with Georganne Burton) "Abraham Lincoln's Beardstown Trial: The Play" Premiered Sept. 29, 2009, Beardstown, Il. (Endorsed by the Congressional Abraham Lincoln Bicentennial Commission, November 2009; Play available upon request);
http://www.lincolnbicentennial.gov/calendar/beardstown-trial-11-10-09.aspx;
http://www.civilwar.org/aboutus/events/grand-review/2009/almanac-trial.html

*Introductions and Forewords to Books*:

"Foreword," pp. ix-liv to *Born to Rebel: An Autobiography* by Benjamin Elijah Mays. Athens: University of Georgia Press Brown Thrasher edition, 1987, also in paperback edition (book without foreword originally published by Charles Scribner's Sons, 1971). Revd. Foreword 2003.

Burton, page 3

"Introduction," pp. 9-11 to *Roll the Union On:  Southern Tenant Farmers Union*. As told by its Co-founder, H.L. Mitchell. Chicago: Charles H. Kerr Publishing Company, 1987.

"Introduction," pp. xiii-xviii to *Soldiering with Sherman:  The Civil War Letters of George F. Cram*. Jennifer Cain Bohrnstedt, ed., DeKalb: Northern Illinois University Press, 2000.

"Introduction," pp. x-xxxiv to *Pitchfork Ben Tillman:  South Carolinian* by Francis Butler Simkins, for the reprint edition of the Southern Classics Series of the Institute for Southern Studies. Columbia:  University of South Carolina Press, 2002 (book without Introduction originally published by Louisiana State University Press, 1944).

(with James Barrett) "Foreword," pp. xi-xxv to paperback edition of *Cause at Heart:  A Former Communist Remembers* by Junius Irving Scales with Richard Nickson.  Athens:  University of Georgia Press, 2005 (book without Foreword originally published 1987).

Editor, Book Series, *A Nation Divided: Studies in the Civil War Era*, University of Virginia Press, 2011-

*Journals Edited*:

"Three Articles from a Century of Excellence:  The Best of *The South Carolina Historical Magazine*," pp. 182-89 for *South Carolina History Magazine* 101: 3 (July 2000).

"Introduction," pp. 161-65 for *Social Science Computer Review* 12:2 (Summer 1994).

Co-editor, "Technology and Education," *International Journal of Social Education* 5:1 (Spring 1990).

*History Articles, Chapters, and Essays*:

"The Silences of Slavery, in *The Battlefield and Beyond: Essays on the American Civil War*.  Edited by Clayton E. Jewett (Baton Rouge:  Louisiana State University Press, 2012), pp. 13-27.

"Abraham Lincoln," in *The Oxford Encyclopedia of American Political and Legal History*.  Edited by Donald T. Chritchlow and Philip R.VanderMeer, 1:560-64. 2 vols. (NY:  Oxford University Press, 2012).

"Lincoln at Two Hundred: Have We Finally Reached Randall's Point of Exhaustion?" In *The Living Lincoln:  Essays from the Harvard Lincoln Bicentennial Symposium*, pp. 204-25.  Edited by Thomas A. Horrocks, Harold Holzer, and Frank J. Williams (Carbondale:  Southern Illinois University Press, 2011), pp. 204-25.

(with Nick Gaffney) "South Carolina," Vol. 2:  pp. 745-764 in *Black America:  A State by State Encyclopedia*.  Edited by Alton Hornsby.  (Westport, CN:  Greenwood Press, 2011).

"Mays, Benjamin" *in The New Encyclopedia of Southern Culture*. Vol. 19 *Education*, Edited by Clarence Mohr.  (Chapel Hill:  University of North Carolina Press, 2012).

"The Age of Lincoln:  Then and Now," Keynote for the South Carolina Historical Association Annual Meeting, *The Proceedings of the South Carolina Historical Association*, 2010, pp. 7-22. Edited by Robert Figueira and Stephen Lowe (Columbia: South Carolina Department of Archives and History, 2010).

(with Larry McDonnell and Troy D. Smith) "Slavery and Anti-Slavery: A Transnational Archive," pp. 121-26 in L'abolition de l'esclavage au Royaume-Uni 1787-1840 : débats et dissensions The abolition of slavery in Britain 1787-1840 : debate and dissension." Edited by Susan Finding (Paris:  ArmandColin, Nov. 2009).

"Abraham Lincoln at Two Hundred," OAH (Organization of American Historians) Newsletter, 37:4 (Nov. 2009), pp. 1, 8, 12.

"Author's Response to the Southern Intellectual History Circle Forum on *The Age of Lincoln*." *The Journal of the Historical Society* IX:3 (September 2009): 355-72.

"Colbert History," Pan-African Studies, Fall 2009, p. 3.

(with Georganne Burton) "Lucy Holcombe Pickens: Belle, Political Novelist, and Southern Lady," in *South Carolina Women: Their Lives and Times*, Vol 1. Editors Marjorie Julian Spruill, Valinda W.  Littlefield, and  Joan Marie Johnson (Athens:  University of Georgia Press, 2009), pp.273-98.

"Radical Reconstruction, United States, Promise and Failure of" VI: 2798-2801
    <http://www.revolutionprotestencyclopedia.com/public/tocnode?query=burton%2C+vernon&wid
    en=1&result_number=3&from=search&id=g9781405184649_chunk_g97814051846491238&typ

Burton, page 4

e=std&fuzzy=0&slop=1>;

(with Beatrice Burton) "American Civil War and Slavery," I: 70-72
http://www.revolutionprotestencyclopedia.com/public/tocnode?query=burton%2C+vernon&widen=1&result_number=1&from=search&id=g9781405184649_chunk_g978140518464940&type=std&fuzzy=0&slop=1;

(with Beatrice Burton) "Lincoln, Abraham (1809-1865) and African Americans" Volume V: 2121-2123" <http://www.revolutionprotestencyclopedia.com/public/tocnode?query=burton%2C+vernon&widen=1&result_number=2&from=search&id=g9781405184649_chunk_g9781405184649925&type=std&fuzzy=0&slop=1>; all three essays in the *International Encyclopedia of Revolution and Protest: 1500 to the Present*. Edited by Immanuel Ness. (Oxford: Wiley-Blackwell, 2009).

"Imagine Another Ending: Tweaking History to Shape an Alternative World, " pp. 48-50 in *A New Birth of Freedom, 1809*2009: Abraham Lincoln's Bicentennial*. Edited by Don Wycliff (Washington, D.C.: The Lincoln Bicentennial Commission, 2009).

(with Simon Appleford and Beatrice Burton) "Seeds in Unlikely Soil: The *Briggs v. Elliott* School Segregation Case." Pp 176-200 in *Toward the Meeting of the Waters: Currents in the Civil Rights Movement of South Carolina during the Twentieth Century*. Editors Orville Vernon Burton and Winfred B. Moore, Jr. Columbia: The University of South Carolina Press, 2008.

(with Lewie Reece) "Palmetto Revolution: The Coming of Desegregation in South Carolina," pp. 59-91, 283-94 in *With All Deliberate Speed: Implementing Brown v. Board of Education*. Editors Brian Daugherity and Charles Bolton. Fayetteville: University of Arkansas Press, 2008.

"Civil Rights Movement in South Carolina," 178-80; (with Matthew Cheney) "Benjamin Mays," 601-02; (with Beatrice Burton) "Francis Butler Simkins," 866; (with Beatrice Burton) "Lucy Pickens"; (with Beatrice Burton) "Sharecropping/ Tenantry," 952-54 in *The South Carolina Encyclopedia* [A project of the South Carolina Humanities Council]. Editor Walter Edgar. Columbia: University of South Carolina Press, 2006.

(with Matthew Cheney) "African Americans," 245-248 in *The Encyclopedia of the Midwest* [a project of the Institute for Collaborative Research and Public Humanities at The Ohio State University]. Editor Richard Sisson, et al. print version. Bloomington: Indiana University Press, 2007.

"The Voting Rights Act," Vol. 4: pp. 1134-1136 in *Postwar America: An Encyclopedia of Social, Political, Cultural, and Economic History*. Editor James Ciment. M.E. Sharpe, 2006,

"Emancipation," 237-42, "Sharecropping," 563-67, "South Carolina," 584-593, "Suffrage," 614-20, "Wade Hampton, III," 306-08, in *Encyclopedia of the Reconstruction Era*. Editor Richard Zuczek. Westport, CN: Greenwood Press, 2006.

(with David Herr) "Religious Tolerance and the Growth of the Evangelical Ethos in South Carolina," 146-64 in *The Dawn of Religious Freedom in South Carolina*, Editor James Lowell Underwood and W. Lewis Burke. Columbia: University of South Carolina Press, 2006.

(with Beatrice Burton) "Jefferson Davis," in *Frederick Douglass Encyclopedia*. Editors Julius E. Thompson, James L. Conyers, Jr., and Nancy J. Dawson. Westport, CN: Greenwood Press, 2009

"The 1965 Voting Rights Act in the South," in *History* Vol. 3 (2007) and in James W. Ely, Jr. and Bradley G. Bond, eds., *Law and Politics* Vol. 10, pp. 399-401 (2008) of *The Encyclopedia of Southern Culture*, 2nd revised ed. Editor Charles Reagan Wilson. Chapel Hill: University of North Carolina Press, 2007.

"Problems and Methods in Family History Research," *Journal of Humanities* (National Central University at Chuhgli/Taoyuen), 2006.

(with Matthew Cheney and David Herr) "Defining Reconstruction," pp. 299-322 in *The Blackwell Companion to the Civil War and Reconstruction*. Editor Lacy Ford. Boston: Blackwell Publishers, 2005.

"John H. McCray,"pp. 125-27 in the *Dictionary of Twentieth Century Black Leaders*. Editor Alton Hornsby, Jr. Montgomery. AL: E-Book Time, LLC, 2005.

"Stranger in a Strange Land: Crossing Boundaries," pp. 256-283 in *Shapers of Southern History: Autobiographical Essays by Fifteen Historians*. Editor John Boles. Athens: University of Georgia Press, 2004.

Burton, page 5

"Dining with Harvey Gantt:  Myth and Realities of 'Integration with Dignity,'" pp. 183-220 in *Matthew J. Perry: The Man, His Times and His Legacy*.  Editors W. Lewis Burke and Belinda F. Gergel.  Columbia:  University of South Carolina Press, 2004.

"'Tis True that Our Southern Ladies have Done and are Still Acting a Conspicuous Part in this War':  Women on the Confederate Home Front in Edgefield, South Carolina," pp. 95-108 in  *"Lives Full of Struggle and Triumph":  Southern Women, Their Institutions, and Their Communities*.  Editors Bruce L. Clayton and John A. Salmond.  Gainesville:  University of Florida Press, 2003.

"Reaping What We Sow:  Community and Rural History," Presidential address in *Agricultural History* 76: 4 (Fall 2002): 631-58.

(with Georganne Burton) "Lucy Holcombe Pickens and *The Free Flag of Cuba*," *South Carolina History Magazine* 103:4 (October 2002): 296-324.

(with Ian Binnington) "Civil War:  The Homefront in the South," *Encyclopedia of the United States in the Nineteenth Century*, vol. 1, pp. 256-59.  Editor Paul Finkelman. New York:  Charles Scribner's Sons, 2001.

"Civil War and Reconstruction," pp. 47-60 in *A Companion to Nineteenth Century America*.  Editor William L. Barney.  Oxford, UK:  Blackwell Publishers, 2001, paperback 2006.

"South Carolina" and "South Carolina Democratic Party (PDP)," vol. 2: pp. 692-94 in *Civil Rights in the United States*.  Editors Waldo E. Martin and Patricia Sullivan.  New York: Macmillan, 2000.

"A Monumental Labor,"  Review Essay of Walter Edgar's *South Carolina:  A History*," *South Carolina Historical Magazine* 100:3 (July 1999): 262-268.

"Bosket Family," 166-68 in vol. 1, *Violence in America:  An Encyclopedia*.  Editor Ronald Gottesman.  New York: Charles Scribner's Sons, 1999.

"Butler, Andrew Pickens," 4:88-90; "Gary, Martin Witherspoon," 8:775-77; "Mays, Benjamin Elijah," 14: 795-97; "Mitchell, Harry Leland," 15: 602-3; "Owsley, Frank Lawrence, " 16: 870-72; "Simkins, Francis Butler," 19: 942-44; and "Tillman, Benjamin Ryan," 21: 672-75, in *American National Biography*.  Editors John A. Garraty and Mark C. Carnes, 24 vols. New York:  Oxford University Press, 1999.

"Legislative and Congressional Redistricting in South Carolina," pp. 290-314 in *Race and Redistricting in the 1990s*.  Editor Bernard Grofman. New York:  Agathon Press, 1998.

"Race Relations in the Rural South Since 1945," pp. 28-58 in *The Rural South Since World War II*.  Editor R. Douglas Hurt.  Baton Rouge:  Louisiana State University Press, 1998.

"Benjamin E. Mays:  Born to Rebel," pp. 21-75 in *Walking Integrity:  Benjamin Elijah Mays:  Mentor to Generations*.  Editor Lawrence E. Carter, Sr.  Atlanta:  Scholars Press of Emory University, 1996 (paperback, Mercer University Press, 1998).

"Edgefield, South Carolina:  Home to Dave the Potter," pp. 38-52 in *I Made This Jar:  The Life and Works of the Enslaved African-American Potter, Dave*.  Editor Jill Beute Koverman.  Columbia:  McKissick Museum University of South Carolina, 1998.

"African American Status and Identity in a Postbellum Community:  An Analysis of the Manuscript Census Returns," *Agricultural History* 72:2 (Spring 1998): 213-240.

"Confederate States of America:  Homefront," pp. 163-64 in *Reader's Guide to American History*.  Editor Peter Parrish.  London:  Fitzroy Dearborn, 1997.

"The Modern `New' South in a Postmodern Academy:  A Review Essay," *Journal of Southern History*, LXII, no. 4 (Nov. 1996):767-786.

"The Ninety Six Story," pp. 4-7 in *Historic Ninety Six, South Carolina* in 9/6/96 Special Issue.

"South Carolina" in *Encyclopedia of African American Culture and History*, vol 5: 2529-2533.  Editors Jack Salzman, et al.  New York:  Macmillan, 1996, rev. ed. and CD-ROM 2000.

"Farm Protest\Populism," pp. 265-267, and "Tenancy," pp. 747-749, in *Encyclopedia of Social History*.  Editor Peter N. Stearns.  New York:  Garland Publishing, Inc., 1994.

NSF investigator and principal author (with Terrence R. Finnegan, Peyton McCrary, and James W. Loewen) "South Carolina" chap. 7, pp. 191-232, 420-432, in *The Quiet Revolution in the South: The Impact of the Voting Rights, 1965-1990*.  Editors Chandler Davidson and Bernard Grofman.  Princeton:  Princeton University Press, 1994.  (Winner of the 1995 Richard F. Fenno Prize, Legislative Studies Section, American Political Science Association).

Burton, page 6

"Society," 4:1483-1493, "Family Life," 2:562-565, "Cotton" (with Patricia Bonnin), 1:416-420, and "Tobacco" (with Henry Kamerling), 4:1597-1599, in *Encyclopedia of the Confederacy*.  Editor Richard N. Current.  NY:  Simon and Schuster, 1993.

"Large Questions in Small Places:  Why Study Mount Pleasant's Institutions," pp. 37-48, in *Mount Pleasant's Institutions:  Proceedings of the Third Forum of the History of Mount Pleasant*.  Mount Pleasant, September 1993.  Editor Amy Thompson McCandless.

"Sectional Conflict, Civil War, and Reconstruction," pp. 131-157, in *Encyclopedia of American Social History*, vol. 1.  Editors Mary Kupiec Cayton, Elliott J. Gorn, and Peter W. Williams. N.Y.:  Charles Scribner's Sons, 1993; with revisions on CD-ROM 1998.

"The Burden of Southern Historiography:  W J. Cash and the Old South," pp. 59-79, in *The Mind of the South Fifty Years Later*.  Editor Charles W. Eagles.  Oxford:  University Press of Mississippi, 1992.

"'The Black Squint of the Law':  Racism in South Carolina," pp. 161-185, in *The Meaning of South Carolina History:  Essays in Honor of George C. Rogers, Jr.*  Editors David R. Chesnutt and Clyde N. Wilson.  Columbia:  University of South Carolina Press, 1991.

"Reconstruction,"  A review essay of Eric Foner's *Reconstruction* in *South Carolina Historical Magazine* 91:3 (July 1990): 217-220.

"Howard Kester," pp. 401-3 (414-15 2nd rev); "Edward Britt McKinney," pp. 462-3 (489-90 rev. 2nd); "Henry Leland Mitchell," pp. 475-76 (502 rev. 2nd); Modjeska Monteith Simkins, pp. 700-1 (747-48 rev. 2nd ) in *The Encyclopedia of the American Left*.  Editors Mari Jo Buhle, Paul Buhle, and Dan Georgakas.  New York:  Garland Publishing, 1990, University of Illinois Press paperback, 1992 (rev. 2nd ed. Oxford University Press, 1998).

"Whence Cometh Rural Black Reconstruction Leadership:  Edgefield County, South Carolina," *The Proceedings of the South Carolina Historical Association, 1988-1989*.  Aiken: The South Carolina Historical Association, 1989, pp 27-38.

"Fatherhood," pp. 1106-1107; "Motherhood," pp. 1111-1113; "Family, Modernization of," pp. 1540-1541 in *Encyclopedia of Southern Culture*.  Editors Charles Reagan Wilson and William Ferris.  Chapel Hill: The University of North Carolina Press, 1989; paperback 1991; rev. ed. "Motherhood" and "Fatherhood" in *Myth, Manners, and Memory* vol 4 (2007) and also in *Gender* vol. 13 (2009)

"Hiring Out," pp. 320-326, in the *Dictionary of Afro-American Slavery*.  Editors Randall M. Miller and John David Smith.  Westport, Conn.: Greenwood Press, 1988 (rev. 2nd. ed. 1997).

"In My Father's House Are Many Leaders:  Can the Extreme Be Typical?"  *The Proceedings of the South Carolina Historical Association, 1987*.  Aiken:  The South Carolina Historical Association, 1988, pp 23-32.

"The Development of the Tenant Farm System in the Postbellum South," *Tar Hill Junior Historian* 27, #1 (Fall 1987): 16-18.

"The Effects of the Civil War and Reconstruction on the Coming of Age of Southern Males, Edgefield County, South Carolina," in *The Web of Southern Relations: Women, Family and Education*.  Editors Walter J. Fraser, Jr., R. Frank Saunders, Jr., and Jon L. Wakelyn, pp. 204-223.  Athens: University of Georgia Press, 1985, paperback ed. 1987.

"Economics as Postbellum Southern History."  A Review Essay of *Old South, New South: Revolutions in the Southern Economy Since the Civil War* by Gavin Wright.  NY: Basic Books, 1986 in *Reviews in American History* 16:2 (June 1988): 233-40.

"Anatomy of an Antebellum Rural Free Black Community: Social Structure and Social Interaction in Edgefield District, South Carolina," *Southern Studies: Interdisciplinary Journal of the South* 21, (Fall 1982): 294-325.  Special editor, Ira Berlin.

"The Rise and Fall of Afro-American Town Life:  Town and Country in Reconstruction Edgefield County, South Carolina."  In *Toward a New South?  Studies in Post-Civil War Southern Communities*, Editors Orville Vernon Burton and Robert C. McMath, Jr., pp. 152-92.  Westport, Conn: Greenwood Press, 1982. .

Review essay of Elizabeth H. Pleck, *Black Migration and Poverty: Boston, 1865-1900*, in *Social Science History*, vol. 5 (Fall 1981): 483-88.

Burton, page 7

"The Development of Tenantry and the Post-Bellum Afro-American Social Structure in Edgefield County, South Carolina." In *Presentations Paysannes, Dimes, Rente fonciere et Mouvement de la Production Agricole a l'epoque Preindustrielle: Actes du Colloque preparatoire* (30 juin-let et 2 juillet 1977) au VIIe *Congres international d'Histoire economique Section A3*. Edimbourg 13-19 aout 1978. Editors E. LeRoy Ladurie and J. Goy, Vol. 2: 762-78. Paris: Editions De L'Ecole des Hautes Etudes En Sciences Sociales, 1982. Reprinted pp.19-35 in *From Slavery to Sharecropping: White Land and Black Labor in the Rural South, 1865-1900*, vol. 3 of *African American Life in the Post-Emancipation South 1861-1900*. Editor Donald G. Nieman. Hamden, CT: Garland Publishing, 1994.

"Race and Reconstruction: Edgefield County, South Carolina," *Journal of Social History* 12 (Fall 1978): 31-56. Referenced and summarized in *Sociological Abstracts* 12, #1 (April 1978): 45. Reprinted in *The Southern Common People: Studies in Nineteenth Century Social History*. Editors Edward Magdol and Jon L. Wakelyn, pp. 221-237. Westport, Conn: Greenwood Press, 1980. Reprinted pp. 87-112 in *The Politics of Freedom: African Americans and the Political Process During Reconstruction*, vol. 5 of *African American Life in the Post-Emancipation South 1861-1900*. Editor Donald G. Nieman. Hamden, CT: Garland Publishing, 1994.

"The Antebellum Free Black Community: Edgefield's Rehearsal for Reconstruction," *The Furman Review* 5 (Spring 1974): 18-26.


*Accepted and in Press*:

"The Gettysburg Address." In *1863*. Edited by Harold Holzer and Sara Gabbard. (Carbondale: Southern Illinois University Press, expected 2013).

 "Lincoln and Secession." In *Secession and War Come to Washington*. Edited by Paul Finkelman and Donald R. Kennon for the U.S. Capitol Historical Society (Athens: Ohio University Press, expected 2013).

"Religion and the Academy," *Books and Culture* 17:3 (May/June), 2012.

"The South as Other, The Southerner as Stranger," Presidential Address for the Southern Historical Association, *The Journal of Southern History* (expected Dec. 2012).

 "Lincoln, Race, and African Americans," Part 2, in *Pan-African Studies*, Clemson University, expected 2012.

 (with David Roediger, Simon Appleford, and Kalev Leetaru) "Race, Place, and the American Dream: A Case Study of East St. Louis." Commissioned by Editor of the *American Historical Review,* expected 2012.

(with Simon Appleford) "The Voting Rights Right of 1965 in Historical Perspective," *The Journal of the Historical Society* (expected 2013).

"Picturing Lincoln in the 1850s," *Journal of the Abraham Lincoln Association*, expected 2013.

(with Ian Binnington) "And Bid Him Bear A Patriot's Part:" National and Local Perspectives on Confederate Nationalism in *Deconstructing Dixie*. Edited by Jason Kyle Phillips (Athens: University of Georgia Press, expected 2013).

 "The Slave Family," in *Enslaved Females: An Encyclopedia of Daily Life during Slavery in the United States*. Edited by Daina R. Berry and Deleso Alford Washington  (Santa Barbara & Westport, CN: Greenwood Press-ABC-CLIO, expected 2012).

 "Remembering the Civil War," in *Civil War: Global Conflict*. Edited by Simon Lewis and David Gleeson (Columbia:  University of South Carolina, expected 2013).


*Articles on Digital History, Statistics, Computing, and Scholarship of Teaching and Learning (SoTL)*:

(with Simon Appleford) "Cyberinfrastructure for the Humanities, Arts, and Social Sciences," in *ECAR (Educause Center for Applied Research) Bulletin* 9: 1 (January 13, 2009): 2-11.

 (with James Onderdonk and Simon Appleford) **"**History: The Role of Technology in the Democratization of Learning."  In *Ubiquitous Learning,* pp. 197-205. Edited by Bill Cope and Mary Kalantzis. Urbana: University of Illinois Press, 2009.

Burton, page 8

"Teaching Race and Citizenship" in *America on the World Stage:  A Global Approach to U.S. History*, pp. 229-35.  Edited by Ted Dickinson and Gary Reichard.  Urbana:  Published for the Organization of American Historians by University of Illinois Press, 2008.

(with Simon Appleford)  "Digital History:  Using New Technologies to Enhance Teaching and Research," Web Site Reviews in *The Journal of American History* 99 (March 2008): 1329-31.

 (with James Onderdonk and Simon Appleford) "The Illinois Center for Computing in Humanities, Arts, and Social Science," Cyberinfrastructure Technology Watch Quarterly (CTWatch) http://www.ctwarch.org.  May, 2007.

Chapter 3, U.S. History Survey Syllabus (annotated), Teaching Philosophy, and examples, pp. 94-107 in *AP US History Teacher's Guide*.  Edited by Nancy Schick and Warren Hierl (with Marc Singer, Assessment Specialist).  Princeton:  College Board Advanced Placement of the Educational Testing Service, 2007.  Also available as a download at (http://apcentral.collegeboard.com/apc/public/courses/teachers_corner/3501.html).

 "American Digital History," *Social Science Computer Review* 23: 2 (Summer 2005): 206-220.

 "Creating a Sense of Community in the Classroom," pp. 131-35 in *The Art of College Teaching:  28 Takes*.  Edited by Marilyn Kallet and April Morgan.  Knoxville, University of Tennessee Press, 2005.

(with Ian Binnington and David Herr)  "What Difference Do Computers Make?  History, Historians, and Computer-Mediated Learning Environments," *History Computer Review* 19 (Spring 2003): 98-103.

(with Ian Binnington and David Herr)  "Computer Mediated Learning Environments:  How Useful Are They?" *AHR Perspectives:  Newsmagazine of the American Historical Association* 41:1 (January 2003): 14, 22 (More detailed Carnegie Report as "Historians Face the E-Future: Findings from the Carnegie Scholar Survey on Computer Mediated Learning Environments," at AHA Website www.theaha.org/perspectives/issues/2003/0301/0301not3.cfm).

(with Terence Finnegan and Beatrice Burton) "The Census Workbench:  A Distributed Computing U.S. Census Database Linkage System," in *Wayfarer:  Charting Advances in Social Science and Humanities Computing*.  Editors Orville Vernon Burton, David Herr, and Terence R. Finnegan.  Urbana:  University of Illinois Press, 2002.

(with David Herr and Beatrice Burton) "RiverWeb:  History and Culture of the Mississippi River Basin American Bottom," in *Wayfarer:  Charting Advances in Social Science and Humanities Computing*.  Editors Orville Vernon Burton, David Herr, and Terence R. Finnegan.  Urbana: University of Illinois Press, 2002.

"Interviews with Exemplary Teachers:  Orville Vernon Burton and Beverly San Augustin," *The History Teacher* 35 (February 2002): 237-251.

"A Special Kind of Community," *Furman Magazine* 44, no. 1 (Spring 2001), 16-19.

"Why Care About Teaching?  An interview with an Accomplished Scholar and National Teaching Award Winner," *The Real Issue* (January/February 2000): 2-5.

"The Use of Historical and Statistical Data in Voting Rights Cases and Redistricting:  Intent and Totality of Circumstances Since the Shaw Cases," "Understanding Ecological Regression Techniques for Determining Racial Bloc Voting:  An Emphasis on Multiple Ecological Regression," and "Report on South Carolina Legislative Delegation System for *Vander Linden v. South Carolina*, Civ. Non. 2-91-3635-1, December 1995," in *Conference Workbook*.  Lawyer's Committee for Civil Rights Under Law Voting Rights Project, American University Washington College of Law, Voting Rights Conference, November 19-20, 1999, Washington D.C.

"Presenting Expert Testimony in Voting Rights Cases" and "Understanding Ecological Regression Techniques for Determining Racial Bloc Voting," in *Conference Proceedings*.  CLE/NAACP Annual Meeting, Indianapolis, IN, 1993.

(with James W. Loewen, Terence Finnegan, Robert Brischetto) "It Ain't Broke, So Don't Fix It:  The Legal and Factual Importance of Recent Attacks on Methods Used in Vote Dilution Litigation," lead article in *The University of San Francisco Law Review* 27:4 (Summer 1993): 737-780.

"Teaching Historians with Databases," *History Microcomputer Review* 9:1 (Spring 1993): 7, 9-17.

(with Terence Finnegan), "Two Societies at War, 1861-1865," pp. 273-290 in *Documents Collection America's History*, vol. 1.  Edited by Orville Vernon Burton, et al., to accompany James Henretta, et al., *America's History*, 2nd ed. (New York:  Worth Publishers, 1993).

Burton, page 9

"Populism," pp. E7-E11, in *Instructor's Resource Manual America's History*, 2nd ed., vol. 2 to accompany James Henretta, et al., *America's History* (New York:  Worth Publishing, 1993).

"Quantitative Methods for Historians:  A Review Essay," *Historical Methods* 25:4 (Fall 1992): 181-88.

"Computers, History, and Historians:  Historians and Converging Cultures?" *History Microcomputer Review* 7:2 (Fall 1991): 11-23.

(with Terence Finnegan) "Historians, Supercomputers, and the U.S. Manuscript Census," in *Proceedings of the Advanced Computing for the Social Sciences Conference*.  Editors Bruce Tonn and Robert Hammond.  Washington, D.C.: GPO (U.S. Department of Commerce Bureau of the Census), 1990.  Revised edition published in *Social Science Computer Review* 9:1 (Spring 1991), 1-12.

(with Terence Finnegan) "Developing Computer Assisted Instructional (CAI) Materials in the American History Surveys," *The History Teacher* 24:1 (Nov. 1990): 1-12.

(with Terence Finnegan) "Teaching Historians to Use Technology:  Databases and Computers," *International Journal of Social Education* 5:1 (Spring 1990): 23-35.

"Complementary Processing:  A Supercomputer/Personal Computer U.S. Census Database Project" in *Supercomputing 88*, vol. 2 *Science and Applications*.  Editors Joanne L. Martin and Stephen Lundstrom.   Washington, D.C.: IEEE Computer Society Press, 1990, pp. 167-177.

"History's Electric Future" in *OAH* (Organization of American Historians) *Newsletter* 17: #4 (November 1989): 12-13.

"New Tools for 'New' History: Computers and the Teaching of Quantitative Historical Methods" in *Proceedings of the 1988 IBM Academic Information Systems University AEP Conference, "Tools for Learning*," Dallas/Ft. Worth, Texas, June 1988.  Editor Frederick D. Dwyer.  Abstract in *Agenda*, pp. 73-74.  An expanded and significantly different version with Terence Finnegan as coauthor appears in *History Microcomputer Review* 5:1 (Spring 1989): 3, 13-18.

(with Robert Blomeyer, Atsushi Fukada, and Steven J. White) "Historical Research Techniques: Teaching with Database Exercises on the Microcomputer," *Social Science History* 11:4 (Winter 1987): 433-448.

*The United States in the Twentieth Century* (History 262).  Champaign: University of Illinois Guided Individual Study, Continuing Education and Public Service, 1986.

"The South in American History" in *American History: Survey and Chronological Courses, Selected Reading Lists and Course Outlines from American Colleges and Universities*, Editors Warren Susman and John Chambers, vol. 1: 121-27.  New York: Marcus Wiener Publishing, Inc., 1983, rev. 2nd ed. 1987, rev. 3rd ed. 1991.

"Using the Computer and the Federal Manuscript Census Returns to Teach an Interdisciplinary American Social History Course," *The History Teacher* 12 (November 1979): 71-88.  Reprinted with a few changes in *Indiana Social Studies Quarterly* 33 (Winter 1980-81): 21-37.


*Interviews, Reports, and Other Publications*:

"A Brief Conversation with James M. McPherson," in *The Struggle for Equality: Essays on Sectional Conflict, the Civil War, and the Long Reconstruction in Honor of James M. McPherson*. Edited by Burton et al., pp. 288-92 (Charlottesville:  University of Virginia Press, 2011).

 "UI Earns Right to be Mr. Lincoln's University: Excerpted from remarks by Prof. Vernon Burton, April 1, 2010 keynote address at the UI College of Law," *The News Gazette* (Champaign, Illinois) May 23, 2010, pp. C-1 and C-4.

"Learning from the Bicentennial:  Lincoln's Legacy Gives Americans Something for which to Strive," *The News Gazette* (Champaign, Illinois) February 12, 2010, pp. C-1 and C-4.

 "Life of Lincoln Resonates Today," *The Atlanta Journal-Constitution*, Opinion, Dec. 9, 2009, A19.

"Remarks by Professor Orville Vernon Burton at the October 10, 2009 Celebration of Abraham Lincoln's September 30, 1959 Speech," Delivered at the Milwaukee War Memorial Center at the Invitation of the Wisconsin Lincoln Bicentennial Commission, Appendix pages 166-177 in *Final Report and Appendix of the Wisconsin Lincoln Bicentennial Commission*, To:  The Governor of the State of Wisconsin, Jim Doyle, Responsive to:  Executive Order #245, Date:  February 12, 2010.

Burton, page 10

"Max Bachmann's Bust of Abraham Lincoln, Circa 1915," pp. 88-89 in *Lincoln in Illinois*, Ron Schramm, Photographer and Richard E. Hart, Compiler and Editor (Springfield: published by the Abraham Lincoln Association, 2009.

 "Why Another Book on Abraham Lincoln," *Historically Speaking*, 2008.

 "An Interview with Vernon Burton" *Lincoln Lore*, no. 1894 (Fall 2008), pp. 18-24.

"Lincoln's Generation also Faced Crisis Involving Religion and Terrorism," in *History Network Newsletter*, February 25, 2008.

"Abraham Lincoln, Southern Conservative: An Interview with Orville Vernon Burton" ( 2 Parts), posted by Allen Barra, October 2, 2007.  http://www.americanheritage.com/blog/200710_2_1259.shtml and http://www.americanheritage.com/blog/200710_2_1260.shtml

Interview by Roy A. Rosenzweig, 2001, "Secrets of Great History Teachers," History Matters, at http://historymatters.gmu.edu/browse/secrets/.

"Keeping Up With the e-joneses:  Information Technology and the Teaching of History," *Proceedings for First Annual Charleston Connections:  Innovations in Higher Education Conference.  Learning from Each Other:  The Citadel, The College of Charleston, The Medical University of South Carolina, Charleston Southern University and Trident Technical College.*  June 1 and 2, 2001, The Citadel, Charleston, South Carolina, p. 63.

(with Terence Finnegan and Barbara Mihalas) "Developing a Distributed Computing U.S. Census Database Linkage System," Technical Report 027 (December 1994).  National Center for Supercomputing Applications, UIUC.

"On the Study of Race and Politics," *Clio:  Newsletter of Politics & History,  An Organized Section of the American Political Science Association* 3:1 (Fall & Winter, 1992/1993): 6.

"Benjamin Mays of Greenwood County:  Schoolmaster of the Civil Rights Movement," *South Carolina Historical Society* News Service, published in various newspapers, 1990.

"Quantitative Historical U.S. Census Data Base" in *Science: The State of Knowing*.  National Center for Supercomputing Applications, Annual Report to the National Science Foundation 1987, p. 29.

"Computer-Assisted Instructional Database Programs for History Curricula" *Project EXCEL.*  1986-87 Annual Report.  Office of the Chancellor, UI at Urbana-Champaign, pp. 41-42.

"Postmodern Academy," *The Octopus*, January 24, 1997, p. 6.

(with David Herr and Ian Binnington) "Providing Lessons in Mississippi River Basin Culture and History: riverweb.ncsa.uiuc.edu," in *Touch the Future:  EOT-PACI,* 1997, p. 43.

"The Coming of Age of Southern Males During Reconstruction:  Edgefield County, South Carolina," Working Papers in Population Studies, School of Social Sciences, University of Illinois at Urbana-Champaign, 1984.

In addition, I have written a number of reports as expert witness for minority plaintiffs in voting rights and discrimination cases.


*Accepted and In Press*:

 "Liberty," in the Fetzer Institute's *Booklet of Notable Lincoln Quotations*, expected 2012.


*Digital Publications and Projects*:

Editor in Chief, *Slavery and Anti-Slavery:  A Transnational Archive.* The World's Largest Archive on the History of Slavery.  Farmington Hills, MI:  Thompson-Gale, 2008--.

http://www.galetrials.com/default.aspx?TrialID=16394;ContactID=15613

    Part I:  Debates Over Slavery and Abolition, 2009

    Part II:  Slave Trade in the Atlantic World, 2011

    Part III: Institution of Slavery, 2012

    Part IV:  Age of Emancipation

Advisory Board:  Ira Berlin, Laurent Dubois, James O. Horton, Charles Joyner, Wilma King, Dan Littlefield, Cassandra Pybus, John Thornton, Chris Waldrep.

Webmaster for the Abraham Lincoln Bicentennial Commission Website, now maintained by the ALBFoundation. http://www.lincolnbicentennial.gov/

Burton, page 11

Lincoln Remembered:  Twelve essays commemorating the bicentennial of Lincoln's birth, February 2009 to February 2010.  A monthly blog for the Illinois LAS On-line Newsletter; available at http://www.las.illinois.edu/news/lincoln/

Editor, "Slavery in America in Sources in U.S. History Online." Farmington Hills, MI:  Thompson Gale, 2007.

 "The Mississippi River in American History," for *Mark Twain's Mississippi*.  Editor Drew E. VandeCreek, Institute of Museum and Library Services *(IMSL)* Project (2007).

RiverWeb:  An interdisciplinary, multimedia, collaborative exploration of the Mississippi River's interaction with people over time (now redone as Cultural Explorer).  CD-ROM and Website http://riverweb.ncsa.uiuc.edu/.

The Illinois RiverBottom Explorer (IBEX).  Part of the East Saint Louis Action Research Project (ESLARP) where Faculty and East St. Louis neighborhood groups and local churches work on tangible and visible projects that address the immediate and long-term needs of some of the city's poorest communities.  (More is available at http://www.eslarp.uiuc.edu/).  IBEX serves as a resource for historical documents, primary and secondary sources, and oral history interviews. Website:  http://www.eslarp.uiuc.edu/ibex/archive/default.htm.

Text96.  A collection of primary source electronic texts for teaching American History.  Website http://www.history.uiuc.edu/uitext96/uitexttoc.html.

"Database Exercises and Quantitative Techniques: Exercise I: Colonial America." Madison, WI: Wiscware, 1987. (for IBM and compatible computers, 1 disk, Instructional Workbook, and Teacher's Instructional Sheet).

"Lessons in the History of the United States." Wentworth, NH: COMPress, 1987 (1989 with QUEUE, Fairfield, CT). For IBM color monitor; originally 50 computer exercise modules on 25 computer disks + instructor's manual.  An interactive electronic textbook of U.S. history.

Automated linkage and statistical systems Unix Matchmaker, AutoLoad, RuleMatch, DisplayMatch, ViewCreate (Urbana:  UI NCSA, 2000).
            Website http://www.granger.uiuc.edu/aitg/maps/1870/htm/default.htm

"Illinois Windows Dataentry System for U.S. Census." University of Illinois, 1988 (for IBM PS2 and compatible computers with Windows applications, 1 disk, Instructional Sheet)


In addition, I continue to use Edgefield County, South Carolina to investigate, "large questions in small places."  I have accumulated a quantitative database that includes every person and farm recorded in the U.S. manuscript census returns linked from 1850 to 1880 for old Edgefield District, South Carolina (a region now comprising five different counties).  With this unique database I (and my students) can study, test, and suggest themes in American History with details and specificity related to the lives of ordinary folks.


*Accepted and in Press:*
"Abraham Lincoln," http://www.essentialcivilwarcurriculum.com/.  Editors, William C. Davis and James I. Robertson, Sesquicentennial Project of the Virginia Center for Civil War Studies and the History Department of Virginia Polytechnic Institute and State University (Virginia Tech),expected 2012.


Honors, Fellowships, Awards
*Major Honors and Fellowships*:
U.S. Professor of the Year, Outstanding Research and Doctoral Universities Professor (Council for Advancement and Support of Education and Carnegie Foundation for the Advancement of Teaching), 1999

American Historical Association Eugene Asher Distinguished Teaching Prize, 2004

Chicago *Tribune*'s Heartland 2007 Literary award for nonfiction for *The Age of Lincoln*

Illinois House Resolution of Congratulations, HR 0711, 2007.  The Illinois State legislature honored with a special resolution for contributions as a scholar, teacher, and citizen of Illinois.

Society of American Historians, Elected 2012

Fellow, National Humanities Center (NEH Senior Scholar Award), 1994-95

Burton, page 12

Fellow, Woodrow Wilson International Center for Scholars, 1988-89
Fellow, Pew Foundation, 1996
National Fellowship Program for Carnegie Scholars, 2000-2001
Rockefeller Humanities Fellowship, 1978
Earl and Edna Stice Lectureship in the Social Sciences at the University of Washington, 2005
Strickland Visiting Scholar, Department of History, Middle Tennessee State University, 2006
Pew-Lilly Foundation Graduate Professor, Notre Dame University, 2001
Mark W. Clark Distinguished Chair of History, The Citadel, 2000-01


*Other Selected Honors and Awards*:
Organization of American Historians Distinguished Lecturer, 2004-2014
*Choice* Outstanding Academic Book for *The Age of Lincoln*, 2008
Choice Outstanding Academic Title for *Slavery and Anti-Slavery:  A Transnational Archive*, 2009
*Booklist*'s Editors' Choice Title for *Slavery and Anti-Slavery:  A Transnational Archive*, 2009
*Choice* Outstanding Academic Book for *Computing in the Social Sciences and Humanities*, 2003
Richard F. Fenno Prize, Legislative Studies Section, American Political Science Association, for *Quiet Revolution*, 1995
Certificate of Excellence from the Carnegie Academy for the Scholarship of Teaching and Learning for Work that Advances the Practice and Profession of Teaching In Support of Significant Student Learning, 2001.
Elected to honorary life membership in BrANCH (British American Nineteenth-Century Historians)
Award of Distinction in the Film/Video-History/Biography category from the International Academy of the Visual Arts, 16th Annual Communicator Awards, for "People: A Lincoln Portrait" television interstitial series (The Communicator Awards is the leading international awards program honoring creative excellence for communications professionals), 2010 (part of program I put together for Lincoln commemoration at UIUC).
SC African American Heritage Commission's 2009 "Preserving Our Places in History" Project Award for Claw's (College of Charleston Carolina Lowcountry and Atlantic World – I am executive director) work in commemorating the banning of the international slave trade
Senior Research Fellow, Southern Studies, University of South Carolina, 1988
Phi Beta Kappa, Furman University, 1986
Princeton University Scholar Award, 1969
National Defense Educational Award Title IV Fellowship, 1971 (Princeton University)
Clark Foundation Scholarship, 1966-69 (Furman University)
Wicker Award for Outstanding Student (sophomore), Furman University, 1967
Endel History Award, Furman, 1969
Bradshaw-Feaster General Excellence Award (Furman's highest honor for the graduating senior selected by faculty), 1969


*UIUC Honors and Teaching Awards and Recognition*
Inaugural University "Distinguished Teacher/Scholar," 1999-2008
University Scholar, 1988 – 2008
Campus Award for Excellence in Public Engagement, 2006
Graduate College Outstanding Mentoring award, 2001-02
Fellow, Center for Advanced Study, 1982, Associate, 1994
Burlington Northern Faculty Achievement Award (UIUC), 1986
Study in a Second Discipline, Statistics and Demography, 1984
All-Campus Award for Excellence in Undergraduate Teaching, 1999
LAS Dean's Award for Excellence in Undergraduate Teaching, 1999
LAS Award for Distinguished Teaching, 1986
School of Humanities Teaching Award, 1986
George and Gladys Queen Excellence in Teaching Award in History, 1986

Burton, page 13

Undergraduate Instructional Award (UIUC), 1984
Every semester and for every undergraduate course that I taught at the University of Illinois (excluding
large survey classes of between 300-750 students), I was deemed excellent in the UIUC
"Incomplete List of Excellent Teachers."  I was noted on the list for more than twenty different
courses.  I was noted as "outstanding" from 1979 as long as they used that designation.
Recognized by the Pan-Hellenic Council at as an "outstanding staff member for furthering scholastic
achievement"
Selected by History Department as the "one instructor whom you believe best at creating intellectual
excitement in students" for an educational study of teaching practices of college teachers, 1978
Received the Resident Hall Association Award for the Best Educational Program for lectures/discussion
on *Gone With the Wind* and *Jubilee* for Black History Month, 1996
The Honor Society of Phi Kappa Phi, UIUC, Vice President, 2002-03; President, 2003-04
Ronald E. McNair Scholars Program Dedicated Service Award for Minority Students, 1996
Associate Vice Chancellor Academic Affairs award for contributions to the Student Research
Opportunities Program and work with minority students (1995, 2006)


*Selected Grants*:
National Science Foundation (NSF), GK-12: Ed Grid Graduate Teaching Fellows Program, 2003-09
($4,990,015)
NSF CISE/IRIS Division Award, Grant No. ASC 89-02829, Automated Record Linkage, 1991
NSF Grant No. CDA-92-11139, "Historical U.S. Census Database with High Performance Computing,"
1992
NSF, EPIC Grant, 2006-08, $20k
NSF Catalyst Grant for Social Science Learning Center (with MATRIX, Michigan State University),
2006-09, $175K
National Endowment for the Humanities (NEH) Challenge Grant for Institute for Computing in
Humanities, Arts, and Social Science.  $750 (3 mil. Total with challenge matches), 2008-2011.
NEH Educational Technologies Grant, ED-20758 (1997-99)
NEH Humanities High Performance Computing Collaboratory (HpC): Coordinating High Performance
Computing Institutes and the Digital, 2008-09, $249,997. To support a total of nine institutes and
one joint conference for humanities scholars, to be hosted by three different high-performance
computer centers: the National Center for Supercomputing Applications, the Pittsburgh
Supercomputing Center, and the San Diego Supercomputer Center.
(with Max Edelson) NEH, The Cartography of American Colonization Database Project, To support the
development of a database of 1000 historical maps illustrating the trajectory of colonization in the
Americas. The database will provide a searchable introduction to the mapping of the western
hemisphere in the era of European expansion, ca. 1500-1800. 2008-9, $24,997.
NEH Conference Grant (with R. C. McMath, Jr., History and Social Sciences, Georgia Institute of
Technology), 1978
NEH Summer Research Fellowship, 1983
American Council of Learned Societies (ACLS) Travel grant, 1977
American Council of Learned Societies  (ACLS) Grant-in Aid to Recent Recipients of the Ph.D., 1977
PT3/Technology Across Learning Environments for New Teachers grant, U.S. Department of Education,
2002-03, 2003-04
Academy of Academic Entrepreneurship, 2006-08
National Archives Record Administration grant for digital records, 2003-05
IBM Shared University Research Grant, 1994
IBM Innovations grant, Educational Technologies Board, 1992
IBM Technology Transfer IBM grant, 1988
IBM EXCEL II, History Database Teaching Project, 1987
IBM EXCEL Project, History Database Teaching Project, 1986
Partnership Illinois Award, 1998 (with Brian Orland, Pennsylvania State University Landscape
Architecture, East St. Louis Research Project), RiverWeb 2002-03, 2003-04

Burton, page 14

East Saint Louis Action Research Program Grant, 2005-06, 06-07, 07-08
Andrew Carnegie Foundation 3-year Baccalaureate Study Grant, 1976
Sloan Center for Asynchronous Learning Environment Grant, 1998
The Humanities Council (South Carolina) Outright Grant ($8,000), THC grant #10-1363-1 (Writing the
        South in Fact, Fiction, and Poetry), 2011
South Carolina Humanities Council Conference Grant (with Tricia Glenn), 2005
South Carolina Humanities Council Conference Grant (with Winfred Moore), 2002-03
South Carolina Humanities Council Conference Grant (with Bettis Rainsford), 2000-01

*Selected Grants from University of Illinois*
Office of Continuing Education Grant, 2005-06, 06-07
Chancellor, Provost, and Vice Chancellor Research, RiverWeb Grant, 2004-05 ($30K)
Advanced Information Technologies Group Research Award, 1994, 96, 97, 2000
Applications of Learning Technologies in Higher Education grant for UI--Text96 Project, 1995--2000
        (co-principal investigator with Richard Jensen of UIC campus)
Educational Technologies Board Grant for RiverWeb 1998
Guided Individual Study Grant for RiverWeb, 1997-98
Program for the Study of Cultural Values and Ethics, Course Development Award, 1993
Arnold O. Beckman Research Award, UIUC Research Board, 1989, 1992
Language Laboratory Computer Assisted Instruction Award, 1988
Research Board Humanities Faculty Research Grant, 1986
Graduate Research Board, support for various projects, 1976-08

*Selected Grants from Clemson University*
2011/2012 University Research Grant Committee (URGC) Program, $10,000

Selected Professional Activities and Service:
Officer Congressional Abraham Lincoln Bicentennial Commission Foundation, 2008-2010; Board of
        Directors, Abraham Lincoln Bicentennial Foundation, interim President, 2010, vice-chair 2010-
Southern Historical Association, President 2011-12, President Elect, 2011, Vice President Elect, 2010,
        Executive Council, 2005-08; Program Committee 1989, 1998; 2005 (Chair); Membership
        Committee, 1986-87, 1991-92; 1995-98; 2002; Committee on Women, 1992-95, Nominating
        Committee, 1999-2000, Chair H.L. Mitchell Book Award Committee, 2000-02
Agricultural History Society, President 2001-02, Vice President 2000-01, Executive Committee, 1997-
        2006; Committee to Review and Revise Constitution and By-Laws, 2004-05; Nominating
        Committee, 1991-94, chair 1993-94; Committee to Select first Group of Fellows for Society,
        1995; Committee to select new Secretary/Treasurer, 2009-10
Organization of American Historians, OAH/ALBC (Abraham Lincoln Bicentennial Commission)
        Abraham Lincoln Higher Education Awards Committee, 2007-09; ABC-CLIO "America:
        History and Life" Award Committee, 1997-99; Membership Committee, 1990-94
Social Science History Association, Executive Committee 2000-03; Nominating Committee 1990-91;
        Program Committee 1989, 1993; Community History Network Convener, 1976-79; Rural History
        Network Convener, 1988-90, 1993-94
Social Science Computing Association, Executive Council, 1993-2002; Organizing Committee
        Chairperson for Annual Conference, 1993, Conference on Computing for the Social Sciences
        (CSS93); program committee 1993-95, 2001
Southern Association for Women Historians, Membership Committee, 1996-99
H-Net, founding member of H-Net, Treasurer and Executive Committee, 1993-94; Chair, committee to
        evaluate multimedia NEH grant; Editor H-South (book review editor 1997-2000); Editorial Board
        of H-Rural, H-Slavery, and H-CivWar.  In 1997, H-Net received the James Harvey Robinson
        Prize for teaching from the American Historical Association
Scholarly Advisory Group, President Lincoln's Cottage at the Soldier's Home, 2012-14
Executive Council, The University South Caroliniana Society, 2011-14
Search Committee for Director South Caroliniana Library, 2012-

Burton, page 15

Member South Carolina Abraham Lincoln Bicentennial Commission, 2008-2010
Member Champaign County, Illinois, Abraham Lincoln Bicentennial Commission, 2006-10
Council, Civil War Sesquicentennial Commission, 2009-
Historical Advisory Committee" to the "Fort Sumter/Fort Moultrie Trust," charged with organizing
        Sesquicentennial Activities in Charleston and South Carolina Lowcountry, 2010-
Associate Editor for History, *Social Science Computer Review*, 2012-
Editorial Board, Digital Humanities Series, University of Illinois Press, 2005-
Editorial Board, *Change and Continuity*, 1995-
Editorial Board *Fides et Historia*, 2010-
Editorial Board *Proceedings of the South Carolina Historical Association*, 2009-
Editorial Board, *History Computer Review*, 1990-2003
Editorial Board, *Locus:  An Historical Journal of Regional Perspectives on National Topics*, 1994-96
The Illinois Humanities Council Scholar, 2004-05
Invited to present to President's Information Technology Advisory Commission (PITAC), 9-16-2004
Invited to NEH Digital Humanities Initiative Mini-Conference, 3-6-06 and Digital Humanities Summit,
        4-11, 12-07
Digital Library Federation Scholars' Advisory Panel, 2004-7
*E-Docs*, (one of 3 founding members) Editorial Board, 1998-
Advisory Board, *Postwar America: An Encyclopedia of Social, Political, Cultural, and Economic History*
Mentor for Southern Regional Council Minority Scholars Program, 1992-96
UIUC Representative to Lincoln Presidential Library Committee: Educational Activities Committee,
        2001; Fellowship Committee, 2002
Faculty Associate, Council for International Exchange of Scholars, 2002-03
Evaluator/Referee (one of two for history) for the Pew Foundation Faculty Research Fellowships, 1997-
        98, 1998-99; 2001 (for graduate students for summer seminar)
Evaluator and Referee for American Council of Learned Societies Grants, 2005-08
Humanities Review Panel for Digital Grants, 2010
National Science Foundation Review Panel for Knowledge and Distributed Intelligence grants, 1998,
        1999
Advisory Board for *International Journal of Social Education*, 1986-2000
Advisory Reviewer for *The Journal of Negro History* (since 2002, *The Journal of African American
        History)*, 1992-
Editorial Advisory Board, *The South Carolina Encyclopedia*, general editor Walter Edgar, 2000-06
Advisory Board, Digital Library on American Slavery, University of North Carolina, Greensboro, 2004-
        10
Advisory Board, Biographies: The Atlantic Slaves Data Network
Strategic Advisory Council for MATRIX: The Center for Humane Arts, Letters and Social Sciences On-
        line at Michigan State University, 2004-
Humanities, Arts, Science, and Technology Advanced Collaboratory (HASTAC), Steering Committee
        and Planning Committee, 2003-04
External Advisory Board, NHPRC "Effective User-Centered Access For Heterogeneous Electronic
        Archives" project, Illinois Institute of Technology, 2003-05
Advisory Committee, American Studies Program, Bureau of Educational and Cultural Affairs, U.S.
        Information Agency, 1989-93
Delegate to the Mexican/American Commission on Cultural Cooperation, Mexico City, June 1990;
        Chairperson of United States delegation (Co-Chairperson with Mexican counterpart), U.S.
        Studies Working Group
National Advisory Board to Alan Lomax's Global Jukebox:  Giving Voice to the Human Species, 1993-
Advisor for "Crossroads of Clay":  NEH Alkaline Glazed Stoneware Exhibition and Catalog, McKissick
        Museum, University of South Carolina, 1987-90
Advisory Committee Film Project for Historic Southern Tenant Farmers Union, 1986-90
Consultant, Commercial film, "Roll the Union On" about H.L. Mitchell and the Southern Tenant Farmers
        Union

Burton, page 16

Consultant on the Renewal of the 1965 Voting Rights Act, 1981-82, 2004-07, including consultation for an NBC TV Special.

The Civil Rights Project at University of California, Berkeley, Advisory Board for "The Decade Ahead: Reauthorization of the Voting Rights Act and the Future of Democratic Participation," 2004-07

Consultant for Documentary, "Behind the Veil," 1995-2005

Board of Directors of the Abraham Lincoln Historical Digitization Project, 1997-

Advisory Council for the Lincoln Prize at Gettysburg College, 1997-

Prize Committee for the Technology and History Award, The Gilder Lehrman Institute of American History, 2000-01

International Committee on Historic Black Colleges and Universities, 2001-

Consultant, Belle Meade and The Hermitage and Vanderbilt University.  Presentations of slavery.

Consultant, Morven Park, 2010-

Consultant, for Matt Burrows, documentary "The Assassination of N.G. Gonzales by James H. Tillman," 2010-

Consultant, for Chris Vallilo musical performance, "This Land is Your Land:  Woody Guthrie and the Meaning of America," 2010-

Organizing and Founding Committee International Society for the Scholarship of Teaching and Learning (IS-SOTL), 2003-7

NEH, Review Panel for Digital Humanities Grants, 2010

Atlantic Slave Data Network (ASDN) advisory board, 2010-


*Service - University of Illinois* (three campus system – Urbana, Chicago, Springfield)

UI Senate Conferences (elected), all three campuses of the University of Illinois, 2006-09, Presiding officer (chair) 2007-08

Lincoln Bicentennial Commission, 2006-9

Academic Affairs Management Team, 2007-08

Task Force for Global Campus, 2006-2007

External Relations Management Team, 2006-09

Strategic Plan Committee, 2005-06


Service (selected) University of Illinois at Urbana-Champaign

Faculty Senate (elected), 1999-2001, 2002-03; 2005-06, 2006-07, Presiding Officer (Chair, Senate Executive Committee), 05-06, 06-07 (was Senate Council) elected 2000-01, 2003-04; 2005-06; 06-07; Chair, Education Policy Committee, 2002-03, Chair 03-04; Budget and Priorities Committee, 1999-01, Chair 2000-01

As Chair Faculty Senate Executive Committee, 2005-07 Represented faculty at Board of Trustee meetings, and CIC meetings.  Led in developing ideas of shared governance, helped in the drafting and implementing of a strategic plan for both the University of Illinois and the Urbana-Champaign campus. Oversaw establishment of the Illinois Informatics Institute (I3) and the School of Earth, Society, and Environment.  Dealt with issues of Multi year contracts for Research faculty and staff policy, rehiring of retirees, Global Campus, and led study of Academic affects of Chief Illini and diversity issues.

Organizer and Chair, Planning Committee for the Lincoln Bicentennial, 2006-09

Task Force for Diversity and Freedom of Speech, 2007-08

Convocation address, August 21, 2000

Search Committee for Chancellor, vice-chair, 2004-5

Association of American Colleges and Universities campus representative and Associate, 2004-05

Martin Luther King, Jr., Week Planning Committee, co-chair, 2002-03, 2003-04, 2004-05, 2005-06

Strategic Plan Committee, 2005-06

Chancellor's Task Force ("Kitchen Cabinet") for the Humanities, 2002-04

Provost's ad hoc Committee on Evaluating Public Service for Promotion and Tenure, 2003-04

Brown Jubilee Planning Committee, Diversity Initiative, 2002-04

Burton, page 17

Law-Education *Brown* Jubilee Conference Program Committee, 2002-04
East St. Louis Action Research Projects (ESLARP) Campus Advisory Committee, 2004-
University Planning Council, 2000-01
Selection Committee for University Scholars, 1999 -- 2000, Chair Subcommittee for Social Sciences, Humanities, FAA, Communications, Education, Law 2000
UI President's Distinguished Speakers Program, 2000-02, 2006-8
University of Illinois Press Board, 1995-2000, Chair 1998-2000
Search Committee for Director University of Illinois Press, 1998-99
Committee on University Publishing, 1997-98
Graduate College Executive Committee, 1998-2000; Committee to Evaluate Dean of Graduate College, Committee to Review and Implement Graduate Program Revisions, Graduate Student Grievance Policy Committee
Graduate College Office of Minority Affairs Strategic Planning Committee, 1999-2000
University Administration Budget and Benefits Study Committee, 2000-02
Budget Strategies Committee, 1993-94, Subcommittee for Library. Subcommittee for Faculty Productivity and Teaching Models
Illinois Program for Research in the Humanities (IPRH) Advisory Committee, 2001-03
Center for Advanced Study George A. Miller Committee, 2000-03
UI-Integrate Faculty Advisory Committee, 2003-04
Graduate College Area Subcommittee for the Humanities and Creative Arts, 1996-98
Campus-wide Advisory Committee for the Center for Writing Studies, 2000-01
Committee on Institutional Cooperation (CIC), Selection Committee for CIC Research Grants in the Humanities, 1993-94
Chancellor's Task Force for Minority Graduate Students, 1989-92
Chair, Subcommittee for Summer Program for Minority Graduate Students, 1990
Computer Resources Development Committee, Program for the Study of Cultural Values and Ethics, 1991-93
High Performance Computing Committee for the Social Sciences, 1989-95
Rural History Workshop Convener, 1989-94 (with Sonya Salamon)
Faculty Fellow, 1990-2003
Graduate College Fellowship Committee, 1988
Selection Committee for Lily Fellows, 1987
Social Studies Committee for the Preparation of Teachers, Council on Teacher Education, 1986
Afro-American Studies and Research Program (AASRP  --renamed African American Studies and Research Program), Advisory Council, 1982-86; Curriculum Development & Faculty Recruitment Committee, 2002-2003; Research and Course Competition Committee, 1991-94, Chair 93-94; Electronic Networking Committee, 1996-2000, Chair 1997-98; Library Advisory Committee, 1997-2003
Chair, Search Committee for African-American Scholar, 1986-87
Search Committee, Director for AASRP, 1985-86, Chair 87-88
Graduate College Appeals Committee, 1984
Chancellor's Allerton Conference, 1988; Chancellor's Beckman Conference, 2001-06; Chancellor's Conference on Diversity, 2002, faculty facilitator
Combating Discrimination and Prejudice Workshop, 1988
Krannert Art Museum, Committee on The Black Woman as Artist, 1992
H. W. Wilson Faculty Panel, 1993
Advanced Information and Technology Committee, 1992-97, Advisory Committee, 1993-94
Honors Symposium for UI recruitment of High School Seniors, 1993
Search Committee for Archivist, UIUC Computing and Communications Service Office, 1993
Search Committee for Research Librarian, UIUC Library, 1997; Undergraduate Library Advisory Committee, 2002-
Member Human Dimensions of Environmental Systems Group, 1997-
Faculty Learning Circle for 2003-2004
Illini Days Speaker, 1999, 2000, 2002

Burton, page 18

Public Interest Fund of Illinois Representative, 1996-
Facilitator for Interinstitutional Faculty Summer Institute on Learning Technologies, UIUC, 2000, 2002
Board of Advisors, Collaborative for Cultural Heritage and Museum Practices (CHAMP), 2005-08
Faculty Mentor for Campus Honors Program, 1980-2008


*Service - College of Liberal Arts and Science UI*:

Lecturer at Pedagogy 2000:  Teaching, Learning and Technology, Annual UIUC Retreat on Active
      Learning (2000)
Keynote Address at LAS Awards Banquet, 2000 and Keynote at UIUC Campus Awards Banquet, 2000
Dean's Committee to Evaluate Chair of History Department (1 of 3 elected by History Department), 1996
Oversight Committee Computing for the Social Sciences, 1993-95
Committee to select nominees for election to College Executive Committee, 1992
Academic Standards Committee, 1983-85, Chair 1984-85
School of Humanities Scholarship and Honors, 1986-88, Chair 1987-88
Social Sciences and Humanities Respondent to the Joint Task Force on Admission Requirements and
      Learning Outcomes, 1988
Advisory Committee, Social Sciences Quantitative Laboratory, 1987-88, 1989-93
Alumni Association Annual Speaker, 1990
General Education Committee, 1990-91
Awards Committee, Chair, 1991-92
Race & Ethnicity, Class & Community Area Committee of Sociology Graduate Program, 1993-
LAS Alumni Association Speaker, 2000
Cohn Scholars Honors Mentoring Program (choosing the 10-14 best Humanities first-year students),
      1986-88, 1989-90, 1992-93, 1995-96, 1998-99, 2002
Faculty Mentor, Committee of Institutional Cooperation Summer Research Opportunities Program for
      Minority Students, 1987, 1991-95, 1997-2000, 2002, 2003
Faculty Mentor, McNair Minority Scholars, 1993-94, 96-97
Summer Orientation and Advance Enrollment Program, Faculty Leader, 1991-93, 2000, 2002, 2004
Gender Inclusivity Seminar, 1992
The African-American Experience:  A Framework for Integrating American History:  An Institute for
      High School Teachers of History, instructor 1992, 94
Faculty Advisor for UIUC Law School Humanities Teaching Program, 1998-99
Senior Faculty Mentor, LAS Teaching Academy, 1999-08


*Service - Department of History UI*:

Lincoln Bicentennial Committee, Chair, 2005-06, co-Chair 2006-08
Department Distance Learning and Global Campus committee, 2007-08
Carnegie Initiative on the Doctorate, 2003-05
Ethical Conduct Liaison, 2004-05
Phi Alpha Theta Faculty Advisor, 2005-06
Graduate Placement Officer, 1990, 1991-94, 1997-99
Graduate Admissions Officer, 1990-91
Graduate Committee, 1990-93
Organizer of OAH Breakfast Meeting, 1989-90, 93-94
Computer Resources, 1976-88, 1989-91, 1995-99, Chair 1976-85, 1997-99
Teaching Awards, 1986-88, 92-93, 97-98, 99-2000, Chair, 1987-88, 97-98, 99-2000
T.A. Evaluation, 1975-76, 78-82, 84-88, 90-91, 95, 98-99, 2002, 2005-06
Speakers and Colloquia, 1981-82
Grants and Funding, 1981-82
Capricious Grading, 1985-86, 2002-3
Social Science History Committee, 1980
Advisor, History Undergraduate Club, 1976-78

Burton, page 19

Swain Publication Prize Essay Committee, 1991
Proposal-Writing Workshop, 1991-92, 2002
Teaching Workshop, 1993
Chair Library Committee, 1996-97
Faculty Advisor for Phi Alpha Theta, 2005-06
American History Search Committee, 1991-92
Chair, American History Search Committee, 1993-94
James G. Randall Distinguished Chair Search Committee, 1999-2000

*Service Coastal Carolina University*:  Arts and Humanities:
        Search committee for Archaeologist, 2008-9
        Selection Committee for Clark Chair of History, 2010
        Third Year Assistant Professor Faculty Review Committee, 2010

*Service Clemson University*:
        History Department Civil War Sesquicentennial Committee
        History Department Digital MA committee
        Clemson University Computational Advisory Team (CU-CAT)
        University Academic Technology Committee.
        Ex-officio Steering Committee, Clemson CyberInstitute
        University Committee to commemorate the 50th Anniversary of the Integration of Clemson, 2011-
        Outstanding Staff Employee Award, Division of Academic Affairs Selection Committee, 2011
        University Morrill Act Anniversary Celebration, 2011-

A more complete list of Service and Public Engagement is available upon request.

Conferences Organized (selected list):

In 1978, I (with Robert C. McMath, Jr.) organized and chaired a National Endowment for the Humanities Conference on Southern Communities at the Newberry Library.  In 1993, I organized, hosted, and chaired the annual meeting of the Conference on Computing for the Social Sciences at the National Center for Supercomputing Applications.  In 1999, I organized and hosted the 12th Annual Meeting of the Southern Intellectual History Circle in Edgefield and Ninety Six, S.C.  In 2001, I organized a workshop and conference on diversity and racism in the classroom with Carnegie Scholars at the Citadel in Charleston, S.C.  In 2001, I (with James Farmer and Bettis Rainsford) organized a South Carolina Humanities Council Edgefield Summit History Conference.  In January 2003, I organized a Workshop on Diversity and Racism and a Conference on the Scholarship of Teaching and Learning, both at the University of Illinois.  In March 2003 I organized the Citadel Conference on the South, "The Citadel Symposium on the Civil Rights Movement in South Carolina." I organized the Humanities, Arts, Science, and Technology Advanced Collaboratory (HASTAC) meeting in January 2004 in Washington, D.C.  I hosted the 2004 Southern Intellectual History Circle Meeting at the College of Charleston.  I (with John Unsworth) organized and hosted a Humanities Computing Summit in August 2004 at NCSA and UIUC.  In 2005, I planned and hosted the British American Nineteenth Century History (BrANCH) Conference in March 2005 in Edgefield, South Carolina and a symposium honoring Jim McPherson's retirement in April 2005 in Princeton.  As program chair I helped organize the Southern Historical Annual meeting in Atlanta in November 2005.  As Director of I-CHASS, I regularly organized conferences and workshops, at least two major conferences a year such as the 2007 e-science and Geographic Information Systems conferences.  And as Executive Director of the College of Charleston Atlantic World and Lowcountry Program, I regularly work with others to organize conferences and meetings.

Reviews:

I have reviewed books for numerous journals and book manuscripts for numerous presses.  In addition, I have refereed article manuscripts for numerous journals.  I have also reviewed proposals for various

Burton, page 20

granting agencies.  I have also reviewed and written outside letters of recommendation for promotion, tenure, and endowed chair decisions for more than ninety cases at various colleges and universities.  Lists of these reviews, presses, journals, universities, and granting agencies are available upon request.


Invited lectures and conference participation available upon request.  Selected invited lectures 2009-11, Harvard University, University of Pennsylvania, Black Congressional Caucus, Printers Row Book Fair, Society of Civil War Historians, Society of Historians of Early America, ALBC Atlanta Town Hall meeting on Race at Morehouse College and at Jimmy Carter Presidential Library Center, Western Illinois University, Drake University, University of Illinois Law School, University of Georgia, Lawrence University, Wisconsin Lincoln Bicentennial, University of Kansas, Samford University, Talladega University, ALBC Morrill Act Conference, Arkansas State University, San Francisco State University, Clemson University, Notre Dame, University of Oklahoma, University of South Carolina, Augusta State University.


Samples of recognition given to me or my work:

*The Chronicle of Higher Education*, Vol. L: 2 (September 5, 2003), cover page, A37-38.  On-line at
        http://chronicle.com/prm/weekly/v50/i02/02a03701.htm

C. Vann Woodward, "District of Devils," *New York Review of Books*, xxxii #15: 30-31

*Chicago Tribune*, October 13, 2007, cover of the Book Review Section, "Orville Vernon Burton's
        Heartland Prize-winning "The Age of Lincoln."  Catherine Clinton, "Lincoln and His Complex
        Times," pp. 4-5.

Featured as example of "Faculty Excellence" on UIUC Homepage:
        http://www.uiuc.edu/overview/explore/

Numerous examples, including newspaper, television (including C-SPAN Book TV), radio (NPR), and other media, are available upon request.

APPENDIX B

Burton Moultrie Report, page 1

Report of Dr. Orville Vernon Burton for *Moultrie v. Charleston County Council*, C.A. No. 9 –01 562 11

Orville Vernon Burton
October 5, 2001

P.O. Box 57 (3520 S. 246 Highway)          605 W. Washington
Ninety Six, S.C. 29666                              Urbana, IL 61801
Phone 864-543-3820; 543-2552                Phone:  217-337-0051

I am Professor of History and Sociology at the University of Illinois at Urbana-Champaign, where my research and writing focus on American History and particularly on race relations.  I teach courses in U.S. History, Southern History, race relations, discrimination, ethnicity, family, and community.  I use statistical analysis in my own research and writing, and I also teach courses in quantitative techniques at the University of Illinois.  I am a member of the graduate statistics faculty and a Senior Research Scientist at the National Center for Supercomputing Applications.

I earned a B.A. degree from Furman University and M.A. and Ph.D. degrees at Princeton University.  My primary training was in the History of the United States, with a specialization in the History of the South in the 19th and 20th centuries.  For the past twenty-eight years I have taught courses in my specialization at the University level.

I am a recognized and respected scholar of United States history and the history of race relations.  I have numerous publications in scholarly books and peer-reviewed journals, I have presented scholarly papers both in the United States and abroad on these subjects, and I have received various awards.  I am the author or editor of six books, including In My Father's House Are Many Mansions: Family and Community in Edgefield, South Carolina (University of North Carolina Press, 1985, fifth printing 1998; subject of sessions at the Southern Historical Association and the Social Science History Association's annual meetings; nominated for Pulitzer) and two co-edited books on southern communities.  I have been recognized by my peers as a leader in my field, both as scholar and a teacher.  I am currently the president of the Agricultural History Society, which publishes the premier journal in rural history, and am on the executive committee of the Social Science History Association.  I chair the prize committee for the Southern Historical Association's H. L. Mitchell Award for the best book in Labor History, and I served as a member of the Organization of American Historian's ABC-CLIO "America: History and Life" Award Committee, 1997-99, to select the best article published in that two-year period in United States history.  I have received fellowships from the Rockefeller Foundation, the National Endowment for the Humanities, the National Science Foundation, the American Council of Learned Societies, the Woodrow Wilson International Center for Scholars, the National Humanities Center, the Carnegie Foundation, and the Pew Foundation.  I was selected nationwide as the 1999 U.S.

Burton Moultrie Report, page 2

Research and Doctoral University Professor of the Year (presented by the Carnegie Foundation for the Advancement of Teaching and by the Council for Advancement and Support of Education).  I am a Pew National Fellow Carnegie Scholar for 2000-2001.  At the University of Illinois I was named a University Scholar in 1988 and was designated one of the first three University "Distinguished Teacher/Scholars" in 1999.  Last academic year, I served as the General Mark Clark Distinguished Professor of History at the Citadel.

Race relations and politics in the American South have been my specialty since I received my Ph.D. at Princeton in 1976.  I have also researched and written on the Voting Rights Act of 1965 and presented this research to academic conferences in England and the United States.  I was part of a large National Science Foundation study of the effects of the 1965 Voting Rights Act in the United States.  I headed the research team for South Carolina and was the principal author of chapter seven on South Carolina that is contained in the book resulting from the study, The Quiet Revolution: The Impact of the Voting Rights Act in the South, 1965-1990  (Edited by Chandler Davidson and Bernard Grofman.  Princeton:  Princeton University Press, 1994.  Winner of the 1995 Richard F. Fenno Prize, Legislative Studies Section, American Political Science Association).  My article, "Legislative and Congressional Redistricting in South Carolina," was published in Race and Redistricting in the 1990s (Edited by Bernard Grofman.  New York: Agathon Press, 1998).  I have also contributed the entry for "South Carolina" in the Encyclopedia of African American Culture and History (Edited by Charles V. Hamilton and Jack Salzman.  NY:  Macmillan, 1996, revd ed. 2000).  I have been commissioned to write the entry on "Civil Rights" for the South Carolina Encyclopedia edited by Walter Edgar and sponsored by the South Carolina Humanities Council.  The University of South Carolina Press is publishing my introduction to Francis Butler Simkins, Pitchfork Ben Tillman: South Carolinian (originally published by Louisiana State University Press, 1944) for the reprint edition of the Southern Classics Series of the Institute for Southern Studies, University of South Carolina Press.  A detailed record of my professional qualifications is set forth in the attached Curriculum Vitae.

I have had extensive experience in analyzing social and economic status, discrimination, intent in voting rights cases, and group voting behavior.  I have served as an expert witness and consultant in a number of voting rights cases beginning with McCain v. Lybrand and also as a consultant in state redistricting.  My testimony has been accepted by federal courts on both statistical analysis of racially polarized voting and socioeconomic analysis of the population, as well as on the history of discrimination and the discriminatory intent of laws.  I conducted the extensive ecological regression analysis presented by the plaintiffs and accepted by the court in Jackson v. Edgefield County, South Carolina School District, 650 F.Supp. 1176, 1194-97 (D.S.C. 1986).  To the best of my knowledge and memory, the last two cases in which I have testified or given depositions are Vander Linden v. South Carolina, Civ. No. 2-91-3635-1 and Elliott Harvey, III v. National Association of Letter Carriers, C.A. No. 98 CV 2312 (POR).  In summer 2000 attorney Laughlin McDonald contacted me about consulting on the Charleston County Council case, especially the change from a district to an at-large method of election.  I am being compensated at $100 an hour.

At the request of attorneys Laughlin McDonald, Armand Derfner, and Cheryl Whipper Hamilton, I have conducted research on the historical circumstances surrounding the change in the form of government for Charleston County, South Carolina, in the 1960s.  Among the issues I was asked to investigate were the following: a) the purposes behind Act No. 94 (R142, H1262) passed by the South Carolina General Assembly on March 19, 1969; b) the effects of the change in local government occasioned by this statute; c) the larger historical context in which this specific change took place, including the history of official state discrimination; d) the socioeconomic status of African Americans and whites in Charleston County and the continuing effects of historical discrimination.

Pursuant to this investigation I have examined a wide range of sources.  For the most part I gathered these materials independently, but in some cases I requested specific documents and examined copies supplied by the attorneys who hired me.  I also had considerable material from previous research.  As a matter of course, I began by reviewing all peer reviewed published work by historians, political scientists, and sociologists, as well as Masters and Ph.D. theses relevant to the issues being investigated and pertinent to my inquiry.  Some of these scholarly works will appear in specific citations.  I read the Charleston News and Courier and Evening Post and the Columbia State for various periods from the 1950s and concentrated on the period from 1965 through 1969 that included coverage of relevant legislative proceedings.  I consulted various data from the U.S. Censuses of 1940, 1950, 1960, 1970, 1980, 1990, and 2000.  I examined the text of pertinent statutes and the Journals of South Carolina House and Senate.  I read parts of trial transcripts and depositions from other cases.  I searched the relevant files at the Charleston County Library, including the minutes of the County Council and the Charleston Legislative Delegation.  I also examined relevant materials at the South Carolina Department of Archives and History, the South Caroliniana Library, the South Carolina Historical Society, the Cooper Memorial Library at Clemson University, and the Avery Research Center for African American History and Culture.  I reviewed the published opinions and relevant correspondence of the Attorney General of South Carolina and the published school expenditures for African American and white children in Charleston County from 1896 to 1960.  I have also conducted interviews.  In preparing my report and my testimony in this case, the sources and types of documentation that I have used are those an expert normally consults in investigating questions of this nature.  The methodology that I have employed in preparing my report is the same methodology I and other scholars in my field employ when examining issues of the sort investigated here.  Finally, the analysis presented here is consistent with related scholarly research.  In my analysis for this case, I have used assumptions, methods, and analytical principles consistent with those employed in my past scholarly writing.  On the basis of the evidence discussed in the following pages, any expert in my field could legitimately reach a conclusion concerning the purposes and effects of the shift to at-large elections for the Charleston County Council.

According to the Supreme Court in the Arlington Heights case, plaintiffs need not show that race was a predominant factor in the decision, only "that a discriminatory

Burton Moultrie Report, page 4

purpose has been a motivating factor."  The factors listed by the Court as relevant to a circumstantial proof of discriminatory intent include 1) the historical background of the decision, 2) the views expressed by decision-makers on related issues, 3) the specific sequence of events leading to the decision (including whether there has been a departure from the usual practices or procedures of the decision-making body), and 4) the anticipated or foreseen effect of the change on minority citizens.[1]

This report will first cover the historical background of discrimination in South Carolina and in Charleston specifically.  Then I will present the sequence of events leading up to the change from district to at-large and show that the County Council and the Legislative Delegation foresaw the effect of this change on their minority citizens.  I will also present the views expressed by the decision-makers.

## I.  History of Discrimination in South Carolina

South Carolina was the first state to challenge the 1965 Voting Rights Act.  The state's attorneys maintained that the Voting Rights Act of 1965 subjected the state to unnecessary intrusive supervision without proof of intentional discrimination.  In denying their challenge, and affirming the constitutionality of the act in *South Carolina v. Katzenbach*, Chief Justice Earl Warren stated, "Congress felt itself confronted by an insidious and pervasive evil."  He noted the long history of racial discrimination in the voter registration process in South Carolina, directly quoting some of the more outrageous remarks of Benjamin Ryan "Pitchfork Ben" Tillman at the 1895 disfranchising convention as evidence of its discriminatory purpose.  Warren stated that "the constitutional propriety of the Voting Rights Act of 1965 must be judged with reference to the historical experience which it reflects."[2]

That historical experience includes racism and discrimination.  The degree to which African Americans have held public office in South Carolina in the century and a quarter since the Civil War was largely determined by state election laws and the manner in which they were implemented.  "The central fact in the history of black Carolina," states historian I. A. Newby, "has been the racism of white Carolina."[3]  Another historian, Jack Temple Kirby, found that "Lower South whites, surrounded by black folk, were more preoccupied with race and belligerent in championing white supremacy."[4]  Renowned historian of South Carolina, Francis Butler Simkins, confirmed the intent of his native state's legislation:  "Reviewing the South Carolina law in respect to the Negro since 1876, it is apparent that its frank purpose is to perpetuate the division of society into two distinct castes--the white, or dominant ruling class, and the Negro, or subject class."  South Carolina's "proud record in interracial harmony," he continued, relied on a policy of "absolute white supremacy."[5]

The 17th century charter for Carolina, which John Locke helped draft, contained two unique colonial provisions:  one for religious freedom, the other a specific stipulation for chattel slavery.  Locke's Fundamental Constitution of Carolina guaranteed that "every freeman of Carolina shall have absolute power over his Negro slaves of what opinion or religion soever."  South Carolina served as the leading advocate for the rights of

slaveholders in debates over the Constitution. Under the leadership of John C. Calhoun, South Carolina attempted to "nullify" a federal tariff law in 1832 in order to establish a constitutional precedent against future antislavery legislation. Resentful of dissent on the issue of slavery, antebellum South Carolina established an aristocratic structure of government and largely withheld power from the electorate. Although every white male could vote, the only offices put before the people were those of state representative and U. S. Congressman, and often only one pre-selected candidate was on the ballot. Legislative cliques determined who would "run" for governor and which "candidates" would be awarded state offices.[6]

South Carolina was the first state to secede from the Union, and a few months later, South Carolinians fired the first shot of the Civil War at Fort Sumter. After the Confederate defeat, white officials were very clear about the level of African American participation in government. As Governor Benjamin Perry explained, "This is a white man's government, and intended for white men only."[7] South Carolina, like other recalcitrant Southern state legislatures, enacted "black codes" that severely restricted the rights of freedpersons, requiring agricultural workers to sign away most of their rights as citizens in annual labor contracts with landowners or risk prosecution for vagrancy. The enactment of black codes throughout the South played a key role in persuading Congress to enforce the franchise for African Americans and to implement Reconstruction.[8]

Granted the franchise, South Carolina's black majority elected Republican candidates to the bulk of the seats in a new Constitutional Convention, which then granted the right to vote to every adult male, "without distinction of race, color, or former condition."[9] Subsequently, African Americans controlled a majority of seats in the lower house of the General Assembly (and from 1874 to 1876 both the senate and the house), and African Americans won elections as lieutenant governor, secretary of state, and state treasurer. Equally important, African Americans were elected to a significant number of local offices, such as sheriff, county commissioner, magistrate, school commissioner, and alderman.[10] Under Reconstruction, the people of South Carolina ratified a new state constitution in 1868. This constitution, the handiwork of black and white Republicans, introduced a broad level of democracy to the state. It instituted public education for the first time in the state. It put local government in the hands of the people and held counties "accountable to the local electorate."[11] Reconstruction in South Carolina lasted longer than in any other state, and South Carolina's black Republicans achieved as great a degree of political power as did African Americans anywhere.

Bitterly opposed to African American equality, some whites advocated violence to overthrow Republican control. Clashes between whites and blacks occurred throughout the state. Whether through open mob violence or secretive activity by the Ku Klux Klan, physical beatings, arson, and threats of death were common. Democrats even resorted to political assassination and murder. Seven state legislators were murdered between 1868 and 1876.[12] White paramilitary groups rioted against African Americans and assassinated black militiamen and political leaders in cold blood.[13] In 1876 in the notorious "Red Shirt" campaign, former Confederate generals orchestrated a violent take-over of state government from Republican control. One of those generals, Martin

Burton Moultrie Report, page 6

Witherspoon Gary, had announced as early as 1874 that political contests in South Carolina were "a question of race and not of politics."[14]  According to historian Eric Foner, Charleston was the only exception to "the Reconstruction pattern that cast blacks as victims of political violence and whites as sole aggressors."  In September and October 1876, in Charleston and in the nearby village of Cainhoy, African American Republicans attacked black and white Democrats, resulting in the deaths of seven white and African American Democrats, and the wounding of others.[15]

Elsewhere in the state the Red Shirt campaign of intimidation, voter fraud, and violence paid off:  Wade Hampton was elected governor.[16]  From Charleston, several African Americans who supported Hampton were elected as Democrats to the South Carolina House.  George M. Mears was re-elected in the House every two years from 1880 through 1890.[17]

Following this overthrow of Republican government in South Carolina, the legislature adopted laws to institutionalize its control of state politics and to limit political access.  Because black-majority counties elected some African American legislators, the white state legislature was determined to combat these successes.  In 1882 a new registration law required all citizens to re-register or face permanent disfranchisement; registrars had great discretion in applying the law so that they could avoid striking white voters from the rolls.  This discriminatory tactic effectively cut the African-American electorate in half.[18]  In addition, the legislature abolished a large number of precincts in heavily Republican counties, requiring voters to travel long distances in order to vote.[19]  The legislature adopted a law that was intended to eliminate federal scrutiny of state affairs by requiring separate ballot boxes for state and federal elections.[20]  A companion statute, the "Eight Box Law," required voters to place ballots for various offices in separate, unmarked boxes, which election officials periodically shuffled.

Another move to restrict African American voting power was through congressional redistricting.  The legislature adopted a plan that "packed" African Americans into one malapportioned district where they made up 82 percent of the population, thereby diluting African American voting strength in the rest of the state.  The "black district," as it was called, incorporated most black neighborhoods of Charleston and ran from the coast to the city of Columbia.  Although this one district generally elected an African American Republican to the U.S. House of Representatives until 1896, the gerrymander assured Democrats safe contests for the remaining seats.[21]

Even so, black voters remained numerous enough to be troublesome to white supremacists, and the political movement by Benjamin Ryan Tillman brought about an end to any vestige of African American equality of citizenship.  The Tillman movement sought explicitly racist ends, including the segregation of public accommodations and the effective disfranchisement of African American men.  Tillman told the nation, in characteristically blunt language, that white South Carolina had triumphed over black South Carolina by the use of shotguns, election fraud, and intimidation, and that white South Carolina was determined, if necessary, to maintain its supremacy by a reapplication of these methods.  Tillman's movement to purge the African American vote

in South Carolina was as openly racist and its post-disfranchisement regime as rigidly committed to white supremacy as any in Dixie.[22]

As part of its efforts to buttress white supremacy, the Tillman movement supported the elimination of Home Rule and the creation of Legislative Delegation System. In 1888, South Carolina Governor J. C. Sheppard, who had been a participant in the terrorist red shirt campaign against African Americans, addressed the legislature and declared that the Home Rule power granted counties in the Constitution of 1868 "is not suited to our condition, and is the cause of many of the evils of which the people complain."[23] The repeal of Home Rule in 1890 set the stage for Ben Tillman's abolishing locally elected governments and aggregating power in the county legislative delegation system.

The legislative delegation system was discriminatory and established to disfranchise and dilute the vote of African Americans at the county level. This system of local government can only be understood within the historical context of its establishment; it derived from Tillman. In the minds of many of South Carolina's whites, local control of county government was associated with Reconstruction and the election of African American leaders.[24] White supremacists, therefore, preferred to curtail local elections, to give the governor the power to appoint and dismiss local officials, thereby maintaining control of county government.[25]

Initially Tillman recommended a model of township government where each township elected representatives.[26] Realizing, however, that some areas of the state were not secure from African American voting, Tillman made crucial alterations in his original, more democratic, plan. Ultimately Tillman supported a system whereby each county would have a board of commissioners made up of a county supervisor elected at large and chairmen from each of the townships—not elected, but appointed by the Governor. The bill was passed in November of 1893.[27] South Carolina Democratic white legislators were still concerned about both the African American and the white Republican voting populations. Black citizens continued to vote during this time period. In fact, African American legislators were involved in some of the debates, and the last black state representative did not leave the General Assembly until 1902. Without a doubt, the African American vote was still considered a threat during the time period that the County Legislative Delegation System was established.[28]

Because of a specific fear of political activism in Charleston and similar areas where the African American vote might be appealed to by opposing groups of whites, Tillman vowed to disfranchise blacks altogether, and he almost reached that goal in his rewriting of the state constitution.[29] At the South Carolina Constitutional Convention of 1895, now U.S. Senator Tillman chaired the South Carolina Convention's Committee on the Rights of Suffrage. He wrote into the state constitution various articles of disfranchisement, such a poll tax, proof of payment of all other taxes, and a "petty crimes" provision that disfranchised all those convicted of certain crimes that whites believed African Americans frequently committed.[30] In addition, a prospective voter had to satisfy a literacy test and demonstrate an understanding of any constitutional provision

Burton Moultrie Report, page 8

read to him by the registrar. The discretion of the registrar was unlimited.  As late as 1940 a local executive observed to a journalist, "There are dam few negroes registered in any way.... If a coon wants to vote in the primary, we make him recite the Constitution backward, as well as forward, make him close his eyes and dot his t's and cross his i's. We have to comply with the law, you see."[31]  The disfranchising constitution of 1895 was very effective.  "The whites," Tillman announced, "have absolute control of the government, and we intend at any hazard to retain it."[32]

 The structure of primary elections is a clear example of the state's maneuvering to keep African Americans from voting.  In 1896, when the South Carolina legislature authorized statewide party primaries, the State Democratic Executive Committee prohibited all African Americans from voting in the primary, which was, in the one-party system after disfranchisement, the only election that mattered.[33]  The state poll tax requirement never applied to these primary elections, probably because party rules already excluded African Americans.[34]  When the U.S. Supreme Court overturned the white primary in 1944, Governor Olin D. Johnston called a special session of the legislature to repeal all laws relating to primary elections.[35]  "After these statutes are repealed," Johnston told the legislature, "we will have done everything in our power to guarantee white supremacy in our primaries."[36]  After South Carolina passed a constitutional amendment erasing all mention of primaries from the state constitution, the Democratic Party adopted rules excluding African Americans from its "private" primary elections.[37]

 When the NAACP challenged the "private" primary in federal court, Judge J. Waties Waring of Charleston ruled, on July 12, 1947, in their favor because the governor and legislature violated the Fourteenth and Fifteenth Amendments, acting "solely for the purpose of preventing the Negro from gaining a right to vote."[38]  After the Supreme Court refused to review the case in which the Circuit Court had upheld Judge Waring's ruling, the Democratic Party no longer excluded African Americans on their party rolls, but they did extend the literacy test required for general elections to the primary. Furthermore, they would allow qualified African Americans to vote only if they swore an oath:  "I believe in and will support the social and educational separation of the races." In 1948, in *Brown v. Baskin*, Waring overturned that allowance and issued a court order that voting "be opened to all parties irrespective of race, color, creed or condition."[39]

 In 1950, the General Assembly adopted new state regulations of primary elections.  Besides the literacy test, electoral devices restored to the primary election laws were statewide full-slate and majority vote requirements, all of which may dilute the votes of African American citizens.[40]  Although these features of the statute were reenacted without comment, they had the same purpose attributed to the statute as a whole in contemporary accounts.  "Conservative lawmakers admit that the bill is designed to control Negro voting in primaries."[41]

 South Carolina's politicians continued to control election laws and voter registration to maintain white supremacy.  Congressman and native Charlestonian James F. Byrnes, who eventually became a senator, Supreme Court justice, secretary of state,

Burton Moultrie Report, page 9

and governor of South Carolina, cautioned in 1920: "It is certain that if there was a fair registration they [African Americans] would have a slight majority in our state.  We cannot idly brush the facts aside.  Unfortunate though it may be, our consideration of every question must include the consideration of this race question."[42]  The effect of disfranchising legislation was profound:  only 1500 African Americans in South Carolina were registered to vote in 1940.[43]  Still, state legislators felt threatened.  The South Carolina House of Representatives passed a resolution in 1944 denouncing "indignantly and vehemently" any and all "amalgamation of the White and Negro races by a co-mingling of the races upon any basis of equality."  It further resolved an affirmation of "our belief in and our allegiance to established white supremacy as now prevailing in the South" and pledged "lives and our sacred honor to maintain it, whatever the cost, in War and Peace."[44]

Segregation was entrenched in South Carolina society.  Whites and African Americans were separate, but not equal.  Looking at education as an example, an analysis of educational expenditures in South Carolina from 1896 to 1960 demonstrates the inequality of education.  In 1952, per-pupil expenditures for black children were only 60 percent of the amount spent to educate white children.[45]

Teachers in the state also faced discrimination.  When African American teachers, who were paid less than white teachers, took the issue to court, Judge Waring found in favor of African American plaintiffs for equalization of teacher pay.  South Carolina formed a committee to study this issue; working with this committee was attorney David Robinson, who later played a key role in the state's "Segregation Committee."  Once the committee verified that black teachers scored lower on the National Teacher Exam, South Carolina in 1945 adopted use of this exam.[46]

*Brown v. Board of Education* of 1954 began in South Carolina as *Briggs v. Elliot*.  In 1950, when experienced politician James F. Byrnes was a candidate for governor, he anticipated that South Carolina might be ordered to desegregate its school system.  He recommended legal ways to counter the rulings.  He counseled, for instance, that local school districts gerrymander.  "The Washington administration and the United States Supreme Court cannot regulate the area or boundaries of our school districts.  We must investigate to see if it is practical to establish school districts to include the sections where most of the Negro population resides and other school districts to include sections where most of the white people reside."  He wanted local school boards to use waivers for children who needed to go to school outside their district, "a Negro child residing in the school district for whites," or "a white student residing in a preponderantly Negro district."  Byrnes thought that "this Gerrymandering of districts" could be used effectively in cities, but less so in rural areas.[47]

After Byrnes won his election, he continued his tactics of a "calculated moderation."  Experienced in national politics and in the judiciary, Byrnes brought a sophisticated and subtle approach to resisting racial integration.  In order to forestall integration, for example, Byrnes used a significant portion of a new sales tax for the education of African American children, and white leaders throughout the state began

Burton Moultrie Report, page 10

equalizing the facilities of white and black schools in a desperate attempt to salvage segregation.  Byrnes urged the creation of the so-called segregation committee and staffed it with some of the state's leading legal minds.  Chaired by state representative L. Marion Gressette, this special school committee coordinated efforts to maintain the racial status quo.[48]  Byrnes even recommended that South Carolina eliminate from its constitution the provision for public schools, which it did.  In 1952 in the general election, the constitutional amendment eliminating public schools was passed, and in 1954 the General Assembly ratified the amendment.  (Despite eliminating public schools from the state constitution, South Carolina chose to continue its public school system.)[49] South Carolina also repealed its compulsory school attendance laws and refused to provide state funds for any school that capitulated and accepted students under court order.[50]  The South Carolina legislature passed fifteen bills between January and April 1956, including a resolution that gave itself the right to nullify or overrule federal laws.[51] South Carolina's Massive Resistance to integration, a technique of bending a little to prevent larger changes, gave the state another decade of segregation.[52]  By 1963, only Mississippi and South Carolina had not even token integrated schools.

In November 1955, the state went after the NAACP.  Governor George Bell Timmerman asked the South Carolina Attorney General to file suit against the group for not registering as an organization in the state.  The NAACP State president would not provide names of the membership because of fear of retaliation on the members.  South Carolina then barred the NAACP from the state.[53]

On the eve of the Voting Rights Act, South Carolina was thoroughly in the grip of white supremacy.  African American voter registration in South Carolina was weakest in counties with a high percentage of blacks in their population.[54]  Whites kept black registration down and sometimes did not count all the votes cast by African Americans. Charged with telling a black voter during the 1964 presidential election "to place his ballot in the wrong box," precinct manager Wade H. Ratcliffe explained, "I knew this was wrong but we have always done these things."[55]  Only 37 percent of the 1964 black voting-age population were registered, and South Carolina elected no black officials in the twentieth century before the Voting Rights Act.[56]

The Voting Rights Act of 1965 and the Federal Court ruling on one-person, one-vote had immense impact on South Carolina.[57]  When the Federal Court ordered the South Carolina General Assembly to reapportion the state Senate on the basis of one-person, one-vote, legislators realized that some counties would no longer have a resident senator.  The South Carolina Senate then adopted multimember districts, which had the effect of excluding African Americans.  Finally, in the 1970s, after more litigation, the General Assembly passed the Local Government Act beginning a measure of home rule to the counties.[58]

The Voting Rights Act of 1965 was supposed to eliminate voter discrimination, and after South Carolina lost its challenge to the constitutionality of the act, South Carolina's literacy test and "understanding" clause were abolished.[59]  By 1967 African American voter registration had climbed to 51 percent of the age-eligible population.[60]

Burton Moultrie Report, page 11

By and large, South Carolina's white officials conceded that the Voting Rights Act made it impossible to prevent African-American citizens from registering and casting their ballots.[61]  Because of the success of the Voting Rights Act, advocates of white supremacy had to turn to election methods that could dilute the black vote, although some barriers to registration and voting continued.  Location and hours of operation were problematical because local voting registration boards had the discretion to appoint deputies and set office hours.  Often offices were not open when African American laborers might be available to register.[62]

During the 1960s, violence often accompanied demonstrations for Civil Rights in South Carolina.  In the Orangeburg Massacre in 1968, three students were killed and twenty-seven were shot, among them at least two Charlestonians, Albert Dawson and Jordan Simmons.  SNCC leader Cleveland Sellers was put on trial, convicted, and served time in prison, and did not receive a pardon until a quarter century later.  When the patrolmen who had done the shooting were acquitted, the Reverend I. DeQuincey Newman protested that South Carolina "is just about in the same boat as Alabama and Mississippi."  Newman continued, "The perpetrators of the tragedy and those who have covered up for them have rendered a great disservice to sometimes heroic efforts that have been made in the area of race relations and interracial cooperation."[63]

**Discrimination in Charleston**

As shown above, white South Carolina leaders have had a long history of discrimination against African Americans.  The same was true for Charleston County, which did not escape the turmoil of race relations endemic in a system of white supremacy.  Charleston experienced a race riot in 1866 when former slaves rioted, and again in 1919 when white sailors and locals went on a rampage against African Americans.[64]  According to historian Walter Edgar, during the modern Civil Rights Movement, "Charleston witnessed rioting before city officials indicated a willingness to move forward."[65]  In Charleston, during the turbulent challenges to white supremacy in the 1940s, 1950s and 1960s, frequent mentions were made to the "horrors" of Reconstruction.  The Reconstruction era, with its elected local African American officials, was never far from the minds of white Charlestonians as the events of the Civil Rights Movement, often called the Second Reconstruction, unfolded.  Charleston champion of aristocratic conservatism, and long-time editor of the Charleston News and Courier, William Watts Ball, argued in 1913 that for South Carolina "socially and politically the presence of this race [African Americans] in majority is perhaps the ruling factor in our progress, or want of it."[66]

Charlestonians got their news from the Charleston News and Courier, called by Judge J. Waties Waring, the uncle of editor Thomas Waring, the "bible of the supremacists."  After the court ruling banning the white primary, the editor of the Charleston News and Courier argued, "If we are to retain the primary system in South Carolina with herded negroes voting in them, with white and colored leaders herding them (many if not most of the negro leaders will be preachers from the lower class) we shall have corrupt government, government that is rotten, government that offends the

nostrils of decent people."[67]  In his analysis of the newspaper, historian Stephen O'Neill wrote, "Hardly a day went by for six years after *Brown* that [Thomas] Waring did not attack the evils of race mixing, champion states' rights, or in some other way defend the South's case for segregation."[68]  In 1962, after noting that the <u>News and Courier</u> was not covering the black boycott of Charleston businesses (they were asking that the businesses hire some African American sales persons), <u>Time Magazine</u> quoted the Charlotte <u>Observer</u>, "The News and Courier's boycott of the boycott is only expected behavior for one of the South's noisiest advocates of segregation.  The paper's editorial policy is one long high fidelity rebel yell to hold that color line."[69]

Black Charlestonians endured segregation just as the rest of South Carolina did. Charleston was a segregated city with segregated schools, restaurants, and theaters. Recreational facilities, such as golf courses and parks, were segregated; the best, such as Edisto Park, were available only to whites.  Signs directed African Americans to separate restrooms and drinking fountains.  "Charleston had a color line that divided its people and institutions."[70]  Esau Jenkins relates two incidents, one in 1938 and the other in the 1940s, of white men shooting African American men.  Jenkins attributed these two incidents, where the white men were not held accountable under the law, as motivational in his efforts in 1949 to organize a "progressive movement."  Jenkins also remembered that before African Americans organized and registered to vote, they did not have a chance in court.[71]

## Socioeconomic disparities

Disparities between white and African American socio-economic positions were marked.  In 1950, seven thousand African American children were crowded into six schools, necessitating double shifts at four of the schools.  In the Charleston area, more than 50,000 African Americans were allowed only 148 hospital beds. According to the 1950 census, the median income for African American families in Charleston County was one-third that of whites ($ 672---$ 2,007).  The percentage of unemployed non-whites was three times higher than that of whites (male 13.9 percent---4.4 percent, female 10.8 percent---2.7 percent).[72]  Whereas only 3 percent of the white households had no running water, 27.5 percent of the non-white households had none.  Inside toilets were not available in 73 percent of the non-white households, but such households were just 12.8 percent among whites.[73]  Also, while 81 percent of the white public schools had more than four teachers, only 27 percent  of the African American schools did in 1951.[74]

According to the 1960 Census, the total median income for families (includes whites and non-whites) was $4,518; while the non-white median family income was only $2,149.  White males fourteen years and older had an unemployment rate of 3.3 percent (3.8 for white females) compared to 8.2 percent (7.5 for non-white females) for non-white males.  Only 0.8 percent of whites twenty-five years of age or older had no schooling compared to 8.6 percent of non-whites.[75]  In 1960-61, the number of white students per elementary school was 526; for African American students, that figure was 633.  Similarly, an average of 680 white students were studying in a high school, while 810 African American students were. [76]  In 1961-62, two African American high schools

enrolled 1,783 students, while three different high schools enrolled 1,528 white students. Student-teacher ratios were 29:1 for blacks and 25:1 for whites.[77]

According to the 1970 census, 44.6 percent of the county's African American families lived below the poverty level, and another 10 percent subsisted just above the poverty level.[78]  In 1980, the median income for Charleston County African American families was half of that for white families ($10,907---$ 20,400; the comparative income in the City of Charleston was $10,726 for African Americans and $23,145 for whites).  In Charleston County, 32.2 percent of the African American families were still below the poverty level, while only 6.1 percent of the white families were.  As for unemployment, the figure for African Americans was 2.6 percent higher than that for whites (10.9 percent compared to 3.7 percent).  Two studies in the 1980s pointed especially to geographically isolated rural areas with high proportions of African American population as impoverished and lacking adequate services such as sanitation or transportation.[79]

The 1990 census shows that socioeconomic disparities were still wide between the African American and whites of Charleston County.  Just like a decade ago, the median income for African American families was half of that for white families ($18,603---$38,052).  One-third of the African American families still lived below the poverty level. The percentage of unemployed African Americans was three times higher than that of whites.  Whereas more than 80 percent of whites (25 years and older) graduated from high school, only 57 percent of African Americans did.  Moreover, 31.6 percent of African Americans had no vehicles at home and 13.4 percent had no telephone installed, while such households were less than 5 percent among whites.[80]

Segregated schools epitomized the problem.  In 1960, the last year South Carolina reported separate official figures for black and white education, half a dozen years after the *Brown* decision, after deliberate efforts of Gov. James Byrnes to keep schools separate and make them less unequal, and after the careful application of the Gressette segregation committee's guidelines for "equalization," nevertheless, in Charleston County schools spent $201.22 on each white student and $150.20 on each African American student.  In 1961-62, according to one historian, Charleston schools spent $267 for each white, but only $169 for each African American student.[81]

A recent Associated Press story (8 August 2001) published in several South Carolina newspapers documented the lingering effects of discrimination.  "Race has been an undercurrent throughout South Carolina history."  The report discussed how slavery, then segregation divided African Americans and whites in South Carolina.  "Today, a divide remains."  The reporter showed that whites who have the same education as African Americans make more money.  African Americans score lower on standardized educational tests, African Americans are disproportionately more in jails and juvenile delinquent centers in South Carolina, whites are healthier than African Americans, whose health problems include higher infant mortality rates.  The divide is also reflected in the voting patterns of whites and African Americans.  "In 400 elections between 1982 and last year, no black candidates were elected to the General Assembly from white majority districts." [82]

South Carolinians were aware of the relationship of socio-economic status and voting at least as early as 1966 when the University of South Carolina Governmental Review published a report that explained, "people of upper socio-economic status (high income and education, and holding prestigious occupations) tend to vote more frequently, are more interested in political affairs, and are better informed. The education element has been identified as uniquely important in providing adequate motivation for political participation." That section of the report concluded that "perhaps the socio-educational circumstances in which most Negroes find themselves are as great deterrents to active, effective political participation as were the legal obstacles and informal intimidations to which they have been subjected for decades."[83]  Scholars believe, as well, that socio-economic conditions flow in large part from state sponsored discrimination.[84]

**Civil Rights Chronology in Charleston County prior to Act 94: The local context**

In February 1944, Judge Waring ruled in favor of Charleston African American school teachers' lawsuit that the state could not pay black teachers less than white teachers because of race.[85]

In 1947, Charleston County native John Wrighten (who had attempted to integrate the College of Charleston as an undergraduate) sued to attend the University of South Carolina law school. He prevailed in Judge Waring's courtroom, but, in order to avoid integrating the University of South Carolina, the state established a second law school at South Carolina State.[86]  Until this time all law school graduates were automatically admitted to the state bar in South Carolina. Henceforth, law school graduates would have to have passed a bar exam.[87]

In 1947, Charleston's Judge J. Waties Waring ruled against white primaries, and in 1948 he ruled against the ruse of a segregation oath.[88]  Charleston County African Americans were then able to register and vote in Democratic primaries. In 1948, former Charlestonian John McCray's Progressive Democratic Party was especially successful in a voter registration drive. On the eve of the first Democratic primary where African Americans could participate, 4,360 African American voters were added in Charleston County, leading historian Stephen O'Neill to remark that this represented "potentially a revolutionary" change for municipal politics.[89]

After this ruling on the white primary, Charleston Congressman Mendel Rivers initiated impeachment investigations against Waring, who was vilified by whites throughout the state and especially in Charleston. In 1950, the Southern Association for the Advancement of White People collected 20,000 signatures on an impeachment petition, nearly 10,000 of those were from Charleston County.[90]

In 1948 when the Charleston County Council was given some home rule power, a resident of Charleston County sued because he did not want local power. According to University of South Carolina legal scholar James Lowell Underwood, this case against the establishment of the County Council in 1948 argued that "dissatisfaction with

political conditions prevalent during Reconstruction spawned a distaste for local government, the level at which abuse of power was considered greatest, and resulted in the omission of detailed local government provisions from the Constitution of 1895."[91]

In 1948, A. J. Clement, NAACP president active in the Progressive Democratic Party, ran for County Council.[92]

In 1950, with increased voter presence from African Americans, the City of Charleston became more responsive to the black electorate, and Mayor William Morrison hired the first African American policemen.[93]

To placate demands for integration of the College of Charleston, the city offered scholarships for African American students to attend South Carolina State College in Orangeburg.[94]

In 1950, Progressive Democratic Party candidate A. J. Clement challenged Democratic incumbent Mendel Rivers for Congress.[95]

In May 1950 a hundred members of the KKK drove through Charleston Heights. At this time the city of Charleston itself reported no Klan activity; however, Klan rallies were held in Ladson, Mt. Pleasant, Goose Creek, Red Top, and James Island.[96]

In late May 1951, in a Charleston courtroom, Charleston attorney Robert Figg defended Clarendon County against African American plaintiffs. Charleston's Judge Waties Waring, in the first known opinion by a federal judge that segregation was unconstitutional, dissented in favor of the African American plaintiffs in *Briggs v. Elliott.*

By 1951 African American voting strength was growing. State Senator Oliver T. Wallace, something of a liberal for Charleston, more openly appealed to African American voters. Voting machines were set up in churches and in NAACP president A. J. Clement's office to demonstrate balloting.[97]

At a January 21, 1952 meeting with the City of Charleston school board, three African American groups petitioned for a fair distribution of the "equalization fund," and protested the lack of an African American school board member, "there has never been a greater need for a qualified member of the board of District No. 20." The petitioners cited the *Briggs* Clarendon County ruling as legal precedent for claims.[98]

In 1952, African American leaders Herbert Fielding, J. Arthur Brown, and the Reverend Frank Veal ran unsuccessfully for the state legislature from Charleston. The chairperson of the Board of Registration reported that in the weeks before the election, 6,000 new voters had registered, half of them African Americans.[99]

In 1953, the newspaper reported on the 64th anniversary of Lincolnville in the northwestern part of Charleston county near Summerville. This town of about 450 people was "one of the few communities in the United States governed exclusively by

Negroes," reminding Charlestonians of African American elected officials and black political participation during Reconstruction.[100]

In 1954, African Americans in Charleston openly advocated black representation on the city council and other local governing bodies.  In February 1954 African American leader Robert Morrison urged representation of qualified African Americans on school boards and outlined for the News and Courier the qualifications of African Americans in Charleston.  He noted the problem:  "Although Negroes have over seventy percent of the votes in ward #9," he complained, "it is impossible to elect a Negro to the City Council."[101]

The 1954 *Brown v. Board of Education* decision held that the segregation of schools was unconstitutional.  The decision overwhelmed Charleston, where the "city's business and civic leaders, its politicians, and especially its daily paper, the News and Courier, forcefully and prominently elevated the issue of race above all others in their attempt to defend the peninsular city," according to O'Neill.  He concluded that for the next two decades, "every community social and political issue was overshadowed or at least strongly influenced by racial questions."[102]  The News and Courier reported that *Brown* was the "most radical upheaval since Reconstruction."[103]

Reaction in Charleston following the *Brown* decision was to join with the state, and other Southern states, in a program of "massive resistance" against school desegregation.  Governor James F. Byrnes' "Segregation Committee," included two Charlestonians, Robert Figg and Creighton Frampton, who served on the committee from its founding until its official termination in 1966, the year before the Charleston County Council proposed to the Legislative Delegation that it change the method of election to an at-large system.[104]

In the mid-1950s, after the *Brown* decision, white Citizens' Councils were very active in Charleston.  The county boasted six organizations, and Micah Jenkins, the local president, served as the state president as well.  One historian believes that "the anti-segregation sentiments they [citizens' councils] expressed were shared by most white Charlestonians."[105]  (See more on Micah Jenkins below under "Policymakers.")

Charleston was especially successful in drawing just the sort of district lines that James F. Byrnes urged in his 1950 campaign for governor.  Byrnes had encouraged local boards to gerrymander districts so that some districts included areas with a large African American majority and other districts included sections where most of the white population resided.  Charleston's districts, as shown by Dr. William Gordon , maximized segregation in Charleston County schools.  Gordon claimed that "no other configuration of district consolidation would have more effectively separated students by race into separate school districts than those chosen by the county board."[106]

In the 1950s Charleston high school students Harvey Gantt, James Blake, and Minerva Brown led an active NAACP Youth Council which in turn invigorated the African American community.  In 1955, Realtor  J. Arthur Brown became president of

the Charleston NAACP and directed massive voter registration drives.  Membership in the NAACP grew from 300 to 1,500; by 1960 there were more than 2,000 members.[107]

In July, 1955 the NAACP and black parents petitioned to integrate schools in Charleston, North Charleston, and Mt. Pleasant.  The newspaper published the names of the petitioners, "as a means of intimidation," so that groups like the white Citizens' Council members would know who the troublemakers were.[108]

In 1955, after three years of unsuccessful petitions, Charleston African Americans filed suit for the use of Edisto Beach State Park.  In answer to their petition the year earlier, the superintendent of Edisto had responded that the park "was established in 1935 for the exclusive use of white persons, and based on custom and precedence, we will have to deny your request."  When sued, the Charleston Legislative Delegation wondered whether "to scrap the entire park system, or deal with the race issue in some other manner."  They decided to close the state park.  The park was closed until 1966.[109]

In 1956, in the presidential election, Charleston County ranked among the biggest supporters for the independent candidate, Virginia's Harry Byrd.  The Citizens' Councils urged support of the Byrd ticket, and the Citizens' Council President, Micah Jenkins, then a Democrat, was instrumental in getting South Carolina Democrats to pledge their votes to Byrd.  Charleston County generally continued to vote for extremely conservative candidates.[110]

In 1956, when South Carolina State students demanded more equitable funds for African American higher education, the Charleston County School Board voted to revoke all financial aid to Charleston students involved.[111]

In 1956, Charleston Senator T. Allen Legare co-sponsored the law prohibiting South Carolina municipalities or school boards from hiring members of the NAACP. The Charleston school district then fired teachers Septima Clark, Jessica Pearson Brown, and Henry P. Hutchinson for their membership in the NAACP.[112]

In 1957 the first citizenship schools were established on Johns Island by Bernice Robinson.  Citizenship schools trained many of the most important civil rights activists. Citizenship schools taught civics and civil rights to adults in the African American community to prepare them to register to vote.  Soon Robinson was supervising five citizenship schools, in Charleston Heights, Accabee, on Cannon Street in Charleston, and on Wadmalaw Island where Esau Jenkins's daughter started a citizenship school.[113]

In a 1957 special election for the seat of a Charleston representative who had died, African American activist and attorney John Wrighten came in second among the four candidates.[114]

In 1958, African Americans sued to have the municipal golf course desegregated. After various stalling tactics, the judge ordered desegregation in November 1960.  The order was finally implemented in May 1961.[115]

These challenges to segregation in Charleston in the 1950s disturbed the majority of whites, but the 1960s were much more turbulent.  According to historian William D. Smyth, "The 1960s, beginning with the Kress demonstration and ending with the 1969 hospital workers strike, were marked by even more challenges to Charleston's segregation."[116]  Returning to Charleston, James Blake, an NAACP Youth leader from the 1950s, observed that except for the few changes such as the integrated golf course, the bus terminal, and the county library, Charleston was "one of the most backward cities on the map."  White Charlestonians and decision makers were shaken by the Civil Rights Movement and especially by events that unfolded around them in Charleston County. After careful study of the Civil Rights Movement in Charleston, historian Stephen O'Neill has concluded "as a city also preoccupied with race throughout its history, Charleston saw its very self-identity profoundly threatened by the civil rights movement."[117]

On April 1, 1960, students sat down at Kress Department Store.  The modern Civil Rights movement in Charleston wrought lunch counter sit-ins, regular demonstrations, and protests by African Americans.  In the spring of 1960 there were at least eight separate protests involving more than 75 students, who were charged with trespassing.[118]

On October 11, 1960, the African American PTA, led by Herbert Fielding and others, kept their children out of school in an official boycott because of overcrowding.[119] Three days later, black parents sued Charleston District 20 to allow African American children to attend white schools.[120]

In 1962 the NAACP boycotted businesses that refused to hire African Americans as sales clerks.[121]  In response, the National Association for the Preservation of White People counter-demonstrated, picketing the stores along King Street which had agreed to desegregate.  Their handbills read, "If you are in favor of preserving your way of life won't you please boycott any store who favors integration. Thank you. The Charleston Chapter of the NAPWP."   On October 1 the NAPWP drew a crowd of 600 to hear Red Bethea of Dillon and Lester Maddox of Georgia.[122]          In retrospect, Mayor J. Palmer Gaillard observed, "Our biggest problems were not with the blacks … but … with whites."  Whites boycotted and sent hate mail to those merchants who desegregated or removed the offensive "Colored Only" signs.[123]

In May 1962, Arthur Brown sued to desegregate Charleston schools.  At this same time, Civil Rights veteran and Charleston's Burke High School graduate, Harvey Gantt, was suing to desegregate Clemson University.  January 1, 1963, Gantt integrated Clemson University.[124]

On June 5, 1963, the NAACP announced that Charleston, last large South Carolina city still to have segregated lunch counters, was targeted for demonstrations. The state and Charleston NAACP directed a campaign to "eliminate all state imposed and state upheld racial segregation and discrimination."  Among nine demands was "the

Burton Moultrie Report, page 19

banning of racial segregation in the schools." The first arrests began June 13 and included DeQuincey Newman of the state NAACP. By July 4, over 500 African Americans were arrested in Charleston, and 229 were already tried and convicted. Fifty-five African Americans were arrested trying to integrate Hampton Park and Colonial Lake. When protesters demonstrated in front of the News and Courier to protest its reactionary editorial policy, violence broke out between angry whites and angry protesters, and rioting ensued. The National Guard and the South Carolina Law Enforcement Division occupied Charleston. On September 11, a bomb was tossed at Canaan Baptist Church and a Molotov cocktail at an African American social club. The Mayor of Charleston held firm on segregation of playgrounds and parks, but he agreed to hire more African Americans as city workers.[125]

During the summer of 1963 Charleston police arrested 600 African Americans; bail bonds reported to be $1.4 million.[126]

On August 22, 1963, Judge Robert Martin found the Charleston public schools were completely segregated and ordered the admittance of the African American children who were plaintiffs to the previously all white schools. When eleven of the children entered the white schools, District 20 in the city of Charleston was the first school district in the state to desegregate. In this desegregation case for Charleston schools, Thomas A. Carrere, school superintendent, "expressed his own belief that genetic differences accounted for Negroes' poor scores on achievement tests."[127]

After Judge Martin's order to desegregate, the school board initiated three responses. It reaffirmed that segregation was in the best interests of all students and instructed its attorney to try to reverse the order. In addition, it instituted a "freedom of choice plan," which required African American parents to get the school board's approval to send their children to a desegregated school.[128] It also decided to participate in the State's tuition grants program to assist parents avoid integration by enrolling their children in private schools.[129]

Many whites chose private schools instead of Charleston city public schools. Charleston's Reverend Eugene Kelly of St. John's Catholic Church criticized the private school movement in Charleston, arguing that it would "perpetuate an evil." He wrote that "the fundamental point is that racial discrimination is contrary to the central teaching of Christ and thus evil, and no amount of legal maneuvering or camouflaging can change that point."[130]

In the 1964-65 school year, the Charleston School District was told it had to totally desegregate, leading to more white flight and more students attending segregation academies.[131] In 1966, only 185 African American students attended desegregated schools in Charleston.[132]

In 1964, Charleston was among the strongest bastions of support for Republican presidential nominee Barry Goldwater after Lyndon Johnson signed the Civil Rights Act of 1964.[133] This election illustrated again that African Americans were voting, and

voting differently than most white Charlestonians.  According to Esau Jenkins, on Wadmalaw Island nearly all whites voted for Goldwater.  Jenkins contended that it was the African Americans on places like Wadmalaw and Johns Islands that voted for Johnson and the Democrats in 1964.  In 1966 the University of South Carolina Governmental Review confirmed Esau Jenkins's observations that in South Carolina "all of the predominantly Negro precincts, except one … gave majorities to President Johnson in 1964."[134]

This phenomenon of increasing black voting was noticed.  The white "Charleston Citizens' Council" put out a brochure in 1965, "Why Must Greater Charleston Organize?" and their first answer as to why the Citizens' Councils should organize was "(1) that the integrationists and bloc voters are themselves organized to a dangerous pitch."  They listed as their goals, "local resistance to un-Constitutional integration," a "protest against the race-mixing mania of the times," reversal of the "'Black Monday' decision of 1954 and repeal of the misnamed 'Civil Rights' Act of 1964," opposition to "forced integration in the Greater Charleston area," and the "maintenance of racial integrity."[135]  In 1967, the News and Courier characterized the Citizens' Council as "instituted to fight for states' rights and racial integrity."[136]

June 1965, the Charleston County Legislative Delegation, in "a break with tradition" according to the News and Courier, "in effect appointed a Negro to the board of trustees of Charleston School District 20."  The paper reported that the seventy-one year old Methodist minister, who was not a member of the NAACP, was the first African American "who has won a public school trustee post for Charleston" in the twentieth century.[137]

In 1965, Herbert Fielding and others formed the Democratic Party's Political Action Committee (PAC).  Historian Stephen O'Neill described the PAC as the "black wing of the Broad Street machine."[138]

In 1967, black leaders Fred Moore, Lilliemae Marsh Doster, and Reginald Barrett formed a rival to PAC.  This "Committee of 100" considered themselves more progressive than the PAC and less dependent upon white politicians' wishes.[139]

In April 1967, Judge Robert Martin ruled that the Charleston School Board had failed to comply with his directives, and he struck down the freedom of choice plans that required parents to make a request from the school board if they wanted to transfer their children.  For the 1967-68 school year, every parent could select the school they wanted their child to attend.[140]

On July 30, 1967, Dr. Martin Luther King was the speaker at a voter registration drive.  On the same day, about 15 miles away, near the predominantly African American community of Ravenel, the Ku Klux Klan held a rally.[141]

In 1967, Charleston Senator Charles Gibson introduced a bill to consolidate the Charleston County School districts.  Debate over this bill dominated the South Carolina

Burton Moultrie Report, page 21

Legislature, set off a record filibuster, and divided both the Charleston Legislative Delegation and the people in the County.  The discussion of the act included issues of race, busing of children, and transfer of teachers to different districts.  The bill was approved 8 June 1967 as Act No. 340.  (See the relevant discussion under "Policymakers.")

In 1968 some three thousand protesters participated in the Southern Christian Leadership Conference's Poor People's March in Charleston.[142]

On March 17, 1969, racial tensions festering in Charleston erupted in the 1969 Hospital Strike, described by a major labor historian as "one of the South's most disruptive and bitter labor confrontations since the 1930s."[143]

The effect of this history has been one of political alienation for much of the African American community.  According to historian Walter J. Fraser, when Joseph P. Riley ran for mayor of Charleston in 1975, he "hoped to overcome" the alienation from government of African Americans and especially to attract those young African Americans who "see most vividly the cruel contrast of our dual society." In his first mayoral bid Riley told the newspaper, "In the city of Charleston … black people have never had a piece of the action."[144]

In the midst of the turbulence of the Civil Rights Movement in Charleston, local decision makers, like politicians everywhere, had to have noticed a new phenomenon: **increases in African American voter registration**.

In 1956 there had been 200 African Americans registered on Johns Island; by 1960 there were 700, and "voter turn-out was often one hundred percent."  Also, in 1956, in Ward 11 of the City so many African Americans had registered to vote that a few were slated and elected to Democratic Party offices in that ward.[145]

Many African Americans from Charleston County had attended Highlander Folk School, and in 1959 Highlander students came to Charleston to work on a voter drive before the June 1959 election.  They assisted some 1,422 African Americans in registering to vote.[146]  Charleston Clerk of Court, A. J. Tamsberg, wrote to Charleston News and Courier editor, Thomas R. Waring, about the increasing strength of the African American vote, "Frankly I doubt the advisability of publishing this information in full, thereby making it available to negro leaders.  Some of it is quite startling."[147]

Whereas Esau Jenkins had estimated that 5,000 African Americans were registered to vote in 1954 in Charleston County, he believed in 1960 there were more than 10,000.  Jenkins and the NAACP estimated nearly 14,000 in 1964.  Jenkins announced in the News and Courier March 1965 that "We are hoping to double our efforts this time."[148]

During the 1967 mayoral primary, the News and Courier stated, "Mayor J. Palmer Gaillard's slate includes a Negro candidate from Ward 9, a predominantly Negro

residential area."[149]  The next day, the paper reported that in "Wards 9, 10, 11: 5000 of 7000 voters are Negroes.  Ward 12: Largest in city: 5299 registered voters, about half Negro."[150]

This interest and notice of increasing voter registration of African Americans accompanied another vivid concern:  **Bloc Voting**.  White political leaders were concerned about African Americans voting as a bloc, but not of whites doing the same.  When politicians used the term *bloc vote*, they were not referring to the white bloc vote.

In the midst of all this turmoil about civil rights, the white people of Charleston were very concerned about the potential voting power of the African American community, what the newspaper referred to the "bloc vote."  As early as 1950, the Charleston News and Courier cautioned white South Carolinians about the increasing strength of the African American bloc vote.  One editorial asked if officeholders in South Carolina would "henceforth be elected in primaries in which negroes as a bloc shall cast the deciding vote?…Shall government in South Carolina in the future be the product of election in which the colored voters will have and will exercise the balance of power?"  The editorial was commenting on a dispatch from William D. Workman, Jr., correspondent of the News and Courier, published a few days earlier on the 1950 Democratic primary, where Olin Johnston beat Strom Thurmond for the Senatorial nomination.  Workman had carefully analyzed voting in Columbia's Ward 9, "the population of which is overwhelmingly colored," and the home of former Charleston African American newspaper editor, John McCray.  Workman's in-depth study of Columbia's Ward 9 had to resonate with Charlestonians aware of the predominantly African American wards in Charleston.  As white Charlestonians were warned by the News and Courier, "it is as well to face as certain that the herded or 'bloc' vote of negroes will be much larger in future primaries."[151]

When white leaders in Charleston recognized the need to improve the African American schools in order to maintain segregation (following the recommendations of the Gressette Segregation Committee), NAACP opposition helped defeat the school bond referendum in May 1957.  In this, the first demonstration of African American political power in Charleston since Reconstruction, President Arthur Brown claimed a "moral victory for the NAACP."  The newspaper reported that the bond issue failed largely because of "Negro opposition" as a bloc vote.[152]

In 1959, the Charleston News and Courier, in an article entitled "Bloc Voting," warned that those who instructed African Americans voters to be "bloc conscious" disserviced the black community.  The paper was referring to the NAACP's distributing sample ballots and identifying the lesser of evils among Democratic candidates in the primary.[153]

In June 1965 Albert Watson, Republican candidate for Congress, reported that he was not looking for Negro support.  His political advertisements contended that the Democratic Party was "courting minority bloc votes."[154]

In 1965, when Herbert Fielding and others formed the Democratic Party's Political Action Committee (PAC), they hoped to pull the African American community together in political unity.  According to historian O'Neill, PAC believed, "By speaking with one voice and delivering the 'bloc vote' of African Americans… they could wield more influence with the city's white Democratic leadership."[155]

In a 1966 report, The University South Carolina Governmental Review analyzed African American voting in the Democratic primary of 1964.  One section of the report was entitled "Bloc Vote?"  The published report explained that in the 1964 presidential election some of the predominantly African American precincts voted for President Lyndon Johnson "by overwhelming percentages of 80, 90, and even 100 percent.  Evidence from other sources indicated that as many as 90 to 95 percent of the Negroes in South Carolina … voted for President Johnson."[156]

In 1967, one editorial in the Evening Post feared that school consolidation "is only the first payment for the bloc vote.  They have others up their sleeves."[157]  In the legislative debate on the Charleston County School Consolidation Bill, Republican Senator Eugene Griffith of Newberry County commented specifically on the Democrats' "bloc Negro vote."[158]  And at that time the News and Courier reported, "The Negro vote, over 96 percent Democrat, obviously played a major role in the Democrat victories."[159]

In May of 1968, when an African American challenged Congressman Mendel Rivers in the primary, the newspaper wrote, "Republican sympathizers who refrain from voting in the Democratic primary might leave the decision to bloc voters."[160]  A little over a week later, the paper remarked, "The time has not yet come—at least, not in South Carolina—when a black man's candidate has built in advantage."[161]  Commenting that Herbert Fielding, the only African American candidate for the House, came in last of the fourteen Democratic candidates in the primary, the paper reported that a Democratic Party official "pointed out that while Fielding did well in the predominately Negro wards, he wasn't the top vote-getter in some of the larger Negro districts."  The article also noted that no Republicans voted in "the 1st Precinct for the city of Charleston's predominantly Negro Ward 9."[162]

After the general election of 1968, the newspaper attributed the Democratic victory for state and local candidates in Charleston County to the bloc vote of African Americans.[163]  Four days later the paper again characterized the African American community as bloc voting for Democrats and "pulling the master lever."[164]  Following the 1968 elections, Republican Party County Chair James Edwards reflected, "We were caught in a crossfire created by the bloc vote composed of the minorities of our county on one side and the embittered George Wallace supporters on the other."[165]  In January of 1969, the newspaper editorialized against the renewal of the Voting Rights Act and the unfairness of its efforts "to enlarge the number of Negro voters."[166]  In May of that year, County Republican Party chairman and former councilman Micah Jenkins "denounced the 'bloc' vote."  He said that any party "which owes its election to the support of such groups cannot best serve the interest of all people."  (Jenkins was on County Council and

Burton Moultrie Report, page 24

was chair of the committee that recommended the change from district to at-large when the issue was first proposed.)[167]

It was in this context of turbulent racial considerations that the Charleston County Council recommended, and the Legislative Delegation changed, the method of election from district to at-large. All County Council members and all legislators were white men at that time. With this general background of changing racial dynamics in Charleston, especially more African American voters and the fear of minority bloc votes, this report now looks at the sequence of events leading up to the change from district elections to at-large in 1969.

## II. Sequence of Events leading to Act 94, the Change of Method of Election from District to At-Large

Both the general background of race relations as well as these specific events in Charleston have impact on political decision-making. At the time when the Charleston County Council changed its method of election from a district system to at-large, there was a "heightened awareness of race."[168] A review of this sequence leaves no doubt that racial considerations were very much in the mind of Council Members and members of the Legislative Delegation when the change to at-large elections was proposed in 1967 and enacted in 1969. Indeed, in the very year that the Charleston Legislative Delegation, meeting in Columbia, was proposing the change of method of election of County Council to at-large, a state Election Law Study Committee was hearing expert testimony. Under the headline, "Professor Says Constitution Anti-Negro," the Columbia State reported on Clemson University Political Science Professor Jack E. Tuttle's explanation that "South Carolina's 1895 constitution was tailor made to prevent Negroes from voting. ….The primary purpose of the 1895 constitution is to disfranchise the Negro," Tuttle testified "Everything else is secondary."[169] Race was very much at the forefront of discussions in both Charleston and in the South Carolina General Assembly in 1967.

The change in Charleston County from a district method of election to an at-large system has a complex legislative history. Unlike counties controlled entirely by their Legislative Delegation, Charleston was granted a degree of home rule in 1948. Charleston was allowed an elected County Council which had some control over local affairs, including the power to set their budget.[170] By the early 1960s Charleston County Council had eight council members elected under a district system. The city of Charleston constituted one district; three residents were elected from that multimember district. The area east of the Cooper River comprised a single-member district. Two council members were elected by voters from the multimember district west of the Ashley River and outside the corporate limits of Charleston. Two council members were elected from two single-member districts in the North Charleston area. "One member shall be a resident of the area of the county included in St. Philip's and St. Michael's Public Service District as constituted on March 16, 1956, and shall be elected by the qualified electors residing in that area of the county. One member shall be a resident of the remainder of the county lying between the Ashley and the Cooper Rivers and shall be elected by the qualified electors residing in that area of the county."[171] In 1963, the state

legislature amended the 1962 Act to add an additional member from North Charleston to the County Council making a total of nine council members.  That third member of the North Charleston district as elected from the combined two existing North Charleston single-member districts and could live in either district.  However, the other two members of the North Charleston area continued to be elected from each single-member district.[172]  The first county councilman elected to that at-large seat within the North Charleston "district" was John E. Bourne, Jr.

     The change to at-large elections had its origins in the 1967 session of the General Assembly.  In 1966, while on County Council, Bourne led a Republican charge that captured three of the four Charleston County State Senate seats in the newly apportioned Senate.  Shortly after taking his seat in the 1967 legislature, Senator Bourne introduced **Senate Bill S131** to amend Section 14-1162, Code of Laws of South Carolina, 1962, as amended, "to provide that members representing a certain area north of the City of Charleston shall be elected at large."  In the Senate there were no objections; the bill was placed on the "Local and Uncontested Senate Calendar," and, after its third reading on 8 February 1967, it was sent to the House.[173]  According to the newspaper, "Bourne said the bill would put the North Charleston councilmen on the same basis as those from other areas of the county, all of whom run at large."  At that time council members ran at-large only within their multimember district; the council member from East of the Cooper River was elected from a single-member district, and that would not change under Bourne's proposal.[174]  On 9 February 1967, the Charleston <u>News and Courier</u> reported that "All three Charleston County Council members from the north of the city limits henceforth will run at large, if the House approves a bill passed yesterday by the Senate."  Although the newspaper speaks of "at-large," Bourne's bill intended for the three North Charleston council members to run at-large within the district of North Charleston, just as three council members ran for election in the multimember district of the City of Charleston.[175]

     In the meantime, another development, this one for a comprehensive change in the method of election, was unfolding in the County Council's Legislative Study Committee.  Before Bourne's Bill S131 was even sent to the House, the local newspaper indicated that the County Council's Legislative Study Committee (later referred to as the Government Study Committee) was considering changes for council, including having all County Council members elected at-large throughout the county.  The newspaper reported on February 6, 1967 that the County Council's Legislative Study Committee, "headed by Republican Councilman Micah Jenkins," would soon submit a report to the Legislative Delegation asking for more authority and that the Legislative Delegation looked favorably on the proposed request.[176]  On 8 February the newspaper reported that Jenkins's committee would recommend a "strong county manager form of government."  Under the council committee's proposed plan, Chair of the Committee Jenkins disclosed, "Six county councilmen and a chairman nominated by petition would be elected in a non-partisan election and would run at large for four year terms."  According to the article, "Partisan election within districts is currently the rule.  The chairman is elected by the Council."[177]

On 12 April 1967, in an article subtitled "Jenkins Proposal to be submitted today," the paper explained that the number of council members would remain at nine, as it was presently constituted:  "County Council shall be composed of nine members.  One councilman shall represent East Cooper; City of Charleston, three; North Charleston, three; and West Ashley, two.  The councilmen all would be at-large delegates." According to the newspaper, "The proposal [was] drawn up by Councilman Micah Jenkins and his Government Study Committee of County Council."[178]  On 13 April in an article discussing County Council's meeting with the General Assembly Delegation about their proposed request, the newspaper reported that "House members could not agree on amendments to a bill earlier introduced in the Senate by Sen. John E. Bourne Jr. Bourne's bill would have council members from North Charleston 'run at large.'  Rep. LeaMond asked that the bill be amended to have all council members run at large throughout the county—one of key items asked for by the council during its appeal to the delegation earlier in the morning."[179]  On 16 April 1967, The Charleston News and Courier editorialized, "the council is now asking that elections be 'at large.'  Members still would come from the city, the North Area, and the regions west of the Ashley and east of the Cooper, but they would be elected in a countywide vote."[180]

Responding to the County Council's request, R. E. Scarborough, Chair of the House Delegation, presented an amended bill to the full House, now requiring all council members to run at-large with residency requirements and increasing the pay of council members.[181]  The News and Courier gave the salary issue predominance, but the newspaper also warned that "Future candidates for Charleston County Council are likely to have to seek votes throughout the county, rather than in their home districts."  The newspaper reported that the "predominately Democratic Charleston County House Delegation tacked an amendment onto a bill by Charleston Republican Sen. John E. Bourne Jr. to make it mandatory that council candidates run at large.  In his Senate bill, Bourne had sought to have only the three councilmen from North Charleston run at large instead of by districts.  But the Democrats in the House didn't like Republican Bourne's proposal.  Their amendment to his bill makes it mandatory that council candidates run at large throughout the county."[182]  This amended bill established the at-large election with the residency requirements for one representative East of the Cooper River, three from the City of Charleston, three from the North Charleston area, and two from west of the Ashley River.  This was a dramatic alteration.  The House amendment of Bourne's bill changed from the idea that the two members who ran from single-member districts in North Charleston would run at-large within the North Charleston area (just like the third member of that multimember district) to the idea that all members of the County Council run at-large in the entire county.

The amended S131 bill was sent back to the Senate and considered on June 8, 1967.  Senator Bourne recommended that the Bill be referred to the Charleston Senators. Then on June 28, the Senate refused "to concur in the amendments proposed by the House."[183]  On July 5 Representative Scarborough "insisted upon the amendments," and a Committee of Conferences was established to work out differences and come up with a compromise.[184]  According to the News and Courier, "Legislation changing the election process for Charleston County Council members goes to a Senate-House conference

committee Thursday morning for an effort to reconcile differing provisions.  As passed by the Senate, all three North Charleston members henceforth would run at large.  At present, one is an 'at large' seat and the other two have a residence restriction.  The House totally rewrote the bill to make all nine council members run countywide but reside in one of the four appropriate districts."[185]

The Conference Report split, however, with a Majority Report recommending that the Senate concur with the House-amended Senate Bill 131.  "A six-man conference committee of Charleston Senate and House members over-rode the objections of two of its members yesterday with a 4-2 favorable vote on a bill that would have all county councilmen run at large and get twice as much money."  Bourne, however disagreed; "A former member of council from North Charleston, Bourne felt all three councilmen in the area should run at large within that district."  He did not approve of the House amendment that provided "that all councilmen be elected by all the county voters."  Representative Scarborough wanted people to know that the Charleston County Council approved of the change.  "Scarborough said after the meeting that Jenkins, chairman of the committee, again restated that County Council unanimously had approved the pay increase and the requirement that they run at-large."[186]

The House adopted the Majority report.[187]  However, the next day the Senate did not:  "However, both Bourne and Cabell officially will refuse to accept the report today, thus killing the bill."[188]

In the next Legislative Session, an almost identical bill was introduced on 18 April 1968 as **House Bill 2891**, "to require members to be elected from the county at large, to designate residency requirements and increase compensation for council members."  After its three readings the bill was sent to the Senate on 24 April.  It was read for the first time in the Senate on 24 April, was placed on the Local and Uncontested Calendar, and received its second reading the next day.[189]  On 25 April the paper noted the bill "that would have Charleston County Council candidates run at-large" cleared the House.  On 1 May 1968, the paper reported that the bill "would double council members' salaries.…At the same time, the amendment would require anyone now seeking a council seat to run at-large, both in the primary and general election."[190]

On 1 May 1968, Republican Senators Cabell, Grice, Worsham, and Bourne made amendments about the timing of the bill, moving up its effective date.  The newspaper reported, "The proposed at-large election of members of Charleston County Council would become effective this year under an amendment agreed to yesterday by Charleston's four Republican senators."  The paper elaborated on the Senators' amendments.  "A bill that would require Charleston county councilmen to run for election countywide was amended yesterday by Charleston's four Republican senators, but its Senate passage was delayed.  Basically the senators' revision of the House-passed bill would require at-large elections in this year's four council contests.  The House bill would make the effective date Jan. 1, 1969.…The senators have indicated they don't intend passing the bill, which also includes doubling the salaries of the council members, until they learn the fate of their council measure in the House."  (The Senate had sent to

the House a separate bill strengthening the county management form of government.)
The article added that the House Delegation had received a telegram from a "Republican
candidate for council in the city, stating that he endorses the at-large elections this
year."[191]

On 9 May 1968, the Charleston <u>News and Courier</u> described the bill to change the
method of election to at-large for county council as "controversial" and "unresolved"; the
House Delegation "decided to pass over another Senate-amended bill dealing with at-
large elections for the Council members.  The House version of the bill set the effective
date at Jan. 13, 1969.  However the senators would have the at-large elections go into
effect immediately, which would effect [sic] up-coming elections for four council
seats."[192]  After the third reading on June 27, 1968, amended House Bill 2891 "returned
to the House with amendments of the Senate."  Amendments as to the effective date of
the bill did not change the method of election and residency requirements, which
remained the same as the House-amended Bill S131 from 1967.  The House did not act
on the Senate-amended H2891 bill.[193]

Newspaper discussion in 1969 focused more on the salary increase for County
Council members than on the change from district to at-large elections.  For instance, the
title of the first article to discuss the change was "Charleston County Council Seeks Big
Salary Increase."  Barbara S. Williams, staff reporter for the newspaper, wrote,
"Charleston County Council members yesterday asked local legislators to more than
double their salaries and last night agreed to indicate their willingness to run for election
at-large."  Chair of the House Delegation, Representative F. Julian LeaMond, "observed
that last year the proposed pay raise was tied to a provision that council members run at-
large."  Noting that "the old council was on record as favoring elections at-large for all
members, the new council was asked for some expression by the legislators."  On 7
January 1969, the County Council voted "seven to one to endorse the at-large elections."
The lone dissenter was a district representative from North Charleston, Councilman
Miner W. Crosby.[194]

On 26 January 1969 in her column, "Dimensions," Barbara S. Williams noted that
the County Council was now twenty-one years old.  Representative Joseph P. Riley, Jr.,
reported for a special legislative committee and suggested that County Council should set
its own salary.  A long article by Williams discussed the salary issue on 5 February and
only in one sentence under the heading "At-large Elections" was the change of method of
election mentioned:  "The lawmakers also have indicated they are willing to go that high
if raising the salary ceiling is coupled with a requirement that the members run at-
large."[195]  On 12 February 1969, Williams's column, entitled "Legislators Reach Accord
on Lifting Salary Ceiling" (and then in smaller letters the subtitle, "At-Large Elections
Planned for Council"), announced that "While the bill agreed to by the House hasn't yet
been drafted, it was indicated yesterday that councilmen still would be required to live in
about the same districts now represented.  They would be voted on by all the residents of
the county, however."  House members who supported raising the Council salary ceiling
imposed by the Legislative Delegation "pointed out that council would be responsible to

the same persons who elected the legislators under the stipulation that the members run at large."[196]

On 18 February 1969, **House Bill 1262** "to provide for election 'at large' in the county and to increase council members' compensation" was introduced and referred to the Charleston delegation.[197]  On 19 February, the newspaper reported that "A proposal that would have the effect of giving North Charleston three at-large seats on county council will be offered to local legislators here today."  Discussing the bill introduced the previous day, the reporter explained that it "would put all council elections on a county-wide basis.  That bill retains the current residency requirements, but allows all Charleston County residents to vote on all members of council.  An amendment will be presented to the bill in a legislative delegation meeting today that would remove the district residency requirements within North Charleston and allow any resident in that area to run for any of the three allotted seats."  As reported, "The existing law provides that councilmen live in a specified area and be elected by the residents of that area.  The countywide election bill for council introduced yesterday retains the other district residency requirements.…All would be voted on by all residents of the county."[198]

House Bill 1262 received a second reading on 20 February 1969, and the Delegation proposed and adopted an amendment to alter the wording "by striking the three sentences beginning with 'one' on line eight and ending with 'Rivers' on line fifteen and inserting "Three members shall be residents of the area of the county between the Ashley and the Cooper Rivers not included in the City of Charleston."  This wording for **House Bill 1262** is basically the same as the 1968 **House Bill 2891** and the 1967 amended **Senate Bill 131** and is identical to the previous bills in the method of election and areas of residency requirements.[199]

After a third reading in the House, the bill was sent to the Senate on 21 February 1969, was read for the first time on 25 February, and placed on the Local and Uncontested Calendar.[200]  Then Senator Robert B. Scarborough asked the Senate to adjourn debate on the bill until he could read the House amendments.  According to the News and Courier, "The amendment would have the effect of giving North Charleston three at-large seats on council.  It removes the boundaries and allows anyone within the area to run for any of three seats designated for that section."[201]  Apparently Senator Scarborough was satisfied with the amendment, especially since it was basically the same as the bill he had supported and sponsored the previous two legislative years as a Representative.  The bill passed on March 5, the title changed to Act 94, and on March 18, 1969 was so entered.  This change in the method of election and the areas of residency requirement was the culmination of a process that had begun in 1967 with the recommendation of Micah Jenkins's county council committee and with John Bourne's Senate Bill S131 as amended by the House.[202]

**Motivation for Change of Election**:

Ordinarily when incumbent members of a governing body propose a change of election from the method from which they themselves were successfully elected, they

provide a reason.  In this case, in April 1967 when the County Council members recommended to the Legislative Delegation that they change the method of election for County Council from district to at-large, they did not provide an explanation.  A question we need to ask is why the County Council proposed in 1967 to change from a district to an at-large method of election.  In my own research and the research of other historians writing about a change from district to at-large elections, there are four commonly offered explanations for such a change.[203]

First, proponents often argue that the move to at-large elections was motivated by a desire for good government.  Second, an at-large system was perhaps selected because it was politically advantageous to participants, that is, a change from a district system to an at-large election system gave a partisan advantage.  Third, the county might argue it had to adopt an at-large system to satisfy the one-person, one-vote principle.  Fourth, and finally, given the timing and sequence of events, one might expect racial vote dilution to be a part of the motivation, as it was in other jurisdictions that went to at-large systems of election at that time.

First of all, in all my research in contemporary journals, newspapers, minutes of the Legislative Delegation, and minutes of the County Council, I found not a single reference by either a member of the County Council or the Legislative Delegation making the argument for at-large elections as a good government reform.  Generally, decision makers who promote "good government" as an argument will state that the change from district to at-large promotes the election of a better candidate who has a broader view of the whole, and responsive to the interests of the county as a whole, rather than a merely parochial candidate who is elected by a specific district.

To the contrary, two Council members presented persuasive arguments for districts.  Regarding district elections, Council member J. Mitchell Graham, long-time chair, explained in December of 1965 that Charlestonians liked districts.  The existing election plan gave Charlestonians "the guarantee of representation from their own districts as the council members are elected from representative areas from the county."[204]  In 1967 John Bourne also liked districts.  Remarking that he "studied at great length the advantages and disadvantages of county councilmen running county-wide," he stated his conclusion for the newspaper: "many good and capable men who would like to serve in county government would be precluded because of the expense, time and work involved in a county-wide race.  It is my opinion, having served on County Council, that all councilmen feel a responsibility to all county affairs and are not sectional or biased in their opinions concerning county-wide government."  Thus, Bourne's good government argument was for districts.[205]  No council member nor legislator at the time offered a differing opinion.  With no evidence to support this good government justification for a change, I discount it.

Second, one might hypothesize a partisan advantage in at-large elections.  In this case, however, no partisan advantage was present.  Neither Republicans nor Democrats in the County Council or the Legislative Delegation offered any partisan political justifications for the change.  The struggle for party power between Democrats and

Republicans did not affect the change to at-large elections in 1967-69; indeed, the Charleston Republicans controlled the Senate Delegation, the Democrats the House Delegation, and both were elected from a multimember district system. Since both Democrats and Republicans wanted at-large elections, party advantage was not a reason for the change. On 3 May 1968, reporter Barbara S. Williams wrote, "The response from the [County Council] candidates on whether they would be willing to run on an at-large basis this year, had no apparent relationship to party affiliation. Both Democrats and Republicans favor the idea, and candidates from both parties also expressed opposition."[206]

The third possible rationale for changing to at-large elections in the 1960s was the idea that it was necessary to satisfy the one-person, one-vote principle resulting from *Reynolds v. Sims* court ruling in 1964.[207] As early as 1966 some jurisdictions in the South were going to at-large elections citing the one-person, one-vote ruling as their justification. However, the explanation that the move to an at-large council system was mandated by the one-person, one-vote ruling does not hold up. When the defendants in *Smith v. Paris* in 1966 in Alabama claimed that the purpose of the at-large election resolution was to comply with the one-person, one-vote principle, Judge Frank Johnson dismissed the excuse as "nothing more than a sham," observing that the jurisdiction kept the same malapportioned districts as residency requirements for candidates in the at-large system that replaced the district system, rather than adjusting "the population disparities between the beats [districts] themselves" while retaining the traditional district system.[208]

In Charleston also this reasoning seems to be a sham. When the change to at-large was first proposed in 1967 by the County Council and debated in the legislature as House-amended Senate Bill S131, neither council members nor legislators mentioned that the change had anything to do with one-person, one-vote. Since the one-person, one-vote explanation was not invoked until nearly a year later, it appears somewhat disingenuous to claim it as the rationale. When the newspaper explained on 25 April 1968, "The county Council bill was re-introduced this year in view of the recent U.S. Supreme Court decision that applies the one-man, one-vote rule to local governments,"[209] it was the very first time that it mentioned the one-person, one-vote issue in relationship to the proposed change. But the change from district to at-large election system for the Charleston County Council was the same bill introduced in 1967 without any such connection to one-person, one-vote.

On 1 May 1968, the paper reported that "The House passed bill was revived here recently in view of the U.S. Supreme Court decision applying the one-man, one-vote rule to local governments. Rep. R. B. Scarborough said he believed the council's legality could be questioned unless the members were elected at large. However, the House bill on the at-large elections would delay the effective date until Jan. 1, 1969."[210] Two days later, the paper explained, "Several of the council candidates questioned the wisdom or necessity for the county-wide races. In the past, the nine-member council has been elected on a district basis." In response, House Delegation chairman Robert B. Scarborough and Senate Delegation chairman Nat W. Cabell said that "they don't believe the court decision leaves any choice in the matter." [211] But the truth is that they knew

otherwise because of a clarification they received from the State's Attorney General in a letter dated 15 April 1968.

In 1968, after the Supreme Court held that one-person, one-vote explicitly applied to local government in *Avery v. Midland County*,[212] Chair of the Charleston House Delegation, Robert B. Scarborough, sent a letter of inquiry on 11 April 1968 to the South Carolina Attorney General, Daniel R. McLeod. Scarborough included a copy of the proposed 1968 House Bill 2891 (which was identical to the 1967 Amended Senate Bill 131 and basically identical to the 1969 House Bill 1262 that became law). Scarborough wrote that "Because of the recent Supreme Court's decision concerning County Government in Texas," the House Delegation was "concerned with the legality of Charleston County Council," composed of nine councilmen from four districts. He requested an opinion on the at-large system proposed for the 1968 session and asked for "your thoughts as to the constitutionality of the make up of County Council if the enclosed or similar type of Bill is not enacted."

In his response letter of 15 April 1968, Attorney General Daniel R. McLeod made several points. One, that at-large elections solved the one-person, one-vote rule. Second, that even with at-large elections, residency districts could be malapportioned. Third, that district elections were also a legal alternative if they were to meet acceptable tolerance standards. McLeod elaborated, "I would assume that greater tolerance would be permitted in county council representation than is permitted in the case of the State Legislature or in Congressional districts; but, in any event, there must be some reasonably corresponding relationship between the number of person in each district."[213] In short, the South Carolina Attorney General determined, and so advised Scarborough, that *Reynolds v. Sims* and/or *Avery vs. Midland County* did <u>not</u> <u>require</u> at-large elections.

Again in 1969, Chair of the House Delegation, Representative F. Julian LeaMond, noted that, "as a result of recent court decisions, council is 'walking a tight rope before someone attacks" the manner in which the members are elected. In early January 1969, Councilman John P. O'Keefe made a motion that "if the delegation feels it is Constitutional and necessary," that the council would agree to at-large elections.[214]

At this same meeting, however, Representative Joseph P. Riley, Jr., informed the County Council and the Legislative Delegation that the county council did not have to change from a district to an at-large election method because of the one-person, one-vote principle. It is very important to note a statement in the 8 January <u>News and Courier</u>. "Rep. Joseph P. Riley, Jr., suggested that members could either all run at-large or the body could be reapportioned every 10 years."[215]

From Riley's statement, County Council knew that they could keep districts as long as they reapportioned correctly. And, the Legislation Delegation had the letter from South Carolina Attorney General McLeod, explained above, that the one-person, one-vote rule did not mean district elections were no longer allowed.

Burton Moultrie Report, page 33

Likewise, the newspaper preferred to ignore that district elections were allowed as long as districts were apportioned correctly.  In February 1969, Barbara Williams wrote about the proposed salary increase, "Council members, according to a recent court decision are going to have to run at-large," and that the legislative delegation believed that if council members "are going to have to run county-wide, an increase certainly would be warranted."[216]

Not long after this, political leaders in Charleston County, wanting to consolidate county and city government, chose a district method of election in a mixed plan with some at-large seats. In early November 1969, the Charleston County Charter Commission proposed twelve equal population "councilmanic" districts and three at-large seats.  The newspaper reported that "The charter would require that within six months of each official federal or state census council would have to be reapportioned on the basis of population."[217]  So, to merge city and county government, political leaders were willing to consider a district method of election and finally did recommend a district election method for the 1974 referendum on county and city consolidation.[218]  Clearly, if they really thought the one-person, one-vote ruling gave them no choice in moving to an at-large method of election for county council, then it is difficult to explain why they immediately proposed districts in order to get consolidation.[219]  That the County was willing to go to district elections to get consolidated county government is further evidence that the one-person, one-vote was not a true reason.

The evidence at the time contradicts the claims that the county had to adopt at-large elections to satisfy the one-person, one-vote ruling.  To reiterate, in 1967 when the County Council first recommended the change from district to at-large elections, and again in 1967, when the at-large system was introduced as amended Senate Bill 131, not one mention was made of the one-person, one-vote concern.  The one-person, one-vote principle served as an excuse, not a valid reason.  Other forces were at work in 1967-69 in Charleston County.

By dismissing these three arguments as fallacious and disingenuous, we are left with the reasoning that the at-large system was adopted for discriminatory purposes.  This is the only reasonable explanation that fits the evidence for the shift from district to at-large elections in Charleston County.  In addition to fitting the evidence, this explanation fits the totality of circumstances, that is the history of discrimination in Charleston and in South Carolina.

First, the at-large plan adopted was effective in diluting the increasingly large African American vote for members of the Charleston County Council because the preferred candidate of the African American community would usually have to run head-on against a white candidate supported by the white community, which was in the numerical majority.  Staggered terms increased the problem for an African American candidate.  In addition, as opposed to the first plan proposed by Micah Jenkins, Chair of County Council's Legislative Study Committee, as revealed to the press on 8 February 1967, these elections were partisan.  This meant more time and more money for candidates who had to campaign twice, for the primary and for the general election.

Burton Moultrie Report, page 34

Moreover, if a candidate did not receive a majority of the votes in the primary, a runoff election was required.

At this time, the full slate law was still in effect, though there was discussion of repealing this dilution-enhancing device.  A newspaper report on the full slate law in January 1969 quoted African American leader Bernard Fielding, "the law makes it virtually impossible for any minority member to be elected."[220]  By calling attention to the discriminatory effects of the full slate law, Fielding was also calling into question the dilutive effects of at-large elections.  The paper elaborated some weeks later that "Some Negroes take the position a member of their race would have little or no chance in a head-on race against a white opponent."[221]  And then, less than two weeks later, the paper explicitly linked the at-large elections with the full-slate law:  "During a discussion in a State Election Law Study Committee meeting yesterday, a member of the legislative council said the full-slate law would apply to countywide council races."[222]

Furthermore, because Charleston County is large, a hundred miles in length, with rivers separating some of the residential areas, it is difficult to campaign throughout the entire county.  African Americans are generally not as high on the socio-economic scale as whites in Charleston County, and the expenses of an at-large campaign are staggering, many times as expensive as a district election, where a candidate can win by expended time and effort canvassing door-to-door.  Moreover, the centers of significant financial resources in Charleston are disproportionately controlled by whites.

**Racial Bloc Voting**:
The problem with at-large elections is the accompanying presence of racial bloc voting.  When whites have a  majority of the voting-age population, and if whites deliberately vote against candidates from the African American community, as whites did in Charleston County, then they can prevent African Americans from winning office by using an at-large method of election.  The dilutive effects of at-large voting are enhanced by the use of staggered terms, such as in Charleston County, and of the full-slate law that was in effect in South Carolina at the time.  If voting is racially polarized, then at-large elections prevent minorities from electing candidates of their choice.

Responding to white charges of African American bloc voting in 1951, NAACP President A. J. Clement protested, "We do not like bloc-voting, but you have taught us many of its advantages.  You have used it for 50 years against us….You voted for all of your political candidates as a solid bloc on a platform of racism… you put men into office and statutes on the books that make me go in side doors, sit in galleries, ride in the rear of buses."[223]

In 1990-91, while serving as an expert witness in a Charleston County school board case, I analyzed elections in Charleston County, South Carolina.  I have also studied analyses of elections in Charleston County by Dr. James Loewen, by Dr. John C. Ruoff, and by Dr. Harold Stanley.  All of these statistical analyses demonstrate that racial polarization was the dominant trend in elections when a white candidate opposed an African American.  Moreover, in 1974 when the Department of Justice objected to the

"racially motivated annexations" to the City of Charleston, it cited the dilutive effect of the city's at-large election system "with the readily apparent pattern of racial bloc voting in Charleston."[224]   Again in 1975, the Justice Department objected to the first three plans submitted by the city "on grounds of a potential unnecessary vote dilution of minority votes through their at-large feature, which in the context of Charleston's history of racial bloc voting," was detrimental to African Americans electing candidates of their choice.[225] In 1974 the Justice Department objected to a mixed plan for the Charleston County Council with the merger of city and county government.  According to the Justice Department objection, "there is a cognizable racial minority and a history of voting along racial lines."  The Justice Department recommended that "methods of election such as those proposed here have an impermissible dilutive effect on black voting strength if, as is also apparent here, available alternative methods of election such as single-member districting would allow a fair opportunity for the election of representatives directly responsive to the needs of the minority population."[226]

### III.  Anticipated or foreseen effect of the change on minority citizens

During this time period members of the County Council and the Legislative Delegation were astute and savvy politicians.  They understood the electoral procedures under which they ran and knew the probable electoral impact of a change from district to at-large elections.  When changing the elective system, Charleston County might have adopted a single-member district or mixed plan, had it not considered the racial implications.  Charleston County political leaders knew that a single-member district system raised a genuine threat of African Americans winning seats on the county governing body because the Charleston News and Courier reported on the growing strength of the African American vote.  Furthermore, historians and political scientists had for some time adopted the view that at-large elections dilute minority votes.  Charles A. Beard, for example, as early as 1912 in his classic American City Government, argued that at-large elections "substantially exclude minority representation."[227]  This view was common in standard textbooks of the 1960s, and scholars had communicated that at-large elections diluted minority representation to city and county officials through the National Civic Review.[228]  And even before House Bill 1262 was introduced in 1969, the Charleston News and Courier carried an article that specifically denoted that at-large elections are a discriminatory device.  When Congressman William M. McCulluch, Republican from Ohio, introduced a bill in the U.S. Congress to extend the Voting Rights Act of 1965, he noted that for those who opposed African American voting, "A whole arsenal of racist weapons has been perfected."  The paper continued, "He listed among those weapons gerrymandering, consolidation of counties, *at-large elections* [my emphasis], full-slate voting, increased filing fees, and physical and economic intimidation."[229]

The idea that an at-large system minimizes the electoral chances of minority candidates, as compared with a single-member district plan, was commonplace in the 1960s.  The men on County Council and the Legislative Delegation had to have been familiar with the City of Charleston's change in 1954 from districts to at-large elections following the elimination of the white primary and increasing African American voter

registration.  African Americans were then urging representation on city council.  That year, the same year as the *Brown* decision, the City Council of Charleston changed from a single-member district to an at-large election system, and, according to African American leader Herbert Fielding, this change was in response to black candidates and the increasing African American black registration in certain city wards.[230]  Historian Walter J. Fraser, Jr. analyzed the move to at-large elections for the city council.  "As in other urban areas of the state, the number of aldermen were reduced and Charleston's twenty-four City Councilmen were cut to twelve at-large aldermen.  This was important for keeping the Broad Street power establishment in power in view of the continuing white flight to the suburbs, and the increasing political assertiveness of a black population approaching 50 percent in the city.  At-large aldermen represented the various city wards, but did not necessarily have to reside in those wards.  Henceforth the mayor could hand-pick his slate of candidates and if half lived below Broad Street and none came from the primarily black wards of the city, this was perfectly legal."[231]  According to historian Millicent Brown, the change for the city to at-large elections diminished "the likelihood that the four heavily black city wards (#9, #10, #11, and #12) could elect candidates to the city council unless they were endorsed by the white majority.  The restructured system was implemented just as black voter awareness and participation had increased."[232]

According to Political Scientist Everett Carll Ladd, Jr., when he was in South Carolina in 1963 researching his book, Negro Political Leadership in the South, "At the time of my work the question of single member districts versus multiple member districts came up repeatedly.  It was a very salient issue in terms of black political participation."  Ladd elaborated, "These basic facts all came together in the research that I did in discussions with black and white leaders in both North and South Carolina.  It was generally acknowledged that blacks had a far greater opportunity to secure equitable representation in either municipal council seats, on the one hand, or legislative seats, on the other, if one operated with a vehicle of single member districts….Indeed, there were concrete instances when the franchise was extended to blacks in the urban south in the 1940's and 1950's, of cities that elected their representatives – their councilmen, rather – on the basis of a ward or single element district system previously going to an at large system for the precise purpose of diluting black votes, preventing the election of black candidates."[233]

Along these same lines in Charleston County, when African American voting strength increased, the school board of trustees changed from elected to appointed positions in the predominantly African American school districts.  Esau Jenkins, who ran for school trustee on Johns Island in 1956 soon after returning from Highlander Folk School in the mid-1950s, came in third of four candidates.  Jenkins explained that "The reason why I ran is because I wanted the Negroes to know that it is their privilege to go into any office they're qualified to hold.  They are taxpayers and they have just as much right to run for public office as the white persons.  I ran because some Negroes thought that if a Negro name ever was placed on a voting machine, that person would be killed."  Jenkins actually finished ahead of one white man, and, apparently in reaction to Jenkins's unexpected showing, white policy makers decided to change the school board from

elected to appointed so there would be no similar challenges.  Referring to his able campaign, Jenkins summarized, "That scared some of the white folks here, and the man who is on the county council decided that they would change voting for trustees on the school board.  They would have it be appointed because Johns Island strength was growing too much."  Esau Jenkins's analysis was right on target; in 1956, the South Carolina General Assembly upon recommendation of the Charleston Legislative Delegation abolished elected school trustees and made the trustees appointed in St. John's District No. 9 and also in another predominantly African American school district No. 23, St. Paul's.[234]

The 1965 Voting Rights Act, and South Carolina's failed attempt to block the Act, put white Charlestonians on notice that the black vote will be counted.  In response to the Voting Rights Act, a number of counties in South Carolina (such as Sumter, Edgefield, Colleton, Horry, Chester) opted for an at-large elected system to dilute the effect of the black vote (These were struck down in the 1980s through litigation because vote dilution violated the Voting Rights Act).[235]  Like these other South Carolina counties, the change in the method of election to the Charleston County Council was enacted when African Americans registration was increasing after the 1965 Voting Rights Act and when African Americans were gaining significant political strength and influence.  In Charleston County the 1960 Voting Age population was 77,909 whites and 35,499 nonwhites.  Pre-Voting Rights registration was 50,310 for whites (64.6 percent of eligible whites ) and 13,976 for nonwhites (39.4 percent of eligible nonwhite voters).[236]  In 1967 registration was 54,648 for whites (70.1 percent of eligible whites) and 17,991 for nonwhites (50.7 percent of eligible nonwhite voters).[237]  This was the year the County Council proposed to change the method of election to at-large from district.

The population figures for the City of Charleston itself, from which all eligible voters cast ballots on all three County Council seats, are instructive.  In 1950, Charleston, with 70,174 citizens, was 56 percent (39,287) white.[238]  By 1960, with 65,925 residents, the city had become 51 percent (33,612) non-white.[239]  By 1970, the City of Charleston had 66,945 denizens, 45.4 percent non-white (36,576 white and 30,369 non-white, of which 30,251 were African American)[240]  Thus, without the annexation of largely white areas, the city would have had an even higher concentration of African Americans in 1970 than it did in 1960.  However, the new mayor in 1960, J. Palmer Gaillard, had promised change.  According to historian Stephen O'Neill, "the change Gaillard promised was intended to preserve white electoral power in the city."  Annexation preoccupied the first months of Mayor Gaillard's administration as he brought into the city white areas west of the Ashley River.  "By the end of 1960, these first additions to Charleston in 111 years had added 12,521 people to the city, nearly everyone white."  Working with the Mayor, Harold Petit, a founder of Charleston's Citizens' Councils, headed suburban residents who worked for Mayor Gaillard's annexation plan.  The News and Courier went beyond the usual code words to warn that if whites from other areas were not annexed, "greater Charleston is headed for serious trouble….They know the College of Charleston could become dominated by votes of slum dwellers if suburban people don't join the city."  Thus, according to O'Neill, "Gaillard's successful dilution of the black vote" impeded African American political advances.[241]

Historian Walter J. Fraser, Jr. concurs in O'Neill's analysis.  From 1959 to 1969, Gaillard tripled the size of the city from 5 to 18 square miles "through mergers and annexations that encompassed the burgeoning suburbs and growing shopping malls west of the Ashley River.  Already populated by white ethnic groups who had left the city for the countryside years before, the area was adding people daily who were new to the region and employed in the expanding north area.  Through such an annexation program Gaillard added thousands of white voters loyal to the city administration – thereby diminishing the effect of black voters in municipal elections – while he 'packed' the City Council with friendly black aldermen under the at-large system."[242]  In 1974, the U.S. Department of Justice found that City of Charleston's annexations were "racially motivated" because they "changed the majority population of the city from black to white."  This Justice Department objection led to the city's 1975 change of method of election from at-large to single-member districts and the election of a number of African American candidates to the City Council.[243]

There is no doubt that policy makers were conscious of the importance of the African American vote and knew that its concentration in certain areas would be especially influential if district elections were used.  In the same legislative session where Senator Bourne introduced Senate Bill 131, and where the House amended the bill so that all council persons run at-large in the county, the controversial Charleston school consolidation bill set off a filibuster, and the debate included a number of references to the increased strength and influence of the African American vote.  Also during this same 1967 session, there arose a concern over where to place the black majority Williamsburg County with the realignment of senate districts with mandated one-person, one-vote reapportionment.  According to Government Affairs Editor of the Columbia State, Philip G. Grose, this was "racially tinged."  According to Grose, those supporting the move of Williamsburg, "reportedly feared a Williamsburg-Clarendon-Sumter combination would result in a Negro voting majority in the district."[244]  According to State reporter Paul Clancy, the legislators from different counties explained that they did not want Williamsburg as part of their Senatorial district because they "have no community of interests."  But these were code words cloaking a racial purpose; "one of the reasons not given but strongly implied is fear of the county's predominantly Negro population at election time."[245]  Thus, the legislative session where the House Delegation amended Senator's Bourne bill so that County Council would be elected at-large was a session where legislators were concerned about aligning a black majority county so that the African American vote would be diluted.

Changes in voting patterns for local offices would also have been noticed.  It could not have escaped John E. Bourne's attention that in the 1966 election in which he won the State Senate race as a Republican, that Miner Crosby, a Democrat, beat Republican Roberts for one of the district seats in North Charleston for the County Council.  Crosby's opponent won two of the three wards that voted in the district, but lost by enough votes in the one ward with a substantial African American population that he lost to Crosby.[246]  This would certainly help to explain Bourne's Senate Bill S131 to make the other two single-member district elections in the North Charleston area voted

on by all the members of the North Charleston area.  The North Charleston area was predominantly white and was becoming even more so.  North Charleston had the one Council seat that was voted on by all residents, which Bourne had won in 1964, and now Bourne wanted to change the method of election so that it would be similar to the City of Charleston where all voters in the city of Charleston voted for all three council members, thereby diluting the heavily black wards.  Savvy politicians could have foreseen that Micah Jenkins would lose his district race in his bid for re-election in 1968.  He lost by 290 votes, and his district contained heavily black areas like Johns Island.[247]

With the high proportion of the peninsula city's population now African American, the likelihood looked promising that African Americans would capture at least one of the seats on the Charleston County Council under the multimember district plan. Moreover, as shown, the newspapers emphasized the African American growing political strength and influence.  It is implausible to think that the decision makers in 1967-1969 did not know the implications of the increasing number of black voters, particularly how the increasing segregation patterns in the city and county concentrated African Americans into natural constituent voting districts.

Ironically, in the first election after the method of election was changed to at-large, the first African American, Lonnie Hamilton, III, was elected to the Charleston County Council.  This was not an unusual occurrence in the South at this time.  At the same time that recognition of the growing impact of the African American vote motivated elected bodies to go to at-large elections, the increased influence of African American voters meant that Southern governing bodies were becoming more willing to appoint or slate an African American for election.  Since African Americans were voting primarily for Democrats, and since the Republican Party was growing in Charleston, the leaders of the Democratic Party found themselves in something of a dilemma after they recognized that 1965 Voting Rights Act was going to be enforced.

In his 1972 deposition, Dr. Everett Carll Ladd, Jr., when asked why some African Americans were elected from at-large systems, helped to clarify the particular situation of the Democratic Party in Charleston.  Ladd explained that one reason "might be that a political party wished to secure black votes and made some concessions in order to secure them.  Now if you have a situation of strong antipathy between blacks and whites where whites are likely to punish a party if it goes too far in courting black votes, well presumably in that context the political party is going to give just as little as it possibly can out of its self interest in order to get black votes, on the one hand, but not turn off, or turn away, white voters."[248]  And, in 1967, Democratic Governor Robert McNair announced his intention of appointing African Americans both to state-wide office and to local draft boards;[249] thus, as shown earlier, the Charleston Legislative Delegation had recommended the appointment of an African American to the school board for District 20, and the only African American member of a draft board in South Carolina in 1967 was from Charleston.[250]  In a 1972 deposition, former chair of the Charleston Democratic Party (March 1968-October 1971) Dr. Gordon Stine was asked whether there were "still numbers of white voters who are reluctant to vote for black candidates in Charleston County," he responded, "I would have to say I think so, probably because of the nature of

the individual."  Attorney Armand Derfner had Dr. Stine read an article, "GOP 'Negative leadership' Is Rapped By Stine"' written by Barbara S. Williams after the 1970 general election.  Derfner read, "While the white community as a whole felt it was time to have black representation, many, Stine said, felt there only should be one and Fielding was better-known."  Stine acknowledged that basically this was "an accurate summary" of what he told Williams.[251]

Partisan politics influenced the vote, but did not change the racial polarization, and politicians had to balance between the races.  The 1967 slating process of African American St. Julian F. Divine for black ward 9 in the City by Mayor Palmer Gaillard's machine is illustrative of the problems white Democrats faced with the increasing black voter registration.  The Committee of 100 (see above) ran three of their own candidates in wards with the highest black registration in the primary, including one challenging St. Julian Divine.  The paper reported that those "three wards that have the largest percentage of Negro voters" expected the heaviest voter turnout.  The racial atmosphere was tense.  The Committee of 100 sent merchants a circular encouraging them to vote for their candidates.  In direct reference to the earlier protests of the Charleston Civil Rights Movement, especially the traumatic riot of 1963, they claimed Mayor Gaillard used police and force after riots started.  "Would you prefer to negotiate with respected Negro leaders to stop the trouble before it starts?  Thereby preventing destruction of your homes, the killing of your loved ones and the destruction and utter ruin of your business?"  According to the News and Courier, this was interpreted by some merchants as "injecting racially oriented riots and their control into the primary."  Despite some organized African American opposition to St. Julian Divine, Divine won in this at-large election because he was on the Gaillard slate.[252]

Thus in 1970, in the first at-large election to Charleston County Council, Democratic policy makers slated popular high school teacher Lonnie Hamilton, III, to represent North Charleston.  The eight-year veteran of the Charleston County Council, Miner W. Crosby, the only member to vote against changing the method of election from district to at-large, lost in the primary to Hamilton.  According to the News and Courier, Crosby "blamed Democratic party bosses for his defeat."[253]  Hamilton believes that he was able to win because Congressman Mendell Rivers, who was a noted segregationist Democratic Party leader, placed his hand on Hamilton's shoulder during a campaign rally at the auditorium and told people he was supporting Hamilton and they should vote for him.[254]  In a deposition in 1990, attorney Robert N. Rosen asked Hamilton, "Did you have the support of any of the political figures in the community?  I mean, for example, did Gedney Howe go out of his way to support you in the primary or – "  Hamilton answered, "They all – yeah, I got the support to [sic] the political figures at the time."  Throughout his deposition Hamilton stressed the uniqueness of his situation in 1970 and in subsequent elections.  In 1970, he explained, "I happened to have had all of the elements then of satisfying things that – those kinds of qualities that people were looking for at the time.  It will probably never happen again in the history probably of the county."[255]  Hamilton also testified to the continuing importance of race in elections in Charleston.  When asked if "racism played any role in any of your elections," Hamilton responded, "Racism was there, but the thing that helped me with the racism was the fact

that I had – I had been working with these same racist people's children."  He then gave an example, a "white man came up to me and told me that he didn't like me, and, you know, he called me the favorite word, but that he'd never lie to his daughter and he'd promised his daughter that he would vote for me."  Hamilton believed that some white Charlestonians would not vote for a black candidate and some African Americans would not vote for a white. [256]  Thus, Lonnie Hamilton confirmed political scientist Dr Everett Carll Ladd, Jr.'s theories as the situation in Charleston County.

## IV.  Views Expressed by Policymakers on Related Issues

This section of the report will examine some of the viewpoints of politicians involved in setting up the at-large elections:  Micah Jenkins, John E. Bourne, Jr., Nathan Cabell, and George Grice, all members of the County Council or of the Charleston Legislative Delegation.  As noted by Charleston NAACP leader J. Arthur Brown in 1964, "the local power structure can and does set the stage for whatever happens."[257]  I will also look at the school consolidation bill because the same Legislative Delegation enacted that bill also, and the views of the decision-makers, as expressed on this related issue, are relevant in showing that discriminatory purpose was a motivating factor.

Micah Jenkins

In 1967, when the County Council's Legislative (sometimes called Government Study) Committee proposed the shift to at-large elections, that committee was chaired by Republican Micah Jenkins who had led the white citizens' council movement in Charleston and South Carolina in the mid-1950s.[258]  In 1956, an article in the News and Courier discussed Jenkins' involvement in white organizations opposed to integration, "He was chairman of the States Right League which later became the Citizens Council." According to another 1956 newspaper article, Jenkins was leader of "a third party movement in South Carolina by serving as state chairman of the Federation of Constitutional Government."[259]  Furthermore, Jenkins was described as a major player in white supremacist groups in Charleston, South Carolina, and in the South by historians; one historian notes that Jenkins was among the Citizenship Council "notables serving on either the executive board or the advisory board" of the Federation for Constitutional Government, which was a "'national' coordinating organization for white resistance groups."[260]  In addition, as the chair of the Religious Affairs Committee of the Charleston Grass Roots League, Jenkins prepared Bulletin No. 3 accusing the National Council of Churches of supporting "the Supreme Court's left-wing segregation ruling."[261]  One historian described the purpose of the Citizens' Councils as the same as "other white supremacy groups….Its members wear business suits instead of bedsheets," a description echoed in the deposition of former Charleston State Senator Charles Gibson.  When asked about the Citizens' Council of Greater Charleston of 1967, Gibson replied, "I know generally citizens councils around the south were … I always considered they were members of Klan and has (sic) suits on instead of sheets."[262]

John E. Bourne, Jr.

It was Senator John E. Bourne of North Charleston who introduced Senate Bill S131 that would have had all three members of the County Council from the North

Charleston area run at-large within the North Charleston multimember district in 1967. In 1967 also, Senator John E. Bourne pushed for passage of a Republican bill that would have required all voters to reregister before the 1968 primary or general elections. According to press accounts, the Republicans were making a "stubborn fight to trim Negro strength in 1968 elections."  As the newspaper reported, "Sen. John E. Bourne Jr. of Charleston was even more specific in spelling out GOP fears that adoption of the amendment would keep thousands of illiterate Negroes on the rolls to vote Democratic next year."  In opposing a Democratic amendment to postpone implementation of reregistration until after the fall elections, Bourne protested, "If we pass this amendment it seems to me we will be slapping the federal registrars on the back and saying, 'We were glad to have you.  You did a good job.'"[263]  Also, in 1967, as the designated "workhorse" of the 31-hour Republican filibuster against the School Consolidation bill introduced by Senator Charles Gibson, Senator Bourne made several statements that reveal his views on race at that time.  According to Bourne, the Consolidation bill had "overriding political implications that have not come out and may not come out."  Bourne pointed out that District 20 was 82 percent African American, and he worried that "the Department of Health, Education and Welfare is seeking to force racial balance by breaking down school district lines."[264]  Both the Columbia State and the Charleston News and Courier reported that Bourne "also raised the specter of forced racial integration by busing if the county's eight districts are merged into one.  District 20 is 82 per cent Negro, while the St. Andrews district is 84 per cent white, he stressed."  The paper quoted Bourne's prediction that "'Orders from the great white fathers in Washington to wipe out 'these imbalances' wuld [sic] follow consolidation."[265]  About three weeks later Bourne repeated the warnings that consolidation would lead to busing and integration.[266]  In 1986, in the deposition of former state senator Charles Gibson, the attorney for Charleston County School District, Robert N. Rosen, asked, "And the people who were talking race, and I can use John Bourne as an example because he is in the newspaper, you know, I guess we have to assume some of the newspaper reports are vaguely correct, that he was talking about busing and using race as an issue."  Gibson answered, "Right."[267]

In 1978, the newspaper quoted Bourne's opponent in the North Charleston mayoral race, Miner W. Crosby.  The headline read, "North Charleston mayoral candidate and others blasted John E. Bourne's administration as racist at a Democratic Breakfast Club Friday."  The paper quoted Crosby as saying of Bourne, "He's very much a racist.  For some reason or other, he doesn't like black people."  President of the North Charleston NAACP, the Rev. Omega Newman, and NAACP political action chairman, Walter Jenkins, "cited various ways the city of North Charleston discriminates against minorities."  Although more than 16,000 African Americans were North Charleston city residents, "Bourne has never appointed one black person to the North Charleston sewer district or one black in a top position in city government."  Interestingly, a major issue in the 1978 North Charleston mayoral election was the African American demand for single-member district elections to City Council.  Buck Miller, a white Democrat, said, "The election system in North Charleston makes it impossible for a black to be elected."  Crosby, in 1969 the only member of the Charleston County Council who had voted against the move to at-large elections, proposed for the city a mixed plan with six single-

Burton Moultrie Report, page 43

member districts.  Crosby wanted "equal representation" for the North Charleston City
Council.  According to the NAACP president, "Crosby and many of the challenging
candidates promise to vote for single-member districts if they are elected."[268]  Bourne
opposed this demand from the African American community in North Charleston for
single-member districts.

Nathan Cabell and George Grice

       State Representative Nathan Cabell and then College of Charleston President
George Grice were among white leaders who obtained a new charter for the College of
Charleston in order to block its desegregation.  Both Cabell and Grice helped establish
private segregated schools in Charleston during the 1960s.[269]  In 1964, when five
segregated private schools were established in the wake of the 1963 Charleston school
desegregation order, Cabell withdrew his daughter from public school, and, according to
one scholar, offered "advice to those who wanted to establish segregated academies."  He
arranged for the leaders of the segregation academy movement to meet with Governor
Donald Russell "to secure state approval for the leasing of church property for private
schools."  In 1963, Senator Cabell was Chairman of the Board of Charleston Academy,
Inc., an association with the purpose of organizing private "segregation" institutions.[270]
At a Legislative Delegation meeting in 1963, Cabell accused Charleston's Senator T.
Allen Legare of attempting to appoint an African American to the school board.  Legare
responded, "I did not take my children out of the public schools in the City of Charleston
and place them in another school district outside the city and leave my fellow citizens to
face the problem alone, as Mr. Cabell did."[271]  In his 1986 deposition, former State
Senator Charles Gibson remarked on Mr. Cabell's quotation in an editorial of 9 January
1968 where Senator Cabell wanted to reestablish the districts before consolidation
because consolidation would result in busing children between districts and the assigning
of teachers.  Cabell was quoted in the editorial as saying anyone who opposed him was "a
racial extremist," whereupon, Gibson commented, "God knows he ought to recognize
one."[272]

       As president of the College of Charleston, George Grice resisted integration.[273]
Grice was the segregated academy's "educational advisor" when the College of
Charleston offered refresher courses for whites teaching in private schools.[274]  Grice lent
the resources and the prestige of the college to the private segregation school movement.
He helped found "College of Charleston Prep" (8-12 grade) and let "that segregation
academy use the College's facilities."[275]  As state senator in 1967 George Grice opposed
the Gibson School Consolidation Bill and warned that the removal of district lines would
be "regretted forever," and would permit the federal government to enforce "50 percent
integration" in all the schools.[276]  He attempted to amend the bill so that District 20 (82
percent African American) was excluded from consolidation.[277]  In a series of articles,
the paper reported on Senator's Grice's continued opposition to the consolidation bill and
on his warnings against integration, specifically that the bill would "speed up"
desegregation.[278]  The Columbia State reported, "Grice, former president of the College
of Charleston, warned that public education will suffer if the school districts are
consolidated.  He said increased integration will result and more private schools will be
established."[279]  Grice argued that consolidation would "lead to bussing students from

Burton Moultrie Report, page 44

one school to another to accomplish 'racial balance' under Supreme Court and Washington edicts."[280]

School Consolidation

The reaction of the above politicians to the Gibson School Consolidation Bill introduced in 1967 is an excellent gauge for racial attitudes by decision makers who were in the Legislative Delegation.  As the newspaper coverage makes clear, and as the deposition of Gibson states explicitly, the issue behind many of the code words was race.[281]  Although Gibson's bill was intended to move money around, not people, he found it necessary to amend the bill to ensure against student and teacher transfers and to assure people that it would not lead to desegregating the schools in 1967.  Dean of South Carolina Law School Robert Figg, who had been the counsel working for the state in the *Briggs* desegregation case, and Dr. G. Creighton Frampton, who as Charleston School Superintendent had worked with Figg on the state's defense of segregated education (both Figg and Frampton were among the original members of Senator's Marion Gressette's Segregation Committee and both worked with the committee through its entire tenure until 1966), helped develop a compromise to end the Republican filibuster.  They (and Senator Gressette) were brought in to help amend the bill so that it would be "more palatable."[282]

The Gibson School Bill was amended by the same House Delegation that amended Senate Bill S131 to change the method of electing county council to at-large.  The motivation behind the amendments to the Gibson School Bill has been carefully researched by Dr. R. Scott Baker, who concludes, "The Act of consolidation was a fitting conclusion to a quarter century of shrewd white resistance, testimony to the ability of whites to limit the impact of NAACP litigation.  By equalizing expenditures and maintaining constituent district boundaries, consolidation stymied the NAACP's attempt to achieve meaningful desegregation in Charleston."  Baker showed that "Equalization was always a means to a larger end:  the maintenance of racial separation in education. ….  By blocking desegregation across district lines, consolidation embedded schools in racially segregated and economically unequal social environments."[283]

In March 1967 the <u>News and Courier</u> reported that the school board would be elected by the county at-large, but with residency requirements.  A Board of trustees would head each constituent district.  The legislators kept in place the appointed and elected methods that existed at the time, which meant that District 20, the City of Charleston, which had been appointed by the Governor upon recommendation of the Legislative Delegation since 1951, would continue as appointive.  We have already discussed how District 9 (St. John's) and District 23 (St. Paul's) had their election of trustees abolished in 1956 after Esau Jenkins nearly won in a race for school board trustee.  Following the activism of the Civil Rights Movement in Charleston, the legislature in 1964 also abolished elected school board trustees for the only other predominantly African American District (St. James-Santee).  All other school district trustees were elected.

Racial motivation is all too obvious when the trustees were to be an elected board, except in four districts, 20, 23, 9, and 1.  Thus, in the Gibson School Consolidation Bill, Act 340, this racial distinction was incorporated, denying African Americans the vote where they might have the majority and determining vote for school trustees.  In these four predominantly African American districts, they would be appointed.  It was not until 1974 that these predominantly African American school districts were allowed to elect their trustees.[284]

The very same Legislative Delegation that enacted the Consolidation School Bill, Act 340, that set up elected trustees for white school districts but appointive trustees for black school districts (and an at-large system for the County Consolidated district) is the Delegation that amended Senator Bourne's Bill S131 to make the Charleston County Council elected at-large county-wide.  Because the Consolidated School Act created "constituent districts" and maintained a different method of selecting trustees to those constituent districts—that is predominantly white school constituent districts elected trustees while the predominantly African American constituent districts had their trustees appointed, there is a clear racially discriminatory purpose.  It is reasonable to infer, therefore, that the at-large election system for County Council by the same legislators was established, similarly, for a racially discriminatory purpose, that is, to prevent Charleston County African Americans from electing candidates of their choice to County Council.  Thus, the at-large election system was a means to ensure white control of election to County Council.

**Aftermath of Act 94:**

In my study of the issue, there is no one clear answer as to the motivation for preserving the at-large system; for a variety of reasons the at-large system has not been changed.  In the thirty years since the change from districts to at-large elections, there have been a number of times that African Americans have wanted to change to a single-member district system of election.  African American legislators proposed bills to change the method of election from at-large to single-member districts, but were unsuccessful in these endeavors.  I would confirm that, among a number of different factors in that history, it is clear that the desire of some people to dilute the black vote has continued to play a part in the continuation of at-large elections.[285]

The County Council went to great length and expense to deny Charleston County a referendum on the method of election during the implementation of the South Carolina Home Rule Act No 283.  Early in 1976 during the home rule debates, Barbara S. Williams wrote, "The recent city election is an example of the fact that single-member districts do give minority groups a better chance for election."[286]  Charleston County Council Chair, James A. Stuckey, was adamant against single-member districts and strongly opposed having a referendum on the changes being made under Home Rule. "We would lose our method of election" if a referendum were held, Stuckey claimed. The paper reported that Stuckey believed, "if the voters select the at-large method of election, the Justice Department will disapprove it and order the single-member district method."[287]  Although citizens approached the County Council and asked for an election,

Council voted to stay at-large.  As provided under Act 283, Charleston citizens presented a petition with 14,115 signatures; according to Representative Wheeler M. Tillman the petition was originally spearheaded by "black members on the delegation."[288]  However, when the Board of Voter Registration examined the signatures, they rejected over two-fifths, thus finding the petition short of the 10 percent needed for a referendum.[289]  The petitioners quickly gathered additional signatures, but the Election Committee would not accept them because the deadline had passed.  Native Charlestonian, Republican Governor James Edwards, intervened and also supported a referendum on the method of election.

In late 1976, the newspaper reported there were three lawsuits on home rule from Charleston County.[290]  The Election Commission successfully sued to extend the deadline for the referendum on the method of election.  However, County Council appealed that decision, and the State Supreme Court sided with the County Council's rejection of the referendum.  House Representative Wheeler Tillman then initiated a second petition for a referendum and got more than 17,000 signatures.  County Council sued Tillman and again the Court sided with County Council that the second petition for a referendum was invalid as it was after the deadline.[291]  In June 1977 the Justice Department rejected Charleston's implementation of home rule, declaring that "the council's present method of election is invalid."  The newspaper cited a Justice Department official who said "the decision was based on the department's belief that the present election method dilutes black voting strength and therefore violates the Voting Rights Act of 1965."[292]  The County again appealed its case to the Justice Department, but Justice objected again.  The paper quoted a letter by Assistant Attorney General Drew S. Days, "There is substantial support for single-member district elections in the county but this sentiment … has not even been brought to a vote."  Moreover, he contended that in Charleston County, "we are presented with a serious problem of potential dilution of minority voting strength through continuation of the old election system in a context where change and improvement seemed to be promised to the electorate."  The paper noted that "County Council, insistent that the at-large method of election now used is better, has resisted the referendum attempts."[293]

Despite the Justice Department's objection, the Charleston County Council proceeded to hold elections under the at-large system.  Thus, in 1978, both the Justice Department and African American plaintiffs filed a case against the County Council for not having sought preclearance for their Home Rule change.  County Council claimed that, although some of the County Council's powers had been changed, they did not change the method of election from that established under Act No. 94 in 1969 and therefore they could still use at-large elections.  The Court agreed with the County Council.[294]  One argument that County Council had used against holding a referendum on Home Rule was that it would be too costly, yet they willingly went to the huge expense involved in defending the at-large method of election.

Finally in 1989, the county did have a referendum on the method of election.  The referendum to change to district elections did not pass, but African Americans strongly supported the change to single-member district in this close vote.  Lonnie Hamilton

concurred that he had supported the referendum for single-member districts and that the African American community wanted district elections.[295]

**Conclusion:**

Section I of this report examined the general background of discrimination in South Carolina and in Charleston.  The report then turned to specific events in Charleston to ascertain the climate of race relations prior to Act 94.  This was the local context for the change in Method of Election.  A look at this chronology has demonstrated that the decision makers during this time were very concerned about increased African American voting strength and were fearful that African Americans would vote as a "bloc."  Section II of the report presented the sequence of events in the Charleston County Council and the South Carolina General Assembly leading to the change from districts to at-large elections for the Charleston County Council.  This section also questioned the rationale for this change.  My research has persuaded me that the goal of hindering African American office holding played a substantial role (along with other, non-racial factors) in the introduction of the issue in 1967 and in the passage of Act No. 94 in spring 1969. The clear explanation for the change is that it was intended to dilute the growing strength of the African American vote.  At-large elections occasioned by this statute were accompanied by a significant pattern of racial bloc voting in Charleston County.  This combination is, to a significant degree, racially discriminatory.

Section III examined the anticipated and foreseen effects on minority citizens of the change from districts to an at-large method of election.  This section included an analysis of the racially motivated annexations to the City of Charleston.  Section IV looked at the views expressed by policy makers on related issues, especially school consolidation.  Racial motivation is all too obvious in the school consolidation issue because racial distinction was incorporated.  The constituent district trustees were to be an elected board if the school district was white and an appointed board if the school district was predominantly African American.

In conclusion, in Charleston County, South Carolina, as in other Southern communities I have investigated, at-large elections have served as a device to dilute the African American vote, to deny them the opportunity to elect candidates of their choice, and thus minimize the impact of the 1965 Voting Rights Act.

Burton Moultrie Report, page 48

_____

Notes:

[1] *Village of Arlington Heights v. Metropolitan Housing Corp.*, 429 U.S. (1977) 252, 265-68, 97 Supreme Court Reporter, pp. 555-68.

[2] *South Carolina v. Katzenbach*, 383 U.S. 301 (1966).  South Carolina filed the original complaint.  At the Court's invitation, Alabama, Georgia, Louisiana, Mississippi, and Virginia filed briefs as amicus curiae supporting South Carolina's claim that certain provisions of the Voting Rights Act were unconstitutional.  Numerous other states filed briefs supporting the constitutionality of the act.  383 U.S. 301, 308-309, 310n, 329-330 (1966).

[3] I. A. Newby, Black Carolinians: A History of Blacks in South Carolina, 1865-1968 (Columbia: University of South Carolina Press, 1973), 15.

[4] Kirby concluded that while the upper South practiced some moderation and restraint in race relations, in South Carolina, and especially in low country counties like Charleston, the tone was much more racist.  Jack Temple Kirby, Rural Worlds Lost:  The American South, 1920-1960 (Baton Rouge:  Louisiana State University Press, 1987), p. 247.

[5] Francis Butler Simkins, "Race Legislation in South Carolina since 1865," South Atlantic Quarterly, XX (June 1921), pp.177, 168.

[6] See James M. Banner, Jr., "The Problem of South Carolina," in Stanley Elkins and Eric McKitrick, eds., The Hofstadter Aegis:  A Memorial (New York:  Alfred A. Knopf, 1974), pp. 76-80.

[7] Orville Vernon Burton, "'The Black Squint of the Law':  Racism in South Carolina" in David R. Chesnutt and Clyde N. Wilson eds., The Meaning of South Carolina History:  Essays in Honor of George C. Rogers, Jr. (Columbia:  University of South Carolina Press, 1991), p. 166; Laughlin McDonald, "An Aristocracy of Voters: The Disfranchisement of Voters in South Carolina." South Carolina Law Review 37 (1986): 558.

[8] Joel Williamson, After Slavery:  The Negro in South Carolina During Reconstruction, 1861-1877 (Chapel Hill:  University of North Carolina Press, 1965), 72-79; Eric Foner, Reconstruction:  America's Unfinished Revolution, 1863-1877 (New York:  Harper and Row, 1988), 200; Burton, "Black Squint," pp. 166-167; Orville Vernon Burton, et al., "South Carolina," p. 192 in The Quiet Revolution:  The Impact of the Voting Rights Act in the South, 1965-1990, edited by Chandler Davidson and Bernard Grofman (Princeton:  Princeton University Press, 1994).

[9] McDonald, "An Aristocracy of Voters," p. 560.

[10] Bernard E. Powers, Jr., Black Charlestonians: A Social History 1822-1885 (Fayetteville:  University of Arkansas Press, 1994 ); and "Community Evolution and Race Relations in Reconstruction Charleston, South Carolina" South Carolina Historical Magazine, 95:1 (January  1994), 27-34; William Hine, "Frustration, Factionalism, and Failure:  Black Political Leadership and the Republican Party in Reconstruction Charleston, 1865-1877" (Ph.D. dissertation, Kent State University, 1979); Foner, Reconstruction, pp. 352-354, 357, 538; Thomas Holt, Black Over White:  Negro Political Leadership in South Carolina During Reconstruction. (Urbana: University of Illinois Press, 1977), esp. 97; Williamson, After Slavery, esp. 363-417; Burton, "Whence Cometh

Rural Black Reconstruction Leadership:  Edgefield County, South Carolina," The Proceedings of the South Carolina Historical Association, 1988-1989 (Aiken: The South Carolina Historical Association, 1989), pp 27-38.

[11]  James L. Underwood, The Constitution of South Carolina, II:  The Journey Toward Local Self-Government (Columbia:  University of South Carolina Press, 1989), pp. 47-50; McDonald, "An Aristocracy of Voters," p. 560.

[12]  Walter B. Edgar, ed., Biographical Directory of the South Carolina House of Representatives, Volume 1:  1692-1973. Columbia:  University of South Carolina Press, 1974), 141, 407, 409, 420-422; Emily Bellinger Reynolds and Joan Reynolds Faunt, eds., Biographical Directory of the Senate of the State of South Carolina, 1776-1964 (Columbia:  South Carolina Archives Department, 1964), 62.

[13]  Foner, Reconstruction, pp. 352-354, 357, 538; Holt, Black Over White, esp. 97; Williamson After Slavery, esp. 363-417; Orville Vernon Burton, "Race and Reconstruction:  Edgefield County, South Carolina." Journal of Social History 12, 1978, pp. 27-38; George C. Rable, But There Was No Peace: The Role of Violence in the Politics of Reconstruction (Athens: University of Georgia Press, 1984), pp. 165-172.

[14]  William J. Cooper, Jr. The Conservative Regime:  South Carolina, 1877-1890 (Baltimore:  The Johns Hopkins University Press, 1968), p. 89.  Burton, et.al., "South Carolina," pp. 192-94;  See also Orville Vernon Burton, In My Father's House Are Many Mansions:  Family and Community in Edgefield, South Carolina (Chapel Hill: University of North Carolina Press, 1985), pp. 228, 290.

[15]  Foner, Reconstruction, pp. 573-74.

[16]  Burton, "Race and Reconstruction," pp.  42-44; Foner, Reconstruction, pp. 570-575; Richard M. Gergel, "Wade Hampton and the Rise of One Party Racial Orthodoxy in South Carolina," The Proceedings of the South Carolina Historical Association, 1977, 7-8; Robert J. Kaczorowski, The Politics of Judicial Interpretation: The Federal Courts, Department of Justice and Civil Rights, 1866-1876 (New York: Oceana, 1985), pp. 57-61; Kermit L. Hall, "Political Power and Constitutional Legitimacy: The South Carolina Ku Klux Klan Trials, 1871-1872," Emory Law Journal 33: 1984, 936-941; Simkins and Woody, South Carolina During Reconstruction; Williamson, After Slavery; Burton, "Ungrateful Servants? Edgefield's Black Reconstruction:  Part I of the Total History of Edgefield County, South Carolina."  (Ph.D. dissertation, Princeton University, 1976).

[17]  George B. Tindall, South Carolina Negroes, 1877-1900 (Columbia: University of South Carolina Press, 1952), pp. 309-10.

[18]  Tindall, South Carolina Negroes, pp. 54, 69; J. Morgan Kousser, The Shaping of Southern Politics:  Suffrage Restriction and the Establishment of the One-Party South, 1880-1910 (New Haven:  Yale University Press, 1974), pp. 32, 49-50, 85-87, 89, 91-92.

[19]  Tindall, South Carolina Negroes, pp.  31, 39.

[20]  Current law allowed congressional regulation of elections to national office, and Democratic reliance on violence, intimidation, and fraud to carry state and local elections would not bear federal scrutiny.

[21]  Tindall, South Carolina Negroes, p. 54; Kousser, Shaping of Southern Politics, p. 32 and "The Voting Rights Act and the Two Reconstructions," in Bernard Grofman and Chandler Davidson, eds., Controversies in Minority Voting:  The Voting Rights Act

in Perspective (Washington, D.C.:  The Brookings Institute, 1992), pp. 598-602; McDonald "Aristocracy of Voters," p. 568.  Kousser shows that the proportion of the five other districts was also black majority and probably the sixth as well.  Dilutive and disfranchising methods allowed Democrats to control the outcome of the other districts.

[22] Journal of the Constitutional Convention of the State of South Carolina ... 1895 (Columbia, 1895), p. 469.  While in the U.S. Senate Tillman declared,  "We have done our level best.  We have scratched our heads to find out how we could eliminate every last one of them.  We stuffed ballot boxes.  We shot them.  We are not ashamed of it."  Richard Maxwell Brown, Strain of Violence:  Historical Studies of American Violence and Vigilantism (New York:  Oxford University Press, 1975), pp. 85-86, 89; Francis Butler Simkins, Pitchfork Ben Tillman:  South Carolina (Baton Rouge:  Louisiana State University Press, 1944), 407, 531-534; and Simkins, "Ben Tillman's View of the Negro," Journal of Southern History 3 (May 1937), p. 161, 167-168; Stephen Kantrowitz, Ben Tillman and the Reconstruction of White Supremacy (Chapel Hill:  University of North Carolina Press, 2000); James G. Banks , "Strom Thurmond and the Revolt Against Modernity" (Ph.D. dissertation, Kent State University, 1970), pp. 26, 29-30, 60-73.  C. Vann Woodward, Origins of the New South, 1877-1913 (Baton Rouge:  Louisiana State University Press, 1951), p. 333.  One of Tillman's native Edgefield County political lieutenants was J. Strom Thurmond's father.

[23] J. C. Sheppard to the General Assembly in Journal of the S. C. House (1886), p. 50. Underwood, The Constitution of South Carolina, pp. 67-69, 73, 80-81, 265.

[24] Powers,  Black Charlestonians and "Community Evolution and Race Relations in Reconstruction Charleston, South Carolina" South Carolina Historical Magazine, 95:1 (January  1994), 27-34; Hine, "Frustration, Factionalism, and Failure"; Williamson, After Slavery; Burton, "Ungrateful Servants?"  See also My Father's House, "Race and Reconstruction," 31-56, and "The Rise and Fall of Afro-American Town Life: Town and Country in Reconstruction Edgefield County, South Carolina," in Toward a New South? Studies in Post-Civil War Southern Communities, edited by Orville Vernon Burton and Robert C. McMath, Jr., pp. 152-92 (Westport, Conn: Greenwood Press, 1982).

[25]  First  Request for Judicial Notice:  Document List Regarding Historic Racial Discrimination in South Carolina in U.S. v. Charleston County (C.A. 2-01 01155 11), Moultrie v. Charleston County Council. (C.A. 9-01 562 11) (hereinafter referred to as First Request for Judicial Notice), II.  Court Decision, 109: Vander Linden v. Hodges 193 F. 3d 268 (4th Cir. 1999), p. 73; Underwood, The Constitution of South Carolina, pp. 67, 265.

[26] Underwood, The Constitution of South Carolina, pp. 67, 265.

[27] John Gary Evans shepherded Tillman's legislation through the General Assembly in 1893 (Acts 1893, 481ff ).  Evans, state senator from Aiken County, colleague of Tillman's since the Farmers' Movement days of the 1880s, and Tillman's successor in the Governorship in 1894, was the nephew of Confederate General Martin Gary and lived at Gary's home, Oakley Park, from which Gary had directed the Red Shirt paramilitary movement.  The home was made a "Shrine" and was noted in the local Edgefield paper as "the only shrine to the Red Shirt movement in the world."  The Citizen News, Thursday, 30 November 1995, p. 3, "Tour of Homes set this Sunday."

28 Tindall, South Carolina Negroes, pp. 309-10. This helps explain why there are so many exceptions and variances in the Act; counties like Charleston and Beaufort where there were large African American populations were exempt from parts of the law. That variance was allowed at all in the County Government Act is suspect in itself. Underwood, The Constitution of South Carolina, see pp. 68-104, esp. p. 92-95; Columbus Andrews, Administrative County Government in South Carolina, (Chapel Hill: University of North Carolina Press, 1933), pp. 34-40, esp. p. 37. See The Charleston News and Courier, "Vengeance on Charleston," Dec. 9, 1893; "Tillmanites Grow Tired," Feb. 13, 1894; "Home Folk in Washington," March 9, 1894; "The Negro in Politics," March 25, 1894; "Under Negro Rule Again," Jan. 11, 1895; "The Republican Challenge," Jan 8, 1895; "Who separated `The Decent White People,' Governor?," Jan 6, 1895; "A Dangerous Experiment," Dec. 18, 1893; "A Delusion and a Snare," April 19, 1894.

29 The history of the 1895 Disfranchising Convention is well known. See especially Burton, "Black Squint," pp. 161-185.

30 Tindall, South Carolina Negroes, p. 82; Kousser, Shaping of Southern Politics, pp. 150-151; McDonald, "Aristocracy of Voters," p. 571; Burton, "Black Squint," pp. 1991, 161, 170.

31 Quote from Burton, "Black Squint," p. 171.

32 Simkins, Pitchfork Ben Tillman, pp. 289-291; Kousser, Shaping of Southern Politics, p 147; Burton, "Black Squint," pp. 169-170; Tillman, "Message of Benjamin R. Tillman to the General Assembly ...1892," (Columbia, 1892), p. 24.

33 In 1876 three counties, Anderson, Pickens, and Oconee, adopted a primary system. In 1878 Martin Gary proposed that African Americans be excluded from the political process by barring them from the Democratic party primary. Charleston News and Courier, 4 June 1878. Eight more counties followed in 1878, nine in 1880, and four in 1882. In 1886 the Democratic party held the first primary for Congress.

34 Tindall, South Carolina Negroes, 1952, 89; Frederic Ogden, The Poll Tax in the South (University, Alabama: University of Alabama Press, 1958), pp. 42, 123, 188.

35 Smith v. Allwright, 321 U.S. 649 (1944).

36 V. O. Key, Jr., Southern Politics in State and Nation (New York: Alfred A. Knopf, 1949), p. 627.

37 Rules Adopted by State Convention, May 15, 1946 (Columbia: Democratic Party of South Carolina), p. 2.

38 Tinsley E.Yarbrough, A Passion for Justice: J. Waties Waring and Civil Rights (NY: Oxford University Press, 1987, pp. 65-66; Elmore v. Rice, 72 F.Supp. 516, 527 (E.D.S.C. 1947), aff'd sub nom Rice v. Elmore, 165 F.2d 387 (4th Cir. 1947), cert. denied, 333 U.S. 875 (1948).

39 Brown v. Baskin, 78 F.Supp. 933 (E.D.S.C. 1948), 80 F.Supp. 1017 (E.D.S.C. 1948), aff'd, 174 F.2d 391 (4th Cir. 1949). Key, Southern Politics, pp. 628-632. Fraser, Charleston! pp. 398-99.

40 S.C. Acts (1950), No. 858. In addition to restoring previously eliminated provisions of the state's election code, the statute includes numerous revisions. Debate over the bill was infused with racial comments. "The white primary is gone," lamented a legislator from Chesterfield County, and "we have a problem of biracial voting in our state." Charleston News and Courier, 9 February 1950, 11A; see also 24 February, 1B; 15

March, 1A; 14 April 1950, 1A.  The newspaper also commented that the regulation of primary elections had been removed in 1944 "to avoid having the white primary outlawed in the courts." Charleston News and Courier, 14 April 1950, 1A.  Under the full-slate requirement, Section 7(13), "if a voter marks more or less names than there are persons to be elected or nominated to an office...his ballot shall not be counted for such office."  Section 10 provided that "no candidate shall be declared nominated in a first primary election unless he received a majority of the votes cast for the office for which he was a candidate," and Section 11 required a runoff primary in the event that candidates failed to secure the requisite majority.  Both the full-slate and runoff requirements date from the days of the white primary;  see South Carolina Code (1942), Sec. 2365-2367.  The first adoption of both devices seems to have been in S.C. Acts (1915), No. 118, Sec. 1.

[41]  Charleston News and Courier, 12 February 1950, 4B.

[42]  Burton, "Black Squint," pp. 170-171.

[43]  Gunnar Myrdal, An American Dilemma: The Negro Problem and Modern Democracy (New York: Harper and Brothers, 1944), p. 488n.  Historian I. A. Newby puts registration at 3,000 (0.8 percent of voting age African Americans in South Carolina). Newby, Black Carolinians, p. 291.

[44]  Journal of the House of Representatives of the Second Session of the 85th General Assembly of the State of South Carolina being the Regular Session, Beginning Tuesday, January 11, 1944, resolution dated February 29, 1944, pp. 569-570.

[45]  Burton, "Black Squint," pp. 175-177, see table 9.2; Orville Vernon Burton, "Foreword" to Benjamin E. Mays, Born to Rebel (Athens: University of Georgia Press, Brown Thrasher Edition, 1987), p. xxiii, Table 2.  School expenditures are calculated from the Annual Reports of the South Carolina Department of Education.

[46]  Duvall v. School Board, C.A. No. 1082 (E.D.S.C.); R. Scott Baker, "Ambiguous Legacies: The NAACP's Legal Campaign Against Segregation in Charleston , South Carolina, 1935-1975," (Ph.D. dissertation, Columbia University, 1993),  pp. 69, 80-93; Millicent Ellison Brown, "Civil Rights Activism in Charleston, South Carolina, 1940-1970," (Ph.D. dissertation, Florida State University, 1997), p. 38.

[47]  The Byrnes statement on "gerrymandering of districts" from the 1950 radio address is in a file pertaining to the 1950 gubernatorial campaign, in the Papers of James F. Byrnes, Cooper Memorial Library, Clemson University.  Interview with Dr. Marcia Synott, March 3, 2001; Deposition of Dr. Marcia Synott, U.S. Plaintiffs, Richard Ganaway, et al., Plaintiffs-Intervenors v. Charleston County School District and State of South Carolina; Plaintiffs' Proposed Post-Trial Findings of Fact," in U.S. Plaintiffs, Richard Ganaway, et al., Plaintiffs-Intervenors v. Charleston County School District and State of South Carolina, C.A. No. 81-50-8; pp. 24-36; Baker, "Ambiguous Legacies," p. 176, 265-66;

[48]  Burton, "Black Squint," p. 177; Newby, Black Carolinians, pp. 274-313; John G. Sproat, "Firm Flexibility:  Perspectives on Desegregation in South Carolina," in Robert H. Abzug and Stephen E. Maizlish, eds., New Perspectives on Race and Slavery in America:  Essays in Honor of Kenneth M. Stampp (Lexington:  University of Kentucky Press, 1986), pp. 164, 166-169.

[49]  "Negro Leaders Jubilant Over Court Decision," Charleston Evening Post, 17 May 1954, 2A;   "S.C. Now in Position to End Public Schools," (7A) and "Byrnes is

'Shocked' at Court's Decision," (1 and 6A) 18 May 1954, 7A, both Charleston <u>News and Courier</u>.

[50]   1952 Code of Laws of South Carolina, Section 21-2 (1960 Supplement); Plaintiffs' Proposed Post-Trial Findings of Fact, *United States of America, Plaintiff, Richard Ganaway, et al., Plaintiff-Intervenors, v. Charleston County School District and State of South Carolina*, C.A. No. 81-50-8, p. 195.

[51] Walter Edgar, <u>South Carolina:  A History</u> (Columbia:  University of South Carolina Press, 1998), p. 523; Stephen O'Neill, "From the Shadow of Slavery:  The Civil Rights Years in Charleston," (Ph.D. dissertation, University of Virginia, 1994), pp. 154-58.

[52]  Sproat, "Firm Flexibility."

[53]   Brown, "Civil Rights Activism," p. 272.

[54]  Fowler, <u>Presidential Voting</u>, pp. 43-47; Donald R. Matthews and James W. Prothro, "Social and Economic Factors and Negro Voter Registration in the South," <u>American Political Science Review</u>, 57 (1963): 4-44; Michael Ray Cline, "The South Carolina Negro Vote in the Presidential Elections of 1952 through 1964" (M.A. thesis Political Science, University of South Carolina, 1966).

[55]  Camden <u>Chronicle</u>, 19 February 1965, p. 1.

[56]  This was a higher proportion than other states of the deep South.  U.S. Commission on Civil Rights 1968, 222-23; Columbia <u>Record</u>, 16 March 1965, 1B. The U. S. Commission on Civil Rights.  Other sources suggest that there were a few African American elected officials in black majority districts.  Burton, et al., "South Carolina," pp. 197-8, 200-201.

[57]  O'Shields v. McNair, 254 F. Supp. 708 (D.S.C. 1966).

[58] See Burton, et al. "South Carolina," pp. 202-205; Underwood, <u>The Constitution of South Carolina</u>, pp.116-75; Walter A. Edgar, <u>South Carolina in the Modern Age</u> (Columbia:  University of South Carolina Press, 1992), pp. 117-119; Michael A. Maggiotto, "Reapportionment and Voting Rights," in Graham and Tyler, eds., <u>Local Government in South Carolina</u>, Vol. II, pp. 87-106; Bryant Simon, "The Devaluation of the Vote: Legislative Apportionment and Inequality in South Carolina, 1890-1962, <u>The South Carolina Historical Magazine</u>, 97 No. 3 (July 1996),  pp. 227-245.

[59]  383 U.S. 301, 308-309, 310n, 329-330 (1966).

[60] Columbia <u>State</u>, 14 December 1965, 14B; 26 December 1965, 3D.

[61]  U.S. Commission on Civil Rights 1968, 61-64, 72-73, 86-87, 95-96, 117-118, 167-168.

[62]  Columbia <u>State</u>, 26 December 1965, 3D and 18 October 1987, 9B; Columbia <u>Record</u>, 16 March 1965, 1B.  Burton, et al., "South Carolina," pp. 200-01. Whites as well as blacks registered at a higher rate after the passage of the Voting Rights Act.

[63]  Quoted in Jack Bass and Jack Nelson, <u>The Orangeburg Massacre</u>  (1970; 2nd ed. Macon:  Mercer University Press, 1984), p. 197.

[64]  Fraser, <u>Charleston!</u> pp. 279-80, 363; Arthur I. Waskow, <u>From Race Riot to Sit-In: 1919 and the 1960s</u> (Garden City, NY:  Doubleday and Co., 1966), pp. 12-16, 180, 210; O'Neill "From the Shadow of Slavery," p. 43.

[65]  Edgar, <u>South Carolina</u>, p. 540.

Burton Moultrie Report, page 54

---

[66] Anthony Harrigan, ed.  The Editor and the Republic:  Papers and Addresses of William Watts Ball (Chapel Hill:  University of North Carolina Press, 1954), pp. 18-19; Howard H. Quint, Profile in Black and White: A Frank Portrait of South Carolina (Washington, D.C.: Public Affairs Press, 1958), p. v.

[67] "Before You South Carolinians," Charleston News and Courier, 9 December 1950. Judge Waring's quote is from 1954 and cited in Stephen O'Neill, "To Endure, but Not Accept: The News and Courier and School Desegregation," The Proceedings of the South Carolina Historical Association, 1990, p. 87.

[68] See O'Neill,  "To Endure, but Not Accept," pp. 87-89.

[69] "Paper Curtain," Time Magazine, 22 May 1962, in Integration File, Vertical Files, South Carolina Room, Charleston Public Library.

[70] O'Neill, "To Endure, but Not Accept," pp. 87-94;  William D. Smyth, "Segregation in Charleston in the 1950s: A Decade of Transition," South Carolina Historical Magazine, p. 99.

[71] "Mr. Esau Jenkins:  'Here's A Man Being Shot For A Dog,'" and "We didn't have a chance when we go into court." in Carawan, Ain't You Got a right to the Tree of Life?, pp. 145-46, 154.

[72] In 1950 and 1960, 99 percent of Charleston County's non-white population was black. U. S. Department of Commerce. Bureau of the Census, Census of Population: 1950, Volume 2, Characteristics of the Population, Part 40, South Carolina (Washington, D.C., 1952), pp. 46-51, 74, 140, 192; U.S. Census of Housing 1950, Part 40, p. 26; O'Neill, "From the Shadow of Slavery," pp. 84-85;

[73] U. S. Department of Commerce. Bureau of the Census, Census of Housing: 1950, Volume 1, General Characteristics, Part 40, South Carolina (Washington, D.C., 1953), pp. 45, 48, 54.

[74] Eighty-Third Annual Report of the State Superintendent of Education of the State of South Carolina 1951 (Columbia, 1951), pp. 240-245, 248-249, 270-277.

[75] U. S, Department of Commerce. Bureau of the Census, Census of Population: 1960, Volume 1, Characteristics of the Population, Part 42, South Carolina (Washington, D.C., 1961), pp. 150, 162, 1666, 170.

[76] Ninety-Third Annual Report of the State Superintendent of Education, State of South Carolina 1960-1961 (Columbia, 1961), pp. 116-119, 124-131, 148, 170; Stephen Lowe, "Brown on Trial:  School Desegregation in Charleston, South Carolina, 1960-1964," The Avery Review III:1 (Spring 2000), p. 34.

[77] Ninety-Fourth Annual Report of the State Superintendent of Education, State of South Carolina 1961-1962 (Columbia, 1962), pp. 116-119, 124-131, 142, 162.

[78] U. S. Department of Commerce. Bureau of the Census, 1970 Census of Population, Volume 1, Characteristics of the Population, Part 42, South Carolina (Washington, D.C., 1973), p. 293; Leon Fink and Brian Greenberg, Upheaval in the Quiet Zone: A History of Hospital Workers' Union, Local 1199 (Urbana: University of Illinois Press, 1989), p. 130.

[79] U. S. Department of Commerce. Bureau of the Census, 1980 Census of Population, Volume 1, Characteristics of the Population, Part 42, South Carolina (Washington, D.C, 1983), pp. 384, 410, 423; Pockets of Poverty in Charleston County,

South Carolina; Berkley-Charleston-Dorchester Council of Governments, Report on Economically Less Developed Areas in the Berkeley-Charleston-Dorchester Region.

[80] U. S. Department of Commerce. Bureau of the Census, *1990 Census of Population and Housing, Population and Housing Characteristics for Census Tracts and Block Numbering Areas, Charleston, SC MSA* (Washington, D.C., 1993), pp. 245, 261, 277, 294, 375, 407.

[81] All school expenditures and ratios were calculated from the Annual Reports of the State Superintendent of Education. For 1959-60, from the  Ninety-Second Annual Report of the State Superintendent of Education, State of South Carolina, 1959-1960 (Columbia, 1960), pp. 156, 160, 274-77. Per student spending for 1961-62 from Cox, "1963—The Year of Decision," p. 168;

[82] Bruce Smith, Associated Press writer,  "Racial Divide Smaller, but Persistent," Greenwood Index-Journal, 19 August 2001, 1, 5 A; "Race an Issue throughout State's History," Greenville News, 19 August 2001, 1, 4 G.

[83] Donald L. Fowler, "Negro Voting—1966, S.C. Democratic Primary," The University of South Carolina Governmental Review (Bureau of Governmental Research and Service) No. 3, August, 1966, quotations from pp. 3, 4.

[84] William Julius Wilson, When Work Disappears: The World of the New Urban Poor (New York:  Alfred A. Knopf, 1996) and Wilson, The Truly Disadvantaged:  The Inner City, the Underclass, and Public Policy (Chicago:  University of Chicago Press, 1987); Joe R. Feagin, Racist America: Roots, Current Realities, Future Reparations (New York: Routledge, 2000); Cheryl Harris, "Whiteness as Property," Harvard Law Review, 106:8(June 1993), pp.1707-1791; Douglas S. Massey and Nancy A. Denton, American Apartheid (Cambridge: Harvard University Press, 1993); Charles Abrams, Forbidden Neighbors:  A Study of Prejudice in Housing (NY:  Harper, 1955).

[85] *Duvall v. School Board*, C.A. No. 1082 (E.D.S.C.); O'Neill, "From the Shadow of Slavery," p. 100; Brown, "Civil Rights Activism," p. 41; Baker, "Ambiguous Legacies," pp. 80-81.

[86] Brown, "Civil Rights Activism," pp. 47-49; O'Neill, "From the Shadow of Slavery," p. 100.

[87] Brown, "Civil Rights Activism," p. 49.

[88] *Elmore v Rice*, 72 Supp. At 528; *Brown v. Baskin*, 78 F.Supp. 933 (E.D.S.C. 1948), 80 F.Supp. 1017 (E.D.S.C. 1948), *aff'd*, 174 F.2d 391 (4th Cir. 1949).  Key, Southern Politics, pp. 628-632.  Fraser, Charleston!, pp. 398-99.

[89] O'Neill, "From the Shadow of Slavery," p. 110; Brown, "Civil Rights Activism," pp. 237-46.  Brown gives the numbers as 3,036 Charlestonians and 1,001 North Charlestonians for a total of 4,727 newly registered African American voters.  On McCray and the Progressive Democrats see Patricia Sullivan, "Southern Reformers, The New Deal, and the Movement's Foundation," in Armistead Robinson and Patricia Sullivan, eds., New Directions in Civil Rights Studies (Charlottesville:  University of Virginia Press, 1991), pp. 87, 88; and Days of Hope:  Race and Democracy in the New Deal Era (Chapel Hill:  University of North Carolina, 1996) pp. 8, 170-71, 189-91; Robert A. Garson The Democratic Party and the Politics of Sectionalism, 1941-1948 (Baton Rouge:  Louisiana State University Press, 1974), p. 117; Orville Vernon Burton,

"South Carolina Democratic Party (PDP)," in Waldo E. Martin and Patricia Sullivan, eds., <u>Civil Rights in the United States</u>, vol 2 (NY: Macmillan, 2000), pp. 693-94.

[90]  O'Neill, "From the Shadow of Slavery," p. 106.

[91]  Underwood, <u>The Constitution of South Carolina</u>, p. 265 n. 224.  Citing *Gaud v. Walker*, 214 S.C. 451, 464, 53 S.E. 2d 316, 321 (1949).

[92]  Brown, "Civil Rights Activism," p. 250.

[93]  "Four Negro Policemen Go on the Beat Today," Charleston <u>News and Courier,</u> 29 August 1950.

[94]  Brown, "Civil Rights Activism," pp. 250-52.

[95]  Ibid.

[96]  Smyth, "Segregation in Charleston in the 1950s," pp. 110-11.

[97]  O'Neill, "From the Shadow of Slavery," p. 117; Brown, "Civil Rights Activism," p. 254.

[98]  Brown, "Civil Rights Activism," pp. 72-77.

[99]  "Local Voters Ballot Today," 8 July 1952 and Bryan Collier, "Negroes Eliminated; 10 Men Apparently win House Seats," 9 July 1952, both in Charleston <u>News and Courier</u>, cited in Brown, "Civil Rights Activism," pp. 264-67.

[100]  "Lincolnville to Celebrate 64th Anniversary," Charleston <u>News and Courier</u>, 23 April 1953.

[101]  Charleston <u>News and Courier</u>, 14 February 1954; Brown, "Civil Rights Activism," pp. 270-71.

[102]  O'Neill, "From the Shadow of Slavery," p. 90.

[103]  Charleston <u>News and Courier</u>, 18 May 1954, quoted in Brown, "Civil Rights Activism," p. 76.

[104]  Edgar, <u>South Carolina</u>, p. 523.

[105]  Smyth,  "Segregation in Charleston in the 1950s," pp. 110-11, 127; Cox,"1963—The Year of Decision," p. 303; O'Neill, "From the Shadow of Slavery," p. 138.

[106]  For Byrnes' explanation of the gerrymandering, see his quoted radio address in the above Section: History of Discrimination in South Carolina.  "Byrnes Withholds Specific Comment," Charleston <u>News and Courier</u>, 18 May 1954, 6A; Brown, "Civil Rights Activism," p. 67; O'Neill, "From the Shadow of Slavery," p. 96; Baker, "Ambiguous Legacies," p. 176, 265-66. Dr. Gordon was the expert witness for the plaintiffs in *U.S., Plaintiff, Richard Ganaway, et.al., Plaintiffs-Intervenors v. Charleston County School District and State of South Carolina*, C.A. No. 81-50-8.

[107]  Smyth, "Segregation in Charleston in the 1950s," pp. 110-11; Cox, "1963-The Year of Decision," p. 352.

[108]  O'Neill, "From the Shadow of Slavery," pp. 152, 155-56; Brown, "Civil Rights Activism," p. 76-77.

[109]  *Brown v. South Carolina State  Forestry Commission*, 226 F. Supp., 646 (E.D.S.C. 1963), afff'd, 331 F. 2d 142 (4th Cir. 1964);  W.D. Workman, "S.C. May Eliminate State parks as Result of Negroes Court Action,"  Charleston <u>News and Courier</u>, 26 July  1955 cited in Brown, "Civil Rights Activism," p. 150; Cox, "1963—The Year of Decision," pp. 342-45, 263-64. O'Neill, "From the Shadow of Slavery," pp. 154-55, 158, 166.  See also Robert F. Morrison, "Beach for Negroes," Letters to the Editor, 27 April

1952, "Possible Court Action Hinted in Negro Park Controversy," 24 November 1952, "Negro Spokesmen Dislike Park Site," 17 December 1952, "Negroes Threaten Court Fight to Open State Parks," 2 July 1953, "Court Action to Open State Parks to Negroes Advocated,"3 July 1953,  "Negroes Seek Use of Edisto State Park," 17 August 1953, "Entry to Edisto Park or Court, NAACP Writes" and "Legislators to Consider Request That Edisto Be Opened to Negroes," both 28 August 1953, all in Charleston News and Courier.

[110] "Man in the News:  Independence Key to Micah Jenkins," Charleston News and Courier, 28 August 1956 and Charleston Evening Post, "Micah Jenkins, Conservative," 23 June 1956, both in Micah Jenkins file, Vertical Files, South Carolina Room, Charleston Public Library; Fowler, Presidential Voting in South Carolina; Cline, "The South Carolina Negro Vote."

[111] Brown, "Civil Rights Activism, " p. 79.

[112] O'Neill, "From the Shadow of Slavery," p. 169; Brown, "Civil Rights Activism," p. 78; Baker, "Ambiguous Legacies," pp. 177-78;  Smyth,  "Segregation in Charleston in the 1950s," p. 112.  See the Minutes of the County Board of Education, May 24, 1956, exhibit in U.S. and Ricahrd Ganaway, et al. v. Charleston County.

[113] Simon Cuthbert-Kerr, "'You Don't Have to Make the X for Me, Because I can Write my Own Name':  Septima Clark, Citizenship Education, and Voter Registration in the South Carolina Sea Islands, 1954-1963," The Avery Review, III:1 (Spring 2000), 56-80; Smyth, "Segregation in Charleston in the 1950s," p. 113; Brown, "Civil Rights Activism," p. 124.

[114] "Special Election Results," Charleston News and Courier, 4 December 1957 cited in Brown, "Civil Rights Activism," p. 274.

[115] Cummings v. City of Charleston, 288 F.2d 817 (4th Cir. 1961);  O'Neill, "From the Shadow of Slavery,"  pp. 212-14; Brown, "Civil Rights Activism," p. 151-57; Baker, "Ambiguous Legacies," p. 192.

[116] Smythe, "Segregation in Charleston in the 1950s," p. 122.

[117] O'Neill, "From the Shadow of Slavery," pp. 2, 90.

[118] Cox, "1963—The Year of Decision," p. 352; O'Neill, "From the Shadow of Slavery," p. 198; Brown, "Civil Rights Activism," pp. 81, 166; Baker, "Ambiguous Legacies," pp. 198-201.

[119] Brown, "Civil Rights Activism," p. 82; Baker, "Ambiguous Legacies," pp. 204-5.

[120] Brown, "Civil Rights Activism," p. 84; O'Neill, "From the Shadow of Slavery," p. 224; Lowe, "Brown on Trial," pp. 34-6.

[121] Brown, "Civil Rights Activism," pp. 170-75.

[122] Cox, "1963—The Year of Decision," pp. 416, 419-20.

[123] Edgar, South Carolina, p. 540.

[124] Brown v. Charleston District Twenty School Board, 226 F. Supp. 819 (E.D.S.C. 1963); Brown, "Civil Rights Activism," p. 102.

[125] O'Neill, "From the Shadow of Slavery," pp. 218, 225-38; Cox, "1963 – The Year of Decision," pp. 404-18; Brown, "Civil Rights Activism," pp. 176-216; "Baker, "Ambiguous Legacies," pp. 213-18; Alada Shinault-Small, "Several Rungs Up the Ladder—The Struggle for Civil Rights in Charleston Summer 1963," The Avery Review,

2:1(Spring 1999): 8-29, see p. 22-25 for a chronology of the events of the 1963 Charleston movement; see files on the Charleston Movement of 1963 and particularly the riot at the Avery Research Center, College of Charleston.

[126] Cox, "1963—The Year of Decision," p. 421.

[127] Cox, "1963—The Year of Decision," p. 168; "Fund to Aid District 20 in Court Battle is Cut," Charleston News and Courier, 29 April 1965, 1B..

[128] Brown, "Civil Rights Activism," p. 96.

[129] Lowe, "Brown on Trial," pp. 33-55; Cox "1963—The Year of Decision," pp. 161, 230-31, 243-44; O'Neill, "From the Shadow of Slavery," pp. 239-40; Baker, "Ambiguous Legacies," p. 225; Brown, "Civil Rights Activism," pp. 90, 93.

[130] Cox, ,"1963 –The Year of Decision," pp. 186, 217-230, 235-37, 240-43.

[131] Cox, ,"1963—The Year of Decision," p. 169.

[132] Gary Orfield, Public School Desegregation in the US, 1968-1980 (Washington:  Joint Center for Political Studies, 1983), p. 23; Brown, "Civil Rights Activism," p. 98.

[133] Fowler, Presidential Voting in South Carolina.

[134] Carawan, Ain't you got a right to the tree of life? p. 150.  Fowler, "Negro Voting ," p. 1.

[135] "Why Must Greater Charleston Organize?" Prepared by:  Organization Committee, Greater Charleston Citizens' Council in Associations file, Vertical Files, South Carolina Room, Charleston Public Library.

[136] News and Courier, 31 January 1967, 1B.

[137] "Negro Named to School Board," Charleston News and Courier," 9 June 1965, 1B.

[138] O'Neill, "From the Shadow of Slavery," pp. 290-91, Brown, "Civil Rights Activism," pp. 275-76.

[139] Brown, "Civil Rights Activism," p. 276-77.

[140] Baker, "Ambiguous Legacies," p. 255-56.

[141]  "Dr. King Will Speak Here Today," and "Klan Holds Rally Near Ravenel," Charleston News and Courier, July 30, 1967.

[142] O'Neill, "From the Shadow of Slavery," p. 248-249.

[143] Leon Fink and Brian Greenburg, Upheaval in the Quiet Zone:  A History of the Hospital Workers' Union, Local 1199 (Urbana:  University of Illinois Press, 1989), chap. 7, pp. 129-58, quotation from p. 130; Leon Fink, "Union Power, Soul Power:  The Story of 1199B and Labor's Southern Strategy," Southern Changes 5:2 (1983), 9-20; for the background of the racial atmosphere, see the excellent documentary, "You Got to Move."  On the conditions leading to the strike and the strike itself, see Steve Estes, "'I Am Somebody':  The Charleston Hospital Strike of 1969," The Avery Review 3:1 (Spring 2000), 8-32;

[144] Fraser, Charleston!, p. 428.

[145] Smyth, "Segregation in Charleston in the 1950s," p. 113; Brown, "Civil Rights Activism," p. 124; Carawan, Ain't you got a right to the tree of life? p. 150, 152.  See also the excellent documentary on politics and African American life in Charleston in the 1960s, "You Got to Move."  Bernice Robinson and Bill Saunders are interviewed about

politics and discrimination in Charleston at the time the County Council method of election is changed to at-large.

[146]   Baker, "Ambiguous Legacies,"  p. 114.

[147]   A. J. Tamsberg to Thomas R. Waring, 1959, in the Papers of Thomas R. Waring, South Carolina Historical Society, Charleston, South Carolina.

[148]   Brown, "Civil Rights Activism," p. 124; "Negro Leaders Call Local Voter Registrations Fair," Charleston News and Courier, 25 March 1965, 10B; Carawan, Ain't you got a right to the tree of life? p. 2.

[149]   Editorial, "City Election," Charleston News and Courier, 12  June 1967, p. 8A.

[150]   "Three Aldermanic Seats up for Grabs in Primary," News and Courier, 13 June 1967, 1A, 2A.

[151]   "Before You South Carolinians," Charleston News and Courier, 8 August 1950 commenting on earlier published article, "Johnston and the Negro Vote."

[152]   Baker, "Ambiguous Legacies," p. 188-89.

[153]   "Bloc Voting," Charleston News and Courier, 11 and 12 March 1959, cited in Brown, "Civil Rights Activism, " p. 126, n. 30 p. 132.

[154]   "Favored to Win," Charleston News and Courier, 15 June 1965, 3A.

[155]   O'Neill, pp. 290-91; Brown, "Civil Rights Activism," pp. 275-76.

[156]   Fowler, "Negro Voting," p. 2.

[157]   "Figg Wrote School Bill," Evening Post, 15 March 1967.

[158]   Charleston News and Courier, 22 February 1967.

[159]   Charleston News and Courier,  17 February 1967.

[160]   Charleston News and Courier, 8 May 1968.

[161]   Charleston News and Courier, 19 May  1968.

[162]   "County Officials Suffer Defeat," Charleston News and Courier, 12 June 1968, 1A, 6A.

[163]   Charleston News and Courier, November 20, 1968.

[164]   Charleston News and Courier, November 24, 1968.

[165]   "Edwards Says Rivers Reneged," Charleston News and Courier, 4 January 1969.

[166]   Editorial:  "Stop Discrimination," Charleston News and Courier, 26 January 1969.

[167]   "County Republicans Name Jenkins Party Chairman," News and Courier, 13 May 1969, 1B.

[168]   O'Neill, "From the Shadow of Slavery," pp. 2, 90.

[169]   "Professor Says Constitution Anti-Negro," Charleston News and Courier, 11 January 1967, 8A.

[170]   Underwood, The Constitution of South Carolina, see chap. 4 "Prelude to Home Rule:  Charleston County, 1948," pp. 106-115.

[171]   Charleston County, Section 14-1162, 1975 Cumulative Supplement, chap. 26, pp. 455-56.

[172]   No. 304, "An Act to Amend Sections 14-1162 and 14-1163 of the 1962 Code….," S.C. Statutes at Large, pp. 570-73.

[173] <u>Journal of the Senate of the First Session of the 97th General Assembly</u> …1967, (February 2, 7, 8), pp. 226, 304-5, 317. (Hereinafter referred to as <u>Senate Journal</u>) The bill received its second reading on February 7, and third reading February 8. pp. 304-305, 317. <u>Journal of the House of Representatives of the First Session of the 97th General Assembly</u> …, 9 June 1967, p. 340 (hereinafter referred to as <u>House Journal</u>).

[174] "Bourne Seeks Change In Election of Council," Charleston <u>News and Courier</u>, 3 February 1967, p. 8A. Bourne intended the three members from North Charleston to be elected by all members of the North Charleston area, not at-large by the entire county. Later newspaper accounts, however, simply talk about electing the North Charleston council members at-large.

[175] "Senate Gives Nod to Council Bill," Charleston <u>News and Courier</u>, 9 February 1967, 1B. The South Carolina Department of Archives and History was unable to locate the initial S131 proposed by Senator Bourne. Interview with John E. Bourne, Jr. August 15, 2001.

[176] "Delegation Favors More Authority to Council," Charleston <u>News and Courier</u>, 6 February 1967 1B.

[177] "Council Desires Are Spelled Out," Charleston <u>News and Courier</u>, 8 February 1967, 10A.

[178] "County Council Request Expansion of Powers" Charleston <u>News and Courier</u>, 12 April 1967, p. 1-2A. Previously the newspaper referred to the Committee as the Legislative Study Committee.

[179] "Council Proposal May Face Delay," Charleston <u>News and Courier</u>, 13 April 1967, pp. 1-2A.

[180] "Changing County Council," Charleston <u>News and Courier</u>, 16 April 1967, 14A.

[181] <u>House Journal</u>, 1 June 1967, p. 1508.

[182] "Delegation Prepares Council Bill," 1 June 1967, 17C.

[183] <u>Senate Journal</u> June 8, p. 1462, June 29, p. 1906.

[184] <u>Senate Journal</u> July 5, 1967, pp. 2221-2, 243-44; <u>House Journal</u>, July 5 1967, p. 2083.

[185] "Disputed Bill Goes to Committee," Charleston <u>News and Courier</u>, July 6, 1967, 1B.

[186] "Committee Gives Nod to Bill," Charleston <u>News and Courier</u>, July 11, 1967, 1B, 6B.

[187] <u>House Journal</u> July 13, 1967, pp. 2356-2357.

[188] <u>Senate Journal</u> July 14, 1967, pp. 2240-41, <u>House Journal</u>, 1967, July 14, p. 2361. "Delegation Fails to Agree on County Council Legislation," Charleston <u>News and Courier</u>, 14 July 1967, 1B, 6B.

[189] <u>House Journal</u> 1968, April 18, 1968, p. 1079, April 23, p.1136, April 24, p. 1157; <u>Senate Journal</u> 1968, April 24, p. 940, April 25, p. 962, May 1, p. 1019.

[190] "Senators Agree to Amend At-Large Election Bill," Charleston <u>News and Courier</u>, 1 May 1968, 1B.

[191] "Council Bill is Delayed in Senate," Charleston <u>News and Courier</u>, 2 May 1968, 2B.

---

[192] "House Group Holding Up Two Bills," Charleston News and Courier, 9 May 1968, 22A.

[193] Senate Journal 1968, April 24 (p. 940), April 25 (p. 962), May 1 (p. 1019). Read in the House April 18, 23, 24, 1968 and read in the Senate April 24, 25 and June 27, 1968. Jacket Cover of House Bill 2891, South Carolina Department of Archives and History (hereinafter referred to as SCDAH).

[194] "Charleston County Council Seeks Big Salary Increase," Charleston News and Courier, 8 January 1969.

[195] "Council Asks Delegation to Put Ceiling on Salary," Charleston News and Courier, 2 February 1969, 1B.

[196] "Legislators Reach Accord On Lifting Salary Ceiling:  At Large Elections Planned for Council," Charleston News and Courier, 12 February 1969.

[197] House Journal  18 February 1969, p. 318.

[198] "Change to Be Proposed On Council Seats," Charleston News and Courier, 19 February 1969, 1B.

[199] House Journal 1969, Feb. 20, p. 50.   See the House Amended Bill in House Journal 1967, June 6, "S. 131—Amended…", pp. 1545-46; and the draft for House Bill 2891 dated April 9, 1968 attached to letter from R. B. Scarborough to Honorable Daniel R. McLeod, Attorney General, April 11, 1968, in the South Carolina, Attorney General's Office, Opinions, 1878-1994, Box 114, File Reapportionment, S110031, SCDAH.  The two bills are identical, and the wording for the area of North Charleston read, "Three members shall be residents of the area of the county lying north of the City of Charleston, as now constituted, between the Ashley and Cooper Rivers extending to the Dorchester and Berkeley County lines."

[200] House Journal  February 21, 1967, p. 357; Senate Journal  February 25, 1969, p. 313.

[201] "Council Bill Hits Snag in Senate," Charleston News and Courier, 27 February 1969, 11C.

[202] House Reading were Feb. 18, 20, 21 and Senate Reading Feb. 25, March 4 and 5, 1969.  Jacket Cover to House Bill 1262, Acts, Legislative Records, SCDAH; House Journal February 18 1969, p. 318, February 19, p. 333, February 20, p. 350, February 21, p. 357, March 18, p. 532; Senate Journal  February 25, 1969, p. 313, March 4, p. 383,  March 5, p. 393, March 18, p. 459.

[203] See for example, the essays in Chandler Davidson, ed. Minority Vote Dilution (Washington, D.C. Howard University Press, 1984) and Chandler Davidson and Bernard Grofman, eds., Quiet Revolution in the South:  The Impact of the Voting Rights Act, 1965-1990 (Princeton:  Princeton University Press, 1994) and the books by J. Morgan Kousser, Colorblind Injustice:  Minority Voting Rights and the Undoing of the Second Reconstruction (Chapel Hill:  University of North Carolina Press, 1999); Frank R. Parker, Black Votes Count:  Political Empowerment in Mississippi after 1965 (Chapel Hill: University of North Carolina Press, 1990);  Steven F. Lawson, In Pursuit of Power: Southern Blacks and Electoral Politics, 1965-1982 (New York, Columbia University Press, 1985); see articles by Peyton McCrary, "The Dynamics of Minority Vote Dilution: The Case of Augusta Georgia, 1945-1986," Journal of Urban History, 25:2 (January 1999): 199-224;  McCrary and Steven F. Lawson, "Race an Reapportionment, 1962:  The

Case of Georgia Senate Redistricting, Journal of Policy History, 12:3 (2000): 293-320; J. Morgan Kousser, "How to Determine Intent:  Lessons from L. A.," Journal of Law and Politics 7: 591-732.  Several articles have appeared in law journals, for example, Peyton McCrary and J. Gerald Hebert, "Keeping the Courts Honest:  The Role of Historians as Expert Witnesses in Southern Voting Rights Cases," 16 (1989): 101-28 and McCrary, "Discriminatory Intent:  The Continuing Relevance of 'Purpose' Evidence in Vote-Dilution Lawsuits," Howard Law Journal 28 (1985): 463-93; and McCrary "Yes, But What Have They Done to Black People Lately?  The Role of Historical Evidence in the Virginia School Board Case," Chicago-Kent Law Review 70:3 (1944): 1275-305.

[204]   Columbia State and Record, combined Sunday edition, 5 December 1965, D3.  Graham served seventeen years on County Council and served longer than any other member as the Chair of the Council.  He had been chair from 1957-65, but had given up the chairmanship for health reasons briefly in 1965.  He was chair again in 1967 when the Council recommended changing to an at-large election method.  Charleston News and Courier, "Graham to Quit Chairmanship," 19 December 1964, 1B and "County Council Getting New Look," 28 February 1974, 15E.

[205]   "Committee Gives Nod to Bill," Charleston News and Courier, 11 July 1967, 1B, 6B.  Ironically for a "good government" argument, in 1974, several members who had supported the change to at-large election were accused of embezzlement.  "Price, Balliet Indicted," 9 January 1974; "It's A Sticky Problem," 28 April 1974, p. 21C; "County Council Getting New Look," 28 July 1974, p. 15E, all in Charleston News and Courier.

[206]   "Majority of Candidates Favor At-Large Election," Charleston News and Courier, 3 May 1968.  It appears at least two of the candidates who supported district elections won over candidates who supported the at-large system.

[207]   377 US 533 (1964).

[208]   257 F. Supp. 905; see discussion in Peyton McCrary, Jerome A. Gray, Edward Still, and Huey L. Perry, "Alabama," in Chandler Davidson and Bernard Grofman, eds., Quiet Revolution, pp. 40, 399 (n. 25).

[209]   "2 More Local Bills Cleared by House," Charleston News and Courier, 25 April 1968, 1B.

[210]   "Senators Agree to Amend At-Large Election Bill, Charleston News and Courier, 1 May  1968, 1B.

[211]   "Majority of Candidates Favor At-Large Election," Charleston News and Courier, 3 May 1968.

[212]   390 US 474 (1968).

[213]   R. B. Scarborough, Chairman  to Honorable Daniel R. McLeod,  Attorney General, 11 April 1968, and Daniel R. McLeod, Attorney General to Honorable R. B. Scarborough, Member, House of Representatives, 15 April 1968, and "A Bill:  To amend Section 14-1162 and 14-1165, Code of Laws… to require members to be elected from the county at Large, to Designate Residency Requirements and Increase Compensation for Council Members," House, Attorney:  Lipton; Stenographer: Ballinger; Date:  4-9-68, all in South Carolina, Attorney General's Office, Opinions 1878-1994, Box 114 File Reapportionment s110031, SCDAH.  See also the letter of Grady L. Patterson, Jr., Assistant Attorney General to Hon. W. O'Dell Venters (House Representative from

Burton Moultrie Report, page 63

Florence), 16 February 1966, on his inquiry as to the constitutionality of Senate Bill No. 524 on the application *of Reynolds v. Sims*.

[214]   "Charleston County Council Seeks Big Salary Increase," Charleston News and Courier, 8 January 1969, 1,7A..

[215]   Ibid.

[216]   "County Council Reaching Manhood," Charleston News and Courier, 26 January 1969, 10A.

[217]   "Twelve Council Districts Outlined," Charleston News and Courier, 9 November 1969.

[218]   See the File on City-County Consolidation, in the Vertical Files, Charleston County Public Library.

[219]   The 1966 Public Administration Service, "Local Government in Charleston County, South Carolina," (1313 East Sixtieth Street, Chicago Il) recommended county-city merger, and in their report they also recommended that the consolidated government adopt at-large elections.  They included no discussion nor rationale for this election system, and at no point in this report did consultants ever say that it required one- person, one-vote.  For newspaper coverage of the city-county merger, see the Charleston City-County Consolidation file, Vertical Files, South Carolina Room, Charleston Public Library.  Apparently the referendum was defeated by the areas outside the city who voted against merger.  The two areas used for comparisons were Jacksonville, Florida and Nashville, Tennessee.  Jacksonville adopted a mixed plan (district and at-large) and Nashville adopted a district election system.  Don H. Doyle, Nashville Since the 1920s (Knoxville:  University Tennessee Press, 1985), pp. 190, 207-9, Richard Martin, Consolidation:  Jacksonville Duval County, The Dynamics of Urban Political Reform (Jacksonville, Florida:  Crawford Publishing Company, 1968).

[220]   "Controversial full-slate law recommendations," Charleston News and Courier, 4 January 1969.

[221]   "Opposition Mounting to Repeal of Full Slate Law," Charleston News and Courier, 31 January 1969.

[222]   "Legislators Reach Accord on Lifting Salary Ceiling," Charleston News and Courier, 12 February 1969.

[223]   A. J. Clement, "Letter to the Editor, Charleston News and Courier, 21 July 1951; Brown, "Civil Rights Activism," p. 256.

[224]   "First Request for Judicial Notice," III.  Objections Under Section 5 of the Voting Rights Act, 16, Charleston City Council, September 20, 1974, p. 78.

[225]   "First Request for Judicial Notice," III.  Objections Under Section 5 of the Voting Rights Act, 20, Charleston City Council, February 18, 1975, pp. 79-80.

[226]   "First Request for Judicial Notice," III.  Objections Under Section 5 of the Voting Rights Act, 16, Charleston County Council, September 24, 1974, pp. 78-79.  Ladd Deposition, 10 March 1972, pp. 3, 10,12, 23 discusses in general the inability of African American candidates in the South to attract white voters.  For  South Carolina and racial bloc voting see, Burton, et al., "South Carolina," pp. 212-13; James W. Loewen, "Racial Bloc Voting and Political Mobilization in South Carolina," Review of Black Political Economy 19 (1990): 23-37; John C. Ruoff, "Racial Polarization and Participation in Voting in South Carolina Elections, 1992-2000," June 26, 2001 Presented to Election

Burton Moultrie Report, page 64

---

Laws Subcommittee, Judiciary Committee, S.C. House of Representatives, Prepared on Behalf The Southern Poverty Law Center.

[227]   Charles A. Beard, American City Government: A Survey of Newer Tendencies (New York: The Century Company, 1912), pp. 95-97.

[228]   A 1960s standard political science textbook, Edward C. Banfield and James Q. Wilson, City Politics (Cambridge:  Harvard University Press, 1963), pp. 87-96, develop this argument in more detail.  See Paul T. David, "1 Member vs. 2, 3, 4 or 5," National Civic Review, LV (February 1966), pp. 75-81.

[229]   "Bill Would Extend Voting Rights Act," Charleston News and Courier, 31 January 1969, 15A.

[230]   Acts and Joint Resolutions of the General Assembly of the State of South Carolina, Regular Session of 1954, Second Part of Forty-Eighth Volume of Statutes at Large, No. 721 (R848m H2121), pp. 1795-96; House Journal 1954, March 16 (pp. 987-88, 1005-6), March 17 (p. 1039), March 24 (p. 1323), March 27 (p. 1372); Senate Journal 1954, March 17 (pp. 718, 720), March 23 (p. 930), March 24 (pp. 934, 953), March 26 (p. 989); Interview with Herbert Fielding, August 11, 2001; 14 February, "Session Opens in Secrecy, Adjourns in Controversy," 4 March, "Delegation Favors Council Reduction Plan," 17 March, "General Assembly Directs $1 Million Bond Issue for Bridge Construction Here," 26 March, all 1954, Charleston News and Courier; Brown, "Civil Rights Activism," pp. 270-71.

[231]   Fraser, Charleston! p.408.

[232]   Brown, "Civil Rights Activism," p. 250.  Brown has the date wrong, she has the City Council going at-large in 1950.

[233]   Deposition of Professor Everett Carll Ladd, Jr. 10 March 1972, pp. 5, 8 in Stevenson v. West, CA 72-45; Everett Carll Ladd, Jr., Negro Political Leadership in the South (Ithaca, NY:  Cornell University Press, 1966).

[234]   Carawan, Aint You Got a Right to the Tree of Life?, p. 152; Act. No. 890 (R1103, H2252), "An Act to Amend Section 21-1631 of the Code of Laws of South Carolina, 1952, Relating to the Election or Appointment of Trustees of School Districts in Charleston County, So as to Make Further Provision for the Appointment of the Trustees of St. John's School District No. 9 and St. Paul's School District No. 23, in the County," 19 April 1956,  Statutes at Large of South Carolina:  General and Permanent Laws – 1956, pp. 2143-44.

[235]   Burton, et al. "South Carolina," Table 7.8A, pp. 207-11, 228-30.

[236]   According to unofficial figures published in the Charleston News and Courier, 1 November 1964.

[237]   U.S. Commission on Civil Rights, Political Participation (Washington, D.C. 1968), pp. 252-53.

[238]   U.S., Census of Population: 1950 Volume 2 Characteristics of the Population, Part 40 South Carolina (Washington, D.C., 1952), p. 47

[239]   U.S., Census of Population: 1960 Volume 1 Characteristics of the Population, Part 42 South Carolina (Washington, D.C., 1961), p. 38.

[240]   U.S., 1970 Census of Population Volume 1, Characteristics of the Population Part 42 South Carolina (Washington, D.C.,1973), pp. 39, 55, 67, 77, 200.  One historian has the 1970 old peninsula city population as 46,575, of whom nearly two-thirds were

---

non-whites and another argues that 42 percent of whites left the old peninsula city in the 1960s. See O'Neill, "From the Shadow of Slavery," pp. 209-212 and Baker, "Ambiguous Legacies," pp. 235-36.

[241] O'Neill, "From the Shadow of Slavery," pp. 209-212.

[242] Fraser, Charleston! pp. 420-21.

[243] First Request for Judicial Notice, III. Objections Under Section 5 of the Voting Rights Act, No. 16, p. 78 (September 24, 1974); Burton, et al., "South Carolina," p. 207.

[244] Columbia State, 26 April 1967, 1, 13A.

[245] Columbia State, 30 April 1967, 3D.

[246] "Election Returns from Charleston County," Charleston News and Courier, 9 November 1966. Interviews with Lonnie Hamilton, 3 and 15 August 2001; Interview with Rev. LeRoy Fayell, 3 August 2001. Using the 1970 registration data for those precincts north of the City of Charleston and east of the Ashley and west of the Cooper rivers, there were a total of 14,391 whites and 4,235 non-whites registered to vote. In St. Michael and St. Phillip precinct, there were 1,008 African American and 334 whites. Azalea precinct had 759 non-white voters.

[247] "Election Changes Council," Charleston News and Courier, 7 November 1968, 9B.

[248] Ladd Deposition, 10 March 1972, p. 15; "Study: Race Important in South Carolina Voting," Associated Press Newswires, Wednesday, July 25, 2001.

[249] "Appointment of Negroes Suggested," Charleston News and Courier, 19 April 1967, 4C; Columbia State, 14 April (p. 1) and 9 (p. 7B) and 24 (p. 3B) June 1967.

[250] "Negro Named to School Board," Charleston News and Courier, 9 June 1965, 1B; "Appointment of Negroes Suggested," Charleston News and Courier, 19 April 1967, 4C.

[251] Deposition of Dr. Gordon Stine, March 9, 1972, in *Leverne Stevenson, et al, v John C. West, etc.*, C.A. No. 72-45, pp. 3-4, 32, 36-38.

[252] "Voters Urged to Cast Ballots," Charleston News and Courier 12 June 1967, 1B; County Officials Suffer Defeat," Charleston News and Courier, 12 June 1968, 1A, 6A; O'Neill, "From the Shadow of Slavery," pp. 295-97.

[253] "Challenger Crosby," Charleston News and Courier, 16 April 1978, 1E.

[254] Interview with Lonnie Hamilton, III, 3 and 15 August 2001.

[255] Deposition of Lonnie Hamilton, 5 June 1990, pp. 16, 19, 23, 26, 34, 45,55-56, 58-59, 63 Charleston, S.C. NAACP v. Charleston County School Board, C.A. No. 2:88-2938-1.

[256] Hamilton Deposition, pp. 21-2, 45.

[257] Columbia State, 28 August 1964; Baker, "Ambiguous Legacies," p. 231.

[258] Especially relevant to Micah Jenkins's role as chair of the County Council committee that recommended in 1967 the change to at-large elections is the 1965 Citizens' Council's answer to "What can a Citizens' Council do?" According to a brochure the Council distributed, "Through its own committees and individual members it can identify and disseminate lawful ways of resisting destructive applications of statutes and edicts." Brochure entitled "Why Must Greater Charleston Organize?"

Prepared by:  Organization Committee, Greater Charleston Citizens' Council in Associations file, Vertical Files, South Carolina Room, Charleston Public Library.

[259]  "Man in the News:  Independence Key to Micah Jenkins,  Charleston News and Courier, 28 August 1956 and Charleston Evening Post, "Micah Jenkins, Conservative," 23 June 1956, both in Micah Jenkins file, Vertical Files, South Carolina Room, Charleston Public Library.

[260]  Quint, Profile in Black and White, pp. 44-45, 47-48, 137-38, quotation p. 45; Neil R. McMillen, The Citizens' Council:  Organized Resistance to the Second Reconstruction, 1954-64 (Urbana:  University of Illinois Press, 1972), pp. 75-6, 78, 117-18, 313, quotation note 6, pp. 117-18; Smyth,  "Segregation in Charleston in the 1950s," p. 127.

[261]  Quint, Profile in Black and White, p. 44.

[262]  Ibid., p. 46 and Deposition of Charles M. Gibson, 16 December 1986, pp. 68-69, U.S. v. Richard Ganaway, et al., CA No. 81-50-8.

[263]  " GOP Loses Fight to Cut Negro Vote," Charleston Post and Courier, 2 June 1967, 1A, 13A.

[264]  "School Bill Clears Senate," Charleston News and Courier, 8 June 1967, 1, 8A; "County School Bill Passes Senate, 23-5," Charleston Evening Post, 1 March 1967.

[265]  "GOP To Caucus On Bill Today," Charleston News and Courier, 2 March 1967; "School Merger:  Charleston Bill Passes," Columbia State, 2 March 1967.

[266]  Charleston Evening Post, 23 March 1967, 2B; Gibson deposition, pp. 113-14.

[267]  Gibson Deposition, p. 128.

[268]  Quotations from  "Crosby Blasts Bourne Administration as 'Racist'," 29 April 1978, 3A; see also "Challenger Crosby," 16 April 1978 1E, both in Charleston News and Courier.

[269]  R. Scott Baker, "Ambiguous Legacies," pp. 232-3; Brown, "Civil Rights Activism," p. 93; see also, "College Issue May Cost Charleston Unit Charter," Baltimore African American, 20 August 1949.

[270]  Charleston News and Courier, 10 November 1963; Baker, "Ambiguous Legacies," p. 233; Cox, "1963—Year of Decision," p. 233, 235.

[271]  Columbia State, 24 (p. 8B) and 25 (p. 1B) September 1963 quoted in Cox, "1963—Year of Decision," p. 236.

[272]  Editorial, Charleston Evening Post, 9 January 1968, 2B; Gibson deposition, p. 109.

[273]  See for example, President Grice's Statement to the Trustees, n.d. (probably 1965), Box 45, folder 8, the Papers of George Grice, College of Charleston.

[274]  Baker, "Ambiguous Legacies," p. 233 citing Charleston News and Courier, 3, 4, 7, 8,9, 10, 11, 12, 22 September, 25 October, and 11 December 1963; Edmund L. Drago, Initiative, Paternalism, and Race Relations:  Charleston's Avery Normal Institute (Athens: University of Georgia Press,1990), pp. 274-75.

[275]  Baker, "Ambiguous Legacies," p. 234; Drago, Initiative, Paternalism, and Race Relations, 274-75.

[276]  Charleston News and Courier, 4 March 1967; Baker, "Ambiguous Legacies," p. 268.

[277]   "School Consolidation Bill May Go To House Today: Delay In Debate Expected," Charleston News and Courier, 19 April 1967.

[278]   "By House Members: School Bill Given Key 2nd Reading," Charleston Evening Post, 20 April 1967.

[279]   "Charleston School Bill Passes House," The State, 21 April 1967.

[280]   "Foes Fail to Stall School Bill," Charleston News and Courier, 21 April 1967.

[281]   In a meeting reported in the Charleston News and Courier, Senator Worsham used the code words of states' rights, "There's a lot of talk today about states rights. Now the city rights have been taken away and the majority should rule." Charleston News and Courier, 20 February 1967. See Gibson Deposition, pp. 63, 70, 87-93, 158-59.

[282]   Gibson Deposition, pp. 51-53, 56, 63 "palatable" quotation; Deposition of Dr. Creighton Frampton, 14 March 1986, US, Richard Ganaway, et al. v. Charleston County School District, Case Number 81-50-8, pp.39, 68; Baker, "Ambiguous Legacies," pp. 267-70; Plaintiffs' Proposed Post-Trial Findings of Fact, U.S. and Richard Ganaway, et al. v. Charleston County School District, pp. 211-12.

[283]   Baker, "Ambiguous Legacies," p. 270.

[284]   Act 844 (R294, H1931), "An Act to make Additional Provisions …," 22 March 1952, pp. 2085-87, and Act 379 (R256, H1150), pp. 546-661, both in  Statutes at Large of South Carolina,; Article 4, 1960 Cumulative Supplement, pp. 53, 185; Act 890 (R1103, H2252) "An Act to Amend Section 21-1631 of the Code of Laws of South Carolina, 1952, Relating to the Election or Appointment of Trustees of School Districts in Charleston County, So as to Make Further Provision For the appointment of the Trustees of St. John's School District No. 9 and St. Paul's School District No. 23, in the County, 19 April 1956, Statutes at Large of South Carolina:  General and Permanent Laws – 1956, pp. 2144; Article 4, Charleston County, ch 27, S.C. Code 1962, 1975 Cumulative Supplement, pp. 211-12, 371-74; Act 1037 (R1272, S838) "An Act to Amend Section 21-1631 of the 1962 Code, Relating to the Elective or Appointment of Trustees of School Districts in Charleston County, So As to Make Further Provision for the Appointment of the Trustees of St. James Santee School District No. 1,.24 April 1964, Statutes at Large of South Carolina:  General and Permanent Laws – 1964, p. 2368; Act No. 340 (R472, S20) "An Act to Abolish the School District of Charleston County and to Abolish the County Board of Education of Charleston County," Statutes at Large of South Carolina:  General and Permanent Laws – 1967,  8 June 1967, pp. 470-476;  Act No. 936 (R983, S612) "An Act to Amend Act No. 340 of 1967 …, 13 March 1970, Statutes at Large:  General and Permanent Laws – 1970, pp. 2032-4; Act No. 397 (R644, H1870) "An Act to Amend Section 21-1631 …So as to Provide that All Trustees Shall Be Elected," Statutes At large:  General and Permanent Laws –1973, pp. 692-93; Act No. 914 (R945, H2556) "An Act to Amend Section 21-1631, As Amended …To Delete References to Appointments of the Trustees of School District No. 20 of Charleston County ….," Statutes At Large:  General and Permanent Laws –1974, pp. 1978-79; "Editorial:  Break with the Past," "School Bill Clears Senate," Charleston  News and Courier, 19 February, 24 March, and 8 June 1967.

[285]   Interview with Herbert Fielding, August 11, 2001.  Mr. Fielding stated that several bills were introduced to change the election of County Council to single member

district.   See House Journal, 1978 House Bill 3661 introduced by Reps. Robert R. Woods, Tillman, Kohn, Bradley, Washington and Rawl, p. 3747; February 21, p. 856, March 14, p. 1210, March 15, p. 1264, March 16, p. 1308.

[286]   "Blacks and Republicans Pushing Home Rule," Charleston News and Courier, 11 January 1976, 15C.

[287]   "Stuckey Raps Bourne on Home Rule Vote," Charleston News and Courier, 19 April 1976, 1B.

[288]   "Home Rule Election Target Date," Charleston News and Courier, 21 January 1976, 1B.

[289]   "Home Rule Vote Clouded," Charleston News and Courier, 1 June 1976, 1A.

[290]   "Home Rule – Pick Your Question," Charleston News and Courier, 12 December 1976, 31B.

[291]   "Decision Due Soon," Charleston Evening Post, 10 September 1977, 1A.

[292]   "Justice Department Rejects County's Home Rule, Charleston News and Courier, 15 June 1977, 1A; "Local Home rule Plan is Rejected, Charleston Evening Post, 15 June 1977, 1, 2A.

[293]   "Justice Still Objects to County Home Rule," Charleston News and Courier, 23 December 1977, 1A.

[294]   See Woods v. Hamilton, CA. No. 78-873, 473 F. Supp. 641 (D.S.C. 1979); U.S. v. County Council of Charleston County, South Carolina, C.A. No. 78-905; Hamilton v. Tillman (April 18, 1977; Infinger v. Edwards; Dodds v. Stuckey, 234 S.E. 2d 214 (S.C. 1977); County Council Minutes, 20 April, 18 May, 6 July 1976 in South Carolina Room, Charleston Public Library.   The tangled web of the home rule debate in Charleston County can be followed through the newspaper articles in the Home Rule File, (Government County), in the Vertical files in the South Carolina Room, Charleston Library.   See especially, "Home Rule Referendum is Debated," 31 July, 1,3A, "Decision on County Council's Future Must Be Faced, " 28 September 15E, "Choice of Local Government Bill Unlikely to Pass," 20 November 1,8B all 1975, "Blacks and Republicans Pushing Home Rule," 11 January 15-C, "Home Rule Election Target Date," 21 January 1B, "Bourne Backs Home Rule Petition Drive, 18 April 1,2A; "Stuckey Raps Bourne on Home Rule Vote," 19 April, 1B, "Home Rule Could Be Traumatic Experience Here," 2 May 27E, "Home Rule: A Chinese Puzzle," 6 May 1,7B, "Home Rule Vote Clouded," 1 June 1A, "Home Rule – Pick Your Question," 12 December 31B all 1976, "Justice Department Rejects County's Home Rule, Charleston News and Courier, 15 June 1A, "Council Seeks Reconsideration," 22 June 1A, "County Appeals Decision," 14 July 1A, "Home Rule Decision Soon," 10 September 1A; "Hamilton, Woods Debate Forms of Government," 16 September 11A, "Justice Still Objects to County Home Rule," 23 December 1A all 1977, all in Charleston News and Courier.  Referendum Still Strong Possibility," 14 April 1A, "Local Home Rule Plan I Rejected," 15 June 1A, and "Decision Due Soon," 10 September 1A all in Charleston Evening Post, 1977.

[295]   Hamilton Deposition, p. 55; Interviews with Lonnie Hamilton, 3 and 15 August 2001; Interview with Rev. LeRoy Fayell, 3 August 2001; Interview with Herbert Fielding, August 11, 2001.

APPENDIX C

Case 1:12-cv-00203-CKK-BMK-JDB    Document 165-3    Filed 08/13/12    Page 143 of 151

# South Carolina General Assembly
119th Session, 2011-2012

Download This Bill in Microsoft Word format

**A27, R54, H3003**

## STATUS INFORMATION

General Bill
Sponsors: Reps. Clemmons, Harrell, Lucas, Bingham, Harrison, Cooper, Owens, Sandifer, Allison, Ballentine, Bannister, Barfield, Bowen, Cole, Crawford, Daning, Delleney, Forrester, Frye, Gambrell, Hamilton, Hardwick, Hiott, Horne, Huggins, Limehouse, Loftis, Long, Lowe, Merrill, V.S. Moss, Norman, Parker, G.M. Smith, G.R. Smith, Sottile, Stringer, Toole, Umphlett, Viers, White, Crosby, Thayer, Simrill, Ryan, McCoy, Murphy, Atwater, Henderson, Quinn, Tallon, Patrick, J.R. Smith, Hixon, Taylor, Young, Bedingfield, Corbin, Pitts, Chumley, Spires, Pope, Bikas, Pinson, D.C. Moss, Erickson, Willis, Brady, Herbkersman, Nanney, Brannon and Whitmire
Document Path: l:\council\bills\ms\7070zw11.docx
Companion/Similar bill(s): 1, 3961

Introduced in the House on January 11, 2011
Introduced in the Senate on January 27, 2011
Last Amended on May 11, 2011
Passed by the General Assembly on May 11, 2011
Governor's Action: May 18, 2011, Signed

Summary: Voter ID

## HISTORY OF LEGISLATIVE ACTIONS

```
     Date      Body    Action Description with journal page number
-------------------------------------------------------------------------------
  12/7/2010    House   Prefiled
  12/7/2010    House   Referred to Committee on Judiciary
  1/11/2011    House   Introduced and read first time (House Journal-page 3)
  1/11/2011    House   Referred to Committee on Judiciary (House Journal-page 3)
  1/12/2011    House   Member(s) request name added as sponsor: Atwater
  1/18/2011    House   Member(s) request name added as sponsor: Henderson,
                          Quinn, Tallon, Patrick, J.R.Smith, Hixon, Taylor,
                          Young, Bedingfield, Corbin, Pitts, Chumley, Spires,
                          Pope, Bikas, Pinson
  1/19/2011    House   Committee report: Favorable with amendment Judiciary
                          (House Journal-page 2)
  1/20/2011    House   Member(s) request name added as sponsor: D.C.Moss
  1/25/2011    House   Member(s) request name added as sponsor: Erickson, Willis
  1/25/2011    House   Objection by Rep. Cobb-Hunter and Sellers
                          (House Journal-page 32)
  1/25/2011    House   Requests for debate-Rep(s). Clemmons, Crawford, JE
                          Smith, Hart, Govan, McEachern, Erickson, Brantley,
                          King, Jefferson, Munnerlyn, Forrester, Parker,
                          Allison, Mack, Mitchell, Bikas, DC Moss, JR Smith,
                          Hixon, Taylor, Young, RL Brown, GA Brown, Anderson,
                          Clyburn, Hosey, Brannon, Hayes, Battle, Gilliard,
                          McCoy, Stringer, Sandifer, Whitmire, VS Moss, Nanney,
                          Bedinfield, Henderson, Allen, Hearn, Dillard, Corbin,
                          Hardwick, Loftis, Pope, Whipper, Ott, and Vick
                          (House Journal-page 32)
  1/26/2011    House   Member(s) request name added as sponsor: Brady,
```

|            |        | Herbkersman, Nanney, Brannon, Whitmire |
|------------|--------|----------------------------------------|
| 1/26/2011  | House  | Amended (House Journal-page 28) |
| 1/26/2011  | House  | Read second time (House Journal-page 28) |
| 1/26/2011  | House  | Roll call Yeas-74  Nays-45 (House Journal-page 28) |
| 1/27/2011  | House  | Read third time and sent to Senate (House Journal-page 34) |
| 1/27/2011  | Senate | Introduced and read first time (Senate Journal-page 17) |
| 1/27/2011  | Senate | Referred to Committee on **Judiciary** (Senate Journal-page 17) |
| 2/3/2011   |        | Scrivener's error corrected |
| 2/8/2011   | Senate | Motion For Special Order Failed (Senate Journal-page 14) |
| 2/8/2011   | Senate | Roll call Ayes-25  Nays-15 (Senate Journal-page 14) |
| 2/9/2011   | Senate | Motion For Special Order Failed (Senate Journal-page 23) |
| 2/9/2011   | Senate | Roll call Ayes-26  Nays-14 (Senate Journal-page 23) |
| 2/10/2011  | Senate | Special order, set for February 10, 2011 (Senate Journal-page 19) |
| 2/10/2011  | Senate | Roll call Ayes-26  Nays-17 (Senate Journal-page 19) |
| 2/15/2011  | Senate | Debate interrupted (Senate Journal-page 24) |
| 2/16/2011  | Senate | Debate interrupted (Senate Journal-page 23) |
| 2/17/2011  | Senate | Debate interrupted (Senate Journal-page 12) |
| 2/22/2011  | Senate | Debate interrupted (Senate Journal-page 23) |
| 2/23/2011  | Senate | Committee Amendment Amended and Adopted (Senate Journal-page 36) |
| 2/23/2011  | Senate | Read second time (Senate Journal-page 36) |
| 2/23/2011  | Senate | Roll call Ayes-26  Nays-15 (Senate Journal-page 36) |
| 2/24/2011  |        | Scrivener's error corrected |
| 2/24/2011  | Senate | Read third time and returned to House with amendments (Senate Journal-page 11) |
| 2/24/2011  | Senate | Roll call Ayes-24  Nays-15 (Senate Journal-page 11) |
| 2/24/2011  |        | Scrivener's error corrected |
| 2/25/2011  |        | Scrivener's error corrected |
| 3/2/2011   | House  | Debate adjourned until Thursday, March 3, 2011 (House Journal-page 49) |
| 3/3/2011   | House  | Debate adjourned until Tuesday, March 8, 2011 (House Journal-page 28) |
| 3/8/2011   | House  | Debate adjourned until Wednesday, March 9, 2011 (House Journal-page 73) |
| 3/9/2011   | House  | Debate adjourned on amendments (House Journal-page 27) |
| 3/10/2011  | House  | Debate adjourned on amendments (House Journal-page 30) |
| 3/29/2011  | House  | Debate adjourned on Senate amendments until Wednesday, March 30, 2011 (House Journal-page 30) |
| 3/30/2011  | House  | Debate adjourned on Senate amendments until Thursday, March 31, 2011 (House Journal-page 33) |
| 3/31/2011  | House  | Debate adjourned on amendments (House Journal-page 35) |
| 4/5/2011   | House  | Debate adjourned on Senate amendments until Wednesday, April 6, 2011 (House Journal-page 22) |
| 4/6/2011   | House  | Senate amendment amended (House Journal-page 36) |
| 4/6/2011   | House  | Returned to Senate with amendments (House Journal-page 36) |
| 4/13/2011  | Senate | Non-concurrence in House amendment (Senate Journal-page 35) |
| 4/13/2011  | Senate | Roll call Ayes-28  Nays-15 (Senate Journal-page 35) |
| 4/14/2011  | House  | House insists upon amendment and conference committee appointed Reps. Clemmons, Lucas, and Merrill (House Journal-page 2) |
| 4/14/2011  | Senate | Conference committee appointed McConnell, Campsen, and Scott (Senate Journal-page 21) |
| 4/26/2011  | House  | Conference report received and adopted (House Journal-page 38) |
| 4/26/2011  | House  | Roll call Yeas-71  Nays-36 (House Journal-page 38) |
| 5/11/2011  | Senate | Conference report received and adopted (Senate Journal-page 35) |
| 5/11/2011  | Senate | Roll call Ayes-26  Nays-16 (Senate Journal-page 35) |
| 5/11/2011  | Senate | Ordered enrolled for ratification (Senate Journal-page 47) |

```
5/17/2011        Ratified R 54
5/18/2011        Signed By Governor
5/24/2011        Effective date See Act for Effective Date
5/24/2011        Act No. 27
```

View the latest legislative information at the LPITS web site

## VERSIONS OF THIS BILL

12/7/2010
1/19/2011
1/26/2011
2/2/2011
2/3/2011
2/23/2011
2/24/2011
2/25/2011
4/6/2011
5/11/2011

---

(Text matches printed bills. Document has been reformatted to meet World Wide Web specifications.)

(A27, R54, H3003)

**AN ACT TO AMEND SECTION 7-1-25, CODE OF LAWS OF SOUTH CAROLINA, 1976, RELATING TO THE DEFINITION OF "DOMICILE", SO AS TO PROVIDE FACTORS TO CONSIDER IN DETERMINING A PERSON'S INTENTION REGARDING HIS DOMICILE FOR VOTING PURPOSES; TO AMEND SECTION 7-5-125, RELATING TO WRITTEN NOTIFICATION OF REGISTRATION, SO AS TO PROVIDE THAT IF AN ELECTOR LOSES OR DEFACES HIS REGISTRATION NOTIFICATION, HE MAY OBTAIN A DUPLICATE NOTIFICATION FROM HIS COUNTY BOARD OF REGISTRATION; TO AMEND SECTION 7-5-230, AS AMENDED, RELATING TO LEGAL QUALIFICATIONS OF APPLICANTS FOR REGISTRATION AND CHALLENGES OF QUALIFICATIONS, SO AS TO REVISE WHAT THE BOARD OF REGISTRATION MUST CONSIDER WHEN A CHALLENGE IS MADE REGARDING RESIDENCE OR DOMICILE OF AN ELECTOR; BY ADDING SECTION 7-5-675 SO AS TO PROVIDE THAT THE STATE ELECTION COMMISSION SHALL IMPLEMENT A SYSTEM TO ISSUE VOTER REGISTRATION CARDS WITH A PHOTOGRAPH OF THE ELECTOR, AND TO PROVIDE WHEN THE PROVISIONS OF THIS SECTION TAKE EFFECT INCLUDING A REQUIREMENT THAT IMPLEMENTATION IS CONTINGENT ON FUNDING TO IMPLEMENT THIS REQUIREMENT; TO AMEND SECTION 7-13-710, AS AMENDED, RELATING TO PROOF OF THE RIGHT TO VOTE, SO AS TO REQUIRE CERTAIN PHOTOGRAPH IDENTIFICATION IN ORDER TO VOTE, TO PROVIDE THAT ONE OF THE POLL MANAGERS SHALL COMPARE THE PHOTOGRAPH CONTAINED ON THE REQUIRED IDENTIFICATION WITH THE PERSON PRESENTING HIMSELF TO VOTE AND SHALL VERIFY THAT THE PHOTOGRAPH IS THAT OF THE PERSON SEEKING TO VOTE, TO PERMIT PROVISIONAL BALLOTS IF THE PHOTOGRAPH IDENTIFICATION CANNOT BE PRODUCED OR IF THE POLL MANAGER DISPUTES THE PHOTOGRAPH, TO PROVIDE EXCEPTIONS FOR A RELIGIOUS OBJECTION TO BEING PHOTOGRAPHED OR IF THE ELECTOR SUFFERS FROM A REASONABLE IMPAIRMENT THAT PREVENTS HIM FROM OBTAINING PHOTOGRAPH IDENTIFICATION, TO PERMIT THE CASTING OF A PROVISIONAL BALLOT IN THESE CASES UPON SPECIFIC REQUIREMENTS INCLUDING AN AFFIDAVIT, TO PROVIDE FOR THE MANNER IN WHICH THE COUNTY BOARD OF REGISTRATION AND ELECTIONS SHALL PROCESS THESE PROVISIONAL BALLOTS, AND TO PROVIDE THAT THE IDENTIFICATION REQUIRED**

**ABOVE IS FOR THE PURPOSE OF CONFIRMING THE IDENTITY OF THE ELECTOR AND TO PROVIDE FOR THE MANNER IN WHICH THE ELECTOR'S DOMICILE SHALL BE DETERMINED FOR PURPOSES OF VOTING; TO AMEND SECTION 56-1-3350, AS AMENDED, RELATING TO SPECIAL IDENTIFICATION CARDS ISSUED BY THE DEPARTMENT OF MOTOR VEHICLES TO RESIDENTS OF THIS STATE TEN YEARS OF AGE OR OLDER, SO AS TO REDUCE THIS AGE TO FIVE YEARS OF AGE OR OLDER, TO PROVIDE THAT THESE CARDS MUST BE ISSUED FREE OF CHARGE TO PERSONS SEVENTEEN YEARS OF AGE AND OLDER AND FOR THE FEE TO BE CHARGED TO PERSONS BETWEEN THE AGES OF FIVE AND SIXTEEN, TO DELETE LANGUAGE OF THE SECTION RELATING TO RENEWAL FEES AND WAIVER OF FEES, AND TO REVISE PROVISIONS OF THE SECTION PERTAINING TO USE OF THE FEES COLLECTED; TO PROVIDE THAT THE STATE ELECTION COMMISSION SHALL ESTABLISH AN AGGRESSIVE VOTER EDUCATION PROGRAM CONCERNING THE PROVISIONS OF THIS ACT TO EDUCATE THE PUBLIC IN CERTAIN PARTICULARS OF THIS ACT AND THE COMMISSION ALSO MAY IMPLEMENT ADDITIONAL EDUCATIONAL PROGRAMS IN ITS DISCRETION; TO PROVIDE THAT THE STATE ELECTION COMMISSION IS DIRECTED TO CREATE A LIST CONTAINING ALL REGISTERED VOTERS OF SOUTH CAROLINA WHO ARE OTHERWISE QUALIFIED TO VOTE BUT DO NOT HAVE A SOUTH CAROLINA DRIVER'S LICENSE OR OTHER FORM OF IDENTIFICATION CONTAINING A PHOTOGRAPH ISSUED BY THE DEPARTMENT OF MOTOR VEHICLES AS OF DECEMBER 1, 2011, AND TO PROVIDE THAT THE DEPARTMENT OF MOTOR VEHICLES MUST PROVIDE THE LIST OF PERSONS WITH A SOUTH CAROLINA DRIVER'S LICENSE OR OTHER FORM OF IDENTIFICATION CONTAINING A PHOTOGRAPH ISSUED BY THE DEPARTMENT OF MOTOR VEHICLES AT NO COST TO THE COMMISSION.**

Be it enacted by the General Assembly of the State of South Carolina:

**Factors to consider**

SECTION   1.   Section 7-1-25 of the 1976 Code, as added by Act 103 of 1999, is amended to read:

"Section 7-1-25.     (A)    A person's residence is his domicile. 'Domicile' means a person's fixed home where he has an intention of returning when he is absent. A person has only one domicile.

(B)    For voting purposes, a person has changed his domicile if he (1) has abandoned his prior home and (2) has established a new home, has a present intention to make that place his home, and has no present intention to leave that place.

(C)    For voting purposes, a spouse may establish a separate domicile.

(D)    For voting purposes, factors to consider in determining a person's intention regarding his domicile include, but are not limited to:

(1)    a voter's address reported on income tax returns;

(2)    a voter's real estate interests, including the address for which the legal residence tax assessment ratio is claimed pursuant to Section 12-43-220(C);

(3)    a voter's physical mailing address;

(4)    a voter's address on driver's license or other identification issued by the Department of Motor Vehicles;

(5)    a voter's address on legal and financial documents;

(6)    a voter's address utilized for educational purposes, such as public school assignment and determination

of tuition at institutions of higher education;

(7)    a voter's address on an automobile registration;

(8)    a voter's address utilized for membership in clubs and organizations;

(9)    the location of a voter's personal property;

(10)    residence of a voter's parents, spouse, and children; and

(11)    whether a voter temporarily relocated due to medical care for the voter or for a member of the voter's immediate family."

### Duplicate registration

SECTION    2.    Section 7-5-125 of the 1976 Code, as added by Act 507 of 1988, is amended to read:

"Section 7-5-125.    (A)    Any person who applies for registration to vote and is found to be qualified by the county board of registration to whom application is made must be issued a written notification of registration. This notification must be on a form prescribed and provided by the State Election Commission.

(B)    If an elector loses or defaces his registration notification, he may obtain a duplicate notification from his county board of registration upon request in person, or by telephone or mail."

### Consideration of challenges

SECTION    3.    Section 7-5-230 of the 1976 Code, as last amended by Act 103 of 1999, is further amended to read:

"Section 7-5-230.    (A)    The boards of registration to be appointed under Section 7-5-10 shall be the judges of the legal qualifications of all applicants for registration. The board is empowered to require proof of these qualifications as it considers necessary.

Once a person is registered, challenges of the qualifications of any elector, except for challenges issued at the polls pursuant to Sections 7-13-810, 7-13-820, and 7-15-420 must be made in writing to the board of registration in the county of registration. The board must, within ten days following the challenge and after first giving notice to the elector and the challenger, hold a hearing, accept evidence, and rule upon whether the elector meets or fails to meet the qualifications set forth in Section 7-5-120.

(B)    When a challenge is made regarding the residence or domicile of an elector, the board must consider the provisions of Section 7-1-25(D).

(C)    Any person denied registration or restoration of his name on the registration books shall have the right of appeal from the decision of the board of registration denying him registration or such restoration to the court of common pleas of the county or any judge thereof and subsequently to the Supreme Court."

### System to be implemented

SECTION    4.    Article 7, Chapter 5, Title 7 of the 1976 Code is amended by adding:

"Section 7-5-675.    The State Elections Commission shall implement a system in order to issue voter registration cards with a photograph of the elector. This voter registration card may be used for voting purposes only."

**Photograph identification required, provisional ballots**

SECTION    5.    Section 7-13-710 of the 1976 Code, as last amended by Act 459 of 1996, is further amended to read:

"Section    7-13-710.    (A)    When a person presents himself to vote, he shall produce a valid and current:

(1)    South Carolina driver's license; or

(2)    other form of identification containing a photograph issued by the Department of Motor Vehicles; or

(3)    passport; or

(4)    military identification containing a photograph issued by the federal government; or

(5)    South Carolina voter registration card containing a photograph of the voter pursuant to Section 7-5-675.

(B)    After presentation of the required identification described in subsection (A), the elector's name must be checked by one of the managers on the margin of the page opposite his name upon the registration books, or copy of the books, furnished by the board of registration. One of the managers also shall compare the photograph contained on the required identification with the person presenting himself to vote. The manager shall verify that the photograph is that of the person seeking to vote. The managers shall keep a poll list which must contain one column headed 'Names of Voters'. Before a ballot is delivered to a voter, the voter shall sign his name on the poll list, which must be furnished to the appropriate election officials by the State Election Commission. At the top of each page, the voter's oath appropriate to the election must be printed. The signing of the poll list or the marking of the poll list is considered to be an affirmation of the oath by the voter. One of the managers shall compare the signature on the poll list with the signature on the voter's driver's license, registration notification, or other identification and may require further identification of the voter and proof of his right to vote under this title as he considers necessary. If the voter is unable to write or if the voter is prevented from signing by physical handicap, he may sign his name to the poll list by mark with the assistance of one of the managers.

(C)(1)    If the elector cannot produce the identification as required in subsection (A), he may cast a provisional ballot that is counted only if the elector brings a valid and current photograph identification to the county board of registration and elections before certification of the election by the county board of canvassers.

(2)    If the manager disputes that the photograph contained on the required identification is the person presenting himself to vote, the elector may cast a provisional ballot. A determination of that provisional ballot must be made in accordance with Section 7-13-830.

(D)(1)(a)    If an elector does not produce a valid and current photograph identification due to a religious objection to being photographed, he may complete an affidavit under penalty of perjury at the polling place and affirm that the elector: (i) is the same individual who personally appeared at the polling place; (ii) cast the provisional ballot on election day; and (iii) has a religious objection to being photographed. Upon completion of the affidavit, the elector may cast a provisional ballot. The affidavit must be submitted with the provisional ballot envelope and be filed with the county board of registration and elections before certification of the election by the county board of canvassers.

(b)    If an elector does not produce a valid and current photograph identification because the elector suffers from a reasonable impediment that prevents the elector from obtaining photograph identification, he may complete an affidavit under the penalty of perjury at the polling place and affirm that the elector: (i) is the same individual who personally appeared at the polling place; (ii) cast the provisional ballot on election day;

and (iii) the elector suffers from a reasonable impediment that prevents him from obtaining photograph identification. The elector also shall list the impediment, unless otherwise prohibited by state or federal law. Upon completion of the affidavit, the elector may cast a provisional ballot. The affidavit must be submitted with the provisional ballot envelope and be filed with the county board of registration and elections before certification of the election by the county board of canvassers.

(2)   If the county board of registration and elections determines that the voter was challenged only for the inability to provide proof of identification and the required affidavit is submitted, the county board of registration and elections shall find that the provisional ballot is valid unless the board has grounds to believe the affidavit is false.

(3)   If the county board of registration and elections determines that the voter has been challenged for a cause other than the inability to provide proof of identification as required by subsection (A), the county board of registration and elections shall:

(a)   note on the envelope containing the provisional ballot that the voter complied with the proof of identification requirement; and

(b)   proceed to determine the validity of the remaining challenges before ruling on the validity of the provisional ballot.

(E)   The purpose of the identification required pursuant to subsection (A) is to confirm the person presenting himself to vote is the elector on the poll list. Any address listed on the identification is not determinative of an elector's domicile for the purpose of voting. An elector's domicile for the purpose of voting is determined pursuant to the provisions of Section 7-1-25."

## Special identification card provisions revised

SECTION   6.   Section 56-1-3350 of the 1976 Code, as last amended by Act 277 of 2010, is further amended to read:

"Section 56-1-3350.   (A)   Upon application by a person five years of age or older who is a resident of South Carolina, the department shall issue a special identification card as long as:

(1)   the application is made on a form approved and furnished by the department; and

(2)   the applicant presents to the person issuing the identification card a birth certificate or other evidence acceptable to the department of his name and date of birth.

(B)(1)   The fee for the issuance of the special identification card is five dollars for a person between the ages of five and sixteen years.

(2)   An identification card must be free to a person aged seventeen years or older.

(C)   The identification card expires five years from the date of issuance.

(D)   Special identification cards issued to persons under the age of twenty-one must be marked, stamped, or printed to readily indicate that the person to whom the card is issued is under the age of twenty-one.

(E)   The fees collected pursuant to this section must be credited to the Department of Transportation State Non-Federal Aid Highway Fund."

## Voter education program

SECTION    7.    The State Elections Commission must establish an aggressive voter education program concerning the provisions contained in this legislation. The State Elections Commission must educate the public as follows:

(1)    Post information concerning changes contained in this legislation in a conspicuous location at each county board of registration and elections, each satellite office, the State Elections Commission office, and their respective websites.

(2)    Train poll managers and poll workers at their mandatory training sessions to answer questions by electors concerning the changes in this legislation.

(3)    Require documentation describing the changes in this legislation to be disseminated by poll managers and poll workers at every election held following preclearance by the United States Department of Justice or approval by a declaratory judgment issued by the United States District Court for the District of Columbia, whichever occurs first.

(4)    Coordinate with each county board of registration and elections so that at least two seminars are conducted in each county prior to December 15, 2011.

(5)    Coordinate with local and service organizations to provide for additional informational seminars at a local or statewide level.

(6)    Place an advertisement describing the changes in this legislation in South Carolina newspapers of general circulation by no later than December 15, 2011.

(7)    Coordinate with local media outlets to disseminate information concerning the changes in this legislation.

(8)    Notify each registered elector who does not have a South Carolina issued driver's license or identification card a notice of the provisions of this act by no later than December 1, 2011. This notice must include the requirements to vote absentee, early, or on election day and a description of voting by provisional ballot. It also must state the availability of a free South Carolina identification card pursuant to Section 56-1-3350.

In addition to the items above, the State Elections Commission may implement additional educational programs in its discretion.

**Registered voter list**

SECTION    8.    The State Election Commission is directed to create a list containing all registered voters of South Carolina who are otherwise qualified to vote but do not have a South Carolina driver's license or other form of identification containing a photograph issued by the Department of Motor Vehicles as of December 1, 2011. The list must be made available to any registered voter upon request. The Department of Motor Vehicles must provide the list of persons with a South Carolina driver's license or other form of identification containing a photograph issued by the Department of Motor Vehicles at no cost to the commission. The commission may charge a reasonable fee for the provision of the list in order to recover associated costs of producing the list.

**Findings**

SECTION    9.    The General Assembly finds that all the provisions contained in this act relate to one subject as required by Section 17, Article III of the South Carolina Constitution in that each provision relates directly to or in conjunction with other sections to the subject of election reform as stated in the title. The General

Assembly further finds that a common purpose or relationship exists among the sections, representing a potential plurality but not disunity of topics, notwithstanding that reasonable minds might differ in identifying more than one topic contained in this act.

**Time effective**

SECTION    10.    Except for SECTION 4, the provisions of this act are effective upon approval by the Governor.

**Approval and funding**

SECTION    11.    SECTION 4 takes effect upon preclearance approval by the United States Department of Justice or approval by a declaratory judgment issued by the United States District Court for the District of Columbia, whichever occurs first. However, the implementation of the procedures provided for in this SECTION is contingent upon the State Election Commission's receipt of funds necessary to implement these provisions. Until the provisions of this SECTION are fully funded and executed, implementation of the provisions of this SECTION shall not prohibit the State Election Commission from issuing voter registration cards by the methods allowed prior to the implementation of this SECTION.

Ratified the 17th day of May, 2011.

Approved the 18th day of May, 2011.

——————————

This web page was last updated on August 19, 2011 at 10:42 AM