# EXHIBIT 4

# IN THE UNITED STATES DISTRICT COURT FOR THE
# DISTRICT OF COLUMBIA

---

STATE OF SOUTH CAROLINA )
)
*Plaintiff*, ) CIVIL ACTION NO:
)
v. ) 1:12-CV-203-CKK-BMK-JDB
)
THE UNITED STATES OF AMERICA ) (Three Judge Court)
And ERIC H. HOLDER, JR. in his )
Official capacity as Attorney General )
Of the United States, )
)
*Defendants*, )
)
And )
)
JAMES DUBOIS, *et al.*, )
)
*Defendant-Interveners.* )
)

---

**REBUTTAL DECLARATION OF THEODORE S. ARRINGTON, PH.D.**

1.      The purpose of this declaration is to rebut the claims of Dr. M.V. Hood III, expert witness for South Carolina, in his declaration and supplemental declaration. My analysis will include the manuscript he wrote with Charles S. Bullock, III, titled "An Empirical Assessment of the Georgia Voter Identification Statute" which has been revised and resubmitted to *State Politics and Policy Quarterly*, and is dated March 2012. He relies on data and conclusions from this manuscript in his initial and supplemental declarations.

2.      Dr. Charles Stewart's initial and rebuttal declarations demonstrate that Minority voters are more likely than White[1] voters to lack one of the kinds of photo ID that are required to vote under the proposed photo ID law (Act R54). These data alone show that the photo ID law places a disproportionate burden on the ability of Minorities to vote. Dr. Stewart's initial declaration, his rebuttal declaration, and my initial and supplemental declarations show that the disproportionate burden on Minority voters is actually greater than is indicated by the difference between the proportion of Minorities and the proportion of Whites who lack the required photo ID, because Minority voters in South Carolina have, on average, lower socio-economic status (SES). In this rebuttal declaration, I will address Dr. Hood's conclusion: "I have no reason to suspect that full implementation of Act R54 will produce any disparate effect on the ability of minority registrants within South Carolina to fully participate in the electoral process" (Hood supplemental declaration, p. 15. See also a similar conclusion in Dr. Hood's initial declaration, p. 19).

---

[1] I will use the simple term "White" to refer to non-Hispanic Whites, who are often called "Anglos" in the west. I believe that both Georgia and South Carolina use the term White in their registration data to describe this demographic category. "Minorities" means all voters who are not White.

1

3.     First, I will present statistical evidence that Minority voters who lack a South Carolina DMV-issued ID, military ID, or U.S. passport tend live in places where family incomes are low and poverty is common, while White voters who lack such ID are more likely to live in areas where incomes are much higher and poverty is rare. Dr. Stewart and I opine that those with lower SES will be more burdened by the requirement to obtain a photo ID based on established social science findings about the effects of low SES on political participation. Even the manuscript by Drs. Hood and Bullock (p. 22) shows the relationship between SES and the burden on voters who lack a photo ID in Georgia as is discussed below. Second, I will show that Dr. Hood's analysis of the effects of the photo ID law in Georgia are seriously flawed as they apply to an assessment of the racial impact of the photo ID law there and its application to the potential impact of the South Carolina version of the law.

**Geographic Distribution of Non-Matches by Race**

4.     Dr. Stewart's initial and rebuttal declarations present data demonstrating that Minority voters who lack the required photo ID are more likely to have lower socio-economic status than the White voters who lack the required ID using county-level data (Stewart's initial declaration, paragraphs 121-138). I present data below at the level of municipalities, small towns, and unincorporated places in South Carolina. These data rebut Dr. Hood's conclusion about the effect of the law and provide further support for Dr. Stewart's opinions by providing statistical data at a more basic geographic level.

5.     This new analysis requires the merging of two kinds of data. First, is a list of all of the registered voters who lack a South Carolina DMV-issued ID, military ID or U.S. passport from Dr. Stewart (his revised non-match list, as presented in Tables 10 and 11 of his rebuttal declara-

2

tion). This list includes the race/ethnicity and the mailing address of each voter who lacks an acceptable ID. Second, is the American Community Survey (ACS) of the U.S. Census Bureau. ACS data were obtained from the five-year dataset (2006-10). The five-year dataset provides information on the smallest areas possible for the ACS methodology (in terms of population). Where the number of people in a particular category in a particular place is small enough to potentially identify specific people, ACS data is suppressed to protect confidentiality. In addition, in very underpopulated places the number of households that are included in the sample is too small to yield reliable data, and therefore the ACS reports no data for such places. The ACS data pertains to the population within a place's boundaries, but many of the people on the non-match list do not live within the places for which we have ACS data. They may be connected to the place as indicated in their address. Thus they probably work there, go to school there, shop there, and so forth. But their socio-economic characteristics were not counted in the ACS place data.

6.      Dr. Stewart's revised non-match list contains 134,508 registered voters who do not have any of the photo IDs required to vote under Act R54. Of these, it was possible to automatically geocode the registration addresses of 93.1% (or 125,224) from the non-match list.[2] "Geocode" simply means to identify the exact location of each residence to determine whether each non-matched voter lives within the boundaries of any of the 395 places identified by the U.S. Census in South Carolina. Out of those non-matched voters who could be geocoded, a total of 62,495 of them have addresses within the boundaries of 316 different census-recognized places out of the total 395 places. The relevant ACS data is, however, only available for 281 places. As a result, ACS data is available for 56,842 registered voters on the non-match list who reside in these 281

---

[2] Approximately 6.9% of the addresses could not be geocoded because, for example, they were incomplete or were for a post office box.

3

places. The places with reported ACS data tend to be the more populated places in the state. The rest of the non-matched voters live in rural areas for which there is no ACS data. The analysis that follows is based on SES data from the 281 ACS communities.

7.     This combined dataset (combining the non-match list with ACS data) provides a representative picture of the relation of SES to the race and ethnicity of the voters who lack the required ID under Act R54. Table 1 compares the racial/ethnic breakdown of these 56,842 non-matched voters with the total non-matches in Dr. Stewart's revised list. The distribution is very similar. The racial makeup of the non-matches in the 281 ACS communities is roughly the same as the racial makeup of the non-matches in the entire State. The analysis of these data is a supplement to the county-level data from Dr. Stewart's initial declaration. His analysis included all of the non-matched voters, because the ACS presents data for all whole counties in South Carolina, including urban and rural populations. The robustness of the data presented here is further confirmed by the fact that both Dr. Stewart's county-level analysis and the analysis presented below show the same relationship between race/ethnicity and SES.

8.     There are four variables in the ACS that measure levels of socio-economic status that can be meaningfully related to the proportion of non-matches that are White and Black. The Pearson's correlation[3] between these four variables and the percentage of White non-matches and the

---

[3] The Pearson's correlation is simply a measure of the strength and nature of the relationship between two variables. It can vary from -1.0 (a perfect negative relationship) to +1.0 (a perfect positive relationship). A relationship of 0.0 would mean that the two variables are not related. If the relationship were 0.0 this would mean that as one of the variables increases or decreases the other one does not change with it systematically. A negative relationship would mean that as one variable increases the other decreases. For example, age among adults is negatively related to athletic ability. On average, older people cannot run as fast or jump as high as younger people. On the other hand, a person's weight is positively related to height. Taller people are, on average, heavier than short people. These relationships would not be -1.0 or +1.0, because the relation-

percentage of Black non-matches are presented in Table 2. The Pearson's correlations for the Black non-matches are not an exact opposite of Pearson's correlations for the White non-matches, because there are also other Minority voters who lack a photo ID, and their SES may differ slightly from Blacks.

9.     Median household income, and per capita income are both positively correlated with the percentage of the non-matches that are White and negatively correlated with the percentage of the non-matches that are Black. The relationships are slightly stronger with percentage Black than with percentage White. All four of these relationships are statistically significant at the .000 level, indicating that there are less than five chances in 10,000 that this relationship would occur by chance (Table 2). The higher the percentage of White non-matches there are in a place, the higher the household and per capita incomes in that place. In other words, White non-matches tend to live in places with high incomes, and Black and other Minority non-matches are more likely to live in places with low income.

10.    There are two direct measures of poverty in the ACS survey: percentage of households on food stamps and percentage of all people living in households below the poverty level. Table 2 shows that both of these measures are negatively related to the percentage of White non-matches and positively related to the percentage of Black non-matches. Whites who lack the required photo ID for voting are more likely to live in places where few people need government subsidized food and few people are living below the Census defined poverty line. Black non-matches, on the other hand, are somewhat more likely to live in places where a larger number of people are living below the poverty line and depending on the government for food.

---

ships are not that "strong," but they would certainly be statistically significant at least at the .05 level usually required in social science to flag a relationship that is worth notice.

5

11.     Sometimes a comparison of extreme cases is illustrative. Table 3 compares the median household income of the 20 places with the highest percentage of Black non-matches to the 20 places with the lowest percentage of Black non-matches after excluding the places with fewer than 10 non-matches. (These places are selected from the 281 places with data from the ACS.) The difference in the SES of these two groups of places is stark. The 20 places with the highest percentages of Black non-matches averages 89.2% Black non-matches and only 9.9% White non-matches. These areas have very low income levels (they average $28,444 median household income), and high levels of poverty and dependence on food stamps. The 20 places with the lowest level of Black non-matches (average 2.6% Black non-matches) and highest levels of White non-match (average 94.4% White) are high income, low poverty areas. The average median family income in these 20 places is $70,108, while only 4.3% are using food stamps and 8.3% live below the poverty level.

12.     Another way to illustrate the socio-economic relationship to the racial component of the non-matches is to examine the places along the popular, prosperous beaches where we would expect to find more individuals who would have little trouble obtaining a South Carolina ID if they needed one to vote. Some of these places are listed in Table 4. Almost all of them have a much higher proportion of non-matched voters who are White than the statewide average in the 281 places where we have ACS data (55%). The only exceptions are those places that are more military or commercial centers than beach and tourist destinations.

13.     A brief look at several representative places may put some "meat" on these statistical bones. The data come from the sources cited in the tables. Take for example, Denmark, which is an historic railroad town located in southwest South Carolina at the junction of U.S. Highways

6

78 and 321. It is not near the beach, the resorts in the northwest, or any metropolitan area. The population is about 90% Black. There are 93 Black non-matches and 11 White non-matches in Denmark (10.6% White non-matches). The median household income is $23,818, while 26.6% of the population receives food stamps, and 38.4% of the population is living below the poverty line.

14.     A second example is Lake City, which is in the tobacco growing area in the southeastern part of the state. There are small lakes for swimming just north of the town. The population is about 71% Black. It is considered part of the small Florence metropolitan statistical area. There are 315 Black non-matches and 64 White non-matches in Lake City (16.4% White non-matches). The median household income is $26,567, while 26.6% of the households receive food stamps, and 38.4% of the population live below the poverty line.

15.     Lyman, on the other hand, is west of Spartanburg and in that more substantial metropolitan area. Seventy-five percent of the non-matches in Lyman are White: 18 Blacks, 56 Whites out of a total of 75 non-matches. The population of this suburban town is 3,243 and it has increased 22% since 2000. The median household income is $51,800, and only 3.8% of the population receives food stamps and 7.4% are poor by the Census standard.

16.     A last example is Lexington, which is west of Columbia near Murray Lake at the dam. In this town, 79% of the non-matches are White: 111 Blacks and 487 Whites out of a total of 616 non-matches. The population of Lexington in 2010 was 17,850 and its population has exploded since 2000, increasing by 82.5%. The median household income is $58,800, only 5.2% of the households are receiving food stamps, and 11.1% of the population is below the poverty line.

7

17.     Dr. Hood's data from Georgia indicate that there is a linkage between lower SES and the extent to which a photo ID law would significantly burden voters who do not possess one of the required photo IDs (manuscript, pp.18, 22). These data on non-matches and SES in South Carolina (presented above) are, therefore, relevant rebuttal of Dr. Hood's suspicion that Minority voters who lack a required photo ID will be no more burdened by Act R54 than White voters who lack such an ID. Dr. Stewart's data show that Minority voters are more likely than White voters to lack the required ID for voting. These raw differences between the proportion of Whites and Minorities who lack the required photo ID in South Carolina severely understate the extent to which the photo ID law has a disproportionate impact on the ability of Minority citizens to vote. The Minority voters who lack a required photo ID are more likely to be located in isolated, rural areas with a higher rates of poverty. White voters who lack one of the required photo IDs are more likely to be found in areas, such as suburban metropolitan regions, with high family incomes and greater access to DMV and county EC offices. White voters without one of the required IDs are also more likely than Blacks without IDs to be found in areas with high concentrations of tourists and part-time residences such as along the beach or in the new resort areas in the higher elevations in the northwest region of the state.

**Analysis of the Georgia Data by Dr. Hood**
**Including the Hood and Bullock Manuscript**

18.     I have read both declarations of Dr. Charles Stewart and I agree with his opinions. I will only add a few points to his analysis that relate to the intent of the proponents of the photo ID law. Dr. Hood maintains in several places in his declaration that the Georgia photo ID law and the proposed South Carolina law are "more similar than different" (e.g., initial declaration p.5). But these differences are critical (see Table 13 in Dr. Stewart's rebuttal declaration). The South

Carolina photo ID law provides a very narrow selection of ID that is acceptable for voting. Georgia, on the other hand, has a wide variety of photo ID that can be used for voting, including employee ID from all levels of government and student ID. Both of these forms of ID were suggested as amendments to the photo ID bills by Black legislators in the South Carolina General Assembly and rejected by the proponents of the photo ID law in both houses. Student ID from 62 Georgia colleges and universities are valid for voting in that state. Some of these institutions are historically Black, as are some colleges and universities in South Carolina. The Georgia law also allows Federal government photo ID, Native American Indian Tribal ID with photo, and even photo IDs issued by any other state. The Georgia law does not require that Georgia driver's licenses be current, that is, not expired. As Dr. Stewart's analysis shows, the number of registered voters without a photo ID to vote in South Carolina is much smaller if expired DMV-issued ID could be used to vote.

19.     In his rebuttal declaration, Dr. Stewart also demonstrates that the inclusion of military ID and U.S. passports to the list of acceptable ID for voting actually increases the disparity between proportion of Minority and White voters who lack an acceptable ID for voting. The proponents of the photo ID law in South Carolina were more interested in restricting the kinds of ID that could be used for voting than in replicating the Georgia law, even though they claimed it as a model. And they were unconcerned about the disparate effect the provisions of the South Carolina photo ID law, which differ from those of Georgia, might have on Minority voters.

20.     The literature review in the manuscript written by Drs. Hood and Bullock demonstrates that many scholarly, empirical, refereed studies have shown that any barrier to registration and voting will suppress turnout, especially among Minorities, that Minority voters are more likely to

9

lack a photo ID, and that Minority voters are more likely to be asked for ID when they go to vote even in states where less specific ID is required (manuscript, pp. 1-4). But the authors cite mixed results in research that asks specifically whether turnout declines as ID becomes more restrictive, and whether it affects Minority voters to a greater extent than White voters (manuscript pp. 4-5). The authors write that individual level data in a natural experiment provides better evidence than either survey data or aggregate data on geographic units to answer these latter questions (p. 6). While they may have collected the Georgia data that would be somewhat relevant to the analysis of the South Carolina photo ID law, they have not presented those data in either Dr. Hood's declarations or in the manuscript.

21.     Drs. Hood and Bullock present actual percentages showing the effect of the photo ID law in Georgia, but without the critical racial breakdown that we need to determine the actual effect of the law on Minorities and Whites <u>without controls that hide the actual effect</u>. Their total registration figures for Georgia from the manuscript as shown in Table 5, do not agree with the total registration figures from the Georgia Secretary of State's website given in Table 6. The turnout figures for all voters from the manuscript, however, are close to the numbers given by the Georgia Secretary of State. The authors provide no explanation for why the registration figures in the manuscript should not agree with the figures presented by the Georgia Secretary of State.

22.     Voter turnout, especially among Blacks in 2008 was higher than in 2004 in South Carolina. Table 7 shows the turnout in 2004 and 2008 in South Carolina broken down by race/ethnicity to match the Georgia Secretary of State's data in Table 6. These data show that both White and non-White voter turnout was higher in 2008 than in 2004 in South Carolina. But the major difference was in the non-White category. White turnout in South Carolina was only 3.0 percentage

10

points higher, while non-White turnout was 10.4 percentage points higher. This pattern was repeated in most states as Minority voters responded to the first Black person nominated for the Presidency by a major party (see Stewart rebuttal declaration ¶¶119-124). Black legislators in the South Carolina General Assembly often referred to the large Minority voter turnout in 2008 and the desire on the part of the proponents of the photo ID law to suppress that turnout in the future as a major impetus for the enactment of a photo ID law. Indeed, the photo ID law in Georgia seems to have held down that explosive growth in Minority turnout in that state.

23. In my initial declaration I opined that individuals without a photo ID are qualitatively different than those of us who use photo ID on a regular basis. I explained that they are part of an "other world." Drs. Hood and Bullock confirm this idea as being a "known fact." They write: "The combinations of these calculations takes into account the known fact that those without identification are already less prone to participate compared to those who possess photo identification" (manuscript p. 18).

24. Older registrants, who lack a photo ID, were more likely to be affected by the photo ID law in Georgia than younger voters <u>even with controls for SES</u> (manuscript, p. 22). This finding confirms the concerns of Black legislators in the South Carolina General Assembly and the American Association of Retired Persons that the proposed photo ID law would present a hardship on the elderly.

25. The manuscript also confirms the lack of impersonation fraud in Georgia as in South Carolina and the much more serious concern about absentee voter fraud which the South Carolina proposed photo ID law does not address: "It is unclear, however, just how much voter fraud, much less the in-person variety, has been committed in Georgia lately. . . the small body of

11

scholarly research conducted on vote fraud indicates that mail absentee balloting is more susceptible to fraud than in-person voting methods" (manuscript pp. 22-23).

**Conclusions**

26.     In this rebuttal declaration I have shown that, contrary to Dr. Hood's declarations, Minority voters who lack a photo ID are more likely to be burdened by a photo ID law in South Carolina than similarly situated Whites. I have shown this by a qualitative analysis of where Minority voters who lack a photo ID in South Carolina live. This geographic analysis shows that the Minorities who lack such a photo ID are more likely to live in places with lower SES. As Dr. Hood admits, the photo ID law in Georgia disproportionately affected those with lower SES (manuscript, p. 22).

27.     I have also pointed out that the manuscript written by Drs. Hood and Bullock on the photo ID law in Georgia does not present appropriate data to determine whether the Georgia law disproportionately burdened the ability of Black registered voters who lack a photo ID more than Whites who lack such documentation in that state. The differences between the Georgia photo ID law and the proposed South Carolina photo ID law suggests the latter would impose even more of a burden on voters who lack a photo ID for voting, and even more of a disproportionate burden on Minority voters.

Table 1

Comparison of the Racial/Ethnic Makeup of the Non-Matched Voters Contained in the 281 ACS Places with the Total Revised Non-Match List of Dr. Charles Stewart

| Racial/Ethnic Category | 281 ACS Places | Total Stewart Revised Data |
|---|---|---|
| Whites | 48.8% | 51.9% |
| Blacks | 48.2 | 45.3 |
| Asians | 0.4 | 0.3 |
| Hispanics | 1.3 | 1.3 |
| Mixed | 0.0* | 0.0* |
| Native American Indians | 0.3 | 0.3 |
| Others | 1.0 | 0.8 |
| Unknown | 0.0* | 0.0* |
| Total | 100.0% | 99.9%** |
| Number of Non-Matches | (56,842) | (134,508) |

*Less than 0.05%

**Does not total to 100.0% because of rounding.

Source: Rebuttal Declaration of Dr. Charles Stewart, Table 11, p. 33; and data compiled by the author from the ACS Five-year compilation (2006-2010) combined with Dr. Stewart's data.

13

Table 2

Pearson Correlations Between the Percent White Non-Matches and Percent

Black Non-Matches with Measures of Socio-Economic Status In South Carolina Places

| Measure of Socio-Economic Status | Pearson's Correlation[1] |
|---|---|
| Relationship to Percent White Non-Match | |
| Median household income | .419 |
| Per capita income | .405 |
| Percent of households on food stamps | -.459 |
| Percent of all people who are poor | -.460 |
| | |
| Relationship to Percent Black Non-Match | |
| Median household income | -.429 |
| Per capita income | -.410 |
| Percent of households on food stamps | .471 |
| Percent of all people who are poor | .470 |

1. All of these Pearson's Correlations are statistically significant at least at the .0005 level, meaning that a relationship that strong could occur by chance less than five times in 10,000.

Sources: Non-Match data from Dr. Charles Stewart, derived from data provided by South Carolina State Election Commission, South Carolina Department of Motor Vehicles, U.S. Department of Defense, U.S. State Department; and Socio-Economic Status data from U.S. Census American Community Survey five-year compilation (2006-2010).

14

Table 3
Comparison of the 20 Places with the Highest and 20 Places with
the Lowest Percentage of Black Non-Matches to Measures of SES
(Places with more than 10 Non-Matches Only)

| Place Name | Median HH Income | Per capita Income | Percent on Food Stamps | Percent in Poverty | Percent Non-Match Black | Percent Non-Match White |
|---|---|---|---|---|---|---|
| Carlisle | 24,844 | 16,435 | 6.4 | 18.4 | 100.0 | 0.0 |
| Gifford | 24,271 | 13,233 | 19.8 | 18.7 | 100.0 | 0.0 |
| Eastover | 17,442 | 11,099 | 33.6 | 38.9 | 94.4 | 0.0 |
| Gadsden | 28,359 | 14,431 | 31.1 | 24.7 | 94.2 | 5.8 |
| Mayesville | 28,750 | 18,680 | 17.6 | 18.5 | 92.3 | 5.8 |
| Timmonsville | 19,886 | 11,158 | 36.9 | 47.4 | 91.7 | 7.9 |
| Hopkins | 44,359 | 19,674 | 10.5 | 20.0 | 91.6 | 7.5 |
| Sellers | 19,167 | 12,558 | 48.4 | 37.0 | 90.3 | 9.7 |
| Denmark | 23,818 | 11,181 | 26.6 | 38.4 | 89.4 | 10.6 |
| Estill | 31,537 | 14,811 | 30.5 | 32.7 | 89.3 | 10.1 |
| Hollywood | 47,472 | 26,228 | 22.3 | 18.2 | 88.4 | 9.6 |
| Bowman | 27,813 | 13,249 | 24.0 | 38.0 | 88.0 | 10.8 |
| Orangeburg | 31,320 | 16,475 | 17.2 | 28.8 | 86.2 | 12.2 |
| Bradley | 55,192 | 24,397 | 0.0 | 12.7 | 85.7 | 14.3 |
| Clarks Hill | 33,482 | 16,236 | 20.7 | 26.2 | 85.0 | 15.0 |
| Summerton | 29,250 | 16,215 | 27.3 | 23.5 | 84.4 | 15.6 |
| Greeleyville | 17,019 | 12,210 | 27.5 | 35.2 | 83.9 | 16.1 |
| Allendale | 17,632 | 9,506 | 37.8 | 51.8 | 83.4 | 15.3 |
| Ridgeville | 32,083 | 6,759 | 23.0 | 20.8 | 83.3 | 16.7 |
| Fairfax | 15,184 | 11,788 | 35.5 | 50.6 | 82.9 | 15.2 |
| **AVERAGES** | **$28,444** | **$14,816** | **24.8%** | **30.0%** | **89.2%** | **9.9%** |
| | | | | | | |
| McClellanville | 56,563 | 41,469 | 1.5 | 9.8 | 8.3 | 91.7 |
| Pelion | 56,000 | 21,951 | 1.1 | 8.7 | 6.7 | 86.7 |
| Hilton Head Is | 67,629 | 45,195 | 3.2 | 8.9 | 5.3 | 84.2 |
| Pine Ridge | 53,958 | 27,191 | 8.5 | 5.0 | 5.3 | 89.5 |
| Arcadia Lakes | 101,750 | 51,908 | 1.0 | 5.6 | 5.3 | 94.7 |
| Tega Cay | 103,750 | 38,313 | 1.8 | 2.2 | 5.1 | 93.9 |
| Chapin | 43,110 | 26,060 | 0.0 | 4.4 | 4.9 | 93.4 |
| Walhalla | 37,214 | 21,987 | 20.6 | 15.7 | 4.7 | 87.9 |
| Elgin (town) | 60,444 | 22,544 | 2.3 | 5.4 | 3.1 | 96.9 |
| Elgin (CDP) | 34,890 | 18,532 | 9.8 | 14.4 | 3.1 | 96.9 |
| Gilbert | 48,000 | 19,590 | 2.2 | 10.5 | 0.0 | 83.3 |
| Kiawah Island | 173,636 | 122,827 | 0.0 | 7.4 | 0.0 | 92.9 |
| Garden City | 35,879 | 29,238 | 3.5 | 10.5 | 0.0 | 97.7 |
| Isle of Palms | 86,477 | 62,290 | 0.9 | 8.2 | 0.0 | 98.2 |
| Briarcliffe Acr | 108,125 | 66,735 | 0.0 | 4.2 | 0.0 | 100.0 |
| Folly Beach | 57,734 | 42,481 | 0.0 | 8.8 | 0.0 | 100.0 |
| Modoc | 98,021 | 78,384 | 5.9 | 6.3 | 0.0 | 100.0 |
| Seabrook Isle | 96,667 | 77,162 | 0.7 | 2.6 | 0.0 | 100.0 |
| Sharon | 35,375 | 14,896 | 19.8 | 17.0 | 0.0 | 100.0 |
| Six Mile | 46,944 | 25,934 | 3.0 | 9.7 | 0.0 | 100.0 |
| **AVERAGES** | **$70,108** | **$42,734** | **4.3%** | **8.3%** | **2.6%** | **94.4%** |

Sources: Non-Match data from Dr. Charles Stewart, derived from data provided by South Carolina State Election Commission, South Carolina Department of Motor Vehicles, U.S. Department of Defense, U.S. State Department; and Socio-Economic Status data from U.S. Census American Community Survey five-year compilation (2006-2010).

Table 4

Percent of the Non-matches that are White Voters
In the Beach and Island Places
Included in the American Community Survey
(Only Places With At Least One Non-Match)

| Name of the Place | Percent of the Non-Matches that are White |
|---|---|
| Surfside Beach | 100% |
| Folly Beach | 100 |
| Seabrook Island | 100 |
| Pawley's Island | 100 |
| Briarcliffe Acres | 100 |
| Rockville | 100 |
| Isle of Palms | 99 |
| Garden City | 98 |
| Kiawah Island | 93 |
| McClellanville | 92 |
| Murrell's Inlet | 89 |
| Mount Pleasant | 88 |
| Little River | 88 |
| North Myrtle Beach | 86 |
| Hilton Head | 84 |
| Myrtle Beach | 82 |
| Meggett | 70 |
| Port Royal[1] | 64 |
| Charleston[2] | 54 |
| Beaufort[3] | 52 |
| Georgetown[4] | 26 |
| Awendaw[5] | 17 |
| **STATEWIDE ACS** | **55** |

1. Port Royal is adjacent to the Parris Island Marine base and has a Naval Hospital, not mostly a beach community
2. Charleston is a Major metropolitan urban area and port city
3. Beaufort is also a port city with commercial areas, not mostly a beach resort
4. Georgetown is the second largest seaport in South Carolina, not mostly a beach resort
5. Awendaw is a small fishing village

Sources: Non-Match data from Dr. Charles Stewart, derived from data provided by South Carolina State Election Commission, South Carolina Department of Motor Vehicles, U.S. Department of Defense, U.S. State Department; and Socio-Economic Status data from U.S. Census American Community Survey five-year compilation (2006-2010).

16

Table 5
Voter Turnout as a Percentage of Voter Registration in Georgia in 2004 and 2008
General Elections by Availability of DMV-Issued Identification in 2007

|  | 2004 Election | | | 2008 Election | | |
| --- | --- | --- | --- | --- | --- | --- |
|  | No ID | ID | All Voters | No ID | ID | All Voters |
| %Voted | 47.6 | 72.9 | 71.3 | 39.6 | 70.0 | 68.5 |
| % No Vote | 52.4 | 27.1 | 28.7 | 60.4 | 30.0* | 31.5 |
| Total | 100.0 | 100.0 | 100.0 | 100.0 | 100.4 | 100.0 |
| N= | (289,039) | (4,305,213) | (4,594,252) | (273,547) | (5,460,109) | (5,733,656) |

*These are the figures as presented in the manuscript; there is a typographical error in the table showing this figure as 30.4%.
Source: Hood and Bullock Manuscript, Table 1, cited at p. 15, appears on p. 27.

Table 6
Voter Turnout in Georgia as a Percentage of Registration
In 2004 and 2008 General Elections by Race/Ethnicity

|  | 2004 Election | | | 2008 Election | | |
| --- | --- | --- | --- | --- | --- | --- |
|  | Whites | Non-Whites | All Voters | Whites | Non-Whites | All Voters |
| Voted | 80.4 | 70.6 | 77.3 | 77.4 | 72.8 | 75.7 |
| Did Not Vote | 19.6 | 29.4 | 22.7 | 22.6 | 27.2 | 24.3 |
| Total | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 |
| N= | (2,917,322) | (1,331,515) | (4,248,837) | (3,258,454) | (1,940,517) | (5,198,971) |

Source: Georgia Secretary of State
http://www.sos.ga.gov/elections/voter_registration/Turnout_by_demographics.htm

Table 7
Voter Turnout in South Carolina as a Percentage of Total Voter Registration
In 2004 and 2008 General Elections by Race/Ethnicity

|  | 2004 Election | | | 2008 Election | | |
| --- | --- | --- | --- | --- | --- | --- |
|  | Whites | Non-Whites | All Voters | Whites | Non-Whites | All Voters |
| Voted | 72.3 | 65.8 | 70.4 | 75.3 | 76.2 | 75.6 |
| Did Not Vote | 27.7 | 34.2 | 29.6 | 24.7 | 23.8 | 24.4 |
| Total | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 |
| N= | (1,655,816) | (659,366) | (2,315,182) | (1,778,547) | (773,925) | (2,552,472) |

Source: South Carolina State Election Commission
http://www.state.sc.us/scsec/election.html

17

I declare under penalty of perjury, that the foregoing is true and correct.

Executed this __6th__ day of __August__ 2012.

_Theodore S. Arrington_
Theodore S. Arrington, Ph.D.