UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| STATE OF SOUTH CAROLINA,<br><br>   *Plaintiff*,<br><br> v.<br><br>UNITED STATES OF AMERICA and ERIC H. HOLDER, JR., in his official capacity as Attorney General,<br><br>   *Defendants*,<br><br> and<br><br>JAMES DUBOSE, *et al.*,<br><br>   *Defendant-Intervenors*. | Case No. 1:12-cv-203 (CKK-BMK-JDB) |

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF SOUTH CAROLINA'S MOTION TO EXCLUDE THE TESTIMONY OF <u>CHARLES STEWART III</u>**

  Federal Rule of Evidence 702 provides that expert testimony is admissible only if it is based on "scientific, technical, or other specialized knowledge" that will "assist the trier of fact." Fed. R. Evid. 702. Any such testimony must be "based on sufficient facts or data," and the product of "reliable principles and methods." *Id.* The expert must also "appl[y] those principles and methods reliably to the facts of the case." *Id.* The proffered testimony of Charles Stewart III plainly fails to meet that standard.

  *First*, and most important, Stewart's testimony is not based on sufficient facts or data, as his analysis relies on an incomplete and flawed data set. Indeed, instead of analyzing South Carolina's actual voter registration list, Stewart picks and chooses data to analyze in a manner that maximizes the apparent racial disparity between white and black voters who currently lack

DMV-issued photo identification. Thus, Stewart specifically excludes from his analysis an entire category of active, registered voters—*i.e.*, voters whose DMV-issued licenses have been returned from out of state—who Stewart himself identifies as "much more likely to be white than voters without such licenses." Stewart Rebuttal ¶ 41. And Stewart then includes in his analysis other voters whose licenses appear on a list of licenses returned for reasons other than being returned from out of state—but he excludes just the licenses themselves, not the voter, even if the licenses are identified as valid, active licenses in the DMV database. This leads to the anomalous result that voters who actually have active DMV licenses are treated in Stewart's analysis as if they do not. And Stewart identifies these voters as more likely to be black than white.

*Second*, Stewart's methodology for reaching his conclusions about the number of voters who lack photo ID fails to meet the basic threshold of evidentiary reliability. Stewart's most serious methodological flaw is the one that leads him to analyze incomplete data: he creates and analyzes his own list of voters and his own list of DMV photo identification without regard to how those lists are actually maintained and used in the State. But his methodology is also flawed in other ways as well. Not least, he failed to speak with or consider the deposition testimony of anyone from the Election Commission or DMV knowledgeable about the data he was analyzing, relying instead upon the "assumption" of the director of the DMV that voters whose licenses are returned from out of state are no longer qualified to vote in South Carolina and Stewart's own uninformed consideration of the data. And although he purports to offer the opinion that "Act R54 imposes a disproportionate burden on the black and Hispanic voters of South Carolina, compared to white voters," Stewart Decl. ¶ 145 (Ex. 1), Stewart in fact did not follow a methodology that allowed him to analyze the law actually enacted. Indeed, Stewart readily concedes that he did not read, much less consider, the State's plans for implementing Act R54

2

and he did not consider what effect the availability of free photo voter registration cards would have on his conclusions.

At bottom, Stewart applies a method that, by design, uses an incomplete set of data that skews his analysis in favor of Defendants by artificially increasing the disparity between white and black voters who currently lack currently available photo ID. And he offers conclusions about the effects of Act R54 after implementation without ever considering in any reasoned much less reliable way the post-implementation world.

## ARGUMENT

### I. STEWART'S TESTIMONY DOES NOT RELY ON SUFFICIENT OR COMPLETE FACTS AND DATA

Reliable data is critical to proper expert analysis. *See* Fed. R. Evid. 702 (requiring that expert testimony be "based on sufficient facts or data"). When an expert relies on an "incomplete set of data," any findings that flow from such data "are not scientifically valid" and must be excluded. *Innis Arden Golf Club v. Pitney Bowes, Inc.*, 629 F. Supp. 2d 175, 190-91 (D. Conn. 2009) (excluding two experts' testimony based on their use of incomplete data sets, and holding that such methodological defects "go well beyond being merely the stuff of cross-examination"); *see also North v. Ford Motor Co.*, 505 F. Supp. 2d 1113, 1119 (D. Utah 2007) (excluding proffered expert testimony that "relied on incomplete information").

Stewart's stated assignment was to address whether Act R54 "would create a disproportionate burden on minority voters in the state," Stewart Decl. ¶ 11, and as a necessary part of his analysis he purports to "compare the names on the list of registered voters with the names on the lists that record who currently holds forms of identification required by the law," *id.* ¶ 20. He describes his analysis in terms of a "ledger": On one side of the ledger is the Election Commission's voter registration list; on the other side is the DMV's data concerning

3

who holds valid and current DMV-issued photo identification.  Stewart Dep. Tr. 58:11-59:16, (Ex. 3).  But Stewart cooks the books in two ways.

*First*, instead of using the actual South Carolina voter registration roll as of the date it was produced by the State Election Commission, Stewart excluded from his analysis tens of thousands of active, registered South Carolina voters.  He simply declares all voters who had a driver's license returned from out of state to have "removed themselves from electoral politics in South Carolina."  Stewart Decl. ¶ 37.  He does this even though at least some of these legal voters have casts ballots in the State even after their licenses were returned (almost 40,000 in 2008 alone).  *See* Stewart Rebuttal, Table 4 (Ex. 2).  This critical omission from the data studied renders Stewart's entire analysis and ultimate conclusions unreliable.  And as Stewart himself emphasizes, "voters with licenses returned from out-of-state jurisdictions are much more likely to be white than voters without such licenses."  Stewart Rebuttal ¶ 41.  The effect of his excluding these registered voters *en masse* therefore is to drive down the number of white South Carolina voters without government issued photo identification acceptable to vote under Act R54 and to drive up the apparent disparity between white and black voters who lack such ID—the very disparity he asks the Court to rely on his analysis to find.

*Second*, and even worse, Stewart manipulates the data from the South Carolina DMV, this time to drive up the number of black registered voters who lack currently available R54 ID.  He accomplishes this by excluding from his analysis any license that appears on a DMV data table that includes information about licenses returned to the DMV, even where the license remains classified as "active" in the DMV system—and therefore valid and in the possession of the license holder.  In other words, Stewart assumes that all licenses on the DMV data table have already been surrendered and excludes them from the data for purposes of his analysis—even if

4

the DMV itself identifies the license as "active." Stewart Dep. Tr. 90:18-91:17 (Ex. 3). This potentially removes from the data Stewart uses to perform his Election Commission-to-DMV matching comparison active licenses that are still recognized identified in the DMV database as valid. Stewart argues that more black than white DMV-issued licenses in South Carolina have been suspended or revoked at some point, Stewart Decl. ¶ 116; *see also* Stewart Rebuttal ¶ 49. The effect of excluding these active licenses in Stewart's view therefore is to drive up the number of black voters without a license and also to drive up the disparity between black and white voters who lack currently available Act R54 ID.

## II.     STEWART'S OPINIONS ARE NOT BASED ON A RELIABLE METHODOLOGY

A reliable methodology is central to the *Daubert* inquiry. The proffered testimony must be "the product of reliable principles and methods," and the expert must "appl[y] the principles and methods reliably to the facts of the case." Fed. R. Evid. 702(1)-(3); *see Daubert*, 509 U.S. at 589-90. That is, "[a]n expert must offer good reason to think that his approach produces an accurate estimate using professional methods, and this estimate must be testable." *Zenith Elec. Corp. v. WH-TV Broadcasting Corp.*, 395 F.3d 416, 419 (7th Cir. 2005); *see also In re TMI Litig.*, 193 F.3d 613, n.144 (3d Cir. 1999) (excluding expert testimony based on a "subjective" methodology in which "there are no discernible standards governing its operation, and it is not generally accepted"). This Court "has the responsibility to exclude an expert opinion that overlooks factors that render the testimony unreliable and/or speculative." *MicroStrategy Inc. v. Business Objects*, 429 F.3d 1344, 1355-56 (Fed. Cir. 2005). Stewart's methodology fails to meet the basic threshold of evidentiary reliability.

*First*, Stewart failed to take steps to understand the data he was analyzing and therefore excluded voters, licenses, or both from his analysis that he should not have. *See supra* Section I.

5

Instead of considering information available in the record concerning the data from both key sources of data—*i.e.*, the Election Commission and DMV—Stewart's judgment about the data was informed significantly by the assumptions of the director of DMV without any consideration of information from the Election Commission. Had Stewart performed any sort of independent investigation, he would have learned, at minimum: (a) Director Shwedo in fact testified that he really was not expert in the data; and (b) that the Election Commission had explained that it does not deem voters ineligible to vote simply because they have had a license returned from out of state. Stewart excluded voters from the voter rolls who had licenses returned from out of state based in the first instance upon the assumption of DMV Executive Director Kevin Shwedo that such voters were "most likely no longer [ ] resident[s] of the state, and therefore should not be included in the count of registered voters who lacked a driver's license or SCDMV-issued ID card." Stewart Decl. ¶ 15. Indeed, Stewart asserts that he "became aware that I should take into account voters who had returned their licenses from out-of-state from an undated letter, presumably written in late 2011," from Mr. Shwedo to the Attorney General's office and that the letter "did inform significantly my judgment" to exclude licenses returned from out of state and suspended licenses. *Id.* ¶ 14; Stewart Dep. Tr. 196:4-197:5 (Ex. 3); *see also* Shwedo Ltr. to J. Smith (Shwedo Int. Dep. Ex. 13) (Ex. 4). But Stewart was unaware—because he did not investigate the matter—that the DMV director testified that he really is "not qualified" to address what the Election Commission should or should not do with respect to voters who vote after their driver's licenses were returned from other states. K. Shwedo Dep. Tr. 150:23-152:19 (Ex. 5). And although Stewart concedes that voters whose driver's licenses are returned from out of state are affected by Act R54, Stewart nevertheless did not read any documents by state election

6

officials concerning these voters or consider their views in his analysis.  Stewart Dep. Tr. 64:14-66:15 (Ex. 3).

*Second*, Stewart does not apply a methodology that actually allows him to study the effects of Act R54.  In fact, when he was writing his reports, Stewart did not even have possession of—much less consider—the procedures developed by the State Election Commission to implement Act R54.  Stewart Dep. Tr. 137:12-138:1-5; *see also* Stewart Decl. ¶ 24 ("I have not analyzed in this report whether or how the measures proposed to implement Sections 5, 7, and 8 would affect the new burdens imposed on voters by Act R54.").  Only *after* Stewart filed his report about the effects of Act R54—indeed, only after he filed his rebuttal report just last week—did he even read any of the materials that the State has provided concerning its plans to implement the law.  Stewart Dep. Tr. 138:6-20.  Nor did Stewart study the actual Act R54 photo identification requirement.  Stewart asks the Court to adopt his conclusions concerning the rates at which whites and non-whites hold four of the five forms of identification under Act R54—*i.e.*, South Carolina driver's licenses, DMV photo identification cards, military IDs, and passports.  But Stewart concedes that "analysis concerning the fifth form of identification is not included" in his report.  Stewart Decl. ¶ 23.

At bottom, Stewart applies an unreliable matching methodology to only part of the available registered South Carolina voter and DMV license data.  And he fails to analyze in any way the law as it is actually written and proposed to be implemented by the State, choosing instead to ignore all of the plans to implement provisions of the law designed to ameliorate the very "burdens" he claims will result from implementation.  Stewart's methodology therefore is not reliably applied to the facts of this case, and it is highly speculative.

7

## CONCLUSION

The Court should enter an order barring any expert testimony from Charles Stewart.

Respectfully submitted,

/s/ H. Christopher Bartolomucci
Paul D. Clement (DC Bar No. 433215)
H. Christopher Bartolomucci (DC Bar No. 453423)
Stephen V. Potenza (admitted *pro hac vice*)
Brian J. Field (DC Bar No. 985577)
Michael H. McGinley (DC Bar No. 1006943)
BANCROFT PLLC
1919 M Street, N.W., Suite 470
Washington, D.C. 20036
(202) 234-0090

Dated: August 13, 2012        *Counsel for the State of South Carolina*

## CERTIFICATE OF SERVICE

I hereby certify that on August 13, 2012, I filed the foregoing notice with the Court's electronic filing system, which will provide notice to all counsel of record.

<u>/s/ H. Christopher Bartolomucci</u>

H. Christopher Bartolomucci
(D.C. Bar No. 453423)