# EXHIBIT 3

1

1              UNITED STATES DISTRICT COURT

2              FOR THE DISTRICT OF COLUMBIA

3    --------------------------------x

4    STATE OF SOUTH CAROLINA,           :

5            Plaintiff,                 :   Case No.

6       v.                             :   1:12-cv-203

7    UNITED STATES OF AMERICA and       :   (CKK-BMK-JDB)

8    ERIC H. HOLDER, JR., in  his       :

9    official capacity as               :

10   Attorney General,                  :

11           Defendants,                :

12        and                          :

13   JAMES DUBOSE, et al.,              :

14           Defendant-Intervenors.  :

15   --------------------------------x

16          Deposition of CHARLES STEWART, III Ph.D.

17                  Washington, DC

18              Thursday, August 9, 2012

19                   9:32 a.m.

20   Job No.: 24251

21   Pages: 1 - 218

22   Reported by: Lee Bursten, RPR, CRR

DEPOSITION OF CHARLES STEWART, III, Ph.D.
CONDUCTED ON THURSDAY, AUGUST 9, 2012

58

1    in paragraph 27?

2        A      That's what -- 29 is referring to back to

3    27.

4        Q      Okay.  Now, one of the differences that I

5    think you identify -- one of the potential sources of

6    difference that you identified was your removal from

7    the voter registration database of voters who had had

8    driver's licenses returned from out of state; is that

9    right?

10       A      That is correct.

11       Q      And you removed those voters from the voter

12   registration database because you assumed that a

13   voter whose driver's license had been returned to

14   South Carolina was no longer living in South Carolina

15   and therefore was no longer eligible to vote in the

16   state; is that right?

17       A      I discuss that in the report.  And that is

18   the implication of that assumption, that those people

19   are no longer resident in the state and therefore are

20   no longer eligible to vote in the state.

21       Q      What do you mean, that is the implication

22   of the assumption?  What assumption are you talking

DEPOSITION OF CHARLES STEWART, III, Ph.D.
CONDUCTED ON THURSDAY, AUGUST 9, 2012

59

1    about?

2        A    Their being removed from -- as you stated,

3    they are being removed from, as I like to put it,

4    both sides of the ledger.  They are neither -- when I

5    run the analysis, they are not in the set of voters

6    or in the set of driver's licenses that I considered.

7        Q    Now, you also -- another difference that

8    you note is that you took into account licenses that

9    are listed on the license received table in the DMV

10   database, correct?

11       A    Yes.

12       Q    And for that part of the analysis, do you

13   also remove the voter from both sides of the ledger?

14       A    As I express in the rebuttal report, they

15   remain in the voter registration side of the ledger.

16   And their license is removed.

17       Q    Now, how did you first become aware that

18   you should remove from the voter registration list

19   voters whose driver's licenses have been returned

20   from out of state?

21       A    I have a two-step process.  I would say

22   that the general knowledge came when I was just

DEPOSITION OF CHARLES STEWART, III, Ph.D.
CONDUCTED ON THURSDAY, AUGUST 9, 2012

65

1    officials agreed with the director of the Department

2    of Motor Vehicles that voters can be removed from the

3    state's voter registration rolls simply because their

4    driver's license had been returned from out of state?

5            MS. MEZA:  Objection.

6       A    Could you ask the question again?

7    BY MR. POTENZA:

8       Q    Sure.  Did you consider the views of any

9    election officials in the State of South Carolina

10   about whether it is even permissible under the law to

11   exclude from the voter registration database

12   registered voters whose driver's licenses had been

13   returned from out of state?

14           MS. MEZA:  Objection.

15      A    I did not consider -- I did not read

16   anything about or consider those opinions, because I

17   considered this aspect of the data preparation to try

18   to come up with a list of people who were most likely

19   to be affected by the law and whose behavior could be

20   most readily studied.

21   BY MR. POTENZA:

22      Q    And in reaching -- in formulating that

DEPOSITION OF CHARLES STEWART, III, Ph.D.
CONDUCTED ON THURSDAY, AUGUST 9, 2012

66

1    starting point for your analysis, that is, in making

2    the decision to exclude these people from the voter

3    rolls, did you consider what the requirements are

4    under Federal and State law with respect to how the

5    state maintains its voter rolls?

6        A    Well, I understand that simply by moving

7    out of state and returning a driver's license, that

8    you are not removed from the voter rolls.  And in

9    fact they are still on the voter rolls.  It seemed to

10   me that the question at hand, though, was what is the

11   behavior of the people who were likely to be affected

12   by the law, which is a different question.

13       Q    Aren't voters whose driver's licenses are

14   returned from out of state affected by the law?

15       A    Yes.

16       Q    And you conclude in your rebuttal

17   declaration that the vast majority of residents with

18   out-of-state returned licenses have removed

19   themselves from the electoral process of South

20   Carolina; is that right?

21       A    Could you point that out?

22       Q    Paragraph 37.

DEPOSITION OF CHARLES STEWART, III, Ph.D.
CONDUCTED ON THURSDAY, AUGUST 9, 2012

90

1    are licenses that have been surrendered.

2        Q      But doesn't the reason code "must be

3    returned due to suspension" lead you to believe that

4    at least for that category, those licenses are not

5    yet returned?

6              MS. MEZA:   Objection.

7        A      One could draw that -- you're asking that

8    question.  To answer the question and confirm the

9    answer, I would look at other information in the

10   table.  For instance, there is a code in the table

11   about the date on which the license was received.

12   And I remember my examination of that date was that

13   as a general matter, that date was filled in.

14            And so I came to the conclusion that the

15   licenses in the table were licenses that had in fact

16   been surrendered and received.

17   BY MR. POTENZA:

18       Q      Now, you're familiar with the license

19   status code on the license table in the database?

20       A      Yes.

21       Q      And if the license status code is zero

22   zero, that means that the license has been

DEPOSITION OF CHARLES STEWART, III, Ph.D.
CONDUCTED ON THURSDAY, AUGUST 9, 2012

91

1    surrendered or canceled, right?

2        A     It indicates invalid, I guess.

3        Q     Okay.  And if the value of that code is 1,

4    then it's an active license, right?

5        A     Yes.

6        Q     Did you do anything to compare the licenses

7    that were listed on the license received table to the

8    license table to determine whether or not the license

9    was still coded active?

10       A     Yes, I did.  And there are licenses on the

11   receive table.  Some of them are coded active and

12   some of them are coded inactive.

13       Q     And then did you just exclude all of these

14   licenses irrespective of whether they were coded

15   active on the license table?

16             MS. MEZA:  Objection.

17       A     I excluded them all.

18   BY MR. POTENZA:

19       Q     So if for example there are DMV customers

20   whose license appears on the license received table

21   because they have not paid their parking tickets in a

22   long time, and then -- and so their license is coded

DEPOSITION OF CHARLES STEWART, III, Ph.D.
CONDUCTED ON THURSDAY, AUGUST 9, 2012

137

1      A      Mm-hmm.  That was not involved in any of

2  the statistical information I did.

3      Q      Was it involved in any of the analysis you

4  did concerning socioeconomic conditions or burdens on

5  people who currently lack Act R54 ID?

6      A      Well, it did to the degree that this is a

7  generic -- seems to me to be a generic passage of law

8  and is not particularly cognizant of the fact that

9  the people who are in most need of these sorts of

10  voter registration cards may have special burdens in

11  meeting that requirement.

12      Q      You said that this is a generic part of the

13  law.  Did you consider the procedures that the State

14  Election Commission has developed to implement this

15  section 4 of the law?

16      A      I was not in possession -- when I was

17  writing my reports, I was not in position of any of

18  the plans.

19      Q      Did you ask for any of the plans that the

20  State Election Commission has for implementing

21  section 4, Act R54?

22      A      Not in the preparation of my reports.

DEPOSITION OF CHARLES STEWART, III, Ph.D.
CONDUCTED ON THURSDAY, AUGUST 9, 2012

138

1      Q     Did you consider any testimony of any

2   members of the State Election Commission about how

3   they planned to implement section 4 of Act R54?

4      A     In the preparation of my report I did not.

5   I relied on the language of the law.

6      Q     Have you reviewed or considered those

7   materials outside the preparation of your report?

8      A     After I wrote the report, I've read some

9   materials that the State has provided concerning, you

10   know, what their plans are.

11      Q     When we say "the report," we're referring

12   to your initial declaration?

13      A     Both my initial declaration and the

14   rebuttal.

15      Q     Was the first time you considered materials

16   from the State Election Commission with respect to

17   the implementation of section 4 after you submitted

18   your rebuttal declaration?

19      A     That was when I first read the materials

20   from the State, yes.

21      Q     And you had not -- even if you had read

22   them, you hadn't considered them, even, prior to your

DEPOSITION OF CHARLES STEWART, III, Ph.D.
CONDUCTED ON THURSDAY, AUGUST 9, 2012

196

1      then go back and change any of those decisions about

2      what records or data to exclude?

3            A      No.

4            Q      When making the decision to exclude

5      licenses returned from out of state and suspended

6      licenses specifically, did you rely exclusively on

7      the letter that you received, the letter sent by

8      Kevin Shwedo, the executive director of the DMV, to

9      the South Carolina Attorney General's Office?

10           A      I didn't rely exclusively on that.  It did

11     inform significantly my judgment in the matter.

12           Q      Had you not seen that letter or been made

13     aware of what it said, would you have made the same

14     decisions about what data and/or records to exclude

15     from your analysis?

16           A      I probably would have -- that's a

17     hypothetical.  I have a hard time answering, knowing

18     everything I know right now.  The Shwedo letter was,

19     again, a strong endorsement of the idea.

20     Nonetheless, what I would have discovered is that

21     these were people who were also behaving as if they

22     were not engaged, on the whole, engaged voters in the

DEPOSITION OF CHARLES STEWART, III, Ph.D.
CONDUCTED ON THURSDAY, AUGUST 9, 2012

197

1    state of South Carolina.

2         So if I had not seen the Shwedo letter, I

3    would have liked to investigate the matter further to

4    inform my decision whether to include or exclude the

5    data.

6    Q    And do you recall your testimony earlier

7    today regarding Dr. Hood's conclusion that for

8    persons over 65, 65 and older, being able to vote

9    absentee under South Carolina's law would be

10   ameliorative?  Do you remember that testimony you

11   gave?  Just generally.

12   A    I remember those questions concerning that

13   matter, yes.

14   Q    And isn't it correct that under Act R54, ID

15   would be required to vote in person absentee?

16   A    Yes.

17   Q    Therefore, the only option, if any, to vote

18   absentee or to cast an absentee ballot that

19   individuals 65 and older would have would be a

20   mail-in absentee ballot, correct?

21        MR. POTENZA:  Objection, leading.

22   A    That is correct.