IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| STATE OF SOUTH CAROLINA,<br><br>   Plaintiff,<br><br>  v.<br><br>UNITED STATES OF AMERICA, and ERIC HIMPTON HOLDER, JR., in his official capacity as Attorney General of the United States,<br><br>   Defendants,<br><br>JAMES DUBOSE, *et al.*,<br><br>   Defendant-Intervenors. | Civil Action No.  1:12-CV-203<br>(CKK-BMK-JDB)<br>Three Judge Court |

## MEMORANDUM IN OPPOSITION TO THE STATE OF SOUTH CAROLINA'S MOTION TO EXCLUDE THE TESTIMONY OF DR. THEODORE ARRINGTON

  Defendants the United States of America and Eric H. Holder, Jr. (collectively "the United States") respectfully oppose Plaintiff the State of South Carolina's motion to exclude the expert testimony of Dr. Theodore Arrington (ECF No. 165).  Dr. Arrington's proposed testimony easily satisfies the standard for the admissibility of expert testimony, as set out in Federal Rule of Evidence 702.  Dr. Arrington has been qualified as an expert witness concerning challenged voting practices in numerous cases.  Earlier this year this Court rejected a nearly identical challenge to expert testimony Dr. Arrington offered concerning legislative purpose, finding that the motion "reflect[ed] a stingy reading of the Federal Rules of Evidence and the testimony [Dr. Arrington] intend[ed] to offer."  Trial Tr. at 6, *Texas v. United States*, No. 11-cv-1303 (D.D.C.

Jan. 17, 2012 a.m.) (Ex. 1) [hereinafter *Texas* Tr.][1]. South Carolina's motion should fare no better, as it grossly mischaracterizes Dr. Arrington's testimony and misapprehends the nature of the purpose inquiry under Section 5 of the Voting Rights Act and the qualitative methods employed by historians and political scientists. Dr. Arrington's opinions are anchored to and drawn from the legislative record, well-established social science literature, reliable demographic data, and his vast experience as an election official. South Carolina's cavils go to the weight of Dr. Arrington's testimony, and not its admissibility.

## I. THERE IS A STRONG PRESUMPTION OF ADMISSABILITY FOR EXPERT TESTIMONY IN A BENCH TRIAL.

Under Federal Rule of Evidence 702, a witness may provide expert opinion testimony if he is "qualified as an expert by knowledge, skill, experience, training, or education," Fed. R. Evid. 702, and if his testimony is "relevant and reliable." *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 141 (1999). "The presumption under the Federal Rules is that expert testimony is admissible." *Evans v. Wash. Metro. Area Transit Auth.*, 674 F. Supp. 2d 175, 178 (D.D.C. 2009). To assess admissibility, district courts "assume[] only a 'limited gatekeep[ing] role' directed at excluding expert testimony that is based upon 'subjective belief' or 'unsupported speculation.'" *Harris v. Koenig*, 815 F. Supp. 2d 6, 8 (D.D.C. 2011) (quoting *Ambrosini v. Labarraque*, 101 F.3d 129, 135-36 (D.C. Cir. 1996)). District courts have broad discretion to admit expert testimony, *see United States ex rel. Miller v. Bill Harbert Int'l Constr. Inc.*, 608 F.3d 871, 895 (D.C. Cir. 2010), particularly in a bench trial, where "there is no risk of tainting the trial by exposing a jury to unreliable evidence.'" *United States v. H&R Block, Inc.*, 831 F. Supp. 2d. 27, 30 (D.D.C. 2011) (quoting *Whitehouse Hotel Ltd. P'ship v. Comm'r of Internal Revenue*, 615

---

[1] As noted below at 4, this Court limited testimony concerning particular legislators' subjective intent. Texas Tr. at 7. No such testimony is offered here.

F.3d 321, 330 (5th Cir. 2010)); *see also United States v. Hall*, 969 F.2d 1102, 1109-10 (D.C. Cir. 1992) (upholding bench trial admission of expert testimony concerning defendant's intent to distribute narcotics); *David E. Watson, P.C. v. United States*, 668 F.3d 1008, 1015 (8th Cir. 2012) ("[W]e relax *Daubert*'s application for bench trials" because "'[t]here is less need for the gatekeeper to keep the gate when the gatekeeper is keeping the gate only for himself.'" (quoting *United States v. Brown*, 415 F.3d 1257, 1269 (11th Cir. 2005) (second alternation in original)).

## II. COURTS ROUTINELY PERMIT EXPERT ANALYSIS OF THE PRESENCE OF A DISCRIMINATORY LEGISLATIVE PURPOSE.

Courts in voting rights cases routinely admit expert testimony concerning legislative purpose and the history of discrimination in voting. *See, e.g.*, *Hunt v. Cromartie*, 526 U.S. 541, 547-48 (1999) (discussing intent evidence); *United States v. Blaine Cnty., Mont.*, 363 F.3d 897, 912-913 (9th Cir. 2004) (discussing expert testimony on history of discrimination); *Garza v. Cnty. of Los Angeles*, 918 F.2d 763, 767 n.1 (9th Cir. 1990) (crediting expert testimony concerning intent); *United States v. Brown*, 494 F. Supp. 2d 440, 452 & n.13 (S.D. Miss. 2007) (crediting purpose evidence offered by Dr. Arrington); *Johnson v. DeSoto Cnty. Sch. Bd.*, 995 F. Supp. 1440 (M.D. Fla. 1998) (discussing intent evidence); *Bolden v. City of Mobile, Ala.*, 542 F. Supp. 1050, 1075 (S.D. Ala. 1982) (same). Courts have also found that such experts satisfy the requirements of Rule 702. *See Bone Shirt v. Hazeltine*, 336 F. Supp. 2d 976, 1005-06 1034 (D.S.D. 2004) (finding experts had the education, training, skill and knowledge to satisfy Rule 702 and *Daubert*).

In the past year, this Court has twice denied motions to exclude the testimony of political scientists concerning the purpose of statutes undergoing judicial preclearance under Section 5 of the Voting Rights Act, including the testimony of Dr. Arrington. During recent litigation concerning the State of Texas's reapportionment plans, the three-judge panel specifically

rejected the State's complaint that expert political scientists would "merely summarize easy to understand documents such as e-mails [and the] legislative record." *Texas* Tr. at 3. The Court emphasized that the value of expert analysis lies in a political scientist's ability to place this information in the context of "demographics, registration records, voting patterns, alternative [voting procedures] and the like." *Id.*; *see also* Minute Order, *Texas v. Holder*, No. 1:12-cv-128 (D.D.C. July 3, 2012) (denying the State's motion to exclude the testimony of Dr. J. Morgan Kousser, a historian and political scientist who offered opinion testimony concerning the purpose of Texas's photographic voter identification statute).

In permitting the expert testimony of political scientists concerning legislative purpose, this Court has "somewhat limited" these experts only by restricting testimony concerning the subjective intent of particular legislators. *Texas* Tr. at 7. The reason for this is clear: such testimony lies outside the core purpose inquiry. *See* Order at 2-3, *Texas v. Holder*, No. 1:12-cv-128 (D.D.C. May 21, 2012) (Ex. 2 at 3) ("Section 5 is 'directed at' … and 'turns on' … overall legislative purpose and not the purpose or motivation of individual actors.") (internal citations omitted). Scrutinizing legislative purpose does not require "judicial psychoanalysis of a drafter's heart of hearts," *McCreary Cnty. v. ACLU of Ky.*, 545 U.S. 844, 862 (2005), and Dr. Arrington expressly notes this constraint in his declaration:

> In determining intent of a legislature, one reviews the process that led to the adoption of the law and how it might be implemented with the use of depositions, newspapers, official minutes, and other records. The effect of the law is, of course, a critical piece of evidence. This scholarship indicates that one can only examine what individuals wrote, said, and did, not what they were thinking.

Arrington Decl. ¶ 14 (Ex. 3). As a result of this limitation, political scientists' analysis of legislative purpose is readily distinguishable from impermissible expert testimony concerning

individual criminal or fraudulent intent. *See* Pl.'s Br. at 3 (collecting cases).[2]

A permissible inquiry into discriminatory purpose may "occasionally" touch on "the subjective 'intent,' 'motive,' or 'actual purpose' of government actors." *Grossbaum v. Indianapolis-Marion Cnty. Bldg. Auth.*, 100 F.3d 1287, 1292 & n.3 (7th Cir. 1996). However the State's claim that Dr. Arrington engages wholly or even substantially in considering the state of mind of particular South Carolina legislators grossly mischaracterizes his clear testimony. *See, e.g.*, Arrington Rep. ¶ 4 (ultimately concluding "that the photo ID law was enacted with a purpose of reducing the ability of Minority citizens to vote"). For example, Dr. Arrington's explanation of the legislators' knowledge simply sets out information that had been presented directly to them. *See id.* ¶ 39. On the other hand, his statement concerning a particular legislator's lack of knowledge is drawn from that legislator's sworn deposition testimony, which Dr. Arrington places into vital context. *See id.* ¶ 82.[3] The State's complaints ignore the far larger focus of Dr. Arrington's testimony on the ability of identification requirements to suppress voting, the foreseeability of a retrogressive impact on minority voters, the persistence of racial bloc voting in South Carolina, the likelihood that the State will be unable to mitigate these

---

[2] *See also In re Rezulin Prods. Liab. Litig.*, 309 F. Supp. 2d 531, 536-37 (S.D.N.Y. 2004) (subjective intent of pharmaceutical executives); *SEC v. Johnson*, 525 F. Supp. 2d 70, 78-79 (D.D.C. 2007) (intent to defraud); *Lippe v. Bairnco Corp.*, 288 B.R. 678, 688-89 (S.D.N.Y. 2003) (intent to engage in a fraudulent conveyance); *Highland Capital Mgmt. v. Schneider*, 379 F. Supp.2d 461, 469 (S.D.N.Y. 2005) (speculation concerning knowledge contemporaneous to a breach of contract).

[3] Some other instances of what the State contends are impermissible testimony, *see* Pl.'s Br. at 4, recount facts external to the legislative process that are established in the political science literature and by Dr. Arrington's experience as an election administrator. For instance, the State takes issue with Dr. Arrington's statement, "Anyone who has been involved in the administration of elections understands that there are no perfect elections. Clerical errors, human errors throughout the process from the poll managers to the canvassing board, bad ballot design, and machine errors far exceed any imagined votes changed by impersonation at the polls." Arrington Rep. ¶ 94. Not only does Dr. Arrington rely on expertise gleaned from a decade of service on the Charlotte/Mecklenburg Board of Elections, *see id.* ¶ 7, he also specifically cites to a recently released monograph by Martha Kropf and David C. Kimball, professors of political science at the University of North Carolina and the University of Missouri, *see id.* ¶ 94.

effects prior to the November 2012 federal election and beyond, and the plausibility of the publicly articulated rationale for the photo ID bill.  *See id.* ¶¶ 25-108.

### III.     EXPERT ANALYSIS OF LEGISLATIVE PURPOSE IS HIGHLY RELEVANT FACTUAL EVIDENCE.

It is well-settled that expert witnesses may provide opinion testimony about any relevant factual issue in a case, including outcome-determinative factual disputes. *See* Fed. R. Evid. 704(a) ("An opinion is not objectionable just because it embraces an ultimate issue."); *see also* Fed. R. Evid. 704 Advisory Comm. Note (1972) ("[T]he so-called 'ultimate issue' rule is specifically abolished by the instant rule."); *SEC v. Johnson*, 525 F. Supp. 2d 70, 78 & n.8 (D.D.C. 2007) ("Although [a] particular factual conclusion is associated with one of the more significant factual disputes between the parties, that does not make it off limits for expert opinion."). As the D.C. Circuit has explained, "an expert may offer his opinion as to facts that, if found, would support a conclusion that the legal standard at issue was satisfied" so long as the expert does not testify "as to whether the legal standard has been satisfied." *Burkhart v. Washington Metro. Area Transit Auth.*, 112 F.3d 1207, 1213-14 (D.C. Cir. 1997).

Dr. Arrington's testimony will assist the Court in resolving a highly relevant and unusually complex factual question—the purpose of South Carolina's photographic voter identification statute—without impinging on this Court's role to reach conclusions of law.  As explained above, Dr. Arrington's declaration examines the evidence in the legislative record, media, and other non-confidential sources to determine whether there is evidence that the legislature intended to disenfranchise minority voters who do not possess one of the listed forms of photo identification. While Dr. Arrington's declaration concludes that evidence exists that the legislature intended to discriminate against minority voters in this way, it avoids drawing conclusions as to the legal implications of these findings.

Two examples of Dr. Arrington's factual analysis and conclusions clarify that his opinions do not prescribe the legal determinations that are the sole province of this Court. With regard to the legislative debate, Dr. Arrington wrote:

> The speeches in favor of the bill are captured in the remarks of Senator George Campsen (a White Republican) in the Journal for 24 February 2012. The arguments are precisely the reverse of those offered by the opponents. There are several things to notice in the arguments for the bill. The argument is that having a photo ID is so accepted in the general population that it would not be a substantial burden on anyone, despite the known fact (from the Andino report) that perhaps 178,000 South Carolina voters did not have a photo ID. Nor is there any attempt to deny that the burden—whatever it might be—weighs more heavily on Minority voters than on Whites as the Andino report demonstrated. Other provisions in the bill supporters claim to mitigate whatever burden there may be. The emphasis is on the importance of preventing fraud. The cases cited, however, tend to be largely irrelevant to the incidence and prevention of voter impersonation fraud in South Carolina. The cited events come mostly from other states, and the few South Carolina cases didn't involve impersonation fraud. Indeed, the proponents of the photo ID bill could not deny the assertion of the photo ID bill's opponents that there were no established cases of impersonation vote fraud in the state. The General Assembly legislated on a nonexistent problem, while ignoring the consequences of requiring a photo ID on the political participation of Minority voters.

Arrington Decl. ¶ 45 (internal citations omitted). Similarly, with regard to historical parallels to the burden that an identification requirement would impose on minority voters, Dr. Arrington wrote:

> The requirement to go downtown to get a photo ID is the practical equivalent of requirements for reregistration that have been objected to by the U.S. Attorney General and were of concern to the Congress. A report of the United States Commission on Civil Rights to the Congress in January 1975 titled "The Voting Rights Act: Ten Years After" stated that a requirement for reregistration ". . . places a substantial burden on the Minority voter, who has often succeed in registering only after overcoming many obstacles. The result of a reregistration can be a decline in the number of Minorities who are registered." The report goes on to cite a specific example in Arizona in 1970, and is critical of the Department of Justice for sometimes not objecting to reregistration in Mississippi. A basic source on this subject is "The Shameful Blight: The Survival of Racial Discrimination in Voting in the South," by the Washington Research Project, 1972, which provides a list of Mississippi counties' use of the reregistration strategy and the Justice Department's response.

*Id.* ¶ 69 (internal citations omitted). The State suggests that portions of Dr. Arrington's declaration are "precisely" the same as the "bare legal conclusions" rejected by other courts. Pl.'s Br. at 6. However the cited pages actually contain Dr. Arrington's explanation of the categories of evidence typically used to determine legislative purpose, *see id.* ¶¶ 11, 57, discussion of the legislative process that led to the passage of South Carolina's photographic voter identification bill, *see id.* ¶¶ 37-56, descriptions of factual findings from prior Voting Rights Act cases in South Carolina, *see id.* ¶¶ 58-60, 75, 84, and provision of concluding opinion testimony based on his analysis of these facts, *see id.* ¶¶ 103-108. These discussions provide only factual evidence—albeit evidence highly probative of core legal questions in this case.

## IV. QUALITATIVE POLITICAL SCIENCE REPRESENTS SPECIALIZED KNOWLEDGE AND RELIABLE PRINCIPLES THAT WILL AID THE COURT.

The State's final complaint takes as its premise that Dr. Arrington's decades as a scholar of political science and service as an election administrator confer neither expertise nor methodology. Expert testimony is reliable if it employs scientifically valid reasoning or methodology that is properly applied to the facts of the case. *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 592-93 (1993). The Court's reliability inquiry should be "flexible" and must focus "solely on principles and methodology, not on the conclusions that they generate." *Id.* at 594-95. Far from merely characterizing documentary evidence, *see* Pl.'s Br. at 5, "repeating hearsay evidence without applying any expertise whatsoever," Pl.'s Br. at 9 (quoting *United States v. Mejia*, 545 F.3d 179, 197 (2d Cir. 2008)), or "merely summarize[ing] a hodgepodge of materials," Pl.'s Br. at 10, Dr. Arrington's testimony provides the Court with a sophisticated assessment of the voter identification law based on the context in which it was drafted, and its known or foreseeable consequences.

As a general matter, analysis of legislative purpose "takes account of the traditional

external signs that show up in the text, legislative history, and implementation of the statute." *McCreary Cnty.*, 545 U.S. at 862. However the analysis need not be limited to tools taught in law schools; the skills of trained historians and political scientists may bring a distinct and reliable methodology to the analysis of legislative purpose. *See, e.g.*, *Garza v. Cnty. of Los Angeles*, 756 F. Supp. 1298, 1309 (C.D. Cal. 1990), *aff'd*, 918 F.2d 763 (9th Cir. 1990); *Hunter v. Underwood*, 471 U.S. 222, 228-29 (1985); *see also Brown v. Entm't Merchants Ass'n*, 131 S. Ct. 2729, 2769 (2011) (Breyer, J., dissenting) (noting that most judges lack "social science expertise"); *Major v. Treen*, 700 F. Supp. 1422, 1437 (E.D. La. 1988) (distinguishing "talents as an attorney" from "talents as a political scientist" in Voting Rights Act litigation). Nor must all reliable methodologies rest on mathematical formulae. *See, e.g.*, *United States v. James*, 737 F. Supp. 2d 1, 6 (D.D.C. 2010) (permitting expert testimony that certain physical evidence was consistent with prohibited intent); *United States v. Gonzalez*, 608 F.3d 1001, 1005 (7th Cir. 2010) (finding "sufficient expert evidence, albeit qualitative rather than quantitative").

The State's claim that Dr. Arrington's testimony should be excluded on the basis that this Court "does not need expert assistance to review" the materials he considered has already been squarely rejected by the D.C. Circuit:

> The perceived danger of indiscriminate admission of expert testimony is that because of its aura of special reliability and trust it can unduly bias the factfinder. But if, as appellant asserts, the court was already an "expert" on [the subject of the expert's testimony], then it is highly unlikely that it would have been swayed by the "aura" of the expert's testimony.

*Hall*, 969 F.2d at 1110 (internal citations omitted). The reliability of Dr. Arrington's basic application of political science is once again best demonstrated through a few examples. First, Dr. Arrington ably sets out the socioeconomic disparities between white and black communities in South Carolina, as well as the effects of such disparities on political participation, as

established in the political science literature.  *See* Arrington Decl. ¶¶ 30-31.  He then explains the likelihood that experienced politicians would understand such effects and the implications for minority political participation.  *See id.* ¶ 39.  Second, Dr. Arrington also converts the real-world probabilities of voter impersonation and the detection of such fraud into an algebraic formula—a common technique in political science—to clarify and discredit the legislature's pretextual public motivations.

> Impersonation vote fraud can be put in formula terms like the calculus of voting presented above: PF > One-Vote. The impersonator has a chance (P) of being caught committing felony (F). If he or she succeeds in the impersonation the preferred candidate or party gains one vote. The chance of one vote deciding any election is virtually nil. While it is true that without photo ID, the probability of detection (P) is also low, the incentive to commit this crime still cannot match the possible cost. In other words, we would logically expect this particular kind of vote fraud to be extremely rare, unless part of an organized effort that would surely be detected unless it involved corrupt election officials.

Arrington Decl. ¶ 88.  Lawyers may comprehend such analysis, but political scientists such as Dr. Arrington are in the best position to introduce such expert testimony to this Court.[4]

### V.  CONCLUSION.

For the reasons above, the Court should deny South Carolina's motion to exclude Dr. Arrington's testimony.

Date: August 20, 2012

                                                                Respectfully submitted,

| | |
|---|---|
| RONALD C. MACHEN, JR. | THOMAS E. PEREZ |
| United States Attorney | Assistant Attorney General |
| District of Columbia | Civil Rights Division |
| | |
| | */s/ Bradley E. Heard* |

---

[4] This Court recently relied in part on Dr. Arrington's testimony before Congress in an opinion upholding the constitutionality of Section 5 of the Voting Rights Act.  *Shelby County, Ala. v. Holder*, 811 F. Supp.2d 424, 465 (D.D.C. 2011), *aff'd*, 679 F.3d 848 (D.C. Cir. 2012), *petition for cert. filed* (July 20, 2012).

T. Christian Herren, Jr.\
Richard Dellheim\
Bradley E. Heard (D.C. Bar No. 458309)\
Catherine Meza\
Jared M. Slade\
Anna M. Baldwin (D.C. Bar No. 998713)\
Erin M. Velandy\
Attorneys\
Voting Section, Civil Rights Division\
U.S. Department of Justice\
950 Pennsylvania Ave. NW\
Washington, DC 90530\
(202) 305-4196\
bradley.heard@usdoj.gov
