IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| STATE OF SOUTH CAROLINA, | |
| Plaintiff, | |
| v. | |
| UNITED STATES OF AMERICA, and ERIC HIMPTON HOLDER, JR., in his official capacity as Attorney General of the United States, | Civil Action No.  1:12-CV-203 (CKK-BMK-JDB) Three Judge Court |
| Defendants, | |
| JAMES DUBOSE, *et al.*, | |
| Defendant-Intervenors. | |

**MEMORANDUM IN OPPOSITION TO THE STATE OF SOUTH CAROLINA'S MOTION TO EXCLUDE THE TESTIMONY OF DR. CHARLES STEWART**

Defendants United States of America and Eric H. Holder, Jr. (collectively "the United States") respectfully oppose Plaintiff State of South Carolina's motion to exclude the expert testimony of Dr. Charles Stewart (ECF No. 166).  Dr. Stewart's proposed testimony easily satisfies the standard for the admissibility of expert testimony, as set out in Federal Rule of Evidence 702.

Dr. Stewart is one of the nation's leading political scientists and a foremost expert in the analysis of voter registration and election data.  Faced with the clear disparate impact revealed by Dr. Stewart's painstaking analysis, the State of South Carolina disagrees with Dr. Stewart's principled decisions to exclude voters from his analysis who have likely moved from South Carolina, choices endorsed by a high-ranking State official and even the State's own expert.

South Carolina also takes issue with Dr. Stewart's refusal to speculate as to future effects of potentially ameliorative measures contained within Act R54.  None of these purported deficiencies call into question the admissibility of Dr. Stewart's testimony.  Even if this Court were to question some of the choices Dr. Stewart made in reaching his ultimate conclusions, his painstaking and well-documented analysis allows the Court as the finder of fact to admit Dr. Stewart's testimony and nonetheless to reach its own conclusions.[1]

## I.      THERE IS A STRONG PRESUMPTION OF ADMISSABILITY FOR EXPERT TESTIMONY IN A BENCH TRIAL.

Under Federal Rule of Evidence 702, a witness may provide expert opinion testimony if he or she is "qualified as an expert by knowledge, skill, experience, training, or education," Fed. R. Evid. 702, and if the testimony is "relevant and reliable." *Kumho Tire Co. Ltd. v. Carmichael*, 526 U.S. 137, 141 (1999).  "The presumption under the Federal Rules is that expert testimony is admissible." *Evans v. Wash. Metro. Area Transit Auth*., 674 F. Supp. 2d 175, 178 (D.D.C. 2009).  To assess admissibility, district courts "assume[] only a 'limited gatekeep[ing] role' directed at excluding expert testimony that is based upon 'subjective belief' or 'unsupported speculation.'" *Harris v. Koenig*, 815 F. Supp. 2d 6, 8 (D.D.C. 2011) (quoting *Ambrosini v. Labarraque*, 101 F.3d 129, 135-36 (D.C. Cir. 1996)).  District courts have broad discretion to admit expert testimony, *see United States ex rel. Miller v. Bill Harbert Int'l Constr. Inc.*, 608 F.3d 871, 895 (D.C. Cir. 2010), particularly in a bench trial, where "there is no risk of tainting the trial by exposing a jury to unreliable evidence.'" *United States v. H&R Block, Inc.*, 831 F. Supp. 2d. 27, 30 (D.D.C. 2011) (quoting *Whitehouse Hotel Ltd. P'ship v. Comm'r of Internal*

---

[1] Another three-judge panel of this Court recently credited expert testimony from Dr. Stewart in a different declaratory judgment action under Section 5 of the Voting Rights Act.  *See Florida v. United States*, No. 11-cv-1428, slip op. at 45-46, 48, 50, 52, 62, 64, 79-82, 91 (D.D.C. Aug. 16, 2012) (three-judge court).

*Revenue*, 615 F.3d 321, 330 (5th Cir. 2010)); *see also United States v. Hall*, 969 F.2d 1102, 1109-10 (D.C. Cir. 1992) (upholding bench trial admission of expert testimony concerning defendant's intent to distribute narcotics); *David E. Watson, P.C. v. United States*, 668 F.3d 1008, 1015 (8th Cir. 2012) ("[W]e relax *Daubert*'s application for bench trials" because "'[t]here is less need for the gatekeeper to keep the gate when the gatekeeper is keeping the gate only for himself.'" (quoting *United States v. Brown*, 415 F.3d 1257, 1269 (11th Cir. 2005) (second alternation in original)).

## II.    DR. STEWART'S TESTIMONY MEETS THE REQUIREMENTS OF RULE 702.

The reliability requirements of Rule 702 ask three logical questions. First, is the testimony "based on sufficient facts or data?" Fed. R. Evid. 702(b). Second, is the testimony "the product of reliable principles and methods?" Fed. R. Evid. 702(c). Third, does the testimony consist of a reliable application of those "principles and methods to the facts of the case." Fed. R. Evid. 702(d). The State seizes upon the language of Rule 702 with little regard to its meaning, improperly attempting to shoehorn disagreements with Dr. Stewart's principled choices into the foundational admissibility inquiry. *See generally Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 596 (1993) (holding that the "traditional and appropriate means of attacking" expert testimony are "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof"). A systematic examination of Dr. Stewart's analysis demonstrates that his testimony is unquestionably admissible and will aid this court in resolving a highly relevant and technical factual question: Do the photographic voter identification requirements of Act R54 impose burdens on South Carolina voters and, if so, do African American voters shoulder a disproportionate share of those burdens?

### A. Dr. Stewart Analyzed All Relevant Facts and Data.

The requirement that experts consider "sufficient facts or data" is not intended to
"authorize a trial court to exclude an expert's testimony on the ground that the court believes one
version of the facts and not the other."  Fed. R. Evid. 702 Advisory Comm. Note (2000).  As the
Rules Advisory Committee aptly noted, "When facts are in dispute, experts sometimes reach
different conclusions based on competing versions of the facts," *id.*, and such disagreements do
not undermine the reliability of expert evidence for admissibility purposes.  *See, e.g.*,
*McReynolds v. Sodexho Marriott Services, Inc.*, 349 F. Supp. 2d 30, 42 (D.D.C. 2004) (quoting
*Micro Chem., Inc. v. Lextron, Inc.*, 317 F.3d 1387, 1392 (Fed. Cir. 2003)).  Critically, an expert's
decision not to include additional data in his ultimate analysis "is not a reason to exclude [his]
testimony for lack of reliability."  *United States v. Naegele*, 471 F. Supp. 2d 152, 164-65 (D.D.C.
2007); *see also Freeland v. Iridium World Commc'ns, Ltd.*, 545 F. Supp. 2d 59, 88 (D.D.C.
2008) ("'[T]he factual basis of an expert opinion goes to the credibility of the testimony, not the
admissibility,' making it a jury determination." (quoting *Sappington v. Skyjack, Inc.*, 512 F.3d
440, 450 (8th Cir. 2008)).[2]

Dr. Stewart sets out in his report the four sources of data upon which he
principally relied: the State of South Carolina's driver's license database, the voter
registration list, the voter participation list, and the death certificate list.  *See* Stewart
Decl. ¶¶ 27-32 (Ex. 1).  In addition, Dr. Stewart used demographic and socioeconomic
data from the 2010 U.S. Census, the 2006-2010 American Community Survey, and the

---

[2] The decisions on which the State relies are not nearly as broad as the State suggests.  For example, *Innis Arden Golf Club v. Pitney Bowes, Inc.* excluded experts' conclusions because they were "by the experts' own admissions . . . not the product of an open-minded search for the truth" and were "artificially narrow."  629 F. Supp. 2d 175, 190 (D. Conn. 2009).  Similarly, *North v. Ford Motor Co.* excluded a psychologist's report that provided "no independent diagnosis" and failed to consider the individual's "medical and psychological history," including "pre-existing conditions" and "post-accident events."  505 F. Supp. 2d 1113, 1119 (D. Utah 2007).  Such fundamental failures are not at issue here.

2003 National Assessment of Adult Literacy.  *See id.* ¶ 126 & n.38.  Dr. Stewart also

took into account research contained within the political science literature, including

several of his own peer-reviewed publications.  *See id.* ¶¶ 7, 12 & n.11, 15 & nn.2-3, 72

& n.18, 90 & n.23, 134 & n.42.  Finally, Dr. Stewart followed guidance promulgated by

or received from the State concerning the contents of its databases.  *See* Stewart Rebuttal

Decl. ¶ 14 (Ex. 2); Email from Steve Potenza, Counsel to the State of South Carolina, to

Catherine Meza, Trial Attorney, U.S. Department of Justice (May 25, 2012) (Ex. 3)

(providing data dictionary and answering specific questions concerning DMV data).

　　　The State's first complaint concerns Dr. Stewart's decision to exclude from his ultimate

conclusion regarding the universe of individuals likely to be affected by Act R54 consideration

those voters who surrendered their South Carolina driver's licenses upon obtaining a new

driver's license in another state.  *See* Pl.'s Br. at 4.  Dr. Stewart treated "these individuals as no

longer residents of South Carolina," after considering the possibility that "some of these

individuals are still eligible voters in the Palmetto State."  Stewart Decl. ¶ 96 & n.26.  In

addition, Dr. Stewart thoroughly assessed what effect including such individuals in his ultimate

conclusion would have had.  *See* Stewart Rebuttal Decl. ¶¶ 43-50.  Thus Dr. Stewart included

these data in his analysis, although he set such individuals aside for transparent and principled

reasons when reaching his ultimate opinion.

　　　The State's second complaint concerns Dr. Stewart's decision to exclude from the set of

valid licenses those records that have been marked as surrendered.  *See* Pl.'s Br. at 4-5.  Again,

Dr. Stewart considered such data; he simply made an appropriate decision to exclude these data

from a step in his matching analysis.  The records excluded by Dr. Stewart included an actual

date on which the license at issue had been surrendered to and received by the State.  *See* Charles

Stewart Dep., Aug. 9, 2012, at 90:2-16 (Ex. 4); *see also* South Carolina Department of Motor

Vehicles, *Phoenix Database Tables and Columns* at 51 (2005) (Ex. 5) (defining the

<RETURN_ACTUAL_DATE> field).  In some cases a conflict exists within the database, and

driver licenses that have an actual surrender date nonetheless remain labeled "active," a

designation meaning that the license has not been surrendered.  *See* Stewart Dep. at 91:6-12; *see*

*also Tables and Columns* at 46 (defining <LICENSE_STATUS> field.  The question of how to

address these conflicting status indicators is a matter for cross-examination and is not properly

the basis for excluding an expert under Rule 702(b).

### B.  Dr. Stewart Devised and Executed a Clear and Reliable Methodology.

Dr. Stewart's testimony is plainly the product of reliable principles and methods.  "A

'principle' is a theory that can be used to explain the meaning of observations," and "'method'

refers to *how* the expert derives those theories.  29 Charles Alan Wright et al., *Federal Practice*

*& Procedure* § 6266 (2012).  Appropriate methodology may be contrasted to mere "casual,

sporadic observations."  *United States v. Glenn*, 312 F.3d 58, 67 (2d Cir. 2002); *see also Nimely*

*v. City of New York*, 414 F.3d 381, 398-99 (2d Cir. 2005) (rejecting expert testimony concerning

police credibility based on experience working with police officers and unverifiable

"misperception hypothesis" that officers had simultaneously "experienced an optical illusion").

Even when addressing technical matters, practical methods that constitute generally acceptable

methodology need not be "susceptible to testing or peer review."  *Bitler v. A.O. Smith Corp.*, 400

F.3d 1227, 1235 (10th Cir. 2004).

Dr. Stewart's methodology proceeded in two stages.  First, he undertook initial

preparation "to ensure that the data were valid for the analysis."  Stewart Decl. ¶ 27.  This stage

began with gathering the four databases at issue, comparing the data in his possession to agency

publications, and posing remaining questions to the State concerning the meaning of the data.

*See id.* ¶¶ 28-31; Potenza Email, *supra*.  Dr. Stewart then flagged records in the driver's license

database that were unlikely to reflect photographic identification needed to vote under Act R54,

including expired, surrendered, and suspended licenses.  *See* Stewart Decl. ¶¶ 93, 101-117.  He

additionally flagged individuals in the voter registration database who were unlikely to be

affected by Act R54, including deceased individuals, inactive voters, and those voters who had

surrendered their South Carolina driver's license in order to acquire a driver's licenses from

another State.  *See id.* ¶¶ 62-63, 92, 96.  Dr. Stewart established those methodological standards

at the outset of his process, prior to any analysis of the data and the racial disparities that analysis

ultimately demonstrated.  Stewart Dep. at 195:15-196:3.  Dr. Stewart then matched records

between the databases, relying solely on perfect matches by full social security number and

gender.  *See* Stewart Decl. ¶¶ 72-85.  His conclusions rest on two sets of matches: first, between

voters likely to be affected by Act R54 and any driver's license and, second, between voters

likely to be affected by Act R54 and valid driver's licenses.  *See id.* ¶¶ 92-93.  Finally, Dr.

Stewart analyzed racial and geographic distributions and the voting history of the non-matched

voters—based on data contained in the registration database—and estimated sociological traits of

voters lacking needed photographic identification, based on those known racial and geographic

distributions.  *See id.* ¶¶ 94-114, 122-139.

The State does not truly take issue with Dr. Stewart's core methodologies: database

construction, matching by social security numbers and gender, and estimates of socioeconomic

status based on known distributions.[3]  First, the State claims that Dr. Stewart "failed to take steps

---

[3] In its concluding paragraph, the South Carolina claims that Dr. Stewart's matching methodology is "unreliable."  *See* Pl.'s Br. at 7.  This statement is wholly unsupported and plainly false.  Similarly, the State asserts in its final paragraph that Dr. Stewart's methodology is "highly speculative."  *See id.*  This charge finds no support in the State's brief, let alone in the empirically based research conducted by Dr. Stewart in this case.

to understand the data he was analyzing."  Pl.'s Br. at 5.  This allegation is incorrect and, in any event, irrelevant to admissibility.  As noted above, Dr. Stewart relied upon statements by State officials and State publications, and where he lacked necessary knowledge, he directed questions to the State.  *See* Stewart Decl. ¶ 31; Stewart Rebuttal Decl. ¶¶ 14-17; Potenza Email, *supra*.  Notably, Dr. Stewart in part based his decision to remove individuals from his analysis whose South Carolina driver's license had been canceled because they had obtained a license in another state on South Carolina's use of that same filter in its analysis of the likely effects of Act R54.  *See* Stewart Rebuttal Decl. ¶¶ 14-17; Letter from Kevin A. Shwedo, Executive Director, South Carolina Department of Motor Vehicles, to Jay W. Smith, Director of Consumer Protection and Antitrust, South Carolina Attorney General's Office (undated) (Ex. 6).[4]

There is no more merit to be found in the State's substantive dispute with the exclusion from the universe of affected voters those who have surrendered their South Carolina driver's licenses in order to obtain identification from another state.[5]  As noted above, Dr. Stewart's

---

[4] Dr. Stewart relied in part on Mr. Shwedo's view that any attempt to match DMV records against the State's voter registration list should not include persons whose "records had been canceled by the Department of Motor Vehicles in response to a notification from another state's department of motor vehicles that the individual had registered for a driver's license in that state."  Ex. 6, at 2; Stewart Dep. at 196:10-11.  Mr. Schwedo argues that the failure to remove persons who have surrendered their driver's license to other states renders the data "flawed."  *Id.*

South Carolina claims that Dr. Stewart should not have relied on the letter from the Executive Director its Department of Motor Vehicles because Mr. Shwedo testified at his deposition that he is not an expert in election law.  *See* Pl.'s Br. 6.  In fact, Mr. Shwedo testified only that he did not know whether individuals who acquired an out-of-state license and subsequently cast a ballot in South Carolina had committed a crime, although he did testify that they should have been referred to law enforcement for investigation.  *See* Kevin Shwedo Dep., June 7, 2012, at 152:6-17 (Ex. 10).  At no point did Mr. Shwedo disavow the analysis in his letter.

[5] South Carolina maintains a citizenship and residency requirement to participate in elections in the State, *see* S.C. Code § 7-5-120(A), and it is a simple matter of logic that most individuals who surrender their South Carolina driver's license in order to obtain a driver's license from another State have concomitantly obtained an out-of-state domicile.  *See Nienow v. Nienow*, 232 S.E.2d 504, 506 (S.C. 1977) (holding that obtaining a new driver's license "evinc[es] a change of domicile"); *see also Russell v. Cox*, 678 S.E.2d 460, 463 (S.C. App. 2009) (holding that an individual had "remained a resident of Georgia" based in part

analysis focused on those voters most likely to be affected by Act R54, and the State takes no

issue with his removal of inactive voters from his analysis.  However, active voters whose

licenses were returned prior to the election at issue vote at a lower rate than inactive registrants

whose licenses remain valid.  *See* Stewart Rebuttal Decl. ¶¶ 30-42 & tbl.4.

Critically, even the State's expert agrees that Dr. Stewart's methodological choice to

exclude voters who surrendered their South Carolina driver's licenses in other states was sound;

in fact Dr. Melvin Vernon Hood, III, testified that he assumed that such individuals had been

removed from the data he analyzed.  Melvin Vernon Hood, III Dep., Aug. 6, 2012, at 38:11-23

(Ex. 7) ("It's my understanding that [persons who surrendered their South Carolina driver's

licenses to other states] should not be included in the data set that I produced."). [6]  Dr. Hood

testified that "in the future" he would "make sure that [his] list does not include those who had

surrendered driver's licenses."  Hood Dep., at 38:11-39:4; 47:12-48:8.  Dr. Stewart faced the

decision to include or exclude *in toto* voters whose South Carolina licenses had been returned,

and his decision to exclude them was not only permissible—it was the entirely sound.  *See*

Stewart Rebuttal Decl. ¶ 42; *see also* Hood Dep. at 47:12-48:8; *Milwaukee Branch of the*

*NAACP v. Walker*, No. 11-cv-5492, at 10 (Wisc. Cir. Ct. July 17, 2012) (disapproving Professor

Hood's data-matching analysis in voter ID case in part for its failure to adjust "for out-of-state

migration") (Ex. 8).  Finally, even if this Court were to determine that Dr. Stewart erred by

on his continuing "to hold a Georgia driver's license"); *Gasque v. Gasque*, 143 S.E.2d 811, 812 (S.C. 1965) (holding that an individual had not abandoned his South Carolina domicile based on "documentary evidence showing repeated and consistent declarations as to his residence in South Carolina").  The State's expert, Dr. Melvin Hood, confirmed the validity of this conclusion.  *See* Hood Dep., Aug. 6, 2012, at 43:24-44:2 (Ex. 7) ("I would assume, if they've surrendered a license to another state, they've established residency in another state.").

[6]  Dr. Hood's assumption was incorrect.  Such data were not excluded from the data provided by South Carolina.  *See* Stewart Decl. ¶ 95; *id.* at n. 25, *id.* at Attachment N; Stewart Rebuttal Decl. ¶¶ 8, 13-17, 30-50; *id.* at Attachments D and E.

excluding this group from the analysis underpinning his conclusions, he has painstakingly and transparently established the impact of this particular choice, and the Court may reach its own conclusion based on Dr. Stewart's clear explanations and methodologically valid analysis. *See* Stewart Rebuttal Decl. ¶¶ 19-22.[7]

The State's final complaint is that Dr. Stewart did not analyze the future effects of the implementation of Act R54, including the voter registration card containing a photograph of the voter. Pl.'s Br. at 7. However at present, no individual holds this new form of identification, and so any attempt to include it in Dr. Stewart's analysis of present data would have no effect on his conclusions. Moreover, the State's own expert declared that "[a]ny conclusion concerning the *future* effect of the law is . . . speculative in nature." Hood Rebuttal Decl. at 3 (Ex. 9). As the State's brief notes, expert opinion that is speculative is subject to exclusion. *See* Pl.'s Br. at 5 (quoting *MicroStrategy Inc. v. Business Objects*, 429 F.3d 1344, 1355-56 (Fed. Cir. 2005). Dr. Stewart properly based his quantitative analysis on empirical data presently available and declined to speculate as to how, if at all, Act R54's retrogressive impact might be remediated by the State's implementation plan or the possible availability of a photographic voter identification card. These methodological choices allowed Dr. Stewart to answer his research question based solely upon the best available data, and not baseless speculation. *See, e.g.*, *Daubert*, 509 U.S. at 590 (barring expert testimony based on "unsupported speculation").

## III.   CONCLUSION.

For the reasons above, the Court should deny South Carolina's motion to exclude the

---

[7] Although the State does not expressly argue that Dr. Stewart committed a methodological error by excluding licenses marked with a surrender date not to be valid, *see* Pl.'s Br. at 4-5 (setting out this concern under Rule 702(b)), it is worth noting that the decision to exclude such records is methodologically sound. *See* Stewart Rebuttal Decl. ¶¶ 19-20. Logically it is unlikely that a license with a specific surrender date entered will still be in a driver's possession, even if the more general "active" status remains unchanged.

testimony of Dr. Charles Stewart.

Date: August 20, 2012

                                        Respectfully submitted,

RONALD C. MACHEN, JR.                   THOMAS E. PEREZ
United States Attorney                  Assistant Attorney General
District of Columbia                    Civil Rights Division

                                        */s/ Bradley E. Heard*
                                        T. Christian Herren, Jr.
                                        Richard Dellheim
                                        Bradley E. Heard (D.C. Bar No. 458309)
                                        Catherine Meza
                                        Jared M. Slade
                                        Anna M. Baldwin (D.C. Bar No. 998713)
                                        Erin M. Velandy
                                        Attorneys
                                        Voting Section, Civil Rights Division
                                        U.S. Department of Justice
                                        950 Pennsylvania Ave. NW
                                        Washington, DC 90530
                                        (202) 305-4196
                                        bradley.heard@usdoj.gov