# Exhibit 1

# IN THE UNITED STATES DISTRICT COURT FOR THE

# DISTRICT OF COLUMBIA

-----------------------------------------------------------------------)
                     )

| | |
|---|---|
| STATE OF SOUTH CAROLINA | ) |
| | ) |
| *Plaintiff,* | ) CIVIL ACTION NO: |
| | ) |
| v. | ) 1:12-CV-203-CKK-BMK-JDB |
| | ) |
| THE UNITED STATES OF AMERICA | ) (Three Judge Court) |
| and ERIC H. HOLDER, JR. in his | ) |
| official capacity as Attorney General | ) |
| of the United States, | ) |
| | ) |
| *Defendants,* | ) |
| | ) |
| and | ) |
| | ) |
| JAMES DUBOIS, *et al.,* | ) |
| | ) |
| *Defendant-Intervenors.* | ) |
| | ) |

-----------------------------------------------------------------------)

## Declaration of Charles Stewart III, PhD.

Pursuant to 28 U.S.C. § 1746, I, Charles Stewart III, make the following declaration:

    1.      My name is Charles Stewart III.  I am the Kenan Sahin Distinguished Professor of Political Science at the Massachusetts Institute of Technology, where I teach graduate and undergraduate subjects and do research in the fields of American politics, elections, voting technology, and research methods.  I am currently the co-director of the Caltech/MIT Voting

Technology Project, and have been involved as a leader and team member of numerous research projects concerning election administration and voting technology.

2.      I received a B.A. degree from Emory University in 1979, and an S.M. and Ph.D degrees from Stanford University in 1982 and 1985, respectively.  I joined the faculty at MIT in 1985 as an assistant professor, was promoted to associate professor with tenure in 1992, and then was promoted to full professor in 1999.  I served as the Head of the MIT Department of Political Science from January 2005 to June 2010.  Previously I had served three years as Associate Dean of the School of Humanities, Arts, and Social Sciences.

3.      I am a fellow of the American Academy of Arts and Sciences.

4.      During my twenty-seven years at MIT, I have been responsible for a variety of subjects in American politics and research methods.  At the graduate level, I have taught advanced seminars in American politics, congressional politics, and statistical methods.  At the undergraduate level, I have taught classes in American politics, congressional politics, presidential elections, research design, and quantitative analysis.  I recently taught a class called "The Political Science Laboratory," which is required of all political science majors at MIT; this class introduces MIT students to the foundations of dataset creation and management, statistical methods, and the reporting of quantitative findings in political science.

5.      For nearly two years I have been a consultant with the Pew Charitable Trusts, in which I have been providing advice about the use of elections data to help assess the quality of election administration in the United States.  Prior to that, I was a grantee on two projects funded by Pew that examined the performance of American election administration using both survey research and official election data reported by national, state, and local election officials.  I was the co-author of a report funded by Pew, "Residual Voting in Florida," with Professor Paul

Gronke of Reed College, which relied on Florida election data to examine patterns of over- and under-votes in Florida elections.  In addition, I played an instrumental role in the research contained in the Pew Report, "Election Administration by the Numbers," which reviews the availability of election data to address questions about the performance of election administration across the United States.

6.     I have published five books, 18 articles in refereed journals, 13 book chapters, two law review articles, and 17 other publications.

7.     The publications most relevant to the issues discussed in this declaration include the following:  "*What Hath HAVA Wrought? Consequences, Intended and Unintended, of the Post-Bush v. Gore Reforms*," in Bush v. Gore Ten Years Later (R. Michael Alvarez and Bernard Grofman, eds., forthcoming); "*Function Follows Form: Voting Technology and the Law*," in America Votes! (Benjamin E. Griffith, ed., American Bar Association 2008);  "*Improving the Measurement of Election System Performance in the United States*," in Mobilizing Democracy: A Comparative Perspective on Institutional Barriers and Political Obstacles (Margaret Levi, James Johnson, Jack Knight, and Susan Stokes eds., Russell Sage 2008); "*Residual Voting in Florida*," Pew Charitable Trusts (with Paul Gronke and James Hicks) (2010); "*Early- and Late-Adopters of Provisional Ballots*," in Pew Report on Provisional Ballots (2009); "*Residual Vote in the 2004 Election*," 5 Election Law Journal 158–169 (2006); "*Studying Elections: Data Quality and Pitfalls in Measuring the Effects of Voting Technologies*" (with R. Michael Alvarez and Stephen Ansolabehere), 33 The Policy Studies Journal 15–24 (2005); "*Residual Votes Attributable to Technology*" (with Stephen Ansolabehere), 67 Journal of Politics 365–389 (2005); "*Basic Principles of Data Collection*," in Data for Democracy: Improving Elections through Metrics and Measurement (Pew Charitable Trusts 2008); "*Voting in Massachusetts*"

(Report by the Caltech/MIT Voting Technology Project 2003); and "*Race, Region, and Vote Choice in the 2008 Election: Implications for the Future of the Voting Rights Act*" (with Stephen Ansolabehere and Nathaniel Persily), 123 Harvard Law Review 1385–1436 (2010).

8.      Immediately following the 2000 presidential election, I responded to a request from the President of MIT, Charles M. Vest, to participate in the Caltech/MIT Voting Technology Project.  As a leader and member of that project, I have focused my research on the performance of voting technologies and on strategies to best measure the performance of voting systems.

9.      I have testified in Florida state court as an expert witness in the disputed election in 2006 in the 13th congressional district of Florida, and co-authored an amicus brief on behalf of neither party in the Supreme Court case *Northwest Austin Municipal Utility District Number One v. Eric H. Holder, Jr.*, 557 U.S. 93 (2009).  I have served as an expert witness in the case *State of Florida v. United States of America*, No. 1:11-CV-01428 (D.D.C), a Section 5 preclearance case concerning among other issues, changes to Florida's early voting laws.

10.      I have also been retained to provide expert testimony in this case.  I am compensated for my time at the rate of $350 per hour.

## Introduction to the Analysis

11.      I was asked by attorneys at the Department of Justice to provide a report that addresses whether changes to South Carolina's voter identification law, reflected in Act R54, which passed the South Carolina legislature, and was signed into law by the governor on May 18, 2011, would create a disproportionate burden on minority voters in the state.

12.       It is clear that the requirements of Act R54 impose a new burden on any registered voter who does not currently possess one of the forms of identification required under the statute.  It is a burden, because voters who are most directly affected — registered voters without the required identification — are now required by the State of South Carolina to take actions in order to vote which they would not have otherwise taken.  These actions may include going to the South Carolina Department of Motor Vehicles (SCDMV), or other facilities, to acquire a state-issued identification card.  Doing so may require the acquisition of documents, such as birth certificates, that may not be possessed by registered voters who do not currently have the requisite identification card.  These registered voters have already expressed a preference for voting *and* not possessing a driver's license (or similar government-issued identification card).  Requiring these registered voters to possess a driver's license, or similar form of identification, is, by definition, a burden on them, by the principle of "revealed preferences."[1]

13.       By the same reasoning, it is clear that the law imposes burdens on new registrants who do not already possess the required identification.

14.       A different reasoning applies to registered voters who do not possess a driver's license or SCDMV-issued identification card for reasons not of their own choosing, such as having a revoked or suspended license.  Currently, these individuals may vote using the voter registration card that was mailed to them when they registered.  Under the new law, in order to vote, a voter whose driver's license has been revoked or suspended will face the added burden of

---

[1] The principle of revealed preferences is one of the most influential ideas in economics, associated with the work of Nobel Prize winning economist Paul Samuelson.  It is based on the simple idea, expressed by Samuelson when he wrote "if an individual selects batch one over batch two, he does not at the same time select two over one." In other words, if I am a utility maximizer, and choose an apple over an orange when those are my only two options, one can infer that I do not prefer an orange over an apple.

acquiring another form of identification.  Again, this is an effort they did not freely choose.
Therefore, it is, by definition, a burden.

15.     We can understand why the photo-ID requirement imposed by Act R54 would be
a burden through an extension of the empirical findings of the political science literature that
have studied the effects of voter registration laws on turnout.  A large body of research within the
field of political science has demonstrated that the imposition of barriers to registering and
voting depresses voter turnout.  Citizens perform a sort of cost-benefit calculation when they
decide whether to vote; anything that raises the cost of voting — in terms of time, energy, or
money — will diminish the chance that an individual will find it worth their while to vote.[2]
Provisions such as requiring voters to register well in advance of Election Day, limiting the days
on which citizens may register to vote, and restricting access to absentee voting raise the costs of
voting and cause voter turnout to fall.[3]  Although a photo-ID requirement is not a registration
requirement, it imposes transaction costs that are qualitatively similar to that of many registration
laws.  Thus, one would expect for the effect of any photo-ID requirement to diminish the
tendency of people to vote, and for that tendency to be diminished the most among people who
would have the most difficulty in paying the new costs, such as the poor and those with low
amounts of education.

16.     Because a burden clearly falls on all registered voters (current and future) who do
not possess the required identification, the question of whether the burdens are
disproportionately borne by minority voters comes down to whether registered voters, and

---

[2] ANTHONY DOWNS, AN ECONOMIC THEORY OF DEMOCRACY (1957); William H. Riker and Peter C. Ordeshook, "*A Theory of the Calculus of Voting*," 62 AM. POLITICAL SCIENCE REV. 25–42 (1968).
[3] Steven J. Rosenstone and Raymond E. Wolfinger, "*The Effect of Registration Laws on Voter Turnout*," 72 AM. POLITICAL SCIENCE REV. 22–45 (1978); G. Bingham Powell, Jr., "*American Voter Turnout in Comparative Perspective*," 80 AM. POLITICAL SCIENCE REV. 17–43 (1986).  For a more recent review of the literature on the effect of registration laws on voter turnout, see Benjamin Highton, "*Voter Registration and Turnout in the United States*," 2 PERSPECTIVES ON POLITICS 507–515 (2004), and Benny Geys, "*Explaining Voter Turnout: A Review of Aggregate-Level Research*," 25 ELECTORAL STUDIES 637–663 (2006).

potentially registered voters, who do not hold the identification required by the law are more likely to be minority, compared to registered voters who do hold such identification.

17.      As I demonstrate below, minority voters are less likely to possess either a South Carolina driver's license or an SCDMV-issued identification card.  Furthermore, African American registered voters who possess neither a driver's license nor an SCDMV-issued identification card live in areas with lower average incomes and lower average educational attainment than white registered voters who similarly possess neither form of identification.  One of the most robust findings in all of political science research is that individuals are more likely to participate in all forms of politics, including voting, the wealthier and better-educated they are. Because African American and Hispanic voters in South Carolina are less likely to possess the "social resources" that the political science literature associates with participating in political life, it is reasonable to conclude that minority voters, more so than white voters, will be less likely to acquire the necessary identification cards in order to vote.

18.      The tests of disproportionality I perform revolve around a series of statistical tests that are commonly used in the social sciences that estimate the probability that differences in the racial composition of registered voters who currently hold the required identification, compared to the racial composition of registered voters who do not currently hold the required identification, could have occurred due to random chance.

19.      In conducting statistical tests, the researcher must decide the level of statistical certainty (or "significance") he or she requires in order to conclude that the differences between groups of people that are observed in a sample are unlikely to have arisen due to random chance. The level of statistical certainty tends to be expressed as the probability that a relationship of a certain strength could be observed, *even if* the processes generating the observed data were

random.  In the social sciences, this level of statistical certainty is usually set at the 5% level, or 5 chances in 100.  In the results I report below, I adopt a much higher standard, by requiring the statistical test to pass a level of significance at the 0.05% level, or 5 chances in 10,000.  As a shorthand, sometimes I will refer to this as "a *p*-value less than 0.05%."

20.	To answer the question about disproportionality, it is necessary to compare the names on the list of registered voters with the names on the lists that record who currently holds forms of identification required by the law.  The following text, from Section 5 of Act R54, provides a list of acceptable forms of identification:

> Section 7-13-710.(A)  When a person presents himself to vote, he shall produce a valid and current:
> (1)	South Carolina driver's license; or
> (2)	other form of identification containing a photograph issued by the Department of Motor Vehicles; or
> (3)	passport; or
> (4)	military identification containing a photograph issued by the federal government; or
> (5)	South Carolina voter registration card containing a photograph of the voter pursuant to Section 7-5-675.

21.	This is in contrast with South Carolina's current law, which requires a voter to show a South Carolina driver's license, a SCDMV-issued ID card, or a voter registration card.  Unlike the Act R54 provision allowing a voter to present a voter registration card *with a photograph of the voter*, the current voter registration card does not contain a photograph and is mailed to the voter upon registration.  That means that South Carolina residents are currently not required to go to the office of any state agency in order to register and then proceed to vote in person on Election Day.  Under the requirements listed in paragraph 20, they will have to visit the office of a state agency to procure an identification card before voting in person.

22.	Of the forms of identification allowed under Act R54, only the first two — a South Carolina driver's license or other form of photo identification issued by the South Carolina

Department of Motor Vehicles (SCDMV) — may currently be examined for evidence about the disproportionality of burdens imposed by Act R54.  I was informed that the State of South Carolina requested access to information from the U.S. State Department regarding the number of passport holders in the state, and to information from the Defense Department regarding the number of military identification-card holders in the state.  I understand that an agreement has been reached to share information with the state, but that it would not be possible to have access to that data in time for this report.  Therefore, analysis concerning the third and fourth forms of identification is not included in this report.

23.       The fifth form of identification, the South Carolina voter registration card containing a photograph of the voter, is a new form of identification under Section 4 of Act R54. Because the South Carolina State Election Commission has yet to implement this portion of the law, I have no basis on which to draw conclusions about the degree to which the use of such cards could affect the burdens the other photo-ID requirements of Act R54 impose.  Therefore, analysis concerning the fifth form of identification is not included in this report.

24.       Additionally, I am aware that the state is awaiting preclearance of provisions of Sections 5, 7, and 8 of Act R54 regarding exceptions from the photographic identification requirement based on reasonable impediment and religious objections, a voter education program, and notification of voters who do not have SCDMV-issued identification.  Because the SCSEC has not yet undertaken the tasks required by those provisions, I have not analyzed in this report whether or how the measures proposed to implement Sections 5, 7, and 8 would affect the new burdens imposed on voters by Act R54.

25.       Therefore, the following analysis is based on matching individuals who are on the South Carolina voter list with individuals on the SCDMV's list of licensed drivers and holders of

SCDMV-issued identification cards.  The necessary data from these lists were made available to me, and are described below.

26.        In addition, in order to improve the accuracy of the matching information, it was necessary to compare both the voter list and the SCDMV database against the list of death certificates provided by the Office of Public Health Statistics of the Department of Health and Environmental Control.


**Structure and Initial Preparation of Databases**

27.        This section describes the data files I received from the State of South Carolina, and the initial preparation I undertook to ensure that the data were valid for the analysis I performed.

28.        The following databases were provided to me by various State of South Carolina agencies, through attorneys and staff at the U.S. Department of Justice.

- Driver's license database, provided by the South Carolina Department of Motor Vehicles;

- Voter list, provided by the South Carolina State Election Commission;

- Voter participation list, provided by the South Carolina State Election Commission; and

- Death certificate list, provided by the Office of Public Health Statistics of the Department of Health and Environmental Control.

29.        The data were not provided in "native" format, that is, in the binary, machine-readable form in which the data are stored with the respective agencies.  Rather, the agencies first converted the relevant data into a common "plain text" format that is widely used to exchange data between different computer platforms and different data analysis programs.  These plain text formats are sometimes referred to as "flat files," "ASCII files," and "CSV (or

.CSV) files." I then converted these plain text files into binary files that could be used by the statistical software on which I performed my analysis.

30.        Despite the fact that hardware and software manufacturers follow standards that allow for the sharing of data between different hardware and software platforms, the translation of a data file from one native format to a plain text format and then back into another native format introduces the possibility of data translation errors. In addition, the sheer size of some of the data files from the SCDMV was so great that it was necessary for the agency to divide some data files into parts, which I then had to reassemble. For these reasons, I could not assume that the data files I received were correct; I had to verify this for myself.

31.        Because file transfer between platforms introduces the possibility of data translation errors, and because I did not have access to a full set of documentation concerning the design and management of the datasets, my first task upon reassembling these datasets was to compare the reconstructed datasets in my possession with agency publications. Below, I describe how I did this.

32.        I performed the analysis in this report using version 12.0 of the statistical package Stata. To translate the plain text files into the Stata file format, I used version 9 of the file conversion software package Stat/Transfer.


**Driver's license database — overview**

33.        By far the most complex of the databases I analyzed was the driver's license database provided by the SCDMV. The SCDMV database system is termed "Phoenix," and is

run on the database system Oracle, which is commonly used by businesses to manage complex databases.[4]

34.      It is often useful to think of any database, regardless of its complexity, in terms of a common spreadsheet, in which each row (or "observation") pertains to an individual, and the columns (or "variables") hold specific information about those individuals, such as name and address. However, many complex databases in fact consist of numerous tables, each of which holds only part of the information that pertains to an individual. These various tables are then linked together, using a series of "keys" or "indexes" that associate information from one table with the information in another table. For instance, in a database used to track information about public school students, one table might hold information about the name, address, and phone number of each student. Another table might hold information about all the classes that students have enrolled in. Each table might then contain a unique identification number for each student. By using this identification number to match information from the "address table" to the "enrollment table," it would be possible to produce a report, for instance, that listed the name and address of each student, along with a list of each class she or he was enrolled in, despite the fact that the data for the report resided in two separate tables.

35.      Such a database structure is called a "relational database," because the information in a series of tables is "related" to each other through a series of indexes. The SCDMV Phoenix system is such a relational database.

36.      We can think about the tables in a relational database as consisting of two types. The first are "data tables," which record the substantive information of interest, such as the

---

[4] According to the website of Celtic Systems, a company that designs Motor Carrier software solutions, located in Arizona, "[Phoenix] has been in production since May, 2010 and was deployed in a .Net environment with an Oracle database. Celtic is under contract for maintenance and support services." http://fee.celtic.bz/CELTIC/Celtic.aspx?pgId=10, last accessed May 28, 2012.

addresses of students or the classes students are enrolled in.  The second type of file is a "lookup table," which can help to decode information that is found in the data tables.  For instance, to continue with the school example given above, every science class in the enrollment file might be indicated by the abbreviation "SCI," every English class might be indicated by the abbreviation "ENG," history classes by "HIS," etc.  Using codes like this saves space in the file, thus speeding up processing time and reducing the likelihood of data entry errors.  However, if one wished the enrollment report to indicate the text of the actual subjects (Science, English, History, etc.) rather than the abbreviations (SCI, ENG, HIS, etc.), it would be necessary to use a simple lookup table that contained two variables for each record, the abbreviation and the full name of the subject, to link the abbreviation with its full corresponding text.  So long as the same subject abbreviations are used in the enrollment data table and in the subject look-up table, it is possible to link the information between the two tables together, so that more informative reports can be generated.

37.     The relevant files I received from the SCDMV consisted of a series of data tables and lookup tables, to use the nomenclature I just introduced.  The most important data tables in the SCDMV database are listed in Attachment B.

38.     Figure 1, which follows, illustrates how these tables are linked together:



Figure 1. Illustration of the relationship between major data tables in the SCDMV database

39.     As Figure 1 illustrates, the central table used to construct a single driver's license list is called license_header.  This table consists of 5,720,209 records.[5]  Each record in license_header pairs a unique identifying number for a customer with a unique identifying number for a license.  Using this information, one can match up information about individual driver's license holders, on the one hand, with information about the driver's licenses they hold, on the other.

40.     The license_header file can be thought of as the master list of all licenses and license holders in the database.

---

[5] A "record" is a line of data that constitutes one observation in a table.  It is analogous to a row of data in a spreadsheet.

**Driver license database — customer data**

41.     Focusing on the customer side of Figure 1, we can use the customer number (key variable customer_no) to link to information about driver's license holders in the different tables. The customer_individual table stores relatively stable information about license holders, such as the name, date-of-birth, sex, race, citizenship status, and Social Security number.  As the name of the table suggests, customer_address stores address information about license holders.  Finally, the customer table stores information about whether the customer is active, deceased, or inactive.

42.     Note that these three tables contain more records than are contained in the license_header table (5,720,209):  customer holds 9,543,196 records, customer_address holds 10,273,774 records, and customer_individual holds 7,543,824 records.

43.     Each of the records in the customer and customer_individual tables represents a unique individual.  Of the 10,273,774 records in the customer_address table, 7,993,406 records store a single address for a single customer.  The remaining 2,280,368 records store what amount to multiple addresses for a total of 1,109,368 other customers.

44.     Visual inspection of the customer_address table reveals that multiple addresses for a single customer occur for three major reasons.  First, there are pure duplicates in the table.  Second, there are over 500,000 customers who have both a physical and mailing address in the table.[6]  Third, there are some customers with addresses for the housed location of mobile homes or registered vehicles.[7]  Furthermore, there are combination of all three of these reasons in the table — for instance, duplicates of physical and mail addresses for a single customer.

---

[6] Whether the address is physical or mail is indicated by the column named "address_type".
[7] E-mail correspondence from South Carolina's counsel, Steve Potenza, to Catherine Meza, counsel for the U.S., May 25, 2012, relaying information provided by the SCDMV.

45.      Further inspection of this table revealed that each customer had at least one physical address in the table, and that all the multiple physical addresses for customers appeared to be duplicates.  Therefore, in all the analysis I report below, I rely on a table of my own construction, which consists of a single physical address for each unique customer number.  I labeled the table I constructed, which holds a unique address for each customer, the customer_address_reduced table.

46.      After I constructed the customer_address_reduced table from the unique physical addresses in the customer_address table, I discovered that a small number of customers (2,225) in the license_header table had no corresponding address in the customer_address table.  I used records found in the customer_address_history table to replace these missing addresses, which resulted in the final customer_address_reduced table having a total of 9,125,964 records.  In the end, there were 733 customers in the license_header table who had no corresponding addresses in either the customer_address or the customer_address_history tables.[8]

**Driver's license database — license data**

47.      Focusing now on the other half of Figure 1, it is possible to match records in the license_header table with records in the license table through the license number (key variable license_no) variable.

48.      The license table contains information about the various driver's licenses that might be issued to a customer, including identification cards that are not properly called driver's licenses.  Attachment C provides an account of the specific card types.  Overall, there are 7,974,066 cards described in this table.  Of these, 1,351,238 are identification cards and two are temporary identification cards.  The remainder (6,622,826) are various types of driver's licenses.

---

[8] These 733 records represent 0.013% of the records in the license_header table.

49.	It is possible for a customer to have more than one record in the license table.  It is common, for instance, for a customer to have a record describing his or her beginner's permit, and then to have another record describing his or her regular driver's license, or an ID card followed by a regular driver's license.  Thus, the license table consists of both current and expired licenses.[9]

50.	In all, the license table consists of 7,974,066 records.  However, there are only 5,720,195 unique license *numbers* in the table.  The difference between the number of records and the number of unique license numbers is due to some customers holding more than one license with the SCDMV for the time period recorded in the database.

51.	In the analysis that follows, whenever there are multiple valid licenses associated with one license number, it is sufficient to retain the information from only one license. Therefore, to facilitate the matching described below, I created a new table which contained the relevant information about valid licenses only, and that also restricted itself to a single valid license whenever there were duplicates associated with a license number.  This new table was created by taking the license table provided by the SCDMV, removing any license that expired before (or on) the date the license table was written, and then removing any license that was identified in the license_receive file as having been returned by the license-holder.[10]  Finally, once the procedure described in the previous sentence was executed, the table was searched for duplicate license numbers.  When a duplicate was encountered, I retained the license that had the latest expiration date.  The procedures described in this paragraph resulted in a table I labeled

---

[9] It is possible to distinguish between active and expired licenses through the "expiration_date" variable in the "license" table.
[10] To accomplish this task, I merged the license and license_receive tables using the following fields as the key matching variables:  license_no, license_type, license_function, and issue_date.

license_valid_reduced, which contained information about 3,934,210 unique, valid driver's licenses and identification cards.

**Double-checking the SCDMV database**

52.     To test whether the SCDMV database I constructed corresponded with the data used by the state, I created a dataset of all holders of valid driver's licenses (including identification cards) in South Carolina as of April 23, 2012, the date the data tables were first written.  This dataset was created by merging the license_header table with the license_valid_reduced, customer, customer_address_reduced, and the customer_individual tables, all described above.

53.     In order to double-check the merging described in the previous paragraph against reports issued by the State of South Carolina, I compared the county location of license holders in the database with a report on the SCDMV's website, dated December 2011, of the number of driver's licenses by county.[11]  The table reporting these comparisons is in Attachment D.

54.     The first column of Attachment D reports the number of "driver's licenses" as reported by the SCDMV website.  The next three columns report statistics, at the county level, about records in the SCDMV database.  Column 2 reports the number of unexpired records in the database (20,835 for Abbeville County, 140,980 for Aiken, etc.).  Column 3 reports the number of records that remain when we remove unexpired records and ID cards (since they are not driver's licenses).  Column 4 removes any records in which the mailing address lists a state outside of South Carolina.

55.     Columns 5 through 7 report percentage differences between the preceding three columns and the website totals.  The final column, which should be the number of valid driver's

---

[11] http://www.scdmvonline.com/DMVNew/default.aspx?n=historical_information, last accessed June 4, 2012.

licenses per county, is within 1.5% of the statewide total from the website report.  However, in the specific county comparisons, the variations are often much greater than this.  For instance, I calculate 6.1% more driver's licenses in Beaufort County than are indicated in the website report, and 3.5% fewer driver's licenses in Marlboro County.  I also calculate many fewer licenses associated with an "undetermined" county.

56.　　　The date on the website report (December 2011) and the dates on which the SCDMV database files were written (April 23–24, 2012) are separated in time by four months, and so we should not expect the two sets of numbers to match perfectly.  Because of the closeness in the aggregate number of valid driver's licenses I calculate using the SCDMV database, compared to the online publication, I am confident that I have a valid list that reproduces the SCDMV's list of valid license/ID-card holders, to a very close approximation.

### State Election Commission data — voter list

57.　　　The voter list I received from the South Carolina State Election Commission (SCSEC) was written on April 18, 2012, as a single ASCII flat file.  The file includes records reflecting voters who are classified as "active," "inactive," "archived," and "pending."  Active and inactive individuals on this list may be considered registered voters.[12]  I assume that voters

---

[12] The following responses by South Carolina to the U.S. Election Assistance Commission's 2010 "Statutory Overview" survey help to summarize the processes by which voters appear as active and inactive, and the processes by which voters are removed from the rolls:

*Question B2. Please describe the process used in your state to move voters from the active list to the inactive list, and from the inactive list to the active list. Is a different process used for UOCAVA voters?*

> Voters are placed on inactive status only by the State office.

> Convictions are made inactive based on a match with a file we receive from the State and Federal courts. The file is compared to the statewide database and voters receive a letter that they were placed on inactive status and what steps they need to take to re-register.

identified as "archived" are those who are sometimes described as having been "purged" from

the voter rolls.

58.     Table 1, below, reports the distribution of each type of voter in the file:

| Table 1.  Distribution of voter registration status in the voter list | | |
|---|---|---|
| Voter status | Number | Pct. |
| Active | 2,735,910 | 42.6 |
| Archived | 3,517,065 | 54.8 |
| Inactive | 170,515 | 2.7 |
| Pending | 84 | 0.0 |
| Total | 6,423,574 | 100.1[a] |
| [a]Percentage does not sum to 100.0 because of rounding. | | |

59.     The voter list contains demographic information about voters (race, date-of-birth,

sex), addresses, and a unique identification number that allows records in this file to be merged

with records in the participation list described below.  There is also information about why voters

may have been moved between voter status categories — mostly, why voters have been moved

---

Deaths are placed on inactive status based on a file from Vital Statistics. The file is matched on full SSN, birthdate, and Name (same for convictions).

Voters who move are placed on inactive status based on returned mail or information we receive from county offices or the voter.

Written requests are when voters send a written request to be removed.

Confirmation mailings - voters who do not respond to the mailing are placed on inactive status for failure to respond to the mailing.

All removals are made at the state level and the process is the same for UOCAVA.

*Question B3. Please describe your state's process for removing voters from the voter registration rolls (not merely moving them from active to inactive).  Please include information regarding notices and confirmations.  Are these procedures the same for UOCAVA voters?*

A purge is done once per year. Moves and conviction status voters are purged every 2 years. Deaths are purged every year. Confirmation mailing voters are purged after 2 consecutive general elections.

Source:  South Carolina's responses to the 2008 and 2010 Statutory Overview survey by the U.S. Election Assistance Commission may be access at http://www.eac.gov/ftp/2008_statutory_overview_dataset.zip and http://www.eac.gov/assets/1/Documents/Statutory_Overview_Datasets_n-z.zip.

from active to inactive status.  The distribution of these "reason" categories is reported in Attachment E.[13]

60.      To ensure that the translation of the data files was successful, I generated a report of the number of active and inactive registered voters in each county, and then compared it to the online report of registered voters on the South Carolina State Election Commission's website, dated January 1, 2012.[14]  This report is summarized in the table in Attachment F.  The number of active voters in the voter list file deviates from the SCSEC's online report by only 0.5%, which undoubtedly reflects the net addition of voter registrations since the beginning of this year.  The deviation is not uniform across counties, however, ranging from a +2.2% difference in Berkeley County (comparing the voter file figures to the figures in the online report) to a -1.6% difference in Bamberg County.

61.      The SCSEC website does not report the number of inactive voters by county, so I was unable to compare the voter list data file with a published state report, to verify the data about the number of inactive voters, nor was I able to independently verify the count of "archived" voters.

62.      One important detail to understand about the voter file is the degree to which voters who are classified as "inactive" are likely to vote in the future.  In Attachment G, I have reported the percentage of individuals who were on the voter list, who also appear on the voter participation list for the 2008 and 2010 elections.  (I describe the voter participation list below.)  Among those identified as "active" in the voter list, 66.0% voted in the 2008 general election, compared to 30.9% of those currently classified as inactive.  Among those identified as voting in

---

[13] Attachment C reveals a few anomalous combinations of categories, such as the 295 inactive voters who are listed as being assigned to that category because they are "active."  The anomalies in the file represent only 0.0043% of the records, and therefore do not materially affect any analysis that follows.
[14] http://www.scvotes.org/statistics/by_counties_and_precincts, last updated January 1, 2012.

the 2008 general election, 93.7% are currently categorized as "active" in the voter list.  For the 2010 election, 48.7% of those currently categorized as "active" voted in that election, compared to 13.3% of those currently categorized as "inactive."  Among those identified as voting in the 2010 election, 98.1% are currently identified as "active" voters.

63.     Because of the small contribution of (currently-classified) inactive voters to turnout in recent elections, and because the recent relative non-participation of these inactive voters indicates that most are soon likely to be moved to "archived" status in the voter list, the following analysis will generally focus on active voters.

**Election Commission data — participation list**

64.     The voter participation list records individuals who voted in South Carolina elections.  The plain text file I received from the State Election Commission was written on April 18, 2012, and contained 15,907,756 records.  The file contains information about participation in state elections starting with the Republican primary of February 19, 2000, ending with the Republican primary of January 21, 2012.  The file contains a limited amount of information about the participants, being confined to the voter identification number, the name of the voter, the date the vote was cast, and the mode of voting (absentee or at the polls).

65.     Using the "electionid" variable in this file,[15] I extracted records associated with the 2008 and 2010 general elections.  I then produced a report of the number of voters in each election who are registered in each of South Carolina's counties.  A table of that report is in Attachment H, along with a comparison of turnout figures from the State Election Commission's website.[16]  Note that while the State Election Commission's website reports turnout by county *on*

---

[15] The electionid is 11974 for the 2008 general election and 12280 for the 2010 general election.
[16] http://www.scvotes.org/statistics/voter_history, last accessed June 4, 2012.

*Election Day,* the report I generated was of the *current county of residence* of people who voted in these two elections.  Because of residential mobility, the two reports are not expected to match perfectly.  Indeed, they do not.  However, the differences between my report and that of the state are so small that I conclude that the voter participation list is valid for the purposes of this report.

**Death certificate list**

66.        I received a plain text data file of death certificates issued in South Carolina in the years 2000 through 2010.  The file was written on April 23, 2012.  The state provided a one-page written description of the file and the information it contained, presumably written by the staff of the Office of Public Health Statistics.  That document is reproduced in Attachment I.

67.        As mentioned in Attachment I, the death certificate file includes the name of the deceased, the residential address, date of birth and death, and Social Security number.

68.        The first column of the table in Attachment J reports the total number of death certificates in the complete file, broken down by county of residence.  There are 416,540 records in the file.

69.        In attempting to test the validity of this data file, I compared the distribution of death certificates by county for the year 2008 with the report of the number of deaths, by county of residence, in the 2008 report *South Carolina Vital and Morbidity Statistics* (VMS), issued by the Division of Biostatistics, Office of Public Health Statistics and Information Services, South Carolina Department of Health and Environmental Control.[17]  (The year 2008 was chosen because that is the most recent report posted online.)  The second column of Attachment J lists the number of deaths reported by residency of the decedent; the third column lists the number of individuals from each county (i.e., county of residency) taken from the data file.

---

[17] http://www.scdhec.gov/co/phsis/biostatistics/an_pubs/vms2008.pdf, last accessed June 4, 2012.

70.      The number of deaths reported by the VMS report and the number produced using the death certificate data file are close, but not precisely the same.  Overall, there are 2.2% fewer records in the data file than the number of deaths reported in the VMS report.  The number of death certificates recorded in the data file is less than the number of deaths accounted for in the VMS report for each county.  Furthermore, there are some counties in which the discrepancy between the data file and the VMS report are quite large.  The largest in percentage terms is Edgefield County, where the VMS figure is 34.6% greater than the number contained in the data file.  It is quite possible that many of these county-by-county discrepancies are due to the allocation of non-South Carolina residents into the county statistics in the VMS report.  However, there is no definitive clue in the data file about why the two sets of numbers are sometimes quite different, at the county level.

71.      Because the correlation between the VMS report and the data file at the county level is so high, and because the *aggregate* statewide discrepancy between the two reports is relatively modest, I proceed assuming that the death certificate data are valid for the purposes of this report.

### The Use of Social Security Numbers to Match across Databases

72.      The empirical goal of my analysis — testing whether Act R54 imposes a disproportionate pattern of burdens across racial groups — depends on merging together the databases described above, especially the SCDMV data base, voter list, and death certificate databases.  For such a merging to be successful, we need a common variable, or set of variables,

in each database that uniquely identifies each individual.  In this case, we are fortunate that all three databases contain the Social Security number of the individuals contained therein.[18]

73.        Before proceeding with these matches, it is necessary to understand the quality of the Social Security numbers that are in the various sources of data.  For the Social Security numbers to be useful as a matching variable, a unique number must in fact be assigned to every individual.  If a large number of Social Security numbers are missing, or have numerous different names associated with them, then the quality of the Social Security number matching strategy will suffer.

74.        I checked the data files for three possible deficiencies in the Social Security numbers — (1) invalid or impossible numbers, (2) missing numbers, and (3) multiple individuals sharing a number.

75.        The Social Security numbering scheme breaks the number into three blocks, separated by a hyphen, of the form:  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.[19]  The first three digits are a regional number,

---

[18] A 2010 report by a National Research Council (NRC) panel, "Improving State Voter Registration Databases: Final Report," provides a comprehensive examination of database matching issues in the context of state voter registration databases (VRDs).  National Academy of Sciences, "Improving State Voter Registration Databases: Final Report," National Academy of Sciences Press (2010), https://download.nap.edu/catalog.php?record_id=12788.  The NRC report notes that the full Social Security number is the closest thing in the United States to a unique national identification number, and therefore is the most preferred variable to use when matching VRDs to other lists.  ("From a technical standpoint, the use of a commonly used unique identifier generally enhances the accuracy of matching. Today, the full SSN is the only commonly used unique identifier in the United States. Thus, if technical considerations were the only relevant considerations, the committee would recommend its use, even though today's SSN has a number of technical flaws even as a unique identifier." p. 47).  *See also*, William E. Winkler, "*Should Social Security Numbers Be Replaced by Modern, More Secure Identifiers?*," 106 Proceedings of the National Academy of Sciences 10877-10878 (July 7, 2009), http://www.pnas.org/content/106/27/10877.full.pdf (addressing the "technical flaws" of the SSN as a unique identifier).  As a general matter, the Federal Privacy Act of 1974 prohibits states from requesting full Social Security numbers from people registering to vote — states are limited to requesting the last four digits of the SSN.  However, South Carolina is one of the states that is allowed to ask for the full SSN, under a "grandfather" provision of the Act.  *See* South Carolina Help America Vote Act of 2002 State Plan, http://www.state.sc.us/scsec/StatePlanSouthCarolinaHAVAImplementation.htm, last accessed June 14, 2012.  *See also*, "*Election Reform: Nine States' Experiences Implementing Federal Requirements for Computerized Statewide Voter Registration Lists*," U.S. Government Accountability Office, 4 (January 2006),.

[19] For a description of the numbering scheme, see U.S. Census Bureau, "The SSN Numbering Scheme," http://www.ssa.gov/history/ssn/geocard.html, last accessed June 2, 2012.  Starting June 25, 2011 the Social Security Administration began a randomization program that renders the historic way of issuing numbers obsolete.  For the

followed by a two-digit "area number," and then a four-digit "serial number." Under this scheme, 000, 666, and the range from 900 to 999 are never used as regional numbers. In addition, the number 00 is never used as an area number, and 0000 is never used as a serial number. Thus, any numbers that break these conventions should be regarded invalid. Furthermore, it is likely that a repetitive pattern that might otherwise constitute a valid number, such as 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, is an invalid number.

76.     Attachment K reports the number of cases in the various databases in which the Social Security number was invalid (upper table) or the valid Social Security number was held by more than one person (lower table). The upper table reveals that 210,910 (3.7%) records in the SCDMV's customer_individual file had an invalid Social Security number, 6,248 (0.2%) records in the State Election Commission voting list had an invalid Social Security number, and 5,563 (1.3%) records in the death certificate file held an invalid Social Security number. These all represent cases that cannot be matched, and thus were removed from subsequent analysis.

77.     Because we do not know the true Social Security numbers of these individuals, we cannot estimate the precise degree to which excluding these cases will affect the estimates below. Because the core of this report concerns the racial distribution of voters who do not currently have a driver's license or SCDMV-issued ID, it is especially important that we understand how missing, invalid, and duplicate Social Security numbers are distributed among different racial groups.

78.     To help gauge the degree to which the cases of invalid, missing, or duplicate[20] Social Security numbers are distributed evenly among the different racial groups, Table 2 below

---

purpose of this report, I assume that all Social Security numbers in the various datasets were issued before the onset of randomization.

[20] For the sake of brevity in the rest of this report, I substitute the word "usable" for the phrase "invalid, missing, or duplicate."

reports the percentage of cases that are removed from analysis for these reasons, broken down by race.

| Table 2. Racial distribution of records removed from analysis because of unusable Social Security numbers. | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | Pct. missing a Social Security number | | | | Pct. with duplicate Social Security numbers | | | |
| Database | Total | Black | Hispanic | White | Total | Black | Hispanic | White |
| SCDMV | 3.7% | 3.1% | 15.6% | 1.8% | 0.24% | 0.37% | 0.66% | 0.18% |
| Voter list | 0.23% | 0.36% | 0.12% | 0.18% | 0.08% | 0.11% | 0.04% | 0.08% |
| Death cert. | 1.3% | 2.2% | 36.6% | 0.6% | 0.30% | 0.45% | 0.29% | 0.24% |
| Note: All comparisons across racial groups are statistically significant at a *p*-value of less than 0.05%. | | | | | | | | |

79.     As Table 2 reports, the only racial group with what appears to be an especially large number of removals due to unusable Social Security numbers is Hispanics, 15.6% of whom do not have a Social Security number in the SCDMV database, and 36.6% of whom do not have a Social Security number in the death certificate file. The percentage of Hispanics with unusable Social Security numbers in the voter list is in line with that of whites and blacks.

80.     Further investigation of the SCDMV database reveals that this was due, in part, to the relatively large percentage of Hispanics who are identified as non-citizens in the SCDMV database, compared to blacks (1.0%) and whites (0.1%). *Among citizens,* the percentages of members of racial categories missing Social security numbers in the SCDMV database are 3.1% for blacks, 6.0% for Hispanics, and 1.7% for whites. Thus, there still is a disproportionate number of missing Social Security numbers in the SCDMV database among Hispanic citizens, compared to black and white citizens, but the difference is much smaller.

81.     There is no variable in the database I was given indicating whether someone in the death certificate list was a citizen, and therefore an analysis similar to that conducted on the SCDMV database is not possible. It is reasonable to assume that, as with the SCDMV database,

most of the identified Hispanics in the death certificate database without Social Security numbers are not citizens.

82.     Therefore, assuming that everyone on the voter list is a citizen, then the disproportionate presence of Hispanics among those with unusable Social Security numbers in the SCDMV and death certificate data files will have little bearing on the analysis that follows, since there are no records on the voter list that could have been matched in the first place concerning these individuals.

83.     Nonetheless, even among citizens, the percentage of files removed from the analysis because of unusable Social Security numbers is not equal across the different racial groups.

84.     As I show below when I run the matching analysis, because the percentage of excluded cases due to unusable Social Security numbers is so small in percentage terms, the removal of these individuals from the analysis does not affect the conclusions that I draw.  For instance, even if we assume that *all* African American voters who have unusable Social Security numbers *in fact* have a valid driver's license or SCDMV-issued ID card, and that *no* white voters who have unusable Social Security numbers *in fact* have such a card, the disparity in the racial differences would hold.

85.     The lower half of Attachment K reports the number of cases in which valid Social Security numbers appeared to be associated with more than one individual.  In percentage terms, the number of duplicates is quite small.  In the worst case, the SCDMV database, 0.2% of records with a valid Social Security number are duplicates.  Visual inspection of the duplicate records revealed that they appeared in the SCDMV file primarily due to last name changes, and in the death certificate file primarily due to spouses sharing a single Social Security number.  In

the death certificate file, the combination of Social Security number and sex uniquely identifies virtually every individual with a valid Social Security number. Therefore, in the merging below, I rely on the joint match of the Social Security number and sex to combine data files.[21]  For the sake of brevity, I refer to this as the "SSN+sex" matching rule throughout the remainder of this report.

### Comparing Racial Classifications across Databases

86.      Before determining whether minority registered voters were less likely to produce a match with the SCDMV file, it was necessary to assess whether racial designations in each of the datasets are consistent.  Lack of consistency between databases could complicate inferences drawn about the distribution of burdens imposed across racial groups on account of Act R54.

87.      The SCDMV database, the voter list, and the death certificate database all contain variables that record the racial identity individuals in the databases.[22]  I assume that in most cases, classification is based on the self-identification of the applicants, in the case of driver's licenses/ID-cards and voter registration, and based on the reported identification by individuals reporting a death, in the case of death certificates.  Therefore, inconsistencies across databases could occur for one of three reasons:  (1) clerical errors, (2) inconsistent responses by individuals as they interact with the agencies involved, and (3) differences in responses given by individuals when they were alive to the SCDVM and to voting officials, compared to responses given by those who reported the deaths of these individuals at some later date.

---

[21] When I examine unique combinations of SSNs and sex in the death certificate file, there remain only 408 cases (0.1% of all cases) in which a SSN+sex combination has a duplicate in the file.

[22] The SCDMV database and the voter list each treat "Hispanic" as a separate racial category.  The death certificate list treats Hispanic as a separate ethnic category — that is, one can be identified as black *and* Hispanic, white *and* Hispanic, Native American *and* Hispanic, etc.  In the analysis that follows, I have recoded the racial data within the death certificate list so that all individuals who are identified as Hispanic are assigned a Hispanic *racial* category, regardless of their initial racial category.  I do this to facilitate comparing racial classification across the three databases.

88.      Attachment L reports the racial distribution of records in the SCDMV customer_individual table, the voter list, and the death certificate list.  The aggregate racial distributions are similar across the lists.  Aggregate differences across the lists should not be taken as an indication of problems, since it is reasonable to assume that the actual racial distributions of voters, license-holders, and decedents are not identical.  The important thing to note is that the death certificate list contains a different coding scheme than either the SCDMV or voter lists — even when we account for the fact that the death certificate list counts Hispanic origin as an ethnic, and not a racial, category.  Therefore, in order to directly compare racial codings across databases, we will need to recode racial designations in the SCDMV and voter lists, to consolidate Native Americans, Asian Americans, and Mixed individuals into a single "Other" category, joining those who were already classified as "Other."

89.      I merged all of the lists together using the SSN+sex matching rule identified above in paragraph 85.  When we merge the different lists, we see that the designations are consistent across datasets.  The greatest degree of agreement is between the SCDMV and voter lists, with a 98.8% agreement rate; the agreement rate between the SCDMV and death certificate list is 97.8%; and the agreement between the voter list and the death certificate list is 90.1%. Attachment M provides the detailed results of these matches.

90.      Given the information I have, I cannot verify independently which of the databases has the "best" racial information about the individuals reflected in this report.  I am reassured by the fact that the highest agreement rate is between the SCDMV and voter lists, since these two lists are at the center of my analysis.  The core of each list's racial classification is the self-identification of the individual in question.  If there are further systematic errors introduced

by SCDMV or voter registration clerks into these records, they are of such a small magnitude that they do not affect the statistical tests I perform below.[23]

91.　　　　Furthermore, the possibility of misclassification of racial identity introduces what is known as "measurement error" into the racial measures.  In the parlance of the social sciences, race in my analysis is called an "independent variable."  It is well known that measurement error in an independent variable causes the estimated relationship between the independent variable and the outcome variable (in this case, not possessing a driver's license or voter identification card) to be less than  the "true" relationship we are trying to estimate.  (The term of art for this problem, in which the *estimated* statistical effect is known to be less than the *true* statistical effect, is "attenuation.").  In other words, if I possessed 100% perfect information about racial identity, the calculated differences in burdens would be even greater than the ones I estimate below.[24]

---

[23] To give an example, suppose we take the SCDMV racial classification to be without error.  Then, according to subtable a in Attachment M, 8,483 of 737,664 blacks were misclassified when they registered to vote (The 8,483 sum is arrived at by adding the number of individuals identified as black in the SCDMV file who were classified on the voter list as missing [1], Hispanic [324], other [4,034], and unknown [31].)  This would amount to a misclassification rate for blacks of 1.2% (i.e., 8,483/737,664 = 0.0115).  On the other hand, the same analysis would reveal that 16,993 whites had been misclassified, at a rate of 0.9%.  The misclassification rate for blacks is slightly higher than that for whites.  If we conduct this exercise treating the voter list as containing the "true" classification, then the disparity in the misclassification rates is greater.  The misclassification rate calculated this way is 1.2% for blacks and 0.4% for whites.
　　　　If the statistical tests below revealed that the racial differences in the distributions of voters who would be burdened by Act R54, compared to those who would not be burdened, were on the borderline of statistical significance, using the prevailing standards in the social sciences, then these possible misclassifications would be an issue in the analysis.  However, as I shall show, the probability that the difference in burdens across racial groups is due to chance is so small, that these issues of racial misclassification are not a factor in the analysis.

[24] For a standard explanation of the attenuation problem, see Robert Pindyck and Daniel Rubinfeld, Econometric Methods and Economic Forecasts, 176–178 (2nd ed. 1981).

## Matching the Voter List with the SCDMV Database

92.      In this section, I report the results of merging the active voter list with the driver's license list.[25]  I report the results of two merging strategies.  The *first strategy* tests the degree to which active voters match *any* individual in the SCDMV database who is not deceased.  This first strategy casts our net widely, in terms of defining who is in the SCDMV database.  It includes, for instance, people who may have an expired license.  We can think of the individuals on the first "no-match list" as voters who have not engaged with the SCDMV at all in the past — voters who, for whatever reason, have never acquired a driver's license or state identification card.  These voters are most burdened by Act R54, due to the fact that they must now interact with the SCDMV if they want to vote, having never done so in the past.

93.      The *second strategy* is to test the degree to which active voters match with living individuals accounted for in the SCDMV database who have an unexpired license or identification card.  This strategy reduces the number of individuals in the SCDMV database who could potentially provide a match with the voter list.  These voters will also be burdened by Act R54.  This second strategy is the more realistic, from the perspective of estimating the actual burdens imposed by Act R54, because it is the lack of a license or identification card, rather than the lack of contact with the SCDMV, that is at question.


## Matching Strategy 1 — *any* match between the SCDMV database and the voter list

94.      Attachment N describes the procedures I undertook to create a list of active registered voters who were not in the SCDMV database.  Attachment N also describes the parallel procedures I undertook to create a list of active registered voters who *were* in the SCDMV data base.

---

[25] *See* ¶¶ 62 and 63, above, for a discussion of why I do not analyze "inactive" voters.

95.　　　Table 3, below, summarizes the results of the matching, which produces a comparison of the racial distribution of voters who were (a) unmatched with the SCDMV database *vs.* (b) voters who were matched with the SCDMV database.  Full detailed statistics are provided in Attachment O.

| Table 3.   Results of matching active voter list with SCDMV database. | | | | |
|---|---|---|---|---|
| | Racial distribution of matching lists | | | |
| | All active voters | Not matched in SCDMV database | Matched in SCDMV database | Lost due to matching[b] & returned licenses | Probability of no match |
| Asian | 0.7% | 0.9% | 0.7% | 0.8% | 3.2% |
| Black/Afr. Amer. | 28.0% | 41.4% | 28.2% | 20.9% | 3.6% |
| Hispanic | 1.0% | 2.0% | 1.0% | 1.3% | 4.8% |
| Mixed | 0.0% | 0.0% | 0.0% | 0.0% | 10.6% |
| Native American | 0.2% | 0.4% | 0.2% | 0.2% | 4.9% |
| Other | 0.5% | 1.6% | 0.5% | 0.7% | 8.0% |
| Unknown | 0.0% | 0.0% | 0.0% | 0.0% | 29.2% |
| White | 69.5% | 53.7% | 69.5% | 76.0% | 1.9% |
| Total | 99.9%[a] | 100.0% | 100.1%[a] | 99.9%[a] | 2.4% |
| | | | | | |
| Number of voters | 2,735,909 | 62,890 | 2,504,753 | 168,266 | 2,567,643 |
| [a]Does not add to 100.0% because of rounding. | | | | | |
| [b]"Lost due to matching" refers to cases removed from the analysis due to unusable Social Security numbers. | | | | | |

96.　　　Table 3 consists of two major parts.  The first disaggregates the original active voter list into three parts — voters not matched in the SCDMV database, voters matched in the SCDMV database, and voters lost in the matching process, or because of an out-of-state unreturned license.  The number of voters in each category is given at the bottom of the table — 2,735,909 total active voters who are divided into 62,890 who do not match, 2,504,753 who match, and 168,266 lost due to matching or a returned license from out-of-state.[26]  Above each of

---

[26]Above, I addressed the issue of the racial distribution of voters removed from the analysis because they did not have usable Social Security numbers for matching purposes.  An additional set of voters are removed here because they had a license returned by an out-of-state jurisdiction.  For the sake of my analysis, I am treating these individuals as no longer residents of South Carolina (by virtue of their surrendering their South Carolina driver's

these numbers is the percentage distribution of these categories by race as recorded in the voter list.  Thus, for instance, 28.0% of all active voters are black; 41.4% of the unmatched voters are black, whereas 28.2% of the matched voters are black.  Finally, 20.9% of active voters lost due to matching are black.  In contrast, 69.5% of active voters are white; 53.7% of the unmatched voters are white, whereas 69.5% of the matched voters are white.  Finally, 76.0% of the active voters lost due to matching are white.

97.     By visual inspection of Table 3, it is clear that the unmatched list has a higher proportion of black and Hispanic voters than the matched list, and a lower proportion of white voters.  The important question is whether these differences in proportions could have occurred due to random chance.  This question can be addressed through the use of a common statistical procedure, a $\chi^2$ (pronounced "chi-square") test.  When I perform this test on this data, I conclude that the probability the difference in these two racial distributions could have arisen due to random chance has a $p$-value of less than 0.05%.[27]

98.     The second major part of Table 3 reports the probability of being on the unmatched list, as a consequence of being in one of the racial categories.  These probabilities are simply the percentage of each racial group in the unmatched list.  For instance, there are 26,035 blacks on the unmatched list, and 705,856 on the matched list.  The percentage of blacks on the unmatched list is 26,035/(26,035+705,856) = 3.6%.  This can be restated as the probability of

---

license), even though it is conceivable that some of these individuals are still eligible voters in the Palmetto State.  This set of voters has a slightly higher proportion of whites (79.3%) compared to the active voter list as a whole (69.5%), a lower proportion of black voters (15.5% *vs.* 28.4%) and a high proportion of Hispanic voters (1.9% *vs.* 1.0%).  These are all individuals who appear in the voter list *and* on the SCDMV database, and therefore have a no-match rate of 0%.  Had we not excluded these voters, the no-match rate for all racial groups would have been lower.  Because this block of registered voters has proportionately more whites than blacks, the effect of not removing them would be to lower the no-match rate for white voters *more* than the rate for black voters.  Thus, the exclusion of these registered voters from the analysis *diminishes* the difference in the no-match rate between black and white voters, compared to the rate I would have calculated had I not excluded them.

[27] The $\chi^2$ test statistic is 8,700, with 7 degrees of freedom.  If we confine ourselves solely to black and white voters, the statistical results are substantively the same.  The $\chi^2$ test statistic in this alternative test is 6,100, with 1 degree of freedom, with a $p$ value less than 0.05%.  In the comparison of Hispanic and white voters, the $\chi^2$ test statistic in this alternative test is 1,100, with 1 degree of freedom, with a $p$ value of less than 0.05%..

being on the unmatched list, given that a voter is black. The corresponding probability for a Hispanic voter is 4.8%; for a white voter it is 1.9%.

99.　　　A common statistical procedure that can be performed to test whether the differences in the probabilities across the racial groups in the last column of Table 3 could have arisen due to random chance is the $F$-test. When I perform this test on this data, I conclude that the probability the differences in probabilities could have arisen due to random chance is less than 0.05%, or less than 5 chances in 10,000.[28]

100.　　　One of the ways to interpret these results is to consider how many African Americans would have been on the unmatched list, had the probabilities across racial groups been equal. The overall probability of being on the unmatched list is 2.4%. If this probability is applied to the number of African Americans on one of the two lists, that results in 17,926 African Americans who *should have been* on the no-match list, compared to the 26,035 who *actually are*, for a difference of 8,109 voters. In contrast, if the 2.4% is applied to the number of white voters on one of the two lists, that results in 43,469 whites who *should have been* on the no-match list, compared to the 33,754 who *actually are*, for a difference of 9,715 voters. Thus, the percentage of African American voters on the first no-match list is 45.2% (8,109/17,926) greater than it would have been if being on the first no-match list was independent of a voter's race.

---

[28] The $F$-statistic is 1,249.71, with (7; 2,567,635) degrees of freedom. If we confine ourselves solely to black and white voters, the statistical results are substantively the same. The $F$-statistic in this alternative test is 6,113.20, with (1; 2,567,635) degrees of freedom. If we confine ourselves solely to Hispanic and white voters, the $F$-statistic is 1,110.24, with (1;1,800,707) degrees of freedom. All of these statistical tests exceed the criterion of the $p$ value being less than 0.05%.

**Matching Strategy 2 — matching voters with license/identification card holders**

101.        Attachment P describes the procedures I undertook to create a list of active

registered voters who did not have a valid driver's license or identification card issued by the

SCDMV.  Attachment P also describes the parallel procedures I undertook to create a list of

active registered voters who *do* have a valid driver's license or identification card.

102.        Table 4 below summarizes the results of the matching, providing racial

comparisons comparable to those described in the previous subsection.  Full details of the

outcomes of the matching are provided in Attachment Q.

| Table 4.  Results of matching active voter list with list of valid driver's license/ID card holders. | | | | |
|---|---|---|---|---|
| | Racial distribution of matching lists | | | |
| | All active voters | Not matched to a valid license/ID card | Matched to a valid license/ID card | Lost due to matching[b] & returned licenses | Probability of no match |
| Asian | 0.7% | 0.6% | 0.7% | 0.8% | 6.2% |
| Black/Afr. Amer. | 28.0% | 40.0% | 27.7% | 21.0% | 9.5% |
| Hispanic | 1.0% | 1.5% | 1.0% | 1.3% | 10.0% |
| Mixed | 0.0% | 0.0% | 0.0% | 0.0% | 14.4% |
| Native American | 0.2% | 0.3% | 0.2% | 0.2% | 10.1% |
| Other | 0.5% | 1.0% | 0.5% | 0.7% | 12.9% |
| Unknown | 0.0% | 0.0% | 0.0% | 0.0% | 31.5% |
| White | 69.5% | 56.6% | 70.0% | 75.9% | 5.5% |
| Total | 99.9%[a] | 100.0% | 100.1%[a] | 99.9%[a] | 6.7% |
| | | | | | |
| Number of voters | 2,735,909 | 173,250 | 2,394,439 | 168,220 | 2,567,689 |
| [a]Does not add to 100.0% because of rounding. [b]"Lost due to matching" refers to cases removed from the analysis due to missing, invalid, and duplicate Social Security numbers. | | | | | |

103.        Table 4 is organized identically to Table 3.  Because the SCDMV database

includes people who do not hold a currently valid driver's license or identification card, the

number of voters not matched to the valid driver's license/ID card list is much greater than the

number of voters who are not in the database altogether — 2.8 times greater (173,250/62,890).

104.      Under Matching Strategy 2, 40.0% of the registered voters who *do not* hold a valid license or ID card are African American, compared to 27.7% of the voters who *do* have a valid license or ID card.  In contrast, 56.6% of voters who *do not* hold a valid license or ID card are white, compared to 70.0% of the list of voters who *do* hold a valid license or ID card.

105.      As before, these differences in the racial distributions of the two lists, matching and non-matching, are highly unlikely to be due to random chance.  When I perform the $\chi^2$ test on this data, I conclude that the probability the difference in these two racial distributions could have arisen due to random chance is less than 0.05%, or less than 5 chances in 10,000.[29]

106.      The final column of Table 4 reports the probability of being on the list of active voters without a valid driver's license or identification card, by racial group.  The probability of being on this list is 9.5% among African Americans, 10.0% among Hispanics, and 5.5% for whites.  Thus, the probability of being on the second no-match list if one is black is 1.7 times greater than if one is white; if Hispanic, the probability is 1.8 times greater.  (In raw numbers, these percentages correspond with 69,283 black, 2,586 Hispanic, and 98,113 white registered voters who do not produce a match in the SCDMV valid license/ID-card list.)

107.      When I perform an *F*-test on this data, I conclude that the probability the differences in probabilities could have arisen due to random chance is less than 0.05%, or less than 5 chances in 10,000.[30]

108.      One of the ways to interpret these results is to consider how many African Americans would have been on the unmatched list, had the probabilities across racial groups

---

[29] The $\chi^2$ test statistic is 14,000, with 7 degrees of freedom.  If we confine ourselves solely to black and white voters, the statistical results are substantively the same.  The $\chi^2$ test statistic in this alternative test is 13,000, with 1 degree of freedom. If we confine ourselves solely to Hispanic and white voters, the $\chi^2$ test statistic is 953.3, with 1 degree of freedom.

[30] The *F*-statistic is 2,040.48, with (7; 2,567,681) degrees of freedom.  If we confine ourselves solely to Black and white voters, the statistical results are substantively the same.  The *F*-statistic in this alternative test is 12,974.38, with (1; 2,506,696) degrees of freedom.  All of these statistical tests exceed the criterion of the *p* value being less than 0.05%.

been equal.  The overall probability of being on the unmatched list is 6.7%.  If this probability is applied to the number of African Americans on one of the two lists, that results in 49,375 African Americans who *should have been* on the no-match list, compared to the 69,283 who *actually are*, for a difference of 19,908 voters.  In contrast, if the 6.7% is applied to the number of white voters on one of the two lists, that results in 119,760 whites who *should have been* on the no-match list, compared to the 98,113 who *actually are*, for a difference of 21,647.

109.    Based on the analysis provided in paragraph 86 through 108, I conclude that African Americans will be disproportionately burdened by the implementation of Act R54.

**Sensitivity analysis of Matching Strategy 2**

110.    In paragraphs 77 to 83, I examine the racial distribution of individuals in the three main databases I am analyzing who did not have usable Social Security numbers necessary to ensure a match between these databases.  Because the proportion of unusable Social Security numbers is unequal across racial categories, it is important to understand the degree to which excluding these individuals from the analysis might affect my conclusions.

111.    To develop this understanding, I performed a "sensitivity analysis" of Matching Strategy 2, by seeing what would happen under an extreme counterfactual.  That extreme counterfactual supposes that *every* African American and Hispanic voter or license-holder excluded from the matching exercise because of an unusable Social Security number would have produced a match, if their records had not been excluded, and that *no* white voter or license-holder excluded from the matching exercise because of an unusable Social Security number would have produced a match, had their records not been excluded.  By doing so, I can calculate what the *smallest possible* difference in no-match rates across racial groups could be.

112.        The results of this sensitivity analysis are reported below in Table 5.

| Table 5.  Comparison of estimated and counterfactual no-match rates, Matching Strategy 2 | | |
|---|---|---|
| | Probability of no match from Table 4 | Counterfactual probability of no match |
| Black | 9.5% | 9.4% |
| Hispanic | 10.0% | 9.9% |
| White | 5.5% | 5.8% |

113.        The figures in the second column of Table 5 were produced using the following

procedure.  In the process of removing cases from the analysis because of unusable Social

Security numbers, 2,783 blacks were removed from the voter file and 988 blacks were removed

from the SCDMV database; 35 Hispanics were removed from the voter file, 246 from the

SCDMV database; and 3,331 whites were removed from the voter file, 1,572 from the SCDMV

database.  Assume that all the black voters removed from the voter list *in fact* had a

corresponding match in the SCDMV database, and that all the black license holders removed

from the SCDMV database *in fact* had a corresponding match in the voter list.  That would have

added 3,771 (i.e., 2,783+998) black voters to the denominator of the expression that calculated

the no-match list, but nothing to the numerator — because, under the assumption of the

counterfactual, all of the cases are matches.  As a consequence, the probability of no match

calculated in the counterfactual would have been 9.4%,[31] rather than 9.5%,[32] as reported in the

last column of Table 4.  The same reasoning applies to Hispanic voters.  On the other hand,

assume that all the white voters removed from the voter list *in fact* did not have a corresponding

match in the SCDMV database, and that none of the white license holders removed from the

SCDMV database *in fact* had a corresponding match in the voter list.  That would have added

4,903 white voters to both the numerator and the denominator of the expression that calculated

---

[31] 69,283/(69283+662,489+2,783+988)
[32] 69,283/(69283+662,489)

the no-match list.  As a consequence, the probability of no match calculated in the counterfactual would have been 5.8%,[33] rather than 5.5%.[34]

114.     As Table 5 demonstrates, even under an extreme, and quite implausible, counterfactual, the results of the analysis summarized in Table 4 are essentially unchanged: black and Hispanic voters would still be roughly twice as likely to be on the no-match list as white voters *even if* all the cases removed from the analysis because of unusable Social Security numbers involved black and Hispanic voters with a match between the SCDMV list and the voter list, plus white voters with no match between these two lists.

**Accounting for revoked and suspended licenses**

115.     A further issue concerning the match between the driver's license/ID list and the voter list is the fact that at any given time, some fraction of licenses will be revoked or suspended.  Voters with a revoked or suspended license may not have the license in their possession, and therefore would be burdened if they attempted to vote, because they would have to produce another form of identification.

116.     In my examination of the license_suspension table made available by the SCDMV, 45.3% of all licenses held by African Americans and 37.0% Hispanics have at some point been suspended, compared to 27.3% held by whites.  Furthermore, 20.3% of licenses held by African Americans, 5.8% of licenses held by Hispanics, and 10.1% of licenses held by whites have been revoked at some point.[35]

---

[33] (98,113+3,331+1572)/(98,113+1,676,813+3,331+1,572)
[34] 98,113/(98,113+1,676,813)
[35] All of the differences reported across racial groups in this paragraph are statistically significant at a *p*-value of less than 0.05%.

117.        Although I have been unable to estimate the number of suspended and revoked
licenses outstanding at any given point, it is clear that to the degree that voters may not be able to
produce a driver's license in order to vote, because of license suspensions or revocations, this is
more likely to affect black voters than whites.

**Participation of voters on the no-match list in recent elections**

118.        An indicator of the degree to which registered voters are likely to vote in the
future is whether a registered voter has voted in the past.  I compared the no-match and match
lists produced under Matching Strategy 2 against the voter participation list, to see the degree to
which voters assigned to these two lists were likely to vote in the future.

119.        Of those on the no-match list, 55.1% of blacks, 28.2% of Hispanics, and 49.1% of
whites voted in the 2008 general election.  This is in contrast with those on the matched list, in
which 71.0% of blacks, 44.3% of Hispanics, and 69.0% of whites voted.[36]  Expressed in terms of
numbers of voters, 38,152 blacks who voted in the 2008 general election do not have a valid
driver's license or SCDMV-issued ID card, in addition to 729 Hispanic and 48,203 white voters.

120.        Similarly, of those on the no-match list, 31.7% of blacks, 8.3% of Hispanics, and
29.0% of whites voted in the 2010 general election.[37]  This is in contrast with those on the match
list, in which 50.7% of blacks, 23.1% of Hispanics, and 53.6% of whites voted.  Expressed in
terms of numbers of voters, 21,989 blacks who voted in the 2010 general election do not have a
valid driver's license or SCDMV-issued ID card, in addition to 215 Hispanic and 28,429 white
voters.

---

[36] The differences in the racial distributions of those on the no-match and matched lists are statistically significant at a *p*-value of less than 0.05%.
[37] The differences in the racial distributions of those on the no-match and matched lists are statistically significant at a *p*-value of less than 0.05%.

121.     As is clear from these statistics, the registered voters on the no-match list are less likely to vote than those who have a match between records in the SCDMV database and the voter list.  This suggests that voters without driver's licenses are more likely to be marginal voters, that is, people with the least intrinsic interest in politics, and thus most likely to be influenced by the costs of voting — particularly those associated with administrative barriers — in deciding whether to turn out.  As these statistics demonstrate, such marginal voters are more likely to be black and Hispanic than white.

**Geographic distribution of burdens**

122.     The analysis in the previous section has been at the state level.  In this subsection, I examine the geographic distribution of the burden imposed by Act R54.

123.     The map in Figure 2, below, uses shades of gray to illustrate the geographic distribution of non-matches with the valid driver's license list — that is, with the no-match list generated using the second matching strategy.  The four shading categories divide the counties into fourths ("quartiles"), with the lightest shading representing counties with between 4.9% and 6.2% non-matches, and the darkest shading representing the counties with between 9.1% and 12.8% non-matches.  The detailed statistics associated with the counties are reported in Attachment R.



Figure 2.  Geographic distribution of non-matches to the valid driver's license list.

124.       As a general matter, the lowest no-match rates are in the three largest

metropolitan areas in the state, in particular, in the suburban portions of those areas.  The bulk of

the lighted-colored counties are in the Greenville area (Anderson [5.7%], Greenville [5.5%],

Oconee [5.8%], Pickens [5.4%], Spartanburg [6.1%].)  The rest are around Charleston (Berkeley

[5.9%], Charleston [6.1%]) and Columbia (Kershaw [5.9%], Lexington [5.2%], Newberry

[4.9%], Saluda [5.8%]), and in the Charlotte, North Carolina metropolitan area (York [5.6%]).

125.       The counties with the highest no-match rates — that is, the counties whose

registered voters are least likely to have a valid driver's license or SCDMV-issued identification

card, are mostly in the inner coastal plain counties that are between Charleston and Columbia.

The darkest-colored counties in the Figure 2 map are all in this region:  Allendale (12.8%),

Bamberg (9.1%), Clarendon (9.5%), Dillon (11.4%), Hampton (9.3%), Jasper (9.3%), Lee

(9.2%), Marion (10.2%), Marlboro (12.7%), Orangeburg (10.5%), and Williamsburg (9.5%).

126.    Measured at the county level, the distribution of no-matches is highly correlated

with three prominent demographic characteristics:  race, income, and literacy.  I illustrate this in

two ways.  The first is to compare the map in Figure 2 with the three maps in Figure 3 below,

which report (a) the percentage of the Voting Age Population that is African American (b) the

percentage of adults lacking basic prose literacy, and (c) the median household income of each

county in each county.[38]

---

[38] Sources: African American voting age population from the 2010 census redistricting (PL 94-171) data; median household income from the 2006–2010 American Community Survey, five-year estimates; literacy data from the 2003 National Assessment of Adult Literacy.

Figure 3.  Racial, literacy, and income characteristics of South Carolina counties.

a.  Pct. of voting-age population that is African American



b.  Pct. lacking basic prose literacy



Figure 3 (continued).  Racial, literacy, and income characteristics of South Carolina counties.

c.  Median household income



127.       By visual inspection of these maps, we see that the areas that are darkest in Figure 2 (i.e., with the greatest percentage of non-matches) are also in general the darkest in Figure 3a (highest African American population) and Figure 3b (highest levels lacking prose literacy), and lightest in Figure 3c (lowest median household income).

128.       A second way to visualize these relationships is through scatterplots, which graph the value of the no-match rate on the *y*-axis and the racial, income, or lack-of-literacy measures on the *x*-axis.  Figure 4, below, shows these three scatterplots.

Figure 4.  Relationship between no-match rates and racial, literacy, and income characteristics of South Carolina counties.

a.  Pct. of voting-age population that is African American



b.  Pct. lacking basic prose literacy skills





Figure 4 (continued).  Relationship between no-match rates and racial/income characteristics of South Carolina counties.

c.  Median household income

129.     These scatterplots summarize what can be discerned less efficiently by comparing the maps in Figure 3 with the map in Figure 2.  There is a very strong positive correlation between the no-match rate and the African-American population in South Carolina counties and with the percentage of the adult population that lacks basic literacy skills; there is a very strong negative correlation between the no-match rate and the median household income in South Carolina counties.[39]

_____

[39] The Pearson correlation coefficient ($r$) is the standard measure of linear relationship between two variables in a scatterplot.  That coefficient is .80 in the case of the African American population/no-match relationship, .73 in the case of the lacking-literacy/no-match relationship, and -.69 in the case of the household income/no-match relationship.  A formal statistical test of whether these linear relationships were a result of pure random chance, using linear regression, allows me to conclude that the probability that these relationships were produced randomly is less than 0.05%.

130.      Finally, it should be noted that African Americans will be burdened more often than whites by Act R54 in every county in the state.  This is illustrated in the two maps in Figure 5, below, which shows the percentage of black and white voters without a valid driver's license or identification card in every county in the state.  (The data underlying this map is reported in Attachment S.)  Unlike the maps above, which have adopted a shading scheme that divides the data in each map into quartiles, the maps in Figure 5 adopt a convention in which the shading categories are the same across the two maps.[40]  By so doing, it is possible to look at the shading of the same county in both maps and get a rough estimate of the difference in the no-match rates, between blacks and whites, in that county.

---

[40] In adopting this convention, we can think about each combination of race (black/white) and county as constituting a single "county," so that there are effectively 92 counties being mapped, not 46.  The darkest counties are the counties with the highest percentage of non-matches *across the two maps,* the lightest counties are those with the lowest percentage of non-matches *across the two maps,* etc.



Figure 5. Percentage of white and black registered voters without a driver's license or DMV-issued ID card.

131.     With only a few exceptions, when we sort the counties by the no-match rate for its white voters, and then do the same sort by the no-match rate for its black voters, the lowest countywide no-match rates for black voters are almost all higher than the *highest* no-match rates of white voters.  For instance, the county with the lowest no-match rate for its black voters is

Newberry County, with a rate of 6.45%.  There are only ten counties in South Carolina in which the no-match rate for *white* voters is higher.[41]

**Demographic characteristics of burdens**

132.    Above, I demonstrated that African Americans would be more burdened by Act R54 than white voters (paragraphs 86–108).  I also demonstrated that the burdens are geographically concentrated in the parts of the state with higher concentrations of African American voters (paragraphs 126–131).  In this section, I examine demographic characteristics of voters without a driver's license or SCDMV-issued identification card, and demonstrate that African-Americans who are registered to vote but do not hold a driver's license or SCDMV-issued identification card would be burdened more than white registered voters who do not hold these cards.

133.    An examination of the demographic characteristics of those who do not currently hold a requisite photo identification card is important, because some demographic characteristics are strongly associated with the types of skills necessary to navigate the formal requirements of full citizenship.  In order to exercise the most basic right of citizenship, voting, a potential voter must first register and then follow through with the other practical requirements, such as educating oneself about the candidates and issues, figuring out where the polling place is, getting to the polling place, and meeting the requirements to validate oneself at the polling place.

134.    Through a variety of mechanisms, including formal education, participation in civic associations such as churches, and socialization, citizens acquire "social resources" that help them to successfully navigate the practical requirements of voting.  People with higher

---

[41] These counties are Marlboro (10.6%), Allendale (9.6%), Dillon (7.1%), Beaufort (7.0%), Marion (6.8%), Lee (6.8%), Edgefield (6.7%), Chester (6.6%), McCormick (6.6%), Georgetown (6.5%).

incomes, greater literacy skills, and more civic knowledge are more likely to have these social resources.[42]  Adults with limited functional literacy will have a more difficult time reading instructions about what constitutes the necessary forms of documentation to receive an SCDMV-issued identification card, and procuring the proper birth certificate and other supporting documents.[43]  Based on robust findings in the political science literature, it is reasonable to believe that registered voters — and potentially registered voters — with higher income, wealth, and education levels will find it easier to acquire a driver's license or SCDMV-issued identification card, if they do not have one.

135.    To test whether there are resource-related differences between black and white registered voters who do not possess a driver's license or SCDMV-issued identification card, I acquired data about median household income, per capita income, median home value, and educational attainment in every ZIP code of South Carolina.[44]  I then matched this data to every registered voter without a license or SCDMV-issued ID card, based on their ZIP code of residence.

136.    ZIP code data are more finely grained than county-level demographic data, since there are roughly 400 ZIP codes in South Carolina and only 46 counties.  We can think of my matching demographic characteristics to voters on the no-match list by ZIP code as "imputing" income, wealth, and education measures to these individuals.  Thus, although we do not know

---

[42] The classic study of political participation that documents the relationship between key demographics and voting is RAYMOND E. WOLFINGER AND STEPHEN J. ROSENSTONE, WHO VOTES (1980); *see also*, SIDNEY VERBA AND NORMAN H. NYE, PARTICIPATION IN AMERICA (1972); STEPHEN J. ROSENSTONE AND JOHN MARK HANSEN, MOBILIZATION, PARTICIPATION, AND DEMOCRACY IN AMERICA (1993); and Henry E. Brady, Sidney Verba, and Key Lehman Schlozman, "*Beyond SES: A Resource Model of Political Participation*," 89 AM. POLITICAL SCIENCE REV. 271–94 (1995).

[43] *See* the Form MV-93 Checklist for First Time Issuance of Driver's License, Beginner's Permit, or Identification Card, http://www.scdmvonline.com/DMVNew/forms/MV-93.doc.

[44] I purchased this data from Melissa Data Corporation, a commercial provider of geographic data used primarily for business planning purposes.

the actual education, income, and wealth levels of the non-matched voters, we can produce a close approximation through the use of the ZIP code data.

137.        Table 6, below, reports the average values of these quantities, for black and white voters.

| Table 6.  Demographic differences between white and black registered voters who do not hold a valid driver's license/ID card, measured by characteristics of the ZIP code of residence. | | | |
|---|---|---|---|
| Demographic measure | White | Black | Difference (black - white)[a] |
| Median household income | $40,191 | $33,911 | -$6,280 |
| Per capita income | $20,287 | $16,996 | -$3,291 |
| Median house value | $113,295 | $85,858 | -$27,437 |
| Pct. with some college | 48.9% | 42.1% | -6.8% |
| [a]All differences are statistically significant with a *p*-value of less than 0.05%. | | | |

138.        The comparisons reported in Table 6 show that, on average, black voters who currently lack the requisite driver's license or SCDMV-issued identification card will find it more difficult to acquire a license/ID card than white voters.  This is true because the incomes of black voters, measured by the average/median incomes in their ZIP codes of residence, are lower than whites — 15.6% lower, measured by median household income, and 16.2% lower, measured by per capita income.  Wealth is less, measured by median house value (24.2% less).  African Americans without the requisite identification card are also less likely to have high levels of education than white non-holders of the needed identification cards.

139.        To conclude, on average, registered black voters who do not currently have the requisite identification will find it more difficult to acquire one, compared to white registered voters, because of social resource differentials.  If black and white voter turnout levels remain unchanged in the future, should the law be implemented, that would only be because black voters had overcome higher barriers than white voters to acquire the requisite identification.  It is reasonable to predict that not all affected voters will acquire the requisite identification, with

black voters less like to acquire the necessary identification card in order to vote than white voters.  Therefore, any negative effect on turnout due to the implementation of Act R54 is likely to impact black voters more than white voters.

## Conclusion

140.       Act R54 will burden registered voters who do not hold a valid driver's license or SCDMV-issued identification card, and all future registered voters who do not hold such a card. These burdens will be greater than those currently imposed by South Carolina law, which allows registered voters to cast a ballot using a voter registration card that does not include a photograph. The data analysis shows that these burdens will be disproportionately borne by minority voters in South Carolina:

141.       African American registered voters currently are less likely to hold a valid driver's license or SCDMV-issued identification card, compared to white registered voters (paragraphs 86–108).

142.       African American registered voters are less likely to hold a valid driver's license or SCDMV-issued identification card in every county of the state (paragraphs 130–131).

143.       African American and Hispanic registered voters who do not hold the requisite identification are less likely to possess the "social resources" necessary to navigate the administrative hurdles necessary in order to acquire such identification (paragraphs 132–138).

144.       In none of the analysis I have done for this report have I found a relevant demographic characteristic on which white voters would be more burdened than black voters.

145.      Based on the evidence I have examined, it is clear to me that Act R54 imposes a disproportionate burden on the black and Hispanic voters of South Carolina, compared to the white voters.

I declare under penalty of perjury that the foregoing is true and correct. Executed this **26th** day of June, 2012.

Charles Stewart III

**Attachment A**

CURRICULUM VITAE

CHARLES HAINES STEWART III

DEPARTMENT:  Political Science
DATE OF BIRTH:  March 31, 1958
CITIZENSHIP:  United States

EDUCATION

| INSTITUTION | Degree | Date |
|---|---|---|
| Stanford University | Ph.D. | 1985 |
| Stanford University | A.M. | 1982 |
| Emory University | B.A. | 1979 |

TITLE OF DOCTORAL THESIS:  The Politics of Structural Reform:  Reforming the Budgetary Process in the House, 1865-1921 (Dissertation committee: John E. Chubb [chair], Terry M. Moe, and John A. Ferejohn)

PROFESSIONAL EXPERIENCE

*MIT*

| | |
|---|---|
| 1985–1989 | Assistant Professor of Political Science |
| 1989–1999 | Associate Professor of Political Science |
| 1990–1993 | Cecil and Ida Green Career Development Associate Professor of Political Science (3-yr. term) |
| 1999–present | Professor of Political Science |
| 2007–present | Kenan Sahin Distinguished Professor of Political Science |

*MIT: Administrative*

| | |
|---|---|
| 2002–2005 | Associate Dean of Humanities, Arts, and Social Sciences |

| 2005–2010 | Head of the Department of Political Science |

*Non-MIT*

| 1989–1990 | National Fellow, Hoover Institution, Stanford University |
| 1998 (summer) | Visiting Associate Professor of Political Science, Stanford University |
| 2010–2011 | Visiting Scholar, Moritz College of Law, The Ohio State University |
| 2010– | Consultant, Pew Center on the States |
| 2011–2012 | Expert Witness, U.S. Department of Justice |

### SEMINARS, COLLOQUIA, PUBLIC PRESENTATIONS, ETC.

Note: The following list excludes numerous presentations at professional conferences.

| June 2012 | "Measuring the Performance of Elections," presentation given at the annual meeting of the Massachusetts Town and City Clerks Associations, North Falmouth, Massachusetts. |
| June 2012 | "The Measure of American Democracy," presentation given at the 2nd Annual Social Science Librarians' Boot Camp, Tufts University. |
| May 2012 | "What Hath HAVA Wrought? Or, the Garbage Man Cometh," presentation at the symposium on "HAVA at 10," Moritz College of Law, the Ohio State University |
| April 2012 | "Partisanship and Voter Confidence: 2000–2010," presentation in the American Politics Speakers Series, MIT. |
| April 2011 | "What Hath HAVA Wrought? Consequences, Intended and Not, of the post-*Bush v. Gore* Reforms," faculty workshop in the Moritz College of Law, The Ohio State University |
| July 2009 | "Racial Discrimination in Election Administration," presentation at the annual conference of the National Association of County Recorders, Election Officials, and Clerks, Nashville, Tennessee. |

CHARLES HAINES STEWART III

| July 2009 | "The 2008 Election: Trends and Turnout," presentation at the annual meeting of the International Association of Clerks, Recorders, Election Officials, and Treasurers, Spokane, Washington. |
|---|---|
| December 2008 | "The 2008 Survey of the Performance of American Elections," presentation at the Voting in America Conference, sponsored by the Pew Center on the States, Washington, DC. |
| January 2007 | "U.S. Senate Elections before 1914," seminar in the Department of Political Science, University of Pennsylvania. |
| December 2006 | "Lessons from Electronic Voting in Georgia."  Talk given at a Public Hearing on the Voter Verifiable Audit Trail Pilot Program and Electronic Voting, Georgia Secretary of State, Powder Springs, Georgia. |
| May 2006 | "Elections since 2000: *Still* in Search of Accurate Vote Totals?" Talk given to the Milwaukee Public Policy Forum, Milwaukee, Wisconsin. |
| December 2005 | "U.S. Senate Elections before 1914," seminar in the Department of Political Science, University of Wisconsin. |
| October 2004 | "Increasing Voter Participation and Confidence," talk given at the symposium on The Integrity of the Electoral Process," University of Toledo College of Law. |
| April 2004 | "The Long Strange Trip of Election Reform:  Why 2004 Won't Be Much Different from 2000," talk given at the symposium on Voting in an E-Democracy, Yale University |
| April 2000 | "The Inefficient Secret: Organizing for Business in the U.S. House of Representatives, 1789–1861," seminar in the Department of Political Science, New York University. |
| January 2000 | "The Inefficient Secret: Organizing for Business in the U.S. House of Representatives, 1789–1861," seminar in the Department of Political Science, Yale University. |
| November 1998 | "Architect or Tactician?  Henry Clay and the Institutional Development of the U.S. House of Representatives," seminar in the Department of Political Science, Columbia University. |

CHARLES HAINES STEWART III

| | |
|---|---|
| April 1994 | "Ain't Misbehavin':  Reflections on Two Centuries of Congressional Corruption," seminar in the Department of Government, Harvard University. |
| October 1992 | "Stacking the Senate, Changing the Nation: Republican Rotten Boroughs and American Political Development," seminar in the Political Science Department, Yale University. |
| April 1992 | "Stacking the Senate, Changing the Nation: Republican Rotten Boroughs and American Political Development," seminar in the Politics Department, Princeton University. |
| February 1992 | "Stacking the Senate, Changing the Nation: Republican Rotten Boroughs and American Political Development," seminar in the political economy program, Government Department, Harvard University. |
| November 1991 | "Stacking the Senate, Changing the Nation," seminar in the Department of Political Science, Duke University. |
| November 1991 | "Committee Hierarchies in the Modernizing House of Representatives," seminar in the program on political economy, University of North Carolina, Chapel Hill. |
| March 1991 | "Through a Glass Darkly:  The U.S. in the Middle East," lecture in the MIT Community Series on the Middle East. |
| October 1990 | "A Theory of Supreme Court Nominations," presentation to the Harvard/MIT Discussion Group on Political Economy (with Peter Lemieux). |
| April 1990 | "Political Institutions and Fiscal Policy," seminar in the Domestic Studies Program, Hoover Institution, Stanford University. |
| February 1990 | "Parties and Deficits:  Some Historical Evidence," seminar in the Department of Political Science, University of California at San Diego. |
| October 1989 | "Advice? Yes! Consent? Maybe. Supreme Court Nominations from Washington to Reagan," seminar in the Workshop on Politics and Organizations, Graduate School of Business, Stanford University. |

CHARLES HAINES STEWART III

| March 1987 | "How Does Reform Change Congress? The Consequences of Budget Reform in the House of Representatives, 1865-1921," presentation in the Seminar on History and Political Economy, The University of Pennsylvania. |

## FIELDS OF INTEREST

American politics
Legislative politics
Campaigns and elections
Voting reform
American political development
Research methods

## AWARDS

| 1989 | The Everett Moore Baker Memorial Award for Excellence in Undergraduate Teaching, M.I.T. |
| 1993–2003 | Margaret MacVicar Faculty Fellow, M.I.T. (10-year term) |
| 1994 | Mary Parker Follett Award, for Best Published Essay or Article, 1993-1994, Politics and History Section, American Political Science Association (with Barry Weingast). |
| 1999 | Franklin L. Burdette Pi Sigma Alpha Award, for Best Paper Presented at the 1998 Annual Meeting of the American Political Science Association. ("Architect or Tactician?  Henry Clay and the Institutional Development of the U.S. House of Representatives") |
| 2000–2003 | Class of 1960 Fellow, M.I.T.  (3-year term) |
| 2002 | Jewell-Loehenberg Award, for best article to have appeared in the *Legislative Studies Quarterly*, Legislative Studies Section, American Political Science Association (with Steven Ansolabehere and James M. Snyder, Jr.) |

| 2002 | Jack Walker Award, honoring an article or published paper of unusual significance and importance to the field, Political Organizations and Parties Section, American Political Science Association (with Steven Ansolabehere and James M. Snyder, Jr.) |
| 2002 | Best Reference Source 2002 by *Library Journal* for *Committees in the United States Congress, 1789–1946.* |
| 2011 | Elected Fellow, American Academy of Arts and Sciences |
| 2011 | Phi Beta Kappa (honorary member), Xi Chapter of Massachusetts |

## GRANTS

| 1989–90, 2000–01 | Everett McKinley Dirksen Congressional Leadership Research Center |
| 1991, 2010 | Marion and Jasper Whiting Foundation |
| 1991–93 | National Science Foundation, "The Development of the Committee System in the House, 1870-1946," SES-91-12345 |
| I. | Boston Foundation, "Voting in Massachusetts" |
| 2003–06 | John S. and James L. Knight Foundation, "Internet and Electronic Voting" |
| 2005–07 | National Science Foundation, "Collaborative Research: U.S. Senate Elections Data Base, 1871–1913" (with Wendy Schiller). |
| 2007–10 | Pew Charitable Trusts and JEHT Foundation, "The 2008 Survey of the Performance of American Elections" |
| 2008–10 | Ewing Marion Kauffman Foundation, "Congressional and Executive Staff Seminar" |
| 2012–13 | Pew Charitable Trusts, "Measuring Elections" |

PROFESSIONAL ORGANIZATIONS

American Political Science Association (Sections: Legislative studies, political methodology, politics and history) (Member, E.E. Schattschneider Award Committee, 1988–89)
Legislative Studies Section of the American Political Science Association (Member, Richard Fenno Award Committee, 1993–94; Chair, CQ Award Committee, 2002–03, 2008–09; Chair, Jewell-Loehenberg Award, 2004–05; Council member, 2005–2007)
Politics and History Section of the American Political Science Association (Council member, 1995–97; Chair, Mary Parker Follett Award Committee, 2001)
*Legislative Studies Quarterly,* Editorial Board, 2003–2007
*Studies in American Political Development,* Editorial Board, 2003–present
*Congress and the Presidency,* Editorial Board, 1994–present
*American Politics Quarterly,* Editorial Board, 1992–1997
Planning committee, Senate Election Study (1990 election)
Midwestern Political Science Association
Southern Political Science Association
American Association for the Advancement of Science
American Association of Wine Economists

M.I.T. ACTIVITIES AND COMMITTEES

)Housemaster, McCormick Hall (1992–present)
 Chair, Housemasters Council (1999–2001)
 Bexley Hall Housemaster Search Committee (chair, 1999–2000)
 Senior House Search Committee (chair, 2009, 2010)
Director, MIT Washington Summer Internship Program (1994–present)

Institute Committees
    HASS-D Review Committee (1993–94)
    Committee on Undergraduate Program (1993–1998; chair, 1995–1997)
    Committee on Curricula (*ex offici,* 1995-1997)
    Committee on Academic Performance (2011–present; chair, 2011–present)
    Task Force on Student Life and Learning (1996–1998)
    *Ad hoc* Advisory Group on Orientation 1998 (1997)
    *Ad hoc* Advisory Committee on the Principles and Goals of MIT's Residential System (1998)
    Special CUP Subcommittee on Pass/No Record Credit and Advanced Placement (chair, 1999–2000)
    Faculty Policy Committee (2001–2003)
    Committee on Faculty Quality of Life (co-chair, 2003–2005)
    Task Force on the Educational Commons (associate chair, 2003–2006)
    Experimental Study Group Advisory Committee (2007–2010)
    Terrascope Advisory Committee (2007–present)
    Subcommittee on the Educational Commons (co-chair, 2007–2009)

Institute-Wide Planning Task Force, Student Life working Group (2009)
Housing Strategy Group (2010–present)
Review Committee on Orientation (2010-present)
Task Force on Dormitory Security (co-chair, 2011–2012)
Political science search committees
Formal theory and research methodology (1986–1989, 1990–1992)
American politics (1988–1989, 1990–1993, 1997–1998; chair, 1992–1993, 1997–1998, 2004–05, chair, 2011)
DepartmentIndependent Activities period coordinator (1985–1987)
committeesGraduate admissions (1985–1989, 1990–1993, 2002–2004, 2007–present)
Financial aid (1986–1989, 1990–1993, 1994–1995; chair, 1990–1993)
Undergraduate program (1987–1989, 1993–2005; chair, 1993–2005)
Computer representative (1994–1995)
HASS distribution oversight committee on cultures and societies (1987–1989)
HASS Overview Committee (1999–2000, 2002–05; chair, 2002–05)
Faculty fellow, Burton House (1988–1989)
Truman Scholarship Selection Committee (1988–1989, 1994–1996, 2002)
Burchard Scholar Selection Committee (1992–1996, 2000, 2002–04)
Kelly-Douglas Prize Selection Committee (2002–04)

JA_001270

# PUBLICATIONS

*Books*

| | |
|---|---|
| 2012 | *Fighting for the Speakership: The House and the Rise of Party Government.*  Princeton University Press (with Jeffery A. Jenkins). (in press) |
| 2010 | *Committees in the U.S. Congress, 1993–2010.* CQ Press (with Garrison Nelson). |
| 2002 | *Committees in the United States Congress, 1789–1946,* 4 vols. Congressional Quarterly Press (with David Canon and Garrison Nelson). |
| 2001 | *Analyzing Congress*  W. W. Norton. [2nd edition, 2012] |
| 1989 | *Budget Reform Politics: The Design of the Appropriations Process in the House, 1865-1921.* Cambridge University Press. |

*Chapters in Edited Collections*

| | |
|---|---|
| 2012 | "What Hath HAVA Wrought? Consequences, Intended and Unintended, of the Post-*Bush v. Gore* Reforms," in *Bush v. Gore Ten Years Later,* eds. R. Michael Alvarez and Bernard Groffman.  (forthcoming) |
| 2011 | "Congressional Committees in a Partisan Era: The End of Institutionalization as We Know It?" in *New Directions in Congressional Politics*, ed. Jamie Ll. Carson, Routledge. |
| 2008 | "Function follows Form: Voting Technology and the Law," in *America Votes!,* ed. Benjamin E. Griffith American Bar Association. |
| 2008 | "Improving the Measurement of Election System Performance in the United States" in *Mobilizing Democracy: A Comparative Perspective on Institutional Barriers and Political Obstacles,* eds. Margaret Levi, James Johnson, Jack Knight, and Susan Stokes, Russell Sage. |
| 2006 | "Architect or Tactician?  Henry Clay and the Institutional Development of the U.S. House of Representatives" in *Process, Party, and Policy Making: New Advances in the Study of the History of Congress*, eds David W. Brady and Mathew D. McCubbins, Stanford University Press. |
| 2005 | "Congress in the Constitutional System," in *Institutions of Democracy: The Legislative Branch,* ed. Sarah Binder and Paul Quirk, Oxford University Press. |

| | |
|---|---|
| 2002 | "The Evolution of the Committee System in the U.S. Senate" (with David Canon), in *Senate Exceptionalism,* ed., Bruce Oppenheimer, Ohio University Press. |
| 2002 | "Order from Chaos: The Transformation of the Committee System in the House, 1810–1822," in *Party, Process, and Political Change in Congress: New Perspectives on the History of Congress,* eds. David Brady and Mathew McCubbins, Stanford University Press. |
| 2001 | "The Evolution of the Committee System in Congress," in *Congress Reconsidered,* 7th edition, eds., Lawrence Dodd and Bruce I. Oppenheimer.  Congressional Quarterly Press. |
| 1992 | "Committees from Randall to Clark," in *The Atomistic Congress,* eds. Ron Peters and Allen Hertzke.  M.E. Sharpe. |
| 1992 | "Responsiveness in the Upper Chamber:  The Constitution and the Institutional Development of the U.S. Senate," in *The Constitution and the American Political Process,* ed. Peter Nardulli. University of Illinois Press. |
| 1991 | "Lessons from the Post-Civil War Era," in *Causes and Consequences of Divided Government,* eds. Gary Cox and Samuel Kernell.  Westview Press. |
| 1991 | "Tax Reform in the 1980s," in *Politics and Economics in the 1980s,* eds. Alberto Alesina and Geoffrey Carliner.  University of Chicago Press, pp. 143-170. |

*Articles in Refereed Journals*

| | |
|---|---|
| 2011 | "Adding up the Costs and Benefits of Voting by Mail." *Election Law Journal* 10(3): 1–5. |
| 2011 | "Voter Opinions about Election Reform" (with R. Michael Alvarez, Thad E. Hall and Ines Levin) *Election Law Journal* 10(2): 73–87. |
| 2006 | "Residual Vote in the 2004 Election" *Election Law Journal* 5(2): 158–169. |
| 2005 | "Studying Elections: Data Quality and Pitfalls in Measuring the Effects of Voting Technologies" (with R. Michael Alvarez and Stephen Ansolabehere). *The Policy Studies Journal* 33(1): 15–24. |

2005            "Residual Votes Attributable to Technology" (with Stephen
               Ansolabehere). *Journal of Politics* 67(2): 365–389.

2003            "Out in the Open:  The Emergence of Viva Voce Voting in House
               Speakership Elections" (with Jeff Jenkins). *Legislative Studies Quarterly*,
               28(4): 481–508.

2001            "The Effects of Party and Preferences on Congressional Roll Call Voting
               (with Stephen D. Ansolabehere and James M. Snyder, Jr.). *Legislative
               Studies Quarterly,* 26(4): 533-572.

2001            "Candidate Positioning in U.S. House Elections," (with Stephen D.
               Ansolabehere and James M. Snyder, Jr.). *American Journal of Political
               Science,* 45(1): 136–159.

2000            "Old Voters, New Voters, and the Personal Vote: Using Redistricting to
               Measure the Incumbency Advantage" (with Stephen D. Ansolabehere and
               James M., Snyder, Jr.), *American Journal of Political Science,* 44(1): 17–
               34.

1999            "The Value of Committee Seats in the United States Senate, 1947–91,"
               (with Tim Groseclose), *American Journal of Political Science.* 43(3):
               963–973.

1998            "The Value of Committee Seats in the House, 1947-1991," (with Tim
               Groseclose) *American Journal of Political Science,* 42(2): 453–474.

1994            "Let's Go Fly a Kite:  Correlates of Involvement in the House Bank
               Scandal," *Legislative Studies Quarterly.* 19(4): 521-535.

1992            "Committee Hierarchies in the Modernizing House, 1875-1947,"
               *American Journal of Political Science,* 36(4):835-56.

1992            "Stacking the Senate, Changing the Nation: Republican Rotten Boroughs,
               Statehood Politics, and American Political Development," (with Barry
               Weingast) *Studies in American Political Development,* pp. 223-271.

1990            "Television Markets and Senate Elections," (with Mark Reynolds)
               *Legislative Studies Quarterly,* 15(4): 495-524. (See *LSQ* 16(3):327 for
               correction of table 2 misprint.).

1989            "A Simultaneous Determination Model of Senate Elections," *Legislative
               Studies Quarterly,* 14(4): 567-601.  Reprinted in *The Changing World of
               the U.S. Senate,* ed. John Hibbing. IGS Press.

| 1988 | "Budget Reform as Strategic Legislative Action: An Exploration," *Journal of Politics,* 50(2): 292-321. |
|---|---|
| 1987 | "Does Structure Matter? The Effects of Structural Change on Spending Decisions in the House, 1871 to 1922," *American Journal of Political Science,* 31(3): 584-605.  Reprinted in *The Congress of the United States, 1789-1989,* eds. Joel Silbey, et al.  Carlson Publishing. |

*Articles in Law Reviews*

| 2010 | "Losing Votes by Mail," in *Journal of Legislation and Public Policy* 13(3): 573-602. |
|---|---|
| 2010 | "Race, Region, and Vote Choice in the 2008 Election:  Implications for the Future of the Voting Rights Act." (with Stephen Ansolabehere and Nathaniel Persily)  *Harvard Law Review* 123(6): 1385–1436. |

*Other Publications*

| 2011 | "Voting Technologies," *Annual Review of Political Science,* 14: 353–78. |
|---|---|
| 2010 | "Residual Voting in Florida," Pew Charitable Trusts (with Paul Gronke and James Hicks) |
| 2010 | "What Happened in Massachusetts," *Boston Review* March/April 2010 (with Stephen Ansolabehere). |
| 2009 | "Early- and Late-Adopters of Provisional Ballots,"  *Pew Report on Provisional Ballots,* August 2009. |
| 2009 | "Assessment of Voting Systems," *Election Law Journal*, forthcoming. [Review of R. Michael Alvarez and Thad Hall, *Electronic Elections: The Perils and Promise of Digital Democracy*] |
| 2009 | "Amazing Race: How Post-Racial Was Obama's Victory," *Boston Review* January/February 2009 (with Stephen Ansolabehere). |
| 2008 | "Election Fraud Fears: The Cure," *Los Angeles Times,* October 27, 2008. |
| 2008 | "Basic Principles of Data Collection," *Data for Democracy: Improving Elections through Metrics and Measurement*, Pew Charitable Trusts. |
| 2008 | "Roll Calls," *International Encyclopedia of the Social Sciences,* ed, William A. Darity, Jr., vol. 7, 2nd ed., pp. 276–277. |

2005            "Truth in Numbers: Moral Values and the Gay-Marriage Backlash Did
                Not Help Bush," *Boston Review* February/March 2005 (with Stephen
                Ansolabehere).

2003            *Voting in Massachusetts*.  Report by the Caltech/MIT Voting Technology
                Project.

1996            Review of *Ethics in Congress: From Individual to Institutional
                Corruption,* Dennis F. Thompson, *American Political Science Review,*
                90(1): 206-207.

1994            Contributor to the *Encyclopedia of the United States Congress,* ed. Donald
                C. Bacon, et al. Simon and Schuster.  Essays on the House Appropriations
                Committee and the 1921 Budget and Accounting Act.

1994            Contributor to the *Encyclopedia of the American Legislative System,* ed.
                Joel H. Silbey, et al. Scribner's.  Essay on Congressional Appropriations
                Committees.

1991            Contributor to the *Encyclopedia of American Political Parties and
                Elections,* ed. L. Sandy Maisel. Garland Publishing Company.  Articles on
                Henry Clay, Thomas P. O'Neill, Samuel J. Randall, Sam Rayburn,
                Thomas B. Reed, Champ Clark, Tony Coelho, George Norris, James P.
                Clarke, William Frye, Thomas Taggart, Norman Mack, Conservative
                Coalition, Democratic Study Group, Democratic Congressional Campaign
                Committees (House and Senate), and Republican Congressional Campaign
                Committees (House and Senate).

1989            Review of *Balanced Budgets and American Politics,* James D. Savage,
                *Congress and the Presidency,* 16(1): 77-79.

1986            Review of *Representation and Responsibility,* eds., Bruce Jennings and
                Daniel Callahan, *American Political Science Review,* 80(4): 1322-1323.


*Court filings*

2009            "Brief for Nathaniel Persily, Stephen Ansolabehere, and Charles Stewart
                III as *Amici Curae* on Behalf of Neither Party," in the case of Northwest
                Austin Municipal Utility District Number One *vs.* Eric H. Holder, Jr., in
                the Supreme Court of the United States.

2006            "Declaration of Charles Stewart III on Excess Undervotes Cast in Sarasota
                County, Florida for the 13th Congressional District Race.  URL:
                http://moritzlaw.osu.edu/electionlaw/litigation/documents/declarationstew
                art.pdf

*Unpublished manuscripts*

| 2011 | "Voting Technology, Vote-by-Mail, and Residual Votes in California, 1990–2010" (with Dustin Beckett and R. Michael Alvarez). Under revise and resumit at *Political Research Quarterly*. |

2011       "The Effect of the 17th Amendment on the Party Composition of the Senate: A Counterfactual Analysis" (with Wendy Schiller), paper presented at the annual meeting of the Midwest Political Science Association.

2010       "Voter Attitudes toward Poll Workers in the 2008 Election," (with Thad E. Hall). Under revise and resubmit at *Public Administration Review*.

2009       "Election Technology and the Voting Experience in 2008," paper presented at the annual meeting of the Midwest Political Science Association.

2009       "Committee Hierarchy and Assignments in the U.S. Congress: Testing Theories of Legislative Organization, 1789–1946" (with David Canon), paper presented at the Conference on Bicameralism, Duke University.

2009       "The Effect of Party Loyalty on the Election of U.S. Senators, 1871–1913" (with Wendy Schiller), paper presented at the annual meeting of the Midwest Political Science Association. (Revision of paper presented at the 2008 annual meeting of the American Political Science Association).

2007       "Challenging the Myths of 19th Century Party Dominance: Evidence from Indirect Senate Elections, 1871–1913" (with Wendy Schiller), paper presented at the annual meeting of the American Political Science Association.

2006       "The Value of Committee Assignments in Congress since 1994" (with Keith Edwards), paper presented at the annual meeting of the Southern Political Science Association.

2004       "Party Control and Legislator Loyalty in Senate Elections Before the Adoption of the 17th Amendment" (with Wendy Schiller), paper presented at the annual meeting of the American Political Science Association.

2004       "U.S. Senate Elections before 1914" (with Wendy Schiller), paper presented at the annual meeting of the American Political Science Association.

| | |
|---|---|
| 2003 | "The Gag Rule, Congressional Politics, and the Growth of Anti-Slavery Popular Politics" (with Jeff Jenkins), paper presented at the annual meeting of the Midwest Political Science Association. |
| 1998 | "The Development of the Senate Committee System, 1789–1879" (with David Canon), paper presented at the annual meeting of the American Political Science Association. |
| 1998 | "Committee Assignments as Side Payments: The Interplay of Leadership and Committee Development in the Era of Good Feelings," (with Jeffery A. Jenkins), paper presented at the annual meeting of the Midwest Political Science Association. |
| 1996 | "Careerism and Career Ladders in the Early Days," (with Bill Bianco) paper presented at the annual meeting of the American Political Science Association. |
| 1995 | "Taking Care of Business:  The Revolution of the House Committee system before the Civil War," (with David Canon) paper presented at the annual meeting of the American Political Science Association. |
| 1994 | "Ain't Misbehavin':  Reflections on Two Centuries of Congressional Corruption," paper presented to the Government Department, Harvard University. |
| 1990 | "A Theory of Supreme Court Nominations," (with Peter Lemieux) paper presented at the Conference on Political Economy, National Bureau of Economic Research, Cambridge, Massachusetts, December. |
| 1990 | "Senate Confirmation of Supreme Court Nominations from Washington to Reagan," (with Peter Lemieux), Hoover Institution Working Paper Series, Domestic Studies Program, P-90-3, April. |
| 1990 | "Parties and the Deficit:  Some Historical Evidence," (with James Alt) presented at the Workshop on Political Economics, National Bureau of Economic Research, Cambridge, Massachusetts, February. |

LIST OF THESES SUPERVISED

*Ph.D. Thesis: Primary Supervision: Completed*
Bruce Bimber
Seong Ho Lim
Amy E. Black
Stephen Minicucci
Beth Rosenson
Kathleen H. Hicks
Suzanne Neill

*Ph.D. Theses: Secondary Supervision: Completed*
Lee Perlman
Rob Stowe
Jean Peretz
John Coleman
David Guston
Jeff Lewis
Sharon Weiner
Judy Layzer
Jocelyn Crowley
David Burbach
Marsha Simon
Rachel Cobb
David Konisky
Douglas Kriner (Harvard)
William LeBlanc
Brian D. Feinstein (Harvard)
Tony Hill
Zack Smith (Boston University, History)

*PhD. Theses: Primary Supervision: In Progress*
Angela Romero
Krista Loose

*Ph.D. Theses: Secondary Supervision: In Progress*
Michele Margolis

*S.M. Theses: Primary Supervision: Completed*
Nancy Otis
Gregory Mayew
Nancy Cohen
Jay Youngclaus
Brooks Mendall
Keith Edwards

*S.M. Theses:  Secondary Supervision:  Completed*
Reid Lifset
Robert Snyder
Sarah Lawrence
Anders Hove
Samantha Green-Atchley
Raffaela Wakeman
Matthew Clifford

*S.M. Thesis:  Primary Supervision: In progress*

*S.M. Theses: Secondary Supervision: In progress*

*S.B. Theses:  Primary Supervision:  Completed*
Thomas Murphy
Christopher Crowley (Course 6, Computer Science)
Andrew Fish
Daniel Pugh
T. Michael Smith (Course 6, Computer Science)
Clifford Rothenberg
John Abbamondi
Karen Kaplan  (joint with Course 14, Economics)
Andrei Saunders
Janice Yoo
Brooks Mendell
David Kessler (joint with Course 14, Economics)
J. Paul Kirby
Colin Page
Robert Fowler
Norman Brodesser
William LeBlanc
Sarah Anderson
Orion Smith
Andrew Montgomery (Course 6, Electrical Engineering and Computer Science)
Melanie Wong
Courtney Shiley
Kristie Tappan
David Tobias
Amanda Berry

*S.B. Theses:  Secondary Supervision:  Completed*
Michael Sununu
David Alcocer
Christine Coffey
Rebecca Berry
Alice Yao

Karl Erdmann
Miranda Priebe
Kaitlin E.M. Lewis
Tabitha Bonilla
Daniel Yelen
Kevin Clough

*S.B. Thesis: Primary Supervision: In progress*
Jonathan Frazier

*S.B. Theses: Secondary Supervision: In progress.*

JA_001280

**Attachment B**

**Major data tables contained in the South Carolina Department of Motor Vehicles database.**

| Table name | Description[a] | Index variables | Important variables |
|---|---|---|---|
| license_header | Stores a "single license record for any individual, regardless of the number of valid licenses held (i.e. BP, CDL, regular DL, etc)." | customer_no<br>license_no | Customer number<br>License number |
| license | "This table holds all the information for each license and has as primary key the combination of the license-no and the licensetype." | license_no | License type<br>Issue date<br>Expiration date<br>License status |
| license_history | "Previous images of a LICENSE record before it was updated." | license_no,<br>history_ref_ts | License type<br>Issue date<br>Expiration date<br>License status |
| license_receive | "This table holds all the information about the DL received by SC DMV.This table can hold both license turned in by a driver and special licenses that are automatically revoked when a suspension, violation, adsap incompletion, or SR-26 are put on the license." | customer_no | License type<br>Issue date<br>Reason for receiving<br>License back<br>Returning jurisdiction |
| customer | Records information about the status of the customer record | customer_no,<br>customer_status | Customer status |
| customer_individual | "The purpose of this table is to store customer attributes that are person specific." | customer_no | Name<br>Date of birth<br>Sex<br>Race<br>Citizenship<br>Social Security number |
| customer_individual_hist | The "before file"[b] for customer-individual | customer_no | Name<br>Date of birth<br>Sex<br>Race<br>Citizenship<br>Social Security number |
| customer_address | "The purpose of this table is to store one or more addresses per customer (individuals and businesses)." | customer_no,<br>address_type | Address |
| customer_address_history | The "before file" for customer_address. | customer_no,<br>address_type | Address |

[a]Taken from the document "2012 05 25 SCDMV - Database Tables_and_Columns.pdf" and "2012 04 024 Files Produced to Defendants via FTP - SC v US.xlsx," both supplied by the State of South Carolina.
[b]A "before file" stores values of a data file before they are updated. A "before file" can be thought of as an archived version of all previous values of the data contained in the associated data file.

**Attachment C**

**Number of driver's license types in the license table of the SCDMV database**

| License type | Number |
|---|---|
| Commercial Beginner's Permit | 97,781 |
| Commercial Driver's License | 220,226 |
| Conditional/Provisional Driver's License | 140,700 |
| ID card | 1,351,238 |
| Moped License | 13,218 |
| | |
| Provisional Beginner's Permit | 142 |
| Provisional Drivers License | 27,381 |
| Regular Beginner's Permit | 1,009,002 |
| Regular Driver's License | 4,863,532 |
| Route Restricted | 19,209 |
| | |
| Seasonal Conditional Drivers License | 2 |
| Special Restricted | 203,814 |
| Temporary ID | 2 |
| Temporary Alcohol Driver's License | 27,819 |
| Total | 7,974,066 |

**Attachment D**

**Comparison of county-of-residence of individuals in the SCDMV database with published information about the number of driver's licenses per county**

| County | From SCDMV website Driver's licenses | Number in SCDMV database | | | Difference between SCDMV database and website | | |
|---|---|---|---|---|---|---|---|
| | | All unexpired records | Unexpired records, excluding IDs | Only SC records, no IDs | All unexpired records | Unexpired records, excluding IDs | Only SC records, no IDs |
| Abbeville | 19,086 | 20,835 | 18,816 | 18,816 | 9.2% | -1.4% | -1.4% |
| Aiken | 123,913 | 140,980 | 127,869 | 127,869 | 13.8% | 3.2% | 3.2% |
| Allendale | 5,565 | 6,920 | 5,377 | 5,377 | 24.3% | -3.4% | -3.4% |
| Anderson | 142,812 | 157,082 | 142,195 | 142,195 | 10.0% | -0.4% | -0.4% |
| Bamberg | 10,393 | 12,357 | 10,258 | 10,258 | 18.9% | -1.3% | -1.3% |
| Barnwell | 16,249 | 18,451 | 16,035 | 16,035 | 13.6% | -1.3% | -1.3% |
| Beaufort | 122,527 | 140,201 | 129,974 | 129,973 | 14.4% | 6.1% | 6.1% |
| Berkeley | 136,034 | 151,753 | 137,885 | 137,884 | 11.6% | 1.4% | 1.4% |
| Calhoun | 12,057 | 13,554 | 11,959 | 11,959 | 12.4% | -0.8% | -0.8% |
| Charleston | 267,686 | 314,459 | 278,007 | 278,007 | 17.5% | 3.9% | 3.9% |
| Cherokee | 41,364 | 46,992 | 41,214 | 41,214 | 13.6% | -0.4% | -0.4% |
| Chester | 25,419 | 28,498 | 24,925 | 24,925 | 12.1% | -1.9% | -1.9% |
| Chesterfield | 32,909 | 36,825 | 32,425 | 32,424 | 11.9% | -1.5% | -1.5% |
| Clarendon | 24,446 | 28,074 | 24,334 | 24,334 | 14.8% | -0.5% | -0.5% |
| Colleton | 30,033 | 34,214 | 29,686 | 29,685 | 13.9% | -1.2% | -1.2% |
| Darlington | 49,405 | 56,778 | 49,201 | 49,201 | 14.9% | -0.4% | -0.4% |
| Dillon | 21,423 | 25,234 | 20,933 | 20,933 | 17.8% | -2.3% | -2.3% |
| Dorchester | 107,248 | 119,175 | 109,772 | 109,770 | 11.1% | 2.4% | 2.4% |
| Edgefield | 18,234 | 20,402 | 18,434 | 18,434 | 11.9% | 1.1% | 1.1% |
| Fairfield | 17,273 | 19,649 | 16,815 | 16,815 | 13.8% | -2.7% | -2.7% |
| Florence | 98,723 | 113,416 | 98,919 | 98,919 | 14.9% | 0.2% | 0.2% |
| Georgetown | 48,995 | 55,011 | 49,451 | 49,451 | 12.3% | 0.9% | 0.9% |
| Greenville | 343,074 | 385,403 | 350,912 | 350,911 | 12.3% | 2.3% | 2.3% |
| Greenwood | 49,250 | 54,677 | 48,555 | 48,555 | 11.0% | -1.4% | -1.4% |
| Hampton | 14,262 | 16,004 | 13,894 | 13,894 | 12.2% | -2.6% | -2.6% |
| Horry | 226,720 | 258,450 | 235,190 | 235,189 | 14.0% | 3.7% | 3.7% |
| Jasper | 16,143 | 19,283 | 16,453 | 16,453 | 19.5% | 1.9% | 1.9% |
| Kershaw | 48,431 | 54,033 | 48,822 | 48,822 | 11.6% | 0.8% | 0.8% |
| Lancaster | 58,524 | 64,995 | 59,141 | 59,141 | 11.1% | 1.1% | 1.1% |
| Laurens | 49,543 | 55,191 | 48,936 | 48,936 | 11.4% | -1.2% | -1.2% |
| Lee | 12,416 | 14,705 | 12,097 | 12,097 | 18.4% | -2.6% | -2.6% |
| Lexington | 204,146 | 223,946 | 206,752 | 206,750 | 9.7% | 1.3% | 1.3% |
| Marion | 23,822 | 27,542 | 23,237 | 23,237 | 15.6% | -2.5% | -2.5% |
| Marlboro | 19,822 | 23,227 | 19,125 | 19,125 | 17.2% | -3.5% | -3.5% |
| McCormick | 7,190 | 8,072 | 7,320 | 7,320 | 12.3% | 1.8% | 1.8% |
| Newberry | 27,544 | 30,982 | 27,408 | 27,408 | 12.5% | -0.5% | -0.5% |
| Oconee | 58,775 | 64,727 | 59,703 | 59,701 | 10.1% | 1.6% | 1.6% |

| County | From SCDMV website | Number in SCDMV database | | | Difference between SCDMV database and website | | |
| | Driver's licenses | All unexpired records | Unexpired records, excluding IDs | Only SC records, no IDs | All unexpired records | Unexpired records, excluding IDs | Only SC records, no IDs |
| --- | --- | --- | --- | --- | --- | --- | --- |
| Orangeburg | 64,084 | 74,772 | 63,124 | 63,124 | 16.7% | -1.5% | -1.5% |
| Pickens | 87,109 | 94,996 | 88,314 | 88,313 | 9.1% | 1.4% | 1.4% |
| Richland | 262,032 | 307,116 | 269,171 | 269,170 | 17.2% | 2.7% | 2.7% |
| Saluda | 13,486 | 14,748 | 13,375 | 13,375 | 9.4% | -0.8% | -0.8% |
| Spartanburg | 213,042 | 237,566 | 212,330 | 212,330 | 11.5% | -0.3% | -0.3% |
| Sumter | 75,964 | 89,563 | 77,328 | 77,328 | 17.9% | 1.8% | 1.8% |
| Undetermined | 290 | 772 | 624 | 46 | 166.2% | 115.2% | -84.1% |
| Union | 21,988 | 24,598 | 21,594 | 21,594 | 11.9% | -1.8% | -1.8% |
| Williamsburg | 23,703 | 27,912 | 23,155 | 23,155 | 17.8% | -2.3% | -2.3% |
| York | 178,500 | 199,566 | 184,673 | 184,669 | 11.8% | 3.5% | 3.5% |
| Total | 3,471,654 | 3,933,706 | 3,525,717 | 3,525,121 | 13.3% | 1.6% | 1.5% |

JA_001284

**Attachment E**

**Table of voter status against reason for being assigned to voter status, in the SCSEC voterlist**

| Reason for assignment | Voter status | | | | |
|---|---|---|---|---|---|
| | Active | Archived | Inactive | Pending | Total |
| Active | 2,475,543 | 0 | 195 | 0 | 2,475,738 |
| Convicted | 1 | 0 | 12,869 | 0 | 12,870 |
| Deceased | 0 | 0 | 52,338 | 0 | 52,338 |
| District Assignment | 0 | 0 | 0 | 84 | 84 |
| Failed To Respond | 24 | 0 | 60,113 | 0 | 60,137 |
| Hold | 0 | 0 | 723 | 0 | 723 |
| Moved out of County | 0 | 0 | 7,463 | 0 | 7,463 |
| Moved | 32 | 0 | 10,259 | 0 | 10,291 |
| Other | 0 | 0 | 1,509 | 0 | 1,509 |
| Reinstated | 260,308 | 0 | 22 | 0 | 260,330 |
| Inactive switched counties | 2 | 0 | 24,705 | 0 | 24,707 |
| Twice registered | 0 | 0 | 280 | 0 | 280 |
| Archived | 0 | 3,517,065 | 0 | 0 | 3,517,065 |
| Written Request for Removal | 0 | 0 | 39 | 0 | 39 |
| Total | 2,735,910 | 3,517,065 | 170,515 | 84 | 6,423,574 |

**Attachment F**

**Comparison of voter registration figures contained in SCSEC database, compared to published report**

| County | From State Election Commission website Total Registered | From voter file database | | | % deviation, Active list in database to website |
|---|---|---|---|---|---|
| | | Active | Inactive | Total | |
| Abbeville | 14,112 | 14,101 | 1,019 | 15,120 | -0.1% |
| Aiken | 97,263 | 97,985 | 5,010 | 102,995 | 0.7% |
| Allendale | 5,701 | 5,620 | 535 | 6,155 | -1.4% |
| Anderson | 103,751 | 103,736 | 7,282 | 111,018 | 0.0% |
| Bamberg | 8,729 | 8,591 | 669 | 9,260 | -1.6% |
| Barnwell | 13,005 | 13,180 | 817 | 13,997 | 1.3% |
| Beaufort | 100,320 | 101,130 | 5,001 | 106,131 | 0.8% |
| Berkeley | 95,588 | 97,666 | 6,577 | 104,243 | 2.2% |
| Calhoun | 10,132 | 10,028 | 674 | 10,702 | -1.0% |
| Charleston | 228,484 | 230,493 | 13,447 | 243,940 | 0.9% |
| Cherokee | 30,444 | 30,302 | 2,160 | 32,462 | -0.5% |
| Chester | 19,571 | 19,508 | 1,377 | 20,885 | -0.3% |
| Chesterfield | 22,934 | 23,123 | 1,480 | 24,603 | 0.8% |
| Clarendon | 22,357 | 22,114 | 1,618 | 23,732 | -1.1% |
| Colleton | 22,960 | 23,010 | 1,552 | 24,562 | 0.2% |
| Darlington | 39,837 | 40,131 | 2,667 | 42,798 | 0.7% |
| Dillon | 19,156 | 19,217 | 1,492 | 20,709 | 0.3% |
| Dorchester | 80,485 | 81,611 | 4,997 | 86,608 | 1.4% |
| Edgefield | 15,245 | 15,431 | 819 | 16,250 | 1.2% |
| Fairfield | 15,111 | 15,004 | 1,003 | 16,007 | -0.7% |
| Florence | 78,863 | 78,801 | 5,015 | 83,816 | -0.1% |
| Georgetown | 40,089 | 39,944 | 2,708 | 42,652 | -0.4% |
| Greenville | 272,089 | 272,987 | 13,900 | 286,887 | 0.3% |
| Greenwood | 38,193 | 38,500 | 2,177 | 40,677 | 0.8% |
| Hampton | 12,563 | 12,529 | 1,099 | 13,628 | -0.3% |
| Horry | 160,023 | 161,215 | 10,910 | 172,125 | 0.7% |
| Jasper | 13,465 | 13,592 | 833 | 14,425 | 0.9% |
| Kershaw | 37,557 | 37,666 | 2,244 | 39,910 | 0.3% |
| Lancaster | 44,535 | 44,938 | 2,382 | 47,320 | 0.9% |
| Laurens | 35,882 | 35,468 | 2,944 | 38,412 | -1.2% |
| Lee | 11,867 | 11,753 | 910 | 12,663 | -1.0% |
| Lexington | 154,338 | 155,299 | 9,272 | 164,571 | 0.6% |
| Marion | 21,219 | 20,932 | 1,791 | 22,723 | -1.4% |
| Marlboro | 16,781 | 16,862 | 1,271 | 18,133 | 0.5% |
| McCormick | 6,554 | 6,625 | 340 | 6,965 | 1.1% |
| Newberry | 21,586 | 21,401 | 1,376 | 22,777 | -0.9% |
| Oconee | 43,643 | 44,020 | 2,465 | 46,485 | 0.9% |

| County | From State Election Commission website Total Registered | From voter file database | | | % deviation, Active list in database to website |
|---|---|---|---|---|---|
| | | Active | Inactive | Total | |
| Orangeburg | 58,961 | 58,433 | 4,552 | 62,985 | -0.9% |
| Pickens | 62,156 | 62,520 | 4,395 | 66,915 | 0.6% |
| Richland | 226,891 | 228,250 | 15,774 | 244,024 | 0.6% |
| Saluda | 11,066 | 10,969 | 835 | 11,804 | -0.9% |
| Spartanburg | 154,532 | 154,884 | 9,976 | 164,860 | 0.2% |
| Sumter | 62,453 | 63,427 | 4,013 | 67,440 | 1.6% |
| Union | 16,858 | 16,639 | 1,389 | 18,028 | -1.3% |
| Williamsburg | 21,378 | 21,091 | 1,766 | 22,857 | -1.3% |
| York | 133,553 | 135,184 | 5,982 | 141,166 | 1.2% |
| State Totals | 2,722,280 | 2,735,910 | 170,515 | 2,906,425 | 0.5% |

**Attachment G**

**Percentage of voters in the 2008 and 2010 general election who are in the SCSEC voter list, by status in the voter list**

a. 2008

| Status | Number | Pct. who voted in 2008 | Contribution to vote |
|--------|--------|------------------------|----------------------|
| Active | 2,735,910 | 66.0% | 93.7% |
| Archived | 3,517,065 | 2.0% | 3.7% |
| Inactive | 170,515 | 30.9% | 2.7% |
| Pending | 84 | 2.4% | 0.0% |
| Total | 6,423,574 | 30.0% | 100.1%[a] |

b. 2010

| Status | Number | Pct. who voted in 2010 | Contribution to vote |
|--------|--------|------------------------|----------------------|
| Active | 2,735,910 | 48.7% | 98.1% |
| Archived | 3,517,065 | 0.1% | 0.3% |
| Inactive | 170,515 | 13.3% | 2.7% |
| Pending | 84 | 1.2% | 0.0% |
| Total | 6,423,574 | 21.1% | 100.1%[a] |

[a] Percentages do not round to 100.0 because of rounding.

**Attachment H**

**Turnout in the 2008 and 2010 general elections, comparing figures published on the SCSEC website with figures calculated from the SCSEC voter list**

| County | 2008 | | | 2010 | | |
|---|---|---|---|---|---|---|
| | From website | From data file | Pct. diff | From website | From data file | Pct. diff |
| Abbeville | 10,998 | 10,956 | 0.4% | 7,406 | 7,405 | 0.0% |
| Aiken | 69,962 | 69,832 | 0.2% | 49,391 | 49,374 | 0.0% |
| Allendale | 4,046 | 4,015 | 0.8% | 2,508 | 2,497 | 0.4% |
| Anderson | 74,208 | 74,196 | 0.0% | 50,537 | 50,546 | 0.0% |
| Bamberg | 6,803 | 6,763 | 0.6% | 4,873 | 4,857 | 0.3% |
| Barnwell | 9,825 | 9,800 | 0.3% | 7,079 | 7,071 | 0.1% |
| Beaufort | 69,380 | 69,339 | 0.1% | 51,775 | 51,796 | 0.0% |
| Berkeley | 65,394 | 65,520 | -0.2% | 43,904 | 43,952 | -0.1% |
| Calhoun | 7,801 | 7,780 | 0.3% | 5,889 | 5,894 | -0.1% |
| Charleston | 156,254 | 156,146 | 0.1% | 103,979 | 104,011 | 0.0% |
| Cherokee | 20,839 | 20,837 | 0.0% | 14,476 | 14,483 | 0.0% |
| Chester | 14,226 | 14,222 | 0.0% | 9,636 | 9,637 | 0.0% |
| Chesterfield | 16,378 | 16,354 | 0.1% | 11,243 | 11,231 | 0.1% |
| Clarendon | 16,058 | 16,025 | 0.2% | 11,433 | 11,427 | 0.1% |
| Colleton | 17,410 | 17,369 | 0.2% | 11,624 | 11,621 | 0.0% |
| Darlington | 29,482 | 29,442 | 0.1% | 21,595 | 21,589 | 0.0% |
| Dillon | 13,751 | 13,728 | 0.2% | 8,097 | 8,090 | 0.1% |
| Dorchester | 52,908 | 52,937 | -0.1% | 36,703 | 36,719 | 0.0% |
| Edgefield | 11,603 | 11,586 | 0.1% | 8,312 | 8,310 | 0.0% |
| Fairfield | 11,705 | 11,677 | 0.2% | 8,988 | 8,976 | 0.1% |
| Florence | 57,192 | 57,118 | 0.1% | 39,986 | 39,961 | 0.1% |
| Georgetown | 30,153 | 30,102 | 0.2% | 21,333 | 21,334 | 0.0% |
| Greenville | 191,868 | 191,897 | 0.0% | 133,567 | 133,587 | 0.0% |
| Greenwood | 29,665 | 29,615 | 0.2% | 20,176 | 20,149 | 0.1% |
| Hampton | 9,502 | 9,482 | 0.2% | 6,629 | 6,626 | 0.0% |
| Horry | 105,589 | 105,592 | 0.0% | 70,884 | 70,963 | -0.1% |
| Jasper | 8,929 | 8,912 | 0.2% | 6,355 | 6,341 | 0.2% |
| Kershaw | 27,652 | 27,665 | 0.0% | 22,519 | 22,543 | -0.1% |
| Lancaster | 28,833 | 28,815 | 0.1% | 22,052 | 22,050 | 0.0% |
| Laurens | 26,391 | 26,361 | 0.1% | 17,605 | 17,599 | 0.0% |
| Lee | 9,227 | 9,201 | 0.3% | 6,686 | 6,674 | 0.2% |
| Lexington | 109,225 | 109,353 | -0.1% | 83,615 | 83,713 | -0.1% |
| Marion | 15,404 | 15,377 | 0.2% | 10,579 | 10,575 | 0.0% |
| Marlboro | 10,791 | 10,751 | 0.4% | 7,286 | 7,282 | 0.1% |
| McCormick | 5,251 | 5,246 | 0.1% | 4,093 | 4,090 | 0.1% |
| Newberry | 16,537 | 16,509 | 0.2% | 12,254 | 12,244 | 0.1% |
| Oconee | 31,544 | 31,497 | 0.1% | 21,560 | 21,563 | 0.0% |
| Orangeburg | 42,140 | 42,015 | 0.3% | 29,263 | 29,246 | 0.1% |
| Pickens | 44,700 | 44,662 | 0.1% | 30,544 | 30,561 | -0.1% |

| County | 2008 | | | 2010 | | |
| --- | --- | --- | --- | --- | --- | --- |
| | From website | From data file | Pct. diff | From website | From data file | Pct. diff |
| Richland | 164,986 | 164,905 | 0.0% | 119,850 | 119,783 | 0.1% |
| Saluda | 8,602 | 8,594 | 0.1% | 6,378 | 6,380 | 0.0% |
| Spartanburg | 108,459 | 108,370 | 0.1% | 74,578 | 74,547 | 0.0% |
| Sumter | 44,805 | 44,757 | 0.1% | 31,525 | 31,522 | 0.0% |
| Union | 13,454 | 13,427 | 0.2% | 9,314 | 9,295 | 0.2% |
| Williamsburg | 16,621 | 16,577 | 0.3% | 11,743 | 11,717 | 0.2% |
| York | 93,801 | 93,797 | 0.0% | 68,726 | 68,715 | 0.0% |
| State Totals | 1,930,352 | 1,929,121 | 0.1% | 1,358,548 | 1,358,546 | 0.0% |

**Attachment I**

**Description of death certificate data file obtained from the State of South Carolina**

South Carolina Certificate of Death Data Element Description

The items listed below are provided per request from the South Carolina Certificate of Death. The data file contains the requested information on deaths that occurred in South Carolina in years 2000 through 2010. In 2005, the certificate was revised and some variables were added or modified.  A description of these differences is provided below.

Death certificates are filed with the state by the funeral director or person acting as such.  This funeral director collects the information from an informant, usually a close family member or friend of the decedent.  The Office of Public Health Statistics and Information Systems, Division of Biostatistics performs many quality checks on these records and queries on information that is out of range or inconsistent.  We do not verify the accuracy of information on every record.

The following items were collected in the same way across all years.
   Decedent's Name
   Sex
   Social Security Number
   Age – In most cases, the age matches with the date of birth calculated using the date of death.
   However, this is a reported age, not a calculated age so there may be inconsistencies.
   Date of Birth
   Place of Birth – State or Country

The following address information was collected in a similar manner across years. It is possible that a decedent owns multiple properties and this is not their main residence.  We are dependent on the information provided by the informant and do not verify this information.
   State of Residence
   County of Residence
   City or Town of Residence
   Street and Number of Residence Address
   Apartment Number of Residence
   Zip Code of Residence

Date of Death  - The date of death will contain, at minimum, the year of death.  In some cases, the month and/or day may be missing.  These are generally cases where remains were found and the exact date of death could not be determined.

File Date – This is the date the record was officially filed with the state.

Education – This field changed significantly between revisions.  We are not able to collapse or bridge this information for it to be consistent across all years.  For 2000 – 2004, the number of years of education is provided.  For 2005 – 2010, there are specific categories, such as "High school diploma or GED completed".  Information is provided with the file layout that explains the different values.

Hispanic Origin – This indicates whether the decedent was of Hispanic Origin, e.g. Mexican, Puerto Rican, Cuban, etc.

Race – Race categories were expanded in 2005 and put into a check box format, as well as allowing an option of choosing multiple races.  For 2000 – 2004, a literal value was written on the death certificate and coded in the data entry process to 9 categories.  For comparison, we collapsed these categories for all years into White, Black, Other, Multiple Races and Unknown.

Note: Hispanic is not a race category, thus the "Other" category does not contain all who are of Hispanic origin.  An individual can be of Hispanic origin and fall into any of the race categories listed.  The categories of race and Hispanic origin are consistent with those of the US Census Bureau.

**Attachment J**

**Comparison of deaths reported in *Vital and Morbidity Statistics* report with deaths in death certificate file received from the State of South Carolina**

| County | Total data file 2000-2010 | 2008 From vital records report | From data file | Pct. difference |
|---|---|---|---|---|
| Abbeville | 2,733 | 271 | 265 | 2.2% |
| Aiken | 11,517 | 1,555 | 1,092 | 29.8% |
| Allendale | 1,140 | 133 | 107 | 19.5% |
| Anderson | 19,716 | 1,848 | 1,815 | 1.8% |
| Bamberg | 1,911 | 188 | 182 | 3.2% |
| Barnwell | 2,281 | 247 | 211 | 14.6% |
| Beaufort | 10,778 | 1,174 | 1,070 | 8.9% |
| Berkeley | 10,855 | 1,021 | 998 | 2.3% |
| Calhoun | 1,761 | 172 | 170 | 1.2% |
| Charleston | 30,210 | 2,814 | 2,770 | 1.6% |
| Cherokee | 5,956 | 599 | 571 | 4.7% |
| Chester | 3,598 | 394 | 375 | 4.8% |
| Chesterfield | 4,100 | 488 | 397 | 18.6% |
| Clarendon | 3,743 | 388 | 380 | 2.1% |
| Colleton | 4,640 | 477 | 466 | 2.3% |
| Darlington | 7,979 | 770 | 766 | 0.5% |
| Dillon | 3,608 | 323 | 318 | 1.5% |
| Dorchester | 8,345 | 818 | 814 | 0.5% |
| Edgefield | 1,694 | 218 | 162 | 25.7% |
| Fairfield | 3,028 | 255 | 252 | 1.2% |
| Florence | 14,606 | 1,391 | 1,372 | 1.4% |
| Georgetown | 6,364 | 611 | 590 | 3.4% |
| Greenville | 36,869 | 3,620 | 3,536 | 2.3% |
| Greenwood | 7,352 | 706 | 687 | 2.7% |
| Hampton | 2,207 | 258 | 244 | 5.4% |
| Horry | 23,011 | 2,321 | 2,203 | 5.1% |
| Jasper | 1,605 | 221 | 179 | 19.0% |
| Kershaw | 5,778 | 568 | 556 | 2.1% |
| Lancaster | 5,970 | 687 | 603 | 12.2% |
| Laurens | 7,967 | 743 | 734 | 1.2% |
| Lee | 2,369 | 221 | 219 | 0.9% |
| Lexington | 20,238 | 1,912 | 1,887 | 1.3% |
| Marion | 4,188 | 406 | 399 | 1.7% |
| Marlboro | 3,073 | 323 | 277 | 14.2% |
| McCormick | 1,136 | 105 | 94 | 10.5% |
| Newberry | 4,379 | 406 | 401 | 1.2% |
| Oconee | 7,461 | 760 | 728 | 4.2% |
| Orangeburg | 10,753 | 987 | 966 | 2.1% |
| Pickens | 10,162 | 1,008 | 988 | 2.0% |
| Richland | 28,052 | 2,570 | 2,526 | 1.7% |

| County | Total data file 2000-2010 | 2008 From vital records report | From data file | Pct. difference |
|---|---|---|---|---|
| Saluda | 2,067 | 208 | 201 | 3.4% |
| Spartanburg | 27,986 | 2,724 | 2,664 | 2.2% |
| Sumter | 10,299 | 932 | 912 | 2.1% |
| Union | 3,986 | 371 | 370 | 0.3% |
| Williamsburg | 4,276 | 401 | 398 | 0.7% |
| York | 13,898 | 1,583 | 1,366 | 13.7% |
| Unknown | 76 | 1 | 9 | -800.0% |
| Non-S.C. resident | 10,819 | | 1,027 | |
| Total | 416,540 | 40,197 | 39,317 | 2.2% |

**Attachment K**

**Number of invalid and duplicate Social Security numbers in SCDMV database, SCSEC voter list, and death certificate file**

a. Invalid/missing numbers

| Database | Number of records in file | Social Security numbers missing due to . . . | | | |
| --- | --- | --- | --- | --- | --- |
| | | Digits out of range | Repetitive digits | Missing SSN | All reasons |
| DMV file: customer_individual[a] | 5,720,209 | 41,345 (0.7%) | 40,720 (0.7%) | 169,561 (3.0%) | 210,910 (3.7%) |
| Election Commission file: voter list[b] | 2,729,681 | 6,229 (0.2%) | 5,898 (0.2%) | 0 (0.0%) | 6,248 (0.2%) |
| Death certificate file | 416,386 | 154 (0.0%) | 2 (0.0) | 5,407 (1.3%) | 5,563 (1.3%) |

b. Duplicate numbers

| Database | Number of unique Social Security numbers | Duplicate Social Security Numbers | |
| --- | --- | --- | --- |
| | | SSN's with only one individual holding the number | Number of individuals among duplicate numbers |
| DMV file: customer_individual[a] | 5,502,640 | 5,496,059 (99.8%) | 13,240 |
| Election Commission file: voter list[b] | 2,728,464 | 2,727,267 (99.96%) | 2,395 |
| Death certificate file | 410,357 | 409,738 (99.9%) | 1,239 |

[a]Only customers in the "license_header" file

[b]Active voters only.

**Attachment L**

**Distribution of races in SCDMV database, SCSEC voter list, and death certificate list records**

| SCDMV | | | Voter list | | | Death certificate | | |
|---|---|---|---|---|---|---|---|---|
| Category | Number | Pct. | Category | Number | Pct. | Category | Number | Pct. |
| White | 3,290,949 | 68.6% | White | 1,902,625 | 69.5% | White | 295,733 | 71.0% |
| Black | 1,466,088 | 25.6% | Black/Afr.Amer. | 767,037 | 28.4% | Black | 114,290 | 27.4% |
| Hispanic | 126,614 | 2.2% | Hispanic | 28,214 | 1.0% | Hispanic | 3,259 | 0.8% |
| Unknown | 90,965 | 1.6% | Asian | 18,293 | 0.7% | Other | 1,848 | 0.4% |
| Asian | 87,485 | 1.5% | Other | 14,140 | 0.5% | Unknown | 913 | 0.2% |
| Nat. Amer. | 18,722 | 0.3% | Nat. American | 5,345 | 0.2% | Mixed | 497 | 0.1% |
| Mixed | 5,270 | 0.1% | Mixed | 164 | 0.0% | Total | 416,540 | 99.9% [a] |
| Other | 3,762 | 0.1% | Unknown | 91 | 0.0% | | | |
| Missing | 354 | 0.0% | Missing | 1 | 0.0% | | | |
| Total | 5,720,209 | 100.0% | Total | 2,735,910 | 100.3% [a] | | | |

[a] Percentages do not add to 100.0% because of rounding.

**Attachment M**

**Comparison of racial designations of individuals across databases**

a.  Comparison of SCDMV database and SCSEC voter list

| SCDMV database | SCSEC voter list | | | | | | |
|---|---|---|---|---|---|---|---|
| | Missing | Black | Hispanic | Other | Unknown | White | Total |
| Missing | 0 | 2 | 0 | 3 | 0 | 3 | 8 |
| Black | 1 | 729,181 | 324 | 4,034 | 31 | 4,093 | 737,664 |
| Hispanic | 0 | 183 | 23,652 | 584 | 2 | 962 | 25,383 |
| Other | 0 | 508 | 296 | 23,050 | 7 | 1,641 | 25,502 |
| Unknown | 0 | 732 | 42 | 1,386 | 3 | 532 | 2,695 |
| White | 0 | 7,391 | 2,626 | 6,954 | 22 | 1,858,291 | 1,875,284 |
| Total | 1 | 737,997 | 26,940 | 36,011 | 65 | 1,865,522 | 2,666,536 |

Agreement statistic: 98.8%

b.  Comparison of SCDMV database and death certificate list

| SCDMV database | Death certificate list | | | | | | |
|---|---|---|---|---|---|---|---|
| | Missing | Black | Hispanic | Other | Unknown | White | Total |
| Missing | 0 | 0 | 0 | 0 | 0 | 4 | 4 |
| Black | 0 | 80,339 | 240 | 177 | 412 | 808 | 81,976 |
| Hispanic | 0 | 19 | 469 | 30 | 3 | 82 | 603 |
| Other | 0 | 33 | 62 | 732 | 3 | 174 | 1,004 |
| Unknown | 0 | 1,026 | 7 | 49 | 11 | 1,114 | 2,207 |
| White | 0 | 1,565 | 389 | 564 | 249 | 235,835 | 238,602 |
| Total | 0 | 82,982 | 1,167 | 1,552 | 678 | 238,017 | 324,396 |

Agreement statistic:  97.8%

c.  Comparison of SCSEC database and death certificate list

| SCSEC voter list | Death certificate list | | | | | | |
|---|---|---|---|---|---|---|---|
| | Missing | Black | Hispanic | Other | Unknown | White | Total |
| Missing | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Black | 0 | 3,180 | 15 | 12 | 30 | 193 | 3,430 |
| Hispanic | 0 | 1 | 9 | 1 | 0 | 1 | 12 |
| Other | 0 | 9 | 2 | 6 | 0 | 9 | 26 |
| Unknown | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| White | 0 | 315 | 4 | 8 | 7 | 2,357 | 2,691 |
| Total | 0 | 3,505 | 30 | 27 | 37 | 2,560 | 6,159 |

Agreement statistic: 90.1%

Note:  "Agreement statistic" is defined as the percentage of cases in which the racial categorizations in the two databases are in agreement.

**Attachment N**

**Procedures creating lists of registered voters unmatched and matched to the DMV database (Matching Strategy 1)**

The following summarizes the steps taken to create a list of registered voters with *no matching* records in the SCDMV database.

1. Create a list of individuals in the SCDMV database, by merging the license_header and customer_individual tables, using the customer_no key variable.  Retain all records in which there is a match in both files.  Remove all records with an unusable Social Security number. (5,509,299 records)
2. Create a list of all active voters, by retaining all records in the voter list with voter status of "Active."  Remove all records with an unusable Social Security number.   (2,729,662 records).
3. Prepare a list of out-of-state returned licenses, retaining all records in the license_return table in which the returning jurisdiction is not South Carolina.  Remove all records with an unusable Social Security number.  (659,510 records)
4. Prepare death certificate list by removing all records with an unusable Social Security number. (410,977 records)
5. Merge the SCDMV list (step 1) with the active voter list (step 2), using the SSN+sex matching rule.  Select the records in the active voter list that are not in the SCDMV list. (63,881 records remain)
6. Match the list produced at step 5 with the death certificate list, using the SSN+sex matching rule.  Remove any matching records. (62,890 records remain)
7. Create the final SCDMV database no-match list, by merging the list produced at step 6 with the out-of-state returned license file created at step 3.  (62,890 records remain)

The following summarizes the steps taken to create a list of registered voters *with* matching records in the SCDMV database.

1. Create a list of individuals in the SCDMV database, by merging the license_header and customer_individual tables, using the customer_no key variable.  Retain all records in which there is a match in both files.  Remove all records with an unusable Social Security number. (5,509,299 records)
2. Create a list of all active voters, by retaining all records in the voter list with voter status of "Active."  Remove all records with an unusable Social Security number.   (2,729,662 records).

3. Prepare a list of out-of-state returned licenses, retaining all records in the license_return table in which the returning jurisdiction is not South Carolina.  Remove all records with an unusable Social Security number.  (659,510 records)

4. Prepare death certificate list by removing all records with an unusable Social Security number. (410,977 records)

5. Merge the SCDMV list (step 1) with the active voter list (step 2), using the SSN+sex matching rule.  Select the records in the active voter list that are in the SCDMV list. (2,66,536 records remain)

6. Match the list produced at step 5 with the death certificate list, using the SSN+sex matching rule.  Remove any matching records. (2,660,278 records remain)

7. Create the final SCDMV database matching list, by merging the list produced at step 6 with the out-of-state returned license file created at step 3.  (2,504,753 records remain)

**Attachment O**

**Racial distribution of voters unmatched and matched with the DMV database**

a. Racial distribution of voters unmatched and matched with the DMV database

| | | | Result of matching | | | | | |
|---|---|---|---|---|---|---|---|---|
| Race | All active voters | | Voters not in DMV database | | Voters in DMV database | | Voters lost due to matching[a] & returned licenses | |
| Asian | 18,293 | 0.7% | 538 | 0.9% | 16,352 | 0.7% | 1,403 | 0.8% |
| Black/ Afr.Amer. | 767,037 | 28.0% | 26,035 | 41.4% | 705,856 | 28.2% | 35,146 | 20.9% |
| Hispanic | 28,214 | 1.0% | 1,240 | 2.0% | 24,720 | 1.0% | 2,254 | 1.3% |
| Mixed | 164 | 0.0% | 17 | 0.0% | 143 | 0.0% | 4 | 0.0% |
| Nat. American | 5,345 | 0.2% | 245 | 0.4% | 4,708 | 0.2% | 392 | 0.2% |
| Other | 14,140 | 0.5% | 1,035 | 1.6% | 11,916 | 0.5% | 1,189 | 0.7% |
| Unknown | 91 | 0.0% | 26 | 0.0% | 63 | 0.0% | 2 | 0.0% |
| White | 1,902,625 | 69.5% | 33,754 | 53.7% | 1,740,995 | 69.5% | 127,876 | 76.0% |
| Total | 2,735,909 | 99.9%[b] | 62,890 | 100.0% | 2,504,753 | 100.1%[b] | 168,266 | 99.9%[b] |

b. Probability of being unmatched with the DMV database, by race

| Race | Pct. | N[c] |
|---|---|---|
| Asian | 3.2% | 16,890 |
| Black/Afr. Amer. | 3.6% | 731,891 |
| Hispanic | 4.8% | 25,960 |
| Mixed | 10.6% | 160 |
| Native American | 4.9% | 4,953 |
| Other | 8.0% | 12,951 |
| Unknown | 29.2% | 89 |
| White | 1.9% | 1,774,749 |
| Total | 2.4% | 2,567,643 |

[a]"Lost due to matching" refers to cases removed from the analysis due to missing, invalid, and duplicate Social Security numbers.

[b]Totals do not sum to 100.0% because of rounding.

[c]Total number of matches and non-matches from sub-table a.

**Attachment P**

**Procedures creating lists of registered voters without a driver's license or SCDMV identification card. (Matching Strategy 2)**

The following summarizes the steps taken to create a list of registered voters with no valid (unexpired) driver's license or SCDMV-issued ID card.

1. Create the list of current SCDMV licenses.
   a. Merge the license_header table with license_valid_reduced using the key variable license_no, keeping all cases where there is a match.
   b. Merge the file created at step 1a with the customer table, using the customer_no key variable.  Discard if the customer_category equals "DECEASED"
   c. Merge the file created at step 1b with the customer_address_reduced table using the customer_no variable key.  Keep all records where there is a match.
   d. Merge the file created at step 1c with the customer_individual table using the customer_no key variable.  Keep all cases where there is a match.  (3,873,015 cases remaining)
2. Create a list of all active voters, by retaining all records in the voter list with voter status of "Active."  Remove all records with an unusable Social Security number.   (2,729,662 records).
3. Create a list of out-of-state returned licenses, retaining all records in the license_return table in which the returning jurisdiction is not South Carolina.  Remove all records with an unusable Social Security number.  (659,510 records)
4. Prepare death certificate list by removing all records with an unusable Social Security number. (410,977 records)
5. Merge the list of current SCDMV licensees (step 1) with the list created at step 2, using the SSN+Sex merging rule.  Keep all cases that do not merge.  (205,755 remaining cases)
6. Merge the file created at step 5 with the death certificate list created at step 4.  Keep the cases that do not match.  (200,691 cases remain)
7. Merge the file created at step 6 with the returned license file created at step 3, using the SSN+Sex merging rule.  Keep all cases that do not match.  (173,250 remaining cases)

The following summarizes the steps taken to create a list of registered voter with a valid (unexpired) driver's license or SCDMV-issued ID card.

1. Create the list of current SCDMV licenses.
   a. Merge the license_header table with license_valid_reduced using the key variable license_no, keeping all cases where there is a match.
   b. Merge the file created at step 1a with the customer table, using the customer_no key variable.  Discard if the customer_category equals "DECEASED"
   c. Merge the file created at step 1b with the customer_address_reduced table using the customer_no variable key.  Keep all variable where there is a match.
   d. Merge the file created at step 1c with the customer_individual table using the customer_no key variable.  Keep all cases where there is a match.  (3,873,015 cases remaining)

2. Create a list of all active voters, by retaining all records in the voter list with voter status of "Active."  Remove all records with an unusable Social Security number.   (2,729,662 records).

3. Create a list of out-of-state returned licenses, retaining all records in the license_return table in which the returning jurisdiction is not South Carolina.  Remove all records with an unusable Social Security number.  (659,510 records)

4. Prepare death certificate list by removing all records with an unusable Social Security number. (410,977 records)

5. Merge the list of current SCDMV licensees (step 1) with the list created at step 2, using the SSN+Sex merging rule.  Keep all cases that merge.  (2,523,907 remaining cases)

6. Merge the file created at step 5 with the death certificate list created at step 4.  Keep the cases that do not match.  (2,522,412 cases remain)

7. Merge the file created at step 6 with the returned license file created at step 3, using the SSN+Sex merging rule.  Keep all cases that do not match.  (2,394,439 remaining cases)

Attachment Q

**Racial distribution of active registered voters without and with a driver's license or DMV-issued ID card.**

a.  Racial distribution of active registered voters without and with a driver's license or DMV-issued identification card.

| Race | All active voters | | Voters not in DMV database | | Voters in DMV database | | Voters lost due to matching [a] & returned licenses | |
|---|---|---|---|---|---|---|---|---|
| | | | Result of matching | | | | | |
| Asian | 18,293 | 0.7% | 1,047 | 0.6% | 15,841 | 0.7% | 1,405 | 0.8% |
| Black/ Afr.Amer. | 767,037 | 28.0% | 69,283 | 40.0% | 662,489 | 27.7% | 35,265 | 21.0% |
| Hispanic | 28,214 | 1.0% | 2,586 | 1.5% | 23,370 | 1.0% | 2,258 | 1.3% |
| Mixed | 164 | 0.0% | 23 | 0.0% | 137 | 0.0% | 4 | 0.0% |
| Native American | 5,345 | 0.2% | 502 | 0.3% | 4,447 | 0.2% | 396 | 0.2% |
| Other | 14,140 | 0.5% | 1,668 | 1.0% | 11,281 | 0.5% | 1,191 | 0.7% |
| Unknown | 91 | 0.0% | 28 | 0.0% | 61 | 0.0% | 2 | 0.0% |
| White | 1,902,625 | 69.5% | 98,113 | 56.6% | 1,676,813 | 70.0% | 127,699 | 75.9% |
| Total | 2,735,909 | 99.9%[b] | 173,250 | 100.0% | 2,394,439 | 100.1%[b] | 168,220 | 99.9%[b] |

b.  Probability of being unmatched with the DMV database, by race

| Race | Pct. | N[c] |
|---|---|---|
| Asian | 6.2% | 16,888 |
| Black/Afr. Amer. | 9.5% | 731,772 |
| Hispanic | 10.0% | 25,956 |
| Mixed | 14.4% | 160 |
| Native American | 10.1% | 4,949 |
| Other | 12.9% | 12,949 |
| Unknown | 31.5% | 89 |
| White | 5.5% | 1,774,926 |
| Total | 6.7% | 2,567,689 |

[a]"Lost due to matching" refers to cases removed from the analysis due to missing, invalid, and duplicate Social Security numbers.

[b]Totals do not sum to 100.0% because of rounding.

[c]Total number of matches and non-matches from sub-table a.

**Attachment R**

**Percentage of voters without a driver's license, by county**

| County | Pct. | County | Pct. |
|---|---|---|---|
| Abbeville | 7.1% | Greenwood | 6.9% |
| Aiken | 6.2% | Hampton | 9.3% |
| Allendale | 12.8% | Horry | 6.9% |
| Anderson | 5.7% | Jasper | 9.3% |
| Bamberg | 9.1% | Kershaw | 5.9% |
| Barnwell | 7.1% | Lancaster | 6.4% |
| Beaufort | 7.6% | Laurens | 6.5% |
| Berkeley | 5.9% | Lee | 9.2% |
| Calhoun | 6.7% | Lexington | 5.2% |
| Charleston | 6.1% | Marion | 10.2% |
| Cherokee | 6.3% | Marlboro | 12.7% |
| Chester | 8.2% | McCormick | 8.1% |
| Chesterfield | 8.1% | Newberry | 4.9% |
| Clarendon | 9.5% | Oconee | 5.8% |
| Colleton | 6.8% | Orangeburg | 10.2% |
| Darlington | 7.9% | Pickens | 5.4% |
| Dillon | 11.4% | Richland | 7.6% |
| Dorchester | 6.8% | Saluda | 5.8% |
| Edgefield | 8.4% | Spartanburg | 6.1% |
| Fairfield | 7.2% | Sumter | 8.0% |
| Florence | 8.2% | Union | 6.8% |
| Georgetown | 8.2% | Williamsburg | 9.5% |
| Greenville | 5.5% | York | 5.6% |

**Attachment S**

**Percentage of white and black voters without a driver's license, by county**

| County | White | Black | Simple diff. | Proportional diff. |
|--------|-------|-------|--------------|--------------------|
| Abbeville | 6.13% | 9.29% | 3.16% | 52% |
| Aiken | 5.53% | 7.96% | 2.42% | 44% |
| Allendale | 9.59% | 13.78% | 4.19% | 44% |
| Anderson | 5.11% | 8.67% | 3.56% | 70% |
| Bamberg | 6.23% | 10.84% | 4.61% | 74% |
| Barnwell | 4.62% | 10.05% | 5.43% | 117% |
| Beaufort | 6.96% | 9.75% | 2.79% | 40% |
| Berkeley | 4.67% | 8.59% | 3.92% | 84% |
| Calhoun | 4.43% | 9.41% | 4.98% | 113% |
| Charleston | 5.36% | 7.77% | 2.41% | 45% |
| Cherokee | 5.56% | 8.73% | 3.17% | 57% |
| Chester | 6.64% | 10.46% | 3.81% | 57% |
| Chesterfield | 5.90% | 12.02% | 6.12% | 104% |
| Clarendon | 6.31% | 12.47% | 6.16% | 98% |
| Colleton | 5.22% | 8.90% | 3.68% | 70% |
| Darlington | 5.49% | 10.80% | 5.31% | 97% |
| Dillon | 7.10% | 14.03% | 6.93% | 98% |
| Dorchester | 5.90% | 8.90% | 3.01% | 51% |
| Edgefield | 6.68% | 11.26% | 4.59% | 69% |
| Fairfield | 5.28% | 8.65% | 3.37% | 64% |
| Florence | 6.05% | 11.09% | 5.04% | 83% |
| Georgetown | 6.52% | 11.74% | 5.21% | 80% |
| Greenville | 5.03% | 7.20% | 2.16% | 43% |
| Greenwood | 5.82% | 9.34% | 3.52% | 60% |
| Hampton | 5.74% | 11.98% | 6.24% | 109% |
| Horry | 6.42% | 9.94% | 3.52% | 55% |
| Jasper | 6.44% | 11.85% | 5.41% | 84% |
| Kershaw | 4.77% | 8.81% | 4.03% | 85% |
| Lancaster | 5.34% | 9.69% | 4.35% | 81% |
| Laurens | 5.79% | 8.32% | 2.53% | 44% |
| Lee | 6.79% | 10.56% | 3.77% | 56% |
| Lexington | 4.69% | 7.75% | 3.07% | 65% |
| Marion | 6.83% | 12.53% | 5.70% | 83% |
| Marlboro | 10.55% | 14.32% | 3.76% | 36% |
| McCormick | 6.57% | 10.12% | 3.55% | 54% |
| Newberry | 4.05% | 6.45% | 2.41% | 59% |
| Oconee | 5.50% | 8.67% | 3.17% | 58% |
| Orangeburg | 6.20% | 12.14% | 5.94% | 96% |
| Pickens | 5.08% | 8.77% | 3.69% | 73% |
| Richland | 5.95% | 9.01% | 3.05% | 51% |
| Saluda | 4.45% | 8.74% | 4.29% | 97% |
| Spartanburg | 5.34% | 8.64% | 3.30% | 62% |
| Sumter | 5.86% | 9.85% | 4.00% | 68% |

| County | White | Black | Simple diff. | Proportional diff. |
|--------|-------|-------|--------------|--------------------|
| Union | 5.79% | 8.61% | 2.81% | 49% |
| Williamsburg | 5.47% | 11.29% | 5.82% | 106% |
| York | 4.92% | 7.84% | 2.92% | 59% |