# Exhibit 7

Melvin Vernon Hood, III 8/6/2012

### Page 1

```
 1        IN THE UNITED STATES DISTRICT COURT
 2           FOR THE DISTRICT OF COLUMBIA
 3   - - - - - - - - - - - - - - - - -x
 4   STATE OF SOUTH CAROLINA,        :
 5       Plaintiff,                  :
 6       v.                          : Civil Action No.
 7   UNITED STATES OF AMERICA,       : 1:12-CV-203-CKK-BMK-JDB
 8   et al.,                         :
 9       Defendants,                 :
10       and                         :
11   JAMES DUBOSE, et al.            :
12       Defendant-Intervenors.      :
13   - - - - - - - - - - - - - - - - -x
14
15        Deposition of MELVIN VERNON HOOD, III, Ph.D.
16                    Washington, DC
17                 Monday, August 6, 2012
18                       9:27 a.m.
19
20
21
22
23
24   Pages: 1 - 292
25   Reported by: Lee Bursten, RPR, CRR
```

### Page 2

```
 1   Deposition of MELVIN VERNON HOOD, III, Ph.D.,
 2   held at the offices of:
 3
 4
 5
 6              SULLIVAN & CROMWELL LLP
 7              1701 Pennsylvania Avenue, NW
 8              Washington, DC 20006
 9              (202) 956-7500
10
11
12
13
14
15
16       Pursuant to agreement, before Lee Bursten,
17   Registered Professional Reporter, Certified Realtime
18   Reporter, and Notary Public in and for the District
19   of Columbia, who officiated in administering the oath
20   to the witness.
```

### Page 3

```
 1                A P P E A R A N C E S
 2   ON BEHALF OF PLAINTIFF:
 3        STEPHEN V. POTENZA, ESQUIRE
 4        BRIAN FIELD, ESQUIRE
 5        BANCROFT PLLC
 6        1919 M Street, NW
 7        Suite 470
 8        Washington, DC 20036
 9        (202) 234-0090
10
11   ON BEHALF OF DEFENDANT UNITED STATES OF AMERICA:
12        RICHARD DELLHEIM, ESQUIRE
13        BRADLEY E. HEARD, ESQUIRE
14        CATHERINE MEZA, ESQUIRE
15        U.S. DEPARTMENT OF JUSTICE
16        CIVIL RIGHTS DIVISION
17        Room 7200-NWB
18        950 Pennsylvania Avenue, NW
19        Washington, DC 20530
20        (202) 305-4196
```

### Page 4

```
 1        A P P E A R A N C E S   C O N T I N U E D
 2   ON BEHALF OF DEFENDANT-INTERVENORS:
 3        GARRARD R. BEENEY, ESQUIRE
 4        SEAN PETER CAMONI, ESQUIRE
 5        PETER STECIUK, ESQUIRE
 6        SULLIVAN & CROMWELL LLP
 7        125 Broad Street
 8        New York, New York 10004
 9        (212) 558-4000
10
11        MARK A. POSNER, ESQUIRE
12        LAWYERS' COMMITTEE FOR CIVIL RIGHTS
13           UNDER LAW
14        1401 New York Avenue, NW
15        Suite 400
16        Washington, DC 20005
17        (202) 662-8600
18
19        MIMI MARZIANI, ESQUIRE
20        BRENNAN CENTER FOR JUSTICE
21        161 Avenue of the Americas
22        12th Floor
23        New York, New York 10013
24        (646) 292-8327
```

Melvin Vernon Hood, III 8/6/2012

Page 37

1  from the Department of Motor Vehicles list who had
2  driver's licenses surrendered in other states and
3  returned from those other states, correct?
4       A    My methodology to create a list of valid
5  and current ID holders included a step where I
6  selected only those that were indicated that had a
7  valid ID.  And then I created another step to ensure
8  based on the expiration dates that the ID was
9  current.
10           I undertook these steps after studying the
11 data map that was sent along with the data from the
12 DMV office, and charting out what I thought would be
13 the proper course of action for, again, producing a
14 list of valid and current ID holders, in this case
15 "ID holders" meaning driver's license or state ID
16 card with this database.
17      Q    Do --
18      A    I --
19      Q    Forgive me.  I interrupted you, sir.
20      A    I interviewed Mr. Neiswonger, I believe
21 that's -- I don't want to be mispronouncing his name,
22 but -- and asked him -- or I should say I outlined my
23 methodology.  And he confirmed that this would be the
24 correct way to obtain a list of South Carolina
25 registrants -- or excuse me, a list of those in South

Page 38

1  Carolina that had a valid and current driver's
2  license, their state ID card.
3           So getting to the question you posed, those
4  individuals should have been removed up front in my
5  analysis.
6       Q    Do you know whether they were removed?
7       A    I'm assuming from my study of the data and
8  from Mr. Neiswonger's conversation, interview I
9  conducted, that those individuals wouldn't be
10 considered to have a valid ID.
11      Q    Okay.  So as you sit here today, you don't
12 know one way or the other whether your list includes
13 persons whose driver's licenses were returned to
14 South Carolina from another state because the former
15 license holder surrendered that license when he or
16 she obtained a driver's license in that other state?
17      A    From everything I understand, it should not
18 include those individuals.
19      Q    But you don't know whether you've included
20 them or not, correct?
21           MR. POTENZA:  Objection.
22      A    It's my understanding that they should not
23 be included in the data set that I produced.
24 BY MR. DELLHEIM:
25      Q    And you never looked to see whether they

Page 39

1  were or not, right?
2       A    That specific group?
3       Q    Yes, sir.
4       A    No, sir.
5           (Government Exhibit 4 was marked for
6  identification and attached to the deposition
7  transcript.)
8  BY MR. DELLHEIM:
9       Q    I'm going to hand you what's been marked as
10 Government Exhibit 4.  And you're welcome to take
11 your time to read it.  I want to direct your
12 attention in particular to the first bulleted point
13 on page 1 and the first bulleted point on page 2.
14 And let me know when you're ready.
15      A    Okay.
16      Q    Do you know who Kevin Shwedo is?
17      A    No, not besides looking at the back of this
18 letter.
19      Q    Do you have any reason to believe that
20 Kevin Shwedo is not the executive director of the
21 South Carolina Department of Motor Vehicles?
22      A    No.
23      Q    And would you agree with me that this
24 letter discusses the methodology that -- in part the
25 methodology employed by South Carolina when it did

Page 40

1  its own data matching in this case?
2           MR. POTENZA:  Objection.
3       A    Would -- okay.  One more time, please.
4  BY MR. DELLHEIM:
5       Q    Sure.  Would you agree with me that this
6  letter discusses the methodology that South Carolina
7  employed when it did its own data matching in its
8  attempt to determine the potential effect of Act R54?
9           MR. POTENZA:  Objection to the
10 characterization of the document.
11      A    I mean, my brief reading of this document
12 that I was just handed, this seems to be not the
13 actual match that was performed, but a sort of
14 after-action analysis of the match.
15 BY MR. DELLHEIM:
16      Q    It's a criticism of it, isn't it?
17      A    At least from one end of it, yes.
18      Q    Okay.  And I want to direct your attention
19 to the first bulleted point at the top of page 2.
20 Colonel Shwedo, the executive director of the DMV,
21 notes that 91,466 of the records that had been used
22 in the match "had been canceled by the Department of
23 Motor Vehicles in response to a notification from
24 another state's Department of Motor Vehicles that the
25 individual had registered for a driver's license in

Melvin Vernon Hood, III 8/6/2012

Page 41

1  that state."
2      Do you see that, sir?
3  A   I don't see -- did you say 91,000?
4  Q   I'm reading from the second sentence of the
5  first bulleted point on page 2.
6  A   Oh, page 2. Sorry.
7      Okay. What's the question concerning that?
8  Q   And the question is, Kevin Shwedo was
9  concerned that the fact that records that had been
10 canceled by the DMV because the DMV was notified by
11 another state that the driver had surrendered that
12 license made the resulting data match, as he notes in
13 the very last sentence, flawed; do you agree with
14 that?
15 A   So the director of the Department of Motor
16 Vehicles here is reporting that some of the
17 individuals matched between the DMV database and the
18 voter registration database had an ID that had been
19 canceled.
20 Q   And his view was it shouldn't have been
21 included, correct?
22 A   That would appear to be his view, yes.
23 Q   Because not to do so, as he notes in the
24 very last sentence, would make the resulting data
25 flawed?

Page 42

1  A   Those are his words, yes.
2  Q   If the evidence shows that the vast
3  majority of persons who surrendered their South
4  Carolina driver's licenses in other states were white
5  and that they were included on your list, would that
6  affect your conclusions in this case?
7  A   It could.
8  Q   Because it would minimize the racial
9  differences, correct?
10 A   Well, in that hypothetical you've put out
11 there. Obviously it would affect possibly -- or it
12 could affect potentially the number of white
13 registrants who we believe don't have an ID.
14 Q   Right. And I understand from your
15 testimony that as you sit here today, you don't know
16 one way or the other whether your list includes those
17 who had surrendered driver's licenses in other states
18 and thus had moved away. But if your list did
19 include those persons, and if the evidence shows that
20 the vast majority of them were in fact white, that
21 would affect your analysis, correct?
22 A   It could affect the comparisons that are
23 drawn, yes.
24 Q   By minimizing the racial differences,
25 correct? By having more white people in the no-match

Page 43

1  list than in fact live in South Carolina?
2  A   It's possible.
3  Q   So the opinion you offer in this case in no
4  way reflects information regarding surrendered
5  driver's licenses, correct? You just haven't studied
6  it one way or the other?
7  A   Well, again, to the extent to which
8  surrendered licenses should not be included or coded
9  as valid, I believe I've controlled for that.
10 Q   How have you controlled for that?
11 A   Again, by choosing or selecting license
12 holders that have a valid and current license.
13 Q   But as you sit here today, you don't know
14 whether your methodology in fact still included those
15 who surrendered their driver's licenses in other
16 states?
17 A   I would say I did not specifically go,
18 after the fact, and analyze that question.
19 Q   Now, if in fact your list included those
20 who had surrendered driver's licenses in other
21 states, you would agree with me that your data would
22 be more accurate if you had in fact removed them,
23 right?
24 A   I would assume, if they've surrendered a
25 license to another state, they've established

Page 44

1  residency in another state. I would assume that they
2  would be removed from the voter roll as well in South
3  Carolina.
4  Q   But you don't know one way or the other?
5  A   I don't know, no.
6  Q   Do you know -- and I realize you said you
7  had not studied South Carolina election laws or
8  procedures -- do you know what the purging procedures
9  are in South Carolina?
10 A   Not specifically, no.
11 Q   Would it be relevant information to know
12 that in South Carolina -- strike that. If the
13 evidence shows that South Carolina policy is not to
14 remove voters from the voter registration list --
15 strike that. If the evidence shows that the practice
16 in South Carolina is not to purge -- that is,
17 permanently remove from the voter rolls -- voters,
18 would that affect your analysis in this case?
19 A   Well, all states initiate some types of
20 purges, for instance removing deceased registrants.
21 Q   Do you know whether South Carolina does
22 that?
23 A   I would assume they do.
24 Q   If South Carolina -- and you don't know?
25 A   I don't know. But I would assume they

Melvin Vernon Hood, III 8/6/2012

Page 45

1  would undertake that type of...
2      Q    And if they didn't undertake what you
3  suggest many states do, would that affect your
4  analysis in this case?  Or let me ask it a different
5  way.  Could it affect your analysis in this case?
6      A    It could, if the State absolutely --
7  hypothetically, if they did not remove anyone from
8  the registration roll, yes.
9      Q    Now, just a couple of weeks ago, would you
10 agree with me that a court criticized your
11 methodology for data matching by not removing dead
12 voters or persons who had surrendered their licenses?
13 Do you know what I'm talking about, sir?
14     A    Yes.
15     Q    That's the Wisconsin case?
16     A    Yes.  Yes.
17     Q    Did I characterize that accurately, that
18 the Court was critical of your methodological choice
19 not to exclude dead people or those who had
20 surrendered their driver's licenses?
21     A    I think that's -- from what I recall
22 reading, that's accurate.
23     Q    And the Court found your reports and your
24 testimony in that case substantially less credible
25 than your counterparts in part for that reason,

Page 46

1  correct?
2      A    Yes.  But the Court did allow my testimony.
3      Q    Okay.  If you were retained by a
4  jurisdiction tomorrow to do data matching, would you
5  include -- excuse me, would you ensure that you
6  removed dead people and those who had surrendered
7  driver's licenses from the databases before you did
8  your data matching?
9      A    Well, just to clarify, again, it's my
10 understanding that someone with a surrendered license
11 should have been removed, using my methodology in
12 this case.
13     Q    But my question is, if you were retained
14 tomorrow by another jurisdiction to do data matching
15 similar to what you've done here and what you've done
16 in Wisconsin, would you make sure that you had
17 removed dead people and those who had surrendered
18 their driver's licenses before you did your data
19 matching?
20     A    Well, yes.
21     Q    Would you agree with me that it was
22 probably a mistake not to do it here?
23          MR. POTENZA:  Objection.
24     A    I didn't ask for that data.
25 BY MR. DELLHEIM:

Page 47

1      Q    Would you agree with me it was a mistake,
2  probably, not to do it here?
3      A    I don't think, the way that I undertook the
4  methodology, that it would have altered the results
5  to any great extent.
6      Q    And you base that -- what do you base that
7  on, when you don't know, number one, how many dead
8  people were on your list, and number two, how many
9  surrendered driver's license holders are on your
10 list?
11     A    That's true, I didn't run that analysis.
12     Q    So would you agree with me that it was
13 likely a mistake not to have removed the dead people
14 and those who had surrendered their driver's
15 licenses, based on what the Wisconsin court said?
16          MR. POTENZA:  Objection.
17     A    I would agree that I would have undertaken
18 that effort to remove deceased registrants.
19 BY MR. DELLHEIM:
20     Q    You'll do that in the future?
21     A    Yes.
22     Q    And will you also try to make sure that
23 your lists are free of those who -- strike that.
24 Will you also in the future ensure that those who had
25 surrendered driver's licenses in other states are

Page 48

1  also removed from your list?
2      A    Well, again, I did -- from my
3  understanding, I've done that.  I guess, you know, I
4  could run some checks after the fact.
5      Q    Will you in the future make sure that your
6  list does not include those who had surrendered
7  driver's licenses?
8      A    Yes.
9      Q    Did you do any analysis to look, to examine
10 the Social Security Numbers involved on the two lists
11 to see if any of those Social Security Numbers
12 violated the Social Security Administration
13 conventions for assigning numbers?
14     A    Yes.
15     Q    I mean, for instance, if a file listed a
16 number as 333-33-333, did you remove that or not?
17     A    Yes.  Yes.  There were a number of blanks,
18 so no data.  There were all zeroes, all ones, all
19 nines, different numbers straight across.
20     Q    So you made a diligent effort --
21     A    I removed -- I didn't remove the cases, but
22 I coded that value for the Social Security Number
23 field as missing, just blank, in those cases.
24     Q    So you made a diligent effort to ensure
25 that all the Social Security Numbers that appear on