# Exhibit 8

STATE OF WISCONSIN               CIRCUIT COURT               DANE COUNTY

Milwaukee Branch of the NAACP, et al.,

       PLAINTIFFS,

   vs.                                                      Case No. 11 CV 5492

Scott Walker, et al.,

       DEFENDANTS

## ORDER FOR JUDGMENT AND JUDGMENT GRANTING
## DECLARATORY AND INJUNCTIVE RELIEF

2011 Wisconsin Act 23, tells more than 300,000 Wisconsin voters who do not now have an acceptable form of photo identification that they cannot vote unless they first obtain a photo ID card.   That is a lot of people, and most of them already are registered voters.  Certainly, a photo ID requirement can be created by amending the voting provisions of the Wisconsin Constitution. The legal question now before this court is whether this requirement can be imposed by something less than an amendment, simply by the passage of a law.

This is an action for declaratory and injunctive relief seeking to preclude enforcement of that portion of 2011 Wisconsin Act 23 (Act 23) which requires Wisconsin electors to produce one of several specific forms of photo identification in order to receive an election ballot.   The plaintiffs are the Milwaukee Branch of the NAACP (Milwaukee Branch), Voces de la Frontera (Voces) and twelve individuals.   The defendants are Governor Scott Walker and the six members of the Government Accountability Board (GAB).  The plaintiffs allege that the photo identification requirement of Act 23 denies the right to vote guaranteed in Article III, Section 1 of the Wisconsin Constitution.   They further assert the requirement is both a denial of substantive due process and equal protection in violation of Article I, Section 1 of the Wisconsin Constitution.   The defendants assert the legislature has acted within its constitutional powers and further challenge one aspect of the justiciability of this action, arguing that the plaintiff organizations do not have standing to bring this lawsuit.

1

In an order rendered March 6, 2012, the court granted preliminary injunctive relief enjoining enforcement of the requirement of photo identification by qualified voters, pending final order of this court. The case was tried to the court on April 16, 17, 18, 19 and May 4, 2012. The parties have submitted written argument and, for the reasons stated below, the court now grants judgment declaring that the photo identification requirements of Act 23 violate the right to vote set forth in the Wisconsin Constitution. The court hereby renders a permanent injunction prohibiting the defendants from implementing the photo identification requirements of Act 23.

## THE PHOTO IDENTIFICATION REQUIREMENT OF ACT 23.

Act 23 requires qualified voters to present to election officials a prescribed photo identification (Photo ID) to cast a ballot, including an absentee ballot.[1] A voter who lacks a Photo ID on election day may cast a provisional ballot which will be counted only if the voter produces within three days the Photo ID required by Act 23.[2] Act 23 provides that only eight prescribed documents will be acceptable for voting: a) a Wisconsin driver's license; b) an ID issued by the Wisconsin Department of Transportation (WisDOT); c) a U.S. military service ID; d) a U.S. passport; e) a U.S. certificate of naturalization issued within two years before the date of an election at which it is presented; f) an unexpired WisDOT driving or ID card receipt; g) an ID issued by a federally recognized Wisconsin Indian tribe; or h) an unexpired student ID, meeting various requirements.[3] The Act 23 Photo ID requirement generally applies to absentee voting and exempts only limited categories of voters.[4]

The majority of Wisconsin voters, some 80%, possess a drivers license that meets the Photo ID requirements of Act 23. For a qualified voter who does not possess a Wisconsin drivers license, a Photo ID issued by the WisDOT Division of Motor Vehicles (DMV) is an alternative. The DMV issues Photo IDs to an applicant who provides satisfactory

---

[1] §§1-2, 4, 16, 18-19, 45, 47-48, 50, 52-54, 56, 59, 61-64, 66, 68-71, 79, 83-84, 86-93, 95, 101, 103, 144-146.

[2] §§87-92; Wis. Stat. §6.97.

[3] §§1-2; Wis. Stat. §§5.02(6m), (16c).

[4] Voters who a) vote via mail absentee and are members of the military, living overseas, or indefinitely confined in a nursing home or similar residence; b) are subject to a confidential listing; or c) present, in lieu of a driver's license, a citation or notice of intent to revoke or suspend such license. Act 23 §§53, 63-64, 66, 71.

documentation of name, birth date, identity, residence, citizenship, and Social Security number.[5] If the WisDOT Photo ID is intended for voter identification there is to be no fee.[6]  At the DMV, however, only a certified birth certificate provides satisfactory proof of name and birth date; a baptismal certificate or other document is unacceptable.[7]   Original Wisconsin birth certificates are maintained by the State Registrar of Vital Statistics in the Department of Health Services, which authorizes local registrars to issue certified birth certificates at a cost of $20.[8]  In the case of there being no birth record, a circuit court may order the creation of a birth certificate.[9]

Voter fraud in Wisconsin, including felon voting, multiple voting and voter impersonation, is a Class I felony, carrying a punishment of incarceration of up to 3½ years or a $10,000 fine or both.[10]

Although not, of itself, a basis to determine the validity of legislation under the Wisconsin Constitution, Act 23 does appear currently to be the most restrictive voter identification law in the United States, particularly with regard to the limited number of Photo Identification documents deemed acceptable,[11] as well as the absence of any fall-back procedure as to a qualified voter who lacks the required identification.[12]

---

[5]  Wis. Stat. §§343.50(4), 343.14(2)(a),(b),(bm),(er),(f). (Ex. 41)

[6]  The $18 fee for an original, renewal or reinstated WisDOT Photo ID is waived if the applicant states that it is for voting. Act 23 §§138-142; Wis. Stat. §§343.50(5)(a)1,3,(5m),(6),(7). The $16 fee for a duplicate WisDOT Photo ID card is waived, as of Dec. 2, 2011, if the applicant states that it is for voting. Wis. Stat. §343.50(7); 2011 Act 75, § 130.

[7]  Wis. Admin Code §Trans 102.16(3)(a)1. (Ex. 50)

[8]  Wis. Stat. §§69.01(25), 69.03-.05, 69.21(1)(a)1., 69.22(1)(c); Wis. Admin Code §DHS 142.  If no birth certificate is filed within one year after the birth, for a fee of $20, the State Registrar may register a birth certificate 7 years or more after the birth on request, supported by an affidavit of personal knowledge and two documents issued at least 10 years before the request or before the registrant's 10th birthday. Wis. Stat. §§69.14(2)(b)1,3.a,d; 69.22(5)(b).  For a fee of $10, the State Registrar may amend the name or other facts on a birth certificate if one year has elapsed since the birth and the applicant: has a direct interest, completes an appropriate form, provides an affidavit, and provides two documents from early childhood proving the amendment would correct an error. Wis. Stat. §§69.11(4)(b);69.22(5)(a)1.

[9]  If the State Registrar refuses to register a birth certificate or cannot amend a birth certificate, one may petition the circuit court of the birth county for an order establishing the date and place of birth or for an order to amend erroneous information on the birth certificate. Wis. Stat. §§69.12(1); 69.14(2)(b)6. The filing fee is $168 in Milwaukee County and $164.50 in all other counties. Wis. Stat. §§814.61(1)(a), 814.85(1),814.86(1),(1m); Wis. Cir. Ct. Fee . . . Tables, Table 1 (July 1, 2011) http://www.wicourts.gov/courts/circuit/docs/fees.pdf. On court order, the State Registrar charges $20 to register a birth certificate, and $10 to amend. Wis. Stat. §§69.22(5)(a)2; (5)(b).

[10] Wis. Stat. §§12.13; 12.60(1)(a); 939.50(3)(i). (Ex. 3 at 14).

[11]  Georgia, Florida, Hawaii, Idaho, Indiana, Louisiana, Michigan, Pennsylvania and Tennessee allow absentee voting without a Photo ID.  (Ex. 7 at 19).  Georgia and Kansas allow voting with an employment

### JUSTICIABILITY

The defendants argue that neither of the two organization plaintiffs, the Milwaukee Branch and Voces, have sufficiently demonstrated their interest in the issues in this lawsuit to have standing as plaintiffs.   If the defendants are correct in this position, the matter would still remain before the court since there is no claim none of the twelve individual plaintiffs lack standing.   Moreover, looking to federal decisions for guidance, it appears that an individual need not personally lack a Photo ID in order to challenge such a voter identification requirement, Common Cause v. Billups, 554 F.3rd 1340, 1351 (11 Cir. 2009), ACLU v. Santillanes, 546 F.3rd 1313, 1319 (10th Cir. 2008).

Findings of fact – Justiciability

The court finds that the following facts relating to the issue of organizational plaintiffs' standing have been demonstrated by competent evidence.

1. James A. Hall is the President of the plaintiff Milwaukee Branch.   At trial, he was familiar with the plans and activities of the plaintiff organization.  His testimony on direct examination was clear and relevant.   On cross examination he was responsive.   He is a credible source of evidence.

---

ID issued by any municipal, state or federal government. (Ex. 3 at 5; Ex. 5 at 5, 7; Ex. 7 at 19).   Florida law allows voters to show an ID issued by a bank, retirement center, or neighborhood association or a student ID. (Ex. 3 at 5; Ex. 5 at 4-5).  Indiana law does not enumerate the IDs required for voting and specifies only that voters use an ID issued by that state or the U.S. government, including an employment ID or other U.S. government-issued ID. (Ex. 3 at 6; Ex. 5 at 6-7; Ex. 7 at 19).  Voters in Michigan, Oklahoma, Pennsylvania and South Dakota may present a U.S. government employment ID, and Pennsylvania voters may use a local government employment ID. (Ex. 5 at 8, 11-14; Ex. 7 at 19).  In Tennessee voters may present an ID issued by any state; in Kansas voters may present a driver's license issued by any state. (Ex. 5 at 7, 14; Ex. 7 at 19).   Alabama, Georgia, South Carolina, Texas and Virginia accept voter registration cards for proof of identity at the polls. (Ex. 5 at 1-2, 5, 13-16; Ex. 7 at 19). Florida, Kansas and Rhode Island accept government-issued medical ID cards; Florida and Kansas accept government-issued public assistance ID cards for voting. (Ex. 5 at 5, 7, 12-13; Ex. 7 at 19).  Texas and Utah allow voting with a concealed weapons permit, and Alabama and Alaska accept hunting or fishing licenses. (Ex. 5 at 1-2, 15-16; Ex. 7 at 19).   Alabama, Connecticut, Kentucky, Ohio, Rhode Island and Virginia allow voters to present a Social Security card or number to prove identity. (Ex. 5 at 1, 4, 7, 13, 16; Ex. 7 at 19).

[12] In Idaho, Alabama, Delaware, Louisiana, Michigan, North Dakota, South Dakota and Texas a voter without a photo ID can vote upon execution of an affidavit of identity; Indiana law allows voting upon execution of an affidavit of indigency. (Ex. 3 at 5; Ex. 5 at 1, 4-6, 8, 10, 13-16; Ex. 7 at 19)

4

2. The mission of the Milwaukee Branch is to work for racial equality and to encourage political participation of African-American citizens in Milwaukee via voter registration and get-out-the vote activities.

3. The Photo ID requirements of Act 23 have forced the Milwaukee Branch to expend and divert limited volunteer resources from voter registration efforts to educating and assisting voters regarding the Photo ID requirements instead.

4. The diversion of resources of the Milwaukee Branch caused by the Act 23 Photo ID requirements has impaired the ability of the Milwaukee Branch to fulfill its organizational mission.

5. Plaintiffs Danettea Lane, Ricky Lewis, Carolyn Anderson, Ndidi Brownlee, Anthony Fumbanks, Johnnie Garland, and Antonio Williams are qualified voters subject to the Act 23 Photo ID requirements, who are also members of the Milwaukee Branch.

6. These members of the Milwaukee Branch have experienced difficulty obtaining an Act 23 Photo ID.

7. Christine Neumann-Ortiz is the executive director of Voces.   At trial, she was familiar with the plans and activities of the plaintiff organization.  Her testimony on direct examination was clear and relevant.   On cross examination she was responsive.   She is a credible source of evidence.

8. Plaintiffs Joel Torres and Alfonso Rodriguez are qualified voters subject to the Act 23 Photo ID requirements, and members of Voces.

9. The membership of Voces includes Latinos who are eligible to vote in Wisconsin elections who do not have an identification document which meets the Photo ID requirements of Act 23.

10. The central mission of Voces is to work for the economic and civil rights of low-wage, immigrant, and Latino workers in Milwaukee and other communities in Wisconsin. Towards this end, Voces actively encourages and organizes Latino community members into civic participation, and voter registration and voter mobilization.

11. The Act 23 Photo ID requirements of Act 23 have forced Voces to divert limited staff and volunteer resources from voter registration efforts and get-out-the-vote mobilizations to educating and assisting voters regarding the Photo ID requirements instead.

12. The diversion of resources by Voces caused by the Act 23 Photo ID requirements has impaired the ability of Voces to fulfill its organizational mission.

Conclusions of law - Justiciability

In Wisconsin, the concept of standing is to be "construed liberally... aimed at ensuring that the issues and arguments presented will be carefully developed and zealously argued," McConkey v. Van Hollen, 326 Wis. 2d 1, 2, 783 N.W.2d 855 (2010). "(T)he gist of the requirements relating to standing ... is to assure that the party seeking relief has alleged such a personal stake in the outcome of the controversy as to give rise to that adverseness necessary to sharpen the presentation of issues for illumination of constitutional questions," McConkey, at p. 12, quoting Moedern v. McGinnis, 70 Wis. 2d 1056, 1064, 236 N.W. 2d 240 (1975).  In McConkey, the issue was a challenge in which an individual voter asserted that a proposed amendment to the Wisconsin Constitution was being submitted to the voters in an improper form.  While the Court noted that the individual injury was unclear, standing in Wisconsin was a question of "sound judicial policy", unlike in federal courts hold jurisdiction only to hear "cases" and "controversies", McConkey , at p. 12 citing Zehetner  v. Chrysler Fin. Co., ¶ 12, 272 Wis. 2d 628, 679 N.W. 2d 919 (Ct. App. 2004).  Here there can be no question but that both parties have vigorously and fully presented to the court the opposing views as to the constitutionality of the Act 23 Photo ID requirements.

Under Wisconsin law, an organization has standing if a member would have individual standing,  Wisconsin's Environmental Decade, Inc. v. Public Service Commission, 69 Wis.2d 1, 29, 230 N.W.2d 243 (1975).  Looking to federal law for guidance, an organization has associational standing if its members would have standing, the interests to be protected are germane to the group's purpose and the members' individual participation is not required, Hunt v. Washington Apple Adver. Comm., 432 U.S. 333, 343 (1977).  An organization holds federal standing in its own name to challenge a governmental action that causes the organization to divert resources from its mission,  Havens Realty Corp. v. Coleman, 455 U.S. 363, 379 (1982).

Based upon the findings of fact relating to justiciability set forth above, the court adopts the following conclusions of law.

    a.  Protection of the right to vote is an important core interest of the Milwaukee Branch.

    b.  The Milwaukee Branch has both associational and organizational standing to bring this action.

    c.  Protection of the right to vote is an important core interest of Voces.

    d.  Voces has both associational and organizational standing to bring this action.

## EVIDENTIARY RECORD – EFFECT OF WISCONSIN ACT 23

At trial, the plaintiffs presented the testimony of University of Wisconsin-Madison Political Science Professor Kenneth R. Mayer (Mayer).  The defendants presented the testimony of University of Georgia political scientist M. V. Hood(Hood) and demographer Dr. Peter Morrison (Morrison).  Professors Mayer and Morrison have focused their academic work in the area of elections and have published substantial research reports and articles in this area. They have each offered expert analysis in election-related litigation. Dr. Morrison's expertise appears to embrace a broad range of areas in which demographic analysis is applied to evaluate socioeconomic and population trends, curriculum vitae, Ex. 34.

All three experts attempted to estimate the number of individuals in Wisconsin who are eligible to vote but who do not possess an identification document that meets the requirements of Act 23.  Sources of information available to them included Wisconsin population studies by the U.S. Census Bureau, Wisconsin DMV records of drivers licenses and Photo ID's and as well as a listing of all registered Wisconsin voters maintained by GAB known as the Statewide Voter Registration System (SVRS).[13]

Professors Mayer and Hood both began by using a computer analysis technique known as the "exact match" method to compare the registered voters in the SVRS databank with those individuals listed by the DMV as having either a drivers license or a DMV Photo ID.  Both determined essentially the same initial result, that slightly more than 300,000 registered voters lacked either form of photo identification.  In essence, both experts determined that there were approximately 300,000 individuals listed as registered voters whose names did not appear in the DMV files.  Both experts attempted thereafter to estimate more precisely the number of individuals eligible to vote who do not possess an adequate Photo ID.  Professor Mayer estimated that 333,276 people eligible to vote in Wisconsin do not possess a Photo ID that meets the requirements of ACT 23.  Professor Hood concluded that it was not possible to produce a reliable estimate of the size of that group.  Dr. Morrison did not consider the SVRS listing of registered voters, but utilized only census data and DMV records to conclude, using a demographic technique known as "backcasting", that virtually all eligible Wisconsin voters currently possess an adequate Photo ID.

---

[13] The SVRS is a compute data bank of all Wisconsin registered voters maintained and periodically verified by GAB as required by the federal Help America Vote Act of 2002, Public Law 107-252(HAVA).

A Wisconsin drivers license is issued for a six year period. Professor Mayer determined that the DMV does not routinely identify and eliminate from its listings, those individuals who have moved out of the state or who have deceased. He used census data[14] to estimate and to adjust for these factors. The SVRS lists only registered Wisconsin voters and does not include people who are legally eligible but who have not registered to vote. Thus, a person listed in the SVRS but lacking an ACT 23 Photo ID is someone who has already been certified as an eligible Wisconsin voter, but who will no longer be permitted to vote until he or she acquires the requisite Photo ID. There are also, however, additional people in Wisconsin who are legally eligible to register to vote, but who have not yet done so. Professor Mayer used census data to estimate that there are some 948,172 eligible persons not yet registered to vote, and concluded that this group would lack a Photo ID in a proportion similar to that found among registered voters. Finally, Professor Mayer also considered the probability that a proportion of eligible voters do possess an alternate form of acceptable identification such as student, tribal and military photo identification.

Professor Hood, using the same "exact match" methodology used by Professor Mayer, began with an initial estimate that slightly more than 300,000 registered voters lacking an acceptable Photo ID. He, too, eliminated over one hundred thousand duplicate listings found in the DMV database. Before his involvement in this case, Professor Hood conducted voter studies relating to a photo identification law enacted in Georgia. In that work he used the "exact match" method and his findings generally corroborate the results reported by professor Mayer.

Dr. Morrison, in contrast to Professors Mayer and Hood, relied only upon census data and DMV listings to determine the number of eligible Wisconsin voters, and did not include the SVRS listing of actual voters in his analysis. He did not consider the possibility of that the DMV data overstates the actual number of current Wisconsin residents who actually hold a drivers license and did not take into account the substantial number of duplicate listings in the DMV data.[15]

---

[14] The American Community Survey (ACS).

[15] Professor Mayer identified and eliminated 107,673 duplication, Ex. 4, p. 4, Professor Hood identified 109,813 duplicate listings, Ex. 84, p. 4.

Dr. Morrison did not consider the possibility that some people listed in the DOT data had left the state or were actually deceased. Dr. Morrison learned during cross examination that the 2010 DMV listings, when simply accepted at face value as he had done, suggest that the total number of people in Wisconsin who hold drivers license and Photo ID's exceeds the entire voting age population of the state by 128,000.[16]

Every statistical analysis is an estimate and the inquiry must always begin with a consideration as to whether or not the data and the analytical methods assure sufficient reliability of the result produced. The criticism that has been expressed as to Professor Mayer's study has focused upon peripheral, relatively insignificant aspects of the work. The clear import of the work both by Professor Mayer and by Professor Hood is that a substantial portion of persons eligible to vote, even registered to vote, in Wisconsin lack the Photo ID required by Act 23.

The court finds that the following facts have been demonstrated by competent evidence.

1.  The SVRS, the reports of the U.S. Census Bureau, the reports of the United States Election Project, the reports of the Cooperative Congressional Election Study and the 2006 report produced by Professor John Pawasart are reliable sources of factual information which may properly be relied upon by qualified experts.

2.  The DMV data reports, when analyzed by a qualified expert who recognizes the limitations of these reports, are reliable sources of factual information whch may properly be relied upon by qualified experts.

3.  The "exact match" statistical method is a reliable and well-recognized method to compare large governmental databases and was the most dependable method for reasonably and accurately estimating the number of registered Wisconsin voters who do not possess either a Wisconsin drivers license or a DMV Photo ID.

4.  Professor Kenneth Mayer is qualified by virtue of training and experience to prepare and to offer expert testimony as to election procedure and, specifically, the proportion of persons eligible to vote in Wisconsin who lack a Photo ID required by Act 23.

5.  Professor M.V. Hood is qualified by virtue of training and experience to prepare and to offer expert testimony as to election procedure and, specifically, the proportion of persons eligible to vote in Wisconsin who lack a Photo ID required by Act 23.

---

[16] Trial, 4/18/12, morning, pp..25, 33.

6. In academic work and in a report prepared for litigation prior to this case, Dr. Hood relied upon the "exact match" to estimate eligible Georgia voters lacking a Photo ID.   The Georgia databanks of drivers licenses and voter both contain social security identification while, in Wisconsin, the SVRS includes social security identification but the WisDOT data does not.   This difference is not a significant factor in the relative reliability of the "exact match" analysis when used to analyze voter ID issues in Georgia and Wisconsin.

7. Dr. Peter Morrison has not been shown to possess sufficient training or experience to prepare or to offer reliable expert testimony as to election procedures generally nor, specifically, the proportion of persons eligible to vote in Wisconsin who lack a Photo ID required by Act 23.

8. The reports and the testimony of Professor Mayer were clear, relevant, well-founded and helpful to the court.  Professor Mayer was clear and concise on direct examination and responsive on cross-examination.

9. The reports and the testimony of Professor Hood were clear and relevant.  Professor Hood was clear and concise on direct examination and responsive on cross-examination.  He did not, however, adequately explain or justify his failure to adjust the WisDOT data for out-of-state migration and drivers who are deceased.  Nor did Professor Hood adequately explain or justify conclusion that the Wisconsin data available, when evaluated using the "exact Match" method was not sufficiently reliable to estimate the number of eligible voters who lack the required Photo ID.

10. In his reports and testimony, Dr. Morrison did not consider a significant source of relevant, reliable information, the SRVS listing of eligible Wisconsin voters, nor did he recognize or take into account the limitations of the WisDOT data.  On both direct and cross-examination, Dr. Morrison's testimony often was not concise and not responsive.

11. The reports and the testimony of Professor Mayer were substantially more credible and more helpful to the court than those of Professor Hood.  The reports and testimony of Dr. Morrison were not credible nor were they helpful to the court.

12. A reasonable, reliable and accurate estimate of the number of people who are listed in WisDOT records as current licensed Wisconsin drivers, but who have actually moved out of Wisconsin is 277,000 persons.

13. A reasonable, reliable and accurate estimate of the number of people who are listed in WisDOT records as current licensed Wisconsin drivers, but who actually have deceased is 114,690 persons.

14. A reasonable, reliable and accurate measurement of the number of duplicate listings in the WisDOT records of current licensed Wisconsin drivers is 107,673 persons.

15. The WisDOT records substantially over-report the number of state residents who hold a drivers license. Thus, the WISDot records would be a source of substantial statistical error if relied upon without appropriate adjustment.

16. A reasonable, reliable and accurate estimate of the number of registered voters who do not possess a Wisconsin driver's license or a DMV Photo ID is 301,727 persons. This is 9.3% of the total number of registered voters in Wisconsin. In producing this estimate, Professor Mayer properly evaluated and adjusted WisDOT data reports.

17. A "non-match" is a term used to describe those instances in which a registered voter in the SVRS data base does not appear in the DMV data base. A "true non-match" is an instance in which the person is, indeed, registered to vote but does not possess a DMV identification. A "false non-match" is an instance in which some data discrepancy mis-identifies a registered voter who does, in fact, possess a DMV identification. Professor Mayer found that the patterns of "non-match" instances were not randomly distributed but were more heavily concentrated in certain age groups and location. This is a reliable indication that the "non-match" instances are "true non-match" instances and do report registered voters who do not possess DMV identification.

18. Registered voters who are over the age of 65 are less likely to possess a Wisconsin drivers license or a DMV Photo ID than the average registered voter.

19. Seventy percent of the Wisconsin's African-American population lives in Milwaukee County. A registered voter who lives in Milwaukee County is less likely to possess a Wisconsin driver's license or a DMV Photo ID than the average registered voter.

20. A reasonable, reliable and accurate estimate of the number of people who possess an alternative form of Photo ID, such as students (49,370), Native Americans (5,304) and military personnel (1,504), sufficient to meet the voter ID requirements of Act 23 is 56,178 persons.

21. It is reasonable to assume that the number of potentially eligible Wisconsin voters who possess a passport, but not another form of Photo ID acceptable under Act 23, is statistically negligible.

22. One who possesses a recently-expired drivers license or Photo ID may be able to use that document to vote. It is reasonable to assume that the number of such people is statistically negligible.

23. A reasonable, reliable and accurate estimate of the number of people eligible to register to vote in Wisconsin who have not yet done so is 946,712 persons. A reasonable, reliable and accurate estimate of the number of people within this group who also do not possess a Wisconsin driver's license or a DMV Photo ID is 87,747 persons, 9.3% of the total.

24. A reasonable, reliable and accurate estimate of the number of people eligible to vote in Wisconsin who do not have a form of identification that would permit them to vote under

11

Act 23 is 333,276 persons. This estimate is produced by adding 301,727 registered voters plus 87,747 unregistered but qualified voters to reach a total of 389,454. This total is then reduced by the 56,178 people who possess student, tribal or military Photo ID resulting in a net total of 333,276 eligible voters lacking a Photo ID.

25. The opinion of Professor Mayer that imposition of the voter ID requirements of Act 23 will significantly reduce voter turn-out in Wisconsin is plausible, credible and well-founded.

26. In a study of Georgia voting, Professor Hood reported that the imposition of a Photo ID law in Georgia, a law less restrictive than Act 23, coincided with a 5% reduction in the African-American vote in the 2008 general election, notwithstanding an African-American presidential candidate and a black voter registration increase of 14% in the preceding four years. This report supports the opinion of Professor Mayer that Act 23 will impede voter turn-out in Wisconsin.

27. Since 2004, voter fraud investigations have been undertaken by the Milwaukee Police Department, by the Mayor of Milwaukee and by the Wisconsin Department of Justice, working with various county prosecutors working through the Attorney General's Election Fraud Task Force. None of these efforts have produced a prosecution of a voter fraud violation that would have been prevented by the voter ID requirements of Act 23.

28. The evidence of specific individuals who have experienced difficulty and expense obtaining a drivers license or a DMV photo is credible and persuasive. By way of example:

    a. Ruthelle R. Frank is a registered voter who has regularly voted since 1948. She has lived in Brokaw, Wisconsin for 83 years and has served on the Brokaw Village Board since 1996. She does not have and never has had either a drivers license or a birth certificate. She presented her baptismal certificate, Social Security card, two proofs of residence and bank records to the DMV but was refused a Photo ID for lack of a certified birth certificate. She has been advised by county and state representatives that her name is wrongly spelled on the record of her birth and that to correct it she may need to petition a circuit court.

    b. Ricky T. Lewis is a registered voter who was honorably discharged from the U.S. Marine Corps. His sole source of income is his monthly veterans pension of $1,021. Mr. Lewis presented to the DMV his Department of Veterans Affairs photo ID, a Milwaukee County photo ID, his Marine Corps military service record (Form DD-214) and a Wisconsin Energies utility bill. He was denied a Photo ID because he did not present a certified birth certificate and a Social Security card. He then paid $20 to obtain a certified birth certificate only to be told that there was no record of his birth as Ricky Lewis. He was advised that there is record of the birth of "Tyrone DeBarry". Tyrone is his middle name, and DeBarry was his mother's name. The state informed Mr. Lewis that he

could petition a circuit court for an order to the State Registrar to correct the certificate.

c.      Sequoia Cole is a registered voter whose sole source of income is her monthly Social security disability benefit of $600.  Ms. Cole walked approximately 14 blocks to a DMV office to apply for a Photo ID.  She presented her expired school identification and was told that she needed to present a certified birth certificate and a Social Security card.  She was told that she would need to present medical records to obtain a Social Security card.  Ms. Cole then walked approximately 29 blocks from the DMV office to her doctor's office, where she obtained copies of her medical records.  She then walked to the Social Security office and obtained confirmation of her Social Security for the DMV.  She then walked to the Milwaukee County Courthouse where she paid $20 to obtain a certified birth certificate.  Ms. Cole then walked back to the DMV where she was issued a Photo ID.  The entire process took between 5½ and 6½ hours.

d.      Brittany Cramer is a registered Wisconsin voter who has voted in previous elections.  Ms. Cramer had a DMV Photo ID, but it was stolen in November, 2011.  She then went to a DMV office, taking her birth certificate, to obtain a replacement Photo ID, but her application was denied because she did not present her Social Security card or proof of residence.   Thereafter, Ms. Cramer returned to the DMV office accompanied by her work. supervisor and  again presented her birth certificate.  She was again denied a replacement Photo ID.  Her supervisor then appealed the denial to a DMV manager, who agreed to issue a replacement Photo ID at a cost of $16.  The entire process took 3 hours.

e.      Joel Torres is a registered voter who has voted in previous elections.  On or about November 4, 2011, Mr. Torres rode his bicycle to a DMV office to obtain a Photo ID for voting.  He presented his birth certificate, Social security card and a bill from Aurora Health Services as proof of residence, but was denied a Photo ID for insufficient proof of residence.  On or about November 22, 2011, Mr. Torres, accompanied by his step-father, returned to the DMV office with the same documents plus additional hospital bill and correspondence from a bill collector.  His application was again denied.  Mr. Torres thereafter obtained his school transcript from Project Stay Seniors, for which he paid $3.  He returned to the DMV office a third time but his application was denied for insufficient proof of residence.  Mr. Torres and his mother then went to the Milwaukee Election Commission to complain.  The Elections Commission representative gave Mr. Torres a document to take to the DMV.  Mr.

13

Torres took the Election Commission document to the DMV, which accepted it and issued his Photo ID.

29.     Procuring a DMV Photo ID can easily be a frustrating, complex and time-consuming process.

30.     Procuring a DMV Photo ID can require the expenditure of an amount of money that is significant for an eligible voter who is indigent.


## CONSTITUTIONALITY OF THE PHOTO ID REQUIREMENTS OF WISCONSIN ACT 23

Our state constitution sets out the basic framework of our state government.    The right to vote is a fundamental, defining element of our society.  The Wisconsin Supreme Court has described it as a "sacred right", Dells v. Kennedy, 49 Wis. 555, 6 N.W.246, 247 (1880), quoting Page v. Allen, 58 Pa. St. 346.  It is a right which is explicitly and broadly guaranteed in the Wisconsin Constitution, Article III, Suffrage:

**Electors.** Section 1.

Every United States citizen age 18 or older who is a resident of an election district in this state is a qualified elector of that district.

The Wisconsin Supreme Court has often used the term "constitutionally qualified elector" to describe one eligible to vote in our state, e.g. Dells, supra, at p. 558.  That is because the Constitution, not the legislature or any law enacted by the legislature, is the source of the right to vote and, unlike the United States Constitution, the Wisconsin Constitution sets forth explicitly the requirement for eligibility to vote, Art III, Sec. 2 (4).   The court must begin any consideration of voter eligibility legislation with the recognition of this bedrock constitutional foundation of Wisconsin voter eligibility.

The legal issue before this court is what is protected and permitted by the Wisconsin Constitution. That issue is not to be determined by what is protected or permitted by the U.S. Constitution.   Indeed, the U.S. Constitution, unlike the Wisconsin Constitution, does not contain an explicit guarantee of voting rights.    To understand and appreciate what is protected by the Wisconsin Constitution, the proper place to look is the specific language of the Wisconsin Constitution.

14

I. **The Court Must Carefully Consider the Purpose, the Benefits and the Burdens of Act 23 in Light of the Wisconsin Constitution's Guarantee of the Right to Vote .**

The parties dispute the extent to which this court may review the choice of the legislature to adopt Act 23. Essentially, the defendants argue that the court must give deference to the legislature's decision to adopt this law. Indeed, it is true that a court does not hold authority to usurp the legislature's role and should be very cautious in undertaking any sort of review of an act of the legislature. This deferential approach is known as the rational basis standard of review. The plaintiffs, by contrast, look to past decisions of the Wisconsin Supreme Court to argue that the right to vote is so critical and fundamental, that this court must examine carefully and closely the impairment that the Photo ID requirement is likely to have upon that exercise of that right.

A. **The Wisconsin Supreme Court has not deferred to the legislature on questions of voter qualification.**

No court should hastily entertain a challenge to the constitutionality of any act of the legislature and, indeed, every act of the legislature must be assumed to be consistent with the constitution. The burden lies with the party challenging a law to demonstrate clearly the basis for that challenge. It is also true, however, that the Wisconsin Supreme Court has consistently acknowledged that the qualification for voting is guaranteed in the constitution and cannot be changed by statute or impaired by regulation. When there has been a challenge in an election case, particularly a challenge involving a voter's actual access to vote at the poll, the court has looked to the impact of the law as well as its purpose and benefits.

In 1864, the Legislature passed an Election Registry Law which created a system requiring officials to prepare a list of qualified voters prior to an election  In State ex. Rel. Wood v. Baker, 38 Wis. 71 (1875), the court considered a challenge to an election result in which the officials in several wards had failed properly to prepare the registry list. It was uncontested that the officials had failed to do so, and that the registry law required that the votes of otherwise qualified voters not be counted. The court acknowledged the proper purpose of the law, but held that the voters' right to vote was protected by the constitution and ruled that the votes must be counted. A registry law was again at issue in Dells v. Kennedy, 49 Wis. 555 (1880).  The plaintiff claimed that he was qualified to vote, but had been turned away at the poll because he had not appeared to register prior to election day as required by an 1879 registry statute. The circuit court enforced the law, but the Wisconsin Supreme Court reversed that decision, holding that the constitutional right to vote could not be impaired by the registry requirement. In Ollmann v. Kawalewski, 238 Wis. 574, 300 N.W. 183 (1941), certain Milwaukee County ballots had not been properly marked when received

15

by election officials.   Although applicable state election law required that such ballots not be counted, the election officials had counted them.   The circuit court declined to exclude the ballots, and, in its decision the Supreme Court agreed that they should be counted.   The court began with the observation that, "Voting is a constitutional right, Art III, § 1, Consti., and any statute that denies a qualified elector the right to vote is unconstitutional and void," id. at p. 185, and refused to interpret the law to require exclusion of the votes.   The point here is that the Wisconsin Supreme Court has examined closely and carefully challenges to voter statutes which have had the effect of impairing voter access.

The critical need zealously to protect voter access to the ballot was at the heart of the decision in McNally v. Tollander, 100 Wis.2d 490 (1981), involving an election held to determine the location of the Burnett County seat.   Officials in eight of twenty-four towns refused to distribute ballots to voters, thus excluding approximately 40% of the qualified voters.   The trial court declared the election void, but the Court of Appeals reversed, citing an 82% voter participation rate and the need to respect an election result.   The Supreme Court, however, reversed the Court of Appeals, based on the fact that a significant minority of qualified voters had been denied the opportunity to vote, and declared the election void.

The defendants suggest that this court should defer to the determination of the Legislature in this dispute and need not look closely at the possibility of impairment of the constitutional right to vote.   This court does not find support for the defendants' suggestion in the most applicable Wisconsin Supreme Court decisions.   It is true that the Court has deferred to legislative determinations in election matters not involving direct voter access, such as the introduction of the combined "Australian" ballot form, State ex. Rel Van Alstine v. Frear, 142 Wis. 320, 125 N.W. 961 (1910) and the timing of an election, State ex Rel. Frederick v. Zimmerman, 254 Wis. 600, 37 N.W.2d 473 (1949).   Even in such areas, however, the Supreme Court still looked to the constitution, not statutory law as the foundation for election process, refusing to interpret a statute to set qualifications for office, State ex Rel. Barber v. Circuit Court, 178 Wis. 468, 190 N.W. 563, 565 (1922).   Further, in upholding a statutory election regulation, the court has considered both the benefits and burdens of regulation to be sure that the "freest opportunity practicable is given under the law for the voter" to cast a ballot, State ex rel. Runge v. Anderson, 100 Wis. 523, 76 N.W. 482, 485 (1898).

This court concludes that when the issue is whether a legislative enactment substantially impairs the constitutionally guaranteed right to vote, a court has the authority and the obligation at

least to consider the actual impact of the statute rather than simply deferring to the stated purpose of the law.

### B. The proper level of judicial review is strict or heightened scrutiny

The right to vote has been characterized as "inherent .. fundamental .. sacred", State ex rel. McGrael v. Phelps, 144 Wis. 1, 128 N.W. 1041, 1046. Where a statute implicates a fundamental interest, it is the obligation of a court to apply a strict or heightened level of review to the statute to determine if it remains within that range of authority permitted under the constitution, In re Zachary B., 271 Wis.2d 51, 62, 673 N.W.2d 831 (2004)   This means that the court must look not only to see if the law speaks to a legitimate purpose but must go further, as the Wisconsin Supreme Court has done in the past, to consider the both the benefits and the burdens of the law.

Looking first to the purpose of the law, the asserted purpose at is to protect the integrity of the election process. As an abstract concept, this surely is a proper governmental interest. Because this law touches upon a right that is so essential and fundamental, however, this court should properly go on to the following question, whether the law is narrowly tailored to serve that interest effectively without imposing a significant burden upon the opportunity to constitutionally qualified voters to gain access to the ballot. Or, as expressed by the Wisconsin Supreme Court, does this the election law pass the test that it "must be reasonable", State ex rel. Frederick, 254 Wis. at 614. Such scrutiny is required by the significance of the interests involved.

### II.   The Photo Identification Requirement of Act 23 Has Been Shown to be an Unreasonable Impairment of the Constitutional Right to Vote.

It is because the right to vote is so fundamental, that a court is obligated to look at both sides of the ledger, the cost and the benefit of the statute. Here the cost or impairment is significant and in looking to the benefit, little can be found. Serious recent efforts to investigate voter fraud have found nothing that Act 23 would have prevented. It might be suggested, as noted in Crawford v. Marion County Election Board, 553 U.S. 181, 197 (2008) that Act 23 will offer to the public greater assurance that the election process is protected. In rejecting this justification for a photo identification law, however, the Missouri Supreme Court observed, "Perceptions are malleable", and declared that "protection of our most precious state constitutional rights must not founder in the tumultuous tides of public misperception", Weinschenk v. Missouri, 203 S.W.3rd 201, 218, 219 (Mo. 2006). Moreover, a comprehensive study of voter attitudes has found that state

photo ID requirements appear to have no effect upon public confidence in the process, Ex. 3, p. 15-16.

Act 23 addresses a problem which is very limited, if indeed it exists. It does not appear to recognize or to account for the difficulty its demands impose upon indigent and elderly citizens who are eligible under the constitution to vote. It offers no flexibility, no alternative to prevent the exclusion of a constitutionally qualified voter. Given the sacred, fundamental interest at issue, it is clear that Act 23, while perhaps addressing a legitimate concern, is not sufficiently narrow to avoid needless and significant impairment of the right to vote. The enactment steps beyond the proper authority of the legislature and is in violation of the Wisconsin Constitution, Article III, Section 1.

### III.   The Decision of the U S Supreme Court in <u>Crawford v. Marion County Election Board</u> Does Not Require Judicial Deference to Act 23

The defense submits that the court should be guided by the decision of the U. S. Supreme Court in <u>Crawford</u>, supra, in which the court considered a challenge to the Indiana voter ID law. The <u>Crawford</u> decision has very little application to the dispute now before this court, however, for three primary reasons. First, this case is founded upon the Wisconsin Constitution which expressly guarantees the right to vote, while <u>Crawford</u> was based upon the U.S. Constitution which offers no such guarantee. Second, the Indiana law is less rigid than Act 23, and as noted by the U.S. Supreme Court, offered alternative voting opportunities to voters who lacked the Photo ID. Finally, <u>Crawford</u> came to the Court based upon a flawed factual record, lacking the substantial evidence that has been offered by the plaintiffs in this action.

This case is based on a claim that Act 23 violates the Wisconsin Constitution, not the U. S. Constitution. The people of Wisconsin may choose to assure to themselves rights under their own constitution that differ or exceed those guaranteed under the U.S. Constitution, <u>State v. Doe</u>, 78 Wis. 2d 161, 172 (1977). The question of what is permitted and what is protected by the Wisconsin Constitution is the issue before this court and that issue was not before the U.S. Supreme Court in the <u>Crawford</u> case.

The Indiana voter ID law at issue in <u>Crawford</u> permitted one lacking a Photo ID to cast a provisional ballot which will be counted if the voter filed, within ten days, an affidavit stating that the voter is indigent or has a religious objection to being photographed. That available

18

alternative was recognized by the Court as mitigating the potential impact of the law upon the elderly and indigent, Crawford, 555 U.S. at 199. By sharp contrast, an eligible, registered voter in Wisconsin may cast a provisional ballot which will be counted only if that voter shows up within three days with the required Photo ID.

Finally, the record before the court in Crawford did not identify the number of registered voters lacking the Photo ID, supra, p. 200, and said "virtually nothing" about the difficulties imposed upon indigent voters, supra, p. 201.   Moreover, the district court considering the same record, described the petitioners' factual showing "utterly incredible and unreliable," Indiana Democratic Party v. Rokita, 458 F.Supp. 2d 775, 803 (U.S.D.C. S.D. Ind. 2006).   Here, the showing by the plaintiffs has been substantial and entirely credible.   The factual posture of this case is very different from that before the Supreme Court in Crawford.

## Conclusions of Law – Constitutionality of the Photo ID requirements of Act 23

This matter is being decided based upon Article III, Section 1 of the Wisconsin Constitution.  This court need not and does not reach the claims asserting denial of substantive due process and equal protection in violation of Article I, Section 1 of the Wisconsin Constitution. The court hereby adopts the following conclusions of law

a.  The cost and the difficulty of obtaining documents necessary to apply for a DMV Photo ID is a significant burden upon the opportunity of Wisconsin citizens to vote.

b.  The Photo ID requirements of Act 23 impose a substantial burden upon a significant proportion of the Wisconsin citizens who are already registered to vote.

c.  The Photo ID requirements of Act 23 impose a substantial burden upon a significant proportion of the Wisconsin citizens who are not yet registered to vote but who are legally eligible to register.

d.  The cost and the difficulty of obtaining documents necessary to apply for a DMV Photo ID is a substantial burden which falls most heavily upon low income individuals.

e.  The Photo ID requirements of Act 23 are entitled to a presumption of constitutionality.

f.  The Photo ID requirements of Act 23 include no back-up mechanism to examine or to verify the qualification of an eligible Wisconsin voter who, through indigency or other sufficient cause, appears to vote at an election without the required Photo ID

g. The Photo ID requirements of Act 23 are unlikely to protect the electoral process.

h. The Photo ID requirements of Act 23 are not narrowly tailored to achieve a goal of voter verification.

i. The Photo ID requirements of Act 23 constitute a substantial impairment of the right to vote guaranteed by Article III, Section 1 of the Wisconsin Constitution

j. The Photo ID requirements of Act 23 are inconsistent with, and in violation of Article III, Section 1 of the Wisconsin Constitution.

## ORDER FOR JUDGMENT AND JUDGMENT

It is the order for judgment and judgment of the court that the defendants shall cease immediately and permanently all and any effort to enforce or implement the Photo Identification requirements of 2011 Wisconsin Act 23.   This order and judgment is a final order and judgment that disposes of the entire matter in litigation as to all parties and is intended by the court to be an appealable order and judgment  within the meaning of sec. 808.03(1), Wis. Stats.

By the court, this 17th day of July, 2012.

Judge David Flanagan

cc: Attorney Richard Saks

Assistant Attorney General Thomas C. Bellavia

G:11CV5492.OR10

20