# Exhibit 9

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **STATE OF SOUTH CAROLINA,**  *Plaintiff*,  v.  **UNITED STATES OF AMERICA and ERIC H. HOLDER, JR., in his official capacity as Attorney General,**  *Defendants*,  and  **JAMES DUBOSE, et al.,**  *Defendant-Intervenors*. | **Civil Action No. 12-203 (CKK-BMK-JDB)** |

## REBUTTAL DECLARATION OF M.V. HOOD III

I, M.V. Hood III, do hereby declare the following:

I have been asked by counsel for the State of South Carolina to evaluate the opinions offered by the United States' expert, Professor Charles Stewart III. Professor Stewart, like me, has found that more minority registrants than non-Hispanic white registrants in South Carolina currently do not possess Act R54 ID.[1] A small gap in ID possession then has been documented. The inference that Professor Stewart draws from this current gap is that implementation of Act R54 will unduly burden minority registrants. I disagree with Professor Stewart's assessment of the potential effects of Act R54 on a number of grounds. In short, it is quite a leap in causal terms to assert that one can readily predict the future actions and behavior of individuals based on one set of known facts about these individuals at present.

### A. Professor Stewart Improperly Assumes that Circumstances Following Implementation of Act R54 Will Be Unchanged from Current Circumstances

One fundamental problem with Professor Stewart's conclusions about the effects of Act R54 is that the current set of circumstances upon which his conclusions are based is not static. In other words, Act R54 has not yet been precleared and therefore has yet to be implemented. The mitigating provisions of the law I discussed in my initial declaration have not yet become effective.[2] Circumstances are not immutable. In fact, the law itself contains provisions that allow those registrants currently lacking acceptable photo ID to obtain one at no cost. Act R54 contains two key components that make it unacceptable to draw conclusions, as Professor Stewart does, based upon the status quo prior to implementation of the law.

The first of these is an education campaign to inform all registrants in South Carolina of the changes in the State's election procedures. Act R54 requires an *aggressive* education campaign that targets the South Carolina population generally, and the State Election Commission has prepared plans to conduct that required campaign. In addition, those registrants thought to be lacking a DMV-issued photo ID, based upon a comparison of the State's registration database and DMV records similar to the analysis I performed for use in this case, will be specifically targeted with a mailing to inform these registrants of the new identification requirements and the method for obtaining a free ID.[3] Second, once Act R54 is precleared, county election offices will be able to begin issuing a fifth form of acceptable ID at no cost, this being a photographic voter registration card. It should be noted again as well that registrants can already obtain, at no cost, a state ID card from DMV offices in South Carolina which is also an acceptable form of Act R54 ID.  Preclearance of Act R54 will make 46 county election offices, in addition to the 67 DMV locations, throughout the State available for registrants who need to acquire a free ID.

---

[1] I note that the degree to which this is the case remains in question as my figures do not comport with Professor Stewart's.
[2] The one exception to this statement is the availability of free state ID cards from the DMV.
[3] Act R54, Section 7.

1

In my opinion, many registrants, white and minority alike, will take advantage of these new outlets to obtain a free ID. As discussed below, testimony and sworn statements in the record from this case indicate that registered voters in South Carolina who currently lack acceptable identification are already taking steps to obtain one from the DMV despite the fact that Act R54 has not yet become effective. Such information therefore indicates that the availability of free ID cards can be used to assist individuals in obtaining a valid form of Act R54 ID.

In addition to the free ID programs and the education campaign there are other mitigating factors found within Act R54. These additional factors, discussed in my previous declarations, include a reasonable impediment clause, a religious exception clause, and the ability for registrants not in possession of acceptable ID to vote a provisional ballot. In addition, any registrant 65 or older can cast an absentee ballot by mail, a voting method that does not require the possession of Act R54 ID.

In sum, Professor Stewart has analyzed pre-implementation circumstances and offered conclusions about the law's effects following implementation. He has not, however, taken into account how circumstances will be altered once Act R54 is put into effect.

### B. Professor Stewart Makes Unsupported Assumptions About the Preferences of South Carolina Registrants Who Currently Do Not Possess DMV-Issued Identification

Just as future circumstances are not static, neither are the preferences of South Carolina registrants currently lacking Act R54 ID. It is true, as Professor Stewart indicated, that in the past there are registrants in South Carolina who both voted in-person and did not possess an Act R54 ID. Professor Stewart claims that these individuals *have already expressed a preference for voting and not possessing a driver's license (or similar government-issued identification card).*[4] Professor Stewart further asserts that these voters have expressed a simultaneous preference for both voting and not possessing a government-issued identification card. I would contend, however, that if Act R54 is implemented, the preferences of registrants lacking acceptable ID who wish to vote can change.

Voters can, and do, adjust to changes in voting circumstances.[5] This fact is evident if one were to examine the declarations of individuals found in the record in this case. Despite the fact that Act R54 has not been implemented, some individuals who apparently did not have Act R54

---

[4] Declaration of Charles Stewart III. Page 5.

[5] In 2008 Charles S. Bullock, III and myself conducted a study of early voting in Georgia. The study specifically examined efforts on the part of county election administrators to increase turnout during the early voting period. The percentage of votes cast during the early voting period was found to be positively associated with the degree of outreach and advertising undertaken by county election administrators. This example is one indication that with new information voters can, and do, adjust to changes in election laws.
Charles S. Bullock, III and M.V. Hood III. 2011. "An Examination of Efforts to Encourage the Incidence of Early In-Person Voting in Georgia, 2008." *Election Law Journal* 10:103-113.

identification when the law was enacted have already expressed a desire to vote and have made an effort, or indicated they could make an effort, to obtain requisite identification to cast an in-person ballot after the law becomes effective. For example, defendant-intervenor Naomi Gordon states in her declaration that she could, and would, obtain a free photographic voter registration card from her county election office if Act R54 were to go into effect.[6] Likewise, South Carolinian Amanda Wolf, also a defendant-intervenor, stated that she would also obtain a photographic voter registration card from her county election office if that option were to become available.[7] Others, like Mozelle Hughes[8], Donna Suggs Dubose[9], Cathline Jennings[10], Thelma Hodge[11], Willie Blair[12], and Raymond Rutherford[13] (also a defendant-intervenor) have indicated that in order to ensure they would be able to continue to vote in-person they have already obtained a DMV-issued state ID card. These individuals under discussion have already expressed a greater preference for voting than a preference for continuing without a form of government-issued ID. They have, in fact, altered their preferences and have obtained, or indicate they would obtain, a valid form of Act R54 ID.

### C. The Small, Current Gap Between Minority and White Holders of Acceptable Act R54 Identification Is Not Indicative of Any Future Discriminatory Effect

Contrary to Professor Stewart's conclusion that Act R54 will unfairly burden racial minorities in South Carolina, it is my opinion that if the law is implemented there likely will be no such effect. In South Carolina, with Act R54 not in effect, one again can only discuss circumstances related to ID possession at present. Any conclusion concerning the future effect of the law is, therefore, speculative in nature. Bordering South Carolina, the State of Georgia has recently enacted its own strict photo ID law. One possibility, therefore, is to examine the effects of Georgia's voter ID statute following implementation in 2007.

Like Act R54, the Georgia statute also provided for the provision of free photographic IDs which could be used to cast a ballot in-person. Before the law was implemented my own academic work also found a gap in ID possession between non-Hispanic whites and minority registrants.[14] Following implementation I undertook a second study with my colleague Charles S. Bullock, III to examine the effects of the law related to voter turnout. To my knowledge, this is the only before-and-after academic study at the individual-level of the effects relating to the

---

[6]Deposition of Naomi Gordon. June 7, 2012.
[7]Deposition of Amanda Wolf. June 7, 2012.
[8]Declaration of Mozelle Hughes. June 19, 2012.
[9]Declaration of Donna Suggs Dubose. May 2, 2012.
[10]Declaration of Cathline Jennings. April 13, 2012.
[11]Declaration of Thelma Hodge. April 11, 2012.
[12]Declaration of Willie Blair. May 16, 2011.
[13]Declaration of Raymond Rutherford. May 16, 2011.
[14]M.V. Hood III and Charles S. Bullock, III. 2008. "Worth a Thousand Words? An Analysis of Georgia's Voter Identification Statute." *American Politics Research* 36(4): 555-579.

implementation of a strict photo ID law. Comparing turnout between the 2004 and 2008 general elections, the study found that implementation of the new law did depress overall turnout slightly, by about four-tenths of a percentage point. Implementation of the law, however, did not disproportionately affect the turnout for racial or ethnic minority groups in Georgia.[15] In short, a noted gap in ID possession prior to implementation is not a straightforward predictor of the law's effect following implementation. One can also note that over the two presidential election cycles spanning implementation, from 2004 to 2008, overall black turnout increased four percentage points (72% to 76%).[16]

I would expect to see similar results following the implementation of Act R54 in South Carolina to those found in Georgia. Registrants currently lacking acceptable photo identification can use the provisions made possible by the Act itself to comply with the law. Those provisions in the law for a free photo ID should work to enhance the ability of minorities in South Carolina to comply with Act R54. As I have previously stated, following implementation of Act R54 in South Carolina and consistent with what happened following implementation of a photo identification requirement in Georgia, I do not expect any disparate effect of the statute on racial minorities.

---

[15] M.V. Hood III and Charles S. Bullock, III. Forthcoming 2012. "Much Ado About Nothing?: An Empirical Assessment of the Georgia Voter Identification Statute." Accepted for publication in *State Politics and Policy Quarterly*.

[16] Seth C. McKee, M.V. Hood III, and David Hill. 2012. "Achieving Validation: Barack Obama and Black Turnout in 2008." *State Politics and Policy Quarterly* 12:3-22.

**DECLARATION**

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct to the best of my knowledge.

Executed on August 3, 2012

*M.V. Hood III*

_____

M.V. (Trey) Hood III

Department of Political Science
School of Public and International Affairs
The University of Georgia
104 Baldwin Hall
Athens, GA 30602
Phone: (706) 583-0554
FAX: (706) 542-4421
E-mail: th@uga.edu