**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| STATE OF SOUTH CAROLINA,<br><br>    *Plaintiff,*<br><br>  v.<br><br>UNITED STATES OF AMERICA, and ERIC HIMPTON HOLDER, JR., in his official capacity as Attorney General of the United States,<br><br>    *Defendants,*<br><br>  and,<br><br>JAMES DUBOSE, JUNIOR GLOVER, FAMILY UNIT, INC. BRENDA C. WILLIAMS, M.D., AMANDA WOLF, DELORES FREELON, NAOMI GORDON, JOSEPH RILEY, RAYMOND RUTHERFORD, and THE SOUTH CAROLINA PROGRESSIVE NETWORK,<br><br>    *Defendant-Intervenors,*<br><br>  and,<br><br>LEAGUE OF WOMEN VOTERS OF SOUTH CAROLINA and CRAIG DEBOSE,<br><br>    *Defendant-Intervenors,*<br><br>  and,<br><br>SOUTH CAROLINA STATE CONFERENCE OF THE NAACP and KENYDA BAILEY,<br><br>    *Defendant-Intervenors.* | Case No. 1:12-cv-203 (CKK, BMK, JDB)<br><br>**WRITTEN TESTIMONY OF<br>SENATOR C. BRADLEY HUTTO** |

    My name is C. Bradley Hutto. My direct testimony is as follows:

    1.    I currently serve as a Senator in the South Carolina General Assembly and have been a Senator since 1996. I represent District 40, which generally is the area that stetches from

the Georgia border through the low country of South Carolina. I currently am a member of the following Senate committees: Judiciary; Agriculture and Natural Resources; Ethics; Fish, Game and Forrestry; Medical Affairs; and Rules. I was a member of the Judiciary Committee during the 2011-12 legislative session during which the voter identification bill (H.3003) that later became R54 was considered.

2. I have a B.A. from the University of South Carolina and a J.D. from Georgetown University Law Center.

3. In addition to my service as a Senator, I have been employed as a trial lawyer with the firm of Williams & Williams in Orangeburg, South Carolina, for the past 30 years. I also serve as an adjunct professor at the University of South Carolina Honors College.

4. In my years in the Senate, I have found it generally to be a collegial body. The Senate is relatively small, with only 46 members. We have generally worked with each other, listened to opposing views, attempted to reach compromises, and not acted in opposition to strongly held views of members. Much of this was not the case with respect to the voter ID bills.

5. The first voter ID bill, H.3418, was introduced in February 2009, after President Obama's election. Minority turnout in the 2008 presidential election was very high. It was the first time that African American voters turned out in a greater percentage than white voters in South Carolina. I know of no discussion in the General Assembly of a voter ID bill before President Obama's election.

6. The voter ID bill was the top priority of Republicans in the General Assembly. My Democratic colleagues and I came to understand this through conversations with Republican legislators, emails from Republican activists that were forwarded to us, and the unusual speed and effort with which the voter ID bills moved through the Senate.

7. During the course of consideration of the voter ID bills, the following was brought to the attention of the Judiciary Committee and the Senate as a whole through hearings, debates, written submissions, or otherwise:

   a) There has been no confirmed case of voter impersonation fraud in South Carolina.  No person has ever been convicted in South Carolina for voter impersonation.  No person has ever been tried in South Carolina for voter impersonation.  No person has ever been indicted in South Carolina for voter impersonation.  No person has ever been arrested in South Carolina for voter impersonation.  No person has ever been investigated in South Carolina for voter impersonation.  No report has ever been made to a voter registration official that has resulted in a written incident report.  A few anecdotal stories were relayed, but no confirmed facts.  All such stories were uncorroborated and unfounded.

   b) The State Election Commission brought to our attention that a significant number of non-white registered voters did not have DMV-issued photo IDs.

c) Early voting had widespread support among our constituents, the State Election Commission, the organization representing county election officials ("SCARE"), and virtually all others who provided their views to the Senate.

d) Virtually all organizations that testified about voter ID, including the League of Women Voters and NAACP, opposed a photo ID requirement. The State Election Commission took no position, but individual election officials saw no need for the requirement. The individual election officials knew of no problem that would be corrected by the requirement but knew of much mischief that would be engendered.

e) Georgia's voter ID law—which was cited as an example used for R54—included a far broader list of photo IDs than what was proposed in H.3003 and what eventually became law in R54. The Senate attempted to broaden the list of acceptable IDs as compared with the House version of H.3003, and doing so would have, in my view, helped lessen the detrimental effect of R54 on minority voters.

f) The voter ID law being debated would discriminate against African Americans and other minorities.

g) Transportation issues in South Carolina would make it hard for many without photo ID to get to a place where they could obtain a photo ID. Many voters live more than thirty miles from the seat of government for their county. Public transportation is virtually nonexistent in South Carolina. Getting to the county seat can be an all day event if you have to make arrangements to pay a neighbor for a ride that

-4-

includes them waiting while one stands in line at the Department of Health (where birth certificates can be obtained), at the DMV (where driver's licenses or ID cards can be obtained), and/or the Voter Registration Office (where one would have to go under R54 to get a voter registration card with a photograph). In addition to having to pay for a ride, there is also the fee for gas. There is also a fee associated with obtaining a copy of a birth certificate, and there is confusion about whether a birth certificate would be required to obtain photo ID under R54. In some circumstances, an action might have to be filed in Family Court where one's given name does not match the records. All of these potential hurdles are more likely to face African American voters due to the fact that many live in rural areas, many lack their own transportation, and many may not have the required documents.

  h)  Under Act R54, photo IDs that are not valid and current will not be accepted. The Senate version of the bill allowed for the use of valid-when-issued IDs, but that standard was rejected in the conference committee. A photo ID might be not valid or current for a variety of reasons, including the ID expiring, a driver's license being suspended due to an unpaid traffic ticket or a seat belt violation, not being current on child support, or having expired car insurance, to name just a few. There are more than fifty reasons that a person's license may be suspended, including having a seizure. Many of the impediments to curing a license suspension require the payment of money to the state or an insurance company, which may be difficult for people with low incomes. The requirement that the photo identification be current and valid also provides an opportunity for a poll watcher who wants to disrupt the voting in a particular

precinct. One possible scenario that we have discussed is a poll watcher who has been provided under a FOIA request to the DMV a list of persons in an area whose driver's license is either expired or suspended. That poll watcher could challenge the voter, which would slow the process as the poll worker then would have to move to a challenged ballot. This would cause the line at the precinct to back up. Other voters approaching the precinct would encounter longer lines and may be discouraged from getting in line, and thereby turnout would be suppressed. This provides a poll watcher who is sent to disrupt voting with greater opportunity to cause mischief and delay at the polls.

8. The Senate reached a compromise over voter ID and passed a voter ID bill that included early voting and the use of state and federal employment IDs as acceptable IDs to vote.

9. As far as I am aware, there was no debate or hearing that discussed in detail what the "reasonable impediment" provision of R54 means or how it would be implemented at the polls.

10. As far as I am aware, no one in the Senate investigated or asked staff or anyone else to investigate whether in fact R54 would deter voting by African Americans and other minorities either in the absolute sense or as compared to white voters. No investigation was done because everyone knew that any such investigation would find a disparate impact on African American voters.

11. South Carolina faces severe budget issues. I and many of my Senate colleagues believe that many State services are substantially underfunded, including care for the elderly, education, highway and road repair, transportation, and other state services.

12. The second voter ID bill, H.3003 (which later became Act R54), moved through the Senate Judiciary Subcommittee on Election Laws and the Senate Judiciary Committee unusually rapidly. There was one subcommittee meeting and one committee meeting, and then the bill went immediately to the floor. This is unusual for a contested bill. I was told by Republicans in the Senate that it was the top legislative priority.

13. Cloture was successfully invoked with respect to H.3003, the voter ID bill that became R54, on February 16, 2011, meaning that the Republicans voted to cut off debate. Two Senators—Senator Hugh K. Leatherman, Sr., and Senator William H. O'Dell—who are former Democrats and rarely vote for cloture, did so. Based on conversations regarding cloture, I believe that they had been pressured to vote by the Republican Party to invoke cloture to cut off debate.

14. Cloture is not invoked commonly in the Senate because the Senate is a collegial body. Generally, Senators afford other Senators the courtesy of allowing them to finish their remarks. In the last four years, thirty-seven cloture votes were taken, of which thirty involved issues not related to apppropriations. Only four of the thirty cloture votes on issues not related to appropriations were successful. Of those four successful cloture votes, all had bipartisan support except one: the cloture vote to cut off debate for the voter ID bill. In the last four years, ten cloture votes were taken while I held the floor. All of those votes failed.

15. The conference committee for Act R54 (H.3003) adopted the House version of the bill practically in its entirety. This conference committee included Senator Glenn McConnell, at the time President Pro Tempore of the Senate and a highly influential Senator. In my experience, it is extraordinarily uncommon for the President Pro Tempore of the Senate not to secure at least some of the Senate's significant positions on legislation in conference committee. Based on this irregularity, and the fact that the Senate version of H.3003 contained some provisions to lessen the adverse impact on minority voters, such as a broader list of acceptable IDs, an early voting provision, and an exemption for voters age 65 or older, I believe that Senator McConnell was under tremendous pressure from the Republican Party to accede to a more restrictive voter ID bill. The important provisions noted above were the basis of a Senate compromise on voter ID. Had we known that the version of the bill that became law would not include these provisions, I believe that the bill would not have passed the Senate.

16. The opposition that I heard regarding eliminating early voting and a broader category of photo IDs was unpersuasive. Indeed, in my view, the opposition that was voiced was so unpersuasive that I believe other motivations to exclude early voting and other forms of ID were at work.

17. The Senate Democrats proposed a number of amendments that would have lessened the impact of the voter ID bill on minority citizens, including "grandfathering in" (*i.e.*, exempting from the ID requirements) people who already have voter registration cards, exempting voters age 65 or older, allowing the use of student ID and state agency ID, and

accepting valid-when-issued IDs. The ultimate version of H.3003 (Act R54) rejected every one of these ameliorative provisions.

18.     Based on more than fifteen years of experience in the Senate and my interactions with other members of the South Carolina General Assembly, I believe that the members of the General Assembly knew that minority citizens in South Carolina are overwhelmingly likely to vote for Democratic candidates. I also believe that the members of the General Assembly expected the voter ID bill to lead to lower turnout among minority voters, as well as an increase in the number of minority votes challenged and a decrease in the number of minority votes counted.

I declare, under penalty of perjury, that the foregoing is my testimony.

Dated: Columbia, South Carolina
August 21, 2012

_____
C. Bradley Hutto