IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| STATE OF SOUTH CAROLINA,<br><br>        *Plaintiff,*<br><br>  v.<br><br>UNITED STATES OF AMERICA, and ERIC HIMPTON HOLDER, JR., in his official capacity as Attorney General of the United States,<br><br>        *Defendants,*<br><br>  and,<br><br>JAMES DUBOSE, JUNIOR GLOVER, FAMILY UNIT, INC. BRENDA C. WILLIAMS, M.D., AMANDA WOLF, DELORES FREELON, NAOMI GORDON, JOSEPH RILEY, RAYMOND RUTHERFORD, and THE SOUTH CAROLINA PROGRESSIVE NETWORK,<br><br>        *Defendant-Intervenors,*<br><br>  and,<br><br>LEAGUE OF WOMEN VOTERS OF SOUTH CAROLINA and CRAIG DEBOSE,<br><br>        *Defendant-Intervenors,*<br><br>  and,<br><br>SOUTH CAROLINA STATE CONFERENCE OF THE NAACP and KENYDA BAILEY,<br><br>        *Defendant-Intervenors.* | Case No. 1:12-cv-203 (CKK, BMK, JDB) |

**DIRECT TESTIMONY OF DR. KEVIN M. QUINN**

My name is Dr. Kevin M. Quinn, and I have been retained by the Defendant-Intervenors as an expert witness in the above-caption litigation, *South Carolina v. United States*. I am a Professor of Law at the University of California, Berkeley. I have a Ph.D. and an A.M. (masters in arts) in political science from Washington University in St. Louis as well as a B.A. in political science from Johns Hopkins University.

My general research areas are empirical legal studies and statistical methods for law and social science. Much of my past work is relevant to the analyses I have conducted in this litigation. In particular, I am a co-author of a peer-reviewed study (Cobb, Greiner, and Quinn, 2012) that examined whether poll workers in Boston applied the relevant voter ID requirements in a race-neutral manner. This study was awarded the Robert H. Durr Award for best paper applying quantitative methods to a substantive problem in political science and has been published in the *Quarterly Journal of Political Science*. My complete curriculum vita is attached as Exhibit A to my expert report dated June 18, 2012.

My direct testimony is largely set forth in my expert reports dated June 18, 2012 and August 6, 2012. I incorporate these reports (and the exhibits attached to those reports) in this testimony by reference. In what follows, I will briefly review my overall conclusions represented in these reports, summarize the basis for my conclusions, and discuss how documents produced after my reports were written impact the conclusions offered in my reports.

My June 18, 2012 report focused on the reasonable impediment exception of Act R54. In that report, I offer three primary conclusions:

- It is very likely that the reasonable impediment exception of Act R54 will be applied non-uniformly across precincts and counties. It is also likely that the reasonable impediment exception of Act R54 will be applied non-uniformly within precincts and counties.

- In the absence of uniform application, it is unlikely that the reasonable impediment exception will rectify any pre-existing racial disparity in photo ID ownership.

- The State's planned implementation of the reasonable impediment exception poses a substantial risk of racial discrimination.

As set out in further detail in my June 18, 2012 report, I arrived at these conclusions after: (a) examining R54's statutory language to determine the key aspects of the reasonable impediment exception that will impact implementation; (b) looking to the relevant academic literature on election administration to understand these aspects of the reasonable impediment exception based on data from other jurisdictions; and (c) looking to information from South Carolina, including sworn testimony by key State Election Commission ("SEC") officials, to make a judgment as to whether South Carolina will be able to overcome the implementation challenges reflected in the relevant academic literature.

My August 6, 2012 report focused on Dr. M.V. Hood's June 19, 2012 expert report. Specifically, I offered methodological critiques of Dr. Hood's attempt to estimate the causal effect of Georgia's voter photo ID law on turnout in Georgia. To make his claims about the effect of the Georgia law on turnout in Georgia, Dr. Hood relies extensively on a paper he co-authored with Dr. Charles H. Bullock III (henceforth, "Hood and Bullock (2012)"), and essentially incorporates that entire paper in his June 19, 2012 report by reference. In my August 6, 2012 rebuttal report, I offer the following conclusions:

- The Hood and Bullock (2012) study suffers from a number of serious methodological flaws. These flaws include, but are not limited to, the following.
    - The Hood and Bullock (2012) study does not account for the full set of IDs acceptable under Georgia law. Further, the study relies on data that Dr. Hood and Dr. Bullock appear not to have validated.
    - The Hood and Bullock (2012) study does not have a true control group.
    - Dr. Hood and Dr. Bullock misinterpret all of their key results.
    - Dr. Hood and Dr. Bullock improperly deal with, and report, statistical uncertainty.
    - The research design and statistical modeling strategy used by Dr. Hood and Dr. Bullock does not allow them to credibly separate the effect of the change in the Georgia voter ID law from the effects of other time-varying causes of turnout such as the Obama candidacy.

- As a result of these fundamental methodological problems, the Hood and Bullock (2012) study provides no scientifically valid information about the causal effect of the change in the Georgia voter ID law on turnout in Georgia.

- It follows that this study provides no scientifically valid information about the causal effect of the implementation of Act R54 on turnout in South Carolina.

- Dr. Hood's conclusions regarding the reasonable impediment exception of Act R54 are not supported by evidence. The evidence that does exist supports the conclusions that I reached in my expert report of June 18, 2012.

The methodological problems that I identify in the Hood and Bullock (2012) study indicate a failure, on the part of Dr. Hood and Dr. Bullock, to adhere to basic, foundational principles that underlie the modern, scientific approach to causal inference in the fields of statistics, economics, political science, sociology, and empirical legal studies. My August 6, 2012 report documents both the importance and widespread acceptance of these basic principles with numerous references to academic books and articles.

In addition to the contents of my reports, I will testify to the following:

1. In reaching the conclusions found in my June 18, 2012 report, I relied on deposition testimony from high-ranking officers at the SEC. Based upon my

4

expertise in election administration, the individuals responsible at the state level for implementing polling place and ballot counting procedures play a key role (along with others at the polls and in the county election offices) in determining whether the procedures will be implemented in a uniform manner across counties and precincts. When I submitted my June 18 report, Marci Andino, the SEC Executive Director, and Chris Whitmire, Director of Public Information and Training at the SEC, were the *only* election officials who had been deposed. Since submitting my June 18 report, I have reviewed all of the deposition testimony from every state and local election official who has been deposed in this litigation. The testimony of these additional officials adds further support to the conclusions that I reach in my June 18 report.

2. On August 14, 2012, the State produced a number of new documents. In my opinion, three of these documents are relevant for my analysis of the reasonable impediment exception of Act R54. These three documents are: (a) a memo from the SEC titled "Reasonable Impediment / Religious Objection Procedures"; (b) sample postcards entitled "*NEW* South Carolina Photo Identification Requirements"; (c) text of comments from Marci Andino and others (who appear to be county election officials) on "an intranet site used to communicate with county election officials" (ECF No. 178, South Carolina's Opp. to U.S. and Ints.' Motions to Exclude Evidence or Reopen Discovery, at 5) relating to the reasonable impediment exception between August 7, 2012 and August 13, 2012. Below, I discuss each in turn.

3. The State alleged that the "Reasonable Impediment / Religious Objection Procedures" memo was "first created on August 11, 2012 and finalized on August 13, 2012." (ECF No.180, South Carolina's Supp. Resp. to U.S. and Ints.' Motions to Exclude Evidence or Reopen Discovery, at 2). This four-page document addresses some of the implementation concerns that I raised in my June 18 report, and that I discussed during my August 7, 2012 and August 10, 2012 depositions. In my opinion, this document represents an attempt by the SEC to address some of the problems with the reasonable impediment exception that have been highlighted during the course of this litigation, and is a step toward providing more uniform instructions to poll workers and county boards. However, this document does not indicate that the systemic factors identified in my June 18 report are no longer problematic. For example, the newly-created "Reasonable Impediment / Religious Objection Procedures" document does not materially impact these systemic factors, which include: (1) the lack of a centralized election administration system; (2) the increased discretion that the reasonable impediment exception gives to poll workers, notaries, and county election board members; (3) the lack of robust, centralized poll worker training; (4) the lack of uniformity in voter education materials; and (5) the apparent lack of support for the reasonable impediment exception (and perhaps other aspects of Act R54) among local and county election officials.

4. In addition, the "*NEW* South Carolina Photo Identification Requirements" postcards are problematic for a number of reasons. First, the postcard does not state that the photo IDs that are listed need to be current and valid in accordance

6

with Act R54. Thus, a voter reading this card may be led to incorrectly believe that an expired or suspended driver's license would be a form of approved ID under Act R54. Second, the language regarding the reasonable impediment exception on the postcard states, in part:

> "If you […] cannot obtain an approved photo ID for reasons beyond your control, you *may* complete an affidavit at the polls and cast a provisional ballot. If you will *need* to complete an affidavit, <u>bring your current voter registration card with you to the polling place</u>" (SC_00164949) (underlining in original, other emphasis added).

On its face, the postcard is thus contradictory: It states that a non-photographic registration card does not constitute sufficient ID to vote under Act R54; however, a voter should still bring it to the polling place if they lack sufficient ID because the non-photographic registration card may be sufficient to cast a provisional ballot. This contradiction stems from the fact that, as admitted by the State in its July 31, 2012 Responses to the United States' Requests for Admission, the reasonable impediment affidavit requires notarization by a notary public, and such notarization requires the notary public to verify the identity of the registrant invoking that exception. Since the registrant in question cannot acquire any of the forms of photo ID accepted by Act R54, the State instead suggests that the notary public base his or her certification of identity on the same non-photographic voter registration card that is not an approved form of ID for casting an in-person vote. Further, the odd juxtaposition of "may" and "need" renders the meaning of this passage even less clear. This language will likely create confusion among many voters, particularly less-educated voters and/or voters who fail to read the

7

postcard carefully. Taken together, it is likely that some such voters will neglect to bring their non-photo voter identification card with them to the polls.

5. The comments on the SEC intranet site provide additional evidence that at least some local officials do not support aspects of Act R54, including the reasonable impediment exception and the notarized affidavit requirement. At the very least, some local officials are concerned about the additional responsibilities Act R54 creates. Notable quotes from election officials include the following:

> I also wonder who is going to decide what a reasonable impediment is. Are we going to have a list of what is reasonable and what is not? I hope the poll workers will not have to make that decision (SC_00164954).

> I think "reasonable impediment" is intentionally vague so as to give the legislature an "out" as far as pre-clearance goes—a catch-all phrase that allows the buck to be passed yet again. A religious objection would be a more palatable reason (*Id.*).

> […] I am sure you [Marci Andino] also understand how ridiculous it is to require a notary at every polling location. […] In their usual manner, the General Assembly refused to listen to those of who have a working knowledge of elections and forged ahead anyway[…] We are in dangerous territory here and our legislators are the ones who put us there. We have to figure out how to make them liable versus us. I will do whatever I can to see that the SEC, nor my Board or anyone else's takes a hit for this (SC_00164956).

These quotes are consistent with the other evidence in my June 18 report regarding the likely attitudes and concerns of local election officials. As noted in that report, the political science literature on the role played by such "street-level bureaucrats" in policy implementation strongly suggests that the support of such officials is very important for successful implementation of a new policy.

8

6. I understand that, in light of the new documents that the State produced on August 14, 2012, additional depositions of SEC officials have been scheduled. I will promptly review the transcripts of these additional depositions, and, if necessary, will supplement or revise today's testimony as appropriate.

I declare under penalty of perjury that the report is true and correct, to the best of my knowledge.

Executed on this 21st day of August, 2012

*[signature]*

Kevin M. Quinn