**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| STATE OF SOUTH CAROLINA,<br><br>    *Plaintiff,*<br><br>v.<br><br>UNITED STATES OF AMERICA, and ERIC HIMPTON HOLDER, JR., in his official capacity as Attorney General of the United States,<br><br>    *Defendants,*<br><br>and,<br><br>JAMES DUBOSE, JUNIOR GLOVER, FAMILY UNIT, INC. BRENDA C. WILLIAMS, M.D., AMANDA WOLF, DELORES FREELON, NAOMI GORDON, JOSEPH RILEY, RAYMOND RUTHERFORD, and THE SOUTH CAROLINA PROGRESSIVE NETWORK,<br><br>    *Defendant-Intervenors,*<br><br>and,<br><br>LEAGUE OF WOMEN VOTERS OF SOUTH CAROLINA and CRAIG DEBOSE,<br><br>    *Defendant-Intervenors,*<br><br>and,<br><br>SOUTH CAROLINA STATE CONFERENCE OF THE NAACP and KENYDA BAILEY,<br><br>    *Defendant-Intervenors.* | Case No. 1:12-cv-203 (CKK, BMK, JDB) |

**DIRECT TESTIMONY OF SENATOR JOHN L. SCOTT, JR.**

My name is John L. Scott, Jr. My direct testimony is as follows:

1.      I served in the South Carolina House of Representatives for 18 years from 1990 until 2008.  In 2008 I was elected to the South Carolina Senate and I represent District 19.  District 19 is located in Richland County.

2.      I graduated from South Carolina State University in 1975 with a Bachelor of Science degree in Accounting and a minor in Economics.

3.      Before beginning my service in the General Assembly, I served for two years on the Richland County Council, and I served for over 7 years under two governors as an accountant, auditor, and field coordinator.

4.      In addition to my service in the Senate, I am President of C&S Consulting Group Inc., which engages in transportation consulting.  I am also the Broker-in-Charge for J. L. Scott Realty Company.

5.      I am married to Joan C. Scott, and we have one son, John L. Scott III.

6.      I served in the South Carolina Military Department Joint Services Detachment on appointment by the Governor of South Carolina.  I have also received the Order of the Palmetto, which is awarded by the Governor of South Carolina and is the state's highest civilian honor.

7.      I currently serve on the following Senate committees:  Judiciary; Corrections and Penology; General; and Medical Affairs.  I was the principal sponsor of legislation to provide new voting machines throughout the state.

8. When bills are introduced in the Senate they frequently are assigned to committees by the President of the Senate. Committee chairs may then assign bills to subcommittees.

9. In the 118th Session of the General Assembly which occurred in 2009-2010, both the Senate and the House considered photo ID bills. Based on records of the General Assembly, I can testify that the first Senate photo ID bill of which I am aware (S.334) was introduced on January 28, 2009. The first House bill on photo ID of which I am aware (H.3418) was introduced in the House on February 3, 2009. Because the House quickly passed H.3418 by a vote of 67-34 on March 3, 2009 and sent H.3418 to the Senate on March 4, the House bill became the vehicle by which the Senate first considered photo ID. This was because under our rules the House bill was "passed over" to the Senate before the Senate bill was passed and sent to the House. During consideration of H.3418, the Legislative Black Caucus staged a walk-out to protest the bill.

10. During the 2009-2010 General Assembly session, H.3418 was referred to the Senate Judiciary Subcommittee on Election Laws, on which I served.

11. On May 7, 2009, the Subcommittee approved a version of H.3418 that included 12 days of early voting and included federal-, state-, and state-subdivision-employee IDs as acceptable IDs for voting.

12. Also on May 7, 2009, I proposed an amendment to include official IDs issued by South Carolina universities in H.3418's list of acceptable IDs for voting, but that amendment failed in the Subcommittee. The amendment would have made it easier for students at South

-3-

Carolina's colleges and universities, including historically black colleges and universities, to vote.

14. Ultimately, the House and Senate passed different versions of H.3418, and H.3418 died during the conference committee process.

14. In the next (119th) session of the General Assembly, voter ID bills were introduced in the House (H.3003) on December 7, 2010 and in the Senate (S.1) on December 1, 2010. Both bills were "pre-filed" meaning that they were filed before the Senate or House opened its session. H.3003 was read for the first time in the House on January 11, 2010 and, in what was unusual speed based on my House experience, was approved by a vote of 74-45 in the House on January 26, 2011 and sent to the Senate a day later. In the January 26 House vote, all Republicans voted in favor of H.3003, and all Democrats voted against the bill. Consequently, H.3003 became the vehicle for the Senate to consider voter ID rather than S.1. H.3003 was referred to the Senate Judiciary Committee and then to the Subcommittee on Election Laws (on which I served) by Senator Glenn McConnell, then-Chairman of the Judiciary Committee. There was one Subcommittee meeting on the bill, followed by one Committee meeting. We amended the House version of the bill, which was very restrictive.

15. On February 24, 2011, the Senate passed an alternate version of H.3003 that included provisions for early voting and exempted voters age 65 or older from the photo ID requirements. The Senate bill also included additional forms of acceptable ID such as state and federal employment ID cards with a photo. These provisions would have lessened the adverse impact of the bill on minority, elderly and other eligible voters. The Senate passed its version of the bill with a vote of 24 to 15. Prior to passage, the Senate used a "Rules Committee" slot for

special order to cut off debate. When the Senate voted on February 8 and 9, 2010 to "Special Order" to cut off debate, the motion (requiring a 2/3 majority) failed. On February 10, Special Order passed by using the "Rules Committee" slot by majority vote.

16. On April 14, 2011, the Senate bill was referred to a joint conference committee to reconcile the House and Senate versions of the bill.

17. I served on that conference committee.

18. The members of the Senate on the conference committee were Senator Glenn McConnell (Republican), the President Pro Tempore; Senator George Campsen III (Republican), Election Law Subcommittee Chairman; and myself (Democrat). The members of the House of Representatives on the conference committee were Representative Alan Clemmons (Republican), Election Law Subcommittee Chairman; Representative Jay Lucas (Republican), the Speaker Pro Tempore; and Representative James Merrill (Republican), former Majority Leader.

19. Representatives Clemmons, Lucas, and Merrill were appointed by Representative Robert Harrell, Speaker of the House. I was appointed by Senator Glenn McConnell, who was President Pro Tempore and Chair of the Judiciary Committee. Senator McConnell also appointed himself. Senator Campsen was appointed by Senator Harvey Peeler, the Senate Majority Leader.

20. The conference committee adopted the House version of the bill, eliminating Senate provisions that might have reduced the adverse impact on minority voters, such as a provision for 8 days of early voting beginning 11 days before an election, a broader list of

acceptable photo ID, and an exemption for voters age 65 or older. To the best of my recollection, the conference committee met for a total of 5 to 6 hours over two meetings in one day.

21. The Republicans on the conference committee excluded me—the only Democrat—from certain negotiations regarding the bill by meeting privately in the office of the Speaker of the House. During breaks in the public, recorded conference committee sessions, Senator McConnell, Representative Clemmons, and one other Republican conference committee member went to the Speaker's chambers, led by Representative Alan Clemmons, to consult on the bill. Once they came out, they had already agreed on the conference report.

22. It is highly unusual to exclude a member or members of the conference committee, such as myself, from negotiations. There should not have been a sideline negotiation away from the public meeting. I have never seen this sort of exclusion in my approximately twenty years of service in the South Carolina Senate and House of Representatives.

23. I did not support or sign the conference committee report because of: the detrimental effect that the bill would have on minority voters; the removal of mitigating provisions contained in the Senate version of the bill, such as early voting and an exemption for voters aged 65 or older; and my exclusion from certain conference committee negotiations. The members of the conference committee agreed to take up an early voting bill in the next session.

24. Based on approximately twenty years of experience in the Senate and House of Representatives combined, I believe that the members of the General Assembly knew that minorities are overwhelmingly likely to vote Democratic. I also believe that the members of the General Assembly expected the voter ID bill to lead to lower turnout among minority voters.

I declare, under penalty of perjury, that the foregoing is my testimony.

Dated: Columbia, South Carolina
August 21, 2012

_____
John L. Scott, Jr.