IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| STATE OF SOUTH CAROLINA,<br><br>    *Plaintiff,*<br><br>    v.<br><br>UNITED STATES OF AMERICA, and ERIC HIMPTON HOLDER, JR., in his official capacity as Attorney General of the United States,<br><br>    *Defendants,*<br><br>    and,<br><br>JAMES DUBOSE, JUNIOR GLOVER, FAMILY UNIT, INC. BRENDA C. WILLIAMS, M.D., AMANDA WOLF, DELORES FREELON, NAOMI GORDON, JOSEPH RILEY, RAYMOND RUTHERFORD, and THE SOUTH CAROLINA PROGRESSIVE NETWORK,<br><br>    *Defendant-Intervenors,*<br><br>    and,<br><br>LEAGUE OF WOMEN VOTERS OF SOUTH CAROLINA and CRAIG DEBOSE,<br><br>    *Defendant-Intervenors,*<br><br>    and,<br><br>SOUTH CAROLINA STATE CONFERENCE OF THE NAACP, and KENYDA BAILEY,<br><br>    *Defendant-Intervenors.* | Case No. 1:12-cv-203 (CKK, BMK, JDB)<br><br>**WRITTEN TESTIMONY OF<br>BARBARA ZIA.** |

1

My name is Barbara Zia, and I am currently the Co-President of the South Carolina League of Women Voters. My direct testimony is as follows:

1. I have an undergraduate degree from Duchesne College, a master's degree from Memphis State University, and a doctoral degree from Boston College.

2. I am currently retired from teaching, and I serve the South Carolina League of Women Voters (the "League") in a volunteer capacity. I have served as Co-President of the League since April 2011. Prior to that, I served as President of the League since 2007. In this position, I typically spend 40 hours a week working on League business.

3. The League is a volunteer-run, non-partisan organization dedicated to encouraging informed and active citizen participation in our democracy, including, critically, through voting. We have been active in the state of South Carolina since 1920. The National League of Women Voters formally recognized the South Carolina League in 1951.

4. The League's members elect the board, and the board represents the membership according to our bylaws. Our public policy priorities are established by the membership at conventions that take place biannually. Although policy positions are voted on and established by the board, those are based on studies of public policy issues that are conducted by League members as well as research by the National League of Women Voters and other respected sources and organizations.

5. As Co-President of the League, with the other Co-President, I lead the organization, participate in decisions by our elected officers and board of directors, and preside over board meetings, which take place four times a year, at a minimum, according to our bylaws.

6. The League engages in a number of non-partisan activities geared to facilitate voting and other forms of civic participation. Our civic engagement activities are often

2

focused on low-income neighborhoods, rural areas, and communities of color. To bring members of these historically underrepresented communities into the political process, we host regular voter registration drives, distribute information about how and where to vote, assist with a voter protection hotline on Election Day, and send our representatives to speak publicly about the importance of voting and other forms of participation in our democracy.

7. In addition, the League partners with numerous community organizations—such as high schools and universities, local businesses, faith-based groups, and civil rights advocates—to promote and protect voting rights, particularly for low-income and minority South Carolinians. The League has also been involved in monitoring polling booths on Election Day and in audits of voting machines.

8. The League works with 11 local leagues around the state, and most of our voter registration work is done by the local leagues at community-based voter registration events. For example, we recently completed a campaign to help thousands of high school and community college students who will be 18 by the next election register to vote. During that campaign, we had a particular focus on communities with historically underrepresented voting populations.

9. I have been closely involved in all of the League's work in opposing photo ID legislation in South Carolina. The League has long objected to conditioning the right to vote on presenting limited forms of identification, and we actively opposed both H.3003—the photo ID bill that was enacted as Act R54—and its predecessor, H.3418.

10. Based on our experience, including our day by day interaction in the many communities we serve, we believe that Act R54 unfairly discriminates against voters—particularly certain groups, such as minorities, the elderly and students—and that it will have the

effect of suppressing voting. We also believe that a photo ID law is unnecessary because there is no evidence of voter impersonation fraud in South Carolina. Moreover, based on research we conducted on what other states had spent to implement photo ID requirements, educate the public, educate poll workers, and to assist voters affected by the law, we believe that South Carolina e has substantially underestimated the costs of the photo ID law. In any case, the state should not be spending money to solve a problem that does not exist at a time when there are pressing budget priorities like underfunded schools and roads in need of repair. Finally, given the lack of evidence of voter impersonation fraud, the fact that the legislature was confronted with evidence that Act R54 would hurt African-American voters but sidelined those who offered this viewpoint, the refusal to hold statewide public hearings, and the State's refusal to allocate the significant and adequate resources that would be necessary to implement the law effectively, we felt that we had no choice but to conclude that the law intentionally sought to depress turnout by African Americans and other minorities by making it substantially more difficult for them to vote.

11. After the first photo ID bill was initially introduced, the League made efforts to learn whether the state possessed any verified instances of voter impersonation fraud in South Carolina through phone calls with legislators and informal conversations with legislators from both the majority and minority parties.

12. Although proponents of photo ID requirements made claims that voter impersonation fraud was a problem in South Carolina, to my knowledge, no documented cases of such fraud were ever produced in response to my inquiries, the inquiries of other League representatives, or – to the best of my knowledge – in response to any other inquiry. The League also has members across the State who work as poll managers on Election Day and who also

maintain close working relationships with county elections directors across the State. To the best of my knowledge, in the course of their work and their communications with county elections directors, these League members have never encountered any documented cases of voter impersonation fraud in South Carolina. Indeed, to the best of my knowledge, these League members are even unaware of any credible *allegations* of voter impersonation fraud in South Carolina.

13. In the course of its opposition to photo ID legislation, the League requested that the Senate Judiciary Subcommittee hold public hearings around the state so that the people who would be directly affected, including senior citizens and minorities, could speak directly about the impact a photo ID law would have on them. The Subcommittee claimed it was unable to do so because of a lack of funds.

14. Although the legislature held a few legislative subcommittee and committee hearings at the Statehouse that were open to the public on the photo ID bills, these were not an adequate substitute for the public hearings the League had requested. We felt that it was significant to hold public hearings around the State to be able to hear from a broader array of voters who would not be able to travel to hearings in Columbia due to lack of transportation, prohibitive costs of travel, logistical constraints, and—in some cases—lack of knowledge that the hearings were happening. Unlike the hearings held in Columbia, which are generally only publicized on the Statehouse website, public hearings around the state are typically publicized on local radio stations, in local newspapers, and through other media that are geared toward citizens unfamiliar with the legislative process. While not all voters have access even to these sources of information, to the best of my knowledge, more voters are made aware of public hearings held across the State than those held only in Columbia.

5

15. The Subcommittee's refusal to hold public hearings around the State on photo ID stood in stark contrast to the State's treatment of other pieces of legislation that would similarly have a monumental effect on the citizens of South Carolina. For instance, in the case of the recent immigration bill, S. 20, the Chair of the Senate Judiciary Committee and other Committee members conducted numerous hearings around the State. Numerous public hearings around the State were also held on Act 388, a tax reform bill shifting financial responsibility for funding education that the League also opposed, as well as on redistricting legislation.

16. During the consideration of photo ID legislation, the majority party's caucus meetings were closed to the League, and we were not permitted to have a representative speak at these meetings. Nevertheless, the League made known its concerns regarding the bill which included the disproportionate impact of Act R54 on minority voters as a result of, among other things, the fact that many minority voters lacked necessary financial resources and access to transportation in order to obtain IDs required under Act R54 which they did not possess. Our concerns were publicized to the General Assembly and others through press conferences, testimony at legislative hearings in Columbia, letters and fact sheets on the photo ID bill that legislative clerks distributed to all the legislators. Despite the fact that all legislators, including the bill's proponents, were made aware of the discriminatory effects a photo ID law would have on minority voters, the League never received any formal response to these concerns.

17. Instead, over time, the environment surrounding the photo ID debate became progressively more hostile, and its proponents became more entrenched in their positions and less willing to consider any amendments that could have in any way mitigated the harsh effects of the law.

18. This was equally true of amendments related to early voting, despite the fact that public opinion was strongly in favor of early voting. In my experience, voters in South Carolina have consistently expressed support for making voting easier and reducing hurdles to voting. In particular, voters have expressed concerns about long lines on Election Day and the need for an opportunity to vote on weekends because it is too difficult for many to take time off from work on a Tuesday within limited polling hours and with the likelihood of being required to wait in long lines. Indeed, notwithstanding the historic African-American turnout in the 2008 general election, overall voter turnout in South Carolina in 2008—as in other recent elections—was well below the national average.

19. Given the voters' consistent demand for early voting, the League has advocated for this reform for years. Nevertheless, the legislature has never passed an early voting bill.

20. During the consideration of H.3003 and its predecessor, we repeatedly conveyed to the legislature that there was a real need—and a strong public demand for early voting—in contrast to the lack of need for photo ID. Nevertheless, the legislature ultimately stripped all early voting provisions out of the version of the photo ID bill that it passed.

21. Throughout the consideration of H.3003 and its predecessor, proponents of photo ID stated that they were motivated by a concern with preserving election integrity. However, after the League publicized the results of an audit demonstrating that machine errors resulted in the losses of hundreds of votes, the legislature never passed a bill requiring post-election audits. Such a bill was passed in the Senate, but it died in the House. To my knowledge, we never received any explanation for why the legislature failed to address this documented problem undermining the integrity of South Carolina's elections.

22. Since the passage of Act R54, educating voters about the law's requirements and its status has been a major priority for the LWV at both the state and local level. About half of our time is currently dedicated to educational and outreach efforts related to Act R54, and that proportion will only continue to increase leading up to the November election. As just one example of our work, the League is actively making presentations to groups around South Carolina about voting procedures, with a particular focus on college students and minority communities. We are currently in the process of contacting all public and non-profit colleges and universities in the State about the process of registering voters and the kinds of identification that students may need to vote. While we are devoting whatever resources we can to these educational efforts, it is clear that R54 will nevertheless disenfranchise many minority voters who, even if aware of the effect of the law, will be unable to obtain the required IDs.

23. Educating South Carolina voters about the law's requirements and status has proven to be a monumental task and a very significant challenge for the League. Even before the law was passed, we heard voters express confusion about what the law would mean for them, and that confusion persists to this day. In our experience, voters continue to lack the information that they need to understand how they could comply with the law's requirements.

24. Many voters we encounter believe that the law's requirements are already in place and that they will be unable to vote because they lack one of the acceptable forms of ID under the law.

25. Many voters we encounter—who have any information about a potential change in the law at all—believe that they will not be able to obtain any form of ID that satisfies Act R54 without providing the underlying documents required to obtain DMV-issued ID. Voters are unaware of the photo voter registration cards to be issued by county elections offices and

what they would need to do obtain them. The fact that the State Election Commission has not yet begun to educate voters about photo voter registration cards means that the task of doing so will be all the more daunting if the law is precleared.

26. One of the challenges we confront in educating South Carolina's voters about the potential impacts of Act R54 is that we only have established networks in about half of the counties in the State through the eleven local leagues. The parts of the state where the local leagues do not operate tend to be very rural areas. South Carolina is a largely rural state with only a few urban pockets, like Charleston, Columbia, and Greenville. Outside of those urban areas, many people live in isolated hamlets with very few connections among them.

27. Educating voters in these areas requires a major additional outreach effort for the League and significant collaboration with other groups, including faith leaders, family health centers, black sororities, and other civic organizations that are able to operate in rural areas. This outreach will require substantial time, money and volunteer effort.

28. Even with these substantial efforts, it remains extremely difficult to provide information to voters in rural areas. Poor transportation throughout the state combined with the fact that populations and counties are geographically dispersed makes it logistically difficult to reach out to rural voters.

29. Another challenge to educating voters is lack of access to the media in which we strive to publicize information for voters. In my experience, internet use is low in South Carolina, particularly in poorer, rural areas. Voters in these areas may be unable to afford internet, cable TV, or subscriptions to daily newspapers. Free weekly newspapers in South Carolina are struggling financially, and are only delivered to voters' homes in some areas. In

other communities, free newspapers can only be obtained at public places, such as libraries, to which voters may not have access or where they may not know to look for information.

30. If the law is precleared with only a few weeks to go before the November election, it would be a virtual impossibility to inform many voters about the change, to get them the concrete information they would need to attempt to comply with the law, or to connect them to community organizations that may be able to help them to obtain the required ID, something that the League itself lacks the resources or the capacity to do.

31. While preclearance of the law at any time would require a substantial increase in the resources the League dedicates to its outreach and educational efforts, preclearance shortly before the election would greatly intensify the financial burdens on the League and the efforts required of its volunteer members. For example, the League has already begun to create plans for representatives from local leagues to call those registered voters previously identified by the State as lacking DMV-issued photo ID. This kind of voter-by-voter educational effort would consume very substantial resources, even putting aside the question of how to conduct outreach to registered voters lacking ID in those parts of the state where there are no local leagues.

32. Based on our experience, some of the same challenges that make it difficult to educate voters will make it difficult for voters—particularly in poorer, rural areas—to comply with the photo ID law. We do not believe that the steps the state has agreed to take will be adequate to help voters overcome those obstacles. For example, we understand that each county will only have one web camera to take ID photos and one machine to print photo voter registration cards (with the exception of three counties which will have two). Because South Carolina's counties are largely rural and geographically spread out—and because the public

transportation system is poor to non-existent—some voters would be faced with the real hardship of having to travel from one end of the county to another to attempt to obtain these cards. In some cases—such as Beaufort County, which is bifurcated by a river—that is a particularly difficult proposition. In other cases, such as Charleston County, the county elections office is hard to find and located in a very inaccessible area. No public transportation serves that office, and it is located down a busy and intimidating commercial road. These are just two of many examples of logistical challenges that voters would face in trying to comply with Act R54.

33. We are also concerned about the lack of an adequate plan on the part of South Carolina to staff polling places with notaries on Election Day. I have received a letter dated August 13, 2012 from Marci Andino, Executive Director of the State Election Commission asking if the League would be able to "step in to help ensure a smooth and orderly process on election day" by trying to identify League members who may be able and willing to serve as volunteer notaries at the polls on Election Day if the law is precleared. A copy of that letter request is attached to my testimony. While I plan to inquire whether any League members would be able to serve in this capacity, based on my knowledge of the League's membership, I do not expect any significant response. I advised Ms. Andino of this in an email response dated August 17, 2012. That response is also attached to my testimony.

34. Based on our experience, even with the substantial outreach efforts the League has and will undertake, and due in part to the demographic realities of South Carolina Act R54 creates hurdles that present disproportionate challenges to low-income and rural South Carolinians and will have a disproportionate affect on the African-American population and African-Americans' ability to exercise their franchise.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Dated: Washington, DC

August 21, 2012

*Barbara Zia*
Barbara Zia