# Exhibit 1

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA


STATE OF SOUTH CAROLINA,

        Plaintiff,

        vs.

UNITED STATES OF AMERICA, ET AL.,

        Defendants.

_____

CA No. 12-203
Washington, DC
August 31, 2012
1:40 p.m.

DAY 5 - PM SESSION

Pages 150 thru 165


TRANSCRIPT OF TRIAL
BEFORE
DISTRICT JUDGE COLLEEN KOLLAR-KOTELLY
CIRCUIT JUDGE BRETT M. KAVANAUGH
DISTRICT COURT JUDGE JOHN D. BATES


APPEARANCES:

For the Plaintiffs:        H. CHRISTOPHER BARTOLOMUCCI, ESQ.
                           BRYAN J. FIELD, ESQUIRE
                           MICHAEL McGINLEY, ESQUIRE
                           STEPHEN POTENZA, ESQUIRE
                           Bancroft, PLLC
                           1919 M Street, NW
                           Washington, DC 20036
                           (202) 416-0257

                           H. CHRISTOPHER COATES, ESQUIRE
                           934 Compass Point
                           Charleston, SC 29412
                           (843) 609-7080

ALSO PRESENT:           ALAN M. WILSON
                            Attorney General South Carolina
                           BRYAN STIRLING
                            Deputy Attorney General
                            South Carolina
                           KARL S. BOWERS, ESQ.

```
For the Defendants:              BRADLEY E. HEARD, ESQUIRE
                                 RICHARD ALAN DELLHEIM, ESQUIRE
                                 BRYAN L. SELLS, ESQUIRE
                                 ANNA M. BALDWIN, ESQUIRE
                                 CATHERINE MEZA, ESQUIRE
                                 ERIN MARIE VELANDY, ESQUIRE
                                 DANIEL J. FREEMAN, ESQUIRE
                                 ANGELA MILLER, ESQUIRE
                                 U.S. Department of Justice
                                 Civil Rights Division
                                 Voting Section
                                 950 Pennsylvania Avenue, NW
                                 Washington, DC 20530
                                 (202) 353-8743


For Defendant Intervenors:       GARRARD R. BEENEY, ESQUIRE
                                 MICHAEL COOPER, ESQUIRE
                                 THEODORE A.B. McCOMBS, ESQUIRE
                                 TALY DVORKIS, ESQUIRE
                                 SEAN A. CAMONI, ESQUIRE
                                 PETER STECIUK, ESQUIRE
                                 Sullivan & Cromwell, LLP
                                 125 Broad Street
                                 New York, NY 10004
                                 (212) 558-1863

                                 NANCY ABUDU, ESQUIRE
                                 American Civil Liberties Union
                                   Foundation, Inc.
                                 230 Peachtree Street, NW
                                 Suite 1440
                                 Atlanta, GA 30303
                                 (404) 523-2721

                                 SUSAN K. DUNN, ESQUIRE
                                 American Civil Liberties Union
                                   Foundation of South Carolina
                                 40 Calhoun Street
                                 Suite 210
                                 Charleston, SC 29401
                                 (843) 720-1428
```

```
                                      ARTHUR B. SPITZER, ESQUIRE
                                      American Civil Liberties Union
                                        of the Nation's Capital
                                      4301 Connecticut Avenue, NW
                                      Suite 434
                                      Washington, DC 20008
                                      (202) 457-0800 x113

                                      J. GERALD HEBERT, ESQUIRE
                                      The Campaign Legal Center
                                      215 E Street, NE
                                      Washington, DC 20002
                                      (202) 736-2200

                                      MIMI MARZIANI, ESQUIRE
                                      Brennan Center for Justice
                                      161 Avenue of the Americas
                                      12th Floor
                                      New York, NY 10013
                                      (646) 292-8327

                                      MARK A. POSNER, ESQUIRE
                                      Lawyers' Committee for Civil
                                        Rights
                                      1401 New York Avenue, NW
                                      Suite 400
                                      Washington, DC 20005
                                      (202) 662-8389

Court Reporter:                       Bryan A. Wayne, RPR, CRR
                                      Official Court Reporter
                                      U.S. Courthouse, Room 4704-A
                                      333 Constitution Avenue, NW
                                      Washington, DC 20001
                                      (202) 354-3186
```

Proceedings recorded by mechanical stenography; transcript produced by computer-aided transcription.

1          MR. COATES:  All right, sir.

2     **SCOTT E. BUCHANAN, WITNESS FOR THE PLAINTIFFS, SWORN**

3                    EXAMINATION

4     BY MR. COATES:

5     Q.   Would you state your full name for the record, please, sir.

6     A.   Scott Eugene Buchanan.

7     Q.   Where do you reside?

8     A.   Summerville, South Carolina.

9     Q.   Do you teach at the Citadel?

10    A.   I do.

11    Q.   Which subjects do you teach?

12    A.   I teach political science, specifically topics on American

13    politics, Southern politics, state and local government.

14    Q.   Let me show you what's been previously marked as

15    Plaintiffs' Exhibit 52 and ask if you can identify that

16    document.

17    A.   That is the rebuttal report that I submitted to the Court.

18    Q.   What were you asked to do in this case?

19    A.   I was asked to investigate the opinions put forward by

20    Drs. Burton and Arrington, and if I had disagreements with that,

21    to serve as a rebuttal witness in this case.

22    Q.   Okay.  And did you assert any opinions yourself --

23    A.   I did.

24    Q.   -- in your report?

25    A.   I did.

1    Q.   How many opinions did you assert?

2    A.   A total of seven if memory serves.

3    Q.   On what page of the rebuttal report are those opinions

4    outlined?

5    A.   Let me look.  I don't remember the page number.  That would

6    be on page 3 of the rebuttal report.

7    Q.   Did you look at the subject of voter registration

8    particularly among African Americans in forming your rebuttal

9    opinion?

10   A.   I did.

11   Q.   And briefly what did that survey indicate?

12   A.   Very briefly, I found that the registration among black

13   South Carolinians has increased dramatically since the

14   implementation of the Voting Rights Act.  Just to give one sense

15   of that, in 1968, the first year that racial registration data

16   is available from the state, approximately 54 percent of African

17   Americans were registered to vote in South Carolina.  Today,

18   that number is 82 percent, at least as of June of this year.

19   Q.   Okay.  In forming your rebuttal opinion in this case, did

20   you also look at the area of voter turnout?

21   A.   I did.

22   Q.   What did that inquiry show?

23   A.   Again, similar, that the turnout among African Americans

24   has gone up quite dramatically.  1972 presidential election, the

25   first presidential election that that data is available, 59

1    percent turnout statewide.  That figure, I believe, in 2008 was

2    76 percent.

3    Q.   And how does that compare with white turnout in 2008?

4    A.   White turnout in 2008 was 75 percent.

5    Q.   And how does the present rate of African American

6    registration compare with white rates of registration in South

7    Carolina today?

8    A.   Currently the black registration rate is approximately 82

9    percent, and 78 percent among white South Carolinians.

10   Q.   Did you have an opportunity in your study to look at the

11   number of African American elected officials in South Carolina?

12   A.   I did.

13   Q.   And could you tell me which offices you looked at -- or let

14   me ask you, did you look at the congressional elections?

15   A.   I did.  There are currently six congressmen in South

16   Carolina.  Two of the six, or 33 percent, of the congressional

17   delegation are African American members.  One is Democrat Jim

18   Clyburn, and the other is Republican Tim Scott.

19   Q.   And what is your understanding of the -- according to the

20   2010 census, the black percent of population in South Carolina?

21   A.   Approximately 28 percent.

22   Q.   Okay.  And 33 percent of the elected congressional members

23   are African American?

24   A.   That is correct.

25   Q.   Did you look at the figures for black elected officials in

1    the General Assembly?

2    A.    I did.

3    Q.    How many members are there in the House and Senate?

4    A.    Combined across the House and Senate, 38 African American

5    members.

6    Q.    Out of how many?

7    A.    170.

8    Q.    So 21 percent of the members presently are African

9    American?

10    A.    Approximately 21 percent.

11    Q.    Did you look at school boards that are elected in South

12    Carolina?

13    A.    I did.

14    Q.    And how many school board members are there in South

15    Carolina?

16    A.    I remember the percentage is approximately 38 percent of

17    all school board seats in South Carolina are occupied by African

18    American members.

19    Q.    And are the superintendents of schools elected in every

20    South Carolina jurisdiction except for one?

21    A.    Yes.

22    Q.    And how many black persons serve presently as school

23    superintendent in South Carolina?

24    A.    The percentage is 25 percent.

25    Q.    Did you also look at sheriff?

1    A.   Yes, I did.  It's approximately 26 percent of the

2    sheriffs -- or exactly 26 percent.

3    Q.   Sheriff is an elected position in South Carolina?

4    A.   Yes, countywide.

5    Q.   Did you do any study that set forward -- in your rebuttal

6    report that compares turnout rates in 10 specific South Carolina

7    counties that have very different socioeconomic conditions?

8    A.   I did.  I compared the five wealthiest counties and the

9    five poorest counties to get a sense of the socioeconomic factor

10   and what that may be doing.  And basically in 2008, if you

11   looked at the average turnout among the five poorest counties of

12   the state, and you look at the African American turnout, it was

13   approximately 77 percent.

14       If you looked at the white turnout in the five wealthiest

15   counties, it's 76 percent.

16   Q.   So you were looking at specific counties recently in South

17   Carolina, your turnout rates -- and let me ask you, do your

18   turnout rates that you found tend to be in conflict with the

19   general social science notion that where there's low

20   socioeconomic conditions, there will be low voter turnout?

21   A.   Yes.  As has been mentioned here today, lower socioeconomic

22   status usually leads to depressed turnout, but at least in this

23   particular election in those counties, I found that that was --

24   the opposite case.

25   Q.   Now, what did you find in elections in those counties and

1    turnouts in elections other than 2008?

2    A.    In 2010, among these same counties, the white turnout in

3    the wealthiest counties was approximately 54 percent -- 53

4    percent, I believe, and 48 percent in the poorest counties,

5    African American turnout, and again, that's a much closer margin

6    than any of the previous years that I examined.

7    Q.    Based upon your investigation in this case, what, if any,

8    conclusion did you reach concerning Dr. Burton and

9    Dr. Arrington's opinion concerning the issue of whether racial

10   intent underlies the enactment of R54?

11          HON. COLLEEN KOLLAR-KOTELLY:  Is there an objection?

12          MR. SELLS:  Your Honor, the United States would like

13   to voir dire Professor Buchanan before he starts offering expert

14   opinions, of course on the United States' time, not South

15   Carolina's time.  As the Court may be aware, Professor

16   Buchanan's deposition came after the motion *in limine* deadline.

17   His qualifications have not been subject to review, so we would

18   like to ask for a few minutes of voir dire.

19          HON. COLLEEN KOLLAR-KOTELLY:  All right.  I'll allow

20   you to do it.  I'll stop the clock for you and it goes on their

21   clock.

22          MR. COATES:  Very well.

23                    VOIR DIRE EXAMINATION

24   BY MR. SELLS:

25   Q.    Good afternoon, Professor Buchanan.

1   A.   Good afternoon.

2   Q.   It's nice to see you again.

3   A.   And you as well.

4   Q.   I'm Bryan Sells for the United States.  You remember that

5   we met at your deposition on August 16, correct?

6   A.   Yes.

7   Q.   And at that deposition, you admitted that you're not an

8   expert in determining legislative intent; isn't that right?

9   A.   That is correct.

10  Q.   And you don't represent to the Court that you have become

11  an expert in legislative intent in the last two weeks, do you?

12  A.   No.

13  Q.   And at that deposition, you also admitted that you are not

14  an expert in the analysis of voter fraud; isn't that right?

15  A.   That is correct.

16  Q.   And you don't represent to the Court that you're an expert

17  in voter fraud as of today, do you?

18  A.   No.

19  Q.   At your deposition you also testified that you had not read

20  the case called Arlington Heights v. Metropolitan Housing

21  Development Corporation.  Isn't that right?

22  A.   No, I had not read that.

23  Q.   And did the case of the Village of Arlington Heights v.

24  Metropolitan Housing Development Corporation play any role in

25  the formation of your opinions in this case?

1    A.    No.   I was simply rebutting Drs. Burton and Arrington.

2    Q.    And in forming your opinions in this case, you did not read

3    any original documents setting forth the legislative history of

4    Act R54, did you?

5    A.    I did not.

6    Q.    And in fact you did not even read Act R54 itself in the

7    course of forming your opinions in this case, did you, sir?

8    A.    I believe I'd say I did not read it in its entirety.

9          MR. SELLS:   Okay.   Your Honor, the United States

10   objects to Professor Buchanan's opinion testimony in this case.

11   He's admitted that he's not an expert in the two areas in which

12   we believe he's going to offer expert opinions.   And he's

13   clearly not based those opinions on sufficient facts or data if

14   he hasn't read the law, he hasn't read the legislative history,

15   and is not at all familiar with Village of Arlington Heights v.

16   Metropolitan Housing Development Corporation.

17         HON. COLLEEN KOLLAR-KOTELLY:   I think one way of

18   resolving this is, Mr. Coates, what is the field of expertise

19   that you want him to opine about?   In other words, what are you

20   offering him as an expert in?   He's given information that he's

21   looked at various statistics.   What are you -- in terms of

22   voters in these various places, in terms of percentages, but in

23   terms of going any further than that, what are you offering him

24   for?

25         MR. COATES:   We're offering him for the purpose of

1    rebutting --

2              THE COURT:  No.  That's not what I'm asking.

3              HON. JOHN D. BATES:  What subject matter?  What

4    subject matter is he being offered as an expert in?

5              MR. COATES:  Subject matter in Southern politics and

6    elections in South Carolina and in portions of the South, other

7    portions of the South, including Georgia, which he's written

8    extensively on.  We're offering him to testify concerning the

9    socioeconomic conditions of persons in South Carolina and

10   whether or not that has affected their ability to register and

11   vote in elections in South Carolina, and we are offering those

12   expert opinions for the limited purpose -- and his investigation

13   is purposefully limited in this case because we have called him

14   as an expert witness, purposefully limited to rebut the

15   opinions, the ultimate opinions testified to by Drs. Burton and

16   Arrington in this case on the issue of racial intent.  We're

17   offering to show that the bases --

18             HON. JOHN D. BATES:  You don't have to argue your

19   case.  We just wanted the subject matter.

20        (The Court conferring.)

21             HON. JOHN D. BATES:  What we're going to do is not

22   rule on the objection; we're going to go ahead and allow

23   testimony, and if the government wishes to file a written motion

24   asking the Court to strike or not consider the testimony because

25   of the problems in terms of his qualifications that you've

1   identified, then you can file that written motion and South

2   Carolina can respond to it.

3        But we'll go ahead and allow the testimony to be received,

4   and then we can deal with the question of whether it will be

5   considered based on a written motion.

6             MR. SELLS:  Thank you, Your Honor.

7             HON. COLLEEN KOLLAR-KOTELLY:  And I will say to you

8   that you only have a few minutes left.

9             MR. COATES:  Three minutes?

10            HON. COLLEEN KOLLAR-KOTELLY:  A few.

11            MR. COATES:  A few.  Okay.  Thank you.

12            HON. COLLEEN KOLLAR-KOTELLY:  I'm just looking at the

13   number of yellow sheets.

14       (Laughter)

15            MR. COATES:  Most of the yellow sheets I've already

16   been through, Your Honor.

17                              EXAMINATION

18   BY MR. COATES:

19   Q.   Dr. Buchanan, based upon your investigation in this case,

20   what if any conclusions did you reach concerning Dr. Burton and

21   Dr. Arrington's opinions concerning whether racial intent

22   underlies the enactment of R54?

23   A.   In my opinion, they did not present any direct evidence of

24   racial intent, and they did not present a convincing case of

25   circumstantial evidence.

1   Q.   Could you cite us to some examples that you would rely upon

2   to show that the evidence concerning racial intent is not

3   persuasive?

4   A.   One example --

5   Q.   In your opinion.

6   A.   In my opinion, in Dr. Burton's report, there was an

7   occasion in which he made the comment that the state General

8   Assembly had considered a bill on third-party organizations

9   registering people to vote.  He argued that that bill, that

10  would have limited third-party organizations, was an example of

11  racial intent.  However, I do not believe that he took into

12  consideration the fact that there have been some well-publicized

13  abuses of voter registration by third-party organizations,

14  including one in South Carolina involving Florence County.

15  That's one example.

16      An example from Dr. Arrington had to do with his contention

17  on the local election boards in which he argued that they would

18  act with a discriminatory intent when it came to overseeing

19  elections, but I did not see that he presented any data to

20  support that claim.

21          HON. JOHN D. BATES:  Mr. Coates, so as not to

22  unnecessarily use your time, how is this not an opinion on

23  determining legislative intent, which you I understand, or

24  rather the witness indicated he's not an expert in?  I don't

25  want to go back on what we just ruled, but I just don't

1    understand what subject he's talking to if he's not talking to

2    determining legislative intent.  And as I understand it --

3    correct me if I'm wrong -- Dr. Buchanan indicated he's not an

4    expert in determining legislative intent.

5            MR. COATES:  Well, we believe he's an expert --

6            HON. JOHN D. BATES:  No.  What did he say?  Did he say

7    he's not an expert in determining legislative intent?

8            MR. COATES:  Yes, sir.  The question asked on voir

9    dire was answered truthfully.  He said that he was not an expert

10   concerning legislative intent.  Our position is that in

11   rebuttal, that the witness can testify if it's within his realm

12   of expertise concerning --

13           HON. JOHN D. BATES:  Even if he said that he's not an

14   expert on that subject?

15           MR. COATES:  Yes, sir.

16           HON. JOHN D. BATES:  He can testify and we'll consider

17   it for what its worth.  Go ahead.

18           MR. COATES:  Yes, sir.  Our position is that he can

19   testify concerning evidence that the other experts relied upon

20   that he in his field of expertise believes are not persuasive or

21   valid or done properly.

22           HON. JOHN D. BATES:  You asked him to do a little bit

23   more than that, but please go ahead.

24           MR. COATES:  Okay.  That was the last question I had,

25   Your Honor.

1          HON. COLLEEN KOLLAR-KOTELLY:  All right.  Cross?

2          MR. SELLS:  May I have a moment?

3          HON. COLLEEN KOLLAR-KOTELLY:  Yes.

4          MR. SELLS:  Your Honor, may I give Professor Buchanan

5     a copy of his deposition?

6          HON. COLLEEN KOLLAR-KOTELLY:  Yes.

7          MR. SELLS:  May I proceed?

8          HON. COLLEEN KOLLAR-KOTELLY:  Yes.

9          MR. SELLS:  Given that limited direct exam, it's

10    difficult to know what my scope is, but I will try to keep it

11    within the scope of that direct.

12          HON. JOHN D. BATES:  Well, I guess the question is his

13    report will be allowed unless we don't allow it, so that report

14    will be in front of us.

15          MR. SELLS:  Well, if I haven't been clear, our

16    objection would extend to the portions of the documentary

17    evidence in which Professor Buchanan is offering opinions for

18    which he's not qualified either.

19          HON. JOHN D. BATES:  You don't know how we're going to

20    rule on that is what I'm saying.

21          MR. SELLS:  That's right.

22                         EXAMINATION

23    BY MR. SELLS:

24    Q.  Professor Buchanan, picking up where we left off a moment

25    ago, you're not an expert in history, are you?

1    A.   I do not teach history, so I guess that makes me not an

2    expert.   I'm a political scientist.

3    Q.   And in fact you testified in your deposition that you're

4    not an expert in history.

5    A.   Right.

6    Q.   And you're not an expert in sociology either, are you?

7    A.   No.

8           MR. SELLS:   Can we put up Professor Buchanan's report?

9    It's Plaintiffs' Exhibit 52.   I would like to look at Exhibit 9

10   to that report.   For the record, it's JA001184.

11   BY MR. SELLS:

12   Q.   Do you recognize Exhibit 9, Professor Buchanan?

13   A.   I do.

14   Q.   You discussed this briefly with Mr. Coates on direct,

15   correct?

16   A.   Yes, I did.

17   Q.   And you would agree with me that this exhibit shows a gap

18   in the white turnout average and nonwhite turnout average

19   between the poorest counties and wealthiest counties in the year

20   2000, correct?

21   A.   Yes, in the year 2000.

22   Q.   And that gap is about 15 percentage points, correct?

23   A.   If my math is correct, yes.

24   Q.   And the gap is about 10 percentage points in 2002, correct?

25   A.   Correct.

1  Q.   And there's a gap for each year except for 2008, correct?

2  A.   Do you mean in the sense of white turnout being greater

3  than nonwhite turnout?

4  Q.   Correct.

5  A.   Yes.

6  Q.   And you would expect this gap in light of the socioeconomic

7  literature you actually cite in your report, correct?

8  A.   Yes, I would.

9  Q.   I want to ask you, did you perform any significance testing

10  on these differences that you have portrayed in this exhibit?

11  A.   No, I did not.  I simply presented the election turnout

12  data itself.

13  Q.   But you're capable of doing significance testing on these

14  sorts of differences, correct?

15  A.   Yes.

16  Q.   That's something you learned in grad school if not before

17  then?

18  A.   Yes.

19  Q.   Okay.  Is it something that you have your students do in

20  your university?

21  A.   I don't teach graduate students.  I mostly teach

22  undergraduates.  We rarely get into that with undergraduates.

23  Q.   Okay.  Do you teach your students at the Citadel about

24  significance testing?

25  A.   In general terms, yes.

```
 1    Q.   And the importance of significance testing.

 2    A.   Yes.

 3    Q.   But you didn't do any significance testing on this chart.

 4    A.   No.  I simply presented the turnout data, as you see here.

 5    Q.   And you didn't control for the effects of a particular

 6    election cycle such as 2008, did you?

 7    A.   Not with statistical controls, no.

 8    Q.   But, again, that's something that you know how to do and

 9    you could do, correct?

10    A.   Yes.

11    Q.   Do you teach your students about the importance of

12    controlling for variables like election cycle effects when

13    looking at turnout data?

14    A.   I do.

15    Q.   And so in your report, when you make statements and

16    conclusions about this table, you're using what we sometimes

17    call the interocular test; is that correct?  Do you know what

18    the interocular test is?

19    A.   I'm not familiar with that term.  I'm familiar with the

20    term descriptive data.

21    Q.   The interocular test is a fancy name for eyeballing.

22    You're eyeballing this data and drawing conclusions from it

23    rather than making inferences based on statistics, correct?

24    A.   I understand -- yes, I understand what you're saying, but I

25    would also contend that this is actual data, election turnout
```

1    data that's not -- I would just say that it's actual election

2    turnout data.

3    Q.   And the inferences that you are drawing from this are based

4    on your two eyes and not inferential statistics, correct?

5    A.   Yes.

6    Q.   Now, can we look at page 16 of your report which is at

7    JA001120.  I'd like to highlight the sentence that begins

8    "Today" at the bottom of that page.  "The likelihood of" --

9    excuse me.  Let me start again, make sure I read it correctly.

10   "Today, the likelihood of local elections officials being a

11   mixture of both white and black persons is much greater, and the

12   likelihood of racial discrimination occurring as described is

13   much less likely."

14        Now, you have no data to support this sentence, correct?

15   A.   No, I don't.  I was rebutting Drs. Arrington and Burton,

16   who did not present any data.

17   Q.   Okay.  But you have no data, sir?

18   A.   I do not.

19   Q.   And you don't cite social science literature to support

20   this conclusion, do you?

21   A.   I'm not aware of any social science literature that deals

22   with this, at least in the context of South Carolina elections

23   boards.

24   Q.   And in fact, you admitted in your deposition that this was

25   speculation, didn't you?

1    A.   I did.

2    Q.   And you do nothing in your report to identify this as your

3    speculation, did you?

4    A.   I think I qualified and said "much less likely."

5    Q.   Well, when you make statements about likelihood, that's a

6    probability, right?

7    A.   It is.

8    Q.   And you make likelihood statements twice here, correct?

9    A.   I do.

10   Q.   In fact, you're saying the likelihood of racial

11   discrimination is less, correct?

12   A.   I'm saying it's less, but -- I'm saying it's less.

13   Q.   Okay.  But this again is speculation on your part?

14   A.   I do not have data for all of the counties, no.

15   Q.   Well, let's look three pages forward, page 19 of your

16   report, which is at JA001123.  I'd like to focus in on the first

17   sentence of that paragraph, "In sum."

18        "In sum, the argument that voting is racially polarized

19   solely due to racial attitudes is specious."  You wrote that,

20   right?

21   A.   I did.

22   Q.   And do you remember when we discussed this sentence in your

23   deposition?

24   A.   I do.

25   Q.   And this is in the section of your report that is entitled

1    "General rebuttals to Drs. Burton and Arrington," correct?

2    A.   Yes.

3    Q.   So this is where you're responding to something that

4    apparently Dr. Burton or Dr. Arrington said.

5    A.   Yes.

6    Q.   Or at least that's what the heading would suggest.

7    A.   Yes.

8    Q.   And in fact, you admitted in your deposition that

9    Dr. Arrington doesn't make this argument, that voting is

10   racially polarized solely due to racial attitudes, now does he?

11   A.   I did agree to that statement, yes.

12   Q.   And in fact, it's true that Dr. Arrington does not make

13   that argument, correct?

14   A.   Yes.

15   Q.   And so here what you're doing is you're criticizing an

16   argument that Dr. Arrington hasn't actually made, right?

17   A.   Well, Dr. Arrington, but I think I recall that I did say

18   Dr. Burton made that argument.  As far as your question with

19   Dr. Arrington, you are correct.

20   Q.   Your testimony here today is that Dr. Burton has argued

21   that voting is racially polarized solely due to racial

22   attitudes?

23   A.   If my memory is correct from my deposition, but I do

24   remember agreeing with you about Dr. Arrington, yes.

25              HON. COLLEEN KOLLAR-KOTELLY:  So is this supposed to

1    be refuting Dr. Arrington, who says not, or Dr. Burton?

2            THE WITNESS:  It's Dr. Burton, Your Honor.

3            HON. JOHN D. BATES:  And was your answer to the last

4    question that you believe Dr. Burton does make that argument?

5            THE WITNESS:  I believe in his report as I've read it,

6    I believe he does not provide any alternative explanations

7    compared to -- well, I don't believe he offers alternative

8    explanations.

9    BY MR. SELLS:

10   Q.   Professor Buchanan, would you turn with me to page 117 of

11   your deposition, please.

12   A.   I'm there.

13   Q.   Okay.  And I'm starting at line 6.  Were you asked the

14   following questions and did you give the following answers?

15       "Question:  Turn with me to page 19, if you would.  This is

16   where you sum up this section, and I will read it to you.  It

17   says, 'In sum, the argument that voting is racially polarized

18   solely due to racial attitudes is specious.'"

19       And your answer:  "Mm-hmm.

20       "Question:  Do you see that part?

21       "Answer:  I do.  I do.

22       "Question:  And can you point to me in Dr. Arrington's

23   report where he makes that argument?

24       "Answer:  Again, that is an overall summarization of what I

25   saw in the Arrington report, that I don't feel like -- I feel

1    like he focused on the fact that there is racially polarized

2    voting in the state without giving due attention to some other

3    factors that are there."

4         Now, did you give -- were you asked those questions, and

5    did you give those answers?

6    A.   Yes.

7    Q.   And so in your deposition, you directed that at

8    Dr. Arrington, didn't you?

9    A.   Yes.  I think I -- maybe I got tangled up up here, but I

10   felt like I had agreed with your statement a few moments ago.

11   Q.   Okay.  And this is criticizing an argument that

12   Dr. Arrington hasn't made.  I think that's what you just

13   testified.

14   A.   Yes.

15   Q.   And when you criticize an argument that hasn't actually

16   been made, that's called a straw man argument, isn't it?

17   A.   It is.

18             MR. COATES:  Objection, Your Honor.  The

19   characterization of the testimony in deposition is not correct.

20   Counsel has pointed to the fact that Dr. Arrington in his report

21   pointed to racially polarized voting, and he did not go any

22   further in terms of any other cause -- the cause or causes for

23   underlying racially polarized voting.  The witness has simply

24   said in his report --

25             HON. COLLEEN KOLLAR-KOTELLY:  You're talking about his

1    report, but we're going by his testimony.  His testimony appears

2    to be that Dr. Arrington -- he was asked the question, he said

3    Dr. Arrington didn't give this opinion, and he agreed he was

4    criticizing something that Dr. Arrington didn't make.  So we're

5    not looking at reports; we're going by what his testimony is.

6            MR. COATES:  Dr. Arrington said, he cited to racial

7    polarization, and Dr. Arrington didn't say one way or the other

8    what --

9            HON. COLLEEN KOLLAR-KOTELLY:  Mr. Coates, you're just

10   arguing at this point.  He's asked the question and he answers,

11   and you're left with his answers.

12   BY MR. SELLS:

13   Q.   Professor Buchanan, let's cut to the chase here.  This is a

14   straw man argument, isn't it?

15   A.   I think, based upon my testimony in the deposition, that I

16   did admit to you that some of what I said about racial

17   polarization was more in the Burton report than in the Arrington

18   report.

19   Q.   Well, in fact, that's not at all what we discussed in your

20   deposition.  You admitted that this argument is a straw man,

21   didn't you?

22   A.   Can you point me to that discussion?  I do remember the

23   straw man.

24   Q.   Yes.  This is also on page 117.  Let me ask you --

25           HON. COLLEEN KOLLAR-KOTELLY:  What line?

1          MR. SELLS:  This is on page 117 of the deposition at

2     line 22.  We're beginning there.

3     BY MR. SELLS:

4     Q.   So, Professor Buchanan, I'm going to ask you, were you

5     asked these questions and did you give these answers?

6          "But he doesn't make that argument, does he?"

7          There's a pause.  "Witness peruses document."

8          "Answer:  No, I do not see anything.

9          "Question:  Do you know what a straw man is?

10         "Answer:  Yes.

11         "Question:  This would be an example of a straw man

12     argument, right?

13         "Mr. Coates:  Objection.

14         "The Witness:  I disagree in the sense that I'm attempting

15     to show that racially polarized voting is not solely due to

16     racial attitudes, and I believe that the overall argument can be

17     found in the Arrington reports.  So I would disagree with that,

18     that is a straw man.

19         "Question:  Well, a straw man is criticizing an argument

20     that isn't actually made, right?

21         "Answer:  Correct.

22         "Question:  And you are criticizing an argument that

23     Dr. Arrington hasn't actually made.

24         "Mr. Coates:  Objection to form.  Misstatement of the prior

25     testimony.

1          "Question:  Right?  Isn't that what you're doing?

2          "Mr. Coates:  Same objection.

3          "The Witness:  In the case of the Arrington report, yes."

4          Were you asked those questions, and did you give those

5     answers?

6     A.   Yes, I did.

7     Q.   And in fact, your report is full of straw man arguments

8     attributing things to Drs. Arrington and Burton that they don't

9     actually argue, isn't it?

10    A.   I would have to see other examples.  I'm not ready to

11    testify to that.

12    Q.   Okay.  Well, let's take another example.  How about -- on

13    page 3 of your report.  This is JA001107.  These are the

14    opinions that you said you've listed in your report, and the

15    very first one:

16         "Since 1965, South Carolina has made dramatic progress in

17    the area of minority voting rights regarding the ability of

18    racial minority groups, especially African Americans, to

19    participate in the political process and to elect candidates of

20    their choice."

21         Now, are you suggesting that Dr. Arrington has said

22    otherwise?

23    A.   If my memory serves me from the deposition, I believe I

24    said Dr. Burton and did agree with you on Dr. Arrington.

25    Q.   I think I'm going to move on.  In your discussion of voter

1    fraud in your report, you offer the opinion that voter ID

2    statutes increase public confidence in the electoral system.  Do

3    you remember that in your report?

4    A.    That is my opinion.

5    Q.    Okay.  And do you remember that we discussed that in your

6    deposition?

7    A.    I do.

8    Q.    And do you remember in your deposition you told me that

9    that was a personal opinion, not a scientific opinion?

10   A.    I believe if I remember correctly I said a personal

11   opinion, and that was reinforced by my training, but it was a

12   personal opinion.

13   Q.    Well, you weren't relying on any data, were you?

14   A.    I had no specific data that stated that, no.  I had data of

15   voter fraud cases in the report.

16   Q.    Here we're talking about public confidence increased by

17   voter ID statutes.  You had no data, and you didn't cite to any

18   social science literature to support that, did you?

19   A.    I did not.

20   Q.    And you're not an expert in public opinion research, are

21   you?

22   A.    No.

23   Q.    And that was a personal opinion.  Was it speculation too?

24   A.    It was a personal opinion.

25   Q.    Now, you teach undergraduates at the Citadel, correct?

1    A.    That is correct.

2    Q.    Do you teach any upper-level courses?

3    A.    I do.

4    Q.    And in any of those courses do students have to submit

5    papers to you?

6    A.    They do.

7    Q.    In these papers that you receive from your students, if you

8    came across a student that used straw man arguments, speculation

9    not supported by data, had eyeballed some numbers and was

10   drawing conclusions off of those, you would give that student an

11   F, wouldn't you?

12   A.    Quite frankly, if some of them can put two sentences

13   together, then that's sort of doing something, but he or she

14   would receive certainly a lower grade.

15              MR. SELLS:  Thank you.  Those are my questions.

16              MR. HEARD:  Your Honor, the United States is hereby

17   ceding 45 minutes to Mr. Beeney.

18              HON. JOHN D. BATES:  No, no, no.  We don't want 45

19   minutes.

20        (Laughter)

21              MR. BEENEY:  Judge Bates, I was just going to ask for

22   an extra 30 after that.

23              HON. JOHN D. BATES:  I'm sure you were.

24              MR. BEENEY:  No, I will be far more brief than that.

25   I'm certainly the beneficiary of the government's, if not the

1    Court being the beneficiary of it.

2                            EXAMINATION

3    BY MR. BEENEY:

4    Q.   Good afternoon, Dr. Buchanan.

5    A.   Good afternoon.

6    Q.   Good to see you again.

7    A.   You as well.

8    Q.   Dr. Buchanan, you're being offered as a rebuttal expert by

9    the state of South Carolina in a case in which the issue is

10   whether R54 is in compliance with the Voting Rights Act?

11   A.   Yes.

12   Q.   But at least by the time you prepared your opinion, and

13   indeed by the time your deposition had been taken, you hadn't

14   read the law that's at issue in this case; is that right?

15   A.   Not in its entirety.

16   Q.   Would you turn to page 186 of your deposition,

17   Dr. Buchanan.  It's the bottom line of that page, sir, line 25.

18        "Question:  But you haven't read the law?"

19        Over to 187, 1.  "Answer:  I have not read the law."

20        Were you asked that question and did you give that answer?

21   A.   That's correct, but my memory is earlier in the day I did

22   say that I had not read it in its entirety.

23   Q.   Well, it can't be correct if the answer is you hadn't read

24   it in its entirety, but the answer you gave there is that you

25   hadn't read the law, right?

1    A.    Yes, on page 187.

2    Q.    And in terms of the other part of the case, the Voting

3    Rights Act, any view that you would express on the Voting Rights

4    Act is speculation; is that right?

5    A.    How?  I don't know that I understand your question.

6    Q.    Would you turn to page 182 of your deposition.

7    A.    I'm there.

8    Q.    Okay.  Reading on line 20, going over to 183, 7.

9         "Question:  And when a state presents a change in voting

10   law to the Justice Department under Section 5, what does it have

11   to show in order to get the Justice Department to sign off on

12   the law, do you know?

13        "Answer:  My understanding -- well, I would need to take a

14   look at the law.  I could give you my understanding, but it

15   would be speculation, so I would rather take a look at the law

16   itself.

17        "Question:  So you don't have any understanding other than

18   what would be speculation?

19        "Answer:  Yeah, pure speculation.  I have a pretty good

20   feeling, but I just -- well, without being pure speculation."

21        Were you asked those questions and did you give that

22   answer?

23   A.    I was.

24   Q.    So you're being offered as an expert in a case about a law

25   you haven't read, and with respect -- excuse me, about the South

1    Carolina law that you haven't read with respect to law that's

2    being applied that you don't know anything about?

3             MR. COATES:  Objection.  Misstatement of the evidence.

4    The court testimony indicates that he has read some portions of

5    R54.

6             HON. COLLEEN KOLLAR-KOTELLY:  All right.  We'll take a

7    look at whatever he said.  Go ahead.

8             HON. JOHN D. BATES:  Maybe you ought to just rephrase

9    the question.

10   BY MR. BEENEY:

11   Q.   You do agree that you gave an answer in the deposition,

12   Dr. Buchanan, that you hadn't read R54, correct?

13   A.   I agree that this portion, but I also would state earlier

14   that I stated that I had not read it in its entirety.

15   Q.   And today, sitting here, which one do you think is right?

16   A.   That I had not read it in its entirety.

17   Q.   What part of the law did you read?

18   A.   I read the portion about the acceptable forms of

19   identification.

20   Q.   But you didn't read anything else in the law?

21   A.   Not in any depth, no.

22   Q.   Did you read it in any depth at all?

23   A.   Not prior to the deposition.

24   Q.   And not prior to offering your opinion in your written

25   report?

1    A.    Beyond the -- what I was doing was verifying what was said

2    in the expert reports about types of identification.

3    Q.    And even before starting to work on the case, you thought

4    that voter ID laws were generally a pretty good thing; is that

5    right?

6    A.    I believe I mentioned that opinion.

7    Q.    But you can't cite a single academic study that in any way

8    supports a claim that voter ID laws in any way have any impact

9    on any form of voter fraud, can you?

10   A.    I'm not aware of any.

11   Q.    Now, with respect to the voter ID law in this case, which I

12   guess you read a part of?

13   A.    Yes.

14   Q.    You can't tell us one way or the other, or if at all

15   whether R54 deters any voting fraud at all.

16   A.    I don't believe anyone can since it's not gone into effect

17   yet.

18   Q.    Well, I don't want you to speculate about other people, but

19   certainly you can't; is that right?

20   A.    I cannot because it's not gone into effect.

21   Q.    And your opinion that voter ID laws will discourage other

22   types of voting is not a professional opinion, it's your

23   personal opinion, right?

24   A.    It is a personal opinion.

25   Q.    Now, I want to talk to you a little bit about the

```
1    methodology that you used in preparing your report.  To take as
2    an example, you say in your rebuttal report at page 44,
3    Dr. Buchanan, that "voter fraud, including impersonation fraud,
4    does in fact occur at alarming rates across the nation and in
5    South Carolina, and that affects the public view of the
6    electoral system."  Do you recall that?
7    A.   I see that right now.
8    Q.   And that opinion that you're offering is based on one thing
9    and one thing only; is that right?
10   A.   It is based upon the voting fraud cases that appear in one
11   of the tables of the report.
12   Q.   And it's based only on Exhibit 12 to your report; isn't
13   that correct?
14   A.   Yes.  That was the basis of that.
15   Q.   And in order to reach the conclusion that you did based on
16   table 12, what you did was you had a researcher who you had
17   never met, who was provided to you by another source, go to a
18   Web site that compiles underlying data that you never verified,
19   and then you relied on information that was compiled by the
20   source that you never verified without verifying that
21   information either, and that's how you came to your opinion.  Is
22   that right?
23   A.   Yes.
24   Q.   And that's not consistent with methods of social science
25   research, is it?
```

1    A.   Having not published voter fraud cases, I cannot answer

2    that.

3    Q.   Well, let's expand it beyond the limited field of voter

4    fraud cases.  Using a research assistant who you've never met

5    that someone referred to you, that you don't know anything

6    about, to look at a Web site that you never verified, to compile

7    information that in turn you never verified, I mean, that's not

8    social science methods, is it?

9    A.   I would hasten to add on the not verifying that those were

10   news stories that were posted on a variety of different

11   legitimate Web sites, news Web sites.

12   Q.   Well, with apologies to my friends in the press who may be

13   in the room, you believe that it's acceptable social science to

14   read a newspaper and then rely on that as truth to come to an

15   opinion that voter fraud is rampant around the country?

16   A.   Well, that is one tool that you can use.

17   Q.   You think that's acceptable social science.

18   A.   Again, it's one tool that can be used.

19   Q.   Isn't your definition of acceptable social science to

20   verify when you can?

21   A.   When possible.

22   Q.   And you had two months to do this work, right?

23   A.   Yes.

24   Q.   And I think -- let me ask you this.  You wouldn't rely on a

25   survey conducted by someone else unless you understood how that

1   survey was done, right?

2   A.   No.

3   Q.   But that's what you did in order to deliver your opinion in

4   your report.

5   A.   I wouldn't -- maybe we are parsing words on surveys.  When

6   I say survey, I thought you meant an opinion poll.

7   Q.   Now, Dr. Buchanan, you're not offering your own independent

8   views one way or the other as to whether R54 was enacted with a

9   discriminatory purpose, are you?

10  A.   I'm saying that I found no evidence, from what research I

11  did do, I found no evidence.

12  Q.   You found no evidence that R54 was enacted with a

13  discriminatory purpose, right?

14  A.   No, I did not find any evidence.

15  Q.   But you didn't look at any evidence.  You didn't read a

16  deposition, you didn't look at a document produced by the state,

17  you spent 10 minutes talking with a legislator, so the reason

18  you didn't find any evidence is because you didn't see any?

19  A.   I think I provided in the report research that provides

20  alternatives, and again, from what I saw, I did not find any

21  evidence.

22  Q.   Well, let's take it one step at a time.  You're not

23  offering an opinion of your own whether R54 was enacted with a

24  discriminatory purpose, are you?

25              MR. COATES:  Objection.  The witness is not offered by

1   the state of South Carolina for the purpose of proving racial

2   intent or nonracial intent.  The only purpose for the witness

3   being offered is to rebut the conclusions of the defendants' two

4   experts.

5          HON. COLLEEN KOLLAR-KOTELLY:  Yes, but which

6   conclusions?

7          HON. JOHN D. BATES:  And one of those conclusions is

8   exactly what you're talking about.

9          MR. COATES:  He's offered for the purpose of rebutting

10  the conclusions that R54 was enacted with a racially

11  discriminatory purpose.  He is not independently offered to

12  provide his own opinion about whether or not R54 was enacted

13  with a discriminatory purpose.

14         HON. JOHN D. BATES:  All right.

15         HON. COLLEEN KOLLAR-KOTELLY:  Well, we now understand

16  what they're thinking.

17  BY MR. BEENEY:

18  Q.   So just to confirm Mr. Coates's representation,

19  Dr. Buchanan, you're not offering any view one way or the other

20  as to whether R54 was enacted with a discriminatory purpose, are

21  you?

22  A.   I am not.  I am serving as a rebuttal to the opinions

23  offered by the other two gentlemen.

24  Q.   And just to nail this down because I think it's important,

25  would you turn to page 170 of your deposition.

1    A.    I'm there.

2    Q.    On line 21 you were asked:  "And so you are not offering

3    any view one way or the other whether it was or whether it

4    wasn't enacted with a discriminatory purpose?"

5          And your answer is, on line 24, "No."

6          You were asked that question and gave that answer, right?

7    A.    I did.

8    Q.    And that hasn't changed today, right?

9    A.    No.

10   Q.    But you are claiming that you didn't see any evidence that

11   R54 was enacted with a discriminatory purpose, right?

12   A.    I'm claiming I didn't see any evidence as offered in the

13   reports of Drs. Burton and Arrington.

14   Q.    And the reason you're limited to looking at what's in the

15   reports of Drs. Burton and Arrington is because you didn't look

16   at any evidence in the case on your own.

17   A.    Again, I was asked to rebut their reports.

18   Q.    Can you answer my question, Dr. Buchanan?  You didn't look

19   at any evidence in the case on your own?

20   A.    As far as legislative history or...

21   Q.    Or depositions or documents or, by the time you'd done your

22   report, interrogatories or requests to admit or anything else.

23   A.    I was not offered any depositions, no.

24   Q.    Nor were you offered any documents?

25   A.    No.

1    Q.    Nor answers to interrogatories?

2    A.    No.

3    Q.    Nor responses to requests to admit?

4    A.    No.

5    Q.    I don't know if I've left anything out, but you didn't look

6    at any evidence in the case, did you?

7    A.    None of what you said.

8    Q.    Now, you agree that voting in South Carolina is racially

9    polarized.

10   A.    I do.

11   Q.    And based on your understanding of racially polarized

12   voting in South Carolina, you would agree that if one were able

13   to prevent an African American from voting in South Carolina,

14   the overwhelming likelihood is that you prevented someone from

15   voting Democratic, correct?

16   A.    Yes.

17   Q.    And you didn't look at the legislative history of R54, did

18   you?

19   A.    I examined the one that was offered in the Burton report.

20   Q.    And you didn't find anything wrong with that, did you?

21   A.    No.

22   Q.    And you can't tell us of any instance of voter

23   impersonation fraud in South Carolina ever, can you?

24   A.    Not in South Carolina.

25   Q.    And even though you looked for it, didn't you?

1   A.   I looked for it in the sense of what I presented, yes.

2   Q.   Now, if you were going to perform an analysis of whether

3   R54 was enacted with a discriminatory purpose, the way you'd

4   figure out your methodology would be to think about it and sit

5   around the office with a few other professors, talk to each

6   other, say, hey, what do you think about this, and that's how

7   you'd come up with your methodology; is that right?

8   A.   At least the beginning method.  That's one of the things

9   that professors typically do.  I wouldn't say it's the end

10  result, but it's where it gets started.

11  Q.   And Dr. Buchanan, African Americans in South Carolina have

12  lower rates of educational attainment?

13  A.   That is true.

14  Q.   And I think your own data suggests that they have per

15  capita income that is about half of white people?

16  A.   I don't remember the exact figures, but that sounds to be

17  the approximate case, yes.

18  Q.   Why don't you take a look at Exhibit 7 to your report, and

19  then we can get the exact figures.

20  A.   Okay.

21  Q.   And let's compare it with Exhibit 8.  You calculated per

22  capita income of whites in South Carolina to be $24,822?

23  A.   This is based upon census, American Community Survey, to be

24  exact, yes.

25  Q.   You're saying it's incorrect?

1   A.   No, I'm just saying this is where it came from.

2   Q.   This is another one of those pieces of data that you relied

3   on that you didn't verify?

4   A.   I verified it in the sense that it's in the American

5   Community Survey provided by the Census Bureau.

6   Q.   So you're claiming you verified this by looking at it.

7   A.   I don't know that I understand your question.

8   Q.   I'm trying to understand what you mean by you verified it.

9   You went to a source, and you copied it.

10  A.   Well, yes.  It's data provided by the Census Bureau.

11  Q.   Okay.  And comparing white and nonwhite, the white per

12  capita income is $24,822, and nonwhite is $13,531; is that

13  right?

14  A.   That's correct.

15  Q.   And notwithstanding lower levels of educational attainment

16  and about half of the per capita income, you don't think that's

17  got any impact on the ability to overcome costs of voting?

18  A.   Can you rephrase the question?  I want to make sure I

19  understood you.

20  Q.   Sure.  Notwithstanding per capita income of nonwhites of

21  about half of what it is for whites, and notwithstanding lower

22  levels of education attainment of African Americans as compared

23  to whites, you don't believe that affects voter turnout or the

24  ability to overcome hurdles placed in front of voting?

25  A.   Just to make sure that I understand, I'm going to elaborate

1    slightly that I acknowledge that lower SES factors generally

2    lead to lower turnout.  I would agree with that.

3    Q.   Why is that?

4    A.   Again, if you have a relatively low level of education,

5    you're not likely to have a very high level of political

6    efficacy, to feel that you can make a difference at the ballot

7    box.  If you have lower levels of income, you may be worried

8    about other factors than voting itself.  So that's a

9    summarization of very broad literature.

10   Q.   Did you tell us earlier today that African American

11   registration was actually higher than it is for whites in South

12   Carolina?

13   A.   I believe I said that for June 2012.

14   Q.   So it's not a lack of interest in the electoral system

15   among African Americans.

16   A.   I think the figures speak for themselves in that sense.

17   There obviously is a great deal of interest.

18   Q.   Now, I think you also mentioned on direct about certain

19   election of black officials around the state?

20   A.   That is correct.

21   Q.   And I'd like to talk to you now a little bit about

22   statewide elections.  In the history of South Carolina, there

23   has never been an African American governor elected, has there?

24   A.   No, there has not.

25   Q.   And in the history of South Carolina, there has never been

1    an African American United States Senator that's been elected;

2    is that right?

3    A.   Not elected, no, not to the Senate.

4    Q.   In the history of South Carolina, there have been two

5    United States representatives elected?

6    A.   I would have to look at reconstruction era before, but I

7    can say certainly right now there have been two, yes.

8    Q.   And in your view, one of those has positions on issues that

9    are not the way a majority of South Carolina African Americans

10   feel about government; would you agree?

11   A.   I agree that --

12             MR. COATES:  Objection to the foundation.

13             HON. COLLEEN KOLLAR-KOTELLY:  Well, he's ready to

14   answer it, but...

15             MR. BEENEY:  I could also take it out of his

16   deposition if we'd prefer, so the foundation is his deposition.

17             HON. COLLEEN KOLLAR-KOTELLY:  Let's just go.  Go

18   ahead.

19   BY MR. BEENEY:

20   Q.   And Dr. Buchanan, you're also not aware of any expert the

21   state of South Carolina is providing in this case with respect

22   to an opinion as to whether R54 was enacted with a racially

23   discriminatory purpose, are you?

24   A.   Can you restate that?  I lost the first part.  I'm sorry.

25   Q.   Sure.  You're not aware of any expert the state of South

1   Carolina is providing in this case with respect to an opinion as

2   to whether R54 was enacted with a racially discriminatory

3   purpose.

4   A.   Not aware.

5   Q.   And you don't have a view as to whether R54 would in fact

6   retard the progress that has been made in the area of minority

7   voting rights?

8   A.   No.

9   Q.   No, you're not offering --

10  A.   No, I'm simply the rebuttal.  Again, I'm the rebuttal

11  witness to the Burton and Arrington reports.

12  Q.   So, really, do I have it right, Dr. Buchanan, that what

13  your opinion really comes down to is that Dr. Arrington and

14  Dr. Burton did not look at certain information that you think

15  they should have in order to have reached their opinion?

16  A.   I agree that they did not consider all information.

17  Q.   And that's the opinion that you're offering in the case; is

18  that right?

19  A.   Yes.

20  Q.   And because you have not reached any conclusion at all

21  about whether R54 was enacted with a discriminatory purpose, you

22  can't say whether, if Dr. Arrington and/or Dr. Burton had looked

23  at the information that you think they should have, whether they

24  would have come to any conclusion other than the one that they

25  did?

1              MR. COATES:  Calls for speculation.

2              HON. COLLEEN KOLLAR-KOTELLY:  No, I'll allow it.

3              THE WITNESS:  I cannot.

4              MR. BEENEY:  Thank you very much.

5         Thank you, Your Honors.

6              HON. COLLEEN KOLLAR-KOTELLY:  All right.  Mr. Coates,

7    you get three minutes.  Did you want to do something more?

8              MR. SELLS:  The United States renews its objection to

9    Professor Buchanan's testimony and moves to strike it in its

10   entirety.

11             HON. COLLEEN KOLLAR-KOTELLY:  All right.

12             MR. BEENEY:  Join in the motion, Your Honor.  Thank

13   you.

14             HON. COLLEEN KOLLAR-KOTELLY:  All right.  Mr. Coates,

15   three minutes.

16             HON. JOHN D. BATES:  Earlier I'd asked you to submit a

17   motion in writing.  You're making an oral motion, we understand

18   that.  But we've decided to defer ruling on that until we see a

19   written motion from you.

20             MR. COATES:  May I proceed, Your Honor?

21             HON. COLLEEN KOLLAR-KOTELLY:  Yes.

22             MR. COATES:  Thank you.

23                          EXAMINATION

24   BY MR. COATES:

25   Q.   Dr. Buchanan, you had an occasion to read the reports

1   submitted by Dr. Arrington and Burton in this case?

2   A.   I did.

3   Q.   Did they in part rely upon newspaper reports in their

4   expert reports in this case?

5   A.   They did.

6   Q.   Now, with regards to the statewide elections, has there

7   been a minority person elected statewide in South Carolina in

8   the recent past?

9   A.   I believe Governor Haley fits the census definition of a

10   minority.

11   Q.   And what is Governor Nikki Haley's ancestry?

12   A.   She is of, I believe the term the Census Bureau uses is

13   South Asian Indian.

14   Q.   Which party is she affiliated with?

15   A.   The Republican Party.

16   Q.   And in the Republican primary in 2010, did she have

17   opposition?

18   A.   She did.

19   Q.   And how many opponents did she have in the Republican

20   primary?

21   A.   Total of four including herself, so she had three other

22   opponents.

23   Q.   What was the race of the four opponents that Governor Haley

24   had in the Republican primary?

25   A.   They were all white males.

```
 1    Q.   Was one of them Mr. McMaster, who had served as the United

 2    States Attorney in South Carolina and the state Attorney

 3    General?

 4    A.   Yes.

 5              MR. SELLS:  Objection.

 6              HON. COLLEEN KOLLAR-KOTELLY:  These are people who

 7    didn't get -- you made your point that she's a minority.  I'm

 8    not sure what difference it makes for the rest.

 9              HON. JOHN D. BATES:  What's the basis of the

10    objection?  Relevance?

11              MR. SELLS:  Leading and relevance, Your Honor.

12    BY MR. COATES:

13    Q.   Do you know any of the opponents that Governor Haley had in

14    the Republican primary?

15    A.   I do.

16    Q.   And could you tell us about them?

17    A.   They were all white males.

18    Q.   And with regards to the question about significance

19    testing -- and you testified that there had been no significance

20    testing on the turnout figures that you showed in your report?

21    A.   Yes.

22    Q.   Do you feel confident as a social scientist that the

23    percentages showing black and white voter turnout in the

24    counties that you cite to are correct?

25    A.   Yes.
```

 1                    MR. COATES:  No further questions, Your Honor.

 2                    HON. COLLEEN KOLLAR-KOTELLY:  All right.  Anything

 3       else?  You can step down, sir.  Thank you.

 4           (The witness steps down.)

 5                    HON. COLLEEN KOLLAR-KOTELLY:  All right.  I think

 6       we're finished in terms of testimony; am I correct?

 7                    HON. JOHN D. BATES:  Does that close the rebuttal

 8       case?

 9                    HON. COLLEEN KOLLAR-KOTELLY:  Or did you have

10       something else?  I shouldn't have jumped to that conclusion.

11                    MR. BARTOLOMUCCI:  If the United States is finished

12       with its case --

13                    HON. JOHN D. BATES:  This is your rebuttal case.

14                    MR. BARTOLOMUCCI:  Correct.  And we're finished with

15       our rebuttal case.  The Attorney General of South Carolina, who

16       has been here most of the week, had a request to address the

17       Court for one minute on a matter of nonsubstance, with the

18       Court's permission.

19                    HON. JOHN D. BATES:  Nonsubstance.

20                    HON. COLLEEN KOLLAR-KOTELLY:  All right.  Well, what

21       we were going to do -- and he can certainly address us now -- is

22       we were going to take a short break and reconvene and hopefully

23       we would get an answer from the parties, at least an initial

24       answer to the questions that Judge Bates started yesterday and

25       all of us chimed in in one form or another, as to the positions