# Exhibit 2

```
 1              UNITED STATES DISTRICT COURT

 2              FOR THE DISTRICT OF COLUMBIA

 3    ------------------------------x

 4    STATE OF SOUTH CAROLINA,          :

 5                   Plaintiff,    :   Civil Action No.:

 6       v.                        :   1:12 cv-203

 7    UNITED STATES OF AMERICA and  :   (CKK-BMK-JDB)

 8    ERIC H. HOLDER, JR., in his    :

 9    official capacity as Attorney  :

10    General,                       :

11                   Defendants,    :

12    JAMES DUBOSE, et al.,          :

13       Defendant-Intervenors.     :

14    ------------------------------x

15

16       Deposition of SCOTT EUGENE BUCHANAN, Ph.D.

17                   Washington, DC

18              THursday, August 16, 2012

19                   9:05 a.m.

20

21

22

23

24    Pages: 1 - 230

25    Reported by: Leslie Anne Todd
```

**CERTIFIED COPY**

Page 2

```
 1        Deposition of SCOTT EUGENE BUCHANAN, Ph.D.,
 2   held at the offices of:
 3
 4
 5
 6              U.S. DEPARTMENT OF JUSTICE
 7              1800 G Street, NW
 8              7th Floor
 9              Washington, DC 20006
10              (202) 514-2000
11
12
13
14
15        Pursuant to Notice, before Leslie Anne Todd,
16   Court Reporter and Notary Public in and for the
17   District of Columbia, who officiated in
18   administering the oath to the witness.
19
20
21
22
23
24
25
```

Page 4

```
 1   A P P E A R A N C E S    C O N T I N U E D
 2   ON BEHALF OF DEFENDANT INTERVENORS:
 3        GARRARD R. BEENEY, ESQUIRE
 4        Sullivan & Cromwell LLP
 5        125 Broad Street
 6        New York, New York 10004
 7        (202) 558-4000
 8
 9   ALSO PRESENT:
10        PEYTON MC CRARY (US DOJ - Historian)
11        J. GERALD HEBERT (The Campaign Legal Center)
12        RENATA STRAUSE (The Campaign Legal Center)
13        MARY SCOTT KENNEDY (Intern)
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 3

```
 1              A P P E A R A N C E S
 2   ON BEHALF OF PLAINTIFF:
 3        H. CHRISTOPHER COATES, ESQUIRE
 4        Law Office of H. Christopher Coates
 5        934 Compass Point
 6        Charleston, South Carolina 29412
 7        (843) 609-7080
 8
 9   ON BEHALF OF DEFENDANT USA:
10        BRYAN L. SELLS, ESQUIRE
11        RICHARD DELLHEIM, ESQUIRE
12        TOBY MOORE, ESQUIRE
13        U.S. Department of Justice
14        950 Pennsylvania Avenue, NW
15        Room 7264-NWB
16        Washington, DC 20530
17        (202) 353-0792
18
19
20
21
22
23
24
25
```

Page 5

```
 1              C O N T E N T S
 2   EXAMINATION OF SCOTT EUGENE BUCHANAN, Ph.D.    PAGE
 3        By Mr. Sells                                7
 4        By Mr. Beeney                             153
 5        By Mr. Coates                             206
 6        By Mr. Sells                              200
 7        By Mr. Beeney                             223
 8
 9
10              E X H I B I T S
11           (Attached to transcript)
12   BUCHANAN DEPOSITION EXHIBIT                    PAGE
13   Exhibit 1  Curriculum Vitae of Scott Eugene     16
14              Buchanan, Ph.D.
15   Exhibit 2  Declaration of Scott Eugene          35
16              Buchanan, Ph.D.
17
18
19
20
21
22
23
24
25
```

```
1              P R O C E E D I N G S
2            SCOTT EUGENE BUCHANAN, Ph.D.
3      having been duly sworn, testified as follows:
4           MR. COATES:  Before we start, I just want
5  to state for the record that there are several typos
6  in the declaration of Dr. Buchanan, and he wanted to
7  correct those on the record so that you would have
8  the benefit of those corrections prior to the time
9  that you started your deposition.
10          MR. SELLS:  I intend to ask Professor
11 Buchanan about those.  Is there some reason why he
12 needs to go first with that?
13          MR. COATES:  Well --
14          THE WITNESS:  I have them listed.  I can
15 give them to you now or --
16          MR. SELLS:  Let's wait because I don't
17 have your report in front of me, and it's not been
18 marked as an exhibit yet.
19          THE WITNESS:  Okay.
20          MR. SELLS:  And then we will have a
21 chance to do that.
22          MR. COATES:  Okay, that's fine.
23          MR. SELLS:  But I appreciate the heads-up
24 on that.
25          THE WITNESS:  Okay.
```

```
1           EXAMINATION BY COUNSEL FOR
2           DEFENDANT UNITED STATES OF AMERICA
3  BY MR. SELLS:
4      Q    Good morning, Professor Buchanan, and
5  thanks for coming to Washington, D.C.
6      A    Good morning.
7      Q    My name is Bryan Sells, and I'm an
8  attorney with the United States Department of
9  Justice, and I represent the United States in this
10 matter.
11          Would you please state your name for the
12 record?
13     A    Scott Eugene Buchanan.
14     Q    And have you ever been deposed before?
15     A    I have not.
16     Q    In that case I will go over some of the
17 basic ground rules for deposition.
18     A    Okay.
19     Q    Of course everything that you say here
20 today is under oath.
21          Do you understand that?
22     A    Yes.
23     Q    And a deposition is a question-and-answer
24 session where I ask the questions and you give the
25 answers.
```

```
1      Q    Do you understand that?
2      A    Yes.
3      Q    All of your answers and all of my
4  questions have to be taken down by this court
5  reporter so that we can read the transcript later.
6          Do you understand that?
7      A    Yes.
8      Q    And because the court reporter can only
9  take down verbal responses, I would ask you not to
10 use gestures, shrugs, nods, that sort of thing as
11 your answer.
12          Do you understand that?
13     A    I understand.
14     Q    One other ground rule that the court
15 reporter will appreciate is if we try, each other,
16 not to talk when the other person is talking.  That
17 becomes very difficult for the court reporter to keep
18 a clean transcript.
19          Do you understand how that works?
20     A    I understand.
21     Q    There's a chance we may go over some
22 technical terms here this morning.  If there is
23 anything I ask you that you don't understand or need
24 clarification for, would you please ask me?
25     A    Yes, I will.
```

```
1      Q    I will try to clarify it if I can.
2          If you need a break, we can take a break,
3  although I would ask that you not ask for a break
4  while we are in the middle of a line of questioning.
5  Okay?
6      A    I understand.
7      Q    Now, sometimes you remember things later
8  in the day that would be responsive to a question
9  that we discussed earlier.  If that happens would you
10 let me know what's on your mind so that we can get
11 that down on the record?
12     A    Yes.
13     Q    Also sometimes after we've been talking
14 for a while, you will remember that an answer that
15 you previously gave was not completely accurate.  If
16 that happens, would you let me know so we can correct
17 it for the record?
18     A    Yes, I will.
19     Q    And sometimes when you're answering a
20 question, you may think of a document that might help
21 you remember the answer to the question.  And if that
22 happens, would you please let me know, because I may
23 have the document here with me.
24     A    Yes.
25     Q    Are you on any medication or drugs that
```

Page 30

1  opinions in this case?
2      A    No, it did not.
3      Q    Are you familiar with the term "racially
4  polarized voting"?
5      A    I am.
6      Q    What is your understanding of that term?
7      A    My understanding is that this is when you
8  have two different racial -- well, I guess it could
9  be more than that -- but when you have racial groups
10  casting votes in almost completely opposite manners.
11  In other words, if you have a situation of the
12  majority of white voters voting Republican, a
13  majority of black voters voting Democratic, that
14  would be an example of racially polarized voting.
15      Q    When did you gain your understanding of
16  what racially polarized voting is?
17      A    I ran or encountered the idea as early as
18  the early 1990s as an undergraduate.  During graduate
19  school, I learned more of the concept.  I have become
20  more familiar with it, refreshed my memory in the
21  context of this case.
22      Q    Now, the understanding of racially
23  polarized voting that you just recited to me in my
24  previous question, is that the same understanding
25  that you had when you wrote your report and formed

Page 31

1  your opinions in this case?
2      A    It is.
3      Q    Has your understanding of racially
4  polarized voting changed in the last six months?
5      A    Can you restate the question?
6      Q    Has your understanding of what racially
7  polarized voting is changed in the last six months?
8      A    No.
9      Q    How did you gain your understanding of
10  what racially polarized voting is?
11      A    At first as an undergraduate in course
12  work; graduate school the same, during course work;
13  and then during the context of this case by
14  consulting other literature, other research that
15  deals with this particular issue.
16      Q    What other research did you consult?
17      A    I consulted -- most of these -- in fact,
18  they are mentioned, all of them are cited in the
19  report.  Harold Stanley stands out.  Stanley's is the
20  main work.  Also Wolfinger, Who Votes.  Controversies
21  in Voting Behavior, Niemi and Weisberg.
22      Q    Did you consult any other article, book
23  or person in shaping your understanding of what
24  "racially polarized voting" means?
25      A    No.

Page 32

1      Q    Are you familiar with the term "resource
2  model of political participation"?
3      A    I am not.
4      Q    Well, are you familiar with the idea that
5  the more costs a voting system imposes on the voter,
6  the less likely a voter is to turn out and vote?
7      A    I'm familiar with that concept.
8      Q    Is that concept well established in the
9  political science literature?
10      A    It is certainly -- yes, it is certainly
11  one of the schools -- schools of thought in the area
12  of voting behavior, so, yes, it is well established.
13      Q    And are you familiar with that school of
14  thought?
15      A    Yes.  Somewhat, I will say.
16      Q    Do you teach that school of thought in
17  any of your government or political science courses?
18      A    I do not.
19      Q    Who would be the main authorities for
20  that school of thought?
21      A    Ricker stands out as one.
22      And I'm going back to graduate school
23  days on this.  So he -- his stands out to me.  His
24  name stands out to me.
25      Q    Okay.  When were you first contacted

Page 33

1  about this case?
2      A    I was first contacted in April of this
3  year.
4      Q    Who contacted you?
5      A    Christopher Coates.
6      Q    When were you formally retained?
7      A    End of May -- 30th of May.  30th of May.
8      Q    Is your retainer in writing?
9      A    It is.
10      Q    Do you have a copy with you?
11      A    I do not.
12      Q    Does the retainer set forth your scope of
13  work in this case?
14      A    It does.
15      Q    And what is your scope of work in this
16  case?
17      A    I would --
18      Q    As set forth in your retainer.
19      A    I would have to see a copy of that to say
20  definitively, but it was to serve as a rebuttal
21  witness to Dr. Arrington and Dr. Burton.
22      Q    Is there some reason for the time lag
23  between your first contact in April and your
24  retention at the end of May?
25      A    My understanding of this was that the