# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

STATE OF SOUTH CAROLINA,

        *Plaintiff*,

  v.

UNITED STATES OF AMERICA and
ERIC H. HOLDER, JR.,

in his official capacity as Attorney General,

        *Defendants*,

    and,

JAMES DUBOSE, JUNIOR GLOVER,
FAMILY UNIT, INC., BRENDA C.
WILLIAMS, M.D., AMANDA WOLF,
DELORES FREELON, NAOMI GORDON,
JOSEPH RILEY, RAYMOND
RUTHERFORD, and THE SOUTH
CAROLINA PROGRESSIVE NETWORK,

        *Defendant-*
        *Intervenors*,
    and,

LEAGUE OF WOMEN VOTERS OF SOUTH
CAROLINA and CRAIG DEBOSE,

        *Defendant-*
        *Intervenors*,
    and,

SOUTH CAROLINA STATE CONFERENCE
OF THE NAACP and KENYDA BAILEY,

        *Defendant-*
        *Intervenors*.

Case No. 1:12-cv-203 (CKK, BMK, JDB)

## DEFENDANT-INTERVENORS' PROPOSED FINDINGS OF FACT AND
## CONCLUSIONS OF LAW

# TABLE OF CONTENTS

*Page*

PROPOSED FINDINGS OF FACT ..................................................................................... 1

I.   The State Has Not Shown that R54 Will Not Have a Racially Discriminatory
     Effect ........................................................................................................................ 1

     A.  The "Free" IDs Carry Significant Costs ....................................................... 1

         1.  Indirect Financial Costs ....................................................................... 2

         2.  Institutional Costs ................................................................................ 3

         3.  Transportation Costs ............................................................................ 5

     B.  The "Reasonable Impediment" Exception Will Not Mitigate the Racial Gap
         in ID Possession ............................................................................................ 7

         1.  The RI Exception Channels Voters without ID into a More Burdensome
             and Less Effective Mode of Voting ..................................................... 8

         2.  The RI Exception Will Not Be Applied Uniformly .............................. 11

         3.  Without Uniform Application, the RI Provision Will Exacerbate R54's
             Racially Discriminatory Effect ............................................................ 14

     C.  The Voter Education Plan Does Not Address the Racial Gap in Required ID
         Possession ...................................................................................................... 15

II.  The State Has Not Shown that R54 Was Not Enacted with a Discriminatory
     Purpose ..................................................................................................................... 17

     A.  The House, Led by Representative Clemmons, Repeatedly Stripped Crucial
         Mitigating Provisions from the Senate Compromise Amendment ................. 18

     B.  The House Treated Minority Legislators' Concerns with Indifference and
         Contempt ........................................................................................................ 21

     C.  R54 Proponents Resorted to Unusual Procedural Maneuvers to Push Voter
         ID Legislation ................................................................................................ 22

     D.  The State's Historical Background of Discrimination .................................. 24

     E.  The State's Claimed Purposes for R54 Are Pretextual ................................ 25

PROPOSED CONCLUSIONS OF LAW ........................................................ 25

I.   The State Has Not Shown that the Voting Changes Will Not Have a
     Retrogressive Effect ................................................................................ 25

II.  The State Has Not Shown the Voting Changes Do Not Have a Discriminatory
     Purpose .................................................................................................... 28

CONCLUSION .............................................................................................. 30

# TABLE OF AUTHORITIES

*Page(s)*

## CASES

*Allen* v. *State Board of Elections,*
  393 U.S. 544 (1969) ................................................................ 26

*Arlington Heights* v. *Metropolitan Housing Development Corp.,*
  429 U.S. 252 (1977) .............................................................28-29

*Colleton County Council* v. *McConnell,*
  201 F. Supp. 2d 618 (D.S.C. 2002) ......................................... 24

*County Council of Sumter* v. *United States,*
  596 F. Supp. 35 (D.S.C. 1984) ................................................ 24

*Florida* v. *United States, et al.,*
  No. 11- 01428 (D.D.C. Aug. 16, 2012).................................26-29

*Garza* v. *Los Angeles Board of Supervisors,*
  918 F.2d 763 (9th Cir. 1990)................................................... 29

*Jackson* v. *Edgefield County School District,*
  650 F. Supp. 1176 (D.S.C. 1986) ............................................ 24

*Mississippi* v. *United States,*
  No. 87-3464, 1988 WL 90056 (D.D.C. Aug. 9, 1988) ........... 28

*Reno* v. *Bossier Parish School Board,*
  520 U.S. 471 (1997) .............................................................28-29

*Texas* v. *Holder,*
  No. 12-128 (D.D.C. Aug. 30, 2012).....................................25-30

*Texas* v. *United States,*
  No. 11-1303 (D.D.C. Aug. 29, 2012).....................................28-30

*United States* v. *Brown,*
  561 F.3d 420 (5th Cir. 2009)................................................... 28

*United States* v. *Charleston County,*
  316 F. Supp. 2d 268 (D.S.C. 2003) .................................... 14, 24

**STATUTES AND LEGISLATIVE HISTORY**

42 U.S.C. § 1973c ................................................................................................ 28

42 U.S.C. § 1973gg .............................................................................................. 3

42 U.S.C. § 1973l ................................................................................................. 26

H. Rep. 109-478 (2006) .................................................................................24-25

Fannie Lou Hamer, Rosa Parks & Corretta Scott King Voting Rights Act
      Reauthorization and Amendments Act of 2006, Pub. L. 109-246 (2006) .................. 24

S.C. Ann. § 7-13-430 ........................................................................................... 10

## TABLE OF ABBREVIATIONS

| | |
|---|---|
| 2006 VRA Act | Fannie Lou Hamer, Rosa Parks & Corretta Scott King Voting Rights Act Reauthorization and Amendments Act of 2006 |
| A. Martin | Initial Report of Dr. Andrew D. Martin, expert witness for Defendant-Intervenors (June 19, 2012) |
| AA | African-American |
| Am. | Amendment |
| Arrington | Initial Report of Dr. Theodore S. Arrington, expert witness for the United States (June 19, 2012) |
| Arrington Supp. | Supplemental Report of Dr. Theodore S. Arrington (July 28, 2012) |
| Bailey Tr. | Deposition of Kenyda Bailey, Intervenor |
| Bursey Tr. | Deposition of Brett Bursey, Executive Director of Intervenor South Carolina Progressive Network |
| Burton | Initial Report of Dr. Orville Vernon Burton, expert witness for Defendant-Intervenors (June 19, 2012) |
| Burton Supp. | Supplemental Report of Dr. Orville Vernon Burton (July 26, 2012) |
| Calkins Tr. | Deposition of Dr. Patricia Calkins, former York County poll manager |
| Debney Tr. | Deposition of Joseph Debney, Executive Director of Charleston County Board of Elections and Voter Registration |
| Dennis Tr. | Deposition of Patrick Dennis, Staff Attorney for House Judiciary Committee |
| D.I. Ex. | Defendant-Intervenors' Exhibit |
| DL | Driver's license |
| DMV | South Carolina Department of Motor Vehicles |
| DMV ID | The non-driver's license photo ID issued by the DMV |
| DOB | Date of birth |
| DOJ | U.S. Department of Justice |
| Donehue Tr. | Deposition of John Wesley Donehue, former Senate Republican Caucus Director and political consultant |

| | |
|---|---|
| Glover Tr. | Deposition of Junior Glover, Intervenor |
| H.3003 | House Bill 3003, enacted as Act R54 |
| H.3418 | House Bill 3418, predecessor bill to H.3003 |
| Hutto Written | Written Direct Testimony of Sen. C. Bradley Hutto, ECF No. 218-1 (August 21, 2012) |
| ID | Identification |
| JA | Joint Appendix |
| JA-DI | Defendant-Intervenors' Supplement to the Joint Appendix |
| James Tr. | Deposition of Dwight C. James, Sr., Executive Director of Intervenor SC NAACP |
| K. Rutherford Tr. | Deposition of Karen Rutherford, Benedict College |
| NVRA | National Voter Registration Act |
| PB | Provisional ballot |
| Quinn | Initial Report of Dr. Kevin J. Quinn, expert witness for Defendant-Intervenors (June 18, 2012) |
| Quinn Written | Written Direct Testimony of Dr. Kevin J. Quinn, ECF No. 219-1 (August 21, 2012) |
| R. Rutherford Tr. | Deposition of Raymond Rutherford, Intervenor |
| R54 | Act R54 |
| Required ID | The five forms of photo ID accepted at the polls under Act R54 |
| RI | Reasonable impediment |
| Riley Tr. | Deposition of Joseph Riley, Intervenor |
| SC | South Carolina |
| SC NAACP | South Carolina State Conference of the National Association for the Advancement of Colored People |
| Scott Written | Written Direct Testimony of Sen. John L. Scott, Jr. ECF No. 221-1 (August 21, 2012) |
| SEC | State Election Commission |
| Sec. of State | South Carolina Secretary of State |
| SES | Socioeconomic status |
| Shwedo Tr. | Deposition of Col. Kevin Shwedo, Executive Director of the South Carolina Department of Motor Vehicles |

| | |
|---|---|
| Stewart | Initial Report of Dr. Charles Stewart III, expert witness for the United States (June 9, 2012) |
| Stewart Reb. | Rebuttal Report of Dr. Charles Stewart III (August 6, 2012) |
| U.S. | United States |
| U.S. Ex. | United States' Exhibit |
| VE | Voter education |
| VEP | Voter education plan |
| VR | Voter registration |
| VRA | Voting Rights Act |
| Whitmire Tr. | Deposition of Chris Whitmire, SEC Public Information Officer |
| Wolf Tr. | Deposition of Amanda Wolf, Intervenor |
| Zia Written | Written Direct Testimony of Barbara Zia, Co-President of Intervenor South Carolina League of Women Voters ECF No. 222-1 (August 21, 2012) |

## PROPOSED FINDINGS OF FACT

**I.  THE STATE HAS NOT SHOWN THAT R54 WILL NOT HAVE A RACIALLY DISCRIMINATORY EFFECT.**

1.  "African-Americans are more than twice as likely as white voters not to possess an ID that is acceptable under Act R54."  (JA 1339 (Stewart Reb. ¶ 84).)  There are 60,913 active AA registrants who would be prevented from voting in person by regular ballot unless they obtain some form of Required ID.  (JA 1338 (Stewart Reb., Table 11).)

2.  The State's expert witness agrees that the gap in Required ID possession represents a "significant" racially disparate impact.  (8/29/12 Tr. at 219:8-12 (Dr. Hood).)

3.  Many Intervenors are registered voters who lack Required ID.  (8/30/12 Tr. at 54:1-5 (Freelon); *id.* at 100:13-14, 103:10-11, 103:17-20 (Debose); JA-DI 275 (Glover Tr. 21:3-13); JA-DI 1004 (Bailey Tr. 12:7-25); JA-DI 659 (R. Rutherford Tr. 15:7-16:8); JA-DI 812-14 (Wolf Tr. 8:12-16, 9:10-10:14, 15:23-24).)

4.  The State has offered no expert opinion on whether R54 will create a racially disparate impact at the polls.  Its expert agrees there is no evidence that the purported mitigating factors will reduce the racial gap—in fact, they may increase it—and any contrary conclusions he offers are speculation on which the Court should not rely.  (8/29/Tr. at 168:14-24, 257:2-259:10, 8/30/12 Tr. at 25:5-12 (Dr. Hood); *see also* 8/31/12 Tr. at 72:10-14 (Dr. Arrington).)

**A.  THE "FREE" IDS CARRY SIGNIFICANT COSTS.**

5.  Two of the Required IDs, the SC DL and U.S. passport, carry direct fees typically ranging from $25-$238.  (JA-DI 3978 (D.I. Ex. 415); *see* JA-US 367 (D.I. Ex. 522).)

## 1.  INDIRECT FINANCIAL COSTS

6.  The DMV IDs carry significant indirect costs in connection with obtaining underlying required proofs of identity.

    a.  A DMV ID requires most applicants to show a birth certificate.  (JA-DI 2897-98 (D.I. Ex. 412).)  A normal certificate search costs $12-17; a more complicated certificate search, or an out-of-state certificate search, can cost on average $50-$70.  (JA-DI 818 (D.I. Ex. 402); 8/30/12 Tr. at 86:6-14 (Dr. Williams).)

    b.  DMV also requires other vital records to show change of name, such as marriage and divorce records.  (JA-DI 2898 (D.I. Ex. 412); JA-DI 816-17 (Wolf Tr. 23:18-25:8, 25:18-26:10); JA-DI 829 (D.I. Ex. 334).)

    c.  An amended birth certificate—which DMV requires for those whose birth certificates incorrectly spell their names—requires a petition to family court, legal assistance, costly background checks, and court filing fees.  (8/30/12 Tr. at 54:17-55:4, 55:22-56:13, 56:21-23 (Freelon); *id.* at 88:14-89:3 (Dr. Williams); JA-DI 658 (R. Rutherford Tr. 10:25-11:16, 11:21-12:10);  JA-DI 828 (D.I. Ex. 333); *see also* JA-DI 830 (D.I. Ex. 335); JA-DI 831 (D.I. Ex. 338); JA-DI 835 (D.I. Ex. 341); JA-DI 836 (D.I. Ex. 344).)

    d.  Without a government-issued photo ID, voters must use Vitalchek to find vital records.  These searches generally require Internet access and a major credit card, which lower-income voters tend to lack.  (8/30/12 Tr. at 84:21-85:6 (Dr. Williams); *id.* at 102:23-24 (Debose); *id.* at 274:10-12 (Rep. Cobb-Hunter); JA-DI 816 (Wolf Tr. 22:24-23:8); JA-DI 829 (D.I. Ex. 334); JA-DI 833 (D.I. Ex. 339).)

7.  The indirect financial costs of the DMV IDs are likely to prove a significantly greater obstacle for AA voters who lack the Required IDs than for their white counterparts.

    a.  Poor AA seniors in rural areas in many cases lack birth certificates.  (8/30/12 Tr. at 277:5-16 (Rep. Cobb-Hunter); *id.* at 81:18-25 (Dr. Williams); JA-DI 274 (Glover Tr. 20:8-9); JA-DI 825 (D.I. Ex. 328); JA-DI 3862 (James Tr. 132:8-23).)

    b.  AA household income in SC is 25.6% lower than white household income (JA 1259 (Stewart ¶ 138)); African-Americans are twice as likely as whites to live below the poverty line, and twice as likely to be unemployed.  (JA 1259-60 (A. Martin 4-5).)

8.  Voters may be dissuaded from obtaining the photo VR cards due to a belief that these require the same vital records as DMV-issued ID, especially given public discourse around electoral security.  (Hutto Written ¶ 7(g); Zia Written ¶ 25; JA-DI 647, 651 (K. Rutherford Tr. 55:14-23, 72:2-73:2); JA-DI 3851 (James Tr. 85:6-87:4); JA-DI 660 (R. Rutherford Tr. 20:14-21); JA-DI 814 (Wolf Tr. 14:9-15:5).)   The SEC has not publicized the requirements for a photo VR card.  (JA-DI 1147-65 (D.I. Ex. 347).)

### 2.  INSTITUTIONAL COSTS

9.  R54 restricts the "free" IDs to the DMV and county election offices.  In contrast, the current VR cards may be mailed to voters.  (8/28/12 Tr. at 261:18-21 (Andino).)  *See also* NVRA, 42 U.S.C. §§ 1973gg-4, 1973gg-5 (providing for numerous registration agencies, *e.g.* social services agencies, , and for voter registration by mail).

10. Requiring the voter's presence at DMV and county election offices to obtain the "free" IDs creates obstacles that pose institutional costs on voters in terms of accessibility, wait times, bureaucratic complexity, and staff interaction.

a.  The typical SC county has one DMV and one election office, which operate Monday to Friday, from 8-9 a.m. to 5 p.m.  (JA-DI 712 (D.I. Ex. 354) (DMV); ECF No. 224-2 (election offices).)  Because of these limited days and hours, voters will have to arrange time off from work or child care as needed before going to these offices.  (*See, e.g.*, JA-DI 3865 (James Tr. 141:12-143:18).)

b.  SEC and DMV are underfunded and understaffed.  (JA-DI 689 (Shwedo Tr. 108:8-109:12); JA-DI 912 (D.I. Ex. 401); JA-DI 2884 (D.I. Ex. 226); 8/29/12 Tr. at 10:1-5 (Andino).)  SEC plans to supply nearly all county offices with only one camera station to produce the photo VR cards.  (8/29/12 Tr. at 9:8-13 (Andino).)

c.  County election offices generally do not interact with voters in person, and lack the capacity to process large numbers of in-person customers.  (8/29/12 Tr. at 86:9-19 (Bowers); JA-DI 185 (Debney Tr. 21:7-13); JA-DI 2765 (D.I. Ex. 24).)

11. The institutional costs of the "free" IDs are likely to prove a significantly greater obstacle for AA voters who lack a Required ID than for their white counter-parts, thereby increasing the racial disparity caused by the gap in ID possession.

a.  AA voters are 1.3 times more likely to register by mail than white voters, and 3.5 times more likely to register at a social services agency (*see supra* ¶ 9).  (JA 1766-67 (A. Martin 8-9, Table 8).)  White voters are 1.5 times more likely to register at the DMV.  (*Id.*)

b.  AA voters on average possess lower levels of literacy, education, and income, all of which makes interactions with overworked officials more frustrating and likely to fail.  (8/31/12 Tr. at 78:3-19 (Dr. Stewart); JA 1257-58 (Stewart ¶ 133); *see also*

8/30/12 Tr. at 85:12-19, 89:6-8 (Dr. Williams) (most of her clients are barely literate); JA-DI 632 (Riley Tr. 7:12-16); JA-DI 829 (D.I. Ex. 334 (Ms. Keith has a fear of crowds and "dread[s]" the trauma of going to the DMV)).)

    c.  Mr. Debose experienced interactions with DMV officials that contradict DMV policies.  Mr. Debose has tried twice a year for seven years to obtain a DMV-issued ID, even though his documents should provide sufficient proof of his SSN. (*Compare* 8/30/12 Tr. at 104:9-21, 105:1-7 *with* JA-DI 2898 (D.I. Ex. 412).)

    d.  Some voters with low SES will not be able to meet requirements for a photo VR card.  (8/30/12 Tr. at 92:3-10 (Dr. Williams) (some indigent AA voters do not know DOB); JA-DI 271 (Glover Tr. 6:8-25 (Mr. Glover does not know his DOB)).)

12. The temporary photo VR card will be made with a consumer-grade Web camera and printed in black-and-white on paper.  (8/29/12 Tr. at 9:8-25 (Andino).)  Such IDs—especially for voters with darker skin—may not be "high confidence" IDs that PMs can "look at . . . and know that they were legitimate," making these voters more likely to be challenged.  (8/28/12 Tr. at 61:14-17, 63:7-11 (Rep. Harrell); R54, § 5(C)(2).)

### 3.  TRANSPORTATION COSTS

13. Because the DMV IDs and photo VR cards are or will be available in only one DMV office and one election office per county, requiring voters to obtain the IDs in person imposes a significant transportation cost.  (8/29/12 Tr. at 107:4-15 (Bowers) (requiring voters to come to county election offices for IDs would be a "hinderance"); 8/30/12 Tr. at 105:14-16 (Debose); 8/30/12 Tr. at 243:18-244:12 (Sen. Malloy).)

a.  Public transit is almost entirely unavailable to bring voters to DMV or election offices in most SC counties; even in those counties with developed transit systems, voters face significant time and financial costs in using public transit.  (JA-DI 3866, 3869-70 (D.I. Exs. 418, 422, 423); 8/30/12 Tr. at 241:16-22 (Sen. Malloy) (in Darlington, less than 0.5% of people use public transit); Zia Written ¶ 32.)

b.  Without public transit, voters must hire taxis and/or find family or friends willing to drive significant distances and wait, often paying gas and other costs.  (8/30/12 Tr. at 275:3-276:5, 278:3-13 (Rep. Cobb-Hunter) (describing a 60-70 mile round-trip); *id.* at 106:11-17, 110:25-112:5 (Debose); Hutto Written ¶ 7(g); JA-DI 3865 (James Tr. 141:12-143:18); JA-DI 648 (K. Rutherford Tr. 61:8-21).)

14. Accessing transportation is likely to prove a significantly greater obstacle for AA voters who lack the Required IDs than for their white counterparts.

a.  Voting-age AAs in SC are 4.3 times more likely than voting-age whites to live in a household with no access to a vehicle.  (JA 1760 (A. Martin 2).)

b.  Of the seven counties in South Carolina with AA voting-age populations of 60% or more, public transit is available in only one, Orangeburg County, and there only in the immediate vicinity of the county seat, the City of Orangeburg.  (JA-DI 3869 (D.I. Ex. 423); 8/30/12 Tr. at 274:25-275:19 (Rep. Cobb-Hunter).)

15. Several of the individual Intervenors lack access to their own means of transportation and rely almost exclusively on family and/or friends to make even the most common of trips, such as to a grocery store or bank.  (JA-DI 272 (Glover Tr. 9:15-10:13, 12:2-3, 12:20-24); JA-DI 634-35 (Riley Tr. 16:16-17:19, 17:17-22); JA-DI 814-15 (Wolf

Tr. 16:25-17:8); *see also* JA-DI 829 (D.I. Ex. 334); JA-DI 830 (D.I. Ex. 335; JA-DI 835 (D.I. Ex. 341).)

a. Ms. Freelon depends on her daughter to drive her places. (8/30/12 Tr. at 57:22-58:1.) Now that her daughter works as a civilian on a military base, she does not want to risk her daughter's job security by asking for more rides; in fact, Ms. Freelon has canceled medical appointments for this reason. (*Id.* at 64:20-65:11.)

b. Dr. Williams' clients at the Family Unit, Inc., largely lack transportation and usually walk and/or pay for rides to her office. (8/30/12 Tr. at 85:19-22.)

c. Mr. Debose does not have a car, and walks to work. (8/30/12 Tr. at 102:5-6.) He pays friends for rides, when they are not at work and are available, which he describes as a "humbling" experience. (*Id.* at 110:25-112:5.) He could not get a ride from friends to the county registration office 20 miles away and had to hire a cab. (*Id.* at 108:18-23, 113:16-20.)

## B. THE "REASONABLE IMPEDIMENT" EXCEPTION WILL NOT MITIGATE THE RACIAL GAP IN ID POSSESSION.

16. The State has offered contradictory evidence on the RI exception in two key respects: (i) whether the determination of a RI is subjective and by the voter, or objective and by the PMs and county election boards (*compare* 8/28/12 Tr. at 210:17-23 (Andino) *with id.* at 271:14-20, 272:8-19); and (ii) whether RI affidavits will be judged according to the voter's identity or the voter's asserted RI (*compare id.* at 225:2-25 *with* ECF No. 263, at 5). Without clarity on these crucial points, the RI exception cannot meaningfully mitigate the burdens of the established racial disparities in ID possession.

### 1.  THE RI EXCEPTION CHANNELS VOTERS WITHOUT ID INTO A MORE BURDENSOME AND LESS EFFECTIVE MODE OF VOTING.

17. The RI provision creates a two-tiered, unequal voting system in which those with Required ID may vote by machine-counted ballot, while those without Required IDs (who are disproportionately minorities, *see supra* ¶ 1) must cast a less secure, less private ballot after completing a more burdensome process:

   a.  *First*, a voter must understand and answer "yes" to the PM's question:  "Is there a reason beyond your control that created an obstacle to you obtaining one of the necessary IDs, or do you have a religious objection to being photographed?"  (JA-DI 3470 (D.I. Ex. 505).)

   b.  Specifically, a voter unaware of or uninformed about the law or the steps for obtaining Required ID cannot know what constitutes the universe of obstacles (*e.g.*, lack of a birth certificate).  (8/29/12 Tr. at 17:4-18, 39:6-18 (Andino).)

   c.  The SEC's VE materials provide no guidance to the voter on what a RI is or could be; nor will PMs be trained on how to explain the RI exception to a voter.  (JA-DI 1147-65 (D.I. Ex. 347; JA-DI 3470 (D.I. Ex. 505); JA-DI 3469 (D.I. Ex. 506); *see also* 8/29/12 Tr. at 17:12-18 (Andino) (RI question "invite[s] a conversation").)

   d.  *Second*, the voter must write or ask the PM to write her impediment on the back of a PB envelope (if doing so is permitted by law); but PMs will not be trained on which RIs are protected against disclosure.  (8/29/12 Tr. at 16:22-18:6 (Andino).)

   e.  *Third*, the voter must show signed proof of identity that a notary will accept— generally, a photo ID.  (JA-DI 3471 (D.I. Ex. 505); JA-DI 1297, 1300, 1306 (D.I.

Ex. 2); *see also* JA-DI 3928, 3930 (Whitmire Tr. 246:24-248:18, 253:2-11) (SEC
cannot require notaries to accept any particular form of photo ID).)

f.   *Fourth*, the voter must satisfy the notary as to her capacity—*e.g.*, that she is not
under the influence of drugs or alcohol or suffering from mental illness (JA-DI
1298 (D.I. Ex. 2))—participate in the imposing notarial ceremony, and swear
under penalty of perjury to what is in essence a legal conclusion (JA-DI 1306 (D.I.
Ex. 2); *see also* 8/30/12 Tr. at 188:16-17 (Bloodgood)).

g.   *Fifth*, the voter must hand her unsecured (and thus less secret) ballot to the PM,
who places it inside the envelope and places the envelope in the "challenged ballot
box." (JA-DI 3471 (D.I. Ex. 505); 8/29/12 Tr. at 47:18-48:14 (Andino).)

h.   *Sixth*, all or most of this process will occur at the PM's check-in table, in view of
poll watchers and neighbors. (8/29/12 Tr. at 46:3-47:8 (Andino).) Voters with low
SES are especially likely to view this process as "intimidating" and "embarrassing."
(*See* JA-DI 647 (K. Rutherford Tr. 56:22-57:11); JA-DI 189 (Debney Tr. 37:13-
18); JA-DI 50-51 (Calkins Tr. 76:13-77:3); 8/30/12 Tr. at 189:11-20
(Bloodgood).)

i.   *Seventh*, the voter's only real assurance that her vote will be counted will be *if* she
attends the certification hearing at the county seat, after arranging transportation,
time off from work, and/or child care—although her attendance itself may in some
cases provide grounds for the election board to reject her RI ballot. (8/29/12 Tr.
29:16-30:1, 52:21-53:3 (Andino); JA-DI 3932 (Whitmire Tr. 261:1-262:1).)

18. Because of their lower SES on average—particularly lower literacy and education levels—AA voters are less likely than white voters to complete this process successfully.  (8/31/12 Tr. at 117:4-19 (Dr. Stewart).)  For example, Mr. Glover, who never went past first grade in school, responded, "I don't know what that means," when asked if he had a religious objection to being photographed, and "No, sir," when asked if there were "any obstacles to [him] obtaining a photo identification card"—even though he lacks a birth certificate and does not drive.  (JA-DI 271-72, 274-75 (Glover Tr. 7:17-21, 9:15-10:13, 20:8-9, 21:19-24).)

19. Any RI ballot cast is more vulnerable to challenge than a normal ballot, to which the voter would be entitled but for R54.  Voters will have no notice of any challenge, and while the challenger may provide grounds in writing, voters may defend their ballots only in person.  (JA-DI 1681 (D.I. Ex. 348); 8/29/12 Tr. at 26:23-28:2, 30:10-18 (Andino); 8/30/12 Tr. at 184:8-14 (Bloodgood) (voters do not attend hearings); *accord* JA-DI 43 (Calkins Tr. 35:1-4); JA-DI 189 (Debney Tr. 39:16-17).)

20. Any RI ballot cast is more likely to be accidentally damaged or lost than a normal ballot.  (8/30/12 Tr. at 185:19-187:19 (Bloodgood).)

21. A RI ballot is more vulnerable to racial or partisan discrimination than a normal ballot.  (*See infra* ¶¶ 29-31.)

22. No precinct can stock PBs in excess of 10% of its registered voters, meaning a surge in PB use under the RI exception will cause delays and deter eligible voters.  S.C. Ann. § 7-13-430(A).  (JA-DI 1687, 1713 (D.I. Ex. 348); *cf.* 8/29/12 Tr. at 42:15-43:11, 44:17-45:9 (Andino) (county boards by law have only Friday to decide all PBs).)

## 2. THE RI EXCEPTION WILL NOT BE APPLIED UNIFORMLY.

23. Paragraphs 17-22 present the State's *best-case* scenario: the unlikely event that all 46 counties, 2,100 precincts and 20,000 PMs follow SEC guidelines uniformly, with notaries in every precinct. Actual implementation is far more likely to be inconsistent and haphazard, which will undermine any mitigating effect.

24. Based on record evidence and the relevant academic literature, Dr. Quinn concluded that the RI provision will not be implemented consistently and uniformly. (JA 1822 (Quinn 22).) Based on R54's text, the State AG opinions, SEC training materials, deposition testimony, and Ms. Andino's trial testimony, Dr. Quinn concluded that:

   a. State officials lack a clear, consistent definition of what RI means. (JA 1817; *see also supra* ¶ 16.)

   b. The State has neither a robust PM training program nor clear guidelines for county election boards. (JA 1818-19; Quinn Written 6; *see also* JA-DI 3917 (D.I. Ex. 528 (SEC allocated only $4,000 for PM training on R54)); JA-DI 482 (Lowe Tr. 51:12-52:6); JA-DI 948 (D.I. Ex. 401 (as of 2011, 82 county election officials failed to complete training)); *see generally id.* at JA-DI 948-51.)

   c. The voter education materials are incomplete and difficult to understand. (JA 1819-20 (Quinn 19-20); Quinn Written 6-8; *see also infra* ¶ 34.)

   d. The State lacks a strong, centralized election authority to enforce uniform application at the local level. (JA 1821 (Quinn 21); Quinn Written 6.) The SEC has no authority to compel county election officials and poll workers to adopt its guidelines on the RI exception. (8/28/12 Tr. at 254:7-19 (Andino); JA-DI 775-76

(Whitmire Tr. 192:2-23, 193:21-194:23); JA-DI 1952-53 (D.I. Ex. 378); JA-US 381-82 (D.I. Ex. 522).)

e.  Local election officials appear resistant to the RI provision.  (JA 1821-22 (Quinn 21-22); Quinn Written 8; *see also* 8/28/12 Tr. at 265:15-19 (Andino) (county officials were confused by RI provision); *id.* at 53:15-56:20; JA-DI 3882 (D.I. Ex. 520) (calling RI a "catch-all phrase that allows the buck to be passed yet again").)

25. In practice, the hundreds of county election officials and 20,000 poll workers on Election Day misapply or even disregard SEC guidelines.  (JA-DI 232 (Dennis Tr. 141:12-14 (SEC has trouble regulating counties)); JA-DI 648 (K. Rutherford Tr. 58:10-21 (observing poll workers misapplying election procedures)); JA-DI 483 (Lowe Tr. 68:12-69:3 (same)); JA-DI 29-30 (Bursey Tr. 51:11-55:4); JA-DI 3852 (James Tr. 90:10-91:7); 8/30/12 Tr. at 193:20-194:2 (Bloodgood); JA-DI 2724-2735 (D.I. Ex. 6); JA-DI 2289-90 (D.I. Ex. 239).)   For example:

a.  Many PMs do not understand provisional voting procedures, and county election boards lack adequate training on ruling on PBs.  (*See* JA-DI 648 (K. Rutherford Tr. 58:10-21); JA 2734 (D.I. Ex. 6); 8/29/12 Tr. at 12:14-18 (Andino).)

b.  Counties vary in administering VR rules, despite SEC's efforts to unify practice. (JA-DI 232 (Dennis Tr. 141:24-142:23); JA 1497 (Arrington Supp. ¶ 21).)

c.  In Horry County, election officials have serially mismanaged Atlantic Beach elections, leading the SC Supreme Court to rebuke them as being "focused on mistrusting the voter and supplementing [*sic*] their own desires for the voters desires."  (8/27/12 Tr. at 204:3-12, 204:15-20 (Rep. Clemmons).)

26. The RI exception introduces a considerable degree of discretion for PMs and county boards as to whether to count a ballot.  (8/28/12 Tr. at 277:5-9, 278:5-279:7, 294:8-22, 8/29/12 Tr. at 52:17-20 (Andino); 8/30/12 Tr. at 185:11-14 (Bloodgood) (city election board "certainly exercised discretion" in counting PBs); JA-DI 3928 (Whitmire Tr. 245:23-246:12); JA-DI 189 (Debney Tr. 40:7-20); JA-DI 1937-38 (D.I. Ex. 361).)  PMs will have discretion to accept or reject a voter's RI based on its reasonableness. (8/28/12 Tr. at 271:14-20, 272:5-19, 273:14-274:2, 274:11-20 (Andino).)

27. The requirement of a notary for the RI affidavit introduces further opportunity for misapplication, abuse and discrimination.  (8/29/12 Tr. at 21:16-21 (Andino).)

   a. SEC has not identified any notary willing to work at the polls in November at no cost to voters.  (8/29/12 Tr. at 22:13-18, 23:3-5 (Andino); *see* Zia Written ¶ 33.)

   b. SEC has no authority to forbid notaries from charging a fee at the polling place, other than the belief that charging to notarize a RI affidavit would constitute a poll tax.  (8/28/12 Tr. 233:24-234:5 (Andino); *see also* 8/30/12 Tr. at 59:19, 74:13-17 (Freelon) (notaries have charged Ms. Freelon $10.00).)

   c. SEC has no authority to require notaries to accept a non-photo VR card to identify the affiant (*see* JA-DI 3469 (D.I. Ex. 506)) in contravention of the Sec. of State's Notary Handbook (8/29/12 Tr. at 21:10-21 (Andino); JA-DI 1297, 1300, 1306 (D.I. Ex. 2)), and it would be reasonable for notaries to refuse to accept such ID at the polls (*id.* at 20:21-21:9; *see* JA-DI 3926-27 (Whitmire Tr. 240:25-241:17)).

   d. The SEC must, in violation of R54 and state law, ask PMs and county election boards to accept non-notarized RI affidavits so R54 does not disenfranchise voters.

(8/28/12 Tr. at 282:16-283:21, 286:2-5, 8/29/12 Tr. at 24:14-25:3 (Andino); *compare id.* at 108:1-8 (Bowers) (county boards would never violate state law).)

### 3.  WITHOUT UNIFORM APPLICATION, THE RI PROVISION WILL EXACERBATE R54'S RACIALLY DISCRIMINATORY EFFECT.

28. "Systemic disparities are best mitigated through concerted, systemic efforts—not through haphazard implementation."  (JA 1822 (Quinn 22).)

29. In fact, there is a "substantial risk" that the RI provision will be applied in a racially discriminatory manner.  (JA 1802 (Quinn 2).)  Dr. Quinn's 2008 Boston study showed that even with robust training and minimal PM discretion, PMs administered the photo voter ID requirement in a racially discriminatory manner.  (JA 1809-12.)  Here, where PMs have less robust training and more discretion, the risk of discrimination in implementing the RI provision is even graver.  (JA 1823; *supra* ¶¶ 24(b), 26, 27.)

30. SC's precincts have a recent and ongoing history of discriminatory behavior, which exacerbates this risk.  (JA 1823 (Quinn 23).)  For example:

  a.  In Horry County, PMs provide "unsolicited assistance . . . in the voter booth" (8/27/12 Tr. at 205:4-6 (Rep. Clemmons))—the same form of voter intimidation described in *U.S.* v. *Charleston Cnty.*, 316 F. Supp. 2d 268, 286 n.23 (D.S.C. 2003).

  b.  In Richland County, in 2008, a white poll watcher drove away AA students at the Benedict College polling place through improper challenges.  (JA-DI 650-51 (K. Rutherford Tr. 67:24-70:17); *see* 8/30/12 Tr. at 194:5-9 (Bloodgood) (describing "white poll workers with aggressive personalities" being purposefully staffed "in black precincts" and disrupting voting).)

c.  In Laurens County, only AA voters were denied in-person absentee ballots, and in certain precincts, PMs did not assist AA voters with provisional voting.  (JA-DI 30-32 (Bursey Tr. 56:11-57:6, 62:17-22).)

d.  The SC NAACP has received Election Day hotline calls from voters complaining of PMs improperly demanding additional ID.  (JA-DI 3854 (James Tr. 100:21-23).)

31. Empirical evidence shows that election officials' partisanship affects whether PBs are counted, and that "jurisdictions covered by [Section 5 of the VRA] count significantly fewer provisional votes than do non-covered jurisdictions." (JA 1813-14 (Quinn 13-14).)

a.  The county boards do not require partisan parity and vote by majority.  (8/29/12 Tr. at 48:22-25, 49:10-20 (Andino); 8/30/12 Tr. at 183:21-23 (Bloodgood).)

b.  County boards will know a voter's name and precinct when deciding whether to count her RI ballot (8/29/12 Tr. at 52:5-16 (Andino); JA-DI 201-202 (Debney Tr. 136:24-137:13); *see also* 8/29/12 Tr. at 30:2-18 (Andino) (poll watchers able to challenge AA votes by RI ballot in bulk, without notice to voters).)

**C.  THE VOTER EDUCATION PLAN DOES NOT ADDRESS THE RACIAL GAP IN REQUIRED ID POSSESSION.**

32. The VEP is a generic broadcast of information rather than a targeted approach to the SES factors affecting minority political participation, and is therefore unlikely to close the racial "gap" in ID possession.  (8/31/12 Tr. at 179:14-180:15 (Dr. Stewart).)

a.  Consequently, AA voters with lower levels of literacy and education are likely to act in response to the VEP at lower rates than white voters, increasing the racial disparity in ID possession.  (8/31/12 Tr. at 115:6-16 (Dr. Stewart).)

b. SEC has allocated insufficient funds, staff, and time for education (JA-DI 3917 (D.I. Ex. 528 (SEC intends to spend, statewide, $75,000 for newspaper ads and $25,000 for posters and brochures))), well below the amount needed to reach poor, rural areas with limited transportation, literacy and access to media and the Internet (Zia Written ¶¶ 26-29; *cf.* 8/30/12 Tr. at 274:10-12 (Rep. Cobb-Hunter)).

33. There is *no* component of the VEP that addresses the costs to voters in obtaining approved ID, including the cost of required vital records, arranging time off from work, and/or transportation to county offices.  (*See* JA-DI 1147-65 (D.I. Ex. 347).)

a. The SEC's one bus is insufficient to seriously address the heavy transportation costs that voters face, especially since it will travel only to central locations such as county fairs or Wal-Mart parking lots.  (JA-DI 748 (Whitmire Tr. 82:10-83:22).)

b. A similar failure to address key obstacles to voters without ID led to poor results from the DMV's "Voter ID Day," a program to give free rides to voters lacking photo ID to DMV offices.  Ultimately, out of over 170,000 voters without DMV-issued ID, only *21* received IDs.  (JA-DI 691, 693-94 (Shwedo Tr. 116:19-22, 120:19-121:10, 124:18-22, 126:6-13); JA-DI 2219-22 (D.I. Ex. 285).)

34. The VE materials—even the revised materials—omit important information, such as what qualifies as a RI and the process for obtaining a photo VR card.  (JA-DI 1147-65 (D.I. Ex. 347); JA-DI 3469 (D.I. Ex. 506).)   The mailer cards omit the "valid and current" requirement and do not tell voters to bring photo ID for notarization of the RI affidavit.  (8/29/12 Tr. at 58:12-15, 58:20-59:9 (Andino); JA-DI 3469 (D.I. Ex. 506).)

## II. THE STATE HAS NOT SHOWN THAT R54 WAS NOT ENACTED WITH A DISCRIMINATORY PURPOSE.

35. The State has offered no expert evidence on legislative purpose. (8/31/12 Tr. at 220:22-222:9 (Dr. Buchanan).) The only purpose experts concluded that R54 was passed at least in part with a discriminatory intent to suppress AA voting. (JA 1515 (Arrington Supp. ¶ 58); JA 1741-42 (Burton Supp. 1-2); *see also* 8/30/12 Tr. at 271:20-23 (Sen. Scott); *id.* at 290:18-291:1 (Rep. Cobb-Hunter).)

36. The legislative efforts that led to R54 were in part a response to the 2008 general election, which saw historic turnout among AA voters. (JA 1765-66 (A. Martin 7-8); 8/30/12 Tr. at 290:18-291:3, 292:5-9 (Rep. Cobb-Hunter); Hutto Written ¶ 5.)

37. Then-Senator Obama came within single digits of winning SC, which startled certain Republicans accustomed to wide-margin victories. (8/30/12 Tr. at 292:12-293:8 (Rep. Cobb-Hunter).) In response, local GOP chapters and Tea Party activists pressured legislators to pass restrictive photo voter ID legislation. (8/27/12 Tr. at 239:2-16 (Rep. Clemmons); 8/30/12 Tr. at 252:14-23 (Sen. Malloy); JA-DI 239-40 (Donehue Tr. 29:10-16, 34:14-35:1).)

38. The manifest intent of these local activists and Rep. Alan Clemmons, the author and floor leader of the bills that became R54, was to make voting more difficult for AA voters and thereby reduce AA turnout crucial to President Obama's re-election. (8/28/12 Tr. at 34:14-36:9 (Rep. Clemmons) (Clemmons promoted photo voter ID at the state GOP convention with the tagline "stop Obama's nutty agenda"); JA-DI 176 (D.I. Ex. 232); JA-DI 2843 (D.I. Ex. 184 (e-mail from local activist: "[I]f we don't

get this [voter ID law] taken care of, 2012 belongs to Obama.")); JA-DI 2191 (D.I. Ex. 299); JA-DI 2817 (D.I. Ex. 98) ("[A] good ID bill blunts the gain for 'them'"); 8/27/12 Tr. at 42:2-10 (Rep. Clemmons); JA-DI 2846 (D.I. Ex. 185); *see infra* ¶ 41(a) (Clemmons objected to AA churches' bus transportation program to polls); JA-DI 2016 (D.I. Ex. 194); JA-DI 2025 (D.I. Ex. 117) (warning of "bussed liberals").)

39. Legislators understood that voting in SC is racially polarized, such that the percentage of AA voters in a district—and small offsets to that percentage—will swing that district either Republican or Democratic.  (8/30/12 Tr. at 271:1-8 (Sen. Scott); JA-DI 496 (D.I. Ex. 250); JA-DI 487-89 (Lowe Tr. 90:11-98:20).)

**A. THE HOUSE, LED BY REPRESENTATIVE CLEMMONS, REPEATEDLY STRIPPED CRUCIAL MITIGATING PROVISIONS FROM THE SENATE COMPROMISE AMENDMENT.**

40. During deliberations on H.3418, President Pro Tempore McConnell responded to AA senators' concerns by brokering a compromise—Amendment 8—that incorporated bipartisan provisions to mitigate the effects of the photo ID law on minorities, which were later stripped.  (8/28/12 Tr. at 120:13-122:6, 123:20-124:3 (Lt. Gov. McConnell); 8/30/12 Tr. at 257:3-16, 263:20-264:1 (Sen. Malloy); JA 664-79 (D.I. Ex. 55).)

a. *Early voting*.  Early voting would provide voters more advance notice to obtain ID and reduce long lines and wait times at the polls.  (8/27/12 Tr. at 170:5-15 (Sen. Campsen); 8/28/12 Tr. at 179:2-6 (Lt. Gov. McConnell); 8/30/12 Tr. at 271:13-15 (Sen. Scott).)  AA voters made greater use of in-person absentee voting than white voters through a highly publicized bus transportation program organized by AA churches.  (JA 1747-50 (Burton Supp. 7-10); JA-DI 256 (Donehue Tr. 115:23-

116:3); 8/28/12 Tr. at 27:21-28:1 (Rep. Clemmons); JA-DI 49 (Calkins Tr. 57:24-60:25); *see also* JA-DI 2817 (D.I. Ex. 98).)

b. *Transition period*.  Am. 8 provided for a two-year transition period, with the photo VR card available a full year in advance of the ID requirement's effective date. (8/28/12 Tr. at 170:22-172:6 (Lt. Gov. McConnell); JA-DI 2012 (D.I. Ex. 114).)

c. *Government employee IDs*.  Am. 8 expanded the list of accepted IDs in H.3418 to include employee IDs issued by a federal, State, or State political subdivision agency.  Legislators were aware that minorities are overrepresented in the public workforce.  (*See* 8/28/12 Tr. at 176:18-24 (Lt. Gov. McConnell); JA-DI 1359-60 (D.I. Ex. 59) (report to General Assembly); JA-DI 1957 (D.I. Ex. 378).)

d. *"Valid-when-issued" IDs*.  The Senate version of H.3003 allowed, as Georgia and Indiana's voter ID laws allow, a voter to use an expired or suspended license to vote.  (JA 119-121 (D.I. Ex. 162); JA 5452-55 (D.I. Ex. 160).)  Public data showed that AA drivers make up a majority of those with suspended licenses.  (8/30/12 Tr. at 244:22-25 (Sen. Malloy); JA-DI 2409 & n.20, 2424-34 (D.I. Ex. 259).)

41. During conference committee negotiations, the House delegation, led by Rep. Clemmons, stripped out *all* of the above ameliorative provisions.  (*See* 8/30/12 Tr. at 271:20-272:6 (Sen. Scott).)

a. *Early voting*.  House proponents opposed early voting and even tried to eliminate the in-person absentee option.  (8/28/12 Tr. at 121:3-12 (Lt. Gov. McConnell).) Rep. Clemmons opposed early voting particularly due to the AA churches' "busing" project, which he claimed was fraudulent without any evidence.

(8/28/12 Tr. at 31:2-33:1 (Rep. Clemmons) (objecting to "homogeneous groups" that vote together in-person absentee); *id.* at 34:1-3; JA-DI 2025 (D.I. Ex. 117); JA-DI 256 (Donehue Tr. 115:13-116:5).)

b.  *Transition period.*   The State's witnesses have offered no justification for eliminating the staggered transition period from R54.  (*Cf.* JA-DI 3825 (D.I. Ex. 499 (comment by Senate staff attorney that staggered transition dates would show DOJ that "the intent . . . is not to deny access to the polls")).)

c.  *Government employee IDs.*   Rep. Clemmons's argument against accepting government employee IDs—an accepted form of ID under both Georgia and Indiana's statutes—"did not persuade [Sen. McConnell] a bit."  (8/28/12 Tr. at 180:3-9 (Lt. Gov. McConnell).)

d.  *"Valid-when-issued" IDs.*   The H.3003 conference committee eliminated this provision, arguing that requiring licenses to be valid and current would better reflect the elector's current appearance.  (8/27/12 Tr. at 82:13-83:19 (Sen. Campsen).) Yet, paradoxically, the conference approved the photo VR card, which *never* expires.  (8/30/12 Tr. at 243:8-13 (Sen. Malloy); *id.* at 236:4-13 (Sen. Hutto).)

42. During the H.3003 conference, using the "propaganda" that the House wanted a "clean bill," the House removed the mitigating provisions in ¶ 40 and brought "political heat" from party activists—including the threat of primaries—to pressure the Senate to accept the more restrictive bill.  (8/28/12 Tr. at 174:9-174:20, 175:11-19 (Lt. Gov. McConnell); *id.* at 173:6-14 (House bill itself was not "clean"); JA 4875-76, 4911-12 (D.I. Ex. 398); JA-DI 2872 (D.I. Ex. 221); JA-DI 3492 (Donehue

Tr. 178:10-180:1 (House's "clean bill" stance was a "petty, childish public relations campaign")).)  Senator McConnell acceded to the House version despite his better judgment that the House version (which became R54) would *not* be precleared. (8/28/12 Tr. at 140:22-141:12, 176:10-17, 184:5-185:12 (Lt. Gov. McConnell); *see also* JA-DI 2870 (D.I. Ex. 217).)

## B. THE HOUSE TREATED MINORITY LEGISLATORS' CONCERNS WITH INDIFFERENCE AND CONTEMPT.

43. From the beginning, AA legislators strongly voiced their concern that photo voter ID legislation would disenfranchise minorities.  (8/28/12 Tr. at 186:8-187:1 (Lt. Gov. McConnell); 8/30/12 Tr. at 279:11-22 (Rep. Cobb-Hunter); *see also* JA 1560-61 (Burton 22-23); JA 2687, 2743-44, 2853-54 (D.I. Ex. 54).)  In January 2010, the SEC distributed to legislators data validating this concern, showing that minority voters were disproportionately likely to lack DMV-issued IDs.  (JA-DI 1998-2002 (D.I. Ex. 48 (SEC data)); JA-DI 2691-95 (D.I. Ex. 421); JA 2998 (D.I. Ex. 54 (Sen. Matthews explaining the disparate impact)); 8/30/12 Tr. at 268:22-269:4 (Sen. Scott).)

44. Although the House received the SEC data after H.3418 had passed out of the election-law subcommittee, Rep. Clemmons did not feel that this warranted further hearings beyond a single, 70-minute session when the House renewed its push for photo voter ID legislation in January 2011 (JA-DI 2696 (D.I. Ex. 134)):  according to Clemmons, the House had "moved on" (8/27/12 Tr. at 237:5-6 (Rep. Clemmons)).

45. While AA legislators argued that minorities were more likely to lack photo ID due to socioeconomic barriers, party activists and Rep. Clemmons dismissed this fact with

astonishing insensitivity.  (JA-US 1992 (U.S. Ex. 212 (e-mail by Ed Koziol, "I don't buy that garbage" that "a poor black person . . . won't be able to get [a voter ID] . . . All you'd have to do is announce that SC [Legislature] was giving a hundred dollar bill away if you came down with a voter ID card, and . . . [i]t would be like a swarm of bees going after a watermelon"—to which Rep. Clemmons responded, "AMEN, Ed!!!")); 8/28/12 Tr. at 19:19-22:19 (Rep. Clemmons); *see also* JA-DI 1695 (D.I. Ex. 211); JA-DI 2909 (D.I. Ex. 272).)

46. In contrast to Senate proponents' efforts to compromise across party lines, House proponents exhibited no concern for or even interest in opponents' views, tabling amendments offered by AA legislators with little to no discussion and invoking cloture to cut off debate.  (8/28/12 Tr. at 66:14-69:13 (Rep. Harrell); 8/30/12 Tr. at 281:23-282:18 (Rep. Cobb-Hunter); JA-DI 2585-88 (D.I. Ex. 304).)

47. AA legislators grew so frustrated with the House proponents' lack of consideration for their viewpoints that they walked out of the chamber, a form of protest that had occurred once in the past 20 years.  (8/30/12 Tr. at 282:19-25, 283:13-285:2 (Rep. Cobb-Hunter).)  House proponents responded to their protest with a "clinching motion" to cut off opponents' ability to reopen debate on the legislation.  (8/27 Tr. at 222:18-225:19, 8/28 Tr. at 16:18-17:8 (Rep. Clemmons); JA 1756 (Burton Supp. 16).)

## C. R54 PROPONENTS RESORTED TO UNUSUAL PROCEDURAL MANEUVERS TO PUSH PHOTO VOTER ID LEGISLATION.

48. House proponents fast-tracked H.3003 in an attempt to beat the Senate to "cross-over," which would give the House a procedural advantage and help in heading off an early

voting provision.  (JA-DI 211 (Dennis Tr. 46:11-48:16); JA-DI 2826-28 (D.I. 124);

JA 1570 (Burton 32); Scott Written ¶ 14; 8/30/12 Tr. at 269:17-20 (Sen. Scott).)

49. Senate proponents, at the suggestion of their political consultant, resorted to a rare
procedural device, the Rules Committee "slot" for Special Order, to bring the
contested voter ID bills to the floor by majority vote after failing twice to gain the
usual two-thirds supermajority.  (JA 1757 (Burton Supp. 17); JA-DI 3514 (D.I. Ex.
435); JA 2778-79 (D.I. Ex. 54 (floor exchange of Sen. Land and Sen. Martin)).)

50. Outside party activists brought "tremendous pressure" on Republican senators to pass
the House's version of H.3003.  (8/30/12 Tr. at 250:23-251:2 (Sen. Malloy).)  This
prompted a majority to "forg[e]t" Sen. McConnell's negotiated compromise with the
Democrat minority—in stark contrast to the Senate's tradition of consensus.  (8/28/12
Tr. at 132:23-133:14, 187:18-21 (Lt. Gov. McConnell).) This outside pressure and
division within the Senate Republican Caucus "crippled" the Senate position in
conference negotiations.  (*Id.* at 174:9-20, 175:7-19; *see also* Hutto Written ¶ 15).)

51. Both conference committees were conducted irregularly, prompting AA legislators on
each committee to refuse to sign the conference report.  (8/30/12 Tr. at 250:18-22,
251:16-25 (Sen. Malloy); *id.* at 266:5-22, 267:18-268:2 (Sen. Scott); Scott Written
¶¶ 21-22; JA 1746 (Burton Supp. 6); JA 4107, JA 4147-50, 4162-64 (D.I. Ex. 108);
*see also* JA-DI 213 (Dennis Tr. 54:4-55:3).)

52. Sen. McConnell reluctantly acceded to the House's restrictive bill on the basis of Rep.
Clemmons's "assurance" that the House would pass a separate early voting bill.
(8/28/12 Tr. at 138:2-10, 139:25-140:3, 180:10-25 (Lt. Gov. McConnell); JA 4912 (D.I.

Ex. 398).)  But such a bill never materialized, and when the Senate sent over an early

voting bill, it died in committee.  (8/28/12 Tr. at 181:12-23 (Lt. Gov. McConnell).)

### D.  THE STATE'S HISTORICAL BACKGROUND OF DISCRIMINATION

53. South Carolina has a long and well-documented history of discriminating against AA

   voters.  *U.S.* v. *Charleston Cnty.*, 316 F. Supp. 2d 268, 286 n.23 (D.S.C. 2003);

   *County Council of Sumter* v. *U.S.*, 596 F. Supp. 35, 37 (D.S.C. 1984).

54. The State's history—as recent as the 2000s—reveals numerous intricate "second-

   generation" voting changes that diluted or suppressed the AA vote, including the

   enactment of voting changes previously rejected by the DOJ as racially discriminatory.

   (JA 1546-47 (Burton 6-8).)  H. Rep. 109-478, at 23, 39, 73 (2006).

55. Throughout the 1980s and 1990s, and as recent as the 2008 election, AA voters faced

   a pattern of intimidation and harassment at the polls.  *Charleston Cnty.*, 316 F. Supp.

   2d at 286 n.23.  (JA-DI 650-51 (K. Rutherford Dep. Tr. 67:24-71:12); 8/30/12 Tr. at

   194:5-9 (Bloodgood).)

56. The lingering effects of state-sponsored discrimination continue to impede the ability

   of SC's AA citizens to participate in the democratic process.  *Colleton Cnty. Council*

   v. *McConnell*, 201 F. Supp. 2d 618, 642 (D.S.C. 2002); *Jackson* v. *Edgefield Cnty.*

   *Sch. Dist.*, 650 F. Supp. 1176, 1180 (D.S.C. 1986); 2006 VRA Act, § 2(b)(3); H. Rep.

   109-478, at 33.

57. Voting in South Carolina "continues to be racially polarized to a very high degree,"

   *Colleton Cnty.*, 201 F. Supp. at 641, such that if one "prevent[s] an African American

   from voting, your overwhelming likelihood is that [one] stopped a Democrat vote"

(8/27/12 Tr. at 181:4-7 (Sen. Campsen); JA 1760-61 (A. Martin 2-3); JA 1548-50 (Burton 10-12)).  *See also* H. Rep. 109-478, at 35.

### E.  THE STATE'S CLAIMED PURPOSES FOR R54 ARE PRETEXTUAL.

58. Although the State claims that one purpose of R54 was to deter voter impersonation fraud, the principal proponents could not find—despite best efforts—a single credible report of voter impersonation fraud in SC.  (8/27/12 Tr. at 115:10-116:14 (Sen. Campsen); JA-DI 226 (Dennis Tr. 119:15-23); JA 1693 (D.I. Ex. 116 (Rep. Clemmons and political consultant discussing the need to find a "boogey-man" for the photo ID law)); JA-DI 3562 (D.I. Ex. 432 (SC GOP research on voter fraud "not super-solid, but it's better than nothing")).)

59. Although the State claims that R54 intended to address voter confidence, election officials are best positioned to identify needed changes and voters' true concerns; and these officials did not list voter ID as a priority.  Instead, they prioritized removing witness oaths from absentee ballots and early voting, neither of which happened. (8/29/12 Tr. at 85:18-22, 102:8-104:1 (Bowers); 8/30/12 Tr. at 264:9-14 (Sen. Malloy); JA 1431 (Arrington ¶ 100); JA-DI 2771 (D.I. Ex. 100 (early voting was SCARE's No. 1 priority)); Zia Written ¶ 18.)

### PROPOSED CONCLUSIONS OF LAW

## I.  THE STATE HAS NOT SHOWN THAT THE VOTING CHANGES WILL NOT HAVE A RETROGRESSIVE EFFECT.

60. Under Section 5, the State must demonstrate that R54 will not have a retrogressive effect.  *Texas* v. *Holder*, No. 12-128, slip Op. at *54 (D.D.C. Aug. 30, 2012).

61. A voting change affecting ballot access is retrogressive if:  (1) "the individuals who will be affected by the change are disproportionately likely to be members of a protected minority group"; and (2) the change imposes "a burden material enough that it will likely cause some reasonable minority voters not to exercise their franchise." *Florida* v. *U.S., et al.,* No. 11- 01428, slip Op. at *23-24 (D.D.C. Aug. 16, 2012).

   a. "Exercise of the franchise" requires not only that a voter be allowed to cast a ballot, but also that the ballot be "effective."  *Florida*, slip Op. at *24, *36; 42 U.S.C. § 1973l(c)(1) ("voting" includes "having [a cast] ballot counted properly").

   b. A ballot-access change need not make voting "impossible" to be retrogressive; nor must the burden be "severe" or "exceedingly burdensome."  *Florida*, slip Op. at *24, *35-36; *see also Allen* v. *State Bd. of Elec.*, 393 U.S. 544, 565-66 (1969) (VRA was intended to eliminate "the subtle, as well as the obvious" voting barriers); *Texas* v. *Holder*, No. 12-128, slip Op. at *22-23 (D.D.C. Aug. 30, 2012) (burdens such as having to "take a day off work to travel to a distant driver's license office," "pay a substantial amount of money to obtain a photo ID" or "wait in hours of line to get one" could be "heavy burdens" with a retrogressive effect); *see id.* at *48-49 (citing minority poverty rates, minority rates of vehicle ownership and lack of public transportation in finding retrogressive effect).

   c. "[N]o amount of voter disenfranchisement can be regarded as 'de minimis'" because voting is a fundamental right, "preservative of other basic civil and political rights."  *Florida*, slip Op. at *37 (citing *Reynolds* v. *Sims*, 377 U.S. 533, 562 (1964)).

62. Accordingly, requiring photo ID to vote may be retrogressive under either of two approaches:

    a. *First*, the law is retrogressive if:  (i) there is a racial disparity in ID possession, *see Florida*, slip Op. at *45; and (ii) the ID requirement would likely disenfranchise some minority voters, given the nature of the requirement and any mitigating measures, *see id.* at *57-68.   Under this approach, the burdens associated with obtaining ID need not disproportionately affect minority voters, due to the racial gap in ID possession.

    b. *Second*, even in the absence of evidence of racial disparities in ID possession, a photo ID law is retrogressive if:  (i) "would-be voters could [not] easily obtain . . . qualifying ID without cost or major inconvenience," *Texas* v. *Holder*, slip Op. at *23; (ii) "a substantial subgroup, many of whom are [minorities], lack photo ID"; (iii) "the burdens associated with obtaining ID will weigh most heavily on the poor"; and (iv) the state's minorities are "disproportionately likely to live in poverty," *id.* at *45.

63. Individuals affected by R54's photo ID requirement are "disproportionately likely to be" African-Americans, satisfying the first prong of the *Florida* test.  In addition, "a substantial subgroup" of voters, including nearly 61,000 African Americans, lack Required ID, satisfying the first prong of the *Texas* test.  (*Supra* ¶ 1.)

64. In order to vote, these 61,000 AA voters would have to take advantage of one of two mitigating provisions of R54:  either (1) the free DMV ID or photo VR card; or

(2) the RI affidavit.  Their other options involve direct fees (*supra* ¶ 5)—in essence, a poll tax—or are not generally available.  (JA-DI 3976-79, 3974 (D.I. Ex. 414, 415).)

65. However, both the "free" IDs and the RI ballot involve material burdens that "would likely cause some reasonable minority persons not to exercise the franchise."  *Florida*, slip Op. at *24; *see also Texas* v. *Holder*, slip Op. at *23.  These burdens "will weigh most heavily" on AA voters due to their lower SES, and thus are likely to increase the racially disparate impact of the ID possession gap.  *Texas* v. *Holder*, slip Op. at *45.  (*Supra* ¶¶ 5-31; 8/30/12 Tr. at 255:19-24 (Sen. Malloy) (R54 will "absolutely" prevent a reasonable minority person from voting); *id.* at 286:1-5 (Rep. Cobb-Hunter) (same).)  These burdens satisfy the remaining prongs of the *Florida* and *Texas* tests.

66. Accordingly, under either the *Florida* or *Texas* approach, the evidence demonstrates that R54 would be retrogressive.

## II.  THE STATE HAS NOT SHOWN THAT THE VOTING CHANGES DO NOT HAVE A DISCRIMINATORY PURPOSE.

67. The State bears the "heavy burden" of showing that it passed the Act without "any discriminatory purpose" and that discrimination was not "a motivating factor."  *Reno* v. *Bossier Parish Sch. Bd.*, 520 U.S. 471, 488 (1997) ("*Bossier I*"); *see also Texas* v. *U.S.*, No. 11-1303, slip Op. at *25 (D.D.C. Aug. 29, 2012); 42 U.S.C. § 1973c(c); *Arlington Heights* v. *Metro. Housing Dev. Corp.*, 429 U.S. 252 (1977).

    a.  Racial discrimination "need only be one purpose, and not even a primary purpose" of the law to violate the VRA. *U.S.* v. *Brown*, 561 F.3d 420, 433 (5th Cir. 2009); *Mississippi* v. *U.S.*, No. 87-3464, 1988 WL 90056, at *4 (D.D.C. Aug. 9, 1988).

b. A finding of racial animus is not required to conclude that a law intentionally discriminates against minorities. *See Garza* v. *Los Angeles Bd. of Supervs.*, 918 F.2d 763, 778 n.1 (9th Cir. 1990) (Kozinski, J., concurring and dissenting).

68. *Arlington Heights* provides a non-exhaustive list of the categories of circumstantial evidence relevant to whether a law was motivated by discriminatory purpose. 429 U.S. at 266-68; *see also Bossier I*, 520 U.S. at 488; *infra* ¶ 70.

69. Whether the state's claimed purpose is pretextual is also relevant to the purpose test. *Florida*, slip Op. at *98-99. That a state acts to deter in-person voter fraud without evidence thereof does not, by itself, raise an inference of discriminatory intent; but where "the State not only acted without evidence of fraud, but also acted in a way that materially increased the burden of minority voters," such an inference is reasonable. *Id.* at *115; *accord Texas* v. *Holder*, slip Op. at *21.

70. Here, the categories of circumstantial evidence listed in *Arlington Heights* uniformly demonstrate that the State cannot prove a lack of racially discriminatory purpose.

a. *Discriminatory Effect*: Not only is there a "significant" racial disparity in Required ID possession, but the General Assembly knew this to be the case when it enacted R54. (*Supra* ¶¶ 1-2, 43-44.)

b. *History of Discrimination*: South Carolina has a long and ongoing history of enacting racially discriminatory voting changes, even changes previously rejected as discriminatory. (*Supra* ¶¶ 53-57.) *Compare Texas* v. *U.S.*, slip Op. at *41 (noting "Texas's history of failures to comply with the VRA").

- 29 -

c.  *Sequence of Events*:  The weight of evidence indicates that the House and outside party activists pushed for photo voter ID legislation and blocked early voting legislation at least in part as a response to the historic minority turnout in the 2008 general election.  (*Supra* ¶¶ 36-39, 41(a).)

d.  *Departures from Practice*:   Both legislative chambers departed from normal procedural practice in maneuvers to fast-track R54 and limit debate, with a pronounced disregard in the House for the concerns of AA legislators.  (*Supra* ¶¶ 43-52.)   *Compare Texas* v. *U.S.*, slip Op. at *41, *48, *50 (Texas legislature's disregard for minority legislators supported inference of discriminatory intent). The General Assembly also disregarded the recommendations of election officials. (*Supra* ¶ 59.)

e.  *Legislative History*:   R54 proponents, especially in the House, stripped key mitigating provisions from compromise legislation.  (*Supra* ¶¶ 40-42.)  *Cf. Texas* v. *Holder*, slip Op. at *56.   Statements during the legislative process by Rep. Clemmons, the bill's author and floor leader in the House, also point to a discriminatory purpose.  (*Supra* ¶ 38, 45.)

71. The claimed purposes of preventing voter fraud and promoting electoral confidence are pretextual.  (*Supra* ¶¶ 58-59.)  This evidence of pretext, combined with the foreseen retrogressive effects of R54, raise a strong inference of discriminatory purpose.

## CONCLUSION

72. South Carolina has failed to carry its burden as to both discriminatory effect and purpose, and preclearance must be denied.

Dated: September 7, 2012

Respectfully submitted,

/s/  Garrard R. Beeney_____

| | |
|---|---|
| Arthur B. Spitzer (DC Bar No. 235960) | Jon M. Greenbaum (D.C. Bar No. 489887) |
| AMERICAN CIVIL LIBERTIES UNION | Mark A. Posner (D.C. Bar No. 457833) |
| OF THE NATION'S CAPITAL | Robert A. Kengle |
| 4301 Connecticut Avenue, NW, Suite 434 | LAWYERS' COMMITTEE FOR |
| Washington, DC 20008 | CIVIL RIGHTS UNDER LAW |
| (202) 457-0800 | 1401 New York Ave. NW |
| (202) 457-0805 (fax) | Ste. 400 |
| artspitzer@gmail.com | Washington, DC  20005 |
| | Tel:  (202) 662-8389 |
| Laughlin McDonald | Fax:  (202) 628-2858 |
| Nancy Abudu | mposner@lawyerscommittee.org |
| Katie O'Connor | |
| AMERICAN CIVIL LIBERTIES UNION | Michael A. Cooper (pro hac vice) |
| FOUNDATION, INC. | Garrard R. Beeney (pro hac vice) |
| 230 Peachtree Street, N.W., Suite 1440 | Peter A. Steciuk (pro hac vice) |
| Atlanta, GA 30303-1227 | Taly Dvorkis (pro hac vice) |
| (404) 523-2721 | Theodore A.B. McCombs (pro hac vice) |
| (404) 653-0331 (fax) | Sean A. Camoni (pro hac vice) |
| koconnor@aclu.org | SULLIVAN & CROMWELL LLP |
| | 125 Broad Street |
| Susan Dunn | New York, NY  10004-2498 |
| AMERICAN CIVIL LIBERTIES UNION | Tel:  (212) 558-4000 |
| OF SOUTH CAROLINA | Fax:  (212) 291-9007 |
| P.O. Box 20998 | beeneyg@sullcrom.com |
| Charleston, SC 29413 | |
| sdunn@aclusouthcarolina.org | Wendy R. Weiser (pro hac vice) |
| | Keesha M. Gaskins (pro hac vice) |
| J. Gerald Hebert (D.C. Bar No. 447676) | Mimi Marziani (pro hac vice) |
| CAMPAIGN LEGAL CENTER | Elisabeth Genn (pro hac vice) |
| 215 E Street, NE | THE BRENNAN CENTER FOR |
| Washington, DC 20002 | JUSTICE AT NYU SCHOOL OF LAW |
| (202) 736-2200 | 161 Avenue of the Americas, Floor 12 |
| ghebert@campaignlegalcenter.org | New York, NY  10013-1205 |
| | Tel:  (646) 292-8310 |
| *Attorneys for Defendant-Intervenors James* | Fax:  (212) 463-7308 |
| *Dubose,* et al. | keesha.gaskins@nyu.edu |
| | |
| Debo P. Adegbile (D.C. Bar No. NY0143) | Armand Derfner (D.C. Bar No. 177204) |

Elise C. Boddie
Ryan P. Haygood  (D.C. Bar No. NY0141)
Dale E. Ho (D.C. Bar No. NY0142)
Natasha M. Korgaonkar
Leah C. Aden
NAACP LEGAL DEFENSE &
EDUCATIONAL FUND, INC.
99 Hudson Street, Suite 1600
New York, NY 10013
(212) 965-2200
rhaygood@naacpldf.org
laden@naacpldf.org

Douglas H. Flaum
Michael B. de Leeuw
Adam M. Harris
FRIED, FRANK, HARRIS,
SHRIVER & JACOBSON LLP
One New York Plaza
New York, NY 10004-1980
(212) 859-8000

Victor L. Goode
NATIONAL ASSOCIATION FOR THE
ADVANCEMENT OF
COLORED PEOPLE
4805 Mt. Hope Dr.
Baltimore, MD 21215

*Counsel for Defendant-Intervenors South
Carolina State Conference of the NAACP,*
*et al.*

DERFNER, ALTMAN & WILBORN
575 King Street, Suite B
P.O. Box 600
Charleston, SC 29402
Tel:  (843) 723-9804
Fax:  (843) 723-7446
aderfner@dawlegal.com

*Counsel for Defendant-Intervenors the*
*League of Women Voters of South*
*Carolina,* et al.

**CERTIFICATE OF SERVICE**

I certify that on September 7, 2012, I filed the foregoing Opposition through the

Court's electronic filing system, which will provide notice to all counsel of record.


/s/ Theodore A.B. McCombs
Theodore A.B. McCombs