IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

STATE OF SOUTH CAROLINA,

     *Plaintiff,*

v.

UNITED STATES OF AMERICA, and
ERIC HIMPTON HOLDER, JR., in his
official capacity as Attorney General of the
United States,

     *Defendants,*

     and

JAMES DUBOSE, *et al.,*

     *Defendant-Intervenors.*

Civil Action No.

1:12-CV-203-CKK-BMK-JDB
(Three Judge Court)

## UNITED STATES' PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

# Table of Contents

**Preliminary Statement** ................................................................................................ 1

**Proposed Findings of Fact** ........................................................................................ 2

I.   Introduction and Background ................................................................................... 2
    A.  The Benchmark Voting Procedure ..................................................................... 2
    B.  The Proposed Voting Changes: Sections 4, 5, 7, and 8 of R54 .......................... 3
    C.  SEC and State Attorney General Interpretations and Guidance Regarding
        Implementation of R54. ................................................................................. 4

II.  Retrogressive Effect of Photo Voter Identification Requirement of R54 .................. 8
    A.  R54 Will Disproportionately Burden Minority Voters in South Carolina ......... 8
    B.  The Burden Imposed on Minority Voters Who Do Not Possess the Requisite
        Identification is Compounded by Socioeconomic and Demographic Factors ... 9
    C.  South Carolina's Expert Confirms that R54 Will Have Retrogressive Effect on
        Minority Voters ............................................................................................. 11
        1.  Dr. Hood's Analysis Establishes Significant Disparity in PVID
            Possession Between White and Minority Registered Voters .................. 11
        2.  Dr. Hood's Matching Analysis Includes Methodological Flaws ............. 12
        3.  Dr. Hood's Conclusions Regarding R54 Based on his Study of the
            Georgia ID Law are Flawed and Unreliable ....................................... 12

III. Inefficacy of the Purported Ameliorative Provisions of R54 .................................... 13
    A.  The Reasonable Impediment Provision is Vague, Inadequately Defined, and
        Subject to Varying Interpretations .................................................................. 14
    B.  County Boards Have Wide Discretion to Interpret and Implement Election
        Laws and Procedures and Are Inadequately Trained ...................................... 16
    C.  Partisan County Boards Have a Documented History of Discriminating
        Against Minority Voters at the Polls ............................................................... 17
    D.  The Notary Requirement for Reasonable Impediment/Religious Objection
        Affidavits Blunts Any Potential Ameliorative Effect ..................................... 18
    E.  The Reasonable Impediment/Religious Objection Provisions Impose Material
        Burdens on Voters and Pose a Risk of Disenfranchisement ........................... 20
    F.  The Availability of a Free Photo Voter Registration Card at CBRE Offices and
        DMV-Issued Identification Cards at DMV Locations Has Not Been Shown to
        be Sufficiently Ameliorative .......................................................................... 21
    G.  The Availability of Ongoing Funds to Implement Section 4 is Conditional and
        Uncertain ...................................................................................................... 25

IV. Evidence of Discriminatory Purpose ..................................................................... 26
    A.  The Stated Purpose of Preventing In-Person Voter Fraud Is Pretextual .......... 26
    B.  The Stated Purpose of Enhancing Confidence in the Electoral Process Is
        Pretextual ..................................................................................................... 27
    C.  Proponents Knew That R54 Would Impose a Disparate Burden on Minority
        Voters ........................................................................................................... 28

    D.    Proponents Falsely Claimed the Voter ID bills presented to the General Assembly, and Act R54, Were Modeled on Georgia and Indiana Law ........... 30

    E.    Black Legislators Were Excluded From the Legislative Process ..................... 31

        1.    House Refused to Consider Ameliorative Proposals, Leading to a Highly Unusual Walk-Out by Black Members. .................................................... 31

        2.    The Leading House Proponent Responded Positively to Racist Comments. ............................................................................................... 32

        3.    Irregular Procedures Were Used to Override Opposition ....................... 33

        4.    Despite Concerns About VRA Compliance, Less Discriminatory Alternatives Were Rejected. .................................................................... 34

I.    South Carolina has failed to show by a preponderance of the evidence that R54 will not have A Discriminatory effect. ............................................................................. 36

    A.    All Parties Agree That R54 Will Disproportionately Affect Minority Voters in South Carolina ......................................................................................... 37

    B.    R54 Will Impose Material Burdens That Will Likely Cause Some Reasonable Minority Voters Not to Exercise the Franchise ................................................ 38

II.    South Carolina has failed to show by a preponderance of the evidence that R54 was not enacted, at least in part, with a discriminatory purpose. ..................................... 43

    A.    R54 Bears More Heavily on Minority Voters Than White Voters .................. 44

    B.    Contemporaneous Statements ...................................................................... 45

    C.    The Legislature's Asserted Purposes Are Pretextual ...................................... 46

    D.    Less Discriminatory Alternatives Were Rejected ........................................... 48

    E.    Sequence of Events and Departure from Normal Procedures .......................... 49

III.    sections 4, 7 and 8 of R54 cannot be considered independently of Section 5 of Act 54. ............................................................................................................................ 50

# Table Of Authorities

**Cases**

*Apache County High Sch. Dist. No. 90 v. United States,* No. 77-cv-1518, at 13-14
 (D.D.C. June 13, 1980) ......................................................................................... 39
*Beer* v. *United States,* 425 U.S. 130 (1976) ...................................................... 36
*Busbee v. Smith*, 549 F. Supp. 494, 514 (D.D.C. 1982) ......................................... 45, 46, 49
*City of Pleasant Grove v. United States,* 479 U.S. 462 (1987) ......................................... 46
*Common Cause v. Billups*, No. 05-0201, 2007 WL 7600409, at *14 (N.D. Ga. Sept. 6,
 2007) .................................................................................................................. 12
*Crawford v. Marion County Election Board*, 553 U.S. 181 (2008) ................................... 47
*Doe v. South Carolina Dept. of Health and Human Services,* 727 S.E.2d 605, 608
 n.7 (S.C. 2011) ...................................................................................................... 41
*Florida v. United States*, No. 1:11-cv-01428, 2012 WL 3538298 (D.D.C. Aug. 16, 2012)
 ............................................................................................................... passim
*Greater New Orleans Fair Hous. Action Ctr. v. St. Bernard Parish,* 648 F. Supp. 2d 805
 (E.D. La. 2009) ...................................................................................................... 45
*Milwaukee Branch of the NAACP v. Walker*, 11-CV-54 (Wis. Cir. Ct. July, 17, 2012) .. 13,
 37
*Operation Push v. Allain*, 674 F. Supp. 1245 (N.D. Miss. 1987) ..................................... 39
*Perkins v. Matthews,* 400 U.S. 379 (1971) .......................................................... 39
*Reno v. Bossier Parish Sch. Bd.*, 520 U.S. 471 (1997) ......................................... 43, 44, 45
*SEIU, Local 1 v. Husted*, 2012 WL 3643064 at *50-*51 (S.D. Ohio Aug. 27, 2012) ...... 43
*Smith v. Town of Clarkton*, 682 F.2d 1055 (4th Cir. 1982) ...................................... 45
*South Carolina Coastal Conservation League v. South Carolina Dept. of Health and
 Environmental Control*, 702 S.E. 2d 246, 252-53 (S.C. 2010) .................................... 42
*South Carolina v. Katzenbach*, 383 U.S. 301 (1966) ............................................... 41
*St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502 (1993) ............................................... 48
*Texas v. Holder*, No. 1:12-cv-128, 2012 WL 3743676 (D.D.C. Aug. 30, 2012) ........ 48, 49
*Texas v. United States*, No. 11-cv-1303, 2012 WL 3671924 (D.D.C. Aug. 28, 2012) ..... 44
*Thomas v. Delta Enterprises, Inc.*, 396 S.E. 2d 122 (S.C. App. 1990) ............................ 19
*United States v. Charleston County*, 316 F. Supp. 2d 268 (D.S.C. 2003) ........................ 17
*United States v. City of Yonkers*, 837 F.2d 1181 (2d Cir. 1987) ...................................... 45
*Village of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252 (1977) .............. 44
*Wilkes County v. United States*, 450 F. Supp. 1171 (D.D.C. 1978) ................................ 49

**Statutes**

42 U.S.C. § 1973b ............................................................................................... 2
42 U.S.C. § 1973c ...................................................................................... 2, 36, 43
42 U.S.C. § 1973l(c)(1) ........................................................................................ 36
42 U.S.C. §§ 1973gg-2-5 ....................................................................................... 21
Ga. Code Ann. § 21-2-380 ..................................................................................... 31

Ga. Code Ann. § 21-2-417 ................................................................................ 30
Ind. Code Ann. § 3-5-2-40.5 ............................................................................ 31
S.C. Code § 11-9-80 ........................................................................................ 25
S.C. Code § 1-23-10 ........................................................................................ 41
S.C. Code § 2-7-60 .......................................................................................... 25
S.C. Code § 2-7-75 .......................................................................................... 25
S.C. Code § 7-13-70 .......................................................................................... 5
S.C. Code § 7-13-710 (2010) ........................................................................ 2, 3
S.C. Code § 7-13-830 .................................................................................. 18, 21
S.C. Code § 7-5-10 ............................................................................................ 5
S.C. Code § 7-5-155 ........................................................................................ 21
S.C. Code § 7-5-310 ........................................................................................ 21
S.C. Code §§ 7-7-30 - 530 .............................................................................. 22
S.C. Code Ann § 7-15-320 .............................................................................. 31
S.C. Code Title 7, Ch. 27 .................................................................................. 5

**Other Authorities**

30 Fed. Reg. 9897 .............................................................................................. 2

**Regulations**

28 C.F.R. § 51.54 ...................................................................................... 36, 44

# Glossary

## Terms and Abbreviations

| | |
|---|---|
| ACS | American Community Survey |
| CBRE | County Board of Registration and Elections; County Election Commission; County Board of Canvassers |
| DI | Defendant Intervernors |
| DL | Driver's License |
| DMV | South Carolina Department of Motor Vehicles |
| DMV ID | South Carolina Department of Motor Vehicles-issued Identification |
| FY | Fiscal Year |
| H3418 | House Bill 3418 |
| H3003 | House Bill 3003 |
| HJ | House Journal |
| ID | Identification or Identification Card |
| JA | Joint Appendix |
| LBC | Legislative Black Caucus |
| NPRM | South Carolina Notary Public Reference Manual |
| PM | Poll Manager |
| PVID | Photo Voter Identification |
| R54 | 2011 SC Act 27, H3003, 2011 Leg., 119th Sess. (SC 2011) |
| Rep(s). | Representative(s) |
| RI | Reasonable Impediment |
| RO | Religious Objection |
| SC | South Carolina |
| SCAG | South Carolina Attorney General |
| SCARE | South Carolina Association of Registration and Elections Officials |
| SC GA | South Carolina General Assembly |
| SEC PVRC | Photo voter registration card issued by the State Election Commission pursuant to Section 4 of Act R54 |
| SEC | State Election Commission |
| Sen(s). | Senator(s) |
| SJ | Senate Journal |
| US | United States |
| VRA | Voting Rights Act |
| § 4 | Section 4 of Act R54 |
| § 5 | Section 5 of Act R54 |
| § 7 | Section 7 of Act R54 |
| § 8 | Section 8 of Act R54 |
| § 11 | Section 11 of Act R54 |

**Witnesses**

AC     Representative Alan Clemmons
AM     Andrew Martin, Defendant Intervenors' expert
BH     Senator Bradley Hutto
BZ     Barbara Zia, Co-President, South Carolina League of Women Voters
CC     Senator George "Chip" Campsen
CW     Chris Whitmire, Director of Public Information and Training, State Election Commission
CS     Charles Stewart, United States' expert
GCH   Representative Gilda Cobb-Hunter
GM     Senator Gerald Malloy
HA     Heather Anderson, Staff Attorney, SC Senate Judiciary Committee
HL     Representative Harry B. Limehouse
JD     Joseph Debney, Executive Director, Charleston County Election Commission
JH     Representative James Harrison
JR     Janet Reynolds, Director of Administration, State Election Commission
JS     Senator John Scott
KS     Kevin Shwedo, Director, SC Department of Motor Vehicles
LB     Lester Boles, Director, SC State Budget Office
LGM   Lt. Gov. Glenn McConnell
LM     Senator Larry Martin
MA     Marci Andino, Executive Director, State Election Commission,
MB     Marilyn Bowers, Commissioner, State Election Commission
MVH   M.V. Hood, South Carolina's expert
NB     Representative Norman Brannon
PC     Patricia Calkins, York County poll manager
PD     Patrick Dennis, Chief Counsel, SC House Judiciary Committee
PL     Representative Phillip Lowe
OB     Orville Burton, Defendant Intervenors' expert
RC     Senator Raymond Cleary
RH     Representative Robert Harrell
TA     Ted Arrington, United States' expert
TP     Timothy Pearson, Chief of Staff to Governor Haley
WD     Wesley Donehue, Consultant to and former staff member of Senate Republican Caucus

## PRELIMINARY STATEMENT

South Carolina has enacted a photo voter identification law, Act R54, that all parties agree will disproportionately affect minority registered voters in the state. The burdens imposed by this new requirement are not trivial, but rather would fundamentally and materially alter the voting process by making it significantly more difficult for over 130,000 registered voters – disproportionately minority – to cast an effective ballot at the polling place. The changes required by R54 would, in their effect, be functionally indistinguishable from "re-registration" schemes blocked by the Attorney General and federal courts decades ago; or from decisions to close polling places in black precincts – the precise kind of voting changes that this Court has identified as a paradigmatic example of discriminatory practices that Section 5 of the Voting Rights Act aimed to eradicate. The state's purported ameliorative efforts – including the availability of "free" identification (at only two locations in most counties), and the "reasonable impediment" exemption – will, if anything, exacerbate the discriminatory burden R54 would impose on minority voters.

In addition, South Carolina's legislators *knew* when they voted for it that R54 would bear more heavily on minorities than on whites. And during R54's consideration, the lead legislative sponsor repeatedly responded supportively to the discriminatory comments of some supporters of the law. At the same time, the legislature's stated goals – preventing impersonation fraud and improving voter confidence – have been shown to be either unsupported, untrue, or both. When considered in the context of the legislature's decision to discard less discriminatory alternatives that would have served

1

its stated goals no less well, the evidence compels the conclusion that R54 was motivated, at least in part, by a prohibited discriminatory purpose.

Because South Carolina cannot meet its required burden under Section 5 of the Voting Rights Act to show that these changes will not have a discriminatory effect and were not enacted with any discriminatory purpose, the United States respectfully requests that the Court deny the state's request for judicial preclearance of R54.

## PROPOSED FINDINGS OF FACT

**I.    INTRODUCTION AND BACKGROUND**

### A.    *The Benchmark Voting Procedure*

1.    South Carolina ("SC") is a "covered jurisdiction" pursuant to section 4 of the Voting Rights Act ("VRA"), and must accordingly obtain administrative preclearance from the U.S. Attorney General or a declaratory judgment from this Court before implementing any voting changes.  42 U.S.C. §§ 1973b, 1973c; 30 Fed. Reg. 9897.

2.    Under existing SC law, any of the following documents are acceptable forms of identification for in-person voting via a regular ballot: (a) a voter registration card without a photograph issued to all voters; (b) a SC Department of Motor Vehicles ("DMV")-issued driver's license ("DL"); or (c) a SC DMV-issued non-driver identification card that contains a photograph ("DMV ID").  S.C. Code § 7-13-710 (2010).

### B.    *The Proposed Voting Changes: Sections 4, 5, 7, and 8 of R54*

3.      The South Carolina General Assembly ("SC GA") enacted Act R54 on May 11,

2011, and Governor Haley signed it into law on May 18, 2011.  JA-US 002708-19

("R54").

4.      Section 5 of R54 amends S.C. Code § 7-13-710 to require voters to present one of

five forms of valid and current photo voter identification ("PVID") at the polls in order to

vote a regular ballot: (a) a SC DL; (b) a SC DMV ID; (c) a US passport with a

photograph; (d) a federal military photo ID; or (e) a photo voter registration card issued

by the State Election Commission.  JA-US 002715 (R54 § 5(A)).  A voter who has the

required PVID but is unable to produce it may cast a provisional ballot that will be

counted only if the voter brings a PVID to the county board of registration and elections

("CBRE") before certification of the election.  JA-US 002715-16 (R54 § 5(C)).  The

stated purpose of the PVID requirement is to confirm the voter's identity, not domicile.

JA-US 002717 (R54 § 5(E)).

5.      Section 5 of R54 further provides that if a voter does not produce PVID because

she has a religious objection ("RO") to being photographed, or because she suffers from a

reasonable impediment ("RI") that prevents her from obtaining PVID, she may complete

an affidavit under penalty of perjury attesting to the RO or RI (and listing the RI) and

confirming that she is the individual appearing and casting a ballot; then she may cast a

provisional ballot, which the CBRE shall find is valid unless it has grounds to believe the

affidavit is false.  JA-US 002716-17 (R54 § 5(D)).

6.      Section 4 of R54 directs the State Election Commission ("SEC") to implement a system to issue photo voter registration cards ("SEC PVRC"), which would be valid only for voting purposes.  JA-US 002714-15 (R54 § 4).  Section 11 of R54 makes clear that the implementation of § 4 "is contingent upon the SEC's receipt of funds necessary to implement these provisions."  JA-US 002719 (R54 § 11).

7.      Section 7 of R54 requires the SEC to establish a voter education program that includes poll manager ("PM") training and public outreach concerning R54's PVID requirements.  JA-US 002717-18 (R54 § 7).  Section 7 further requires the SEC to provide notice of R54 to each voter who lacks a DMV ID, as well as the requirements to vote absentee, a description of voting by provisional ballot, and the availability of a free DMV ID card.  *Id.*  There is no requirement to inform voters of the availability of the SEC PVRC created by § 4 of R54.  *Id.*

8.      Section 8 of R54 requires the SEC to "create a list containing all registered voters of South Carolina who are otherwise qualified to vote but do not have a South Carolina driver's license or other form of identification containing a photograph issued by the Department of Motor Vehicles as of December 1, 2011," and to provide that list to any registered voter upon request.  The SEC may also require a fee for the list.  JA-US 002718-19 (R54 § 8).

### C.      *SEC and State Attorney General Interpretations and Guidance Regarding Implementation of R54.*

9.      During this litigation, SC has submitted written procedures purporting to implement or interpret §§ 4, 5, and 7 of R54.  *See* US Ex. 299, JA-US 00094-96

("Procedure for Issuing Photo Voter Registration Cards," 4/30/12) (implementing § 4 of R54), JA-US 000098-117 ("Photo ID Voter Education Plan," 4/30/12) (implementing § 7 of R54); US Ex. 353, JA-US 003423-26 ("Reasonable Impediment/Religious Objection Procedures," 8/14/12) (implementing and interpreting § 5 of R54).  These procedures were developed by the SEC's executive director, Marci Andino, and other SEC staff, but not reviewed or formally adopted by the members of the SEC itself.[1]  8/28/12 Tr. at 211:9-212:7, 238:10-239:13, 259:13-20, 260:6-16 (MA); JA-US 003534 (CW Dep. 207:24-208:13).  SEC staff represented that the procedures were merely the most recent versions and subject to change. 8/28/12 Tr. 211:23-212:7, 260:2-5 (MA); JA-US 003534-35 (CW Dep. 209:8-210:1).

10.    Those written implementation procedures, intended merely to provide informal guidance to state and CBRE officials, do not have the force or effect of law.  US Ex. 192, JA-US 000381-82 (SC Resp. to US Interrog. No. 23) ("the proposed procedures for the implementation of R54 provide guidance for use by State and County Election Commission staff in carrying out such implementation and are designed only to comply with the requirements of the statute as opposed to having the force or effect of law.").

11.    Each CBRE is a separate legal entity.  *See* S.C. Code Title 7, Ch. 27 and §§ 7-5-10, 7-13-70.  The SEC has no authority to compel CBREs to act or refrain from

---

[1] The SEC is a state agency with five individual commissioners, all of whom are appointed by the governor.  S.C. Code § 7-3-10.  Marci Andino, the executive director of the SEC, serves at the pleasure of the SEC as its chief administrator officer.  *Id.* § 7-3-20. However, Andino and other administrative staff of the SEC are not members of the SEC.

acting in any way, except through its enactment of formal regulations. 8/28/12 Tr. at 254:4-19 (MA).

12.     South Carolina's Attorney General ("SCAG") has offered at least three written statements regarding the interpretation of various provisions of R54: (1) a letter to Andino regarding the reasonable impediment provisions of § 5 of R54, *see* US Ex. 246, JA-US 003110-14 (8/16/11); (2) a letter to the State's trial counsel in this case regarding timing of implementation of R54, US Ex. 300, JA-US 000072 (ECF No. 117-2, 6/29/12); and (3) a post-trial filing responding to the Court's questions regarding implementation of R54, *see* ECF No. 263 (8/31/12).

13.     The SCAG's August 31, 2012, filing purports to adopt "all of Ms. Andino's interpretations and clarifications of Act R54" as described in her trial testimony.  *Id.* at 2-3.  That trial testimony was internally inconsistent regarding whether the reasonableness of a claimed impediment should be determined solely on the basis of the voter's subjective belief, or instead on an objective standard as applied by each poll manager.  *Compare* 8/28/12 Tr. 210:12-211:8, 219:24-220:12 (MA) (subjective standard), *with id.* at 225:11-21 (objective standard).

14.     The SCAG's August 31, 2012, filing would also apparently adopt Andino's testimony that violating state law is necessary for R54 not to disenfranchise voters.  *Cf.* 8/28/12 Tr. 286:2-5 (MA).  Andino testified that she would, in violation of R54, allow provisional ballots cast pursuant to a false affidavit to be counted in the election, so long as a voter is able to present qualifying R54 ID prior to certification of the election.  *Id.* at 226:17-229:1.  Andino would violate R54's affidavit requirement by allowing PMs who

are not notaries to witness affidavits if a notary is unavailable. *Id.* at 233:2-13, 282:19-283:21. Andino would also violate state law by recommending that certification deadlines be disregarded if necessary to allow CBREs to rule on RI affidavits. 8/29/12 Tr. at 42:15-45:8 (MA).

15.     The SEC has asserted that its "[s]enior leaders maintain legal accountability and protection from lawsuits by closely following state law." *See* US Ex. 291, JA-US 002661 (2011 SEC Accountability Report at 20).

16.     The SCAG's August 31, 2012, filing contradicts the office's prior advice to the SEC. Previously, the SCAG had opined that "the term 'reasonable impediment,' as used in [R54], was intended by the SC GA to mean any *valid* reason, *beyond the voter's control,* which *created an obstacle* to the voter's obtaining the necessary photographic identification in order to vote," and that a voter's RI provisional ballot should be counted "unless there is reason to believe the affidavit contains falsehoods." US Ex. 246, JA-US 003113 (SCAG Op., 8/16/11) (emphasis added). The SCAG's recent opinion replaces this objective standard with a subjective one. ECF No. 263 at 4-6 (8/13/12).

17.     The August 31, 2012, SCAG opinion contradicts the State's prior admissions. SC admitted "that the affidavit to be completed as part of the RI and RO provisions of R54 requires notarization by a notary public," and that "that R54 does not purport to alter any SC law, regulation, or procedure with respect to notaries public, including the laws and procedures set forth in the South Carolina Secretary of State's Notary Public Reference Manual[.]" US Ex. 196, JA-US 000435-36 (SC Resp. to US Req. for Adm. Nos. 19 and 21).

II.   **RETROGRESSIVE EFFECT OF PHOTO VOTER IDENTIFICATION REQUIREMENT OF R54**

     *A.   R54 Will Disproportionately Burden Minority Voters in South Carolina*

18.    Minority voters in SC are disproportionately less likely than white voters to possess any of the currently available, acceptable forms of PVID under R54.  US Ex. 106, JA-US 001338-39 (CS Reb. Decl. ¶ 83-85 & tbl. 11); 8/31/12 Tr. at 77:22-78:2, 97:21-99:16 (CS).  This conclusion holds true for black voters, Native American voters, and Hispanic voters, all of whom are significantly less likely than white voters to possess an allowable PVID under R54.  8/31/12 Tr. at 99:17-23 (CS).  These disparities are statistically significant.  *Id.* at 99:5-9.

19.    The burdens imposed by R54 are greater than those imposed by current law and will bear more heavily on minority voters than on white voters.  US Ex. 105, JA 001260 (CS Decl. ¶ 140); US Ex. 106, JA 001339, 001365 (CS Reb. Decl. ¶¶ 85, 149).

20.    The initial analysis performed by Dr. Charles Stewart included a matching of the SC voter registration database and the SC DMV database state-issued ID holders (of either a DL or a DMV ID).  US Ex. 105, JA 001215-16 (CS Decl. ¶ 25); 8/31/12 Tr. at 81:5-14 (CS).  To improve the accuracy of his analysis, Dr. Stewart removed deceased persons from his analysis.  8/31/12 Tr. at 96:4-9 (CS).  This analysis demonstrated that minority voters are more likely than white voters to lack a valid and current state-issued ID.  US Ex. 105, JA 001243 (CS Decl. ¶ 104; Attach. Q).

21.    When accounting for both military IDs and passports, Dr. Stewart's analysis found that the probability of a white voter not possessing any of the currently available PVID

was 3.9%, while the probability of a black voter not possessing any of the currently available PVID was 8.3%.  US Ex. 106, JA 001339 (CS Reb. Decl. ¶ 84).  8/31/12 Tr. at 97:16-99:16 (CS).  Black registered voters are more than twice as likely as white registered voters not to possess one of the acceptable forms of PVID required by R54.  US Ex. 106, JA 001339 (CS Reb. Decl. ¶ 84; Attach. H).  The PVID non-possession rate is similar among Native Americans, and among Hispanics it is nearly 72% greater than the rate for white voters.  These findings are statistically significant at a very high level of certainty.  US Ex. 106, JA 001338-39 (CS Reb. Decl. ¶¶ 80-85; Attach. G, H).

> ### B.    *The Burden Imposed on Minority Voters Who Do Not Possess the Requisite Identification is Compounded by Socioeconomic and Demographic Factors*

22.    The disproportionate burden imposed by R54 on minority voters is compounded by the fact that minority voters in SC who lack PVID are significantly less likely than white voters lacking a PVID to have the resources necessary to acquire an allowable ID.  8/31/12 Tr. at 78:4-19 (CS); US Ex 105, JA001250-60 (CS Decl. ¶¶ 121-39).

23.    A county-level analysis of the correlation between non-possession of state-issued ID indicates that at a statistically significant level, the counties with the greatest percentages of registered voters without state-issued IDs are also the counties with the greatest percentage of voters who are black, the highest levels of the adult population lacking basic literacy skills, and the lowest median household income.  US Ex. 105, JA 001248-56 (CS Decl. ¶¶ 122-131); 8/31/12 Tr. at 105:19-107:15 (CS).

24.    A ZIP code-level analysis considering median household income, per capita income, median home value, and educational attainment shows that to a high degree of

statistical significance, black voters without a DL or DMV ID live in areas of SC with lower incomes, lower wealth as measured by home value, and lower educational attainment.  US Ex. 105, JA 001257-59 (CS Decl. ¶¶ 132-139); 8/31/12 Tr. at 109:8-110:18 (CS).

25.     Well-established social science, political science, and sociological research confirm that individuals with more social resources, including higher incomes, higher level literacy skills, and higher levels of education, are more likely to participate in the political process and can more easily navigate and comply with formal requirements of participation such as registering to vote.  US Ex. 105, JA 001257-58 (CS Decl. ¶ 134); 8/31/12 Tr. at 110:19-11:21 (CS).  Thus, the percentage of white and black voters lacking an R54 ID, taken in isolation, understates the burden disparately borne by black voters as a result of socio-economic disparities by race.  8/31/12 Tr. at 18:12-19:2 (TA).

26.     Comparing Dr. Stewart's no-match list of active registered voters without state or federal IDs with American Community Survey ("ACS") data on municipalities, small towns, and unincorporated jurisdictions, Dr. Theodore Arrington found that the higher the percentage of registered voters without acceptable ID who are white in a specified place, the higher the median household income and per capita income.  In contrast, areas with a higher percentage of registered voters without an R54 ID who are black are correlated with lower median household incomes and lower per capita incomes.  US Ex. 117, JA 001523 (TA Reb. Decl. ¶ 9).

27.     The higher the percentage of voters who lack R54 ID who are white, the less likely families in that area are to rely on food stamps or live below the poverty line.  In contrast,

the higher the percentage of voters who lack R54 ID who are black, the more likely that families who live in that area receive food stamps and live in poverty.  US Ex. 117, JA 001532 (TA Reb. Decl. at Table 2).

28.     Analysis of the median household incomes of the 40 geographic areas with the highest and lowest percentages of voters who lack R54 ID who are black shows that the burden borne by black voters will be disproportionately severe.  The areas with the highest percentages of voters without ID who are black have very low median household income levels ($28,444) and high levels of poverty and food stamp dependence.  In stark contrast, the areas with the lowest percentages of voters without ID who are black have almost two and a half times higher median household incomes ($70,108) and low poverty levels.  US Ex. 117, JA 001524-33 (TA Reb. Decl. ¶ 11, Table 3).

### C.   South Carolina's Expert Confirms that R54 Will Have Retrogressive Effect on Minority Voters

#### 1.   Dr. Hood's Analysis Establishes Significant Disparity in PVID Possession Between White and Minority Registered Voters

29.     SC's expert, M.V. Hood, also finds that there is a racial disparity disfavoring minority voters in the rates of R54 ID possession.  8/29/12 Tr. at 173:24-174:7, 214:15-215:8, 242:24-243:11 (MVH); JA 001060-61 (MVH Decl. at 13-14); US Ex. 106, JA 001089-90 (MVH Supp. Decl. at 9-10), JA 001333 (CS Reb. Decl. ¶¶ 67-68).

30.     In Dr. Hood's analysis of active and inactive voters, the difference between non-Hispanic white and black voters' rates of R54 ID possession is 2.1 percentage points; that is, black voters are at least 1.45 times (6.81/4.71) more likely not to possess one of the currently available R54 ID.  JA 001090 (MVH Sup. Decl. at 10); 8/29/12 Tr. at 215:9-

218:10 (MVH).  Dr. Hood agrees that this difference represents a significant racially disparate impact.  8/29/12 Tr. at 218:23-219:12 (MVH).

### 2.    Dr. Hood's Matching Analysis Includes Methodological Flaws

31.    Dr. Hood did not remove deceased voters from the data he used to run his matching analysis.  8/29/12 Tr. at 203:7-17, 20-21 (MVH).  Nor did Dr. Hood remove records of voters who surrendered their driver's licenses in other states, despite his assumption such voters had moved from SC.  8/29/12 Tr. at 205:25-207:9 (MVH).

32.    The analysis Dr. Hood submitted in a case challenging a photo ID law in Wisconsin was criticized by the court for failing to remove deceased persons and records of voters who surrendered their DLs in other jurisdictions from the data analysis.  8/29/12 Tr. at 208:15-209:20 (MVH).

### 3.    Dr. Hood's Conclusions Regarding R54 Based on his Study of the Georgia ID Law are Flawed and Unreliable

33.    Dr. Hood's co-authored article, "Worth a Thousand Words?: An Analysis of Georgia's Voter Identification Statute," – and cited throughout his initial declaration – is the same study that Dr. Hood submitted to the court as his expert analysis in the *Common Cause v. Billups* case, a challenge to the Georgia voter ID law.  8/29/12 Tr. at 224:13-19 (MVH).  The court in *Billups* excluded Dr. Hood's analysis because it was not reliable or admissible.  *Id*. at 224:20-22, 225:20-226:9; *Common Cause v. Billups*, No. 05-0201, 2007 WL 7600409, at *14 (N.D. Ga. Sept. 6, 2007).

34.    Dr. Hood's analysis in his study, "An Empirical Assessment of the Georgia Identification Statute," is also flawed and unreliable.  This study presents estimated voter

turnout rates for 2004 and 2008, but does not present actual turnout rates by race for voters who do not possess a DL or DMV ID.  In fact, his model systematically overestimates turnout for both the 2004 and 2008 election.  8/29/12 Tr. at 233:20-236:7 (MVH).

35.     The multivariate analysis in Dr. Hood's second Georgia study controls for income and age, which treats black voters and white voters as if they were, on average, equally wealthy and the same average age.  US Ex. 106, JA 001348-49 (CS Reb. Decl. ¶¶ 106-09); 8/29/12 Tr. at 237:2-240:2 (MVH).

36.     Dr. Hood states that allowable ID under the South Carolina and Georgia laws are very similar, but Georgia's list of acceptable ID is significantly more expansive.  8/29/12 Tr. at 245:15-251:18 (MVH).

37.     In addition to the finding of inadmissibility in *Billups*, courts in two recent voting rights cases in which Hood has offered expert opinions have criticized his analysis and methodology as flawed and unreliable.  *Milwaukee Branch of the NAACP v. Walker*, 11-CV-54 (Wis. Cir. Ct. July, 17, 2012); *Florida v. United States*, No. 1:11-cv-01428, 2012 WL 3538298, at *8 (D.D.C. Aug. 16, 2012) (three-judge court).

## III.   INEFFICACY OF THE PURPORTED AMELIORATIVE PROVISIONS OF R54

38.     Dr. Hood believes that as a general matter, determining whether R54's photo voter registration card, reasonable impediment exemption, and public education program will ameliorate the law's discriminatory effect is "speculative in nature."  JA 001101 (MVH Reb. Decl. at 3); 8/29/12 Tr. at 256:24-258:9 (MVH).  Dr. Hood conceded he cannot

testify with scientific certainty that R54 will not have a discriminatory impact at the polls. 8/29/12 Tr. at 243:12-245:1 (MVH).

### A. The Reasonable Impediment Provision is Vague, Inadequately Defined, and Subject to Varying Interpretations

39.     R54 provides no guidance on the meaning of RI.  8/28/12 Tr. at 284:13-18 (MA).

40.     There is significant confusion regarding the discretion that PMs and CBRE officials will have to determine whether a voter's claimed impediment is reasonable. Andino testified both that voters would decide whether their claimed impediment is reasonable,  8/28/12 Tr. at 210:17-211:8, 219:14-220:12 (MA), and that CBREs will both confirm the voter's identity and assess whether the reason stated on the affidavit is false. *Id*. at 225:2-25, 278:5-281:4.  Andino also testified that PMs might decide whether or not to allow a voter to cast an RI ballot depending on the impediment given.  *Id*. at 271:3-273:20, 274:3-22; *see also* 8/28/12 Tr. at 6:5-22 (AC).

41.     Chris Whitmire, the SEC's Director of Public Information and Training, initially testified that he did know how to interpret the RI provision and would need to seek clarification.  JA-US 001699 (CW Dep. 196:8-198:3).  Later, Whitmire claimed that PMs and CBRE officials would have no discretion in determining the reasonableness of a claimed impediment.  JA-US 003540 (CW Dep. 230:7-232:12).

42.     Several legislators testified that CBREs will have discretion to determine whether an impediment is reasonable.  8/28/12 Tr. at 7:14-8:4 (AC); JA-US 000961 (NB Dep. 44:2-23); JA-US 001292 (JH Dep. 57:4-10); JA-US 001465-66, 001482-83 (LM Dep. 113:20-114:21, 197:7-199:13).

43.     Sen. Cleary gave inconsistent answers when asked whether the CBRE or the voter determines if an impediment is reasonable and he acknowledged that the law is unclear. JA-US 001092 (RC Dep. 164:21-165:4); JA-US 001106 (RC Dep. 222:21-224-23); JA-US 001107 (RC Dep. 228:4-229:4); JA-US 001108-09 (RC Dep. 237:9-238:3, 241:3-241:7).

44.     Andino and certain legislators disagree whether a lack of transportation could be an RI.  *Compare* 8/28/12 Tr. at 266:14-16 (MA), JA-US 001414 (HL Dep. 40:10-18), and JA-US 000959 (NB Dep. 37:10-38:2) (agreeing that lack of transportation is an RI), *with* JA-US 001093 (RC Dep. 168:24-169:5. 206:20-207:10) and JA-US 001465 (LM Dep. 111:24-112:15) (contending that lack of transportation is not an RI).

45.     Local officials are uncertain of how to interpret the RI exemption and the degree of discretion they will have to determine reasonableness or to count provisional ballots cast under this provision.  8/28/12 Tr. at 265:15-23 (MA).  Joseph Debney, the executive director of the Charleston County CBRE, does not know what the meaning of RI is and could not provide a voter with guidance about it.  JA-US 001170 (JD Dep. 82:3-83:1).

46.      Patricia Calkins, who has worked as a PM and in various other election-related positions in York County since 2004, does not know what the term RI means.  JA-US 000975 (PC Dep. 8:16-9:17); JA-US 000992-93 (PC Dep. 77:18-20).  Calkins would be reluctant to try to explain the RI provision to a voter because the term could be open to many different interpretations.  *Id*. (PC Dep. 78:4-7).

47.     Andino testified that she agreed with the concerns raised by CBRE officials regarding the meaning of RI.  8/28/12 Tr. at 265:15-23 (MA).

15

48.     The provisional ballot process is already one of the most confusing tasks that poll managers confront on Election Day.  JA-US 000995 (PC Dep. 88:16-23).

49.     The August 16, 2011, SCAG opinion, US Ex. 246, JA-US 003112-14, setting forth only three examples of what could constitute a RI (*i.e*, not having a birth certificate, a physical disability, and short time frame between preclearance of R54 and any election immediately thereafter), provides insufficient guidance to CBRE officials.  8/28/12 Tr. at 265:24-266:10 (MA).

50.     The SEC's informal, nonbinding written guidance regarding RI/RO affidavits, US Ex. 353, JA-US 003423-26, lists the same three examples of RI as the August 2011 SCAG opinion.  8/28/12 Tr. at 211:16-212:7, 266:11-13 (MA).  The RI/RO procedures provide no guidance regarding the degree of discretion CBREs will have to determine whether a stated impediment is reasonable and/or to count a provisional ballot cast in connection with a RI/RO affidavit.  8/29/12 Tr. at 13:19-14:22, 16:14-17:4 (MA).

### B.     *County Boards Have Wide Discretion to Interpret and Implement Election Laws and Procedures and Are Inadequately Trained*

51.     As separate and independent legal entities, CBREs have wide discretion to interpret and implement election laws, and the SEC cannot guarantee that the informal guidance it disseminates will be consistently followed.  8/28/12 Tr. at 205:8-11, 253:20-254:19, 255:22-256:1 (MA); 8/29/12 Tr. at 10:21-25 (MA),100:4-7 (MB).  The SEC has had trouble ensuring consistency in the implementation of election laws from county to county, in part because of the SEC's failure to issue clear guidance to the CBREs.  JA-US 001216-17 (PD Dep. 141:4-142:23).

16

52.     The SEC provides an online PM training program and supplies counties with SEC-created training materials, but does not generally provide direct training for PMs. 8/28/12 Tr. at 254:24-255:14 (MA).  There are several counties that do not use the SEC-provided online PM training program.  8/29/12 Tr. at 11:17-12:5 (MA).

53.     While CBRE officials are legally required to attend and complete the SEC's CBRE training and certification program, 82 out of 500 CBRE officials failed to do so in 2011.  8/29/12 Tr. at 12:19-13:10 (MA); US Ex. 291, JA-US 002651 (2011 SEC Accountability Report at 10).  CBRE officials are not required to attend R54 training and the SEC has no authority to compel such attendance.  JA-US 001697 (CW Dep. 188:10-190:12, 184:13-185:10).

### C.     Partisan County Boards Have a Documented History of Discriminating Against Minority Voters at the Polls

54.     The selection of election officials in SC is done on a partisan basis.  JA-US 001174 (JD Dep. 106:1-107:20); JA-US 000979 (PC Dep. 23:24-24:9).  CBREs are appointed by the Governor.  The only requirement with respect to partisan balance of CBREs is that there be one member of the majority party and one member of the minority party.  8/29/12 Tr. at 49:4-20 (MA).

55.     In *United States v. Charleston County*, 316 F. Supp. 2d 268, 286-89 n.23 (D.S.C. 2003), a court found "significant evidence of intimidation and harassment" of black voters in Charleston County by PMs and poll watchers in elections from the 1980s through 2002.  US Ex. 108, JA 001423 (TA Decl. ¶ 84).  The SEC has received complaints that PMs act in partisan ways.  8/29/12 Tr. at 48:15-17 (MA).

56.     Partisanship affects how and whether provisional ballots are counted and it is more likely that minority voters' provisional ballots will not be counted than it is that white voters' provisional ballots will not be counted.  US Ex. 108, JA 001423 (TA Decl. ¶ 84).

57.     CBRE officials will know the identity of the voter when making determinations regarding whether to count a provisional ballot.  8/29/12 Tr. at 52:5-9 (MA).  The race of the voter who submitted the provisional ballot can be known prior to the canvass, making it possible for CBRE officials arbitrarily to decide to accept or reject a provisional ballot on the basis of a voter's race and/or assumed party affiliation.  US Ex. 108, JA-US 001423-24 (TA Decl. ¶ 84); 8/29/12 Tr. at 52:5-20 (MA).

58.     Decisions regarding whether or not to count a provisional ballot, including a RI/RO provisional ballot are made by a majority vote of the CBRE, whose decisions are final.  S.C. Code § 7-13-830; 8/29/12 Tr. at 48:22-49:3, 49:17-20 (MA).

## D.     The Notary Requirement for Reasonable Impediment/Religious Objection Affidavits Blunts Any Potential Ameliorative Effect

59.     The RO/RI affidavit must be completed in the presence of a notary, who must verify the voter's identity per state law and the SOS's Procedures set forth in the Notary Public Reference Manual ("NPRM").  US Ex. 196, JA-US 000435-36 (SC Resp. to US Req. for Adm. Nos. 18, 19, 21); US Ex. 199, JA-US 000188-250 (2010 NPRM).

60.     If a notary does not personally know the affiant, he must confirm the affiant's identity through the affiant's presentation of a photo ID or verification by another credible witness who possesses photo ID.  US Ex. 199, JA-US 000195, 000204 (2010 NPRM).  If a notary determines that the proof of ID presented by the affiant is not

sufficient to confirm the voter's identity, the voter will not be allowed to cast a provisional ballot.  8/29/12 Tr. at 21:10-21 (MA).  Noraties can face civil and criminal liability for false or negligent notarization of affidavits.  US Ex. 199, JA-US 000199 (2010 NPRM); S.C. Code § 26-1-95 (criminal penalties); *Thomas v. Delta Enterprises, Inc.*, 396 S.E. 2d 122, 123 (S.C. App. 1990) (allowing tort claim to proceed against notary for negligence "in administering an oath and attesting signatures").

61.     CBREs will be responsible for identifying and recruiting notaries to staff the approximately 2,100 polling places across the State.  8/29/12 Tr. at 22:9-12 (MA).  The SC GA has appropriated no funds to CBREs or to the SEC specifically for this purpose (outside of general election operations appropriations).  *See* JA-US 001787-94 (FY 2013 Budget).

62.     The SEC has made efforts to identify and recruit volunteer notaries, but as of the close of evidence, Andino had not identified any notary who has agreed to work at the polls on Election Day for free.  8/29/12 Tr. at 22:5-18 (MA).

63.     An affidavit that is witnessed by someone who is not a notary would be subject to challenge by anyone at the canvassing of provisional ballots, and there is no guarantee those provisional ballots would be deemed valid by the CBRE (or any state court).  8/29/12 Tr. at 23:6-24:13 (MA).

64.     In cases where a notary is not available to notarize a RI/RO affidavit, it would not be possible to implement the RI/RO provisions without running afoul of state law.  8/28/12 Tr. at 286:2-5 (MA).  Andino is aware of no other situation that would require violating state law in order to not disenfranchise voters.  *Id*. at 24:25-25:2.

19

65.     Notaries may charge a fee for their services.  US Ex. 199, JA-US 000188-250

(2010 NPRM).  Andino believes that charging voters a fee to complete a RI/RO affidavit

would constitute a poll tax.  8/28/12 Tr. at 234:2-5 (MA).  Andino may instruct notaries

that they cannot charge a fee at the polls, but cannot compel notaries to forego payment.

*Id*. at 233:24-234:5.

### E.      *The Reasonable Impediment/Religious Objection Provisions Impose Material Burdens on Voters and Pose a Risk of Disenfranchisement*

66.     A voter who lacks the required R54 PVID and who has a RI/RO cannot cast a

regular ballot that will be counted Election Day.  If a voter without a PVID wants to vote

a regular ballot, it would entail going to the DMV or his or her respective CBRE to

acquire the requisite PVID.  8/28/12 Tr. at 262:19-163:9; 8/29/12 Tr. at 9:3-7 (MA).

67.     A voter who presents himself to vote and does not have  allowable identification

will be asked by a poll manager whether he has a reasonable impediment that prevents

him from obtaining one of the requisite forms of identification, or a religious objection to

being photographed.  If a voter answers affirmatively, he will be notified that he may cast

a provisional ballot but must first complete an affidavit stating his impediment or

religious objection.  Doing so requires the voter to execute the following eight steps at a

minimum: (1) the poll manager and voter must complete the form on the provisional

ballot envelope; (2) the voter must complete and sign the affidavit on the back of the

envelope, including filling in the reasonable impediment; (3) the voter must then prove

his identity to the satisfaction of a notary; (4) the affidavit must then be notarized by the

notary; (5) the poll manager will then provide the voter with a provisional ballot; (6) the

voter will vote the provisional ballot and return it to the poll manager; (7) the poll manager will place the provisional ballot inside the provisional ballot envelope and place the envelope in the provisional ballot box; and (8) the poll manager will provide the voter with a notice regarding the provisional ballot hearing.  US Ex. 353, JA-US 003423-24 (SEC RI/RO Procedures); 8/29/12 Tr. at 16:4-28:9, 45:21-48:25 (MA).

68.     A voter casting a non-RI/RO provisional ballot is not required to complete an additional affidavit or to notarize any documentation.  US Ex. 353, JA-US 003424 (SEC RI/RO Procedures); S.C. Code § 7-13-830 (2010).

69.     Although voters who cast a provisional ballot are not required to attend the provisional ballot hearing that occurs the Thursday after a primary election or the Friday after a general election, they would otherwise have no way of knowing before certification of the election results whether their ballot was challenged or whether the ballot will be counted.  8/29/12 Tr. at 25:4-28:9, 45:11-20 (MA).

70.     Poll watchers, who observe the voting process on Election Day, will have access to the voter registration list and the poll list.  8/29/12 Tr. at 30:2-23 (MA).  RI ballots are subject to challenge by poll watchers.  *Id.* at 30:6-18.

> ### F.     *The Availability of a Free Photo Voter Registration Card at CBRE Offices and DMV-Issued Identification Cards at DMV Locations Has Not Been Shown to be Sufficiently Ameliorative*

71.     Voter registration can be accomplished by mail or at any number of voter registration agencies other than the CBRE office or the DMV.  *See* 42 U.S.C. §§ 1973gg-2-5; S.C. Code §§ 7-5-155, 7-5-310; 8/28/12 Tr. at 262:19-263:21 (MA).

72.     Voting can be accomplished in person at a polling place located close to the person's residence.  *See* S.C. Code §§ 7-7-30 - 530.

73.     To obtain an SEC PVRC, already-registered voters who lack acceptable PVID would need to appear in person at the CBRE office in the county in which they reside. JA-US 000124-25 (Final Procedures of R54); 8/28/12 Tr. at 262:19-263:9 (MA).

74.     Newly registering voters who register by mail or through a disability office or public assistance agency and who lack PVID would likewise be required to appear in person at the CBRE office to obtain an SEC PVRC.  JA-US 000122-24 (Final Procedures of R54); 8/28/12 Tr. at 262:19-263:21 (MA).

75.     To acquire the free non-driver's ID cards being issued by the DMV, voters would have to go to a DMV office and present the same documentation necessary to acquire a DL, such as a birth certificate, to prove the applicant's U.S. citizenship/identity, social security number, and SC residency.  US Ex. 287, JA-US 002586-87 (DMV Checklist of Requirements); JA-US 001627 (KS Dep. 35:16-36:4).

76.     There is one CBRE office per county and they are generally open Monday through Friday during business hours.  *See* ECF No. 224.  Most counties have only one DMV office, located in the county seat.  *See* DI Ex. 417, JA–DI 003868 (Map of SC Counties with BVAP showing location of DMV and Voter Registration Offices).  There are a total of 67 DMV offices for SC's 46 counties.  Most are open during business hours on Monday to Friday.  US Ex. 108, JA 001411 (TA Decl. ¶61).

77.     To be eligible to vote, a certain subset of qualified and validly registered citizens would be obligated to travel either to a DMV office or to the CBRE office at the county

seat.  US Ex. 299, JA-US 000123-25 (Notice of Final Procedures of R54); 8/28/12 Tr. at
262:19-263:21 (MA).

78.     There are counties in SC with large rural geographical areas where public
transportation is virtually nonexistent.  8/30/12 Tr. at 241:16-242-11 (GM).  Counties
with the highest percentage of black voting age population are also counties where there
is virtually no public transportation.  8/27/12 Tr. at 179:8-180:4 (CC); *See* DI Ex. 418,
JA-DI 03866 (Map of SC Counties showing Public Transportation fixed regular routes
and BVAP).

79.     The Attorney General has interposed objections to voting changes that impose a
dual registration or re-registration requirement where one had previously not existed.  US
Ex. 306, JA-US 003266-68 (*Jasper Cnty.*); US Ex. 312, JA-US 003284-86 (*Perry Cnty.*).

80.     The Attorney General has interposed objections to polling place changes based on
additional burdens imposed on minority voters, including objections to the reduction in
the number of polling places, relocation of polling places from predominately black areas
to predominately white areas, relocation of polling places to areas that were inaccessible
to and inconvenient for minority voters, relocation of polling places to areas that minority
voters could not access because of the lack of readily available public transportation and
lack of access to vehicles, and relocation of polling places to specific sites that had a
history of discriminating against blacks and were considered hostile and intimidating to
black voters.  US Ex. 304, JA-US 003258-60 (*Del Valle Indep. Sch. Dist.*); US Ex. 305,
JA-US 003261-65 (*Dinwiddie Cnty.*); US Ex. 307, JA-US 003269-71 (*Jenkins Cnty.*); US
Ex. 308, JA-US 003272-74 (*Johnson Cnty.*); US Ex. 309, JA-US 003275-78 (*Lubbock

23

*Cnty. Water Control and Improv. Dist.*); US Ex. 310, JA-US 003279-81 (*Jefferson Cnty.*); US Ex. 311, JA-US 003282-83 (*North Harris Montgomery Cmty. College Dist.*); US Ex. 313, JA-US 003287-89 (*Pike Cnty.*); US Ex. 314, JA-US 003290-91 (*Quitman Cnty.*); US Ex. 315, JA-US 003292-94 (*Simpson Cnty.*); US Ex. 316, JA-US 003295-97 (*St. Landry Parish*).

81.     Requiring voters who lack PVID to undergo a two-step registration process and appear in person at CBRE or DMV offices or to obtain a SEC PVRC or DMV ID will impose significant burdens upon racial minority groups who, by reason of their disadvantaged socioeconomic status and comparative lack of access to reliable and convenient transportation, are the least likely to be able to bear the burden.  US Ex. 108, JA 001395-98, 001411, 001414-15 (TA Decl. ¶¶ 30-36, 61, 67, 68); 8/31/12 Tr. at 8:8-21 (TA), 126:13-127:19 (CS); *see* 8/31/12 Tr. at 38:2-39:9 (TA), 78:9-19 (CS); 8/30/12 Tr. at 26:13-19 (MVH), 270:15-271:19 (JS); 8/29/12 Tr. at 237:24-238:4 (MVH).

82.     These additional burdens are significantly greater than the burden associated with registering or voting and will likely depress voter turnout in that population.  US Ex. 108, JA 001395-98, 001411, 001414-15 (TA Decl. ¶¶ 30-36, 61, 67, 68); 8/31/12 Tr. at 126:13-128:7 (CS); 8/30/12 Tr. at 117:5-7 (Direct Test. LM ¶ 1, ECF No. 216); 8/29/12 Tr. at 263:18-264:10 (MVH); *see* JA 001392 (TA Decl. ¶ 28); 8/31/12 Tr. at 99:25-100:5 (CS); 8/30/12 Tr. at 270:15-271:19 (JS); *cf.* 8/29/12 Tr. at 244:8-17 (MVH).

83.     In order for the SEC PVRCs to fully address the retrogressive effect of R54, the rate of acquisition of the SEC PVRCs by black voters would have to be twice the rate of acquisition of white voters. 8/31/12 Tr. at 112:24-113:24 (CS).

84. Due to the resource disparities between black and white voters without PVID, it is unlikely that black voters will acquire the SEC PVRC at twice the rate of white voters. 8/31/12 Tr. at 113:25-114:19 (CS).

85. Resource disparities between black and white voters would also lessen the mitigating effect, if any, of the voter education and free DMV-ID provisions of R54 and might even exacerbate the retrogressive effect. *Id*. at 115:6-116:10.

86. The burdens under R54 are substantial and are likely to have a measurable impact on registration rates and turnout rates of minority voters in SC. *Id*. at 126:13-128:5.

> **G.    *The Availability of Ongoing Funds to Implement Section 4 is Conditional and Uncertain***

87. In SC, appropriated funds for state government must be used in the fiscal year during which they are appropriated, and strictly in accordance with annual line item appropriations. *Id.* S.C. Code §§ 2-7-60, 2-7-75, 11-9-80.

88. The FY 2012 budget for the SEC included a $535,000 non-recurring appropriation for implementation of voter ID. JA-US 003511 (LB Dep. 125:3-22); US Ex. 320, JA-US 000776-83 (FY 2012 Budget). The FY 2013 budget for the SEC did not include an appropriation for the implementation of voter ID in FY 2013. JA-US 003525 (JR Dep. 99:11-14); JA-US 001787-94 (FY 2013 Budget).

89. No funds were properly carried forward from the FY 2012 budget for voter ID implementation. JA-US 003511-13, 003520, 003523 (LB Dep. 118:9-17, 129:15-130:22,132:11-14, 161:20-162:6, 178:25-179:17).

25

### IV.   EVIDENCE OF DISCRIMINATORY PURPOSE

90.     SC stated purposes in passing R54 were detecting and deterring voter fraud and ensuring public confidence in the legitimacy and integrity of the election process.  US Ex. 192, JA-US 000362-64 (SC Resp. to US Interrog. Nos. 3-4).

### A.     *The Stated Purpose of Preventing In-Person Voter Fraud Is Pretextual*

91.     The systematic push for photo ID followed the 2008 election, which saw historic turnout among black voters in SC.  JA 001765-66 (AM Decl. 7-8); 8/30/12 Tr. at 290:18-291:3, 292:5-9 (GCH); ECF No. 218 (BH Direct Test. ¶ 5).

92.     Sen. Campsen was unaware of any credible incidents of voter impersonation fraud at the time he introduced his first voter identification bill S334, in 2009.  8/27/12 Tr. at 114:6-9 (CC).  He tried but failed to find examples of voter impersonation fraud in SC, including by asking the then-chairman of the Republican Party for additional research after he had already introduced S334.  *Id*. at 115:25-116:14.

93.     Sen. Campsen was aware of no credible incidents of voter impersonation fraud at any time that photo ID legislation was pending before the SC GA.  *Id.* at 115:10-18.   Nor did other Senate proponents know of instances of voter impersonation fraud in SC.  JA-US 001447 (LM Dep. 40:9-40:17); JA-US 001563 (TP Dep. 78:22-79:12).

94.     Rep. Clemmons previously testified that no evidence of voter impersonation fraud in SC was brought into the House record during the consideration of photo ID legislation.  JA-US 001123 (AC Dep. 40:19-41:10).  At trial, he testified that the only evidence of impersonation fraud in the record before the House was a single line from a floor statement by Rep. Sellers, a bill opponent.  8/27/12 Tr. at 242:17-22 (AC); *see also* US

Ex. 121, JA001693 (Rep. Clemmons and political consultant discussing the need to find a "boogey-man" for the photo ID law).

95.    At trial, Sen. Campsen was unaware of what information is currently contained on a SC voter registration card.  8/27/12 Tr. at 164:18-165:23 (CC).  The current system has a number of tools in place that would prevent impersonation fraud.  *Id*. at 163:17-168:8; US Ex. 108, JA 001425 (TA Decl. ¶ 88).

### B.    The Stated Purpose of Enhancing Confidence in the Electoral Process Is Pretextual

96.    Examples of fraud given during the legislative process included vote buying, mail-in absentee ballot fraud, corruption of election officials, and registration fraud.  *E.g*., US Ex. 25, JA 000275-77 (2/24/11 SJ).  R54 does not directly address these concerns. 8/27/12 Tr. at 245:25-247:6 (AC).

97.    The House rejected at least two bills that would have addressed documented election integrity issues: post-election audits of voting machines, and absentee ballot security. 8/30/12 Tr. at 280:2-9, 280:18-281:2, 288:5-16 (GCH); ECF No. 222 (BZ Direct Test ¶ 21).

98.    The SEC conducted post-election surveys in 2004 and 2006 in which 80% to 90% of respondents reported that they were very confident in SC's electoral system.  Andino has no reason to believe that those confidence levels have changed.  8/28/12 Tr. at 269:24-270:15 (MA).

99.     R54 proponents never sought any data from the SEC or any other source on electoral confidence in SC.  8/27/12 Tr. at 116:15-117:2 (CC), 248:21-249:2 (AC); JA-US 001243 (WD Dep. 136:5-17).

100.    The South Carolina Association of Registration and Election Officials ("SCARE") opposed the ID requirement in R54.  One of SCARE's concerns was an increase in lines at polling places. 8/27/2012 Tr. at 183:15-23 (CC).  Polling place lines can discourage voting.  8/28/2012 Tr. at 179:2-12 (LGM).

## C.   *Proponents Knew That R54 Would Impose a Disparate Burden on Minority Voters*

101.    Early in the consideration of S334, black Senators informed proponents of their concern that a photo ID requirement would chill minority voting.  8/28/12 Tr. at 185:24-187:1 (LGM).  Black House members likewise expressed their concerns about the burdens photo ID would impose on minority voters.  8/30/12 Tr. at 279:11-280:1 (GCH).

102.    Voting in SC is racially polarized and SC Legislators understand this.  Changes to the percentage of black voters in the electorate can affect elections.  US Ex. 108, JA 001409-11 (TA Decl. ¶ 58-59); 8/30/12 Tr. at 271:1-8 (JS); JA-US 000487-89 (PL Dep. 90:11-98:20); JA-US 001795-97 (PL Op-Ed).

103.    SC legislators are aware of the socioeconomic disparities between white and black South Carolinians, as well as the lack of public transportation in many SC counties.  8/27/12 Tr. at 179:25-180:19 (CC); 8/30/12 Tr. at 271:9-13 (JS).

104.    Sen. Campsen did not attempt to determine the impact of a photo ID requirement on black voters prior to introducing S334.  8/27/12 Tr. at 117:3-17 (CC).  Speaker Harrell

did not consider the effect of a photo ID requirement on racial minorities, and has no

memory of asking staff to consider VRA requirements in drafting photo ID legislation.

8/28/12 Tr. at 65:1-9, 104:9-11, 105:19-23 (RH).

105.    As early as 2009, the SJSC heard testimony that, based on existing social science

literature, racial minorities would be disproportionately burdened by a photo ID

requirement.  US Ex. 143, JA 002025-31 (4/16/09 Hr'g) (Test. of Dr. John Ruoff).

106.    While H3418 (a photo ID bill introduced in the House in 2009) was pending in the

Senate, the SEC provided demographic information regarding SC registered voters who

lacked a DMV ID.  JA-US 001657-59 (CW Dep. 25:5-31:10).

107.    The SEC concluded that as of January 2010, 178,175 registered voters in SC

lacked a DMV ID.  It also concluded that 63,756 of the 178,175 voters lacking ID (or

approximately 36%) were non-white.  This data was received in January 2010 by staff

and every member of the SC Senate and, at a minimum, by all members of the House

Judiciary Committee.  US Ex. 201, JA-US 002607-11 (SEC Stats.); US Ex. 200, JA-US

002612-16 (SEC Revised Stats.); US Ex. 208, JA-US 002621-26 (SEC Stats); US Ex.

196, JA-US 000428-29 (SC Resp. to US RFAs Nos. 2-4).

108.    There was discussion on the Senate floor and in committee about the fact that

approximately 36% of voters without ID were racial minorities.  8/27/12 Tr. at 145:18-

146:4 (CC).  The SEC data indicated that photo ID requirements had a potential

disproportionate impact on minority voters.  *Id.* at 146:13-16.  During consideration of

photo ID legislation, Sen. Campsen believed that examining ID possession by race would

be a major way to determine whether R54 would have an adverse impact on minority

voting.  *Id*. at 146:17-21.

109.    No alternatives to the SEC data were presented during consideration of photo ID

legislation.  8/31/12 Tr. at 28:13-18 (TA).

110.    Sen. Martin, Rules Committee chairman during consideration of PVID legislation,

testified it would not have mattered to him that black voters were less likely to have an

acceptable form of ID than white voters.  JA-US 001454-55 (LM Dep. 68:1-71:11).

### D.    Proponents Falsely Claimed the Voter ID bills presented to the General Assembly, and Act R54, Were Modeled on Georgia and Indiana Law

111.    SC claims that "R54 was drawn to 'closely mirror' the Indiana photo ID

legislation that was upheld in *Crawford* and the Georgia photo ID legislation that was

precleared by the Attorney General and upheld in *Billups*."  US Ex. 192, JA-US 000365

(SC Resp. to US Interrog. No. 6); *see* JA 005208 (1/26/2011 House Floor Tr.) (AC

Rmks.); JA 000433 (5/11/2011 SJ, CC Rmks.); JA-US 001450 (LM Dep. 50:20-51:14).

112.    R54 allows for use of only a small subset of the IDs permissible under Georgia

and Indiana law.  In addition to ID allowable under R54, Georgia allows its voters to use

current and expired Georgia drivers' licenses.  *See* Ga. Code Ann. § 21-2-417(a)(1).

Georgia further accepts *all* "valid identification card[s] issued by a branch, department,

agency, or entity of the State of Georgia, any other state, or the United States" so long as

they contain a photo,  *id*. § 21-2-417(a)(2), as well as all tribal IDs and government-

issued employee IDs, including those issued by any of Georgia's 159 counties and 535

municipalities.  *Id.* § 21-2-417(a)(4), (6).

113.   Under Indiana law, all forms of photo ID issued by the state of Indiana or the US
are acceptable, including IDs that have expired since the date of the most recent prior
general election.  *See* Ind. Code Ann. § 3-5-2-40.5.

114.   Georgia has no-excuse absentee voting by mail, for which no photo ID is required.
Ga. Code Ann. § 21-2-380(b).  In SC, all absentee voters must swear to a specific
enumerated excuse.  S.C. Code Ann § 7-15-320.  Lacking photo ID is not a valid excuse
to vote absentee by mail under SC law.  *Id.*

### E.   *Black Legislators Were Excluded From the Legislative Process*

#### 1.   House Refused to Consider Ameliorative Proposals, Leading to a Highly Unusual Walk-Out by Black Members.

115.   The House vote in favor of cloture on H3418 "robbed" members of the Legislative
Black Caucus ("LBC") of the opportunity to voice the concerns of [their] constituents"
regarding photo ID legislation.  8/30/12 Tr. at 282:10-18 (GCH).

116.   During consideration of H3418, the House tabled multiple amendments sponsored
by LBC members that would have: (1) expanded the forms of acceptable ID to include
SC and federal employee IDs, student IDs, tribal IDs, or ID cards issues by other states or
federal agencies; (2) allowed for the use of expired South Carolina drivers' licenses; (3)
exempted voters over age 75 from the ID requirement; or (4) allowed voters who only
had a registration certificate, and no other forms of required ID, to receive a PVID card to
be produced on-site at each polling place.  US Ex. 59, JA 000540-85 (2/26/2009 HJ)
(tabling Amdt. Nos. 4, 5, 6, 7, 8, 9, 10, 11, 13, 16, 19, 20).

117.   Following the tabling of these and other amendments, members of the LBC walked out in protest of H3418 and the majority's refusal to engage with their concerns. 8/30/12 Tr. at 281:22-282:25 (GCH).

118.   This was only the second time that such a walk-out had occurred in approximately 20 years in the House.  8/28/12 Tr. at 70:5-8 (RH); 8/30/12 Tr. at 285:3-25 (GCH).  The previous walk-out protested the majority's unwillingness to appoint qualified black judges to the state courts, on the excuse that "we gave y'all one last year."  8/30/12 Tr. at 285:13-21 (GCH).

119.   Photo ID proponents responded to the walk-out by passing a "clinching motion" while black legislators were not in the chamber, to cut off opponents' ability to reopen debate.  8/27/12 Tr. at 222:18-225:19 (AC); 8/28/12 Tr. at 16:18-17:8 (AC); JA 001756 (Burton Sup. Decl. at 16).

120.   During consideration of H3003, no amendments proposed by black House members were adopted.  US Ex. 196, JA-US 000437-38 (SC Resp. to US RFA No. 24). The House again rejected proposals to allow the use of government-issued employee ID cards.  US Ex. 10, JA 000067-69, 000071-73 (1/26/2011 HJ) (Amdt. Nos. 2, 5).

### 2.     The Leading House Proponent Responded Positively to Racist Comments.

121.   Rep. Clemmons responded favorably to an admittedly racist email from a constituent regarding photo ID legislation.  The constituent's email stated that Democratic party leaders make it sound like "a poor black person or an elderly one" would be "too stupid" to get an ID, but that: "All you'd have to do is announce that SC

Legislation [sic] was giving a hundred dollar bill away if you came down with a voter ID card and you would see how fast they got Voter ID cards . . . It would be like a swarm of bees going after a watermelon." US Ex. 212, JA-US 001992  (Clemmons email). Clemmons admitted that this email had "a shade of racism," 8/28/12 Tr. at 20:22 (AC), but nonetheless responded "AMEN, Ed!!!" and offered his thanks for supporting voter ID. *Id.* at 21:9-10.

### 3.   Irregular Procedures Were Used to Override Opposition

122.   Republican House members serving on the H3418 conference committee abruptly ended negotiations and circulated a conference report that reflected only the House positions on these issues.  Sen. Malloy was excluded from the meeting at which the report was signed.  US Ex. 116, JA 001499 (TA Sup. Decl. ¶ 24).

123.   A "regular" motion for special order requires a two-thirds vote under Senate rules. 8/28/12 Tr. at 130:13-16 (LGM).  H3418 and H3003 both failed to receive a two-thirds vote on special order.  US Ex. 1, JA 000001-03 (H3003 Bill History); US Ex. 49, JA 000488-89 (H3418 Bill History).

124.   H3418 and H3003 were both taken up in the Senate as a result of special order motions by majority vote.  US Ex. 18, JA 000192 (2/10/11 SJ); US Ex. 67, JA 000651 (1/26/10 SJ).  Lt. Gov. McConnell could not recall prior instances where a bill has been placed on special order by majority vote after failing to receive a two-thirds vote. 8/28/12 Tr. at 189:17-20 (LGM).  There have only been five other occasions on which a bill was taken up on special order by majority vote.  8/30/12 Tr. at 30:3-31:5 (TA); JA 001757 (OB Sup. Decl. at 17).

125.    Senate Republicans voted cloture on the black conferee Sen. Scott's attempted filibuster of the H3003 conference report. JA 001746-47 (OB Sup. at 6-7). Republican senators who had previously refused to vote cloture out of principle did so this time under pressure from party activists.  ECF No. 218 (BH Direct Test. ¶ 13); 8/30/12 Tr. at 255:4-6 (GM).  Voting cloture on an individual is rare.  8/30/12 Tr. at 253:9-19 (GM); ECF No. 218 (BH Direct Test. ¶ 14).

### 4.    Despite Concerns About VRA Compliance, Less Discriminatory Alternatives Were Rejected.

126.    Campsen and McConnell, among others, issued a statement explaining that they had voted to non-concur on H3003 "so that the legislation would not fail in the Courts or get tripped up by the Voting Rights Act."  US Ex. 39, JA 000396 (4/13/11 SJ); 8/27/12 Tr. at 148:16-149:9 (CC) (outlining preclearance concerns).

127.    In R54 as passed, there is no transition period before the PVID requirement is effective, unlike in prior Senate compromises.  *Compare* US Ex. 69, JA 000678 (1/28/10 SJ).  Lt Gov. McConnell saw this period as ameliorative.  8/28/12 Tr. at 170:22-171:24 (LGM).

128.    In R54 as passed, the House rejected the Senate compromise provision for early voting, which would have provided voters an increased ability to address a lack of PVID and vote a regular ballot and which was associated with increased black turnout.  8/27/12 Tr. at 169:14-170:15 (CC); 8/30/12 Tr. at 271:13-15 (JS); JA-US 001238 (WD Dep. 115:13-25); 8/28/2012 Tr. at 27:21-28:1 (AC); US Ex. 120, JA 001691-92 (Clemmons'

constituent email stating that "a good ID bill blunts the gain for 'them' that they think they get in early voting").

129.    In R54 as passed, the Senate's broader ID list was rejected.  A broader category of IDs would have been more ameliorative.  8/27/12 Tr. at 171:6-9 (CC); 8/28/12 Tr. 179:22-180:9 (LGM); *see also* 8/28/12 Tr. at 176:18-177:10 (LGM) (McConnell criticizing the exclusion of state employee IDs and noting belief that percentage of state workforce that is black is larger than population percentage).

130.    The RI exception was seen as "constitutionally required" by the House staff drafter.  JA-US 001199 (PD Dep. 71:9-72:18).  PVID proponents understood that the RI affidavit would require notarization and that notaries can charge for their services. 8/27/12 Tr. at 150:16-151:17 (CC); 8/28/12 Tr. at 11:10-15:2 (AC).  The House staff drafter intended for voters casting provisional ballots under R54 to appear before CBREs to have their votes counted.  JA-US 001203 (PD Dep. 88:4-25, 89:15-22).  Campsen did not give much thought to how the RI exception would work in practice.  8/27/12 Tr. at 156:1-3 (CC).

131.    Ultimately, all black legislators voted against R54.  JA 001443-44 (TA Decl. at Tables 3, 4).  McConnell essentially admitted on the Senate floor that he did not expect the bill to be precleared.  8/28/12 Tr. at 184:5-185:12 (LGM).

## PROPOSED CONCLUSIONS OF LAW

**I.      SOUTH CAROLINA HAS FAILED TO SHOW BY A PREPONDERANCE OF THE EVIDENCE THAT R54 WILL NOT HAVE A DISCRIMINATORY EFFECT.**

1.      Section 5 of the Voting Rights Act requires South Carolina to meet its burden of proving that R54 "neither has the purpose nor will have the effect of denying or abridging the right to vote on account of race or color" or membership in a language minority group.  *See* 42 U.S.C. § 1973c (a).

2.      A voting procedure change has a discriminatory effect if it will "lead to a retrogression in the position of racial minorities with respect to their effective exercise of the electoral franchise."  *Beer* v. *United States,* 425 U.S. 130, 141 (1976).  The retrogression analysis requires a comparison between the existing (or "benchmark") voting practice and the proposed voting practice.  *Florida v. United States*, No. 1:11-cv-01428, 2012 WL 3538298, at *8 (D.D.C. Aug. 16, 2012) (three-judge court); *see also* 28 C.F.R. § 51.54(b).  That is, a voting change will have a retrogressive effect if it will make minority voters worse off than they had been before the change with respect to any "action necessary to make a vote effective."  42 U.S.C. § 1973*l*(c)(1).

3.      This Court's decision in *Florida v. United States* establishes a two-part test to determine whether a voting change affecting access to the ballot is retrogressive:

> a change that alters the procedures or circumstances governing voting and voter registration will result in retrogression if: (1) the individuals who will be affected by the change are disproportionately likely to be members of a protected minority group; and (2) the change imposes a burden material enough that it will likely cause some reasonable minority voters not to exercise the franchise.

*Florida*, 2012 WL 3538298, at *9, *23.

36

### A.    All Parties Agree That R54 Will Disproportionately Affect Minority Voters in South Carolina

4.    It is uncontested that currently registered minority voters are disproportionately more likely to lack one of the currently available forms of R54 ID than white voters.  Dr. Stewart's analysis demonstrates that more than 134,000 registered South Carolina voters do not possess an allowable ID, and that those voters are disproportionately likely to be racial minorities.  FF ¶¶ 18-21.  In particular, black registered voters are more than *twice* as likely as whites to lack allowable ID, and Hispanic registered voters are nearly 72% more likely than whites to lack allowable ID. FF ¶ 21.

5.    These disparities conclusively establish that R54 will disproportionately affect minority voters in South Carolina.  *See Florida*, 2012 WL 3538298, at *17-18 (finding disproportionate effect where black voters were between one-third more likely and twice as likely to use early voting as white voters); *id.* at *31-32 (finding disproportionate effect where black voters were "approximately twice as likely as white voters" to be "inter-county movers").

6.    Dr. Hood's analysis of ID possession is methodologically flawed because, among other reasons, he failed to exclude deceased registrants and registrants who have most likely moved out of state.  FF ¶ 31.  These errors are fatal to the reliability of his analysis, and the Court should disregard his conclusions.  *See Milwaukee Branch of the NAACP v. Walker*, 11-CV-54 (Wis. Cir. Ct. July 17, 2012).

7.    However, even if the Court credits Dr. Hood's flawed analysis, he also finds a racial disparity in ID possession that demonstrates R54's disproportionate effect on

minority voters.  FF ¶¶ 29, 30.  The parties disagree on the magnitude of this disparity, but not the fact that it exists.

### B.    R54 Will Impose Material Burdens That Will Likely Cause Some Reasonable Minority Voters Not to Exercise the Franchise

8.    In addition, R54 will "impose a burden material enough that it will likely cause some reasonable minority voters not to exercise the franchise."  *Florida*, 2012 WL 3538298, at *9.  FF ¶¶ 79-82.

9.    First, a registered voter without an allowable ID must acquire a new photographic identification, never before required to vote in South Carolina, by travelling during limited business hours either to a DMV office or the County Elections office. FF ¶¶ 73-76.  This imposes what is effectively a re-registration requirement – that is, a requirement that currently qualified electors undertake a new burden in order to remain qualified to vote in the future.  FF ¶ 79.  Given the documented disparities in socio-economic status between black and white voters, the costs of complying with this re-registration will be imposed on those least able to absorb this added burden.   FF ¶¶ 22-28, 81.  The Attorney General has repeatedly denied preclearance to re-registration requirements where they have a retrogressive effect on minority voters.  *See* JA-US 3284-86 (Perry County); JA-US3266-68 (Jasper County).[2] FF ¶ 79.

_____

[2] Such practices are also described in the House Report of the 1982 reauthorization of the Voting Rights Act as part of the extensive legislative record documenting continued voting rights discrimination.  *See* H.R. Rep. No. 97-227, at 14-17 (1981) ("[T]here are numerous practices and procedures which act as continued barriers to registration and voting," including "inconvenient location and hours of registration, dual registration for county and city elections, . . . frequent and unnecessary purgings and

(Cont'd…)

10.     In addition, in light of the racially disparate effect of R54 described above, the travel and other burdens of obtaining new identification will fall disproportionately on minorities. FF ¶¶ 22-28, 78.  By making a group of disproportionately minority registered voters complete additional steps and travel farther than white voters before they may cast an effective ballot, the new identification requirement in R54 is directly "analogous to (although certainly not the same as) closing polling places in disproportionately African-American precincts."  *Florida,* 2012 WL 3538298 at *23.   This Court and the Attorney General have repeatedly denied preclearance to polling place changes that would burden minority voters.  *See Apache County High Sch. Dist. No. 90 v. United States,* No. 77-cv-1518, at 13-14 (D.D.C. June 13, 1980) (three-judge court) (unpublished opinion at JA-US 0003241-57); FF ¶¶ 80-81.

11.     Indeed, the Supreme Court and this Court have both historically and very recently identified discriminatory polling place changes as paradigmatic examples of prohibited burdens on minority voters.  *Cf. Perkins v. Matthews,* 400 U.S. 379, 387 (1971) ("The accessibility, prominence, facilities, and prior notice of the polling place's location all have an effect on a person's ability to exercise his franchise."); *see Florida*, 2012 WL 3538298, at *14 ("We cannot agree, however, that the mere existence of other possible avenues for voting renders Florida's changes . . . immune from section 5 scrutiny.  If that were the case, a state could close polling places in minority precincts and yet survive the

---

burdensome re-registration requirements . . . ." (compiling examples)).  *Cf. Operation Push v. Allain*, 674 F. Supp. 1245 (N.D. Miss. 1987) (successful Section challenge 2 to dual registration requirement).

effect test so long as voters still had the option to travel across town to more distant polls.").

12.     The inclusion in R54 of a provisional ballot option for some voters who "suffer[] from a reasonable impediment" that prevents them from obtaining allowable ID, *see* R54 § 5(D)(1)(b), does not sufficiently ameliorate the discriminatory burdens of R54 to enable SC to meet its burden of proving the absence of a retrogression, because*:*

    a.  The standard for what constitutes a reasonable impediment is unclear and is subject to differing interpretations, regarding whether it is a subjective or objective standard, as well as who determines whether the affidavit is "false" and what the scope of that inquiry is FF ¶¶ 12,13, 16, 17, 39-50;

    b.  Completing a legally effective RI affidavit requires notarization and the State has not and cannot guarantee that notaries will be present in all polling places, FF ¶¶ 14, 17, 59, 62;

    c.  Notaries are permitted to charge a fee, which State officials concede would be the equivalent of a poll tax, FF ¶¶ 65;

    d.  SC's *ad hoc* efforts to address the aforementioned problems are unpersuasive because, even if the State's guidance were perfectly clear, the State admits that it has no authority to compel action by County elections officials, FF ¶¶ 11, 51-53;

    e.  Even if the State could compel action by CBREs, Andino has provided conflicting testimony of what action exactly she would seek to compel, FF ¶¶ 12-14, and

f.  The State has admitted that other state laws would have to be knowingly violated in order to avoid disfranchising voters, FF ¶ 14, which not only would expose poll managers and notaries to civil and criminal liability, but also creates the risk of state-court litigation over election and other rules, with minority citizens' voting rights at stake.

13.   The Court asked at trial whether – notwithstanding the many obstacles to reading the "reasonable impediment" exemption as broadly as South Carolina now proposes – the Court could preclear R54 on the assumption that the State's non-binding, non-final and conflicting guidance will in fact be followed, with the prospect of election-day injunctive actions by the Attorney General to enjoin local actors from applying any procedures different from those that have been precleared.  *See* 8/31/12 Tr. at 244:14- 246:5.  Apart from the impracticality of monitoring election-day procedures in more than two thousand polling places, the United States believes that taking this approach would effectively undermine the entire purpose of Section 5, which – by placing the burden on covered jurisdictions to prove that voting changes are nondiscriminatory *before* they are implemented – was to "shift the advantage of time and inertia from the perpetrators of the evil to its victims."  *South Carolina v. Katzenbach*, 383 U.S. 301, 328 (1966).[3]

---

[3] Additionally, the informal written guidance and procedures prepared by SEC staff for implementing §§ 4, 5, and 7 of R54 are unenforceable and of no deferential value as a matter of SC law and, therefore, cannot be relied upon to clarify or further define those sections of R54.  S.C. Code § 1-23-10(4) ("Policy or guidance issued by an agency other than in a regulation does not have the force or effect of law."); *Doe v. South Carolina Dept. of Health and Human Services*,  727 S.E.2d 605, 608 n.7 (S.C. 2011) (eligibility requirement listed in agency's informal policy guidelines was entitled to no deference

(Cont'd…)

14.     In addition, even if the reasonable impediment provision is interpreted at its broadest, minority voters – by virtue of their lower rates of ID possession – will still be disproportionately subject to burdens that will decrease the likelihood that they will vote and cast fully effective votes.  FF ¶¶ 18-21.  Because of the increased likelihood that they lack acceptable ID, minority voters will be required to spend additional time filling out the RI affidavit, having the affidavit notarized, obtaining a provisional ballot, and handing the ballot and affidavit – without the privacy inherent in casting a regular ballot – to a poll worker. FF ¶ 67.

15.     Unlike those casting a regular ballot, the ballots of those voting provisionally through the RI exemption may be challenged.  RI voters will be required to attend the Friday canvass if they want to be certain that their vote is counted in the face of any such challenges.  FF ¶¶ 69-70.

16.     Even absent challenge, provisional ballots are subject in greater proportion than regular ballots to being left uncounted due to poll-worker error.  *Cf. SEIU, Local 1 v.*

---

because it was not formally adopted as a regulation and did not have the force or effect of law).  The same holds true for Andino's oral testimony at trial and the SCAG's August 31, 2012, filing purporting to adopt "all of Ms. Andino's interpretations and clarifications of Act R54"—neither of which constitutes a binding regulation under SC law.  Even if that information had been properly promulgated in accordance with SC law, it would be to no avail, since its substance contradicts the plain text of R54.  *South Carolina Coastal Conservation League v. South Carolina Dept. of Health and Environmental Control*, 702 S.E. 2d 246, 252-53 (S.C. 2010) (formal agency regulation "must fall" when it conflicts with, alters, or adds to a statute).  Accordingly, this Court should not grant preclearance based on the unenforceable representations of Andino, SCAG, or any other SC offical.

*Husted*, 2012 WL 3643064 at *50-*51 (S.D. Ohio Aug. 27, 2012) (noting substantial evidence of disqualification of "hundreds—if not thousands" of provisional ballots due to poll worker error).

17.    SC cannot show that all minority voters who would have cast fully effective, regular ballots under the benchmark procedures will continue to do so as result of these changes.  *Florida*, 2012 WL 3538298, at *14 ("If even a small number of voters are sufficiently burdened by a voting change that they do not exercise the franchise when they otherwise would have done so, then that change can (under some circumstances) be considered retrogressive.") (internal citations and quotations omitted). Thus, even after taking the ameliorative provisions of R54 into consideration, SC remains unable to demonstrate that the retrogressive effect of R54 at all.

## II.    SOUTH CAROLINA HAS FAILED TO SHOW BY A PREPONDERANCE OF THE EVIDENCE THAT R54 WAS NOT ENACTED, AT LEAST IN PART, WITH A DISCRIMINATORY PURPOSE.

18.    This Court should also deny SC's request for judicial preclearance because the state has not met its burden of demonstrating that R54 was enacted with no discriminatory purpose.  42 U.S.C. § 1973c (a), (c).

19.    Section 5 prohibits voting changes in which a discriminatory purpose was even a motivating factor.  *Reno v. Bossier Parish Sch. Bd.*, 520 U.S. 471, 478-88 (1997) (*Bossier I*).  Although the evidence precludes SC from meeting its burden to show the absence of discriminatory effect, Section 5 prohibits intentionally discriminatory voting changes even if those changes are nonretrogressive.  *See* 42 U.S.C. § 1973c(c) (providing that the

purpose prong extends to "any discriminatory purpose"); *Texas v. United States*, No. 11-cv-1303, 2012 WL 3671924, at *23-26 (D.D.C. Aug. 28, 2012) (three-judge court) (concluding that the Texas state senate redistricting plan was nonretrogressive but intentionally discriminatory).

20.     The Supreme Court has held that the *Arlington Heights* framework should be applied in determining whether a jurisdiction has met its burden of proving that its proposed voting change is not motivated by any discriminatory purpose.  *Bossier I*, 520 U.S. at 488 (citing *Village of Arlington Heightsv. Metro. Hous. Dev. Corp.*, 429 U.S. 252 (1977)); *see also* 28 C.F.R. § 51.54(a).  In *Arlington Heights*, the Court identified a non-exhaustive list of factors to consider in determining whether racially discriminatory purpose exists, including: the impact of the decision; contemporaneous statements by the decisionmakers; the historical background of the decision; the sequence of events leading up to the decision; and whether the decision departs from the normal practice.  429 U.S. at 266-68.  Section 5 courts have identified additional factors not listed in *Arlington Heights* that may also bear on a determination of discriminatory purpose, including the presence of less discriminatory alternatives that would serve the jurisdiction's stated goals, *see Bossier I*, 520 U.S. at 488-89; as well as evidence that the proffered justifications for the change are pretextual, *see Florida*, 2012 WL 3538298, at *45.

    **A.     *R54 Bears More Heavily on Minority Voters Than White Voters***

21.     An "important starting point" is "the impact of the official action whether it bears more heavily on one race than another."  *Arlington Heights*, 429 U.S. at 266 (internal quotations omitted).  As discussed above, the impact of requiring photo identification to

vote a regular, in-person ballot will fall far more heavily on black voters and other
minorities than on white voters.

22.     In addition, SC legislators knew, given the data provided by the SEC, that this
would be the case.  FF ¶¶ 107-09.  The foreseeability of R54's discriminatory effect
weighs heavily in favor of a finding of discriminatory purpose.  *See Bossier I*, 520 U.S. at
487 ("[T]he impact of an official action is often probative of why the action was taken in
the first place since people usually intend the natural consequences of their actions.").
Proponents of R54 fully expected that the legislation would fall afoul of the VRA; yet,
they still proceeded.  *See Busbee v. Smith*, 549 F. Supp. 494, 514 (D.D.C. 1982) (noting
that decision-makers ignored the VRA consequences of their decision).

### B.     Contemporaneous Statements

23.     Evidence that the lead legislative sponsor of R54 – Rep. Alan Clemmons –
responded favorably to the admittedly racist comments of constituents also supports a
conclusion of discriminatory purpose in this case.  FF ¶ 121.

24.     Courts applying the *Arlington Heights* analysis have concluded that legislative
responsiveness to the racially-inspired views of constituents can be probative of a finding
of discriminatory purpose.  *See, e.g.*, *United States v. City of Yonkers*, 837 F.2d 1181,
1224-26 (2d Cir. 1987); *Smith v. Town of Clarkton,* 682 F.2d 1055, 1066-67 (4th Cir.
1982); *Greater New Orleans Fair Hous. Action Ctr. v. St. Bernard Parish,* 648 F. Supp.
2d 805, 811-12 (E.D. La. 2009).  In *City of Yonkers*, for example, the Second Circuit held
that "[i]t is sufficient to sustain a racial discrimination claim if it has been found, and
there is evidence to support the finding, that racial animus was a significant factor in the

position taken by the persons to whose position the official decision-maker is knowingly responsive." *Yonkers*, 837 F.2d at 1226.

25.     The emails that Rep. Clemmons received – and endorsed – make plain that racial animus was at least a factor in the constituent pressure that legislators reported receiving in support of R54.  Legislative responsiveness to these sentiments undermines any effort by SC to meet its burden of proving the absence of any discriminatory purpose.  *Cf. Busbee*, 549 F. Supp. at 514 (finding that some legislators voted for the redistricting plan in that case because they "[didn't] want to have to go home and explain why I [the Senator] was the leader in getting a black elected to the United States Congress" (alterations in original)).

### C.     The Legislature's Asserted Purposes Are Pretextual

26.     The evidence at trial further demonstrated that the legislature's stated goals – preventing impersonation fraud and improving voter confidence – were either unsupported, untrue, or both.

27.     At no time while photo ID legislation was pending was either Sen. Campsen or Rep. Clemmons aware of a single, credible incident of impersonation fraud. Instead, documented problems with electoral integrity went unanswered by the SC GA. While data was available, proponents did nothing to investigate whether the confidence of SC voters in the electoral process.  FF ¶¶ 91-98.

28.     Evidence that a jurisdiction's stated rationale for a voting change is pretextual can support a finding of discriminatory purpose.  *See, e.g., City of Pleasant Grove v. United States,* 479 U.S. 462, 470 (1987) (denying judicial preclearance under Section 5 because

covered jurisdiction's proffered economic rationale for its annexation decision was pretextual).  Here, the extraordinary push for R54 occurred despite the fact that bill proponents had no evidence for the core justifications they asserted: the need to detect or prevent voter impersonation fraud, or a lack of confidence in the electoral process.

29.   The Supreme Court's decision in *Crawford v. Marion County Election Board*, 553 U.S. 181 (2008), does not insulate SC's stated justifications from scrutiny, for several reasons.  First, *Crawford* dealt solely with the question whether Indiana's photo voter identification law was facially constitutional.  *Id.* at 189.  The Court in *Crawford* simply had no occasion to consider whether Indiana's law had the effect or intent of discriminating on the basis of race.  *See id.* at 202-03 (noting that the Court was considering the law's application to "all Indiana voters").

30.   Second, although *Crawford* recognized that all states have legitimate interests in preventing voter fraud and increasing confidence in the electoral process, *see id.* at 191-97, that fact of course cannot serve as a talisman that forecloses any further inquiry into whether those interests *in fact* motivated a state's actions in a given case.  As a three-judge Section 5 court recognized just a few weeks ago, "the fact that a state has acted proactively to close a loophole in its election laws . . . does not *by itself* raise an inference of discriminatory intent.  It might well be different, of course, had the State not only acted without evidence of fraud, but also acted in a way that materially increased the burden on minority voters."  *Florida*, 2012 WL 3538298, at *45.  The scenario that the *Florida* court posited is squarely presented here: all of SC's stated reasons for enacting

47

R54 are shown by the evidence to be factually unsupportable, and at the same time, R54 will materially burden a group of voters who are disproportionately minority.

31.   Moreover, as this Court recognized in *Texas v. Holder*, despite the general legitimacy of the interests recognized in *Crawford*, other circumstantial evidence as discussed in *Arlington Heights* can suggest that a State has "invoked the specter of voter fraud as pretext for racial discrimination." *Texas v. Holder*, No. 1:12-cv-128, 2012 WL 3743676, at *12 (D.D.C. Aug. 30, 2012).

32.   That SC has chosen simply to parrot the justifications recognized as legitimate state interests in *Crawford* does not operate to preclude further inquiry into whether those interests actually motivated SC's actions here.  The evidence at trial demonstrates that SC's explanation for enacting its voter identification law is factually unsupported and unworthy of credence.  *Cf. St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 511 (1993) (holding that "the factfinder's disbelief of the reasons put forward" support a finding of discriminatory purpose).

### D.   *Less Discriminatory Alternatives Were Rejected*

33.   In enacting R54, the SC GA rejected several ameliorative alternatives that were contained in prior versions of photo ID legislation in SC.  First, a transition period – allowing free IDs to be available for more than a year before the ID requirement went into effect – was not included in R54.  Likewise rejected were provisions that would have allowed a broader range of IDs as well as allowed for early voting, thus affording voters without ID a longer period to cure that deficiency and cast a regular ballot.  FF ¶¶ 126-29.

34.     Because the inclusion of these provisions would not have undercut the asserted

purposes of the ID requirement, while at the same time ameliorating its disparate effect,

their rejection is probative of a discriminatory purpose.  *See Wilkes County v. United

States*, 450 F. Supp. 1171, 1177 (D.D.C. 1978) (three-judge court) (holding that plaintiff

failed to meet its burden of proving the absence of discriminatory purpose where less

discriminatory changes were rejected); *cf. Texas*, 2012 WL 3743676, at *33

("[C]rucially, the Texas legislature defeated several amendments that would have made

this a far closer case.").

### E.     Sequence of Events and Departure from Normal Procedures

35.     The sequence of events leading up to passage of R54 also weighs against SC.

Black legislators in the House had no meaningful input into the bill that became R54,

which was passed against the backdrop of their walk out and the rejection of all

amendments proposed by members of the LBC to H3003; *see also Busbee*, 549 F. Supp.

at 501 (noting the lack of effective representation for blacks in the decision-making

process).

36.     Consideration of both H3418 and H3003 was marked with procedural

irregularities, including the failure of the H3418 conference committee to conclude

meaningful negotiations, and the repeated invocation of the rare Special Order by

majority vote procedure in the Senate.  FF ¶¶ 122-24.   Against this record, SC cannot

show that passage of R54 was not motivated, even in part, by a discriminatory purpose.

49

### III.   SECTIONS 4, 7 AND 8 OF R54 CANNOT BE CONSIDERED INDEPENDENTLY OF SECTION 5 OF ACT 54.

37.   Sections 4, 7 and 8 of Act R54 are related changes that cannot be considered independently of Section 5 of Act R54.  Moreover, the SEC has not enacted final procedures or legally binding regulations implementing §§ 4, 7 and 8 of R54.  The testimony from the SEC director and the most recent guidance from the SC AG are inconsistent with the materials previously produced by the SEC.  Accordingly, the Court should deny preclearance as to §§ 4, 7 and 8 of R54.

## CONCLUSION

The evidence at trial demonstrates both that R54 will have a retrogressive effect on minority voters, and that the law was passed at least in part for a discriminatory purpose.  The United States respectfully requests that the Court deny South Carolina's request for judicial preclearance.

Date:  September 7, 2012                         Respectfully submitted,


RONALD C. MACHEN, JR.                            THOMAS E. PEREZ
United States Attorney                           Assistant Attorney General
District of Columbia                             Civil Rights Division


                                                 */s/ Bradley E. Heard*
                                                 T. CHRISTIAN HERREN, JR.
                                                 RICHARD DELLHEIM
                                                 BRYAN SELLS
                                                 BRADLEY E. HEARD
                                                 (D.C. Bar No. 458309)
                                                 CATHERINE MEZA
                                                 ANNA M. BALDWIN
                                                 (D.C. Bar No. 998713)
                                                 ERIN M. VELANDY
                                                 Attorneys, Voting Section
                                                 Civil Rights Division
                                                 United States Department of Justice
                                                 950 Pennsylvania Avenue, N.W.
                                                 Washington, D.C. 20530
                                                 Telephone: (202) 305-4196
                                                 Facsimile: (202) 307-3961