## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| STATE OF SOUTH CAROLINA,<br><br>*Plaintiff*,<br><br>v.<br><br>UNITED STATES OF AMERICA and<br>ERIC H. HOLDER, JR., in his official<br>capacity as Attorney General,<br><br>*Defendants*,<br><br>JAMES DUBOSE, *et al.*,<br><br>*Defendant-Intervenors*. | Case No. 1:12-cv-203 (CKK-BMK-JDB) |

## SOUTH CAROLINA'S PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

| | |
|---|---|
| Hon. Alan Wilson<br>ATTORNEY GENERAL OF SOUTH CAROLINA<br>Bryan Stirling<br>DEPUTY ATTORNEY GENERAL<br>Rembert Dennis Building, Room 519<br>1000 Assembly Street<br>Columbia, SC 29201<br>(803) 734-3970 | Paul D. Clement (DC Bar No. 433215)<br>H. Christopher Bartolomucci (DC Bar No. 453423)<br>Stephen V. Potenza (admitted *pro hac vice*)<br>Jeffrey M. Harris (admitted *pro hac vice*)<br>Brian J. Field (DC Bar No. 985577)<br>D. Zachary Hudson (admitted *pro hac vice*)<br>Michael H. McGinley (DC Bar No. 1006943)<br>BANCROFT PLLC<br>1919 M Street, N.W., Suite 470<br>Washington, D.C. 20036<br>(202) 234-0090 |
| Karl S. Bowers, Jr. (admitted *pro hac vice*)<br>WOMBLE CARLYLE SANDRIDGE & RICE<br>1727 Hampton Street<br>Columbia, SC 29201<br>(803) 454-6504 | H. Christopher Coates (admitted *pro hac vice*)<br>LAW OFFICE OF H. CHRISTOPHER COATES<br>934 Compass Point<br>Charleston, SC 29412<br>(843) 609-7080 |

*Counsel for the State of South Carolina*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ...................................................................................iii

PROPOSED FINDINGS OF FACT ........................................................................ 1

I.     South Carolina's Current and Enacted Voter Identification Requirements. ...................... 1

II.    Origins of Interest in Voter ID Requirements .................................................... 3

III.   Legislative History of Act R54. ................................................................ 7

      A.     H. 3418:  The First Attempt to Pass Voter ID Legislation Produces the
           "McConnell Compromise" in the Senate and Realizes Substantial
           Compromise by the House of Representatives Buts Ends in a Senate
           Filibuster. ...................................................................................... 7

      B.     H. 3003:  The Second Attempt to Pass Voter ID Succeeds With
           Legislation That Incorporates Key Mitigating Provisions Supported by
           African-American Lawmakers .............................................................. 11

IV.    The State's Planned Implementation of Act R54 Will Ensure That All
      Qualified South Carolina Voters Can Cast A Ballot on Election Day. ......................... 15

      A.     Photo Voter Registration Cards. ........................................................... 15

      B.     Free DMV-Issued Identification Cards .................................................... 17

      C.     Provisional Ballots for Voters Who Currently Possess But Forget to
           Bring to the Polls Photo Identification .................................................... 18

      D.     Reasonable Impediment and Religious Objection Exceptions. ......................... 18

           1.     Ms. Andino Will Ensure A Consistent, Broad Application of
                the Reasonable Impediment Exception. ........................................ 19

           2.     The Notary Requirement Will Not Burden Voters. ................................ 22

           3.     Ms. Andino's Planned Implementation Is Consistent With the
                Purpose of Act R54 and the Reasonable Impediment
                Exception. ........................................................................... 24

      E.     Voter Education and Post-card Notification Plan. ....................................... 26

           1.     Statewide Voter Education Efforts. ............................................... 26

           2.     Direct Voter Outreach. ............................................................. 28

F.      Poll Manager and County Elections and Registration Officials Education and Training. ...................................................................... 29

V.      Current Photo Identification Possession and the Absence of Discriminatory Post-Implementation Effects Under Act R54. .................................................. 31

A.      Current Act R54 ID Possession Rates Are High Among All South Carolina Voters. ...................................................................................... 31

B.      The Difference Between Non-Hispanic White and Black Voters Currently Without Act R54 ID Is Small. ................................................. 32

C.      South Carolina's Matching Analysis Is Reliable. ................................... 32

D.      The Mitigation Provisions In Act R54 Will Ensure That All South Carolinians Will Be Able To Exercise Effectively The Electoral Franchise. ............................................................................................. 35

E.      No Individual Intervenor Will Be Prevented From Obtaining An Act R54 ID and No Intervenor Can Identify A Single Voter Who Will Be Disenfranchised by Act R54. ................................................................ 36

CONCLUSIONS OF LAW ........................................................................................ 37

I.      Act R54 Was Enacted for Legitimate, Non-Discriminatory Purposes. ............................ 38

A.      Act R54's Purposes Are Legitimate. ................................................... 39

B.      Act R54's Purposes Are Non-Discriminatory. ..................................... 41

C.      Defendants Cannot Refute Act R54's Legitimate, Non-Discriminatory Purposes. ............................................................................................. 42

II.     Act R54 Will Have No Discriminatory Effect. ................................................................. 42

A.      Act R54 Will Not Result in Retrogression. ......................................... 43

1.      Act R54 Will Not Disproportionately Affect Minority Voters ................. 44

2.      Act R54 Will Not Impose a Material Burden on Minority Voters. ..................................................................................... 46

B.      Act R54's Effect, If Any, Is Not "on Account of Race or Color." ....................... 48

III.    Preclearance of Act R54 Will Avoid Grave Constitutional Concerns. ............................. 49

CONCLUSION ......................................................................................................... 50

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

## Cases

*Ala. v. Holder*, 679 F.3d 848 (D.C. Cir. 2012) ............................................................. 49

*Anderson v. Celebrezze*, 460 U.S. 780 (1983) ............................................................. 38

*Beer v. United States*, 425 U.S. 130 (1976) ................................................................. 43

*City of Mobile, Ala. v. Bolden*, 446 U.S. 55 (1980) ..................................................... 38

*City of Petersburg v. United States*, 354 F. Supp. 1021 (D.D.C. 1973) ....................... 44

*City of Richmond v. United States*, 422 U.S. 358 (1975) .............................................. 44

*Common Cause/Georgia v. Billups*, 554 F.3d 1340 (11th Cir. 2009) ...................... 4, 45

*Crawford v. Marion Cnty. Election Bd.*, 553 U.S. 181 (2008) ............................... *passim*

*Eu v. San Francisco Cnty. Democratic Cent. Comm.*, 489 U.S. 214 (1989) ................ 38

*Farrakhan v. Gregoire*, 623 F.3d 990 (9th Cir. 2010) (en banc) ................................. 48

*Fla. State Conference of NAACP v. Browning*, 569 F. Supp. 2d 1237 (2008) ............. 41

*Florida v. United States*, No. 11-cv-1428, slip op. (D.D.C. Aug. 16, 2012) ......... *passim*

*Georgia v. Ashcroft*, 539 U.S. 461 (2003) ................................................................... 50

*Glover v. S.C. Democratic Party*, No. 4:04-CV-2171, 2004 WL 3262756
   (D.S.C. Sept. 3, 2004) ................................................................................................ 6

*Gonzalez v. Arizona*, 677 F.3d 383 (9th Cir. 2012) (en banc) ..................................... 48

*Hoffman v. Maryland*, 928 F.2d 646 (4th Cir. 1991) ................................................... 40

*Holder v. Hall*, 512 U.S. 874 (1994) ............................................................................ 43

*In re Korean Air Lines Disaster of Sept. 1, 1983*, 829 F.2d 1171 (D.C. Cir. 1987) ..... 44

*In re Request for Advisory Op. Re: Constitutionality of 2005 PA 71*, 740 N.W.2d 444
   (Mich. 2007) .............................................................................................................. 3

*INS v. St. Cyr*, 533 U.S. 289 (2001) .............................................................................. 49

*Kasper v. Bd. of Election Comm'rs of City of Chi.*, 814 F.2d 332 (7th Cir. 1987) ....... 41

*League of Women Voters of Ind., Inc. v. Rokita*, 929 N.E.2d 758 (Ind. 2010) .............. 4

*Lovelle v. Thornton*, 234 S.C. 21, S.E.2d 531 (S.C. 1959) .......................................................... 23

*Munro v. Socialist Workers Party*, 479 U.S. 189 (1986) ............................................................ 39

*New York v. United States*, 874 F. Supp. 394 (D.D.C. 1994) .................................................. 38, 39

*Nw. Austin Mun. Utility Dist. No. One v. Holder*, 557 U.S. 193 (2009) .......................... 45, 49, 50

*Ortiz v. City of Phila. Office of City Comm'rs Voter Registration Dir.*, 28 F.3d 306
    (3d Cir. 1994) ......................................................................................................... 48

*Pers. Adm'r of Mass. v. Feeney*, 442 U.S. 256 (1979) ........................................................ 38, 42

*Price v. Watt*, 280 S.C. 510, 513 n.1, 313 S.E.2d 58 (S.C. Ct. App. 1984) .................................. 20

*Purcell v. Gonzalez*, 549 U.S. 1 (2006) .................................................................................... 41

*Reaves v. S.C. Democratic Party*, No. 4:04-CV-2047, 2007 WL 895440
    (D.S.C. Mar. 21, 2007) ............................................................................................ 6

*Reno v. Bossier Parish Sch. Bd.*, 528 U.S. 320 (2000) .......................................................... 42, 50

*Riley v. Kennedy*, 553 U.S. 406 (2008) ................................................................................... 43

*Shelby Cnty., Ala. v. Holder*, 811 F. Supp. 2d 424 (D.D.C. 2011),
    *aff'd*, 679 F.3d 848 (D.C. Cir. 2012) .................................................... 39, 49, 50

*Smiley v. Holm*, 285 U.S. 355 (1932) ...................................................................................... 38

*State ex rel. Wolfe, Att'y. Gen. v. Sanders*, 118 S.C. 498, 110 S.E. 808 (S.C. 1920) .................. 19

*Texas v. Holder*, No. 12-cv-128, 2012 WL 3743676 (D.D.C. Aug. 30, 2012) ..................... *passim*

*United States v. Carmichael*, 685 F.2d 903 (4th Cir. 1982) ....................................................... 6

*United States v. Jin Fuey Moy*, 241 U.S. 394 (1916) ................................................................. 49

*United States v. Louisiana*, 363 U.S. 1 (1960) ......................................................................... 49

*United States v. Mason*, 673 F.2d 737 (4th Cir. 1982) .............................................................. 6

*United States v. McCranie*, 169 F.3d 723 (11th Cir. 1999) ....................................................... 41

*United States v. Odom*, 736 F.2d 104 (4th Cir. 1984) ............................................................... 6

**Constitutional Provisions**

S.C. Const. art. IV, § 15 ............................................................................................................ 19

**Statutes**

2 U.S.C. § 1973c .................................................................................................. 50

15 USC § 15483(a)(5)(A) ..................................................................................... 31

42 U.S.C. § 1973(a) .............................................................................................. 48

42 U.S.C. § 1973c ............................................................................... 38, 42, 48, 50

Pub. L. No. 109-246, § 2(b)(6), 120 Stat. 577, 42 U.S.C. § 1973 note ................. 50

S.C. Code § 1-7-110 .............................................................................................. 19

S.C. Code § 7-3-20(A) .......................................................................................... 19

S.C. Code § 7-13-710 (1976) (last amended by Act 459 of 1996) ...................... 1, 19

S.C. Code § 7-13-720 ............................................................................................ 23

S.C. Code § 7-15-220 ............................................................................................ 24

S.C. Code § 26-3-40 .............................................................................................. 24

**Other Authorities**

1996 Mich. Legis. Serv. P.A. No. 583 (H.B. No. 5420) (West) ............................... 3

1997 La. Sess. Law Serv. Act No. 779 (H.B. No. 635) (West) ................................ 3

2005 Ind. Legis. Serv. P.L. No. 109-2005 (West) .................................................. 4

H.R. Rep. No. 109-478 (2006) ............................................................................... 38

H.R. Rep. No. 89-439, *reprinted* in 1965 U.S.C.C.A.N. 2437, 2471 ................... 40

Op. S.C. Att'y Gen., Oct. 11, 1996, 1996 WL 679459 ........................................... 23

S. Rep. No. 109-295 (2006) ................................................................................... 38

## PROPOSED FINDINGS OF FACT

### I.  South Carolina's Current and Enacted Voter Identification Requirements.

1.  Since 1976, South Carolina has required voters to present one of three forms of identification to vote in-person at the polls: (1) a valid South Carolina driver's license, (2) a valid photo identification card issued by the South Carolina Department of Motor Vehicles (DMV), or (3) a (non-photo) voter registration card.  *See* S.C. Code § 7-13-710 (1976) (last amended by Act 459 of 1996); 8/28/12 Tr. 199:1-3 (Andino).  This requirement was precleared by the Department of Justice.  *See* JA-SC_0904 (United States Answer to Request for Admission No. 11).

2.  On May 11, 2011, South Carolina amended its voter identification requirement with Act R54, which has the stated purpose "to confirm the person presenting himself to vote is the elector on the poll list."  JA-US_002717 (Act R54, § 5(E)).  The purpose of Act R54 is to help detect and deter voter fraud and to enhance public confidence in the electoral system.[1]  No member of the South Carolina General Assembly acted with the intent to discriminate against any voters in drafting or voting for Act R54.[2]

3.  Section 5 of the Act provides:  "When a person presents himself to vote, he shall produce a valid and current" (1) South Carolina driver's license; (2) other form of photo ID issued by the S.C. Department of Motor Vehicles ("DMV"); (3) U.S. passport; (4) federal government-issued military photo ID; or (5) South Carolina voter registration card with a photograph of the voter, pursuant to Section 4 of Act R54.  PX-1 (JA-US_002715) (Act R54, § 5(A)).

---

[1] 8/27/12 Tr. 34:5-9 (Campsen); 8/27/12 Tr. 215:13-216:1 (Clemmons); 8/28/12 Tr. 58:2-3 (Harrell); 8/28/12 Tr. 113:21-25 (McConnell); JA-SC_1256 (Cleary Dep. Tr. 66:12-67:19); JA-SC_1325(Knotts Dep. Tr. 86:24-87:3); JA-SC_1312-13, JA-SC_1315 (Harrison Dep. Tr. 31:14-23, 37:20-24, 39:2-8, 40:7-11); JA-SC_1328, JA-SC_1332 (Lowe Dep. Tr. 22:2-23:24, 74:6-25); JA-SC_1353 (Pearson Dep. Tr. 77:6-8); JA-SC_1284 (Donehue Dep. Tr. 36:8-12); JA-SC_1274 (Dennis Dep. Tr. 17:21-23).

[2] 8/27/12 Tr. 105:18-106:13 (Campsen); 8/27/12 Tr. 239:20-240:11 (Clemmons); 8/28/12 Tr. 82:2-12 (Harrell); 8/28/12 Tr. 167:20-168:11 (McConnell).

4.   Section 4 of the Act provides that the State Election Commission ("SEC") "shall implement a system in order to issue voter registration cards with a photograph of the elector." JA-US_002714-15 (Act R54, § 4).

5.   Act R54 also includes provisional ballot procedures for voters who are unable to present an acceptable form of identification.  *See* JA-US_002715-16 (Act R54 §§ 5(C), 5(D)).  If a voter possesses one of the five acceptable forms of photo ID but arrives at the polls without it, he may cast a provisional ballot that will be counted so long as he brings the ID to the county board of registration and elections before certification of the election.  JA-US_002715-16 (Act R54, § 5(C)(1)).

6.   Further, Section 5 provides that if an elector "does not produce a valid and current photograph identification due to a religious objection to being photographed" or "because the elector has a reasonable impediment that prevents the elector from obtaining photograph identification, he may complete an affidavit under the penalty of perjury at the polling place and affirm that the elector: (i) is the same individual who personally appeared at the polling place; (ii) cast the provisional ballot on election day; and (iii) the elector suffers from a reasonable impediment that prevents him from obtaining photograph identification" or "has a religious objection to being photographed."  PX-1 (Act R54 § 5(D)(1)(a)-(b))  Section 5 further provides that "[i]f the county board of registration and elections determines that the voter was challenged only for the inability to provide proof of identification and the required affidavit is submitted, the county board of registration and elections *shall find* that the provisional ballot is valid unless the board has grounds to believe the affidavit is false."  *Id.* (§ 5(D)(2)) (emphasis added).

7.   Section 7 requires the SEC to "establish an aggressive voter education program" to "educate the public" concerning Act R54.  *See* JA-US_002717-18 (Act R54, § 7).  Among other

things, the SEC must advertise in general-circulation newspapers and other local media outlets, JA-US_002718 (Act R54, § 7(6)-(7)), and send a notice to each registered voter who lacks a DMV-issued ID, *id.* (Act R54, § 7(8)).

8.   Section 8 of the Act directs the SEC to create "a list containing all registered voters of South Carolina who are otherwise qualified to vote but do not have a South Carolina driver's license or other form of" DMV-issued photo ID.  JA-US_002718-19 (Act R54, § 8).  This list must be publicly available, *id.*, and will be used to conduct the targeted mailings required in Section 7(8).

**II.  Origins of Interest in Voter ID Requirements.**

9.   Following the 2000 election and recount, public officials became increasingly interested in voting reforms, including voter ID laws.  *See* PX-138 (Pl.'s Voter ID Timeline).[3]  In 2001, a special committee of Democrat Members of Congress, chaired by Rep. Maxine Waters declared: "We support a jurisdiction's right to require voter identification at the polls," including "photo identification."  JA-SC_0407-08 (Democratic Caucus Special Committee on Election Reform, *Revitalizing Our Nation's Election System* 103-04 (2001)).

10.  Shortly thereafter, Congress passed the Help America Vote Act of 2002, 116 Stat. 1666, which "indicate[s] that Congress believes that photo identification is one effective method of establishing a voter's qualifications to vote," *Crawford v. Marion Cnty. Election Bd.*, 553 U.S. 181, 193 (2008), though it does not *require* States to enact voter ID laws.

11.  In 2005, a bipartisan commission led by former President Carter and former Secretary of

---

[3] Michigan and Louisiana enacted voter ID laws with effective dates in 1997.  *See* PX-138; 1997 La. Sess. Law Serv. Act No. 779 (H.B. No. 635) (West); 1996 Mich. Legis. Serv. P.A. No. 583 (H.B. No. 5420) (West).  The Department of Justice precleared both States' laws.  *See* JA-SC_0904 (United States' Answer to Request for Admission No. 12).  Michigan's law was reenacted and upheld by the State's Supreme Court in 2007.  *See In re Request for Advisory Op. Re: Constitutionality of 2005 PA 71*, 740 N.W.2d 444, 448 (Mich. 2007).

State Baker recommended that requiring photo ID would help "detect, deter, or eliminate several potential avenues of fraud—such as multiple voting or voting by individuals using the identities of others or those who are deceased." *See* JA-SC_0213-14 (Commission on Federal Election Reform, *Building Confidence in U.S. Elections* at 18-19 (Sept. 2005)). The Carter-Baker Report went on to conclude: "The electoral system cannot inspire public confidence if no safeguards exist to deter or detect fraud or to confirm the identity of voters. Photo IDs currently are needed to board a plane, enter federal buildings, and cash a check. Voting is equally important." JA-SC_0213 (quoted with approval in *Crawford*, 553 U.S. at 194).

12. During the same period, States began enacting voter ID laws aimed at securing the electoral process and increasing voter confidence. *See* PX-138. In 2005, Indiana enacted a photo voter ID law, *see* 2005 Ind. Legis. Serv. P.L. No. 109-2005 (West), that withstood state and federal constitutional challenges, *see Crawford*, 553 U.S. 181; *League of Women Voters of Ind., Inc. v. Rokita*, 929 N.E.2d 758 (Ind. 2010).

13. Also in 2005, Georgia enacted photo voter ID legislation. That law was amended the next year to provide free photo voter registration cards similar. *See Common Cause/Georgia v. Billups*, 554 F.3d 1340, 1346 (11th Cir. 2009). Both versions of Georgia's law were precleared by the Department of Justice, *see id.* at 1347; *see also* JA-SC_0904 (United States' Answer to Request for Admission No. 12), and the operative version of the law withstood constitutional challenge, *see Billups*, 554 F.3d 1340. During this same time period, Democrats in the General Assembly who now oppose Act R54 introduced legislation requiring voters to show photo identification to cast certain ballots. *See* 8/30/12 Tr. 288:5-16, 291:8-20 (Cobb-Hunter).

14. During this period, South Carolina voters also became interested in voter ID legislation, *see, e.g.*, 8/28/12 Tr. 56:12-16 (Harrell), and urged the General Assembly to consider and pass

voter ID legislation, especially once the Indiana and Georgia laws were upheld, *see, e.g.*, 8/28/12 Tr. 57:5-12 (Harrell); 8/27/12 Tr. 34:10-16 (Campsen).

15. In fact, according to a survey conducted by the United States' own expert, support for voter ID legislation was overwhelming among voters in South Carolina (78%) and nationally (75.6%) following the 2008 presidential election.  8/31/12 Tr. 173:11-174:16 (Stewart); PX-137 (JA-SC_1192, 1197, 1204 (Stewart, *et al*., *Voter Opinions About Election Reform*, 10 Election L.J. 73, 85 (2011)).  A government-issued photo identification requirement was also supported by 74% of black voters surveyed.  8/31/12 Tr. 174:8-175:7 (Stewart); PX-137 (JA-SC_1198). And the study concluded that is "striking that a majority of Obama supporters, strong liberals and Democrats remain supportive of a requirement to show a government-issued piece of photo identification in order to vote."  8/31/12 Tr. 173:18-22 (Stewart).

16. South Carolina has also experienced various forms of election fraud in recent history. Rep. Bakari Sellers, who opposed Act R54, stated on the floor of the House during the Voter ID debate that in-person voter fraud has occurred in South Carolina and that a single vote can decide an election.  *See* JA_005215 (1/26/11 House Debate).[4]  Rep. Gilda Cobb-Hunter, another Act R54 opponent, "was a victim of absentee ballot fraud," which led her to introduce legislation that would have required photo ID to obtain an absentee ballot.  8/30/12 Tr. 288:5-289:16.  Brett Bursey, director of Intervenor the South Carolina Progressive Network, witnessed both registration fraud, JA-SC_1243 (Bursey Dep. Tr. 39:13-40:10), and absentee ballot fraud, JA-SC_1244 (Bursey Dep. Tr. 44:10-14).  Marilyn Bowers, a current commissioner on the SEC, is aware of confirmed cases of vote buying and attempted multiple voting.  *See* 8/29/12 Tr. 97:6-99:12 (Bowers).  Ms. Bowers also explained that local prosecutors typically choose not to pursue

---

[4] Rep. Sellers was identified by the United States as a trial witness, but the day before he was scheduled to testify the United States pulled him from its witness list.

voter fraud cases, which limits the extent to which such fraud is documented in the public record. *See id.* 97:21-22, 98:25-99:6, 99:11-12.  Despite that reluctance, the public record still contains many instances of confirmed or suspected voter fraud in South Carolina.[5]  And voter fraud has been well documented throughout the United States.  *See, e.g.*, JA_001126-33 (Buchanan Decl.); JA_001190-1205 (Ex. 12).

17. In light of this strong public support, history of voter fraud, and recent administrative and judicial decisions upholding Indiana's and Georgia's voter ID laws, South Carolina legislators introduced voter ID legislation at the start of the 2009-2010 legislative session.  *See* 8/27/12 Tr. 31:3-23 (Campsen) ("[I]n April of 2008 when the *Crawford v. Marion County* decision was handed down, I read that decision and was looking to introduce . . . a voter ID provision . . ., and then I became aware that a decision out of Georgia from the 11th Circuit was perhaps imminent, so we waited for that decision to be handed down.");  8/28/12 Tr. 56:17-57:4 (Harrell) ("[W]e had been talking about doing something like this for years," and "the advent of a couple of states successfully getting it passed told us maybe we had a shot at getting it done as well.").

18. Though the bills introduced in South Carolina were not identical to the Indiana or Georgia legislation, they were "model[ed]" on those laws.  8/27/12 Tr. 32:8-25 (Campsen); 8/28/12 Tr. 59:13-25 (Harrell) ("I asked the staff that works with me in the House of Representatives to draft legislation for voter ID and to use those two states as kind of a template or a blueprint or a guide . . . to how you could write this legislation so that we could get it

---

[5] *See Glover v. S.C. Democratic Party*, No. 4:04-CV-2171, 2004 WL 3262756, at *2, *11 (D.S.C. Sept. 3, 2004); *Reaves v. S.C. Democratic Party*, No. 4:04-CV-2047, 2007 WL 895440, at *3 (D.S.C. Mar. 21, 2007); JA_1184-88 (Dodd & Mellnik, *Voters Found on Both N.C., S.C. Rolls*, Charlotte Observer, Oct. 24, 2004); JA-SC_1181 (Hinshaw, *Eastover mayor guilty; chief cleared*, Columbia State, Mar. 1, 2008); JA-SC_1189-90 (*South Carolina v. Hines*, No. H705166 (Twelfth Judicial Circuit Court); *United States v. Odom*, 736 F.2d 104 (4th Cir. 1984); *United States v. Carmichael*, 685 F.2d 903 (4th Cir. 1982); *United States v. Mason*, 673 F.2d 737 (4th Cir. 1982); *see also* 8/27/12 Tr. 40:6-46:21 (Campsen) (discussing instances of voter fraud).

through the Department of Justice and/or get it through the court.").  Still more States adopted

voter ID laws contemporaneously with, or after, South Carolina.  *See* PX-138.  Many of those

laws have already gone into effect.  In fact, just this week, the Department of Justice precleared

New Hampshire's voter ID law.  *See* Doc. 264.

### III. Legislative History of Act R54.

#### A.  H. 3418:  The First Attempt to Pass Voter ID Legislation Produces the "McConnell Compromise" in the Senate and Realizes Substantial Compromise by the House of Representatives Buts Ends in a Senate Filibuster.

19. On February 3, 2009, Speaker Robert Harrell and several co-sponsors in the South

Carolina House of Representatives introduced H. 3418.  PX-2 (JA_000491).  The legislation

would have permitted voters to show one of two forms of photo identification—either a "valid

South Carolina driver's license or other form of identification containing a photograph issued by

the Department of Motor Vehicles."  PX-2 (JA_000492); 8/28/12 Tr. 60:18-61:1 (Harrell).

20. The House Judiciary Committee added which added two more forms of identification—

passports and military identification issued by the federal government—and inserted a provision

allowing a voter who cannot produce one of the valid forms of photo identification to "cast a

provisional ballot that is counted only if the elector brings a valid photo identification to the

board of voter registration within ten days after the election."  PX-2 (JA_000518).

21. During the debate on the committee version of H. 3418, cloture was invoked, which

limits debate.  PX-2 (JA_000528); 8/28/12 Tr. 66:15-16, 67:3 (Harrell).  After the House

considered and rejected all pending amendments offered by Democrats, the House approved H.

3418 on second reading.  PX-2 (JA_000514-593).

22. Consideration of voter ID legislation in the Senate also began in 2009.  8/28/12 Tr.

112:19-23 (McConnell).  On January 28, 2009, Senator Campsen introduced S. 334, which was

immediately referred to the Senate Judiciary Committee and then to a subcommittee comprising

Senators Campsen, Cleary, and Scott.  PX-5 (JA_001026).

23. As introduced, S. 334 was as bare-bones as the initial House version of voter ID,

requiring a voter to show either a valid South Carolina driver's license or a valid DMV-issued

photo ID.  PX-5 (JA_001043-1044).  Unlike the House bill, S. 334 included an exception for

voters with a religious objection to being photographed.  PX-5 (JA_001044).  The bill also

included an early voting provision.  PX-5 (JA_001043).

24. In March 2009, the House sent H. 3418 to the Senate.  Following the customary practice

of the South Carolina General Assembly, the Senate set aside S. 334 and the same committee and

subcommittee took up H. 3418 as the vehicle for voter ID legislation.  8/28/12 Tr. 115:10-16

(McConnell); *see also* 8/27/12 Tr. 72:24-73:12 (Campsen); PX-2 (JA_000488).

25. The Senate Judiciary Committee made several changes to the House version.  The

committee changed "valid" to "valid and current."  PX-2 (JA_000610).  The committee also

added federal, State, and political subdivision employee ID cards to the list of acceptable IDs.

PX-2 (JA_000610).  The committee also included its religious objection exception.  PX-2

(JA_000611).  And it included an early voting period.  PX-2 (JA_000613-614).

26. The bill was placed on the Senate's "contested" calendar and was set for special order, a

procedure commonly used to ensure that contested bills are actually debated.  8/28/12 Tr. 117:5-

118:4 (McConnell); Knotts Dep. Tr. 41:20-23 (JA-SC_1323).

27. Senator Land and other Senate Democrats informed then-Senator McConnell (and

President *pro tempore*) and Republican leaders that they would not support the bill and that the

bill could "divide the chamber."  8/28/12 Tr. 120:3-7 (McConnell).  To prevent the impasse, the

McConnell convened a meeting on January 28, 2010, of Democrat and the Republican leaders

and the "chief activists in the bill, pro and con, in the ceremonial office of the President Pro Tem, and we had a meeting and talked about the difference that we had."  8/28/12 Tr. 120:13-18 (McConnell).  Attending the meeting were, among others, Republican Senators McConnell and Campsen and Democratic Senators Land, Malloy, and Scott (the latter two both African-American).  *Id.* 120:20-24; *see also* Anderson Dep. at 63:22-64:1 (JA-SC_1468).

28. The meeting participants found that the differences could be bridged, 8/28/12 Tr. 121:13-16 (McConnell); 8/30/12 Tr. 249:7-9 (Malloy), ultimately agreed on compromise language that was offered as Amendment No. 8.  PX-2 (JA_000664-678).  This compromise amendment had broad bi-partisan support with forty-five co-sponsors, including Senators McConnell, Malloy, Campsen, Scott, and Hutto.  *Id.*  Senator Malloy described this meeting as the "Senate . . . at its finest."  Senate Floor Session, June 15, 2010, 76:7-9 (JA_004145).

29. Mitigating provisions from this compromise later were included in every version of voter ID legislation subsequently considered, including Act R54.  First, the Senators created the reasonable impediment exception, PX-2 (JA_000666), which was suggested by Democratic Senator Land after "debate about elderly people in South Carolina not having birth certificates[.]"  8/27/12 Tr. 57:9-14 (Campsen); *see also* 8/27/12 Tr. 230:18-231:13 (Clemmons); Anderson Dep. at 65:4-8 (JA-SC_1469); 8/30/12 Tr. 257:7-9 (Malloy).  Second, they created the free photo voter registration card, which voters would not need a birth certificate to obtain.  PX-2 (JA_000665).  Third, the Senators required "aggressive" voter education.  PX-2 (JA_000676).

30. The compromise amendment also included other voter ID provisions that ultimately were enacted as part of Act R54.  It required any photo ID to be "valid and current."  PX-2 (JA_000665).  It included all five forms of photo ID that will be permitted under Act R54 plus one other form that the General Assembly ultimately rejected (government employee IDs).  *Id.*

And it included the religious objection exception.  PX-2 (JA_000666).

31. Amendment No. 8 also included an early voting period beginning fifteen days prior to an election and ending three days prior to the election and for in-person absentee voting on voting machines.  PX-2 (JA_000669, JA_000672).

32. The Senate unanimously adopted Amendment No. 8. and subsequently voted to adopt the as-amended version of H. 3418 on second reading by a near-unanimous vote, 36-2.  PX-2 (JA_000678-679).  The three Democratic Senators who testified during the trial voted for H. 3418 on second reading.  *Id.*

33. On February 3, 2010, on the final reading of the bill, Democratic Senator Hutto proposed and the Senate adopted Amendment No. 14A, which directed the South Carolina SEC to create and make public a list of registered voters who lack a South Carolina driver's license or DMV-issued identification.  PX-2 (JA_000725-726).  This provision, too, became part of Act R54.

34. The amended bill was passed out of the Senate with only seven votes against it, and was returned to the House.  PX-2 (JA_000726).

35. On May 5, 2010, the House amended the bill and passed it again.  The House included the voter ID mitigating provisions drafted for the Senate compromise, PX-2 (JA_000917-918), but did not accept the addition of State, federal, and political sub-division government employee IDs, PX-2 (JA_000917).  The House included early voting, PX-2 (JA_000921), and added absentee voting reforms, PX-2 (JA_000923-924).

36. Following a vote by the Senate to non-concur, H. 3418 went to conference committee.  PX-2 (JA_000933).  The House conferees were Representatives Clemmons, Cato, and Mitchell, an African American Democrat, who was appointed to the conference committee because the House version contained early voting, which was favored by Democrats.  PX-2 (JA_000937);

8/28/12 Tr. 74:2-9 (Harrell).  The Senate conferees were Senators Campsen, Malloy, and
Shoopman.  PX-2 (JA_000940).

37. The conference committee adopted provisions from both the House and Senate versions
of H. 3418, including the provisional ballots, reasonable impediment and religious objection
exceptions, and education program from the Senate compromise as well as one type of
government employee ID (federal) in addition to the five forms of ID in Act R54.  PX-2
(JA_000944-946).  The committee also agreed on an early voting period and absentee voting
reform. PX-2 (JA_000943-956).

38. The House adopted the conference report, PX-2 (JA_000993), but the report died in a
Senate filibuster and the bill was carried-over.  8/28/12 Tr. 128:21-22; 129:9-12 (McConnell);
PX-2 (JA_001024-1025).  Before voting to carry-over H. 3418, the Senate unanimously voted to
send a new conference report to the House, signed by all three Senate conferees, that included
the Senate compromise provisions, but the House did not adopt it.  8/27/12 Tr. 72:21-81:14
(Campsen).

**B.  H. 3003:  The Second Attempt to Pass Voter ID Succeeds With Legislation That
Incorporates Key Mitigating Provisions Supported by African-American
Lawmakers.**

39. On December 7, 2010, just before the next legislative session, the House picked up where
it had left off by pre-filing H. 3003, a voter ID bill largely modeled on the most-recently passed
version of H. 3418.  8/28/12 Tr. 75:22-76:1-6 (Harrell).

40. H. 3003 was described as a "clean voter ID bill" and did include early voting.  8/28/12
Tr. 77:6-8 (Harrell).  Members of the House opted not to include early voting because the House
believed that the Senate had "hidden behind the early voting provision" during the previous
year's debate on the conference committee report.  8/28/12 Tr. 76:24, 77:1-3 (Harrell).  The

House wanted to force "a straight-up vote on a clean voter ID bill[.]"  8/28/12 Tr. 78:5-8
(Harrell).

41. One provision of H. 3003 that was debated at length in the House, and to which House
Democrats were particularly opposed, was an absentee voting reform providing that absentee
ballots could only be requested by a voter and also repealed provisions of law permitting in-
person absentee voting to occur on electronic voting machines.  PX-3 (JA_000041 and
JA_000045).  Representative Sellers, an African-American Democrat, strongly opposed the
reform, arguing that "those among us who are blind or have seriously impaired vision and cannot
get to the polls on election day will not have access to a secret ballot."  PX-29 (JA_005211); PX-
3 (JA_000062-64).

42. The House passed H. 3003 on January 26, 2010.  PX-3 (JA_000087-88).  The House bill
required a voter to show the same valid and current IDs as the Senate version of H. 3418 except
for employee IDs, PX-3 (JA_000101-102); provided for a provisional ballots for voters who
could not produce photo identification before the election was certified, JA_000102-103;
included the religious objection and reasonable impediment exceptions, *id.*; and required that the
SEC establish an aggressive voter education program, JA_000107.  It also included the absentee
voting reforms.  JA_000104, JA_107.

43. When H. 3003 was sent over to the Senate, House members coordinated with grassroots
constituents to create a groundswell of support for the House's "clean" voter ID bill.  8/28/12 Tr.
77:10-12 (Harrell); *see also* Donehue Dep. Tr. 90:7-11 (JA_001234).

44. Voter ID legislation was also pre-filed in the Senate in December 2010.  However, when
H. 3003 passed the House, the Senate took-up consideration of that bill pursuant to customary
practices.  H. 3003 was reported out the Senate Committee on Judiciary with a minority report on

February 8, 2011, PX-1 (JA_000002), and voter ID was again set for special order.  PX-3 (JA_000181-183, JA_000187-188, JA_ 000192-193).  Senate Democrats again filibustered and agreed to end the filibuster only when Senator McConnell agreed that he would serve on any conference committee for the bill.  8/27/12 Tr. 93:16-94:2 (Campsen); 8/28/12 Tr. 131:15-132:17 (McConnell).

45. The Senate passed H. 3003 with provisions that originated in the January 28, 2010 compromise, including the aggressive voter education requirement, the provisional ballot language, and the religious objection reasonable impediment exceptions.  PX-3 (JA_000297-298).  It also added once again certain government employee IDs to the list of approved IDs. The Senate also included an early voting period and rejected the House changes to in-person absentee voting.  PX-3 (JA_000253-269).

46. The House returned to its version of the bill but dropped the absentee voting reforms that Democrats and African-American legislators had opposed.  8/28/12 Tr. 140:6-12 (McConnell); PX-3 (JA_000361-382); *see also supra* at ¶ 41(Sellers).  Then-Senator McConnell personally met with the Speaker of the House and insisted that bill include no changes to absentee voting. 8/28/12 Tr. 121:3-7 (McConnell);

47. When the House returned H. 3003 to the Senate, then-Senator McConnell moved for the Senate to nonconcur in the House amendment, as he had promised to do.  PX-3 (JA_000394-395); *see also* 8/27/12 Tr. 94:19-25 (Campsen).  The Senate voted to nonconcur, PX-3 (JA_000394-395), but several Republican Senators of the Senate voted to concur in the House amendment, showing that Senate Republicans were divided on the bill.  PX-3 (JA_000394-395); *see also* 8/28/12 Tr. 137:4-6 (McConnell).

48. As the conference committee began, grassroots constituents increased public pressure on

Senators to "just pass the House bill."  8/28/12 Tr. 133:7-8 (McConnell).

49. The House conferees were Representatives Clemmons, Lucas, and Merrill.  PX-3 (JA_000400); 8/28/12 Tr. 79:21-24 (Harrell).  The Senate conferees were Senators McConnell, Campsen, and Scott.  PX-3 (JA_000403).

50. In conference, then-Senator McConnell and the Senate conferees advocated for the Senate version of the bill.  As the Senate conferees were in a weaker negotiating position, then-Senator McConnell sought to gain leverage by "beat[ing] up on the House bill" and trying to "show publicly that it wasn't a clean bill."  8/28/12 Tr. 135:23-25 (McConnell).  The Senate conferees also advocated for early voting.  8/28/12 Tr. 138:3-4 (McConnell).

51. As is commonplace during conference committee, some committee members met informally to determine how if at all compromise might be reached between the two chambers.  8/27/12 Tr. 96:12-17 (Campsen).  In the end, "the House gave some and the Senate gave some and there was a conference report that was adopted[.]"  8/27/12 Tr. 97:18-20 (Campsen).

52. The conference committee report for H. 3003 required voters to present one of five valid and current photo IDs, included provisional balloting, retained the religious objection and reasonable impediment exceptions, and kept the aggressive voter education campaign.  PX-3 (JA_000451).

53. During the conference negotiation process, then-Senator McConnell stated that the Senate version of the bill was preferable and more likely to be precleared.  8/28/12 Tr. 141:1-12 (McConnell).  The Senate version had been supported on a bipartisan basis and McConnell believed that having bipartisan support would increase the likelihood of preclearance because no legislators would be able to speak out against the bill.  *Id.* 141:5-6 (McConnell).  McConnell also supported the Senate version because he believed that it was a better-written bill and included a

14

larger set of acceptable identification.  *Id.* 141:8-12 (McConnell).  Nevertheless, McConnell supported the final conference committee report.  *Id.* 139:24 (McConnell).  McConnell believed that he had fixed defects in the House bill and that the final bill included key provisions from the Senate compromise he had brokered.  8/28/12 Tr. 195:5-25 (McConnell); 8/27/12 Tr. 95:14-94:4 (Campsen).  Also, McConnell believed that he "had an assurance from the House that they would send us an early voting bill."  8/28/12 Tr. 140:1-3 (McConnell).

54. McConnell supported voter ID and early voting, but considered them to be separate election reforms that served different purposes.  The purpose of the photo ID requirement was "reliability, to make sure the person who presented themselves to vote was in fact that person."  8/28/2012 Tr. 194:3-8.  The purpose of an early voting provision was "to make voting more convenient and to allow participation."  *Id.* 193:23-194:2.

55. Voter identification and early voting are separate issues tied together for political convenience, even though proponents of each reform preferred to address them separately.  *See* PX-7 at 35:21-22 (JA_002496) (Malloy); *id.* 35:22-36:2 (Malloy); 8/30/12 Tr. 264:5-6 (Malloy) (goal had been to "get an early voting bill stand-alone some time ago"; 8/28/12 Tr. 194:19-21 (McConnell); *see also* Donehue Dep. Tr. 118:14-20 (JA-US_001239).

56. The House and Senate adopted the H. 3003 conference report and Governor Nikki Haley signed Act R54 on May 18, 2011.  PX-3 (JA_000414-415, JA_000438).

## IV. The State's Planned Implementation of Act R54 Will Ensure That All Qualified South Carolina Voters Can Cast A Ballot on Election Day.

### A.  Photo Voter Registration Cards.

57. One mitigating provision under Act R54 is the provision of free photo voter registration cards.  Supra ¶ 4.  On April 26, 2012, the South Carolina State Election Commission ("SEC") issued procedures for issuing photo voter registration cards and the State filed the procedures

with this Court.  PX-87 (JA-SC_0644-646); *see also* Doc. No. 65.

58. Upon pre-clearance, these free photo voter registration cards will be available from every county election and registration office in the State.  PX-87 (JA-SC_0645).  There is at least one registration and elections office in each of the State's forty-six counties.  Doc. No. 224.  And in Beaufort County, there is more than one office.  *Id.*; *see also* 8/29/12 Tr. 6:7-19 (Andino).

59. To obtain a free photo voter registration card, a registered voter need only present her current voter registration card without photo, present a permissible HAVA ID, or verbally confirm the last four digits of her social security number and date of birth.  JA-SC_0645.

60. County registration offices immediately issue temporary cards with a black and white photo and the SEC later mails voters permanent cards with a color photo.  Neither card expires. *See* 8/28/12 Tr. 240:7-14 (Andino); 8/29/12 Tr. 75:8-22 (Andino); PX-87 (JA-SC_0646).

61. These photo voter registration cards are available during regular county election office hours, during any extended hours offered around Election Day, and on Election Day itself.  JA-SC_0646; 8/28/12 Tr. 250:7-251:17 (Andino).  In addition, the SEC has a bus that will be used immediately upon preclearance to visit those areas of the State with the highest concentrations of voters who currently lack currently available forms of photo identification acceptable under Act R54 and to make the free photo voter registration cards available to voters in those areas without the need to visit their county elections and registration office.  The SEC has successfully used the bus to educate voters about past changes in voting procedure and expects to do so again.  8/28/12 Tr. 247:14-249:1 (Andino); PX-88 (JA-SC_0663).

62. By making photo voter registration cards available at county and elections offices, the SEC is making photo voter registration available at locations that black voters in South Carolina can access and are in fact are likely to use.  Black voters are 1.5 times more likely than white

voters to cast an in-person absentee at their county elections and registration offices—the very same place where voters can obtain free photo voter registration cards.  *See* DI Ex. 377 (JA_001792-1799) (Martin Supp. Decl.); 8/30/12 Tr. 118:4-119:6 (Martin).  And contrary to the suggestion of Intervenors' counsel during questioning at trial, Act R54 will not "suppress" efforts to bring voters by bus to cast in-person absentee ballots during the State's 30-day in-person absentee period (which is left unchanged by Act R54), *see* 8/28/12 Tr. 31:2-19 (Clemmons), because the buses will be taking voters the county registration offices where they can obtain free photo registration cards.  In addition, black voters are more likely to register in person in a county registration offices than they are in person at other locations (*i.e.*, the DMV or Department of Social Services) and that in-office registration is the second most likely method of registration overall for black voters after registration by mail.  PX-61 (Martin Decl.) (JA_001767) (Table 8); 8/30/12 Tr. 119:17-121:9 (Martin).

63. In addition, the SEC has and is prepared to use the funds necessary to implement the Section 4.  8/28/2012 Tr. 246:17-247:3 (Andino); PX-94 (JA-SC_0709-718).  The SEC has already identified and tested the cameras and printers that will be necessary to make photo voter registration cards available and is ready to place an order upon preclearance for this equipment, which should be available to the SEC within two to four weeks of the date the order is placed. 8/28/2012 Tr. 209:2-210:7, 226:4-16 (Andino).

**B.  Free DMV-Issued Identification Cards**

64. Act R54 also requires the South Carolina Department of Motor Vehicles ("DMV") to provide free, photo special identification cards to any person aged seventeen or older.  Section 6, Act R54, PX-1 (JA-US_002717).  Specifically, Section 6 of Act R54 provides (a) that the DMV "shall issue a special identification as long as (1) the application is made on a form approved and

furnished by the department; and (2) the application presents to the person issuing the identification card a birth certificate or other evidence acceptable to the department of his name and birth" and (b) that the identification card "must be free to a person aged seventeen or older." *Id.* Because the Attorney General did not interpose any objection to Section 6, this provision was precleared in December 2011. PX-120 (JA-SC_1031). The DMV has been providing free photo identification cards since at least that time. JA-SC_1397 (Shwedo Dep. Tr. 62:5-19).

65. These free DMV special identification cards are accessible to South Carolinians who need them. The DMV operates at least one office in each of South Carolina's forty-six counties and more than one office in some of the counties where there are larger transaction rates. JA-SC_1390 (Shwedo Dep. Tr. 18:13-19:4). For example in Greensville County the DMV operates two offices that issue identification cards and in Charleston County the DMV operates three offices that issue identification cards and a fourth office that can handle renewals. PX-104 (DMV Office Hours) (JA-SC_0843-845); JA-SC_1392 (Shwedo Dep. Tr. 27:22-30:18). Six DMV offices offer Saturday hours in locations that "would allow the largest portion of citizens to have access to DMV services." JA-SC_1391 (Shwedo Dep. Tr. 23:13-22).

### C. Provisional Ballots for Voters Who Currently Possess But Forget to Bring to the Polls Photo Identification.

66. As discussed, Act R54 also provides that voters who have an acceptable form of photo identification but forget to bring it to the polling place on Election Day may cast a provisional ballot. See *supra* ¶ 5. No affidavit is required from a voter who has acceptable photo identification but does not bring it to the polling place or who can obtain identification before certification of the election. 8/28/2012 Tr. 230:3-13 (Andino).

### D. Reasonable Impediment and Religious Objection Exceptions.

67. Most important, Act R54 provides a way for any voter to cast a ballot even if she does

not currently possess and cannot obtain a valid and current form of identification acceptable under Act R54.  *See supra* ¶ 6.

68. There is neither a religious objection nor a reasonable impediment exception to South Carolina's current voter identification requirements.  *See* S.C. Code § 7-13-710 (1976) (last amended by Act 459 of 1996).  Nor is there any requirement under current law that county boards "shall find" provisional ballots valid.  *Id.*

### 1. Ms. Andino Will Ensure A Consistent, Broad Application of the Reasonable Impediment Exception.

69. As Executive Director of the SEC, Ms. Marci Andino is the "chief administrative officer for the State Election Commission."  S.C. Code § 7-3-20(A).  She has primary responsibility for implementing Act R54's requirements. *See* 8/28/2012 Tr. (Andino) 199:25-200:2.  Consistent with that administrative duty, Ms. Andino has primary authority to interpret and apply the law on a "day-to-day" basis and develop implementation procedures and guidance for the county election boards. *See id.* 200:7-21.  The SEC has authority to promulgate formal regulations in some areas.  *Id.* 254:6.  And although there is no state law that specifically requires the counties to comply with SEC guidance, throughout its history, the SEC has had a "very good working relationship with all of the county election officials" and those officials look to the SEC "for guidance on a day-to-day basis" and follow that guidance.  *Id.* 205:12-23.

70. And the South Carolina Attorney General has constitutional authority to interpret state law and advise state agencies and does advise Ms. Andino and the SEC.  *See* S.C. Const. art. IV, § 15 ("The Governor shall take care that the laws be faithfully executed. To this end, the Attorney General shall assist and represent the Governor."); S.C. Code § 1-7-110; *State ex rel. Wolfe, Att'y. Gen. v. Sanders*, 118 S.C. 498, 110 S.E. 808, 810 (S.C. 1920) (Attorney General is "the highest executive law officer of the state," who is "charged with the duty of seeing to the

19

proper administration of the laws of the state, and his duties are quasi-judicial"); *Price v. Watt*, 280 S.C. 510, 513 n.1, 313 S.E.2d 58, 60 n.1 (S.C. Ct. App. 1984) (Attorney General's opinion "should not be disregarded without cogent reason").

71. In August 2011 Ms. Andino requested an opinion from the Attorney General concerning the meaning of "reasonable impediment," asking  "Would voters who participate in these elections suffer from a reasonable impediment because of the short timeframe between potential preclearance and the date of the election."  PX-91 (JA-SC_0667).  The South Carolina Attorney opined that "the short timeframe between any preclearance of the legislation and the date of any election immediately thereafter would constitute a 'reasonable impediment' for purposes of the Voter ID legislation.  Such short time period is beyond the voter's control."  *Id.* (JA-SC_0671) (footnote omitted).  The South Carolina Attorney General further explained that "the term 'reasonable impediment,' as used in the Voter ID legislation, was intended by the General Assembly to mean any valid reason, beyond the voter's control, which created an obstacle to the voter's obtaining the necessary photographic identification in order to vote."  *Id.* (JA-SC_0670); *see also* 8/28/2012 Tr. 218:1-4 (Andino).

72. Consistent with this opinion, Ms. Andino has explained that "reasonable impediment" means "any circumstance that the voter has that may have prevented them from getting a photo ID, whether it's physical, mental, medical or transportation related or, you know, short time frame between implementation and an election."  8/28/2012 Tr. 214:21-215:3 (Andino).  With the exception of the short time frame (which would be available for this November 2012 election only), a voter can assert their impediment in perpetuity, so long as it is not false.  *See* Tr. 8/29/12 38:4-40:7 (Andino).  The reasonability test, as interpreted by the SEC, is focused on the voter, and if the voter believes she has a reasonable impediment that prevents her from voting, the poll

manager should allow her to vote the provisional ballot.  8/28/2012 Tr. 217:7-10 (Andino).  And

Ms. Andino confirmed during her testimony that every voter who presently lacks a currently

available form of identification acceptable under Act R54 will have a "reasonable impediment"

because of the short time between preclearance and the November 2012 election.  8/28/2012 Tr.

216:4-24 (Andino).

73. The SEC has prepared guidance for poll managers and county elections officials about

how to implement the reasonable impediment exception.  PX-99 (JA-SC_0829-832)

("Reasonable Impediment/Religious Objection Procedures").  This document will be a

supplement to both the voter registration and election handbook and the poll manger's handbook.

8/28/2012 Tr. 218:14-22 (Andino).  The guidance provides that a reasonable impediment is "any

valid reason, beyond the voter's control, which created an obstacle to the voter's obtaining the

necessary photographic identification in order to vote."  PX-99 (JA-SC_0829).  The voter, not

poll managers or county election officials, decides whether she has such a reasonable

impediment and poll managers will not be asked to determine whether the voter's reason is valid.

8/28/2012 Tr. 219:14-220:4 (Andino).  Thus, the reasonable impediment exception will be

implemented in a manner that "err[s] on the side of the voter," something that is a "consistent

theme" of the SEC and county board of elections and registration and means that State and

county election officials "make every attempt that we can not to disenfranchise a voter."

8/28/2012 Tr. 208:12-209:1 (Andino); *see also* 8/29/12 Tr. 84:25-85:6 (M. Bowers).  It is "up to

the voter to determine if they have a reasonable impediment," 8/28/2012 Tr. 210:19-20 (Andino).

74. In addition, Act R54 provides that when a reasonable impediment "affidavit is submitted,

the county board[s] of registration and elections *shall* find that the provisional ballot is valid

*unless* the board has grounds to believe *the affidavit is false*." JA-US_002716 (Act R54

§ 5(D)(2)) (emphases added). As authoritatively construed by Ms. Andino, the law provides that provisional ballots will be rejected *only* when a "board has grounds to believe the affidavit is false," meaning the voter is not who they say they are. Although the falsity goes to both the voter's identity and reason, a ballot must be counted even if a voter gives a false reason so long as he establishes his identity. 8/28/2012 Tr. 224:16-229:1 (Andino); *see also id.* 225:15-16 (Andino). This is because the SEC errs on the side of the voter, consistent with State constitutional principles. *See Id.* 227:23; PX-91 (S.C. Att'y Gen. Op.) (JA-SC_0670). This is also consistent with the opinion of the State Attorney General requested by Ms. Andino more than one year ago. *See* PX-91 (JA-SC_0670) (affidavit "will be deemed to speak for itself"). And if voters lie about their reasonable impediment, they are at least exposed to prosecution. 8/28/12 Tr. 228:11-229:5 (Andino); 8/29/12 Tr. 37:6-38:3 (Andino).

### 2. The Notary Requirement Will Not Burden Voters.

75. Because affidavits require notarization under South Carolina law, U.S. Ex. 196 (Resp. to Request for Admission No. 19) (JA-US_000435), Ms. Andino has a plan in place to ensure that as many notaries as possible will be available at polling places. The SEC has contacted all county offices to let them know of the requirement and the offices will ask newly recruited poll managers whether they are also notaries. 8/28/12 Tr. 231:11-22; *see also* DI Ex. 520 (ElectionNet posting communicating need for notaries to counties) (JA-DI_03881). The SEC has also made a comparison of poll manager lists to the Secretary of State's notary list and has already identified approximately 2,000 current poll managers who are also notaries—and that number does not yet include poll managers from the State's two largest counties, Charleston and Greenville (because those counties were not included in the comparison). *Id.* 231:23-232:10. And the SEC contacted both major political parties as well as organizations such as the League

of Women Voters and asked them to identify volunteer notaries who can serve on election day at the approximately 2,100 polling places across the State. *Id.* 231:19-22.

76. In addition, to address the possibility that a notary will not be available at a particular polling precinct, Ms. Andino will instruct the counties to have poll managers—who are authorized under current law to administer oaths—witness the reasonable impediment affidavits. *Id.* 233:2-13, 282:23-283:19; *see also* S.C. Code § 7-13-720 (authorizing poll managers to administer oaths). In the view of the S.C. Attorney General and SEC, a witnessed-but-not-notarized provisional ballot would be in substantial compliance with Act R54, which mandates procedures for casting and counting provisional ballots but says nothing regarding notaries.[6] Doc. No. 263 at 8-9; *see also* JA-US_002716 (Act R54 § 5(D)(2)); *see also Lovelle v. Thornton*, 234 S.C. 21, 25, 106 S.E.2d 531, 534 (S.C. 1959). And the current proposed reasonable impediment affidavit already includes a space for a poll manager signature. *See* PX-86 (Religious Objection/Impediment Affidavit (JA-SC_0642)). This procedure will be included in the SEC's training for counties to ensure that counties and poll managers receive appropriate guidance concerning notaries. *Id.* 233:14-23. This procedure also reconciles the potential conflict between South Carolina's law requiring affidavits to be notarized and Act R54 by "err[ing] on the side of the voter." *See* 8/28/12 Tr. 208:17, 219:25-220:1.

77. This procedure is consistent with South Carolina law on provisional ballots and absentee ballots outside of the Act R54 context. When Ms. Andino discussed reasonable impediment affidavits with a Senate staff attorney at the time the legislation was pending, both assumed that

---

[6] In these situations, Ms. Andino is reconciling two competing laws. Breaking that tie in favor of the voter is the appropriate choice, given the "fundamental nature of the right to vote." PX-91 (8/16/11 Op. S.C. Att'y Gen.) (JA-SC_0670); *see also* Op. S.C. Att'y Gen., Oct. 11, 1996, 1996 WL 679459, at *2 ("[W]hen there is any doubt as to how a statute is to be interpreted and how that interpretation is to be applied in a given instance, it is the policy of this Office to construe such doubt in favor of the people's right to vote.").

the affidavits would be administered in the same manner as oaths administered currently for provisional ballots—that is, without the need for a notary.  JA-DI_03736 (Anderson Dep. Tr. 86:5-87:19).  Oaths given for absentee ballots similarly do not require notarization.  *See* S.C. Code § 7-15-220 ("Signing and witnessing of oath of absentee ballot applicant").

78. Notaries will not be permitted to charge for notarizing reasonable impediment or religious exception affidavits.  8/28/12 Tr. 233:24-234:5.  Because the SEC is recruiting notaries to volunteer their services, they will know in advance that they cannot charge.  *Id.* 231:19-22, 234:2-12.

79. Nor will notaries require photo identification to notarize a reasonable impediment or religious objection affidavit.  The SEC has already prepared guidance for poll managers and county election officials that "[a]cceptable forms of identification for purposes of notarization include personal knowledge of the notary public; verification of a credible witness; and the elector's voter registration card."  PX-99 (JA-SC_0830).  This guidance is consistent with the requirement under South Carolina law that notaries must obtain "satisfactory evidence" that the affiant is who they claim to be, S.C. Code § 26-3-40, and with the non-binding "best practices" *South Carolina Notary Public Reference Manual*, which includes a non-exhaustive list of forms of identification that may be accepted by notaries, PX-98 (JA-SC_0793, 0796).

### 3. Ms. Andino's Planned Implementation Is Consistent With the Purpose of Act R54 and the Reasonable Impediment Exception.

80. As noted, *supra* ¶ 2, the stated purpose of the photo identification requirement in Act R54 is to "confirm the person presenting himself to vote is the elector on the poll list."  Ms. Andino's interpretation and implementation of the reasonable impediment exception is consistent with that purpose. Moreover, Ms. Andino's interpretation is consistent with the purpose of the reasonable impediment exception as expressed by legislators and staff who considered or participated in the

drafting of the legislation.  Ms. Heather Anderson, a staff attorney who drafted parts of the legislation, testified that during the meeting in the President Pro Tempore's office, she drafted the reasonable impediment language.  *See* JA-DI_03730 (Anderson Dep. Tr. 63:16-18).  She further testified that the reasons discussed by Senators for including the reasonable impediment exception were "[t]he inability to obtain a birth certificate, the complete lack of a birth certificate" and "[t]ransportation," because "[n]ot everyone may have access to a car or to a bus system to take them to DMV."  JA-DI_03731 (Anderson Dep. Tr. 67:15-68:11).

81. The interpretation is also consistent with what key legislators themselves testified was the purpose (in their view) of the reasonable impediment exception.  Speaker Harrell, the principal sponsor of H. 3418, testified that "the idea behind it was to make sure that anybody who had a right to vote did in fact get to vote. So we wanted that and we wanted that interpreted very, very broadly."  8/28/12 Tr. 64:9-15 (Harrell).  The term "reasonable impediment" was a "kind of catch-all to make sure that anyone who had a right to vote had a means to be able to do so" and was not defined because "the intent was that it would be interpreted very broadly" and "if we started making a list of things that were reasonable impediments by design, we would be limiting it and making it less broad."  8/28/12 Tr. 94:19-95:5 (Harrell).

82. Rep. Clemmons, the principal sponsor of H. 3003 in the House, similarly viewed the reasonable impediment exception as "a tool that could be used to mitigate any inconvenience that would be created by voters who did not have an existing form of ID that would be allowed to vote."  8/27/12 Tr. 250:19-22 (Clemmons).

83. And Sen. Campsen, the principal sponsor of voter ID legislation in the Senate, explained that he thought the "broadness" of the reasonable impediment exception "good because if we were to try to list all these circumstances that we think a reasonable impediment is, we would

miss something, we would make a mistake."  8/27/2012 Tr. 63:25-64:3 (Campsen).

84. Although these legislators and staff have testified varyingly about what exactly, in their view, a reasonable impediment is, all agree that the purpose of the provision is to ensure that all voters are able to cast a ballot on election day and that no voter is disenfranchised.  And in all events, the legislators do not interpret and implement Act R54 after enactment.

**E.  Voter Education and Post-card Notification Plan.**

85. Another important mitigation provision in Act R54 is education and outreach.  Thus, Act R54 requires the SEC to "establish an aggressive voter education program," JA-US_002717 (Act R54 § 7), and the SEC has done just that with a broad ranging voter education plan and direct voter outreach that will target specifically those voters who are believed to lack currently a DMV-issued driver's license or photo ID.

**1.  Statewide Voter Education Efforts.**

86. The SEC has developed a "Photo ID voter education plan" with its public relations agency.  8/28/2012 Tr. (Andino) 202:2-9, 203:18-204:5; PX-88.

87. The plan is designed to "inform the state's registered voters and citizens of changes in voting procedures as a result of passage of 'Voter ID' legislation." PX-88 (JA-SC_0647).  The SEC will use a variety of educational materials and delivery channels to educate voters about the requirement to show photo IDs and about the availability of the religious objection and reasonable impediment exceptions.  *See id.*  These materials include print materials such as handouts and posters and web materials that describe the law's photo identification requirement. *See* PX-80 (Absentee Voting in S.C. Poster (web version)) (JA-SC_0632-0633); PX-81 (Newspaper Advertisement) (JA-SC_0634); PX-82 (Photo ID Requirements Poster) (JA-SC_0635); PX-83 (Handout Publicizing Photo ID Requirements) (JA-SC_0636-0637); PX-84

(Internet Advertisement) (JA-SC_0638); PX-85 (Voting in S.C. poster) (JA-SC_0639-0640). These materials specifically explain that a voter who does not have a photo ID "due to a religious objection to being photographed, or because the voter suffers from a reasonable disability or obstacle preventing the voter from obtaining a photo ID, may cast a provisional ballot at the polls after completing an affidavit under penalty of perjury stating the objection, disability or obstacle." *See* PX-83 (JA-SC_0637); PX-84 (JA-SC_0638); PX-85 (JA-SC_0640); see also PX-88 (JA-SC_0653) (describing production of print materials).

88. These brochures and posters (and the postcards discussed *infra*) will be provided to a variety of organizations and locations for distribution, specifically senior centers, state and local councils on aging, colleges and universities, high schools, the South Carolina commission for the blind, the South Carolina School for the Deaf and Blind, and the Commission for Minority Affairs.  PX-88 (JA-SC_0653).

89. The SEC will post a notice at polling places, and the Court suggested that this notice might be most effective if it were modified to include additional detail about the reasonable impediment exception, including the fact that, because of the short timeframe for implementation of Act R54, the exception is available during the 2012 general election to any voter who currently lacks acceptable photo identification.  8/29/12 Tr. 38:19-39:18.  Ms. Andino agreed that such modifications can be made. *Id.* 39:16-18.

90. The SEC will issue a press release to media outlets statewide, making spokespersons available for interviews to provide background to reporters, and statewide print advertisements. PX-88 (JA-SC_0648, 0659-661).  The SEC also will seek opportunities to appear at venues such as civic club meetings, advocacy group meetings, religious organizations, and fairs and festivals around the State.  *Id.*  (JA-SC_0662).  As already discussed, the SEC will use its "highly visible

bus" to target "those counties and municipalities with the highest percentage of voters without photo IDs and in counties and municipalities with the highest numbers of voters without photo IDs." *Id.* (JA-SC_0663).

### 2. Direct Voter Outreach.

91. In addition, Section 7 of Act R54 requires the SEC to notify "each registered elector who does not have a South Carolina issued driver's license or identification card" using a notice that includes "the requirements to vote absentee, early, or on election day and a description of voting by provisional ballot" as well as the availability of a free South Carolina identification card.  PX-1 (JA-US_002718) (Act R54 § 7(8)).  The SEC has already designed the postcard that will be used for this voter-specific outreach effort.  *See* PX-100 (JA-SC_0833-0835).

92. The notification postcard identifies the five approved forms of photo ID; informs the voter that she may obtain a free DMV ID or photo voter registration card; describes provisional ballots; and informs the voter that if she has a "religious objection to being photographed, or you cannot obtain an approved photo ID for reasons beyond your control, you may complete an affidavit at the polls and cast a provisional ballot."  PX-100 (JA-SC_0835).

93. The Court suggested during trial that the postcard might be most effective if it were modified to explain to the voter that the photo identification must be "valid and current" (*i.e.*, unexpired).  8/28/12 Tr. 243:7-11 (Andino).  In addition, the Court suggested that it might be better if the postcard includes more information about the reasonable impediment exception, so that voters get the same information as poll managers.  *Id.* 241:19-25; *see also infra* sub-section F.  Ms. Andino agreed that she can add additional explanation to the postcard, which can be edited until the moment it prints.  *Id.* 242:3-11, 243:13-17; 8/29/12 Tr. 60:11-61:6 (Andino).

94. Registered voters who need this targeted notification will be identified by comparing the

SEC's voter registration roll to the list of DMV customers who possess valid and current driver's licenses or special identification cards.  8/28/2012 Tr. 222:15-22; PX-1 (Act R 54 § 8) (JA-US_002718-2719).

### F. Poll Manager and County Elections and Registration Officials Education and Training.

95. The SEC's education efforts are not focused only on voters.  The SEC has always provided poll workers (called "poll managers") and county elections and registration board officials education and training materials that provide guidance concerning the implementation of State law.  8/28/12 Tr. 204:6-19 (Andino); *see also* 8/29/12 Tr. 79:4-80:6 (M. Bowers) (Pickens County and Charleston County used SEC training materials for poll manager training, had "close contact" with the SEC, and followed SEC guidance).  And such materials will be provided concerning Act R54.  *Id.*

96. These training materials include a poll manager handbook that is updated every two years "to reflect any legislative changes" and is distributed to all 46 counties and 20,000 poll managers as well on-line poll manager training Powerpoint slides that are also distributed to the counties. 8/28/12 Tr. 204:9-14 (Andino); *see also* PX-97 (2012 Poll Manager's Handbook) (JA-SC_0724-0785).

97. In addition, the SEC has provided guidance to counties for close to 30 years through a document entitled "The Voter Registration and Election Commission Handbook," which is updated on a regular basis, whenever there is a change in legislation or procedure.  8/28/12 Tr. 206:16-207:2 (Andino); PX-79 (JA-SC_0480-0631).  The handbook is used by the county election and voter registration staff and commissioners and will be updated upon preclearance to reflect changes from Act R54.  8/28/12 Tr. 206:16-207:16. (Andino).

98. The SEC has prepared the guidance concerning implementation of Act R54 that will be

inserted into the Poll Manager's Handbook and Voter Registration and Election Commission

Handbook upon preclearance, including specific guidance concerning how to implement the

reasonable impediment exception.  *See* PX-90 (Poll Manager's Handbook Supplement) (JA-

SC_0666); PX-99 (Reasonable Impediment/Religious Objection Procedures) (JA-SC_0829-

0832); 8/28/12 Tr. 218:14-21 (Andino).

99. Further, the SEC will include in these training materials any additional guidance

necessary to reflect the implementation of the Act described by Ms. Andino during her testimony

at trial in response to this Court's and others' questions.  *See* 8/28/12 Tr. 243:14-15 (Andino).

100.    The SEC provides these materials to the counties so that the counties will "get a

consistent message."  8/28/12 Tr. 205:4-7 (Andino).  And as discussed, although there is no state

law that requires counties to follow guidance from the SEC, it is the norm that counties do so.

*Id.* 205:22-23; *see also* 8/29/12 Tr. 80:3-6 (M. Bowers).

101.    Although there is no specific guidance prepared for poll managers and counties

concerning what constitutes "valid and current," Ms. Andino has testified that "a current photo

ID would be one that has not expired, that has a current date on it" and a valid one "would have

to be one of the five forms that are defined in the legislation."  8/28/12 207:23-208:1 (Andino).

102.    Also, under current law, poll managers are already familiar with the requirement that

identification be "valid."  This is because current law provides that if a voter presents a currently

acceptable form of photo identification in lieu of the (photo-less) voter registration card, that

identification must be "valid."  PX-3 (JA-000455) (showing "valid" present in law being

amended); PX-97 (JA-SC_0741) (current poll manager's handbook stating voter must show

"current and valid documents").  Yet poll managers do not currently ask voters whether the

photo ID presented is "valid."  8/28/12 247:5-13 (Andino).  In addition, poll managers and

county election officials are familiar with "current and valid" because, also under current law, voters who have registered to vote by mail must present a "current and valid photo ID" or other "current and valid" documents with the voter's name and address, such as a current utility bill, current bank statement, current government check, current paycheck, or current government document other than the voter registration card.  *Id.* (JA-SC_0837); *see also* PX-97 (JA-SC_0740-741) (2012 Poll Manager's Handbook).[7]

103.    And in all events, the "valid and current" requirement of Act R54 does not add appreciably to the discretion exercised by poll managers on election day.  Even under current law, if after examining the voter's identification and the voter's signature there is any doubt as to the identity of the voter, poll managers may "require any additional identification they deem necessary."  PX-101 (JA-SC_0836) ("Resolving Issues with Identification" (9/10/2008)); *see also* 8/28/2012 Tr. (Andino) 205:24-206:11.

## V.  Current Photo Identification Possession and the Absence of Discriminatory Post-Implementation Effects Under Act R54.

### A.  Current Act R54 ID Possession Rates Are High Among All South Carolina Voters.

104.    The overwhelming majority of South Carolina voters currently possess a form of identification accepted under Act R54.  Slightly more than 95% of active registered South Carolina voters currently possess one of the four currently available forms of Act R54 ID.  PX-50 (Hood Supp. Decl.) (JA_001085) (Table 3).  When inactive voters are added to the analysis, 94.66% of registrants still currently possess Act R54 ID.  *Id.* (JA_001086) (Table 4).[8]

---

[7] Indeed, "current and valid" language also appears in HAVA, a law that state election officials across the U.S. have been administering since 2002.  *See* 15 U.S.C. § 15483(a)(5)(A) (2012).

[8] Voters can be marked "inactive" in the SEC database for a number of reasons, two of which are that the voter failed to respond to a confirmation card mailing (I-F) or that SEC has sent a piece of mail to the voter and received a notice from the postal service that the forwarding address expired or the mail was undeliverable (I-M).  *See* PX-95 (JA-0720); PX-49 (JA_001055).

105.    Further, any voter over age 65 in South Carolina may cast an absentee ballot by mail, and under Act R54 they may do so without a photo ID.  *See* JA_001091 (Hood Supp. Decl.).  If voters over aged 65 who can avail themselves of this "no excuse" method of absentee voting are removed from the data comparison, then the overall percentage of registrants who lack currently available Act R54 ID is lowered to 3.28% (active registrants) or 3.57% (active plus inactive). *Id.*, (JA_001091-1092) (Tables 7 and 8).

**B.  The Difference Between Non-Hispanic White and Black Voters Currently Without Act R54 ID Is Small.**

106.    When broken out by racial classification, the difference between non-hispanic white and black voters who currently lack Act R54 ID is small:  6.22% of black active registrants and 4.32% of white active registrants are currently thought to lack valid Act R54 ID, a difference of 1.90 percentage points.  *Id.* (JA_1088) (Table 5).  That is 82,193 non-hispanic white registrants and 47,681 black registrants who are thought to lack currently available Act R54 ID.  *Id.*  When inactive voters are added to the analysis, the difference between black registrants and white registrants is 2.1 percentage points.  *Id.* (JA_001090) (Table 6).  That is 91,119 non-hispanic white voters and 53,609 black voters.  *Id.*

107.    And when voters over the age of 65 are removed from the analysis, the difference between black and non-hispanic white registrants who hold valid and current Act R54 photo identification is lowered to 1.76 percentage points among active registrants and to 1.93 percentage points among active and inactive registrants, for a total of 89,562 (active registrants) or 99,734 (active plus inactive) voters under age 65 without Act R54 ID.  PX-50 (JA_001093-1094) (Hood Supp. Decl. Tables 9 & 10); *see also* 8/29/12 Tr. 174:8-177:7 (Hood).

**C.  South Carolina's Matching Analysis Is Reliable.**

108.    These figures are the result of a reliable data matching analysis performed by South

Carolina's expert, Dr. M.V. Hood.  Dr. Hood analyzed how many South Carolina registrants might not currently possess of one of the four forms of currently available Act R54 ID.  8/29/12 Tr. 112:10-17 (Hood).  And in so doing, Dr. Hood used the only reliable matching methodology.[9]  Dr. Hood compared the State's voter registration file and DMV's files that identify DMV customers who currently hold valid and current licenses or photo ID cards.

109.    Dr. Hood adopted this approach after studying a data map produced by the DMV and speaking directly with a DMV analyst to confirm that his approach was consistent with how the DMV itself determines whether a license is valid and current.  *Id.* 121:19-122: 22.

110.    In addition, Dr. Hood requested and used data from the Department of Defense and Department of State showing which South Carolina voters possess valid and current military IDs and passports.  This data was made to available to Dr. Hood after South Carolina moved to compel production of the data from the United States after the United States initially refused.[10]  Thus, Dr. Hood's analysis accounts for all four of the currently available forms of identification acceptable to vote under Act R54.

111.    Importantly, Dr. Hood's matching methodology accounts for all registered voters who appear on the SEC's voter roll.  That is, Dr. Hood used the SEC voter list as the "base" file and matched to that list using DMV, DoD, and State Department data, augmenting the SEC list but not purging any voters.  8/29/12 Tr. 165:21-166:1.  Dr. Hood began and concluded his matching

---

[9] Dr. Hood used the "license table," the table identified by the DMV early during the discovery period as the one that indicates whether a DMV-issued ID is "active" or "cancelled".  U.S. Ex. 290 (SCDMV Proposed Production Tables) (JA-US 000602, 000609 (indicating "License Status" field = "surrendered" or "active").  And Dr. Hood used the expiration date field, which indicates whether the ID is expired.  8/29/12 Tr. 120:14-121:4 (Hood); *see also* JA-US 000608 (describing fields on "License" table).

[10] Indeed, the United States even refused to provide military ID and passport data to its own expert until after the State secured its production.  This notwithstanding the fact that the United States' expert requested the data "fairly early in the process" of preparing his own initial data analysis.  *See* 8/31/12 Tr. 154:1-15 (Stewart).

analysis with the same number of voters—approximately 2.79 million South Carolinians.  *See, e.g.*, PX-50 (Hood Supp. Decl. Tables 5 & 6) (JA_001088, 001090).

112.     Dr. Hood's methodology stands in sharp contrast to that used by Dr. Charles Stewart, the United States' expert.  Unlike Prof. Hood, Dr. Stewart did not interview anyone about the data he purports to analyze.  8/31/12 Tr. 171:6-20 (Stewart).  Instead, Dr. Stewart relies upon his own unverified assumptions about what the various codes and descriptions included in the DMV materials and databases mean.  For example, Dr. Stewart assumed without engaging in further investigation that any license that appears on a separate table in the DMV database, the "License_Receive" table, has been suspended, is not valid, and is no longer in the possession of the DMV customer. 8/31/12 Tr. 168:3-169:19.  But Dr. Stewart's own report shows that 24.6% of the licenses he excluded as "suspended" are actually coded as "reinstatement met," another 3.7% are corded as "another SC license issued," and 10.9% are coded as "must be returned due to the suspension," indicating that the license remains in the possession of the customer.  PX-56 (Stewart Rebuttal Decl. Attach. B) (JA_001371).  Dr. Stewart excluded these are other licenses even if they remain identified on the separate "License" table as "active."  8/31/12 Tr. 165:1-21, 169:14-19 (Stewart).  In other words, Dr. Stewart resolves a conflict between information about specific licenses contained in DMV data tables based solely upon his own assumptions.

113.     According to Dr. Stewart, the racial disparities that he reports in his analysis are "significantly affected" by his exclusion of these licenses.  8/31/12 Tr. 170:21-171:5 (Stewart).  In fact, the racial disparity is significantly increased.  *See* PX-56 (JA_001325 (Table 6)).

114.     The same is true with respect to Dr. Stewart's exclusion from his analysis any registered South Carolina voter whose license had been returned from out of state.  Dr. Stewart excluded these voters from his analysis even if they had voted in recent elections, and even if

they voted *after* their license was returned from out of state.  08/31/12 Tr. 161:15-162:17

(Stewart); PX-56 (JA_001317, 001319 (Tables 3&4)).  These excluded voters are voters who are

affected by Act R54, do not have the license that was returned, and are "disproportionately

white."  08/31/12 Tr. 163:11-164:7  (Stewart).

115.    Dr. Stewart's judgment to exclude these voters was "significantly informed" by a

single letter from the Director of the DMV, which Stewart considered a "strong endorsement" of

the exclusion.  08/31/12 Tr. 157:25-158:24 (Stewart).  Yet Stewart did not consider any

correspondence from the SEC taking issue with the DMV's description of who should and

should not be included on the State's voter rolls.  *Id.* 160:9-161:14.  And the SEC did indeed

reject the DMV's position.  *See* PX-96 (JA-SC_0722).

116.    These two data preparation choices—exclusion of licenses assumed to be returned to

the DMV and exclusion of voters assumed to have moved out of the State—are the principal

sources of disagreement between Drs. Stewart and Hood.  Other data preparation differences

were not a basis for their differing conclusions about racial disparities in the possession of

driver's licenses and photo ID cards.  PX-056 (JA_001315-1316) (Stewart Rebuttal Decl. ¶¶ 27,

29).  And specifically, Dr. Stewart's cleaning deceased individuals from the voter rolls was not a

basis for his and Prof. Hood's differing conclusions.  *Id.*; 8/31/12 Tr. 155:4-22 (Stewart).  The

methodology and data used by Dr. Stewart are therefore not reliable and cannot be the basis of

the Court's decision.

### D.  The Mitigation Provisions In Act R54 Will Ensure That All South Carolinians Will Be Able To Exercise Effectively The Electoral Franchise.

117.    As discussed, *supra* Section IV, Act R54 includes mitigation provisions, including the

reasonable impediment exception.  A gap of any size between white and black voters who

currently do not possess currently available Act R54 ID, and especially one of the size calculated

by Dr. Hood, can be eliminated by those mitigation provisions.  Either voters will be able to obtain a free photo ID from one of the DMV offices or county election offices across the State or, if they cannot do so for reasons beyond their control, they will be able to vote with a reasonable impediment affidavit.  And for the upcoming 2012 election, any South Carolina voter who cannot obtain an acceptable photo ID before the election will be able to identify the short timeframe between preclearance and the election as a reasonable impediment and vote a provisional ballot.  *See supra* ¶72.

118.    In addition, Georgia's experience with its voter ID law indicates that a pre-implementation gap in DMV-issued ID possession between white and black voters did not translate into a turnout in gap.  *See* 8/30/12 Tr. 33:2-8 (Hood).  In his academic work, Dr. Hood studied turnout rates between those with and without ID between the 2004 and 2008 election cycles in Georgia—*i.e.*, before and after that state's voter ID law was implemented—and determined that although implementation of the Georgia voter ID law had a depressive effect on turnout overall for voters without photo ID, it did not disproportionately affect minority voters. 8/29/12 Tr. 192:12-196:11 (Hood); *see also* JA_001064; JA-SC_0461-0463.

### E.  No Individual Intervenor Will Be Prevented From Obtaining An Act R54 ID and No Intervenor Can Identify A Single Voter Who Will Be Disenfranchised by Act R54.

119.    Each individual Intervenor will be able to vote if Act R54 is precleared.  James Dubose, Junior Glover, and Joseph Riley are over 65 years of age and therefore can vote by mail-in absentee ballot without photo ID.  Dubose Dep. Tr. 22:11-13 (JA-SC_1298); Glover Dep. Tr. 7:1-2 (JA-SC_1301); Riley Dep. Tr. 7:4-7 (JA-SC_1369).

120.    James Dubose, Junior Glover, Amanda Wolf, Delores Freelon, Joseph Riley, and Craig Debose either know their dates of birth and last four digits of their Social Security numbers or receive HAVA documents, either of which can be used to obtain a free photo voter

registration card.  Dubose Dep. Tr.  7:5-8 and 16:17-19 (JA-SC_1296, 1297); Glover Dep. Tr.

15:15-16:7 (JA-SC_1303); Wolf Dep. Tr. 6:3-4 and 11:24-25 (JA-SC_1451, 1452); 8/30/12 Tr.

61:9-11 and 69:14-17; Riley Dep. Tr. 12:20-22 and 13:22-14:1 (JA-SC_1370, 1371); 8/30/12 Tr.

113:12-15 (Debose).

121.    Individual Intervenors also can travel to the county elections offices to obtain a free

photo voter registration card.  *See* 8/30/12 Tr. 113:16-18, 115:2-7, 115:11-12 (Debose) (would

"make a way" to get to elections office); Glover Dep. Tr. 12:10-19 (JA-SC_1302) (rides from

daughter); 8/30/12 Tr. 64:11-19, 73:16-19 (Freelon) (same); Riley Dep. Tr. 17:7-12 (JA-

SC_1372) (ride from sister); Rutherford Dep. Tr. 17:19-18:4 (JA-SC_1385) (taxis and city bus);

Gordon Dep. Tr. 9:17-10:8  (JA-SC_1308) (rides from friends).  Indeed, Kenyda Bailey attends

college across the street from her county elections office.  Bailey Dep. Tr. 6:8-11 (JA-SC_1209).

122.    Delores Freelon and Kenyda Bailey also stated that she would be willing to sign a

reasonable impediment affidavit on Election Day, 8/30/12 Tr. 74:8-12 (Freelon); Bailey Dep. Tr.

26:25-8 (JA-SC_1209)., and Ms. Kenyda Bailey could obtain a South Carolina DMV-issued

identification wither Social Security card and birth certificate.  Bailey Dep. Tr. 12:14-18, 23:3-4

(JA-SC_1210, 1213).

123.    Representatives from the organizational Intervenors could not identify a single person

who would be prevented from voting by Act R54.  *See* 8/30/12 Tr. 95:2-96:3 (Williams); 8/30/12

Tr. 230:14-17 (Zia); Bursey Dep. Tr. 84:25-85:6 (JA-SC_1250-1251); James Dep. Tr. 102:12-

103:2 (JA-SC_1510).

## CONCLUSIONS OF LAW

124.    Voter ID laws are a Supreme Court-approved  means of combating voter fraud and

enhancing the integrity of the electoral process.  Indeed, the United States Constitution vests

States with the power to prescribe "[t]he Times, Places and Manner of holding Elections," U.S. Const. art. I, § 4, cl. 1, including the power to enact laws aimed at the "prevention of fraud and corrupt practices." *Smiley v. Holm*, 285 U.S. 355, 366 (1932). "A State indisputably has a compelling interest in preserving the integrity of its election process." *Eu v. San Francisco Cnty. Democratic Cent. Comm.*, 489 U.S. 214, 231 (1989). States may therefore adopt "generally-applicable and evenhanded restrictions that protect the integrity and reliability of the electoral process itself." *Anderson v. Celebrezze*, 460 U.S. 780, 788 n.9 (1983).

125.    The South Carolina General Assembly enacted Act R54 to improve the State's ability to detect and deter voter fraud and to enhance public confidence in the electoral process, not for any discriminatory purpose. And Act R54 will have no discriminatory effect. The State's implementation of Act R54 will ensure that all eligible voters can effectively exercise the electoral franchise.

## I.    Act R54 Was Enacted for Legitimate, Non-Discriminatory Purposes.

126.    Act R54 does not have any "discriminatory purpose." 42 U.S.C. §§ 1973c(a), 1973c(c). A "discriminatory purpose" means "more than intent as volition or intent as awareness of consequences. It implies that the decisionmaker . . . selected or reaffirmed a particular course of action at least in part 'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group." *Pers. Adm'r of Mass. v. Feeney*, 442 U.S. 256, 279 (1979) (citation and footnote omitted); *accord City of Mobile, Ala. v. Bolden*, 446 U.S. 55, 71-72 n.17 (1980). "It is settled that discriminatory purpose" in the VRA § 5 context means the *Feeney* definition. *New York v. United States*, 874 F. Supp. 394, 399 (D.D.C. 1994) (three-judge court). *See* S. Rep. No. 109-295, at 18 (2006) ("[I]t is th[e] constitutional definition which we incorporate."); H.R. Rep. No. 109-478, at 68 (2006).

127.     "[U]nder section 5's 'purpose' analysis, the question is what *actually* motivated the

legislators."  *New York*, 874 F. Supp. at 399.  "[T]he plaintiff must come forward with evidence

of legitimate, nondiscriminatory motives."  *Id*. at 400; *accord Shelby Cnty., Ala. v. Holder*, 811 F.

Supp. 2d 424, 431 (D.D.C. 2011), *aff'd*, 679 F.3d 848 (D.C. Cir. 2012).  Then "the burden shifts

to the Attorney General . . . to provide some evidence of a discriminatory purpose."  *New* York,

874 F. Supp. at 400.  Absent "such a showing, the section 5 plaintiff will be found to have

carried its burden of establishing a lack of discriminatory purpose."  *Id.*

**A.  Act R54's Purposes Are Legitimate.**

128.     South Carolina adopted Act R54 to detect and deter voter fraud and to enhance public

confidence in the integrity of the electoral process.  FOF ¶2.

129.     The Supreme Court has held that these are legitimate, important, and

nondiscriminatory purposes sufficient to justify a voter ID law.  *Crawford*, 553 U.S. at 196-197,

204.  This is true even if there is "no evidence of any [in-person voter] fraud actually occurring

in [the State] at any time in its history."  *Id*. at 194; *see also Munro v. Socialist Workers Party*,

479 U.S. 189, 195-96 (1986) (Legislatures are "permitted to respond to potential deficiencies in

the electoral process with foresight rather than reactively . . . .");  *Florida v. United States*, No.

11-cv-1428, slip op. at 115-16 (D.D.C. Aug. 16, 2012) (per curiam) ("[T]he fact that a state has

acted proactively to close a loophole in its election laws . . . does not *by itself* raise an inference

of discriminatory intent.") (citing *Crawford*).[11]

---

[11] The Seventh Circuit's opinion in *Crawford* explained that "the absence of prosecutions [of
voter fraud in Indiana] is explained by the endemic underenforcement of minor criminal laws . . .
and by the extreme difficulty of apprehending a voter impersonator.  He enters the polling place,
gives a name that is not his own, votes, and leaves.  If later it is discovered that the name he gave
is that of a dead person, no one at the polling place will remember the face of the person who
gave that name, and if someone did remember it, what would he do with the information?"  472

130.    Even without evidence of in-state, in-person voter fraud, *Crawford* held that "the risk of voter fraud [is] real" and "it could affect the outcome of a close election."  553 U.S. at 196. "[F]lagrant examples of such [in-person] fraud in other parts of the country have been documented throughout this Nation's history by respected historians and journalists, [and] that occasional examples have surfaced in recent years."  *Id*. at 195 (footnotes omitted); *see also* H.R. Rep. No. 89-439, *reprinted* in 1965 U.S.C.C.A.N. 2437, 2471 ("The public record is replete with endless instances of vote frauds," and "[t]hese conditions do not exist in just one part of the country, but can be found in many States across the length and breadth of this land.").  The same is true here.

131.    Another court recently adopted *Crawford*'s holdings in a VRA § 5 case concerning voter ID legislation.  *See Texas v. Holder*, No. 12-cv-128, 2012 WL 3743676, at *12 (D.D.C. Aug. 30, 2012) (three-judge court) ("It is crucial, we think, that the Court held in *Crawford* that Indiana could act to prevent in-person voter fraud despite the fact that '[t]he record contains *no* evidence of any such fraud actually occurring in Indiana[.]'").  On this ground, the *Texas* court "reject[ed] the argument . . . that the absence of documented voter fraud . . . somehow suggests that [a State]'s interest in protecting its ballot box . . . [are] 'pretext.'"  *Id.*; *see also id.* ("A state interest that is unquestionably legitimate for Indiana—without *any* concrete evidence of a problem—is unquestionably legitimate for [other States] as well.").

132.    Likewise, the Fourth Circuit considers voter impersonation a "real danger."  *See Hoffman v. Maryland*, 928 F.2d 646, 649 (4th Cir. 1991) (upholding a voter purge statute because it was "designed to curb vote fraud" and "[w]ithout removing the names, there exists the

---

F.3d 949, 953 (7th Cir. 2007), *aff'd*, 553 U.S. 181 (2008); *accord* 8/29/12 Tr. 97:6-99:12 (Bowers).

very real danger that impostors will claim to be someone on the list and vote in their places.”).[12]

133.    Nor is South Carolina immune from voter fraud.  The State has experienced numerous instances of voter fraud in the recent past, as even Act R54’s opponents admit.  FOF ¶16; *see also Crawford*, 553 U.S. at 195 (“Indiana’s own experience with fraudulent voting in the 2003 Democratic primary for East Chicago Mayor—though perpetrated using absentee ballots and not in-person fraud—demonstrate that not only is the risk of voter fraud real but that it could affect the outcome of a close election.”).

134.    Act R54 also promotes “public confidence in the integrity and legitimacy of representative government.”  *Crawford*, 553 U.S. at 197 (quotation marks omitted); *see also Purcell v. Gonzalez*, 549 U.S. 1, 4 (2006) (“Voter fraud drives honest citizens out of the democratic process . . . .”).  And enhancing public confidence in elections is a free-standing justification for a voter ID law, regardless of the magnitude of the voter fraud problem.  *See Crawford*, 553 U.S. at 197 (holding that the public-confidence purpose has “independent significance”); *Fla. State Conference of NAACP v. Browning*, 569 F. Supp. 2d 1237, 1252 (2008) (“This interest . . . is nearly as weighty as the state’s interest in the prevention of fraud.”).

### B.   Act R54’s Purposes Are Non-Discriminatory.

135.    At trial and in numerous depositions, proponents of Act R54 confirmed that they harbored no discriminatory purpose for passing the law.  FOF ¶2  Indeed, the law’s architects intentionally modeled Act R54 on the Indiana and Georgia laws because they shared the common purpose of preventing voter fraud and enhancing public confidence, and because they

---

[12] Other circuits also recognize that in-person voter fraud occurs.  *See United States v. McCranie*, 169 F.3d 723, 724 (11th Cir. 1999) (“This case involves . . . vote buying, vote selling, multiple voting, and votes casts by felons and deceased voters.”); *Kasper v. Bd. of Election Comm’rs of City of Chi.*, 814 F.2d 332, 334 (7th Cir. 1987) (“Once Chicago was known as Hog Butcher to the World.  No more.  One Chicago industry is hardier:  election fraud.  The dead awaken just in time to vote on election day.”).

wanted to ensure that South Carolina, like Indiana and Georgia, would not run afoul of the Constitution or Voting Rights Act.  FOF ¶¶ 17-18.

136.    Act R54 is more than just facially neutral, it contains many mitigating provisions consciously aimed at preventing any disproportionate racial impact. These provisions were created through bipartisan compromise, FOF ¶29, and were added to a predecessor bill by near-unanimous vote in the Senate.  FOF ¶¶31-34.

137.    That Act R54 has no racial purpose is further confirmed by the fact that far more white voters than minority voters lack Act R54 ID.  FOF ¶106-107.  Thus, "[t]oo many [white voters] are affected . . . to permit the inference that the statute is but a pretext for preferring [white voters] over [minority voters]."  *Feeney*, 442 U.S. at 275.  Under any metric proposed by Act R54's opponents, many more white voters than black voters are potentially effected by Act R54, making it a nonsensical vehicle for racial discrimination.

### C.  Defendants Cannot Refute Act R54's Legitimate, Non-Discriminatory Purposes.

138.    Given this strong *prima facie* evidence that Act R54 was enacted for legitimate, non-discriminatory purposes, the burden shifts to the United States and Intervenors "to refute the [State's] prima facie showing."  *Reno v. Bossier Parrish Sch. Bd.*, 528 U.S. 320, 332 (2000) (*Bossier II*).  That Defendants cannot do.

## II.  Act R54 Will Have No Discriminatory Effect.

139.    Act R54 will not "deny[ ] or abridg[e] the right to vote on account of race or color, or [membership in a language minority group]."  42 U.S.C. § 1973c(a).  The State's implementation of the Act, including its key mitigating provisions, will ensure that the law will not disproportionately affect minority voters or impose any material burden on any voters.  Unlike the Texas voter ID, Act R54 will not require voters to pay a fee or travel an inordinate distance in

order to vote.

**A. Act R54 Will Not Result in Retrogression.**

140.    Act R54 will not "lead to a retrogression in the position of racial minorities with respect to their effective exercise of the electoral franchise." *Beer v. United States*, 425 U.S. 130, 141 (1976); *see also Holder v. Hall*, 512 U.S. 874, 883 (1994) (plurality opinion) (retrogression is "measured against the existing voting practice," referred to as the "benchmark" practice); *Riley v. Kennedy*, 553 U.S. 406, 421 (2008) (defining the "baseline as the most recent practice that was both precleared and 'in force or effect'").

141.    The court in the *Florida* case articulated the following retrogression framework for "ballot access" preclearance suits: "a change that alters the procedures or circumstances governing voting and voter registration will result in retrogression if:  (1) the individuals who will be affected by the change are disproportionately likely to be members of a protected minority group; and (2) the change imposes a burden material enough that it will likely cause some reasonable minority voters not to exercise the franchise." *Florida*, slip op. at 23-24.

142.    The *Florida* court emphasized that "the retrogression test in ballot access cases is not solely one of 'disparate impact.'" *Id.* at 24.  Thus, "a change is not retrogressive simply because it deals with a method of voting or registration that minorities use more frequently . . . . Rather, to be retrogressive, a ballot access change must be sufficiently burdensome that it will likely cause some reasonable minority voters not to register to vote, not to go to the polls, or not to be able to cast an effective ballot once they get to the polls." *Id.*

143.    The *Florida* court also stressed that courts "do not focus solely on the burdens imposed by a voting change, but rather must also take account of any off-setting, or 'ameliorative,' adjustments." *Id.*  (citing *City of Richmond v. United States*, 422 U.S. 358, 370-

71 (1975); *City of Petersburg v. United States*, 354 F. Supp. 1021, 1031 (D.D.C. 1973)).

144.    The court in the *Texas* voter ID case did not expressly adopt the two-part *Florida* test, although its analysis is consistent with the general *Florida* framework.  *See Texas*, 2012 WL 3743676, at *13.  Moreover, given *Crawford*'s holding that the "inconvenience of making a trip to the [Bureau of Motor Vehicles] . . . does not qualify as a substantial burden on the right to vote," 553 U.S. at 198, the *Texas* court "fail[ed] to see how that same inconvenience could, absent more, undermine the 'effective exercise of the electoral franchise' for minority voters." 2012 WL 3743676, at *13.

145.    Accordingly, the *Texas* court set forth the following important rule for voter ID preclearance suits:  A State "can prove that [its voter ID law] lacks retrogressive effect even if a disproportionate number of minority voters in the state currently lack photo ID," if "these would-be voters could easily obtain . . . qualifying ID without cost or major inconvenience."  *Id.*

146.    This Court is not bound by the holdings of its sister panels.  *See In re Korean Air Lines Disaster of Sept. 1, 1983*, 829 F.2d 1171, 1176 (D.C. Cir. 1987).  But if this Court adopts the *Florida* framework, Act R54 satisfies both prongs of the test: it will neither disproportionately affect nor impose a material burden on minority voters.  And if this Court adopts the *Texas* holding, Act R54 is even more clearly entitled to preclearance because South Carolina voters will be able to  obtain acceptable ID without cost or major inconvenience.  In fact, Act R54 goes even further, because any voter facing a reasonable impediment may vote.

### 1.    Act R54 Will Not Disproportionately Affect Minority Voters.

147.    The two percentage point gap that Dr. Hood found with respect to ID possession rates among white and minority registered voters is not a definitive measure of Act R54's future effect because many of the law's key mitigating provisions have not yet taken effect.  *See Florida*, slip

op. at 24 (holding that retrogression analysis must "take account of any off-setting, or

'ameliorative,' adjustments").  Voters cannot yet obtain the most accessible form of photo ID

that will be available under the law—the photo voter registration card—nor has the State been

able to implement the educational programs mandated in Sections 7 and 8 of the Act.  FOF ¶¶

57-63, 85-94.  These measures will surely decrease the number of voters without acceptable

photo ID.

148.    The State's already considerable burden in this case, *Nw. Austin Mun. Utility Dist.*

*No. One v. Holder*, 557 U.S. 193, 202 (2009), cannot be compounded by the Attorney General's

refusal to preclear the patently non-retrogressive provision of *free* photo voter registration cards.

149.    Virtually all registered voters are capable of obtaining at least one acceptable form of

photo ID.  This is why Intervenors have failed to identify a single person who would not be able

to obtain at least a free photo voter registration card.  FOF ¶¶ 119-123; *cf. Crawford*, 553 U.S. at

200-201 (noting that the record includes only a handful of individuals who might not have

trouble obtaining photo ID); *Billups*, 554 F.3d at 1354.

150.    Dr. Hood's study of turnout in Georgia suggests that a pre-implementation gap in ID

possession will not necessarily translate to a post-implementation turnout gap. FOF ¶118.

Importantly, Georgia implemented a free photo voter registration card like the one provided in

Section 4 of Act R54.  *See Texas*, 2012 WL 3743676, at *32 ("Georgia's voter ID law was

precleared by the Attorney General—and probably for good reason. . . .  Georgia law requires

each county to provide free election IDs, and further allows voters to present a wide range of

documents to obtain those IDs.").  Act R54 provides an identical form of free ID.

151.    Moreover, unlike the Georgia voters in Dr. Hood's study, South Carolina voters who

cannot obtain photo ID can use the reasonable impediment affidavit.  FOF ¶¶67-79.  This

provision will be implemented so as to "err on the side of the voter," FOF ¶¶73-74, 76, and any

conflicting legal requirements will be resolved in favor of the "fundamental right to vote," FOF

¶¶ 70-74 . *See also* South Carolina's Responses to the Court's Questions Regarding

Implementation of Act R54 (Doc. 263).  This final backstop ensures Act R54 will not

disproportionately affect *any* voters.  *Cf. Texas*, 2012 WL 3743676, at *26 (holding that Texas's

voter ID law, which includes no similar exception, "would in fact have a retrogressive effect on

Hispanic and African American voters").

### 2.  Act R54 Will Not Impose a Material Burden on Minority Voters.

152.    Act R54 will not impose a material burden on minority voters because acceptable ID

can be obtained without cost or major inconvenience, *see Texas*, 2012 WL 3743676, at *13, and

casting a provisional ballot does not constitute a material burden, *see Florida*, slip op. at 87-90.

153.    Under Act R54, voters will be able to obtain acceptable photo ID at no cost.  To

obtain a free photo voter registration card, a voter need only present her current voter registration

card, any of the forms of documentation currently acceptable to register in the first place, or her

date of birth and the last four digits of her social security number.  FOF ¶59.

154.    None of these prerequisites carry a hidden cost, which sets Act R54 apart from the

Texas.  *See Texas*, 2012 WL 3743676, at *27 ("In order to obtain an EIC, would-be voters will

need to present one of several underlying documents, and . . . the least expensive option for most

prospective voters who lack supporting identification will be a certified copy of their birth

certificate—which costs at least $22.").

155.    In addition, free state identification cards will also be available through the DMV to

anyone who possesses the requisite documentation.  FOF ¶¶ 64-65.  This makes South Carolina's

*second* form of free photo ID much more like Indiana's free ID that the *Texas* court suggested

that Indiana's lower cost might be acceptable for preclearance.  *See Texas*, 2012 WL 3743676 at

*15 ("[I]n Indiana the 'fee for obtaining a copy of one's birth certificate' is significantly lower

than in Texas, ranging from $3 to $12, depending on the county.").

156.    Under Act R54, South Carolina voters will be able to obtain either forms of free

photo ID without major inconvenience.  Every county in South Carolina has a voter registration

office and at least one DMV office where voters can obtain free photo ID.  FOF ¶¶ 58, 65.

157.    This too sets South Carolina apart from Texas.  *See Texas*, 2012 WL 3743676, at *16

("81 Texas counties have no [DPS] office, and 34 additional counties have [DPS] offices open

two days per week or less," which "means that in at least one-third of Texas's counties, would-be

voters will have to travel out-of-county merely to apply for an EIC.").  And it puts South

Carolina in line with Georgia and Indiana.  *See id.* ("Georgia law requires each county to

'provide at least one place in the county at which it shall accept applications for and issue [free]

Georgia voter identification cards.'  Similarly, every Indiana county has a BMV office that is

required by law to disperse 'free' photo IDs.") (citations omitted).

158.    Even if all this were not enough, Act R54's provisional ballot measures eliminate any

remaining burden.  FOF ¶¶ 66-84.  It is likely that "a voter who has already committed to waiting

in line to cast a ballot, and then learns that he or she" does not possess the requisite

identification, "will [not] leave the precinct rather than vote a provisional ballot." *Id.* at 89-90.

159.    These broad exceptions set South Carolina apart from all of its peers.  Neither Texas

nor Georgia has any similar exception.  Indiana provides a religious exemption and an exemption

limited to "indigen[ce]," but the voter must travel to "the circuit court clerk" to execute the

requisite affidavit.  *See Crawford*, 553 U.S. at 186.  Act R54's reasonable impediment

exemption, meanwhile, covers *any* obstacle outside a voter's control and allows the voter to

execute her affidavit at the polling place.  FOF ¶¶71, 73, 92.

160.    In short, "[t]he contrast" between Act R54 and Texas's voter ID law "could hardly be more stark," *Texas*, 2012 WL 3743676, at *32, and the comparison with the Georgia and Indiana laws could hardly be more clear.  If anything, Act R54's mitigating provisions go further than all three of these other States.  They are therefore entitled to preclearance.

### B.  Act R54's Effect, If Any, Is Not "on Account of Race or Color."

161.    Even if Act R54 would have a material effect on voters, it would not be "on account of race or color."  42 U.S.C. § 1973c(a).  Act R54 is a "nondiscriminatory law[] supported by valid neutral justifications" that applies to all voters .  *Crawford*, 553 U.S. at 204.

162.    To the extent that registrants who currently lack photo ID cannot vote in person after preclearance of Act R54, the legal cause of their inability to vote will be their own decision.  *See Ortiz v. City of Phila. Office of City Comm'rs Voter Registration Dir.*, 28 F.3d 306, 314 (3d Cir. 1994) (rejecting a VRA § 2 challenge to Philadelphia's voter purge statute because "registered voters are purged . . . without regard to race [or] color").

163.    In two recent VRA cases, the *en banc* Ninth Circuit has adopted this very logic.  In *Farrakhan v. Gregoire*, 623 F.3d 990, 992 (9th Cir. 2010) (en banc), the court held that "statistical evidence" of "racial disparities" does not prove that a felon disenfranchisement law violates the VRA § 2.  Even more on point, in *Gonzalez v. Arizona*, 677 F.3d 383 (9th Cir. 2012) (en banc), the Ninth Circuit held that there was "no proof of a causal relationship between [Arizona's voter ID law] and any alleged discriminatory impact on Latinos."  *Id*. at 406.

164.    Though § 2 and § 5 of the VRA have distinct functions, the operative statutory language is the same.  *Compare* 42 U.S.C. § 1973(a), *with* 42 U.S.C. § 1973c(a).

**III. Preclearance of Act R54 Will Avoid Grave Constitutional Concerns.**

165.    The Supreme Court and D.C. Circuit have recognized that "the extraordinary federalism costs imposed by [VRA § 5] raise substantial constitutional concerns." *Shelby Cnty., Ala. v. Holder*, 679 F.3d 848, 884 (D.C. Cir. 2012); *see also Nw. Austin Mun. Util. Dist. No. 1 v. Holder*, 557 U.S. 193, 201 (2009).  Any construction of VRA § 5 that would not permit the preclearance of Act R54 would raise a serious question as to whether Congress exceeded constitutional limits when in 2006 it extended the law for another 25 years.

166.    "[W]hen a particular interpretation of a statute invokes the outer limits of Congress' power, [the courts] expect a clear indication that Congress intended that result." *INS v. St. Cyr*, 533 U.S. 289, 299 (2001).  Thus, "if an otherwise acceptable construction of a statute would raise serious constitutional problems, and where an alternative interpretation of the statute is 'fairly possible,' [courts] are obliged to construe the statute to avoid such problems." *Id.* at 299-300.  Accordingly, "[a] statute must be construed, if fairly possible, so as to avoid not only the conclusion that it is unconstitutional but also grave doubts upon that score." *United States v. Jin Fuey Moy*, 241 U.S. 394, 401 (1916).

167.    Denying preclearance to Act R54 would violate the "fundamental principle" that "all the States enjoy 'equal sovereignty.'" *Nw. Austin*, 557 U.S. at 203 (quoting *United States v. Louisiana*, 363 U.S. 1, 16 (1960)).  In States that are not covered by VRA § 5, such as Indiana, voter ID laws may go into effect immediately upon adoption.  In covered States, meanwhile, voter ID laws must be precleared by the Attorney General or a district court before taking effect. The voter ID laws of other covered States—Arizona, Georgia, Louisiana, and Michigan—were long ago precleared by the Attorney General and are in effect today.  FOF ¶ 9, 12-13.  Yet, over a year after its adoption, Act R54 remains ineffective.

168.     Refusal to preclear Act R54 would mean that non-covered States such as Indiana, and even some covered States such as Georgia, and New Hampshire may adopt and implement voter ID laws, but South Carolina may not.  The resulting inequality among equal sovereigns would exacerbate the constitutional problems of VRA § 5, especially given the substantial similarities between Act R54 and the Indiana, Georgia, and New Hampshire laws—not to mention that South Carolina ranks higher than Indiana in minority "registration and voting rates, as well as in black elected officials."  *Shelby Cnty.*, 679 F.3d at 902 (Williams, J., dissenting).

169.     The need to avoid a problematic construction of VRA § 5 in this case is particularly acute in light of Congress' 2006 amendments to statute.  In 2006, "Congress extended [VRA] § 5 for yet another 25 years."  *Nw. Austin*, 557 U.S. at 200.  In so doing, Congress retained the 1972 geographic coverage formula, even though it "is based on data that is now more than [38] years old, and there is considerable evidence that it fails to account for current political conditions." *Id*. at 203.  The 2006 reauthorization also overrode two Supreme Court decisions—*Georgia v. Ashcroft*, 539 U.S. 461 (2003); *Reno v. Bossier Parish Sch. Bd.*, 528 U.S. 320, 336 (2000)—that had adopted constructions of VRA § 5 that reduced the constitutional concerns arising from the statute.  *See* 42 U.S.C. § 1973c(b)-(d); *see also* Pub. L. No. 109-246, § 2(b)(6), 120 Stat. 577, 42 U.S.C. § 1973 note.  Thus, after Congress' 2006 amendments, VRA § 5 is even more constitutionally suspect than ever before.  This Court should not add to the weight of those problems by denying preclearance in this case.

## CONCLUSION

For foregoing reasons, the Court should preclear Sections 4, 5, 7, and 8 of Act R54 under Section 5 of the Voting Rights Act, 42 U.S.C. § 1973c.

Respectfully submitted,

<u>s/H. Christopher Bartolomucci</u>

Hon. Alan Wilson                      Paul D. Clement (DC Bar No. 433215)
ATTORNEY GENERAL OF SOUTH CAROLINA    H. Christopher Bartolomucci (DC Bar No. 453423)
Bryan Stirling                        Stephen V. Potenza (admitted *pro hac vice*)
DEPUTY ATTORNEY GENERAL               Jeffrey M. Harris (admitted *pro hac vice*)
Rembert Dennis Building, Room 519     Brian J. Field (DC Bar No. 985577)
1000 Assembly Street                  D. Zachary Hudson (admitted *pro hac vice*)
Columbia, SC 29201                    Michael H. McGinley (DC Bar No. 1006943)
(803) 734-3970                        BANCROFT PLLC
                                      1919 M Street, N.W., Suite 470
                                      Washington, D.C. 20036
                                      (202) 234-0090


Karl S. Bowers, Jr. (admitted *pro hac vice*)   H. Christopher Coates (admitted *pro hac vice*)
WOMBLE CARLYLE SANDRIDGE & RICE                 LAW OFFICE OF H. CHRISTOPHER COATES
1727 Hampton Street                             934 Compass Point
Columbia, SC 29201                              Charleston, SC 29412
(803) 454-6504                                  (843) 609-7080


Dated: September 7, 2012               *Counsel for the State of South Carolina*

51

## CERTIFICATE OF SERVICE

I hereby certify that on September 8, 2012, I filed the foregoing brief with the Court's

electronic filing system, which will provide notice to all counsel of record.

s/H. Christopher Bartolomucci

H. Christopher Bartolomucci
(D.C. Bar No. 453423)