UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

—————————————————————
                                                    )
STATE OF SOUTH CAROLINA,                            )
                                                    )
                  *Plaintiff*,                      )
                                                    )
          v.                                        )
                                                    )
UNITED STATES OF AMERICA, and                       )   Civil Action No. 12-203
ERIC HIMPTON HOLDER, JR. in his                     )   (BMK) (CKK) (JDB)
official capacity as Attorney General of the        )
United States,                                      )
                                                    )
                  *Defendants*,                     )
                                                    )
          and                                       )
                                                    )
JAMES DUBOSE, *et al.*,                             )
                                                    )
                  *Defendant-Intervenors*.          )
                                                    )
—————————————————————)


Before:   KAVANAUGH, *Circuit Judge*; KOLLAR-KOTELLY, *District Judge*; and BATES, *District Judge*.

Opinion for the Court filed by *Circuit Judge* KAVANAUGH, with whom *District Judge* KOLLAR-KOTELLY and *District Judge* BATES join.

Concurring opinion filed by *District Judge* KOLLAR-KOTELLY.

Concurring opinion filed by *District Judge* BATES, with whom *District Judge* KOLLAR-KOTELLY joins.

**MEMORANDUM OPINION**

KAVANAUGH, *Circuit Judge*:  This case concerns South Carolina's new voter ID law, Act R54.  The question presented is whether that new state law is lawful under the federal Voting Rights Act.  As relevant here, Section 5 of the Voting Rights Act bars state laws that have either the purpose or the effect "of denying or abridging the right to vote on account of race or color." 42 U.S.C. § 1973c(a).  The effects prong of Section 5 of the Voting Rights Act measures a State's proposed new voting law against the benchmark of the State's pre-existing law.

For several decades, South Carolina has had a voter ID law.  Under the version of the law in effect since 1988, a voter must show a South Carolina driver's license, DMV photo ID card, or non-photo voter registration card in order to vote.  Under that pre-existing South Carolina law, a voter with a non-photo voter registration card need not show a photo ID in order to vote.  As we will explain, South Carolina's new law, Act R54, likewise does not require a photo ID to vote. Rather, under the expansive "reasonable impediment" provision in Act R54 – as authoritatively interpreted by the responsible South Carolina officials, an interpretation on which we base our decision today – voters with the non-photo voter registration card that sufficed to vote under pre-existing law may still vote without a photo ID.  Those voters simply must sign an affidavit at the polling place and list the reason that they have not obtained a photo ID.

In addition, Act R54 expands the kinds of photo IDs that may be used to vote – adding passports, military IDs, and new photo voter registration cards to the driver's licenses and DMV photo ID cards already permitted by pre-existing law.  Moreover, Act R54 minimizes the burden of obtaining a qualifying photo ID as compared to pre-existing law.  The new law creates a new type of photo ID – namely, photo voter registration cards – which may be obtained for free at

each county's elections office.  Also, under Act R54, DMV photo ID cards may be obtained at each county's DMV office for free; those cards cost $5 under pre-existing law.

In short, Act R54 allows citizens with non-photo voter registration cards to still vote without a photo ID so long as they state the reason for not having obtained one; it expands the list of qualifying photo IDs that may be used to vote; and it makes it far easier to obtain a qualifying photo ID than it was under pre-existing law.  Therefore, we conclude that the new South Carolina law does not have a discriminatory retrogressive effect, as compared to the benchmark of South Carolina's pre-existing law.  We also conclude that Act R54 was not enacted for a discriminatory purpose.  Act R54 as interpreted thus satisfies Section 5 of the Voting Rights Act, and we grant pre-clearance for South Carolina to implement Act R54 for future elections beginning with any elections in 2013.  As explained below, however, given the short time left before the 2012 elections, and given the numerous steps necessary to properly implement the law – particularly the new "reasonable impediment" provision – and ensure that the law would not have discriminatory retrogressive effects on African-American voters in 2012, we do not grant pre-clearance for the 2012 elections.

## I.  Legal and Factual Background

### A.  The Voting Rights Act and Act R54

The Voting Rights Act of 1965 is among the most significant and effective pieces of legislation in American history.  Its simple and direct legal prohibition of racial discrimination in voting laws and practices has dramatically improved the Nation, and brought America closer to fulfilling the promise of equality espoused in the Declaration of Independence and the Fourteenth and Fifteenth Amendments to the Constitution.

Section 5 of the Voting Rights Act requires certain States and political subdivisions – including South Carolina – to obtain pre-clearance of proposed changes in state or local voting laws. Pre-clearance must be obtained from the U.S. Attorney General or from a three-judge court of the U.S. District Court for the District of Columbia. 42 U.S.C. § 1973c(a). The Section 5 pre-clearance requirement seeks to ensure that the proposed changes "neither ha[ve] the purpose nor will have the effect of denying or abridging the right to vote on account of race or color" or membership in a language minority group. *Id.* The effects prong of Section 5 examines the effects of a State's proposed new law on minority voters, as compared to the benchmark of the State's pre-existing law.

Pursuant to the Voting Rights Act, South Carolina here seeks pre-clearance of Act R54, South Carolina's new voter ID law.[1]

South Carolina's pre-existing voter ID law has been in place since 1988. That law has required voters to present one of three forms of ID at the polling place: (i) a South Carolina driver's license, (ii) a South Carolina DMV photo ID card, or (iii) the non-photo voter registration card given to all registered voters in South Carolina.

On May 11, 2011, the South Carolina General Assembly passed Act R54, and Governor Nikki Haley then signed it into law. The stated purpose of the law is "to confirm the person presenting himself to vote is the elector on the poll list." Act R54, § 5. The law adds three forms of qualifying photo ID to the list of photo IDs accepted under pre-existing law. The full list of qualifying photo IDs now includes not only (i) a South Carolina driver's license and (ii) a South

---

[1] South Carolina seeks pre-clearance of Sections 4, 5, 7, and 8 of Act R54; the Attorney General already pre-cleared the sections of Act R54 that are independent of the voter ID requirement.

Carolina DMV photo ID card, but also (iii) a passport, (iv) a federal military photo ID, and (v) a new free photo voter registration card.[2]

Under Section 4 of Act R54, new photo voter registration cards may be obtained for free in person from county elections offices.[3]  There is at least one elections office in each of South Carolina's 46 counties.  The photo voter registration card may be obtained by presenting the citizen's current non-photo voter registration card.  Or a citizen who is already registered to vote may verbally confirm his or her date of birth and the last four digits of his or her Social Security number.  Or, consistent with the Help America Vote Act, Pub. L. No. 107-252 (2002) (codified at 42 U.S.C. §§ 15301-15545), a citizen may present any photo ID, utility bill, bank statement, government check, paycheck, or other government document that shows his or her name and address.

Under Section 6 of Act R54, DMV photo ID cards may now be acquired for free from county DMV offices.  Under pre-existing law, those cards cost $5.  There is at least one DMV office in all 46 counties, and more than one DMV office in some of the more populated counties.  To obtain the free DMV photo ID card, the voter must go to a DMV office and present proof of South Carolina residency, U.S. citizenship, and Social Security number.  Such proof typically requires a voter to present, among other things, either a birth certificate or a passport.  The documents required to obtain a DMV photo ID card are not changed from pre-existing law.

---

[2] Act R54 requires that the qualifying photo ID be valid and current; pre-existing law stated that it must be valid.

Under Act R54, if a voter possesses an acceptable form of photo ID but arrives at the polling place without it, the voter may of course go home and come back with the photo ID.  Or the voter may cast a provisional ballot at the polling place.  That provisional ballot will be counted so long as the voter presents his or her photo ID to the county board of elections before certification of the election, which occurs on a statutorily set deadline a few days after election day.  Act R54, § 5.

[3] To be clear, Act R54 adds a new free photo voter registration card; it does not eliminate the non-photo voter registration card.  *See* Act R54, § 4.  Under Section 2 of Act R54, which has already been pre-cleared by the Department of Justice, citizens who register to vote will continue to be issued a non-photo voter registration card.

Importantly for our purposes, Act R54 still permits citizens to use their *non-photo* voter registration cards to vote, as they could under pre-existing South Carolina law.   Act R54 provides that if a voter has "a reasonable impediment that prevents the elector from obtaining photographic identification," the voter may complete an affidavit at the polling place attesting to his or her identity.  Act R54, § 5.  To confirm the voter's identity to the notary (or, in the case of a notary's unavailability, to the poll manager) who witnesses the affidavit, the voter may show his or her non-photo voter registration card.  The affidavit also must list the voter's reason for not obtaining a photo ID.  Together with the affidavit, the voter may cast a provisional ballot, which the county board "shall find" valid unless it has "grounds to believe the affidavit is false."  *Id.* So long as the voter does not lie about his or her identity or lie about the reason he or she has not obtained a photo ID, the reason that the voter gives must be accepted by the county board, and the ballot must be counted.  As we will explain further below, state and county officials may *not* review the reasonableness of the voter's explanation (and, furthermore, may review the explanation for falsity only if someone challenges the ballot).  Therefore, all voters in South Carolina who previously voted with (or want to vote with) the non-photo voter registration card may still do so, as long as they state the reason that they have not obtained a photo ID.[4]

In order to educate voters and election officials about the new law's effects, Section 7 of Act R54 requires the South Carolina State Election Commission to "establish an aggressive voter education program."   Among other things, the Commission must post information at county elections offices, train poll managers and poll workers, coordinate with local and service organizations, advertise the changes in South Carolina newspapers, and disseminate information through local media outlets.  The law also requires "documentation describing the changes in this

---

[4] Relatedly, if a voter does not produce one of the required photo IDs on election day because of "a religious objection to being photographed," the law expressly provides that the voter may fill out an affidavit to that effect and cast a provisional ballot.  Act R54, § 5.

legislation to be disseminated by poll managers and poll workers" on election day.  Act R54, § 7(3).  In advance of the elections, the Commission must also notify each registered voter who does not currently have a driver's license or DMV photo ID card of the law's effects and of the availability of free photo IDs.

Section 8 of the Act requires the Commission to distribute a list of registered voters without a driver's license or DMV photo ID card to third parties upon request.  That provision is designed to assist outside groups that want to help voters obtain the necessary IDs and educate voters about the law.

## B.  Act R54's Reasonable Impediment Provision

At first blush, one might have thought South Carolina had enacted a very strict photo ID law.  Much of the initial rhetoric surrounding the law suggested as much.  But that rhetoric was based on a misunderstanding of how the law would work.  Act R54, as it has been authoritatively construed by South Carolina officials, does not have the effects that some expected and some feared.  As we have outlined, Act R54 has several important components:  It allows three additional forms of qualifying photo IDs; it makes it far easier to obtain qualifying photo IDs than it was under pre-existing law; and it contains a significant reasonable impediment provision that allows registered voters with non-photo voter registration cards to vote without photo IDs, so long as they fill out an affidavit at the polling place and indicate the reason that they have not obtained an R54-listed photo ID.

Of course, the initial rhetoric surrounding this case arose in part because of a key unanswered question at the time of Act R54's enactment: namely, how would the reasonable impediment provision be interpreted and enforced?  Would it be interpreted restrictively and

force voters – some of whom are poor and lack transportation – to try to obtain new photo IDs? Or would it be interpreted broadly and allow voters to continue to vote with their non-photo voter registration cards so long as they state the reason for not having obtained a photo ID?  We know that at least some South Carolina legislators intended the reasonable impediment provision to be interpreted broadly so as to accommodate voters currently without photo IDs.   For example, Speaker of the House Robert Harrell testified that the legislature intended the reasonable impediment provision to be construed "very, very broadly."  Trial Tr. 64:14-15 (Aug. 28, 2012); *see also* Trial Tr. 63:20-21 (Aug. 27, 2012) (Senator Campsen) (reasonable impediment provision "is very broad").   But those directional signals still left ultimate interpretation to the relevant administrative agencies in the South Carolina Government.

As this litigation unfolded, the responsible South Carolina officials determined, often in real time, how they would apply the broadly worded reasonable impediment provision.  Two officials play critical and complementary roles in the interpretation and implementation of Act R54: the Attorney General of South Carolina and the Executive Director of the South Carolina State Election Commission.  The Attorney General is the chief legal officer of the State, and the Executive Director of the State Election Commission has principal responsibility for implementing Act R54's requirements.   In 2011, the Attorney General of South Carolina officially interpreted the reasonable impediment provision and listed a variety of situations that, as a matter of law, would qualify as a reasonable impediment.  And at the close of trial, the South Carolina Attorney General submitted an additional memorandum to the Court addressing several issues about the reasonable impediment provision.   The Court also heard testimony from the Executive Director of the State Election Commission, Marci Andino.  Ms. Andino testified that she follows the interpretation of South Carolina law offered by the Attorney General of South

Carolina.  Ms. Andino also furnished specific assurances about how the reasonable impediment provision would be implemented.  The evidence shows that county boards and election officials, who will be implementing the law on the ground, adhere to guidance from the central State Election Commission.

The Attorney General of South Carolina and Ms. Andino have emphasized that a driving principle both at the polling place and in South Carolina state law more generally is erring in favor of the voter.  *See* S.C. Responses to the Court's Questions, Aug. 31, 2012, at 8 ("Ms. Andino is also correct to resolve conflicting legal requirements in favor of the voter."); Op. S.C. Att'y Gen., Aug. 16, 2011, 2011 WL 3918168, at *4 (reasonable impediment provision must be interpreted in light of "fundamental nature of the right to vote"); Op. S.C. Att'y Gen., Oct. 11, 1996, 1996 WL 679459, at *2 ("[W]hen there is any doubt as to how a statute is to be interpreted and how that interpretation is to be applied in a given instance, it is the policy of this Office to construe such doubt in favor of the people's right to vote.").

Most importantly for present purposes, the interpretation of South Carolina law rendered by the responsible South Carolina officials has established that Act R54 will continue to permit voting by registered voters who have the non-photo voter registration card, so long as the voter states the reason for not having obtained a photo ID.  As a result, Act R54 will deny *no* voters the ability to vote and have their votes counted if they have the non-photo voter registration card that could be used to vote under pre-existing South Carolina law.

As the responsible South Carolina officials have confirmed repeatedly, any reason asserted by the voter on the reasonable impediment affidavit for not having obtained a photo ID must be accepted – and his or her provisional ballot counted – unless the affidavit is "false."  Thus, the reasonableness of the listed impediment is to be determined by the individual voter, not

by a poll manager or county board.  The reasonable impediment affidavit simply helps to ensure that voters with non-photo voter registration cards are who they say they are.  The purpose of this provision, by its plain text and as it has been administratively interpreted, is *not* to second-guess the reasons that those voters have not yet obtained photo IDs.  So long as the reason given by the voter is not a lie, an individual voter may express any one of the many conceivable reasons why he or she has not obtained a photo ID.

As the South Carolina Attorney General determined, a voter may assert, for example, that he or she lacks a birth certificate, or has a disability, or does not have a car.  (The example of voters who don't have a car is especially important because one of the main concerns during the legislative debates was whether citizens without cars would be required to obtain photo IDs.  They are not.)  So too, a voter may assert any of the myriad other reasons for not procuring one of the required photo IDs, such as: I had to work, I was unemployed and looking for work, I didn't have transportation to the county office, I didn't have enough money to make the trip, I was taking care of my children, I was helping my family, I was busy with my charitable work, and so on.  Any reason that the voter *subjectively* deems reasonable will suffice, so long as it is not false.[5]  If the affidavit is challenged before the county board, the county board may not second-guess the *reasonableness* of the asserted reason, only its *truthfulness*.  As the Attorney

_____

[5] Although county boards generally cannot second-guess whether the reason given was a "reasonable impediment" that prevented the voter from obtaining a photo ID, statements simply denigrating the law – such as, "I don't want to" or "I hate this law" – need not be accepted.  Nor need nonsensical statements such as, to borrow an absurd example given at trial, "The moon is made of green cheese, so I didn't get a photo ID."  The ability of county boards to police the outermost boundaries of the expansive reasonable impediment provision in this commonsense way does not affect our evaluation of Act R54.  As the *Florida* three-judge court did, we assess the "reasonable" voter, not a voter who seeks to flout the law.  *Florida v. United States*, 2012 WL 3538298, at *9 (D.D.C. 2012).  That said, a county board's ability to police the outskirts of the reasonable impediment provision may not be used as a pretext for impermissible disenfranchisement or for backing away from the expansive understanding of the reasonable impediment provision articulated by the responsible South Carolina officials and adopted in this opinion.

General of South Carolina put it, "unless there is reason to believe the affidavit contains falsehoods, the vote will ultimately be deemed valid." Op. S.C. Att'y Gen., Aug. 16, 2011, 2011 WL 3918168, at *4.

That extremely broad interpretation of the reasonable impediment provision will make it far easier than some might have expected or feared for South Carolina voters with a non-photo voter registration card (and without photo ID) to vote as they could under pre-existing law. Yet the Department of Justice and the intervenors have oddly resisted that expansive interpretation of Act R54. They have insisted that the broad interpretation of the reasonable impediment provision advanced by the South Carolina Attorney General and State Election Commission contravenes the statutory language. But interpreting the law as the responsible South Carolina officials have done – to allow the voter's subjective interpretation of reasonable impediment to control – is perfectly consistent with the text of Act R54. Recall that under Act R54, a voter may cast a provisional ballot if he or she has "a reasonable impediment that prevents the elector from obtaining photographic identification." Act R54, § 5. The county board must find that provisional ballot valid "unless the board has grounds to believe the affidavit is *false*." *Id.* (emphasis added). Thus, the plain text of Act R54 provides for county-board review only of the affidavit's factual *falsity*, not of the listed impediment's *reasonableness* or *unreasonableness*. It is a sound reading of Act R54 – indeed, it could well be the best reading of the statutory text – to leave the determination of reasonableness up to the voter. Moreover, we of course owe substantial deference to a State's interpretation of state law. *Cf. Mullaney v. Wilbur*, 421 U.S. 684, 690-91 (1975). We thus accept and adopt, as a condition of pre-clearance, the expansive interpretation offered by the South Carolina Attorney General and the South Carolina State Election Commission. And as we will explain, that understanding is central to our resolution of

the case. *Cf. Florida v. United States*, 2012 WL 3538298, at *37 (D.D.C. 2012) ("Accordingly, our grant of preclearance to the inter-county mover changes is based on our express understanding that Florida will follow its laws as written and will abide by the representations it has made to this court.") (citations omitted).

What this means is that registered voters who could vote under pre-existing South Carolina law with a non-photo voter registration card – and who have not secured one of the qualifying photo IDs – will still be able to vote with the exact same non-photo voter registration card. The only additional requirement is that those voters will have to fill out an affidavit attesting to their identity and stating the reason for not having obtained a photo ID, and cast a provisional ballot.

The Department of Justice and intervenors contend that Act R54's affidavit requirement may negate the efficacy of the reasonable impediment provision. We disagree. Act R54 provides that voters who list a reasonable impediment must be permitted to vote if they complete the affidavit. *See* Act R54, § 5. Another provision of South Carolina law directs that affidavits be notarized. *See* S.C. Response to U.S. Request for Admission No. 19. As this affidavit requirement will be implemented, however, it will not burden the right to vote.

To witness the affidavits, notaries will be at the polling places. Notaries may not charge the voter, and notaries will *not* be able to require photo ID in order to notarize the affidavit (which otherwise would render the provision a circular absurdity). South Carolina election officials have determined that a current non-photo voter registration card will suffice to assure notaries of the voter's identity. *See* S.C. Code § 26-3-40 (notary must obtain "satisfactory evidence" of identity).[6] Notaries may not impose any requirement not permitted under federal

---

[6] It is possible that a notary would not even require the non-photo voter registration card to prove identity and would just rely on the notary's personal knowledge or on the verification of a credible

law or do anything more than confirm identity.  The notary may ensure, for example, that the voter's non-photo voter registration card or other ID matches the voter's name.  But as we interpret South Carolina law, including its voting laws, notaries are not permitted to screen voters based on the notaries' evaluations of voter capacity.

To implement the law, South Carolina may recruit notaries to work at the polls, and it may encourage poll managers to become notaries.  Moreover, if a notary is not available at a certain polling place, the South Carolina Attorney General has determined that poll managers may witness reasonable-impediment affidavits, and county election boards will be directed to count the accompanying provisional ballots.  We accept and require, as a condition of pre-clearance, the South Carolina Attorney General's reconciliation of competing South Carolina statutory provisions and the resulting interpretation of Act R54 as *not* requiring notaries to witness the affidavits, if a notary is unavailable.

## II.  Analysis

### A.  Analysis Under the Effects Test of Section 5 of the Voting Rights Act

The legal question before the Court is whether Act R54 as so interpreted satisfies Section 5 of the Voting Rights Act.  South Carolina has the burden of showing that Act R54 "neither has the purpose nor will have the effect of denying or abridging the right to vote on account of race or color."  42 U.S.C. § 1973c(a).  Because the law's effect will also inform our analysis of legislative purpose, we begin by assessing whether Act R54 will have a discriminatory effect.  To satisfy the effects prong of Section 5 of the Voting Rights Act of 1965, South Carolina must demonstrate that implementation of Act R54 will not "lead to a retrogression in the position of

---

witness.  *See* S.C. Notary Public Reference Manual 3 (2012).  What's important for present purposes is that the non-photo voter registration card is *sufficient* to establish identity and vote, as it was under pre-existing South Carolina law.

racial minorities with respect to their effective exercise of the electoral franchise." *Beer v. United States*, 425 U.S. 130, 141 (1976).   Under Section 5, the new law must not disproportionately and materially burden racial minorities as compared to the benchmark of the State's pre-existing law.

In practice, the expansive reasonable impediment provision in Act R54 means that every South Carolina citizen who has the non-photo voter registration card that could be used under pre-existing South Carolina law may still use that card to vote.   That of course includes all of the intervenor South Carolina citizens.   For example, intervenor Delores Freelon does not currently possess any of the photo IDs listed in Act R54 that are now available.   But like all South Carolina voters, she can vote under Act R54 at her usual polling place with her non-photo voter registration card and cite any one of the multiple reasons why she has not obtained a qualifying photo ID: that she does not have an accurate birth certificate, that she does not own a car, or that she has experienced health problems that have prevented her from traveling.   Or she could cite any other reason she subjectively feels is reasonable, with any potential review by the county board only for the factual accuracy of her affidavit (and even that limited review occurs only if someone challenges her affidavit).   Put simply, under Act R54, Ms. Freelon does not need to obtain any R54-listed photo ID to continue to vote in South Carolina elections.

Moreover, as compared to pre-existing South Carolina law, Act R54 *expands* the list of photo IDs that will qualify for voting.   In addition to the driver's licenses and DMV photo ID cards accepted under pre-existing law, the new law adds military IDs, passports, and new free photo voter registration cards to the list of permissible IDs.

On top of that, the new law makes it far easier to obtain a photo ID than it was under pre-existing law.   The law creates the new free photo voter registration card.   The law also provides

for free DMV photo ID cards.  The free photo voter registration card may be obtained at each county's elections office.  And the DMV photo ID card may now be acquired for free at each county's DMV office.  The availability of those cards makes it far easier for registered voters to obtain a qualifying photo ID than it was under pre-existing South Carolina law.

In addition, Act R54 requires the State to undertake various outreach and educational measures to encourage and make it easier for voters without an R54-listed photo ID to obtain one.  The State Election Commission will advertise the law's changes and the availability of free photo IDs.  To do so, the Commission will use its website and other social media platforms, newspapers of general circulation, and local media outlets.  The Commission will also provide individual notice to every registered voter without a South Carolina driver's license or DMV photo ID card.  And it will make a list of the registered voters without such DMV-issued photo IDs available to other organizations, so as to encourage those organizations to engage in their own mobilization efforts.

Under Act R54 as it has been interpreted, we do not find any discriminatory retrogressive effect on racial minorities under Section 5 of the Voting Rights Act.  A state voting law has a discriminatory retrogressive effect if the law disproportionately and materially burdens minority voters when measured against the pre-existing state law.  *See Florida v. United States*, 2012 WL 3538298, at *9 (D.D.C. 2012) ("In brief, we conclude that a change that alters the procedures or circumstances governing voting and voter registration will result in retrogression if: (1) the individuals who will be affected by the change are disproportionately likely to be members of a protected minority group; and (2) the change imposes a burden material enough that it will likely cause some reasonable minority voters not to exercise the franchise."); *Texas v. Holder*, 2012 WL 3743676, at *13 (D.D.C. 2012) ("Texas can prove that SB 14 lacks retrogressive effect even

if a disproportionate number of minority voters in the state currently lack photo ID.  But to do so, Texas must prove that these would-be voters could easily obtain SB 14-qualifying ID without cost or major inconvenience.").

Here, about 95% of South Carolina registered voters possess one of the R54-listed photo IDs.  But the evidence reveals an undisputed racial disparity of at least several percentage points: About 96% of whites and about 92-94% of African-Americans currently have one of the R54-listed photo IDs.  That racial disparity, combined with the burdens of time and cost of transportation inherent in obtaining a new photo ID card, might have posed a problem for South Carolina's law under the strict effects test of Section 5 of the Voting Rights Act absent the reasonable impediment provision.

But even though the South Carolina law – absent the reasonable impediment provision – may have run into problems under Section 5, the sweeping reasonable impediment provision in Act R54 eliminates any disproportionate effect or material burden that South Carolina's voter ID law otherwise might have caused.  To repeat, under pre-existing law, citizens could vote without a photo ID only if they showed their non-photo voter registration card.  Under Act R54, all citizens may still vote with that non-photo voter registration card, so long as they state the reason for not having obtained a photo ID.  In addition, the new law both increases the number of qualifying photo IDs and makes it far easier to obtain a photo ID.  Therefore, as so designed, Act R54 will not materially burden voters and will not have a discriminatory retrogressive effect on minority groups as compared to pre-existing South Carolina law.[7]

---

[7] South Carolina has represented that, as required by Act R54, it will notify voters about the law. This will include notice that voters with non-photo voter registration cards may continue to vote without photo ID so long as, at the polling place, they sign an affidavit that attests to identity and lists the reason they have not obtained a photo ID.

To ensure that the reasonable impediment provision operates as intended, there is also the question of how the voter who wishes to vote with a non-photo voter registration card will inform poll workers of the voter's reason for not obtaining a photo ID. The text of Act R54 simply requires a voter to "list the impediment" that prevented him or her from obtaining a photo ID. Act R54, § 5. State Election Commission officials have worked on a draft form that voters would complete at the polling places; the draft form has boxes that can be checked and leaves two blank lines for voters with non-photo voter registration cards to explain the reason that they have not obtained a photo ID. At the same time, South Carolina has repeatedly informed the Court that the purpose of Act R54 is to make sure that the voter is who he or she says, and not to improperly deter voters with non-photo voter registration cards from voting. In order to achieve South Carolina's stated purposes and to ensure that the reasonable impediment process does not disproportionately and materially burden minority voters in violation of the Voting Rights Act, South Carolina agrees that the process of filling out the form must not become a trap for the unwary, or a tool for intimidation or disenfranchisement of qualified voters. Therefore, consistent with the laundry list of reasons that South Carolina has told the Court will qualify as a reasonable impediment, the form at a minimum must have separate boxes that a voter may check for "religious objection"; "lack of transportation"; "disability or illness"; "lack of birth certificate"; "work schedule"; "family responsibilities"; and "other reasonable impediment." The form will require a further brief written explanation from the voter *only if* he or she checks the "other reasonable impediment" box on the form. So implemented, the process of listing the reason and filling out the form will not constitute a material burden for purposes of the Voting Rights Act. We base our decision today on that understanding of how the law will be implemented.[8]

---

[8] Throughout the proceedings, South Carolina has repeatedly emphasized to the Court that it will

The reasonable impediment provision thus operates similarly to a requirement that the voter without photo ID simply sign an affidavit stating that the voter is who he or she says. That's noteworthy, because the Department of Justice has concluded that requiring such affidavits does not pose a material burden on the right to vote for Section 5 pre-clearance purposes.  *See* Letter from T. Christian Herren, Jr., Chief, Voting Section of Civil Rights Division of U.S. Department of Justice, to J. Gerald Hebert and Stephen B. Pershing (Sept. 4, 2012) (pre-clearing New Hampshire's voter ID law, which requires an affidavit from voters without photo IDs).  Indeed, some *opponents* of strict photo voter ID laws have proposed such affidavits as an alternative to strict photo voter ID requirements.  *See* America Votes Act, H.R. 6419, 112th Cong. (2012) (proposed bill permitting eligible voters to sign an affidavit if they do not have a state-required ID).  It turns out that, as authoritatively interpreted, South Carolina's reasonable impediment provision strongly resembles the kind of affidavit requirement that the Department of Justice has agreed would not materially burden the right to vote.

It is true that citizens who vote with non-photo voter registration cards will cast provisional ballots, not regular ballots.  But the word "provisional" is a bit of a misnomer in this instance.  These ballots must be counted and will be counted, at least so long as the voter does not lie when he or she fills out and signs the reasonable impediment affidavit.  Counting the reasonable impediment ballots will not differ in substance from the counting of absentee ballots. When the provisional ballot process operates in this way, casting a provisional ballot instead of a regular ballot does not burden the right to vote.  *See Florida*, 2012 WL 3538298, at *33-38.

It is also true that, at the polling place, the process of filling out the reasonable impediment affidavit and casting the provisional ballot may take a few minutes more than the

_____

implement the reasonable impediment process in a way that alleviates material burdens, as determined by the Court.  As described here, the process of completing the form at the polling place will not constitute a material burden.

regular ballot.  On the other hand, in some situations this provisional ballot process might take a few minutes *less* than the regular ballot, if there are long lines for the regular voting machines and if the polling place uses additional lines for provisional ballots.  In any event, under the precise circumstances of this law and this case, speculation about a few minutes more or less at polling places depending on respective times for regular ballots and provisional ballots does not rise to the level of a material burden that could render the entire law impermissible under the Voting Rights Act – as our fellow three-judge courts in this District have recently concluded in similar circumstances.  *See Texas*, 2012 WL 3743676, at *10 ("some voter ID laws impose only 'minor inconvenience' and present little threat to the 'effective exercise of the electoral franchise' – and would thus be easily precleared under section 5"); *see also Florida*, 2012 WL 3538298, at *35.

In addition, a voter who shows a non-photo voter registration card and casts a provisional ballot is not required to attend the canvassing at the county office when the provisional ballots are counted.  Because the reasonable impediment ballot is presumed valid and because any challenger can contest a completed affidavit based only on falsity, it would be nearly impossible for a county board to reject such a provisional ballot *as false* without first seeking to notify and hear from the voter.  So long as the reasonable impediment affidavit is properly completed and actually lists a reason for not obtaining a photo ID, the affidavit generally "will be deemed to speak for itself" and the ballot must be counted.  Op. S.C. Att'y Gen., Aug. 16, 2011, 2011 WL 3918168, at *4.[9]

---

[9] As dictated by the text of Section 5 of Act R54, the South Carolina Attorney General added an obvious caveat: "Of course, this conclusion assumes there is no basis for a challenge to the ballot other than the voter did not present a Photo ID at the polls."  Op. S.C. Att'y Gen., Aug. 16, 2011, 2011 WL 3918168, at *4.

Our overall assessment of this provisional ballot process as ameliorative is strongly buttressed by the Supreme Court's evaluation of provisional ballots in *Crawford v. Marion County Election Board*.  There, the Court stated that any burden created by Indiana's photo ID requirement was, "of course, mitigated by the fact that, if eligible, voters without photo identification may cast provisional ballots that will ultimately be counted."  *Crawford v. Marion County Election Board*, 553 U.S. 181, 199 (2008) (binding opinion of Stevens, J.); *see also Texas*, 2012 WL 3743676, at *33 (listing provisional ballots for indigent persons as one of the ameliorative amendments "that could have made this a far closer case").  In other words, the Supreme Court characterized provisional ballots as curing problems and alleviating burdens, not as creating problems and imposing burdens.

Congress has similarly viewed provisional ballots as ameliorative.  In the Help America Vote Act of 2002, known as HAVA, Congress mandated that States establish a provisional ballot process for certain voters, such as those who have recently moved or who forget to bring their state-required IDs to the polling place.  *See* 42 U.S.C. § 15482(a).  As in Act R54, the HAVA provisional ballot process entails both casting a provisional ballot and executing a written affirmation before an election official at the polling place.  *Id.*  And like Act R54, HAVA requires that, if found eligible, voters' ballots "shall be counted."  *Id.*  So Congress, as well as the Supreme Court, has viewed provisional ballots of this kind as a legitimate way for citizens to vote and have their votes counted.

In addition to Supreme Court and Congressional approval, the landmark Carter-Baker Report issued in 2005 also expressed a similar view of provisional ballots.  A commission led by former President Jimmy Carter and Secretary James Baker issued a report that described provisional ballots as "a crucial safety net" in the current electoral system.  BUILDING

CONFIDENCE IN U.S. ELECTIONS: REPORT OF THE COMMISSION ON FEDERAL ELECTION REFORM, 16 (2005).  In its proposed reforms, the Carter-Baker Report recommended that voters generally be required to present photo IDs in order to vote.  But the Report maintained a role for provisional ballots, suggesting that provisional ballots be made available for those voters who fail to bring a photo ID to the polls.  Those provisional ballots would be counted so long as the voter's signature was verified (for the first two federal elections after implementation) or the voter went to the appropriate election office with the required ID within 48 hours (for all future elections).  This Report, too, supports South Carolina's use of provisional ballots for voters who have only their non-photo voter registration cards.

In sum, we conclude that Act R54, with its expansive reasonable impediment provision, will not have a discriminatory retrogressive effect on racial minorities in violation of Section 5 of the Voting Rights Act.

## B.  Analysis Under the Purpose Test of Section 5 of the Voting Rights Act

South Carolina also must demonstrate that Act R54 was not passed for "any discriminatory purpose."  42 U.S.C. § 1973c(c).

In evaluating legislative purpose, the Supreme Court has instructed that "courts should look to" the "decision in *Arlington Heights* for guidance."  *Reno v. Bossier Parish School Board*, 520 U.S. 471, 488 (1997).  Under *Arlington Heights*, "an important starting point" to the Section 5 purpose inquiry is the analysis we conducted above of whether the voting change bears more heavily on minorities – that is, whether the law has discriminatory retrogressive effects under the effects prong of Section 5.  *Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252, 266 (1977).  Other potential sources of evidence of purpose include the historical

background of the legislative decision, the specific sequence of events leading up to the law's passage, departures from the normal legislative procedure, and legislative history, especially contemporaneous statements by legislators. *Id.* at 267-68. In order to rise to the level of discriminatory purpose, the legislature must have "selected or reaffirmed a particular course of action at least in part 'because of,' not merely 'in spite of,' its adverse effects" on a minority group. *Personnel Administrator of Massachusetts v. Feeney*, 442 U.S. 256, 279 (1979).

As an initial matter, the stated purpose of Act R54's voter ID provisions is "to confirm the person presenting himself to vote is the elector on the poll list." Act R54, § 5. South Carolina legislators have consistently asserted that Act R54 will thereby deter voter fraud and enhance public confidence in the electoral system. Those are the same purposes that have justified South Carolina's pre-existing voter ID law, which has been in place since 1988. And the Supreme Court has specifically recognized the legitimacy of those purposes: In upholding Indiana's stricter voter ID law, the Supreme Court stated that there "is no question about the legitimacy or importance" of the interest in deterring voter fraud and that there is "independent significance" in enhancing public confidence in the electoral system. *Crawford v. Marion County Election Board*, 553 U.S. 181, 196-97 (2008) (binding opinion of Stevens, J.); *see also id.* at 196 ("While the most effective method of preventing election fraud may well be debatable, the propriety of doing so is perfectly clear."); *id.* at 204 (those motives "are both neutral and sufficiently strong"). Notably, the Supreme Court deemed those interests valid despite the fact that the "record contain[ed] no evidence of any such fraud actually occurring in Indiana at any time in its history." *Id.* at 194; *see also Texas*, 2012 WL 3743676, at *12 ("[W]e reject the argument, urged by the United States at trial, that the absence of documented voter fraud in Texas somehow suggests that Texas's interests in protecting its ballot box and safeguarding voter confidence

were 'pretext.'  A state interest that is unquestionably legitimate for Indiana – without *any* concrete evidence of a problem – is unquestionably legitimate for Texas as well."); *Florida*, 2012 WL 3538298, at *45 ("the fact that a state has acted proactively to close a loophole in its election laws . . . does not *by itself* raise an inference of discriminatory intent").

The Supreme Court's affirmation of the general legitimacy of the purpose behind a voter ID law is consistent with the fact that many States – particularly in the wake of the voting system problems exposed during the 2000 elections – have enacted stronger voter ID laws, among various other recent changes to voting laws.  So too, the 2005 bipartisan Carter-Baker Report also forcefully recommended photo voter ID laws.

As the Supreme Court concluded with respect to Indiana and as a recent three-judge court in this District found with respect to Texas, we conclude that South Carolina's goals of preventing voter fraud and increasing electoral confidence are legitimate; those interests cannot be deemed pretextual merely because of an absence of recorded incidents of in-person voter fraud in South Carolina.

Act R54 pursues those goals by requiring either (i) a qualifying photo ID or (ii) a reasonable impediment affidavit from voters who continue to vote with their non-photo voter registration cards.  By allowing voters with non-photo voter registration cards to continue to vote without photo IDs, South Carolina specifically sought to alleviate the burden on voters who might not have obtained one of the qualifying photo IDs.  At the same time, by requiring an affidavit, South Carolina sought to enhance the solemnity of the process by which voters without photo IDs confirm their identities.  *See, e.g.*, Trial Tr. 85:17-18 (Aug. 27, 2012) (Senator Campsen) (affidavits "give some sense of gravity or certainty to the statement that is being made").

When they debated and enacted Act R54, South Carolina's legislators and Governor no doubt knew, given the data obtained from the State Election Commission, that photo ID possession rates varied by race in South Carolina.  Under *Feeney*, legislators' knowledge of the law's potential disproportionate impact does not alone equate to discriminatory purpose.  *See Feeney*, 442 U.S. at 279.  But under *Arlington Heights*, ongoing legislative action with the knowledge of such an impact might be some evidence of discriminatory purpose, depending on the other facts and circumstances.  *See Arlington Heights*, 429 U.S. at 266.  Here, we do not need to thread that analytical needle because, critically, South Carolina legislators did not just plow ahead in the face of the data showing a racial gap.  Presented with that data, South Carolina legislators did not force everyone to obtain a photo ID in order to vote.  Instead, South Carolina legislators – led by Republican Senator and now Lieutenant Governor Glenn McConnell and Democratic Senator John Land, who, according to the evidence, are well-respected in the Assembly by African-American legislators and white legislators, Republicans and Democrats – made several important changes to the bill.  Among those changes was the addition of the sweeping reasonable impediment provision, which as interpreted by the responsible South Carolina officials ensures that all voters of all races with non-photo voter registration cards continue to have access to the polling place to the same degree they did under pre-existing law.[10] The legislators also permitted three *new* forms of qualifying photo IDs on top of the two already permitted under pre-existing law.  And the legislators made it easier to obtain a qualifying photo ID:  They created a new free photo voter registration card and made DMV photo ID cards available for free.  And the legislators mandated a variety of education and outreach efforts to inform voters, poll managers, and county officials about the law's effects.  Those many

---

[10] South Carolina legislators drafted the reasonable impediment provision in order to alleviate burdens on voters without photo IDs.  South Carolina did not model the reasonable impediment provision on any other State's law.

provisions significantly undermine any suggestion that Act R54 was enacted for a discriminatory purpose.

In response, the Department of Justice and the intervenors point to Act R54's proximity to the election of the country's first African-American President, a Republican legislature's refusal to accede to some of the Democratic legislators' amendments, and the bill's sometimes rancorous legislative history. But those pieces of circumstantial evidence, even in the aggregate, do not overcome the central facts that we have described, which convincingly show that Act R54 was not enacted for a discriminatory purpose. When, as here, a law is race-neutral and does not have a discriminatory effect, it is obviously difficult for a challenger to the law to show that it was enacted for a discriminatory purpose. A legislature that intended to enact a discriminatory voting law typically would enact either: (i) a race-based law or (ii) a race-neutral law with racially discriminatory effects. There is neither here; what is more, there is a lot of evidence, including in the text of the final law, that reflects legislators' efforts to avoid discriminatory retrogressive effects on African-American voters.

To be sure, we are troubled by one piece of evidence in the record: an email exchange between a South Carolina constituent and one House member in which the constituent referred disparagingly to African-American voters who do not have photo IDs. The constituent's email demonstrates something we know and do not forget: Racial insensitivity, racial bias, and indeed outright racism are still problems throughout the United States as of 2012. We see that reality on an all-too-frequent basis. *See, e.g.*, *Tweets Put Focus on Racism, Hockey and Boston*, USA TODAY, April 27, 2012 (describing outburst of racist online comments after African-American hockey player from opposing team scored winning goal). The long march for equality for African-Americans is not finished. But the views of one constituent – and one legislator's failure

to immediately denounce those views in his responsive email, as he later testified he should have done – do not speak for the two Houses of the South Carolina Legislature, or the South Carolina Governor.

Of course, we don't know what we don't know about the true motivations of every legislator.  But on the record before us, which is quite extensive, that one email does not overcome key points that, under Supreme Court precedent, must inform proper evaluation of overall legislative purpose in this context, including that: Act R54 is a facially neutral law and has no discriminatory retrogressive effects; Act R54 was passed for stated nondiscriminatory purposes that have been declared valid by the Supreme Court; Act R54 creates new forms of qualifying free photo IDs and makes it far easier to obtain a qualifying photo ID than it was under pre-existing law; Act R54 requires a variety of outreach and educational efforts to help voters obtain the requisite IDs; and Act R54 contains the expansive reasonable impediment provision that was intentionally designed to relieve any potentially problematic aspects of Act R54 and allows voters with non-photo voter registration cards to vote as they could before.

Based on the entire record and the text of Act R54, we cannot conclude that Act R54 was enacted for a racially discriminatory purpose.


**C.  Comparison to Other States' Laws**

Our conclusion that Act R54 lacks discriminatory retrogressive effect or discriminatory purpose finds further support when we compare South Carolina's law to some other recently analyzed voter ID laws, such as those in Indiana, Georgia, New Hampshire, and Texas.  The Indiana, Georgia, and New Hampshire laws have passed legal muster; Texas's law has not.  As

we will explain, if those laws were to be placed on a spectrum of stringency, South Carolina's clearly would fall on the less stringent end.

Like South Carolina, many States have enacted voter ID laws for the stated purposes of deterring voter fraud and enhancing citizens' confidence in elections.  In some States, however, minorities disproportionately lack photo IDs.  That racial gap has exacerbated concerns about voter ID laws – in particular, about the burden of obtaining a photo ID and, correspondingly, about denying voters without photo IDs the ability to vote.  To address those and other concerns, some States have adopted ameliorative provisions in their voter ID laws.  Two broad kinds of ameliorative provisions can reduce the burden on voters who do not possess a qualifying photo ID.  First, the law can make photo IDs readily accessible to voters – for example, by eliminating fees for such IDs, by expanding the kinds of underlying documentation that may be used to obtain the IDs, or by making the IDs available at convenient locations.  Second, the law can create some method by which voters without photo IDs can continue to vote on election day, typically with an affidavit of some kind.

With its new free photo voter registration card and its broad reasonable impediment provision, South Carolina's law includes *both* kinds of ameliorative provisions.  Among other things, Act R54 contains both (i) a free photo ID provision that allows voters to obtain a free photo ID, with minimal documentation, in each county, and (ii) an expansive reasonable impediment exception that allows voters without qualifying photo IDs to still vote.  Among recently pre-cleared or federal court-approved voter ID laws, South Carolina's law stands out for having tackled the lack of photo ID possession in *both* ways.  It is not an overstatement to describe South Carolina's Act R54 as significantly more friendly to voters currently without qualifying photo IDs than the voter ID laws in Indiana, Georgia, New Hampshire, and Texas.

First, consider Indiana.  In *Crawford*, the Supreme Court upheld Indiana's voter ID law against a constitutional challenge.  *See Crawford v. Marion County Election Board*, 553 U.S. 181 (2008).  Although Indiana is not a covered jurisdiction under Section 5 of the Voting Rights Act, that sole Supreme Court decision on voter ID laws remains instructive.  Indiana had neither kind of ameliorative provision that South Carolina has.  Unlike South Carolina, Indiana required many citizens seeking photo IDs to present a birth certificate – and there generally is a fee to obtain a birth certificate (between $3 and $12 in Indiana).  *See id.* at 198 n.17 (binding opinion of Stevens, J.).  Moreover, unlike South Carolina, Indiana did not have anything close to the expansive reasonable impediment provision contained in South Carolina's Act R54.  Indiana voters without photo IDs could vote a provisional ballot only if they were indigent.  And, even then, those ballots were counted only if those who claimed indigence made *a separate trip* to the county seat within 10 days after the election.  *See id.* at 186, 199.

To be sure, *Crawford* was not a Section 5 pre-clearance case.  But in the Section 5 context, the Department of Justice has pre-cleared two States' laws – Georgia's and New Hampshire's – that include only one of the two kinds of ameliorative provisions that South Carolina's law contains.

Take Georgia.  Put simply, Georgia's voter ID law does not permit voters who lack qualifying photo IDs to vote at the polling place.  There is no affidavit or reasonable impediment provision of the kind there is in South Carolina.  In Georgia, if you don't have a qualifying photo ID at the polling place, you cannot vote.  Georgia's law is, for that reason, significantly more stringent than South Carolina's law.  Georgia's law was nonetheless pre-cleared by the Department of Justice, upheld by the Eleventh Circuit against constitutional challenge, and

recently cited by another three-judge court in this District as having been pre-cleared "probably for good reason." *Texas*, 2012 WL 3743676, at *32.[11]

Next, consider New Hampshire.  During the course of this litigation, New Hampshire's voter ID law was pre-cleared by the Department of Justice.  Like South Carolina, New Hampshire allows voters without qualifying photo IDs to vote:  New Hampshire voters who do not have photo IDs must sign an affidavit attesting to their identity.  N.H. Rev. Stat. Ann. § 659:13.[12]  Unlike in South Carolina, however, New Hampshire state officials are required to do a follow-up inquiry after election day for every voter who votes without a photo ID.  And unlike South Carolina, New Hampshire does not make free photo IDs readily available.  Under New Hampshire law, a state photo ID card costs $10, unless the voter first obtains a voucher exempting him or her from the fee.  *Id.* § 260:21(V).  In South Carolina, by contrast, the new photo voter registration card is free.

Finally, there is Texas.  The Texas voter ID law was recently denied pre-clearance by a three-judge court in this District.  The Texas law apparently would have been the most stringent in the Nation.  *See Texas*, 2012 WL 3743676, at *33 ("The State of Texas enacted a voter ID law that – at least to our knowledge – is the most stringent in the country.").  Unlike South Carolina, Texas required many citizens seeking IDs to present a birth certificate – and there generally is a fee to obtain a birth certificate ($22 in Texas).  *Id.* at *1-2.  Moreover, unlike South Carolina, Texas has many counties that lack a place for voters to obtain qualifying photo IDs, meaning that

---

[11]  In trying to deal with the fact that Georgia's law is more stringent than South Carolina's, the Department of Justice has pointed out that Georgia allows a variety of forms of ID to qualify for voting.  That's true but beside the point for the precise issue before us.  What matters for these analytical purposes are the people who *don't* have a qualifying photo ID.  The number of people without qualifying photo IDs in Georgia is significant, and when Georgia's law was enacted, there was a racial gap in voters without qualifying IDs.  Yet in Georgia, those without qualifying photo IDs were not permitted to vote at the polling place.  In South Carolina, they can.

[12]  To be sure, in New Hampshire the voter does not need to check a box identifying the reason why he or she has not obtained a photo ID, nor is the affidavit notarized.

those voters would have to travel to other counties to get one.  *Id.* at *16.  And, most importantly, unlike South Carolina, Texas did not have any kind of reasonable impediment or affidavit provision to accommodate those voters who had not obtained a photo ID and wanted to vote.

In short, the Indiana and Texas laws contained neither kind of ameliorative provision that the South Carolina law contains.  And the Georgia and New Hampshire laws contained only one of the two kinds of ameliorative provisions that the South Carolina law contains.  As a relative matter, South Carolina's law imposes less of a burden on voters currently without qualifying photo IDs than the laws of Indiana, Georgia, New Hampshire, or Texas.

In addition to comparing South Carolina to those other States' laws, it is illuminating to measure South Carolina's law against the proposed voter ID reforms in the Carter-Baker Report issued by President Carter and Secretary Baker.  The comprehensive Carter-Baker Report recommended that States adopt photo voter ID laws, and proposed *less* accommodation for voters without photo IDs than South Carolina's Act R54 provides.  The Carter-Baker approach would make free photo IDs available, but, unlike South Carolina, it would require many citizens to show a birth certificate in order to obtain an ID.  Under the Carter-Baker approach, moreover, voters without photo IDs would have an unqualified right to vote by provisional ballot for only the first two elections after implementation; after that, however, provisional ballots would be counted only if the voters were to make a separate trip to the appropriate election office within 48 hours with a valid photo ID.

In sum, our comparison of South Carolina's Act R54 to some other States' voter ID laws – as well as to the Carter-Baker Report's proposed voter ID reforms – strongly buttresses the conclusion that South Carolina's law has neither a discriminatory effect nor a discriminatory purpose.  South Carolina's new voter ID law is significantly more friendly to voters without

qualifying photo IDs than several other contemporary state laws that have passed legal muster. As a matter of precedent, the decisions upholding those other state laws, while not binding on us, support our conclusion here that South Carolina's law does not have a discriminatory retrogressive effect. Moreover, the fact that South Carolina has gone to greater lengths than those other States to alleviate the burdens of voter ID laws, while not dispositive, tends to support the conclusion that South Carolina did not act with a discriminatory purpose.

* * *

Based on the above analysis of the purpose and effect of Act R54, we conclude that Act R54 "neither has the purpose nor will have the effect of denying or abridging the right to vote on account of race or color" for future elections beginning with any elections in 2013. 42 U.S.C. § 1973c(a). Therefore, we pre-clear Act R54 for future elections beginning with any elections in 2013.

## III.  The 2012 Elections

Although we pre-clear Act R54 for *future* elections, there remains the question of the 2012 elections. Those elections occur in just under four weeks. In short, the Court cannot conclude that Act R54 can be properly implemented in time for the 2012 elections. Therefore, the Court does not pre-clear the relevant provisions of Act R54 (Sections 4, 5, 7, and 8) for the 2012 elections.

We have emphasized the importance of the reasonable impediment provision to our analysis of Act R54 and to our pre-clearance of Act R54 for future elections. But a large number of difficult steps would have to be completed in order for the reasonable impediment provision to be properly implemented on November 6, 2012. In the course of just a few short weeks, the law

by its terms would require: that more than 100,000 South Carolina voters be informed of and educated about the law's new requirements; that several thousand poll workers and poll managers be educated and trained about the intricacies and nuances of the law, including about our decision here today; and that county election boards become knowledgeable of the law, including of our decision here today.  New forms need to be created, and notices posted and mailed, among other things.

The text of Act R54 strongly suggests that those steps cannot be completed in the short time before the 2012 elections.  The South Carolina legislature established several deadlines for education and training that indicated the legislature's belief that implementation of the law would occur over the course of about 11 months.  Under the law, the State Election Commission had to provide individual notice to registered voters without a DMV-issued ID "no later than December 1, 2011."  Act R54, § 7(8).  The Commission had to place informational notices in South Carolina newspapers "no later than December 15, 2011."  *Id.* § 7(6).  And the Commission had to coordinate with county boards and conduct at least two training seminars in each county "prior to December 15, 2011."  *Id.* § 7(4).  Because the law had not been pre-cleared before now, South Carolina has not initiated any of those steps.  The statute's own requirements that education and training begin nearly a *year* before the first elections under Act R54 strongly suggest that those steps cannot be adequately completed in just four weeks.

Furthermore, the reasonable impediment provision is new, and it will likely require some explanation to poll managers and poll workers, and to county officials.  With under four weeks left to go, the potential for chaos is obvious.  In that regard, we note that South Carolina officials – while gamely and admirably saying they will try to get the job done no matter what – have previously told the Court that this is far too late a date for the law to be properly implemented.

For example, Ms. Andino, the Executive Director of the State Election Commission, originally stated that pre-clearance by August 1 would be needed, while the South Carolina Attorney General previously opined that full implementation for the 2012 elections could not occur if pre-clearance came after September 15.  To be clear, the Court does not rest its decision on those prior statements, as those statements may have reflected what was optimal rather than what was absolutely essential.  But those prior statements do add to the overwhelming weight of the evidence that the Court has carefully sifted through.  That evidence convinces the Court that South Carolina – while acting in all good faith – cannot ensure proper implementation of the multi-step training and educational process required by its new law, and in particular the critical reasonable impediment provision, in the few short weeks that remain.

In deciding not to pre-clear for the 2012 elections, the Court also considers it important that South Carolina voters without R54-listed photo IDs would have very little time before the 2012 elections to choose the option of obtaining one of the free qualifying photo IDs.  For the future, the new free photo voter registration cards and the free DMV photo ID cards will be long available in at least two offices in each county.  That will create an ameliorative transition period in which more voters can obtain those IDs, and leave fewer voters to rely on the reasonable impediment provision.  The Supreme Court expressed a similar assumption about the law at issue in *Crawford*:  "Presumably most voters casting provisional ballots will be able to obtain photo identifications before the next election." *Crawford v. Marion County Election Board*, 553 U.S. 181, 199 n.19 (2008) (binding opinion of Stevens, J.).  Notably, the Supreme Court assumed as much notwithstanding that Indiana voters needed a birth certificate, passport, veterans or military ID, or certificate of naturalization in order to obtain a free ID.  *Id.* at 198

n.17.  By contrast to Indiana, South Carolina provides free photo voter registration cards without costly underlying documentation.

And in considering the 2012 elections, keep in mind that Act R54 may *not* have been pre-cleared for any elections without the expansive reasonable impediment provision.  Again, that's because this law, without the reasonable impediment provision, could have discriminatory effects and impose material burdens on African-American voters, who in South Carolina disproportionately lack one of the R54-listed photo IDs.  Without the reasonable impediment provision, the law thus would have raised difficult questions under the strict effects test of Section 5 of the Voting Rights Act.  And the reasonable impediment provision carries even greater importance for the 2012 elections because South Carolina citizens will not have much time to obtain the new free photo voter registration cards.  Because the voters who currently lack qualifying photo ID are disproportionately African-American, proper and smooth functioning of the reasonable impediment provision would be vital to avoid unlawful racially discriminatory effects on African-American voters in South Carolina in the 2012 elections.  Even assuming the best of intentions and extraordinary efforts by all involved, achieving that goal is too much to reasonably demand or expect in a four-week period – and there is too much of a risk to African-American voters for us to roll the dice in such a fashion.

From the outset, the Court has pushed very hard to make a decision in time for the 2012 elections.  We set an extremely aggressive trial schedule to accomplish that objective.  Counsel for all parties have worked diligently, which the Court greatly appreciates.  Unfortunately, as one might have anticipated in a case with this many entities involved, the parties ran into some discovery delays over the summer in trying to obtain relevant information.  In the ordinary case, those minor and typical delays would not have been a big deal.  In this case, those discovery

delays pushed back the trial date by several weeks, with the voluntary consent of all parties.  And that delay has in turn pushed back our date of decision.

We need not belabor the point.  At this late date, the Court is unable to conclude that South Carolina can implement Act R54 for the 2012 elections in a way that will suffice under the Voting Rights Act.[13]  However, as indicated above, South Carolina has satisfied its burden for future elections and may implement Act R54 for future elections, consistent with the understandings of Act R54 articulated by the responsible state officials and reflected in this opinion.[14]

## IV.  Future Enforcement

In reaching our decision to pre-clear Act R54 for future elections, we emphasize that Section 5 of the Voting Rights Act provides that pre-clearance shall not "bar a subsequent action to enjoin enforcement of such qualification, prerequisite, standard, practice, or procedure."  42 U.S.C. § 1973c(a).  If South Carolina were to alter its interpretation of the reasonable impediment provision, or any other relevant provision of Act R54 – as the law has been

---

[13] Some have contended that Section 5's intrusion on state sovereignty is unconstitutional, at least under the statutory coverage formula now in place.  Invoking the constitutional avoidance doctrine, South Carolina has suggested that we should therefore construe the effects test of Section 5 of the Voting Rights Act more narrowly than the statutory text would indicate.  But the text and Supreme Court precedent establish that the effects test of Section 5 is stringent and that a voting law change that disproportionately and materially burdens minority voters is unlawful.  Any argument to narrow Section 5 in this way must be directed to Congress or to the Supreme Court.

[14] Enforcing the Voting Rights Act here only prevents implementation of the new voter ID law for the 2012 elections.  This case thus does not raise the question of how the Equal Protection Clause issue that can arise when enforcement of the Voting Rights Act requires States to engage in race-based treatment of individual voters, as in redistricting cases.  *See Georgia v. Ashcroft*, 539 U.S. 461, 491-92 (2003) (Kennedy, J., concurring); *Shaw v. Hunt*, 517 U.S. 899, 911-16 (1996).

This case also does not raise the question of how a Section 2 effects challenge to voter ID laws should be resolved.  Section 2 applies throughout the Nation, unlike Section 5, which applies only in covered jurisdictions.  Under the Section 2 effects test (known as the "results" test), the pre-existing state law is not a benchmark.  *See Holder v. Hall*, 512 U.S. 874, 880-84 (1994) (binding opinion of Kennedy, J.).  It therefore can be more difficult to establish a violation of the Section 2 results test than a violation of the Section 5 retrogressive effects test.  *See id.* at 883-85.

interpreted by the responsible state officials and described and adopted in this opinion – the State would have to obtain pre-clearance of that change before applying that new interpretation. *See Young v. Fordice*, 520 U.S. 273, 285 (1997) (requiring pre-clearance of "new, significantly different administrative practices – practices that are not purely ministerial, but reflect the exercise of policy choice and discretion by Mississippi officials"); *NAACP v. Hampton County Election Commission*, 470 U.S. 166, 178 (1985) (holding that "the form of a change in voting procedures" is not dispositive of the need for pre-clearance, as Section 5 "reaches informal as well as formal changes").   Moreover, pre-clearance is required not just for legislative or administrative changes but also for any changes that might result from South Carolina courts' interpretations of Act R54.   *See Riley v. Kennedy*, 553 U.S. 406, 421 (2008) ("the preclearance requirement encompasses voting changes mandated by order of a state court") (quotation marks omitted); *Branch v. Smith*, 538 U.S. 254, 262 (2003) (Section 5 "requires preclearance of *all* voting changes" and "there is no dispute that this includes voting changes mandated by order of a state court"); *Lockhart v. United States*, 460 U.S. 125, 133 (1983) ("Section 5 was intended to halt actual retrogression in minority voting strength without regard for the legality under state law of the practices already in effect.").[15]

If South Carolina attempts to make such a change without pre-clearance, the Voting Rights Act authorizes the Attorney General of the United States to bring a Section 5 enforcement action in federal court.   42 U.S.C. § 1973j(d).   And the Supreme Court long ago recognized a

---

[15] Of course, Section 5 applies only when South Carolina "enact[s] or seek[s] to administer" a voting change.  42 U.S.C. § 1973c(a).  Thus, any random, unauthorized failure to follow state election law on the part of a poll manager, county board, or other individual official can be enjoined by a state court as an ordinary violation of state law.  *See United States v. Saint Landry Parish School Board*, 601 F.2d 859, 864 (5th Cir. 1979) ("one would not normally conclude that a state 'enacts or administers' a new voting procedure every time a state official deviates from the state's required procedures").  If the state court does not enforce the law, as outlined and required in this opinion, that would constitute a "change" in South Carolina law.  And the federal courts may act to correct and prevent any such changes in South Carolina law that occur without pre-clearance.

private right of action that permits individuals to do the same. *See Allen v. State Board of Elections*, 393 U.S. 544, 554-55 (1969). We have no doubt that the appropriate federal court would entertain complaints and issue appropriate injunctions if South Carolina were to narrow the interpretation of the reasonable impediment provision articulated here without first obtaining the required pre-clearance of any such change. *See, e.g.*, *Butler v. Columbia*, 2010 WL 1372299, at *4 (D.S.C. 2010) (requiring pre-clearance of change resulting from South Carolina Supreme Court's interpretation of election statute); *Gray v. South Carolina State Election Commission*, 2010 WL 753767, at *2-3 (D.S.C. 2010) (requiring pre-clearance of change in State Election Commission procedures for filing candidate statements).

In closing, we underscore that all South Carolina state, county, and local officials must comply with Act R54 as it has been interpreted by the responsible state officials and as it has been described and adopted in this opinion. Any change in the law as so interpreted would be unlawful, without pre-clearance from the Attorney General of the United States or from this Court. We are fully aware, moreover, that what looks good on paper may fall apart in practice. We expect and anticipate that South Carolina state, county, and local officials will endeavor to prevent such slippage. Given the concerns powerfully expressed at trial by several African-American legislators in South Carolina – namely, Representative Gilda Cobb-Hunter, Senator Gerald Malloy, and Senator John Scott – proper implementation of this law will be important, both for legal reasons and to maintain South Carolina citizens' confidence in the fair and impartial administration of elections.

* * *

In sum, we pre-clear Act R54 sections 4, 5, 7, and 8 for future elections in South Carolina beginning with any elections in 2013 on the basis of the interpretations and understandings that have been expressed by the South Carolina Attorney General and the Executive Director of the

South Carolina State Election Commission, and that we have adopted in this opinion.  We deny

pre-clearance for the 2012 elections.

KOLLAR-KOTELLY, *District Judge*, concurring:   I concur fully in both the Court's excellent opinion and Judge Bates' thoughtful concurrence.  I write separately only to emphasize the importance of the reasonable impediment provision in future elections.

Experts for both South Carolina and the Defendants agree that as of April 2012, approximately 130,000 registered voters in South Carolina lacked a photo ID acceptable under Act R54, and those voters are disproportionately likely to be members of a racial minority.  Over time, this number is reasonably expected to shrink as voters have the opportunity to obtain the free photo IDs made available under Act R54.  However, the photo voter registration card is unlikely to be the panacea South Carolina portrays it to be simply because this form of identification is only available if a voter registers in person at the county elections office.  New voters will continue to receive non-photo voter registration cards if they register in person at any of the myriad of other locations where voter registration is available (including public libraries, social service departments, and armed forces recruitment centers, depending on the county) or if the voter registers by mail, and must make a separate trip to the county elections office to obtain the photo voter registration card.  Moreover, although Act R54 eliminated the fee for the DMV photo ID, it understandably did not alter the underlying documentation requirement.  While Act R54 undoubtedly made it far easier to obtain an acceptable photo ID, some portion of newly registered voters will likely be forced to rely on the reasonable impediment provision in order to vote in the 2014, 2016, and other future elections.  Thus, any narrowing of South Carolina's interpretation of the reasonable impediment provision from what the Court has accepted and required in its opinion must itself be pre-cleared, not just to comply with the procedural requirements of the Voting Rights Act, but also because such narrowing may have the real effect of disenfranchising a group that is likely to be disproportionately comprised of minority voters.

1

BATES, *District Judge*, with whom *District Judge* KOLLAR-KOTELLY joins, concurring: I concur fully in the Court's excellent opinion. I write only to add two brief observations.

First, to state the obvious, Act R54 as now pre-cleared is not the R54 enacted in May 2011. It is understandable that the Attorney General of the United States, and then the intervenor-defendants in this case, would raise serious concerns about South Carolina's voter photo ID law as it then stood. But now, to the credit of South Carolina state officials, Act R54 as authoritatively interpreted does warrant pre-clearance. An evolutionary process has produced a law that accomplishes South Carolina's important objectives while protecting every individual's right to vote and a law that addresses the significant concerns raised about Act R54's potential impact on a group that all agree is disproportionately African-American. As the Court's opinion convincingly describes, South Carolina's voter photo ID law, as interpreted, now compares very favorably with the laws of Indiana, Georgia and New Hampshire, each of which has passed legal muster through either federal court constitutional review or pre-clearance by the Attorney General. The path to a sound South Carolina voter photo ID law has been different, given the essential role of the State's interpretation of key provisions.

Which brings me to my second observation – one cannot doubt the vital function that Section 5 of the Voting Rights Act has played here. Without the review process under the Voting Rights Act, South Carolina's voter photo ID law certainly would have been more restrictive. Several legislators have commented that they were seeking to structure a law that could be pre-cleared. *See* Trial Tr. 104:18-21 (Aug. 28, 2012) (Harrell) ("I was very aware at the time that we were doing this that whatever we would have to do would have to be subject to the Voting Rights Act because that would be the basis for the Department of Justice preclearing the bill for us."); *id.* at 105:15-18 ("[I] ask[ed] the staff who drafted the bill for me to please make sure that we are

passing a bill that will withstand constitutional muster and get through DOJ or through this court."); Trial Tr. 108:23-25 (Aug. 27, 2012) (Campsen) (agreeing that he was "interested in what voter ID legislation had been precleared" in drafting R54); *id.* at 148:10-15 (discussing senators' statement that "[t]he responsible thing to do was to fix [the bill] so that it would not fail in the courts or get tripped up by the Voting Rights Act"); Trial Tr. 141:9-12 (Aug. 28, 2012) (McConnell) (discussing his efforts on behalf of a bill that "had a better chance of getting preclearance"); *id.* at 182:18-20 (on the Senate floor "[t]here was discussion about" how "to craft a bill that would comply with the voting rights amendment"). The key ameliorative provisions were added during that legislative process and were shaped by the need for pre-clearance. And the evolving interpretations of these key provisions of Act R54, particularly the reasonable impediment provision, subsequently presented to this Court were driven by South Carolina officials' efforts to satisfy the requirements of the Voting Rights Act.

Congress has recognized the importance of such a deterrent effect. *See* H.R. Rep. No. 109-478, at 24 (2006) (finding that "Section 5 encourage[s] the legislature to ensure that any voting changes would not have a discriminatory effect on minority voters," and "that the existence of Section 5 deterred covered jurisdictions from even attempting to enact discriminatory voting changes" (internal quotation marks omitted)); S. Rep. No. 109-295, at 11 (2006) (finding "some reason to believe that without the Voting Rights Act's deterrent effect on potential misconduct" racial disparities in voting "might be considerably worse"). The Section 5 process here did not force South Carolina to jump through unnecessary hoops. Rather, the history of Act R54 demonstrates the continuing utility of Section 5 of the Voting Rights Act in deterring problematic, and hence encouraging non-discriminatory, changes in state and local voting laws.