UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA


STATE OF SOUTH CAROLINA,

     Plaintiff,

     vs.

UNITED STATES OF AMERICA, ET AL.,

       Defendants.

_____

CA No. 12-203
Washington, DC
August 31, 2012
1:40 p.m.

DAY 5 - PM SESSION

Pages 150 thru 165


TRANSCRIPT OF TRIAL
BEFORE
DISTRICT JUDGE COLLEEN KOLLAR-KOTELLY
CIRCUIT JUDGE BRETT M. KAVANAUGH
DISTRICT COURT JUDGE JOHN D. BATES


APPEARANCES:

For the Plaintiffs:                H. CHRISTOPHER BARTOLOMUCCI, ESQ.
                                    BRYAN J. FIELD, ESQUIRE
                                    MICHAEL McGINLEY, ESQUIRE
                                    STEPHEN POTENZA, ESQUIRE
                                    Bancroft, PLLC
                                    1919 M Street, NW
                                    Washington, DC 20036
                                    (202) 416-0257

                                    H. CHRISTOPHER COATES, ESQUIRE
                                    934 Compass Point
                                    Charleston, SC 29412
                                    (843) 609-7080

ALSO PRESENT:                    ALAN M. WILSON
                                     Attorney General South Carolina
                                    BRYAN STIRLING
                                     Deputy Attorney General
                                     South Carolina
                                    KARL S. BOWERS, ESQ.

```
For the Defendants:              BRADLEY E. HEARD, ESQUIRE
                                 RICHARD ALAN DELLHEIM, ESQUIRE
                                 BRYAN L. SELLS, ESQUIRE
                                 ANNA M. BALDWIN, ESQUIRE
                                 CATHERINE MEZA, ESQUIRE
                                 ERIN MARIE VELANDY, ESQUIRE
                                 DANIEL J. FREEMAN, ESQUIRE
                                 ANGELA MILLER, ESQUIRE
                                 U.S. Department of Justice
                                 Civil Rights Division
                                 Voting Section
                                 950 Pennsylvania Avenue, NW
                                 Washington, DC 20530
                                 (202) 353-8743


For Defendant Intervenors:       GARRARD R. BEENEY, ESQUIRE
                                 MICHAEL COOPER, ESQUIRE
                                 THEODORE A.B. McCOMBS, ESQUIRE
                                 TALY DVORKIS, ESQUIRE
                                 SEAN A. CAMONI, ESQUIRE
                                 PETER STECIUK, ESQUIRE
                                 Sullivan & Cromwell, LLP
                                 125 Broad Street
                                 New York, NY 10004
                                 (212) 558-1863

                                 NANCY ABUDU, ESQUIRE
                                 American Civil Liberties Union
                                    Foundation, Inc.
                                 230 Peachtree Street, NW
                                 Suite 1440
                                 Atlanta, GA 30303
                                 (404) 523-2721

                                 SUSAN K. DUNN, ESQUIRE
                                 American Civil Liberties Union
                                    Foundation of South Carolina
                                 40 Calhoun Street
                                 Suite 210
                                 Charleston, SC 29401
                                 (843) 720-1428
```

ARTHUR B. SPITZER, ESQUIRE
American Civil Liberties Union
  of the Nation's Capital
4301 Connecticut Avenue, NW
Suite 434
Washington, DC 20008
(202) 457-0800 x113

J. GERALD HEBERT, ESQUIRE
The Campaign Legal Center
215 E Street, NE
Washington, DC 20002
(202) 736-2200

MIMI MARZIANI, ESQUIRE
Brennan Center for Justice
161 Avenue of the Americas
12th Floor
New York, NY 10013
(646) 292-8327

MARK A. POSNER, ESQUIRE
Lawyers' Committee for Civil
  Rights
1401 New York Avenue, NW
Suite 400
Washington, DC 20005
(202) 662-8389

Court Reporter:                    Bryan A. Wayne, RPR, CRR
                                   Official Court Reporter
                                   U.S. Courthouse, Room 4704-A
                                   333 Constitution Avenue, NW
                                   Washington, DC 20001
                                   (202) 354-3186

Proceedings recorded by mechanical stenography; transcript
produced by computer-aided transcription.

```
 1                      P R O C E E D I N G S
 2             HON. COLLEEN KOLLAR-KOTELLY:  Good afternoon,
 3      everyone.  I wanted to bring up a couple of things.  In terms of
 4      remaining time, South Carolina has 59 minutes, DOJ has an hour
 5      and 43 minutes.  If you're at all interested in ceding anything,
 6      I thought you should at least know what was left.
 7             The other thing is the United States requested judicial
 8      notice of some material from the U.S. Census Bureau.  I don't
 9      know what South Carolina's position is.
10             MR. BARTOLOMUCCI:  I think that was just filed today.
11      We haven't reviewed it.  I certainly have not -- I suspect if
12      it's just census data, that we would not object.  I think if the
13      Court does not see an opposition from us by the end of the day,
14      I think the Court should assume that we have no opposition.
15             HON. COLLEEN KOLLAR-KOTELLY:  That's good.  That
16      works.  Okay.  Then let's -- we're picking up.  We have
17      Dr. Stewart, and Mr. Potenza for South Carolina for the court
18      reporter.
19             (The witness resumes the stand.)
20             MR. POTENZA:  Your Honor, may I?
21             HON. COLLEEN KOLLAR-KOTELLY:  Yes.
22                           EXAMINATION
23      BY MR. POTENZA:
24      Q.   Good afternoon, Dr. Stewart.
25      A.   Good afternoon.
```

1   Q.   Dr. Stewart, you considered passport and military ID data

2   in your rebuttal declaration; isn't that right?

3   A.   That's right.

4   Q.   But you did not consider it in your initial declaration,

5   right?

6   A.   I did not have that in my initial, right.

7   Q.   Before you prepared your initial declaration, you had

8   requested that data from the Department of Justice; isn't that

9   right?

10  A.   Yes, I had.

11  Q.   You requested it fairly early in the process, right?

12  A.   Yes.

13  Q.   But that data was not made available to you until Professor

14  Hood was given that data; is that right?

15  A.   That's correct.

16  Q.   When you and Professor Hood added passport and military ID

17  data to your analyses, it's true, is it not, that the percentage

18  of voters who lack the requisite currently available

19  identification under Act R54 is lowered across all racial

20  classifications?

21  A.   Well, each racial classification is lower, but the gaps

22  change as well.

23  Q.   So I wanted to talk about some of the dead wood that you

24  were discussing before.

25  A.   Certainly.

1          HON. JOHN D. BATES:  Academic or otherwise?

2          MR. POTENZA:  Academic.

3    BY MR. POTENZA:

4    Q.    Let's talk about registered voters who are in fact deceased

5    for just a minute.  I understand you used the data that was

6    produced from the Department of Health and Environmental Control

7    in your analysis, right?

8    A.    Yes, I did.

9    Q.    But you would agree with me, would you not, that the basis

10   of your and Professor Hood's differing conclusions about racial

11   disparities in the possession of driver's licenses and photo ID

12   cards is not due to his including and your excluding deceased

13   individuals from the data set; isn't that right?

14   A.    I believe I write that in my report, that the disparities

15   are not materially changed after one does take into account that

16   part of the dead wood, yes.

17   Q.    And -- I'm sorry.  So the answer to my question was yes,

18   there's no material difference caused by either the inclusion or

19   the exclusion of those deceased individuals from the analysis,

20   right?

21   A.    In this particular analysis, it did not have an effect.  I

22   wouldn't have known that until I did the procedure.

23   Q.    And with respect to inactive voters, it's true, is it not,

24   that Professor Hood, in his reports, includes tables that depict

25   his results using his methodology including both active and

1    inactive voters?

2    A.   Yes, he does.

3    Q.   And he in fact breaks that out.  He has a table that shows

4    what his results are when he considers only active voters, and

5    then he does other charts that show what his results are when he

6    includes active plus inactive voters, right?

7    A.   It's certainly in my memory from the original report, and

8    if you represented to me that it's true in the other reports, I

9    would certainly accept that.

10   Q.   And you did not do that, right?

11   A.   I did not do what?

12   Q.   In your initial report, you depicted only active voters;

13   you did not show both active and inactive voters in your

14   analysis?

15   A.   I did that because I did not believe that inactive voters

16   would be informative to the case.

17   Q.   Now --

18   A.   But I should also say that there are times when I do

19   comment in passing on the effects of making these decisions,

20   although I don't have a full set of tables, that's correct.

21   Q.   And another piece of what I think you described as dead

22   wood were voters whose driver's licenses had been returned from

23   out of state, right?

24   A.   Correct.

25   Q.   And you remove -- let me back up a second.  Strike that.  I

1    think that you at one time at least had sort of conceptualized

2    your data set as a ledger, with the election commission on one

3    side of the ledger and the DMV on the other side of the ledger;

4    is that right?

5    A.   Well, what I was talking about on the two sides of the

6    ledger were -- I was conceptualizing, it's not literally a

7    ledger.  But we have the voter list on one side, and we have the

8    list of people with licenses, say, or IDs on the other side,

9    yes.

10    Q.   And with respect to voters whose licenses were returned

11    from out of state, under your methodology, you removed the voter

12    altogether from the analysis.  That is, you removed them from

13    both sides of the ledger; is that right?

14    A.   That's correct.

15    Q.   And you did that because you assume that currently

16    registered South Carolina voters who have had their driver's

17    licenses returned to the DMV should be removed from the voter

18    registration list because they have left the state and are

19    therefore no longer eligible to vote in South Carolina, right?

20    A.   Well, I think it's most likely they have left the state,

21    and if one were to make the choice either to include them all in

22    or exclude them all, that the better choice to do would be to

23    exclude them all.  It is more the one, that is, more having left

24    the state, than the other, still in the state.

25    Q.   With respect to that choice, you say that you became aware

1 that you should take into account voters who had returned their

2 licenses from out of state from the undated letter from DMV

3 director Kevin Shwedo to the South Carolina Attorney General's

4 office; isn't that right?

5 A. Well, I first became aware through press accounts, which I

6 am assuming -- I don't know for sure, but I am assuming were

7 generated by that letter, and then I got more specificity when I

8 actually did read the letter when I came in onto the case.

9 Q. When you say more specificity, you mean you read the letter

10 itself?

11 A. I read the letter itself and it had the specific numbers

12 and the analysis, yes.

13 Q. And that letter significantly informed your judgment to

14 exclude voters whose licenses were returned from out of state;

15 isn't that right?

16 A. It did significantly, but it did not exclusively inform it,

17 that's correct.

18 Q. In fact, you considered the letter a strong endorsement of

19 your decision to exclude from your analysis voters whose

20 licenses had been returned from out of state, right?

21 A. I think it is an endorsement and it is a reason to view

22 that choice as being a reasonable one, yes.

23 Q. It's a strong endorsement, right?

24 A. It looks to be a strong endorsement.  I'll take that.

25 Q. But you didn't mention Colonel Shwedo's letter even once in

1    your initial declaration, did you?

2    A.   If that's what you represent -- I believe that's true.   I

3    believe that's true.

4    Q.   And in fact, you didn't discuss the issue of out of state

5    returned licenses in anything but a footnote in your initial

6    declaration; isn't that right?

7    A.   That's true, because I believed that the choice was one

8    that would be made naturally given the entirety of the

9    circumstances.

10   Q.   And then you spent seven pages on it in your rebuttal

11   declaration, right?

12   A.   I did spend more time in the rebuttal declaration, that's

13   true.

14   Q.   That was after Professor Hood had submitted his analysis,

15   right?

16   A.   That's true.  And the reason is that in the initial report

17   I didn't think it would be an issue, and I, with Professor

18   Hood's report, I realized that I did need to articulate the

19   reason more extensively.

20   Q.   Now, I think you mentioned this morning and you mentioned

21   it just now the controversy in the state over this data.  And I

22   think you mentioned an exchange of letters between the DMV and

23   the SEC; is that right?

24   A.   I did mention an exchange of letters, but probably what I

25   should have said was just an exchange between the two.

1    Q.   Because if it were an exchange of letters, you in fact only

2    reviewed the DMV letter.  You never actually considered the

3    election commission side of that exchange, did you?

4    A.   So what I considered, what I knew of was the press

5    reporting in the late months of last year, and I did read the

6    letter that was introduced this year.  That's correct.

7    Q.   That is the letter from the DMV?

8    A.   From the DMV.

9    Q.   But in the context of this case, you didn't read any of the

10   other parts of the exchange; that is, letters that might have

11   been sent from, say, the executive director of the election

12   commission, concerning whether out of state -- voters whose

13   licenses are returned from out of state should or should not be

14   included in a matching analysis; isn't that right?

15   A.   I did not read those letters.  That is correct.

16   Q.   And so you don't know whether the executive director of the

17   election commission agreed or disagreed with Director Shwedo's

18   assessment of the South Carolina voter rolls and who should and

19   should not be on them.  Isn't that right?

20   A.   I'm sorry.  Could you just repeat the question?

21   Q.   Sure.  Do you know whether the executive director of the

22   election commission agreed with the DMV director's assessment of

23   which voters should be excluded from the South Carolina voter

24   rolls?

25   A.   I didn't read and I didn't take that into account, and at

1    some point the opinions of neither party is dispositive in the

2    case.

3    Q.   Okay.  But you didn't even consider whether the election

4    commission might have said the fact remains that these

5    individuals are registered voters under state law and they

6    cannot be verified as having a current valid DMV credential,

7    right?

8    A.   Well, again, keep in mind that my job was not to produce a

9    list of registered voters.  Rather, my job was to consider the

10   likely behavior of voters, which was drawn from the registered

11   voter list.  So I understand the point.  I am not suggesting

12   that this is in fact the list of registered voters; I'm

13   suggesting this is a set of registered voters who are most

14   informative to the analytical question at hand.

15   Q.   Okay.  With respect to the behavior, then, of these voters

16   whose licenses are returned from out of state, let me show you

17   an excerpt from your rebuttal declaration.  This is U.S. Exhibit

18   106, table No. 3.

19        I'm correct, am I not, that this exhibit shows that

20   thousands, maybe tens of thousands of registered South Carolina

21   voters whose licenses were returned from out of state in fact

22   voted in a 2008 general election and the 2010 general election;

23   is that right?

24   A.   So this is the table that I produced in my rebuttal report

25   to document the lower political participation of folks who had

1   had their license returned from out of state, and just as people

2   who are on the inactive list had voted in these elections in the

3   past, it's also the case that folks who had had their licenses

4   returned from out of state also had voted in elections in the

5   past, but also they had voted at significantly lower rates than

6   other active voters.

7   Q.   They voted at significantly lower rates, but they still

8   voted and you excluded them from your analysis, right?

9   A.   Well, they did still vote, and again, keep in mind that the

10  idea was that I'm trying to create a data set of voters who are

11  the most likely to fall under the provisions of the new law, and

12  given the constraints of the analysis, I needed to decide at

13  this point whether one would exclude these voters because they

14  were most likely out of state, exclude all of them, or include

15  all of them, and on net, the better choice was to exclude all of

16  them because it's clear to me that most of them are no longer

17  active voters in the state.

18  Q.   Now, a person can have more than one DMV-issued form of

19  identification, right?

20  A.   Yes, they can.

21  Q.   And when you exclude the voter from the analysis because

22  one of their licenses has been returned from out of state, you

23  didn't take into account whether that voter might have had

24  another form of valid and current identification issued by the

25  DMV, did you?

1    A.   As I recall, if you -- as I recall, you were removed if

2    you -- let me do recall that.   Right.   You were removed, as I

3    recall, if your most recent license had been removed because it

4    had been returned from out of state.   I believe that's right.

5    Q.   Without regard to whether they might have another form of

6    ID that remained valid and current?

7    A.   I'm trying to think about that, and at the moment without

8    looking at the source code, I can't -- I don't know the answer

9    to that.   A very small fraction of people had more than one

10   license in the database, or more than one form of ID as well.

11   Q.   Now, you would agree with me, would you not, that voters

12   whose licenses are returned from out of state are affected by

13   Act R54, right?

14   A.   To the degree that for those who -- those, for instance,

15   folks that we used to call growing up in Florida snowbirds, who

16   may have gotten, say, their other license maybe in New York and

17   had to surrender it, although they considered themselves to be

18   residents of South Carolina, if they wanted to go and vote in

19   South Carolina, then they would be affected.   Again, on net,

20   that's going to be a relatively -- that's not going to be the

21   majority of these folks, and I think in doing the analysis that

22   I was running, that is not a major issue.

23   Q.   And in doing the analysis that you were running, though, by

24   excluding these registered voters, you in fact -- when you

25   excluded registered voters whose licenses had been returned from

1    out of state, you excluded registered voters who are much more

2    likely to be white; isn't that right?

3    A.   Well, indeed, and I document that in the report.  It looks

4    like snowbirds are -- well, I won't characterize them that way.

5    It does look like the folks who had them returned from out of

6    state are disproportionately white.  That is true and is

7    recounted in the reports, yes.

8    Q.   Now, another piece of dead wood that you addressed were

9    other returned licenses; that is, you removed licenses that were

10   suspended or revoked, I think you said this morning.

11   A.   I did remove them.  I didn't remove them because I

12   considered that to be dead wood.  I removed them because I

13   considered those licenses to be unavailable to whoever might

14   have them in order to present in order to vote.

15   Q.   Thank you.  And those are the licenses, I think you used

16   the license received table when you did that analysis?

17   A.   Yes.

18   Q.   That's right?

19   A.   Yes.

20   Q.   And when I say table, we're talking about sort of a massive

21   database, and it's a relational database, right?

22   A.   That's correct.

23   Q.   So it includes multiple tables, and there's information

24   about DMV customers that spans those multiple tables, right?

25   A.   That's correct.

1   Q.   And so you focused on the license received table in this

2   analysis that you did in deciding to remove licenses that you

3   thought were suspended or revoked, right?

4   A.   I did use that table, yes.

5   Q.   And there's another table in the DMV database called the

6   license table, right?

7   A.   That is correct.

8   Q.   And that table indicates whether a license is active or

9   surrendered; isn't that right?

10  A.   Sitting here, I have not memorized all of the fields that

11  are in that table.  If you represent that, I would accept that,

12  but I'm not familiar with that field.

13  Q.   Okay.  This is United States Exhibit 290.  The first page

14  of it at JAUS 602.  I think if you look at -- well, number 7,

15  there's your license received, right, and number 4, that's the

16  license table; is that right?

17  A.   That is correct.

18  Q.   And then at the end of that, number 4 says "key fields

19  used," "license status, 01 equals active, 00 equals canceled,"

20  and "expiration date"?

21  A.   Correct.

22  Q.   Right.  You made use of that table during your analysis,

23  didn't you?

24  A.   Yes, I did.

25  Q.   And Professor Hood made use of that table during his

1    analysis; isn't that right?

2    A.    I believe so, yes.

3    Q.    Now, from the license received table or another table in

4    the database you developed a set of reasons why DMV customers'

5    licenses were suspended or revoked; isn't that right?

6    A.    There is a variable on the license received table to talk

7    about that, yes.

8    Q.    Do you recognize this as attachment B to your rebuttal

9    report?

10   A.    Yes, it is.

11   Q.    And this -- what does this table depict?

12   A.    Well, there is a variable in the license received table

13   that describes why the licenses have been returned to the state,

14   and this is the different codes that -- these are the different

15   definitions of the codes that are associated with the different

16   reasons.

17   Q.    And it looks like there are -- was it 2.1 million licenses?

18   A.    2.1 million licenses that are reflected in that particular

19   table, across a long period of time.

20   Q.    And you did not do any independent analysis to determine

21   whether these 2.1 million licenses that you excluded from your

22   study in this case were physically in the possession of the

23   licensee, did you?

24   A.    Like I said, the investigation that I did relied on the

25   documentation that had been given to me by the state, which

1   described this table and the licenses on it, and so I took the

2   documentation presented to me by the state as being accurate.

3   Q.   When you say documentation, are you referring to that page

4   that we were just looking at a moment ago?

5   A.   That was one of the pages.  There were two documents that

6   described both tables and then the fields within the tables.

7   Q.   Okay.  So with respect to these reasons why you say

8   licenses were suspended or revoked, you see the OOS, license

9   exchange for SC license, and then SC license returned from OOS

10  about a third of the way down.  Those are the out of state

11  licenses; is that right?

12  A.   Yes.

13  Q.   And for those you didn't just exclude the license, you

14  excluded the voter altogether, so those aren't part of this

15  analysis?

16  A.   Eventually they get excluded, as I say, on both sides of

17  the ledger.

18  Q.   Both sides of the ledger, right.  But for the rest of them

19  we're just talking about excluding licenses from your analysis,

20  right?

21  A.   Right.  And by the way, one of the things I need to make

22  clear so there's no confusion, there's 2.1 million records in

23  the table, but this doesn't indicate that there's 2.1 million

24  licenses currently in South Carolina that are being described.

25  It's 2.1 million licenses across the history of the -- the

1    entire history of the database, which goes back many, many

2    years.

3    Q.   And with respect to these various reasons why a license

4    might appear on the table, there's one called reinstatement met.

5    Is it your understanding that the 24.6 percent of the licenses

6    for which reinstatement is met, that those are no longer in the

7    possession of the voter?

8    A.   Well, again, the data set records the date on which the

9    license is sent back to the state of South Carolina.

10   Q.   Does it also record the date when the reinstatement is met?

11   A.   As I recall, it does not.

12   Q.   But you excluded it anyway from your analysis.

13   A.   Yes, because it -- yes, I did.

14   Q.   Because at one time reinstatement was not met.

15   A.   Well, again, this is a license that had been had returned

16   to the state of South Carolina, and I had the date on which it

17   was returned, and if it's still out there -- well, and this

18   suggests it's still not out there.

19   Q.   Does it suggest to you that it's still not out there or

20   that reinstatement was met so that the South Carolina voter

21   actually has the license?

22   A.   Well, this says reinstatement was met.  That is something

23   that one could investigate, but from the data I had on the

24   table, the implication was that it had been returned to the

25   state.

1    Q.   You didn't investigate that, right?

2    A.   I did not.  I did not engage in further investigation to

3    see that, no.

4    Q.   And what about "another SC license issued"?  Do you know

5    whether licenses, where the reason code is "another SC license

6    issued" is or is not in the possession of the voter?

7    A.   Could you point out about roughly where that is on the

8    table?

9    Q.   Sure.  Just above that blue line.

10   A.   Second to last reason, "another SC license issued"?  Which

11   is 3.7 percent of the -- well, if this was one of the 3.7

12   percent of those licenses, those would have been removed as

13   well, yes.

14   Q.   All the licenses on this table are removed even though you

15   don't know whether they are in the possession of the voter or

16   not.

17   A.   As I say, I relied on the descriptions, and I relied on the

18   recording that these licenses had been returned back to the

19   state.

20   Q.   And according to your analysis, by excluding the licenses

21   that are in this database, you increase the racial disparity in

22   the analysis; isn't that right?

23   A.   Well, either I -- well, either I increase or Professor Hood

24   decreases.  As I document in the rebuttal testimony -- I mean my

25   rebuttal report, there are consequences to all of these actions,

1    and I note that if you were to remove these licenses from the

2    analysis, the disparity increases, and if you include them, the

3    disparity falls.

4              HON. JOHN D. BATES:  Does it vary significantly, by

5    removing them or including them in the analysis?  Just saying

6    that it increases or decreases doesn't tell me much.  How much

7    does it matter?

8              THE WITNESS:  Well, I don't have the table directly in

9    front of me, so without the relevant table directly in front of

10   me, but there is one in the rebuttal report.  And off the top of

11   my head, the out of state movers increases the disparities by

12   about 2.2 percentage points.  This issue that we're talking

13   about, if you were to exclude these licenses, would increase the

14   disparity between African Americans and whites as I recall by

15   about 2.7 percentage points.  So it does increase it, but if

16   you'll recall what the total disparity is, it doesn't get you

17   all the way to what the total disparity is, but I would say this

18   accounts for something like a third to one half of that

19   difference.  Those numbers are in fact in the report.

20   BY MR. POTENZA:

21   Q.   And you characterize in your rebuttal report the difference

22   between yours and Professor Hood's analysis when you use --

23   accounting for either one of these two changes that we've just

24   been discussing, either excluding the licenses that were

25   supposedly suspended, or excluding the voters for whom the

1    license had been returned from out of state.  I think I put

2    paragraph 43 up.  You say that the racial disparities will be

3    significantly affected by how one deals with returned licenses,

4    right?

5    A.   Yes.  I wrote that.

6    Q.   Now, I think you testified earlier -- oh, just one more

7    thing.  You never spoke with anyone at the DMV about the data on

8    these tables that you used in your analysis; isn't that right?

9    A.   I did not interview folks at the DMV about this directly,

10    no.

11    Q.   And you didn't read any deposition testimony about how the

12    DMV uses its databases and whether one should be looking at that

13    license table that we spoke about before, where on that document

14    you had -- you didn't talk to them about those documents either;

15    isn't that right?

16    A.   When you're talking about documents, are you referring --

17    Q.   The documents you cite in your report.

18    A.   You mean the letters?

19    Q.   No, I'm sorry.  The descriptions of the data fields?

20    A.   I did not talk to them directly about those documents, no.

21    Q.   Dr. Stewart, I think you testified earlier that registered

22    voters who currently lack the currently available forms of Act

23    R54 ID have already expressed a preference for voting and not

24    possessing a driver's license or similar government-issued

25    identification card; is that right?

1    A.    That's correct.

2    Q.    And I think you said either earlier today or in one of your

3    declarations that requiring these registered voters to possess a

4    driver's license or similar government-issued identification

5    card is by definition a burden on them by the principle of

6    revealed preferences; is that right?

7    A.    That's correct.

8    Q.    But it's true, is it not, that voters' attitudes about

9    voter identification can affect their preferences?

10   A.    Well, of course their attitudes can affect their

11   preferences, certainly.

12   Q.    But you didn't analyze voter attitudes about voter

13   identification requirements in this case, right?

14   A.    In this report we did not -- no, I did not do that.

15   Q.    But you have studied voter opinions about election reform

16   outside the context of this case, have you not?

17   A.    I have studied public opinion, and I've asked questions

18   about whether people favor generically government ID, being

19   required to show a government ID in order to vote, yes.

20   Q.    You published an article last year with Professors Alvarez,

21   Hall, and Levin entitled "Voter Opinion and Election Reform,"

22   right?

23   A.    Yes, I did.

24   Q.    That was published in the Election Law Journal?

25   A.    Yes, it was.

1  Q.   And the Election Law Journal is a reliable journal, is it
2  not?
3  A.   Yes, it is.
4  Q.   This is Plaintiffs' 137.  Is this the article that we were
5  just discussing?
6  A.   That is.
7  Q.   And this article discusses voter opinions about election
8  reform following the 2008 presidential election; isn't that
9  right?
10 A.   That is the subject of this article, yes.
11 Q.   And in this article, you found that a majority of Americans
12 support two reforms: requiring showing photo identification,
13 overwhelming support; and making election day a holiday, a bare
14 majority support.  And these two reforms have strong support
15 nationally and in most of the states.  Is that right?
16 A.   Showed that a majority of Americans favored these two
17 reforms, yes.
18 Q.   Yes, that's right.  And you also concluded in this paper
19 that it's striking that a majority of Obama supporters, strong
20 liberals and Democrats remain supportive of a requirement to
21 show a government-issued piece of photo identification in order
22 to vote; is that right?
23 A.   Well, again, yes, in favor of a generic requirement at a
24 time in our political history before this issue had become
25 politicized, yes.

1   Q.   And at that time that you studied in this report, that is

2   following the 2008 general election, you also found that 78

3   percent of South Carolinians surveyed said they support a

4   requirement to show government-issued photo identification to

5   vote; isn't that right?

6   A.   Well, I don't recall the 78 percent, but if you represent

7   it, I'll believe you.

8   Q.   Well, here.  Let's take a look.  And this is JASC 1198.

9   This is the column with required ID, right, under South

10  Carolina?

11  A.   Yes.  The one that says "required ID" right there.

12  Q.   Thank you.  And so, did I read that correctly that

13  following the 2008 presidential election, that 78 percent of

14  South Carolinians who responded to your survey favored a

15  requirement to show government-issued photo identification?

16  A.   Stated generically, yes, they did.

17  Q.   And when you say stated generically, you mean stated just

18  the way I that just said it, to show government-issued photo

19  identification.

20  A.   Yes.

21  Q.   And in this report, you also -- in this paper you also

22  reported that you had determined that 74 percent of black voters

23  surveyed said that they support requiring all people to show

24  government-issued photo identification when they vote; isn't

25  that right?

```
 1    A.    Well, again, I haven't memorized all the numbers in the

 2    paper, but I wouldn't deny that if that's what you represent.

 3    Q.    So, Dr. Stewart, did I read that table correctly that 74

 4    percent of black voters surveyed said they support requiring all

 5    people to show government issued photo identification when they

 6    vote?

 7    A.    Well, yes.

 8    Q.    Now, there is a way to study whether voter preferences have

 9    changed at least after the implementation of Act R54; isn't that

10    right?

11    A.    Well, one could -- presumably, and I will actually, if it

12    were precleared, I would do that.  I'm engaged in doing ongoing

13    public opinion work in this area, so I will be asking the same

14    question, I anticipate, in 2012.

15    Q.    Been retained already?

16    A.    Pardon me?

17    Q.    Withdrawn.

18    A.    I'm doing the survey again.

19    Q.    But you can't do that now because the law is not yet

20    implemented, right?

21    A.    Correct.  But I can do the survey now.

22    Q.    Dr. Stewart, I think you also talked this morning about

23    mitigating provisions in Act R54; isn't that right?

24    A.    Yes.

25    Q.    You do not account in your analysis for photo voter
```

1    registration cards, right?

2    A.   Well, photo voter registration cards, as you know, have not

3    been issued, that's correct.

4    Q.   And when you were writing your reports, you were not in

5    possession of any of the election commission's plans for

6    implementing the photo ID card requirement or any other

7    provision of Act R54; isn't that right?

8    A.   That's right, when I was writing the reports.

9    Q.   Either one of the reports, the rebuttal or the initial

10   declaration?

11   A.   That's correct.

12   Q.   You hadn't read them, you hadn't considered them?

13   A.   Well, I had not read -- I had not -- excuse me.  I had not

14   read anything produced by the state about their plans for those

15   cards.

16   Q.   And when you were preparing your report, you were only

17   responding to the statute as enacted without considering how it

18   was going to be implemented, right?

19   A.   Well, again, yes.  I was asked to -- the way that I've been

20   describing it is that if the law were precleared and you were to

21   basically raise the gate, what would the situation be on day one

22   or even on day zero, right before that happened.

23   Q.   So you offered no opinions about anything specific about

24   the State Election Commission programs, right?

25   A.   In my reports I offer general conclusions but nothing

1    specific about the specific aspects of the plan, right.

2    Q.    I'm sorry, I thought you said you hadn't read the plan, you

3    hadn't read the election commission's plan?

4    A.    Correct.

5    Q.    So when you say you offer general conclusions, you offer

6    general conclusions about the statute without considering how

7    the statute was going to be implemented, right?

8    A.    I think that's fair, yes.

9    Q.    Now, in fact, it's your opinion that any voter who gets a

10   free photo registration card will be burdened regardless of what

11   happens with respect to implementation; isn't that right?

12   A.    Well, just stated that way, of course -- I mean, of course,

13   because right now they are mailed a registration card that

14   doesn't have a photo on it, so they will need to go and get one,

15   whereas previously the state just sent it to them, although

16   naturally it didn't have the photo on it.

17   Q.    So in your opinion, it doesn't matter with respect to

18   evaluating the burdens whether the photo voter registration card

19   is available at all; isn't that right?

20   A.    Well, again, the analysis I was running was imagine that

21   you preclear and you start winding history forward, you know, on

22   day one, what is the situation that everybody is facing, dealing

23   with whatever the programs are that had been put in place by the

24   state.

25        So my analysis did indeed consider, kind of hypothetically,

1    right on the precipice of implementation, but not the details of

2    implementation.

3    Q.    Well, did you consider right on the precipice of

4    implementation the reasonable impediment exception and how that

5    would be implemented on day one and whether that would affect

6    the burden?

7    A.    Well, I knew it was available, but I had no way of

8    estimating precisely what the implications would be.

9    Q.    It's the same with respect to the education program in Act

10   R54; you didn't read what the election commission's education

11   program was going to be, and so you didn't form any opinion

12   about what the day one implementation of Act R54 would look like

13   after an education program?

14   A.    Well, of course I did not form any opinions about what the

15   education program would look like, that's right.

16   Q.    Now, I think you said this morning that your table No. 11

17   in your rebuttal report portrays your conclusions about the

18   impact of complying with the requirements of the law; isn't that

19   right?

20   A.    I would say that this quantifies the racial disparities in

21   the possession of the requisite IDs.

22   Q.    Did you not describe it as portraying the impact of

23   complying with the requirements of the law?

24   A.    I don't recall saying that.  I think if I did say that, I

25   think a more accurate thing for me to have said is that it

1   describes the racial disparities currently in the possession of

2   the law, and it helps to inform our understanding of the impact

3   of the implementation of the law.

4   Q.   But it did not inform your understanding of the impact of

5   the implementation of the law because you didn't consider how

6   the law was going to be implemented, right?

7   A.   Well, I did not consider the details of the implementation.

8   My consideration was to -- my analysis and my conclusions are of

9   a general nature and are simply reflective of what I know the

10  characteristics of the voters who need to comply, and whatever

11  the program is and whatever the details are, the likelihood that

12  the implementation would successfully reduce differences between

13  the races.

14          HON. COLLEEN KOLLAR-KOTELLY:  Can I just ask, you did

15  your rebuttal report before August 14.  Did you receive any

16  material after August 14, say from the intervenors or the

17  Department of Justice, relating to purported implementation?

18          THE WITNESS:  Right.  So around the time I did my

19  deposition in -- actually after the deposition I was provided a

20  packet of material that had been provided in the case by the

21  state which described as of that date -- so this would have been

22  a couple of weeks ago -- plans by the state for implementation.

23  I reviewed that.  It had some posters and postcards which

24  described in my view in a general way what they were going to

25  do.

1        HON. COLLEEN KOLLAR-KOTELLY:  Did that material in any

2   way change your opinion one way or the other?

3        THE WITNESS:  I would say that the opinions I

4   expressed earlier today about the likely results of

5   implementation were formed when I looked at that material, and

6   it seemed to me to be pretty generic.  And so it struck me that

7   rather than focus on any particular aspects of that material, I

8   would stay focused on overcoming the resource barriers, that if

9   one wanted to judge these materials, one should just judge them

10  as generic materials.  There will be posters.  What do you think

11  the result of having posters up will be?  There will be

12  postcards of this sort.  What do you think generically the

13  results would be?  So that was the basis of my opinion earlier

14  today, seeing those materials that seemed to be pretty generic

15  and general.

16       HON. COLLEEN KOLLAR-KOTELLY:  Thank you.

17  BY MR. POTENZA:

18  Q.   And Professor Stewart, those materials you considered, are

19  those materials you received just before your deposition in this

20  case?

21  A.   I believe I may have received them after my deposition in

22  the case.  I believe.  If I said in the deposition that I had

23  received them beforehand, then I did receive them beforehand.

24  Q.   But did you receive procedures more than once or --

25  A.   I only received them once, so if I said in my deposition I

1    had received them before, I did.  It was all around that time.

2    The important thing I think here is that it wasn't reflected in

3    my writing, but the material is reflective of my testimony

4    today.

5    Q.   So if you had received any materials after your

6    deposition -- if there were any changes to the election

7    commission's plans to implement Act R54 after the date of your

8    deposition, then you wouldn't have considered them; is that

9    right?

10   A.   I'll tell you what I know.  I know the materials I've

11   considered, and then I was in this courtroom for a small amount

12   of Ms. Andino's testimony when a postcard was flashed on the

13   screen and there was discussion about the postcard and whatever

14   was being discussed about that time.  That's what I know from

15   direct evidence.

16   Q.   Just a couple more questions for you, Professor.  This is

17   an e-mail, I think, that you cite in your report.  I was

18   flattered to be cited, but I just wanted to ask, in the second

19   bullet point right here --

20            HON. JOHN D. BATES:  Can you identify it?  Is this an

21   exhibit?

22            MR. POTENZA:  I don't think this is an exhibit.

23            HON. JOHN D. BATES:  Then what are we doing with it?

24            MR. POTENZA:  That's a good point.  I'll withdraw that

25   line of questions.

1    BY MR. POTENZA:

2    Q.    Let me ask just one final question, then.  Professor

3    Stewart, I think you said these are your summary of your

4    conclusions from both your initial declaration and your rebuttal

5    declaration, right?

6    A.    That's correct.

7    Q.    In conclusion No. 1, given that you did not consider the --

8    given that you did not consider the photo voter registration

9    card because it is not currently available, wouldn't a more

10   accurate way to state this conclusion be that minority voters in

11   South Carolina are significantly less likely than white voters

12   to possess one of the forms of currently available Act R54

13   identification?

14   A.    If I wanted to go into an extra line, that would be more --

15   that would be more accurate.  I did not consider the effect of a

16   nonexistent form of ID.

17   Q.    And in fact, it would be more accurate to say minority

18   voters in South Carolina are currently significantly less likely

19   than white voters to possess one of the forms of currently

20   available Act R54 identification, right?

21   A.    Well, the most accurate would be as of the date that the

22   data sets were created.  But like I say, that's currently true.

23   Q.    And the same is true of conclusion No. 2; isn't that right?

24   A.    The same thing I just said.

25   Q.    Thank you very much, Dr. Stewart.

1    A.   Thank you.

2          HON. COLLEEN KOLLAR-KOTELLY:  Can I just ask a

3    question going back to something else?  In terms of the data

4    regarding the race of the individuals, did you use any data

5    regarding race from DMV?  I believe that in a couple -- there

6    were some instances of unknown from the voter registration as to

7    the race, but DMV also had race.  Did you leave it as unknown,

8    or did you take it from the DMV?

9          THE WITNESS:  You know, I decided to leave it as

10   unknown.  There seemed to be such a small number.  This is

11   where, you know, the principle of parsimony in the social

12   sciences I think won.  Just leave it alone and let it be.  So

13   it's whatever -- the racial categories in my report are taken

14   entirely from the voter list.

15         MR. POTENZA:  Thank you.

16                          EXAMINATION

17   BY MR. SELLS:

18   Q.   Good afternoon, Professor Stewart.

19   A.   Good afternoon.

20   Q.   I want to follow up just I think on one line of questioning

21   from Mr. Potenza, and that involves the people that you had

22   determined had likely moved out of state -- no, excuse me.

23   These were the returned licenses, not the movers, the returned

24   licenses.  Do you recall that discussion with Mr. Potenza?

25   A.   Yes, I do.

1    Q.    Okay.  And Mr. Potenza showed you Exhibit 290 on the

2    screen.  Do you recall that exhibit?

3    A.    I recall that.

4    Q.    Okay.  Let's see if we can get Exhibit 290 on the laptop,

5    Ms. Miller.  Thank you.

6         And this is page 10, for the record, of that exhibit.  Do

7    you see the license received table there?

8    A.    Yes, and so I am noting where that is.

9    Q.    Okay.  And the second column here, what does that

10   represent?

11   A.    Well, those are the license fields that are in the table

12   that we were talking about.

13   Q.    Those are the fields in the table.  And what does this

14   column on the right, the right-most column, represent?

15   A.    Well, these are comments provided by the state to describe

16   more fully what the more -- the shorter, you know, variable

17   names that we would call them, what those variables mean with a

18   little more specificity.

19   Q.    Okay.  And in deciding to remove the returned licenses, was

20   there a field in particular that you examined?

21   A.    Well, the field that I -- could you ask the question again,

22   please?

23   Q.    Sure.  In deciding to remove the returned licenses, was

24   there a field in here that was particularly important to you?

25   A.    Well, if by that you mean if there is a field that was

1    particularly informative -- important to me in informing my

2    understanding of the data in the table --

3    Q.   Professor, what I mean is in deciding to remove these

4    people.

5    A.   Right.  In deciding to remove these people, the receive

6    reason code, where it states here, reason that driver's license

7    was received.  The valid values are stored in the code received

8    reason table.  And then furthermore, there is, again, the return

9    due date, and the return actual dates all together were

10   informative of the decision.

11   Q.   And what is the description for the return actual date

12   field?

13   A.   This is the date when the DL, driver's license, was

14   actually received at DMV.

15   Q.   And you relied on that description, correct?

16   A.   Yes, I did.

17   Q.   What did that description tell you about whether the

18   license that you removed from the DMV database was in the

19   possession of the voter?

20   A.   This tells me it is not in the possession of the voter.

21   Q.   Okay.  Now, if you remove that license from the DMV

22   database as you described, but that voter or that person on the

23   DMV database had another license that was maybe issued later,

24   more recently, how would that have been incorporated into your

25   analysis?

1   A.   Well, what I do, and I do describe this in my report, is I

2   want to make sure that we're talking about a specific license,

3   because as you say, people can have different licenses, you can

4   have an operator -- driver's license and a moped license or one

5   of the free IDs, et cetera.  So I wanted to make sure that we

6   were talking about the license that had been suspended.

7        So there are other fields here, such as the license

8   function field, license type, that I also used in order to try

9   to really drill down into the specific license that might be in

10  question here.

11       Normally, in the matching that I did using this table, I

12  would just go for the generic license number, but here I wanted

13  to drill down.  As well -- no.  That's fine.

14  Q.   Well, my question to you, though, was what if someone had

15  another form of license in the database somewhere that was more

16  recent than the one that had been returned?

17  A.   That one should be reflected in the analysis that I did.

18  Q.   And so if the voter had the same Social Security number and

19  there was a match there, that person would have in fact been a

20  match?

21  A.   Along with gender, yes.

22  Q.   Okay.  So if I'm a South Carolina driver and my license is

23  revoked and I turn it in to the state, I would show up on this

24  return -- or license received table, or that license would show

25  up on that license received table, correct?

1   A.   Yes.

2   Q.   Okay.  And if I then got another license -- in other words,

3   my license was reinstated or my driving privileges were

4   reinstated, and assume that I got another license, I would still

5   be in your database somewhere.

6   A.   That's my understanding, yes.

7   Q.   And if I were a registered voter I would match?

8   A.   Yes.

9        MR. SELLS:  I have no other questions.

10       HON. COLLEEN KOLLAR-KOTELLY:  All right.  You're

11   excused.  Thank you.

12       THE WITNESS:  Thank you.

13       HON. JOHN D. BATES:  Thank you.

14     (The witness steps down.)

15       MR. HEARD:  All right, Your Honors, at this time I

16   believe the United States rests.

17       HON. COLLEEN KOLLAR-KOTELLY:  All right.  South

18   Carolina has 11 minutes.  Short and sweet.  And you have an hour

19   and 38 minutes from the United States that is left.

20       MR. COATES:  Chris Coates for the state again, and we

21   call Dr. Scott Buchanan.

22       HON. JOHN D. BATES:  Let me make a request that

23   neither counsel nor the witness, because there are 11 minutes

24   remaining of your time, penalize the court reporter by speaking

25   very rapidly.

1       MR. COATES:  All right, sir.

2       **SCOTT E. BUCHANAN, WITNESS FOR THE PLAINTIFFS, SWORN**

3                          EXAMINATION

4    BY MR. COATES:

5    Q.   Would you state your full name for the record, please, sir.

6    A.   Scott Eugene Buchanan.

7    Q.   Where do you reside?

8    A.   Summerville, South Carolina.

9    Q.   Do you teach at the Citadel?

10   A.   I do.

11   Q.   Which subjects do you teach?

12   A.   I teach political science, specifically topics on American

13   politics, Southern politics, state and local government.

14   Q.   Let me show you what's been previously marked as

15   Plaintiffs' Exhibit 52 and ask if you can identify that

16   document.

17   A.   That is the rebuttal report that I submitted to the Court.

18   Q.   What were you asked to do in this case?

19   A.   I was asked to investigate the opinions put forward by

20   Drs. Burton and Arrington, and if I had disagreements with that,

21   to serve as a rebuttal witness in this case.

22   Q.   Okay.  And did you assert any opinions yourself --

23   A.   I did.

24   Q.   -- in your report?

25   A.   I did.

1    Q.    How many opinions did you assert?

2    A.    A total of seven if memory serves.

3    Q.    On what page of the rebuttal report are those opinions

4    outlined?

5    A.    Let me look.  I don't remember the page number.  That would

6    be on page 3 of the rebuttal report.

7    Q.    Did you look at the subject of voter registration

8    particularly among African Americans in forming your rebuttal

9    opinion?

10   A.    I did.

11   Q.    And briefly what did that survey indicate?

12   A.    Very briefly, I found that the registration among black

13   South Carolinians has increased dramatically since the

14   implementation of the Voting Rights Act.  Just to give one sense

15   of that, in 1968, the first year that racial registration data

16   is available from the state, approximately 54 percent of African

17   Americans were registered to vote in South Carolina.  Today,

18   that number is 82 percent, at least as of June of this year.

19   Q.    Okay.  In forming your rebuttal opinion in this case, did

20   you also look at the area of voter turnout?

21   A.    I did.

22   Q.    What did that inquiry show?

23   A.    Again, similar, that the turnout among African Americans

24   has gone up quite dramatically.  1972 presidential election, the

25   first presidential election that that data is available, 59

1   percent turnout statewide.  That figure, I believe, in 2008 was

2   76 percent.

3   Q.   And how does that compare with white turnout in 2008?

4   A.   White turnout in 2008 was 75 percent.

5   Q.   And how does the present rate of African American

6   registration compare with white rates of registration in South

7   Carolina today?

8   A.   Currently the black registration rate is approximately 82

9   percent, and 78 percent among white South Carolinians.

10  Q.   Did you have an opportunity in your study to look at the

11  number of African American elected officials in South Carolina?

12  A.   I did.

13  Q.   And could you tell me which offices you looked at -- or let

14  me ask you, did you look at the congressional elections?

15  A.   I did.  There are currently six congressmen in South

16  Carolina.  Two of the six, or 33 percent, of the congressional

17  delegation are African American members.  One is Democrat Jim

18  Clyburn, and the other is Republican Tim Scott.

19  Q.   And what is your understanding of the -- according to the

20  2010 census, the black percent of population in South Carolina?

21  A.   Approximately 28 percent.

22  Q.   Okay.  And 33 percent of the elected congressional members

23  are African American?

24  A.   That is correct.

25  Q.   Did you look at the figures for black elected officials in

1    the General Assembly?

2    A.    I did.

3    Q.    How many members are there in the House and Senate?

4    A.    Combined across the House and Senate, 38 African American

5    members.

6    Q.    Out of how many?

7    A.    170.

8    Q.    So 21 percent of the members presently are African

9    American?

10   A.    Approximately 21 percent.

11   Q.    Did you look at school boards that are elected in South

12   Carolina?

13   A.    I did.

14   Q.    And how many school board members are there in South

15   Carolina?

16   A.    I remember the percentage is approximately 38 percent of

17   all school board seats in South Carolina are occupied by African

18   American members.

19   Q.    And are the superintendents of schools elected in every

20   South Carolina jurisdiction except for one?

21   A.    Yes.

22   Q.    And how many black persons serve presently as school

23   superintendent in South Carolina?

24   A.    The percentage is 25 percent.

25   Q.    Did you also look at sheriff?

1   A.   Yes, I did.  It's approximately 26 percent of the

2   sheriffs -- or exactly 26 percent.

3   Q.   Sheriff is an elected position in South Carolina?

4   A.   Yes, countywide.

5   Q.   Did you do any study that set forward -- in your rebuttal

6   report that compares turnout rates in 10 specific South Carolina

7   counties that have very different socioeconomic conditions?

8   A.   I did.  I compared the five wealthiest counties and the

9   five poorest counties to get a sense of the socioeconomic factor

10   and what that may be doing.  And basically in 2008, if you

11   looked at the average turnout among the five poorest counties of

12   the state, and you look at the African American turnout, it was

13   approximately 77 percent.

14        If you looked at the white turnout in the five wealthiest

15   counties, it's 76 percent.

16   Q.   So you were looking at specific counties recently in South

17   Carolina, your turnout rates -- and let me ask you, do your

18   turnout rates that you found tend to be in conflict with the

19   general social science notion that where there's low

20   socioeconomic conditions, there will be low voter turnout?

21   A.   Yes.  As has been mentioned here today, lower socioeconomic

22   status usually leads to depressed turnout, but at least in this

23   particular election in those counties, I found that that was --

24   the opposite case.

25   Q.   Now, what did you find in elections in those counties and

1    turnouts in elections other than 2008?

2    A.    In 2010, among these same counties, the white turnout in

3    the wealthiest counties was approximately 54 percent -- 53

4    percent, I believe, and 48 percent in the poorest counties,

5    African American turnout, and again, that's a much closer margin

6    than any of the previous years that I examined.

7    Q.    Based upon your investigation in this case, what, if any,

8    conclusion did you reach concerning Dr. Burton and

9    Dr. Arrington's opinion concerning the issue of whether racial

10   intent underlies the enactment of R54?

11              HON. COLLEEN KOLLAR-KOTELLY:  Is there an objection?

12              MR. SELLS:  Your Honor, the United States would like

13   to voir dire Professor Buchanan before he starts offering expert

14   opinions, of course on the United States' time, not South

15   Carolina's time.  As the Court may be aware, Professor

16   Buchanan's deposition came after the motion *in limine* deadline.

17   His qualifications have not been subject to review, so we would

18   like to ask for a few minutes of voir dire.

19              HON. COLLEEN KOLLAR-KOTELLY:  All right.  I'll allow

20   you to do it.  I'll stop the clock for you and it goes on their

21   clock.

22              MR. COATES:  Very well.

23                        VOIR DIRE EXAMINATION

24   BY MR. SELLS:

25   Q.    Good afternoon, Professor Buchanan.

1   A.   Good afternoon.

2   Q.   It's nice to see you again.

3   A.   And you as well.

4   Q.   I'm Bryan Sells for the United States.  You remember that

5   we met at your deposition on August 16, correct?

6   A.   Yes.

7   Q.   And at that deposition, you admitted that you're not an

8   expert in determining legislative intent; isn't that right?

9   A.   That is correct.

10  Q.   And you don't represent to the Court that you have become

11  an expert in legislative intent in the last two weeks, do you?

12  A.   No.

13  Q.   And at that deposition, you also admitted that you are not

14  an expert in the analysis of voter fraud; isn't that right?

15  A.   That is correct.

16  Q.   And you don't represent to the Court that you're an expert

17  in voter fraud as of today, do you?

18  A.   No.

19  Q.   At your deposition you also testified that you had not read

20  the case called Arlington Heights v. Metropolitan Housing

21  Development Corporation.  Isn't that right?

22  A.   No, I had not read that.

23  Q.   And did the case of the Village of Arlington Heights v.

24  Metropolitan Housing Development Corporation play any role in

25  the formation of your opinions in this case?

1   A.   No.   I was simply rebutting Drs. Burton and Arrington.

2   Q.   And in forming your opinions in this case, you did not read

3   any original documents setting forth the legislative history of

4   Act R54, did you?

5   A.   I did not.

6   Q.   And in fact you did not even read Act R54 itself in the

7   course of forming your opinions in this case, did you, sir?

8   A.   I believe I'd say I did not read it in its entirety.

9        MR. SELLS:   Okay.   Your Honor, the United States

10   objects to Professor Buchanan's opinion testimony in this case.

11   He's admitted that he's not an expert in the two areas in which

12   we believe he's going to offer expert opinions.   And he's

13   clearly not based those opinions on sufficient facts or data if

14   he hasn't read the law, he hasn't read the legislative history,

15   and is not at all familiar with Village of Arlington Heights v.

16   Metropolitan Housing Development Corporation.

17        HON. COLLEEN KOLLAR-KOTELLY:   I think one way of

18   resolving this is, Mr. Coates, what is the field of expertise

19   that you want him to opine about?   In other words, what are you

20   offering him as an expert in?   He's given information that he's

21   looked at various statistics.   What are you -- in terms of

22   voters in these various places, in terms of percentages, but in

23   terms of going any further than that, what are you offering him

24   for?

25        MR. COATES:   We're offering him for the purpose of

1    rebutting --

2           THE COURT:  No.  That's not what I'm asking.

3           HON. JOHN D. BATES:  What subject matter?  What

4    subject matter is he being offered as an expert in?

5           MR. COATES:  Subject matter in Southern politics and

6    elections in South Carolina and in portions of the South, other

7    portions of the South, including Georgia, which he's written

8    extensively on.  We're offering him to testify concerning the

9    socioeconomic conditions of persons in South Carolina and

10   whether or not that has affected their ability to register and

11   vote in elections in South Carolina, and we are offering those

12   expert opinions for the limited purpose -- and his investigation

13   is purposefully limited in this case because we have called him

14   as an expert witness, purposefully limited to rebut the

15   opinions, the ultimate opinions testified to by Drs. Burton and

16   Arrington in this case on the issue of racial intent.  We're

17   offering to show that the bases --

18          HON. JOHN D. BATES:  You don't have to argue your

19   case.  We just wanted the subject matter.

20       (The Court conferring.)

21          HON. JOHN D. BATES:  What we're going to do is not

22   rule on the objection; we're going to go ahead and allow

23   testimony, and if the government wishes to file a written motion

24   asking the Court to strike or not consider the testimony because

25   of the problems in terms of his qualifications that you've

1    identified, then you can file that written motion and South

2    Carolina can respond to it.

3         But we'll go ahead and allow the testimony to be received,

4    and then we can deal with the question of whether it will be

5    considered based on a written motion.

6              MR. SELLS:  Thank you, Your Honor.

7              HON. COLLEEN KOLLAR-KOTELLY:  And I will say to you

8    that you only have a few minutes left.

9              MR. COATES:  Three minutes?

10             HON. COLLEEN KOLLAR-KOTELLY:  A few.

11             MR. COATES:  A few.  Okay.  Thank you.

12             HON. COLLEEN KOLLAR-KOTELLY:  I'm just looking at the

13   number of yellow sheets.

14        (Laughter)

15             MR. COATES:  Most of the yellow sheets I've already

16   been through, Your Honor.

17                            EXAMINATION

18   BY MR. COATES:

19   Q.   Dr. Buchanan, based upon your investigation in this case,

20   what if any conclusions did you reach concerning Dr. Burton and

21   Dr. Arrington's opinions concerning whether racial intent

22   underlies the enactment of R54?

23   A.   In my opinion, they did not present any direct evidence of

24   racial intent, and they did not present a convincing case of

25   circumstantial evidence.

1   Q.   Could you cite us to some examples that you would rely upon

2   to show that the evidence concerning racial intent is not

3   persuasive?

4   A.   One example --

5   Q.   In your opinion.

6   A.   In my opinion, in Dr. Burton's report, there was an

7   occasion in which he made the comment that the state General

8   Assembly had considered a bill on third-party organizations

9   registering people to vote.  He argued that that bill, that

10  would have limited third-party organizations, was an example of

11  racial intent.  However, I do not believe that he took into

12  consideration the fact that there have been some well-publicized

13  abuses of voter registration by third-party organizations,

14  including one in South Carolina involving Florence County.

15  That's one example.

16       An example from Dr. Arrington had to do with his contention

17  on the local election boards in which he argued that they would

18  act with a discriminatory intent when it came to overseeing

19  elections, but I did not see that he presented any data to

20  support that claim.

21            HON. JOHN D. BATES:  Mr. Coates, so as not to

22  unnecessarily use your time, how is this not an opinion on

23  determining legislative intent, which you I understand, or

24  rather the witness indicated he's not an expert in?  I don't

25  want to go back on what we just ruled, but I just don't

1    understand what subject he's talking to if he's not talking to

2    determining legislative intent.  And as I understand it --

3    correct me if I'm wrong -- Dr. Buchanan indicated he's not an

4    expert in determining legislative intent.

5              MR. COATES:  Well, we believe he's an expert --

6              HON. JOHN D. BATES:  No.  What did he say?  Did he say

7    he's not an expert in determining legislative intent?

8              MR. COATES:  Yes, sir.  The question asked on voir

9    dire was answered truthfully.  He said that he was not an expert

10   concerning legislative intent.  Our position is that in

11   rebuttal, that the witness can testify if it's within his realm

12   of expertise concerning --

13             HON. JOHN D. BATES:  Even if he said that he's not an

14   expert on that subject?

15             MR. COATES:  Yes, sir.

16             HON. JOHN D. BATES:  He can testify and we'll consider

17   it for what its worth.  Go ahead.

18             MR. COATES:  Yes, sir.  Our position is that he can

19   testify concerning evidence that the other experts relied upon

20   that he in his field of expertise believes are not persuasive or

21   valid or done properly.

22             HON. JOHN D. BATES:  You asked him to do a little bit

23   more than that, but please go ahead.

24             MR. COATES:  Okay.  That was the last question I had,

25   Your Honor.

```
1              HON. COLLEEN KOLLAR-KOTELLY:  All right.  Cross?

2              MR. SELLS:  May I have a moment?

3              HON. COLLEEN KOLLAR-KOTELLY:  Yes.

4              MR. SELLS:  Your Honor, may I give Professor Buchanan

5    a copy of his deposition?

6              HON. COLLEEN KOLLAR-KOTELLY:  Yes.

7              MR. SELLS:  May I proceed?

8              HON. COLLEEN KOLLAR-KOTELLY:  Yes.

9              MR. SELLS:  Given that limited direct exam, it's

10   difficult to know what my scope is, but I will try to keep it

11   within the scope of that direct.

12             HON. JOHN D. BATES:  Well, I guess the question is his

13   report will be allowed unless we don't allow it, so that report

14   will be in front of us.

15             MR. SELLS:  Well, if I haven't been clear, our

16   objection would extend to the portions of the documentary

17   evidence in which Professor Buchanan is offering opinions for

18   which he's not qualified either.

19             HON. JOHN D. BATES:  You don't know how we're going to

20   rule on that is what I'm saying.

21             MR. SELLS:  That's right.

22                            EXAMINATION

23   BY MR. SELLS:

24   Q.   Professor Buchanan, picking up where we left off a moment

25   ago, you're not an expert in history, are you?
```

1    A.    I do not teach history, so I guess that makes me not an

2    expert.  I'm a political scientist.

3    Q.    And in fact you testified in your deposition that you're

4    not an expert in history.

5    A.    Right.

6    Q.    And you're not an expert in sociology either, are you?

7    A.    No.

8              MR. SELLS:  Can we put up Professor Buchanan's report?

9    It's Plaintiffs' Exhibit 52.  I would like to look at Exhibit 9

10   to that report.  For the record, it's JA001184.

11   BY MR. SELLS:

12   Q.    Do you recognize Exhibit 9, Professor Buchanan?

13   A.    I do.

14   Q.    You discussed this briefly with Mr. Coates on direct,

15   correct?

16   A.    Yes, I did.

17   Q.    And you would agree with me that this exhibit shows a gap

18   in the white turnout average and nonwhite turnout average

19   between the poorest counties and wealthiest counties in the year

20   2000, correct?

21   A.    Yes, in the year 2000.

22   Q.    And that gap is about 15 percentage points, correct?

23   A.    If my math is correct, yes.

24   Q.    And the gap is about 10 percentage points in 2002, correct?

25   A.    Correct.

1    Q.    And there's a gap for each year except for 2008, correct?

2    A.    Do you mean in the sense of white turnout being greater

3    than nonwhite turnout?

4    Q.    Correct.

5    A.    Yes.

6    Q.    And you would expect this gap in light of the socioeconomic

7    literature you actually cite in your report, correct?

8    A.    Yes, I would.

9    Q.    I want to ask you, did you perform any significance testing

10   on these differences that you have portrayed in this exhibit?

11   A.    No, I did not.  I simply presented the election turnout

12   data itself.

13   Q.    But you're capable of doing significance testing on these

14   sorts of differences, correct?

15   A.    Yes.

16   Q.    That's something you learned in grad school if not before

17   then?

18   A.    Yes.

19   Q.    Okay.  Is it something that you have your students do in

20   your university?

21   A.    I don't teach graduate students.  I mostly teach

22   undergraduates.  We rarely get into that with undergraduates.

23   Q.    Okay.  Do you teach your students at the Citadel about

24   significance testing?

25   A.    In general terms, yes.

1    Q.    And the importance of significance testing.

2    A.    Yes.

3    Q.    But you didn't do any significance testing on this chart.

4    A.    No.  I simply presented the turnout data, as you see here.

5    Q.    And you didn't control for the effects of a particular

6    election cycle such as 2008, did you?

7    A.    Not with statistical controls, no.

8    Q.    But, again, that's something that you know how to do and

9    you could do, correct?

10   A.    Yes.

11   Q.    Do you teach your students about the importance of

12   controlling for variables like election cycle effects when

13   looking at turnout data?

14   A.    I do.

15   Q.    And so in your report, when you make statements and

16   conclusions about this table, you're using what we sometimes

17   call the interocular test; is that correct?  Do you know what

18   the interocular test is?

19   A.    I'm not familiar with that term.  I'm familiar with the

20   term descriptive data.

21   Q.    The interocular test is a fancy name for eyeballing.

22   You're eyeballing this data and drawing conclusions from it

23   rather than making inferences based on statistics, correct?

24   A.    I understand -- yes, I understand what you're saying, but I

25   would also contend that this is actual data, election turnout

1   data that's not -- I would just say that it's actual election

2   turnout data.

3   Q.   And the inferences that you are drawing from this are based

4   on your two eyes and not inferential statistics, correct?

5   A.   Yes.

6   Q.   Now, can we look at page 16 of your report which is at

7   JA001120.  I'd like to highlight the sentence that begins

8   "Today" at the bottom of that page.  "The likelihood of" --

9   excuse me.  Let me start again, make sure I read it correctly.

10   "Today, the likelihood of local elections officials being a

11   mixture of both white and black persons is much greater, and the

12   likelihood of racial discrimination occurring as described is

13   much less likely."

14        Now, you have no data to support this sentence, correct?

15   A.   No, I don't.  I was rebutting Drs. Arrington and Burton,

16   who did not present any data.

17   Q.   Okay.  But you have no data, sir?

18   A.   I do not.

19   Q.   And you don't cite social science literature to support

20   this conclusion, do you?

21   A.   I'm not aware of any social science literature that deals

22   with this, at least in the context of South Carolina elections

23   boards.

24   Q.   And in fact, you admitted in your deposition that this was

25   speculation, didn't you?

1    A.    I did.

2    Q.    And you do nothing in your report to identify this as your

3    speculation, did you?

4    A.    I think I qualified and said "much less likely."

5    Q.    Well, when you make statements about likelihood, that's a

6    probability, right?

7    A.    It is.

8    Q.    And you make likelihood statements twice here, correct?

9    A.    I do.

10   Q.    In fact, you're saying the likelihood of racial

11   discrimination is less, correct?

12   A.    I'm saying it's less, but -- I'm saying it's less.

13   Q.    Okay.  But this again is speculation on your part?

14   A.    I do not have data for all of the counties, no.

15   Q.    Well, let's look three pages forward, page 19 of your

16   report, which is at JA001123.  I'd like to focus in on the first

17   sentence of that paragraph, "In sum."

18       "In sum, the argument that voting is racially polarized

19   solely due to racial attitudes is specious."  You wrote that,

20   right?

21   A.    I did.

22   Q.    And do you remember when we discussed this sentence in your

23   deposition?

24   A.    I do.

25   Q.    And this is in the section of your report that is entitled

1    "General rebuttals to Drs. Burton and Arrington," correct?

2    A.   Yes.

3    Q.   So this is where you're responding to something that

4    apparently Dr. Burton or Dr. Arrington said.

5    A.   Yes.

6    Q.   Or at least that's what the heading would suggest.

7    A.   Yes.

8    Q.   And in fact, you admitted in your deposition that

9    Dr. Arrington doesn't make this argument, that voting is

10   racially polarized solely due to racial attitudes, now does he?

11   A.   I did agree to that statement, yes.

12   Q.   And in fact, it's true that Dr. Arrington does not make

13   that argument, correct?

14   A.   Yes.

15   Q.   And so here what you're doing is you're criticizing an

16   argument that Dr. Arrington hasn't actually made, right?

17   A.   Well, Dr. Arrington, but I think I recall that I did say

18   Dr. Burton made that argument.  As far as your question with

19   Dr. Arrington, you are correct.

20   Q.   Your testimony here today is that Dr. Burton has argued

21   that voting is racially polarized solely due to racial

22   attitudes?

23   A.   If my memory is correct from my deposition, but I do

24   remember agreeing with you about Dr. Arrington, yes.

25              HON. COLLEEN KOLLAR-KOTELLY:  So is this supposed to

1        be refuting Dr. Arrington, who says not, or Dr. Burton?

2                  THE WITNESS:  It's Dr. Burton, Your Honor.

3                  HON. JOHN D. BATES:  And was your answer to the last

4        question that you believe Dr. Burton does make that argument?

5                  THE WITNESS:  I believe in his report as I've read it,

6        I believe he does not provide any alternative explanations

7        compared to -- well, I don't believe he offers alternative

8        explanations.

9        BY MR. SELLS:

10       Q.   Professor Buchanan, would you turn with me to page 117 of

11       your deposition, please.

12       A.   I'm there.

13       Q.   Okay.  And I'm starting at line 6.  Were you asked the

14       following questions and did you give the following answers?

15            "Question:  Turn with me to page 19, if you would.  This is

16       where you sum up this section, and I will read it to you.  It

17       says, 'In sum, the argument that voting is racially polarized

18       solely due to racial attitudes is specious.'"

19            And your answer:  "Mm-hmm.

20            "Question:  Do you see that part?

21            "Answer:  I do.  I do.

22            "Question:  And can you point to me in Dr. Arrington's

23       report where he makes that argument?

24            "Answer:  Again, that is an overall summarization of what I

25       saw in the Arrington report, that I don't feel like -- I feel

1  like he focused on the fact that there is racially polarized

2  voting in the state without giving due attention to some other

3  factors that are there."

4      Now, did you give -- were you asked those questions, and

5  did you give those answers?

6  A.   Yes.

7  Q.   And so in your deposition, you directed that at

8  Dr. Arrington, didn't you?

9  A.   Yes.  I think I -- maybe I got tangled up up here, but I

10  felt like I had agreed with your statement a few moments ago.

11  Q.   Okay.  And this is criticizing an argument that

12  Dr. Arrington hasn't made.  I think that's what you just

13  testified.

14  A.   Yes.

15  Q.   And when you criticize an argument that hasn't actually

16  been made, that's called a straw man argument, isn't it?

17  A.   It is.

18          MR. COATES:  Objection, Your Honor.  The

19  characterization of the testimony in deposition is not correct.

20  Counsel has pointed to the fact that Dr. Arrington in his report

21  pointed to racially polarized voting, and he did not go any

22  further in terms of any other cause -- the cause or causes for

23  underlying racially polarized voting.  The witness has simply

24  said in his report --

25          HON. COLLEEN KOLLAR-KOTELLY:  You're talking about his

1   report, but we're going by his testimony.  His testimony appears

2   to be that Dr. Arrington -- he was asked the question, he said

3   Dr. Arrington didn't give this opinion, and he agreed he was

4   criticizing something that Dr. Arrington didn't make.  So we're

5   not looking at reports; we're going by what his testimony is.

6           MR. COATES:  Dr. Arrington said, he cited to racial

7   polarization, and Dr. Arrington didn't say one way or the other

8   what --

9           HON. COLLEEN KOLLAR-KOTELLY:  Mr. Coates, you're just

10  arguing at this point.  He's asked the question and he answers,

11  and you're left with his answers.

12  BY MR. SELLS:

13  Q.   Professor Buchanan, let's cut to the chase here.  This is a

14  straw man argument, isn't it?

15  A.   I think, based upon my testimony in the deposition, that I

16  did admit to you that some of what I said about racial

17  polarization was more in the Burton report than in the Arrington

18  report.

19  Q.   Well, in fact, that's not at all what we discussed in your

20  deposition.  You admitted that this argument is a straw man,

21  didn't you?

22  A.   Can you point me to that discussion?  I do remember the

23  straw man.

24  Q.   Yes.  This is also on page 117.  Let me ask you --

25          HON. COLLEEN KOLLAR-KOTELLY:  What line?

1          MR. SELLS:  This is on page 117 of the deposition at

2     line 22.  We're beginning there.

3     BY MR. SELLS:

4     Q.   So, Professor Buchanan, I'm going to ask you, were you

5     asked these questions and did you give these answers?

6          "But he doesn't make that argument, does he?"

7          There's a pause.  "Witness peruses document."

8          "Answer:  No, I do not see anything.

9          "Question:  Do you know what a straw man is?

10          "Answer:  Yes.

11          "Question:  This would be an example of a straw man

12     argument, right?

13          "Mr. Coates:  Objection.

14          "The Witness:  I disagree in the sense that I'm attempting

15     to show that racially polarized voting is not solely due to

16     racial attitudes, and I believe that the overall argument can be

17     found in the Arrington reports.  So I would disagree with that,

18     that is a straw man.

19          "Question:  Well, a straw man is criticizing an argument

20     that isn't actually made, right?

21          "Answer:  Correct.

22          "Question:  And you are criticizing an argument that

23     Dr. Arrington hasn't actually made.

24          "Mr. Coates:  Objection to form.  Misstatement of the prior

25     testimony.

1        "Question:  Right?  Isn't that what you're doing?

2        "Mr. Coates:  Same objection.

3        "The Witness:  In the case of the Arrington report, yes."

4        Were you asked those questions, and did you give those

5    answers?

6    A.   Yes, I did.

7    Q.   And in fact, your report is full of straw man arguments

8    attributing things to Drs. Arrington and Burton that they don't

9    actually argue, isn't it?

10   A.   I would have to see other examples.  I'm not ready to

11   testify to that.

12   Q.   Okay.  Well, let's take another example.  How about -- on

13   page 3 of your report.  This is JA001107.  These are the

14   opinions that you said you've listed in your report, and the

15   very first one:

16       "Since 1965, South Carolina has made dramatic progress in

17   the area of minority voting rights regarding the ability of

18   racial minority groups, especially African Americans, to

19   participate in the political process and to elect candidates of

20   their choice."

21       Now, are you suggesting that Dr. Arrington has said

22   otherwise?

23   A.   If my memory serves me from the deposition, I believe I

24   said Dr. Burton and did agree with you on Dr. Arrington.

25   Q.   I think I'm going to move on.  In your discussion of voter

1    fraud in your report, you offer the opinion that voter ID

2    statutes increase public confidence in the electoral system.  Do

3    you remember that in your report?

4    A.    That is my opinion.

5    Q.    Okay.  And do you remember that we discussed that in your

6    deposition?

7    A.    I do.

8    Q.    And do you remember in your deposition you told me that

9    that was a personal opinion, not a scientific opinion?

10   A.    I believe if I remember correctly I said a personal

11   opinion, and that was reinforced by my training, but it was a

12   personal opinion.

13   Q.    Well, you weren't relying on any data, were you?

14   A.    I had no specific data that stated that, no.  I had data of

15   voter fraud cases in the report.

16   Q.    Here we're talking about public confidence increased by

17   voter ID statutes.  You had no data, and you didn't cite to any

18   social science literature to support that, did you?

19   A.    I did not.

20   Q.    And you're not an expert in public opinion research, are

21   you?

22   A.    No.

23   Q.    And that was a personal opinion.  Was it speculation too?

24   A.    It was a personal opinion.

25   Q.    Now, you teach undergraduates at the Citadel, correct?

1    A.   That is correct.

2    Q.   Do you teach any upper-level courses?

3    A.   I do.

4    Q.   And in any of those courses do students have to submit

5    papers to you?

6    A.   They do.

7    Q.   In these papers that you receive from your students, if you

8    came across a student that used straw man arguments, speculation

9    not supported by data, had eyeballed some numbers and was

10   drawing conclusions off of those, you would give that student an

11   F, wouldn't you?

12   A.   Quite frankly, if some of them can put two sentences

13   together, then that's sort of doing something, but he or she

14   would receive certainly a lower grade.

15            MR. SELLS:  Thank you.  Those are my questions.

16            MR. HEARD:  Your Honor, the United States is hereby

17   ceding 45 minutes to Mr. Beeney.

18            HON. JOHN D. BATES:  No, no, no.  We don't want 45

19   minutes.

20       (Laughter)

21            MR. BEENEY:  Judge Bates, I was just going to ask for

22   an extra 30 after that.

23            HON. JOHN D. BATES:  I'm sure you were.

24            MR. BEENEY:  No, I will be far more brief than that.

25   I'm certainly the beneficiary of the government's, if not the

1    Court being the beneficiary of it.

2                          EXAMINATION

3    BY MR. BEENEY:

4    Q.   Good afternoon, Dr. Buchanan.

5    A.   Good afternoon.

6    Q.   Good to see you again.

7    A.   You as well.

8    Q.   Dr. Buchanan, you're being offered as a rebuttal expert by

9    the state of South Carolina in a case in which the issue is

10   whether R54 is in compliance with the Voting Rights Act?

11   A.   Yes.

12   Q.   But at least by the time you prepared your opinion, and

13   indeed by the time your deposition had been taken, you hadn't

14   read the law that's at issue in this case; is that right?

15   A.   Not in its entirety.

16   Q.   Would you turn to page 186 of your deposition,

17   Dr. Buchanan.  It's the bottom line of that page, sir, line 25.

18        "Question:  But you haven't read the law?"

19        Over to 187, 1.  "Answer:  I have not read the law."

20        Were you asked that question and did you give that answer?

21   A.   That's correct, but my memory is earlier in the day I did

22   say that I had not read it in its entirety.

23   Q.   Well, it can't be correct if the answer is you hadn't read

24   it in its entirety, but the answer you gave there is that you

25   hadn't read the law, right?

1  A.    Yes, on page 187.

2  Q.    And in terms of the other part of the case, the Voting

3  Rights Act, any view that you would express on the Voting Rights

4  Act is speculation; is that right?

5  A.    How?  I don't know that I understand your question.

6  Q.    Would you turn to page 182 of your deposition.

7  A.    I'm there.

8  Q.    Okay.  Reading on line 20, going over to 183, 7.

9      "Question:  And when a state presents a change in voting

10  law to the Justice Department under Section 5, what does it have

11  to show in order to get the Justice Department to sign off on

12  the law, do you know?

13      "Answer:  My understanding -- well, I would need to take a

14  look at the law.  I could give you my understanding, but it

15  would be speculation, so I would rather take a look at the law

16  itself.

17      "Question:  So you don't have any understanding other than

18  what would be speculation?

19      "Answer:  Yeah, pure speculation.  I have a pretty good

20  feeling, but I just -- well, without being pure speculation."

21      Were you asked those questions and did you give that

22  answer?

23  A.    I was.

24  Q.    So you're being offered as an expert in a case about a law

25  you haven't read, and with respect -- excuse me, about the South

1    Carolina law that you haven't read with respect to law that's

2    being applied that you don't know anything about?

3              MR. COATES:  Objection.  Misstatement of the evidence.

4    The court testimony indicates that he has read some portions of

5    R54.

6              HON. COLLEEN KOLLAR-KOTELLY:  All right.  We'll take a

7    look at whatever he said.  Go ahead.

8              HON. JOHN D. BATES:  Maybe you ought to just rephrase

9    the question.

10   BY MR. BEENEY:

11   Q.   You do agree that you gave an answer in the deposition,

12   Dr. Buchanan, that you hadn't read R54, correct?

13   A.   I agree that this portion, but I also would state earlier

14   that I stated that I had not read it in its entirety.

15   Q.   And today, sitting here, which one do you think is right?

16   A.   That I had not read it in its entirety.

17   Q.   What part of the law did you read?

18   A.   I read the portion about the acceptable forms of

19   identification.

20   Q.   But you didn't read anything else in the law?

21   A.   Not in any depth, no.

22   Q.   Did you read it in any depth at all?

23   A.   Not prior to the deposition.

24   Q.   And not prior to offering your opinion in your written

25   report?

1    A.    Beyond the -- what I was doing was verifying what was said

2    in the expert reports about types of identification.

3    Q.    And even before starting to work on the case, you thought

4    that voter ID laws were generally a pretty good thing; is that

5    right?

6    A.    I believe I mentioned that opinion.

7    Q.    But you can't cite a single academic study that in any way

8    supports a claim that voter ID laws in any way have any impact

9    on any form of voter fraud, can you?

10   A.    I'm not aware of any.

11   Q.    Now, with respect to the voter ID law in this case, which I

12   guess you read a part of?

13   A.    Yes.

14   Q.    You can't tell us one way or the other, or if at all

15   whether R54 deters any voting fraud at all.

16   A.    I don't believe anyone can since it's not gone into effect

17   yet.

18   Q.    Well, I don't want you to speculate about other people, but

19   certainly you can't; is that right?

20   A.    I cannot because it's not gone into effect.

21   Q.    And your opinion that voter ID laws will discourage other

22   types of voting is not a professional opinion, it's your

23   personal opinion, right?

24   A.    It is a personal opinion.

25   Q.    Now, I want to talk to you a little bit about the

1   methodology that you used in preparing your report.  To take as

2   an example, you say in your rebuttal report at page 44,

3   Dr. Buchanan, that "voter fraud, including impersonation fraud,

4   does in fact occur at alarming rates across the nation and in

5   South Carolina, and that affects the public view of the

6   electoral system."  Do you recall that?

7   A.   I see that right now.

8   Q.   And that opinion that you're offering is based on one thing

9   and one thing only; is that right?

10  A.   It is based upon the voting fraud cases that appear in one

11  of the tables of the report.

12  Q.   And it's based only on Exhibit 12 to your report; isn't

13  that correct?

14  A.   Yes.  That was the basis of that.

15  Q.   And in order to reach the conclusion that you did based on

16  table 12, what you did was you had a researcher who you had

17  never met, who was provided to you by another source, go to a

18  Web site that compiles underlying data that you never verified,

19  and then you relied on information that was compiled by the

20  source that you never verified without verifying that

21  information either, and that's how you came to your opinion.  Is

22  that right?

23  A.   Yes.

24  Q.   And that's not consistent with methods of social science

25  research, is it?

1   A.   Having not published voter fraud cases, I cannot answer

2   that.

3   Q.   Well, let's expand it beyond the limited field of voter

4   fraud cases.  Using a research assistant who you've never met

5   that someone referred to you, that you don't know anything

6   about, to look at a Web site that you never verified, to compile

7   information that in turn you never verified, I mean, that's not

8   social science methods, is it?

9   A.   I would hasten to add on the not verifying that those were

10   news stories that were posted on a variety of different

11   legitimate Web sites, news Web sites.

12   Q.   Well, with apologies to my friends in the press who may be

13   in the room, you believe that it's acceptable social science to

14   read a newspaper and then rely on that as truth to come to an

15   opinion that voter fraud is rampant around the country?

16   A.   Well, that is one tool that you can use.

17   Q.   You think that's acceptable social science.

18   A.   Again, it's one tool that can be used.

19   Q.   Isn't your definition of acceptable social science to

20   verify when you can?

21   A.   When possible.

22   Q.   And you had two months to do this work, right?

23   A.   Yes.

24   Q.   And I think -- let me ask you this.  You wouldn't rely on a

25   survey conducted by someone else unless you understood how that

1    survey was done, right?

2    A.    No.

3    Q.    But that's what you did in order to deliver your opinion in

4    your report.

5    A.    I wouldn't -- maybe we are parsing words on surveys.  When

6    I say survey, I thought you meant an opinion poll.

7    Q.    Now, Dr. Buchanan, you're not offering your own independent

8    views one way or the other as to whether R54 was enacted with a

9    discriminatory purpose, are you?

10   A.    I'm saying that I found no evidence, from what research I

11   did do, I found no evidence.

12   Q.    You found no evidence that R54 was enacted with a

13   discriminatory purpose, right?

14   A.    No, I did not find any evidence.

15   Q.    But you didn't look at any evidence.  You didn't read a

16   deposition, you didn't look at a document produced by the state,

17   you spent 10 minutes talking with a legislator, so the reason

18   you didn't find any evidence is because you didn't see any?

19   A.    I think I provided in the report research that provides

20   alternatives, and again, from what I saw, I did not find any

21   evidence.

22   Q.    Well, let's take it one step at a time.  You're not

23   offering an opinion of your own whether R54 was enacted with a

24   discriminatory purpose, are you?

25            MR. COATES:  Objection.  The witness is not offered by

1    the state of South Carolina for the purpose of proving racial

2    intent or nonracial intent.  The only purpose for the witness

3    being offered is to rebut the conclusions of the defendants' two

4    experts.

5            HON. COLLEEN KOLLAR-KOTELLY:  Yes, but which

6    conclusions?

7            HON. JOHN D. BATES:  And one of those conclusions is

8    exactly what you're talking about.

9            MR. COATES:  He's offered for the purpose of rebutting

10   the conclusions that R54 was enacted with a racially

11   discriminatory purpose.  He is not independently offered to

12   provide his own opinion about whether or not R54 was enacted

13   with a discriminatory purpose.

14           HON. JOHN D. BATES:  All right.

15           HON. COLLEEN KOLLAR-KOTELLY:  Well, we now understand

16   what they're thinking.

17   BY MR. BEENEY:

18   Q.   So just to confirm Mr. Coates's representation,

19   Dr. Buchanan, you're not offering any view one way or the other

20   as to whether R54 was enacted with a discriminatory purpose, are

21   you?

22   A.   I am not.  I am serving as a rebuttal to the opinions

23   offered by the other two gentlemen.

24   Q.   And just to nail this down because I think it's important,

25   would you turn to page 170 of your deposition.

1   A.   I'm there.

2   Q.   On line 21 you were asked:  "And so you are not offering

3   any view one way or the other whether it was or whether it

4   wasn't enacted with a discriminatory purpose?"

5        And your answer is, on line 24, "No."

6        You were asked that question and gave that answer, right?

7   A.   I did.

8   Q.   And that hasn't changed today, right?

9   A.   No.

10  Q.   But you are claiming that you didn't see any evidence that

11  R54 was enacted with a discriminatory purpose, right?

12  A.   I'm claiming I didn't see any evidence as offered in the

13  reports of Drs. Burton and Arrington.

14  Q.   And the reason you're limited to looking at what's in the

15  reports of Drs. Burton and Arrington is because you didn't look

16  at any evidence in the case on your own.

17  A.   Again, I was asked to rebut their reports.

18  Q.   Can you answer my question, Dr. Buchanan?  You didn't look

19  at any evidence in the case on your own?

20  A.   As far as legislative history or...

21  Q.   Or depositions or documents or, by the time you'd done your

22  report, interrogatories or requests to admit or anything else.

23  A.   I was not offered any depositions, no.

24  Q.   Nor were you offered any documents?

25  A.   No.

1    Q.   Nor answers to interrogatories?

2    A.   No.

3    Q.   Nor responses to requests to admit?

4    A.   No.

5    Q.   I don't know if I've left anything out, but you didn't look

6    at any evidence in the case, did you?

7    A.   None of what you said.

8    Q.   Now, you agree that voting in South Carolina is racially

9    polarized.

10   A.   I do.

11   Q.   And based on your understanding of racially polarized

12   voting in South Carolina, you would agree that if one were able

13   to prevent an African American from voting in South Carolina,

14   the overwhelming likelihood is that you prevented someone from

15   voting Democratic, correct?

16   A.   Yes.

17   Q.   And you didn't look at the legislative history of R54, did

18   you?

19   A.   I examined the one that was offered in the Burton report.

20   Q.   And you didn't find anything wrong with that, did you?

21   A.   No.

22   Q.   And you can't tell us of any instance of voter

23   impersonation fraud in South Carolina ever, can you?

24   A.   Not in South Carolina.

25   Q.   And even though you looked for it, didn't you?

1    A.    I looked for it in the sense of what I presented, yes.

2    Q.    Now, if you were going to perform an analysis of whether

3    R54 was enacted with a discriminatory purpose, the way you'd

4    figure out your methodology would be to think about it and sit

5    around the office with a few other professors, talk to each

6    other, say, hey, what do you think about this, and that's how

7    you'd come up with your methodology; is that right?

8    A.    At least the beginning method.  That's one of the things

9    that professors typically do.  I wouldn't say it's the end

10   result, but it's where it gets started.

11   Q.    And Dr. Buchanan, African Americans in South Carolina have

12   lower rates of educational attainment?

13   A.    That is true.

14   Q.    And I think your own data suggests that they have per

15   capita income that is about half of white people?

16   A.    I don't remember the exact figures, but that sounds to be

17   the approximate case, yes.

18   Q.    Why don't you take a look at Exhibit 7 to your report, and

19   then we can get the exact figures.

20   A.    Okay.

21   Q.    And let's compare it with Exhibit 8.  You calculated per

22   capita income of whites in South Carolina to be $24,822?

23   A.    This is based upon census, American Community Survey, to be

24   exact, yes.

25   Q.    You're saying it's incorrect?

1    A.    No, I'm just saying this is where it came from.

2    Q.    This is another one of those pieces of data that you relied

3    on that you didn't verify?

4    A.    I verified it in the sense that it's in the American

5    Community Survey provided by the Census Bureau.

6    Q.    So you're claiming you verified this by looking at it.

7    A.    I don't know that I understand your question.

8    Q.    I'm trying to understand what you mean by you verified it.

9    You went to a source, and you copied it.

10   A.    Well, yes.  It's data provided by the Census Bureau.

11   Q.    Okay.  And comparing white and nonwhite, the white per

12   capita income is $24,822, and nonwhite is $13,531; is that

13   right?

14   A.    That's correct.

15   Q.    And notwithstanding lower levels of educational attainment

16   and about half of the per capita income, you don't think that's

17   got any impact on the ability to overcome costs of voting?

18   A.    Can you rephrase the question?  I want to make sure I

19   understood you.

20   Q.    Sure.  Notwithstanding per capita income of nonwhites of

21   about half of what it is for whites, and notwithstanding lower

22   levels of education attainment of African Americans as compared

23   to whites, you don't believe that affects voter turnout or the

24   ability to overcome hurdles placed in front of voting?

25   A.    Just to make sure that I understand, I'm going to elaborate

1   slightly that I acknowledge that lower SES factors generally

2   lead to lower turnout.  I would agree with that.

3   Q.   Why is that?

4   A.   Again, if you have a relatively low level of education,

5   you're not likely to have a very high level of political

6   efficacy, to feel that you can make a difference at the ballot

7   box.  If you have lower levels of income, you may be worried

8   about other factors than voting itself.  So that's a

9   summarization of very broad literature.

10   Q.   Did you tell us earlier today that African American

11   registration was actually higher than it is for whites in South

12   Carolina?

13   A.   I believe I said that for June 2012.

14   Q.   So it's not a lack of interest in the electoral system

15   among African Americans.

16   A.   I think the figures speak for themselves in that sense.

17   There obviously is a great deal of interest.

18   Q.   Now, I think you also mentioned on direct about certain

19   election of black officials around the state?

20   A.   That is correct.

21   Q.   And I'd like to talk to you now a little bit about

22   statewide elections.  In the history of South Carolina, there

23   has never been an African American governor elected, has there?

24   A.   No, there has not.

25   Q.   And in the history of South Carolina, there has never been

1   an African American United States Senator that's been elected;

2   is that right?

3   A.   Not elected, no, not to the Senate.

4   Q.   In the history of South Carolina, there have been two

5   United States representatives elected?

6   A.   I would have to look at reconstruction era before, but I

7   can say certainly right now there have been two, yes.

8   Q.   And in your view, one of those has positions on issues that

9   are not the way a majority of South Carolina African Americans

10  feel about government; would you agree?

11  A.   I agree that --

12              MR. COATES:  Objection to the foundation.

13              HON. COLLEEN KOLLAR-KOTELLY:  Well, he's ready to

14  answer it, but...

15              MR. BEENEY:  I could also take it out of his

16  deposition if we'd prefer, so the foundation is his deposition.

17              HON. COLLEEN KOLLAR-KOTELLY:  Let's just go.  Go

18  ahead.

19  BY MR. BEENEY:

20  Q.   And Dr. Buchanan, you're also not aware of any expert the

21  state of South Carolina is providing in this case with respect

22  to an opinion as to whether R54 was enacted with a racially

23  discriminatory purpose, are you?

24  A.   Can you restate that?  I lost the first part.  I'm sorry.

25  Q.   Sure.  You're not aware of any expert the state of South

1    Carolina is providing in this case with respect to an opinion as

2    to whether R54 was enacted with a racially discriminatory

3    purpose.

4    A.   Not aware.

5    Q.   And you don't have a view as to whether R54 would in fact

6    retard the progress that has been made in the area of minority

7    voting rights?

8    A.   No.

9    Q.   No, you're not offering --

10   A.   No, I'm simply the rebuttal.  Again, I'm the rebuttal

11   witness to the Burton and Arrington reports.

12   Q.   So, really, do I have it right, Dr. Buchanan, that what

13   your opinion really comes down to is that Dr. Arrington and

14   Dr. Burton did not look at certain information that you think

15   they should have in order to have reached their opinion?

16   A.   I agree that they did not consider all information.

17   Q.   And that's the opinion that you're offering in the case; is

18   that right?

19   A.   Yes.

20   Q.   And because you have not reached any conclusion at all

21   about whether R54 was enacted with a discriminatory purpose, you

22   can't say whether, if Dr. Arrington and/or Dr. Burton had looked

23   at the information that you think they should have, whether they

24   would have come to any conclusion other than the one that they

25   did?

1              MR. COATES:  Calls for speculation.

2              HON. COLLEEN KOLLAR-KOTELLY:  No, I'll allow it.

3              THE WITNESS:  I cannot.

4              MR. BEENEY:  Thank you very much.

5         Thank you, Your Honors.

6              HON. COLLEEN KOLLAR-KOTELLY:  All right.  Mr. Coates,

7    you get three minutes.  Did you want to do something more?

8              MR. SELLS:  The United States renews its objection to

9    Professor Buchanan's testimony and moves to strike it in its

10   entirety.

11             HON. COLLEEN KOLLAR-KOTELLY:  All right.

12             MR. BEENEY:  Join in the motion, Your Honor.  Thank

13   you.

14             HON. COLLEEN KOLLAR-KOTELLY:  All right.  Mr. Coates,

15   three minutes.

16             HON. JOHN D. BATES:  Earlier I'd asked you to submit a

17   motion in writing.  You're making an oral motion, we understand

18   that.  But we've decided to defer ruling on that until we see a

19   written motion from you.

20             MR. COATES:  May I proceed, Your Honor?

21             HON. COLLEEN KOLLAR-KOTELLY:  Yes.

22             MR. COATES:  Thank you.

23                            EXAMINATION

24   BY MR. COATES:

25   Q.   Dr. Buchanan, you had an occasion to read the reports

1    submitted by Dr. Arrington and Burton in this case?

2    A.    I did.

3    Q.    Did they in part rely upon newspaper reports in their

4    expert reports in this case?

5    A.    They did.

6    Q.    Now, with regards to the statewide elections, has there

7    been a minority person elected statewide in South Carolina in

8    the recent past?

9    A.    I believe Governor Haley fits the census definition of a

10   minority.

11   Q.    And what is Governor Nikki Haley's ancestry?

12   A.    She is of, I believe the term the Census Bureau uses is

13   South Asian Indian.

14   Q.    Which party is she affiliated with?

15   A.    The Republican Party.

16   Q.    And in the Republican primary in 2010, did she have

17   opposition?

18   A.    She did.

19   Q.    And how many opponents did she have in the Republican

20   primary?

21   A.    Total of four including herself, so she had three other

22   opponents.

23   Q.    What was the race of the four opponents that Governor Haley

24   had in the Republican primary?

25   A.    They were all white males.

1    Q.   Was one of them Mr. McMaster, who had served as the United

2    States Attorney in South Carolina and the state Attorney

3    General?

4    A.   Yes.

5              MR. SELLS:   Objection.

6              HON. COLLEEN KOLLAR-KOTELLY:   These are people who

7    didn't get -- you made your point that she's a minority.   I'm

8    not sure what difference it makes for the rest.

9              HON. JOHN D. BATES:   What's the basis of the

10   objection?   Relevance?

11             MR. SELLS:   Leading and relevance, Your Honor.

12   BY MR. COATES:

13   Q.   Do you know any of the opponents that Governor Haley had in

14   the Republican primary?

15   A.   I do.

16   Q.   And could you tell us about them?

17   A.   They were all white males.

18   Q.   And with regards to the question about significance

19   testing -- and you testified that there had been no significance

20   testing on the turnout figures that you showed in your report?

21   A.   Yes.

22   Q.   Do you feel confident as a social scientist that the

23   percentages showing black and white voter turnout in the

24   counties that you cite to are correct?

25   A.   Yes.

1        MR. COATES:  No further questions, Your Honor.

2        HON. COLLEEN KOLLAR-KOTELLY:  All right.  Anything

3   else?  You can step down, sir.  Thank you.

4      (The witness steps down.)

5        HON. COLLEEN KOLLAR-KOTELLY:  All right.  I think

6   we're finished in terms of testimony; am I correct?

7        HON. JOHN D. BATES:  Does that close the rebuttal

8   case?

9        HON. COLLEEN KOLLAR-KOTELLY:  Or did you have

10   something else?  I shouldn't have jumped to that conclusion.

11        MR. BARTOLOMUCCI:  If the United States is finished

12   with its case --

13        HON. JOHN D. BATES:  This is your rebuttal case.

14        MR. BARTOLOMUCCI:  Correct.  And we're finished with

15   our rebuttal case.  The Attorney General of South Carolina, who

16   has been here most of the week, had a request to address the

17   Court for one minute on a matter of nonsubstance, with the

18   Court's permission.

19        HON. JOHN D. BATES:  Nonsubstance.

20        HON. COLLEEN KOLLAR-KOTELLY:  All right.  Well, what

21   we were going to do -- and he can certainly address us now -- is

22   we were going to take a short break and reconvene and hopefully

23   we would get an answer from the parties, at least an initial

24   answer to the questions that Judge Bates started yesterday and

25   all of us chimed in in one form or another, as to the positions

1    to be taken by South Carolina about a number of things.

2         So he can address us now, or we can take a break and he can

3    address us and get into the rest.  But let's hear you now, sir,

4    unless you want to wait.

5              ATTORNEY GENERAL WILSON:  Thank you, Your Honors.

6    First I'd like to thank you for your time and thoughtful

7    consideration for South Carolina's case.  I'm not here to add,

8    supplement or argue any substantive material facts of the case.

9    I'm only here to provide brief remarks which will be confined

10   solely to the context of the questions this court asked of South

11   Carolina yesterday.

12             HON. JOHN D. BATES:  Okay.  So this does address those

13   questions?

14             ATTORNEY GENERAL WILSON:  That is the purpose of this,

15   Your Honor.

16             HON. JOHN D. BATES:  Maybe to get it all at once,

17   maybe we do want to take our break first.

18             HON. COLLEEN KOLLAR-KOTELLY:  If you could give us a

19   10-minute break, and then we'll come back.  And that was the

20   point of getting to it.  Unless you need to --

21             ATTORNEY GENERAL WILSON:  Well, Your Honor, if I may,

22   our responses to your questions are in written form which we're

23   going to file electronically.

24             HON. COLLEEN KOLLAR-KOTELLY:  Well, it probably would

25   help to have a summary unless the rest of the other parties know

1    what your positions are.  If you need to leave, be frank and

2    tell us.  Otherwise, we'll take the short break and figure out

3    how we want to deal with it.  But if you're trying to get out of

4    here, that's fine; you can tell us your remarks now.

5             ATTORNEY GENERAL WILSON:  We'll break, Your Honor.

6             HON. COLLEEN KOLLAR-KOTELLY:  What would help is

7    certainly the written, but if you can give us a summary so we

8    can get the other reactions.  Because we want to hear from the

9    three of them.  10 minutes.

10        (Recess from 3:43 p.m. to 3:55 p.m.)

11             HON. COLLEEN KOLLAR-KOTELLY:  Mr. Attorney General.

12             ATTORNEY GENERAL WILSON:  Thank you, Your Honor.  I

13   wanted to reiterate, my comments are going to be left solely to

14   the context of the questions that you asked of the state of

15   South Carolina yesterday.  This is in no attempt to argue or

16   bring up new facts or supplement our case in any way.

17        To rehash -- and I have about a 10-page document that the

18   state of South Carolina is going to file with the court

19   electronically here at the conclusion of today, and the U.S.

20   government will have it as well.  So I don't want to read

21   straight through, but I will just hit the highlights, and of

22   course if the Court needs further supplementation, South

23   Carolina will provide it.

24        The first question of our responses I believe was asked by

25   Judge Bates.  Does South Carolina intend to put Act R54 into

1    effect for the November 2012 general election?  And there was a

2    second question, I believe, that was asked, also by Judge Bates,

3    reiterated if Act R54 would be put into effect for the 2012

4    election, will it be implemented as interpreted and described by

5    Ms. Andino in her testimony.

6        The answer to those two questions combined is it's a

7    self-executing law.  And if this court should preclear it, it

8    would go into effect immediately.  If that happens, it will go

9    into effect and it will be consistent with the testimony given

10   by Ms. Andino a few days ago.  The Attorney General's office of

11   the state of South Carolina concurs with Ms. Andino in that

12   effect.

13       To add on to that answer, we go on in our response to

14   further say that a reasonable impediment would obviously cover

15   anyone who is affected by the lateness of this law being

16   precleared.  That would certainly fall under the reasonable

17   impediment provision of our law.

18       I'll restate, and I'm reading verbatim from our response,

19   "If granted preclearance, the state will implement Act R54 in

20   accordance with Ms. Andino's testimony and any directions from

21   this court."

22       The next question I believe that was asked by Judge

23   Kavanaugh:  Would the reasonable impediment provision of the law

24   apply to everyone for the 2012 election who claims that the time

25   frame made it an impediment, and that for future elections

covers people without cars, people with disabilities or medical

conditions, people with no birth certificates, people with any

impediment that the voter deems reasonable unless the reason

stated is false.

And I think we already answered that question, absolutely,

it would cover all of those as well as the impediments provided

by the late preclearance for this election.

Who has the authority to interpret and apply the law was

the next question I believe that was also asked by Judge Bates.

I will just read the two sentences here from the response.   It

kind of condenses it down.   For all practical purposes,

Ms. Andino has authority to interpret Act R54, provide guidance

to local election officials, and generally implement the law.

The State Election Commission has the authority to promulgate

more formal regulations, and the Attorney General may advise

Ms. Andino and the election commission, which we have a long

history of doing.   In fact, we are the attorney for the election

commission.

Does the state adopt Ms. Andino's discussion of not

following statutes if she viewed them as an impediment to erring

on the side of letting a voter actually vote?   The state of

South Carolina agrees with Ms. Andino that election officials

should err on the side of the voter.   We also believe that

Ms. Andino is correct to resolve conflicting legal requirements

in favor of the voter at all times.   When there is any doubt as

1    to how a statute is to be interpreted and how that

2    interpretation is to be applied in a given instance, it is the

3    policy of this office to construe such doubt in favor of the

4    people's fundamental right to vote.

5         There was also a question concerning notaries charging.  I

6    believe the question was stated, can you confirm that notaries

7    will not be charging, that they would be available, and the

8    kinds of ID that would be required for a notary.

9         Notaries, while we would consider it illegal or at least

10   unconstitutional for notaries to charge, we would not allow

11   notaries to charge a fee for reasonable impediment or religious

12   objection affidavits.  It has also been brought to my attention

13   that Ms. Andino has identified over 2,000 poll workers who are

14   already notaries for approximately 2,100 precincts.  So there is

15   a group of notaries spread out.

16        The IDs required for a notary could be anything that

17   satisfied the notary's belief that that person is who they say

18   they are: a Blockbuster Video card, their voter registration

19   card that does not have a photo on it, their current voter

20   registration card, a credit card with their name on it,

21   something that gives that notary some belief that that

22   individual is who they say they are for reasonable impediment

23   purposes.

24        I believe that those were all of the questions that I

25   believe I've read from the responses.  They are actually -- they

1    go into much more detail, but those are the highlights for the

2    Court.  Of course, South Carolina is happy to provide further

3    supplementation or additional responses if the Court requires us

4    to.

5                    HON. JOHN D. BATES:  All right.

6                    HON. COLLEEN KOLLAR-KOTELLY:  Okay.

7                    HON. JOHN D. BATES:  Thank you.

8                    ATTORNEY GENERAL WILSON:  Thank you, Your Honors.

9                    HON. COLLEEN KOLLAR-KOTELLY:  Anything that either one

10   of you wish to say in response?

11                    MR. DELLHEIM:  Yes, Your Honor.  Richard Dellheim for

12   the United States.  Just a few brief remarks.  Here we are at

13   the end of a trial and the facts are still changing.  In the

14   administrative context, the Attorney General requires that

15   voting changes be final and in writing.  You need to establish a

16   fixed baseline.  We can't do that, and we would submit this

17   court can't do that, when the baseline continues to evolve.

18        In December the Attorney General precleared certain

19   provisions, denied preclearance to Section 5, and made no

20   determination with respect to Sections 4, 7, and 8 because those

21   provisions were not final.  In April, at the suggestion of this

22   court, South Carolina resubmitted those sections, 4, 7, and 8,

23   claiming they were final, and they were not.

24        We took discovery.  At what we thought was the close of

25   discovery, we thought the procedures were final, and they were

```
 1    not.  Discovery was reopened.  We took more discovery.
 2    Discovery closed, and we thought the procedures were final.  But
 3    they were not.
 4         Trial began.  We thought, finally, the procedures had been
 5    memorialized, finalized, frozen.  But they were not.  We are
 6    particularly troubled, and we will look forward to reviewing
 7    carefully what the Attorney General files with the Court, but I
 8    must say as a caution we are troubled by testimony in this court
 9    from a state administrator that the state is willing to violate
10    the law to ensure that it's precleared by this court.  If I
11    recall the testimony clearly, the testimony was that the law
12    would have to be violated or else voters would be
13    disenfranchised.
14              HON. JOHN D. BATES:  You're speaking of the law
15    generally?  You're not speaking of R54 or the Voting Rights Act?
16              MR. DELLHEIM:  Well, I'm speaking of R54.
17              HON. JOHN D. BATES:  That would have to be violated?
18              MR. DELLHEIM:  Well, if I remember Ms. Andino's
19    testimony correctly from Tuesday, she testified that the
20    affidavit provision, which is linked to other state law
21    requiring notaries, that that law would be violated where
22    necessary to ensure that voters are not disenfranchised,
23    because, as I recall her testimony, if they did not violate
24    R54's affidavit requirement and related notary provisions, then
25    voters would be disenfranchised.
```

 1        It is not my place at this time to give the Court advice on

 2   what to do with the state's procedures that it intends to file.

 3   Again, I have not read them.  But it raises serious concerns for

 4   us that there is a law that in South Carolina will be

 5   interpreted on its face and the representations as to its

 6   meaning in this court appear to diverge greatly from the plain

 7   language of the law.

 8        I guess I would request an opportunity to respond in

 9   writing to whatever the state files later today.

10             HON. JOHN D. BATES:  That's fine.  And you're also

11   going to have your briefs that are going to be filed.

12             HON. BRETT KAVANAUGH:  We're going to have plenty of

13   paper.

14             HON. COLLEEN KOLLAR-KOTELLY:  Do you want to respond

15   separately from -- we could set some date next week.  You're

16   obviously going to have findings of fact and conclusions of law.

17             MR. DELLHEIM:  Forgive me, I guess I hesitate to set

18   something until we've seen it.  We may look at it and want to

19   file something separate from our findings of fact, or it may be

20   appropriate to weave our responses into the findings of fact.  I

21   guess I'm at a disadvantage because I just haven't read --

22             HON. BRETT KAVANAUGH:  Either one is fine.

23             HON. COLLEEN KOLLAR-KOTELLY:  Yes, that's fine.  Or

24   you can give us a notice next week if you want to respond

25   beforehand.  If we don't get a notice indicating that you do,

1    we'll make an assumption you're going to do it as part of the

2    written pleadings that will be filed.

3          HON. JOHN D. BATES:  Your filing is due on the 7th of

4    September.  So if you intend to file something other than just

5    incorporating your response into that document, that would mean

6    you'd better do it by Wednesday.  What I don't want you to do is

7    to think that you can add to the page limit of your filing by

8    filing two things.

9          MR. DELLHEIM:  Understood, Judge Bates.  And I thank

10   you all very much.

11         HON. COLLEEN KOLLAR-KOTELLY:  All right.  Do the

12   intervenors have anything they wish to say at this point?

13         MR. BEENEY:  Thank you, Your Honors.  On behalf of the

14   intervenors, we would like to thank the Court for the patience,

15   attention, and wisdom throughout the course of the trial that

16   the panel has shown.

17       We certainly concur in the statement of the Department of

18   Justice.  I think it is perplexing that we're at the stage of

19   the end of this proceeding and now being faced with being told

20   that the law is something completely, literally completely

21   different than what we litigated the case to be.

22       I will not burden the Court now certainly with some of the

23   evidence that we put together that contradicts everything that

24   Ms. Andino said about who interprets the law, who's got the

25   right to decide whether it's a reasonable impediment, whether

1   notaries are required, whether notaries will be there, whether

2   notaries can charge, and a variety of other issues that were

3   discovered during the course of the case.

4        We will certainly be submitting to the Court excerpts from

5   the notary manual, which require the notary to ask for a photo

6   ID, and list exactly the photo IDs that the law requires,

7   therefore the person who's executing the affidavit won't have

8   them.  We will also be citing to the Court that portion of the

9   notary manual which suggests that the notary also has to find

10  six things about the person who's coming to execute the

11  affidavit:  That they're not under the influence of alcohol or

12  drugs, that they're not suffering from dementia, that they

13  understand what they're doing, that they have the capacity to

14  sign the document.

15       I've lived with R54 for months.  I don't know what it

16  means.  If I have to follow the instructions in the notary

17  manual, I couldn't swear to it.  We've all lived with the

18  language of the law.  There have been 40 lawyers in this

19  courtroom, and we can't figure out what it means.  Asking some

20  person to come to vote to answer that question and then come to

21  the conclusion that they know what it means and what they're

22  answering, and that being the timeline when they vote or they

23  don't vote, it just simply doesn't work.

24       And we would also like an opportunity to respond.  I think

25  there were a couple of things that the Attorney General said --

1    and we haven't seen his filing -- certainly that I think bear

2    emphasis, though, and that is, we heard that Ms. Andino has the

3    authority to interpret the law.  No dispute from intervenors.

4    We heard that she can provide guidance.  Again, no dispute from

5    intervenors.  And we heard that she can issue recommendations.

6    Again, no dispute.

7        But what the record evidence in this case shows is that she

8    has no ability to dictate to any of the 10 or 20,000 poll

9    managers, to any of the county, hundreds of county officials.

10   In fact, the county ballot manual for county local election

11   officials says that their determination about whether a

12   provisional ballot is counted is final.

13       Ms. Andino's testimony at page 129 of her deposition,

14   beginning at line 14:  "Any issue with respect to a voter being

15   able to vote or not would all have to be resolved within those

16   time frames."  This is the certification of the final numbers.

17       "Answer:  That would be resolved at the county level, not

18   the state level.

19       "Question:  Are there no abilities for voters to appeal

20   decisions denying their vote to the State Election Commission?

21       "Answer:  No.

22       "Question:  So the county gets the final say absent relief

23   in the courts?

24       "Answer:  Correct."

25       The party who's represented here the state has no ability

1    to tell this court that it can guarantee or even promise that

2    any of these thousands of people who will affect people's right

3    to vote are going to interpret the law in the way they represent

4    to the Court.  And that perhaps is the biggest problem here.

5         Beyond that, with all the poll watchers taking down names

6    of people, watching what happens, the first time a county

7    election commission official interprets R54 in a way that's

8    different, they'll run directly to the court if that's what they

9    so choose.  And certainly the state cannot guarantee to this

10   court that the courts of South Carolina are not going to

11   interpret R54 as saying, as I believe the reasonable reading of

12   the statute is, is that it is up to the county election

13   commissions to decide what a reasonable impediment is.

14        HON. BRETT KAVANAUGH:  Can I ask one question there,

15   and you can incorporate it into all the paper we're going to get

16   over the next several weeks.  But my understanding is that if it

17   were precleared on the basis of a legal interpretation and then

18   someone in the state were not following that legal

19   interpretation, that that could be enjoined as a change in the

20   election law by that -- which has happened before.  In other

21   words, the state puts out an interpretation, it gets precleared

22   and then the state changes the interpretation, whether it's a

23   state court -- there are cases where the state court's done

24   that, state administrative officers, and you file an action and

25   courts have enjoined that kind of state behavior that I think

1   you're worried about here.

2       So, I'm just opening that issue up, that that's

3   something -- your concern there should be addressed in the legal

4   filings at some point, because I think -- I'm sure all of us

5   would like comfort on that issue.

6       MR. BEENEY:  I think, Judge Kavanaugh, you're

7   absolutely correct about the procedure --

8       HON. BRETT KAVANAUGH:  I know it's not your preferred

9   approach, but if it happens.

10      MR. BEENEY:  But beyond that, Your Honors need to make

11  a decision obviously under the Voting Rights Act.  And I guess

12  my point is not that we can't kick this down the road under a

13  different burden, under a different provision of the Voting

14  Rights Act.  But how can the Court make a determination that the

15  state has met its burden without having any idea at all as to

16  how this act is going to be interpreted, without having any

17  comfort at all that what the state has told you through

18  Ms. Andino and adopted through Ms. Andino is actually going to

19  be what happens at the end of the day?

20      The evidence is and will be that if the Court can draw any

21  conclusion, it is that it is not going to be interpreted that

22  way.

23      HON. JOHN D. BATES:  Well, your briefs will presumably

24  address that.  But we do have the principal administrative

25  individual responsible saying how it would be interpreted, and

1    the state saying that that's how they expect it to be

2    interpreted.  And to the extent that you can inform us, whatever

3    communications -- you meaning South Carolina -- can inform us

4    whatever you intend to put in posters and postcards, et cetera,

5    that's relevant to what we can expect to happen.

6         And I understand that all we can do is make our best

7    assessment of what we expect to happen.  You're painting one

8    picture.  I assume that South Carolina in their briefs will

9    paint another picture.

10             MR. BEENEY:  Judge Bates, I think absolutely, but I

11   think it really isn't, with all due respect, a question of

12   painting pictures.  There just is not any evidence that anything

13   that the state has to say about this is going to be followed

14   through.

15        In the short period of time that the state was willing to

16   produce to us the ElectionNet blog from the county officials --

17   and the state refused to update it, so I can only imagine what

18   must be there that we haven't seen -- there's this avalanche in

19   this very short period of time of county election officials

20   saying this is ridiculous, this is a poll tax, we're being made

21   the laughingstock.

22        There's no evidence at all, first, that the county

23   officials are going to carry this out in the way the state is

24   representing, much less 20,000 people at the polls.  And the

25   guidelines do suggest, why would you give someone an example of

1    what a reasonable impediment is unless you're asking them to

2    interpret what a reasonable impediment is?

3         The State Election Commission asked the Attorney General

4    for its opinion of what's a reasonable impediment.  What's the

5    purpose of that unless someone's going to interpret it?  What's

6    the purpose of the guidelines having examples unless the poll

7    managers are going to do it?  What's the purpose of the

8    guidelines for the county election commissions unless they're

9    intending to do it as well?

10        At the end of the day, certainly the state cannot give this

11   court any comfort that the first time a poll watcher runs into

12   state court to challenge a county official's determination that

13   they're going to count a ballot even though, you know, there is

14   no reason or the reason is ridiculous, and some state court

15   judge reads the law the way we would respectfully suggest it

16   certainly was intended based on the testimony of the

17   legislators, and certainly from the plain words themselves,

18   where are we left then, when the state court interprets the law

19   directly opposite than the way that it was precleared?

20        HON. BRETT KAVANAUGH:  That would be a change in the

21   law that would be illegal by the state court.

22        MR. BEENEY:  So we're back here again.

23        HON. BRETT KAVANAUGH:  I'm just saying that's always a

24   possibility in any preclearance case, right?  Again, I'm just

25   raising this to be addressed.  Don't assume I've reached a

1    conclusion.

2            HON. JOHN D. BATES:  And I'm raising it to be

3    addressed as well.  And another part of it is -- and again, I

4    assume the parties are going to address it -- any change in the

5    law, any voter ID law, is going to to some extent present the

6    problem that you describe, in any state; that implementation is

7    going to have some uncertainty.  Why is it that in this case,

8    and perhaps given the time between now and the 2012 election,

9    why is it that it's a sufficient problem to lead us not to

10   preclear?

11       Because you can't be arguing that there's no voter ID law

12   that's clear enough and that the guidance is clear enough on

13   that would be sufficient to get either the Attorney General or a

14   court to preclear it.  Why is it that this law in this

15   particular context and timing should not be precleared because

16   of those problems?  I hope you'll address that.

17           MR. BEENEY:  Just briefly, if I may, Judge Bates, I

18   think the answer is there are obviously levels of uncertainty

19   and levels of probability.  Here, there's no dispute among the

20   experts, ID ownership, there's a disparate impact.  So the

21   question comes down to how is that racial disparate impact in

22   terms of ownership going to be felt at the polls.  So it is

23   critical to know how this, as best we can, this provision is

24   actually going to get implemented.

25       And there are levels of uncertainty, and I certainly agree

1  with Your Honor that we can never be sure.  But here, where the

2  level of uncertainty is astronomical.  Ms. Andino's testimony

3  changes from time to time, and lord knows I'm not blaming

4  Ms. Andino.  She's doing the best that she can.

5      But we in the courtroom, and the legislators who enacted

6  the law, not a single person can agree what this provision

7  means, who interprets it or how it operates, that is a level of

8  uncertainty that I respectfully would suggest to the panel

9  cannot have the state meet its burden.

10     We have to live with uncertainty in everything we do in our

11 lives, but the level of uncertainty here is so gargantuan that

12 the state can't meet its burden of showing that this provision

13 is going to ameliorate the admitted effect of racially

14 discriminatory ownership of voter ID.

15         HON. JOHN D. BATES:  Presumably we'll hear more from

16 you in your briefs in the context of the legal standard that you

17 believe applies.

18         HON. COLLEEN KOLLAR-KOTELLY:  So if you're going to

19 file something, certainly no later than Wednesday, and it should

20 not be basically augmenting; it should be very responsive to

21 whatever they're filing.  You still have your opportunity with

22 your briefing later.  So it should be a response to whatever it

23 is that South Carolina is filing.

24         HON. JOHN D. BATES:  Limited in pages.

25         HON. COLLEEN KOLLAR-KOTELLY:  Yes, I was just thinking

1   of that.

2        (Laughter)

3        Just getting there.  Don't worry.  Whatever the number of

4   pages they file, that's what your limit is.  I think you said --

5   how many pages?  Same size print and everything.

6        (Laughter)

7        MR. BEENEY:  We may be saying something different,

8   though, if that's all right.

9        ATTORNEY GENERAL WILSON:  We're 18-font printed.

10        (Laughter)

11        HON. COLLEEN KOLLAR-KOTELLY:  All right.  We're all

12   set.  Just keep it to the same, and if you don't want to do it

13   by then, you're obviously welcome to put it in your findings of

14   fact.  So make strategic decisions on your part as to how

15   you want to actually do it.

16        Okay.  So we're finished with that one.  Have you made a

17   decision, South Carolina, about the judicial notice of the

18   Census Bureau material?

19        MR. BARTOLOMUCCI:  Because we have been here, Your

20   Honor, we have not had an opportunity to review that yet, but we

21   did pledge to respond, if at all, by the end of the day.

22        HON. COLLEEN KOLLAR-KOTELLY:  What is the end of the

23   day, midnight?

24        MR. BARTOLOMUCCI:  Midnight.

25        HON. COLLEEN KOLLAR-KOTELLY:  No, we would like to get

1    something -- well, all right, do it by then, because nothing's

2    going to happen anyway.

3         (Laughter)

4         We will be here, but I meant they're not going to be able

5    to come back and do anything about it.  So it's either accepted

6    or it's not.  All right.  Parties are excused.  Take care.

7              HON. JOHN D. BATES:  And let me thank everyone for the

8    presentation this week, for the patience that you've shown with

9    the Court, and for the quality of the presentations.  We

10   appreciate it very much.  Hopefully, we'll have a record that

11   can lead to a decision in a reasonable time frame.

12             HON. COLLEEN KOLLAR-KOTELLY:  Take care.

13        (Proceedings adjourned at 4:20 p.m.)

1                              **INDEX**

2

**WITNESS:**                                        **PAGE:**

3

4    Charles Stewart III:    Examination by Mr. Potenza..........153
                             Examination by Mr. Sells............183
5                                                                188
     Scott E. Buchanan:      Examination by Mr. Coates...........
6                             Voir Dire Examination by Mr. Sells..193
                             Examination by Mr. Coates...........197
7                             Examination by Mr. Sells............200
                             Examination by Mr. Beeney..........214
8                             Examination by Mr. Coates..........229

9    Statement by Attorney General Wilson..................... 85

10   Statement by Mr. Dellheim................................ 89

11   Statement by Mr. Beeney.................................. 92

12

13

14

15

16

17

18

19

20

21

22

23

24

25

\* \* \* \* \* \*

CERTIFICATE

I, BRYAN A. WAYNE, Official Court Reporter, certify that

the foregoing pages are a correct transcript from the record of

proceedings in the above-entitled matter.

_____
BRYAN A. WAYNE

## $

**$13,531** [1] - 76:12
**$24,822** [2] - 75:22, 76:12

## '

**'ln** [1] - 58:17

## 0

**00** [1] - 16:19
**01** [1] - 16:19

## 1

**1** [2] - 33:7, 65:19
**10** [6] - 35:6, 43:6, 52:24, 71:17, 85:9, 94:8
**10-minute** [1] - 84:19
**10-page** [1] - 85:17
**10004** [1] - 2:13
**10013** [1] - 3:10
**106** [1] - 12:18
**11** [3] - 29:16, 38:18, 38:23
**117** [3] - 58:10, 60:24, 61:1
**1198** [1] - 25:8
**12** [2] - 69:12, 69:16
**12-203** [1] - 1:3
**125** [1] - 2:12
**129** [1] - 94:13
**12th** [1] - 3:9
**137** [1] - 24:4
**14** [3] - 30:15, 30:16, 94:14
**1401** [1] - 3:13
**1440** [1] - 2:16
**15** [1] - 52:22
**150** [1] - 1:7
**16** [2] - 45:5, 55:6
**161** [1] - 3:9
**170** [2] - 42:7, 72:25
**18-font** [1] - 101:9
**182** [1] - 66:6
**183** [1] - 66:8
**186** [1] - 65:16
**187** [2] - 65:19, 66:1
**19** [2] - 56:15, 58:15
**1919** [1] - 1:17
**1965** [1] - 62:16
**1968** [1] - 40:15
**1972** [1] - 40:24
**1:40** [1] - 1:5

## 2

**2** [1] - 33:23
**2,000** [1] - 88:13
**2,100** [1] - 88:14
**2.1** [6] - 17:17, 17:18, 17:21, 18:22, 18:23, 18:25
**2.2** [1] - 21:12
**2.7** [1] - 21:15
**20** [1] - 66:8
**20,000** [2] - 94:8, 97:24
**2000** [2] - 52:20, 52:21
**20001** [1] - 3:17
**20002** [1] - 3:6
**20005** [1] - 3:14
**20008** [1] - 3:3
**2002** [1] - 52:24
**20036** [1] - 1:18
**2008** [7] - 12:22, 24:8, 25:2, 25:13, 41:1, 41:3, 41:4, 43:10, 44:1, 53:1, 54:6
**2010** [4] - 12:22, 41:20, 44:2, 81:16
**2012** [7] - 1:4, 26:14, 77:13, 86:1, 86:3, 86:24, 99:8
**202** [6] - 1:18, 2:7, 3:4, 3:7, 3:14, 3:18
**20530** [1] - 2:7
**21** [3] - 42:8, 42:10, 73:2
**210** [1] - 2:20
**212** [1] - 2:13
**215** [1] - 3:6
**22** [1] - 61:2
**230** [1] - 2:16
**24** [1] - 73:5
**24.6** [1] - 19:5
**25** [2] - 42:24, 65:17
**26** [2] - 43:1, 43:2
**28** [1] - 41:21
**290** [3] - 16:13, 35:1, 35:4
**292-8327** [1] - 3:10
**29401** [1] - 2:21
**29412** [1] - 1:20

## 3

**3** [1] - 12:18, 40:6, 62:13
**3.7** [2] - 20:11
**30** [1] - 64:22
**30303** [1] - 2:17

**31** [1] - 1:4
**33** [2] - 41:16, 41:22
**333** [1] - 3:17
**34** [1] - 103:4
**353-8743** [1] - 2:7
**354-3186** [1] - 3:18
**38** [3] - 38:19, 42:4, 42:16
**39** [1] - 103:5
**3:43** [1] - 85:10
**3:55** [1] - 85:10

## 4

**4** [5] - 16:15, 16:18, 89:20, 89:22, 103:4
**40** [2] - 2:20, 93:18
**400** [1] - 3:13
**404** [1] - 2:17
**416-0257** [1] - 1:18
**43** [2] - 4:5, 22:2
**4301** [1] - 3:2
**434** [1] - 3:3
**44** [2] - 69:2, 103:6
**45** [2] - 64:17, 64:18
**457-0800** [1] - 3:4
**4704-A** [1] - 3:16
**48** [2] - 44:4, 103:6
**4:20** [1] - 102:13

## 5

**5** [3] - 1:6, 66:10, 89:19
**51** [1] - 103:7
**52** [2] - 39:15, 52:9
**523-2721** [1] - 2:17
**53** [1] - 44:3
**54** [2] - 40:16, 44:3
**558-1863** [1] - 2:13
**59** [2] - 4:4, 40:25

## 6

**6** [1] - 58:13
**602** [1] - 16:14
**609-7080** [1] - 1:21
**646** [1] - 3:10
**65** [1] - 103:7
**662-8389** [1] - 3:14

## 7

**7** [5] - 16:14, 66:8, 75:18, 89:20, 89:22
**720-1428** [1] - 2:21
**736-2200** [1] - 3:7

**74** [2] - 25:22, 26:3
**75** [1] - 41:4
**76** [2] - 41:2, 43:15
**77** [1] - 43:13
**78** [4] - 25:2, 25:6, 25:13, 41:9
**7th** [1] - 92:3

## 8

**8** [3] - 75:21, 89:20, 89:22
**80** [1] - 103:8
**82** [2] - 40:18, 41:8
**843** [2] - 1:21, 2:21
**85** [1] - 103:9
**89** [1] - 103:10

## 9

**9** [2] - 52:9, 52:12
**92** [1] - 103:11
**934** [1] - 1:20
**950** [1] - 2:6

## A

**A.B** [1] - 2:10
**abilities** [1] - 94:19
**ability** [6] - 47:10, 62:17, 76:17, 76:24, 94:8, 94:25
**able** [3] - 74:12, 94:15, 102:4
**above-entitled** [1] - 104:5
**absent** [1] - 94:22
**absolutely** [3] - 87:5, 96:7, 97:10
**ABUDU** [1] - 2:14
**abuses** [1] - 49:13
**academic** [3] - 6:1, 6:2, 68:7
**accept** [2] - 7:9, 16:11
**acceptable** [4] - 67:18, 70:13, 70:17, 70:19
**accepted** [1] - 102:5
**accordance** [1] - 86:20
**according** [2] - 20:20, 41:19
**account** [5] - 6:15, 9:1, 11:25, 13:23, 26:25
**accounting** [1] - 21:23
**accounts** [2] - 9:5, 21:18

**accurate** [6] - 18:2, 29:25, 33:10, 33:15, 33:17, 33:21
**acknowledge** [1] - 77:1
**act** [2] - 49:18, 96:16
**Act** [24] - 5:19, 14:13, 22:22, 26:9, 26:23, 27:7, 29:9, 29:12, 32:7, 33:12, 33:20, 40:14, 46:4, 46:6, 65:10, 66:3, 66:4, 85:25, 86:3, 86:19, 87:12, 90:15, 96:11, 96:14
**action** [1] - 95:24
**actions** [1] - 20:25
**active** [9] - 6:25, 7:4, 7:6, 7:12, 7:13, 13:6, 13:17, 16:8, 16:19
**actual** [4] - 36:9, 36:11, 54:25, 55:1
**add** [4] - 70:9, 84:7, 86:13, 92:7
**added** [1] - 5:16
**additional** [1] - 89:3
**address** [8] - 83:16, 83:21, 84:2, 84:3, 84:12, 96:24, 99:4, 99:16
**addressed** [4] - 15:8, 96:3, 98:25, 99:3
**adjourned** [1] - 102:13
**administrative** [1] - 89:14, 95:24, 96:24
**administrator** [1] - 90:9
**admit** [3] - 60:16, 73:22, 74:3
**admitted** [7] - 45:7, 45:13, 46:11, 55:24, 57:8, 60:20, 100:13
**adopt** [1] - 87:19
**adopted** [1] - 96:18
**advice** [1] - 91:1
**advise** [1] - 87:15
**affect** [4] - 23:9, 23:10, 29:5, 95:2
**affected** [5] - 14:12, 14:19, 22:3, 47:10, 86:15
**affects** [2] - 69:5, 76:23
**affidavit** [4] - 90:20, 90:24, 93:7, 93:11
**affidavits** [1] - 88:12
**affiliated** [1] - 81:14
**African** [22] - 21:14, 40:8, 40:16, 40:23, 41:5, 41:11, 41:17,

41:23, 42:4, 42:8, 42:17, 43:12, 44:5, 62:18, 74:13, 75:11, 76:22, 77:10, 77:15, 77:23, 78:1, 78:9

**afternoon** [9] - 4:2, 4:24, 4:25, 34:18, 34:19, 44:25, 45:1, 65:4, 65:5

**ago** [5] - 18:4, 30:22, 51:25, 59:10, 86:10

**agree** [15] - 6:9, 14:11, 52:17, 57:11, 62:24, 67:11, 67:13, 74:8, 74:12, 77:2, 78:10, 78:11, 79:16, 99:25, 100:6

**agreed** [4] - 11:17, 11:22, 59:10, 60:3

**agreeing** [1] - 57:24

**agrees** [1] - 87:22

**ahead** [6] - 47:22, 48:3, 50:17, 50:23, 67:7, 78:18

**aided** [1] - 3:25

**AL** [1] - 1:6

**ALAN** [2] - 1:22, 2:1

**alarming** [1] - 69:4

**alcohol** [1] - 93:11

**allow** [6] - 44:19, 47:22, 48:3, 51:13, 80:2, 88:10

**allowed** [1] - 51:13

**alone** [1] - 34:12

**ALSO** [1] - 1:22

**alternative** [2] - 58:6, 58:7

**alternatives** [1] - 71:20

**altogether** [2] - 8:12, 18:14

**Alvarez** [1] - 23:20

**ameliorate** [1] - 100:13

**AMERICA** [1] - 1:6

**American** [19] - 2:15, 2:19, 3:1, 39:12, 41:5, 41:11, 41:17, 41:23, 42:4, 42:9, 42:18, 43:12, 44:5, 74:13, 75:23, 76:4, 77:10, 77:23, 78:1

**Americans** [11] - 21:14, 24:11, 24:16, 40:8, 40:17, 40:23, 62:18, 75:11, 76:22, 77:15, 78:9

**Americas** [1] - 3:9

**amount** [1] - 32:11

**analyses** [1] - 5:17

**analysis** [36] - 6:7, 6:19, 6:21, 7:14, 8:12, 9:12, 9:19, 10:14, 11:14, 13:8, 13:12, 13:21, 14:21, 14:23, 15:16, 16:2, 16:22, 17:1, 17:20, 18:15, 18:19, 19:12, 20:20, 20:22, 21:2, 21:5, 21:22, 22:8, 26:25, 28:20, 28:25, 30:8, 36:25, 37:17, 45:14, 75:2

**analytical** [1] - 12:14

**analyze** [1] - 23:12

**ancestry** [1] - 81:11

**Andino** [13] - 86:5, 86:10, 86:11, 87:12, 87:16, 87:22, 87:24, 88:13, 92:24, 94:2, 96:18, 100:4

**Andino's** [6] - 32:12, 86:20, 87:19, 90:18, 94:13, 100:2

**ANGELA** [1] - 2:4

**ANNA** [1] - 2:2

**answer** [3] - 6:17, 14:8, 58:3, 58:19, 58:21, 58:24, 61:8, 61:10, 61:21, 65:19, 65:20, 65:23, 65:24, 66:13, 66:19, 66:22, 67:11, 70:1, 73:5, 73:6, 73:18, 78:14, 83:23, 83:24, 86:6, 86:13, 93:20, 94:17, 94:21, 94:24, 99:18

**answered** [2] - 50:9, 87:5

**answering** [1] - 93:22

**answers** [7] - 58:14, 59:5, 60:10, 60:11, 61:5, 62:5, 74:1

**anticipate** [1] - 26:14

**anyway** [2] - 19:12, 102:2

**apologies** [1] - 70:12

**appeal** [1] - 94:19

**appear** [3] - 19:4, 69:10, 91:6

**APPEARANCES** [1] - 1:14

**applied** [2] - 67:2, 88:2

**applies** [1] - 100:17

**apply** [2] - 86:24, 87:8

**appreciate** [1] - 102:10

**approach** [1] - 96:9

**appropriate** [1] -

91:20

**approximate** [1] - 75:17

**April** [1] - 89:21

**area** [4] - 26:13, 40:20, 62:17, 79:6

**areas** [1] - 46:11

**argue** [4] - 47:18, 62:9, 84:8, 85:15

**argued** [3] - 49:9, 49:17, 57:20

**arguing** [2] - 60:10, 99:11

**argument** [18] - 56:18, 57:9, 57:13, 57:16, 57:18, 58:4, 58:17, 58:23, 59:11, 59:15, 59:16, 60:14, 60:20, 61:6, 61:12, 61:16, 61:19, 61:22

**arguments** [2] - 62:7, 64:8

**Arlington** [3] - 45:20, 45:23, 46:15

**Arrington** [36] - 39:20, 46:1, 47:16, 49:16, 55:15, 57:1, 57:4, 57:9, 57:12, 57:16, 57:17, 57:19, 57:24, 58:1, 58:25, 59:8, 59:12, 59:20, 60:2, 60:3, 60:4, 60:6, 60:7, 60:17, 61:17, 61:23, 62:3, 62:8, 62:21, 62:24, 73:13, 73:15, 79:11, 79:13, 79:22, 81:1

**Arrington's** [3] - 44:9, 48:21, 58:22

**ARTHUR** [1] - 3:1

**article** [5] - 23:20, 24:4, 24:7, 24:10, 24:11

**articulate** [1] - 10:18

**Asian** [1] - 81:13

**aspects** [2] - 28:1, 31:7

**Assembly** [2] - 42:1, 49:8

**assert** [2] - 39:22, 40:1

**assessment** [3] - 11:18, 11:22, 97:7

**assistant** [1] - 70:4

**associated** [1] - 17:15

**assume** [6] - 4:14, 8:15, 38:4, 97:8, 98:25, 99:4

**assuming** [2] - 9:6

**assumption** [1] - 92:1

**astronomical** [1] - 100:2

**Atlanta** [1] - 2:17

**attachment** [1] - 17:8

**attainment** [3] - 75:12, 76:15, 76:22

**attempt** [1] - 85:15

**attempting** [1] - 61:14

**attention** [3] - 59:2, 88:12, 92:15

**attitudes** [8] - 23:8, 23:10, 23:12, 56:19, 57:10, 57:22, 58:18, 61:16

**attorney** [1] - 87:17

**Attorney** [16] - 1:22, 1:23, 9:3, 82:2, 83:15, 85:11, 86:10, 87:15, 89:14, 89:18, 90:7, 93:25, 98:3, 99:13, 103:9

**ATTORNEY** [7] - 84:5, 84:14, 84:21, 85:5, 85:12, 89:8, 101:9

**attributing** [1] - 62:8

**augmenting** [1] - 100:20

**August** [4] - 1:4, 30:15, 30:16, 45:5

**authority** [4] - 87:8, 87:12, 87:14, 94:3

**available** [11] - 5:13, 5:18, 22:22, 28:19, 29:7, 33:9, 33:12, 33:20, 40:16, 40:25, 88:7

**avalanche** [1] - 97:18

**Avenue** [5] - 2:6, 3:2, 3:9, 3:13, 3:17

**average** [3] - 43:11, 52:18

**aware** [8] - 8:25, 9:5, 44:15, 55:21, 68:10, 78:20, 78:25, 79:4

**B**

**BALDWIN** [1] - 2:2

**ballot** [4] - 77:6, 94:10, 94:12, 98:13

**Bancroft** [1] - 1:17

**bare** [1] - 24:13

**barriers** [1] - 31:8

**BARTOLOMUCCI** [6] - 1:15, 4:10, 83:11, 83:14, 101:19, 101:24

**based** [14] - 44:7, 46:13, 48:5, 48:19,

54:23, 55:3, 60:15, 69:8, 69:10, 69:12, 69:15, 74:11, 75:23, 98:16

**baseline** [2] - 89:16, 89:17

**bases** [1] - 47:17

**basis** [5] - 6:9, 31:13, 69:14, 82:9, 95:17

**BATES** [41] - 1:12, 6:1, 21:4, 32:20, 32:23, 38:13, 38:22, 47:3, 47:18, 47:21, 49:21, 50:6, 50:13, 50:16, 50:22, 51:12, 51:19, 58:3, 64:18, 64:23, 67:8, 72:7, 72:14, 80:16, 82:9, 83:7, 83:13, 83:19, 84:12, 84:16, 89:5, 89:7, 90:14, 90:17, 91:10, 92:3, 96:23, 99:2, 100:15, 100:24, 102:7

**Bates** [8] - 64:21, 83:24, 85:25, 86:2, 87:9, 92:9, 97:10, 99:17

**bear** [1] - 94:1

**became** [2] - 8:25, 9:5

**become** [2] - 24:24, 45:10

**BEENEY** [17] - 2:9, 64:21, 64:24, 65:3, 67:10, 72:17, 78:15, 78:19, 80:4, 80:12, 92:13, 96:6, 96:10, 97:10, 98:22, 99:17, 101:7

**Beeney** [1] - 64:17

**Beeney...........** [1] - 103:7

**Beeney......................** 
**..............** [1] - 103:11

**BEFORE** [1] - 1:11

**beforehand** [3] - 31:23, 91:25

**began** [1] - 90:4

**beginning** [3] - 61:2, 75:8, 94:14

**begins** [1] - 55:7

**behalf** [1] - 92:13

**behavior** [3] - 12:10, 12:15, 95:25

**belief** [2] - 88:17, 88:21

**believes** [1] - 50:20

**beneficiary** [2] - 64:25, 65:1

**best** [3] - 97:6, 99:23,

100:4
**better** [3] - 8:22, 13:15, 92:6
**between** [7] - 10:22, 10:25, 21:14, 21:22, 30:12, 52:19, 99:8
**beyond** [4] - 68:1, 70:3, 95:5, 96:10
**biggest** [1] - 95:4
**bill** [2] - 49:8, 49:9
**birth** [1] - 87:2
**bit** [3] - 50:22, 68:25, 77:21
**black** [10] - 25:22, 26:4, 40:12, 41:8, 41:20, 41:25, 42:22, 55:11, 77:19, 82:23
**blaming** [1] - 100:3
**Blockbuster** [1] - 88:18
**blog** [1] - 97:16
**blue** [1] - 20:9
**board** [2] - 42:14, 42:17
**boards** [3] - 42:11, 49:17, 55:23
**bottom** [2] - 55:8, 65:17
**BOWERS** [1] - 1:24
**box** [1] - 77:7
**BRADLEY** [1] - 2:1
**break** [6] - 83:22, 84:2, 84:17, 84:19, 85:2, 85:5
**breaks** [1] - 7:3
**Brennan** [1] - 3:8
**BRETT** [7] - 1:12, 91:12, 91:22, 95:14, 96:8, 98:20, 98:23
**brief** [3] - 64:24, 84:9, 89:12
**briefing** [1] - 100:22
**briefly** [4] - 40:11, 40:12, 52:14, 99:17
**briefs** [4] - 91:11, 96:23, 97:8, 100:16
**bring** [2] - 4:3, 85:16
**Broad** [1] - 2:12
**broad** [1] - 77:9
**brought** [1] - 88:12
**Bryan** [2] - 3:15, 45:4
**BRYAN** [5] - 1:15, 1:23, 2:2, 104:3, 104:6
**Buchanan** [26] - 38:21, 39:6, 44:13, 44:25, 48:19, 50:3, 51:4, 51:17, 51:24, 52:12, 58:10, 60:13, 61:4, 65:4, 65:8,

65:17, 67:12, 69:3, 71:7, 72:19, 73:18, 75:11, 78:20, 79:12, 80:25, 103:5
**BUCHANAN** [1] - 39:2
**Buchanan's** [4] - 44:16, 46:10, 52:8, 80:9
**bullet** [1] - 32:19
**burden** [7] - 23:5, 29:6, 92:22, 96:13, 96:15, 100:9, 100:12
**burdened** [1] - 28:10
**burdens** [1] - 28:18
**Bureau** [5] - 4:8, 76:5, 76:10, 81:12, 101:18
**Burton** [3] - 39:20, 44:8, 46:1, 47:15, 48:20, 55:15, 57:1, 57:4, 57:18, 57:20, 58:1, 58:2, 58:4, 60:17, 62:8, 62:24, 73:13, 73:15, 74:19, 79:11, 79:14, 79:22, 81:1
**Burton's** [1] - 49:6
**but..** [1] - 78:14
**BY** [20] - 4:23, 6:3, 21:20, 31:17, 33:1, 34:17, 39:4, 44:24, 48:18, 51:23, 52:11, 58:9, 60:12, 61:3, 65:3, 67:10, 72:17, 78:19, 80:24, 82:12

## C

**CA** [1] - 1:3
**calculated** [1] - 75:21
**Calhoun** [1] - 2:20
**CAMONI** [1] - 2:11
**Campaign** [1] - 3:5
**canceled** [1] - 16:19
**candidates** [1] - 62:19
**cannot** [7] - 12:6, 68:20, 70:1, 80:3, 95:9, 98:10, 100:9
**capable** [1] - 53:13
**capacity** [1] - 93:13
**capita** [5] - 75:15, 75:22, 76:12, 76:16, 76:20
**Capital** [1] - 3:2
**card** [11] - 22:25, 23:5, 27:6, 28:10, 28:13, 28:18, 33:9, 88:18, 88:19, 88:20
**cards** [4] - 6:12, 27:1, 27:2, 27:15

**care** [2] - 102:6, 102:12
**carefully** [1] - 90:7
**Carolina** [80] - 1:22, 1:24, 2:19, 4:4, 4:17, 8:16, 8:19, 9:3, 11:18, 11:23, 12:20, 14:18, 14:19, 18:24, 19:9, 19:16, 19:20, 25:10, 33:11, 33:18, 37:22, 38:18, 39:8, 40:17, 41:7, 41:11, 41:16, 41:20, 42:12, 42:15, 42:17, 42:20, 42:23, 43:3, 43:6, 43:17, 47:6, 47:9, 47:11, 48:2, 49:14, 55:22, 62:16, 65:9, 67:1, 69:5, 72:1, 74:8, 74:12, 74:13, 74:23, 74:24, 75:11, 75:22, 77:12, 77:22, 77:25, 78:4, 78:9, 78:21, 79:1, 81:7, 82:2, 83:15, 84:1, 84:11, 85:15, 85:18, 85:23, 85:25, 86:11, 87:22, 89:2, 89:22, 91:4, 95:10, 97:3, 97:8, 100:23, 101:17
**CAROLINA** [1] - 1:3
**Carolina's** [3] - 4:9, 44:15, 84:7
**Carolinians** [4] - 25:3, 25:14, 40:13, 41:9
**carry** [1] - 97:23
**cars** [1] - 87:1
**case** [55] - 7:16, 9:8, 11:9, 12:2, 13:3, 17:22, 23:13, 23:16, 30:20, 31:20, 31:22, 39:18, 39:21, 40:19, 43:24, 44:7, 45:20, 45:23, 45:25, 46:2, 46:7, 46:10, 47:13, 47:16, 47:19, 48:19, 48:24, 62:3, 65:9, 65:14, 66:2, 66:24, 68:3, 68:11, 73:16, 73:19, 74:6, 75:17, 78:21, 79:1, 79:17, 81:1, 81:4, 83:8, 83:12, 83:13, 83:15, 84:7, 84:8, 85:16, 92:21, 93:3, 94:7, 98:24, 99:7
**cases** [4] - 63:15, 69:10, 70:1, 70:4, 95:23
**categories** [1] - 34:13

**CATHERINE** [1] - 2:3
**caused** [1] - 6:18
**causes** [1] - 59:22
**caution** [1] - 90:8
**ceding** [2] - 4:5, 64:17
**census** [4] - 4:12, 41:20, 75:23, 81:9
**Census** [5] - 4:8, 76:5, 76:10, 81:12, 101:18
**Center** [2] - 3:5, 3:8
**certain** [2] - 77:18, 79:14, 89:18
**certainly** [22] - 4:11, 5:25, 7:7, 7:9, 23:11, 64:14, 64:25, 68:19, 78:7, 83:21, 85:7, 86:16, 92:17, 92:22, 93:4, 94:1, 95:9, 98:10, 98:16, 98:17, 99:25, 100:19
**CERTIFICATE** [1] - 104:2
**certificates** [1] - 87:2
**certification** [1] - 94:16
**certify** [1] - 104:3
**cetera** [2] - 37:5, 97:4
**challenge** [1] - 98:12
**change** [6] - 5:22, 31:2, 66:9, 95:19, 98:20, 99:4
**changed** [2] - 6:15, 26:9, 73:8
**changes** [5] - 21:23, 32:6, 89:15, 95:22, 100:3
**changing** [1] - 89:13
**characteristics** [1] - 30:10
**characterization** [1] - 59:19
**characterize** [2] - 15:4, 21:21
**charge** [2] - 88:10, 88:11, 93:2
**charging** [2] - 88:5, 88:7
**Charles** [1] - 103:4
**Charleston** [2] - 1:20, 2:21
**chart** [1] - 54:3
**charts** [1] - 7:5
**chase** [1] - 60:13
**chimed** [1] - 83:25
**choice** [7] - 8:21, 8:22, 8:25, 9:22, 10:7, 13:15, 62:20
**choose** [1] - 95:9
**Chris** [1] - 38:20
**CHRISTOPHER** [2] -

1:15, 1:19
**CIRCUIT** [1] - 1:12
**circumstances** [1] - 10:9
**circumstantial** [1] - 48:25
**Citadel** [3] - 39:9, 53:23, 63:25
**cite** [8] - 22:17, 32:17, 49:1, 53:7, 55:19, 63:17, 68:7, 82:24
**cited** [2] - 32:18, 60:6
**citing** [1] - 93:8
**Civil** [5] - 2:5, 2:15, 2:19, 3:1, 3:12
**claim** [2] - 49:20, 68:8
**claiming** [4] - 73:10, 73:12, 76:6, 89:23
**claims** [1] - 86:24
**classification** [1] - 5:21
**classifications** [1] - 5:20
**clear** [5] - 13:16, 18:22, 51:15, 99:12
**clearly** [2] - 46:13, 90:11
**clock** [2] - 44:20, 44:21
**close** [2] - 83:7, 89:24
**closed** [1] - 90:2
**closer** [1] - 44:5
**Clyburn** [1] - 41:18
**Coates** [9] - 38:20, 46:18, 49:21, 52:14, 60:9, 61:24, 62:2, 80:6, 80:14
**COATES** [28] - 1:19, 38:20, 39:1, 39:4, 44:22, 46:25, 47:5, 48:9, 48:11, 48:15, 48:18, 50:5, 50:8, 50:15, 50:18, 50:24, 59:18, 60:6, 67:3, 71:25, 72:9, 78:12, 80:1, 80:20, 80:22, 80:24, 82:12, 83:1
**coates** [1] - 61:13
**Coates's** [1] - 72:18
**Coates..........** [3] - 103:5, 103:6, 103:8
**code** [4] - 14:8, 20:5, 36:6, 36:7
**codes** [2] - 17:14, 17:15
**COLLEEN** [54] - 1:11, 4:2, 4:15, 4:21, 30:14, 31:1, 31:16, 34:2, 38:10, 38:17, 44:11, 44:19, 46:17,

48:7, 48:10, 48:12,
51:1, 51:3, 51:6,
51:8, 57:25, 59:25,
60:9, 60:25, 67:6,
72:5, 72:15, 78:13,
78:17, 80:2, 80:6,
80:11, 80:14, 80:21,
82:6, 83:2, 83:5,
83:9, 83:20, 84:18,
84:24, 85:6, 85:11,
89:6, 89:9, 91:14,
91:23, 92:11,
100:18, 100:25,
101:11, 101:22,
101:25, 102:12
**Colonel** [1] - 9:25
**COLUMBIA** [1] - 1:1
**column** [4] - 25:9,
35:9, 35:14
**combined** [2] - 42:4,
86:6
**comfort** [3] - 96:5,
96:17, 98:11
**coming** [1] - 93:10
**comment** [2] - 7:19,
49:7
**comments** [2] - 35:15,
85:13
**Commission** [4] -
27:24, 87:14, 94:20,
98:3
**commission** [9] - 8:2,
11:3, 11:12, 11:17,
11:22, 12:4, 87:16,
87:18, 95:7
**commission's** [4] -
27:5, 28:3, 29:10,
32:7
**commissions** [2] -
95:13, 98:8
**Committee** [1] - 3:12
**communications** [1] -
97:3
**Community** [2] -
75:23, 76:5
**compare** [3] - 41:3,
41:6, 75:21
**compared** [3] - 43:8,
58:7, 76:22
**compares** [1] - 43:6
**comparing** [1] - 76:11
**Compass** [1] - 1:20
**compile** [1] - 70:6
**compiled** [1] - 69:19
**compiles** [1] - 69:18
**completely** [2] - 92:20
**compliance** [1] -
65:10
**comply** [1] - 30:10
**complying** [2] - 29:18,

29:23
**computer** [1] - 3:25
**computer-aided** [1] -
3:25
**conceptualized** [1] -
8:1
**conceptualizing** [1] -
8:6
**concern** [1] - 96:3
**concerning** [11] -
11:12, 44:8, 44:9,
47:8, 48:20, 48:21,
49:2, 50:10, 50:12,
50:19, 88:5
**concerns** [1] - 91:3
**concluded** [1] - 24:18
**conclusion** [13] - 33:7,
33:10, 33:23, 44:8,
55:20, 69:15, 79:20,
79:24, 83:10, 85:19,
93:21, 96:21, 99:1
**conclusions** [16] -
6:10, 27:25, 28:5,
28:6, 29:17, 30:8,
33:4, 48:20, 54:16,
54:22, 64:10, 72:3,
72:6, 72:7, 72:10,
91:16
**concur** [1] - 92:17
**concurs** [1] - 86:11
**condenses** [1] - 87:11
**conditions** [4] - 43:7,
43:20, 47:9, 87:2
**conducted** [1] - 70:25
**conferring** [1] - 47:20
**confidence** [2] - 63:2,
63:16
**confident** [1] - 82:22
**confined** [1] - 84:9
**confirm** [2] - 72:18,
88:6
**conflict** [1] - 43:18
**conflicting** [1] - 87:24
**confusion** [1] - 18:22
**congressional** [3] -
41:14, 41:16, 41:22
**congressmen** [1] -
41:15
**Connecticut** [1] - 3:2
**consequences** [1] -
20:25
**consider** [14] - 5:4,
12:3, 12:9, 28:25,
29:3, 30:5, 30:7,
33:7, 33:8, 33:15,
47:24, 50:16, 79:16,
88:9
**consideration** [3] -
30:8, 49:12, 84:7
**considered** [13] - 5:1,

9:18, 11:2, 11:4,
14:17, 15:12, 15:13,
27:12, 31:18, 32:8,
32:11, 48:5, 49:8
**considering** [2] -
27:17, 28:6
**considers** [1] - 7:4
**consistent** [2] - 69:24,
86:9
**Constitution** [1] - 3:17
**constraints** [1] - 13:12
**construe** [1] - 88:3
**contend** [1] - 54:25
**contention** [1] - 49:16
**context** [8] - 11:9,
23:16, 55:22, 84:10,
85:14, 89:14, 99:15,
100:16
**continues** [1] - 89:17
**contradicts** [1] - 92:23
**Control** [1] - 6:6
**control** [1] - 54:5
**controlling** [1] - 54:12
**controls** [1] - 54:7
**controversy** [1] -
10:21
**convincing** [1] - 48:24
**COOPER** [1] - 2:9
**copied** [1] - 76:9
**copy** [1] - 51:5
**Corporation** [3] -
45:21, 45:24, 46:16
**correct** [66] - 5:15,
7:20, 7:24, 8:14,
9:17, 11:6, 11:15,
12:19, 15:22, 15:25,
16:7, 16:17, 16:21,
23:1, 23:7, 26:21,
27:3, 27:11, 28:4,
33:6, 36:15, 37:25,
41:24, 45:5, 45:9,
45:15, 50:3, 52:15,
52:20, 52:22, 52:23,
52:24, 52:25, 53:1,
53:4, 53:7, 53:14,
54:9, 54:17, 54:23,
55:4, 55:14, 56:8,
56:11, 57:1, 57:13,
57:19, 57:23, 59:19,
61:21, 63:25, 64:1,
65:21, 65:23, 67:12,
69:13, 74:15, 76:14,
77:20, 82:24, 83:6,
83:14, 87:24, 94:24,
96:7, 104:4
**correctly** [5] - 25:12,
26:3, 55:9, 63:10,
90:19
**costs** [1] - 76:17
**counsel** [2] - 38:23,

59:20
**count** [1] - 98:13
**counted** [1] - 94:12
**counties** [15] - 43:7,
43:8, 43:9, 43:11,
43:15, 43:16, 43:23,
43:25, 44:2, 44:3,
44:4, 52:19, 56:14,
82:24
**country** [1] - 70:15
**County** [1] - 49:14
**county** [13] - 94:9,
94:10, 94:17, 94:22,
95:6, 95:12, 97:16,
97:19, 97:22, 98:8,
98:12
**countywide** [1] - 43:4
**couple** [5] - 4:3,
30:22, 32:16, 34:5,
93:25
**course** [10] - 23:10,
28:12, 29:14, 44:14,
46:7, 85:22, 89:2,
92:15, 93:3
**courses** [2] - 64:2,
64:4
**court** [22] - 4:17,
38:24, 67:4, 84:10,
85:18, 86:7, 86:21,
89:17, 89:22, 90:8,
90:10, 91:6, 95:1,
95:8, 95:10, 95:23,
98:11, 98:12, 98:14,
98:18, 98:21, 99:14
**COURT** [3] - 1:1, 1:12,
47:2
**Court** [26] - 3:15, 3:16,
4:13, 4:14, 39:17,
44:15, 45:10, 45:16,
47:20, 47:24, 65:1,
83:17, 85:22, 89:2,
89:3, 90:7, 91:1,
92:14, 92:22, 93:4,
93:8, 95:4, 96:14,
96:20, 102:9, 104:3
**Court's** [1] - 83:18
**court's** [1] - 95:23
**Courthouse** [1] - 3:16
**courtroom** [2] - 32:11,
93:19, 100:5
**courts** [3] - 94:23,
95:10, 95:25
**cover** [2] - 86:14, 87:6
**covers** [1] - 87:1
**create** [1] - 13:10
**created** [1] - 33:22
**credential** [1] - 12:6
**credit** [1] - 88:20
**critical** [1] - 99:23
**criticize** [1] - 59:15

**criticizing** [5] - 57:15,
59:11, 60:4, 61:19,
61:22
**Cromwell** [1] - 2:12
**cross** [1] - 51:1
**CRR** [1] - 3:15
**current** [4] - 12:6,
13:24, 14:6, 88:19
**customers** [1] - 15:24
**customers'** [1] - 17:4
**cut** [1] - 60:13
**cycle** [2] - 54:6, 54:12

## D

**DANIEL** [1] - 2:4
**data** [44] - 4:12, 5:1,
5:8, 5:13, 5:14, 5:17,
6:5, 6:13, 8:2, 10:21,
13:10, 19:8, 19:23,
22:7, 22:19, 33:22,
34:3, 34:4, 36:2,
40:15, 40:25, 46:13,
49:19, 53:12, 54:4,
54:13, 54:20, 54:22,
54:25, 55:1, 55:2,
55:14, 55:16, 55:17,
56:14, 63:13, 63:14,
63:17, 64:9, 69:18,
75:14, 76:2, 76:10
**database** [12] - 14:10,
15:21, 16:5, 17:4,
19:1, 20:21, 36:18,
36:22, 36:23, 37:15,
38:5
**databases** [1] - 22:12
**date** [11] - 16:20, 19:8,
19:10, 19:16, 30:21,
32:7, 33:21, 36:9,
36:11, 36:13, 91:15
**dates** [1] - 36:9
**DAY** [1] - 1:6
**days** [1] - 86:10
**DC** [7] - 1:4, 1:18, 2:7,
3:3, 3:6, 3:14, 3:17
**dead** [5] - 5:23, 6:16,
7:21, 15:8, 15:12
**deadline** [1] - 44:16
**deal** [3] - 48:4, 77:17,
85:3
**dealing** [1] - 28:22
**deals** [2] - 22:3, 55:21
**deceased** [4] - 6:4,
6:12, 6:19
**December** [1] - 89:18
**decide** [3] - 13:12,
92:25, 95:13
**decided** [2] - 34:9,
80:18

**deciding** [5] - 16:2, 35:19, 35:23, 36:3, 36:5
**decision** [5] - 9:19, 36:10, 96:11, 101:17, 102:11
**decisions** [3] - 7:19, 94:20, 101:14
**declaration** [11] - 5:2, 5:4, 5:7, 10:1, 10:6, 10:11, 10:12, 12:17, 27:10, 33:4, 33:5
**declarations** [1] - 23:3
**decreases** [2] - 20:24, 21:6
**deems** [1] - 87:3
**Defendant** [1] - 2:9
**Defendants** [2] - 1:7, 2:1
**defendants'** [1] - 72:3
**defer** [1] - 80:18
**definition** [3] - 23:5, 70:19, 81:9
**definitions** [1] - 17:15
**degree** [1] - 14:14
**delegation** [1] - 41:17
**deliver** [1] - 71:3
**DELLHEIM** [6] - 2:1, 89:11, 90:16, 90:18, 91:17, 92:9
**Dellheim** [1] - 89:11
**Dellheim.....................
............** [1] - 103:10
**dementia** [1] - 93:12
**Democrat** [1] - 41:17
**Democratic** [1] - 74:15
**Democrats** [1] - 24:20
**denied** [1] - 89:19
**deny** [1] - 26:2
**denying** [1] - 94:20
**Department** [7] - 2:5, 5:8, 6:6, 30:17, 66:10, 66:11, 92:17
**depict** [2] - 6:24, 17:11
**depicted** [1] - 7:12
**deposition** [39] - 22:11, 30:19, 31:19, 31:21, 31:22, 31:25, 32:6, 32:8, 44:16, 45:5, 45:7, 45:13, 45:19, 51:5, 52:3, 55:24, 56:23, 57:8, 57:23, 58:11, 59:7, 59:19, 60:15, 60:20, 61:1, 62:23, 63:6, 63:8, 65:13, 65:16, 66:6, 67:11, 67:23, 71:16, 72:25, 78:16,

94:13
**depositions** [2] - 73:21, 73:23
**depressed** [1] - 43:22
**depth** [2] - 67:21, 67:22
**Deputy** [1] - 1:23
**describe** [4] - 29:22, 35:15, 37:1, 99:6
**described** [9] - 7:21, 18:1, 18:6, 18:24, 30:21, 30:24, 36:22, 55:12, 86:4
**describes** [2] - 17:13, 30:1
**describing** [1] - 27:20
**description** [3] - 36:11, 36:15, 36:17
**descriptions** [2] - 20:17, 22:19
**descriptive** [1] - 54:20
**detail** [1] - 89:1
**details** [3] - 29:1, 30:7, 30:11
**determination** [4] - 89:20, 94:11, 96:14, 98:12
**determine** [1] - 17:20
**determined** [2] - 25:22, 34:22
**determining** [5] - 45:8, 49:23, 50:2, 50:4, 50:7
**deters** [1] - 68:15
**developed** [1] - 17:4
**Development** [3] - 45:21, 45:24, 46:16
**dictate** [1] - 94:8
**difference** [5] - 6:18, 21:19, 21:21, 77:6, 82:8
**differences** [3] - 30:12, 53:10, 53:14
**different** [11] - 17:14, 17:15, 37:3, 43:7, 70:10, 92:21, 95:8, 96:13, 101:7
**differing** [1] - 6:10
**difficult** [1] - 51:10
**dire** [3] - 44:13, 44:18, 50:9
**Dire** [1] - 103:6
**DIRE** [1] - 44:23
**direct** [6] - 32:15, 48:23, 51:9, 51:11, 51:14, 77:18
**directed** [1] - 59:7
**directions** [1] - 86:20
**directly** [6] - 21:8, 21:9, 22:9, 22:20,

95:8, 98:19
**Director** [1] - 11:17
**director** [4] - 9:3, 11:11, 11:16, 11:21
**director's** [1] - 11:22
**disabilities** [1] - 87:1
**disadvantage** [1] - 91:21
**disagree** [2] - 61:14, 61:17
**disagreed** [1] - 11:17
**disagreements** [1] - 39:20
**discourage** [1] - 68:21
**discovered** [1] - 93:3
**discovery** [5] - 89:24, 89:25, 90:1, 90:2
**discrimination** [2] - 55:12, 56:11
**discriminatory** [14] - 49:18, 71:9, 71:13, 71:24, 72:11, 72:13, 72:20, 73:4, 73:11, 75:3, 78:23, 79:2, 79:21, 100:14
**discuss** [1] - 10:4
**discussed** [5] - 32:14, 52:14, 56:22, 60:19, 63:5
**discusses** [1] - 24:7
**discussing** [3] - 5:24, 21:24, 24:5
**discussion** [5] - 32:13, 34:24, 60:22, 62:25, 87:19
**disenfranchised** [3] - 90:13, 90:22, 90:25
**disparate** [2] - 99:20, 99:21
**disparities** [6] - 6:11, 6:14, 21:11, 22:2, 29:20, 30:1
**disparity** [6] - 20:21, 21:2, 21:3, 21:14, 21:16, 21:17
**dispositive** [1] - 12:1
**disproportionately** [1] - 15:6
**dispute** [4] - 94:3, 94:4, 94:6, 99:19
**DISTRICT** [4] - 1:1, 1:1, 1:11, 1:12
**diverge** [1] - 91:6
**Division** [1] - 2:5
**DL** [1] - 36:13
**DMV** [24] - 8:3, 8:17, 9:2, 10:22, 11:2, 11:7, 11:8, 11:22, 12:6, 13:18, 13:25, 15:24, 16:5, 17:4,

22:7, 22:9, 22:12, 34:5, 34:7, 34:8, 36:14, 36:18, 36:21, 36:23
**DMV-issued** [1] - 13:18
**document** [10] - 12:25, 15:3, 20:24, 22:13, 39:16, 61:7, 71:16, 85:17, 92:5, 93:14
**documentary** [1] - 51:16
**documentation** [3] - 17:25, 18:2, 18:3
**documents** [8] - 18:5, 22:14, 22:16, 22:17, 22:20, 46:3, 73:21, 73:24
**DOJ** [1] - 4:4
**done** [4] - 50:21, 71:1, 73:21, 95:23
**doubt** [2] - 87:25, 88:3
**down** [12] - 18:10, 37:9, 37:13, 38:14, 72:24, 79:13, 83:3, 83:4, 87:11, 95:5, 96:12, 99:21
**Dr** [60] - 4:17, 4:24, 5:1, 22:21, 26:3, 26:22, 33:25, 38:21, 44:8, 44:9, 48:19, 48:20, 48:21, 49:6, 49:16, 50:3, 57:4, 57:9, 57:12, 57:16, 57:17, 57:18, 57:19, 57:20, 57:24, 58:1, 58:2, 58:4, 58:22, 59:8, 59:12, 59:20, 60:2, 60:3, 60:4, 60:6, 60:7, 61:23, 62:21, 62:24, 65:4, 65:8, 65:17, 67:12, 69:3, 71:7, 72:19, 73:18, 75:11, 78:20, 79:12, 79:13, 79:14, 79:22, 80:25, 81:1
**dramatic** [1] - 62:16
**dramatically** [2] - 40:13, 40:24
**draw** [1] - 96:20
**drawing** [3] - 54:22, 55:3, 64:10
**drawn** [1] - 12:10
**drill** [2] - 37:9, 37:13
**driver** [1] - 37:22
**driver's** [6] - 6:11, 7:22, 8:16, 22:24, 23:4, 36:6, 36:13, 37:4

**driving** [1] - 38:3
**Drs** [8] - 39:20, 46:1, 47:15, 55:15, 57:1, 62:8, 73:13, 73:15
**drugs** [1] - 93:12
**due** [10] - 6:12, 36:9, 56:19, 57:10, 57:21, 58:18, 59:2, 61:15, 92:3, 97:11
**DUNN** [1] - 2:18
**during** [3] - 16:22, 16:25, 93:3
**DVORKIS** [1] - 2:10

## E

**e-mail** [1] - 32:17
**early** [1] - 5:11
**education** [6] - 29:9, 29:10, 29:13, 29:15, 76:22, 77:4
**educational** [2] - 75:12, 76:15
**effect** [10] - 6:21, 33:15, 68:16, 68:20, 86:1, 86:3, 86:8, 86:9, 86:12, 100:13
**effects** [3] - 7:19, 54:5, 54:12
**efficacy** [1] - 77:6
**either** [16] - 6:18, 8:21, 20:23, 21:23, 21:24, 22:14, 23:2, 27:9, 51:18, 52:6, 69:21, 89:9, 91:22, 99:13, 102:5
**elaborate** [1] - 76:25
**elect** [1] - 62:19
**elected** [11] - 41:11, 41:22, 41:25, 42:11, 42:19, 43:3, 77:23, 78:1, 78:3, 78:5, 81:7
**Election** [7] - 23:21, 23:24, 24:1, 27:24, 87:14, 94:20, 98:3
**election** [43] - 8:2, 11:3, 11:11, 11:17, 11:22, 12:3, 12:22, 23:15, 24:7, 24:8, 24:13, 25:2, 25:13, 27:5, 28:3, 29:10, 32:6, 40:24, 40:25, 43:23, 49:17, 53:11, 54:6, 54:12, 54:25, 55:1, 77:19, 86:1, 86:4, 86:24, 87:7, 87:13, 87:16, 87:17, 87:22, 94:10, 95:7,

95:12, 95:20, 97:19, 98:8, 99:8

**ElectionNet** [1] - 97:16

**elections** [13] - 13:2, 13:4, 41:14, 43:25, 44:1, 47:6, 47:11, 49:19, 55:10, 55:22, 77:22, 81:6, 86:25

**electoral** [3] - 63:2, 69:6, 77:14

**electronically** [2] - 84:23, 85:19

**eligible** [1] - 8:19

**emphasis** [1] - 94:2

**enacted** [14] - 27:17, 71:8, 71:12, 71:23, 72:10, 72:12, 72:20, 73:4, 73:11, 75:3, 78:22, 79:2, 79:21, 100:5

**enactment** [2] - 44:10, 48:22

**end** [9] - 4:13, 16:18, 75:9, 89:13, 92:19, 96:19, 98:10, 101:21, 101:22

**endorsement** [4] - 9:18, 9:21, 9:23, 9:24

**engage** [1] - 20:2

**engaged** [1] - 26:12

**enjoined** [2] - 95:19, 95:25

**ensure** [2] - 90:10, 90:22

**entire** [1] - 19:1

**entirely** [1] - 34:14

**entirety** [8] - 10:8, 46:8, 65:15, 65:22, 65:24, 67:14, 67:16, 80:10

**entitled** [3] - 23:21, 56:25, 104:5

**Environmental** [1] - 6:6

**equals** [2] - 16:19

**era** [1] - 78:6

**ERIN** [1] - 2:3

**err** [1] - 87:23

**erring** [1] - 87:20

**especially** [1] - 62:18

**ESQ** [2] - 1:15, 1:24

**ESQUIRE** [24] - 1:15, 1:16, 1:16, 1:19, 2:1, 2:1, 2:2, 2:2, 2:3, 2:3, 2:4, 2:4, 2:9, 2:9, 2:10, 2:10, 2:11, 2:11, 2:14, 2:18, 3:1, 3:5, 3:8, 3:11

**establish** [1] - 89:15

**estimating** [1] - 29:8

**et** [2] - 37:5, 97:4

**ET** [1] - 1:6

**Eugene** [1] - 39:6

**evaluating** [1] - 28:18

**eventually** [1] - 18:16

**evidence** [24] - 32:15, 48:23, 48:25, 49:2, 50:19, 51:17, 67:3, 71:10, 71:11, 71:12, 71:14, 71:15, 71:18, 71:21, 73:10, 73:12, 73:16, 73:19, 74:6, 92:23, 94:7, 96:20, 97:12, 97:22

**evolve** [1] - 89:17

**exact** [3] - 75:16, 75:19, 75:24

**exactly** [3] - 43:2, 72:8, 93:6

**exam** [1] - 51:9

**EXAMINATION** [8] - 4:22, 34:16, 39:3, 44:23, 48:17, 51:22, 65:2, 80:23

**Examination** [8] - 103:4, 103:4, 103:5, 103:6, 103:6, 103:7, 103:7, 103:8

**examined** [3] - 35:20, 44:6, 74:19

**example** [8] - 49:4, 49:10, 49:15, 49:16, 61:11, 62:12, 69:2, 97:25

**examples** [3] - 49:1, 62:10, 98:6

**except** [2] - 42:20, 53:1

**exception** [1] - 29:4

**excerpt** [1] - 12:17

**excerpts** [1] - 93:4

**exchange** [7] - 10:22, 10:24, 10:25, 11:1, 11:3, 11:10, 18:9

**exclude** [10] - 8:22, 8:23, 9:14, 9:19, 13:13, 13:14, 13:15, 13:21, 18:13, 21:13

**excluded** [8] - 11:23, 13:8, 14:25, 15:1, 17:21, 18:14, 18:16, 19:12

**excluding** [6] - 6:12, 14:24, 18:19, 20:20, 21:24, 21:25

**exclusion** [1] - 6:19

**exclusively** [1] - 9:16

**excuse** [4] - 27:13,

34:22, 55:9, 66:25

**excused** [2] - 38:11, 102:6

**execute** [1] - 93:10

**executing** [2] - 86:7, 93:7

**executive** [3] - 11:11, 11:16, 11:21

**Exhibit** [11] - 12:17, 16:13, 35:1, 35:4, 39:15, 52:9, 52:12, 69:12, 75:18, 75:21

**exhibit** [2] - 12:19, 32:21, 32:22, 35:2, 35:6, 52:17, 53:10

**expand** [1] - 70:3

**expect** [4] - 53:6, 97:1, 97:5, 97:7

**expert** [28] - 44:13, 45:8, 45:11, 45:14, 45:16, 46:11, 46:12, 46:20, 47:4, 47:12, 47:14, 49:24, 50:4, 50:5, 50:7, 50:9, 50:14, 51:25, 52:2, 52:4, 52:6, 63:20, 65:8, 66:24, 68:2, 78:20, 78:25, 81:4

**expertise** [3] - 46:18, 50:12, 50:20

**experts** [3] - 50:19, 72:4, 99:20

**expiration** [1] - 16:20

**explanations** [2] - 58:6, 58:8

**express** [1] - 66:3

**expressed** [2] - 22:23, 31:4

**extend** [1] - 51:16

**extensively** [2] - 10:19, 47:8

**extent** [2] - 97:2, 99:5

**extra** [2] - 33:14, 64:22

**eyeballed** [1] - 64:9

**eyeballing** [2] - 54:21, 54:22

**eyes** [1] - 55:4

## F

**face** [1] - 91:5

**faced** [1] - 92:19

**facing** [1] - 28:22

**fact** [32] - 6:4, 7:3, 9:18, 10:4, 11:1, 12:4, 12:12, 12:21, 14:24, 21:19, 28:9, 33:17, 37:19, 46:6,

49:12, 52:3, 55:24, 56:10, 57:8, 57:12, 59:1, 59:20, 60:19, 62:7, 69:4, 79:5, 87:17, 91:16, 91:19, 91:20, 94:10, 101:14

**factor** [1] - 43:9

**factors** [3] - 59:3, 77:1, 77:8

**facts** [4] - 46:13, 84:8, 85:16, 89:13

**fair** [1] - 28:8

**fairly** [1] - 5:11

**fall** [2] - 13:11, 86:16

**falls** [1] - 21:3

**false** [1] - 87:4

**familiar** [4] - 16:12, 46:15, 54:19

**fancy** [1] - 54:21

**far** [3] - 57:18, 64:24, 73:20

**favor** [4] - 23:18, 24:23, 87:25, 88:3

**favored** [2] - 24:16, 25:14

**fee** [1] - 88:11

**felt** [2] - 59:10, 99:22

**few** [4] - 44:18, 48:8, 48:10, 48:11, 59:10, 70:5, 86:10, 89:12

**FIELD** [1] - 1:15

**field** [10] - 16:12, 35:20, 35:21, 35:24, 35:25, 36:12, 37:8, 46:18, 50:20, 70:3

**fields** [7] - 16:10, 16:18, 18:6, 22:19, 35:11, 35:13, 37:7

**figure** [4] - 41:1, 75:4, 85:2, 93:19

**figures** [5] - 41:25, 75:16, 75:19, 77:16, 82:20

**file** [10] - 47:23, 48:1, 84:23, 85:18, 91:2, 91:19, 92:4, 95:24, 100:19, 101:4

**filed** [3] - 4:10, 91:11, 92:2

**files** [2] - 90:7, 91:9

**filing** [6] - 92:3, 92:7, 92:8, 94:1, 100:21, 100:23

**filings** [1] - 96:4

**final** [6] - 33:2, 89:15, 89:21, 89:23, 89:25, 90:2, 94:12, 94:16, 94:22

**finalized** [1] - 90:5

**finally** [1] - 90:4

**findings** [4] - 91:16, 91:19, 91:20, 101:13

**fine** [5] - 37:13, 85:4, 91:10, 91:22, 91:23

**finished** [4] - 83:6, 83:11, 83:14, 101:16

**first** [13] - 9:5, 16:13, 40:15, 40:25, 56:16, 62:15, 78:24, 84:6, 84:17, 85:24, 95:6, 97:22, 98:11

**fits** [1] - 81:9

**five** [4] - 43:8, 43:9, 43:11, 43:14

**fixed** [1] - 89:16

**flashed** [1] - 32:12

**flattered** [1] - 32:18

**Floor** [1] - 3:9

**Florence** [1] - 49:14

**Florida** [1] - 14:15

**focus** [2] - 31:7, 56:16

**focused** [3] - 16:1, 31:8, 59:1

**folks** [6] - 12:25, 13:3, 14:15, 14:21, 15:5, 22:9

**follow** [2] - 34:20, 93:16

**followed** [1] - 97:13

**following** [7] - 24:8, 25:2, 25:13, 58:14, 87:20, 95:18

**footnote** [1] - 10:5

**FOR** [2] - 1:1, 39:2

**foregoing** [1] - 104:4

**forgive** [1] - 91:17

**form** [12] - 13:18, 13:24, 14:5, 14:10, 29:11, 29:14, 33:16, 37:15, 61:24, 68:9, 83:25, 84:22

**formal** [1] - 87:15

**formation** [1] - 45:25

**formed** [1] - 31:5

**forming** [4] - 40:8, 40:19, 46:2, 46:7

**forms** [4] - 22:22, 33:12, 33:19, 67:18

**forth** [1] - 46:3

**forward** [5] - 28:21, 39:19, 43:5, 56:15, 90:6

**foundation** [2] - 78:12, 78:16

**Foundation** [2] - 2:15, 2:19

**four** [2] - 81:21, 81:23

**fraction** [1] - 14:9

**frame** [2] - 86:25, 102:11

**frames** [1] - 94:16
**frank** [1] - 85:1
**frankly** [1] - 64:12
**fraud** [13] - 45:14, 45:17, 63:1, 63:15, 68:9, 68:15, 69:3, 69:10, 70:1, 70:4, 70:15, 74:23
**free** [2] - 28:10, 37:5
**FREEMAN** [1] - 2:4
**friends** [1] - 70:12
**front** [4] - 21:9, 51:14, 76:24
**frozen** [1] - 90:5
**full** [3] - 7:20, 39:5, 62:7
**fully** [1] - 35:16
**function** [1] - 37:8
**fundamental** [1] - 88:4
**furthermore** [1] - 36:8
**future** [1] - 86:25

**G**

**GA** [1] - 2:17
**gap** [5] - 52:17, 52:22, 52:24, 53:1, 53:6
**gaps** [1] - 5:21
**gargantuan** [1] - 100:11
**GARRARD** [1] - 2:9
**gate** [1] - 27:21
**gender** [1] - 37:21
**general** [12] - 12:22, 25:2, 27:25, 28:5, 28:6, 30:9, 30:24, 31:15, 43:19, 53:25, 86:1
**General** [16] - 1:22, 1:23, 42:1, 49:7, 57:1, 82:3, 83:15, 85:11, 87:15, 89:14, 89:18, 90:7, 93:25, 98:3, 99:13, 103:9
**GENERAL** [7] - 84:5, 84:14, 84:21, 85:5, 85:12, 89:8, 101:9
**General's** [2] - 9:3, 86:10
**generally** [4] - 68:4, 77:1, 87:13, 90:15
**generated** [1] - 9:7
**generic** [5] - 24:23, 31:6, 31:10, 31:14, 37:12
**generically** [4] - 23:18, 25:16, 25:17, 31:12
**gentlemen** [1] - 72:23

**Georgia** [1] - 47:7
**GERALD** [1] - 3:5
**given** [11] - 5:14, 10:8, 13:12, 17:25, 33:7, 33:8, 46:20, 51:9, 86:9, 88:2, 99:8
**government** [14] - 22:24, 23:4, 23:18, 23:19, 24:21, 25:4, 25:15, 25:18, 25:24, 26:5, 39:13, 47:23, 78:10, 85:20
**government's** [1] - 64:25
**government-issued** [7] - 22:24, 23:4, 24:21, 25:4, 25:15, 25:18, 25:24
**governor** [1] - 77:23
**Governor** [4] - 81:9, 81:11, 81:23, 82:13
**grad** [1] - 53:16
**grade** [1] - 64:14
**graduate** [1] - 53:21
**granted** [1] - 86:19
**great** [1] - 77:17
**greater** [2] - 53:2, 55:11
**greatly** [1] - 91:6
**group** [1] - 88:15
**groups** [1] - 62:18
**growing** [1] - 14:15
**guarantee** [2] - 95:1, 95:9
**guess** [7] - 51:12, 52:1, 68:12, 91:8, 91:17, 91:21, 96:11
**guidance** [1] - 87:12, 94:4, 99:12
**guidelines** [1] - 97:25, 98:6, 98:8

**H**

**Haley** [1] - 81:9, 81:23, 82:13
**Haley's** [1] - 81:11
**half** [4] - 21:18, 75:15, 76:16, 76:21
**Hall** [1] - 23:21
**hand** [1] - 12:14
**happy** [1] - 89:2
**hasten** [1] - 70:9
**head** [1] - 21:11
**heading** [1] - 57:6
**Health** [1] - 6:6
**hear** [3] - 84:3, 85:8, 100:15
**heard** [3] - 94:2, 94:4,

94:5
**HEARD** [3] - 2:1, 38:15, 64:16
**HEBERT** [1] - 3:5
**Heights** [3] - 45:20, 45:23, 46:15
**help** [2] - 84:25, 85:6
**helps** [1] - 30:2
**hereby** [1] - 64:16
**herself** [1] - 81:21
**hesitate** [1] - 91:17
**high** [1] - 77:5
**higher** [1] - 77:11
**highlight** [1] - 55:7
**highlights** [2] - 85:21, 89:1
**history** [15] - 18:25, 19:1, 24:24, 28:21, 46:3, 46:14, 51:25, 52:1, 52:4, 73:20, 74:17, 77:22, 77:25, 78:4, 87:17
**hit** [1] - 85:21
**hmm** [1] - 58:19
**holiday** [1] - 24:13
**HON** [99] - 4:2, 4:15, 4:21, 6:1, 21:4, 30:14, 31:1, 31:16, 32:20, 32:23, 34:2, 38:10, 38:13, 38:17, 38:22, 44:11, 44:19, 46:17, 47:3, 47:18, 47:21, 48:7, 48:10, 48:12, 49:21, 50:6, 50:13, 50:16, 50:22, 51:1, 51:3, 51:6, 51:8, 51:12, 51:19, 57:25, 58:3, 59:25, 60:9, 60:25, 64:18, 64:23, 67:6, 67:8, 72:5, 72:7, 72:14, 72:15, 78:13, 78:17, 80:2, 80:6, 80:11, 80:14, 80:16, 80:21, 82:6, 82:9, 83:2, 83:5, 83:7, 83:9, 83:13, 83:19, 83:20, 84:12, 84:16, 84:18, 84:24, 85:6, 85:11, 89:5, 89:6, 89:7, 89:9, 90:14, 90:17, 91:10, 91:12, 91:14, 91:22, 91:23, 92:3, 92:11, 95:14, 96:8, 96:23, 98:20, 98:23, 99:2, 100:15, 100:18, 100:24, 100:25, 101:11, 101:22, 101:25, 102:7, 102:12

**Honor** [21] - 4:20, 44:12, 46:9, 48:6, 48:16, 50:25, 51:4, 58:2, 59:18, 64:16, 80:12, 80:20, 82:11, 83:1, 84:15, 84:21, 85:5, 85:12, 89:11, 100:1, 101:20
**Honors** [6] - 38:15, 80:5, 84:5, 89:8, 92:13, 96:10
**Hood** [5] - 5:14, 5:16, 6:24, 10:14, 16:25, 20:23
**Hood's** [3] - 6:10, 10:18, 21:22
**hope** [1] - 99:16
**hopefully** [2] - 83:22, 102:10
**hour** [2] - 4:4, 38:18
**House** [2] - 42:3, 42:4
**Housing** [5] - 45:20, 45:24, 46:16
**hundreds** [1] - 94:9
**hurdles** [1] - 76:24
**hypothetically** [1] - 28:25

**I**

**ID** [24] - 5:1, 5:16, 6:11, 14:6, 14:10, 22:23, 23:18, 23:19, 25:9, 25:11, 27:6, 33:16, 63:1, 63:17, 68:4, 68:8, 68:11, 68:21, 88:8, 93:6, 99:5, 99:11, 99:20, 100:14
**idea** [2] - 13:10, 96:15
**identification** [18] - 5:19, 13:19, 13:24, 22:25, 23:4, 23:9, 23:13, 24:12, 24:21, 25:4, 25:15, 25:19, 25:24, 26:5, 33:13, 33:20, 67:19, 68:2
**identified** [2] - 48:1, 88:13
**identify** [3] - 32:20, 39:15, 56:2
**IDs** [5] - 8:8, 29:21, 37:5, 88:16, 93:6
**III** [1] - 103:4
**illegal** [2] - 88:9, 98:21
**imagine** [1] - 28:20, 97:17
**immediately** [1] - 86:8
**impact** [8] - 29:18,

29:22, 30:2, 30:4, 68:8, 76:17, 99:20, 99:21
**impediment** [14] - 29:4, 86:14, 86:17, 86:23, 86:25, 87:3, 87:20, 88:11, 88:22, 92:25, 95:13, 98:1, 98:2, 98:4
**impediments** [1] - 87:6
**impersonation** [2] - 69:3, 74:23
**implement** [3] - 32:7, 86:19, 87:13
**implementation** [15] - 26:9, 28:11, 29:1, 29:2, 29:4, 29:12, 30:3, 30:5, 30:7, 30:12, 30:17, 30:22, 31:5, 40:14, 99:6
**implemented** [7] - 26:20, 27:18, 28:7, 29:5, 30:6, 86:4, 99:24
**implementing** [1] - 27:6
**implication** [1] - 19:24
**implications** [1] - 29:8
**importance** [2] - 54:1, 54:11
**important** [4] - 32:2, 35:24, 36:1, 72:24
**inactive** [6] - 6:23, 7:1, 7:6, 7:13, 7:15, 13:2
**Inc** [1] - 2:15
**include** [3] - 8:21, 13:14, 21:2
**included** [1] - 11:14
**includes** [3] - 6:24, 7:6, 15:23
**including** [7] - 6:12, 6:25, 21:5, 47:7, 49:14, 69:3, 81:21
**inclusion** [1] - 6:18
**income** [6] - 75:15, 75:22, 76:12, 76:16, 76:20, 77:7
**incorporate** [1] - 95:15
**incorporated** [1] - 36:24
**incorporating** [1] - 92:5
**incorrect** [1] - 75:25
**increase** [5] - 20:21, 20:23, 21:13, 21:15, 63:2
**increased** [2] - 40:13, 63:16

**increases** [3] - 21:2, 21:6, 21:11
**indeed** [3] - 15:3, 28:25, 65:13
**independent** [2] - 17:20, 71:7
**independently** [1] - 72:11
**INDEX** [1] - 103:1
**Indian** [1] - 81:13
**indicate** [2] - 18:23, 40:11
**indicated** [2] - 49:24, 50:3
**indicates** [2] - 16:8, 67:4
**indicating** [1] - 91:25
**individual** [2] - 88:22, 96:25
**individuals** [4] - 6:13, 6:19, 12:5, 34:4
**inferences** [2] - 54:23, 55:3
**inferential** [1] - 55:4
**influence** [1] - 93:11
**inform** [5] - 9:16, 30:2, 30:4, 97:2, 97:3
**information** [8] - 15:23, 46:20, 69:19, 69:21, 70:7, 79:14, 79:16, 79:23
**informative** [4] - 7:16, 12:14, 36:1, 36:10
**informed** [1] - 9:13
**informing** [1] - 36:1
**initial** [10] - 5:4, 5:6, 5:7, 7:12, 10:1, 10:5, 10:16, 27:9, 33:4, 83:23
**inquiry** [1] - 40:22
**instance** [3] - 14:14, 74:22, 88:2
**instances** [1] - 34:6
**instructions** [1] - 93:16
**intend** [3] - 85:25, 92:4, 97:4
**intended** [1] - 98:16
**intending** [1] - 98:9
**intends** [1] - 91:2
**intent** [16] - 44:10, 45:8, 45:11, 47:16, 48:21, 48:24, 49:2, 49:11, 49:18, 49:23, 50:2, 50:4, 50:7, 50:10, 72:2
**interest** [2] - 77:14, 77:17
**interested** [1] - 4:5
**interocular** [3] -

54:17, 54:18, 54:21
**interpret** [7] - 87:8, 87:12, 94:3, 95:3, 95:11, 98:2, 98:5
**interpretation** [5] - 88:2, 95:17, 95:19, 95:21, 95:22
**interpreted** [7] - 86:4, 88:1, 91:5, 96:16, 96:21, 96:25, 97:2
**interprets** [4] - 92:24, 95:7, 98:18, 100:7
**interrogatories** [2] - 73:22, 74:1
**Intervenors** [1] - 2:9
**intervenors** [5] - 30:16, 92:12, 92:14, 94:3, 94:5
**interview** [1] - 22:9
**introduced** [1] - 11:6
**investigate** [3] - 19:23, 20:1, 39:19
**investigation** [5] - 17:24, 20:2, 44:7, 47:12, 48:19
**involves** [1] - 34:21
**involving** [1] - 49:14
**issue** [13] - 10:4, 10:17, 14:22, 21:12, 24:24, 44:9, 47:16, 65:14, 94:5, 94:14, 96:2, 96:5
**issued** [15] - 13:18, 13:24, 20:4, 20:6, 20:10, 22:24, 23:4, 24:21, 25:4, 25:15, 25:18, 25:24, 26:5, 27:3, 36:23
**issues** [2] - 78:8, 93:2
**itself** [6] - 9:10, 9:11, 46:6, 53:12, 66:16, 77:8

**J**

**JA001107** [1] - 62:13
**JA001120** [1] - 55:7
**JA001123** [1] - 56:16
**JA001184** [1] - 52:10
**JASC** [1] - 25:8
**JAUS** [1] - 16:14
**Jim** [1] - 41:17
**job** [2] - 12:8, 12:9
**JOHN** [41] - 1:12, 6:1, 21:4, 32:20, 32:23, 38:13, 38:22, 47:3, 47:18, 47:21, 49:21, 50:6, 50:13, 50:16, 50:22, 51:12, 51:19,

58:3, 64:18, 64:23, 67:8, 72:7, 72:14, 80:16, 82:9, 83:7, 83:13, 83:19, 84:12, 84:16, 89:5, 89:7, 90:14, 90:17, 91:10, 92:3, 96:23, 99:2, 100:15, 100:24, 102:7
**join** [1] - 80:12
**Journal** [2] - 23:24, 24:1
**journal** [1] - 24:1
**Judge** [10] - 64:21, 83:24, 85:25, 86:2, 86:22, 87:9, 92:9, 96:6, 97:10, 99:17
**JUDGE** [3] - 1:11, 1:12, 1:12
**judge** [3] - 31:9, 98:15
**judgment** [1] - 9:13
**judicial** [2] - 4:7, 101:17
**jumped** [1] - 83:10
**June** [2] - 40:18, 77:13
**jurisdiction** [1] - 42:20
**Justice** [7] - 2:5, 3:8, 5:8, 30:17, 66:10, 66:11, 92:18

**K**

**KARL** [1] - 1:24
**Kavanaugh** [2] - 86:23, 96:6
**KAVANAUGH** [7] - 1:12, 91:12, 91:22, 95:14, 96:8, 98:20, 98:23
**keep** [4] - 12:8, 13:9, 51:10, 101:12
**Kevin** [1] - 9:3
**key** [1] - 16:18
**kick** [1] - 96:12
**kind** [3] - 28:25, 87:11, 95:25
**kinds** [1] - 88:8
**known** [1] - 6:22
**knows** [1] - 100:3
**KOLLAR** [54] - 1:11, 4:2, 4:15, 4:21, 30:14, 31:1, 31:16, 34:2, 38:10, 38:17, 44:11, 44:19, 46:17, 48:7, 48:10, 48:12, 51:1, 51:3, 51:6, 51:8, 57:25, 59:25, 60:9, 60:25, 67:6, 72:5, 72:15, 78:13,

78:17, 80:2, 80:6, 80:11, 80:14, 80:21, 82:6, 83:2, 83:5, 83:9, 83:20, 84:18, 84:24, 85:6, 85:11, 89:6, 89:9, 91:14, 91:23, 92:11, 100:18, 100:25, 101:11, 101:22, 101:25, 102:12
**KOLLAR-KOTELLY** [1] - 1:11, 4:2, 4:15, 4:21, 30:14, 31:1, 31:16, 34:2, 38:10, 38:17, 44:11, 44:19, 46:17, 48:7, 48:10, 48:12, 51:1, 51:3, 51:6, 51:8, 57:25, 59:25, 60:9, 60:25, 67:6, 72:5, 72:15, 78:13, 78:17, 80:2, 80:6, 80:11, 80:14, 80:21, 82:6, 83:2, 83:5, 83:9, 83:20, 84:18, 84:24, 85:6, 85:11, 89:6, 89:9, 91:14, 91:23, 92:11, 100:18, 100:25, 101:11, 101:22, 101:25, 102:12
**KOTELLY** [54] - 1:11, 4:2, 4:15, 4:21, 30:14, 31:1, 31:16, 34:2, 38:10, 38:17, 44:11, 44:19, 46:17, 48:7, 48:10, 48:12, 51:1, 51:3, 51:6, 51:8, 57:25, 59:25, 60:9, 60:25, 67:6, 72:5, 72:15, 78:13, 78:17, 80:2, 80:6, 80:11, 80:14, 80:21, 82:6, 83:2, 83:5, 83:9, 83:20, 84:18, 84:24, 85:6, 85:11, 89:6, 89:9, 91:14, 91:23, 92:11, 100:18, 100:25, 101:11, 101:22, 101:25, 102:12

**L**

**lack** [3] - 5:18, 22:22, 77:14
**language** [2] - 91:7, 93:18
**laptop** [1] - 35:4
**last** [6] - 11:5, 20:10, 23:20, 45:11, 50:24,

58:3
**late** [2] - 11:5, 87:7
**lateness** [1] - 86:15
**laughingstock** [1] - 97:21
**Laughter** [6] - 48:14, 64:20, 101:2, 101:6, 101:10, 102:3
**Law** [2] - 23:24, 24:1
**law** [54] - 12:5, 13:11, 26:19, 27:20, 29:18, 29:23, 30:2, 30:3, 30:5, 30:6, 46:14, 65:14, 65:18, 65:19, 65:25, 66:10, 66:12, 66:14, 66:15, 66:24, 67:1, 67:17, 67:20, 68:11, 86:7, 86:15, 86:17, 86:23, 87:8, 87:13, 90:10, 90:11, 90:14, 90:20, 90:21, 91:4, 91:7, 91:16, 92:20, 92:24, 93:6, 93:18, 94:3, 95:3, 95:20, 98:15, 98:18, 98:21, 99:5, 99:11, 99:14, 100:6
**laws** [3] - 68:4, 68:8, 68:21
**lawyers** [1] - 93:18
**Lawyers'** [1] - 3:12
**lead** [3] - 77:2, 99:9, 102:11
**leading** [1] - 82:11
**leads** [1] - 43:22
**learned** [1] - 53:16
**least** [11] - 4:6, 8:1, 26:9, 40:18, 43:22, 55:22, 57:6, 65:12, 75:8, 83:23, 88:9
**leave** [4] - 34:7, 34:9, 34:12, 85:1
**ledger** [8] - 8:2, 8:3, 8:6, 8:7, 8:13, 18:17, 18:18
**left** [11] - 4:6, 8:18, 8:20, 8:23, 38:19, 48:8, 51:24, 60:11, 74:5, 85:13, 98:18
**Legal** [1] - 3:5
**legal** [5] - 87:24, 95:17, 95:18, 96:3, 100:16
**legislative** [11] - 45:8, 45:11, 46:3, 46:14, 49:23, 50:2, 50:4, 50:7, 50:10, 73:20, 74:17
**legislator** [1] - 71:17
**legislators** [2] - 98:17,

100:5
**legitimate** [1] - 70:11
**less** [8] - 33:11, 33:18, 55:13, 56:4, 56:11, 56:12, 97:24
**letter** [11] - 9:2, 9:7, 9:8, 9:9, 9:11, 9:13, 9:18, 9:25, 11:2, 11:6, 11:7
**letters** [6] - 10:22, 10:24, 11:1, 11:10, 11:15, 22:18
**letting** [1] - 87:21
**level** [8] - 64:2, 77:4, 77:5, 94:17, 94:18, 100:2, 100:7, 100:11
**levels** [6] - 76:15, 76:22, 77:7, 99:18, 99:19, 99:25
**Levin** [1] - 23:21
**liberals** [1] - 24:20
**Liberties** [3] - 2:15, 2:19, 3:1
**license** [52] - 13:1, 14:3, 14:10, 14:16, 15:16, 16:1, 16:6, 16:8, 16:15, 16:16, 16:19, 17:3, 17:6, 17:12, 18:8, 18:9, 18:13, 19:3, 19:9, 19:15, 19:21, 20:4, 20:5, 20:10, 22:1, 22:13, 22:24, 23:4, 35:7, 35:11, 36:6, 36:13, 36:18, 36:21, 36:23, 37:2, 37:4, 37:6, 37:7, 37:8, 37:9, 37:12, 37:15, 37:22, 37:24, 37:25, 38:2, 38:3, 38:4
**licensee** [1] - 17:23
**licenses** [47] - 6:11, 7:22, 8:8, 8:10, 8:17, 9:2, 9:14, 9:20, 10:5, 11:13, 12:16, 12:21, 13:3, 13:22, 14:12, 14:25, 15:9, 15:13, 15:15, 16:2, 17:5, 17:13, 17:17, 17:18, 17:21, 18:1, 18:8, 18:11, 18:19, 18:24, 18:25, 19:5, 20:5, 20:12, 20:14, 20:18, 20:20, 21:1, 21:13, 21:24, 22:3, 34:23, 34:24, 35:19, 35:23, 37:3
**light** [1] - 53:6
**likelihood** [8] - 30:11, 55:8, 55:10, 55:12,

56:5, 56:8, 56:10, 74:14
**likely** [12] - 8:20, 12:10, 13:11, 13:14, 15:2, 31:4, 33:11, 33:18, 34:22, 55:13, 56:4, 77:5
**limine** [1] - 44:16
**limit** [2] - 92:7, 101:4
**limited** [8] - 47:12, 47:13, 47:14, 49:10, 51:9, 70:3, 73:14, 100:24
**line** [13] - 20:9, 32:25, 33:14, 34:20, 58:13, 60:25, 61:2, 65:17, 66:8, 73:2, 73:5, 94:14
**linked** [1] - 90:20
**list** [9] - 8:7, 8:8, 8:18, 12:9, 12:11, 12:12, 13:2, 34:14, 93:6
**listed** [1] - 62:14
**literally** [2] - 8:6, 92:20
**literature** [5] - 53:7, 55:19, 55:21, 63:18, 77:9
**litigated** [1] - 92:21
**live** [1] - 100:10
**lived** [2] - 93:15, 93:17
**lives** [1] - 100:11
**LLP** [1] - 2:12
**local** [5] - 39:13, 49:17, 55:10, 87:13, 94:10
**look** [32] - 15:5, 16:14, 25:8, 29:12, 29:15, 40:5, 40:7, 40:20, 41:10, 41:14, 41:25, 42:11, 42:25, 43:12, 52:9, 55:6, 56:15, 66:14, 66:15, 67:7, 70:6, 71:15, 71:16, 73:15, 73:18, 74:5, 74:17, 75:18, 78:6, 79:14, 90:6, 91:18
**looked** [8] - 31:5, 41:13, 43:11, 43:14, 46:21, 74:25, 75:1, 79:22
**looking** [9] - 14:8, 18:4, 22:12, 43:16, 48:12, 54:13, 60:5, 73:14, 76:6
**looks** [3] - 9:24, 15:3, 17:17
**lord** [1] - 100:3
**lost** [1] - 78:24
**low** [3] - 43:19, 43:20,

77:4
**lower** [12] - 5:21, 12:25, 13:5, 13:7, 43:21, 64:14, 75:12, 76:15, 76:21, 77:1, 77:2, 77:7
**lowered** [1] - 5:19

# M

**mail** [1] - 32:17
**mailed** [1] - 28:13
**major** [1] - 14:22
**majority** [6] - 14:21, 24:11, 24:14, 24:16, 24:19, 78:9
**males** [2] - 81:25, 82:17
**man** [10] - 59:16, 60:14, 60:20, 60:23, 61:9, 61:11, 61:18, 61:19, 62:7, 64:8
**managers** [2] - 94:9, 98:7
**manual** [4] - 93:5, 93:9, 93:17, 94:10
**margin** [1] - 44:5
**MARIE** [1] - 2:3
**MARK** [1] - 3:11
**marked** [1] - 39:14
**MARZIANI** [1] - 3:8
**massive** [1] - 15:20
**match** [3] - 37:19, 37:20, 38:7
**matching** [1] - 11:14, 37:11
**material** [10] - 4:8, 6:18, 30:16, 30:20, 31:1, 31:5, 31:7, 32:3, 84:8, 101:18
**materially** [1] - 6:15
**materials** [7] - 31:9, 31:10, 31:14, 31:18, 31:19, 32:5, 32:10
**math** [1] - 52:23
**matter** [8] - 21:7, 28:17, 47:3, 47:4, 47:5, 47:19, 83:17, 104:5
**McCOMBS** [1] - 2:10
**McGINLEY** [1] - 1:16
**Mcmaster** [1] - 82:1
**mean** [12] - 9:9, 20:24, 22:18, 25:17, 28:12, 35:17, 35:25, 36:3, 53:2, 70:7, 76:8, 92:5
**meaning** [2] - 91:6, 97:3

**means** [4] - 93:16, 93:19, 93:21, 100:7
**meant** [2] - 71:6, 102:4
**mechanical** [1] - 3:25
**medical** [1] - 31:9
**meet** [2] - 100:9, 100:12
**members** [7] - 41:17, 41:22, 42:3, 42:5, 42:8, 42:14, 42:18
**memorialized** [1] - 90:5
**memorized** [2] - 16:10, 26:1
**memory** [5] - 7:7, 40:2, 57:23, 62:23, 65:21
**mention** [2] - 9:25, 10:24
**mentioned** [6] - 10:20, 10:22, 43:21, 68:6, 77:18
**met** [10] - 19:4, 19:6, 19:10, 19:14, 19:20, 19:22, 45:5, 69:17, 70:4, 96:15
**method** [1] - 75:8
**methodology** [5] - 6:25, 8:11, 69:1, 75:4, 75:7
**methods** [2] - 69:24, 70:8
**metropolitan** [1] - 45:20
**Metropolitan** [2] - 45:24, 46:16
**MEZA** [1] - 2:3
**MICHAEL** [2] - 1:16, 2:9
**midnight** [2] - 101:23, 101:24
**might** [7] - 11:10, 12:4, 13:23, 14:5, 15:13, 19:4, 37:9
**military** [2] - 5:1, 5:16
**Miller** [1] - 35:5
**MILLER** [1] - 2:4
**million** [6] - 17:17, 17:18, 17:21, 18:22, 18:23, 18:25
**MIMI** [1] - 3:8
**mind** [2] - 12:8, 13:9
**minority** [8] - 33:10, 33:17, 62:17, 62:18, 79:6, 81:7, 81:10, 82:7
**minute** [2] - 6:5, 83:17
**minutes** [14] - 4:4, 4:5, 38:18, 38:19, 38:23,

44:18, 48:8, 48:9, 64:17, 64:19, 71:17, 80:7, 80:15, 85:9
**misstatement** [2] - 61:24, 67:3
**mitigating** [1] - 26:23
**mixture** [1] - 55:11
**moment** [4] - 14:7, 18:4, 51:2, 51:24
**moments** [1] - 59:10
**months** [3] - 11:5, 70:22, 93:15
**moped** [1] - 37:4
**morning** [4] - 10:20, 15:10, 26:22, 29:16
**most** [11] - 8:20, 12:13, 13:11, 13:14, 13:16, 14:3, 24:15, 33:21, 35:14, 48:15, 83:16
**mostly** [1] - 53:21
**motion** [8] - 44:16, 47:23, 48:1, 48:5, 80:12, 80:17, 80:19
**move** [1] - 62:25
**moved** [1] - 34:22
**movers** [2] - 21:11, 34:23
**moves** [1] - 80:9
**MR** [88] - 4:10, 4:20, 4:23, 6:2, 6:3, 21:20, 31:17, 32:22, 32:24, 33:1, 34:15, 34:17, 38:9, 38:15, 38:20, 39:1, 39:4, 44:12, 44:22, 44:24, 46:9, 46:25, 47:5, 48:6, 48:9, 48:11, 48:15, 48:18, 50:5, 50:8, 50:15, 50:18, 50:24, 51:2, 51:4, 51:7, 51:9, 51:15, 51:21, 51:23, 52:8, 52:11, 58:9, 59:18, 60:6, 60:12, 61:1, 61:3, 64:15, 64:16, 64:21, 64:24, 65:3, 67:3, 67:10, 71:25, 72:9, 72:17, 78:12, 78:15, 78:19, 80:1, 80:4, 80:8, 80:12, 80:20, 80:22, 80:24, 82:5, 82:11, 82:12, 83:1, 83:11, 83:14, 89:11, 90:16, 90:18, 91:17, 92:9, 92:13, 96:6, 96:10, 97:10, 98:22, 99:17, 101:7, 101:19, 101:24
**multiple** [2] - 15:23,

15:24
**must** [2] - 90:8, 97:18

**N**

**nail** [1] - 72:24
**name** [3] - 39:5, 54:21, 88:20
**names** [2] - 35:17, 95:5
**NANCY** [1] - 2:14
**nation** [1] - 69:4
**Nation's** [1] - 3:2
**nationally** [1] - 24:15
**naturally** [2] - 10:8, 28:16
**nature** [1] - 30:9
**NE** [1] - 3:6
**necessary** [1] - 90:22
**need** [9] - 10:18, 18:21, 28:14, 30:10, 66:13, 84:20, 85:1, 89:15, 96:10
**needed** [1] - 13:12
**needs** [1] - 85:22
**net** [2] - 13:15, 14:19
**never** [11] - 11:2, 22:7, 69:17, 69:18, 69:20, 70:4, 70:6, 70:7, 77:23, 77:25, 100:1
**New** [4] - 2:13, 3:10, 3:13, 14:16
**new** [2] - 13:11, 85:16
**news** [2] - 70:10, 70:11
**newspaper** [2] - 70:14, 81:3
**next** [5] - 86:22, 87:9, 91:15, 91:24, 95:16
**nice** [1] - 45:2
**Nikki** [1] - 81:11
**none** [1] - 74:7
**nonexistent** [1] - 33:16
**nonracial** [1] - 72:2
**nonsubstance** [2] - 83:17, 83:19
**nonwhite** [4] - 52:18, 53:3, 76:11, 76:12
**nonwhites** [1] - 76:20
**normally** [1] - 37:11
**notaries** [11] - 88:5, 88:6, 88:9, 88:10, 88:11, 88:14, 88:15, 90:21, 93:1, 93:2
**notary** [9] - 88:8, 88:16, 88:21, 90:24, 93:5, 93:9, 93:16
**notary's** [1] - 88:17

**note** [1] - 21:1
**nothing** [2] - 27:25, 56:2
**nothing's** [1] - 102:1
**notice** [4] - 4:8, 91:24, 91:25, 101:17
**noting** [1] - 35:8
**notion** [1] - 43:19
**notwithstanding** [3] - 76:15, 76:20, 76:21
**November** [1] - 86:1
**number** [12] - 16:14, 16:15, 16:18, 34:10, 37:12, 37:18, 40:5, 40:18, 41:11, 48:13, 84:1, 101:3
**numbers** [5] - 9:11, 21:19, 26:1, 64:9, 94:16
**NW** [6] - 1:17, 2:6, 2:16, 3:2, 3:13, 3:17
**NY** [2] - 2:13, 3:10

**O**

**Obama** [1] - 24:19
**object** [1] - 4:12
**objection** [14] - 44:11, 47:22, 51:16, 59:18, 61:13, 61:24, 62:2, 67:3, 71:25, 78:12, 80:8, 82:5, 82:10, 88:12
**objects** [1] - 46:10
**obviously** [6] - 77:17, 86:14, 91:16, 96:11, 99:18, 101:13
**occasion** [2] - 49:7, 80:25
**occupied** [1] - 42:17
**occur** [1] - 69:4
**occurring** [1] - 55:12
**OF** [4] - 1:1, 1:3, 1:6, 1:10
**offer** [5] - 27:25, 28:5, 46:12, 63:1
**offered** [13] - 27:23, 47:4, 65:8, 66:24, 71:25, 72:3, 72:9, 72:11, 72:23, 73:12, 73:23, 73:24, 74:19
**offering** [6] - 44:13, 46:20, 46:23, 46:25, 47:8, 47:11, 47:17, 51:17, 67:24, 69:8, 71:7, 71:23, 72:19, 73:2, 79:9, 79:17
**offers** [1] - 58:7
**office** [4] - 9:4, 75:5,

86:10, 88:3
**officers** [1] - 95:24
**offices** [1] - 41:13
**Official** [2] - 3:16, 104:3
**official** [1] - 95:7
**official's** [1] - 98:12
**officials** [11] - 41:11, 41:25, 55:10, 77:19, 87:13, 87:22, 94:9, 94:11, 97:16, 97:19, 97:23
**once** [4] - 9:25, 31:24, 31:25, 84:16
**one** [79] - 6:15, 8:1, 8:2, 8:7, 8:21, 8:23, 9:22, 10:7, 13:13, 13:18, 13:22, 14:9, 14:10, 18:5, 18:21, 19:4, 19:14, 19:23, 20:11, 21:10, 21:18, 21:23, 22:3, 22:6, 22:12, 23:2, 25:11, 26:11, 27:9, 27:21, 28:14, 28:22, 29:5, 29:12, 31:2, 31:9, 33:2, 33:12, 33:19, 34:20, 37:4, 37:16, 37:17, 40:14, 41:17, 42:20, 46:17, 49:4, 49:14, 49:15, 60:7, 62:15, 67:15, 68:14, 69:8, 69:9, 69:10, 70:16, 70:18, 71:8, 71:22, 72:7, 72:19, 73:3, 74:12, 74:19, 75:8, 76:2, 78:8, 79:24, 82:1, 83:17, 83:25, 89:9, 91:22, 95:14, 97:7, 101:16
**ongoing** [1] - 26:12
**OOS** [2] - 18:8, 18:9
**opening** [1] - 96:2
**operates** [1] - 100:7
**operator** [1] - 37:4
**opine** [1] - 46:19
**opinion** [45] - 23:17, 26:13, 28:9, 28:17, 29:11, 31:2, 31:13, 40:9, 40:19, 44:9, 46:10, 48:23, 49:5, 49:6, 49:22, 60:3, 63:1, 63:4, 63:9, 63:11, 63:12, 63:20, 63:23, 63:24, 65:12, 67:24, 68:6, 68:21, 68:22, 68:23, 68:24, 69:8, 69:21, 70:15, 71:3, 71:6, 71:23, 72:12, 78:22, 79:1,

79:13, 79:15, 79:17, 98:4
**Opinion** [1] - 23:21
**opinions** [23] - 12:1, 23:15, 24:7, 27:23, 29:14, 31:3, 39:19, 39:22, 40:1, 40:3, 44:14, 45:25, 46:2, 46:7, 46:12, 46:13, 47:12, 47:15, 48:21, 51:17, 62:14, 72:22
**opponents** [4] - 81:19, 81:22, 81:23, 82:13
**opportunity** [5] - 41:10, 91:8, 93:24, 100:21, 101:20
**opposite** [2] - 43:24, 98:19
**opposition** [3] - 4:13, 4:14, 81:17
**or..** [1] - 73:20
**oral** [1] - 80:17
**order** [9] - 15:14, 23:19, 24:21, 37:8, 66:11, 69:15, 71:3, 79:15
**organizations** [3] - 49:8, 49:10, 49:13
**original** [2] - 7:7, 46:3
**otherwise** [3] - 6:1, 62:22, 85:2
**ought** [1] - 67:8
**outlined** [1] - 40:4
**outside** [1] - 23:16
**overall** [2] - 58:24, 61:16
**overcome** [2] - 76:17, 76:24
**overcoming** [1] - 31:8
**overseeing** [1] - 49:18
**overwhelming** [2] - 24:13, 74:14
**own** [6] - 71:7, 71:23, 72:12, 73:16, 73:19, 75:14
**ownership** [3] - 99:20, 99:22, 100:14

**P**

**p.m** [4] - 1:5, 85:10, 102:13
**packet** [1] - 30:20
**PAGE** [1] - 103:2
**page** [22] - 16:13, 18:3, 35:6, 40:3, 40:5, 40:6, 55:6, 55:8, 56:15, 58:10, 58:15, 60:24, 61:1,

62:13, 65:16, 65:17, 66:1, 66:6, 69:2, 72:25, 92:7, 94:13
**pages** [7] - 10:10, 18:5, 56:15, 100:24, 101:4, 101:5, 104:4
**Pages** [1] - 1:7
**paint** [1] - 97:9
**painting** [2] - 97:7, 97:12
**panel** [2] - 92:16, 100:8
**paper** [5] - 24:18, 25:21, 26:2, 91:13, 95:15
**papers** [2] - 64:5, 64:7
**paragraph** [2] - 22:2, 56:17
**pardon** [1] - 26:16
**parsimony** [1] - 34:11
**parsing** [1] - 71:5
**part** [12] - 6:16, 18:14, 56:13, 58:20, 66:2, 67:17, 68:12, 78:24, 81:3, 92:1, 99:3, 101:14
**participate** [1] - 62:19
**participation** [1] - 12:25
**particular** [7] - 6:21, 17:18, 31:7, 35:20, 43:23, 54:5, 99:15
**particularly** [4] - 35:24, 36:1, 40:8, 90:6
**parties** [4] - 83:23, 84:25, 99:4, 102:6
**parts** [1] - 11:10
**Party** [1] - 81:15
**party** [6] - 12:1, 49:8, 49:10, 49:13, 81:14, 94:25
**passing** [1] - 7:19
**passport** [2] - 5:1, 5:16
**past** [3] - 13:3, 13:5, 81:8
**patience** [2] - 92:14, 102:8
**pause** [1] - 61:7
**Peachtree** [1] - 2:16
**penalize** [1] - 38:24
**Pennsylvania** [1] - 2:6
**people** [21] - 8:8, 13:1, 14:9, 23:18, 25:23, 26:5, 34:21, 36:4, 36:5, 37:3, 49:9, 68:18, 75:15, 82:6, 87:1, 87:2, 95:2, 95:6, 97:24

**people's** [2] - 88:4, 95:2
**per** [5] - 75:14, 75:21, 76:11, 76:16, 76:20
**percent** [30] - 19:5, 20:11, 20:12, 25:3, 25:6, 25:13, 25:22, 26:4, 40:16, 40:18, 41:1, 41:2, 41:4, 41:9, 41:16, 41:20, 42:1, 41:22, 42:8, 42:10, 42:16, 42:24, 43:1, 43:2, 43:13, 43:15, 44:3, 44:4
**percentage** [7] - 5:17, 21:12, 21:15, 42:16, 42:24, 52:22, 52:24
**percentages** [2] - 46:22, 82:23
**perform** [2] - 53:9, 75:2
**perhaps** [2] - 95:4, 99:8
**period** [3] - 17:19, 97:15, 97:19
**permission** [1] - 83:18
**perplexing** [1] - 92:18
**person** [9] - 13:18, 36:22, 37:19, 81:7, 88:17, 93:7, 93:10, 93:20, 100:6
**personal** [7] - 63:9, 63:10, 63:12, 63:23, 63:24, 68:23, 68:24
**persons** [3] - 42:22, 47:9, 55:11
**persuasive** [2] - 49:3, 50:20
**peruses** [1] - 61:7
**PETER** [1] - 2:11
**photo** [19] - 6:11, 24:12, 24:21, 25:4, 25:15, 25:18, 25:24, 26:5, 26:25, 27:2, 27:6, 28:10, 28:14, 28:16, 28:18, 33:8, 88:19, 93:5, 93:6
**physically** [1] - 17:22
**picking** [2] - 4:16, 51:24
**picture** [2] - 97:8, 97:9
**pictures** [1] - 97:12
**piece** [3] - 7:21, 15:8, 24:21
**pieces** [1] - 76:2
**place** [2] - 28:23, 91:1
**placed** [1] - 76:24
**places** [1] - 46:22
**plain** [2] - 91:6, 98:17
**Plaintiff** [1] - 1:4

**PLAINTIFFS** [1] - 39:2
**Plaintiffs** [1] - 1:15
**Plaintiffs'** [3] - 24:4, 39:15, 52:9
**plan** [3] - 28:1, 28:2, 28:3
**plans** [4] - 27:5, 27:14, 30:22, 32:7
**play** [1] - 45:24
**pleadings** [1] - 92:2
**pledge** [1] - 101:21
**plenty** [1] - 91:12
**PLLC** [1] - 1:17
**plus** [1] - 7:6
**PM** [1] - 1:6
**Point** [1] - 1:20
**point** [14] - 12:1, 12:11, 13:13, 20:7, 32:19, 32:24, 58:22, 60:10, 60:22, 82:7, 84:20, 92:12, 96:4, 96:12
**pointed** [2] - 59:20, 59:21
**points** [4] - 21:12, 21:15, 52:22, 52:24
**polarization** [2] - 60:7, 60:17
**polarized** [10] - 56:18, 57:10, 57:21, 58:17, 59:1, 59:21, 59:23, 61:15, 74:9, 74:11
**policy** [1] - 88:3
**political** [6] - 12:25, 24:24, 39:12, 52:2, 62:19, 77:5
**politicized** [1] - 24:25
**politics** [3] - 39:13, 47:5
**poll** [7] - 71:6, 88:13, 94:8, 95:5, 97:20, 98:6, 98:11
**polls** [2] - 97:24, 99:22
**poorest** [4] - 43:9, 43:11, 44:4, 52:19
**population** [1] - 41:20
**portion** [3] - 67:13, 67:18, 93:8
**portions** [4] - 47:6, 47:7, 51:16, 67:4
**portrayed** [1] - 53:10
**portraying** [1] - 29:22
**portrays** [1] - 29:17
**position** [4] - 4:9, 43:3, 50:10, 50:18
**positions** [3] - 78:8, 83:25, 85:1
**POSNER** [1] - 3:11
**possess** [2] - 23:3, 33:12, 33:19

**possessing** [1] - 22:24
**possession** [10] - 6:11, 17:22, 19:7, 20:6, 20:15, 27:5, 29:21, 30:1, 36:19, 36:20
**possibility** [1] - 98:24
**possible** [1] - 70:21
**postcard** [2] - 32:12, 32:13
**postcards** [3] - 30:23, 31:12, 97:4
**posted** [1] - 70:10
**posters** [4] - 30:23, 31:10, 31:11, 97:4
**POTENZA** [11] - 1:16, 4:20, 4:23, 6:2, 6:3, 21:20, 31:17, 32:22, 32:24, 33:1, 34:15
**Potenza** [4] - 4:17, 34:21, 34:24, 35:1
**Potenza.........** [1] - 103:4
**practical** [1] - 87:11
**precincts** [1] - 88:14
**precipice** [2] - 29:1, 29:3
**precisely** [1] - 29:8
**preclear** [4] - 28:21, 86:7, 99:10, 99:14
**preclearance** [4] - 86:19, 87:7, 89:19, 98:24
**precleared** [9] - 26:12, 27:20, 86:16, 89:18, 90:10, 95:17, 95:21, 98:19, 99:15
**prefer** [1] - 78:16
**preference** [1] - 22:23
**preferences** [3] - 23:6, 23:9, 23:11, 26:8
**preferred** [1] - 96:8
**prepared** [2] - 5:7, 65:12
**preparing** [2] - 27:16, 69:1
**present** [6] - 15:14, 41:5, 48:23, 48:24, 55:16, 99:5
**PRESENT** [1] - 1:22
**presentation** [1] - 102:8
**presentations** [1] - 102:9
**presented** [5] - 18:2, 49:19, 53:11, 54:4, 75:1
**presently** [2] - 42:8, 42:22

**presents** [1] - 66:9
**presidential** [4] - 24:8, 25:13, 40:24, 40:25
**press** [3] - 9:5, 11:4, 70:12
**presumably** [1] - 26:11, 96:23, 100:15
**pretty** [4] - 31:6, 31:14, 66:19, 68:4
**prevent** [1] - 74:13
**prevented** [1] - 74:14
**previous** [1] - 44:6
**previously** [2] - 28:15, 39:14
**primary** [4] - 81:16, 81:20, 81:24, 82:14
**principal** [1] - 96:24
**principle** [2] - 23:5, 34:11
**print** [1] - 101:5
**printed** [1] - 101:9
**privileges** [1] - 38:3
**probability** [2] - 56:6, 99:19
**problem** [3] - 95:4, 99:6, 99:9
**problems** [4] - 47:25, 99:16
**procedure** [2] - 6:22, 96:7
**procedures** [5] - 31:24, 89:25, 90:2, 90:4, 91:2
**proceed** [2] - 51:7, 80:20
**proceeding** [1] - 92:19
**Proceedings** [2] - 3:25, 102:13
**proceedings** [1] - 104:5
**process** [2] - 5:11, 62:19
**produce** [1] - 12:8, 97:16
**produced** [5] - 3:25, 6:6, 12:24, 27:14, 71:16
**professional** [1] - 68:22
**professor** [3] - 32:16, 36:3, 60:13
**Professor** [24] - 5:13, 5:16, 6:10, 6:24, 10:14, 10:17, 16:25, 20:23, 21:22, 31:18, 33:2, 34:18, 44:13, 44:15, 44:25, 46:10, 51:4, 51:17, 51:24, 52:8, 52:12, 58:10, 61:4, 80:9

**Professors** [1] - 23:20
**professors** [2] - 75:5, 75:9
**program** [5] - 29:9, 29:11, 29:13, 29:15, 30:11
**programs** [2] - 27:24, 28:23
**progress** [2] - 62:16, 79:6
**promise** [1] - 95:1
**promulgate** [1] - 87:14
**properly** [1] - 50:21
**provide** [7] - 58:6, 72:12, 84:9, 85:23, 87:12, 89:2, 94:4
**provided** [8] - 30:19, 30:20, 35:15, 69:17, 71:19, 76:5, 76:10, 87:6
**provides** [1] - 71:19
**providing** [2] - 78:21, 79:1
**proving** [1] - 72:1
**provision** [6] - 27:7, 86:17, 86:23, 90:20, 96:13, 99:23, 100:6, 100:12
**provisional** [1] - 94:12
**provisions** [5] - 13:11, 26:23, 89:19, 89:21, 90:24
**public** [6] - 23:17, 26:13, 63:2, 63:16, 63:20, 69:5
**publicized** [1] - 49:12
**published** [3] - 23:20, 23:24, 70:1
**pure** [2] - 66:19, 66:20
**purported** [1] - 30:17
**purpose** [21] - 46:25, 47:12, 71:9, 71:13, 71:24, 72:1, 72:2, 72:9, 72:11, 72:13, 72:20, 73:4, 73:11, 75:3, 78:23, 79:3, 79:21, 84:14, 98:5, 98:6, 98:7
**purposefully** [2] - 47:13, 47:14
**purposes** [2] - 87:11, 88:23
**put** [10] - 22:1, 28:23, 39:19, 52:8, 64:12, 85:25, 86:3, 92:23, 97:4, 101:13
**puts** [1] - 95:21

## Q

**qualifications** [2] - 44:17, 47:25
**qualified** [2] - 51:18, 56:4
**quality** [1] - 102:9
**quantifies** [1] - 29:20
**questioning** [1] - 34:20
**questions** [18] - 23:17, 32:16, 32:25, 38:9, 58:14, 59:4, 61:5, 62:4, 64:15, 66:21, 83:1, 83:24, 84:10, 84:13, 84:22, 85:14, 86:6, 88:24
**quite** [2] - 40:24, 64:12

## R

**R54** [41] - 5:19, 14:13, 22:23, 26:9, 26:23, 27:7, 29:10, 29:12, 32:7, 33:12, 33:20, 44:10, 46:4, 46:6, 48:22, 65:10, 67:5, 67:12, 68:15, 71:8, 71:12, 71:23, 72:10, 72:12, 72:20, 73:11, 74:17, 75:3, 78:22, 79:2, 79:5, 79:21, 85:25, 86:3, 86:19, 87:12, 90:15, 90:16, 93:15, 95:7, 95:11
**R54's** [1] - 90:24
**race** [5] - 34:4, 34:5, 34:7, 81:23
**races** [1] - 30:13
**racial** [27] - 5:19, 5:21, 6:10, 20:21, 22:2, 29:20, 30:1, 34:13, 40:15, 44:9, 47:16, 48:21, 48:24, 49:2, 49:11, 55:12, 56:10, 56:19, 57:10, 57:21, 58:18, 60:6, 60:16, 61:16, 62:18, 72:1, 99:21
**racially** [14] - 56:18, 57:10, 57:21, 58:17, 59:1, 59:21, 59:23, 61:15, 72:10, 74:8, 74:11, 78:22, 79:2, 100:13
**raise** [1] - 27:21
**raises** [1] - 91:3
**raising** [2] - 98:25,

99:2
**rampant** [1] - 70:15
**rapidly** [1] - 38:25
**rarely** [1] - 53:22
**rate** [2] - 41:5, 41:8
**rates** [8] - 13:5, 13:7, 41:6, 43:6, 43:17, 43:18, 69:4, 75:12
**rather** [5] - 12:9, 31:7, 49:24, 54:23, 66:15
**reach** [3] - 44:8, 48:20, 69:15
**reached** [2] - 79:15, 79:20, 98:25
**reactions** [1] - 85:8
**read** [51] - 9:8, 9:9, 9:11, 11:5, 11:9, 11:15, 11:25, 12:11, 25:12, 26:3, 27:12, 27:13, 27:14, 28:2, 28:3, 29:10, 45:19, 45:22, 46:2, 46:6, 46:8, 46:14, 55:9, 58:5, 58:16, 65:14, 65:18, 65:19, 65:22, 65:23, 65:25, 66:25, 67:1, 67:4, 67:12, 67:14, 67:16, 67:17, 67:18, 67:20, 67:22, 68:12, 70:14, 71:15, 80:25, 85:20, 87:10, 88:25, 91:3, 91:21
**reading** [2] - 66:8, 86:18, 95:11
**reads** [1] - 98:15
**ready** [2] - 62:10, 78:13
**realized** [1] - 10:18
**really** [4] - 37:9, 79:12, 79:13, 97:11
**realm** [1] - 50:11
**reason** [13] - 9:21, 10:16, 10:19, 20:5, 20:10, 36:6, 36:8, 71:17, 73:14, 87:3, 98:14
**reasonable** [15] - 9:22, 29:4, 86:14, 86:16, 86:23, 87:3, 88:11, 88:22, 92:25, 95:11, 95:13, 98:1, 98:2, 98:4, 102:11
**reasons** [4] - 17:4, 17:16, 18:7, 19:3
**rebut** [3] - 47:14, 72:3, 73:17
**rebuttal** [30] - 5:2, 10:10, 10:12, 12:17, 12:24, 17:8, 20:24, 20:25, 21:10, 21:21,

27:9, 29:17, 30:15, 33:4, 39:17, 39:21, 40:3, 40:6, 40:8, 40:19, 43:5, 50:11, 65:8, 69:2, 72:22, 79:10, 83:7, 83:13, 83:15
**rebuttals** [1] - 57:1
**rebutting** [4] - 46:1, 47:1, 55:15, 72:9
**receive** [6] - 30:15, 31:23, 31:24, 36:5, 64:7, 64:14
**received** [15] - 15:16, 16:1, 16:15, 17:3, 17:6, 17:12, 31:19, 31:21, 31:23, 31:25, 32:1, 32:5, 35:7, 36:7, 36:14, 37:24, 37:25, 48:3
**recent** [3] - 14:3, 37:16, 81:8
**recently** [2] - 36:24, 43:16
**Recess** [1] - 85:10
**recognize** [2] - 17:8, 52:12
**recommendations** [1] - 94:5
**reconstruction** [1] - 78:6
**reconvene** [1] - 83:22
**record** [7] - 19:10, 35:6, 39:5, 52:10, 94:7, 102:10, 104:4
**recorded** [1] - 3:25
**recording** [1] - 20:18
**records** [2] - 18:22, 19:8
**recounted** [1] - 15:7
**reduce** [1] - 30:12
**referred** [1] - 70:5
**referring** [2] - 18:3, 22:16
**reflected** [3] - 17:18, 32:2, 37:17
**reflective** [2] - 30:9, 32:3
**reform** [2] - 23:15, 24:8
**Reform** [1] - 23:21
**reforms** [3] - 24:12, 24:14, 24:17
**refused** [1] - 97:17
**refuting** [1] - 58:1
**regard** [1] - 14:5
**regarding** [3] - 34:4, 34:5, 62:17
**regardless** [1] - 28:10
**regards** [2] - 81:6,

82:18
**register** [1] - 47:10
**registered** [15] - 6:4, 8:16, 12:5, 12:9, 12:10, 12:12, 12:13, 12:20, 14:24, 14:25, 15:1, 22:21, 23:3, 38:7, 40:17
**registering** [1] - 49:9
**registration** [18] - 8:18, 27:1, 27:2, 28:10, 28:13, 28:18, 33:8, 34:6, 40:7, 40:12, 40:15, 41:6, 41:8, 49:13, 77:11, 88:18, 88:20
**regulations** [1] - 87:15
**rehash** [1] - 85:17
**reinforced** [1] - 63:11
**reinstated** [2] - 38:3, 38:4
**reinstatement** [6] - 19:4, 19:6, 19:10, 19:14, 19:20, 19:22
**reiterate** [1] - 85:13
**reiterated** [1] - 86:3
**related** [1] - 90:24
**relating** [1] - 30:17
**relational** [1] - 15:21
**relatively** [2] - 14:20, 77:4
**relevance** [2] - 82:10, 82:11
**relevant** [2] - 21:9, 97:5
**reliable** [1] - 24:1
**relied** [7] - 17:24, 20:17, 36:15, 50:19, 69:19, 76:2
**relief** [1] - 94:22
**religious** [1] - 88:11
**rely** [4] - 49:1, 70:14, 70:24, 81:3
**relying** [1] - 63:13
**remain** [1] - 24:20
**remained** [1] - 14:6
**remaining** [2] - 4:4, 38:24
**remains** [1] - 12:4
**remarks** [3] - 84:9, 85:4, 89:12
**remember** [12] - 40:5, 42:16, 45:4, 56:22, 57:24, 60:22, 63:3, 63:5, 63:8, 63:10, 75:16, 90:18
**remove** [10] - 7:25, 15:11, 16:2, 21:1, 35:19, 35:23, 36:3, 36:5, 36:21

**removed** [11] - 8:11, 8:12, 8:17, 14:1, 14:2, 14:3, 15:9, 15:12, 20:12, 20:14, 36:18
**removing** [1] - 21:5
**renews** [1] - 80:8
**reopened** [1] - 90:1
**repeat** [1] - 11:20
**rephrase** [2] - 67:8, 76:18
**report** [64] - 6:14, 7:7, 7:12, 10:16, 10:18, 12:24, 15:3, 17:9, 20:25, 21:10, 21:19, 21:21, 22:17, 23:14, 25:1, 25:21, 27:16, 29:17, 30:15, 32:17, 34:13, 37:1, 39:17, 39:24, 40:3, 40:6, 43:6, 49:6, 51:13, 52:8, 52:10, 53:7, 54:15, 55:6, 56:2, 56:16, 56:25, 58:5, 58:23, 58:25, 59:20, 59:24, 60:1, 60:17, 60:18, 62:3, 62:7, 62:13, 62:14, 63:1, 63:3, 63:15, 67:25, 69:1, 69:2, 69:11, 69:12, 71:4, 71:19, 73:22, 74:19, 75:18, 82:20
**reported** [1] - 25:22
**reporter** [2] - 4:18, 38:24
**Reporter** [3] - 3:15, 3:16, 104:3
**reporting** [1] - 11:5
**reports** [17] - 6:24, 7:8, 15:7, 27:4, 27:8, 27:9, 27:25, 60:5, 61:17, 68:2, 73:13, 73:15, 73:17, 79:11, 80:25, 81:3, 81:4
**represent** [9] - 10:2, 16:11, 25:6, 26:2, 35:10, 35:14, 45:10, 45:16, 95:3
**representation** [1] - 72:18
**representations** [1] - 91:5
**representatives** [1] - 78:5
**represented** [2] - 7:8, 94:25
**representing** [1] - 97:24
**Republican** [6] -

41:18, 81:15, 81:16, 81:19, 81:24, 82:14
**request** [3] - 38:22, 83:16, 91:8
**requested** [3] - 4:7, 5:8, 5:11
**requests** [2] - 73:22, 74:3
**require** [1] - 93:5
**required** [6] - 23:19, 25:9, 25:11, 88:8, 88:16, 93:1
**requirement** [6] - 24:20, 24:23, 25:4, 25:15, 27:6, 90:24
**requirements** [4] - 23:13, 29:18, 29:23, 87:24
**requires** [3] - 89:3, 89:14, 93:6
**requiring** [5] - 23:3, 24:12, 25:23, 26:4, 90:21
**requisite** [2] - 5:18, 29:21
**research** [5] - 63:20, 69:25, 70:4, 71:10, 71:19
**researcher** [1] - 69:16
**reside** [1] - 39:7
**residents** [1] - 14:18
**resolve** [1] - 87:24
**resolved** [2] - 94:15, 94:17
**resolving** [1] - 46:18
**resource** [1] - 31:8
**respect** [17] - 6:23, 8:10, 8:25, 12:15, 18:7, 19:3, 28:11, 28:17, 29:9, 66:25, 67:1, 68:11, 78:21, 79:1, 89:20, 94:14, 97:11
**respectfully** [2] - 98:15, 100:8
**respond** [6] - 48:2, 91:8, 91:14, 91:24, 93:24, 101:21
**responded** [1] - 25:14
**responding** [2] - 27:17, 57:3
**response** [6] - 86:13, 86:18, 87:10, 89:10, 92:5, 100:22
**responses** [5] - 74:3, 84:22, 85:24, 88:25, 89:3, 91:20
**responsible** [1] - 96:25
**responsive** [1] -

100:20
**rest** [4] - 18:18, 82:8, 84:3, 84:25
**restate** [2] - 78:24, 86:18
**rests** [1] - 38:16
**resubmitted** [1] - 89:22
**result** [2] - 31:11, 75:10
**results** [5] - 6:25, 7:4, 7:5, 31:4, 31:13
**resumes** [1] - 4:19
**retained** [1] - 26:15
**retard** [1] - 79:6
**return** [4] - 36:8, 36:9, 36:11, 37:24
**returned** [31] - 7:22, 8:10, 8:17, 9:1, 9:14, 9:20, 10:5, 11:13, 12:16, 12:21, 13:1, 13:4, 13:22, 14:4, 14:12, 14:25, 15:5, 15:9, 17:13, 18:9, 19:15, 19:17, 19:24, 20:18, 22:1, 22:3, 34:23, 35:19, 35:23, 37:16
**revealed** [1] - 23:6
**review** [2] - 44:17, 101:20
**reviewed** [3] - 4:11, 11:2, 30:23
**reviewing** [1] - 90:6
**revoked** [5] - 15:10, 16:3, 17:5, 18:8, 37:23
**RICHARD** [2] - 2:1
**Richard** [1] - 89:11
**ridiculous** [2] - 97:20, 98:14
**right-most** [1] - 35:14
**Rights** [5] - 2:5, 3:12, 40:14, 65:10, 66:3, 90:15, 96:11, 96:14
**rights** [2] - 62:17, 79:7
**road** [1] - 96:12
**role** [1] - 45:24
**rolls** [2] - 11:18, 11:24
**room** [1] - 70:13
**Room** [1] - 3:16
**roughly** [1] - 20:7
**RPR** [1] - 3:15
**rule** [2] - 47:22, 51:20
**ruled** [1] - 49:25
**ruling** [1] - 80:18
**run** [1] - 95:8
**running** [3] - 14:22, 14:23, 28:20
**runs** [1] - 98:11

**S**

**satisfied** [1] - 88:17
**saw** [2] - 58:25, 71:20
**SC** [7] - 1:20, 2:21, 18:9, 20:4, 20:5, 20:10
**school** [5] - 42:11, 42:14, 42:17, 42:22, 53:16
**schools** [1] - 42:19
**science** [10] - 39:12, 43:19, 55:19, 55:21, 63:18, 69:24, 70:8, 70:13, 70:17, 70:19
**sciences** [1] - 34:12
**scientific** [1] - 63:9
**scientist** [2] - 52:2, 82:22
**scope** [2] - 51:10, 51:11
**Scott** [4] - 38:21, 39:6, 41:18, 103:5
**SCOTT** [1] - 39:2
**screen** [2] - 32:13, 35:2
**SEAN** [1] - 2:11
**seats** [1] - 42:17
**SEC** [1] - 10:23
**second** [5] - 7:25, 20:10, 32:18, 35:9, 86:2
**Section** [3] - 2:6, 66:10, 89:19
**section** [2] - 56:25, 58:16
**Sections** [1] - 89:20
**sections** [1] - 89:22
**Security** [1] - 37:18
**see** [9] - 4:13, 18:8, 20:3, 35:4, 35:7, 45:2, 49:19, 54:4, 58:20, 61:8, 62:10, 65:6, 69:7, 71:18, 73:10, 73:12, 80:18
**seeing** [1] - 31:14
**self** [1] - 86:7
**self-executing** [1] - 86:7
**Sells** [1] - 45:4
**SELLS** [24] - 2:2, 34:17, 38:9, 44:12, 44:24, 46:9, 48:6, 51:2, 51:4, 51:7, 51:9, 51:15, 51:21, 51:23, 52:8, 52:11, 58:9, 60:12, 61:1, 61:3, 64:15, 80:8, 82:5, 82:11

**Sells** [1] - 103:6
**Sells...........** [2] - 103:4, 103:7
**Senate** [3] - 42:3, 42:4, 78:3
**Senator** [1] - 78:1
**sense** [7] - 40:14, 43:9, 53:2, 61:14, 75:1, 76:4, 77:16
**sent** [3] - 11:11, 19:9, 28:15
**sentence** [4] - 55:7, 55:14, 56:17, 56:22
**sentences** [2] - 64:12, 87:10
**separate** [1] - 91:19
**separately** [1] - 91:15
**September** [1] - 92:4
**serious** [1] - 91:3
**serve** [2] - 39:21, 42:22
**served** [1] - 82:1
**serves** [2] - 40:2, 62:23
**serving** [1] - 72:22
**SES** [1] - 77:1
**SESSION** [1] - 1:6
**set** [11] - 6:13, 7:20, 8:2, 12:13, 13:10, 17:4, 19:8, 43:5, 91:15, 91:17, 101:12
**sets** [1] - 33:22
**setting** [1] - 46:3
**seven** [2] - 10:10, 40:2
**several** [1] - 95:16
**sheets** [2] - 48:13, 48:15
**sheriff** [2] - 42:25, 43:3
**sheriffs** [1] - 43:2
**short** [5] - 38:18, 83:22, 85:2, 97:15, 97:19
**shorter** [1] - 35:16
**show** [18] - 7:5, 7:13, 12:16, 23:19, 24:21, 25:4, 25:15, 25:18, 25:23, 26:5, 37:23, 37:24, 39:14, 40:22, 47:17, 49:2, 61:15, 66:11
**showed** [3] - 24:16, 35:1, 82:20
**showing** [3] - 24:12, 82:23, 100:12
**shown** [2] - 92:16, 102:8
**shows** [4] - 7:3, 12:19, 52:17, 94:7
**Shwedo** [1] - 9:3

**Sells.** [1] - 103:6
**Shwedo's** [2] - 9:25, 11:17
**side** [7] - 8:3, 8:7, 8:8, 11:3, 87:21, 87:23
**sides** [4] - 8:5, 8:13, 18:16, 18:18
**sign** [2] - 66:11, 93:14
**significance** [7] - 53:9, 53:13, 53:24, 54:1, 54:3, 82:18, 82:19
**significantly** [8] - 9:13, 9:16, 13:5, 13:7, 21:4, 22:3, 33:11, 33:18
**similar** [3] - 22:24, 23:4, 40:23
**simply** [7] - 30:9, 46:1, 53:11, 54:4, 59:23, 79:10, 93:23
**single** [2] - 68:7, 100:6
**sit** [1] - 75:4
**site** [2] - 69:18, 70:6
**sites** [1] - 70:11
**sitting** [2] - 16:10, 67:15
**situation** [2] - 27:21, 28:22
**six** [3] - 41:15, 41:16, 93:10
**size** [1] - 101:5
**slightly** [1] - 77:1
**small** [3] - 14:9, 32:11, 34:10
**snowbirds** [2] - 14:15, 15:4
**social** [11] - 34:11, 43:19, 55:19, 55:21, 63:18, 69:24, 70:8, 70:13, 70:17, 70:19, 82:22
**Social** [1] - 37:18
**socioeconomic** [6] - 43:7, 43:9, 43:20, 43:21, 47:9, 53:6
**sociology** [1] - 52:6
**solely** [7] - 56:19, 57:10, 57:21, 58:18, 61:15, 84:10, 85:13
**someone** [6] - 37:14, 70:5, 70:25, 74:14, 95:18, 97:25
**sometimes** [1] - 54:16
**somewhere** [2] - 37:15, 38:5
**sorry** [5] - 6:17, 11:20, 22:19, 28:2, 78:24
**sort** [4] - 8:1, 15:20, 31:12, 64:13
**sorts** [1] - 53:14

**sounds** [1] - 75:16
**source** [4] - 14:8, 69:17, 69:20, 76:9
**south** [2] - 47:6, 47:7
**SOUTH** [1] - 1:3
**South** [88] - 1:22, 1:24, 2:19, 4:4, 4:9, 4:17, 8:16, 8:19, 9:3, 11:18, 11:23, 12:20, 14:18, 14:19, 18:24, 19:9, 19:16, 19:20, 25:3, 25:9, 25:14, 33:11, 33:18, 37:22, 38:17, 39:8, 40:13, 40:17, 41:6, 41:9, 41:11, 41:15, 41:20, 42:11, 42:14, 42:17, 42:20, 42:23, 43:3, 43:6, 43:16, 44:14, 47:6, 47:9, 47:11, 48:1, 49:14, 55:22, 62:16, 65:9, 66:25, 69:5, 72:1, 74:8, 74:12, 74:13, 74:23, 74:24, 75:11, 75:22, 77:11, 77:22, 77:25, 78:4, 78:9, 78:21, 78:25, 81:7, 81:13, 82:2, 83:15, 84:1, 84:7, 84:10, 85:15, 85:18, 85:22, 85:25, 86:11, 87:22, 89:2, 89:22, 91:4, 95:10, 97:3, 97:8, 100:23, 101:17
**Southern** [2] - 39:13, 47:5
**spans** [1] - 15:24
**speaking** [4] - 38:24, 90:14, 90:15, 90:16
**specific** [9] - 9:11, 27:23, 28:1, 37:2, 37:9, 43:6, 43:16, 63:14
**specifically** [1] - 39:12
**specificity** [3] - 9:7, 9:9, 35:18
**specious** [2] - 56:19, 58:18
**speculate** [1] - 68:18
**speculation** [11] - 55:25, 56:3, 56:13, 63:23, 64:8, 66:4, 66:15, 66:18, 66:19, 66:20, 80:1
**spend** [1] - 10:12
**spent** [2] - 10:10, 71:17
**SPITZER** [1] - 3:1
**spread** [1] - 88:15

**stage** [1] - 92:18
**stand** [1] - 4:19
**standard** [1] - 100:16
**start** [2] - 28:21, 55:9
**started** [2] - 75:10, 83:24
**starting** [2] - 58:13, 68:3
**starts** [1] - 44:13
**State** [4] - 27:24, 87:14, 94:20, 98:3
**STATE** [1] - 1:3
**state** [95] - 7:23, 8:11, 8:18, 8:20, 8:24, 9:2, 9:14, 9:20, 10:4, 10:21, 11:12, 11:13, 12:5, 12:16, 12:21, 13:1, 13:4, 13:14, 13:17, 13:22, 14:4, 14:12, 15:1, 15:6, 17:13, 17:25, 18:2, 18:10, 19:9, 19:16, 19:25, 20:19, 21:11, 22:1, 27:14, 28:15, 28:24, 30:21, 30:22, 33:10, 34:22, 35:15, 37:23, 38:20, 39:5, 39:13, 40:16, 43:12, 49:7, 59:2, 65:9, 66:9, 67:13, 71:16, 72:1, 77:19, 78:21, 78:25, 82:2, 85:14, 85:18, 86:11, 86:19, 87:19, 87:21, 90:9, 90:20, 91:9, 94:18, 94:25, 95:9, 95:18, 95:21, 95:22, 95:23, 95:24, 95:25, 96:15, 96:17, 97:1, 97:13, 97:15, 97:17, 97:23, 98:10, 98:12, 98:14, 98:18, 98:21, 99:6, 100:9, 100:12
**state's** [1] - 91:2
**statement** [3] - 57:11, 59:10, 92:17
**Statement** [3] - 103:9, 103:10, 103:11
**statements** [3] - 54:15, 56:5, 56:8
**States** [14] - 4:7, 16:13, 38:16, 38:19, 44:12, 45:4, 46:9, 64:16, 78:1, 78:5, 80:8, 82:2, 83:11, 89:12
**STATES** [2] - 1:1, 1:6
**states** [2] - 24:15, 36:6
**States'** [1] - 44:14
**statewide** [4] - 41:1,

77:22, 81:6, 81:7
**statistical** [1] - 54:7
**statistics** [3] - 46:21, 54:23, 55:4
**status** [2] - 16:19, 43:22
**statute** [5] - 27:17, 28:6, 28:7, 88:1, 95:12
**statutes** [3] - 63:2, 63:17, 87:20
**stay** [1] - 31:8
**STECIUK** [1] - 2:11
**stenography** [1] - 3:25
**step** [2] - 71:22, 83:3
**STEPHEN** [1] - 1:16
**steps** [2] - 38:14, 83:4
**Stewart** [11] - 4:17, 4:24, 5:1, 22:21, 26:3, 26:22, 31:18, 33:3, 33:25, 34:18, 103:4
**still** [9] - 8:24, 13:7, 13:9, 19:17, 19:18, 19:19, 38:4, 89:13, 100:21
**STIRLING** [1] - 1:23
**stop** [1] - 44:20
**stored** [1] - 36:7
**stories** [1] - 70:10
**straight** [1] - 85:21
**strategic** [1] - 101:14
**straw** [10] - 59:16, 60:14, 60:20, 60:23, 61:9, 61:11, 61:18, 61:19, 62:7, 64:8
**Street** [5] - 1:17, 2:12, 2:16, 2:20, 3:6
**strike** [3] - 7:25, 47:24, 80:9
**striking** [1] - 24:19
**strong** [5] - 9:18, 9:23, 9:24, 24:14, 24:19
**struck** [1] - 31:6
**student** [2] - 64:8, 64:10
**students** [6] - 53:19, 53:21, 53:23, 54:11, 64:4, 64:7
**studied** [3] - 23:15, 23:17, 25:1
**study** [5] - 17:22, 26:8, 41:10, 43:5, 68:7
**subject** [9] - 24:10, 40:7, 44:17, 47:3, 47:4, 47:5, 47:19, 50:1, 50:14
**subjects** [1] - 39:11
**submit** [3] - 64:4,

80:16, 89:16
**submitted** [3] - 10:14, 39:17, 81:1
**submitting** [1] - 93:4
**substantive** [1] - 84:8
**successfully** [1] - 30:12
**suffering** [1] - 93:12
**sufficient** [3] - 46:13, 99:9, 99:13
**suggest** [5] - 19:19, 57:6, 97:25, 98:15, 100:8
**suggesting** [3] - 12:11, 12:13, 62:21
**suggestion** [1] - 89:21
**suggests** [3] - 19:18, 75:14, 93:9
**Suite** [4] - 2:16, 2:20, 3:3, 3:13
**Sullivan** [1] - 2:12
**sum** [4] - 56:17, 56:18, 58:16, 58:17
**summarization** [2] - 58:24, 77:9
**summary** [3] - 33:3, 84:25, 85:7
**summerville** [1] - 39:8
**superintendent** [1] - 42:23
**superintendents** [1] - 42:19
**supplement** [2] - 84:8, 85:16
**supplementation** [2] - 85:22, 89:3
**support** [9] - 24:12, 24:13, 24:14, 25:3, 25:23, 26:4, 49:20, 55:14, 55:19, 63:18
**supported** [1] - 64:9
**supporters** [1] - 24:19
**supportive** [1] - 24:20
**supports** [1] - 68:8
**supposed** [1] - 57:25
**supposedly** [1] - 21:25
**surrender** [1] - 14:17
**surrendered** [1] - 16:9
**Survey** [2] - 75:23, 76:5
**survey** [7] - 25:14, 26:18, 26:21, 40:11, 70:25, 71:1, 71:6
**surveyed** [1] - 25:3, 25:23, 26:4
**surveys** [1] - 71:5
**SUSAN** [1] - 2:18
**suspect** [1] - 4:11
**suspended** [6] -

15:10, 16:3, 17:5, 18:8, 21:25, 37:6
**swear** [1] - 93:17
**sweet** [1] - 38:18
**SWORN** [1] - 39:2
**system** [3] - 63:2, 69:6, 77:14

## T

**table** [41] - 7:3, 12:18, 12:24, 15:16, 15:20, 16:1, 16:4, 16:5, 16:6, 16:8, 16:11, 16:16, 16:22, 16:25, 17:3, 17:6, 17:11, 17:12, 17:19, 18:1, 18:23, 19:4, 19:24, 20:8, 20:14, 21:8, 21:9, 22:13, 26:3, 29:16, 35:7, 35:11, 35:13, 36:2, 36:8, 37:11, 37:24, 37:25, 54:16, 69:16
**tables** [8] - 6:24, 7:20, 15:23, 15:24, 18:6, 22:8, 69:11
**TALY** [1] - 2:10
**tangled** [1] - 59:9
**tax** [1] - 97:20
**teach** [10] - 39:9, 39:11, 39:12, 52:1, 53:21, 53:23, 54:11, 63:25, 64:2
**tend** [1] - 43:18
**tens** [1] - 12:20
**term** [1] - 54:19, 54:20, 81:12
**terms** [11] - 4:3, 34:3, 46:21, 46:22, 46:23, 47:25, 53:25, 59:22, 66:2, 83:6, 99:22
**test** [3] - 54:17, 54:18, 54:21
**testified** [8] - 22:6, 22:21, 45:19, 47:15, 52:3, 59:13, 82:19, 90:19
**testify** [5] - 47:8, 50:11, 50:16, 50:19, 62:11
**testimony** [29] - 20:24, 22:11, 32:3, 32:12, 46:10, 47:23, 47:24, 48:3, 57:20, 59:19, 60:1, 60:5, 60:15, 61:25, 67:4, 80:9, 83:6, 86:5, 86:9, 86:20, 90:8, 90:11,

90:19, 90:23, 94:13, 98:16, 100:2
**testing** [7] - 53:9, 53:13, 53:24, 54:1, 54:3, 82:19, 82:20
**THE** [11] - 1:1, 21:8, 30:18, 31:3, 34:9, 38:12, 39:2, 47:2, 58:2, 58:5, 80:3
**themselves** [3] - 14:17, 77:16, 98:17
**THEODORE** [1] - 2:10
**therefore** [2] - 8:19, 93:7
**thinking** [2] - 72:16, 100:25
**third** [5] - 18:10, 21:18, 49:8, 49:10, 49:13
**third-party** [3] - 49:8, 49:10, 49:13
**thoughtful** [1] - 84:6
**thousands** [3] - 12:20, 95:2
**three** [6] - 48:9, 56:15, 80:7, 80:15, 81:21, 85:9
**throughout** [1] - 92:15
**Tim** [1] - 41:18
**timeline** [1] - 93:22
**timing** [1] - 99:15
**today** [17] - 4:10, 23:2, 31:4, 31:14, 32:4, 40:17, 41:7, 43:21, 45:17, 55:8, 55:10, 57:20, 67:15, 73:8, 77:10, 85:19, 91:9
**together** [2] - 36:9, 64:13, 92:23
**took** [4] - 18:1, 49:11, 89:24, 90:1
**tool** [2] - 70:16, 70:18
**top** [1] - 21:10
**topics** [1] - 39:12
**total** [4] - 21:16, 21:17, 40:2, 81:21
**training** [1] - 63:11
**TRANSCRIPT** [1] - 1:10
**transcript** [2] - 3:25, 104:4
**transcription** [1] - 3:25
**trial** [3] - 89:13, 90:4, 92:15
**TRIAL** [1] - 1:10
**troubled** [2] - 90:6, 90:8
**true** [14] - 5:17, 6:23, 7:8, 10:2, 10:3, 10:7,

10:13, 10:16, 15:6, 23:8, 33:22, 33:23, 57:12, 75:13
**truth** [1] - 70:14
**truthfully** [1] - 50:9
**try** [2] - 37:8, 51:10
**trying** [4] - 13:10, 14:7, 76:8, 85:3
**Tuesday** [1] - 90:19
**turn** [7] - 37:23, 58:10, 58:15, 65:16, 66:6, 70:7, 72:25
**turnout** [28] - 40:20, 40:23, 41:1, 41:3, 41:4, 43:6, 43:11, 43:12, 43:14, 43:17, 43:18, 43:20, 43:22, 44:2, 44:5, 52:18, 53:2, 53:3, 53:11, 54:4, 54:13, 54:25, 55:2, 76:23, 77:2, 82:20, 82:23
**turnouts** [1] - 44:1
**twice** [1] - 56:8
**two** [20] - 8:5, 10:25, 18:5, 21:23, 24:12, 24:14, 24:16, 41:16, 45:11, 46:11, 55:4, 64:12, 70:22, 72:3, 72:23, 78:4, 78:7, 86:6, 87:10, 92:8
**type** [1] - 37:8
**types** [2] - 68:2, 68:22
**typically** [1] - 75:9

## U

**U.S** [5] - 2:5, 3:16, 4:8, 12:17, 85:19
**ultimate** [1] - 47:15
**unavailable** [1] - 15:13
**uncertainty** [7] - 99:7, 99:18, 99:25, 100:2, 100:8, 100:10, 100:11
**unconstitutional** [1] - 88:10
**undated** [1] - 9:2
**under** [11] - 5:19, 8:11, 12:5, 13:11, 25:9, 66:10, 86:16, 93:11, 96:11, 96:12, 96:13
**undergraduates** [3] - 53:22, 63:25
**underlies** [2] - 44:10, 48:22
**underlying** [2] - 59:23, 69:18
**understood** [3] -

70:25, 76:19, 92:9
**Union** [3] - 2:15, 2:19, 3:1
**United** [15] - 4:7, 16:13, 38:16, 38:19, 44:12, 44:14, 45:4, 46:9, 64:16, 78:1, 78:5, 80:8, 82:1, 83:11, 89:12
**UNITED** [2] - 1:1, 1:6
**university** [1] - 53:20
**unknown** [3] - 34:6, 34:7, 34:10
**unless** [10] - 51:13, 70:25, 84:4, 84:20, 84:25, 87:3, 98:1, 98:5, 98:6, 98:8
**unnecessarily** [1] - 49:22
**up** [19] - 4:3, 4:16, 7:25, 14:15, 22:22, 31:11, 34:20, 37:23, 37:25, 40:24, 51:24, 52:8, 58:16, 59:9, 75:7, 85:16, 95:12, 96:4
**update** [1] - 97:17
**upper** [1] - 64:2
**upper-level** [1] - 64:2
**uses** [2] - 22:12, 81:12

## V

**valid** [5] - 12:6, 13:24, 14:6, 36:7, 50:21
**values** [1] - 36:7
**variable** [3] - 17:6, 17:12, 35:16
**variables** [2] - 35:17, 54:12
**variety** [2] - 70:10, 93:2
**various** [3] - 19:3, 46:21, 46:22
**vary** [1] - 21:4
**VELANDY** [1] - 2:3
**verbatim** [1] - 86:18
**verified** [8] - 12:6, 69:18, 69:20, 70:6, 70:7, 76:4, 76:6, 76:8
**verify** [2] - 70:20, 76:3
**verifying** [3] - 68:1, 69:20, 70:9
**Video** [1] - 88:18
**view** [8] - 9:21, 30:24, 66:3, 69:5, 72:19, 73:3, 78:8, 79:5
**viewed** [1] - 87:20

views [1] - 71:8
**Village** [2] - 45:23, 46:15
**violate** [2] - 90:9, 90:23
**violated** [3] - 90:12, 90:17, 90:21
**voir** [3] - 44:13, 44:18, 50:8
**Voir** [1] - 103:6
**VOIR** [1] - 44:23
**vote** [20] - 8:19, 13:9, 14:18, 15:14, 23:19, 24:22, 25:5, 25:24, 26:6, 40:17, 47:11, 49:9, 87:21, 88:4, 93:20, 93:22, 93:23, 94:15, 94:20, 95:3
**voted** [6] - 12:22, 13:2, 13:4, 13:5, 13:7, 13:8
**voter** [63] - 8:7, 8:11, 8:17, 11:18, 11:23, 12:11, 13:21, 13:23, 18:14, 19:7, 19:20, 20:6, 20:15, 23:9, 23:12, 23:15, 24:7, 26:8, 26:25, 27:2, 28:9, 28:18, 33:8, 34:6, 34:14, 36:19, 36:20, 36:22, 37:18, 38:7, 40:7, 40:20, 43:20, 45:14, 45:17, 49:13, 62:25, 63:1, 63:15, 63:17, 68:4, 68:8, 68:9, 68:11, 68:21, 69:3, 70:1, 70:3, 70:15, 74:22, 76:23, 82:23, 87:3, 87:21, 87:23, 87:25, 88:18, 88:19, 94:14, 99:5, 99:11, 100:14
**Voter** [1] - 23:21
**voters** [47] - 5:18, 6:4, 6:23, 7:1, 7:4, 7:6, 7:12, 7:13, 7:15, 7:22, 8:10, 8:16, 9:1, 9:14, 9:19, 11:12, 11:23, 12:5, 12:9, 12:10, 12:12, 12:13, 12:15, 12:21, 13:6, 13:10, 13:13, 13:17, 14:11, 14:24, 14:25, 15:1, 21:25, 22:22, 23:3, 25:22, 26:4, 30:10, 33:10, 33:11, 33:18, 33:19, 46:22, 90:12, 90:22, 90:25, 94:19
**voters'** [1] - 23:8

**Voting** [8] - 2:6, 40:14, 65:10, 66:2, 66:3, 90:15, 96:11, 96:13
**voting** [23] - 22:23, 56:18, 57:9, 57:21, 58:17, 59:2, 59:21, 59:23, 61:15, 62:17, 66:9, 68:15, 68:22, 69:10, 74:8, 74:12, 74:13, 74:15, 76:17, 76:24, 77:8, 79:7, 89:15
**vs** [1] - 1:5

## W

**wait** [1] - 84:4
**Washington** [7] - 1:4, 1:18, 2:7, 3:3, 3:6, 3:14, 3:17
**watcher** [1] - 98:11
**watchers** [1] - 95:5
**watching** [1] - 95:6
**Wayne** [1] - 3:15
**WAYNE** [2] - 104:3, 104:6
**wealthiest** [4] - 43:8, 43:14, 44:3, 52:19
**weave** [1] - 91:20
**Web** [4] - 69:18, 70:6, 70:11
**Wednesday** [2] - 92:6, 100:19
**week** [4] - 83:16, 91:15, 91:24, 102:8
**weeks** [3] - 30:22, 45:11, 95:16
**welcome** [1] - 101:13
**well-publicized** [1] - 49:12
**whereas** [1] - 28:15
**white** [19] - 15:2, 15:6, 33:11, 33:19, 41:3, 41:4, 41:6, 41:9, 43:14, 44:2, 52:18, 53:2, 55:11, 75:15, 76:11, 81:25, 82:17, 82:23
**whites** [5] - 21:14, 75:22, 76:21, 76:23, 77:11
**willing** [2] - 90:9, 97:15
**WILSON** [8] - 1:22, 84:5, 84:14, 84:21, 85:5, 85:12, 89:8, 101:9
Wilson...................
[1] - 103:9

**winding** [1] - 28:21
**wisdom** [1] - 92:15
**wish** [2] - 89:10, 92:12
**wishes** [1] - 47:23
**withdraw** [1] - 32:24
**withdrawn** [1] - 26:17
**Witness** [2] - 61:14, 62:3
**WITNESS** [10] - 21:8, 30:18, 31:3, 34:9, 38:12, 39:2, 58:2, 58:5, 80:3, 103:2
**witness** [13] - 4:19, 38:14, 38:23, 39:21, 47:14, 49:24, 50:11, 59:23, 61:7, 71:25, 72:2, 79:11, 83:4
**won** [1] - 34:12
**wood** [5] - 5:23, 6:16, 7:22, 15:8, 15:12
**words** [5] - 38:2, 46:19, 71:5, 95:21, 98:17
**workers** [1] - 88:13
**works** [1] - 4:16
**worried** [2] - 77:7, 96:1
**worry** [1] - 101:3
**worth** [1] - 50:17
**write** [1] - 6:14
**writing** [6] - 27:4, 27:8, 32:3, 80:17, 89:15, 91:9
**written** [9] - 47:7, 47:23, 48:1, 48:5, 67:24, 80:19, 84:22, 85:7, 92:2
**wrote** [2] - 22:5, 56:19

## X

**x113** [1] - 3:4

## Y

**year** [8] - 11:5, 11:6, 23:20, 40:15, 40:18, 52:19, 52:21, 53:1
**years** [2] - 19:2, 44:6
**yellow** [2] - 48:13, 48:15
**yesterday** [3] - 83:24, 84:11, 85:15
**York** [4] - 2:13, 3:10, 3:13, 14:16
**yourself** [1] - 39:22

## Z

**zero** [1] - 27:22